Timothy A. Scott (SBN 215074)
Michele C. Angeles (SBN 298883)
Lauren M. Mellano (SBN 306918)
MCKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 652-9964
Email: tscott@mckenziescott.com
       mangeles@mckenziescott.com
       lmellano@mckenziescott.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST; <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; | Case No.: 3:23-cv-0785-DMS-AHG <br><br> **THIRD AMENDED COMPLAINT FOR DAMAGES FOR:** <br> 1. **42 U.S.C. § 1983: Deliberate Indifference** <br> 2. **42 U.S.C. § 1983: Substantive Due Process** <br> 3. **42 U.S.C. § 1983: Deliberate Indifference (*Monell*)** <br> 4. **42 U.S.C. § 1983: Substantive Due Process (*Monell*)** <br> 5. **Cal. Gov. Code § 52.1 (Bane Act)** <br> 6. **Cal. Gov. Code § 845.6 (Failure to Summon Medical Care)** <br> 7. **Negligence** <br> 8. **Negligence: Negligent Training and Supervision** <br> 9. **Wrongful Death** <br><br> **DEMAND FOR JURY TRIAL** |

JAMEELYN BARRERA RN, IN HER
INDIVIDUAL CAPACITY; ROMEO
DEGUZMAN RN, IN HIS
INDIVIDUAL CAPACITY; EMILY
LYMBURN RN, IN HER INDIVIDUAL
CAPACITY; CARINA ECHON RN, IN
HER INDIVIDUAL CAPACITY;
JENNIFER VIVONA RN (#6338), IN
HER INDIVIDUAL CAPACITY;
DEPUTY THOMAS MACE (#4324), IN
HIS INDIVIDUAL CAPACITY;
DEPUTY JEFF AMADO (#4193), IN
HIS INDIVIDUAL CAPACITY; ;
DEPUTY ALLAN VALBUENA, IN
HIS INDIVIDUAL CAPACITY;
DEPUTY JUSTIN PAGE, IN HIS
INDIVIDUAL CAPACITY; DEPUTY
JESSICA RAMIREZ, IN HER
INDIVIDUAL CAPACITY;
NICHOLAS KAHL NP, IN HIS
INDIVIDUAL CAPACITY;
DEFENDANT DEPUTY DOE, IN
THEIR INDIVIDUAL CAPACITIES;
DEFENDANT MEDICAL PROVIDERS
DOES 2-3, IN THEIR INDIVIDUAL
CAPACITIES; DEFENDANT DEPUTY
SUPERVISOR DOES 1-6, IN THEIR
INDIVIDUAL CAPACITIES,

Defendants.

THIRD AMENDED COMPLAINT

## INTRODUCTION

1.    William Hayden Schuck ("Hayden") died at the age of 22 while in custody at the San Diego County Jail on March 16, 2022.  His death was entirely preventable.



2.    Hayden, an Orange County native, had just moved to San Diego in 2021 and for the first time, with the help of his parents, Hayden was living on his own in an apartment.  He had just started the process of studying for his real estate license.  Hayden was an adventuresome, fun-loving, thrill-seeker with a bright smile. Hayden took full advantage of what Southern California had to offer—he loved going to the beach, surfing, cliff-jumping, and snowboarding.

3.    But growing up, Hayden was also diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), and he struggled with restlessness.  As is not uncommon, his struggles led him to substance abuse in his early teens.

4.    Hayden struggled with sobriety up to his arrest on March 10, 2022 and incarceration in San Diego's County Jail.

5.    At the jail, County employees and other medical staff deliberately failed to care for him despite glaringly obvious signs of serious medical distress.

6.    Plaintiffs Sabrina and Timothy Schuck, individually and in their capacities as successors-in-interest (hereinafter "Plaintiffs"), sue to seek justice and recover damages arising from the wrongful death of their son Hayden while he was in the care and custody of the County at the San Diego Central Jail.

7.    Plaintiffs request a jury trial to pursue justice on these claims.

/ / /

THIRD AMENDED COMPLAINT

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert causes of action for constitutional violations arising under 42 U.S.C. § 1983.

9.    The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  In accordance with the requirements of the California Tort Claims Act (Cal. Gov. Code §§ 810-996.6), Plaintiffs filed a timely tort claim against the County of San Diego and its employees under Cal. Gov. Code § 900.4 on September 15, 2022.  Defendants mailed Plaintiffs a notice of rejection of claim on November 1, 2022.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiffs' claims arise out of events and omissions occurring in the County of San Diego, which is situated in the Southern District of California.

## PARTIES

11.    Plaintiffs Sabrina and Timothy Schuck are and were, at all times relevant to this Complaint, residing in Lake Forest, California.  Sabrina and Timothy Schuck are the parents of decedent William Hayden Schuck.  In addition to suing individually for personal damages arising from losing their son, Plaintiffs sue as Hayden's successors-in-interest to prosecute all claims surviving Hayden's death pursuant to Cal. Civ. Code § 377.30.  *See* Exhibit A, Declaration by Sabrina and Timothy Schuck; Exhibit B, Death Certificate.

12.    Defendant County of San Diego (hereinafter "County") is a governmental entity organized and existing under the laws of the State of California.

13.    Defendant Jameelyn Barrera RN, at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of her employment.

THIRD AMENDED COMPLAINT

14.     Defendant Romeo DeGuzman RN, at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of his employment.

15.     Defendant Emily Lymburn RN, at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of her employment.

16.     Defendant Carina Echon RN, at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of her employment.

17.     Defendant Jennifer Vivona RN (formerly Defendant Medical Providers Doe 1), at all times relevant, was a Registered Nurse employed by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of her employment.

18.     Defendant Deputy Thomas Mace (#4324) (formerly Defendant Deputy Doe 1), at all times relevant, was a Sheriff's Department deputy employed at the San Diego County Central Jail, and was acting under color of law and within the scope of his employment at all times.

19.     Defendant Deputy Jeff Amado (#4193) (formerly Defendant Deputy Doe 2), at all times relevant, was a Sheriff's Department deputy employed at the San Diego County Central Jail, and was acting under color of law and within the scope of his employment at all times.

20.     Defendant Deputy Allan Valbuena (formerly Defendant Deputy Doe 4), at all times relevant, was a Sheriff's Department deputy employed at the San Diego County Central Jail, and was acting under color of law and within the scope of his employment at all times.

5

21.     Defendant Deputy Jessica Ramirez (formerly Defendant Deputy Doe 5), at all times relevant, was a Sheriff's Department deputy employed at the San Diego County Central Jail, and was acting under color of law and within the scope of his employment at all times.

22.     Defendant Deputy Justin Page (formerly Defendant Deputy Doe 6), at all times relevant, was a Sheriff's Department deputy employed at the San Diego County Central Jail, and was acting under color of law and within the scope of his employment at all times.

23.     Defendant Bill Gore (hereinafter "Gore") was the Sheriff for the San Diego County Sheriff's Department just prior to Hayden's death, retiring on February 3, 2022.  In his capacity as Sheriff, Gore was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the San Diego County Jail, and its deputies, employees, and agents. He was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

24.     Defendant Kelly Martinez (hereinafter "Martinez") was the Undersheriff for the San Diego County Sheriff's Department prior to Hayden's death and the Acting Sheriff at the time of Hayden's death, from February 3, 2022 to April 5, 2022.  In her capacity as Undersheriff and Acting Sheriff, Martinez was a final policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the San Diego County Jail, and its deputies, employees, and agents.  She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

25.     Defendant Dr. Jon Montgomery, DO was, at all times relevant, the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at the San Diego County Jail.  He was

responsible for and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors and staff at the San Diego County Jail worked under Dr. Montgomery's direction. He is sued in his individual capacity for his failure to properly treat Hayden, failure to properly oversee Hayden's care, and failure to supervise other medical staff in caring for Hayden.

26. Defendant Correctional Healthcare Partners ("CHP") is a California corporation and was a third-party contractor to San Diego County. CHP contracted with the County beginning in 2020 through the date of Hayden's death.

27. Defendant CHP was responsible for providing medical care staffing and on-site medical services to detainees in the San Diego County Jail. CHP, with Defendant County, was responsible for and oversaw the development and implementation of peer review, quality assurance, utilization review, and clinical policies and procedures. CHP employed, supervised, and/or trained Defendant Nicolas Kahl, NP.

28. Defendant CHP and its employees, including Defendant Nicolas Kahl NP, acted under color of state law while contracting with the County as described herein.

29. Defendant Nicholas Kahl, NP[1], (formerly Defendant Medical Provider Doe 4), at all times relevant, was a Nurse Practitioner employed by CHP and was contracted by the San Diego Sheriff's Department in the Medical Services Division at the San Diego County Central Jail, and was acting within the scope of his employment.

_____

[1] On February 8, 2024, Plaintiffs' received Defendant Correctional Healthcare Partners, Inc.'s Responses to Plaintiffs' Interrogatories Set One (propounded December 14, 2023), where they learned of Nicholas Kahl, NP's, identity, and role in Hayden Schuck's medical care.

THIRD AMENDED COMPLAINT

30.    Defendant Deputy Does 4-10 are all Sheriff's Department deputies who were responsible for summoning medical or mental health care, observing any audio or video monitors, or conducting wellness or safety checks on Hayden in any housing unit in which Hayden was housed from March 10, 2022 to March 16, 2022.  On information and belief, this would include both the booking unit and housing unit "7D" or Module D on the seventh floor.

31.    Defendant Deputy Does 11-14 are Sheriff's Department deputies who were responsible for transporting Hayden to and from court, holding cells, and transportation vehicles on March 15, 2022.

32.    Defendant Deputy Does 1-14 will hereinafter be referred to collectively as "Doe Deputies" unless otherwise noted.  Doe Deputies were acting under color of law, and within the scope of their employment at all times relevant to the events described in this Complaint.

33.    Defendant Deputy Supervisor Does 1-6 (hereinafter "Doe Deputy Supervisors") are Sheriff's Department deputies who were responsible for training and supervising Doe Deputies.  Doe Deputy Supervisors were acting under color of law, and within the scope of their employment at all times relevant to the events described in this Complaint.

34.    Defendant Medical Providers Doe 2-3 (hereinafter "Doe Medical Providers") are all County employees, agents, or contractors working within the Sheriff's Department Medical Services Division who were responsible for Hayden's medical care, including follow-up assessments and referrals for further treatment, whether or not they actually provided Hayden with any medical care. Doe Medical Providers include all Qualified Mental Health Providers, including the individual who evaluated Hayden at intake, as described in this Complaint. Doe Medical Providers were acting under color of law, and within the scope of their employment at all times relevant to the events described in this Complaint.

35.     Doe Deputies, Doe Deputy Supervisors, and Doe Medical Providers are sued in their individual capacities for the purposes of claims arising under § 1983 and as County employees for the purposes of claims arising under state law.

36.     Plaintiffs are ignorant of the true names of all Doe Deputies and Doe Medical Providers despite due diligence and will amend the Complaint to add their true names upon learning them.

37.     The San Diego County Central Jail (hereinafter "Central Jail") is owned and operated by Defendant County and staffed by County employees, agents, and contractors.

## FACTUAL ALLEGATIONS

**A. Hayden Schuck's Pain, Suffering, and Death In Custody March 10, 2022.**

38.     On March 10, 2022, Hayden was in a car collision while driving at a speed between 50 and 70 miles per hour.  On information and belief, his truck rolled a couple of times.  When California Highway Patrol ("CHP") officers arrived, Hayden had extricated himself from his truck but appeared unable to focus and confused.

39.     Officers found baggies containing powdery substances suspected to be drugs in Hayden's car, back pocket, and wallet.

40.     Hayden allegedly declined medical treatment by medics at the scene.

41.     SDPD officers arrested Hayden for various charges including driving under the influence of drugs and possession of a controlled substance.

42.     In a post-arrest interview, Hayden reported having been awake for the past 44 hours.  He denied having used drugs that day.

43.     In the three days *prior*, though, Hayden had been using drugs daily.

44.     On the morning of March 10, at 5:21 a.m., Hayden took a Lyft ride to pick up his car, which he had left in Mission Bay the evening prior.  On

information and belief, Hayden then went surfing in Ocean Beach. It was on his way back from Ocean Beach that Hayden was in the car accident.

45.    On information and belief, SDPD Officer Borish Wong transported Hayden to the Central Jail from the scene of the accident.

46.    At the jail, at approximately 4:56 p.m., Manuel Nozawa, a registered nurse (RN), marked that Hayden was "willing to sign [the medical services rights form], but [was] unable to sign."

47.    Nozawa failed to record any additional information in Hayden's medical file as to why Hayden was "unable to sign."

48.    Nozawa then issued a "Gate Refusal" to obtain medical clearance at a hospital due to Hayden having been in a car accident.

49.    On information and belief, Officer Wong then transported Hayden to the UC San Diego ("UCSD") Medical Center Emergency Department.

50.    At USCD, medical providers evaluated Hayden and took his vitals. At 5:36 p.m., his blood pressure was documented as 138/106 mm Hg and he had a high pulse of 106. At 8:10 p.m., Hayden's blood pressure had risen to 142/102 mm Hg, which, according to the American Heart Association, is considered "Hypertension Stage 2"—one category below a hypertensive crisis requiring urgent medical intervention. A normal blood pressure reading should be below 120/80 mm Hg. His pulse remained somewhat high at 95 beats per minute.

51.    Medical personnel at UCSD also noted in his chart a family history of ischemic heart disease and other diseases of the circulatory system. High systolic blood pressure is considered a major risk factor for ischemic heart disease and ischemic heart disease can cause arrhythmia and heart failure.

52.    Medical personnel saw no swelling, deformities, abrasions, or additional external signs of trauma on Hayden's extremities. They also saw no lacerations on his head, ears, eyes, nose, or throat.

THIRD AMENDED COMPLAINT

53.    Hayden allegedly refused additional workup which would have included "at least" a chest x-ray.  The doctor assessing Hayden noted that he "appear[ed] *clinically* sober" and determined he had decision-making capacity at that time.  He was discharged Against Medical Advice ("AMA").  Discharge paperwork, including the After Visit Summary, read: "No obvious signs of trauma or illness but occult injury is possible given mechanism."

54.    Officer Wong then transported Hayden back to the Central Jail.  They arrived at approximately 9:10 p.m. the night of March 10, 2022.

55.    On information and belief, contrary to policy, Officer Wong failed to provide jail staff with a signed hospital form indicating that Hayden had acted against medical advice ("AMA") at the hospital prior to his return to the jail. Per policy stated in Operations Manual section E.2.1 which governs "Receiving Screening," "[i]f an AMA form is not received, hospital ED records should be requested upon clinical assessment." On information and belief, jail staff (Doe Medical Provider 3[2]) did not timely request such records.

56.    Jameelyn Barrera RN conducted Hayden's medical clearance for acceptance into the facility.

57.    Barrera listed Hayden's blood pressure as 144/94 mm Hg—still abnormally high and within "Hypertension Stage 2."  She also documented an abnormally high or "tachycardic" pulse of 118.

---

[2] Plaintiffs' do not know the identity of who was responsible for ordering Hayden Schuck's ED records. As stated above, on February 8, 2024, Plaintiffs' received Defendant Correctional Healthcare Partners, Inc.'s Responses to Plaintiffs' Interrogatories Set One that indicate that CHP employees employed to work at the San Diego Central Jail rely on medical staff for access to detainee's medical records because they can only access medical records that are kept in the Sheriff's database and did not have access to medical records from outside entities that were not scanned into the database unless CHP employees directly formally requested that information.

58.     Barrera listed Hayden as being 6'2" and 131 pounds with a BMI of 16.8, which is profoundly underweight.

59.     On information and belief, a Qualified Mental Health Provider (Doe Medical Provider 2) was also present during the "receiving screening" process. They reported that "[d]uring intake, pt [sic] [was] making grandiose statements and is not understanding booking process- asking to take photos of his medical records with his phone (which per officers, was 'in pieces' [due to] his car accident), and is asking for '$20 to give to the nurse for some water.'"

60.     On information and belief, Barrera witnessed Hayden's altered mental state.  Both Barrera and the Qualified Mental Health Provider present knew or should have known that Hayden was either under the influence of drugs or alcohol, suffering withdrawal, or otherwise needed additional monitoring and medical care.

61.     On information and belief, Hayden was also subjected to a body scan which caused jail staff to suspect that he was body-carrying a baggy or balloon that could contain dangerous drugs.

62.     On information and belief, Barrera knew that staff suspected Hayden of body-carrying drugs.

63.     There was never any additional evidence that Hayden was actually carrying a baggy or balloon in or on his body. Instead, staff later concluded that the scan had merely detected an air pocket or void rather than a baggy or balloon.

64.     Nevertheless, Defendants failed to meet the standard of care for individuals believed to have consumed hidden drugs in that manner, particularly considering how dangerous body-carrying drugs is.  Had Hayden received the medical care that *would have been* appropriate for that scenario that the jail *wrongly believed existed*, Hayden's death could have been prevented.

65.     Per department policy, Defendant Barrera also obtained answers to questions from the arresting or transporting officer, Officer Wong, who knew that

Hayden had been arrested on suspicion of driving under the influence and possession of a controlled substance.

66.     During her assessment, Barrera checked off that Hayden had no history or risk of alcohol or drug withdrawal or recent use of alcohol, heroin, prescription pain medications or sedatives, or any other illegal drugs, despite knowing this to be untrue based on the nature of his arrest.

67.     On information and belief, at no point in time did anyone perform any type of drug test, such as urinalysis, on Hayden.

68.     Barrera should have known, and did know, that Hayden presented with several serious and dangerous health issues.  Barrera should have known that Hayden was at high risk of illness and death due to his low BMI and suspected history of drug use.  Further, several conditions Hayden was suffering from are explicitly listed on the Gate Refusal form as medical conditions "that raise potential concerns about the patient's medical condition, and the ability to safely provide for the health and welfare of the patient within a correctional environment."  Specifically, "elevated blood pressure" is listed as an atypical vital sign that warrants Gate Refusal in order to rule out the use of illicit substances, coarctation, stroke, and signs and symptoms of end organ system damage. Tachycardia, or a heart rate higher than 100 beats per minute, is also listed. Further, "[a]ltered mental status" or "affected cognition" are listed as grounds for refusing acceptance in order to rule out a "head injury or neurological deficit."

69.     Barrera knew that the doctors at UCSD had not fully cleared Hayden for booking.  Yet, Barrera marked that Hayden was fit to continue the booking process and merely checked a box for Hayden to receive a "sick call" at some undetermined point in the future.

70.     As a registered nurse, and an employee of the Sheriff's Medical Services Division, Barrera was trained, or should have been trained, and knew or should have known, when detainees should be refused for booking and sent back to

the hospital, or referred for additional assessment, treatment, and observation within the jail.

71.    Barrera's conduct constituted failure to follow myriad policies delineated in the Medical Services Operations Manual for medically clearing a detainee for acceptance into the jail, including but not limited to Operations Manual section E.2.1 which governs "Receiving Screening."

72.    Despite Hayden's alarming medical conditions, Barrera failed to perform a proper "Gate Refusal" and instead admitted Hayden into the facility rather than having him sent back to the hospital.

73.    This conduct violated section E.2.1, subsection I, which states that any individuals "exhibiting signs of excited delirium, disorganization of thoughts, altered mental status and confusion will require medical and possible psychiatric evaluation prior to being accepted into the detention facility."

74.    That policy, E.2.1, subsection I, also lists "nonsensical communication" as another sign that could necessitate evaluation at an emergency department.

75.    The same policy also mandates the rejection of individuals reported to have ingested baggies of drugs without clearance from an emergency department.

76.    Hayden's grandiose statements and inability to understand basic information such as the booking process fell within the above parameters of E.2.1, subsection I.

77.    Because Barrera knew that Hayden had not been fully cleared by the hospital, and considering his symptoms, Barrera knew or should have known that Hayden needed to be housed in a medical observation bed ("MOB"), Psychiatric Stabilization Unit, or sobering cell for his safety.

78.    But at intake, Barrera did not recommend Hayden be housed in a medical observation bed ("MOB"), Psychiatric Stabilization Unit, or sobering cell.

79.    Barrera did not even follow the procedures for a "Clinically Indicated Assessment" ("CIA") for Hayden.  Such procedures are required where individuals present "with mild or moderate clinical signs or symptoms during screening."  *See* E.2.1., subsection IV.C.  Undoubtedly, this would include suspicion of body-carrying dangerous drugs, abnormally high blood pressure, or altered mental status.  A CIA is also required where an individual such as Hayden is AMA.

80.    The procedures for a CIA would have required Barrera to place a red wristband on Hayden—signaling to medical staff and deputies alike that he required further assessment.

81.    A CIA also would have required Barrera to refer Hayden for a "2nd Stage Medical" evaluation which would have required further assessment "no later than two (2) hours" later.

82.    During a "2nd Stage Medical" evaluation, Hayden would have had a "focused physical assessment based on [his] clinical presentation," "appropriate nursing assessment protocol" would have been initiated, and staff would have scheduled "necessary medical chart review for medication ordering or doctor sick call follow-up."  *See* E.2.1., subsection V.

83.    Barrera accordingly failed to furnish or summon requisite medical care.

84.    Instead, Hayden was housed in a single occupancy *holding* cell from March 10, 2022 to March 15, 2022.

85.    It was not until the evening of March 15, 2022 that Hayden was transferred to a single occupancy cell on the seventh floor in Module D.

**March 11, 2022.**

86.    On information and belief, Hayden received no medical or mental health care, and no deputies requested he receive care, on March 11, 2022.

**March 12, 2022.**

THIRD AMENDED COMPLAINT

87.     On information and belief, and according to his medical records, Hayden did not receive any additional medical care until March 12, 2022 when a nurse performed a chest x-ray on Hayden.

88.     On information and belief, that nurse did not assess Hayden's vital signs on March 12, 2022.

89.     The nurse recorded no notes regarding any additional assessment aside from performing the chest x-ray on March 12.

90.     On information and belief, no deputies requested he receive any care that day.

**March 13, 2022.**

91.     On information and belief, Hayden received no medical or mental health care, and no deputies requested he receive care, on March 13, 2022.

92.     On March 13, 2022, at 3:05 p.m., Defendant Deputy Page assessed Hayden for classification.  As a classification deputy, Page was required to assess and screen individuals coming into jail.  In part, Deputy Page's duties included assessing detainees for any disabilities that required accommodations or any safety concerns.  And, if he witnessed medical or mental health issues, he was to refer detainees to medical or mental health professionals.

93.     Despite having been in jail for three days, Hayden had not previously been assessed to be classified for housing.

94.     When Deputy Page assessed Hayden, he interviewed Hayden in the holding cell.  Deputy Page observed Hayden exhibiting odd behavior, but did not refer him to medical or mental health staff who could have evaluated his health and treated him.

**March 14, 2022.**

95.     On March 14, 2022, Hayden was unable to go to court for his arraignment and it was rescheduled for the following day.

THIRD AMENDED COMPLAINT

96.    On information and belief, Hayden received no medical or mental health care, and no deputies requested he receive care, on March 14, 2022.

**March 15, 2022.**

97.    On March 15, 2022, Defendant Dr. Montgomery ordered Hayden's wound dressings be changed and antibiotic be applied.

98.    Dr. Montgomery did not provide or order any other care that day.

99.    Based on Hayen's medical records, Dr. Montgomery should have known or did know of Hayden's serious medical issues and failed to administer treatment or order subordinate medical staff to do so.

100.    That morning, at approximately 8:45 a.m., Romeo DeGuzman RN took Hayden's vitals for only the second time since Hayden had been in custody for five days.

101.    Hayden's blood pressure remained abnormally high at 148/96 mm Hg.

102.    DeGuzman assessed Hayden as suffering from "altered thought process."

103.    Hayden complained of having ADHD and said that he "uses acid drugs in the street."

104.    DeGuzman noted that Hayden was having "difficulty in following direction, [was] disorganized, [and] non sensical."

105.    He appeared "disheveled, with soiled t shirt [sic]" and was "not wearing pants."  He had "dry blood" on his t-shirt and on "both lower extremities."

106.    DeGuzman knew or should have known that Hayden had been exhibiting concerning symptoms over the past few days but had not received any meaningful or adequate medical treatment to assess and treat him.

107.    DeGuzman was trained or should have been trained to know that Hayden's condition warranted an emergency response.

108.    Despite these increasingly serious signs of medical distress, including unexplained wounds, DeGuzman did not summon or furnish medical care.

109.    DeGuzman failed to request immediate evaluation by a physician or order Hayden's transport to the hospital emergency department.

110.    Rather, DeGuzman merely wrote "wound care" and "psych eval" as Hayden's care plan and told Hayden—who was suffering altered thought process—to inform staff if his health conditions changed.

111.    Around an hour later, Emily Lymburn RN observed Hayden lying naked on his bed facing the wall with "multiple pressure sores on his tailbone, buttocks, elbows and legs."

112.    Despite "multiple tries to talk to him, [Hayden] did not acknowledge staff" and "kept moving his lower extremities but kept facing the wall." These symptoms alone warranted Lymburn initiating an emergency response.

113.    Lymburn knew or should have known that Hayden had been exhibiting concerning symptoms continuously over the past few days, that those symptoms were in fact worsening, and that Hayden had not received any meaningful or adequate medical treatment or assessments.

114.    Lymburn was trained or should have been trained to know that Hayden's condition warranted an emergency response.

115.    Instead of initiating an emergency response to Hayden's disturbing symptoms, Lymburn merely "[n]otified floor deputies # 4324 and 4193" (Defendants Mace and Amado) that Hayden needed to be seen by a medical provider in the clinic, notified clinic RN Defendant Vivona that Hayden needed to be seen as soon as possible, and noted that Hayden was already scheduled for assessment for his sores.

116.    However, Lymburn did not furnish further medical care nor initiate an emergency response as was obviously necessary.

117.    Lymburn also failed to contemporaneously record and enter her notes regarding this visit in Hayden's medical record.

THIRD AMENDED COMPLAINT

118. <u>Her note is marked as a late entry</u>—a notorious forensic red-flag in jail-death cases.

119. On information and belief, Lymburn entered her note a full day late—meaning other staff would not have had access to the note and the alarming contents in the interim.

120. Lymburn also did not record the date of that visit and failed to indicate whether it occurred in the morning or the evening.

121. On information and belief, Mace and Amado did nothing to summon medical care.

122. On information and belief, Vivona also did not summon or furnish medical care to Hayden.

123. Instead, at approximately 10:35 a.m., staff provided Hayden with clean clothes and transported him to court for his arraignment.

124. In court, the public defender appearing for Hayden expressed concerns to the judge regarding Hayden's ability to understand and proceed with court proceedings that day.

125. Hayden was unable to confirm even his name in court.

126. As a result, the judge ordered jail staff to take Hayden to "jail medical to be screened for medications" and held only a "partial arraignment," feeling the need to "clarify [Hayden's] acknowledgment of rights," "true name," and date of birth "at [the] next hearing."

127. Meanwhile, on the same day (March 15, 2022) at 4:12 p.m., four days after Hayden was seen at UCSD, Defendant Nicholas Kahl, NP reviewed the "After Visit Summary" medical record from UCSD that was scanned by one of the County's medical personnel (Doe Medical Provider 3).

128. The "After Visit Summary" stated:

    a. That Hayden had been in a motor vehicle accident;

    b. Had relatively high blood pressure of 142/102;

19

c.  Had a relatively high pulse of 95;

d.  That he was discharged AMA ("Patient refusing medical evaluation"); and

e.  That there were "[n]o obvious signs of trauma or illness but *occult injury is possible given mechanism*."

129.  Thus, the After Visit Summary conveyed to Kahl that Hayden had not been properly cleared for booking because he had not undergone the medical evaluation that doctors recommended and was necessary to ensure he was safe to book.

130.  The Summary conveyed that there could be a hidden injury considering the "mechanism," meaning the motor vehicle collision.  "Occult" means concealed or hidden.

131.  Kahl reviewed the Summary as part of a "medical chart review."  This would have required him to review all records relating to Hayden Schuck that were in TechCare.  Accordingly, he knew or should have known all of the contents of these records.

132.  TechCare is an electronic filing system or application where scanned documents such as the After Visit Summary and all of Hayden's medical records created by County and/or CHP medical staff are stored, including the other notes and medical records described within this complaint.

133.  For example, Kahl had easy, immediate, access to, and should have reviewed, the medical records describing how DeGuzman noted that day that Hayden was having "difficulty in following direction, [was] disorganized, [and] non sensical," appeared "disheveled, with soiled t shirt [sic]" and was "not wearing pants."  He had "dry blood" on his t-shirt and on "both lower extremities."

134.  He had access to and should have reviewed the medical records indicating that Hayden had extremely concerning symptoms at intake and that those had obviously not subsided and in fact, had worsened in custody.

THIRD AMENDED COMPLAINT

135.    Kahl immediately requested that nursing staff obtain the full ER records, including all physician notes.  This indicates that Kahl had subjective knowledge that Hayden required further assessment and care, but Kahl did nothing to care for or assess Hayden in that moment or as soon as possible when Hayden returned from court around 20 minutes after Kahl's review of the records.

136.    Kahl, as a Nurse Practitioner, knew or should have known from his medical training that the circumstances warranted *immediate* intervention.  Kahl should have ensured that Hayden was seen by a Nurse Practitioner or doctor right away. After all, he knew of his gravely serious symptoms spanning several days without medical intervention or assessment.  And he knew that Hayden had never been properly cleared for booking contrary to policy and with the risk of hidden injury.

137.    Based on Hayden's medical records, Kahl knew of Hayden's serious medical issues and failed to administer treatment or summon medical care.

138.    After court proceedings ended, deputies took detainees back to the jail.

139.    Deputy Griffith, a transportation deputy, transported Hayden back from court to the jail.  He quickly noticed something was off and became concerned about Hayden's wellbeing.

140.    For example, when Griffith arrived to court, he learned that Hayden's hearing had not proceeded as planned.

141.    During transportation, he witnessed Hayden having difficulty following directions and needing extra guidance.

142.    Upon arrival back at the jail from court, Griffith stayed with Hayden in the hallway while Valbuena escorted other detainees back to their cells.  Hayden sat down on the floor of the hallway.

THIRD AMENDED COMPLAINT

143.    When Deputy Griffith asked if Hayden was okay, it appeared as if Hayden was trying to speak, but could only mumble incoherently.  Hayden would look at Deputy Griffith, but would not communicate back.

144.    When Valbuena returned, he saw Hayden had "slid down the wall," and sat down, leaning up against the wall.  He felt this was "not normal" since that was an area where detainees were supposed to be walking.  Hayden told Valbuena he was thirsty.  Valbuena suspected he could be suffering from "detox" because symptoms of drug withdrawal include weakness and dehydration.

145.    Griffith told Valbuena his concerns and that Hayden needed to be seen by medical staff.

146.    Valbuena told Hayden he could not sit there, and he and Griffith picked Hayden up on either side to walk him to his holding cell.

147.    Once at the cell, the deputies took the waist and leg chains off Hayden, holding him up while they did so.  Video evidence depicts Hayden having trouble standing up and holding onto a cell door during this time.

148.    Griffith then left Hayden in Valbuena's care.

149.    Instead of taking Hayden to see medical staff, Valbuena put Hayden back in a holding cell and shut the door.

150.    Valbuena failed to make any note in the JIMS system about his interaction with Hayden or his observations regarding his behavior or wellbeing.

151.    Valbuena did not call for medical staff or mental health professionals to come assess Hayden.

152.    Between 8:00 and 9:00 p.m., Defendant Deputies Page and Ramirez escorted Hayden to Module D, cell 01.  While doing so, Hayden continued to exhibit concerning symptoms: he slumped down a wall and sat on the floor.

153.    When Page and Ramirez went to get him from the holding cell to take him to Module D, Hayden acted like he thought he was in a canoe on the bench.

THIRD AMENDED COMPLAINT

154.    At this point, Ramirez knew that Hayden had been in a holding cell for at least a couple of days, if not five to ten days. She stated that when Hayden "canoed" to her, she believed he "may still be under the influence."

155.    Ramirez also noted that Hayden appeared to believe he was on the phone with his mother when he was in fact not.  Ramirez asked Hayden to come over to be escorted and Hayden acted as if he were hanging up the phone.

156.    Both Ramirez and Page knew that if someone was under the influence of drugs, they needed to be seen by medical staff right away.  Yet, instead of taking Hayden to the medical clinic, they proceeded with their plan of housing him in Module D.

157.    In the elevator on the way to Module D, Hayden said he was Spiderman and tried to climb the wall of the elevator.  Ramirez testified that Hayden was "acting childlike."  Ramirez did not believe Hayden was "faking" or "malingering" with respect to these behaviors.

158.    According to video evidence, shortly after leaving the elevator, Hayden abruptly stopped, went to the ground, and sat on the floor.  Ramirez and Page pulled him up, but he went to the ground again.  He was then able to stand and walk to the door of his cell.

159.    According to Ramirez, Hayden then shook his pants off and started peeing from the doorway to his cell.  Ramirez and Page then uncuffed him and shut the door behind him.

160.    According to Ramirez, when they left Hayden alone in his cell, Page and Ramirez "weren't sure" whether he was able to "take care of himself."  In fact, Ramirez wondered "Does he possibly have the mental state of, for example, a 4-year-old?"

161.    Yet, neither Ramirez nor Page summoned medical care for Hayden.

162.    At 9:42 p.m., Carina Echon RN received the court order stating that Hayden was to be referred for medical treatment.

THIRD AMENDED COMPLAINT

163.   On information and belief, Echon did not provide or summon medical treatment for Hayden.

164.   On information and belief, Hayden was not seen by a healthcare provider and did not receive any medical treatment after Court on March 15, 2022.

165.   At 3:44 a.m. on March 16, 2022, deputies provided Hayden with a morning meal, but he would not (or could not) eat.

166.   Nearly six hours later, at 9:37 a.m., deputies went to Hayden's cell to bring him to the medical clinic for evaluation of his sores, but he was unresponsive.  They found no pulse, began CPR, and administered two doses of Narcan by the time the medical team arrived at 9:43 p.m.  The medical team applied an automated external defibrillator (AED) which did not advise a shock. Staff administered four additional dosages of Narcan to no effect.

167.   Emergency Medical Services arrived at 9:49 a.m. and continued CPR.

168.   Hayden was pronounced dead at 10:18 a.m.

169.   Hayden's cell contained one unopened food tray.

170.   The cell was dirty and there were pieces of toilet paper scattered about the cell, some with what appeared to be dried blood on them.

171.   There was no alcohol or drugs or drug paraphernalia in the cell.

172.   According to the Medical Examiner Investigator's investigation, Hayden "did not have contact with any other inmates at the facility during his incarceration period."

173.   The Deputy Medical Examiner described Hayden as appearing "gaunt" upon viewing him in his cell after his death.  The Deputy Medical Examiner also noted scabs of varying ages and sizes on his face as well as on the front and back of Hayden's body in various places.  Hayden had swelling on his forehead and on the back of his head.  He had multiple contusions and an area indicating sharp force trauma on his right hand.  He had pressure sores or pressure ulcers on his back, buttocks, arms and legs.

174. The Medical Examiner's Department failed to complete the autopsy report for nearly a year after Hayden's death, until February 2023.

175. Pursuant to the Medical Examiner's toxicology report, Hayden had low levels of cocaine metabolite, MDMA, and MDMA metabolite in his system—all of which are all consistent with Hayden's use of drugs prior to being incarcerated on March 10, 2022.

176. The toxicology results do not support the notion that Hayden had used cocaine and MDMA while he was in custody.

177. Hayden died from profound dehydration and completely untreated withdrawals, which ultimately caused heart failure.

178. By being severely underweight at intake, Hayden was clearly at substantial risk of dying in this way, among others.

179. Hayden's vitreous urea nitrogen (VUN) level as recorded in the toxicology report was exceedingly high—at 103 mg/dL.

180. By comparison, a normal range is generally 6 to 24 mg/dL.

181. Testing VUN is important because it is a reliable indicator of the amount of nitrogenous waste present in someone's blood at the time of their death.

182. A level of 103 mg/dL is indicative of profound dehydration and means that Hayden was collecting tremendous amounts of waste material in his blood.

183. Hayden's dehydration is consistent with the symptoms he was exhibiting, which Defendants were aware of throughout his time in their custody.

184. Extreme dehydration can cause dizziness, fainting, fatigue, confusion, irritability, excessive sleepiness or inactivity (as evidenced by multiple pressure sores on his backside), sunken eyes (as evidenced by the Deputy Medical Examiner's report that Hayden looked "gaunt"), and dry skin or lips (as evidenced by his lips being dry and covered with dried blood at the time of his death).

THIRD AMENDED COMPLAINT

185.   On information and belief, Doe Deputies failed to perform timely, adequate wellness checks on Hayden and failed to summon medical care despite his obvious, serious medical conditions.  Doe Deputies violated policies and procedures and established law in their actions and omissions.

186.   For example, on information and belief, Doe Deputies violated San Diego County Sheriff's Department Detention Services Policies and Procedures section I.64 as well as Cal. Code Regs. Tit. 15, § 1027.5 which require sworn staff such as Doe Deputies to conduct safety checks of incarcerated persons "through direct visual observation."

187.   Section I.64 defines safety checks as "looking at the incarcerated persons for any obvious signs of medical distress, trauma or criminal activity."

188.   Sworn staff must conduct such checks at least once every 60-minute period and the intervals must vary and be logged properly into the jail information system ("JIMS").

189.   Doe Deputies were also required to pay attention to cleanliness during safety checks.

190.   At no point during his time at the jail was Hayden treated by a physician, including Defendant Montgomery.

191.   At no point while he was in custody did anyone drug test Hayden.

192.   At no point while he was in custody did anyone do any lab work (aside from a nasal COVID-19 test) on Hayden.

Hayden's death was preventable.  Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Kahl, Doe Medical Providers, and Doe Deputies had notice and opportunity to provide Hayden with necessary medical care and deliberately ignored his needs.

/ /

/ /

/ /

THIRD AMENDED COMPLAINT

**B. The County's and CHP's Long History of Deliberate Indifference to Detainees' Health, Mental Health, and Constitutional Rights**

193.   From 2006 through 2020, a total of 185 people died in San Diego County's jails—a rate higher than any other large county across the State.

194.   In both 2021 and 2022, the infamous Rikers Island jail had fewer deaths despite a far larger jail population.

195.   The County is also well aware that drug use among individuals in custody in San Diego County jails was at a 22-year high in 2021.[3]  In 2021, a staggering 83% of adult male arrestees tested positive for at least one controlled substance.  Further, 56% of adults reported beginning using illicit substances as substitutes for medication they had previously been prescribed for ADHD or ADD.

196.   In February 2022, the California State Auditor completed its audit[4] of the San Diego County Sheriff's Department to determine the cause of the high rate of in-custody deaths in San Diego County jails and to identify any steps that the Sheriff's Department took in response to those deaths.

197.   The Auditor reviewed data over a 15-year period.

198.   The Auditor found deficiencies in caring for and protecting individuals, which likely contributed to in-custody deaths.

199.   Also, these were not limited occurrences—the audit's findings "suggest[ed] that the problems with the Sheriff's Department's care for incarcerated individuals are systemic."

200.   Specifically, the Auditor found the following deficiencies:

---

[3] *See* SANDAG, *2021 Adult Arrestee Drug Use in the San Diego Region*, available at: https://www.sandag.org/-/media/406C28D7970844A899C0C808FF3834FB.ashx.

[4] Plaintiffs incorporate herein by reference the State Auditor's report: https://www.auditor.ca.gov/pdfs/reports/2021-109.pdf.

a. Inadequate and inconsistent provision of medical and mental health care;

b. Inadequate and inconsistent identification of individuals' health care needs during intake;[5]

c. Inadequate and inconsistent follow-up regarding medical and mental health needs;

d. Inadequate and inconsistent performance of visual checks to ensure the health and safety of detainees;

e. Failure to implement meaningful corrective action to guard against future deaths when deaths have occurred;

f. Failure to adequately investigate and review in-custody deaths;

g. Failure to implement key recommendations from external entities related to detainees' welfare and safety; and

h. And inadequate policies.

201. State auditors found that the department had yet to meaningfully implement recommendations made by independent experts over the last several years.

202. The San Diego Citizens' Law Enforcement Review Board (CLERB) also conducted an analysis of data regarding in-custody deaths in San Diego County jails over the past 10 years, the results of which were released in April 2022.

203. CLERB made the following findings, in pertinent part:

a. Residents of San Diego County are no more likely to die than residents of other California counties;

---

[5] Auditors noted that studies regarding health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody.

b. San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population;

c. The risk of overdose/accidental deaths is the greatest in San Diego jails; and

d. Elevated risk of death appears to be isolated to the unsentenced jail population.

204. At the time of Hayden's death, the County and CHP had *de facto* policies or widespread, longstanding practices or customs including but not limited to:

a. Failing to properly conduct "receiving screenings" at intake;

b. Failing to properly document medical or mental health conditions during "receiving screenings" at intake;

c. Failing to properly house individuals to ensure their safety and well-being;

d. Leaving individuals unattended in their cells for extended periods despite signs of medical or mental distress;

e. Failing to summon medical or mental health care when obviously necessary;

f. Failing to coordinate, share, or update internal information systems with critical medical or mental health information;

g. Failing to provide critical treatment to individuals suffering from withdrawal;

h. Failing to provide critical medical treatment to individuals suffering from overdose;

i. Failing to provide critical medical treatment to individuals suffering from dehydration;

THIRD AMENDED COMPLAINT

j.  Failing to provide medical or mental health treatment to individuals suffering from mental health conditions; and

k.  Failing to adequately staff the medical services division.[6]

205.  Myriad cases demonstrate the County's and CHP's *de facto* policies or widespread, longstanding practices or customs described herein.

206.  For example, the Medical Examiner's office recently deemed Lonnie Rupard's in-custody death a *homicide*.

207.  Rupard died on March 17, 2022—just one day after Hayden.

208.  Like Hayden, Rupard exhibited symptoms of mental illness and distress during his time in custody and died in large part due to dehydration.

209.  He had similarly elevated levels of sodium, chloride, and urea nitrogen.

210.  He, like Hayden, also had pneumonia, a duodenal ulcer, and pressure sores on his back.

211.  Like Hayden, Rupard was neglected by deputies and medical staff despite obvious signs that he needed care.  The Deputy Medical Examiner concluded:

> Records document that care was made available to the decedent in the form of meals, continuous in-cell water supply, prescription medications to treat his psychiatric illness, and medical evaluations; nevertheless, the ineffective delivery of that care ended with his death.

---

[6] Unionized health care workers stated that understaffing created "dangerous and inhumane" conditions for people in custody and medical staff.  In June 2022, 199 medical division positions were vacant.  *See* Jeff McDonald, Kelly Davis, *Persistent medical staffing shortages in San Diego jails are causing lapses in care, driving down morale*, San Diego Union-Tribune, Sept. 4, 2022, https://www.sandiegouniontribune.com/news/watchdog/story/2022-09-04/jail-staff-shortages.

> While elements of self-neglect were present, ultimately
> this decedent was dependent upon others for his care;
> therefore, the manner of death is classified as homicide.

212.    Like Rupard, Hayden was dependent on staff for his care due in part to his deteriorating mental health and withdrawal.

213.    Additionally, Ronaldino Estrada,[7] a 24-year-old, was found dead on July 5, 2021, hours after his death alone in his cell.

214.    Estrada was likely dead for twelve hours before deputies found him, meaning deputies had not been conducting adequate safety checks in clear violation of law and policy.

215.    Estrada had a history of hypertension and suffered from cardio-respiratory arrest.

216.    Staff failed to take Estrada's vital signs or provide prescribed medications.

217.    Just as staff neglected Estrada, Defendants neglected to monitor Hayden's vital signs and on information and belief, failed to conduct timely and adequate safety checks.

218.    Additional examples are specifically incorporated herein by reference to the Second Amended Complaint, Doc. No. 34, ¶ 127 in *Serna v. County of San Diego et al*, 20-cv-2096-LAB.

219.    Further, Plaintiffs specifically incorporate by reference the Second and Third Amended Civil Class Action Complaints for Declaratory and Injunctive Relief, Doc. Nos. 81 and 231, in *Dunsmore v. San Diego County Sheriff's Department et al*, 20cv00406-AJB.

---

[7] *See Mother and father sue San Diego County over death of their son in jail*, CBS8, available at: https://www.cbs8.com/article/news/local/the-parents-of-a-man-who-died-in-a-san-diego-county-jail-sues/509-5b59c3d4-4406-43ae-9367-cdbe412fa0cc.

THIRD AMENDED COMPLAINT

220. The *Dunsmore* plaintiffs are a class of individuals who are or were in custody in the San Diego County jails who are collectively suing, in pertinent part, for the County's and CHP's failures to adequately staff the medical division, including mental health professionals, interference by deputies with the delivery of medical and mental health care, failure to identify and treat medical and mental health conditions at intake, failure to provide adequate medical care for individuals with substance use disorders and/or who are under the influence at intake, failure to continue medically necessary medications and treatments upon arrival, failure to maintain adequate, accurate, and complete medical records, failure to adequately diagnose individuals and refer them to outside specialists where needed, failure to provide adequate follow-up medical treatment, and failure to implement and maintain quality assurance and improvement processes to ensure adequate care.

221. Plaintiffs further specifically incorporate by reference the declarations by plaintiffs as well as experts filed in the *Dunsmore* case at Doc. No. 119 and Doc. No. 162.

222. Additionally, the Sheriff's Department's belated implementation of programs and policy changes after Hayden's (and many others') deaths serve to demonstrate the Sheriff's Department's knowledge of and past apathy regarding its failures.

223. In June 2022, the San Diego Central Jail implemented "wellness checks" which require recurring visits to higher risk and vulnerable individuals in the jail.

224. Those new checks require a multidisciplinary team of sworn deputies, medical staff, mental health staff, and reentry services representatives to visit individuals in their cells.

THIRD AMENDED COMPLAINT

225.    Additionally, the County has begun collaborative multi-disciplinary group meetings to discuss individuals who may need additional care and/or are at a higher risk of harm.

226.    They have also recently established a more thorough drug interdiction program to more accurately determine whether someone is body-carrying drugs which could be fatal to them or others.

227.    Further, the County purports to be implementing updated protocols for when someone refuses medical or mental health care.

228.    The County is also revising its policies and procedures for implementation in 2023 in the hopes of becoming accredited by the National Commission on Correctional Health Care (NCCHC).

229.    The Sheriff's Department / County jails have never successfully achieved NCCHC certification.

230.    NCCHC sets standards for health services in correctional facilities and operates an accreditation program for institutions that meet those standards.

231.    Rather, in 2017, NCCHC reviewed the practices of San Diego County jails and found they failed to meet 26 of 38 "essential standards."

232.    Had the County addressed known deficiencies within its jails and made changes in order to comply with NCCHC standards earlier, these changes could have saved lives, including Hayden's.

233.    In sum, Defendants Gore, Martinez, Montgomery, the County of San Diego, and CHP were aware of a perpetual pattern of preventable in-custody deaths caused by Defendants' systemic and wide-ranging misconduct, negligence, and failures.

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT

# I.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983: Fourteenth Amendment Deliberate Indifference**

**(By Plaintiffs As Successors-in-Interest Against Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Gore, Martinez, Kahl, Doe Deputies, Doe Medical Providers 2-3, Doe Deputy Supervisors)**

234.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

235.    Plaintiffs allege this cause of action as Hayden's successors in interest.

236.    The actions and omissions by Defendants constituted objective and subjective deliberate indifference to Hayden's medical needs and unsafe conditions of confinement.  Defendants' actions and omissions violated the due process clause of the Fourteenth Amendment prohibiting deprivation of life without due process of law.

237.    Defendants made intentional decisions and omissions regarding Hayden's conditions of confinement and the denial of adequate medical care, including but not limited to:

      a.  Accepting Hayden into the jail without a full medical clearance despite the above-described signs and symptoms of medical conditions;

      b.  Deciding not to house Hayden in a medical observation unit;

      c.  Deciding not to house Hayden in a Psychiatric Stabilization Unit;

      d.  Deciding not to house Hayden in a sobering cell;

      e.  Failing to monitor Hayden after he was suspected to have, upon intake, a baggie or balloon of dangerous narcotics in his body;

f.  Failing to timely and adequately check on Hayden's safety and wellbeing while he was in his cell;

g.  Failing to summon medical care in the face of obvious signs that Hayden's health was deteriorating dangerously, including but not limited to disorganized thinking, confusion, altered thought process, disheveled appearance and improper dress, an unclean cell, the inability to confirm his name, falling and inability to walk, and the appearance of obvious, unexplained wounds that had not been present at intake;

h.  Failing to timely and adequately document information regarding Hayden's condition in the jail information system; and

i.  Failing to take appropriate measures to ensure Hayden was receiving adequate and prompt medical care, particularly when he exhibited gravely concerning signs of illness.

j.  Failing to timely request and review Hayden's hospital records.

238.  Defendants' intentional decisions and omissions put Hayden at substantial risk of suffering serious harm.

239.  Defendants did not take reasonable available measures to abate or reduce the risk of serious harm, even though a reasonable officer or employee under the circumstances would have understood the high degree of risk involved—making the consequences of the defendants' conduct obvious.

240.  As alleged above, Defendants' conduct and omissions constituted various policy violations.

241.  Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' damages including both Hayden's pain and suffering prior to his death and his death.  Plaintiff seeks compensatory damages.

THIRD AMENDED COMPLAINT

242.   Plaintiff also seeks punitive damages against the individual defendants on the grounds that Defendants acted with deliberate and reckless disregard of Hayden's constitutional rights.

243.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## II.

### SECOND CAUSE OF ACTION

**42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process**

**(By Plaintiffs As Individuals Against Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez,  Gore, Martinez, Kahl, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors)**

244.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

245.   Plaintiffs Sabrina and Timothy Schuck, as individuals, allege this Fourteenth Amendment substantive due process claim against Defendants for depriving them of their rights to companionship and society with their son, Hayden.

246.   While Hayden was in their custody and care, Defendants had adequate time to reflect and reason prior to acting or failing to act.  Because Hayden's health deteriorated over the span of several days, actual deliberation was practical.

247.   Yet, Defendants' actions and omissions constituted objective deliberate indifference to Hayden's medical needs and unsafe conditions of confinement.

248.   Plaintiffs specifically incorporate by reference here, as alleged in the above cause of action, the myriad ways in which Defendants made intentional decisions and omissions regarding Hayden's conditions of confinement and their denial of adequate medical care.

249.   Defendants' deliberate indifference was an actual and proximate cause of Plaintiffs' economic and non-economic damages including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiffs seek compensatory damages.

250.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Hayden's constitutional rights.

251.   Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

### III.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983: Fourteenth Amendment Deliberate Indifference (*Monell*)

### (By Plaintiffs As Individuals Against Defendants County and CHP)

252.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

253.   Defendant County was acting under color of state law because its employees and agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

254.   Defendant CHP was acting under color of state law because it is a private entity that contracted with Defendant County to perform the state function of providing medical care within the County's jails.  Defendant CHP's employees and agents were acting or purporting to act in the performance of their official duties as contractors with the County.  *See West v. Atkins*, 487 U.S. 42, 53–54 (1988); *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991) (per curiam); *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 757 (9th Cir. 2020) (stating a private physician under contract with a state to provide medical services to inmates was a state actor for purposes of section 1983).

255.   As alleged above, Defendants County and CHP, by and through their employees, agents, and contractors, deprived Hayden of his constitutional rights

under the due process clause of the Fourteenth Amendment prohibiting deprivation of life without due process of law.

256.    Defendants County and CHP, by and through their employees, agents, and contractors, acted pursuant to the following official policies, or widespread or longstanding practices or customs, of Defendants County and CHP:

      a.  Failing to recognize when a detainee has serious medical needs during intake screening;

      b.  Failing to communicate detainees' medical needs between medical staff and deputies;

      c.  Providing insufficient medical care to detainees;

      d.  Failing to place detainees suspected of carrying drugs inside of their bodies in medical observation cells;

      e.  Failing to interdict drugs from entering the jail;

      f.  Failing to transfer detainees to the hospital when medically necessary;

      g.  Failing to respond properly or timely to serious medical needs of detainees;

      h.  Failing to conduct timely safety checks;

      i.  Failing to monitor live video feeds for signs of medical distress;

      j.  Failing to respond properly to detainees exhibiting drug or alcohol overdose or withdrawal;

      k.  Failing to recognize when a detainee has serious medical needs during safety checks;

      l.  Failing to meet accepted community standards of care with respect to medical care of detainees; and

      m. Failing to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths.

257.    Defendants County and CHP knew of a substantial risk that their polices were inadequate to prevent violations of law by its employees and agents.

Defendants were deliberately indifferent to this risk and the well-documented history of widespread unconstitutional acts by employees and agents at the jail. Yet, Defendants failed to set forth appropriate policies regarding the treatment of detainees.

258.   Defendants County and CHP are also liable in that Hayden's death was also the result of a failure to train their employees, contractors, and agents to properly evaluate the health of and risks to detainees at intake and while in custody, to identify serious symptoms of medical distress, to determine proper and adequate courses of treatment for detainees in need of medical treatment, and how to summon and provide adequate medical care when necessary.

259.   The County and CHP knew their failure to adequately train their staff made it highly predictable and foreseeable that its employees and agents would engage in conduct that would deprive detainees of constitutionally protected rights and result in additional deaths.  The County and CHP were deliberately indifferent to the rights of individuals in their custody and care as evidenced by their knowledge of disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers who they failed to properly train would come into contact with detainees.  The inadequacy of the County's and CHP's training actually caused Hayden's constitutional deprivations.

260.   Defendant County also acted through and is liable by virtue of its final policymakers, such as Gore and Martinez, and/or their subordinates who had been delegated final policymaking authority.  Defendant County's final policymakers, including Gore and Martinez, and/or their subordinates were acting under color of state law.  Their final policymaking authority concerned all constitutional violations described in this Complaint.

261.   Defendant CHP also acted through and is liable by virtue of its final policymakers and/or their subordinates who had been delegated final

policymaking authority. Defendant CHP's final policymakers and/or their subordinates were acting under color of state law. Their final policymaking authority concerned all constitutional violations described in this Complaint.

262. Defendant County is also liable based on Gore's and Martinez's failure to enact new and different policies despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths at the San Diego County Jail.

263. Defendant CHP is also liable based on their policymakers' and their policymakers' subordinates' failure to enact new and different policies despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths at the San Diego County Jail.

264. Defendant County is also liable based on their ratification and approval of the constitutional, statutory, and other law violations as alleged in this Complaint. This is evidenced by the Sheriff's Critical Incident Review Board finding no "policy changes or action items" necessary in response to Hayden's death.

265. Defendant County's policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees, caused Hayden's deprivation of rights by the individual defendants. That is, Defendants' policies, customs, or practices, actions and failures to act by final policymakers, ratification of constitutional and law violations, and failure to train its employees were so closely related to Hayden's deprivation of rights that they were the moving force causing Hayden's injury and death.

266. Defendant County's and Defendant CHP's actions and omissions actually and proximately caused Plaintiffs' economic and non-economic damages

THIRD AMENDED COMPLAINT

including funeral expenses, loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiffs seek compensatory damages.

267.    Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Hayden's constitutional rights.

268.    Plaintiffs are entitled to costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

# IV.

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983: Fourteenth Amendment Substantive Due Process (*Monell*)**

**(By Plaintiffs As Individuals Against Defendants County and CHP)**

269.    Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.  Plaintiffs specifically repeat and incorporate by reference the *Monell* theories of liability set forth in the above cause of action in particular, in support of this claim.

270.    Defendant County was acting under color of state law because its employees and agents were acting or purporting to act in the performance of their official duties as deputies and employees of the County.

271.    Defendant CHP was acting under color of state law because it is a private entity that contracted with Defendant County to perform the state function of providing medical care within the County's jails.  Defendant CHP's employees and agents were acting or purporting to act in the performance of their official duties as contractors with the County.

272.    As alleged above, Defendants County and CHP, by and through their employees and agents, deprived Sabrina and Timothy Schuck of their rights to companionship and society with their son, Hayden, in violation of the Fourteenth Amendment.

273.    Defendant County's and Defendant CHP's actions and failures to act actually and proximately caused Plaintiffs' economic and non-economic damages

including loss of love, companionship, society, comfort, care, assistance, protection, and moral support.  Plaintiffs seek compensatory damages.

274.   Plaintiffs also seek punitive damages on the grounds that Defendants acted with deliberate and reckless disregard of Hayden's constitutional rights.

**V.**

**FIFTH CAUSE OF ACTION**

**Cal. Gov. Code § 52.1 (Bane Act)**

**(By Plaintiffs as Successors-in-Interest Against County, Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Kahl, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP)**

275.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

276.   Pursuant to Cal. Gov. Code § 377.30, Plaintiffs Sabrina and Timothy Schuck assert this claim as successors-in-interest.

277.   As alleged above, Defendants acted, or failed to act, with deliberate indifference to the substantial risk to Hayden's health and safety while he was in their custody and care.  Defendants' due process violations are sufficient in and of themselves to constitute violations of the Bane Act.

278.   "Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials 'knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening,' such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations."  *Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018).

279.   As alleged above, Defendants knowingly deprived Hayden of constitutionally protected rights through inherently coercive and threatening acts

and omissions such as when they chose to house Hayden in a cell other than a MOB, Psychiatric Stabilization Unit, or sobering cell, failed to summon medical care, failed to provide Hayden with adequate medical care, and failed to conduct adequate and timely safety checks.

280.   Defendants' deliberate indifference was an actual and proximate cause of Hayden's pain, suffering, and death, which were a direct and foreseeable result of Defendants' actions and inaction.

281.   Plaintiffs seek compensatory damages including for the pain and suffering Hayden was subjected to prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).  Plaintiffs also seek all statutory remedies available pursuant to Cal. Civ. Code § 52 and 52.1 including civil penalties, treble damages, and attorneys' fees.

282.   Pursuant to Cal. Gov. Code § 815.2, the County is vicariously liable for the actions and/or omissions of its employees, contractors, or agents, Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors because they were acting within the scope of their employment.

283.   Defendant CHP is vicariously liable for the conduct of their employees, and agents, and contractors, including Kahl, because they were acting within the scope of their employment.  Kahl was at all relevant times acting within the scope of his employment with CHP.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT

# VI.

## SIXTH CAUSE OF ACTION

### Cal. Gov. Code § 845.6 (Failure to Summon Medical Care)

**(By Plaintiffs as Successors-in-Interest Against Defendants County, Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors)**

284. Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

285. Plaintiffs assert this claim as successors-in-interest pursuant to Cal. Civ. Proc. § 377.30.

286. Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Kahl, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors:

    a. Knew or had reason to know that Hayden required medical care;

    b. Knew or had reason to know that Hayden's need for medical care was immediate; and

    c. Failed to take reasonable action to summon medical care.

287. Regarding (a), Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew or had reason to know that Hayden required medical care for a multitude of reasons, including but not limited to: the potential for "occult injury" after his serious car collision, lack of full medical clearance prior to booking, requests for water at intake and self-reports of being thirsty, suspected recent drug use, suspected drugs in his body, low BMI, abnormally high blood pressure and pulse, disorganized thinking, confusion, and altered thought process that did not dissipate with time, disheveled appearance and improper dress, an unclean cell, inability to confirm

44

his name in court or understand court proceedings, falling and inability to walk, inability to speak at times, non-responsiveness toward staff despite moving his legs, and the appearance of obvious, unexplained wounds that had not been present at intake.

288.    Regarding (b), Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors knew or should have known of Hayden's need for medical care was immediate because of all of the circumstances and symptoms described above.

289.    Regarding (c), Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors failed to take reasonable action to summon medical care by: booking Hayden into jail instead of sending him back to the hospital despite signs he was at substantial risk of harm, by choosing not to house Hayden in a medical observation cell, sober cell, or psychiatric cell, and by failing to summon medical care throughout his time in custody despite obvious, grave signs of illness.

290.    Pursuant to Cal. Gov. Code §§ 845.6 and 815.2, Defendant County is liable because Defendants Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors were at all times acting within the scope of their employment.

291.    Defendant Martinez is liable for Doe Deputies' failure to summon medical care, as described above, and due to their negligent supervision and training of employees regarding when to summon medical care.

292.    Defendants are not immune from liability pursuant to Cal. Gov. Code § 844.6, which is inapplicable to allegations for failure to summon medical care arising under § 845.6. *See Hart v. Orange Cnty.*, 254 Cal. App. 2d 302, 306 (Ct.

App. 1967); *Sanders v. Yuba Cnty.*, 247 Cal. App. 2d 748, 754 (Ct. App. 1967); *Greer v. Cnty. of San Diego*, No. 19CV378-JO-DEB, 2023 WL 2316203, at *15 (S.D. Cal. Mar. 1, 2023) (stating § 845.6 claims for failure to summon medical care are excepted from § 844.6's grant of immunity).

293.   Defendants' conduct was an actual and proximate cause of Hayden's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

294.   Plaintiffs Sabrina and Timothy Schuck seek compensatory damages for Hayden's pain and suffering prior to his death, *see* Cal. Civ. Proc. § 377.34(b), as well as damages for his death.

## VII.

## SEVENTH CAUSE OF ACTION

## Negligence

**(By Plaintiffs as Successors-in-Interest Against County, Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Kahl, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP)**

295.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

296.   Plaintiffs allege this claim as successors in interest pursuant to Cal. Civ. Proc. § 377.30.

297.   All individual defendants owed Hayden a duty of reasonable care as "jailers" due to Hayden's position of dependence and vulnerability in the jail context.

298.   As alleged above, Defendants breached that duty.  Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors negligently failed to recognize, document, and monitor Hayden's serious medical needs and failed to summon medical treatment.  Doe Deputies, Doe Medical Providers, and Doe Deputy

Supervisors failed to provide and place Hayden in proper housing to ensure proper monitoring of Hayden's medical needs.  Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors violated multiple County policies applicable to deputies and staff of the Medical Services Division as alleged above.

299.   Defendants Martinez, Montgomery, negligently failed to ensure that all detainees exhibiting signs of intoxication, withdrawal, or medical distress receive proper medical care, including an appropriate treatment plan, evaluation by a physician, and continuity of care despite their knowledge of woefully inadequate care of past detainees, a high rate of substance use prior to booking, and a high rate of in-custody deaths.

300.   All individual defendants failed to avoid violating Plaintiff's constitutional rights pursuant to the Fourteenth Amendment as alleged above.

301.   The County is vicariously liable for the conduct of Defendants Martinez, Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Doe Deputies, Doe Medical Providers, and Doe Deputy Supervisors.

302.   Defendant CHP is vicariously liable for the conduct its employees, agents, and contractors, who were acting within the scope of their employment, including Defendant Kahl.

303.   Pursuant to Gov. Code § 855.8, the individual defendants, who were acting within the scope of their employment, are liable for failing to use due care and proximately causing Hayden's injuries due to their negligence and wrongful acts and omissions in providing such treatment.

304.   Hayden's injury and death were foreseeable results of Defendants' negligence.

305.   Defendants' negligence was the actual and proximate cause of Hayden's pain, suffering, and ultimate death.

306.   Plaintiffs, Hayden's successors-in-interest, seek compensatory damages including for Hayden's pain and suffering prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).

## VIII.

## EIGHTH CAUSE OF ACTION

## Negligence: Negligent Training and Supervision[8]

## (By Plaintiffs as Successors-in-Interest Against Defendants County, Montgomery, Gore, Martinez, Doe Deputy Supervisors, CHP)

307.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

308.   Plaintiffs allege this claim as successors in interest pursuant to Cal. Civ. Proc. § 377.30.

309.   Defendants had a duty to use reasonable care in the training and supervision of its employees, deputies, sworn staff, contractors, and agents.

310.   Defendants had a duty to properly train and supervise its employees to use reasonable care in evaluating the health of and risks to detainees and determining the proper and adequate course of treatment for detainees in need of medical treatment.

311.   Defendants had a duty to properly train and supervise its employees to summon medical care for detainees whom they knew, or had reason to know, required medical care.

312.   Defendants failed to train their employees, contractors, and agents to properly evaluate the health of and risks to detainees at intake and while in custody, to identify serious symptoms of medical distress, to determine proper and

---

[8] Plaintiffs allege the instant claim as a separate cause of action for the sake of clarity, understanding that it constitutes a theory of liability for the overarching tort of negligence.

adequate courses of treatment for detainees in need of medical treatment, and how to summon and provide adequate medical care when necessary.

313.    Defendants knew their failure to adequately train their staff made it highly predictable and foreseeable that its employees and agents would engage in conduct that would cause detainees harm and result in additional deaths. Defendants knew of the County's disparately high rates of in-custody deaths, systemic failures, and the fact that the individual deputies and medical providers who they failed to properly train would come into contact with detainees.

314.    Defendants breached their duty of care such that Hayden's prolonged health crisis was deliberately ignored.

315.    The inadequacy of Defendants' training actually caused Hayden's pain, suffering, and death.  Had Defendants trained their employees, agents, and contractors properly, staff would have identified Hayden's need for medical care, furnished and/or summoned requisite care, and Hayden would not have suffered prolonged pain and would still be alive today.

316.    The County and CHP are vicariously liable for the conduct of individual defendants in supervisory and training positions who were acting within the scope of their employment: Defendants Montgomery, Gore, Martinez, and Doe Deputy Supervisors.

317.    As a direct, proximate, and foreseeable result of Defendants' breach of their duty of care, Plaintiffs suffered damages in an amount according to proof at the time of trial.

318.    Plaintiffs, Hayden's successors-in-interest, seek compensatory damages including for Hayden's pain and suffering prior to his death pursuant to Cal. Civ. Proc. § 377.34(b).

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT

# IX.

## NINTH CAUSE OF ACTION

### Wrongful Death

### (By Plaintiffs as Individuals Against County, Montgomery, Barrera, DeGuzman, Lymburn, Echon, Vivona, Mace, Amado, Valbuena, Page, Ramirez, Martinez, Kahl, Doe Deputies, Doe Medical Providers, Doe Deputy Supervisors, CHP)

319.   Plaintiffs allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs.

320.   Plaintiffs, as Hayden's parents, have standing to assert a claim for wrongful death.  Plaintiff had no spouse or issue.  *See* Cal. Civ. Proc. § 377.60; Ex. A.

321.   As alleged above, Defendants violated Gov. Code § 845.6, which constitutes "wrongful acts" within the meaning of § 377.60.

322.   As alleged above, Defendants violated § 1983 by showing deliberate indifference to Hayden's medical needs.  This constituted "wrongful acts" within the meaning of § 377.60.

323.   As alleged above, Defendants committed tortious (including negligent) conduct, which constituted "wrongful acts" within the meaning of § 377.60.  *See Lattimore v. Dickey*, 239 Cal.App.4th 959 (2015).

324.   Defendants' conduct constituted actual and proximate causes of Hayden's pain, suffering, and death, which were direct and foreseeable results of Defendants' conduct.

325.   Defendant County is liable for the conduct of the individual defendants who were acting within the scope of their employment with the County. *See* Cal. Gov. Code §§ 815.2, 845.6.

326.   Defendant CHP is vicariously liable for the conduct of its employees, agents, and contractors who were acting within the scope of their employment,

such as Kahl.  Kahl was at all relevant times acting within the scope of his employment with CHP.

327.    Plaintiffs Sabrina and Timothy Schuck seek economic and non-economic damages in an amount to be proven, including compensatory damages which include, but are not limited to, any coroner's fees and funeral expenses, emotional distress, loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against defendants as follows:

      a.    General and compensatory damages in an amount according to proof;

      b.    Punitive and exemplary damages against all individual defendants;

      c.    Civil penalties as provided by law;

      d.    Attorney fees pursuant to Cal. Civil Code § 52.1(b) and Cal. Civil Code § 52;

      e.    Costs and reasonable attorney fees pursuant to 42 U.S.C. § 1988;

      f.    All other damages, penalties, costs, and fees as allowed by Cal. Civ. Proc. §§ 377.20, 377.60, 1021.5

      g.    Costs;

      h.    And for all other and further relief as the Court may deem proper.

/ / /

/ / /

/ / /

/ / /

/ / /

THIRD AMENDED COMPLAINT

DATE: August 9, 2024                    MCKENZIE SCOTT, PC


                                By:   _/s/ Timothy A. Scott_____
                                      TIMOTHY A. SCOTT
                                      MICHELLE C. ANGELES
                                      LAUREN M. WILLIAMS
                                      Attorneys for Plaintiffs

THIRD AMENDED COMPLAINT