CLAUDIA G. SILVA, County Counsel (SBN 167868)
By STEVEN P. INMAN, II, Senior Deputy (SBN 227748)
SOFIA REZVANI, Senior Deputy (SBN 333447)
LINDSEY M. BURNETTE, Senior Deputy (SBN 294888)
Office of County Counsel, County of San Diego
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 884-2931
Facsimile: (619) 531-6005
Email: Steven.Inman@sdcounty.ca.gov

Attorneys for Defendants County of San Diego, William Gore, Kelly Martinez, Jon Montgomery, Jessica Ramirez, Justin Page, Allan Valbuena, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, and Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Estate of William Hayden Schuck; Sabrina Schuck; Timothy Schuck,<br><br>Plaintiffs,<br><br>v.<br><br>County of San Diego; Bill Gore, in his individual capacity; Kelly Martinez, in her individual capacity; Correctional Healthcare Partners (CHP) Jon Montgomery, DO, in his individual capacity; Jameelyn Barrera, in her individual capacity; Romeo Deguzman, in his individual capacity; Emily Lymburn, in her individual capacity; Carina Echon, in her individual capacity; Jennifer Vivona RN (#6338), in her Individual Capacity; Deputy Thomas Mace (#4324) in his individual capacity; Deputy Jeff Amado (#4193), in his individual capacity; Deputy Allan Valbuena, in his individual capacity; Deputy Justin Page, in his individual capacity; Deputy Jessica Ramirez, in her individual capacity; Nicholas Kahl, NP, in his individual capacity; Deputies Doe, in their individual capacities; Medical Providers Does 2-3, in their individual capacities; Deputy Supervisor Does 1-6, in their individual capacities,<br><br>Defendants. | No. 23-cv-00785-DMS-AHG<br><br>**COUNTY DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date: June 27, 2025<br>Time: 1:30 p.m.<br>Judge: Dana M. Sabraw<br>Courtroom: 13A<br><br>Magistrate Judge: Allison H. Goddard |

# Table of Contents


**I. INTRODUCTION** ..... 1

**II. STATEMENT OF FACTS** ..... 1

**III. STANDARD FOR SUMMARY JUDGMENT** ..... 7

**IV. PLAINTIFFS CANNOT MEET THE BURDEN TO SHOW CONDUCT THAT RISES TO THE LEVEL OF A CONSTITUTIONAL VIOLATION** ..... 8

- A. Deliberate Indifference is a High Standard ..... 8
- B. No Evidence Exists to Support a Deliberate Indifference Claim Against Jameelynn Barrera ..... 9
- C. No Evidence Supports a Deliberate Indifference Claim Against Nurse DeGuzman ..... 11
- D. Nurse Lymburn's Actions Show the Opposite of Deliberate Indifference ..... 11
- E. Deputy Valbuena Did Not Show Deliberate Indifference ..... 12
- F. Carina Echon Never Treated Schuck and was not Deliberately Indifferent ..... 12
- G. Nurse Vivona Similarly Never Treated Schuck and was not Deliberately Indifferent ..... 13
- H. Deputies Page and Ramirez Acted Reasonably ..... 13
- I. Deputies Amado and Mace Acted Reasonably ..... 14

**V. NO EVIDENCE EXISTS TO SHOW DELIBERATE INDIFFERENCE OR SUBSTANTIVE DUE PROCESS VIOLATIONS ON THE PART OF THE SUPERVISORY DEFENDANTS** ..... 14

**VI. PLAINTIFFS' MONELL CLAIM FAILS BECAUSE THEY CANNOT ESTABLISH THE EXISTENCE OF A CONSTITUTIONAL VIOLATION** 16

**VII. PLAINTIFFS' BANE ACT CLAIM FAILS BECAUSE CANNOT SHOW DELIBERATE INDIFFERENCE** ..... 17

**VIII. PLAINTIFFS CANNOT SHOW A FAILURE TO SUMMON MEDICAL CARE** ..... 17

**IX. PLAINTIFFS LAW CLAIMS FOR NEGLIGENCE. WRONGFUL DEATH, AND NEGLIGENT SUPERVISION AND TRAINING ARE ALSO PRECLUDED BY STATUTORY IMMUNITY** ..... 19

**X. PLAINTIFFS CANNOT PREVAIL ON THEIR NEGLIGENT SUPERVISION AND TRAINING CLAIM BECAUSE THEY CANNOT SHOW PERSONAL INVOLVEMENT** ..... 19

**XI. CONCLUSION** ..... 20

## Table of Authorities

**Cases** **Page(s)**

*Alexander v. Cmty. Hosp. of Long Beach*,
46 Cal. App. 5th 238 (2020) .... 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .... 8

*Barry v. Cnty. of Riverside*,
2022 WL 2063247 (C.D. Cal. May 11, 2022) .... 17

*Bousman v. Cnty. of San Diego*,
2024 WL 1496220 (S.D. Cal. Apr. 5, 2024) .... 19

*Castaneda v. Dep't of Corr. & Rehab.*,
212 Cal. App. 4th 1051 (2013) .... 18

*Castro v. County of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) .... 9

*Celotex v. Catrett*,
477 U.S. 317 (1986) .... 8

*Davis v. City of Ellensburg*,
869 F.2d 1230 (9th Cir. 1989) .... 16

*Dougherty v. City of Covina*,
654 F .3d 892 (9th Cir. 2011) .... 16

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*,
515 F.3d 1019 (9th Cir. 2008) .... 8

*Estelle v. Gamble*,
429 U.S. 97–06 (1976) .... 9

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) .... 10, 11, 14, 9

*Gordon v. Cty. of Orange*,
888 F.3d 1118 (9th Cir. 2018) .... 9

*Lapachet v. Cal. Forensic Med. Grp., Inc.*,
313 F. Supp. 3d 1183 (E.D. Cal. 2018) .... 18

*May v. Cnty. of Monterey*,
139 Cal. App. 3d 717 (1983) .... 19

*Porter v. Osborn*,
546 F .3d 1131 (9th Cir. 2008) .... 1, 2

*Reese v. Cnty. of Sacramento*,
888 F.3d 1030 (9th Cir. 2018) .... 17

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) .... 9

## Table of Authorities

## (continued)

**Cases** **Page(s)**

*Russell v. Lumitap*,
31 F.4th 729 (9th Cir. 2022) .......... 10-11

*SEC v. Seaboard*,
677 F.2d 1301 (9th Cir. 1982) .......... 8

*Shapley v. Nev. Bd. of State Prison Comm'rs*,
766 F.2d 404 (9th Cir. 1985) .......... 9

*Sierra Med. Servs. All. v. Kent*,
883 F.3d 1216 (9th Cir. 2018) .......... 8

*Watkins v. City of Oakland*,
145 F.3d 1087 (9th Cir.1998) .......... 14-15

**Statutes**

Cal. Civ. Code § 52.1 .......... 17

Govt. Code § 845.6 .......... 17, 18

Govt. Code § 844.6 .......... 19

Penal Code § 1368 .......... 4, 5, 6, 7

**Rules**

Fed. R. Civ. P. 56 .......... 7

## I. INTRODUCTION

William Hayden Schuck's tragic death resulted from his decision to take illicit drugs, his refusal to disclose those drugs upon intake at the San Diego Central Jail, and his refusal against medical advice to be evaluated in an Emergency Room. The Medical Examiner listed his cause of death as "complications of cocaine and methylenedioxymethamphetamine (MDMA) toxicity" (MDMA is commonly known as "ecstasy").

In an attempt to present Schuck's cause of death as something that would appear more preventable, Plaintiffs made this case about just one of the listed complications of Schuck's drug toxicity: dehydration. They have done so despite no evidence that Schuck lacked access to water in the jail, and without any consideration of the other drug toxicity complications that contributed to Schuck's death.

While a factual dispute may exist as to Schuck's cause of death, no evidence exists to show that any of the individual defendants acted with deliberate indifference or even negligence. As the evidence recited below demonstrates, none of them had reason to believe that Schuck was experiencing a medical emergency or in need of immediate care. Thus, no reasonable jury could find deliberate indifference or a violation of substantive due process rights. *Porter v. Osborn*, 546 F .3d 1131, 1137 (9th Cir. 2008) (holding that deliberate indifference is also the test for substantive due process claims when the situation allowed time for deliberation). And statutory immunities precludes Plaintiffs other claims. Accordingly, defendants are entitled to summary judgment.

## II. STATEMENT OF FACTS

On March 10, 2022, San Diego police arrested William Hayden Schuck ("Schuck") for driving under the influence of a controlled substance after Schuck was involved in a traffic collision. Exh. A at p. 32:11-21.[1] The collision was a roll-over, but Schuck said he was fine, and the arresting officer believed he was in good enough

[1] Citations are to County Defendants' Compendium of Exhibits in Support of Motion for summary Judgment.

condition to perform the field sobriety test after he had been seen by paramedics. *Id*. at p. 35:11-17. No one on-scene believed Schuck was in medical distress.

When an SDPD officer transported Schuck to the San Diego Central Jail, a nurse initially "gate refused" him because detainees that have been in an accident with air bag deployment must be medically cleared at a hospital prior to booking. Exh. B at p. 3 (CSD633). The officer took Schuck to the Emergency Department at UCSD where Schuck declined treatment and was discharged against medical advice. Exh. B at p. 17. While Schuck's blood pressure was elevated and he had not undergone a thorough evaluation at the ER, UCSD doctors did not express any concerns regarding his condition. Exh. C at p. 40:7-13. The transporting officer believed that he had nothing to report medical-wise when he returned to book Schuck into the jail. Exh. C at p. 40:7-13.

After SDPD officers, the paramedics, and the ER staff had expressed no concerns regarding Schuck's medical condition (as set forth above), the intake nurse, Defendant Barrera, saw no sign of medical distress either and found Schuck "fit for booking." Exh. B at p. 13. Barrera asked Schuck a series of questions that are on the jail intake forms. Schuck told Barrera he had ADHD, but he denied alcohol and drug use. Exh. B at at pp. 12-13.

Schuck did seem altered in that he asked to take photos of his medical records with his phone camera (which broke in the accident) and asked for $20 to give the nurse for water. Exh. B at p. 15. But Barrera testified that when a patient displays a disorganized thought process, she looks at the patient as a whole: and in this case she saw nothing medically wrong with Schuck apart from a slightly elevated blood pressure. Exh. D at p. 55:14-24. Nevertheless, out of her concern regarding Schuck's disorganized thought process, she scheduled an appointment with a mental health clinician. Exh. B at p. 15.

/ /

/ /

/ /

Although Schuck had refused to be evaluated at the ER, Nurse Barrera admitted him for booking because she saw nothing physically wrong with him and did not believe it was in his best interest to be ping-ponged back and forth between the ER and the Jail. Exh. D at p. 116:3-14. He appeared medically stable, with no trauma, bleeding, broken bones, or outward signs that he was in need of care. *Id*.

Due to the COVID intake quarantine and its impact on housing, Schuck was unable to move from a holding cell to a regular housing floor for several days. On March 15, 2022, Schuck had a court appearance for his arraignment. When deputies went to his cell they found food on the floor and saw that Schuck had smeared food across the walls and windows. Exh. E at p. 15:4-15. Schuck's shirt was also soiled with an unknown substance, and he was not wearing pants. *Id*. The deputies believed that some of the material in Schuck cell might be feces because it had a strong smell. *Id*. at 15:18-16:10. They decided to take Schuck to Medical (the clinic in the jail) to be evaluated. *Id*. at 18:1-5.

At the clinic, Defendant Nurse DeGuzman cleaned Schuck for court, treated his wounds, and evaluated him. Exh. F (DeGuzman Depo) at p. 29:11-30:8. DeGuzman found Schuck to be alert, responsive, ambulatory, and walking okay. *Id*. at pp. 41:24-43:7. Schuck made non-sensical statements, but he did not exhibit signs of drug withdrawal. *Id*. DeGuzman asked him if he used drugs, and he replied that he had used acid on the streets. *Id*. at 47:16-48:1. But he was uncooperative and did not provide information regarding the type if drug he was calling "acid." *Id*. at 47:16-48:1.

DeGuzman took Schuck's vital signs and respirations, made sure he was scheduled for a psychiatrist or mental health clinician due to his nonsensical statements, and put him on the sick call list for would care. *Id*. at 44:23-45:17. Like the paramedics, the SDPD officers, the ER staff, and Nurse Barrera, DeGuzman did not believe that Schuck was in medical distress or in need of immediate care—he only believed Schuck to be mentally unwell. *Id*. at p. 124:14-19.

/ /

No evidence exists that Schuck displayed any physical ailments at his arraignment either—just suspected mental illness. Exhs. J & W; RFJN at ¶ 1; Houk Decl. at Exh. 1. The judge referenced Penal Code section 1368, the mental competency statute and issued a referral for Schuck to be "screened for medications"—not to receive medical treatment. *Id*. Schuck's public defender, Steven Trenholme, also kept contemporaneous notes from the hearing and did not notate any physical concerns. Houk Decl., Exh. 1 (voicemail transcript). He saw nothing to make him believe that Schuck was physically ill or experiencing physical symptoms. *Id*. Trenholme is also familiar with the symptoms of drug withdrawal and did not believe Schuck was experiencing withdrawal symptoms. *Id*. He requested court intervention only because he was concerned that Schuck might be suffering from mental illness—not any type of medical distress. *Id*.

When Schuck returned from court, the transporting deputy brought him to Defendant Deputy Allan Valbuena, the deputy in charge of receiving detainees that were coming back from court. Exh. G at pp. 54:23-55:5. While waiting for Deputy Valbuena, the transportation deputy asked Schuck if he wanted to sit down and Schuck, who was chained, used the wall to slide into a sitting position and wait. *Id*. at 91:5-18. When Deputy Valbuena arrived, the transportation deputy told him that Schuck "was acting odd and weird" and not really talking. *Id*. at 57:6-16.

Based on Schuck's odd behavior—and not any sign of medical distress—the transportation deputy said he felt that Schuck should see Medical, and Deputy Valbuena agreed. They brought Schuck up to the second floor where Deputy Valbuena repeated the same information to a floor deputy and said that Schuck should see Medical. *Id*. at p. 59:4-60:11.

Like the paramedics, the SDPD officers, the ER staff, Nurse Barrera, Nurse DeGuzman, and the deputy public defender, Deputy Valbuena did not believe that Schuck was in medical distress or had an urgent medical need. Valbuena testified, "[By] my observation, he was fine. He was talking . . . I asked him what was going on with him. He mentioned he was thirsty and, you know, just tired." Exh. H at pp. 43:20-44:4.

Schuck was chained, so Deputy Valbuena and the transportation deputy helped him to his feet; and "then he walked just fine [for someone in leg chains] to the second floor." *Id*. at 49:9-24. They took him to his cell and Deputy Valbuena directed him to the water fountain inside. *Id*. at 51:2-24.

That evening, after doctors on-staff had gone home for the day, Defendant Nurse Carina Echon received the court order from the arraignment via facsimile. She received it, reviewed it, documented her review of it, and made sure that Schuck would be seen the following day: She saw that Schuck already had an appointment for wound care that Nurse DeGuzman had scheduled). Exh. I at pp. 75:7 – 76:1.

The court order said, "The Court refers defendant to jail medical to be screened for medications." Exh. J. Nurse Echon saw nothing in the court order to indicate that Schuck needed immediate medical attention or that signaled any type of urgency. Exh. I at p. 75:7-76:1 & 81:3-11; Exh. S (Ojo Depo Vol. 1) at pp. 95:11-23; 98:2-100:4. Like the paramedics, the SDPD officers, the ER staff, Nurse Barrera, Nurse DeGuzman, the deputy public defender, and Deputy Valbuena, Nurse Echon saw nothing to indicate that Schuck was in medical distress or in need of immediate care. Exh. I (Echon Depo) at p. 82:18-25.

Around the same time, Defendants Deputies Page and Ramirez took Schuck from his holding cell on the second floor to a housing module on the seventh floor that had become available for him. Exh. K at pp. 12:22-13:22. Deputy Page had conducted Schuck's classification interview earlier; and he had referred him for an outpatient psychiatric eval based on his odd behavior Exh. L at p. 63:2-22.

While the deputies escorted Schuck to the 7th floor, Schuck followed directions but acted in a childlike manner. Exh. K at p. 51:4-16. He pretended to canoe to the deputies, and in the elevator he put his leg on the handrail and said he was Spiderman. *Id*. at pp. 51:4-16 & 79:14-80:2. As the deputies approached the housing module with Schuck, he started saying that he needed to pee, moved his hips back and forth to attempt to lower pants, dropped his weight, and went down to the ground. *Id*. at 102:2-103:6;

Exh. L at 73:24-76:18. The deputies then got Schuck to stand-up and walked him to the module where he immediately began peeing after entering his cell. Exh. K at p. 103:7-11.

Defendants Page and Ramirez believed that Schuck was fine physically. Deputy Ramirez testified, “He followed instructions. Skin tone dry. He wasn’t flush or anything out of the ordinary. He wasn’t bleeding. Visually to me he looked fine except the fact that he had abnormal behavior.” *Id*. at pp. 66:24-67:18. Like the paramedics, the SDPD officers, ER staff, Nurse Barrera, Nurse DeGuzman, the deputy public defender, Deputy Valbuena and Nurse Echon, they had no reason to believe that Schuck was in medical distress or needed immediate medical attention.

Schuck received hourly safety checks on the seventh floor. In the early morning (March 16, 2022) the checks were conducted by Defendants Deputies Amado and Mace. During one of the safety checks Deputy Amado observed Schuck standing up and facing away. Exh. M at p. 27:2-16. While conducting a later safety check he saw Schuck lying in his bunk facing the other direction. *Id*. at pp. 40:20-41:3. Deputy Amado asked Schuck if he was okay. *Id*. Schuck nodded and then turned back. *Id*.

A little after 8:00 a.m. Nurse Palmeda, LVN came by to get Schuck’s signature on a release of information form so that jail staff could communicate with Schuck’s mother about his care. Defendant Deputy Mace, who was doing safety checks, accompanied her. Exh. N at 77:8-24. When Deputy Mace banged on the cell door, Schuck rolled over and said “fuck you” or “fuck off.” *Id*. at 15:15-16:4; 18:20-20; 107:18-108:6.

Nurse Palmeda, LVN informed Defendant Nurse Lymburn, RN (the next level of care) regarding sores she saw on Schuck’s body that the deputies were also concerned about, and Nurse Lymburn then approached the cell to attempt to get Schuck’s signature and to perform a wellness check. Nurse DeGuzman. Exh. O at pp.11:23 – 12:5. The wellness check was to check with drug withdrawal after Schuck had reported “acid drugs” to Nurse DeGuzman. Exh. O at pp.11:23 – 12:5.

From the cell window, Nurse Lymburn noted that Schuck’s respirations appeared even and unlabored, but he was turned away and had multiple pressure sores on his

buttocks and legs. Exh B. She wanted to make sure he okay by seeing if he could follow directions, so she asked him to move his legs, which he did. Exh. O at p. 65: 15-22.

Nurse Lymburn remained concerned about Schuck, and after seeing her next patient she went downstairs to the medical to tell the clinic deputy that Schuck needed to be seen in the clinic. Exh. O at p. 65: 15-22. Nurse DeGuzman had already put Schuck on the list to be seen by Defendant Nurse Vivona for wound care, but Nurse Lymburn told Nurse Vivona that she should have the clinic deputy bring Schuck down to the clinic now. Exh. P at p. 53:15 – 54:14.

Nurse Vivona immediately sent the clinic deputy, Deputy Cortez, to get Schuck and bring him to the clinic. *Id*. at p. 53:15-22. Ordinarily, patients are brought down floor by floor—and they had not yet gotten to the 7th floor—but Nurse Vivona decided to have Schuck brought now due to the concerns Nurse Lymburn expressed. *Id*. at 55:5-9.

Deputy Cortez went up to the 7th floor to retrieve Schuck from his cell. Through the window, he could see Schuck naked on the bottom bunk, facing away from him. Exh. Q at p. 73:9-13. After calling Schuck's name 3-4 times, he called for Defendant Deputies Amado and Mace. They entered the cell, found Schuck unresponsive, and then pulled him out of the cell to attempt Narcan, CPR, and other lifesaving efforts. *Id*. at pp. 74:15-18; 76:7-15; 85:10-86:16. Nurses and paramedics also responded but Schuck was pronounced dead at the jail.

The Medical Examiner determined that Schuck's death to be accidental, and listed the cause of death as complications of cocaine and meth toxicity with dehydration and a history of polysubstance abuse. Exh. R (Medical Examiner Report). More specifically, the Medical Examiner's report states that Schuck "likely died of a sudden cardiac arrest (arrhythmia) due to complications of mixed drug toxicity including dehydration, pressure ulcers, and early bronchopneumonia. *Id*.

## III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its

very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment: the requirement is that no genuine issue of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (Italics in original).

A fact is considered "material" if it "affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *SEC v. Seaboard*, 677 F.2d 1301, 1306 (9th Cir. 1982). Whereas "[f]actual disputes that are irrelevant or unnecessary" to that inquiry "will not be counted." *Anderson*, 477 U.S. at 248. A dispute about a material fact is only "genuine," and thus precludes summary judgment, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To this end, the parties bear the same substantial burden of proof on summary judgment as would apply at trial, including plaintiff's burden to establish each essential element to her case. *See e.g*., *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

"Where, as here, the party moving for summary judgment is not the party that bears the burden of proof at trial, it may secure summary judgment by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (emphasis added). It follows that, to defeat summary judgment, a plaintiff cannot merely rely on the allegations contained in the pleadings, "but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) (internal quotations omitted) (emphasis added). Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323-24.

## IV. PLAINTIFFS CANNOT MEET THE BURDEN TO SHOW CONDUCT THAT RISES TO THE LEVEL OF A CONSTITUTIONAL VIOLATION

### A. Deliberate Indifference is a High Standard

Deliberate indifference is a high standard. It requires a plaintiff to show that (i) the

defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

The third element requires a plaintiff to show "objectively unreasonable" conduct. *Id*. This requires showing conduct involving "more than negligence but less than subjective intent—something akin to reckless disregard." *Id*. (*quoting Castro v. County of* Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc)); *see also, e.g., Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020).

The "reckless disregard" standard itself is "a formidable one." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021). As the Ninth Circuit has stated, "Neither mere lack of due care, nor an inadvertent failure to provide adequate medical care, nor even medical malpractice, without more, is sufficient to meet this standard." *Id*. (*citing Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). "Instead, a plaintiff must show that the defendant disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *Id*. (quotation marks omitted). Moreover, for deliberate indifference, there must be a purposeful act or failure to act on the part of the defendant and resulting harm. *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

B. <u>No Evidence Exists to Support a Deliberate Indifference Claim Against Jameelynn Barrera</u>

No reasonable jury could conclude that Nurse Barrera acted with deliberate indifference. No facts existed that should have caused her to perceive any substantial risk to Schuck's health or safety. It was not objectively unreasonable for her to permit Schuck's booking when she saw nothing physically wrong with him, he had denied

treatment at UCSD and sending him back to UCSD would have left him ping ponging back and forth between the two facilities—an unreasonable result.

While Nurse Barrera did note Schuck's altered mental status, that is not unusual at the jail—where upwards of 30% of detainees are experiencing mental illness—and certainly not unusual for someone who had just been arrested for driving under the influence. For that reason, in situations involving altered mental status, Nurse Barrera would evaluate the patient as a whole. Exh. D at p. 55:14-24.

Plaintiffs may argue that Nurse Barrera could have sent Schuck for secondary screening at intake, which is available when a detainee shows mild or moderate symptoms. But the correct standard for deliberate indifference is not that the official did not take steps that could have been taken—it is that the official acted in a way that was objectively unreasonable. *Fraihat*, 16 F.4th at 636. Further, Schuck displayed no mild or moderate symptoms except the altered mental status, which Nurse Barrera testified that she evaluates based on the patients as whole (with such a large percentage of detainees experiencing mental illness). Nevertheless, she still scheduled Schuck to be seen by a mental health clinician.

Schuck was also untruthful about the drugs he had taken. No withdrawal protocols exist for cocaine and ecstasy (protocols exist for opiates and fentanyl) but, regardless, Barrera had incomplete information upon which to evaluate the potential risks due to Schuck's own omissions when responding to questions. Moreover, the transporting SDPD officer came back with Schuck from the ER with nothing to report. Had the ER doctor seen something concerning, it's reasonable to assume that he would have included it in the after-visit summary.

If Nurse Barrera should have perceived a substantial risk to Schuck when nothing was physically apparent, she had misinformation from Schuck, and Schuck had just come from the Emergency Department with no concerns reported by the doctor or transporting officer, then she should be entitled to qualified immunity because no established case law establishes liability in such a situation. *Russell v. Lumitap*, 31 F.4th 729, 740 (9th Cir.

2022) ("to determine whether the defendants are entitled to qualified immunity . . . we conduct "an objective examination of whether established case law would make clear to every reasonable official that the defendant's *conduct* was unlawful in the situation he confronted."). Accordingly, Nurse Barrera has no liability for deliberate indifference.

C. No Evidence Supports a Deliberate Indifference Claim Against Nurse DeGuzman

Plaintiffs similarly lack evidence to show deliberate indifference by Nurse DeGuzman. The only physical ailment he saw were Schuck's wounds, which he cleaned and treated before scheduling Schuck to also receive regular wound care the next day. He also took action on Schuck's altered mental status by making sure that Schuck had been scheduled for psychiatry or a mental health clinician. The other issue that came up was Schuck's use of "acid drugs," but the drug withdrawal protocols are for fentanyl and opiates, and Nurse Lymburn still came to do a wellness check on Schuck in response to the report of "acid drugs." Schuck was not forthcoming with Nurse DeGuzman about what drugs he was on, but Nurse DeGuzman acted on everything he saw, and did not believe Schuck was in medical distress: he was alert, responsive, ambulatory. Thus, Nurse DeGuzman's actions were objectively reasonable and no deliberate indifference occurred.

D. Nurse Lymburn's Actions Show the Opposite of Deliberate Indifference

Nurse Lymburn took action. After an LVN nurse raised concerns to her about Schuck and Nurse Lymburn confirmed those concerns through her own observations of Schuck, she went down to the clinic and told the clinic deputy and Nurse Vivona that Schuck needed to be seen then (rather than waiting for the clinic deputy to come and get him in the ordinary course of the day). Plaintiffs may argue that she could have called 911 first or refrained from seeing her last patient before going to the clinic, but again the standard is not what could have been done but whether she acted reasonably *Fraihat*, 16 F.4th at 636. The clinic deputy came down to get Schuck less than an hour after the LVN first escalated her concerns to Nurse Lymburn. No reasonable jury could conclude that

Nurse Lymburn did not act reasonably. She saw that Schuck's respirations were even and unlabored and he was not in medical distress.

E. Deputy Valbuena Did Not Show Deliberate Indifference

Deputy Valbuena and the transportation deputy acted appropriately in the manner described above because they had a concern about Schuck's odd behavior and asked that a floor deputy take Schuck to Medical. Deputy Valbuena was the out courts deputy and worked in the area where detainees arrive back from court. He would not have been familiar with the second floor where he and the transportation deputy (bus driver) took Schuck back to his holding cell. It was reasonable, therefore, for Deputy Valbuena to tell the second floor deputy what was happening and that Schuck needed to see Medical. Exh. H at. p. 55:4-18. Plaintiffs may argue that Valbuena should have taken Schuck himself. But that is not the standard and the floor deputy was responsible for deputies on that floor. Had he seen that Schuck needed immediate care, he may have acted differently, but Valbuena "saw nothing medical or anything else going on with him—to Valbuena he appeared fine. Exh. H at 40:5-41:3, 43:20-44:9, & 44:10-45:3.

F. Carina Echon Never Treated Schuck and was not Deliberately Indifferent

The addition of Nurse Echon as a party to this case is perplexing. She received an order from the Court after-hours (after the doctors had left) that said only that Schuck was being referred to be "screened for medications." She made a record of it and would have scheduled Schuck for an appointment the next day. She didn't because she saw that Schuck already had an appointment for the next day. She knew that during the wound care appointment the nurse would go over with Schuck all of his medications. Had the court order contained anything to signal urgency or that Schuck needed to see Medical asap, she would have called the housing deputy to bring Schuck to the clinic as soon as possible. Exh. I at 111:15 – 112:5. She had received such orders in the past that said "asap" or "immediately." This is contained no such language, but only a vague instruction.

/ /

Nurse Echon acted on the order even though the order was so vague that Plaintiffs' own expert testified that he would not have known what to do with it (i.e., if the order just said "screen for medications"). Exh. S at 95:11-23; 98:2-100:4. If even Plaintiffs' own expert would be confused, no reasonable jury could conclude that Nurse Echon was deliberately indifferent in her handling of the order.

G. <u>Nurse Vivona Similarly Never Treated Schuck and was not Deliberately Indifferent</u>

Nurse Vivona is another party who should not have been named in this lawsuit. Schuck was on her list for wound care on the day of his death. She had no information to lead her to believe that he needed to be seen before the other patients on her list that day, and the visit was just for "wound care". But as soon as Nurse Lymburn told her that she should bring Schuck down and see him now, she immediately sent the clinic deputy down to get him. Exh. P at pp. 53:15-54:14. The clinic had only been open a half hour when Schuck died, and Nurse Vivona had no knowledge of any excessive risk Schuck might face until Nurse Lymburn escalated Schuck's need to be seen. No grounds exist to find that she acted with deliberate indifference.

H. <u>Deputies Page and Ramirez Acted Reasonably</u>

Neither Deputy Page nor Deputy Ramirez had any reason to perceive any substantial risk to Schuck either. Deputy Page had referred him for an outpatient psychiatric evaluation based on his odd behavior—an action that does not reflect deliberate indifference. And while Schuck behaved oddly and even childlike, Deputy Page did not believe he was in medical distress and Deputy Ramirez saw nothing about him physically that caused her concern. Exh. L at pp. 76:2-7 & 82:11-83:18 & Exh. K at pp. 66:24-67:18. Their testimonies are consistent that Schuck needed to pee and that he dropped his weight while they were walking with him to housing. Exh. L at pp. 73:24-76:18 & Exh. K at pp. 102:2-103:6. As is apparent from his standing up and his ability to walk before and after, no evidence exists that the incident was part of any medical distress or that any excessive risk to Schuck was apparent.

I. Deputies Amado and Mace Acted Reasonably

Plaintiffs can show no deliberate indifference on the part of Deputies Amado and Mace. The evidence shows only that they conducted their safety checks in accordance with Sheriff's policies. Exh. N at pp. 74:3-8; 127:8-128:18; & 129:22-130:5. Both were able to communicate with Schuck. *Id*. at pp. 15:15-16:4 & 18:3-20; Exh. M at pp. 40:20-41:3. No evidence exists that either of them saw any reason to believe that Schuck was in need of care (other than care for his pressure wounds) and no evidence exists that they saw anything to lead them to believe that Schuck was at substantial risk of harm. And no evidence exists that they acted unreasonably.

Defendants lack evidence to show that any of the individual defendants had a reason to believe that Schuck was in distress or at substantial risk of harm. While Defendants believe no evidence exists to raise an issue of fact at this issue, the County ask that the Court consider the arguments as to each individual defendant as they all differed greatly in their roles and in the durations of time they spent with Mr. Schuck. Nevertheless, the County defendants assert that Plaintiffs cannot meet the high standard of deliberate indifference and cannot prove that any constitutional violation occurred as to their deliberate indifference claim and their substantive due process claim. The County asks that the Court grant summary judgment as to these claims.

## V. NO EVIDENCE EXISTS TO SHOW DELIBERATE INDIFFERENCE OR SUBSTANTIVE DUE PROCESS VIOLATIONS ON THE PART OF THE SUPERVISORY DEFENDANTS

The evidence in the case could not support a finding of deliberate indifference or substantive due process violations on the part of the Supervisory Defendants either (Sheriff Gore, Sheriff Martinez, and Chief Medical Officer Jon Montgomery, D.O.). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)

(internal alteration and quotation marks omitted). No evidence exists in this case, however, that any of the Supervisory Defendants were personally involved in the training, supervision, or control of any of the individual defendants named in this action (and Sheriff Gore retired in February 2022, shortly before Schuck's death).

The evidence in this case also shows that rather than acquiesce or show indifference to constitutional rights, the Supervisory Defendants were working to improve care and reduce deaths in the jails. For example. While Plaintiffs seek to rely on the California state auditor report to support their claims, the evidence in the case shows that the state auditors' recommendations were all items that the Sheriff's Office itself had identified for the auditors and had told them that they were working on—processes that they were already working to get into place. Exh. U at p. 88:1-11.

As Dr. Montgomery testified, the auditors recommendations consisted of "procedures that were already in -- under consideration·and were already evolving at the time that the audit was·made." Exh. V at. p. 49:6-25. Neither the audit report nor other evidence exists to create a question of fact as to whether the Supervisory Defendants were already working on the areas that the auditors parroted back to them in the report.

Apart from a couple of antidotal examples, the audit report does not contain factual support for the conclusions stated within it. Plaintiffs' correctional medicine expert, Olugbenga B. Ojo, M.D., conceded that he did not know what data the auditors relied upon other than the number of in-custody deaths, and he had no information as to whether the auditors' discussion of death rates appropriately took into account demographics and length of stay information (*e.g.*, metrics based on average daily population could involve many more people where lengths of stays are shorter; and suicide rates may vary among different demographics). Exh. S at pp. 124:21-128:7 & Exh. T at p. 82:8-14.

Plaintiffs deliberate indifference, substantive due process and Monell claims likewise rely on a report from the National Commission on Correctional Healthcare (NCCHC). No court has ever held, however, that NCCHC standards are a constitutional

floor. In fact, Dr. Ojo could not name a single prison or jail facility accredited as complying with all of the NCCHC standards—including facilities he oversees. Exh. S at pp. 13:1-14:7, 68:19-69:14; Exh. T at p. 80:3-11. As Dr. Montgomery testified, the NCCHC was invited to the jail to provide recommendations and see how San Diego County Jails compare to NCCHC standards (an effort to improve): "It wasn't an audit or an inspection of any·sort.· So there certainly wouldn't have been any·indication of a failure or not meeting any standards Exh. V at. pp. 25:24-26:15. Thus, the evidence shows that rather than acquiesce or show reckless or callous indifference the Supervisory Defendants were reasonably working on improvements. No deliberate indifference or substantive due process claim is viable under such circumstances.

## VI. PLAINTIFFS' MONELL CLAIM FAILS BECAUSE THEY CANNOT ESTABLISH THE EXISTENCE OF A CONSTITUTIONAL VIOLATION

Plaintiffs' *Monell* claim fails for the reasons stated above: Plaintiffs cannot show deliberate indifference or substantive due process violations by any of the individual defendants, including the Supervisory Defendants. To establish a *Monell* claim, Plaintiffs must prove (1) that Schuck possessed a constitutional right of which he was deprived; (2) that the County had a policy; (3) that the policy amounted to deliberate indifference to Schuck's constitutional right; and (4) that the policy was the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F .3d 892, 900 (9th Cir. 2011). Without a finding that any constitutional violation occurred, Plaintiffs cannot satisfy these elements.

Additionally, a single occurrence of unconstitutional conduct is not sufficient to establish the existence of policy. No evidence exists of other in custody deaths in situations in which the detainee had refused evaluation, had withheld information about his drug use, and showed no physical sign of a need for immediate care. *See Davis v. City of Ellensburg*, 869 F.2d 1230, 1233-34 (9th Cir. 1989). This tragedy was singular and no evidence exists to show that it resulted from any policy or de facto policy alleged in the pleadings. Plaintiffs' *Monell* claim fails.

## VII. PLAINTIFFS' BANE ACT CLAIM FAILS BECAUSE CANNOT SHOW DELIBERATE INDIFFERENCE

Plaintiffs lack of evidence of deliberate indifference is also fatal to their Bane Act claim. To prove a Bane Act violation, the Plaintiffs must show a violation of Schuck's rights by threat, intimidation, or coercion. Cal. Civ. Code § 52.1. This requires a showing of intent. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) (the Bane Act's requirement for interference with rights by "threat, intimidation or coercion," connotes an element of intent). The intent element can be met by showing a defendant's deliberate indifference to serious medical needs. *Barry v. Cnty. of Riverside*, 2022 WL 2063247, at *7 (C.D. Cal. May 11, 2022). Where the Plaintiffs lack evidence to show deliberate indifference to medical needs, however, the intent requirement is not met. *Id*. Even if, arguendo, jail staff did not do everything that they could, without evidence to show that they intended to violate Schuck's rights or were deliberately indifferent to Schuck's medical needs, Plaintiffs cannot prevail on their Bane Act claim.

## VIII. PLAINTIFFS CANNOT SHOW A FAILURE TO SUMMON MEDICAL CARE

Multiple reasons exist for why Plaintiffs cannot prevail on their failure to summon medical care claim either. The first is that some of the defendants this claim was brought against did not see Schuck or have any reason to know that he needed care: these include the Supervisory Defendants, Nurse Echon, and Nurse Vivona.

Second, California Government Code section 845.6 precludes this claim unless the defendant, "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." As detailed above, none of the individual defendants saw any reason to think that Schuck needed immediate medical care—nor did the paramedics at the scene of the accident, the SDPD officers, the deputy public defender, or the court (which ordered solely that Schuck be "screened for medications."

/ /

Third, some of the defendants that Plaintiffs have asserted the failure to summon medical care claim against are, in fact, "medical care" themselves—the nurses. Nurses that provided care to Schuck (e.g.., Nurse Barrera and Nurse DeGuzman) cannot be sued for failure to summon medical care on the basis that the care they provided was inadequate. *Lapachet v. Cal. Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1197 (E.D. Cal. 2018) ("California law is clear that inadequate medical treatment does not provide the basis for asserting a claim under§ 845.6 as long as medical treatment was in fact provided."). "[T]he failure . . . to provide further treatment, or to ensure further diagnosis or treatment, or to monitor [an inmate] or follow up on his progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to *summon* medical care. C*astaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1072 (2013). Thus, Plaintiffs cannot prevail on the claim as to these defendants.

Fourth, and finally, while none of the individual defendants saw a reason to believe that Schuck needed immediate care, all of them summoned further care, Nurse Barrera made an appointment for the mental health clinician; Nurse DeGuzman provided care, made an appointment for wound care, and made sure Schuck had an appointment scheduled with a mental health clinician or psychology; Nurse Echon made sure Schuck had an appointment for the following day; Deputy Valbuena told a deputy that Schuck needed to go to Medical; Deputy Page listed Schuck for an psych evaluation; Deputies Mace and Amado expressed their concerns to Nurse Lymburn (as did the LVN); Nurse Lymburn went to the clinic and told Nurse Vivona that Schuck needed to be seen at the clinic, and Nurse Vivona immediately sent the clinic deputy to bring Schuck to the clinic. Each took action. The failure to summon medical care claim is not supported by the applicable legal standards or the evidence.

/ /

/ /

/ /

## IX. PLAINTIFFS LAW CLAIMS FOR NEGLIGENCE. WRONGFUL DEATH, AND NEGLIGENT SUPERVISION AND TRAINING ARE ALSO PRECLUDED BY STATUTORY IMMUNITY

Plaintiffs remaining state law claims are also precluded by statutory immunity. Government Code section 844.6 typically bars wrongful death and related negligence claims regarding the death of an inmate. See *May v. Cnty. of Monterey*, 139 Cal. App. 3d 717, 720 (1983). Pursuant to the immunities for inmate injuries in the Government Code,

> public entities cannot be held liable for wrongfully or negligently injuring prisoners but public employees can be; unless (2) the prisoner's injury resulted from a failure to furnish medical care (in which case, neither the public employee or public entity are liable); except (3) when the public employee knew or had reason to know that the injured prisoner was in need of immediate medical care and failed to take reasonable action to summon such medical care.

*Bousman v. Cnty. of San Dieg*o, 2024 WL 1496220, at *11 (S.D. Cal. Apr. 5, 2024).

As previously stated, this immunity applies as to each individual defendant because none of them knew or had reason to know that Schuck was in immediate need of care. This immunity also applies to Plaintiffs' negligent training and supervision claim because the claim seeks damages for the injury to/death of Schuck.

## X. PLAINTIFFS CANNOT PREVAIL ON THEIR NEGLIGENT SUPERVISION AND TRAINING CLAIM BECAUSE THEY CANNOT SHOW PERSONAL INVOLVEMENT

Even in the absence of the statutory immunity, Plaintiffs could not prevail against Sheriff Gore, Sheriff Martinez, or Dr. Montgomery on their negligent training and supervision claim. Under California law, an employer or supervisor can only be liable for negligent supervision if they know or have reason to believe that an employee is unfit, or if they fail to use reasonable care to discover the employee's unfitness. *Alexander v. Cmty. Hosp. of Long Beach*, 46 Cal. App. 5th 238, 253 (2020). No evidence exists that any of the Supervisory Defendants had personal involvement in the training and

supervision of any of the other individual defendants. For that reason also, in addition to the statutory immunities, this claim fails.

## XI. CONCLUSION

Schuck's tragic death was a surprise to all who had interacted with him. As illustrated by the foregoing, no evidence has emerged in this case to show that any nurse or deputy had a reason to believe that Schuck faced any substantial risk of harm, let alone death. While defendants regret Schuck's death, they are each entitled to summary judgment because the standard of deliberate indifference has not been met and state law immunities preclude Plaintiff's state law claims, which also fail on other grounds. Defendants request that the Court grant their motion for summary judgment.

Respectfully submitted,

DATED: May 30, 2025

CLAUDIA G. SILVA, County Counsel

By: s/STEVEN P. INMAN, II, Senior Deputy
Attorneys for Defendants County of San Diego, William Gore, Kelly Martinez, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, Allan Valbuena, Jessica Ramirez, Justin Page and Jeff Amado