# EXHIBIT A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Case No. 3:23-cv-00785-DMS-AHG

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF BORISH WONG

San Diego, California

Wednesday, June 26, 2024

REPORTED BY:

NATALIE M. KHAMIS
CSR NO. 14260
JOB NO. 1038222
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOGRAPHER: Thank you, Counsel.
Would the reporter please swear in the witness.
(Sworn by the court reporter.)
THE WITNESS: Yes, I do.
BORISH WONG,
having been first duly sworn, testified as follows:
EXAMINATION
BY MS. WILLIAMS:
Q. All right. And, again, I'm Lauren Williams. I am one of the attorneys representing the plaintiffs in this case.
First, I just kind of want to go over sort of some ground rules and basic kind of information.
So, Officer Wong, have you used any other names? No? So Borish Wong is your --
A. It's my legal name.
Q. -- your legal name. And you've never used any other, like, nicknames or aliases that --
A. I mean, I had in high school. It was my Chinese name.
Q. Oh, okay.
A. Yeah. But I -- when I became a citizen, I changed my name. So...
Q. Oh, okay. And have -- so can you tell us what that name was?

A. I -- sorry, I -- before we start, I request -- we request the medics to come back -- this would be the second time I believe medics actually came back to the scene. And they spoke to him. And I -- if I recall correctly, he said he was fine. He was fine. That's when I performed the field sobriety tests and asked him those questions.

So at that particular time, I wasn't concerning that he may have a head injury at that time, once I start my field sobriety test.

Q. Once you started your field sobriety test, you thought that the paramedics had -- had cleared him?

A. Yeah. And also he verbally say, like, he was fine. So maybe --

Q. Okay.

A. Yeah. I thought he was good enough to do the field sobriety test.

Q. Okay. But you -- again, I don't want to misstate your prior testimony -- but you did not see exactly how the paramedics assessed him; is that right?

A. Yeah, I don't recall, like, how detailed they were. I don't recall that part.

Q. Do you recall off the top of your head or from reading your report some of Hayden's responses to the standardized questions that seemed off or sort of

REPORTER'S CERTIFICATION

I, Natalie M. Khamis, CSR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 12th day of July, 2024.

Natalie M. Khamis

Natalie M. Khamis, CSR,

CSR No. 14260

# EXHIBIT B

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 1:52:16 PM PDT

## MEDICAL SERVICES - Completed by: Manuel Nozawa RN on 3/10/2022 4:56:42 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | [redacted] | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | | | | |

☐ Refused

☑ Patient is willing to sign, but is unable to sign

English

**MEDICAL SERVICES**

**Inmates have the right to access medical, dental, and psychiatric care:**

**Emergency: Contact the nearest corrections officer and he/she will call for a nurse.**

**Non-emergency: You may request a Medical/Dental Request Form from the nurse at medication pass. These forms are to request medical assistance and must be turned into the nurse during medication pass for triage (review) of the complaint.**

**Medical/Dental Request Forms: The forms are available from the nurse twice daily. The sick call nurse will triage (review) the forms. The sick call/charge nurse, who will assess your symptoms within 24-72 hours after your form has been picked up, will see you. If he/she cannot address your symptoms or complaints through nursing protocols, you will be referred to the next available physician or physician assistant sick call.**

**Medical Request/Grievance Forms: If you are not satisfied with any aspect of your health care, you have the right to request information or send a grievance to the contracted Medical Services provider, Health Services Administrator, for an investigation and response to your complaint.**

**Medical/Dental Access and Medication Fee Policy Statement:**

**No inmate will be refused medical treatment because of inability to pay. A Medical/Dental Access and Medication Fee may be charged to the Inmate's Trust Account for medical care provided. For non-chronic care requests, the medical access fee process begins with the sick call/charge nurse assessment of the problem. There is no charge for referral to the physician or follow-up care; however, if medication is prescribed or renewed by the sick call/charge nurse or physician, there will be an additional medication fee assessed. If an inmate requests emergency care that is determined not to be an emergency condition, that inmate may be charged a Medical Access Fee for calling a false emergency. The determination of the condition will be made by medical/nursing staff and the inmate will be informed of the assessed charge.**

**Any complaints regarding the Medical/Dental Access and/or the Medication Fee policies should be addressed to Jail Administration.**

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 1:53:37 PM PDT

## GATE REFUSAL - Completed by: Manuel Nozawa RN on 3/10/2022 4:57:41 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | [redacted] | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | | | | |

**One or more medical or psychiatric conditions have been identified during the intake screening process that raise potential concerns about the patient's medical condition, and the ability to safely provide for the health and welfare of the patient within a correctional environment. Due to the functional restrictions of an outpatient primary care facility, we request further medical review and assessment for the following observed medical conditions**

Situation/Background:

Involved in Motor vehicular accident. Airbag deployed. SDCJ asking for medical clearance to continue Incarceration

### Atypical values

- ☐ Neurologic condition (Altered mental status, affected cognition, r/o head injury or neurologic deficit)
- ☐ Elevated blood pressure (R/O illicit substances, coarctation, stroke, s/s of end organ system damage)
- ☐ Low blood pressure (concern for distributive shock [sepsis, anaphylaxis, adrenal crisis, etc.])

- ☐ Tachycardia/bradycardia
- ☐ Poor oxygen saturation
- ☐ Other concerns:
- ☐ Elevated blood glucose (concern for DKA, HHS)

Other:

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | **Height(in)** | **Weight** | **BMI** | **MAP** | | | |
| | | | NA | | | | |

### Emergency Room

Facility: Provider:
Clinical findings: Discharge diagnosis:

### Discharge summary/Narrative:

☐ Admitted ☐ AMA ☐ Medically/Psychiatrically cleared

Recommendation:

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:54 PM PDT

## MEDICAL CLEARANCE - Completed by: Jameelyn Barrera RN on 3/10/2022 9:21:00 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | [redacted] | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 144 / 94 | 97.5 | 118 | 18 | 100 | na | na | 6 |
| **Height(in)** | **Weight** | **BMI** | **MAP** | | | | |
| 2 | 131 | 16.8 | 110.67 | | | | |

### Does the screener observe, or is the inmate demonstrating any of the following?

☐ In need of Emergency Medical Treatment due to injury, excessive bleeding, extreme pain, or unconsciousness?

Describe:

☐ Hallucinating, delusional, nonsensical, unresponsive, confused, paranoid, altered mental status, or inappropriate conduct?

Describe:

☐ Intoxicated, in withdrawal, slurred speech, unsteady gait, stupor, tremulous, sweating, anxious, abnormal breathing, or hyperventilating?

Describe:

☐ Voicing current, or very recent, suicidal thoughts?

Describe:

☐ Disoriented to person, place, time, and/or situation?

Describe:

☐ Head injuries or fainting/passing out in the last 72 hours

### Please provide details of injury and/or symptoms below

Prior to your arrest, did you swallow or hide any drugs in any body cavity?

☐ Yes

- [x] No
- [ ] No Response

Fit to Continue Booking Process?

- [x] Yes
- [ ] No

- [ ] Rec To ISP - Immediate
- [ ] Rec To ISP – Post Screen
- [ ] Rec To Sobering Cell - Immediate
- [ ] Rec To Sobering Cell – Post Screen
- [ ] Gate refusal

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:55 PM PDT

**RECEIVING SCREENING** - Completed by: Jameelyn Barrera RN on 3/10/2022 9:25:32 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | [redacted] | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

- [x] Patient is willing to sign, but unable to sign
- [ ] Refused

Current Allergies

No Known Drug Allergy

*****************************************************************************************************************

**Screeners: All questions in this form must be addressed. For questions with a single checkbox, by leaving the checkbox unselected, you are documenting your conclusion that all parameters of the question are false. By selecting the checkbox, you are acknowledging a positive response to the item and further documentation must be provided in the corresponding questions and text boxes.**

*****************************************************************************************************************

**ARRESTING OFFICER QUESTIONS--Select and Document all that apply**

---

Arresting Agency? SDPD - SAN DIEGO POLICE DEPARTMENT

Officer's Name?

Wong

Officer's Badge #?

7277

Is the attending officer aware of any Illness or Injuries?

- [ ] Yes
- [x] No

Is the attending officer aware of any Current/Recent Suicidal Ideation?

- [ ] Yes
- [x] No

Is the attending officer aware of any signs that the patient is under the influence of Drugs or Alcohol?

☐ Yes
☑ No

Is the attending officer aware of any Combative, Assaultive or Extremely Hostile Behavior?

☐ Yes
☑ No

Is the attending officer aware of any Treatment by Medical Personnel in the Field?

☐ Yes
☑ No

Was a PERT Evaluation performed surrounding the arrest?

☐ Yes
☑ No

Do you have any additional information to help us care for the patient's health and safety?

☐ Yes
☑ No

During the initial call, was there any indication of a mental health concern?

☐ Yes
☑ No
☐ NA

**GENDER IDENTITY--Select and Document all that apply**

---

Do You Identify as Transgender?

☐ Yes
☑ No

☐ Transgender - Male Gender ☐ Transgender - Female ☐ Transgender - Non-Binary

**CHRONIC CONDITIONS--Select and Document all that apply**

---

**Neurological**

☐ Seizures

**Respiratory**

☐ Asthma

**Cardiovascular**

☐ Hyperlipidemia ☐ Hypertension

**Endocrine**

☐ Diabetes

**Infectious Disease**

☐ HIV ☐ Tuberculosis

**Behavioral Health Chronic Care**

☐ Mood Disorders ☐ Psychotic Disorders

**Hematology/Oncology**

☐ Dialysis

**If the item below is checked, the patient has a pending TB workup from an incarceration within the last 6 months. This patient will be added to the TB Workup queue in Admissions/Discharge, and a Medical Chart Review sick call will be scheduled.**

☐ TB Workup
☐ Other

**GENERAL MEDICAL ASSESSMENTS–Select and Document all that apply**

---

☐ Current medications or treatments

Current Medications:

☐ Yes
☑ No

| Medication | Strength | Filling Pharmacy | Address | Phone Number | Frequency | Last Dose | Last Fill Date |
|---|---|---|---|---|---|---|---|

☑ Past medical or psychiatric hospitalizations?

**List location, time and reason for each**

UCSD for MVA clearance 3/10/11- pt refused

☐ Dental issues requiring Dentist Sick Call appointment

**Describe**

Does the patient have any active infections or contagious illnesses?

- ☐ Yes
- ☑ No
- ☐ No Response

- ☐ General-fever, lethargy, weight loss, loss of appetite, night sweats
- ☐ Skin-Lesions, needle marks, abscesses, bruises, rash, jaundice, lice, trauma, scars, tattos
- ☐ Pulmonary-Persistent cough, coughing up blood

Have you traveled outside of the United States in the past weeks or months?

- ☐ Yes
- ☑ No

Does the inmate have issues with mobility (Cane, Wheelchair, Prosthetics, Crutches, Splints)?

- ☐ Yes
- ☑ No
- ☐ No Response

- ☐ Crutches
- ☐ Cane
- ☐ Wheelchair
- ☐ Prosthetics

Does the individual have other limitations like hearing, visual, communication?

- ☐ Yes
- ☑ No
- ☐ No Response

- ☐ Hearing (Category ADM)
- ☐ Visual (Category ADM)
- ☐ Communications (Category ADM)

Do you have any other medical conditions or problems?

- ☐ Yes
- ☑ No
- ☐ No Response

**MENTAL HEALTH SCREENING–Select and Document all that apply**

Is the patient a state hospital returnee?

☐ Yes
☑ No

Was the patient evaluated at the EPU in conjunction with this arrest?

☐ Yes
☑ No

## Mental Health History

Are you a client of the regional center for the developmentally disabled, or have you been in special educational classes in school?

☐ Yes
☑ No
☐ No Response

☐ PSU
☐ In Custody Suicide Attempt
☐ History of ISP
☐ History of JBCT
☐ State Hospital Returnee

Have you ever been a victim of sexual assault while incarcerated or in the community?

☐ Yes
☑ No
☐ No Response

## Columbia-Suicide Severity Rating Scale

1) Have you wished you were dead or wished you could go to sleep and not wake up?

☐ Yes
☑ No

2) Have you had any actual thoughts of killing yourself?

☐ Yes
☑ No

3) Have you been thinking about how you might do this?

☐ Yes
☐ No

4) Have you had these thoughts and had some intention of acting on them?

☐ Yes
☐ No

5) Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

☐ Yes
☐ No

6) Have you ever done anything, started to do anything, or prepared to do anything to end your life?

- [ ] Yes
- [x] No

**How long ago did you do any of these?**

- ○ Over a year ago?
- ○ Between three months and a year ago?
- ○ Within the last three months?

---

**Additional Suicide Risk Questions**

Have you recently experienced a significant loss (relationship, death of a family member/close friend, job, etc.)?

- [ ] Yes
- [x] No
- [ ] No Response

Has a family member or close friend ever attempted or committed suicide?

- [ ] Yes
- [x] No
- [ ] No Response

Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?

- [ ] Yes
- [x] No
- [ ] No Response

**SUBSTANCE USE ASSESSMENTS--Select and Document all that apply**

---

History or risk of alcohol or drug withdrawal?

- [ ] Yes
- [x] No
- [ ] No Response

Recent use of alcohol, heroin, prescription pain medications or sedatives?

- [ ] Yes
- [x] No
- [ ] No Response

**Most recent alcohol, sedative, or opiate use:**

○ 5 days or less
○ 6 days or greater

Use of any other illegal drugs?

☐ Yes
☑ No
☐ No Response

Have you been in a detox program or substance abuse treatment program in the last 90 days?

☐ Yes
☑ No
☐ No Response

**MISCELLANEOUS ASSESSMENTS–Select and Document all that apply**

---

**Does the inmate have any of the following:**

☐ Medicaid/MediCAL
☐ Medicare
☐ Private Health Insurance

Insurance Carrier(s):

Plan Name:

**DISPOSITION/TREATMENT PLAN–Select and Document all that apply**

---

☑ Medical Sick Call needed

☐ Release signed to obtain all medical records, pharmacy records, substance abuse records

☑ Oral Hygiene Instructions Provided

**Housing Assignment:**

☐ Infirmary/MOB ☐ PSU ☐ OPSD
☐ Med ISO ☐ Med Mainline

Fit to Continue Booking Process?

☑ Yes
☐ No

- [x] Clinically Screened – Cleared to Class
- [ ] 2nd Stage Nurse Evaluation/NAP
- [ ] Rec To ISP
- [ ] Rec To Sobering Cell
- [ ] Gate Refusal

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:03:36 PM PDT

**Sick Calls - SCHUCK, WILLIAM 22709797**

| Name | Scheduled Date | Reason | Completed Date |
|---|---|---|---|
| QMHP | 3/12/2022 | Pt reports that he has ADHD. Denied AH/VH/SI/HI. During intake, pt making grandiose statements and is not understanding booking process- asking to take photos of his medical records with his phone (which per officers, was 'in pieces' d/t his car accident), and is asking for "$20 to give to the nurse for some water." | |
| Medical Chart Review | 3/15/2022 | Review scanned discharge order from UCSD | 3/15/2022 |
| Medical Doctor Sick Call | 3/16/2022 | Mandown 7th floor | |
| Registered Nurse Sick Call | 3/16/2022 | Wellness check, claimed uses Acid drugs? in the street | 3/16/2022 |
| Dental Sick Call | 1/4/2023 | Dental Sick Call scheduled from Receiving Screening | |

SOAP NOTE BY: Jameelyn Barrera RN POSTED ON 3/10/2022 9:29:14 PM PST Type: RN NOTE

**Subjective**

**Objective**

| BP: | Temp: | Pulse: | Resp: 18 | Wt: 131 | Sa02: | BS: na | Pain: |
|---|---|---|---|---|---|---|---|
| 144/94 | 97.5 | 118 | | | 100 | | |

**Assessment**

**Plan**

covid test done at intake

| Diagnostic Name | Scheduled Date | Doctor |
|---|---|---|
| SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR | 3/10/2022 12:00:00 AM PST | Montgomery, Jon DO |

Addendum:

SOAP NOTE BY: Romeo DeGuzman RN POSTED ON 3/15/2022 8:45:08 AM PDT Type: MEDICAL CLEARANCE

**Subjective**

C/O ADHD, uses Acid drugs? in the street

**Objective**

| BP: | Temp: | Pulse: 76 | Resp: 18 | Wt: | Sa02: | BS: | Pain: |
|---|---|---|---|---|---|---|---|
| 148/96 | 97.8 | | | | | | |

Alert and verbally responsive, not in respiratory distress, afebrile, ambulatory. With difficulty in following direction, disorganized, non sensical, disheveled, with soiled t shirt not wearing pants. With dry blood to T shirt and both lower extrmeties, cleansed with NS. Wound to Right shin healing well, no s/s of infection. Denies taking medication. No suicidal / self harming gestures noted. Going to court this morning per sworn staff. Instructed to notify staff for any changes in health condition

**Assessment**

Altered Thought process

**Plan**

Wound care
Psych eval

| Diagnostic Name | Scheduled Date | Doctor |
|---|---|---|
| SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR | 3/10/2022 12:00:00 AM PST | Montgomery, Jon DO |

Addendum:

Nicholas Kahl NP POSTED ON 3/15/2022 4:12:59 PM PDT Type: NP NOTE

MDCC:
Review scanned discharge order from UCSD

DC summary from UCSD reviewed
Pt sent to UCSD for eval after MVA. Per record "patient refusing medical evaluation, has decision-making capacity".
No new orders.

> ROI for full records:
- please obtain ROI for Full records from ER visit to include all physician notes

Addendum:

Carina Echon RN POSTED ON 3/15/2022 9:42:12 PM PDT Type: RCC

Received court order for referral to jail medical,IP refused MDSC today

Addendum:

SOAP NOTE BY: Emily Lymburn RN POSTED ON 3/16/2022 10:37:10 AM PDT Type: RN NOTE

**Subjective**

Late entry

RNSC
Wellness check, claimed uses Acid drugs? in the street

**Objective**

BP: / Temp: Pulse: Resp: Wt: Sa02: BS: Pain:

Pt. was seen @ approx between 9:30-9:40 (?) for RNSC

Patient observed lying on bed naked, facing the wall with blanket on his side. Respirations even and unlabored, NAD. Patient refused to engage despite multiple tries to talk to him, did not acknowledge staff. Pt. kept moving his lower extremeties but kept facing the wall.
Noted multiple pressure sores on his tailbone, buttocks, elbows and legs.

**Assessment**

Impaired skin integrity
Alteration in helath maintenance

**Plan**

22709797

UC San Diego Health

# AFTER VISIT SUMMARY

**William Schuck** MRN: 31939359 [redacted]

3/10/2022 Hillcrest Emergency 619-543-6222

## Instructions

Patient refusing medical evaluation, has medical decision-making capacity

No obvious external signs of trauma or illness but occult injury is possible given mechanism

**Follow up with Brian Y Kim, MD**
Why: As needed
Specialty: Family Practice, Sports Medicine
Contact: 101 THE CITY DR
Orange CA 92868
714-456-5705

## Today's Visit

You were seen by Binh Thanh Ly, MD

**Reason for Visit**
MVA

**Diagnosis**
Motor vehicle accident, initial encounter

Blood Pressure
142/102

Temperature
98.1 °F

Pulse
95

Respiration
15

Oxygen Saturation
99%

## What's Next

You currently have no upcoming appointments scheduled.

# Your Medication List

## ASK your doctor about these medications

ASK **amphetamine-dextroamphetamine** 15 MG Extended-Release capsule
Commonly known as: ADDERALL XR

ASK **sulfacetamide** 10 % ophthalmic solution
Commonly known as: Bleph-10
Quantity: 1 bottle
Place 1 drop into right eye every 4 hours.

## MyChart

Sign up for access to our MyUCSDChart patient web portal. With an account, you can access your health information online, view most lab test results, securely exchange messages with your clinic, request appointments, access our free mobile app, and more.

To sign up for MyUCSDChart, please call Customer Support at 619-543-5220 (24/7)) or visit our web page at myucsdchart.ucsd.edu and click "Sign Up Now". Or, click Create Account if activation code provided below.

Activation code not generated
Current MyChart Status: Active

## Allergies as of 3/10/2022

No Known Allergies

## Be Fast! Know stroke warning signs

## Be Fast! Know stroke warning signs (continued)




Remember **BE FAST** for warning signs of stroke. These symptoms may represent a serious problem that is an emergency. Do not wait to see if the symptoms will go away. Get medical help right away. Call 911. Do not drive yourself to the hospital. Get help right away if you or a loved one has any of these signs.

Hang this image on your fridge for quick and easy reference!

## Additional Information

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

### Daily Summary of Test Results Available on MyChart

If you have a MyChart account, you can now receive a single, daily notification of any new test results. Our new Daily Digest makes it easy and convenient for you to receive any new test result notifications once a day between 8 and 10 a.m., Monday through Friday, excluding holidays.

### Prepare for your Care

UC San Diego Health asks all of our patients to have a voice in your medical care by spending a few moments on https://prepareforyourcare.org where you can learn about and complete your advance directives in just a few easy steps.

## Billing and Insurance Information

We're here to help. For billing questions. Call **855-827-3633**, 9a.m. to 6 p.m. Weekdays, or email askus@ucsd.edu

## Your feedback is important to us

We strive to provide every patient with an exceptional patient care experience. In the next few days, you may receive an email or phone survey about your most recent visit. Your feedback is important to us, and we ask that you please complete this survey to help us enhance the experience at UC San Diego Health for all of our patients. You may also call our We Listen line at (619) 543-5678 to share compliments, concerns or suggestions. Please call your physician's office for any medical concerns. If you have a medical emergency, call 911. Thank you!

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | |
| Plaintiffs, | |
| vs. | No. 3:23-CV-00785-DMS-AHG |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193) IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES | |

2-3, IN THEIR INDIVIDUAL )
CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
Defendants. )
________________________________)

VIDEOTAPED DEPOSITION OF OFFICER LUIS PULIDO

San Diego, California

Monday, August 12, 2024

Reported by:
LORI M. BROWN
CSR No. 12614
JOB No. 1117606

of Defendant Correctional Healthcare Partners.

THE VIDEOGRAPHER: Thank you, Counsel.

Madam Court Reporter, would you please swear in the witness.

OFFICER LUIS PULIDO,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. MELLANO:

Q All right. Hi, Officer Pulido.
A Hello.
Q Like I mentioned -- oh, that's okay. Like I mentioned, my name's Lauren. I represent the plaintiffs in this matter.
Have you ever had your deposition taken before?
A No.
Q No. Okay. Have you ever testified in court?
A Yes.
Q Okay. So the oath you took today is the same oath that would apply in court.
Do you have any questions about that?

paperwork from the hospital.

Q Okay. Did you explain to them that he was behaving erratically?

A No.

Q Why not?

A Because at that point he had calmed down.

Q Isn't it important to -- well, are you trained to let them know that -- whether somebody seems to be under the influence so that they know that?

A No, but they -- they do ask us if we have anything to report. I take that to mean anything medical-wise, and I did not.

Q So you don't think that it's -- you just didn't think that it was relevant medically whether or not he was under the influence of drugs or alcohol?

A That he was rejected for whatever reason and we went to the hospital and we're back with the clearance. But generally I -- I don't remember what I would have told them. Normally the second time back I don't have a conversation with them. I just give them the paperwork.

Q The first time around, did the medical staff ask you any questions?

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not required.

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 28, 2024.

Lori M. Brown

LORI M. BROWN

CSR No. 12614

Dismantling of transcript will void Reporter's certificate.

56

# EXHIBIT D

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs.

CASE NO. 23-cv-00785DMS-AHG

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY;

DEFENDANT MEDICAL PROVIDERS )
DOES 2-3, IN THEIR INDIVIDUAL )
CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
Defendants. )
______________________________)

VIDEOTAPED DEPOSITION OF JAMEELYN BARRERA

Tuesday, May 7, 2024

10:10 a.m.

(Pages 1 through 151, Inclusive)

Volume 1

REPORTED BY:
LEYLA S. JONES, CSR 12750

09:20 defendants.

09:20 MS. SCHULER: Katie Schuler on behalf of Correctional Healthcare Partners and Nicholas Kahl.

09:20 MR. SCOTT: Tim Scott for Plaintiffs.

09:20 MS. ANGELES: Michelle Angeles for Plaintiffs.

09:20 THE VIDEOGRAPHER: We are ready to proceed. The court reporter today is Leyla Jones with Steno.

09:20 Would the reporter please swear in the witness.

09:20 JAMEELYN BARRERA,

09:20 having been first duly sworn, was examined and testified as follows:

09:20 THE WITNESS: Yes, I do.

09:20 THE VIDEOGRAPHER: Please begin.

09:20 EXAMINATION

09:20 BY MS. ANGELES:

09:20 Q. Good morning, Ms. Barrera. Am I pronouncing your name correctly?

09:20 A. Yes.

09:20 Q. So we're here to take your deposition today. Before we begin, I just wanted to ask, did you review anything or do anything to prepare for your testimony today?

09:21 A. Yeah. I had a meeting with the lawyers

correct?

A. Yes.

Q. And -- or if they're not medically fit for -- and -- for acceptance --

A. Yes.

Q. -- correct?

And is that -- is that consistent with I(C) [sic] or your understanding of I(C)?

A. Yes.

Q. So you might reject somebody if they're delirious or they're sort of saying random things or if you feel like there's a serious mental health issue?

A. I'm sorry. Can you say that question one more time?

Q. Sure. If you see someone who's very delirious or exhibiting signs of severe mental illness, is that -- is that a reason why you might reject somebody?

MR. INMAN: Objection. Vague.

THE WITNESS: How should I answer this? So for the exhibiting signs and symptoms of excited delirium, yes. For the disorganization of thoughts, I look at the patient as a whole.

12:29 like a back-and-forth between the hospital and the
12:29 jail.
12:29 Q. Okay. Is there -- in a situation where you
12:29 think the person should go back to the hospital but
12:29 they are refusing care, what do you do in that
12:29 situation?
12:29 A. Well, we can't force them to accept
12:29 treatment. So if he -- if the patient is clinically
12:29 stable, then we can take him into the jail.
12:29 Q. And what tells you if they're clinically
12:30 stable?
12:30 A. Based on their vital signs, outward
12:30 appearance, so no obvious signs of trauma/broken
12:30 bones/bleeding.
12:30 Q. Okay. And there --
12:30 MS. ANGELES: Madam Court Reporter, can you
12:30 repeat her last answer.
12:30 (Record read.)
12:30 BY MS. ANGELES:
12:30 Q. If you observed any of those things that
12:30 you are -- listed, then where would you direct them
12:30 to if you -- if they're not allowing for medical
12:31 care at the -- at the hospital, if they're refusing
12:31 medical care at the hospital and you have concerns
12:31 about their medical condition?

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

I, Leyla S. Jones, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: May 22, 2024

Leyla S. Jones CSR No. 12750

Job No. 934452
Date: May 07, 2024
Witness Name: JAMEELYN BARRERA
Case Caption: ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 27 day of May, 2024.

__________________________
Signature JAMEELYN BARRERA

PAGE 1 OF 3

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3:23-CV-00785-DMS-AHG

\- - -

ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck, et al.,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.

---

VIDEOTAPED DEPOSITION OF DEPUTY KYLE C. HOLMAN

---

DATE TAKEN: Friday, March 28, 2025

TIME BEGAN: 10:31 a.m. Pacific

TIME ENDED: 12:26 p.m. Pacific

LOCATION: Conducted via videoconference

REPORTED BY: Cherie J. Anderson, RMR, RPR, CRR
Steno
315 West 9th Street, Suite 807
Los Angeles, CA 90015
(310) 573-8380
NV FIRM# 108F

Would the reporter please swear in the witness.

THE COURT REPORTER: Yes, sir. I have a brief statement to make: The parties and their counsel agree that while I am a licensed notary, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.

The attorneys appearing in this deposition further acknowledge that I am not physically present in the deposition room, that I will be reporting on this deposition remotely, and that I will administer the oath to the witness remotely.

If any party does have an objection to this manner of reporting or anything stated above, please state so now.

Hearing none, we can proceed.

Deputy Holman, please raise your right hand. I will swear you in. Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth, please?

THE WITNESS: Yes, ma'am.

THE COURT REPORTER: Thank you.

We may proceed.

/ / /

10:45:47 Q Okay. So you were the first person to do an 11-53 on his cell at that time?
10:45:59 A During that shift, yes.
10:46:01 Q Yes. During that check. Okay. And -- okay. So please describe then what you saw at that time.
10:46:10 A After I approached the cell, I saw that the IP in question was talking to himself, he wasn't wearing pants, and there was food smothered around the walls and windows of the cell.
10:46:26 Q Okay. And was there food -- so it was on the windows and the walls of the cell. Anywhere else? Was it on his body as well or on the floor?
10:46:38 A His clothes -- T-shirt that he was wearing appeared to be soiled with some unknown substance. But yeah, there was food on the floor as well.
10:46:53 Q Okay. And did his shirt appear to be wet?
10:46:56 A I don't recall that.
10:46:58 Q And I know there was mention in your email -- and we can go over that in more detail later, but in your email, you mentioned feces. Can you describe in more detail what you saw in that regard.
10:47:13 A So I mentioned the word fecal matter and feces in the email you're referencing solely because of the smell of the cell just because it had a -- essentially an odor inside. So that's the only

10:47:28 reason I put the word feces was just the smell of the
10:47:32 cell.
10:47:32 Q Okay. And you had written that it appeared to
10:47:34 be fecal matter. Can you describe what you saw that
10:47:39 appeared to be fecal matter?
10:47:42 A It's not so much what I saw. Like I said, it
10:47:45 was what I smelled inside the cell. It smelled
10:47:48 fairly pungent, so I figured maybe it could have been
10:47:51 fecal matter, but I only wrote that strictly because
10:47:55 of the smell. It's not that I physically saw it.
10:47:57 Q Okay. Okay. And what did you overhear him
10:48:06 saying to himself, if anything?
10:48:10 A I don't recall any specific statements he was
10:48:12 making to himself; I just remember that he was
10:48:14 talking to himself.
10:48:19 Q Okay. Did you -- what did you do next after
10:48:22 witnessing those -- making those observations?
10:48:29 A We escorted him to the second-floor medical
10:48:31 staff and secured him in a medical chair unit to get
10:48:34 him medically evaluated.
10:48:36 Q And sorry to be -- I'm sure this is annoying,
10:48:39 but I would like to go through it in as much detail
10:48:43 as possible. So were you by yourself when you did
10:48:48 the 11-53 at first?
10:48:54 A No, ma'am. I believe I was with several other

10:50:21 Q Okay. And did they agree or did anyone disagree? What were their responses?
10:50:26 A If I remember correctly, nobody disagreed. It was all in mutual agreement that, yeah, we should get this guy over to Medical and get him evaluated.
10:50:36 Q Okay. At that point in time, did you know that he was going to court later that day?
10:50:45 A I don't specifically remember when we were notified that the IP in question was scheduled for court. That's my best answer for that.
10:51:01 Q Okay. And then at what point then did you open the cell door? Did you do it pretty much immediately?
10:51:10 A Probably would have been, once we approached the cell door, within a 10- to 60-second window.
10:51:17 Q And when you -- well, did you enter the cell?
10:51:24 A I don't recall if I breached the threshold of the door to enter the cell, but I remember popping the door or someone -- one of the deputies with me did.
10:51:33 Q And is that when you noticed the smell of feces? When the door was opened?
10:51:39 A That's when I noticed the pungent odor coming from the cell, yes.
10:51:43 Q Okay. And -- but you don't recall whether you

CERTIFICATE OF REPORTER

I, Cherie J. Anderson, Registered Merit Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken remotely before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate, and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on this 28th day of March 2025, at Wilmington, New Hanover County, North Carolina.

Cherie J. Anderson, RMR, CRR
My Commission expires
December 22, 2026

# EXHIBIT F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY | Case No. 3:23-CV-00785-DMS-AHG<br><br>VIDEOTAPED DEPOSITION OF ROMEO DEGUZMAN, RN<br><br>JUNE 6, 2024<br><br>1350 Columbia Street<br>Suite 600<br>San Diego, California |

(#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

Videotaped Deposition of ROMEO DEGUZMAN, RN

San Diego, California

June 6, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938229

09:12:26 plaintiffs.

09:12:26 MS. ANGELES: Michelle Angeles, McKenzie Scott,

09:12:27 for the plaintiffs.

09:12:29 THE VIDEOGRAPHER: We are all ready to proceed.

09:12:30 Would the reporter please swear in the

09:12:48 witness.

ROMEO DEGUZMAN,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. ANGELES:

09:12:49 Q. Good morning, Mr. DeGuzman.

09:12:51 A. Good morning, Michelle.

09:12:52 Q. Good morning. So we are here today to take

09:12:57 your deposition. Have you ever participated in a

09:12:59 deposition before?

09:13:00 A. Yes, I did.

09:13:02 Q. When did you participate in that deposition?

09:13:06 A. Maybe more than ten years ago.

09:13:11 Q. And what was that regarding?

09:13:14 A. A different case.

09:13:17 Q. Related to your employment?

09:13:20 A. Yes.

09:13:21 Q. So were you testifying as a witness in an

09:49:26 Q. You are?
09:49:29 A. Yes.
09:49:30 Q. So on March 15, you know you were assigned to
09:49:36 medical screening. Do you remember any other
09:49:39 assignments that you had?
09:49:41 A. I don't remember what other assignment I had.
09:49:44 I can't remember now.
09:49:46 Q. Okay. Do you remember on March 15 how you
09:49:51 came to encounter Mr. Schuck?
09:49:54 A. Yes.
09:49:59 Q. Can you tell me about that?
09:50:01 A. The deputy asked me to -- told me that the
09:50:09 patient will go to court, and from I remember, he asked
09:50:18 me to check his wound and prepare the patient to go to
09:50:27 court.
09:50:27 Q. I'm sorry. I didn't catch that last part.
09:50:33 A. And prepare the patient because he's going to
09:50:36 court.
09:50:37 Q. What do you mean by "prepare the patient,"
09:50:43 what does that mean?
09:50:45 A. Because when I observe -- when the patient
09:50:51 was presented to me by the deputy, he was -- I still
09:51:00 remember -- he was not wearing pants, he's not
09:51:05 organized -- like the shirt was wet and with wound on
09:51:15 his lower leg.

09:51:23 Q. Okay. So when you say to "prepare the
09:51:26 patient," does that mean that you were cleaning up the
09:51:33 patient?
09:51:34 A. I have to make -- yeah, clean up the patient
09:51:38 because the wound -- we have to treat the wound over it
09:51:43 because it's like -- we have to treat the leg and
09:51:48 change the -- going to court, make sure the patient is
09:51:54 presentable to appear to the court.
09:51:57 Q. Why is it important that the patient be
09:52:01 presentable in court?
09:52:02 A. It's very important. Because, you know, we
09:52:10 cannot send the patient to court not wearing pants and
09:52:16 look untidy.
09:52:18 Q. I'm sorry. I didn't catch that last part.
09:52:19 A. Untidy, and the wound was not covered.
09:52:27 Q. So when you say that someone can't go to
09:52:42 court untidy, would you describe Mr. Schuck as untidy
09:52:49 on that date?
09:52:50 A. Yes.
09:52:53 Q. What about his appearance made him untidy?
09:52:57 A. Because like, first of all, he has -- not
09:53:04 wearing pants, walking without not wearing pants, and
09:53:08 then he's like -- his shirt with small -- small streak
09:53:15 of blood, not really clean, but -- not clean.
09:53:22 Q. Let me see if I understood you correctly. So

10:09:20 A. Yes.
10:09:20 Q. Besides cleaning his wound, what else did you do to prepare Mr. Schuck for court?
10:09:28 A. I gave him -- I gave him clothes to wear, new piece of clothes so he can wear it.
10:09:47 Q. Anything else?
10:10:03 A. What do you mean anything else?
10:10:05 Q. Did you provide any -- did you do anything else to prepare Mr. Schuck for court?
10:10:10 A. I don't think that I gave anything.
10:10:13 Q. Did you provide any additional medical care for Mr. Schuck on March 15 of 2022?
10:10:24 A. As a -- like medical care, like aside from dressing change or what?
10:10:34 Q. So you've mentioned that you cleaned his wounds and you gave him clean clothes. Did you provide any additional care on that date?
10:10:43 A. The only thing that I -- you know, I asked -- I asked -- I did my assessment. That's what we do regularly. I asked him how he's doing, you know -- if he has any medical problem, if he's taking medication, if he's -- you know, like my assessment. I did my assessment.
10:11:16 Q. Can you describe your assessment for me?
10:11:19 A. He's alert and responsive, he's not in

10:11:32 respiratory distress; I saw him walking, he's
10:11:36 ambulatory; and I asked him if he has like medical
10:11:40 issue, he denies; did he have psychiatric issues, he
10:11:48 said ADHD; and I asked him if he's using drug on the
10:11:54 street and he said acid. But that's the only thing
10:12:00 that he said. I said I want to -- give me more
10:12:06 information about it.
10:12:08 So what I did, I use my observation, be
10:12:15 objective based on my experience and based on my
10:12:21 knowledge. He's a little bit disorganized because he's
10:12:30 supposed to be -- he's doing what he's not supposed to
10:12:34 be doing, he's naked, and I saw the appearance of
10:12:38 clothes and everything, and he's talking nonsensical.
10:12:43 I can't really understand what he's trying to say.
10:12:46 Because of being uncooperative, he doesn't want to say
10:12:50 much more.
10:12:52 And since -- so I scheduled him to -- I
10:13:03 scheduled him for psych -- he's already scheduled. I
10:13:08 reviewed this one, and he's already scheduled for
10:13:11 psych. And since he take -- he said he takes acid in
10:13:18 the street but he doesn't want to give more information
10:13:21 about the acid, when, how much, everything.
10:13:25 So based on my objective assessment, he was
10:13:34 not exhibiting any -- any signs of withdrawal of drugs.
10:13:42 So I scheduled him for housing unit rounds or RN sick

10:13:52 call, and I -- because of his altered talk, I scheduled
10:13:57 him for psychiatric evaluation. And I scheduled him
10:14:02 also for wound care -- you know, wound care, so it will
10:14:09 be taken care of, the wound, every day. And with the
10:14:16 notes and he was -- he has records from the hospital
10:14:19 that he was -- what do you call it? -- he was evaluated
10:14:25 in the hospital. So I report him to the doctor.
10:14:31 Q. Okay. So I kind of want to go through --
10:14:37 sort of piece that out a little bit. You covered a
10:14:41 lot.
10:14:41 So you first discussed that you conducted
10:14:44 your assessment. Can you tell me, when you conduct an
10:14:51 assessment, the things that you are looking for?
10:14:56 A. Of course I have to gather information
10:15:03 about -- I have to stamp his -- you know, medical or
10:15:09 psychiatric issue, and I did also vital signs, which is
10:15:13 very important. I did the vital signs, from what I
10:15:20 remember.
10:15:20 Q. Okay. When you take vital signs, what does
10:15:23 that mean?
10:15:23 A. So we have to get the pulse rate, blood
10:15:33 pressure, temperature, the respiration.
10:15:42 Q. When you were conducting this assessment,
10:15:46 where were you?
10:15:46 A. When doing vital signs?

10:15:55 Q. When you were conducting this assessment on Mr. Schuck, where were you guys located? Were you in the clinic?
10:16:02 A. Medical screening. At the time when I was doing my assessment, I was in medical screening.
10:16:07 Q. And medical screening is located, I think you said, on the second floor?
10:16:14 A. Yes.
10:16:14 Q. So there's like a specific office or medical screening room that you conducted this evaluation at?
10:16:24 A. Yeah. There's a cubicle.
10:16:27 Q. Okay. So can you describe what you did? Did you -- did the officers present Mr. Schuck at your cubicle?
10:16:43 A. Yeah. I think he was placed there.
10:16:48 Q. Okay. So on March 15, the deputies bring Mr. Schuck to the medical screening cubicle; is that right?
10:16:59 A. Yes.
10:17:00 Q. You conduct your assessment at the cubicle on the second floor?
10:17:06 A. Yes.
10:17:06 Q. Your assessment was to ask a series of questions, correct?
10:17:14 A. Yes.

10:17:15 Q. Get Mr. Schuck's vital signs?
10:17:18 A. Yes.
10:17:20 Q. Which includes his pulse, blood pressure, and
10:17:26 I --
10:17:27 A. Temperature.
10:17:28 Q. And temperature. Anything else?
10:17:30 A. Respiration.
10:17:36 Q. Respiration. Anything else?
10:17:39 A. That's it.
10:17:40 Q. So besides asking these questions and taking
10:17:43 his vital signs, did you do anything else?
10:17:46 A. I did -- after I stop my assessment, I
10:17:53 referred him to the doctor, to -- I saw disoriented,
10:18:01 referred to psychiatrist or mental health clinician, I
10:18:08 scheduled him for wound care for dressing change, and I
10:18:14 scheduled him for housing unit rounds for wellness
10:18:20 check.
10:18:21 Q. Okay. So I just want to make sure that I
10:18:25 have all of your actions that -- you conducted an
10:18:30 assessment, which was your observations, his vital
10:18:34 signs, and then based off your assessment and his vital
10:18:38 signs, you referred him to a doctor; is that correct?
10:18:40 A. Yes.
10:18:40 Q. You referred him to a mental health
10:18:47 specialist?

10:20:17 Q. You asked Mr. Schuck if he had any medical issues?
10:20:21 A. Yes.
10:20:23 Q. And he indicated that he did not have any medical issues?
10:20:27 A. Yes.
10:20:27 Q. You asked him if he had any psychological issues?
10:20:32 A. Yes.
10:20:33 Q. And he indicated that he had ADHD?
10:20:36 A. Yes.
10:20:40 Q. And you asked him if he took medications?
10:20:43 A. Yes.
10:20:44 Q. And what was his response?
10:20:48 A. No, he denies.
10:20:52 Q. And then you said that you asked him if he used drugs in the street?
10:20:57 A. Yes.
10:20:58 Q. And his response was acid?
10:21:03 A. Acid.
10:21:08 Q. From your training and experience, what kind of drug is acid?
10:21:12 A. It depends. I don't know what kinds of drugs that -- because I really try to get more information about the acid drugs. He refused to give me more

10:21:33 information.
10:21:33 Q. Do you know what acid is?
10:21:34 A. Any -- based on my experience, acid is a lot of different kind of products. I don't know what kind of acid, to tell you the truth. I don't know what acid --
10:21:48 Q. Have you been trained or do you know that acid is LSD?
10:21:54 A. There's a possibility because there's a lot of street name, but -- you know, like acid can be like a meth. We have a lot of -- a lot of things, you know, in the street, we call it -- street drugs name, they don't want to -- they understand each other by using acid, they know it already, but I know I heard it before, but I'm not sure really. I'm not really using drugs. I don't know how -- what kind of drug is that.
10:22:30 Q. Okay. So have you been trained to know sort of different names for different types of drugs?
10:22:42 A. Yes.
10:22:42 MR. INMAN: Objection. Vague, overbroad.
10:22:44 THE WITNESS: Huh?
10:22:45 MR. INMAN: Objection. Vague, overbroad.
10:22:48 You can answer. Always answer unless I tell you not to. Go ahead.
10:22:53 THE WITNESS: We have training. That's what

died; they come here healthy, walking, and then died. I don't know. Something like I have maybe a lot of experience like that, sometimes maybe emotionally -- I don't know. I can't explain. If I have an answer, I will tell you. I don't know. I feel like emotionally affected for -- I can't believe. I really -- I don't know what to say. Like to help, based on me -- not only me. Everybody is working together for the benefits of the inmate. I don't know what happened. That's what I said. I can't believe -- I was shocked during that time because it just happened that time. I'm like what's going on. It should be -- somebody that's happening like that, I don't feel good.

Q. So you mentioned something that sometimes people come in healthy and then they die. Do you know if Mr. Schuck came in healthy?

A. From what I know, he was not in distress. He was not in distress. It's like mentally, he needed psych, he's not healthy mentally from what I see.

Q. What is medical distress for you?

A. Something like having a difficulty breathing, like seizing like that, you know, really stress.

Q. You also make a statement that says something like, "I don't know what they are taking inside, outside." What are you referring to when you make that

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 18, 2024



Sheri L. Somers
CLR, CSR No. 9734

Job No. 938229

Date: June 06, 2024

Witness Name: Romeo Deguzman, RN

Case Caption: ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 15th day of July, 2024.

[signature]

Signature Romeo Deguzman, RN

PAGE 1 OF 3

# EXHIBIT G

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | VIDEOTAPED DEPOSITION OF DEPUTY ALAN GRIFFITH |
| vs. | MAY 15, 2024 |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | 1600 Pacific Highway<br>Room 355<br>San Diego, California |

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2 3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of DEPUTY ALAN GRIFFITH

San Diego, California

May 15, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938235

09:06:35 MS. ANGELES: Michelle Angeles on behalf of plaintiffs.
09:06:37 MR. SCOTT: Tim Scott, McKenzie Scott, on behalf of the plaintiffs.
09:06:42 THE VIDEOGRAPHER: We are ready to proceed. The court reporter today is Sheri Somers with STENO.
Would the reporter please swear in the witness.

EMILY LYMBURN, RN,
having been administered an oath, was examined and testified as follows:

EXAMINATION
BY MR. SCOTT:
09:07:37 Q. Good morning, sir.
09:07:38 A. Good morning.
09:07:39 Q. We met off the record. My name is Tim Scott and I represent the plaintiffs in this case, which is the estate of the young man that died in March of 2022 as well as his family.
09:07:53 I understand that you, at least in 2022, worked as a deputy with the San Diego Sheriff's Department; is that right?
09:08:02 A. Yes, I did.

10:09:40 point of contact there. So I informed him what was -- what I observed and what I was told.

10:09:49 Q. Now, did you say that Deputy Valbuena was at the court -- was a court deputy?

10:09:55 A. No. He's a central jail deputy and out ports is -- it's the bottom area of the jail where the buses, trucks, patrol cars comes in, and on one side you have the booking area, and then the other side is where we bring in transfers and your court inmates. And those deputies, we give them a list of who we have so that they can check them in, and that's transportation's most -- our point of contact right there, out-port deputies.

10:10:37 Q. Okay. So I'm hearing you say that you brought Mr. Schuck back on a truck and then had a conversation with Deputy Valbuena back at the men's central jail; is that accurate?

10:10:52 A. Yes.

10:10:52 Q. And at that time Deputy Valbuena was working on the first floor of the men's central jail or at least that's where you encountered him that day?

10:11:02 A. Yes.

10:11:02 Q. And Deputy Valbuena's job was to receive incarcerated people that were coming back from court to the men's central jail?

A. Yes.

Q. And in that context you interacted with him more or less passing off Mr. Schuck or handing off Mr. Schuck; is that so?

A. Yes.

Q. And so I'm hearing you say that you had a conversation with Deputy Valbuena kind of about what happened at court. Is that overstating it?

A. No. I briefed him because if they were briefing me that Mr. Schuck was acting odd or weird and his court appearance was cut short, that was one thing that I would brief a deputy at central jail for their information, this is what's happening.

Q. Is "briefing" like a term of art, is that like -- like are you taught how to brief somebody in the police academy?

A. I use "brief" kind of -- basically telling them what I know, this is my observations.

Q. Now, when lawyers talk about briefs, we're talking about writing many, many page documents. Is this brief that you're talking about written?

A. No.

Q. So you're talking about like an oral report, an oral briefing?

A. Yes.

If you know.

THE WITNESS: I don't know how long. It wasn't -- it wasn't a real long time. It was enough to get the information over, couple minutes maybe.

BY MR. SCOTT:

Q. Okay. And now tell us, as completely as you can, the entirety of the information that you delivered to Deputy Valbuena in this oral briefing.

A. If I remember everything -- I don't remember everything from two years ago, but I did tell him that the appearance was cut short, he was acting odd and weird, he was cross-chained for that reason, and then about me trying to speak with him, that I was not able to really talk with him. I mean ask him a question, him looking at me. And said, You know, I think he needs to go see medical.

Q. You told Deputy Valbuena specifically this man needs to see medical?

A. Yes.

Q. And what was Deputy Valbuena's response, if any?

A. Deputy Valbuena, he agreed with me and he said -- he asked me if I would walk with him and take him up to the second floor. He said, "On the second floor is medical observation."

10:31:21 THE VIDEOGRAPHER: We are back on the record. The time is 10:31 a.m. Pacific time.
10:31:48 BY MR. SCOTT:
10:31:48 Q. All right. Deputy Griffith, good morning again. I think when we took our break, you and Hayden Schuck and Deputy Valbuena were on -- in my mind anyway, were sort of getting off the second-floor elevator with Mr. Schuck, having come back from court and determining that he needed to see medical. What happened next, please.
10:32:17 A. So we were met at some point by what -- who I thought was, I guess, a floor deputy or the deputy that worked that level, and Deputy Valbuena told him basically what I told Valbuena about --
10:32:44 Q. Do you -- I'm sorry to interrupt you. I didn't mean to.
10:32:48 Did you actually overhear this conversation between Deputy Valbuena and who you understood to be the second-floor floor deputy?
10:33:00 A. Yes. I was standing with them.
10:33:01 Q. How long did that conversation take?
10:33:04 A. Couple minutes, give or take.
10:33:05 Q. And as best as you can remember -- and I understand it was two years ago -- what do you remember exactly Deputy Valbuena saying to the floor deputy?

10:33:19 A. Exactly I don't know, but it was the same points that I made to Valbuena.
10:33:29 Q. And I remember those points being that Hayden Schuck's court appearance had been cut short --
10:33:37 A. Yes.
10:33:37 Q. -- was one point, that he had been acting odd or strange?
10:33:41 A. Odd and strange.
10:33:42 Q. And that he needed to see medical, in your view?
10:33:45 A. Yes.
10:33:46 Q. So I list those as sort of three points. Does that sound right or are there more points?
10:33:52 A. Yes. My concern was I just wanted him to see medical, and I was told that's what was going to happen.
10:34:01 Q. So after Deputy Valbuena said to the floor deputy that Mr. Schuck's court appearance had been cut short, he had been acting strange, and he needs to see medical, how did that floor deputy respond?
10:34:18 A. If I -- I remember Mr. Schuck being placed into a holding area there and just acknowledging it, and that was it of our conversation.
10:34:32 Q. Let me back that up a hair. Do you have a memory of the floor deputy responding to

11:16:14 looser, but that's -- that is a cross-chain.
11:16:18 Q. So maybe not as crossed as you would expect, but it's the idea?
11:16:22 A. Yeah.
11:16:22 Q. Now, what do you remember about Hayden Schuck's wrists and the application of handcuffs on him?
11:16:32 MS. REZVANI: Objection. Lacks foundation.
11:16:34 Go ahead.
11:16:34 THE WITNESS: So when I got to the end of the corridor, this is when I had more time with Mr. Schuck because Valbuena was -- Deputy Valbuena was busy. He was over by the elevators, he was doing other things. That's when I started talking to him. And at some point I asked him if he wanted to sit down: Why don't you sit down. If you want to sit down, it's going to take a while, something like that. I don't remember when and where exactly --
11:17:02 BY MR. SCOTT:
11:17:02 Q. I'm sorry to interrupt. You said that to Schuck?
11:17:05 A. Yeah. And I basically sat him down at some point, and I don't remember exactly when. But I did have him sit down and I was trying to talk with him. At some point I'm like, you know what, let's get you

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 28, 2024

Sheri L. Somers
CLR, CSR No. 9734

DECLARATION UNDER PENALTY OF PERJURY

I, DEPUTY ALAN GRIFFITH, hereby certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 25 day of June, 2024 at San Diego, California.

DEPUTY ALAN GRIFFITH

# EXHIBIT H

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Case No. 3:23-cv-00785-DMS-AHG

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF ALLAN M. VALBUENA

San Diego, California

Thursday, May 30, 2024

REPORTED By:

NATALIE M. KHAMIS
CSR No. 14260
JOB No. 968520
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

THE VIDEOGRAPHER: Thank you, Counsel.
Would the reporter please swear in the witness.
(Sworn by the court reporter.)
THE WITNESS: Yes, ma'am.

ALLAN M. VALBUENA,
having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. SCOTT:
Q. All right. Good morning, sir.
A. Good morning.
Q. Could you please state your name and spell it for the record.
A. Allan M. Valbuena, A-l-l-a-n; M, middle initial; last name spelled as V, as in "Victor," -a-l, B as in "boy," -u-e-n-a.
Q. And what is your job title, please?
A. Deputy sheriff, sir, detentions/court services.
Q. How long have you been a deputy sheriff?
A. A little bit over ten years now.
Q. Did you attend the -- a law enforcement academy for that?
A. Yes, sir, detention side, yes. At Miramar.
Q. You said the detention side at Miramar?
A. Yes.

A. Yes.
Q. And near where the buses drop off inmates?
A. That's correct, yes.
Q. And when you first saw the person you later learned was Hayden Schuck, he was slumped down on the ground?
A. He wasn't. He was leaning up -- sitting down. He was leaning on the wall at the end of the hallway from the -- from the sally port.
Q. Was he seated on his bottom?
A. Yes.
Q. Were his legs stretched out in front of him?
A. Kind of like Indian style. His legs were up.
Q. Was he sitting cross-legged, or were his legs sort of --
A. I don't remember those -- the details, sir. I just -- I know his -- his legs weren't underneath him. He was leaning up against the wall, probably stretched out or cross-legged.
Q. Based on your observations, did it seem like Mr. Schuck was unable to stand up or simply that he was just sitting down?
A. My observation, he was fine. He was talking. Again, I asked him what was going on with him. He mentioned he was thirsty and, you know, just tired, I

guess, but -- I shouldn't say -- you know, that specifically I remember him saying he was thirsty. I was like, "Okay, you can't sit down here, you know. You have to go back to your holding cell."

That's when we asked him to get up. And he -- we just held him on both sides. I believe Deputy Griffith held him on one side, and I held him on the other and, you know, escorted him back up to the second floor where he came from in the morning.

Q. Did I hear you say that when you first saw Mr. Schuck sitting down, you asked him what was wrong or words to that effect?

A. Yeah, I did say, "What's going on with you?" because he's just sitting down on the floor.

Q. And was that unusual?

A. Well, yeah, because that -- where he was sitting down at, sir, is when they come in and they pretty much walk up to their -- to the elevator well, where they get sent up to their housing. So for him to sit there -- plus, there will be other inmates waiting -- IPs waiting to come in off the bus. So for him to come in -- and he just kind of sat down there.

So, obviously, I said, "What's wrong with you?" You know, I made sure he was okay. You know, there was nothing medically or anything else going on with him, so

was good -- he was fine, you know. But it's not normal for someone to just squat down. It's either -- you're right, sir. It's either they're noncompliant or something medically going wrong with them.

I asked Mr. Schuck, "Are you okay?"

He was like, "No, I'm just thirsty, tired."

Helped him up, took him to the holding cell where he could get water.

Q. Okay. So you're -- I hear you say that you and Griffith -- Deputy Griffith helped Mr. Schuck to his feet on the first floor?

A. We just got him up pretty much, yes. We had gotten him up because he was -- he had leg and waist chains on. So we didn't want him falling over as he tried to get up, you know.

Q. So how did you help him?

A. I am pretty sure I held him -- I held him on one side and Griffith might have held him on the other side before he -- you know, so he keeps him from falling over from one side to the other.

Q. Did it seem that he was falling to one side or the other when you weren't holding him?

A. No. He was -- he was walking just fine from what I remember.

Q. After he got to his feet, Mr. Schuck, I'm

10:01 A. Yes.
10:01 Q. Okay. Take us through everything that happens next until you shut the door on Mr. Schuck's cell.
10:01 A. We just walked him around, took him to the cell that he was taken out from in the morning. And then we unchained him, took off the waist and legs' chains that was put on him for transport. And said, "Hey, there is water right there, you know, use the water fountain." And then we shut the door. And that was it, yeah. Went back down to my workstation afterwards.
10:01 Q. Where was your workstation after that?
10:01 A. Back on the first floor, sir.
10:01 Q. When you got back to the first floor, did you report to anybody else the interaction that you had just had with Mr. Schuck?
10:02 A. No -- well, when I was on the second floor, there was deputies that were helping us place him in the bay. And I told them.
10:02 I said, "Hey, you know, he probably needs to see medical. He had sat down on the thing. He said he's feeling, I don't know, dehydrated. He's thirsty." So I said -- I brought him to the -- to the -- "I told him he could get water right here in the holding cell," so...
10:02 And, yeah, that was it. I just notified the

REPORTER'S CERTIFICATION

I, Natalie M. Khamis, CSR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 11th day of June 2024.

Natalie M. Khamis

Natalie M. Khamis, CSR,

CSR No. 14260

# EXHIBIT I

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

DEPOSITION OF CARINA ECHON

SAN DIEGO, CALIFORNIA

MAY 8, 2024

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

VIDEO RECORDED DEPOSITION OF CARINA ECHON, commencing at the hour of 10:21 a.m., Wednesday, May 8, 2024, at 1350 Columbia Street, Suite 600, San Diego, California, 92101, before Kaylee G. Wood, Certified Shorthand Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of California.

SAN DIEGO, CALIFORNIA; MAY 8, 2024; 10:21 A.M.

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are on the record at 10:21 a.m. Pacific on May 8, 2024, to begin the deposition of Carina Echon, RN, in the matter of The Estate of William Hayden Schuck, et al., versus County of San Diego, et al. This case is venued in the United States District Court, Southern District of California, case number 23-cv-00785-DMS-AHG. The legal videographer is David Kim here on behalf of Steno, and the court reporter, Kaylee Wood, also here on behalf of Steno. Would counsel please identify yourselves and state whom you represent?

MR. INMAN: Good morning. Steve Inman on behalf of the witness, Carina Echon, and the county defendants.

MR. LOPEZ: Saul Lopez for Correctional Healthcare Partners.

MS. ANGELES: Michelle Angeles from Mackenzie Scott for the plaintiffs.

THE VIDEOGRAPHER: Thank you, Counsel. Will the reporter please swear in the witness.

CARINA ECHON,

having first been duly sworn, was examined and testified as follows:

Q. So the judge had a concern that Mr. Schuck in court needed some sort of medication, needed some sort of treatment, correct?

A. Yes.

12:20 MR. INMAN: Objection. Calls for speculation.

Q. The court order instructed you based off of what happened in court to provide medical treatment?

MR. INMAN: Objection. Misstates the

12:20 evidence. Calls for speculation.

Q. You can answer.

A. Okay. What we do is if I receive a court order, I will check the patient if there's already an exist -- let's say schedule. If there's an existing

12:20 schedule already then I will not schedule, you know, the second -- a second -- how do I say it -- another one because it's there already. He's scheduled to be seen already for assessment.

Q. I don't think I understand. You said he's

12:21 already scheduled to be assessed?

A. If -- let's say I receive a court order. So I will check if there's already a scheduled sick call for that patient. If there is one already, then I'm not going to schedule another one because he will be

12:21 seen. It's already scheduled. There's an existing

schedule already.

Q. Okay. And in this case looking at the sick call log for William Schuck in March of 2022, do you see a sick call --

A. Yes.

Q. -- scheduled for the 15th?

A. The registered nurse sick call, it says that claimed uses acid drugs. So our process is -- like I explained earlier, that's where we get their past medical history, if they have psychiatric problem, medical problem, what medication are they using outside. If yes, then we will generate release of information so we can get a copy of the list of medication from their outside pharmacy or their outside provider.

Q. Okay. I guess I'm trying to get an understanding of the timeline of what happened when -- after you received the court order. Let me summarize what I believe your testimony is today, and if I'm incorrect, you can correct me, but I just want to make sure that I understand correctly. So on the 15th of March of 2022 Mr. Schuck goes to court. You don't know what happens at court. The court issues an order for medical care with concerns about medication, that Mr. Schuck needed a medication evaluation. That court

care on 3/15?

A. Yes.

Q. Beyond what you testified today, did you do anything else in relation to Hayden Schuck's medical care?

12:31 A. No. I just reviewed the court order, made sure that he will be seen or scheduled the following day. At the time when I was reviewing the court order it just says he need to be screened for medication.

12:31 There's no indication that he needs immediate medical attention at that time.

Q. I'm going to hand you a physical copy of Hayden Schuck's medical record from the San Diego Central Jail during March of '22 that was produced in

12:32 this case. I want you to take a moment to review it and see if there's anything in the record that would tell you whether you provided any additional medical care to Hayden Schuck during his time in custody.

MR. INMAN: Objection. Asked and answered.

12:32 Argumentative.

MR. LOPEZ: Is that an exhibit?

MS. ANGELES: Yeah. It's Exhibit 6.

MR. INMAN: And just to clarify you're asking whether she personally gave -- cared for -- provided

12:33 medical care to Hayden Schuck?

MS. ANGELES: Yes.

Q. So my question is, during the time that he was in custody from March 10th to his death on March 16th, did you provide any medical care to Hayden Schuck during his time there? I understand that I have his complete medical record on the screen, so I wanted to give you the opportunity to quickly review his medical record to see if there's anything in his medical record that would prompt your memory about anything that you could have done in his case, in his medical care. And I'm not trying to hide the ball. The only thing -- the only entry I saw from you is what we've discussed, but I wanted to give you a fair opportunity to review the medical record and have a chance to explain anything that you haven't had a chance to explain today.

MR. INMAN: I'll add an objection that the document speaks for itself.

Q. And just to be clear, I'm not asking you to repeat what's in the medical record. I'm just asking you to review the medical record and identify anything or -- that you -- about your medical care for Hayden Schuck between March 10th of 2022 and his death on March 16th of 2022?

A. No. I did not see the patient. I only received the letter to court.

01:59 02:06 02:06 02:07 02:07

or --

MS. ANGELES: Sure. Did you have any questions?

MR. INMAN: Yeah.

MS. ANGELES: Oh, okay. Sure. Go off the record.

THE VIDEOGRAPHER: The time is 1:59. We are off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER: The time is 2:06. We are on the record.

EXAMINATION BY COUNSEL FOR THE DEFENDANT,
COUNTY OF SAN DIEGO, ET AL.

BY MR. INMAN:

Q. Okay. So earlier today we looked at the court order referring Mr. Schuck to medical -- to be screened for medications. In reviewing that document how would you describe your interpretation as to the urgency of him being seen?

A. I did not see any urgency or that will signal me to -- for Mr. Schuck to be seen by medical as soon as possible.

Q. And could you compare this court order to other orders in which you have interpreted the matters being urgent and tell us what the differences are?

A. With other court orders it was -- it will be written there that says defendant is referred to medical -- to be seen by medical as soon as possible or by mental health condition as soon as possible. There's always the word ASAP or immediately.

Q. Okay. Or if you saw, for example, something the court had written -- let's say had the court written instead of what needs to happen at the next hearing, the court had written, he's not able to remember his name or something to that effect. Would you -- how would you have treated the court order in that scenario?

A. I would have informed the floor deputy or called the housing deputy to bring the patient down to clinic for assessment.

Q. Okay. Now, you were showed a video of Mr. Schuck. I believe it was Exhibit 16G. And if you were to see anyone anywhere on the street go to the ground, would you ask them -- what would you do?

A. I will ask them if they're okay.

Q. And you mentioned that you thought from watching the video that perhaps Mr. Schuck had lost his balance. How can you tell without talking to the individual or performing any examination that they'd lost their balance as opposed to another cause for them

: : : CERTIFICATE OF REPORTER : : :

I, Kaylee Lachmann, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, No. 14348, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taking down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X ) Reading and signing was requested.

( ) Reading and signing was waived.

( ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated: This 22nd day of May, 2024

at San Diego, California.

Kaylee Wood

KAYLEE G. WOOD

CSR NO. 14348

Job No. 934424
Date: May 08, 2024
Witness Name: Carina Echon
Case Caption: ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 10 day of June, 2024.

Carina Echon [signature]

Signature Carina Echon

PAGE 1 OF 3

DEPOSITION ERRATA SHEET

Page No. 33 Line No. 15 Change to: Sick call request are scanned after the patients are seen by the nurse

Reason for change: Once the patient is seen, the nurse will write an answer in the sick call request and a copy will be given to the patient

Page No. 40 Line No. 4 Change to: The nurse who receive the record will schedule ~~the~~ chart review.

Reason for change: The desk nurse schedule chart review of those records coming from the medical record department.

Page No. 52 Line No. 16 Change to: Medical chart review documentation is not a SOAP note

Reason for change: Patients are not seen during chart review, it will be just a quick note or a progress note by the provider

Page No. 61 Line No. 14-15 Change to: List of patients to see

Reason for change: not peeked at patients to see

Page No._____ Line No._____ Change to:__________

Reason for change:__________

Page No._____ Line No._____ Change to:__________

Reason for change:__________

Page No._____ Line No._____ Change to:__________

Reason for change:__________

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Signed on the ______ day of

____________, 20_____.

SIGNATURE: [signature] DATE: 6/10/2024

Carina Echon

PAGE 3 OF 3

# EXHIBIT J

03/15/2022 20:19 6196152576 SDCJ CRT PULL PAGE 01/01

BLT 20 107-19 SD/ARRT#1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

☒ Central Division ☐ East County Division ☐ North County Division ☐ South County Division

PEOPLE vs. SCHUCK WILLIAM STATUS: CUST $ 10000 ☐ 88 ☐ CB (Y/N)

CASE # CD293848 PROS. # ACX30101 DOB [redacted] BKG # 22709797 CTS: ____ days ____ hrs.

DATE: 03/15/22 AT 08:30 DEPT. # 101 INTERP: ____ ☐ Spanish ☐ Sworn ☐ Oath on File

JUDGE/COMM/TEMP JUDGE: HALGREN, LAURA W. ☐ STIP. FILED REPORTER: Natalie Khamis, CSR #14260

CLERK: C. Herrera CSR # / COUNTER #:

CHARGE(S): HS11370.1(A) HS11550(E) VC23152(F) HS11350(A) PC25850(A)

FUTURE DATES: ☐ CONFIRMED ☐ VACATED

N. Spano w/ L. Fox — Attorney for the People (DDA/DCA/DAG) ☐ Supervised Cert. Legal Intern

S. Ibrahim — Attorney for Defendant (PD/APD/OAC/Retained/Counseling) ☐ Supervised Cert. Legal Intern

DEFENDANT: ☒ PRESENT ☐ VIA AUDIO VIDEO ☐ SELF REPRESENTED ☐ NOT PRESENT ☐ NOT PRODUCED ☐ FAILED TO APPEAR

Case called for ☐ FTA ☒ Arraignment ☐ Bail Review ☐ Readiness/DWT ☐ Jury Trial ☐ Preliminary Examination ☐ Motion

☐ PC1000 ☐ Full ☐ Limited Protective Order Expires: Protected Party:

☐ Warrant Ordered/Issued on ____ ☐ Held to today ☐ Cleared ☐ Outstanding ☐ Bail Bond # ____ $ ____ forfeited.

CASE TRANSFERRED TO DEPT. ____ TIME ESTIMATE: ____

Complaint amended ☐ by interlineation to read:

☐ Amended ☐ Amendment to ☐ complaint filed ☐ charging ☐ adding ☐ VC23103 (a) pursuant to VC23103.5 ☐ VC22107, VC21658(a), PC647(f) as INFRACTION(S) pursuant to PC17(d)(2). ☐ other:

☒ Defendant advised of and waives the right to a separate and conflict-free attorney / interpreter for this court appearance.

☒ Defendant duly arraigned and advised of the constitutional and statutory rights as indicated on the reverse side of this minute order.

☐ Acknowledgment of advisal of constitutional rights signed and filed. ☐ Defendant has received copy of complaint.

☒ Defendant waives reading of complaint. ☐ Deft. states true name is ____ ☐ on complaint (____ line)

☒ DEFENDANT PLEADS NOT GUILTY and denies any prior/allegations/separate convictions alleged ☐ on amended complaint.

☐ Defendant WAIVES: ☐ time for speedy trial ☐ 10 day/60 day statutory time for preliminary hearing ☐ personal presence ☐ per PC977 ☐ bail review ☐ jury trial ☐ preliminary hearing

COUNSEL ☒ MOTION FOR APPOINTED ATTORNEY ☒ Granted ☒ Public Defender ☐ Alternate Public Defender ☐ Office of Assigned Counsel

Atty: ☐ Re-appointed ☐ Denied ☐ Referred to Near Indigent Panel ☐ Defendant to retain counsel.

☐ Motion for self-representation is ☐ granted ☐ denied. ☐ Faretta/Lopez Waiver signed & filed. ☐ OAC appointed - legal runner/reasonable ancillary services.

CONVICTION ☐ Deft. is sworn and examined. ☐ Defendant withdraws any previously entered plea.

DEFENDANT PLEADS: ☐ GUILTY ☐ NO CONTEST to: ____ ☐ VC23152(a) / (b)

☐ Admits ____ separate conviction(s) alleged/ ____ allegation(s)

☐ Charges contained in amended/amendment to complaint. ☐ VC23103(a) ☐ per 23103.5 ☐ as a lesser included/related offense of

☐ On motion of Court/People/Defendant remaining count(s) ____ is/are DISMISSED. Allegation(s)/Prior(s) remaining is/are STRICKEN ☐ FOJ ☐ VOP

☐ Plea form executed and filed ☐ People vs. West ☐ BAC:

☐ Court finds a knowing and intelligent waiver of constitutional rights and factual basis for the plea.

☐ ADVISALS given by the court: ☐ Theft (PC666) ☐ DUI (VC23593) ☐ Immigration consequences (PC1016.5)

☐ WAIVERS: ☐ Arbuckle ☐ Blakely ☐ Cruz ☐ Harvey ☐ Appeal Rights ☐ Non-Std. Evidence Disposal ☐ Time for sentencing, see JUDGMENT MINUTES.

☐ PC1210 ☐ Drug Court ☐ accepted ☐ declined.

☐ Stipulated bindover. ☐ Case certified as a general jurisdiction matter. ☐ Complaint deemed the information.

☐ Defendant to provide DNA database samples as directed by Sheriff or Probation Dept. (PC296).

MOTION for ____ by ☐ People ☐ Defendant ☐ with ☐ without objection ☐ GRANTED ☐ DENIED.

PC1000 ☐ Defendant's motion for PC1000 ☐ granted as to count(s) ____ and criminal proceedings suspended for ____ months ☐ denied.

☐ Enroll in and successfully complete the diversion program, including payment of fees and compliance with all orders.

☐ Enroll in ☐ county certified program ☐ S.D. Rescue Mission Program ☐ Other ____. Enroll by ____

☐ Pay $ ____ div. rest. fee (PC1001.90). ☐ Pay $ ____ div. admin fee (PC1001.15, 1001.16). Total due $ ____

☐ Payment due: ____ ☐ Payments set at $ ____ per month starting ____ and on the ____ of each month thereafter until paid in full.

☐ Report immediately to clerk/SAAU for program assignment/enroll-by date/payment date(s). ☐ Def. motion to re-enroll granted – enroll by ____

☐ Defendant has satisfactorily COMPLETED the PC1000 Program. ☐ Previously entered plea to count(s) ____ set aside ☐ count(s) ____ dismissed.

☐ Defendant has FAILED to satisfactorily complete the PC1000 Program. ☐ PC1000 terminated and criminal proceedings reinstated.

☐ Unpaid diversion fees set aside. ☐ Court makes a finding of guilt to the charge(s) pled. ☐ Time waived for sentencing, see JUDGMENT.

REFERRALS Report ☐ immediately ☐ by ____ to ☐ SAAU ☐ Probation Department ☐ Probation to interview.

☐ Pre-sentence ☐ Mini ☐ Supplemental ☐ Psych. ☐ Limited re: Drugs / Alcohol / Domestic Violence / Anger Management / Restitution Report Ordered.

☐ Pre-sentence report waived. ☐ Court Collections ☐ for payment of attorney fees ** $ ____ ☐ Indigent as to attorney fees.

** The court finds that the defendant has the ability to repay the County of San Diego for the costs of court appointed attorney fees.

HEARINGS Set/cont. on motion of ☐ People ☐ Defense ☐ Opposed ☐ Unopposed ☐ By Stipulation. ____ ☐ Statutory time is WAIVED

DEFENDANT IS ORDERED TO APPEAR for ☐ ____ on ____ at ____ in Dept. ____

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Re: Attorney | at | in Dept. | ☐ Motion/PC1538.5 | at | in Dept. |
| ☐ Arraignment | at | in Dept. | ☐ Jury / Court Trial | at | in Dept. |
| ☐ Bail Review | at | in Dept. | ☐ Sentencing | at | in Dept. |
| ☒ Readiness/DWT 3.24.22 | at 830 | in Dept. 1103 | ☐ Prob. Hrg.& Sent | at | in Dept. |
| ☒ Prelim Exam 3.28.22 | at 830 | in Dept. 101 | ☐ PC1000/Drug Ct | at | in Dept. |

Time Estimate: ____ days (?) Days remaining: ____ Bal with case(s): ____

MENTAL HEALTH ☐ Proceedings suspended pursuant to PC1368. Mental competency examination on ____ at ____ by Forensic Psychiatry Clinic. Females - Central Division, Hall of Justice, Room 481; Males – Central Detention Facility. Hearing on ____ at ____ in Dept. ____ of the Central Division. ☐ The Sheriff is ordered to transport the defendant to and from the examination and hearing stated above.

OTHER - ☐ Verbal notice of license suspension (DL 310) signed. ☐ Fingerprint form filed.

☐ Book & Release – Report on ____ at ____ to ☐ Central ☐ Vista ☐ Las Colinas Detention Facility.

Protective Order re: Law Enforcement Generated Video is Signed & Filed. THE COURT REFERS DEFENDANT TO JAIL MEDICAL TO BE SCREENED FOR MEDICATIONS. PARTIAL ARRAIGNMENT: CLARIFY ACKNOWLEDGMENT OF RIGHTS & TRUE NAME, DOB AT NEXT HEARING.

CUSTODY STATUS Defendant ☒ REMANDED to custody of Sheriff ☐ without bail ☒ with bail set at ☐ increased to / reduced to $ 10,000 W/O PREJUDICE

☐ PC1275.1 HOLD. ☐ Pretrial Services Report Ordered re: SOR ☐ Refer to CPAC.

☐ REMAINS AT LIBERTY ☐ RELEASED: ☐ on bail previously posted ☐ after booking ☐ PC1000 ☐ OR ☐ SUPERVISED OR-comply with PTS conditions

☐ same terms and conditions ☐ to an authorized representative of: ____ on ____ at ____

☐ Release Conditions: ☐ Attend ____ self-help mtgs. per week and submit proof at each court hearing. ☐ Abstain from alcohol.

☐ Not use or possess any controlled substances without a valid prescription. ☐ Not possess narcotic paraphernalia.

☐ Deft. waives 4th amendment rights and agrees to submit person, vehicle, place of residence, property, personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by a Probation Officer or other law enforcement officer ☐ until revoked. ☐ for the duration of PC1000. ☐ Have no contact with / stay away from: ____ ☐ Protective Order Issued.

☐ Previously ordered: ☐ 4th WAIVER ☐ continues ☐ deleted ☐ PROTECTIVE ORDER ☐ continues ☐ deleted.

WARRANT ☐ Arrest ☐ Bench ☐ ____ Warrant ordered ☐ Bail set at $ ____ ☐ No Bail. ☐ Counsel reports no contact with defendant.

☐ Schedule for hearing. ☐ Mandatory appearance. ☐ Night service authorized. ☐ Cash bail may be forfeited. ☐ ISSUED ON: ____

☐ HOLD issuance to DATE ABOVE. ☐ Warrant previously ordered/issued ☐ remains outstanding ☐ rescinded ☐ RECALLED ON: ____

☐ Affidavit requested. Due by: ____

BAIL is ☐ exonerated ☐ forfeited ☐ Fine from bail, refund balance. ☐ Declaration of non-collusion/ re-assumption of liability filed.

☐ Bail forfeiture is set aside and bond is ☐ reinstated ☐ exonerated ☐ upon payment of court cost $ ____ within 30 days ☐ cost waived

☐ Bond #: ____ Bond $ ____ Bond Co. ____

Date: ATTEST A TRUE COPY, Clerk of the Superior Court by ____ Deputy

Distribution by: CAH on 3.15.22 to Def. Atty. Pros. Prob R&R Interpreter Acct. SAAU Other: ____

SDSC CRM-153 (Rev. 10/18) MISDEMEANOR/FELONY – PRE-DISPOSITION MINUTES

cc: med

cmill 5356

SCHUCK, WILLIAM 400496356 (22709797)

# EXHIBIT K

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No. 23-cv-00785-DMS-AHG

DEPOSITION OF JESSICA RAMIREZ

SAN DIEGO, CALIFORNIA

MAY 8, 2024

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

VIDEO RECORDED DEPOSITION OF JESSICA RAMIREZ, commencing at the hour of 2:28 p.m., Wednesday, May 8, 2024, at 1350 Columbia Street, Suite 600, San Diego, California, 92101, before Kaylee G. Wood, Certified Shorthand Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of California.

the reporter please swear in the witness.

JESSICA RAMIREZ,

having first been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MR. SCOTT:

Q. Good afternoon.
A. Hi.
Q. Have you ever had your deposition taken before?
02:30
A. No.
Q. Can you please state your name and spell it for the record?
A. Jessica Ramirez, J-E-S-S-I-C-A, R-A-M-I-R-E-Z.
02:30
Q. And what is your title, please?
A. Detective.
Q. Where are you employed?
A. San Diego Sheriff's Department.
02:30
Q. How long have you been employed at the San Diego Sheriff's Department?
A. Since December of 2011.
Q. What was your job title when you were first hired in 2011?
02:30
A. Deputy sheriff.

silly example, does that distinction make sense?
A. Yes.
Q. Are you able to give us your best estimate when I ask for that but to not speculate or guess?
02:36 A. For the amount of videos?
Q. No, for anything.
A. Yes.
Q. Just as a general matter.
A. Yes.
02:36 Q. Okay. And you effectively redirected me back to my question which is, do you have an estimate for how many different videos you looked at with the homicide detective?
A. There's a video in the elevator, and there's
02:36 the video outside the module, and there's the video inside the module, so --
Q. So that --
A. -- approximately three.
Q. Okay. Appreciate that. Do you remember
02:37 yourself being in those videos?
A. Yes.
Q. And what do you remember yourself doing?
A. Escorting Schuck.
Q. And what does that mean for people who are
02:37 unfamiliar with what it means when a correctional

officer is escorting a detainee?
A. Moving him from one floor to another.
Q. And do you remember specifically where Mr. Schuck was going that day, the day --
02:37 (Reporter clarification.)
Q. Do you recall where Mr. Schuck was going to when you were escorting him initially in the videos that you were watching?
A. 7 David.
02:37 Q. 7 David, you said?
A. Mm-hmm.
Q. Which is one of the housing modules in the men's central jail?
A. Yes.
02:37 Q. The seventh floor specifically?
A. Yes.
Q. Going to 7 David?
A. Yes.
Q. From where, if you know?
02:38 A. The second floor.
Q. From the second floor?
A. Yes.
Q. You had told us that you have not reviewed any paperwork in association with this case ever, is
02:38 that true?

somewhere other than the cell in the back 40 where you got him from?

A. Based on when we moved him and his behavior.

Q. What do you mean by that?

03:24 A. He was able to follow directions, but he was acting very childlike. When my partner told me we needed to move him upstairs he canoed to us.

Q. What do you mean?

A. As in like pretended he was canoeing while 03:25 sitting on the bench. So I believed he may still be under the influence. As for how long he was back there, I do not know. How long he was in the sobering cell, I do not know. What I briefly remember from this incident from over two years ago, I believe he came 03:25 from the sobering cell but we wanted to move him upstairs so that he wasn't just sitting in the cell.

Q. What I'm trying to figure out is how you heard or understood or believe that he had come from a sobering cell, because if I'm understanding you 03:26 correctly, it was your belief that prior to being in a cell in the back 40 he was in a different cell, like a designated sobering cell. Am I understanding that correctly?

A. Yes.

03:26 Q. So your belief was that at some period of

he was still -- well, I don't know, still. He was acting either under the influence or possibly this is his norm as in he has a mental disability. I don't know this individual before this day. I have never had any interactions with him. I don't know if he has any disabilities. We deal with that daily. So he was able to follow minor instructions. He cuffed up when we told him to. He was not angry or violent, and we escorted him upstairs.

04:08 Q. When -- you've used the term a couple times, this is his norm. What do you mean by that?

A. Well, there's mental health issues on the streets. That's all over the news. So you don't -- if you don't know an individual personally you don't know if they have -- like, is this his mental state? Does he possibly have a mental state of, for example, a 4-year-old? He was acting very childlike. I don't know. So we didn't want to keep him on the floor on a bench when we could possibly give him a bed.

04:09 Q. I'm hearing you say that you yourself made certain observations about Hayden Schuck based on what you witnessed of his behavior, is that right?

A. Yes.

Q. And what specifically about his behavior, if anything, caused you any concern?

A. Not concern, just possibly that it was more of a mental disability, not necessarily under the influence. He followed instructions, like I said. His skin tone was dry. He wasn't flush or anything out of the ordinary. He wasn't bleeding. He was breathing. Visually to me he looked fine except the fact that he had abnormal behavior of a -- I'm just going to keep explaining it, childlike. He pretended to be canoeing on the bench. He pretended that he was on the phone with his mom when I was like, come over here so we can cuff you up. And then he -- okay and hangs up with his mom on the phone, but it's like a hand phone.

And then he followed instructions, stood up, placed his hands behind his back, let him place handcuffs on him and we did that for his safety and ours based on I don't know him and he could be unpredictable. He could not. That's how we move inmates in the jail.

Q. Are inmates always handcuffed when they're moved between floors?

A. Not all. Generally if we deem them unpredictable, it's a safety. Let's control him and prevent any issues.

Q. Is the norm for inmates not to be handcuffed when moved between floors?

screen?
A. Myself escorting Schuck.
Q. And where were you going from and to?
A. From the inmate elevator well over to where I'm assuming 7 David is which is the camera before this.
Q. So your understanding is that you are taking Mr. Schuck from the elevator to the housing area or do I have that backwards?
A. Elevator to the housing area.
Q. What do -- do you remember that walk?
A. Yes.
Q. What do you remember about it?
A. Where would you like me to start?
Q. I guess at the beginning of your contact with Mr. Schuck.
A. In the elevator he thought -- or said he was Spiderman and was trying to climb the wall.
Q. Mr. Schuck was trying to climb the --
A. The wall of the elevator, so he was trying to put his leg up on the rail of the elevator. And my partner and I were just trying to tell him put your leg down, that's enough, yes, you're Spiderman, whatever. Then he put his leg down. The elevator doors opened. We walk out. We're escorting him, and at some point

rounding that corner he starts yelling that he has to pee.

04:26 Q. Okay. Now, we'll get to that in just a second, but I want to talk about the Spiderman part. What did you think was going on when he was climbing the wall and claiming to be Spiderman?

A. He was acting childlike.

04:26 Q. Did you think that he was just misbehaving or did you think that there -- perhaps he had a mental health issue or was under the influence of something?

A. I truly believed he had a mental disability, not an emergency, which is why we separated him.

Q. Tell me what you mean by that. You thought he had a disability, not an emergency?

04:27 A. Yes, a disability, meaning that he could possibly be a regional center client which is someone who's deemed with a mental disability at a young age. But being at night shift you can't contact anyone to confirm that, which is why I believe we placed him on 04:27 that QMHP based on all his other canoeing and talking to his mom on the phone.

Q. And when you say talking to his mom on the phone --

A. Fake phone.

04:27 (Reporter clarification.)

A. Yes.
Q. All right. So what do you remember about him and needing to urinate?
A. Just had to pee.
04:52 Q. What do you remember happening?
A. He wanted to pee right there.
Q. How did he express that to you?
A. He started moving his pants down.
Q. In what way?
04:53 A. Moving his hips back and forth so they'd fall off.
Q. Was he saying anything?
A. I have to pee.
Q. I think we established that he was
04:53 handcuffed. Do you recall if his hand -- if he was handcuffed in front or behind?
A. Behind.
Q. What do you mean when you say wiggling his pants off?
04:53 A. Moving his hips back and forth, side to side.
Q. And that was sufficient to make his pants fall off?
A. Yes. Jail clothing is not tight.
Q. Okay. And what happened after that?
04:53 A. Then he dropped his weight and went to the

floor and said he was going to pee right there. And Deputy Page and I told him no, no, no, no. We're going to get you to your cell. Just hold it. Just hold it. Stand up. We'll get you to your bathroom. And then we got him to his feet. He stood up on his own, and we walked him into the module.

04:54

Q. Okay. And then what happened next?

A. And then as we're getting to the cell he wiggled his hips again and his pants started to fall, and approximately 3-ish feet to the cell he starts peeing into the cell.

04:54

Q. Like, a stream of urine was going into the cell from outside of the cell?

A. Yes.

04:54

Q. Was he -- and I'm sorry to be so explicit, but was he, like, holding his penis while he was urinating --

(Reporter clarification.)

Q. You got to give me a beat.

04:54

A. Sorry.

Q. The question was, while, as you say, Mr. Schuck was urinating from outside of his cell to inside of his cell, was he holding his penis to do that or were his hands still handcuffed behind him?

04:55

A. He was still handcuffed and we were uncuffing

: : : CERTIFICATE OF REPORTER : : :

I, Kaylee Lachmann, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, No. 14348, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taking down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X ) Reading and signing was requested.

( ) Reading and signing was waived.

( ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated: This 24th day of May, 2024

at San Diego, California.

Kaylee Wood

KAYLEE G. WOOD

CSR NO. 14348

# EXHIBIT L

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, | ) CASE NO.: 3:23-CV-00785-DMS-AHG |
| V. | ) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | ) |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)

---o0o---

Deposition of Justin Page located at 1350 Columbia Street, Suite 600, San Diego, California, commencing at 2:13 P.M. PST on Monday, June 17, 2024, before Nicole O'Neil, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

court reporter today is Nicole O'Neil with Steno.

Will the reporter please swear in the witness?

JUSTIN PAGE

called as a witness herein, having been administered an oath, was examined and testified as follows:

---o0o--

EXAMINATION

BY MS. ANGELES:

Q. Deputy Page, nice to meet you. I know we met off the record. My name is Michelle Angeles. I represent the Schuck's -- parents of Hayden Schuck, and we represent the estate.

We're here to take your deposition today. As you heard, you are under oath, which means that you are prepared to tell the truth today. Is there any reason, medication or anything, any reason why you can't give your best and most truthful and complete testimony today?

A. No.

Q. I want to go over some ground rules before we begin. Because everything is being recorded and transcribed, I am going to try to take this at a slower pace. I encourage you to do that as well just to give her time to jot everything down, okay? Because it's being written and transcribed, things that we normally do in conversation, don't necessarily work as well. I will

A. Right at the cell, yes.
Q. What, if anything, did you observe about Mr. Schuck or did you remember about your interview with Mr. Schuck?
A. The specific things, due to the length of time, I don't recall, however, I do remember some odd behavior. Specifically I can't recall what that was. I believe -- it was just the odd behavior, specifically.
Q. Okay. And you don't remember specifics about the odd behavior, but you remember him exhibiting odd behavior?
A. Yeah.
Q. Is there a reason why you remember he was showing odd behavior?
A. Yeah. I did request what is called an outpatient psychiatric stepdown unit evaluation.
Q. Can you repeat that again for me?
A. Outpatient psychiatric stepdown unit evaluation.
Q. What is that?
A. It's a program run by mental health that have more available services for individuals experiencing a psychiatric event or issues.
Q. Walk me through the process of making that request.
A. What do you want to know?

A. I don't know.
Q. Who belonged to some agency or something?
A. I don't know.
(Audio recording playback)
Q. So, again, you say, "solely her judgement." It sounds like it's one individual. Do you have a description of that person?
A. I can't remember who it was or if it was one person. It's been long time.
Q. Okay. Besides his -- your interaction with him on the 13th for his classification, did you interact with Mr. Schuck at any other point in March of 2022?
A. Yes.
Q. When was that?
A. I'm looking at the report. It was March 15th of 2022.
Q. Can you tell me about your interaction with Mr. Schuck on March 15th of 2022?
MS. REZVANI: Objection. Calls for a narrative.
Go ahead.
THE WITNESS: Just my entire interaction with him?
BY MS. ANGELES:
Q. Sure. How did you first go to interact with him? Or why did you interact with him on March 15th of

2022?

A. We had set housing for him if a bed became available or a cell became available for him, and then we went to the court holding cells where he was located. And once again he kind of exhibited some odd behavior. He -- I believe he was handcuffed due to his odd behavior. Deputy Ramirez and I escorted him to the seventh floor. And he had -- while waiting for another administrative separation inmate to go inside their cell and secure the door, we were waiting outside the module. And Schuck dropped his weight to the floor or attempted to sit down on two occasions. He was breathing, talking, conscious, on both occasions. After the incarcerated person inside of the module went inside their cell, we entered the module with Schuck and then the -- took the handcuffs off him and placed him into his cell.

Q. And that cell was on the seventh floor?

A. Yes.

Q. Now you said that he was exhibiting odd behavior. Do you remember anything about his demeanor at that point?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: What do you mean by "demeanor"?

///

BY MS. ANGELES:

Q. Sure. Is there anything about the way he looked that stood out to you?

MS. REZVANI: Same objection.

Go ahead.

THE WITNESS: Not specifically that I can remember.

BY MS. ANGELES:

Q. Did you notice any injuries on his face or body?

A. No.

Q. Any wounds or cuts or anything like that?

A. No.

Q. Did you notice if his eyes were dilated?

A. No.

Q. Did you notice if he was sweating?

A. No.

Q. Did you notice any like, issues with his clothes like blood or dirt or anything like that?

A. No.

Q. Anything about his appearance that you remember that stood out to you?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: His appearance, no.

///

BY MS. ANGELES:

Q. And you said his behavior was odd. Do you remember him saying anything that was -- stood out to you?

A. The only thing I can remember -- and I don't remember exactly when he said -- it is that he needed -- he needed to use the bathroom.

Q. Anything else that you remember about your interaction with him?

A. He was fidgety.

Q. What do you mean by that?

A. Like moving his body back and forth, not completely still when he's standing.

Q. Do you remember discussing anything with Deputy Ramirez about Mr. Schuck?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: That I can remember? No.

MS. ANGELES: Now you mentioned earlier that you watched some videos in relation to your interactions with Mr. Schuck. I kind of, want to go through those at this point. These have already been previously marked. I will try to go in the order of timing.

I will start with Exhibit 16-J.

(Previously marked Exhibit 16-J was introduced

# CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [  ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 18th of June, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774