# EXHIBIT M

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | ) | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | ) | VIDEOTAPED DEPOSITION OF DEPUTY JEFF AMADO |
| vs. | ) | MAY 22, 2024 |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | ) | 1350 Columbia Street Suite 600 San Diego, California |

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2-3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of DEPUTY JEFF AMADO

San Diego, California

May 22, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 965076

01:07:47 individually named County defendants.

01:07:49 THE VIDEOGRAPHER: Thank you, Counsel.

01:07:52 Will the reporter please swear in the
01:07:54 witness.

DEPUTY JEFF AMADO,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. SCOTT:

01:08:09 Q. Good afternoon, sir.

01:08:10 A. Good afternoon.

01:08:11 Q. Could you please state your name and spell it
01:08:15 for the record.

01:08:16 A. My name is Jeff Amado, J-e-f-f, A-m-a-d-o.

01:08:20 Q. Could you please tell us how you're employed.

01:08:23 A. I'm employed with the San Diego sheriff's
01:08:25 department.

01:08:25 Q. What's your job title?

01:08:27 A. I'm a deputy.

01:08:29 Q. You're a deputy sheriff?

01:08:32 A. A detention deputy, detention deputy sheriff.

01:08:35 Q. Yeah. Your attorney is dead on. I was going
01:08:38 to gently ask you to try and keep your voice up, and
01:08:43 the only reason for that is because it's being

01:29:45 BY MR. SCOTT:
01:29:46 Q. Is finding Mr. Schuck dead kind of the first memory that you have of that day?
01:29:52 A. My first memory is seeing him inside the cell during a safety check, and I remember seeing him naked and had sores on his body. He wasn't very responsive to me. I was asking questions.
01:30:08 Q. When you said you saw him naked and you remember there being sores on his body, how were you able to see that he was naked and that he had sores on his body?
01:30:19 A. When I did my safety check, I would look in the window. He was standing at the cell -- in the middle of the cell, and I could see like from -- he was facing away from me. So I could see the sores like on his butt and towards his legs.
01:30:34 Q. Do you remember how many safety checks you did that day before finding Mr. Schuck dead?
01:30:43 A. I believe I did three safety checks.
01:30:44 Q. What do you remember, if anything, about the first safety check you did that day?
01:30:49 A. I think during the first safety check he was sitting on the stool inside his cell.
01:30:56 Q. He was what?
01:30:58 A. Sitting on his stool.

01:42:27 A. Yes.
01:42:27 Q. Do you remember anything about that third safety check?
01:42:31 A. The last safety check, I remember looking inside his cell and I asked him -- I remember he was laying on his bunk with his back facing towards the window, and I just asked him if he was okay, and he looked towards me just nodding and then turned back.
01:42:49 Q. So when you say he looked towards you and was nodding -- you're on camera so it's okay to sort of demonstrate, if that's okay. Can you do with your head what he was doing with his?
01:43:01 A. Yes. He looked back, I asked if he was okay, and he just turned away from me.
01:43:08 Q. The camera will speak for itself, of course, but I kind of saw you nod your head once?
01:43:14 A. Uh-huh.
01:43:15 Q. Is that the way you remember it?
01:43:17 A. Yes.
01:43:17 Q. Did you say anything else to Hayden during that third check?
01:43:21 A. No.
01:43:21 Q. Do you remember him saying anything at all to you?
01:43:25 A. No.

01:43:25 Q. What happened after he nodded?
01:43:30 A. After he had nodded that he was okay, I
01:43:33 started continuing my safety check on the other cells.
01:43:36 Q. Do you recall how long that third check took?
01:43:39 A. I don't recall how long.
01:43:42 Q. I want to go back to an earlier question to
01:43:47 make sure I had the whole answer.
01:43:50 We were talking about obvious signs of
01:43:52 medical distress?
01:43:53 A. Yes.
01:43:54 Q. And you shared with us that if somebody is
01:43:57 having a seizure or if somebody appears to be unable to
01:44:02 breathe, that that would count, certainly, and you
01:44:04 would summon medical care in that situation; is that
01:44:07 correct?
01:44:07 A. Yes.
01:44:07 Q. So those are kind of like two examples of
01:44:10 obvious medical distress, as I take it?
01:44:12 A. Yes.
01:44:13 Q. My question, I guess, is a little bit
01:44:16 different. I want you to put yourself -- well, you're
01:44:19 a training officer, right?
01:44:21 A. Yes.
01:44:21 Q. So I take it that you would have had to
01:44:24 either explain or supervise more junior deputies in

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 5, 2024

Sheri L. Somers
CLR, CSR No. 9734

Job No. 965076
Date: May 22, 2024
Witness Name: DEPUTY JEFF AMADO
Case Caption: ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 19 day of June, 2024.

Jamdo
_______________________________
Signature DEPUTY JEFF AMADO

PAGE 1 OF 3

DEPOSITION ERRATA SHEET

Page No. 17 Line No. 17 Change to: Change L.A. to L.E.

Reason for change: It was suppose to be abbreviation for Law Enforcement

Page No. 77 Line No. 19 Change to: Change SPI to SPUI

Reason for change: It was suppose to be abbreviation for Suspected Person Under Investiagtion

Page No._____Line No._____Change to:__________

Reason for change:__________

Page No._____Line No._____Change to:__________

Reason for change:__________

Page No._____Line No._____Change to:__________

Reason for change:__________

Page No._____Line No._____Change to:__________

Reason for change:__________

Page No._____Line No._____Change to:__________

Reason for change:__________

PAGE 2 OF 3

DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Signed on the ______ day of

____________, 20_____.

SIGNATURE:_______________________DATE:___________

DEPUTY JEFF AMADO

PAGE 3 OF 3

# EXHIBIT N

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST,<br>PLAINTIFFS,<br><br>V.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2 3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | CASE NO.:<br>3:23-CV-00785-DMS-AHG |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
__________________________________

---o0o---

Deposition of THOMAS MACE located at 1600 Pacific Highway, Room 355, San Diego, California, commencing at 9:04 A.M. PST on Friday, May 17, 2024, before NICOLE O'NEIL, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

for Plaintiffs.

MR. SCOTT: Tim Scott, Mckenzie Scott for Plaintiffs.

THE VIDEOGRAPHER: We are ready to proceed. The court reporter today is Nicole O'Neil with Steno.

Will the reporter please swear in the witness?

THOMAS MACE

called as a witness herein, having been administered an oath, was examined and testified as follows:

---o0o---

EXAMINATION

BY MR. SCOTT:

Q. Good morning, sir.

A. Good morning.

Q. Could you please state your name and spell it for the record?

A. Thomas Mace, T-h-o-m-a-s M-a-c-e.

Q. And what is your job title, please?

A. I'm a deputy sheriff, detention and court services.

Q. Is that your job title today?

A. Yes.

Q. Was that your job title in March of 2022?

A. Yes, sir.

Q. Before we get started, let me just do a couple

using my radio to call for medical help. He may have activated 911, but I remember using my radio to call for nurses to come to the floor.

Q. Okay. Thank you for that. You clarified you started your shift at 1600 -- 600 hours verses 800 hours. And then you also clarified that you recall using your service radio to call in for medical assistance, which may have occurred in addition to Deputy Cortez calling 911.

A. Yes.

Q. Thank you for that. Any other clarifications based on your review of the report that you would like to make?

A. No, sir.

Q. Slightly different question. Are there any omissions, meaning, is there anything important that you remember that is not documented in this report?

A. Yeah. Typically, you know, I'm knocking on the door pretty hard if someone is not responding. The escalation of, you know, "Hey, are you good?" And we open the flap, "Hey, are you good?" And then it's beating on the door real good.

When I was doing that for him, he would roll over and look, but I was trying to get him to make eye contact and he would say, like, "Go away," or "Fuck off,"

or "Fuck you." And I don't recall what he exactly said, if it was, "Fuck off," or "Fuck you," but I turned and looked at the nurse like, you know, basically, what do you want to do?

Q. Okay. So you remember at least one incident where you were with the nurse and actually had a verbal exchange with Mr. Schuck?

A. We didn't have a conversation, but he told me to leave, basically, in an unpolite way.

Q. So let me make sure I'm understanding that. I was asking if there were omissions or things that are important that aren't in this written report, and the first thing that we began talking about was Mr. Schuck telling you in what you just said is not super polite terms to go away?

A. Right.

Q. How many times did that happen, if you remember?

A. I can only recall him speaking to me those couple words one time with the initial visit.

Q. And when -- was anyone else around when that happened?

A. I believe the nurse was standing right next to me.

Q. Which nurse?

A. I could not tell you her name.

"Hey, Bro, are you good? Come open the door. The nurse is here." Nothing.

Q. You don't remember saying anything to him, but you do remember trying to get his attention, either by making noise on his door or saying words to get his attention. Is that a fair statement?

A. I remember yelling into the door and kind of like, shifting. There's a portion of the cell door where there's a crack between the wall and the metal, and when you are having a conversation with somebody and you are trying to hear them, if there's noises going on in the module, you put your head next to it. I remember like, "Is he talking? I can't hear him."

Multiple times I was yelling, beating on the door. Just that one time that he spoke and told me to go away unpolitely.

Q. Do you remember the words he used?

A. He either said, "Fuck off," or "Fuck you."

Q. And you remember that vividly?

A. Yes.

Q. You said that you were trying to summon him by banging on the door?

A. Yes.

Q. Tell us about that.

A. There's a lot of noise in the module on a daily

Q. Do you remember one thing that you could have done better?
A. No.
Q. Do you remember one thing that anybody identified as maybe they could have done better?
A. No.
(Audio statement playback)
Q. I'm pausing now 4:53 of Exhibit 27.
You were saying to the homicide detective something about Mr. Schuck's being -- Mr. Schuck's name being on a medical follow-up list. Is that right?
A. Yes.
Q. Tell us about that, please.
A. Different nurses throughout the facility had different tasks. The nurse that came to that floor with that list was there following up with people for various things. Anytime they had made a complaint to medical staff or if the nurse had observed something about them in the intake process, there would be a nurse assigned to follow up with them to further investigate whatever their complaint was or the observation was.
Mr. Schuck's name was on a list that that nurse provided me to escort her around from cell to cell talking to people.
Q. When did you first learn that Mr. Schuck's name

Q. What else did the nurse say to you before you went to see him, if anything?
A. I can't recall.
Q. When you and the nurse approached the cell, what's the first thing that happened?
A. I can't recall. Typically, due to my training, I would walk in first just to make sure the area is safe. And then I will usually, "Hey, nurse is here. Come on up."
And you like, let them know, hey, we're here. It's a nurse. They want to talk to you.
Because sometimes they don't want to come up to talk to me, but of course they want to talk to her. If you say, "The nurse is here," they usually come up.
Q. I'm hearing you describe kind of, a general practice.
A. Yeah.
Q. We can get to that, and I do want to hear about that. Before that, though, can you tell us what you specifically remember about the Hayden Schuck interaction with you and the nurse and him? And then we'll go into sort of, general practice.
What specifically do you remember, if anything?
A. I remember knocking on the door and not getting a response right away and then knocking on the door again

and like, listening, and then knocking on the door, again and looking at the nurse. And then she started talking. I don't remember what she said. And then I hit the door again, and it's like, "Hey, fuck off." "Hey, fuck you," or something to that affect, and he rolled over in the bed and kind of like -- and that was it.
Q. Okay. Do you remember Mr. Schuck saying anything other than, hey F you or F off?
A. No.
Q. Do you remember the nurse saying anything else to Mr. Schuck other than what you've just said?
A. I can't recall any specifics.
Q. Do you remember having any other interactions with Mr. Schuck before you eventually responded to the man down call that involved him?
A. Other than the interactions with the nurse, no.
Q. You touched on earlier Mr. Schuck's physical appearance as you and the nurse were looking at him. What do you remember?
A. I remember he was laying on top of his blankets naked, and he had -- what looked like bed sores on his back or his bum and lower back.
Q. So you were able to discern that he was naked?
A. Yes.
Q. And you said he was on top of his blankets?

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken remotely before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 25th of May, 2024.

Nicole O'Neil
Nicole O'Neil, CSR No. 1077470

# EXHIBIT O

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2-3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of EMILY LYMBURN, RN

San Diego, California

May 15, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938244

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al.,<br><br>Defendants. | Case No. 3:23-CV-00785-DMS-AHG |

Videotaped Deposition of EMILY LYMBURN, RN, taken on behalf of plaintiffs, at 1600 Pacific Highway, Room 355, San Diego, California, beginning at 1:33 p.m. and ending at 5:15 p.m., on Wednesday, May 15, 2024, before Sheri L. Somers, CSR No. 9734.

01:35:00 the plaintiffs.
01:35:00 THE VIDEOGRAPHER: We are ready to proceed. The
01:35:04 court reporter today is Sheri Somers with STENO.
01:35:04 Would the reporter please swear in the
01:35:05 witness.

EMILY LYMBURN, RN,
having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. ANGELES:
01:35:20 Q. Good afternoon, Ms. Lymburn. Am I
01:35:24 pronouncing your name --
01:35:26 A. That's right. Lymburn.
01:35:27 Q. Lymburn.
01:35:27 A. Yes.
01:35:29 Q. I apologize.
01:35:29 A. That's okay.
01:35:29 Q. And I know that you and I had a chance to
01:35:32 meet before we got on the record. I represent the
01:35:35 Schucks, the Estate of William Hayden Schuck and his
01:35:38 family. We're here to take your deposition today.
01:35:41 Before we get started, I just kind of want to lay out
01:35:45 some rules just so that everyone is on the same page

01:39:38 A. That is correct.
01:39:39 Q. When do you learn about your particular
01:39:42 assignment?
01:39:43 A. The day of.
01:39:44 Q. Do you remember what your assignment was on
01:39:50 March -- in March of 2022 or March 16 of 2022?
01:39:55 A. I would not remember unless I didn't get the
01:40:01 paper, the summon.
01:40:03 Q. I'm sorry. Say that again?
01:40:04 A. The summon, the paper that -- the lawsuit,
01:40:07 that reminded me where I was at. But otherwise if you
01:40:09 ask me now, without that paper I would not remember.
01:40:12 Q. Okay. You don't remember what you were doing
01:40:15 on that particular day?
01:40:16 A. That is correct.
01:40:17 Q. Do you remember Mr. Schuck?
01:40:20 A. I do.
01:40:21 Q. Do you remember being there for his death?
01:40:30 A. The day of, yes -- the day of his death, yes.
01:40:35 Q. Do you remember interacting with Mr. Schuck
01:40:38 prior to his death?
01:40:39 A. I saw him, but he did not interact with me.
01:40:43 Q. So do you remember what role you were playing
01:40:46 during that interaction the day that you interacted
01:40:48 with Mr. Schuck?

01:40:49 A. He's -- we have housing HR -- housing unit rounds. That was my assignment that day. I was doing a wellness check for him and I was going to have him sign an ROI. That was my interaction with him that day, the first interaction.

01:41:13 Q. Okay. So let's take a step back. So you said that that day you were assigned to the housing unit rounds?

01:41:20 A. Yes.

01:41:21 Q. What does that mean?

01:41:22 A. It means -- there's patients that ask for -- say if they are constipated, they have a headache, they have rashes, they would fill out an inmate request form or a sick call slip is a better word for it. They'll write it down and then they put it in a red box in the housing area. It gets collected, it gets triaged, and then the list -- it gets put on their record, and then when you're assigned to the housing unit rounds, you see them.

01:42:01 Q. Okay. So I'm going to -- just so that I understand, I'm going to take this sort of step by step because I think we have a lot to unpack there.

01:42:11 A. Okay.

01:42:12 Q. Okay. So you mentioned that as a housing unit rounds -- and just so that I can make sure that I

03:07:50 Q. Now, in this case you, I think, were briefly
03:08:01 discussing earlier your memory of the event. You
03:08:07 explained that you went to Mr. Schuck's cell because
03:08:12 you were looking for -- he was on your withdraw list,
03:08:16 you had concerns about withdraw; that you had learned
03:08:20 that he had mentioned acid to a different nurse and
03:08:23 that his mom had made a phone call, and so you were
03:08:26 also getting a report of investigation.
03:08:30 A. Release of information.
03:08:31 Q. Release of information. I apologize.
03:08:33 Is there any other reasons or any other
03:08:35 concerns as to why you were responding to Mr. Schuck on
03:08:39 that day that you haven't mentioned?
03:08:41 A. No.
03:08:41 Q. Can you tell me a little bit about what
03:08:45 happened on that day.
03:08:47 A. I came in because, like I said, he was on my
03:08:50 list, and we saw him laying down, and I tried to engage
03:08:56 him, he would not respond to me, but I told him, "Move
03:09:02 your leg" just to see for like a sign of life, just to
03:09:09 make sure that he's able to follow directions, and he
03:09:14 did that.
03:09:20 Q. Okay. So the list that he was on -- and I
03:09:27 believe you said this earlier -- was the sick call list
03:09:30 that was assigned to you for that day?

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 29, 2024

Sheri L. Somers
CLR, CSR No. 9734

DECLARATION UNDER PENALTY OF PERJURY

I, EMILY LYMBURN, RN, hereby certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of July, 2024 at San Diego, California.

[signature]

EMILY LYMBURN, RN

Job No. 938244
Date: May 15, 2024
Witness Name: EMILY LYMBURN, RN
Case Caption: ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the 4th day of July, 2024.

[signature]

Signature EMILY LYMBURN, RN

PAGE 1 OF 3

# DEPOSITION ERRATA SHEET

CASE NAME: SCHUCK v. COUNTY OF SAN DIEGO
DEPOSITION DATE: May 15, 2024
WITNESS NAME: EMILY LYMBURN, RN

Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page 38 Line 13 Reason Code 3
From hike to like

Page 57 Line 4 Reason Code 3
From video to radio

Page 58 Line 20 Reason Code 3
From come to calmed

Page 68 Line 5 Reason Code 3
From assaulted to assaultive

Page 79 Line 7 Reason Code 3
From Palmetta to Palmeda

Page 106 Line 6 Reason Code 3
From A.D. to A.E.D.

Page ______ Line ______ Reason Code ______
From ______ to ______

Page ______ Line ______ Reason Code ______
From ______ to ______

Page ______ Line ______ Reason Code ______
From ______ to ______

Page ______ Line ______ Reason Code ______
From ______ to ______

Page ______ Line ______ Reason Code ______
From ______ to ______

Page ______ Line ______ Reason Code ______
From ______ to ______

# EXHIBIT P

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, | CASE NO.: 3:23-CV-00785-DMS-AHG |
| V. | |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2 3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
_______________________________

---o0o---

Deposition of JENNIFER VIVONA located at 1600 Pacific Highway, Room 355, San Diego, California, commencing at 2:14 P.M. PST on Friday, May 17, 2024, before NICOLE O'NEIL, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

VIDEOGRAPHER: We are ready to proceed. The court reporter today is Nicole O'Neil with Steno.

Will the court reporter please swear in the witness?

JENNIFER VIVONA

called as a witness herein, having been administered an oath, was examined and testified as follows:

---o0o--

EXAMINATION

BY MS. ANGELES:

Q. Good afternoon, Ms. Vivona. Is it Vivona?

A. Vivona.

Q. I might butcher it and I apologize.

A. That's okay.

Q. My name is Michelle Angeles, and we met off the record. I represent Mr. Schuck's estate, meaning his parents and his family.

We're here to take your deposition today. As you heard, you know the court reporter put your under oath, which means that you're required to tell the truth today. Have you ever participated in a deposition before?

A. No.

Q. Have you ever participated in a trial or any sort of testimony?

do you -- where is -- how is this list created?
A. It's generated through our EMR, whoever has an order for wound care, dressing changes. I go through the list and determine who needs to be seen that day for wound care. Some people have every-other-day orders. Some people have every day orders. His was to assess the wounds and see if they were bad, if they needed every day dressing changes.
Q. I think I heard you say EMR?
A. Yeah.
Q. What does that stand for?
A. Electronic medical records.
Q. That's the same thing as TechCare?
A. That's our TechCare system.
Q. Do you know in this case who made the request or who put him on the list for wound care?
A. I'm not sure who made the actual order for it. I didn't look that far into it, but it was Emily that alerted me that I should bring him down.
Q. Emily is?
A. Another RN.
Q. Do you know what her last name is?
A. Lymburn.
Q. Can you tell me about that interaction and when that occurred?

A. It occurred probably about 10 minutes before he was found. She came up to me in the clinic, and said she was just up there trying to talk to him and he wasn't answering her questions. So she asked me if I could bring him down and do an assessment on him and also look at his wounds, and so I sent the deputy to go get him right in that moment.
Q. When you say, "do an assessment on him," what do you mean by that?
A. I was going to assess all the wounds. She said he wasn't answering her questions. I was going to see if something else was maybe going on. She wasn't really specific in -- she just said that the wounds didn't look good, and that I should see him now.
Q. What did you do after Nurse Lymburn advised you about Mr. Schuck?
A. I sent Deputy Cortez up to go get him and bring him down to the clinic.
Q. Just to be clear, you sent him up to the seventh floor so he could be brought down to the third floor where the clinic is?
A. Yes.
Q. Anything else that -- any other concerns that Nurse Lymburn advised you about?
A. No. Not that I can remember.

Q. Separate from her telling you -- or telling you that he needed to be seen, was Mr. Schuck already on your list to be seen that day?
A. Yes.
Q. Is there a reason why he hadn't been already called up to the clinic?
A. It was 9:00 in the morning. Usually our clinic goes all day, and we just call them down by floors. We just hadn't gotten to the seventh floor yet.
Q. Do you know when he was put on the list?
A. I mean, I personally put him on my list that morning. I don't know when he was scheduled -- when it had been actually scheduled.
Q. Is there a policy or procedure about how quickly someone who has wounds is supposed to be seen?
A. Usually it's once we notice that there is a wound or wound has developed, or we do any sort of procedure to where now they have a wound, they are scheduled immediately for wound care.
Q. If you were to see somebody with a wound, what would be your expectation? How soon after you enter that into the system do you typically expect them to be seen? Within a day? Within a couple of days? Within an hour?
A. Within the day. If I saw them personally, I would take care of the wound right there and that would

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 28th of May, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT Q

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF DEPUTY ALEXANDER CORTEZ

San Diego, California

Tuesday, June 25, 2024

Reported by: SUSAN SWAN, RPR, CRR, CCRR, CSR No. 7338

JOB No. 1025047
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

DEPUTY ALEXANDER CORTEZ, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:04 a.m. and ending at 11:47 a.m. on Tuesday, June 25, 2024, before SUSAN SWAN, RPR, CRR, CCRR, Certified Shorthand Reporter No. 7338.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

the reporter please swear in the witness.

DEPUTY ALEXANDER CORTEZ,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. ANGELES:

Q. Good morning, Deputy Cortez.

A. Good morning.

09:06AM Q. I know that we briefly introduced ourselves earlier this morning. I am Michelle Angeles. I represent the plaintiffs here in this case and we're here today to take your deposition. The court reporter just put you under oath, so you are required to tell the truth today. 09:06AM

Is there any reason why you can't give your most complete and truthful testimony today?

A. No, ma'am.

Q. Any sort of medications or anything that would -- substances that would impact your testimony today? 09:07AM

A. No.

Q. As you can see, everything is being recorded and transcribed, so I am just going to lay out a couple of ground rules for us today just so that this can go as 09:07AM

window. Whose cell is that?
A. Mr. Schuck.
Q. What are you doing -- we have just played about 10 seconds. What were you doing, if anything, at Mr. Schuck's window?
11:07AM
A. I was attempting to communicate to him. I was telling him to come up to me and get ready to go to the third floor.
Q. What did you observe through the window?
11:08AM
A. I observed Mr. Schuck was laying at the bottom bunk. Mr. Schuck was the sole occupant of that cell. Mr. Schuck was naked and on the bottom bunk laying on his left side facing the wall away from me.
Q. So when he's laying down, would his feet or his head be closest to the door?
11:08AM
A. I believe his feet was closest to the door.
Q. Could you see Mr. Schuck's face from the door?
A. No, ma'am.
Q. What, if anything, did you notice about Mr. Schuck?
11:08AM
A. I noticed he was nude, he was naked in the cell.
Q. Did you notice any vomit anywhere in the cell?
A. No.
11:09AM
Q. Did you notice any urine anywhere in the cell?

A. No.
Q. Did you notice any blood anywhere in the cell?
A. No.
Q. Did you notice any pus or mucus on Mr. Schuck?
11:09AM A. There was a little bit of a boil on his buttock area, but I didn't notice that till -- until after we -- I believe when we made entry.
Q. Beyond the wound that you noticed once you made entry, did you notice any wounds at this moment from
11:09AM your observations at the window?
A. I believe there was one on his leg area as well. I am not sure which leg, left or right, but there was one on his leg. Maybe about an inch diameter.
Q. You mentioned that you called out to him.
11:10AM Do you remember how many times you attempted to call out to Mr. Schuck?
A. Approximately three or four times at that point.
Q. Did you notice anything about the color of
11:10AM Mr. Schuck's skin?
MS. REZVANI: Objection. Vague and ambiguous. If you remember.
THE WITNESS: At that point, no.
BY MS. ANGELES:
11:10AM Q. Anything about his hair or his -- was there

Q. Down here.
A. Oh, there it is. I can see it.
Q. It's 9:37 a.m. with 51 seconds at the top left-hand corner. Do you see that?
11:13AM A. I can see it now. The camera was blocking the 11:05.
Q. No worries. So replaying again at minute 11:05 at 9:37 with 51 seconds. It looks like you reached back over to your side and put your keys back.
11:13AM After you couldn't open the food slot, what, if anything, did you do?
A. I remember using my facility radio and asked for Deputy Amato and Deputy Mace to come over to the seventh floor, Module D, Cell 1, to come over and then 11:14AM we'd go inside the cell to see the status of Mr. Schuck.
Q. For the record, we stopped at 9:38 a.m. with 11 seconds, and that would be minute 11:25 on the video.
Now, you're facing the door in the video. So 11:14AM we can't see your radio. Where is the radio located on your body?
A. It's in the front of my uniform shirt.
Q. Typically, like where you would have a tie; is that correct?
11:14AM A. Typically where the V of my shirts, it would

than once?
A. I am uncertain.
Q. I'm sorry?
A. I am uncertain.
11:29AM Q. You didn't administer the NARCAN directly?
A. No.
Q. Do you remember who you provided the NARCAN to?
A. I gave it to one of my two partners, either Amato or Mace.
11:29AM Q. After you provided them with the NARCAN, what, if anything, else did you do?
A. I went ahead and took my deputy notebook from my pocket and started documenting which medical staff arrived on the scene, so that way we could document 11:30AM which nurses, which doctors arrived, which deputies arrived, and which fire departments came, which engine number, paramedics came.
Q. And why do you do that?
A. Typically, we have an incident -- you want to 11:30AM describe whether a man-down or a fight. I always want to document who was present. That way, if you have any questions, we can look back at the notes to follow up what they saw or anything from their point of view.
Q. Is there a reason why you took on that role to 11:30AM document?

A. No particular reason.
Q. Were you ordered by anyone to be the person to document the incident?
A. No.
11:31AM Q. Are you trained -- I guess, what's your training, say, about who is responsible for the documentation of a particular incident?
MS. REZVANI: Objection. Calls for speculation. Vague and ambiguous. Go ahead.
11:31AM THE WITNESS: You just work with your team, what we have. Communicating with your radio and documenting the key role of getting medical personnel there fast.
We just divvied up the task and I just took
11:31AM control and I started documenting what occurred from that point and Amato and Mace took care of Mr. Schuck.
BY MS. ANGELES:
Q. Do you remember receiving any specific orders from control?
11:31AM A. No.
Q. I am going to play again at 14:09. Stopping at 14:23, we see you walk back towards Mr. Schuck's body and then drop something down.
Do you remember what you were writing in that
11:32AM particular instance?

REPORTER'S CERTIFICATION

I, Susan Swan, RPR, CRR, CCRR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 10th day of July, 2024.

Susan Swan

Susan Swan, RPR, CRR, CCRR

CSR No. 7338