# EXHIBIT R

# County of San Diego

**GLENN N. WAGNER, D.O.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

MEDICAL EXAMINER'S DEPARTMENT
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sandiegocounty.gov/me

**STEVEN C. CAMPMAN, M.D.**
CHIEF DEPUTY MEDICAL EXAMINER
(858) 694-2895

## CALL INFO

| NAME OF DECEASED | AKA | HIO | CASE NUMBER |
|---|---|---|---|
| **SCHUCK, William Hayden** | | ☐ | **2022-00982** |

| INVESTIGATOR | REPORTED BY | REPORTING AGENCY | PREVIOUS WAIVE # |
|---|---|---|---|
| Charles Thomson | Det Lewis ID 0307 | San Diego Sheriff | |

| CALL DATE AND TIME | ARRIVAL DATE AND TIME | RETURN DATE AND TIME |
|---|---|---|
| 3/16/2022 1108 | 3/16/2022 1357 | 3/16/2022 1516 |

## DECEDENT

| DATE AND TIME OF DEATH | DATE OF BIRTH | AGE | GENDER | RACE |
|---|---|---|---|---|
| 3/16/2022 1018 | [redacted] | 22 Years | Male | White |

| RESIDENCE (STREET, CITY, STATE, ZIP) | COUNTY | LAST SEEN ALIVE |
|---|---|---|
| [redacted] | San Diego | 03/18/2022 0344 |

| COUNTRY OF RESIDENCE | OCCUPATION | PAID AUTOPSY |
|---|---|---|
| San Diego | | ☐ |

## DEATH

| LOCATION OF DEATH | TYPE OF PLACE |
|---|---|
| San Diego Central Jail | Jail, Prison, Detention Facility |

ADDRESS (STREET, CITY, STATE, ZIP)
1173 Front Street, San Diego, California, 92101

SUMMARY

The decedent was a 22-year-old White male incarcerated in the San Diego Central Jail. On 03/10/2022, the decedent was arrested by San Diego Police Department officers for a suspected driving under the influence violation associated with a motor vehicle collision. The decedent was transported to the UC San Diego Medical Center for medical care which he refused against medical advice. The decedent was then transported and booked into the San Diego Central Jail. The decedent remained in a single occupancy holding cell until 03/15/2022 when he was transferred to a single-occupancy cell in another module. In the early morning hours of 03/16/2022, the decedent refused his morning meal provided by deputies who noticed multiple bed sores on his body and arranged for a medical wellness check later that day. Upon their return, medical staff found the unresponsive decedent lying in bed prior to calling 9-1-1 and provided cardiopulmonary resuscitation while awaiting paramedics. Upon their arrival, paramedics provided advanced cardiovascular life support procedures to no avail prior to contacting a local emergency room via radio with death being pronounced. Detectives noted an in-processing bodyscan may have revealed a balloon secreted within the decedent's colon.

Medical Examiner's jurisdiction invoked according to the California Government Code 27491: Deaths due to known or suspected as resulting in whole or in part from or related to accident or injury, either old or recent.

## INCIDENT

| LOCATION OF INCIDENT | INCIDENT PLACE TYPE | AT WORK | AT RESIDENCE |
|---|---|---|---|
| | Jail, Prison, Detention Facility | ☐ | ☐ |

| ADDRESS (STREET, CITY, STATE, ZIP) | COUNTY |
|---|---|
| 1173 Front Street, San Diego, California, 92101 | San Diego |

| DATE AND TIME OF INCIDENT | INVESTIGATING AGENCY | OFFICER | BADGE # | REPORT # |
|---|---|---|---|---|
| 03/16/2022 unk | San Diego Sheriff | Det Jurisaga | | 22111544 |

| DECEDENT WAS | BELTED | HELMETED | POSITION | ON PRIVATE PROPERTY |
|---|---|---|---|---|
| | No | ☐ YES ☑ NO | | ☐ YES ☐ NO |

| VEHICLE | LICENSE NUMBER | STATE |
|---|---|---|
| | | |

## NOTIFICATION

| IDENTIFIED BY | METHOD | DATE AND TIME |
|---|---|---|
| San Diego Sheriff's Department | Visually | 03/16/2022 |

| FUNERAL HOME | PROPERTY | PUBLIC ADMINISTRATORFalse | TYPE OF EXAM |
|---|---|---|---|
| | ☑ YES ☐ NO | ☐ YES ☑ NO | Autopsy |

| NAME OF NOK OR OTHER | RELATIONSHIP | DATE NOTIFIED | NOTIFIED BY |
|---|---|---|---|
| Sabrina Schuck | Mother | 3/16/2022 | By Phone |

| San Diego Medical Examiner<br>5570 Overland Avenue, Suite#101<br>San Diego, CA 92123-1206<br>(858) 694-2895 | Case Number<br>Investigator<br>Date of Death<br>Date Today | : 2022-00982<br>: Charles Thomson<br>: 03/16/2022<br>: 04/16/2022 |
|---|---|---|

## INVESTIGATIVE NARRATIVE

**Decedent:** SCHUCK, William

**Antemortem Events:**
The following information was learned on 03/16/2022 during a telephone conversation with the decedent's mother, Sabrina Schuck. The decedent previously resided with family but had moved to San Diego during Calendar Year 2021 in order to attend classes at Mesa College. In January 2022, the decedent relocated with the assistance of his parents to his own apartment in the city of San Diego. On 03/16/2022, the decedent's parents spoke with a friend to the decedent who was in a motor vehicle collision along with the decedent resulting in the totaling of two vehicles. Sabrina was aware of the decedent's subsequent arrest and incarceration in the San Diego Central Jail.

The following information was learned on 03/16/2022 during a personal conversation with San Diego County Sheriff's Department Homicide Detective Jurisaga regarding the preliminary investigation of the incident associated with this case. On 03/10/2022, the decedent was arrested by San Diego Police Department Officers and charged with driving under the influence of drugs along with other violations associated with a motor vehicle collision that day (San Diego Police Department Case #22010489). The decedent was transported to the UC San Diego Medical Center Emergency Department for a clearance physical but refused medical care against medical advice. The decedent was then transported by law enforcement to San Diego Central Jail for in-processing and placed in a single occupancy holding cell in which he remained until 03/15/2022. During his process screening, a body scan examination revealed the decedent may have secreted a balloon into his colon prior to arrival. On 03/15/2022 at 2046 hours, the decedent was transferred to a single-occupancy cell located on the facility's 7th floor in Module D cell 01. The decedent did not have contact with any other inmates at the facility during his incarceration period. On 03/16/2022 at 0344 hours, deputies arrived at Module D to provide the morning meal. The decedent declined his meal and deputies noted the numerous bedsores on his body; the deputies scheduled a medical wellness check for later that morning. At 1000 hours, medical staff arrived at the decedent's cell to find him unresponsive while lying on his bed. Medical staff called 9-1-1 at 0941 hours to request emergency medical services prior to transitioning the decedent to the module's dayroom floor and providing cardiovascular life support procedures while awaiting the arrival of paramedics. San Diego Fire Department Engine 201 was dispatched to the call for service. Upon their arrival at 0949 hours, paramedics contacted the decedent and provided advanced cardiovascular life support procedures to no avail prior to contacting Dr. Mastonis of the Palomar Medical Center's Emergency Department via radio with death being pronounced at 1018 hours. San Diego Central Jail personnel contacted their agency's Homicide Division with Detective Jurisaga and her team dispatched to the call for service. Upon their arrival, Detective Sergeant Lewis ID 0307 telephoned the San Diego County Medical Examiner's Office at 1108 hours to report the incident with jurisdiction being invoked. San Diego Central Jail personnel searched the decedent's cell without finding any drugs or paraphernalia.

**Past Medical, Surgical, and Social History:**
The following information was learned on 03/16/2022 during a telephone conversation with the decedent's mother, Sabrina Schuck. The medical history included multiple mental health diagnoses to include Attention Deficit Hyperactivity Disorder; Tourette's Syndrome; Dyslexia; and Oppositional defiant disorder. The social history included polysubstance abuse to include the use of ketamine; hallucinogenics; alcohol; and marijuana. The decedent was not known to voice suicidal ideations nor have attempts of self-harm.

**Scene Description:**
On 03/16/2022 at 1357 hours, I arrived at the decedent's location which was within the San Diego Central Jail in Module D Cell 01 located on the facility's seventh floor. The module had controlled access and consisted of a central dayroom; one upstairs and one downstairs shower; and multiple single-occupancy cells. The decedent's cell was dirty with multiple tissue papers scattered throughout the space. The decedent's cell was at ground level and next to the shower. The decedent was lying supine on the dayroom floor. No signs of foul play or ransack nor the presence of illicit drugs, alcoholic beverages, or suicide-type notes were found.

**Body Description:**
On further investigation, at 1427 hours I viewed the nude decedent as he lay supine upon the module's concrete floor; a white towel was laid upon the decedent's groin prior to my arrival. Items of medical intervention attached to the decedent's body included an oropharyngeal airway; automated external defibrillator pads; and an intravenous catheter with tubing and fluid bag attached to the decedent's right antecubital fossa. The decedent was cool to the touch with rigor moderately difficult to overcome with force. Blanching lividity present in the dependent areas of the decedent's body was consistent with the position in which he was viewed.

Crepitus was not felt in the skull or facial bones; neck; shoulders; anterior or posterior torso; or upper and lower extremities. The decedent was gaunt. Multiple scabbed defects of varying ages and sizes were in the face as well as in the anterior and posterior aspects of the body and its extremities. Palpable swelling was felt midline in the forehead inferior of the hairline as well as in the occipital area of the scalp. The eyes had tache-noire without petechiae or congestion. The lips were dry and covered with dried blood. The neck, shoulders, and anterior chest were unremarkable while the abdomen was flat and firm. Congestion and multiple defects were bilaterally in the upper and lower arms. The right hand and its fingers had multiple contusions as well as an area of sharp force trauma in the anterior aspect of the fifth finger. The legs and feet were congested. The remainder of the examination was unremarkable. No signs of neglect, abuse, or other trauma were noted.

92M Transport personnel Edmundo Arenas and Carlos Partida Jr. arrived on scene to assist me with the decedent's body. A yellow identification band was attached to the decedent's right leg. The decedent was placed in a new, clean, white vinyl body bag and sealed with tamper-evident seal 4387953 at 1515 hours. The decedent was then transported to the San Diego County Medical Examiner's Office for further evaluation.

**Special Requests:**
San Diego County Sheriff's Department Homicide Detective Jurisaga will be attending the autopsy with arrival time of 0900 hours on 03/17/2022

**Identification:**
The decedent's identity was confirmed on 03/16/2022 by San Diego Central Jail staff.

**Antemortem Specimens:**
Not applicable.

**Public Administrator:**
Not applicable due to the decedent's family residing in California.

**Other Important Factors:**
The decedent's body bag was initially sealed on 03/16/2022 at 1438 hours with blue seal 2614997 due to a misunderstanding with law enforcement. The body bag was resealed on 03/16/2022 at 1515 hours with red seal 4387953; Detective Jurisaga was informed of the change.

**Signed:** ______________________________ 03/16/2022
Charles Thomson
Medical Examiner Investigator

**Approved by:** ____________________________________________

# County of San Diego

**STEVEN C. CAMPMAN, M.D.**
CHIEF MEDICAL EXAMINER
(858) 694-2895

**MEDICAL EXAMINER'S DEPARTMENT**
5570 OVERLAND AVE, STE 101, SAN DIEGO, CA 92123-1215
http://www.sdcounty.ca.gov/me/

## AUTOPSY REPORT

| | | | |
|---|---|---|---|
| **Name:** | WILLIAM HAYDEN SCHUCK | **ME#:** | 2022-0982 |
| **Place of death:** | San Diego Central Jail<br>1173 Front Street<br>San Diego, CA 92101 | **Age:**<br><br>**Sex:** | 22 Years<br><br>Male |
| **Date of death:** | March 16, 2022; 1018 Hours | | |
| **Date of autopsy:** | March 17, 2022; 0948 Hours | | |

---

CAUSE OF DEATH: COMPLICATIONS OF COCAINE AND METHYLENEDIOXYMETHAMPHETAMINE (MDMA) TOXICITY

Contributing: PEPTIC ULCERS

MANNER OF DEATH: ACCIDENT

AUTOPSY SUMMARY:

I. Cocaine and methylenedioxymethamphetamine (MDMA) toxicity.
   A. Toxicology detected cocaine metabolite benzoylecgonine, MDMA, and MDMA metabolite methylenedioxyamphetamine (MDA); see Toxicology Report.
   B. Dehydration: elevated vitreous urea nitrogen, creatinine, sodium, and chloride; see Toxicology Report.
   C. Superficial pressure ulcers of torso and extremities.
   D. Focal acute bronchopneumonia; postmortem nasopharyngeal swab negative for SARS-C0V-2 (COVID-19) virus.
   E. History of polysubstance abuse disorder.

II. Peptic ulcers of duodenum.

III. Minor blunt force injuries of head, torso, and extremities.

IV. Status post attempted cardiopulmonary resuscitation.
   A. Fractures of left 4th and 5th sternocostal joints.
   B. Hemorrhage of soft tissues of anterior mediastinum.

OPINION: According to investigative information, review of San Diego Police Department Arrest Report, review of San Diego County Sheriff's Department medical records, and review of UC San Diego Health medical records, this 22-year-old man had a history of attention-deficit/hyperactivity disorder, Tourette's syndrome, dyslexia, oppositional defiant disorder, concussion, and polysubstance abuse disorder.

On the morning of March 10, 2022, at approximately 1136 hours, the decedent was driving a private passenger vehicle (Ford F150) and was involved in a multivehicle accident. He was restrained and airbags deployed. When officers arrived, the decedent had already self-extricated from the vehicle. During questioning by the officers, the decedent was unable to focus and was confused. There were concerns that he was under the influence of a controlled substance and that he may have head injury. Medics were called to the scene and the decedent refused treatment. Officers found a small baggie with powdery substance in his vehicle along with a loaded firearm. A baggie with powdery substance was found in his back pocket and another baggie with powdery substance was found in his wallet. The decedent was arrested by San Diego Police Department officers and transported to police headquarters for processing. The arrest report does not comment on any visible injuries on the decedent at the scene. Review of his booking photo shows no obvious facial injury.

During the booking process and medical screening, a medical clearance was requested by medical staff to continue his incarceration due to the history of motor vehicle collision. The decedent was transported to UCSD Medical Center Emergency Department for a clearance physical. The decedent arrived at UCSD Emergency Room at 1731 hours. Vital signs were documented as blood pressure of 142/102 mmHg, temperature of 98.1 degrees Fahrenheit, pulse of 95 beats per minutes, respirations of 15 per minute, and oxygen saturation of 99%. The decedent denied any injuries from the motor vehicle collision, including denial of head trauma or loss of consciousness at the time of the accident. The decedent had no medical complaints. He denied headache, neck pain, backpain, chest pain, and abdominal pain. He also denied using drugs that day. A physical examination was performed, and no external signs of trauma were documented. The decedent refused any additional workup even though medical staff recommended "at least chest x-ray for further evaluation." The decedent appeared "clinically sober" at that time and was deemed to have "decision-making capacity." The decedent decided to leave the hospital against medical advice and was discharged to jail.

The decedent was then transported by law enforcement to San Diego Central Jail. During intake medical screening, at approximately 2115 hours, the decedent answered "No" to all medical questions. He did not disclose any medical concerns and denied being on any medications. He also denied recent drug use. Vital signs were documented as blood pressure of 144/94 mmHg, temperature of 97.5 degrees Fahrenheit, pulse of 118 beats per minute, respirations of 18 per minute, and oxygen saturation of 100%. His SARS-

COV-2 (COVID-19) test was negative. Based on the decedent's responses, he was placed on the medical sick call list for future visit. Body scanning during intake was initially concerning for a balloon size foreign object which was later declared to be an 'air void" or "air pocket." No contraband was found on the decedent.

At approximately 2139 hours, the decedent was placed in a holding tank with several inmates until housing was available. There were no reported incidents with other inmates while he awaited housing. He was eventually transferred to a single-occupancy cell in Module D.

On March 12, 2022, the decedent was seen by a staff nurse. At that time, he stated he had attention deficit hyperactivity disorder (ADHD). A chest x-ray was performed and showed no evidence of an active pulmonary parenchymal or pleural disease process. The cardiovascular silhouette was within normal limits.

On the morning of March 15, 2022, at approximately 0845 hours the decedent was seen by a staff nurse during a wellness check. He reported he used "acid" drugs. The nurse described him as being disorganized, nonsensical, and disheveled. He was not wearing any pants and he had dry blood stains on his shirt. He was treated for a wound on his "shin" (possible misspelling for chin) and was scheduled for a psychological evaluation and follow up wound care. At 0930 hours, another staff nurse conducted a wellness check. She noted him lying on his bed naked and facing the wall. He refused to engage with her. She noted multiple pressure sores on his tailbone, buttocks, elbows and legs. She notified the floor deputies to have him evaluated by a medical provider as soon as possible. At approximately 1035 hours, the decedent was given clean clothes and escorted to the transportation bus for a court appearance. Upon return from court, he exited the bus and was placed in a holding tank. On the way to the holding cell, he lost his balance, slumped down the wall, sat on the floor, and then got up and continued to walk. At 2020 hours, while being escorted back to module D by two deputies, he abruptly stopped, fell to the ground, and sat on the floor. Deputies assisted him up, but he dropped to the ground a second time. He then stood up and walked on his own without assistance to his cell.

On March 16, 2022, at approximately 0344 hours, deputies arrived at Module D to provide the morning meal. The decedent declined his meal. At approximately 0907 hours, a deputy and a staff nurse conducted sick call but the decedent verbally refused treatment. At approximately 0934 hours, another nurse approached his cell to check his vitals but he refused. At approximately 0937 hours, deputies approached his cell to take him to lab and treatment for his chin abrasion and sores on his buttocks and found him unresponsive on the lower bunk. A radio call for 911 was placed. Deputies moved him to the floor. Cardiopulmonary resuscitation (CPR) was initiated. Narcan was given. Medical personnel arrived at 0943 hours and Emergency Medical Services arrived at 0949 hours. Lifesaving measures were continued until death was pronounced.

Deputies noted the inside of his cell contained a mattress, blanket, one unopened food tray, a white towel, hygiene items, and toilet paper. The cell had torn pieces of toilet paper scattered about the floor. Some had small amounts of red stains that appeared to be dried blood. No illicit drugs, drug paraphernalia, or suicide-type notes were found in the decedent's cell.

The autopsy documented a well-developed, thin (BMI 17.9) young adult male with evidence of attempted cardiopulmonary resuscitation consistent with history. There were fractures of the anterior left 4th and 5th sternocostal joints and there was hemorrhage of the soft tissues of the anterior mediastinum, consistent with attempted CPR. Numerous small superficial cutaneous wounds were on multiple body surfaces, some of which were minor blunt force injuries (abrasions, contusions/ecchymoses, and lacerations), and some of which appeared to be superficial pressure ulcers and nontraumatic in nature. A probable peri/postmortem laceration was noted on the left back of the head superimposed upon an older healing lesion, possible pressure ulcer. There was no associated intracranial injury associated with the defect. There was a single small abrasion on the left side of the neck with no internal neck injuries and no facial or conjunctival petechial hemorrhages. The only other significant autopsy findings were peptic ulcers in the duodenum and microscopic early focal acute bronchopneumonia in the lungs. A postmortem nasopharyngeal swab was negative for SARS-CoV-2 (COVID-19) virus.

Toxicological testing detected cocaine metabolite benzoylecgonine (0.04 mg/L), MDMA (0.02 mg/L), MDMA metabolite MDA (<0.01 mg/L), and cannabinoids THC (4.14 ng/mL) and metabolite THC-COOH (130 ng/mL) in the peripheral blood. No alcohol was detected. A vitreous chemistry panel showed an elevated creatinine (1.6 mg/dL), elevated urea nitrogen (103 mg/dL), slightly elevated sodium (153 mmol/L), and slightly elevated chloride (138 mmol/L), consistent with dehydration. There was no elevation of glucose or potassium. Elevation of creatinine and urea nitrogen can be seen in renal failure or dehydration. Causes of dehydration include, but are not limited to, not drinking enough fluids, vomiting, diarrhea, sweating, intrinsic kidney disease, and use of diuretics.

Based on the autopsy findings and the circumstances surrounding the death, as currently understood, the decedent likely died of a sudden cardiac arrest (arrhythmia) due to complications of mixed drug toxicity including dehydration, pressure ulcers, and early bronchopneumonia. His peptic ulcers with no apparent acute hemorrhage are considered a contributing condition. His minor cutaneous blunt force injuries were not contributory to his death. Therefore, the cause of death is listed as **complications of cocaine and methylenedioxymethamphetamine (MDMA) toxicity**, with **peptic ulcers** listed as a contributing condition, and the manner of death is classified as **accident**.

PAIGE PETERSON, M.D.
Forensic Pathology Fellow

SUPERVISING PATHOLOGIST:

BETHANN SCHABER, M.D.
Deputy Medical Examiner

Date signed:

IDENTIFICATION: When initially viewed, the body is in a white vinyl body pouch, sealed with red tamper-evident tag number "4387953." A white rag is on the left thigh. A clear plastic bag containing a brown bag is on the lower extremities. The body is identified by a yellow Medical Examiner's identification band secured around the right ankle bearing the decedent's name and case number. A blue Medical Examiner's identification band bearing the decedent's name, case number and weight as received of 132 pounds is secured to the right ankle.

WITNESSES: Assisting is Forensic Autopsy Specialist Deanne Rugani-Osuna. Outside observers from the San Diego Sheriff's Department include Sergeant J. Stein, Detective A. Jurisaga, and Forensic Evidence Technicians D. Racicot, and M. Gervasoni.

CLOTHING AND PERSONAL EFFECTS: The body is received clad in a bloodstained white T-shirt, which is worn inside-out. The front of the T-shirt is pulled over the face and head.

Received within the body pouch is a clear plastic bag with inner brown paper bag containing:

1. Dark blue jacket with vertical partial-thickness tear on left side of body. There is orange-red material smeared on the left sleeve.
2. Multicolor plaid long-sleeve shirt with button front. There is a small amount of red-brown dried material on the front of the body to the right of the buttons.
3. Soiled black and white socks with tears on the bottoms.
4. Bloodstained gray pants.
5. A clear plastic baggie containing:
    1. iPhone in case. The case has a sticker on the back. The screen of the phone is broken.
    2. Two white-metal keys on a white-metal key ring.
    3. White-metal chain.
    4. Pink DMV paperwork (two pages).
    5. UC San Diego Health paperwork (three pages).
    6. Orange envelope containing twenty-dollar bill (American currency).
    7. TouchPay receipt.
    8. White belt with white-metal buckle.
    9. Black and red wallet, empty.
    10. VISA debit card.
    11. Mastercard.
    12. Portion of VISA debit card.
    13. Healthnet card.
    14. Two Park Blvd Liquor & Deli cards.
    15. Discover card.
    16. Gift card.

EVIDENCE OF MEDICAL THERAPY:

1. Oropharyngeal airway.
2. Defibrillator pads on right side of chest and sidewall of left side of chest and defibrillator electrode adhered to T-shirt.
3. Intravascular catheter secured with clear tape in right antecubital fossa with attached bag of normal saline.

## EXTERNAL EXAMINATION

*Injuries are described in a separate section below.*

GENERAL: The body is that of a normally developed, thin, light-complexioned young adult male appearing consistent with the listed age of 22 years. The length is 72-1/2 inches, and the weight is 132 pounds as received. The body is well preserved, cold, and has not been embalmed. Rigidity is fully developed in the jaw and extremities. Lividity is pink-purple, nonblanching, and in a posterior distribution. There is early green decomposition discoloration of the lower abdomen.

HEAD: The scalp is covered with light brown hair measuring up to 8 inches on the top of the head. The facial hair consists of 1/4 inch mustache and 3/4 inch beard at the tip of the chin. The ears are normally formed and without drainage. The earlobes are not pierced. The irides are green, the corneas clear, and the bulbar and palpebral conjunctivae free of petechiae. The sclerae are white. The nose is intact, and the nares are clean and unobstructed. The lips are normally formed. The lip mucosa has drying artifact and scaling. There is a 3/16 x 1/8 inch red-brown scabbed wound on the right oral commissure. There is a 1/4 x 1/8 inch red-brown scabbed wound on the left oral commissure. The teeth are natural and in good condition.

NECK: The neck is symmetrical.

CHEST AND ABDOMEN: The chest is normally formed, symmetrical, and without palpable masses. The abdomen is flat and soft. No masses are palpable. There are several red-brown scabbed wounds ranging in size from 1/16 to 1/8 inch in greatest dimension on the suprapubic area within the pubic hair.

EXTERNAL GENITALIA: The atraumatic external genitalia are those of a normal circumcised adult male with both testes palpable in the scrotum.

BACK: The back is straight. The anus is atraumatic. There is a strip of white paper on the left side of the back. There are several dried pink-brown wounds overlying the scapula and thoracic spine, up to 1 x 1/2 inch that may represent superficial abrasions or partial-thickness pressure ulcers. There is a 2-1/2 x 2 inch pink-brown partial-thickness ulcer on

the sacrum which shows superimposed postmortem epidermal sloughing. There is a 2-1/4 x 1-1/2 inch area of dark red partial thickness pressure ulcers that range in size from punctate to 3/4 inch in greatest dimension on the inferior left buttock. There are coalescing dark red-brown crusted pressure ulcers on the inferior right buttock that measure in aggregate 3 x 1 inch.

ARMS: The arms are normally formed. No track marks or ventral wrist scars are noted. The fingernails are short and intact. There are several dried pink-brown wounds on the elbows and forearms that may represent superficial abrasions or partial-thickness pressure ulcers; see "Evidence of Injury" section below.

LEGS: The legs are normally formed and have no edema, amputations, or deformity. There is a 5/8 x 1/2 inch scabbed partial-thickness ulcerated lesion on the mid anterior right lower leg, which shows faint green peripheral discoloration. There is a 3/16 x 1/8 inch partial-thickness ulcerated lesion with surrounding faint green discoloration on the mid anterior left lower leg. The toenails are short with brown debris beneath the nails. There is a small amount of dry brown debris on the plantar surfaces of the feet. There is a small amount of dirt on the posterior left lower leg. There is dried and liquid blood on the legs.

BODY MARKINGS (SCARS AND TATTOOS):
Scars: Anterior left shoulder, 4 inches.

Tattoos:
1. Right lower leg, monochromatic.
2. Right thigh, monochromatic.
3. Right buttock, monochromatic.

## EVIDENCE OF INJURY

HEAD
There is a 5-1/2 x 2-1/2 inch area of scabbed red-brown abraded contusions that range in size from punctate to 3/4 inch in greatest dimension that extends from the right side of the forehead to the left side of the forehead. There is a 1-1/4 x 1 inch red-purple contusion on the left side of the face, anterior to the left ear. There is a 5/8 x 3/16 inch brown scabbed abrasion with overlapping partial-thickness laceration on the right side of the chin. There is a 3/16 x 1/8 inch brown scabbed abrasion on the left side of the submental area. There is a 1-5/8 inch full-thickness non-hemorrhagic laceration of the left occipital scalp. There is minimal dried blood in the adjacent scalp hair. The surrounding skin has dried red brown partially scabbed abrasion rim measuring up to 3/16 inch on the superior aspect and the inferior aspect; there is no associated soft tissue hemorrhage of the underlying scalp. There is small soft tissue hematoma of the right parietal scalp. There are no skull fractures. There is no intracranial hemorrhage.

NECK
There is a 3/4 x 1/8 inch brown scabbed abrasion on the superior left side of the neck. There are no internal neck injuries.

TORSO
There is a 1/4 x 1/4 inch red-brown scabbed abrasion on the right side of the upper chest. There is a 5 x 4-1/2 inch area of oval faint red compression markings on the midline chest with overlapping yellow-red abrasions that range in size from 1/8 to 3/8 inch in greatest dimension, consistent with attempted resuscitative efforts. There is a 4 x 2 inch area of red abraded contusions ranging in size from 1/8 to 5/16 inch in greatest dimension that extends from the anterior right hip to the lateral right hip. There is a 1-1/8 x 3/16 inch interrupted yellow-red abrasion on the left lower quadrant of the abdomen. There is a 11 x 3-1/2 inch area of red to red-brown to pink-brown wounds that range in size from 3/16 to 1-1/8 inch in greatest dimension that extends from the superolateral right side of the back to the mid right side of the back. A 2-1/2 x 3/4 inch area of red abrasions that range in size from 1/2 to 3/4 inch in greatest dimension is on the posterior left shoulder. There is a 3 x 1 inch area of red-brown to pink-brown wounds that range in size from 5/16 to 1-1/2 inches in greatest dimension on the mid left side of the back. There is a 10 x 6 inch area of dark red-brown wounds that range in size from punctate to 1/2 inch in greatest dimension on the mid back to lower back, some overlying spinous processes of the vertebrae. There is a 5-1/2 x 2-1/2 inch area of red abraded contusions that range in size from 1/4 to 2 inches in greatest dimension on the lateral left hip.

There are minimally hemorrhagic nondisplaced fractures of the left 4th and 5th sternocostal joints as well as soft tissue hemorrhage of the anterior mediastinum, compatible with attempted CPR.

EXTREMITIES
There is a 1/8 x 1/8 inch red scabbed abrasion on the distal ventral right upper arm, which is lateral to a 1 x 1/4 inch red contusion. There are multiple small red abraded contusions ranging in size from 1/8 to 2 inches in greatest dimension along the dorsal surface of the right arm, that extends from the distal dorsal right upper arm to the dorsal right hand. There is a 1 x 1/4 inch non-hemorrhagic tan abrasion on the proximal ventromedial right forearm. There are four parallel linear pink compression markings horizontally-oriented on the distal lateral right forearm. The compression markings range in size from 1-1/8 to 1-1/4 inch in greatest dimension; from superior to inferior the distance between markings is 1/16 inch, 3/16 inch and 1/16 inch. There is a 2-1/2 x 1-1/4 inch red abraded contusion on the distal lateral right forearm. There is a 1-1/4 inch partially avulsed skin flap on the pad of the right thumb without associated abrasion or contusion. There are two ovoid areas of avulsed epidermis, exposing dermis, on the palmar 5th finger of the right hand, which measure 1/4 x 3/16 inch and 5/16 x 5/16 inch from distal to proximal. There is a 2-3/4 x

3/8 inch area of red to brown scabbed abrasions ranging in size from 1/16 to 1/4 inch in greatest dimension on the dorsal and lateral aspects of the 2nd finger of the right hand. There is a 1/2 x 1/16 inch red abrasion on the dorsal 3rd finger of the right hand. There is black ecchymosis of the base of the right thumbnail.

There is a 2-1/2 x 2 inch red-purple contusion on the proximal anterior left upper arm. There is a 2-1/2 x 2 inch red-purple contusion on the proximal lateral left upper arm. There is a 2-1/2 x 2 inch red-purple contusion on the mid lateral left upper arm. There is a 6 x 3 inch area of red abraded contusions ranging in size from punctate to 5/8 inch in greatest dimension that extends from the distal dorsal left upper arm to the proximal dorsal left forearm. There is a 1/2 x 1/2 inch red contusion on the mid dorsal left forearm. There is a 1/4 inch tan-pink scabbed abrasion on the mid medial left forearm. There is a 3/4 x 7/16 inch red-brown scabbed abraded contusion on the distal medial left forearm. There is an irregularly-shaped 3/4 x 1/2 inch pink-red abraded contusion on the distal lateral left forearm. There is a 1/2 x 5/16 inch pink-brown scabbed wound on the dorsal left hand which is surrounded by red ecchymosis. There is a 3-1/4 x 2-1/2 inch area of red-brown scabbed abrasions ranging in size from punctate to 1/8 inch in greatest dimension on the dorsal left hand and dorsal left fingers. There is a 1/4 x 1/8 inch red abrasion on the palmar middle phalanx of the 5th finger of the left hand.

Small red abraded contusions ranging in size from 1/4 to 1 inch in greatest dimension are scattered on the anterior right thigh to the dorsal right foot. There is a 3-1/2 x 2 inch red-purple contusion on the lateral right foot. Small, 1/8 to 3/8 inch diameter, red-brown abrasions are on the dorsal right foot and dorsal surfaces of the toes.

There are multiple small pink-red to red-brown abraded contusions ranging in size from punctate to 2-3/4 inches in greatest dimension extending from the distal anterior left thigh to the dorsal left foot. There is a 5 x 1-1/2 inch area of dried red-brown wounds on the lateral left knee. There is a 3 x 2 inch area of red-purple contusions ranging in size from 1/4 to 1-1/8 inch in greatest dimension on the posterior left lower leg. There is a 3/4 x 1/2 inch red-purple wound on the lateral left foot.

*These injures, having been described, will not be repeated.*

## INTERNAL EXAMINATION

BODY CAVITIES: The abdominal fat layer measures up to 0.5 cm in thickness. The body cavities have no hemorrhage or abnormal fluid. The serosal surfaces are smooth, glistening, and without adhesions. The organs are normally located. The diaphragm is intact.

CARDIOVASCULAR SYSTEM: The heart weighs 320 grams and is not enlarged. It has a normal shape with a smooth, glistening epicardium. The coronary arteries have a normal origin and distribution with right dominance. They have no atherosclerotic stenosis and are widely patent.

The myocardium is red-brown, firm, and uniform without focal fibrosis, softening, or hyperemia. The ventricles are not dilated or hypertrophied. The right ventricle, left ventricle, and interventricular septum measure 0.3 cm, 1.4 cm, and 1.4 cm, respectively.

The endocardium is intact, smooth, and glistening. The cardiac valve leaflets are of normal number, pliable, intact, and free of vegetations. The atrial and ventricular septa are free of defects.

The aorta follows its usual course and has no atherosclerotic changes. There are no vascular anomalies or aneurysms. The vena cavae and pulmonary arteries are without thrombus or embolus.

RESPIRATORY SYSTEM: The right and left lungs each weigh 320 grams and have the usual lobation. The pleurae are smooth and glistening; the lungs have moderate anthracotic pigment. The lungs are well expanded and crepitant. The parenchyma is dark red and exudes mild amounts of fluid. The lungs have no consolidation, hemorrhage, infarct, tumor, gross fibrosis, or enlargement of airspaces. The bronchi contain no foreign material and have unremarkable mucosa.

HEPATOBILIARY SYSTEM: The liver weighs 1400 grams. The intact capsule is smooth and glistening. The parenchyma is red-brown and uniform without mass, hemorrhage, yellow discoloration, or palpable fibrosis.

The gallbladder contains an estimated 40 mL of bile and no stones. Its mucosa is uniform, and the wall is not thickened.

The pancreas has a normal size, shape, and lobulated structure. The parenchyma is pink-tan, firm, and uniform.

HEMOLYMPHATIC SYSTEM: The spleen weighs 110 grams. The capsule is smooth and intact. The parenchyma is maroon, firm, and uniform.

There is no enlargement of the lymph nodes in the neck, chest, or abdomen.

ENDOCRINE SYSTEM: The thyroid gland is not enlarged, and the lobes are symmetrical. The parenchyma is uniform, firm, and red-brown.

The adrenal glands have the usual size and shape. The cortices are thin, uniform and yellow, and there is no hemorrhage or tumor. The pituitary gland is not enlarged.

GASTROINTESTINAL SYSTEM: The esophagus and gastroesophageal junction are unremarkable. The stomach contains approximately 40 mL of green fluid without visible pills or pill residue. The gastric mucosa is intact. The duodenal mucosa shows three well-circumscribed partial-thickness brown ulcerations near the pylorus measuring up to 1.7 cm in greatest dimension. The small and large intestines are opened longitudinally along their entire lengths revealing green to brown feces with no foreign material. The appendix is unremarkable to inspection and palpation.

GENITOURINARY SYSTEM: The right and left kidneys each weigh 130 grams and have a normal shape and position. The cortical surfaces are smooth. The kidneys have the usual corticomedullary structure without tumors or cysts. The pelves and ureters are not dilated or thickened. The bladder contains 150 mL of brown-yellow urine. The mucosa is intact, and the bladder wall is not hypertrophied.

The prostate gland is of average size and grossly unremarkable. The testes are not examined.

NECK: The tongue, strap muscles, and other anterior neck soft tissues have no hemorrhage. The hyoid bone and the cartilaginous structures of the larynx and trachea are normally formed and without fracture. The airway is unobstructed, lined by smooth, pink-tan mucosa, and contains no foreign material. The cervical vertebrae have no displacement, hypermobility, or crepitus.

MUSCULOSKELETAL SYSTEM: The musculoskeletal system is well developed. There are no fractures of the clavicles, vertebrae, or pelvis. The ribs are not brittle. The skeletal muscle is dark red and firm.

HEAD: The calvarium and base of the skull are normally configured and have no fractures. The dura is intact, and there is no epidural or subdural hemorrhage.

CENTRAL NERVOUS SYSTEM: The unfixed brain weighs 1450 grams. The leptomeninges are glistening and transparent without underlying hemorrhage, exudate, or cortical contusions. The hemispheres are symmetrical and have a normal gyral pattern. There is no flattening of the gyri, narrowing of the sulci, midline shift, or evidence of herniation. The arteries at the base of brain have no atherosclerotic changes or aneurysms.

Sections through the cerebral hemispheres have a uniform, intact cortical ribbon and uniform white matter. The basal ganglia, thalami, hippocampi and other internal structures

are symmetrical and without focal change. The ventricles are not enlarged, and the linings are smooth and glistening. Sections of the brainstem and cerebellum show an intact structure without focal lesions.

## SPECIMENS RETAINED

TOXICOLOGY: Samples of central and peripheral blood, vitreous humor, gastric contents, urine, and liver are retained for toxicology.

MICROBIOLOGY: A postmortem nasopharyngeal swab is submitted for COVID-19 viral testing.

HISTOLOGY: Representative sections of organs and tissues are retained. Sections of the heart (1), lungs (6), liver (1), kidney (1), and occipital scalp (2) are submitted for histology.

Cassette summary:
Cassette 1: Occipital scalp lesion.
Cassette 2: Occipital scalp lesion.
Cassette 3: Right kidney and left ventricle of heart
Cassette 4: Right lung (central and peripheral)
Cassette 5: Left lung (central and peripheral)
Cassette 6: Liver
Cassette 7: Lung
Cassette 8: Lung

PHOTOGRAPHS: Facial identification photographs, external overall photographs, and photographs of selected findings are taken.

RADIOGRAPHS: Full-body radiographs are performed and show orthopedic hardware in the left humerus.

EVIDENCE: A blood specimen is turned over to the Forensic Evidence Technicians.

## MICROSCOPIC EXAMINATION

HEART: Section shows orderly cardiomyocytes. There is no increase in interstitial or perivascular fibrosis. The myocardial vessels contain bacterial forms; there is no associated inflammation. There is no myocardial necrosis or inflammatory cell infiltrate.

LUNGS: Sections show alveolar lung parenchyma with variably dilated and atelectatic airspaces with scattered pigmented alveolar macrophages and extravasated red blood cells. Rare alveolar spaces of the left lung contain neutrophils. The airways contain macrophages, sloughed respiratory epithelial cells, and extravasated red blood cells. In multiple sections, airways and adjacent alveoli contain early neutrophil infiltrate. There is no bacterial overgrowth. The vessels contain rare optically clear vacuoles displacing red blood cells consistent with CPR-related fat emboli.

LIVER: One section shows expected hepatic architecture. There is minimal mixed microvesicular and macrovesicular steatosis. There is no evidence of fibrosis or necrosis. There is no lobular inflammatory infiltrate. The vessels are unremarkable.

KIDNEY: Section shows numerous unremarkable glomeruli. The tubules are unremarkable. There is no fibrosis. The vessels contain bacterial forms; there is no inflammation.

OCCIPITAL SCALP: The edge of the scalp laceration shows epithelial ulceration and necrosis. There is bacterial overgrowth on the edge of the tissue, extending from the epidermis to the subcutaneous tissue. There is vascular congestion and extravasation of red blood cells in the deep subcutaneous tissue, along with a mild neutrophilic infiltrate and focal necrosis. Iron stains are negative.

PP:BS:cmh
D: 3/17/22 T: 3/18/22
Rev. 2/7/23 cmh

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

DEPARTMENT OF THE MEDICAL EXAMINER
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

## TOXICOLOGY REPORT

| | |
|---|---|
| Name: | **SCHUCK, William** |
| Medical Examiner Number: | **2022-00982** |
| Date of Death: | **03/16/2022** |
| Time of Death: | **10:18** |
| Pathologist: | **Paige Peterson, M.D. / Bethann Schaber, M.D.** |
| Specimens Received: | **Central Blood, Gastric, Liver, Peripheral Blood 1, Peripheral Blood 2, Urine, Vitreous** |
| Date Specimens Received: | **03/18/2022** |

| Test Name (Method of Analysis) | Specimen Tested | Result |
|---|---|---|
| Alcohol Analysis (GC/FID-Headspace) | Peripheral Blood 2 | |
| Alcohol (Ethanol) | | Not Detected |
| Acetone, Isopropanol, Methanol | | Not Detected |
| Drugs of Abuse Screen (ELISA) | Central Blood | |
| **Amphetamines** | | **Presumptive Positive** |
| Benzodiazepines | | Not Detected |
| Buprenorphine | | Not Detected |
| **Cannabinoids** | | **Presumptive Positive** |
| Carisoprodol | | Not Detected |
| **Cocaine metabolites** | | **Presumptive Positive** |
| Fentanyl | | Not Detected |
| Methadone | | Not Detected |
| Opiates | | Not Detected |
| Phencyclidine (PCP) | | Not Detected |
| Zolpidem | | Not Detected |
| Base Screen (GC/MS) | Peripheral Blood 1 | |
| **MDMA** | | **Detected** |
| Acid/Neutral Screen (HPLC/DAD) | Peripheral Blood 1 | Not Detected |
| Amphetamines (LC/MS) | Peripheral Blood 1 | |
| Amphetamine | | Not Detected |
| Ephedrine | | Not Detected |
| **MDA** | | **Detected (<0.01 mg/L)** |
| **MDMA** | | **0.02 mg/L** |
| Methamphetamine | | Not Detected |
| Phentermine | | Not Detected |
| Phenylephrine | | Not Detected |
| Pseudoephedrine | | Not Detected |
| Cannabinoids (GC/MS) | Peripheral Blood 1 | |
| **THC** | | **4.14 ng/mL** |
| **THC-COOH** | | **130 ng/mL** |

# County of San Diego

STEVEN C. CAMPMAN, M.D.
CHIEF MEDICAL EXAMINER

**DEPARTMENT OF THE MEDICAL EXAMINER**
5570 OVERLAND AVE., STE. 101, SAN DIEGO, CALIFORNIA 92123-1206
TEL: (858) 694-2895 FAX: (858) 495-5956

| | | |
|---|---|---|
| Cocaine metabolites (GC/MS) | Peripheral Blood 1 | |
| **Benzoylecgonine** | | **0.04 mg/L** |
| Cocaethylene | | Not Detected |
| Cocaine | | Not Detected |
| Vitreous Chem Panel (Cobas c111) | Vitreous | |
| **Chloride** | | **138 mmol/L** |
| **Creatinine** | | **1.6 mg/dL** |
| **Glucose** | | **2 mg/dL** |
| **Potassium** | | **12.3 mmol/L** |
| **Sodium** | | **153 mmol/L** |
| **VUN** | | **103 mg/dL** |

Unless otherwise requested, all specimens will be destroyed six (6) months after the closure of the case by the Medical Examiner
End Results

**Comment:**

Approved and Signed: ______________________________
08/18/2022 Theresa Hippolyte
Forensic Toxicology Laboratory Manager

# EXHIBIT S

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

No. 23-cv-00785-DMS-AHG

---

VIDEOTAPED AND VIDEOCONFERENCE
DEPOSITION OF OLUGBENGA B. OJO, M.D.

---

ESTATE OF WILLIAM HAYDEN SCHUCK; SABRINA SCHUCK; TIMOTHY SCHUCK,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, in his individual capacity; KELLY MARTINEZ, in her individual capacity; CORRECTIONAL HEALTHCARE PARTNERS (CHP); JON MONTGOMERY, DO, in his individual capacity; JAMEELYN BARRERA, in her individual capacity, ROMEO DEGUZMAN, in his individual capacity; EMILY LYMBURN, in her individual capacity; CARIN ECHON, in her individual capacity; JENNIFER VIVONA, RN (#6338), in her individual capacity; DEPUTY THOMAS MACE (#4324), in his individual capacity; DEPUTY JEFF AMADO (#4193), in his individual capacity; DEPUTY ALLAN VALBUENA, in his individual capacity; DEPUTY JUSTIN PAGE, in his individual capacity; DEPUTY JESSICA RAMIREZ, in her individual capacity; NICHOLAS KAHL, NP, in his individual capacity; DEPUTIES DOES, in their individual capacities; MEDICAL PROVIDERS DOES 2 - 3, in their individual capacities; DEPUTY SUPERVISOR DOES 1 - 6, in their individual capacities,

Defendants.

---

VOLUME I

April 11, 2025

9:06 a.m. - 11:59 a.m.

The deposition of OLUGBENGA B. OJO, M.D., taken before Leeann Stellor, a Registered Merit Reporter, Certified Realtime Reporter, and a Notary Public in and for the County of Denver and the State of Colorado, via Zoom, on Friday, April 11, 2025, at the hour of 9:06 a.m. Pacific Time.

MR. SCOTT: Good morning. Tim Scott on behalf of the plaintiffs. And also with us are Lauren Mellano and Michelle Angeles.

THE VIDEOGRAPHER: Okay. We are ready to proceed. The court reporter today Leeann Stellor, NCRA No. 832952, with Steno.

Would the reporter please swear in the witness.

MS. COURT REPORTER: Thank you. Counsel.

The parties and counsel agree that while I am a license notary and court reporter, the witness may be in a state where I am not licensed. The parties stipulate that this deposition may be taken before me.

If any party does have an objection to this manner of reporting or anything stated above, please state so now. Thank you.

MR. SCOTT: No objection.

MS. COURT REPORTER: Thank you. We may proceed.

(Witness duly sworn.)

OLUGBENGA B. OJO, M.D.,

having been first duly sworn, was examined and testified as follows:

Q. And of those 100 facilities, how many are certified by the NCCHC as compliant with all of their standards?
A. I don't have that number off the top of my head, but I can tell you for -- there's an accred -- accreditation body which is called the American Correctional Association. And if memory serves me right, I think all facilities have American Correctional Association accreditation. That I know. That number I know off the top of my head, but I don't know the NCCHC number.
Q. Do you -- can you provide an estimate of the number of facilities in the system, the -- the systems you oversee that are accredited by the NCCHC?
A. I don't have --
MR. SCOTT: Objection. Calls for speculation.
A. I -- I don't have a number off --
Q. Okay.
A. -- the top of my head.
Q. Do you -- do you know if it's more than one?
A. I think over the years Texas has moved more from ACA accreditation. We've stopped with

ACA, so that's the number I know.

Q. Okay. And are you aware of any jails in Southern California that are accredited by the NCCHC?

A. Not to my knowledge. I don't -- I don't know. I don't -- I don't have a -- I don't have that information.

Q. Okay. Other than the NCCHC accreditation or credential, sorry, that -- that you just described, would there be any other updates to your resum ?

A. No.

Q. So other than that, the credential that you added, your resum  encompasses all of your education and experience in the correctional healthcare field?

A. Yes.

Q. Okay. I see you're nodding your head yes. Okay.

So I'd like to go back then to Exhibit No. 2, and I'll pull it back on the screen for us.

Does this expert report that we marked as Exhibit No. 2 contain all of the opinions that you plan to give at trial?

with -- with urgent medical needs.

So it's -- it's an important process for prisons and jails.

Q. I understand that.

But what treatment do you believe Nurse Barrera should have provided that she didn't provide to Schuck?

A. She should have escalated his care based on the evaluation that she documented.

Q. And that escalation of care is considered a treatment?

A. It can be considered part of the treatment, treatment plan.

Q. And based on your review, I -- I think we've already testified that she -- based on her observation, she scheduled him for a review by a qualified mental health professional, correct?

A. That's what her records stated.

Q. Okay. And, again, with respect to the NCCHC, you can't name any facilities in California or Texas that are accredited by the NCCHC as meeting all their standards, correct?

MR. SCOTT: Object. Isn't that asked and answered? Didn't -- didn't you ask that precise question this morning?

MR. INMAN: No, a little bit different.
Q. Go ahead, sir.
MR. SCOTT: You can tell when you start by saying "and again," and then you ask the question.
But I guess you can answer it again, if you'd like to.
MR. INMAN: Well, please don't make speaking objections, Mr. Scott. Just --
Q. Okay. Go ahead, Mr. -- Mr. -- Dr. Ojo, go ahead.
A. Not to my knowledge, sir. Not -- not that I can recall at this time.
Q. Okay. Thank you.
So the next opinion, No. 5, "RN Barrera did not obtain a release of information as required by the Receiving Screening procedure outlined in E.2.1, and order ER records."
She put "not indicated." What records would she have received, what information could she have received from the ER other than the discharge summary, given that Mr. Schuck had refused any treatment or evaluation at the ER?
A. (Inaudible).

there must have been a behavior observed by the court to make -- so -- and I think -- and there must have been a behavior done by the court to make -- to -- that would lead to that decision, for the court to say, hey, this guy needs to be seen. Something must have happened in court that would have led to that decision being made by the court.

Clearly they judge, the court, saw what they saw and said this guy needs evaluation. Go do it.

Q. So -- but you didn't see the order, so you don't know whether the court order actually said that he should be seen?

A. I can't remember. Like I said, I -- I can't remember if I -- if I saw the actual order. But I saw, you know, in the records, you know, it's -- it's a documented fact that, you know, he was seen and the -- the recommendation from the court was he needs to be evaluated.

I -- I can't remember if I saw the actual order, but I know that the records state after the court he was -- he was to be seen by jail medical.

Q. And so in your -- in your report you say, "RN -- RN Echon failed to schedule Mr. Schuck for a

then.

Q. Let's say hypothetically the order didn't say anything about being seen. It only said that he needed to be screened for medication. In this hypothetical, that's the scenario. And the nurse who received it, received it at the time when a doctor's not on duty. And she sees that he has an appointment scheduled for the next day for a wellness check or a qualified mental health provider visit, where they would be going through with Mr. Schuck his medications. The medication screening would occur there.

Is there anything she needs to do other than document the existence of the order --

MR. SCOTT: Object to the form of the question.

Q. -- or the visit?

A. (Inaudible).

MS. COURT REPORTER: I can't hear you, sir.

Q. (Simultaneous speaking) you're saying.

A. I'm -- I'm not sure I understand the question.

Q. Well, I gave you a hypothetical.

So the hypothetical is the order

only says to screen for medication. And the nurse that receives the order sees that he's got an appointment scheduled for the next day, where they would go through with Schuck his medications as -- in the ordinary course of the wellness check or the qualified medical health provider -- qualified mental health provider visit that's scheduled.

Is she -- does she need to do anything other than check that there's an appointment where he's going to be screened for medication?

MR. SCOTT: Object to the form of the question.

A. I'm not sure I underscan what screened for medication means. If it means --

Q. That's a great point.

A. If -- if it means screen for drug, then when she got there -- if -- if you mean screen for drug because there's a con -- concern for drug intoxication, at the very least she gets that, she calls the on-call doctor, this is what we've got. Then the doctor will get give an explicit order, get a urine drug test.

Q. So, in other words, you're saying the screen for medication would be ambiguous. You

wouldn't know if you received it what was meant by it?

A. I -- I don't know what was meant by screen for medication. No, sir.

Q. Okay. Thank you for that.

Okay. Let's go to Opinion No. 17. And this is -- this pertains to LVN Gallegos.

Do you know what the difference is between an LVN and an RN?

A. Yes, sir. An RN is a -- can -- can work independently, where an LVN has to take orders from an RN to -- to practice. The -- but -- but then it varies from state to state. Some states, so you just have to be -- and I'm not conversant with what they allow -- what LVNs. I -- I just spoke generally.

But that varies from state to state. So I'm not sure what LVNs are allowed to do in the state of California, or, you know, I don't know how that -- you know, it varies by state to state and sometimes actually by facility to facility. So I'm -- I'm not sure what the purviews are.

Q. So you don't know one way or the other whether in California LVN Gallegos, what the scope

you, sir.
A. Because there are a plethora of examples throughout the medical records I reviewed, sir. And we've talked about a few of them --
Q. That's just --
A. -- during this deposition.
Q. So you're basing that on just one patient, just on Schuck?
MR. SCOTT: Object to the form of the question.
A. Yes. Based on the care or lack thereof that Mr. Schuck reviewed at -- did not get.
Q. And just to kind of short circuit things here. Are all of these conclusions here, 1 through 9 of paragraph 38, based solely on one patient, Mr. Schuck?
MR. SCOTT: Object to form of the question.
A. Based on the medical records of Mr. Schuck. Yes, sir.
Q. Okay. With respect to No. 23, the disability rights organization, do you know what data they base their conclusions on?
A. No, I -- no, I do not.
Q. Okay. So you don't know one way or the

other whether they were using -- what -- what metrics they were using to make their conclusions about suicides in San Diego Jail?

A. No. No, I do not. I -- I do know that the -- the, you know, report from DRC and the report from the California -- I -- I -- I read this and I read the report from the California state auditor. But I -- I don't know what -- what metrics was specifically used. No, sir.

Q. And so you don't know if those metrics were adjusted based on demographics or length of stays in the jail, information like that?

A. No, I don't have that information.

Q. Okay. And by the way, you note the conclusions of the state auditor. Do you know what they base their conclusions on?

MR. SCOTT: Objection. Vague.

A. Pattern of events at the San Diego County Jail. You know, their -- if -- and I'm going to -- hopefully I get this right. There -- you know, it was a report from Michael Tilden, the state auditor. There were -- you know, San Diego County Jail has the highest in-custody jail death rate.

And I think the number from 2006 to -- from 2006 to 2020, 185 in-custody deaths. So

there was -- you know, it was a pattern -- pattern of -- pattern -- pattern of -- it was a pattern, you know, that the -- that was observed by the state auditor, from -- from --

Q. And --

A. -- from that landmark report. I think that report was --

Q. When the --

A. -- actually February of 2022.

Q. Okay. And so when it says, "highest rates of in-custody jail deaths," again you don't know what metrics they're basing that on, correct?

MR. SCOTT: Object to the form of the question.

A. I think the metric is in-custody deaths. Deaths when you're in -- when you're in jail. I guess I'm not --

Q. Would it be --

A. -- (simultaneous speaking).

Q. Okay. Let's say for suicides, for example, because that applies both to the disability rights community and to commissioning and to the state auditor.

Let's say that white people commit suicide at a higher rate than people of other races.

If the population of the San Diego Jail is more white than in other places, would you expect San Diego Jail to have more suicides than other places?

MR. SCOTT: I object to the form of that question.

A. In that hypothetical scenario, yes, sir.

Q. Okay. And if the -- if the metric they're using is based on average daily population in the jail and the detainees in the San Diego Jail have shorter lengths of stay, so there's a lot more people cycling through, would you expect to see more deaths with a lot more people cycling through the jail than in other jails in the large communities?

A. I'm not sure that particular, you know, metric, that that would change. I think what could change is, you know, obviously, you know, if it's a bigger jail than most -- most of the jails, you know -- you know, that -- that would be a factor that -- you know, say if you -- if you -- and, you know, if you -- if you -- if you're bigger jail and, you know, you have more -- more patients, you're more likely to have more -- more deaths, it's possible.

Q. So -- so then if you have more detainees

coming in the jail than in other places, you would expect to have more deaths than other places?
A. It -- it's -- it's possible. Yes, sir.
Q. And you don't know one way or the other whether those met -- whether the metrics used were adjusted for differences such as that?
A. No. No, I don't for a fact.
Q. Did you review Dr. Montgomery's deposition?
A. Yes, I did. Yes.
Q. Do you recall anything from his testimony about how the state auditors reached their conclusions?
A. No, I don't recall, sir.
Q. If I told you that he testified that they -- the areas that the state auditor identified are the areas that the sheriff's department told the state auditors they were working on, would that refresh your recollection at all about his testimony?
A. No, it doesn't -- doesn't really help me much. No, sir.
Q. Did you review the -- the state auditor report?
A. I read -- I read it. I --

REPORTER'S CERTIFICATE

I, LEEANN L. STELLOR, Registered Merit Reporter and Certified Realtime Reporter within Colorado, ID 20004016879, appointed to take the deposition of OLUGBENGA B. OJO, M.D., do hereby certify that before the deposition he was duly sworn by me to testify to the truth; that the deposition was taken by me then reduced to typewritten form herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had.

I further certify that I am not related to any party herein or their Counsel, and have no interest in the result of this litigation.

In witness hereof I have hereunto set my hand this 25th day of April, 2025.

___________________________
Leeann L. Stellor
Registered Merit Reporter
Certified Realtime Reporter
and Notary Public

My commission expires June 8, 2028

# EXHIBIT T

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--o0o--

ESTATE OF WILLIAM HAYDEN SCHUCK; SABRINA SCHUCK; TIMOTHY SCHUCK;

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.
______________________________/

Case No. 23-cv-0785-DMS-AHG

Volume II

Pages 1 - 87

VIDEOTAPED DEPOSITION OF OLUBENGA B. OJO, M.D.

Friday, May 2, 2025

10:32 a.m. PDT

U.S. Legal Support - Remote Teleconference

Galveston, Texas

STENOGRAPHICALLY REPORTED BY:

CARRIE HEWERDINE, RDR, CSR No. 4579

JOB # 6871340

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--o0o--

ESTATE OF WILLIAM HAYDEN SCHUCK; SABRINA SCHUCK; TIMOTHY SCHUCK;

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.
_______________________________/

Case No. 23-cv-0785-DMS-AHG

Videotaped Deposition of OLUBENGA B. OJO, M.D., taken on behalf of the Defendants, via Zoom videoconference, commencing at 10:32 a.m., Friday, May 2, 2025, before Carrie Hewerdine, RDR, California CSR No. 4579, Texas CSR No. 12952.

the witness. And then counsel may begin.
Thank you.
MS. SCHULER: Katie Schuler on behalf of the Correctional Healthcare Partners and Nicholas Kahl.
MR. INMAN: I'm Steve Inman on behalf of the County defendants.
MS. MELLANO: Lauren Mellano on behalf of the Plaintiffs.
THE REPORTER: My name is Carrie Hewerdine, California Certified Shorthand Reporter, License Number 4579, also certified in Texas, taking this deposition remotely.
To the witness: Doctor, would you raise your right hand, please.

OLUBENGER B. OJO, M.D.,
having been first duly sworn, was examined and
testified as follows:

THE WITNESS: I do.
THE REPORTER: Thank you.
Go ahead.
/ /
/ /
/ /

EXAMINATION

BY MR. INMAN:

Q You mentioned that in addition to the documents from this case, you got the, uh, standards you're relying from the National Standards for Medical Care in Prisons and Jails.

Can you tell me where those standards come from?

A Umm, the NCCHC, the -- the National -- I may butcher this -- National Commission on Correctional Health Care.

Q Okay. Thank you.

You testified previously about LBNs' difference the responsibilities state by state.

So I'm wondering if you could tell me, do you know RNs, state by state, how the scope of their responsibilities may differ?

California versus Texas, for example?

A No. No, sir, I don't have the specific.

But I know, for the most part, they're -- they vary state -- vary throughout the nation, responsibilities, but I -- I don't know them offhand.

Q So you don't know, for example, what RNs can and can't do in California versus in Texas?

deaths or just in-custody deaths broadly?
MS. MELLANO: Object to the form of the question.
THE WITNESS: I'm sorry. I didn't get that question.
BY MR. INMAN:
Q Let me change it.
Is there any data, that you're aware of, that the State Auditor reviewed, other than the number of in-custody deaths in San Diego County jails?
MS. MELLANO: Objection. Misstates the testimony.
THE WITNESS: Not that I recall.
MR. INMAN: Okay. No further questions.
MS. SCHULER: I don't have anything further.
MS. MELLANO: Okay.
THE REPORTER: Does the witness wish to read and sign?
MS. MELLANO: Yes.
THE REPORTER: Could the Reporter get copy orders on the record, please.
MS. MELLANO: A synched video with transcripts.

REPORTER'S CERTIFICATE

I, CARRIE HEWERDINE, RDR, California CSR No. 4579, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed, with the witness requesting reading and signing of the transcript;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this [illegible]th day of May, 2025.

CARRIE HEWERDINE, Registered Diplomate Reporter
CA CSR No. 4579 / NV CCR No. 820 / NM CCR No. 521
WA CCR 21033864 / OR CCR 230123 / TX CSR 12952

# EXHIBIT U

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck; SABRINA SCHUCK, individually and in her capacity as Successor-in-interest; and TIMOTHY SCHUCK, individually and in his capacity as Successor-in-interest;<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | CASE NO.<br><br>3:23-CV-00785-DMS-AHG |

DEPOSITION OF PERSON MOST QUALIFIED

LT. AARON BOORMAN

VOLUME 2, PAGES 43 THROUGH 183

SAN DIEGO, CALIFORNIA

FRIDAY, OCTOBER 4, 2024

REPORTED BY: JULIA LENNAN
CSR NO. 12843

JOB NO. 1185500

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck; SABRINA SCHUCK, individually and in her capacity as Successor-in-interest; and TIMOTHY SCHUCK, individually and in his capacity as Successor-in-interest;

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

CASE NO. 3:23-cv-00785-DMS-AHG

DEPOSITION OF LT. AARON BOORMAN, VOLUME 2, taken on behalf of Plaintiffs, on Friday, October 4, 2024, at 10:02 a.m., at 1350 Columbia Street, Suite 600, San Diego, California, before Julia Lennan, California certified stenographic reporter, License No. 12843.

10:03:48 Madam Court Reporter, would you please swear in
10:03:50 our witness.
10:03:51

10:03:51 LT. AARON BOORMAN, VOLUME 2,
10:03:51
10:03:51 having been first duly sworn, testifies as follows:
10:03:51
10:03:51
10:03:51 EXAMINATION
10:03:51 BY ATTORNEY MELLANO:
10:04:03 Q Okay. All right. Good morning,
10:04:07 Lieutenant Boorman. I know we haven't met, but this is
10:04:12 a continuation of the deposition that Mr. Scott had
10:04:17 began in -- I think it was September, or was it late
10:04:22 August? Maybe late August.
10:04:24 A Somewhere around there.
10:04:26 Q Somewhere around there. Well, nice to meet
10:04:28 you.
10:04:29 So I'm just going to jump back in here. I
10:04:32 think there was maybe one issue that kind of arose
10:04:34 and -- at the beginning of the last deposition. So we
10:04:41 won't be asking you about any legal advice that you've
10:04:44 received. If there have been facts that are relevant to
10:04:50 Hayden Schuck's death or the investigation surrounding
10:04:54 that that are relevant, those are not privileged.
10:04:58 ATTORNEY MELLANO: I don't know if there's
10:04:59 anything you want to add to that Mr. Inman, but --
10:05:02 ATTORNEY INMAN: No.

11:03:28 Q Okay. So the County -- so the County did want to implement the change that was recommended, right?
11:03:40 A They were already working on -- so -- also, in a conversation I had with Dr. Montgomery in regards to this, since I wasn't involved with any of the drafting or anything like that, his statement in regards to the audit was basically that a lot of the recommendations that were made by the State Auditors were items that we were already discussing with them, telling them that we were looking into doing, prior to the State Audit and in the process of getting these things in place.
11:04:17 Q When was this conversation with Dr. Montgomery?
11:04:22 A I want to say it was yesterday.
11:04:24 Q Oh. And was that in preparation for your deposition?
11:04:25 A Yes. Sorry.
11:04:26 Q That -- you did not mention that, right? I didn't miss that earlier, right?
11:04:32 A I did not.
11:04:32 Q Okay. Is there anyone else that you can think of that you spoke to to prepare for today?
11:04:37 A No.
11:04:38 Q Okay. So it was, like, Sergeant Pike, those other deputies that you spoke of, and Dr. Montgomery?
11:04:43 A Yes.

REPORTER S CERTIFICATE

I, Julia Lennan, Certified Shorthand Reporter, CSR No. 12843, certify:

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness was put under oath by me; that the proceedings were recorded stenographically by me and were thereafter transcribed into typewriting; that a review of the transcript by the deponent was not requested; and that the foregoing is a true and correct transcript of the proceedings.

I do further certify that I am in no way interested in the outcome of this action or connected with or related to any of the parties in this action or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript, other than by order of the Court, renders this reporter's certificate null and void.

In witness whereof I have subscribed my name this 16th day of October 2024.

JULIA LENNAN,CSR NO. 12843

# EXHIBIT V

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF JON MONTGOMERY, DO

San Diego, California

Tuesday, August 20, 2024

Reported by: SUSAN SWAN, RPR, CRR, CCRR, CSR No. 7338

JOB No. 1087032
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

JON MONTGOMERY, DO, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:09 a.m. and ending at 12:25 p.m. on Tuesday, August 20, 2024, before SUSAN SWAN, RPR, CRR, CCRR, Certified Shorthand Reporter No. 7338.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

yourselves and state whom you represent.

MS. ANGELES: Michelle Angeles, McKenzie Scott, for the plaintiffs.

MR. INMAN: Steve Inman on behalf of the County

09:11AM of San Diego and the individual County defendants.

MS. SCHULER: Katie Schuler on behalf of Correctional Healthcare Partners and Nicholas Kahl.

THE VIDEOGRAPHER: Thank you. Would the court reporter please swear in the witness.

JON MONTGOMERY, DO,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. ANGELES:

Q. Good morning, Dr. Montgomery.

A. Good morning.

Q. As you just heard, we're here to take your deposition today.

09:12AM Have you ever participated in a deposition before?

A. Yes, a few.

Q. When do you think was, like, your last deposition?

09:12AM A. It's been several months. I have been involved

Central Jail had participated in sort of like a preliminary, like, review or assessment by the -- they had invited them to sort of do a review of the jail; that they had invited the NCCHC to do a review and see sort of where their baseline is to see how far they were from maybe acquiring accreditation.

Is that your understanding of sort of where they were in 2017?

MR. INMAN: Objection. Vague. Misstates evidence.

THE WITNESS: Thank you. It is true that the Sheriff's Department/Sheriff's Office had requested some members of that organization, NCCHC, to assist with findings of fact, as an assist for quality improvement purposes.

It wasn't an inspection. It wasn't an audit. It was -- in order to help prepare for a potential application at some point in time, we needed to know what our baseline was and some areas of potential improvement. And so they asked one of their representatives to assist the department/office with that endeavor.

BY MS. ANGELES:

Q. My understanding is that through that process, the County was made aware of sort of some of the

requirements or aware of what the disparities were in terms of where they needed to make fixes to get to the accreditation; like, where they weren't meeting some of those requirements to get the accreditation? I don't want to call them "failures," but where they were basically not going to hit those markers to get that accreditation.

A. I appreciate you changing the term. It was an assist visit out of -- it's my understanding that it was an assist visit out of a good faith effort to learn more about their processes and procedures and to solicit their recommendations about means to improve.

It wasn't an audit or an inspection of any sort. So there certainly wouldn't have been any indication of a failure or not meeting any standards.

Q. But the County was made aware of sort of where they fell in terms if they were to sort of apply, you know, where -- how close they would have been in terms of being able to get accreditation or not, right? Whether they would be ready to get accredited or not?

A. I apologize for my hesitancy.

That's not quite accurate in that it was an assist visit, and it wasn't really providing -- it was certainly commenting on areas to improve. But I think it's worth noting that many of the NCCHC standards are

MR. INMAN: Well, if you are talking -- I thought that was 2022.

MS. ANGELES: 2022. I apologize.

MS. SCHULER: They reviewed cases up to 2020.

10:35AM BY MS. ANGELES:

Q. Are you familiar with the state audit review?

A. Thank you. Yes, I am familiar.

Q. In response to that state audit, were any policies or changes -- are you aware of any major 10:35AM changes that were made in response to that audit?

A. Thank you for asking. Is that the policies and procedures that were already in -- under consideration and were already evolving at the time that the audit was made.

10:36AM So most of the changes that we were previously discussing with regards to the drug screening, intake management, and medications were already in process prior to the audit. So while they certainly have benefited the organization, they were not a direct 10:36AM result of the audit.

Q. Okay. So I understand that you were already in the process of changing those. So those changes were consistent with the recommendations that the audit -- the recommendations that the auditors had made as well?

10:36AM A. Yes.

REPORTER'S CERTIFICATION

I, Susan Swan, RPR, CRR, CCRR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 26th day of August, 2024.

Susan Swan

Susan Swan, RPR, CRR, CCRR

CSR No. 7338

# EXHIBIT W

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN DIEGO

DEPARTMENT D-101 BEFORE HON. LAURA W. HALGREN, JUDGE

| | |
|---|---|
| THE PEOPLE,<br>PLAINTIFF,<br>VS.<br>WILLIAM SCHUCK,<br>DEFENDANT. | CASE NO. CD293848<br><br><br><br>CERTIFIED TRANSCRIPT |

***OFFICIAL REPORTER'S TRANSCRIPT***

MARCH 15, 2022

PAGES 1 - 5

**APPEARANCES:**

FOR THE PEOPLE: SUMMER STEPHAN,
DISTRICT ATTORNEY
BY: NATALIE GARCIA
LEGAL INTERN
BY: LISA FOX
DEPUTY DISTRICT ATTORNEY
330 WEST BROADWAY
SAN DIEGO, CA 92101

FOR THE DEFENDANT: KATHERINE BRANER, CHIEF DEPUTY
PRIMARY PUBLIC DEFENDER
BY: STEVE TRENHOLME
DEPUTY PUBLIC DEFENDER
450 B STREET, SUITE 900
SAN DIEGO, CA 92101

NATALIE KHAMIS, CSR NO. 14260
OFFICIAL COURT REPORTER
SAN DIEGO SUPERIOR COURT

SAN DIEGO, C.A.; TUESDAY, MARCH 15, 2022; 11:20 A.M.

-- OOO --

THE BAILIFF: UP NEXT FROM THE 8:30 CALENDAR, ITEM 11, SCHUCK, TANK B.

MS. GARCIA: GOOD MORNING, YOUR HONOR. NATALIE GARCIA, CERTIFIED LEGAL INTERN, UNDER THE DIRECT SUPERVISION OF DEPUTY DISTRICT ATTORNEY LISA FOX FOR THE PEOPLE.

MR. TRENHOLME: YOUR HONOR, PUBLIC DEFENDER STEVE TRENHOLME. I'M APPEARING WITH THE DEFENDANT, WHO IS IN THE TANK.

THE COURT: YOUR MIC IS NOT ON, MR. TRENHOLME.

MR. TRENHOLME: OH. I'LL START OVER AGAIN.

PUBLIC DEFENDER STEVE TRENHOLME. I'M APPEARING WITH THE DEFENDANT, WHO IS INCARCERATED.

THE COURT: THAT'S OKAY. HE CAN STAY --

MR. TRENHOLME: I'M NOT GOING TO DO THE MORNING SPEECH THING. I DO NOT KNOW FOR CERTAIN IF THE CLIENT'S NAME IS CORRECT THAT'S ON THE COMPLAINT. I DON'T KNOW IF THE BIRTH DATE IS CORRECT. I HAVE TALKED TO HIM. I HAVE -- I WILL BE ASKING THE COURT TO MAKE A REFERRAL WITHIN -- WITHIN THE JAIL FOR MEDICAL ATTENTION.

WE WILL WAIVE READING OF THE COMPLAINT. I HAVE ADVISED HIM OF HIS CONSTITUTIONAL AND STATUTORY RIGHTS. WE ARE ASKING TO APPOINT PUBLIC DEFENDER. WE WILL STIPULATE TO THE BODY-WORN PROTECTIVE ORDER, AND I THINK THAT'S ALL I NEED TO SAY ON THAT.

THE COURT: HOWEVER, BASED ON YOUR CONVERSATIONS

SO FAR, YOU'RE NOT FEELING THAT YOU NEED TO DECLARE A DOUBT UNDER 1368?

MR. TRENHOLME: I AM -- COULD I APPROACH THE BENCH FOR THE RECORD?

THE COURT: SURE. YOU CAN HAVE MS. FOX COME UP.

(SIDEBAR CONFERENCE; NOT REPORTED.)

THE COURT: ALL RIGHT. MR. SCHUCK, THE COURT IS GOING TO ENTER A NOT GUILTY PLEA ON YOUR BEHALF AND APPOINT THE PUBLIC DEFENDER. I'LL ASK THE CLERKS TO NOTE ON THE DOCKET THAT WE WILL WANT TO CONFIRM HIS TRUE NAME AND DATE OF BIRTH AT THE NEXT HEARING.

I AM GOING TO REFER HIM TO THE JAIL MENTAL HEALTH UNIT TO SEE HIM AS SOON AS POSSIBLE TO DETERMINE IF MEDICATIONS ARE APPROPRIATE, AND HE CURRENTLY HAS BEEN BOOKED WITH -- IT'S UNCLEAR WHAT THE BAIL IS IN THIS CASE. IT LOOKS LIKE ORIGINALLY IT WAS ORDERED AT -- AT THE LAST HEARING, IT WAS SET AT $10,000, AND THAT'S WHAT IT WAS WHEN HE WAS ORIGINALLY BOOKED.

SO SUBMIT ON BAIL WITHOUT PREJUDICE TO ADDRESS LATER?

MR. TRENHOLME: YES.

THE COURT: OKAY. SO IT WILL REMAIN AT $10,000, AND THEN WE'LL SET DUE COURSE DATES, WHICH WOULD BE MARCH 24TH AT 8:15 IN DEPARTMENT 1103 WITH PRELIM ON MARCH 28TH AT 8:30, DEPARTMENT 102.

TIME ESTIMATE?

MS. GARCIA: 45 MINUTES, YOUR HONOR.

THE COURT: OKAY. THAT WILL BE NOTED.

ALL RIGHT. THANK YOU.

MR. TRENHOLME: YOUR HONOR, DID WE ENTER THE PLEA OF NOT GUILTY?

THE COURT: YES, ENTERING A NOT GUILTY PLEA ON HIS BEHALF.

MR. TRENHOLME: THANK YOU.

MS. GARCIA: THANK YOU, YOUR HONOR.

(PROCEEDINGS ADJOURNED AT 11:24 A.M.)

STATE OF CALIFORNIA )
) SS:
COUNTY OF SAN DIEGO )

I, NATALIE KHAMIS, CSR NO. 14260, COURT-APPROVED COURT REPORTER FOR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, IN AND FOR THE COUNTY OF SAN DIEGO DO HEREBY CERTIFY:

THAT AS SUCH REPORTER, I REPORTED IN MACHINE SHORTHAND THE PROCEEDINGS HELD IN THE FOREGOING CASE;

THAT MY NOTES WERE TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION AND THE PROCEEDINGS HELD ON MARCH 15, 2022, CONTAINED WITHIN PAGES 1 THROUGH 5, ARE A TRUE AND CORRECT TRANSCRIPTION.

DATED JUNE 26, 2023, AT SAN DIEGO, CALIFORNIA.

Natalie Khamis

NATALIE KHAMIS, CSR NO. 14260
CERTIFIED SHORTHAND REPORTER
SAN DIEGO SUPERIOR COURT