EXHIBIT D

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: October 11, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO

## CAPTAIN DEREK DON WILLIAMSON - PMK

CERTIFIED COPY

Reported by:
Adriana S. Angulo

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

ESTATE OF SCHUCK, et al., )
Plaintiff, )
vs. )
COUNTY OF SAN DIEGO, )
Defendant. )
___________________________________)

VIDEOTAPED DEPOSITION OF

CAPTAIN DEREK DON WILLIAMSON

PERSON MOST KNOWLEDGEABLE FOR

CORRECTIONAL HEALTHCARE PARTNERS, INC.

San Diego, California
Friday, October 11, 2024

Pages 1 through 64, inclusive

Reported by Adriana S. Angulo, CSR
Certificate No. 13824

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

ESTATE OF SCHUCK, et al.,

Plaintiff,

vs.

COUNTY OF SAN DIEGO,

Defendant.

THE VIDEOTAPED DEPOSITION OF CAPTAIN DEREK DON WILLIAMSON, PERSON MOST KNOWLEDGEABLE FOR CORRECTIONAL HEALTHCARE PARTNERS, INC., was taken pursuant to Notice, at McKenzie Scott, 1350 Columbia Street, Suite 600, San Diego, California on Friday, October 11, 2024, commencing at 2:09 p.m., before Adriana S. Angulo, CSR No. 13824, a Certified Shorthand Reporter in and for the State of California.

# A P P E A R A N C E S

For the Plaintiff:

MCKENZIE SCOTT PC
BY: LAUREN MELLANO, ESQ.
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
mangeles@mckenziescott.com

For the Defendant:

COUNTY OF SAN DIEGO
BY: STEVEN PAUL INMAN ESQ.
1600 Pacific Highway, Suite 355
San Diego, California 92101
(619) 388-9578
steven.inman@sdcounty.ca.gov

A P P E A R A N C E S (Continued)

For the Defendant: CORRECTIONAL HEALTHCARE PARTNERS, INC.

LOTZ DOGGETT & RAWERS, LLP
BY: CASSANDRA ROBINSON, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
crobinson@ldrlaw.com

Also Present:

Tracy Ward Escobar - Legal Video Technician

# I N D E X

Witness: Captain Derek Don Williamson

| Examination by: | PAGE |
|---|---|
| Ms. Mellano | 8 |
| Mr. Inman | 57 |

# E X H I B I T S


| EXHIBITS | | PAGE |
|---|---|---|
| Exhibit 93 | Amended Notice of Fed R. CIV.P.30(B)(6) Deposition of Defendant County of San Diego | 15 |
| Exhibit 94 | San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures | 19 |
| Exhibit 95 | McKenzie Scott Letter dated April 28, 2022 Re: William Schuck, addressed to the San Diego Central Jail | 30 |
| Exhibit 96 | McKenzie Scott Letter dated April 28, 2022 Re: William Schuck, addressed to San Diego County Sheriff's Department | 30 |
| Exhibit 97 | Retention Policy Schedule Report for Owning Department: SHF | 45 |

SAN DIEGO, CALIFORNIA; FRIDAY, OCTOBER 11, 2024
2:09 P.M.
--OOO--

02:09:50 THE VIDEOGRAPHER: Good afternoon. We are on the record. My name is Tracy Ward Escobar. I'm
02:09:55 a notary public, commissioned license 2493138,
02:10:03 contracted by Steno.

02:10:04 I am not financially interested in this
02:10:09 action, nor am I a relative nor employee of any of
02:10:13 the attorneys or of any of the parties today.

02:10:16 Today is October 11, 2024. The time is
02:10:22 2:10 p.m. Pacific time.

02:10:24 This deposition is being taken at McKenzie
02:10:30 Scott, PC, 1350 Columbia Street, Suite 600,
02:10:35 San Diego, California 92101.

02:10:37 The name of the case is the Estate of
02:10:41 William Hayden Schuck, et al., versus the County of
02:10:45 San Diego, et al., filed in the district -- excuse
02:10:50 me -- the District Court of the State of California,
02:10:53 for the County of the Southern District of
02:10:57 California.

02:10:57 Case Number 3:23-CV-00785-DMS-AHG.

02:11:08 This is the video-recorded deposition of the
02:11:12 person most knowledgeable, Captain Derek Don
02:11:16 Williamson, Volume I.

02:11:18 The attorney taking this deposition is Counselor Lauren M. Mellano.

02:11:23

02:11:27 Would all who are present please identify themselves beginning with the witness.

02:11:30

02:11:33 THE WITNESS: Captain Derek Williamson.

02:11:36 MS. MELLANO: Lauren Mellano counsel for plaintiffs.

02:11:39

02:11:40 MR. INMAN: Steve Inman for the County defendants and the witness.

02:11:42

02:11:43 MS. ROBINSON: Cassandra Robinson on behalf of Correctional Healthcare Partners.

02:11:45

02:11:49 THE VIDEOGRAPHER: Thank you.

02:11:49 We are ready to proceed.

02:11:51 The court reporter today is Adriana Angulo also with Steno. Would the report -- would Madam Court Reporter, would you please swear in the witness.

02:11:55

02:11:59

02:12:01

DEREK DON WILLIAMSON,

Having been first duly sworn, testified as follows:

--o0o--

02:12:14 E X A M I N A T I O N

02:12:14 BY MS. MELLANO:

02:12:16 Q. Okay. Good afternoon.

02:12:17 A. Good afternoon.

02:12:18 Q. It's Captain Williamson, right; is that correct?
02:12:21 A. That's correct.
02:12:22 Q. Okay. Great. My name is Lauren Mellano. I'm an attorney for the plaintiffs in this case. Thank you for being here.
02:12:27 Feel free to let me know if at any point you need a break. We'll probably take one roughly every hour. So just kind of some -- well, let me ask you this first, have you ever had your deposition taken?
02:12:42 A. Yes, I have.
02:12:43 Q. About how many times?
02:12:44 A. I can remember two to three prior. I want to say three, but I can actually only remember two of the cases.
02:12:53 Q. Okay. No problem. Okay. And so some of this is probably repetitive, but -- so I'll kind of go through it briefly. But, you know, we try not to talk over one another. Of course this is being recorded on video, but also by a court reporter. And so she'll appreciate if we, one, we talk slowly, and then, two, we try to let the other one finish.
02:13:15 I know it's natural to sort of anticipate the end of a question, or if you know the answer, it's easy to start answering it. And I also

sometimes mistakenly think someone is done answering, so apologize if I do that, but in -- and then feel free to pause for any objections by your attorney.

And then unless you're instructed not to answer, of course, then, even if there's an objection, we would ask you answer the question.

Do you have any questions or concerns about the oath that you took today?

A. No.

Q. And is there any reason today that you wouldn't be able to provide your best testimony, for example, you know, like if you were taking some sort of new medication or don't feel well or something like that?

A. No.

Q. And so sometimes -- sometimes attorney-client privileged communications can be sort a confusing topic. We would never be asking for any legal advice that you've received from any attorney. Sometimes folks of course discuss, like, facts underlying a case with attorneys. Those facts themselves are not privileged, but legal advice, of course, is.

Does that make sense?

02:14:31 A. Yes.
02:14:31 Q. Okay. And if there's ever any question about that, feel free to let us know, and we can either go off the record or resolve it somehow.
02:14:40 Today your understanding is that you're testifying on behalf of the County, right?
02:14:48 A. Yes.
02:14:49 Q. Okay. And so you're not testifying, you know, on your own behalf. Rather you're here as a representative of the County?
02:14:59 A. Yes.
02:14:59 Q. Okay. And do you have any questions about how you're testifying in that capacity today?
02:15:03 A. I do not.
02:15:04 Q. So for the purposes of this deposition, the relevant time period is March of 2022. So unless I notify you that we're talking about a different time period, that's going to be the assumption.
02:15:23 I'll try to just include that in my questions, but if I -- if I'm not doing that, then that's going to be implied.
02:15:33 Does that make sense?
02:15:34 A. Yes.
02:15:34 Q. Okay. Sorry. I interrupted you.
02:15:37 Okay. And so we're going to go through the

topic areas, but first I just want to get an idea of what you did to prepare for your deposition today.

A. To prepare for the deposition today, I spoke with the homicide detective assigned to the case, Detective Andrijana Van Lingen. I also spoke with Lieutenant Aaron Boorman. He actually worked for me at the timeline that's relevant to this case. And then also to review what were the available camera angles during this time period.

I also spoke with now Sergeant but then Deputy Hahn. I'm not certain of his first name. I'm sorry. He was the administrative deputy at San Diego Central Jail at the time. And my relevance for talking to him is he would have been one of the people responsible for fulfilling one of these type of video requests.

Outside of talking to people, I -- well, I also spoke with Heidi Williams from our sheriff's legal regarding what relevant government codes there were regarding video retention.

At first we were looking at Government Code 39040.7, but that seems specific to city jails. So 26202.6 was what we decided was the relevant government code related to this.

And then also, County of San Diego's

02:17:15 retention policies, the global retention policies
02:17:19 for the entire county, and those specific to the
02:17:22 sheriffs department, and video of this case.
02:17:28 Q. Okay. Yeah, I think you mentioned that.
02:17:30 In terms of video, did you watch all of the
02:17:33 video of the -- depicted of Hayden Schuck?
02:17:36 A. Not at the full slow speed, but I did watch
02:17:40 all video.
02:17:41 Q. Okay. So did you sort of just kind of click
02:17:44 through it all?
02:17:44 A. In some cases I clicked through it. In some
02:17:47 of the shorter videos, it was -- I watched it on a
02:17:50 two, three, four times speed.
02:17:53 Q. Sure.
02:17:53 And for all of the cameras that you saw what
02:18:02 the -- I don't know how to phrase this.
02:18:04 For all the video that you watched, were the
02:18:07 cameras that took those videos, were they mounted in
02:18:10 a stationary position?
02:18:12 A. Yes.
02:18:12 Q. Okay. So none -- in other words, none of
02:18:15 the videos you saw had a camera, like, moving back
02:18:18 and forth so that there were different angles at
02:18:20 different points in time, right?
02:18:21 A. That is correct.

02:18:22 Q. Okay. Did any of the cameras that you watched video from, did any of them even have the capability of moving unless they were manually moved, like by hand?

02:18:35 A. Yeah. Any cameras would have to be manually changed. We don't have any pan-and-tilt capabilities on the camera system.

02:18:43 Q. Okay. Pan-and-tilt capabilities. That makes a lot more sense than whatever I was saying. Thank you. That's helpful.

02:18:55 I had a question. Hold on.

02:18:56 Oh, for the court reporter's sake, so Deputy Hahn, how do you spell that?

02:19:05 A. I believe H-a-h-n. I'm not certain. He would be able to be identified on the facility staffing roster, not the general shift in deployment, but facility staffing roster under the second page, which would be the team five administrative personnel.

02:19:24 Q. Okay. And you mentioned like a code section that you thought applied to the City.

02:19:30 What was that one?

02:19:31 A. 39040.7, I believe.

02:19:37 Q. 39040.7?

02:19:43 A. Correct.

02:19:43 Q. Okay. But you had just said the was not -- probably --
02:19:48 A. (Indiscernible crosstalk.)
02:19:48 MR. INMAN: I'll object to the extent it may call for attorney-client privilege communication.
02:19:52 But you can answer without revealing any communications with sheriff's legal.
02:19:56 MS. MELLANO: We can move on. Honestly, I just wanted to get the code section.
02:20:00 So, yeah, we'll just move on. I think I agree with you, Steve. It's kind of -- okay.
02:20:13 Thank you.
02:20:13 BY MS. MELLANO:
02:20:17 Q. Was there anything that you would have liked to have been able to review but either couldn't because it didn't exist, or you didn't have access to it, or you just didn't have time? Something like that?
02:20:28 A. I mean, camera angles that don't exist.
02:20:33 Q. Sure. Okay.
02:20:34 A. Yes.
02:20:34 Q. Okay. So I think I'm going to bring up for you the notice of deposition, which I'm marking as Exhibit 93, and it might take me a second.
02:20:55 (Exhibit 93 marked for identification.)

02:21:43 MS. MELLANO: That's so weird.

02:21:44 There we go.

02:21:47 BY MS. MELLANO:

02:21:46 Q. Okay. And do you recall receiving a notice 02:21:52 of deposition for this case?

02:21:54 A. Yes.

02:21:55 Q. Okay. And does -- do you recognize this as 02:22:00 being a copy of that?

02:22:01 A. I do.

02:22:02 Q. Okay. And so this page has some of the 02:22:07 topics that you've been designated to testify about 02:22:11 today.

02:22:11 The sort of overarching theme being, the 02:22:16 process by which surveillance footage from Hayden 02:22:20 Schuck's incarceration at the men's Central Jail was 02:22:23 or was not collected and retained by county 02:22:29 investigators.

02:22:30 And then there's sort of, I think, four -- 02:22:35 no -- five subtopic areas under that.

02:22:44 And then for the court reporter's sake, I'm 02:22:47 not going to read these out loud, but are there any 02:22:51 areas or subareas listed here that you feel like 02:22:57 you're unprepared to discuss today?

02:23:00 A. No.

02:23:00 Q. Okay. And then on this third page, there

02:23:12 are requests for production of documents.
02:23:14 Did you personally do any searches for documents or -- and that would include video?
02:23:18 A. I did not do document production.
02:23:20 Q. Okay. Did you search for any documents or video though personally?
02:23:24 A. No, not search for video. The only searches I would say I did were relevant to the County of San Diego's directives on video retention.
02:23:36 Q. Okay. So sort of like policies and procedures?
02:23:38 A. Correct.
02:23:39 Q. Was that a yes?
02:23:40 A. Yes.
02:23:41 Q. Sorry. I just -- if we talk over each other, I try to have you repeat it just for the court reporter's sake.
02:23:50 Okay. And so you produced -- I think it was policy number, either I19, or is it L19?
02:23:58 I think it's probably I?
02:23:59 A. It's I19.
02:24:00 Q. Okay.
02:24:01 A. Yes.
02:24:02 Q. And was that the only -- was that the policy that you found that pertained to these topic areas?

A. Yes.

Q. Okay. And so it's your understanding that there's no outstanding, like, video surveillance, or at least you didn't do a search for any?

A. Well, I do know that the -- the video for that time period would not be retained in our current system. Anything that was not downloaded and produced would not be retained at this point.

Q. Okay. And we'll probably talk a little bit more about that later.

But regarding the Request for Production Number 2, in searching for any documents or in preparing to testify today, do you know if a log of what was produced to CLERB was kept?

MR. INMAN: I haven't got documents responsive to that, but I'm working on that still to see if it exists.

MS. MELLANO: Okay. Okay. And so regarding number five, I don't -- oh no. It's number four. Sorry.

Is that something that's outstanding as well, Mr. Inman? It's the produce all documents and records regarding the investigation, which you include, like, PowerPoint slides.

MR. INMAN: I think we produced everything

02:25:32 we have on that, but I'll double check.
02:25:34 MS. MELLANO: Okay. I'll move on from
02:25:37 there, then. Thank you.
02:25:38 BY MS. MELLANO:
02:25:43 Q. Okay. So I'm going to go ahead and move on
02:25:48 to what I've marked as -- hold on. One second.
02:25:58 I don't think I have that one open.
02:26:03 Exhibit 94, which is the policy I19.
02:26:02 (Exhibit 94 marked for identification.)
02:26:02 BY MS. MELLANO:
02:26:14 Q. Probably a little bit difficult to see, so
02:26:16 I'm going to zoom in for you.
02:26:18 So under policy -- well, first, the purpose
02:26:34 of this policy is to define the use of security
02:26:38 video systems within a detention facility.
02:26:42 That's at least what it says here, right?
02:26:44 A. Yes.
02:26:45 Q. And under policy, this second to last
02:26:51 sentence states that, facility staff and supervisors
02:26:56 will inspect the security video system equipment
02:26:59 each shift to insure their equipment is functioning
02:27:02 properly.
02:27:03 Can you just tell me how that works, kind of
02:27:07 generally speaking, or at least at the time of
02:27:11 Hayden's death?

A. Generally speaking, each housing unit area or control station will have a set of monitors showing all of the available camera angles that are applicable to that floor.

Also, the supervisor's office, the processing sergeant, and watch commander's office. And at the beginning of their shift, they would look at the camera system. And then in our jail information management system, there's an area checklist that the deputies that work the housing floors or central control, that they would just check the box if there was nothing to note as a discrepancy, being a camera down, or something being un-viewable, blurry, glitching.

If there are any notes like that, then they should make those in the area impact log for their log entries, and then notify administrative staff via e-mail or phone call that there was a problem with the camera that needed to be fixed.

Q. Okay. And unless I'm mistaken, one of the sort problems that you listed as examples did not include like a camera angle that allowed for a blind spot.

So does this policy govern that type of issue?

A. No.
Q. Okay. And so was there a policy or a practice written or un-written in place in March 2022 that would have governed when sworn staff should have notified the powers that be in administration that there was a blind spot in their cameras?
A. No. All of our camera systems do have limitations, whether that, you know, the amount of data, the amount of equipment available to the county, the budget that went into installing that camera system. So depending on which facilities that the camera system is at, blind spots are not uncommon.
Q. Okay. And are -- I understand that, you know, it may be technically impossible to have cameras in every square inch of a jail, but in this case, the blind spot included cells where folks were housed, right?
A. Yes.
Q. Including Hayden Schuck, of course?
A. Yes.
Q. How many cells were in that area that weren't being captured by any cameras?
A. I mean, the camera systems there on the

02:30:06 2nd floor outside of a very limited number of cells, generally show the hallways. It's not designed to look into each one of the cells. It's designed to capture the activity in the facility where probably the most frequent interaction between sworn staff and the incarcerated individuals takes place because of the heightened frequency of incidents that does happen in those areas.

02:30:39 Q. Okay. But -- and -- so I apologize if my question was sort of unclear. When I say cells, I certainly don't mean that the cameras would be inside of those cells, but the camera angle that's missing in this case would have been the hallway outside of Hayden Schuck's cell, right?

02:30:59 A. Correct.

02:31:00 Q. And sworn staff, if they're interacting with Hayden Schuck, either in his cell or at his cell door, would not be depicted on any camera then?

02:31:11 A. No.

02:31:11 Q. Right.

02:31:14 And sworn staff are required to, by law, under Title 15, to do safety checks of cells in that area, in the blind spot, right?

02:31:25 A. Correct.

02:31:26 Q. Okay. And so, you know, are you aware of

02:31:32 any reason -- you gave some sort of kind of raw
02:31:37 reasons about generally why there can't be
02:31:41 potentially cameras in every square inch of the
02:31:43 jail, but -- and one of them being, like, budget,
02:31:45 for example, but are you aware of any specific
02:31:47 reason as to why there was no camera facing that
02:31:52 particular hallway where Hayden was housed for five
02:31:56 days?
02:31:56 A. No.
02:31:56 Q. Okay. And so during your investigation,
02:31:59 nobody said, Oh, hey, you know, there's actually a
02:32:02 really good reason for why there was no camera
02:32:05 there. Nobody had any reason to provide?
02:32:08 A. No. To my knowledge, that camera system was
02:32:13 installed around 2010/2011 timeframe, and there had
02:32:19 been some camera angles added since then, but most
02:32:23 of those camera angles that were added since the
02:32:27 initial install were due to frequent incidents
02:32:30 occurring in certain areas.
02:32:34 Q. Okay. And are you aware of whether there's
02:32:38 a camera covering that area now?
02:32:44 A. No. I don't believe there is.
02:32:45 Q. And sworn -- okay. Go ahead.
02:32:54 A. Not that I don't believe there is. I do --
02:32:57 I know that there is not at this time. That was one

of my conversations with Lieutenant Boorman, was going through the camera angles and seeing if anything had been changed since then, and if there was a camera at the other end of the hallway, which would have viewed into that cell, but there still is not.

Q. Okay. I really appreciate you clarifying that. Thank you.

And -- oh, so in the activity logs, sworn staff are required to log when they begin, like, Title 15 -- I think they're logged as 1153, the safety checks?

A. That is correct.

Q. And those logs would only show when someone began those checks, not when they end them?

A. Correct.

Q. And they obviously wouldn't have details -- any additional details about those checks unless somebody were to manually log something about a particular detainee, right?

A. Correct.

Q. So it wouldn't say, for example, oh, I stopped at Hayden Schuck's cell for two seconds, unless somebody manually logged that, right?

A. That is correct.

Q. And there are no notes like that -- well, actually, did you review the area activity logs for the area where Hayden was?

A. I did not.

Q. Okay. Going back to this I19 policy. This last sentence says that: All facilities will create a process to audit and track issues and repairs of their video system equipment.

What is that process, or is it the same as sort of as what you described earlier?

A. I can tell you what it is now, in terms San Diego Central Jail, but I don't know what it was in the immediate aftereffects of this policy being changed.

So this -- the timeline of this incident that we're talking about today is shortly after this policy going into effect. And the changes that were made on this February 3rd, '22 version were for all the facilities to create that method to audit and track issues and repairs that needed to be done to the security systems, the video systems. And that was actually on recommendation of CLERB.

I was assigned to the detention support division at the time of that, and Lieutenant Aaron Boorman was my sergeant at detention support, and he

was the sergeant for the policy and procedures committee. And so he was heavily involved in the changing of this policy.

So that was part of my conversations with him. And then that's when I got this archived version of what that change was.

Q. Okay. And so suffice it to say that you're not sure if that process had been finalized between February 3rd, when this was amended, to March 10th to the 16th, when Hayden was in custody?

A. Correct. I can say definitively that the area checklist for deputies in our jail information management system had the added box for surveillance cameras, or -- I'm not certain exactly how it's worded, because that was in the proposal to change the policy section.

Q. Okay.

A. But as far as the supervisors logging it, at the time I did not see it go into effect in the watch commanders log. But starting probably about a year later, in the first quarter of 2023, in the watch commanders log, there's an entry that's relevant to the DVR/surveillance camera system. And then of course they notify administration via e-mail.

02:37:16 So that would be the only other way to track, would be in those archived e-mails.

02:37:21 Q. Okay. And so when this amended policy was promulgated, was staff, like sworn staff, were they trained on it?

02:37:31 A. The detentions policy and procedures changes goes out in the form of e-mail and is also assigned to all deputies assigned to detention services bureau in our learning management system.

02:37:51 So -- but that's not to say that everybody reviewed it and knew it on February 3rd, 2022. It's just as time goes on, everybody hits a due date in the learning management system.

02:38:06 And that's -- you know, supervisors will typically review any very relevant policy changes at briefing, but there's not necessarily a tracking to see when everybody was told.

02:38:23 Q. Okay. And at briefing, is that sort of an in-person briefing?

02:38:27 A. Yes.

02:38:27 Q. And it wouldn't be recorded in any way?

02:38:30 A. No.

02:38:30 Q. Okay. Which sworn staff would be the ones to check the equipment pursuant to this procedure?

02:38:43 A. Typically on one of those shift deployments.

02:38:49 Specifically at the San Diego Central Jail, you have
02:38:53 an intake control deputy. Third floor you have your
02:38:57 PSU control deputy.

02:39:00 Typically, whatever has the control deputy
02:39:02 assignment, they're typically the person assigned to
02:39:05 the tower, responsible for making the log entries in
02:39:09 JIMS, and reviewing the video cameras.

02:39:16 Q. Okay. So what does it mean by adjustment,
02:39:25 under 1A?

02:39:31 A. In my experience, sometimes people have been
02:39:38 in certain cells. For instance, the cells where
02:39:43 there is a camera present inside the cell, are
02:39:46 sobering cells, or our safety cells. Every once in
02:39:50 a while you get somebody who has enough motivation
02:39:53 and reach to smack, damage.

02:39:56 So if it needed to be adjusted, in that
02:40:01 terms of it became loose and veered off to an area
02:40:07 where it wasn't viewing the right spot, or if stuff
02:40:12 had been thrown at it and rendered it covered or
02:40:23 blurry.

THE COURT REPORTER: Rendered it what?

THE WITNESS: Covered.

02:40:24 MS. MELLANO: Okay. Or blurry, is what I
02:40:25 think the next part was.

THE WITNESS: Yes.

02:40:27 So that would be the type of, you know, adjustment or repair that we would e-mail the administrative staff about.

BY MS. MELLANO:

02:40:33 Q. Okay. And so under number two, what is referred to by professional staff?

02:40:47 Would that be, like, medical staff or mental health professionals or something like that?

02:40:51 A. Correct.

02:40:52 Q. And is that intended to limit it from view of, like, detainees mainly, or visitors?

02:41:04 A. Yes.

02:41:04 Q. Okay. So this subsection three pertains to outside law enforcement agencies requesting copies of recorded video footage.

02:41:18 I don't see anywhere any policy with respect to folks like, you know, attorneys requesting preservation of video or requesting copies.

02:41:37 And so it's my understanding -- is there no policy on point like that?

02:41:44 MR. INMAN: Objection. Vague. Overbroad.

02:41:45 THE WITNESS: That's in there specifically because there's a lot of interaction between outside law enforcement agencies and our detention facility staff; for instance, if an arresting agency had an

incident happen during the booking process, and they needed a copy of it, or their supervisors were requesting a copy of it.

So that's why this policy section specifically addresses the outside agencies. If it's our own agency -- whether it's sheriff's homicide, our Detention Investigations Unit, any other investigations unit in our department or sheriff's legal -- then we don't have a policy for making their request process formalized because we're cooperating inside of our own agency.

So if there was a request to come from an outside attorney or anybody, it would typically be done by subpoena and could alert sheriff's legal or county counsel.

Q. And so these subsections here under three appear to pertain only to outside law enforcement agencies; is that right?

A. That's correct.

Q. Okay. Okay. So I'm going to mark -- let's see. I think I have one of them open.

I'm going to mark two exhibits here.

(Exhibit 95 marked for identification.)

(Exhibit 96 marked for identification.)

////

BY MS. MELLANO:

Q. So this one is marked 95, and it's a preservation letter to the San Diego -- addressed to the San Diego Central Jail.

And then 96 is a preservation letter addressed to San Diego County Sheriffs Department.

Have you seen these before?

A. I don't believe I've seen these specifically.

Q. Okay. Have you ever seen any preservation letters that have been sent either to the Central Jail or the sheriff's department requesting preservation of evidence on behalf of, like, attorneys and their clients?

A. I have.

Q. And do you know the process by which -- well, how those are handled, I guess?

MR. INMAN: Objection. Scope.

THE WITNESS: Not specifically. My familiarity with them was mostly related to my position at detention support, and then Sergeant Aaron Boorman, and then after him Sergeant Matt Jenson; having to interact with sheriff's legal a lot to prepare packets and folders of digital data related to these preservation requests.

02:44:54 BY MS. MELLANO:
02:44:55 Q. So do you know if there is any sort of policy, whether written or unwritten, regarding when and how to preserve video evidence, or other evidence -- well, you're here to talk about video -- so video evidence regarding a potential incident that might be the subject to a lawsuit?
02:45:17 A. No.
02:45:18 Q. So you don't know what occurs when a preservation letter is received at either the central jail or by the sheriff's department requesting preservation of video at the Central Jail?
02:45:32 A. No. It has not been part of my job up to this point.
02:45:35 Q. Okay. Are you aware of how evidence regarding an incident is preserved video evidence -- is preserved for CLERB?
02:45:59 MR. INMAN: Objection. Scope.
02:46:00 THE WITNESS: I would not say specifically for CLERB. Jail incidents, uses of force, in-custody deaths -- the relevant video or extended requests for that video are typically downloaded by -- in, you know, more minor cases. The deputy who is the primary writer of the case, whether that

be the crime report or the use of force.

THE COURT REPORTER: Whether it be the?

THE WITNESS: Crime report or use of force.

And in cases similar to this one where sheriff's homicide were making an extended request, not just of the incident itself but relevant video leading up to the incident, it would typically go to, as I spoke earlier, the administrative deputy, which at the time of this incident would have been Deputy Hahn.

And then at that point, that deputy starts reviewing and downloading all video where -- like specifically in this case, where it would say that videos or photographs of Mr. Schuck or related events.

So typically when sheriffs homicide -- just speaking as to my background, I was at our investigation detentions units as a detective, and then back there for close to three years as a sergeant. So I had a lot of interaction with sheriff's homicide on in-custody death cases.

So typically their request would be for all times that the individual was on video, going back a certain timeframe. If the person was in custody for several months, they wouldn't request it all the way

02:47:45 up to the time of booking, but if they felt through
02:47:49 their interviews something relevant happened during
02:47:52 the booking, or relevant happened in a certain time
02:47:56 period before the incident, then they would request
02:48:00 all video of that person on video up to that
02:48:03 incident.

BY MS. MELLANO:

02:48:05 Q. Okay. And so that request, I mean,
02:48:09 theoretically, could have been made here,
02:48:11 considering Hayden was only in the custody at the
02:48:16 Central Jail from the night of 10th to the morning
02:48:19 of 16th, right?

02:48:20 A. Yes.

02:48:20 Q. And so that's only really like five days of
02:48:24 video?

02:48:25 A. That's correct.

02:48:25 Q. And so what -- why was it that the County --
02:48:38 do you know why was it that the County did not
02:48:40 preserve all of the video that would have depicted
02:48:45 the areas in which Hayden was --

02:48:46 A. Well, I mean --

02:48:46 MR. INMAN: Objection. Assumes facts not in
02:48:48 evidence.

02:48:49 THE WITNESS: If you're talking about areas
02:48:51 or all video of Mr. Schuck on video, based on my

02:48:57 review of the video and my conversation with Deputy Hahn, who specifically does not remember pulling the video in this case, but he did walk me through the thought process that he and his partners would typically take.

Because if he was assigned a different project that was taking up most of his time, then the request to pull up all this video would have fallen on somebody else.

So in this case, based on my review of the video, I believe that all of the video where Mr. Schuck was on video was pulled.

Now, there is a moment where you say -- or not you say -- but where he was placed in a cell directly under a camera. And if I remember correctly, there's approximately 36 hours of video that continues after that.

And in speaking with Deputy Hahn, I asked, "Why would we put that video in, but not continue to put the rest down there?"

He said, "Well, if the individual wasn't on video, then we didn't necessarily have to pull the video."

But if it was a blind spot, sometimes he or his partners would pull an extended amount of video

just to show the level of activity -- the safety checks continuing to occur in the area, nursing staff going back into the area to provide medication, deputies passing out meals stuff of that nature.

So I did ask why there was that 36 hours, but not any video after that. He said -- and that was the response.

He said, "If we ran into a situation like that, where the person was off video for an extended period of time, then we would pull enough to show that the legal monitoring requirements and care were being taken, and then move on to the next time that that person did show up on video."

Q. But Deputy Hahn didn't have personal knowledge of whether that was -- what happened here?

A. No. He was just speaking to the typical matter of practice.

Q. And -- but in the safety checks, though, would have had to have continued to be conducted during the time period that's not depicted on camera, right?

A. Yes.

Q. So it wouldn't be sufficient, you know, for example, to say, Well, this detainee, he was checked

every hour on the hour for a couple of days, so it's -- you know, it's fine that we didn't check him again for a couple of days, right?

Like that wouldn't be a position that the County would ever take, right?

MR. INMAN: Objection. Argumentative.

THE WITNESS: No, that wouldn't be a position the County would ever take, but he said typically the requests were when that person was shown on video.

So then when I asked why there's additional 36 hours, you know, he said, then maybe we downloaded an additional, just to show that there was stuff going on, but we didn't need to pull any video where the person themselves were not depicted on video.

BY MS. MELLANO:

Q. And when you say "we didn't need to," need to pursuant to what?

A. To a request.

Q. But that request wouldn't include from outside attorneys? It would only include homicide detectives?

A. I mean --

MR. INMAN: Objection. Speculation. Lacks

02:52:33 foundation.

02:52:33 THE WITNESS: At the time the video was
02:52:35 pulled, the request was from a sheriff's homicide
02:52:38 detective.

02:52:38 But reading this request, it even says: All
02:52:43 videos and photographs of Mr. Schuck or related
02:52:47 events.

BY MS. MELLANO:

02:52:48 Q. Right. And related events would have
02:52:52 included safety checks on Mr. Schuck, right?

02:52:55 MR. INMAN: Objection. Document speaks for
02:52:57 itself.

02:52:58 MS. MELLANO: I mean. Sorry.

02:53:03 MR. INMAN: Speculation.

THE COURT REPORTER: Repeat what you said, Mr. Inman.

02:53:04 MR. INMAN: Speculation. The document
02:53:04 speaks for itself.

02:53:07 THE WITNESS: I believe that would be the
02:53:09 person's interpretation.

02:53:10 BY MS. MELLANO:

02:53:11 Q. Right. Okay. And just, you know, to be
02:53:17 very extra clear for the record, you're not aware of
02:53:20 whether anyone, including -- oh, shoot. I forget
02:53:26 his title -- anyone including Hahn --

02:53:31 A. Yes.

02:53:32 Q. Deputy Hahn, right?

02:53:33 A. Yes.

02:53:33 Q. You're not aware of anyone, including Deputy Hahn, having received this?

02:53:37 You don't know whether this was ever received by anyone who had the power to preserve this type of evidence?

02:53:44 A. I do not.

02:53:46 THE COURT REPORTER: Did you say something, Mr. Inman?

02:53:49 MR. INMAN: I didn't finish saying it, but objection. Speculation.

02:53:56 BY MS. MELLANO:

02:54:05 Q. Is it the county's position that the jail surveillance video from the 2nd floor, even though it's at an angle facing away from Hayden Schuck's cell, but that camera footage was available between March 10th and March 16th?

02:54:26 A. Yes.

02:54:26 Q. Okay. And so it's not, of course, the county's position that that camera had stopped working, for example?

02:54:32 A. Correct.

02:54:32 Q. And is there any way for anyone to know

whether anyone reviewed that actual video from -- that were missing? I think it's from the 13th and the 14th of March from the 2nd floor.

Is there any way -- does the County know whether anyone downloaded that and reviewed it, and then decided not to produce it to homicide?

MR. INMAN: Objection. Vague.

BY MS. MELLANO:

Q. Or not to preserve it, rather?

A. No. I would say just based on the thoroughness in which the video was pulled, and that the next time Mr. Schuck left that cell, video was recorded. I would say that somebody did review video during the entire time period, whether it was on fast-forward or in realtime. I doubt in realtime. It would take days.

But based on the fact that the next piece of video that was pulled was Mr. Schuck leaving that cell to get dressed and go to court, I believe somebody reviewed that time period in between.

Q. Okay. And that's just an assumption based on the factors you just explained?

A. Correct.

Q. Okay. And again, just for clarity of the record, I think you sort of answered this, at least

02:56:16 impliedly, you don't know who it was that would have done that review and made that decision?

02:56:22 A. Correct.

02:56:23 Q. That would not be logged in any sort of record?

02:56:29 A. I did ask Deputy Hahn about the preservation in either their hard drive, whether these were kept in folders prior to being downloaded.

02:56:44 And he did say typically, whether they were on the desktop of the computer that was being used or in the administrative folder for San Diego Central Jail's shared drive, that typically a folder would have been created.

02:57:02 He did say there was a possibility, because he actually reviewed the administrative folder and didn't find a folder related to this incident. He did say there was a possibility, that based on the amount of video the data was going to take up, that there was the possibility that instead of downloading it into the administrative folder or down to the desktop, that they downloaded it directly to a thumb drive or removable hard drive to provide to sheriff's homicide.

02:57:38 Q. Okay. What is the policy or practice, if any, for when the video recordings are, like,

02:57:50 written over?
02:57:51 A. There's --
02:57:53 MR. INMAN: Objection. Vague.
02:57:54 THE WITNESS: There isn't. The facility
02:58:00 DVRs at every single one of the facilities
02:58:03 automatically write over themselves when they start
02:58:06 reaching the data retention threshold.
02:58:10 So as years have gone on and additional
02:58:13 cameras have been added, that time period in which
02:58:16 the data is retained, gets to be shorter and
02:58:20 shorter. And as all electronics, you have a
02:58:25 different life of the electronic device at the
02:58:30 beginning of it than you do towards the end of it.
02:58:35 You know, I'm not a super technical person,
02:58:39 but as something gets older, its data retention does
02:58:46 get to be, you know, shorter.
BY MS. MELLANO:
02:58:47 Q. Okay. So unless somebody, like, pulls some
02:58:48 video and sort of saves it elsewhere, it's going to
02:58:51 be automatically written over at some point?
02:58:53 A. Correct.
02:58:54 Q. Do you know how quickly that occurs at the
02:58:58 Central Jail?
02:58:59 A. At Central Jail, currently, I believe it's
02:59:05 about nine months.

02:59:06 Q. Nine months?
02:59:07 A. Correct.
02:59:07 Q. Okay. And is that why earlier you testified to the -- correct me if I'm wrong, but I believe earlier you said something along the lines of that video would not exist anymore at this point, meaning the video that we're sort of missing in this case?
02:59:28 MR. INMAN: Objection to the characterization of missing.
02:59:34 THE WITNESS: I don't remember saying that specifically, but that is correct, the video would not exist anymore.
02:59:39 BY MS. MELLANO:
02:59:39 Q. Okay. Well, I'm sorry if I misunderstood something you said previously.
02:59:46 And I think I understood you correctly earlier. What you were saying is that, you know, the video gets overwritten at the point in which -- like automatically --
03:00:04 A. Correct.
03:00:04 Q. -- at the point at which there's no storage space left. But there's no policy for, like, automatically pulling a certain period of time and then, you know, deleting it 30 days later, and then pulling the next time, deleting it? Anything like

03:00:20 that?

03:00:20 A. There's not.

03:00:21 Q. Okay. The 2nd floor area where Hayden was 03:00:44 housed for most of his time in custody, the area 03:00:50 where there was a blind spot, how many cells are in 03:00:53 that area?

03:00:53 A. Just one.

03:00:54 Q. Oh, it was just the one that Hayden was in, 03:00:58 just cell -- was it six?

03:00:59 A. I believe so.

03:01:00 Q. Interesting.

03:01:04 Okay. Prior to COVID, what was that area of 03:01:12 cells used for?

03:01:14 A. It was used for regular, like, in-person 03:01:18 court holding.

03:01:21 Q. As in people on their way to physically go 03:01:25 to court?

03:01:25 A. Yes. So at the far end of that camera view, 03:01:32 prior to the 2020/2021 timeframe, that camera looked 03:01:41 at the court bridge. There used to be a bridge that 03:01:44 went over Front Street from San Diego Central Jail 03:01:49 over to court.

03:01:50 Q. Yeah, I remember that.

03:01:52 So you're saying there used to be a camera 03:01:55 at that angle?

03:01:56 A. So that camera used to look down that hall,
03:02:00 and you could see where the court bridge started.
03:02:03 Q. And I forget, did you tell us earlier
03:02:07 already when that camera turned sort of the other
03:02:10 way?
03:02:14 I'm sorry. I'm not trying to --
03:02:16 A. It didn't turn the other way at all.
Q. Okay.
03:02:18 A. So it would -- the view would go from that
03:02:20 holding cell six, down that hall, and towards the
03:02:24 court bridge.
03:02:24 Q. I see. So it's always been above holding
03:02:28 cell six, and it wasn't -- I thought you were saying
03:02:30 that it was angled the other way previously and it
03:02:32 got turned. But I see.
03:02:33 A. No. It was always looking in that
03:02:34 direction.
03:02:35 Q. And now there's just no bridge there?
03:02:36 A. Now there's just no bridge.
03:02:38 Q. I see. Okay. Thank you.
03:02:41 Okay. I think -- I don't have many more
03:02:46 questions for you.
(Exhibit 97 marked for identification.)
BY MS. MELLANO:
03:02:47 Q. But we did receive some documents -- so I

03:02:52 was actually just going to mark this whole batch here as 97. These are retention schedules.
03:03:03 A. Yes.
03:03:03 Q. I mean, I guess before we delve into them, what are these?
03:03:10 A. These are retention schedules put forward and signed by the County of San Diego to all county entities. The global retention schedule is the one that covers all county departments, buildings, et cetera.
03:03:28 Q. And is that -- I'm sorry.
03:03:29 A. And then there's a specific sheriff's department retention schedule that the County assigns to the sheriff's department.
03:03:36 Q. And so looking at this one, beginning at Bates 2036, so this is the global retention policy schedule report?
03:03:51 A. Yes.
03:03:51 Q. And -- so what is this -- under description and, like, retention timeframe, for example, what are those two columns sort of mean together?
03:04:03 A. So this was -- this is the version -- in the upper-right corner it says 7/23/2019. So this is the version that would have been in effect at the time of this. So I believe on page 10 or so,

03:04:18 there's security videos or surveillance videos, something of the sort.

03:04:24 Q. Okay. I see --

03:04:28 A. Maybe on the newer version it's ten. I believe it's all in alphabetical order regarding the -- there we go.

03:04:37 Third from the top says "Security Videos: Any videos relating to county building, property or employee security." Two years for retention timeframe.

03:04:47 Q. Okay. And so earlier when you testified that there was no, like, written policy about retaining videos, why would this not apply here?

03:04:59 A. Oh, no, it does apply. There's nothing that the sheriff's department themselves have said specifically. There's nothing in our policy and procedures section. And prior to, you know, doing my homework for this deposition, I didn't even know that this existed.

03:05:17 Q. Okay. And so I guess I probably missed this. Who promulgates this?

03:05:23 A. The County of San Diego. So I believe the board of supervisors comes together and reviews and revises the retention schedule on a semi-regular basis.

Q. I see. Okay.

Okay. And so do you have any information about how this is interpreted, this quote, "Any videos related to county building, property or employee security"?

A. I mean, I would say it's -- it's right there in black and white, "Any videos relating to county building, property or employee security."

Q. Would you think that would include all of it then, all of the video?

A. In my opinion, yes.

Q. And this code, is this -- would GC stand for government code section here, or do you know?

A. I believe that's what it would stand for. I actually didn't even look at that government code section.

Q. Okay. That's okay.

Okay. And then so moving on to the next set.

A. So that's the newer version.

Q. Okay.

A. And there's actually, I believe, no change between the 2019 and 2023 versions of this. It's just a longer document.

Previous page.

03:07:10 Q. There we go.
03:07:12 Okay. And then I think there's four of
03:07:17 them. What is the difference between this and the
03:07:24 global?
03:07:24 A. This is the County's specific directive to
03:07:28 the sheriff's department on document or video
03:07:34 retention.
03:07:34 Q. Okay. And I'm just -- for the record, I
03:07:36 should have said that this is the -- this is the PDF
03:07:40 that begins on Bates 2058.
03:07:47 A. This is a long document. Since this has
03:07:50 already been provided, I do have in -- what I
03:07:54 brought, so I can tell you what specific page it's
03:07:57 on.
03:07:58 Q. Sure. Thank you so much.
03:08:00 A. So we're not scrolling through 60 pages.
03:08:03 Q. I do know the alphabet though, so I can
03:08:06 probably go a little quicker.
03:08:08 A. There's different verbiage here.
Q. Okay?
03:08:10 A. So page 26 -- and these are the only two
03:08:14 places. If you took the document, and you searched
03:08:16 the word video, there's only two places where it's
03:08:18 going to show up in there.
03:08:19 So page 26 it says "Facility Incident

Videos: Store digitally on a detention facility digital video recorder hard drive and/or compact disc. Also stored on video cassette tape if recorded via handheld video recorder."

So that -- facility incident videos. So I would say these were automatically in compliance with, because if there is a specific incident, deputies would typically download that video to attach to a use of force report or a crime report.

So -- and those are uploaded into our net records management system, and then also copied onto a disc and stored into sheriffs evidence.

Q. Okay. And the retention timeframe for that is two years?

A. Correct.

And then on page 55 --

Q. So can I ask you a follow-up question real quick before we move on?

A. Absolutely.

Q. So I understand what you're saying, in terms of it's terms of it's sort of automatic, in a sense that when one incident occurs, they would grab that video and save it, but what would compel them to save it for specifically for two years or more without knowing of this, for example?

03:09:43 A. I would say there probably isn't a single deputy on the department that knows that this retention schedule exists, but just as matter of how the sheriffs department stores evidence, it's retained for over two years.

03:09:58 Q. Okay. But, for example, like in this case, I mean, I know at this very day right now, it's been a little over two years of Hayden's death. Two years would have been March of 2024.

03:10:11 But, I mean, is it your understanding that all of the video of his time in jail was saved up until March of 2024?

03:10:19 A. Not up until March 2024. The video that was downloaded, yes.

03:10:25 Q. Okay. And you were going to turn me to page -- what was it -- 50-something?

03:10:33 A. 55. It's a retention schedule specifically to use of force tapes. So just pointing out that those are the only two places in this document where video comes up.

03:10:46 Q. Okay. Okay. And thank you for that.

03:10:51 And that is a six-year timeframe for retention; is that right?

03:10:58 A. Correct.

03:10:59 Q. Okay. And then this last batch here --

03:11:03 well, actually. Let me go back. Sorry.
03:11:05 So the time in the top right corner is
03:11:09 December 3rd, 2018.
03:11:10 Do you know if this was the retention policy
03:11:14 schedule in effect in March 2022?
03:11:17 A. Correct.
03:11:17 Q. And then turning to the next batch, starting
03:11:22 at Bates number 2118, this is also another longer
03:11:28 document.
03:11:29 Is this the same as what we looked at before
03:11:32 but the most current version?
03:11:34 A. Yes.
03:11:34 Q. Okay.
03:11:35 A. So what I asked for when I was looking for
03:11:38 these was current retention schedules, and then
03:11:41 whatever the previous version that was archived. So
03:11:44 there were no changes in between that 2018 version
03:11:48 and the 2024 version.
03:11:49 Q. And who did you seek these from?
03:11:51 A. Sheriff's legal.
03:11:53 Q. Okay. I don't know that I have any
03:12:00 additional questions for you.
03:12:07 MS. MELLANO: Give me just one --
03:12:09 ten seconds. Let me just make sure before I move
03:12:11 on.

03:12:22 BY MS. MELLANO:
03:12:23 Q. Well, let me ask you this. You know, I appreciate -- it sounds like you did quite a bit to prepare for today. Was there any topic area that you felt like was responsive to any of our subjects that we haven't talked about?
03:12:38 A. No, not to the subjects.
03:12:42 Q. Okay. And with -- can I follow-up on what the qualifier was.
03:12:48 Is there anything else that you think was sort of relevant to what we discussed today, that --
03:12:53 A. No. I just expected way more questions.
03:12:55 Q. Oh, no.
03:12:57 A. I expected to be asked to speculate way more than -- than I had been.
03:13:02 Q. Well, we don't like to have anyone speculate, so I hope that's --
03:13:08 MR. INMAN: So, Mr. Mellano, one more document that we produced that was responsive was the letter from CLERB about the security camera above the cell. I just want to make sure you were aware of that.
MS. MELLANO: I do --
03:13:24 MR. INMAN: And I did email you a briefing packet for the homicide brief, because I didn't find

03:13:29 Bates number on those documents, just in case they hadn't been produced.

03:13:34 Of course it's not one of the topics, but it's one of the document requests that we're -- we provide those today, but we have it. We did bring the CLERB letter.

03:13:45 MS. MELLANO: I really appreciate that, Mr. Inman. And I do recall that now, now that you're mentioning it. So if you don't mind -- does anyone want to take a quick like five-minute break, then? We'll go off the record real quick.

03:14:00 THE VIDEOGRAPHER: The time is 3:14 -- excuse me. 3:14 p.m. Pacific time and we're off the record.

03:23:07 (Recess taken.)

03:23:07 THE VIDEOGRAPHER: The time is 3:23 p.m. Pacific time. We're on the record.

03:23:14 BY MS. MELLANO:

03:23:17 Q. Okay. So -- I don't have this up, but -- so I just have a couple more questions for you about this CLERB, I guess, a letter from CLERB to Sheriff Martinez.

03:23:32 And actually, give me one moment. I should have done this a second ago, but I'm going to see if we already marked this as an exhibit.

03:23:45 I don't think so.
03:23:45 This will be marked as Exhibit 97.
03:23:57 And this is one of the documents that you had reviewed in preparation for your testimony today; is that right?
03:24:01 A. Yes.
03:24:02 Q. Okay. So this letter has a recommendation from CLERB to Sheriff Martinez about the placement of that video camera that is right above court holding cell six where Hayden was housed, right?
03:24:21 A. Yes.
03:24:21 Q. And that recommendation was that the sheriffs department angle that in a more opportune position to capture a greater view; is that right?
03:24:32 A. I believe so. I don't have the document in front of me anymore.
03:24:35 Q. Sure. Would you like to review it?
03:24:37 A. Sure. I don't want to be passing it back and forth.
03:24:40 Q. No. It's okay. I think I have a copy.
03:24:43 So is that your understanding based on the recommendation at the bottom there? And feel free to review it as long as you need to.
03:24:58 A. Yes.
03:24:58 Q. Okay. And specifically their concern was

03:25:01 that they weren't able to see Hayden Schuck's cell,
03:25:08 or the outside of at least the hallway outside of
03:25:12 the cell?
03:25:12 A. Correct.
03:25:13 Q. And any interactions at the doorway, for
03:25:16 example, that would have been visible otherwise?
03:25:19 A. Correct.
03:25:20 Q. And so that recommendation was made by way
03:25:22 of this letter to Sheriff Martinez.
03:25:26 Are you aware of any response by Sheriff
03:25:29 Martinez?
03:25:30 A. I am not.
03:25:31 Q. Okay. And did you inquire into whether
03:25:36 there was a response?
03:25:37 A. I did not.
03:25:38 Q. Okay. Earlier you did testify, correct me
03:25:44 if I'm wrong, that that camera hasn't yet been moved
03:25:46 at all?
03:25:47 A. It has not been moved.
03:25:48 Q. Okay. And are you aware of any plans to
03:25:53 move it or to at another camera?
03:25:55 A. I am not.
03:25:55 Q. Okay.
03:25:57 MS. MELLANO: I think that's all I got.
03:26:00 Thank you.

03:26:00 MR. INMAN: Do you, or do you want to --
03:26:03 MS. ROBINSON: No questions.

E X A M I N A T I O N

BY MR. INMAN:
03:26:04 Q. The CLERB letter that you just testified
03:26:06 about, although the date is in February, do you know
03:26:11 when the sheriffs department first received it?
THE COURT REPORTER: One moment. Can you please put on your microphone. Thank you.
Can you start from the top, Counsel?
BY MR. INMAN:
Q. Sure.
03:26:22 The letter that we were just -- that you
03:26:25 just testified about, the date is February 2024, but
03:26:31 do you know when the sheriff's department first
03:26:32 received the letter?
03:26:33 A. I do not.
03:26:34 Q. Okay. Do you know when you first heard
03:26:36 about the letter?
03:26:37 A. I first heard about the letter in
03:26:41 preparation for this case.
03:26:42 Q. Okay. Is it possible that a copy was first
03:26:46 provided to the sheriff's department within the
03:26:48 first couple of weeks?

03:26:49 A. I mean, I wouldn't really know.
03:26:53 Q. Okay. To your knowledge, has all video from the jails that showed Schuck been preserved?
03:27:02 A. Yes.
03:27:04 Q. Okay. And the cell that Schuck was in, do you know whether people are normally housed there for an extended period of time in the ordinary court of the jails?
03:27:16 A. During the booking process, while awaiting a cell assignment and housing.
03:27:23 Q. And is it -- is it normal in non-COVID times for someone to be a period of days in one of those cells?
03:27:33 A. During times outside of COVID, including now, it is uncommon for somebody to spend that much time on the 2nd floor.
03:27:45 At this time, we were experiencing a lot of overcrowding due to COVID. The limitations of placing people in housing due to COVID exposures and contact tracing and quarantine periods that we were putting people through during COVID, and in March of 2022, caused a huge backlog on the 2nd floor.
03:28:17 At one point, shortly after this, I believe we had roughly 200 people waiting on the 2nd floor to go up to housing, at which point later on in the

03:28:29 year, approximately in August of 2022, we switched
03:28:33 from requiring a quarantine period and a negative
03:28:40 PCR test, and we switched from the PCR testing to
03:28:45 rapid testing to clear somebody from intake up to
03:28:47 housing.

03:28:48 Q. And in what way, if at all, was the state
03:28:55 prison system contributing to the crowding in the
03:28:58 jail?

03:28:58 A. Well, state prisons wouldn't accept anybody
03:29:04 who came from a housing unit that had been placed in
03:29:08 quarantine.

03:29:09 Prior to my assignment at detention support,
03:29:11 I was assigned to sheriff's transportation, which
03:29:14 was responsible for taking all of our people from
03:29:17 county off to prison, and there were two significant
03:29:21 factors that were leading to our overcrowding at the
03:29:25 time: State prison is not accepting people, and our
03:29:32 COVID operations and how they effected the court
03:29:35 process.

03:29:35 You know, that area now is video court. And
03:29:39 at the time in 2022, there was some video
03:29:41 arraignments for people that weren't making in court
03:29:45 or in-person court appearances, but nobody could go
03:29:48 to either video court or to in-person court if they
03:29:52 were coming from a module that was in quarantine, if

03:29:55 there was a COVID exposure.

03:29:57 So the two major factors for relieving our
03:30:01 overcrowding are the prison system, and people
03:30:04 getting released after their court hearings. And we
03:30:07 were experiencing significant delays in both due to
03:30:12 our COVID operations at the time. That really
03:30:14 forced us to switch from the more accurate PCR
03:30:19 testing to rapid tests to get people cleared, and
03:30:24 try to relieve our numbers.

03:30:27 Q. So ordinarily, people wouldn't be housed in
03:30:30 a cell where the -- in normal times -- where an
03:30:35 extended period could pass without you being able to
03:30:39 see a safety check on a camera because the camera
03:30:42 doesn't pick up the cell?

03:30:43 A. No. Now on average, people are making it up
03:30:46 to housing somewhere between 12 and 24 hours.

03:30:52 MR. INMAN: I have no further questions.

03:30:53 MS. MELLANO: I just have a clarification
03:30:55 question, if that's okay.

03:30:56 When you say that at -- around the time of
03:31:01 when Hayden was in custody, there was 200 people on
03:31:07 the 2nd floor at some point.

03:31:08 Can you explain to me where they were in
03:31:16 relation to Hayden, I guess.

03:31:19 THE WITNESS: Well, so that area where

03:31:22 Hayden Schuck was placed is typically an area that
03:31:25 would only be used if we had run out of all of the
03:31:29 remaining cells on that floor.
03:31:32 Just because it was an extra route that
03:31:34 somebody would have to take, it wasn't your normal
03:31:39 circuitous route in a complete circle to walk and
03:31:41 check on the security and safety of the floor, you
know.
03:31:43 You can see into other videos how there's
03:31:47 another hallway you have to go down to make it past
03:31:51 the elevator to get back to that court holding area.
03:31:54 So it's not typically an area that we would
03:31:56 use if there were other available spaces.
03:31:59 So Hayden is one of the first in that
03:32:03 36 hours of video that gets placed in the cell back
03:32:06 there, but as the time goes on, you can see the
03:32:09 other cell doors being closed and people being
03:32:12 placed in those cells; in some of those cases,
03:32:15 multiple people being place in those cells and not
03:32:18 just a single person.
03:32:24 MS. MELLANO: Okay.
03:32:25 MR. INMAN: Nothing further from me.
03:32:27 MS. MELLANO: Thank you.
03:32:27 THE VIDEOGRAPHER: I have a few questions
03:32:31 for the counselors, if I may.

03:32:33 Counsel Mr. Mellano, would you like video synced, ma'am?

03:32:35 THE VIDEOGRAPHER: Thank you.

03:32:37 Counselor Inman, would you like a copy and synced as well?

03:32:40 MR. INMAN: Yes. A copy and synced.

03:32:41 THE VIDEOGRAPHER: Thank you so much.

03:32:42 Counselor Robinson, would you like a copy and synced?

03:32:44 MS. ROBINSON: Just the written transcript. Thank you.

03:32:46 THE VIDEOGRAPHER: Anymore orders for transcripts?

03:32:48 MS. MELLANO: Written transcript, yes.

03:32:52 Thank you.

03:32:52 MR. INMAN: For the county as well.

03:32:53 THE VIDEOGRAPHER: Thank you.

03:32:55 This ends the deposition for captain Derek Don Williamson, person most qualified. Thank you.

03:33:04 The time is 3:33 p.m. Pacific time, and we are off the record.

(Proceedings concluded at 3:33 p.m.)

--oOo--

DECLARATION UNDER PENALTY OF PERJURY

I, CAPTAIN DEREK DON WILLIAMSON, hereby declare under penalty of perjury that I have read the foregoing deposition and that the testimony contained therein is a true and correct transcription of my testimony given at said time and place.

Dated this ________ day of ________________________

20____, at ____________________, ________________________.
(City) (State)

______________________________
CAPTAIN DEREK DON WILLIAMSON

REPORTER'S CERTIFICATE

I, Adriana S. Angulo, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place therein named; that said deposition was reported by me in shorthand and later transcribed under my direction, and the preceding pages contain a true record of the testimony of the witness; and I do further certify that I am a disinterested person and am in no way interested in the outcome of said action, or connected with or related to any of the parties in said action, or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certification null and void.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of October 2024.

Adriana S. Angulo
Certificate No. 13824

ERRATA SHEET
CHANGES IN TESTIMONY
ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO
CAPTAIN DEREK DON WILLIAMSON - PMK
October 11, 2024

Page Line From To

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

_______________________________________________________

SIGNATURE:_______________________DATE:___________

CAPTAIN DEREK DON WILLIAMSON - PMK

## Exhibits

**Exhibit 93** 6:4 15:24,25
**Exhibit 94** 6:7 19:8,9
**Exhibit 95** 6:11 30:23
**Exhibit 96** 6:15 30:24

## -

**--o0o--** 7:3 8:21
**--ooo--** 62:23

## 1

**10** 46:25
**10th** 26:9 34:11 39:19
**11** 7:1,11
**1153** 24:11
**12** 60:16
**1350** 7:14
**13th** 40:2
**14th** 40:3
**15** 22:22 24:11
**16th** 26:10 34:12 39:19
**1A** 28:9

## 2

**2** 18:12
**200** 58:24 60:21
**2010/2011** 23:15
**2018** 52:3,17
**2019** 48:23
**2020/2021** 44:19
**2022** 11:16 21:4 27:11 52:5 58:22 59:1,21
**2023** 26:21 48:23
**2024** 7:1,11 51:9,12,13 52:18 57:15
**2036** 46:16
**2058** 49:10
**2118** 52:8
**22** 25:18
**24** 60:16
**2493138** 7:6
**26** 49:21,25
**26202.6** 12:23
**2:09** 7:2
**2:10** 7:12
**2nd** 22:1 39:16 40:3 44:3 58:16,22,24 60:22

## 3

**30** 43:24
**36** 35:16 36:6 37:12 61:15
**39040.7** 12:22 14:23,24
**3:14** 54:12,13
**3:23** 54:16
**3:23-CV-00785-DMS-AHG** 7:22
**3:33** 62:20,22
**3rd** 25:18 26:9 27:11 52:3

## 5

**50-something** 51:16
**55** 50:16 51:17

## 6

**60** 49:16
**600** 7:14

## 7

**7/23/2019** 46:23

## 9

**92101** 7:15
**93** 15:24,25
**94** 19:8,9
**95** 30:23 31:2
**96** 30:24 31:5
**97** 45:23 46:2 55:2

## A

**Aaron** 12:6 25:24 31:22
**Absolutely** 50:19
**accept** 59:9
**accepting** 59:17
**access** 15:16
**accurate** 60:7
**action** 7:9
**activity** 22:4 24:9 25:2 36:1
**actual** 40:1
**added** 23:16,17 26:13 42:9
**additional** 24:18 37:11,13 42:8 52:22
**addressed** 31:3,6
**addresses** 30:5
**adjusted** 28:16
**adjustment** 28:8 29:2
**administration** 21:6 26:24
**administrative** 12:12 14:19 20:17 29:3 33:8 41:11,15,20
**Adriana** 8:14
**advice** 10:20,23
**aftereffects** 25:13
**afternoon** 7:4 8:24,25
**agencies** 29:14,24 30:5,18
**agency** 29:25 30:6,11
**agree** 15:11
**ahead** 19:5 23:23
**alert** 30:14
**allowed** 20:22
**alphabet** 49:17
**alphabetical** 47:5
**amended** 26:9 27:3
**amount** 21:9,10 35:25 41:18
**and/or** 50:2
**Andrijana** 12:5
**angle** 20:22 22:12 39:17 44:25 55:13
**angled** 45:14
**angles** 12:9 13:23 15:19 20:3 23:16,17 24:2
**Angulo** 8:14
**answering** 9:25 10:2
**anticipate** 9:23
**anymore** 43:6,12 55:16 62:12
**apologize** 10:2 22:9
**appearances** 59:23
**applicable** 20:4
**applied** 14:21
**apply** 47:13,14
**approximately** 35:16 59:1

**archived** 26:5 27:2 52:16
**area** 20:1,9,16 21:23 22:23 23:21 25:2,3 26:12 28:17 36:2,3 44:3,4,6,12 53:4 59:20 60:25 61:1,11,12
**areas** 12:1 16:19,22 17:25 22:8 23:19 34:20, 24
**Argumentative** 37:6
**arraignments** 59:22
**arresting** 29:25
**assigned** 12:4 25:23 27:7,8 28:5 35:6 59:13
**assignment** 28:5 58:10 59:12
**assigns** 46:14
**Assumes** 34:22
**assumption** 11:18 40:21
**attach** 50:9
**attorney** 8:1 9:5 10:4,21 30:13
**attorney-client** 10:18 15:5
**attorneys** 7:10 10:22 29:17 31:14 37:22
**audit** 25:7,19
**August** 59:1
**automatic** 50:21
**automatically** 42:6, 20 43:19,23 50:6
**average** 60:15
**awaiting** 58:9
**aware** 22:25 23:5,20 32:16 38:23 39:4 53:22 56:10,20

**B**

**back** 13:22 25:5 33:19,23 36:3 52:1 55:18 61:11,15
**background** 33:17
**backlog** 58:22
**based** 34:25 35:10 40:10,17,21 41:17 55:21
**basis** 47:25
**batch** 46:1 51:25 52:7
**Bates** 46:16 49:10 52:8 54:1
**began** 24:15
**begin** 24:10
**beginning** 8:4 20:7 42:13 46:15
**begins** 49:10
**behalf** 8:10 11:6,9 31:13
**bit** 18:9 19:11 53:3
**black** 48:7
**blind** 20:22 21:6,13,18 22:23 35:24 44:5
**blurry** 20:14 28:20,23
**board** 47:23
**booking** 30:1 34:1,3 58:9
**Boorman** 12:6 24:1 25:25 31:22
**bottom** 55:22
**box** 20:12 26:13
**break** 9:8 54:10
**bridge** 44:20 45:2,11, 18,19
**briefing** 27:16,18,19 53:24
**briefly** 9:18
**bring** 15:22 54:5
**brought** 49:13
**budget** 21:11 23:4
**building** 47:8 48:4,8
**buildings** 46:9
**bureau** 27:9

**C**

**California** 7:1,15,19, 21
**call** 15:5 20:18
**camera** 12:8 13:22 14:7 15:19 20:3,8,13, 19,22 21:8,12,13,25 22:12,18 23:6,12,14,16, 17,21 24:2,4 26:23 28:12 35:15 36:22 39:18,22 44:18,19,24 45:1,4 53:20 55:9 56:17,21 60:13
**cameras** 13:15,18 14:1,5 21:7,17,24 22:11 23:3 26:14 28:7 42:9
**capabilities** 14:7,8
**capability** 14:3
**capacity** 11:13
**captain** 7:24 8:5 9:1 62:18
**capture** 22:4 55:14
**captured** 21:24
**care** 36:12
**case** 7:16,22 9:5 10:22 12:4,7 13:3 16:5 21:18 22:13 32:25 33:13 35:3, 10 43:7 51:6 54:1 57:22
**cases** 9:15 13:11 32:24 33:4,21 61:18
**Cassandra** 8:10
**cassette** 50:3
**caused** 58:22
**cell** 22:14,17 24:5,23 28:12 35:14 39:18 40:12,19 44:9 45:10,13 53:21 55:10 56:1,3 58:5,10 60:11,14 61:15, 17
**cells** 21:18,23 22:1,3, 10,12,22 28:11,13 44:5, 13 58:13 61:3,18,19
**central** 12:13 16:15 20:11 25:12 28:1 31:4, 11 32:11,12 34:11 41:12 42:23,24 44:21
**cetera** 46:10
**change** 26:6,15 48:22
**changed** 14:6 24:3 25:14
**changing** 26:3
**characterization** 43:9
**check** 19:1 20:12 27:24 37:2 60:13 61:7
**checked** 36:25
**checklist** 20:10 26:12
**checks** 22:22 24:12, 15,18 36:2,19 38:10
**circle** 61:6
**circuitous** 61:6
**city** 12:22 14:21
**clarification** 60:18
**clarifying** 24:7
**clarity** 40:24
**clear** 38:23 59:4
**cleared** 60:8
**CLERB** 18:14 25:22 32:18,21 53:20 54:6,21 55:8 57:6
**click** 13:9
**clicked** 13:11
**clients** 31:14
**close** 33:19
**closed** 61:17
**code** 12:22,24 14:20 15:9 48:12,13,15

**codes** 12:19
**collected** 16:16
**Columbia** 7:14
**columns** 46:21
**commander's** 20:6
**commanders** 26:20,22
**commissioned** 7:6
**committee** 26:2
**communication** 15:5
**communications** 10:18 15:7
**compact** 50:2
**compel** 50:23
**complete** 61:6
**compliance** 50:6
**computer** 41:10
**concern** 55:25
**concerns** 10:8
**concluded** 62:22
**conducted** 36:20
**confusing** 10:19
**contact** 58:20
**continue** 35:19
**continued** 36:20
**continues** 35:17
**continuing** 36:2
**contracted** 7:7
**contributing** 59:7
**control** 20:2,11 28:2, 3,4
**conversation** 35:1
**conversations** 24:1 26:4
**cooperating** 30:11
**copied** 50:11
**copies** 29:14,18
**copy** 16:8 30:2,3 55:20 57:23 62:4,6,8
**corner** 46:23 52:2
**correct** 9:2,3 13:25 14:25 17:12 22:15,24 24:13,16,21,25 26:11 29:9 30:19 34:16 39:24 40:23 41:3 42:21 43:2, 4,11,20 50:15 51:24 52:6 56:4,7,16
**Correctional** 8:11
**correctly** 35:16 43:16
**counsel** 8:6 30:15 57:11 62:1
**Counselor** 8:2 62:4, 8
**counselors** 61:25
**county** 7:17,20 8:8 11:6,10 12:25 13:2 16:16 17:8 21:11 30:15 31:6 34:17,18 37:5,8 40:4 46:7,9,13 47:8,22 48:4,7 59:15 62:16
**county's** 39:15,22 49:5
**couple** 37:1,3 54:20 57:25
**court** 7:19 8:14,16 9:20 14:12 16:20 17:17 28:21 33:2 38:15 39:10 40:19 44:15,17,20,22 45:2,11 55:9 57:9 58:7 59:18,20,22,23,24 60:4 61:11
**covered** 28:19,22
**covering** 23:21
**covers** 46:9
**COVID** 44:12 58:14, 18,19,21 59:18 60:1,6
**create** 25:6,19
**created** 41:13
**crime** 33:1,3 50:9
**crosstalk** 15:3
**crowding** 59:7
**current** 18:7 52:11,15
**custody** 26:10 33:24 34:10 44:4 60:21

## D

**damage** 28:15
**data** 21:10 31:24 41:18 42:7,10,15
**date** 27:12 57:7,15
**day** 51:7
**days** 23:8 34:14 37:1, 3 40:16 43:24 58:12
**death** 19:25 33:21 51:8
**deaths** 32:22
**December** 52:3
**decided** 12:23 40:6
**decision** 41:2
**defendants** 8:9
**define** 19:14
**definitively** 26:11
**delays** 60:5
**deleting** 43:24,25
**delve** 46:4
**department** 13:3 30:8 31:6,12 32:11 46:13,14 47:15 49:6 51:2,4 55:13 57:8,16,24
**departments** 46:9
**depending** 21:12
**depicted** 13:6 22:18 34:19 36:21 37:15
**deployment** 14:17
**deployments** 27:25
**deposition** 7:13,23 8:1 9:10 11:15 12:2,3 15:23 16:5 47:18 62:18
**deputies** 20:10 26:12 27:8 36:4 50:8
**deputy** 12:11,12 14:12 28:2,3,4 32:24 33:8,10,11 35:1,18 36:15 39:2,4 41:6 51:2
**Derek** 7:24 8:5,19 62:18
**description** 46:19
**designated** 16:11
**designed** 22:2,3
**desktop** 41:10,21
**details** 24:17,18
**detainee** 24:20 36:25
**detainees** 29:11
**detective** 12:4,5 33:18 38:4
**detectives** 37:23
**detention** 19:15 25:23,25 27:8 29:24 30:7 31:21 50:1 59:12
**detentions** 27:6 33:18
**device** 42:12
**Diego** 7:1,15,18 12:13 25:12 28:1 31:3,4,6 41:11 44:21 46:7 47:22
**Diego's** 12:25 17:9
**difference** 49:3
**difficult** 19:11
**digital** 31:24 50:2
**digitally** 50:1
**direction** 45:17
**directive** 49:5
**directives** 17:9
**directly** 35:15 41:22
**disc** 50:3,12
**discrepancy** 20:13
**discuss** 10:21 16:23
**discussed** 53:11
**district** 7:18,19,20
**division** 25:24
**document** 17:4 38:11,17 48:24 49:6,11,

22 51:19 52:9 53:19 54:4 55:15
**documents** 17:1,3,5 18:12,15,22 45:25 54:1 55:3
**Don** 7:24 8:19 62:19
**door** 22:18
**doors** 61:17
**doorway** 56:5
**double** 19:1
**doubt** 40:15
**download** 50:8
**downloaded** 18:7 32:23 37:13 40:5 41:8, 21 51:14
**downloading** 33:12 41:20
**dressed** 40:19
**drive** 41:7,12,22 50:2
**due** 23:18 27:12 58:18, 19 60:5
**duly** 8:20
**DVR/ SURVEILLANCE** 26:23
**DVRS** 42:5

## E

**e-mail** 20:18 26:25 27:7 29:2
**e-mails** 27:2
**earlier** 25:10 33:8 43:3,5,17 45:3 47:11 56:16
**easy** 9:25
**effect** 25:17 26:19 46:24 52:5
**effected** 59:18
**electronic** 42:12
**electronics** 42:11
**elevator** 61:11
**email** 53:24
**employee** 7:9 47:9 48:5,8
**end** 9:24 24:4,15 42:13 44:18
**ends** 62:18
**enforcement** 29:14,24 30:17
**entire** 13:2 40:14
**entities** 46:8
**entries** 20:17 28:6
**entry** 26:22
**equipment** 19:20,21 21:10 25:8 27:24
**Escobar** 7:5
**Estate** 7:16
**et al** 7:17,18
**events** 33:15 38:7,9
**evidence** 31:13 32:4, 5,6,16,17 34:23 39:8 50:12 51:4
**examples** 20:21
**excuse** 7:18 54:13
**exhibit** 15:24,25 19:8, 9 30:23,24 45:23 54:25 55:2
**exhibits** 30:22
**exist** 15:16,19 43:6,12
**existed** 47:19
**exists** 18:17 51:3
**expected** 53:12,14
**experience** 28:10
**experiencing** 58:17 60:5
**explain** 60:23
**explained** 40:22
**exposure** 60:1
**exposures** 58:19
**extended** 32:22 33:5 35:25 36:10 58:7 60:12
**extent** 15:4
**extra** 38:23 61:4

## F

**facilities** 21:12 25:6, 19 42:5
**facility** 14:15,17 19:15,19 22:4 29:24 42:4 49:25 50:1,5
**facing** 23:6 39:17
**fact** 40:17
**factors** 40:22 59:16 60:2
**facts** 10:22 34:22
**fallen** 35:9
**familiarity** 31:20
**fast-forward** 40:15
**February** 25:18 26:9 27:11 57:7,15
**feel** 9:7 10:3,14 11:3 16:22 55:22
**felt** 34:1 53:5
**filed** 7:18
**finalized** 26:8
**financially** 7:8
**find** 41:16 53:25
**fine** 37:2
**finish** 9:22 39:12
**five-minute** 54:10
**fixed** 20:19
**floor** 20:4 22:1 28:2 39:16 40:3 44:3 58:16, 22,24 60:22 61:3,7
**floors** 20:11
**folder** 41:11,12,15,16, 20
**folders** 31:24 41:8
**folks** 10:21 21:18 29:17
**follow-up** 50:17 53:8
**footage** 16:14 29:15 39:18
**force** 32:21 33:1,3 50:9 51:18
**forced** 60:7
**forget** 38:24 45:3
**form** 27:7
**formalized** 30:10
**forward** 46:6
**found** 17:25
**foundation** 38:1
**free** 9:7 10:3 11:3 55:22
**frequency** 22:7
**frequent** 22:5 23:18
**FRIDAY** 7:1
**front** 44:21 55:16
**fulfilling** 12:15
**full** 13:7
**functioning** 19:21

## G

**gave** 23:1
**GC** 48:12
**general** 14:16
**generally** 19:24 20:1 22:2 23:2
**give** 52:23 54:23
**glitching** 20:14
**global** 13:1 46:8,16 49:4
**good** 7:4 8:24,25 23:12
**govern** 20:24
**governed** 21:4

**government** 12:19, 21,24 48:13,15
**grab** 50:22
**Great** 9:4
**greater** 55:14
**guess** 31:17 46:4 47:20 54:21 60:24

## H

**H-A-H-N** 14:14
**Hahn** 12:11 14:13 33:10 35:2,18 36:15 38:25 39:2,5 41:6
**hall** 45:1,10
**hallway** 22:13 23:7 24:4 56:2 61:10
**hallways** 22:2
**hand** 14:4
**handheld** 50:4
**handled** 31:17
**happen** 22:8 30:1
**happened** 34:2,3 36:16
**hard** 41:7,22 50:2
**Hayden** 7:17 13:6 16:14 21:21 22:14,17 23:7 24:23 25:3 26:10 34:10,20 39:17 44:3,8 55:10 56:1 60:21,24 61:1,14
**Hayden's** 19:25 51:8
**health** 29:8
**Healthcare** 8:11
**heard** 57:19,21
**hearings** 60:4
**heavily** 26:2
**Heidi** 12:18
**heightened** 22:7
**helpful** 14:10
**hey** 23:11
**hits** 27:12
**hold** 14:11 19:6
**holding** 44:15 45:10, 12 55:10 61:11
**homework** 47:18
**homicide** 12:4 30:7 33:5,16,21 37:22 38:3 40:6 41:23 53:25
**Honestly** 15:8
**hope** 53:17
**hour** 9:9 37:1
**hours** 35:16 36:6 37:12 60:16 61:15
**housed** 21:19 23:7 44:4 55:10 58:6 60:10
**housing** 20:1,10 58:10,19,25 59:5,10 60:16
**huge** 58:22

## I

**I19** 17:19,21 19:8 25:5
**idea** 12:1
**identification** 15:25 19:9 30:23,24 45:23
**identified** 14:15
**identify** 8:3
**impact** 20:16
**implied** 11:21
**impliedly** 41:1
**impossible** 21:16
**in-custody** 32:22 33:21
**in-person** 27:19 44:14 59:23,24
**incarcerated** 22:6
**incarceration** 16:15
**inch** 21:17 23:3
**incident** 25:15 30:1 32:6,17 33:6,7,9 34:4,6 41:16 49:25 50:5,7,22
**incidents** 22:7 23:18 32:21
**include** 11:19 17:3 18:24 20:22 37:21,22 48:9
**included** 21:18 38:10
**including** 21:21 38:24,25 39:4 58:14
**indiscernible** 15:3
**individual** 33:23 35:21
**individuals** 22:6
**information** 20:9 26:12 48:2
**initial** 23:18
**Inman** 8:8 15:4 18:15, 22,25 29:21 31:18 32:19 34:22 37:6,25 38:11,14,16,17 39:11, 12 40:7 42:3 43:8 53:18,24 54:8 57:1,5,12 60:17 61:22 62:4,6,16
**inquire** 56:13
**inside** 22:12 28:12 30:11
**inspect** 19:20
**install** 23:18
**installed** 23:15
**installing** 21:11
**instance** 28:11 29:25
**instructed** 10:5
**insure** 19:21
**intake** 28:2 59:4
**intended** 29:10
**interact** 31:23
**interacting** 22:16
**interaction** 22:5 29:23 33:20
**interactions** 56:5
**interested** 7:8
**Interesting** 44:11
**interpretation** 38:20
**interpreted** 48:3
**interrupted** 11:24
**interviews** 34:2
**investigation** 18:23 23:10 33:18
**investigations** 30:7,8
**investigators** 16:17
**involved** 26:2
**issue** 20:25
**issues** 25:7,20

## J

**jail** 12:13 16:15 20:8 21:17 23:4 25:12 26:12 28:1 31:4,12 32:11,13, 21 34:11 39:15 42:23, 24 44:21 51:11 59:8
**Jail's** 41:12
**jails** 12:22 58:3,8
**Jenson** 31:23
**JIMS** 28:7
**job** 32:14

## K

**kind** 9:9,17 13:9 15:11 19:23 23:1
**knew** 27:11
**knowing** 50:25
**knowledge** 23:14 36:16 58:2
**knowledgeable** 7:24

## L

**L19** 17:19
**Lacks** 37:25
**Lauren** 8:2,6 9:4
**law** 22:21 29:14,24 30:17
**lawsuit** 32:7
**leading** 33:7 59:16
**learning** 27:9,13
**leaving** 40:18
**left** 40:12 43:22
**legal** 10:20,23 12:19 15:7 30:9,14 31:23 36:12 52:20
**letter** 31:3,5 32:10 53:20 54:6,21 55:7 56:9 57:6,14,17,20,21
**letters** 31:11
**level** 36:1
**license** 7:6
**Lieutenant** 12:6 24:1 25:24
**life** 42:12
**limit** 29:10
**limitations** 21:9 58:18
**limited** 22:1
**lines** 43:5
**Lingen** 12:5
**listed** 16:22 20:21
**log** 18:13 20:16,17 24:10,19 26:20,22 28:6
**logged** 24:11,24 41:4
**logging** 26:18
**logs** 24:9,14 25:2
**long** 49:11 55:23
**longer** 48:24 52:8
**looked** 44:19 52:10
**loose** 28:17
**lot** 14:9 29:23 31:24 33:20 58:17
**loud** 16:21

## M

**Madam** 8:15
**made** 25:18 34:9 41:2 56:8
**major** 60:2
**make** 10:25 11:22 20:16 52:24 53:21 61:10
**makes** 14:9
**making** 28:6 30:10 33:5 59:22 60:15
**management** 20:9 26:13 27:9,13 50:11
**manually** 14:3,5 24:19,24
**March** 11:16 21:4 26:9 39:19 40:3 51:9, 12,13 52:5 58:21
**mark** 30:20,22 46:1
**marked** 15:25 19:6,9 30:23,24 31:2 45:23 54:25 55:2
**marking** 15:23
**Martinez** 54:22 55:8 56:9,11
**Matt** 31:22
**matter** 36:18 51:3
**Mckenzie** 7:13
**meals** 36:4
**meaning** 43:6
**medical** 29:7
**medication** 10:14 36:4
**Mellano** 8:2,6,23 9:4 15:8,13 16:1,3 18:18 19:2,4,10 28:23 29:4 31:1 32:1 34:7 37:17 38:8,13,21 39:14 40:8 42:17 43:13 45:24 52:23 53:1,18,23 54:7, 18 56:24 60:18 61:21, 23 62:1,14
**men's** 16:15
**mental** 29:7
**mentioned** 13:4 14:20
**mentioning** 54:9
**method** 25:19
**microphone** 57:10
**mind** 54:9
**minor** 32:24
**missed** 47:20
**missing** 22:13 40:2 43:7,9
**mistaken** 20:20
**mistakenly** 10:1
**misunderstood** 43:14
**module** 59:25
**moment** 35:13 54:23 57:9
**monitoring** 36:12
**monitors** 20:2
**months** 33:25 42:25 43:1
**morning** 34:11
**motivation** 28:14
**mounted** 13:18
**move** 15:8,10 19:2,5 36:13 50:18 52:24 56:21
**moved** 14:4 56:17,19
**moving** 13:22 14:3 48:18
**multiple** 61:19

## N

**natural** 9:23
**nature** 36:5
**necessarily** 27:16 35:22
**needed** 20:19 25:20 28:16 30:2
**negative** 59:2
**net** 50:10
**newer** 47:4 48:20
**night** 34:11
**non-covid** 58:11
**normal** 58:11 60:11 61:5
**notary** 7:6
**note** 20:12
**notes** 20:15 25:1
**notice** 15:23 16:4
**notified** 21:5
**notify** 11:17 20:17 26:24
**number** 7:22 17:19 18:12,19 22:1 29:5 52:8 54:1
**numbers** 60:9
**nursing** 36:2

## O

**oath** 10:9
**object** 15:4
**objection** 10:7 29:21 31:18 32:19 34:22 37:6, 25 38:11 39:13 40:7 42:3 43:8
**objections** 10:3
**occur** 36:2
**occurring** 23:19
**occurs** 32:9 42:22 50:22

**October** 7:1,11
**office** 20:5,6
**older** 42:15
**open** 19:7 30:21
**operations** 59:18 60:6
**opinion** 48:11
**opportune** 55:13
**order** 47:5
**orders** 62:12
**ordinarily** 60:10
**ordinary** 58:7
**outstanding** 18:3, 21
**overarching** 16:13
**Overbroad** 29:21
**overcrowding** 58:18 59:16 60:3
**overwritten** 43:18

**P**

**p.m.** 7:2,12 54:13,16 62:20,22
**Pacific** 7:12 54:13,17 62:20
**packet** 53:25
**packets** 31:24
**pages** 49:16
**pan-and-tilt** 14:6,8
**part** 26:4 28:24 32:14
**parties** 7:10
**partners** 8:11 35:4, 25
**pass** 60:12
**passing** 36:4 55:18
**past** 61:10
**pause** 10:3
**PC** 7:14
**PCR** 59:3 60:7
**PDF** 49:9
**people** 12:15,17 28:10 44:16 58:6,19,21, 24 59:14,17,22 60:3,8, 10,15,21 61:17,19
**period** 11:16,18 12:9 18:6 34:4 36:11,21 40:14,20 42:9 43:23 58:7,12 59:2 60:12
**periods** 58:20
**person** 7:24 28:5 33:24 34:5 36:10,14 37:9,15 42:14 61:20 62:19
**person's** 38:20
**personal** 36:15
**personally** 17:2,6
**personnel** 14:19
**pertain** 30:17
**pertained** 17:25
**pertains** 29:13
**phone** 20:18
**photographs** 33:14 38:6
**phrase** 13:16
**physically** 44:16
**pick** 60:14
**piece** 40:17
**place** 21:3 22:6 61:19
**placement** 55:8
**places** 49:22,23 51:19
**placing** 58:19
**plaintiffs** 8:7 9:5
**plans** 56:20
**point** 9:7 18:8 29:20 32:15 33:11 42:20 43:6, 18,21 58:23,25 60:22
**pointing** 51:18
**points** 13:24
**policies** 13:1 17:10
**policy** 17:19,24 19:8, 13,14,18 20:24 21:2 25:5,13,17 26:1,3,16 27:3,6,15 29:16,20 30:4,9 32:3 41:24 43:22 46:16 47:12,16 52:4
**position** 13:19 31:21 37:4,8 39:15,22 55:14
**possibility** 41:14, 17,19
**potential** 32:6
**potentially** 23:3
**power** 39:7
**Powerpoint** 18:24
**powers** 21:5
**practice** 21:3 36:18 41:24
**preparation** 55:4 57:22
**prepare** 12:2,3 31:24 53:4
**preparing** 18:13
**present** 8:3 28:12
**preservation** 29:18 31:3,5,10,13,25 32:10, 12 41:6
**preserve** 32:4 34:19 39:7 40:9
**preserved** 32:17,18 58:3
**previous** 48:25 52:16
**previously** 43:15 45:14
**primary** 32:25
**prior** 9:13 41:8 44:12, 19 47:17 59:12
**prison** 59:7,15,17 60:3
**prisons** 59:9
**privilege** 15:5
**privileged** 10:18,23
**problem** 9:16 20:18
**problems** 20:21
**procedure** 27:24
**procedures** 17:11 26:1 27:6 47:17
**proceed** 8:13
**proceedings** 62:22
**process** 16:14 25:7,9 26:8 30:1,10 31:16 35:4 58:9 59:19
**processing** 20:6
**produce** 18:22 40:6
**produced** 17:18 18:8,14,25 53:19 54:2
**production** 17:1,4 18:11
**professional** 29:6
**professionals** 29:8
**project** 35:7
**promulgated** 27:4
**promulgates** 47:21
**properly** 19:22
**property** 47:8 48:4,8
**proposal** 26:15
**provide** 10:12 23:13 36:3 41:23 54:5
**provided** 49:12 57:24
**PSU** 28:3
**public** 7:6
**pull** 35:8,22,25 36:11 37:14
**pulled** 35:12 38:3 40:11,18
**pulling** 35:2 43:23,25
**pulls** 42:18
**purpose** 19:13
**purposes** 11:15
**pursuant** 27:24 37:19

**put** 35:19,20 46:6 57:10

**putting** 58:21

## Q

**qualified** 62:19

**qualifier** 53:9

**quarantine** 58:20 59:2,11,25

**quarter** 26:21

**question** 9:24 10:7 11:2 14:11 22:10 50:17 60:19

**questions** 10:8 11:12,20 45:22 52:22 53:12 54:20 57:2 60:17 61:24

**quick** 50:18 54:10,11

**quicker** 49:18

**quickly** 42:22

**quote** 48:3

## R

**ran** 36:9

**rapid** 59:4 60:8

**raw** 23:1

**reach** 28:15

**reaching** 42:7

**read** 16:21

**reading** 38:5

**ready** 8:13

**real** 50:17 54:11

**realtime** 40:15,16

**reason** 10:11 23:1,6, 12,13

**reasons** 23:2

**recall** 16:4 54:8

**receive** 45:25

**received** 10:20 32:10 39:5,7 57:8,17

**receiving** 16:4

**recess** 54:15

**recognize** 16:7

**recommendation** 25:22 55:7,12,22 56:8

**record** 7:5 11:4 38:23 40:25 41:5 49:8 54:11, 14,17 62:21

**recorded** 9:20 27:21 29:15 40:13 50:4

**recorder** 50:2,4

**recordings** 41:25

**records** 18:23 50:11

**referred** 29:6

**regular** 44:14

**related** 12:24 31:20, 25 33:14 38:6,9 41:16 48:4

**relating** 47:8 48:7

**relation** 60:24

**relative** 7:9

**released** 60:4

**relevance** 12:14

**relevant** 11:16 12:7, 19,23 17:8 26:23 27:15 32:22 33:6 34:2,3 53:11

**relieve** 60:9

**relieving** 60:2

**remaining** 61:3

**remember** 9:13,14 35:2,15 43:10 44:23

**removable** 41:22

**rendered** 28:19,21

**repair** 29:2

**repairs** 25:7,20

**repeat** 17:16 38:15

**repetitive** 9:17

**report** 8:15 33:1,3 46:17 50:9

**reporter** 8:14,16 9:20 28:21 33:2 38:15 39:10 57:9

**reporter's** 14:12 16:20 17:17

**representative** 11:10

**request** 18:11 30:10, 12 33:5,22,25 34:4,8 35:8 37:20,21 38:3,5

**requesting** 29:14, 17,18 30:3 31:12 32:12

**requests** 12:16 17:1 31:25 32:23 37:9 54:4

**required** 22:21 24:10

**requirements** 36:12

**requiring** 59:2

**resolve** 11:4

**respect** 29:16

**response** 36:8 56:10,14

**responsible** 12:15 28:6 59:14

**responsive** 18:16 53:5,19

**rest** 35:20

**retained** 16:16 18:6,8 42:10 51:5

**retaining** 47:13

**retention** 12:20 13:1 17:9 42:7,15 46:2,6,8, 13,16,20 47:9,24 49:7 50:13 51:3,17,23 52:4, 15

**revealing** 15:6

**review** 12:8 15:15 25:2 27:15 35:1,10 40:13 41:2 55:17,23

**reviewed** 27:11 40:1, 5,20 41:15 55:4

**reviewing** 28:7 33:12

**reviews** 47:23

**revises** 47:24

**Robinson** 8:10 57:2 62:8,10

**roster** 14:16,17

**roughly** 9:8 58:24

**route** 61:4,6

**run** 61:2

## S

**safety** 22:22 24:12 28:13 36:1,19 38:10 60:13 61:7

**sake** 14:12 16:20 17:17

**San** 7:1,15,18 12:13, 25 17:9 25:12 28:1 31:3,4,6 41:11 44:21 46:7 47:22

**save** 50:23,24

**saved** 51:11

**saves** 42:19

**schedule** 46:8,13,17 47:24 51:3,17 52:5

**schedules** 46:2,6 52:15

**Schuck** 7:17 13:6 21:21 22:17 33:14 34:25 35:12 38:6,10 40:12,18 58:3,5 61:1

**Schuck's** 16:15 22:14 24:23 39:17 56:1

**Scope** 31:18 32:19

**Scott** 7:14

**scrolling** 49:16

**search** 17:5,7 18:4

**searched** 49:22

**searches** 17:2,7

**searching** 18:12

**seconds** 24:23 52:24

**section** 14:20 15:9 26:16 30:4 47:17 48:13, 16

**security** 19:14,20 25:21 47:1,7,9 48:5,8 53:20 61:7
**seek** 52:19
**semi-regular** 47:24
**sense** 10:25 11:22 14:9 50:21
**sentence** 19:19 25:6
**sergeant** 12:10 20:6 25:25 26:1 31:21,22 33:20
**services** 27:8
**set** 20:2 48:19
**shared** 41:12
**she'll** 9:21
**Sheriff** 54:21 55:8 56:9,10
**sheriff's** 12:18 15:7 30:6,9,14 31:12,23 32:11 33:5,21 38:3 41:23 46:12,14 47:15 49:6 52:20 57:16,24 59:13
**sheriffs** 13:3 31:6 33:16 50:12 51:4 55:13 57:8
**shift** 14:16 19:21 20:7 27:25
**shoot** 38:24
**shorter** 13:12 42:10, 11,16
**shortly** 25:16 58:23
**show** 22:2 24:14 36:1, 11,14 37:13 49:24
**showed** 58:3
**showing** 20:3
**shown** 37:10
**signed** 46:7
**significant** 59:15 60:5
**similar** 33:4
**single** 42:5 51:1 61:20
**situation** 36:9
**six-year** 51:22
**slides** 18:24
**slow** 13:7
**slowly** 9:21
**smack** 28:15
**sobering** 28:13
**sort** 9:23 10:13,19 13:9 16:13,18 17:10 20:21 22:10 23:1 25:10 27:18 32:2 40:25 41:4 42:19 43:7 45:4 46:21 47:2 50:21 53:11
**sounds** 53:3
**Southern** 7:20
**space** 43:22
**spaces** 61:13
**speaking** 19:24 20:1 33:17 35:18 36:17
**speaks** 38:11,18
**specific** 12:22 13:2 23:5 46:12 49:5,13 50:7
**specifically** 28:1 29:22 30:5 31:9,19 32:20 33:13 35:2 43:11 47:16 50:24 51:17 55:25
**speculate** 53:14,17
**Speculation** 37:25 38:14,17 39:13
**speed** 13:7,13
**spell** 14:13
**spend** 58:15
**spoke** 12:3,5,10,18 33:8
**spot** 20:23 21:6,18 22:23 28:18 35:24 44:5
**spots** 21:13
**square** 21:17 23:3
**staff** 19:19 20:17 21:4 22:5,16,21 24:10 27:4, 23 29:3,6,7,25 36:3
**staffing** 14:16,17
**stand** 48:12,14
**start** 9:25 42:6 57:11
**started** 45:2
**starting** 26:20 52:7
**starts** 33:11
**state** 7:19 59:6,9,17
**states** 19:19
**station** 20:2
**stationary** 13:19
**Steno** 7:7 8:15
**Steve** 8:8 15:11
**stopped** 24:23 39:22
**storage** 43:21
**Store** 50:1
**stored** 50:3,12
**stores** 51:4
**Street** 7:14 44:21
**stuff** 28:18 36:4 37:14
**subareas** 16:22
**subject** 32:7
**subjects** 53:5,7
**subpoena** 30:14
**subsection** 29:13
**subsections** 30:16
**subtopic** 16:19
**suffice** 26:7
**sufficient** 36:24
**Suite** 7:14
**super** 42:14
**supervisor's** 20:5
**supervisors** 19:19 26:18 27:14 30:2 47:23
**support** 25:23,25 31:21 59:12
**surveillance** 16:14 18:3 26:13 39:16 47:1
**swear** 8:16
**switch** 60:7
**switched** 59:1,3
**sworn** 8:20 21:4 22:5, 16,21 23:23 24:9 27:4, 23
**synced** 62:2,5,6,9
**system** 14:7 18:7 19:20 20:8,9 21:12,13 23:14 25:8 26:13,23 27:9,13 50:11 59:7 60:3
**systems** 19:15 21:8, 25 25:21

## T

**takes** 22:6
**taking** 8:1 10:13 35:7 59:14
**talk** 9:19,21 17:15 18:9 32:5
**talked** 53:6
**talking** 11:17 12:14, 17 25:16 34:24
**tape** 50:3
**tapes** 51:18
**team** 14:18
**technical** 42:14
**technically** 21:16
**ten** 47:4 52:24
**terms** 13:5 25:11 28:17 50:20,21
**test** 59:3
**testified** 8:20 43:3 47:11 57:6,15
**testify** 16:11 18:13 56:16
**testifying** 11:6,8,13
**testimony** 10:12 55:4
**testing** 59:3,4 60:8

**tests** 60:8
**theme** 16:13
**theoretically** 34:9
**thoroughness** 40:11
**thought** 14:21 35:4 45:13
**threshold** 42:7
**thrown** 28:19
**thumb** 41:22
**time** 7:11,12 11:16,17 12:9,13 13:24 15:17 18:6 19:24 23:25 25:24 26:19 27:12 33:9 34:1,3 35:7 36:11,13,21 38:2 40:12,14,20 42:9 43:23, 25 44:4 46:25 51:11 52:2 54:12,13,16,17 58:7,16,17 59:17,21 60:6,20 61:16 62:20
**timeframe** 23:15 33:24 44:19 46:20 47:10 50:13 51:22
**timeline** 12:7 25:15
**times** 9:12 13:13 33:23 58:11,14 60:11
**title** 22:22 24:11 38:25
**today** 7:10,11 8:14 10:9,11 11:5,13 12:2,3 16:12,23 18:13 25:16 53:4,11 54:5 55:5
**told** 27:17
**top** 47:7 52:2 57:11
**topic** 10:19 12:1 17:25 53:4
**topics** 16:11 54:3
**tower** 28:6
**tracing** 58:20
**track** 25:7,20 27:2
**tracking** 27:16
**Tracy** 7:5
**trained** 27:5
**transcript** 62:10,14
**transcripts** 62:13
**transportation** 59:13
**turn** 45:7 51:15
**turned** 45:4,15
**turning** 52:7
**type** 12:16 20:24 29:1 39:8
**typical** 36:17
**typically** 27:15,25 28:4,5 30:13 32:23 33:7,16,22 35:5 37:9 41:9,12 50:8 61:1,12

## U

**un-viewable** 20:14
**un-written** 21:3
**unclear** 22:10
**uncommon** 21:14 58:15
**underlying** 10:22
**understand** 21:15 50:20
**understanding** 11:5 18:2 29:19 51:10 55:21
**understood** 43:16
**unit** 20:1 30:7,8 59:10
**units** 33:18
**unprepared** 16:23
**unwritten** 32:3
**uploaded** 50:10
**upper-right** 46:23

## V

**Vague** 29:21 40:7 42:3
**Van** 12:5
**veered** 28:17
**verbiage** 49:19
**version** 25:18 26:6 46:22,24 47:4 48:20 52:11,16,17,18
**versions** 48:23
**versus** 7:17
**video** 9:20 12:16,20 13:3,5,6,8,17 14:2 17:3, 6,7,9 18:3,5 19:15,20 25:8,21 28:7 29:15,18 32:4,5,6,12,17,22,23 33:6,12,23 34:5,15,19, 25 35:1,3,8,11,12,16, 19,22,23,25 36:7,10,14 37:10,15,16 38:2 39:16 40:1,11,12,14,18 41:18, 25 42:19 43:6,7,11,18 48:10 49:6,23 50:2,3,4, 8,23 51:11,13,20 55:9 58:2 59:20,21,24 61:15 62:1
**video-recorded** 7:23
**videos** 13:12,18,22 33:14 38:6 47:1,7,8,13 48:4,7 50:1,5 61:9
**view** 29:10 44:18 45:9 55:14
**viewed** 24:5
**viewing** 28:18
**visible** 56:6
**visitors** 29:11
**Volume** 7:25

## W

**waiting** 58:24
**walk** 35:3 61:6
**wanted** 15:9
**Ward** 7:5
**watch** 13:5,7 20:6 26:20,22
**watched** 13:12,17 14:2
**weeks** 57:25
**weird** 16:1
**white** 48:7
**William** 7:17
**Williams** 12:18
**Williamson** 7:25 8:5,19 9:1 62:19
**word** 49:23
**worded** 26:15
**words** 13:21
**work** 20:10
**worked** 12:6
**working** 18:16 39:23
**works** 19:23
**write** 42:6
**writer** 32:25
**written** 21:3 32:3 42:1,20 47:12 62:10,14
**wrong** 43:4 56:17

## Y

**year** 26:21 59:1
**years** 33:19 42:8 47:9 50:14,24 51:5,8,9

## Z

**zoom** 19:12