Timothy A. Scott (SBN 215074)
Lauren M. Mellano (SBN 306918)
Michelle C. Angeles (SBN 298883)
MCKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 202-7461
Email: tscott@mckenziescott.com
lmellano@mckenziescott.com
mangeles@mckenziescott.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, et al.,<br><br>Plaintiffs,<br><br>V.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No.: 3:23-CV-00785-DMS-AHG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT COUNTY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 1, 2025<br>Time: 1:30 p.m.<br>Judge: Hon. Dana M. Sabraw |

# TABLE OF CONTENTS

**I. INTRODUCTION .......... 1**

**II. FACTS .......... 1**

A. 2006-2022: The County's Notice. .......... 1

B. March 10, 2022: Hayden Obviously Impaired During Booking. .......... 3

C. March 11-14: Schuck Forgotten in "the Back 40." .......... 7

D. March 15 (morning): Hayden Discovered in a Feces-Covered Cell; "Cleaned up" for Court; but too Sick to be Arraigned. .......... 9

E. March 15 (afternoon): Hayden "Thirsty," Cannot "Walk the Line" after Court; Still No Medical Care. .......... 10

F. March 15 (evening): Hayden is Unwell, Collapses Twice En Route to the 7th floor. .......... 12

G. March 16: Hayden, Naked and Covered with Sores, Left in 7D Until His Death. .......... 14

H. March 16, 2022-Present: The County never provides deputies and nurses *any* feedback regarding this death. .......... 16

**III. DISCUSSION .......... 18**

A. Qualified immunity is waived or moot. .......... 18

B. Defendants were "Deliberately Indifferent" under § 1983. .......... 19

1. . Sandoval shows that Defendants were "deliberately indifferent" to the need for medical care. ........ 19

2. . The facts demonstrate liability for the individual defendants under § 1983........ 21

C. These Facts Support *Monell* Liability........ 26

D. Overwhelming evidence supports Plaintiffs' state causes of action........ 29

1. . Bane Act........ 29

2. . Negligence and Immunity........ 29

3. . Negligent Training and Supervision. ........ 30

4. . Failure to Summon Care. ........ 31

**IV. CONCLUSION ........ 32**

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Cmty. Hosp. of Long Beach*
Cal. Ct. App. 238, 253 (2020)........................................................32

*Castro v. Cnty. of Los Angeles*
833 F.3d 1060, 1075–76 (9th Cir. 2016) ........................................29

*Davis v. City of Ellensburg*
869 F.2d 1230, 1235 (9th Cir.1989) ...............................................28

*D'Braunstein v. California Highway Patrol*
131 F.4th 764, 768–70 (9th Cir. 2025) ...........................................23

*Est. of Escobar v. United States*
2022 WL 3209380, at *3 (S.D. Cal. Aug. 8, 2022)..........................32

*Est. of Serna v. Cnty. of San Diego*
2022 WL 827123, at *4 (S.D. Cal. Mar. 18, 2022) ..........................24

*Estate of Serna v. County of San Diego*
2022 WL 827123, at *8 (S.D. Cal. Mar. 18, 2022) ..............................31

*Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*
627 F.Supp. 2d 1187, 1208 (E.D. Cal. 2009) ....................................33

*Henry v. Cnty. of Shasta*
132 F.3d 512, 519-20 (9th Cir. 1997).........................................29, 30

*Hunter v. Cty. of Sacramento*
652 F.3d 1225, 1234 n.8 (9th Cir. 2011) .........................................28

*Kingsley v. Hendrickson*
576 U.S. 389, 397 (2015) .......... 23

*Larez v. City of Los Angeles*
946 F.2d 630, 647 (9th Cir. 1991) .......... 29

*Lentini v. California Ctr. for the Arts, Escondido*
370 F.3d 837, 843 n.6 (9th Cir. 2004) .......... 21

*McRorie v. Shimoda*
795 F.2d 780, 784 (9th Cir. 1986) .......... 29

*Oviatt v. Pearce*
954 F.2d 1470, 1477–78 (9th Cir. 1992) .......... 28

*Reese v. County of Sacramento*
888 F.3d 1030, 1043 (9th Cir. 2018) .......... 31

*Russell v. Lumitap*
31 F.4th 729, 739 (9th Cir. 2022) .......... 23

*Sandoval v. County of San Diego*
985 F.3d 657, 679 (9th Cir. 2021) .......... passim

*Schmidt v. Cnty. of San Diego*
2024 WL 4308793, at *10 (S.D. Cal. Sept. 26, 2024) .......... 23

*State Farm Fire & Casualty Co. v. Keenan*
216 Cal. Rptr. 318, 331 (Cal. Ct. App. 1985) .......... 33

*Tsao v. Desert Palace, Inc.*
698 F.3d 1128, 1143 (9th Cir. 2012) .......... 28

*United States v. Bentson*
947 F.2d 1353, 1356 (9th Cir. 1991) .................... 21
*Villarreal v. Cnty. of Monterey*
254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017) .................... 32, 33
*Ward v. Cnty. of San Diego*
No. 23CV1819 BJC (BLM), 2025 WL 319250, at *2 (S.D. Cal. Jan. 28, 2025) .................... 24

**Statutes**

Cal. Civ. Code § 52.1(b) .................... 31
Fed. R. Civ. P. 30(b)(6) .................... 6
Government Code § 844.6 .................... 31

## I. INTRODUCTION

The County Defendants' summary judgment motion rests on the premise that Hayden Schuck did not obviously need immediate medical attention. But the facts—including gruesome photos from shortly after Hayden's death[1]—say otherwise. Those photos, jail-surveillance videos, and damning admissions during depositions create a tidal wave of facts precluding summary judgment. Notably, Defendants argue *only* that Plaintiffs cannot prove deliberate indifference; they do ***not*** argue that qualified immunity protects individual Defendants from liability. Their motion should be dismissed except where unopposed.

## II. FACTS[2]

### A. 2006-2022: The County's Notice.

San Diego County officials have been on notice for years that death rates in its jails were persistently high. The title of a California State Auditor's report, which the County received before Hayden died, says it all: "*San Diego County Sheriff's Department: It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody.*" Ex. 46 (Audit Report). According to the report, from 2006 through 2020, a staggering 185 individuals died in the County jails. These deaths, 18 of which were in 2021, occurred at *the highest* rate in the state based on average daily inmate population. *Id.* at 59.[3] But the County knew long before this that its policies and procedures put inmates at risk. In 2017, the

---

[1] Ex. 53. Hayden's parents want these pictures to be part of the record and for the public to know the truth about Hayden's death. *See* Declarations at ECF 122-1 and 122-2.

[2] Plaintiffs also incorporate by reference all facts and exhibits set forth and filed with Plaintiffs' opposition to CHP's motion for summary judgment filed today at ECF 121.

[3] A record 19 deaths, including Hayden's, occurred the year *after* this report. *See* https://www.sdsheriff.gov/resources/transparency-reports ("In-Custody Deaths by Year") (last visited July 14, 2025). As discussed *infra*, these numbers cast doubt on the County's position that it was already implementing and heeding some of the Auditor's recommended reforms.

County was evaluated for compliance with NCCHC standards, and Defendants admit that they did not meet them. Ex. 52 (Sheriff's Annual Report).

San Diego Grand Juries have also repeatedly made recommendations to the County that went unheeded. In 2014 and 2017, the Grand Jury recommended the jails update their surveillance systems for inmate safety. Ex. 46 at 40. But in 2022, the Sheriff had yet to replace the system—a "concerning" fact given that the system's "age is a major safety issue." Ex. 46 at 40. Further notice came from a 2018 Disability Rights California (DRC) report, "Suicides in San Diego County Jail: A System Failing People with Mental Illness."[4] This investigation found the number of individuals who had died in the County jails since 2010 "far outpaces other county jail systems." Ex. 47. The DRC report attributed this "shocking" suicide rate to factors including inadequate mental health treatment, overuse of solitary confinement, and a lack of meaningful, independent jail oversight.

And the California Auditor's report found the Sheriff's Department "failed to adequately prevent and respond to the deaths" and it identified "underlying systemic issues" in its provision of medical care, mental-health care, and regular safety checks. Ex. 46 at 19, Figure 5. The report also highlighted that "the [Sheriff's] department's

**Figure 5**
Significant Deficiencies in the Sheriff's Department's Policies and Procedures Likely Contributed to the Deaths of Individuals in Its Custody




---

[4] The state auditors adopted the DRC recommendations as well. *See* Ex. 46 at 38-39, 119.

reviews of deaths are insufficient" and generally did not lead to meaningful corrective action. Ex. 46 at 33. *See also* Ex. 46 at 34. The County was provided a draft version of this report in **2021**.

Defendants took no meaningful action in response. Hayden died the following March after: 1) insufficient health evaluation at intake; 2) lack of follow-up care; 3) inadequate safety checks; and 4) sworn staff's failure to respond to an obvious medical emergency—the exact problems that the Auditor had identified a year earlier. Also consistent with the Auditor's findings, no corrective action—or even sincere investigation—followed Hayden's death.

**B. March 10, 2022: Hayden Obviously Impaired During Booking.**

On the morning of March 10, 2022, Hayden was involved in a rollover car accident. Police arrested him for driving under the influence. Body-worn camera (BWC) footage shows Hayden in the back of a police car, his hair matted with sweat and his pupils dilated. Ex. 3 at 4:20. Hayden was hallucinating and asked a girlfriend who was not present if he should consent to a blood draw. An officer transported Hayden to jail. Ex. 1 at 15-16. During the ride, Hayden appeared "under the influence" "not very responsive," and "erratic" according to the transport officer. Ex. 1 at 24. Hours later, the BWC footage showed Hayden still noticeably intoxicated, with slurred and nonsensical speech. Ex. 4.

Upon arrival at the jail around 4:30 p.m., the initial intake nurse, Nozawa, "gate refused" Hayden and sent him to the ER. Ex. 7 at 633. On his way to the hospital, Hayden still appeared to be under the influence. Ex. 1 at 31. Hayden purportedly refused care at the hospital. Ex. 1 at 34. Police then transported Hayden back to the County jail.

Hayden continued to look impaired when he arrived at the jail for the second time. Ex. 8; Ex. 9 at 9:11:50-9:12:50. He appears on video without shoes, with his

shirt unbuttoned, and his hair disheveled Ex. 8. Hayden also appeared unsteady during his booking photos, requiring guidance from the police officer. Ex. 9 at 9:11:50-9:12:50, 9:13:45-9:14:25; Ex. 1 at 28, 39.

Defendant Barrera, a different intake nurse, saw Hayden next. To medically clear Hayden for booking, Barrera had a duty to "perform a comprehensive clinical assessment . . . prior to acceptance into the detention facility." Ex. 5 at 958-959. Part of that assessment requires interviewing the officer about any known illness or injuries; any signs of being under the influence; and whether the officer had "any indication of a mental health concern." Ex. 7 at 644-645, Ex. 10 at 23,27. The officer would have had important information in response. Ex. 1 at 18-19, 24, 39-40, 43-44; Ex. 2 at 53. But Barrera never asked; she simply checked "no" to each question without talking to the officer. Ex 7. at 644-645. As she later explained in her deposition, this is the County's real practice and procedure. Ex. 12 at 58 ("we just basically speak to the patient" instead of the officer). Indeed, the video footage confirms that the officer left after 7 seconds. Ex. 9 at 9:14:46 P.M- 9:14:53 P.M; Ex. 1 at 39-44.

But from her own observations alone, Barrera still documented that Hayden was "making grandiose statements"; was "not understanding [the] booking process"; was trying to take pictures with his phone (which per officers, "was 'in pieces'" due to his car accident); and was "asking for $20 to give to the nurse for some water." Ex. 7 at 658. These symptoms should have been significant to Barrera, because per policy, "[i]ndividuals exhibiting signs of excited delirium, disorganization of thoughts, altered mental status and confusion will require medical and possible psychiatric evaluation *prior to being accepted into the detention facility.*" Ex. 5 at 958 (emphasis provided). Yet, Barrera cleared Hayden for booking.

No qualified mental health provider (or "QMHP") was present at the intake/booking process to rule out any mental health issues. Ex. 11 at 132-136; Ex. 12 at 101-102. This was ***per policy***. Ex.11 at 132-136; Ex. 16 at 52. That is, despite repeated safety recommendations that the jail have a QMHP at intake, Ex. 46, ***the County refused to adopt that policy***.[5]

Still, according to other witnesses' deposition testimony, Barrera could have called the charge nurse for guidance. Ex. 10 at 21, 39-40; Ex. 6 at 21-25. She could have placed Hayden in medical holding cell for observation. Ex. 11 at 259. Or, she could have called the on-site clinic to have Hayden examined. Ex. 6 at 25. She did not do so. Barrera also failed to utilize another option: placing Schuck in a "Medical Observation Bed" (an "MOB") for monitoring. In fact, if he was admitted to the jail at all, policy *required* Schuck to be placed in a MOB because he had not received treatment at the hospital.[6] That would have afforded him more frequent safety checks every 30 minutes. Ex. 43 at 823; Ex. 16 at 21. Barrera could also have recommended that Schuck be placed in a Sobering Cell where he would have been checked on every 30 minutes.[7] *See* Ex. 7 at 643 (giving RN the opportunity to "Recommend to Sobering Cell – Immediate" and "Recommend to

---

[5] A designated Fed. R. Civ. P. 30(b)(6) witness has since confirmed that notwithstanding these safety recommendations, QMHP's were not required at intake in 2022, and according to the witness, they still are not required today. Ex. 16 at 52.

[6] The relevant policy states: "[i]n the event an arrestee refuses treatment and ignores the recommendations of the emergency department physician . . . a copy of the refusal form indicating that he/she acted against medical advice (AMA) will accompany the patient back to detention. *The patient should be housed in one of the Medical Observation Bed(s) (MOB) for monitoring until seen by MD at sick call*." Ex. 5 at 977 (emphasis provided). Accordingly, Barrera should have also scheduled Hayden for a MD sick call.

[7] 15 C.C.R. § 1056 requires "at 12 hours from the time of placement, all persons must receive an evaluation by responsible health care staff. Intermittent direct visual observation of people held in the sobering cell shall be conducted no less than every half hour. Such observation shall be documented."

Sobering Cell - Post Screen.")[8]. According to the County's 30(b)(6) witness, "if a nurse is uncertain about whether to recommend placement in a sobering cell, they should err on the side of caution." Ex. 11 at 142. Though Barrera observed Hayden's appearance and wrote that he "was not understanding the booking process," she inexplicably failed to do so. Ex. 7 at 642, 658.

Barrera failed to follow other policies too. She failed to schedule blood pressure screenings.[9] She failed to refer Hayden to the second floor where he would have received a clinical assessment "no later than 2 hours."[10] Ex. 5 at 960-962; Ex. 11 at 253-259; Ex. 12 at 131; Ex. 21 at 20-25. She failed to obtain Schuck's medical records from the hospital despite his discharge against medical advice, Ex. 12 at 105-08; *see also* generally Ex. 7, another clear violation of the "gate refusal policy." Ex. 5 at 961, 963; Ex. 11 at 250-251, 297-300; Ex. 12 at 105-108,134-135, 146-147. Ex. 6 at 23-25.

Hayden continued to exhibit signs of intoxication or withdrawal the night of March 10, 2022. In a video from 9:35 P.M., Ex. 13, Hayden appeared off-balance during the booking process, waved his arms around, and randomly pointed to the ceiling. Ex. 13 at 9:35-9:37. He leaned his body against a counter. Hayden's head lolled backwards towards the ceiling as he waited. Ex. 13 at 9:35-9:38. After being placed in a holding cell, **Hayden retrieved a discarded milk carton from**

---

[8] Sobering cells house "[p]atients who are unable to function in regular holding areas or who are unable to complete the booking process due to their state of intoxication;" and "[p]atients who are intoxicated and are in need of special observation in a controlled environment." Ex. 5 at 1228.

[9] Hayden's blood pressure was "144/94" at intake. Ex. 7 at 642, 659. "For patients under age 60 with or without co-morbidity, elevated blood pressure (BP) reading is defined as BP exceeding 140/90." Ex. 5 at 1108; Ex. 11 at 283. Policy required Barrera to "schedule blood pressure screenings" to monitor Hayden for hypertension. Ex. 5 at 1109.

[10] A second-floor evaluation provides personalized attention, an in-depth evaluation, the ability to conduct testing and labs, provide medication, treatment and access a doctor. Ex. 12 at 135-136; Ex. 6 at 19-30, 33; Ex. 10 at 40-42; Ex. 5 at 960-963,956.

**the trash and drank its dregs**. Ex. 14 at 10:07 P.M. He then tried to get water from the sink, but could not operate the toilet/sink apparatus. *Id.* At midnight on March 11, 2022, the video footage shows Hayden in a corridor of the SDCJ, still noticeably impaired. Ex. 15 at 12:42:33-12:44:33 A.M.

**C. March 11-14: Schuck Forgotten in "the Back 40."**

Defendants next chose to place Schuck in an area known as "the Back 40," which a deputy described as "on the second floor where the old court side -- section was." He explained that "*we weren't allowed to use that to put people because historically, sometimes they would not know that they were back there.*" Ex. 44 at 61 (emphasis provided); Ex.17.[11] The evidence suggests that this is precisely what happened to Hayden.

According to housing deputy Jessica Ramirez, the living conditions in the "Back 40" were so inadequate that she described them as "punishing" Hayden. Ex 33 at 85. Indeed, while in the "Back 40" Hayden had no access to toiletries, a shower, or even a mattress. Ex 33 at 88. He slept on a metal bench and had no blanket. Ex 33 at 89- 90. While Hayden was supposed to receive sack lunches through the cell door, there is no way to tell if that occurred—or whether Hayden was able to consume them if so. Ex. 33 at 89- 90.

Housing deputies had other options but did not use them. There are sobering and safety cells on the second floor, for example. Ex. 33 at 18, 48. Indeed, Ramirez was well-aware of the serious risks associated with drug withdrawal. She knew it can be a serious medical issue and that dehydration was the "number one [risk] factor," including a risk with cocaine withdrawal. *Id.* at 118-19, 140-41. But in 2022, ***jail policy allowed inmates to "kick it on their own,"*** meaning withdrawal

---

[11] Soderberg explained that this was because the Back 40 required a deputy to take "an extra route;" "it wasn't your normal circuitous route in a complete circle to walk and check on the security and safety of the floor." Ex. 43 at 61.

generally ***was not medically supervised***. *Id.* at 120-121. To get help for withdrawal, a detainee had to tell a Registered Nurse at intake that they anticipated these symptoms; otherwise they would have to request a sick call. *Id*. at 123- 125. A detainee had to know about a "withdrawal list" and ask a deputy to be put on it. *Id*. But there was no sick call available in the "Back 40" area anyway. *Id*.

An inmate safety program was available, as was enhanced observation housing; mental health clinicians are available 24/7, and psychiatrists with prescription power are available during business hours. Ex. 33 at 28-32. While a 60-minute housing check is required by law for inmate safety, sobering cells required more frequent 30-minute checks and would have included evaluation by a nurse. Ex. 33 at 37-38. Deputy Ramirez also acknowledged that, had they chosen to, staff could have referred Schuck to a QMHP for *immediate* evaluation at any time. Ex. 33 at 128. But they did none of these things. Hayden languished in an isolated cell without basic human necessities instead.

The County has never produced a witness who claims to have interacted with Hayden on March 12, 2022 or March 13, 2022. Jail inmate records ("JIMS") do not reflect any information specific to Mr. Schuck during this time. Ex. 15 at 32-34. There is no evidence that he was consistently fed or if he was, that he ate. *Id.*[12] And it is undisputed that from March 10 to March 15, Mr. Schuck had no access to toiletries, a shower, a mattress, or the recreation day room. Ex 33 at 88; Ex. 15 at 145-146. He slept on a metal bench without a blanket instead. Ex 33 at 89- 90.

---

[12] Surveillance footage would have provided that evidence. But despite a specific preservation letter, a tort claim, and the County's own general retention policies, the County allowed the relevant footage from the Back 40 to be destroyed. *See* generally Docket 111 (Plaintiffs' Motion for Sanctions for Spoliation of Evidence).

**D. March 15 (morning): Hayden Discovered in a Feces-Covered Cell; "Cleaned up" for Court; but too Sick to be Arraigned.**

The morning of March 15, 2022, deputies found Hayden in his cell talking to himself and naked from the waist down. Ex. 18 at 13, 15; Ex. 19 at 16; Ex. 20 at 8:01:45A.M. According to a deputy, the cell was "covered in food and possible fecal matter." Ex. 49 at 9; Ex. 18 at 15-16, 70-71; Ex. 19 at 19. "[H]is jail clothing appeared to be soiled and covered in food and feces." Ex. 49 at 9; Ex. 18 at 15-16, 18, 51, 115; Ex 19 at 17.

The deputies brought Schuck to Registered Nurse Romeo DeGuzman as a result. Ex. 20 at 8:01:45; Ex. 18 at 24,62; Ex. 21 at 29. DeGuzman admits that "when the patient was presented to me by the deputy . . . he was not wearing pants, he's not organized – like the shirt was wet and with wound on his lower leg." Ex. 21 at 29; 35-36. He described Hayden as "untidy" and saw that his shirt was soaked in sweat or water and appeared "wet and smeared with blood." Ex. 21 at 32, 35-36, 43. DeGuzman elaborated: "he's naked . . . and he's talking nonsensical. I can't really understand what he's trying to say." Ex. 21 at 42.[13] Hayden also reported "using acid on the street" to DeGuzman. Ex. 7 at 659; Ex. 11 at 313- 314. DeGuzman documented Hayden's blood pressure at an elevated 148/96. Ex. 11 at 312-313, Ex. 7 at 659; Ex. 5. at 1108. DeGuzman did not seek further medical treatment for Hayden, however.[14] He simply cleaned his wounds, gave him fresh clothes, and sent him off to court. Ex. 21 at 41-45. On the way to court, Hayden

[13] DeGuzman knew this was a visit prompted by concerned deputies. Ex. 21 at 37.

[14] Since his BP exceeded "140/90," policy required DeGuzman to "schedule blood pressure screenings" to monitor Hayden for hypertension. Ex. 5 at 1108-1109; Ex. 11 at 283; Ex. 21 at 103-104. Moreover, the 30(b)(6) witness for the County admitted that since SDCJ does not have a protocol for withdrawal of acid drugs DeGuzman should have "scheduled for a doctor sick call." Ex. 11 at 314.

continued to appear impaired and unable to care for himself. Two deputies comb Hayden's hair for him, for example. Ex. 22, Ex. 23 at 10:34:22-10:35:02.

When Hayden arrived in court "he sounded different" and "was not okay." Ex. 45 at 32. Hayden's court-appointed attorney stopped the proceedings and asked the Court for a sidebar. Ex. 45 at 33-34. After speaking with counsel for approximately five minutes, the Court ordered a "medical evaluation" to occur "right away." *Id*. The Court noted during the hearing that she had to answer on Hayden's behalf, held only a "partial arraignment," and that the Court would need to "clarify acknowledgment of rights, true name, [and] DOB at next hearing." Ex. 7 at 679; Ex 45 at 34. The Court forwarded the "pre-disposition minutes" to the SDCJ medical unit with a handwritten message stating "the Court refers Defendant to jail medical to be screened for medication. Partial arraignment: clarify acknowledgment of rights, true name, DOB at next hearing." Ex. 7 at 679. After the hearing, Hayden's father spoke with Hayden's attorney who expressed concern about Mr. Schuck's health. Ex. 45 at 33. Mr. Schuck testified he "remember[ed] the appointed lawyer stopping the timeline of things because he had met with Hayden and was alarmed, silenced, awestruck. Said he was like talking to a wall. He said, you know, 'You could put a picture of him on a wall and have a better conversation.'" Ex. 45 at 33.

**E. March 15 (afternoon): Hayden "Thirsty," Cannot "Walk the Line" after Court; Still No Medical Care.**

A transport deputy, Griffith, brought Hayden back from court. He described Hayden as not at all violent, but "acting odd and weird and not following instructions." Ex. 28 at 48. Griffith noticed Hayden "wandered" or "drifted off" when not following instructions. *Id*. at 48-49; Ex. 24 at 4:41:20- 4:45:16. Griffith could not make out anything that Hayden said, as if he "had gotten his wisdom

teeth out." *Id*. at 50- 51. He had to physically guide Hayden to prevent him from wandering off and observed that he was physically unable to "walk the line." Ex. 28 at 82-84. Ex. 26 at 4:47:14 P.M. Griffith was concerned enough about Schuck's appearance that when he encountered the receiving deputy at the jail, Deputy Valbuena, he explicitly stated, ***"this man needs to go to medical"*** and expected he would be seen by medical within the hour. Ex. 28 at 57 (emphasis provided), 72.

Valbuena saw these symptoms and behaviors himself. Ex. 24 at 4:44:34-4:45:16; Ex. 25 at 4:45:51- 4:47:08; Ex. 26 at 4:47:14 P.M.-4:47:36; Ex. 27 at 4:48:31-4:50:37. Unable to stand on his own, Hayden slid down a wall and onto the floor. Ex. 29 at 39-40; Ex. 24 at 4:42:14. Valbuena later testified that an inmate sitting down during transport is a "red flag" indicating a medical issue. Ex. 29 at 45-48. He did not believe Hayden was being non-compliant—leaving "medical issue" as the only other alternative. *Id.* Valbuena remembers **the only coherent word that Schuck could say was "thirsty."** *Id*. at 40, 43-45, 68, 69. Valbuena also believed that Hayden might be suffering from detoxification, noting withdrawal signs include dehydration and feeling weak. *Id*. at 54, 55.

Valbuena had received training on when to take an inmate to the doctor, which, along with policy, dictates that if in doubt deputies should "err on the side of medical." *Id*. at 80-82, 119-120.[15] In fact, medical services were immediately available on the third floor. *Id*. at 70. Despite these observations and his training,

---

[15] In fact, "[i]t is important for deputies to inform medical staff about their observations because they are interacting with the patients and nurse are not" and "[n]urses rely on the information provided by the deputies in deciding what type of care [] to provide a particular patient." Ex. 35 at 109-110.

Valbuena did not take Hayden to medical or tell anyone that Schuck was sick. *Id*. at 84. He simply put Hayden back in his cell and left him there. *Id*. at 41.[16]

That evening, RN Carina Echon received the court's order from the arraignment. Ex. 35 at 69; Ex. 7 at 660; Ex. 15 at 151-154. She did not refer him for medical care. Ex. 35 at 79-80; Ex. 11 at 322-328. Echon testified that she misread a prior entry in Hayden's medical record and *mistakenly* believed Hayden *refused* care on March 15. Ex. 35 at 73-74, 79, Ex. 11 at 328-329, Ex. 5 at 95.

**F. March 15 (evening): Hayden is Unwell, Collapses Twice En Route to the 7th floor.**

Eventually, Deputy Ramirez and another officer, Deputy Page, took Hayden from the Back 40 to the 7th floor housing unit. Ex. 33 at 48. Both Ramirez and Page were involved in housing decisions for Hayden. Ex. 33 at 92.

Upon interacting with Hayden that night, Ramirez thought Hayden might have a "mental disability" and described his behavior as that of a "4-year-old." Ex. 33 at 66. Hayden pretended to "row a canoe" in his cell and used a "hand phone" to talk to his mom. Ex. 33 at 67. Hayden's behavior led Ramirez and Page to handcuff him during the walk between floors, which was not the norm. Ex 33 at 67.[17] Video shows Ramirez and Page escorting Hayden to the elevator at 8:17:34 PM. He leaned his head against the wall, stumbled, and Ramirez appeared to be holding him up. Ex. 30 at 8:17:34-8:18:28. Inside the elevator, Hayden leaned his head against the wall and appeared to sway backward, with

---

[16] Valbuena claims now that he told an unknown second-floor deputy that Hayden needed to see medical due to his appearance and possible dehydration. Ex. 29 at 51, 54-55. However, this is impeached by other evidence such as video footage and the lack of any such documentation by Valbuena in JIMS. Ex. 27 at 2:25; Ex 29 at 71-72.

[17] Though less specific, Deputy Page also remembered Mr. Schuck exhibiting "odd behavior" Ex. 34 at 63. Like Ramirez, Page failed to document Mr. Schuck's demeanor or odd behavior in JIMS for the benefit of other deputies or care providers. Ex. 34 at 68.

Page placing a hand on his back to steady him and Ramirez using two hands to hold him. Ex. 31 at 8:19:13- 8:19:52 PM. At 8:20:10, before Hayden could enter the sallyport to the cell block, ***he collapsed on the floor.*** Page and Ramirez ***had to physically lift Hayden to his feet.*** Ex. 32 at 8:20:10. At 8:20:45, Hayden ***collapsed a second time***. *Id*. at 8:20:45.

Ramirez has since claimed that Hayden did not collapse but was just trying to urinate and did in fact urinate into his cell. Her credibility is subject to question, to put it mildly. First, the video speaks for itself and does not corroborate this explanation. Ex. 32 at 8:20. And another witness, Deputy Mace, does not recall urine being on the floor of Mr. Schuck's cell on March 16. Ex. 33 at 97. Plus Hayden died with documented *dehydration* shortly thereafter. But even according to her questionable story, Ramirez supposedly left a mental "4-year-old" in his own urine and has no specific memory of briefing floor deputies about the incident. *Id*. at 105-106. In any event, Ramirez and Page both simply shut the door and left Hayden in a cell alone, despite clear evidence that he was unable to care for himself. *Id*. at 107, 108.

These omissions occurred even though by that time, March 15, Ramirez believed that Schuck had been in a sobering cell (though this was untrue) and she thought he might still be "under the influence." Ex. 33 at 50-51. Ramirez testified that she did not know how long he had been in the "Back 40" or in a sobering cell, but that she had been told he had been "back there" for "a couple days." *Id*. at 51-52. Moreover, a 30(b)(6) witness has since admitted that apparent hallucinations require "some kind of medical intervention, either it be medical or mental health." Ex. 15 at 163. Ramirez and Page never documented or told anyone else about Hayden's "canoeing," or "air phone" after leaving him alone in his cell. Ex. 33 at 98-99.

**G. March 16: Hayden, Naked and Covered with Sores, Left in 7D Until His Death.**

Hayden remained in 7D, where Ramirez and Page left him, until he died. Additional deputies on the floor had opportunities to intercede and summon care during regular cell checks on March 15 and 16. But they failed Hayden too.

In fact, Deputy Amado was aware of his obligation to take an inmate to medical right away if they were in medical distress and knew medical staff relied on deputies to monitor inmates.[18] Ex. 39 at 29-30, 32-33, 35. He knew that if an inmate was in urgent need, deputies had the means and ability to take them to medical immediately without calling for permission. *Id*. at 30- 32. He also knew that if there was no response or an ambiguous response during a safety check, he should enter the cell, shake the inmate, and ask if they are okay. *Id*. at 43-45.

Amado claims that Hayden was responsive during his safety checks, testifying that during his last safety check Hayden was sitting upright on a metal stool and that he turned and "nodded" that he was okay. *Id*. at 40-41, 47-48, 83. **Amado's account is demonstrably untrue: contemporaneous photos show that Hayden's cell *lacked a stool.*** Ex. 48 at 245-250. Moreover, when Amado provided a statement to homicide detectives, he omitted that Hayden responded—a fact Amado admits was important because otherwise, he would have had a duty to get medical assistance. Ex. 39 at 58-59 (stating if Hayden had been unresponsive and he did nothing, he could "get in trouble").

Approximately 30 minutes before Hayden was found dead in his cell, Amado escorted Nurse Gallegos to Hayden's cell. Ex. 36 at 9:07 A.M.; Ex. 38 at 35-39, 41,64-67. Amado testified that he opened the food flap and "[he] called

---

[18] "During safety checks in housing locations, sworn staff shall physically enter each module and observe each incarcerated person present in the common areas of the module looking for obvious signs of medical distress, or criminal activity" Ex. 43 at 869-871.

for Mr. Schuck to come to the door, and the nurse [told] him that he had to sign some paperwork, and he walked away from us." Ex.39 at 47-48,83; Ex. 38 at 39, 41, 64-67; Ex. 36 at 9:07-9:08. Contradicting Amado, Gallegos testified that Hayden was **lying down, not responding, and "mumbling"** so she asked him to move his leg. Ex.38 at 47, 66. She said she and Amado discussed how they were going "to try to get him to get the paper signed and [she] was going to have a nurse talk to him." Ex. 38 at 42. The video confirms that they left Hayden's cell to continue their rounds after a minute. Ex. 36 at 9:07-9:08.

Approximately 20 minutes before Hayden's body was discovered, Deputy Mace escorted Nurse Lymburn to Hayden's cell so that should she could conduct a wellness check. Ex. 40 at 69-70; Ex. 36 at 9:13 A.M. Mace observed: trash in the cell; that Hayden was laying down naked with his back towards them; and golf-ball-sized sores which looked like sores "older folks who can't turn on their bed" get. Ex. 41 at 97, 108-109, 111. When shown some photos of the gruesome sores visible on Hayden, Mace testified that he did not see them and if he had, he would have followed up "to make sure he was getting the help he needed." *Cf.* Ex. 53 (photos of Hayden's sores); Ex. 41 at 114-118. Mace claimed that Hayden rolled over and said "fuck off," but this story was new, however. Ex. 41 at 107-108. Mace did not tell homicide detectives about this supposed comment by Schuck, and had "no fair answer" for why not. Ex. 41 at 136.

Nurse Lymburn states that when she and Mace "went to his cell, [she] saw him naked, and [she] saw some sores [on] his body" and "he was really skinny." Ex. 40 at 32,71. Ex. 7 at 660. Hayden "was facing the wall so… [she] saw his behind." Ex. 40 at 32; Ex. 7 at 660. The sores were "quarter sized and looked two to three days old" because they look like wounds "on skinny people in nursing homes." Ex. 40 at 109-110. In contrast with Mace's story, Lymburn

testified that Hayden did **not respond** when they called his name so she asked him to "move his leg" for "a sign of life." Ex. 40 at 65. They decided not to open the food flap to better communicate with Hayden because he purportedly moved his leg. Ex. 40 at 67-72.

Lymburn admitted she knew Hayden was withdrawing because she had looked at his chart and knew she was sent to check if "he is going through withdrawal." Ex. 40 at 37, 110-111. She also knew twitching, tremors and/or sleeping can be symptoms of withdrawal. *Id*. at 45-46, 89-92. She acknowledged that someone withdrawing might need to be "pumped with fluids" and could die of dehydration and withdrawal otherwise. *Id*. at 47, 62-63. However, Mace testified that when Hayden wiggled his foot, he and the nurse left and considered the interaction a medical "refusal." Ex. 41 at 112-113; Ex. 40 at 65.

Despite Hayden's condition, Lymburn and Mace did not act and continued to finish their rounds. Ex. 40 at 95-96; Ex. 36 at 9:16 A.M. Twenty minutes after seeing Hayden, Lymburn finally returned to the clinic and told the clinic nurse that Hayden needed to be seen. Ex. 40 95-96, 100-101; Ex. 7 at 661. But it was too late. At 9:38 AM, Mace and Amado entered 7D and dragged Hayden's lifeless body out of his cell. Ex. 37 at 9:38:38 AM.

**H. March 16, 2022-Present: The County never provides deputies and nurses *any* feedback regarding this death.**

The County and its employees learned little from Hayden's death. Ramirez testified she did not follow up with supervisors by watching video of the incident. Ex. 33 at 129. She confirmed there were no training changes. *Id.* at 130. She did not reflect on her actions after learning Hayden died or even give Hayden's death another thought until approximately 20 minutes before her deposition. *Id*. at 130, 132. No one from the County ever reviewed her decisions

or suggested alternative ways to handle the situation. *Id*. at 132. Ramirez maintains she would do nothing differently if she could do it over again. *Id*. at 132-133.

Similarly, Valbuena never reviewed any written materials associated with Hayden's death, never read an incident report about it, and had never been shown any video footage, including of his own interactions with Hayden on March 15th after court. Ex. 29 at 17-18. He has "never spoken to another human being about the Hayden Schuck matter." *Id*. He was never a part of any process designed to determine how Hayden died and it has never been suggested to him that he could have done anything differently. *Id*. at 73. In all his time with the Sheriff, he cannot remember a time where he has had a meeting with any supervisor to review any in-custody death. *Id*. at 74. Valbuena remembered the state audit as a topic of conversation, but critically, "no changes to training because of audit" occurred. *Id*. at 149-51, 154-55. He did not think about Hayden until he was subpoenaed, as it "left his mind" *Id*. at 177-178.

Page's testimony was in accord: he has not spoken to any deputies or staff about Hayden; and he stated he would do nothing differently in hindsight. Ex. 34 at 88-91.

Amado testified no one shared the audit report with him and he was not told about the jail having a problem with jail deaths. Ex. 39 at 71, 74. Shockingly, Amado stated that gruesome sores on Hayden's body were common in San Diego jails. *Id*. at 84. Due to the housing system—a system that the housing deputy described as "a mess,"[19]—Amado had no idea why Hayden was in 7D, or if it might have been for a medical reason; he never questioned it and

[19] Deputy Jessica Ramirez testified about the disorganization of housing classifications, describing it as "a mess" during COVID. Ex. 33 at 16.

never looked at JIMS. *Id*. at 79-83. Amado similarly never received any feedback about Hayden's death, or about any other in-custody death, and has never received any feedback regarding what he could have done differently. *Id.* at 80. Nor had Amado even heard of another deputy receiving any kind of feedback after an in-custody death in the County jail system. *Id*. at 82.

The same is true of the County nursing staff. DeGuzman, Lymburn, Echon, Nozawa, Gallegos were never interviewed about Hayden's death after March 16. They never participated in a briefing; no one asked or suggested what could have been done differently; nor did they meet to try to learn what happened. *See* Ex. 21 at 154-155; Ex. 35 100-103; Ex 40 at 140-141. Ex. 10 at 82-83; Ex. 38 at 72-74. Based on the feedback nurses and staff received, Hayden's death has thus far been in vain. This lawsuit aims to change that.

## III. DISCUSSION

### A. Qualified immunity is waived or moot.

As an initial matter, qualified immunity is not an issue here. "Legal issues raised for the first time in reply briefs are waived." *United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991). Thus, in the interests of fairness, courts refuse to consider arguments raised for the first time after the other side's response. *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 n.6 (9th Cir. 2004).

In its motion, the County moves for summary judgment on behalf of all individually named defendants, and with one minor exception discussed below, *does **not** raise qualified immunity arguments on behalf of any defendants*. Instead, the Defendants merely argue that the evidence fails to show that Defendants DeGuzman, Lymburn, Valbuena, Echon, Vivona, Page, Ramirez, Amado, and Mace were deliberately indifferent, and that these defendants "acted reasonably."

The only exception is one sentence on behalf of Nurse Barrera, in which Defendants argue glancingly that "she should be entitled to qualified immunity because no established case law establishes liability in such a situation." While Nurse Barrera's conduct certainly did violate clearly-established Ninth Circuit law, *see e.g. Sandoval v. County of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021), *Plaintiffs do not oppose dismissal of the § 1983 claim (and that claim only) against Nurse Barrera.*[20] Qualified immunity is thus no longer at issue in these motions.

**B. Defendants were "Deliberately Indifferent" under § 1983.**

***1. <u>Sandoval</u> shows that Defendants were "deliberately indifferent" to the need for medical care.***

An individual defendant violates the Constitution where they "'deny, delay or intentionally interfere' with needed medical treatment." *Sandoval v. County of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021). A pretrial detainee must show the following for a medical care claim against an individual defendant:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d 1118, 1125 (9th Cir. 2018). "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case.'" *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). A plaintiff must

[20] Additionally, after a thorough review of the evidence, Plaintiffs do not oppose dismissal of Nurse Vivona from this lawsuit entirely.

"prove more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125.

Though the County fails to cite it, a previous jail-death case involving the same facility and defendants, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021), is instructive here. In *Sandoval,* a detainee died of a methamphetamine overdose at Men's Central Jail. Evidence suggested that medical staff left him unmonitored for eight hours (despite signs that he was under the influence) and then failed to promptly summon paramedics when they discovered him unresponsive. The district court dismissed § 1983 claims against the County and individual defendants. *Id.* at 662. The Ninth Circuit reversed. *Id.*

In so doing, *Sandoval* reiterated a "clear" rule: "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Id.* at 680-81 (collecting cases).[21]

District court cases *involving San Diego County jails and factually similar circumstances* are in accord.[22] *See e.g. Schmidt v. Cnty. of San Diego,* No. 23-CV-0899-W-DDL, 2024 WL 4308793, at *10 (S.D. Cal. Sept. 26, 2024) (denying motion to dismiss for nurse who failed to treat detainee with "thought disorganization, nonsensical communication, altered mental status, and confusion" and who "lost his balance and fell and was placed in a wheelchair" among other symptoms); *Ward v. Cnty. of San Diego*, No. 23CV1819 BJC (BLM), 2025 WL 319250, at *2 (S.D. Cal. Jan. 28, 2025) (denying motion to dismiss where Plaintiff was "left naked in his cell, with no blanket, and not given

---

[21] *See also D'Braunstein v. California Highway Patrol*, 131 F.4th 764, 768–70 (9th Cir. 2025) (failing to summon medical care for an arrestee who was sweating, disoriented, off-balance, with dilated pupils and slurred speech stated cause of action under § 1983); *Russell v. Lumitap,* 31 F.4th 729, 739 (9th Cir. 2022).

[22] These cases also provide substantial notice to the County and its supervisors under *Monell*.

any water to drink" and "became dehydrated and severely ill with pneumonia, bacteremia, and a lung infection."); *Est. of Serna v. Cnty. of San Diego,* No. 20CV2096-LAB-MSB, 2022 WL 827123, at *4 (S.D. Cal. Mar. 18, 2022) (denying motion to dismiss because "[i]t doesn't take a physician to know that a person who can't keep clear fluids in her stomach for four days, is too weak to stand, and has insufficient bloody oxygen saturation requires medical attention. . . . Serna's symptoms called for urgent treatment, regardless of their cause.").

***2. The facts demonstrate liability for the individual defendants under § 1983.***

There is ample evidence to deny summary judgment for each individually named defendant. For the Court's convenience, some of the most salient facts for each defendant are set forth in chart form below:

| Defendant | Key Facts | Citation |
|---|---|---|
| Barrera | *Hayden was showing signs and symptoms of intoxication, withdrawal and dehydration because video shows he had sweaty hair, dilated pupils, slurred speech, was nonsensical, was hallucinating. | Ex. 3; Ex. 4;Ex. 14 at 9:40:32-9:41:41 10:07-10:09:45, 10:27 |
| | *He arrived shoeless, disheveled, unsteady on his feet, fidgety and in need of continued assistance. | Ex. 8 at 9:09:28-9:09:49, Ex. 9 at 9:11:50-9:12:50, 9:13:45-9:14:25 |
| | *She observed Hayden making grandiose statements, not understanding the booking process, "asking for $20 to give the nurse for water." | Ex. 7 at 658. |
| | *She knew Hayden had an elevated BP, low BMI, high pulse, had sustained a DUI for a controlled substance where he was involved in a rollover car accident and had left the hospital AMA. | Ex. 7 at 642,646, 658, Ex. 11 at 250-251, 283, 297-300, Ex. 6 at 29, Ex. 1 at |

| | | |
|---|---|---|
| | *She failed to conduct a complete intake evaluation, refer him to follow up evaluation with a doctor or nurse, failed to place in a MOB, medical holding cell, sobering cell, send him back to the hospital or obtain his hospital records. | 29, 39-44, Ex. 12 at 85, 93- 94.<br><br>Ex. 12 at 58,85, 93-94, 105-108,131, 135-136,146-147; Ex 11 at 142, 250-259, 297-300; Ex.1 at 18-19, 24, 39-40, 43-44; Ex. 2 at 53; Ex. 9 at 9:14:46-9:14:53; Ex. 6 at 19-30, 33; Ex. 5 at 960-963, 977, 1228; Ex 7 at 642-645,658; Ex. 21 at 20-25; Ex. 10 at 21, 39-42 |
| Ramirez and Page | * Ramirez and Page knew Hayden was in medical distress because he was found in a cell pretending to row a canoe, using a "hand phone" to talk to nobody and said he was spiderman. He was swaying, unsteady on his feet and collapsed multiple times.<br><br>*Ramirez and Page knew Hayden had been in a cell with no access to toiletries, a shower, a mattress, a blanket, or the recreation day room, and slept on a metal bench for days before his collapsing while in transport.<br><br>*Ramirez thought he might be still under the influence, might have a mental disability and appeared child-like. | Ex. 33 at 65-67, 85, 98; Ex. 30 at 8:17:34-8:18:28; Ex. 31 at 8:19:13-8:19:52; Ex. 32 at 8:20:10-8:20:45; Ex 34 at 59-69, 76, 79, 82-84.<br><br>Ex 33 at 48, 85, 88-90.<br><br>Ex 33 at 50-52, 66-67, 85. |

| | | |
|---|---|---|
| | *Hayden collapsed twice during transport to 7D. Ramirez and Page failed to place Hayden in a sobering cell, safety cell or refer him to medical, the inmate safety program, the enhanced observation housing or to see a QMHP despite knowing he might be at risk withdrawal and dehydration. They later fabricated a story about him urinating. | Ex. 33 at 18, 28-32, 37-38, 92, 98-99, 102-108, 118-125, 128-133,140-141; Ex 34 at 71-74, 82-84; Ex. 15 at 163; Ex 16 at 20-30. |
| DeGuzman | *Hayden was showing signs and symptoms of intoxication, withdrawal and dehydration because he was found in a cell “talking to himself,” not wearing pants, with food and likely feces smothered all over the cell walls and window.<br><br>*He was brought to DeGuzman by four deputies when he had no scheduled appointment, was wearing no pants, no shoes, with open wounds, “soiled clothes”, “untidy”, “possibly sweating,” had “brown dark-colored stains” on his clothes that indicate he possibly diarrhea, he was unsteady on his feet, he reported drug use, had “altered talk,” had “difficulty in following directions,” was “disorganized,” “non-sensical,” “disheveled,” and had an “altered thought process.”<br><br>*DeGuzman should have referred Hayden to a medical provider, a QMHP, and scheduled him for blood pressure monitoring. | Ex. 18 at 13, 15-16, 70-71; Ex. 19 at 16,19; Ex. 20 at 8:01:45; Ex. 49 at 9<br><br>Ex. 18 at 8,13, 15-16, 23-26, 32, 51 70-71; Ex. 19 at 16-19; Ex. 20 at 8:01A.M-8:26:06; Ex. 49 at 9; Ex. 7 at 659; Ex. 11 at 306-308, 312-314; Ex. 21 at 29, 31, 35-37, 43, 58, Ex. 23 at 10:34:22-10:35:02.<br><br>Ex. 11 at 314; Ex. 21 at 58, 103-104, 107-108123-125, Ex. 6 at 29; Ex. 5 at 1108-1109. |

| | | |
|---|---|---|
| Valbuena | * Valbuena knew that Hayden was in medical distress because he saw Hayden falling, hunched over, unsteady on his feet and mumbling that he thirsty. He saw that Hayden slumped to the ground and couldn't walk. He was explicitly told by Griffith that Hayden needed to go immediately to medical and admitted that he knew Hayden needed medical. He did not take him to medical and later lied about it, as he was impeached by the video.<br><br>*Valbuena failed to take Hayden to the medical unit and failed to notify anyone about his condition despite believing he might be detoxing and/or withdrawing. | Ex. 24 at 4:44:34-4:45:16; Ex. 25 at 4:45:51- 4:47:08; Ex. 26 at 4:47:14 P.M.-4:47:36; Ex. 27 at 4:48:31-4:50:37; Ex. 28 at 57, 72; Ex. 29 at 39-48, 54-55 68-70<br><br>Ex. 29 at 51, 54, 55-84, 119-120; Ex 35 at 109-110. |
| Echon | *Echon received a Court order from failed court appearance that indicated that Hayden need to be medically evaluated.<br><br>*Echon did not schedule Hayden to be seen by a doctor because she misread the medical record and thought that Hayden had refused care.<br><br>*Echon was deliberately indifferent and should have immediately referred Hayden for medical care because there were no signed refusal forms in Hayden's chart to support Echon's error, the prior entries did not involve medication screening, which was the basis of the Court referral for a medical evaluation. In fact, the records showed that Hayden had signs of medical distress earlier that day. | Ex. 35 at 69; Ex. 7 at 660; Ex. 15 at 151-154.<br><br>Ex. 35 at 73-74.<br><br>Ex. 35 at 79-80, Ex. 11 at 322-329, Ex. 5 at 95; Ex. 7. |

| | | |
|---|---|---|
| Lymburn | *Hayden was showing signs of medical distress because Lymburn saw him lying in cell naked, skinny, with quarter-sized sores, and was not verbally responsive.<br><br>*Lymburn knew that Hayden might be experiencing withdrawal and dehydration because she reviewed his medical record and knew that he was on her list for potential withdrawal.<br><br>*Instead of evaluating him or ordering deputies to take him to the clinic immediately, Lymburn continued with the rest of her duties in the module and did not notify the clinic until 20 minutes later. | Ex. 40 at 32, 65, 71-72, 109-110. Ex. 7 at 660.<br><br>Ex. 40 at 37, 45-47,62-63, 89-90,92,110-111.<br><br>Ex. 40 at 66, 80-82, 95-96, 100-101. Ex. 36 at 9:15:40 AM; Ex. 7 at 660-661. |
| Amado and Mace | *Hayden was showing signs of medical distress because Amado and Mace saw Hayden laying in cell naked, skinny, with quarter-sized sores, and not responsive. Amado told demonstrable lies about Hayden sitting on a non-existent stool, showing consciousness of liability.<br><br>*Mace and Amado failed to immediately take Hayden to the clinic even though he was in medical distress and the nurses made it clear that Hayden did not look well and needed treatment. | Ex. 39 at 40-41, 47-48, 56-59, 64-67, 79-84; Ex. 40 at 32, 65, 67-72, 109-110. Ex. 7 at 660. Ex. 48 at 245-250; Ex 36 at 9:07-9:08, 9:13; Ex. 38 at 35-39, 41-45, 47-51, 57-58, 64-67; Ex. 41 at 97, 107-118.<br><br>Ex. 39 at 29-35, 39-48 , 107-118; Ex. 40 at 65-66, 80-82, 95-96; Ex. 36 at 9:15:40-9:16; Ex. 7 at 661; Ex. 41 at 22-25, 42, 97, 107-118, 136. |

| | | |
|---|---|---|
| Gore, Martinez, Dr. Montogomery | [Same notice and analysis as *Monell* liability; see below.] | |

**C. The Facts Create *Monell* Liability Under Multiple Legal Theories.**

"Under *Monell* . . . the County can be liable under § 1983 if its 'policy or custom' caused [a detainee's] injuries through deliberate indifference to his constitutional right to adequate medical care." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021). A *failure* to implement a policy can create *Monell* liability where policymakers had notice that the omission would likely result in a constitutional violation. *See e.g. Oviatt v. Pearce,* 954 F.2d 1470, 1477–78 (9th Cir. 1992); *see also Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1143 (9th Cir. 2012).[23]

A failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference" as well. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir.1989). A plaintiff may also meet this burden through evidence of a "failure to investigate and discipline employees in the face of widespread constitutional violations.*" Hunter v. Cty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). Finally, *Monell* liability can be inferred from the failure to take corrective action, discipline, or train employees after a constitutional violation. *See Henry v. Cnty. of Shasta*, 132 F.3d 512, 519-20 (9th Cir. 1997), *opinion amended on denial of reh'g,* 137 F.3d 1372 (9th Cir. 1998) ("post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, *but is highly probative with respect to that*

[23] *See also Connick v. Thompson,* 563 U.S. 51, 62 (2011) (holding that deliberate indifference can be established by "continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct by employees").

*inquiry.*") (emphasis provided).[24] A jury could find *Monell* liability in each of these ways here.

*First*, the County has known for years that its detainees were dying at staggering rates. It knew that the causes of death included: 1) inadequate screening at intake; 2) insufficient medical follow-up; 3) ineffective safety-checks; and 4) failure to respond timely to medical emergencies. The County did not make any meaningful changes in response to this information and Hayden's death resulted from these same issues. This strongly supports *Monell* liability.

*Second*, the County had specific policies that were known to be dangerous. Experts had recommended a QMHP at intake for years. Ex. 46. The County refused to do so before Hayden died, or apparently afterwards either. The County knew after *Sandoval* that "mixed-use" cells and informal oral pass-down of information regarding detainees put inmates at risk (and according to the Ninth Circuit, supported *Monell* liability). 985 F.3d at 681.[25] Yet those policies and practices still prevailed in 2022. At that time, housing was still a "mess" according to its housing deputy. Ex. 33 at 16. Records were not centralized and were spread out in haphazard spreadsheets and workarounds instead. Ex. 33 at 53-56.[26] The reason for placement in the cell that Hayden ultimately died in, 7D, changed

---

[24] *See also McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir. 1986) ("Policy or custom may be inferred if, after the [incident] the prison officials took no steps to reprimand or discharge the guards, or if they otherwise failed to admit the guards' conduct was in error"); *Larez v. City of Los Angeles,* 946 F.2d 630, 647 (9th Cir. 1991) ("The jury properly could find such policy or custom from the failure . . . to take any remedial steps after the violations.").

[25] *See also Castro v. Cnty. of Los Angeles,* 833 F.3d 1060, 1075–76 (9th Cir. 2016) (holding that choices regarding the use of sobering cells coupled with insufficient checks amounted to actionable policies and practices under *Monell*.)

[26] Deputy Page acknowledged the need for a system for communication between sworn staff and nurses, Ex. 34 at 42, but there was "no communication on how to communicate with the nurses." Ex. 34 at 43.

"daily," reflecting an "extremely fluid housing classification system" Ex. 33 at 71. This fluid system meant there was no way for a deputy to tell why Hayden was isolated in 7D. Ex. 33 at 74. Floor deputies could not tell if a detainee was on the mental health evaluation list. Ex. 33 at 95. Any information passed down was oral and informal, with no training on these oral pass-down briefings, and no apparent reason why the briefing system was not in writing. Ex. 33 at 96-98. These practices were dangerous, already condemned by the Ninth Circuit in *Sandoval*, and yet continued unabated.

*Third*, the County failed to supervise employees. Nurse DeGuzman was a named defendant in the *Sandoval* case. The Ninth Circuit found sufficient evidence of his role in an in-custody death that it denied him qualified immunity. Yet he apparently suffered no consequences whatsoever from those failings, and he played a key role in Hayden's death. Moreover, sworn deputies and nurses alike also stated that they either heard nothing about the audit findings and/or the high death rates in custody, or if they did hear about them, they were not accompanied by any changes. Business continued as usual despite prior deaths.

*Fourth,* it is relevant *Monell* evidence that the County did nothing to discipline or train employees after *this* death. *See Henry v. Cnty. of Shasta*, 132 F.3d at 519-20. Failure to learn from prior incidents was already a chief criticism of the Auditor's report. Yet that continued unabated also.

Fifth, Plaintiffs' experts in both healthcare and corrections have testified at length that the County jails systems, policies, procedures, and practices are inherently dangerous and pose known serious risks. Ex. 50 (expert on correctional healthcare); Ex. 51 (expert on correctional safety). The County submits no expert opinions in support of their motions, perhaps because these practices and policies are indefensible.

*Monell* liability exists for County here, as does supervisory liability for the final policymakers responsible—Sheriff Gore, Sheriff Martinez, and Dr. Montgomery. Their motions to the contrary should be denied.

**D. Overwhelming evidence supports Plaintiffs' state causes of action.**

***1. Bane Act.***

Cal. Civ. Code § 52.1(b) is violated when a Defendant "interfere[s] . . . with the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state". The Ninth Circuit has held "the Bane Act does not require the 'threat, intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged" so long as the claimant shows the defendant had a "specific intent" to commit the constitutional violation. *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018); *see also Estate of Serna v. County of San Diego*, 2022 WL 827123, at *8 (S.D. Cal. Mar. 18, 2022) (noting that "the act [amounting] to a deprivation of a constitutional right may . . . satisfy th[e] ['threat, intimidation, or coercion'] element"). There is specific intent when "the defendant . . . acted with '[r]eckless disregard of the right at issue.'" *Id.*

The reckless disregard discussed above for each individual defendant would also show a Bane Act violation.

***2. Negligence and Immunity.***

Defendants also move for summary judgment as to Plaintiffs' negligence, wrongful death, and negligent supervision and training claims based on statutory immunity under Government Code § 844.6.

Regarding Plaintiffs' wrongful death claim, "[b]oth § 1983 and § 845.6 can form the basis of a claim for wrongful death," so insofar as Plaintiffs' § 1983 deliberate indifference claims survive summary judgment, Plaintiffs' wrongful death claims survive. *See Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017).

Regarding negligence and negligent supervision and training, "[p]rison officials may also be liable for their employees' failure to summon medical care under California Government Code § 845.6 for negligent supervision and training as to when to summon medical care." *Villarreal*, 254 F. Supp. 3d at 1187. As set forth herein, the County utterly failed to properly train its employees regarding when to summon care.

***3. Negligent Training and Supervision.***

"An employer can be held liable for negligent supervision if it knows or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness." *Est. of Escobar v. United States,* No. 20-CV-2454-L-KSC, 2022 WL 3209380, at *3 (S.D. Cal. Aug. 8, 2022)(*citing Alexander v. Cmty. Hosp. of Long Beach*, Cal. Ct. App. 238, 253 (2020). As stated above, Sheriff Gore, Sheriff Martinez, or Dr. Montgomery knew and had reason to know Defendant DeGuzman was an unreasonable risk to detainees and "could not be trusted to act properly without being supervised" in light of the prior detainee death and his failure to provide adequate medical care. *See Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 679 (9th Cir. 2021).

Furthermore, "a plaintiff alleging negligent training under California law must show that the employer negligently trained the employee as to the performance of the employee's job duties and as a result of such negligent instruction, the employee while carrying out his job duties caused injury or

damage to the plaintiff." *Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F.Supp. 2d 1187, 1208 (E.D. Cal. 2009)(citing *State Farm Fire & Casualty Co. v. Keenan*, 216 Cal. Rptr. 318, 331 (Cal. Ct. App. 1985)).

The County has failed to adequately train deputies in how to identify and respond to individuals who are undergoing medical distress, substance abuse issues, withdrawal, mental health issues, and how to properly support the medical unit. Ex. 15 at 77-80, 86-90, 116-117, 129-130,143-145,156-163, 168-175, 176-177; Ex. 16 at 57-59; Ex. 39 at 28-36, 41-45, 89-90; Ex. 41 at 21-23, 34-50, 80, 96-97, 151-152,156-162; Ex 13 at 66-69,73-75. Ex. 33 at 62,85-86, 113,119, 130-131, 138-139; Ex 34 at 15-20,30-48,60; Ex. 29 at 11-13, 55-58,76-77, 81-84, 86-93, 154, 173; Ex. 41 at 21-25, 34-55, 79-80, 96, 138, 151-162, 165; Ex. 39 at 33-43, 67-69, 89-90; Ex. 54. The County has also failed to adequately to train their nursing staff to properly screen and care for individuals at intake, care for individuals experiencing substance abuse issues and/or mental health issues, and when to refer patients to doctors and providers. Ex. 12 28-35, Ex. 11 at 28-35,110-120, 136-142, 172-190, 231, 276, 315-317, 328-329; Ex. 10 at 30-34, 64; Ex. 13 at 39-40, 47-50, 69-73; Ex. 40 at 22-29, 39, 49-56.

***4. Failure to Summon Care.***

Defendants argue each of them did "something" to summon medical care. As an initial matter, this is not true as to Deputies Ramirez or Page on March 15; they indisputably did nothing. Second, Defendants understate what it means to summon medical care. Defendants argue essentially that medical providers are insulated from liability under § 845.6 simply because they are medical providers. This is not so. *See Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1188 (N.D. Cal. 2017) ("Even though medical staff were present at the jail and heard Gillis's cries for help, this did not discharge the County's Defendants' duty to at

least 'call[ ] a doctor or other trained health care provider to examine a prisoner.'"). Based on the above facts, Plaintiffs have sufficiently alleged that the County Defendants failed to take *reasonable action* to summon medical care.

## IV. CONCLUSION

Plaintiffs do not oppose dismissal of Nurse Vivona, and the § 1983 action (only) against Nurse Barrera. Otherwise, the County's motions should be denied in their entirety.

DATE: July 18, 2025 MCKENZIE SCOTT, PC

By: */s/ Timothy A. Scott*
TIMOTHY A. SCOTT
LAUREN M. MELLANO
MICHELLE C. ANGELES
Attorneys for Plaintiffs