# EXHIBIT 1

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: August 12, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Officer Luis Pulido

CERTIFIED COPY

Reported by:
LORI M. BROWN

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193) IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES | No. 3:23-CV-00785-DMS-AHG |

2-3, IN THEIR INDIVIDUAL )
CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
Defendants. )
______________________________)

Deposition of OFFICER LUIS PULIDO, taken on behalf of Plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 10:32 a.m. and ending at 11:30 a.m. on Monday, August 12, 2024, before LORI M. BROWN, Certified Shorthand Reporter No. 12614.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
BY: LAUREN M. MELLANO
Attorney at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
lmellano@mckenziescott.com

For Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, and Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
BY: SOFIA REZVANI
Attorney at Law
1600 Pacific Highway, Room 355
San Diego, California 92101
(619) 884-2931
Sofia.Rezvani@sdcounty.ca.gov

For Defendant Correctional Healthcare Partners, Inc., and Nicholas Kahl, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: CASSANDRA F. ROBINSON
Attorney at Law
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
crobinson@ldrlaw.com

Videographer:

STENO
JESSICA BRODKIN WEBB

Okay. Where is that?
A You know what, I might not be recalling that correctly. It may have been at 1401 Broadway.
Q Oh, okay.
A Either two. I may not remember correctly.
Q Okay. Or headquarters. Okay.
The Broadway address is the headquarters; is that right?
A Yes.
Q Okay. Do you recall speaking to an Officer Wong, Borish Wong, about Hayden Schuck?
A Yes.
Q Okay. What do you recall about sort of how you came to be interacting with Hayden Schuck for the first time?
A Officer Borish Wong requested a second watch unit to transport his arrested person to central jail. And so I don't remember if I picked him up from police headquarters or the Western Division substation, but I did pick him up.
Q Okay. And so tell me what you remember about picking him up, then.
A I remember putting him in my vehicle, seat belting him, taking him to central jail for booking. I remember he was rejected and needed medical

clearance. And I don't recall exactly what hospital. It may have been UCSD in Hillcrest. Then I transported him there for medical clearance. And there he was not very cooperative with the medical staff and did not want to be treated. And they then cleared him because you can't treat someone that doesn't want to be treated. I don't know. And then I brought him back to central jail and finished booking him.

Q Okay. Thank you for that overview. I'm going to take it piece by piece now with some follow-up questions.

So when Officer Wong requested a second unit, did he tell you why?

A He requested a second watch unit. So second watch works from 2:00 p.m. to midnight. First watch works 6:00 a.m. to 4:00 p.m. If I remember correctly, he was a first watch officer. So he wanted someone from the next shift to transport him.

Q So his -- it's your understanding that Officer Wong's shift had ended at 4:00 p.m.?

A We are scheduled to end our shift at 4:00 p.m.

Q Okay. And by "we," you mean Officer Wong?

A Officers from the first watch.

or volunteered over the radio.
Q Okay. But you do recall speaking to him either on the phone or on the radio?
A When I picked up his prisoner, I have to collect the booking paperwork. So I did speak to Officer Borish Wong in person, when I took custody of his prisoner.
Q Okay. And so you arrived either at the substation or the headquarters. You met with Officer Wong.
And then you had some sort of conversation about Hayden Schuck; is that correct?
A Yes.
Q Can you describe in as much detail as possible that conversation?
A It's the same conversation I have with every officer that I transport a prisoner for. I ask them what happened. And if I remember correctly, Officer Wong told me that Mr. Schuck was involved in a vehicle collision involving a Toyota Tacoma and he was evaluated for being under the influence of a controlled substance or driving under the influence and subsequently arrested for that charge and then additional charges for items that were found in his vehicle.

Q Do you recall what any of those items were?
A One of them was a weapon --
Q Do you recall --
A -- and narcotics.
Q Thank you. I'm sorry. I didn't mean to cut you off. Thank you.
Do you recall whether Officer Wong told you that his car had rolled over?
A Yes. I did hear that it -- I do remember it flipped over.
Q Did Officer Wong tell you anything about Hayden's state of mind?
A No.
Q About his, like, presentation with respect to maybe mental health?
A No.
MS. REZVANI: Objection. Calls for speculation.
BY MS. MELLANO:
Q Did he tell you anything about what drugs he suspected him to be on?
MS. REZVANI: Objection. Calls for speculation.
THE WITNESS: Do I answer?
MS. MELLANO: Oh, yeah.

they're able to walk and communicate, so he did not have -- he didn't meet that criteria when I met Mr. Schuck.

Q Was Hayden able to communicate clearly? Do you remember?

A He was, in my opinion, under the influence at the time and not very responsive.

Q Okay. Can you elaborate a little bit on that, any example if you --

A He swore a lot and so wasn't very cooperative with the process.

Q Would you describe him as, like, being nonsensical?

MS. REZVANI: Objection. Vague and ambiguous.

THE WITNESS: I would say erratic.

BY MS. MELLANO:

Q So would you say that his behavior was, like, odd in any way?

A His behavior was consistent with someone under the influence of methamphetamines.

Q Okay. So that was what you suspect --

A In my opinion. But I did not evaluate him to see if he was.

Q So in other words, you didn't do, like, a

screening? Were you standing right there for it?
A It would have been -- there's two rooms. One east. One west. It was on the room to the west. And he would have been sat down. I sat him down. And they did their medical screening there. I was across from them.
Q What do you mean by "across from them"?
A So there's a doorway, and then maybe six feet away, seven feet.
Q So you could hear the conversation between the staff and Hayden?
A I can hear, generally, what they're talking about.
Q Do you recall anything from that conversation that they were having?
A No.
Q Did the medical staff ask you any questions?
A Not that I recall.
Q Were you required to provide them with any information?
A Not that I recall.
Q Did you tell them that he was in a rollover vehicle collision?
A I don't remember.
Q And so do you remember anything else about

that interaction that you haven't already explained?

A I do give them the arrest declaration and the booking paperwork. So the circumstances of his arrest would have been provided to the nurse. So even though I didn't express why they were there, they can clearly read, you know, why. There was a probable cause declaration.

Q Right. And that declaration would have details about --

A Yeah.

Q -- why he was arrested?

And did you see the -- do you remember who the medical person was who was there during this interview with Hayden?

A No.

MS. REZVANI: Objection. Asked and answered.

BY MS. MELLANO:

Q Do you remember whether they read the declaration you handed them?

MS. REZVANI: Objection. Calls for speculation.

THE WITNESS: I do not.

BY MS. MELLANO:

Q Okay. So the next thing you remember -- is

Q Okay.
A I'm a people person.
Q Okay. Do you recall whether they gave you the gate refusal form?
A They would have had to, otherwise I would have had nothing to give to the hospital. But I don't remember it. Fairly sure it happened.
Q Okay. Do you recall anything about them transporting Hayden to the hospital?
A Putting him back in my vehicle. Reseat-belting him. Transporting him to a hospital. Taking him out. Bringing him in. Again, I don't remember -- I think it may have been UCSD, but I'm not specifically sure. I do remember he declined to be treated. And the medical staff at the ER then cleared him for medical booking into jail.
Q Okay. Did he continue to appear to be under the influence for the transport from the jail to the hospital?
A In my opinion, yes.
Q Do you recall any details as to, like, what made you think that?
A Pupils were still dilated, and he was not wanting to be treated. I do remember he didn't want to be arrested.

A The process starts all over again. So we would do the booking photo again and then medical clearance.

Q Do you have a specific memory of that happening in this case, the booking photo again?

A No.

Q Okay. Do you remember taking him to do the medical clearance again?

A Yes.

Q Okay. And did you stay in the room again?

A Yes.

Q Roughly six feet away?

A About.

Q Were you able to hear the conversation between Hayden and the medical staff?

A I would have been able to hear it. I don't recall what was said.

Q Okay. Did they -- "they" being the medical staff doing this interview -- ask you any questions?

A Not that I recall.

Q Do they typically ask you questions?

A I don't know. Usually they ask, you know, why we're here, you know, anything to report. And I gave them the paperwork. I let them know that we were rejected earlier and now we're back with the

paperwork from the hospital.

Q Okay. Did you explain to them that he was behaving erratically?

A No.

Q Why not?

A Because at that point he had calmed down.

Q Isn't it important to -- well, are you trained to let them know that -- whether somebody seems to be under the influence so that they know that?

A No, but they -- they do ask us if we have anything to report. I take that to mean anything medical-wise, and I did not.

Q So you don't think that it's -- you just didn't think that it was relevant medically whether or not he was under the influence of drugs or alcohol?

A That he was rejected for whatever reason and we went to the hospital and we're back with the clearance. But generally I -- I don't remember what I would have told them. Normally the second time back I don't have a conversation with them. I just give them the paperwork.

Q The first time around, did the medical staff ask you any questions?

A I don't recall.
Q Okay. So the second time around, did you still have the probable cause declaration?
A Yes.
Q So you gave that to the medical staff again, basically?
A Yes.
Q Okay. So the first time around they gave that to you back?
A When he was rejected after I gave them, they gave it back to me.
Q Okay. And then you bring it back to the next person to do the medical clearance?
A Yes.
Q And you recall doing that this time?
A Yes. I did that the first time as well.
Q Okay. I just want to make sure you do recall actually receiving the form back and then giving them the declaration the second round.
A I don't have a specific memory of it, but that is what would have happened. Otherwise, I wouldn't have been able to continue with the booking process without the probable cause arrest declaration or the booking slips.
Q Okay. Do you recall telling the staff

anything else about Hayden?
A No.
Q If somebody were acting out of the ordinary, would you typically tell the medical staff that?
A In what way out of the ordinary?
Q Well, if they were acting erratic, for example.
A Like, under the influence?
Q Yeah.
A If it's -- it's specifically listed in the charges, I wouldn't normally because they'd be able to read that, why they're arresting.
Q Okay. Did you fill out any sort of form for them answering, like, a written list of questions?
A Not that I recall.
Q Do they typically ask you to fill out a written list of questions?
A Not that I know of.
Q And when I say "they," I mean the medical staff doing the intake at the jail.
So they typically do not ask you to --
A To fill out a form, no.
Q Or to even just review a written set of questions and verbally give them answers to all of them?

A When we book people, there is -- they do ask us questions, but I don't recall exactly what questions I would have been asked or in that instance.
Q Okay. So earlier when you testified that they don't typically ask you questions, was that incorrect testimony? I'm just a little confused. Sorry.
A I think it depends on who's screening.
Q Okay. So they're not super consistent about it, basically?
MS. REZVANI: Objection. Misstates prior testimony.
THE WITNESS: I don't know.
BY MS. MELLANO:
Q Well, how long had you been bringing people there at the time?
A About eight years.
Q So you don't know if they're consistent about it?
A How do you define "inconsistent"?
Q Okay. Well, so to be consistent would be essentially every single time they go through the same questions and ask you all of those questions every single time. That would be what I would define

as consistent.

Do they do that?

A I don't think so.

Q Thank you. Give me one moment. I'm sorry. My computer just restarted.

Do you recall Hayden ever asking you for any water?

A No.

Q Do you recall him ever saying that he was thirsty?

A I do not have a memory of him asking for water.

Q Okay. Do you recall him asking anyone else for water in your presence?

A I don't remember.

Q How many medical staff were present for this clearance sort of interview that we're talking about?

A At central jail?

Q Yes.

A At least one nurse.

Q Okay. Sorry. Give me one quick moment. I want to get my notes back up here.

Are you required to write any reports when you are the officer assigned to transport someone to the hospital?

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not required.

I further certify I am neither financially interested in the action, nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: August 28, 2024.

Lori M. Brown

LORI M. BROWN
CSR No. 12614

Dismantling of transcript will void Reporter's certificate.

# EXHIBIT 2

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: June 26, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Borish Wong

Reported by:
Natalie M. Khamis

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Case No. 3:23-cv-00785-DMS-AHG

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

MEDICAL PROVIDERS DOES 26, IN THEIR INDIVIDUAL CAPACITIES;
DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF BORISH WONG

San Diego, California

Wednesday, June 26, 2024

REPORTED BY:

NATALIE M. KHAMIS
CSR NO. 14260
JOB NO. 1038222
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Case No. 3:23-cv-00785-DMS-AHG

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

MEDICAL PROVIDERS DOES 26, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF BORISH WONG, taken on behalf of Plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California 92101, beginning at 2:00 p.m. and ending at 3:51 p.m. on Wednesday, June 26, 2024, before NATALIE M. KHAMIS, Certified Shorthand Reporter No. 14260.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES:

FOR PLAINTIFFS:

McKenzie Scott PC
By: Lauren M. Williams
Attorney at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
lwilliams@mckenziescott.com

FOR PLAINTIFFS:

McKenzie Scott PC
By: Michelle C. Angeles
Attorney at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
mangeles@mckenziescott.com

FOR DEFENDANTS CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

Lotz, Doggett & Rawers, LLP
By: Briana L. Berg
Attorney at Law
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
bberg@ldrlaw.com

FOR DEFENDANTS COUNTY OF SAN DIEGO AND BORISH WONG:

County of San Diego
By: Steven P. Inman II
Attorney at Law
1600 Pacific Highway, Suite 355
San Diego California 92101
619.884.2931
steven.inman@sdcounty.ca.gov

Also Present:

David Kim, Videographer

# INDEX


| WITNESS: BORISH WONG | PAGE |
|---|---|
| EXAMINATION BY MS. WILLIAMS | 8 |
| EXAMINATION BY MR. INMAN | 75 |


## EXHIBITS


| EXHIBIT NO. | DESCRIPTION | ID |
|---|---|---|
| Exhibit 46 | Borish Wong's Arrest Report | 28 |
| Exhibit 47 | Officer Tellam's Body-Worn Camera Footage | 41 |
| Exhibit 48 | Unknown Officer's Body-Worn Camera Footage of Sobriety Tests | 41 |
| Exhibit 49 | Officer Wong's Body-Worn Camera Station Footage | 41 |

San Diego, California; Wednesday, June 26, 2024
2:00 p.m. - 3:51 p.m.

VIDEOGRAPHER: Good afternoon. We are on the record at 2:00 p.m. Pacific on June 26, 2024, to begin the deposition of Borish Wong in the matter of the Estate of William Hayden Schuck et al. versus County of San Diego et al.

This case is venued in the United States District Court, Southern District of California. Case number 3:23-cv-00785-DMS-AHG.

This deposition is taking place at 1350 Columbia Street, Suite 600, San Diego, California 92101.

The legal videographer is David Kim here on behalf of Steno, and the court reporter, Natalie Khamis, also here on behalf of Steno.

Would counsel please identify yourselves and state whom you represent.

MS. WILLIAMS: Lauren Williams representing the plaintiffs.

MS. BERG: Briana Berg for Correctional Healthcare Partners.

MR. INMAN: Steve Inman on behalf of the County and the County defendants.

MS. WILLIAMS: And then Michelle Angeles for the plaintiffs. She'll be stepping back in shortly.

VIDEOGRAPHER: Thank you, Counsel.
Would the reporter please swear in the witness.
(Sworn by the court reporter.)
THE WITNESS: Yes, I do.

BORISH WONG,

having been first duly sworn, testified as follows:

EXAMINATION

BY MS. WILLIAMS:

Q. All right. And, again, I'm Lauren Williams. I am one of the attorneys representing the plaintiffs in this case.
First, I just kind of want to go over sort of some ground rules and basic kind of information.
So, Officer Wong, have you used any other names? No? So Borish Wong is your --
A. It's my legal name.
Q. -- your legal name. And you've never used any other, like, nicknames or aliases that --
A. I mean, I had in high school. It was my Chinese name.
Q. Oh, okay.
A. Yeah. But I -- when I became a citizen, I changed my name. So...
Q. Oh, okay. And have -- so can you tell us what that name was?

A. Yeah. I'll spell it out for you.
Q. Yeah, okay. That'd be great.
A. T-h-e-n and then space, s-u-n-g. And then last name is Wong.
Q. And then same last name, Wong?
A. Yes.
Q. Great. Thank you so much.
Have you ever had your deposition taken before?
A. No.
Q. No, okay.
Have you ever testified, like, in court?
A. Yes.
Q. About how many times would you say?
A. Ten, I would say maybe, roughly.
Q. Okay. And when you're in court testifying, you have to take an oath, right?
A. That's correct.
Q. That's the same oath as you took today?
A. Yes.
Q. Is there any reason that you wouldn't be able to provide your best testimony today? For example -- an example I always give is, you know, like, maybe you had to stay up all night or you're sick, taking medication, things like that.
A. No.

Q. No?
So you believe that you can provide your best testimony today? There's nothing stopping you from doing so; is that right?
A. Yes.
Q. Okay. Great.
So just some sort of, like, ground rules for lack of a better term. It's natural to sort of finish each other's sentences or anticipate a question and jump in before the question is finished, but just because, of course, we have a court reporter, it's best to just wait, even if you know what I'm going to be asking or what I'm trying to get at. And I'm going to do the same. I probably will interrupt you at some point by mistake, so I apologize in advance. But we'll just have to do our best, and it's a good reminder at the beginning to just sort of let people finish.
A. Yes.
Q. Okay. Feel free to ask me to repeat any questions if it's confusing. I may ask clarification of some of your answers as well, so just bear with me.
And then -- oh, the -- so we always kind of preface the difference between an estimation and speculation.
So I may ask you to estimate something, but I

don't expect you to speculate about anything. An example we always give is, you know, if I ask you the length of this table that we're sitting at, you would be able to estimate it. You know, you know roughly what a foot is and how to measure with your eyes. You can see the table. It's in this room.

If I asked you to estimate the length of the dining room table at my home, you wouldn't be able to do that. You'd be speculating. You've never seen the dining room table at my home, of course.

Does that make sense, the difference between those?

A. Yes.

Q. Okay. Sounds good.

All right. Okay. So did you do anything to prepare for your deposition in this case?

A. Yeah, I read my report. I watched my body-worn camera.

Q. Okay. Did you watch any other officer's body-worn camera?

A. No, because I don't have access to that.

Q. Oh, you don't. Okay.

When you wrote your report in this case, did you have access to body-worn camera footage from other officers?

A. We only have access to our body-worn camera.
Q. Oh, interesting. Okay.
A. Only detectives will have access to the body- --
Q. Okay. I see.
THE COURT REPORTER. Hold on one second.
You are really soft-spoken. If you can just speak up a little bit.
THE WITNESS: Oh, okay. Sorry.
BY MS. WILLIAMS:
Q. I think what you said was only detectives have access to all of the --
A. Yeah, from -- sorry. From my understanding, yes.
Q. Okay. All right. And so not to belabor the point, but the only things that you did to prepare were review your own body-worn camera footage and the report you wrote?
A. Yes.
Q. Did you -- well, never mind. I'll scratch that. I'm sorry.
Okay. So going back to the date of the incident at issue here on March 10th, 2022, you were an officer with the San Diego Police Department, right?
A. Yes, that's correct.

Q. How long had you been an officer at that department?
A. At that time would be close to two years.
Q. Did you have, like, a supervising role at that time?
A. No. I was a patrol officer.
Q. Okay. So what were your duties as a patrol officer when you arrived on scene in your capacity, of course, as a SDPD officer?
A. On this particular scene, or what do I do as a police officer?
Q. Well, I guess maybe just -- it might be helpful to describe just generally, as a patrol officer, what those duties are first.
A. Yeah. My duties, respond to call for service. That's 911 calls, including fight calls, stabbing, overdosing, vehicle collisions, all that stuff. And then if -- when I have free time, I conduct traffic stops, enforcing traffic laws.
Q. Okay. And so on March 10, 2022, when you arrived at the scene of the car accident involving Hayden Schuck, what were your duties with respect to that scene?
A. I was to make sure -- I responded to make sure that everybody was okay and to investigate the

collision.
Q. Okay. And just kind of backing up a little bit more broadly. At the time, you had about two years of experience as an officer with SDPD.
Have you encountered people that were under the influence in your time as an officer?
A. Yes.
Q. And in that time leading up to the incident, had you also encountered people who had suffered from head injuries, for example?
A. Not that I recall of.
Q. And what about, had you encountered anyone suffering from mental health crises?
A. Yes.
Q. For example, schizophrenia?
A. Yes.
Q. Okay. And had you encountered people who were hallucinating, for example --
A. Yes.
Q. -- who were speaking to themselves or people who weren't actually present?
A. If I can recall, yes.
Q. Okay. On your report, you were listed as the arresting officer. When were you assigned that role at the scene? Or -- before or whenever that happened?

A. Usually it all depends on the service of that beat. I believe that day I was assigned particularly in that Ocean Beach beat. So it is my responsibility to take over the investigation and as the leading role, I would say, in that investigation.
Q. Okay. And were you -- well, you weren't the first person on scene; is that right? The first officer, I should say, from your office, from your department?
A. That is correct. I was not.
Q. Okay. Would -- oh, I'm so sorry. Go ahead.
A. That is correct. I was not the first one on the scene.
Q. Do you remember? Were you, like, the second or the third? Do you recall?
A. I don't recall if I was the second or third, but I just know that I arrived shortly after the first.
Q. And when you arrived, then you took a sort of supervising role; is that correct?
A. I kind of -- because it is my beat, I kind of took charge, I would say, a little bit, but I was not the supervisor on the call.
Q. Okay.
A. But I would just kind of, because I know it's probably going to be my case, so I kind of assign people

to do certain things to kind of help me out.
Q. Okay. And when you say it was probably going to be your case, can you describe for me what it means for a case to be yours?
A. It's going to be my investigation that's -- like, the collision investigation part.
Q. And what are some of the things that you do to investigate a collision?
A. We spoke to the parties that are involved and we take their statements and we take photos of the scene. And we check to make sure the driver are not under the influence and how the collision occur.
Q. Do you also -- do you also sort of interview the other officers that have encounters with the folks who are driving or a suspect, for example, of a crime?
A. Yeah. You, as a leading role, you kind of ask, like, "Hey, what do you have on your part?" Or "What did they say?" Or "What did you find out?"
Q. Okay. And that day on March 10th, did you speak to other officers about what their observations were of Hayden?
A. Yes.
Q. Is the goal of that to, of course, figure out what actually is going on but also to be able to memorialize that in a report?

A. Yeah, to kind of know what happened. Because, like I said, when I got first on the scene, I'm speaking to different parties that's involved. And, obviously, the driver, Mr. Schuck, was with a different officer. So I had to ask that officer, "Hey, like, is he okay? Like, what happened on his end of it?"
Q. Was that officer Officer Tellam?
A. Yes.
Q. And so it was your understanding that Officer Tellam had quite a bit of -- or at least some -- let me just start over my question. I'm sorry.
Was it your understanding when you arrived on scene that Officer Tellam had been interacting with Hayden Schuck for some time at the point that you arrived?
A. That's correct.
Q. Okay. And so Officer Tellam had information about Hayden's demeanor, for example?
A. I'm not sure. I'm sure he looked at Mr. Hayden and see, but I'm not sure what he saw at the time of his contact.
Q. Did Officer Tellam not tell you anything about his observations, or was that just later in time?
A. I don't recall specifically. I just -- if I recall, I just heard him say something about some --

like, he had some head injury or something like that. Like, he complained of head pain, and that's when he called for medics.

MR. INMAN: Move to strike for hearsay.

MS. WILLIAMS: Oh, okay.

BY MS. WILLIAMS:

Q. Let me back up. There's actually one thing that I didn't sort of go over.

There may be some objections by the attorneys. Those are sort of just to be memorialized for the record. Unless somebody tells you otherwise, you do have to answer the question. In this case, you already had and so that's totally fine. But if someone objects, then you will proceed with answering the question.

Does that make sense?

A. So if he's object, I still keep answering the questions? Okay.

Q. Yeah, exactly. Since there's no -- since we're not in court, it's just sort of for the record --

A. Okay.

Q. -- that we're creating.

Yeah. Thank you.

So what did you observe when you first arrived on scene?

A. He was sitting down. I asked him, like, "Hey,

what happened?" Or he kind of mumble and then gave me like a blank stare.

So I just keep asking, like, "Hey, are you okay? Can you tell me what happened with the investigation?"

He couldn't really kind of tell me why. He just say he's been up -- like, I think something along 40-something hours or -- and then...

Q. Okay. And was your body-worn camera activated at that time?

A. Yes.

Q. Okay. Do you know if that was -- that -- well, were you able to review that footage before this deposition today?

A. Yes.

Q. Okay. And you mentioned that you were trying to ask him questions about what had happened. I think you mistakenly said about the investigation. I think what you mean -- and correct me, of course, if I'm wrong, but I think what you were saying is that you were asking Hayden what happened with the collision, the car crash, right?

A. Yes, that's part of the investigation. A part of the collision investigation is asking what happened.

Q. Right. And he was -- were you saying that he

was unable to sort of articulate what had happened very well?

A. Yeah, he was saying, but very soft-spoken. And I know there was, like, road noises, and airplane was, like, over our heads, but I couldn't kind of figure out, like, what he was going, what he was doing prior to the collision. So he was kind of mumbling.

Q. Was he also slurring his words?

A. Yeah, I would say so.

Q. And when you arrived, did you see damage to the cars that were involved?

A. Yeah, slightly. At the -- the two cars that were involved, but I did not see Mr. Hayden's vehicle because it was far.

Q. Eventually, were you able to see Hayden Schuck's car?

A. I don't recall if I walk over there and see it.

Q. Did you see where it was?

A. I had roughly an idea, because it was east, so -- but I did not like -- I don't recall if I physically walk over there and saw the truck. Because I was with Mr. Hayden, which was away from the vehicle.

Q. Was the vehicle in a -- in the street?

A. No. It was off the embankment, like on the grass area. And I believe it hit a fence.

Q. Were you aware of whether it had flipped on its way down into the embankment?
A. Yes, I was aware of that.
Q. So it had flipped; is that correct?
A. I don't know if it had flipped, but per the radio call when it came out, it stated that it had rolled over.
Q. Was it the witnesses who were in the other cars that reported that? Do you know?
A. I believe it was the involved parties that called it in.
Q. Okay. And when you interacted with Hayden, you said he was a ways away. Can you describe where he was?
A. Yeah, he was sitting down, like, on the embankment but was away from the vehicle. I would say maybe east of the Nimitz Boulevard and then just south of the 8 freeway, like on the embankment.
Q. Okay. Do you know why he was sitting down?
A. Because he had involvement in the collision. I don't want him to stand up. So just have him sit down until medics gets there.
Q. Were you concerned that he could have had a head injury?
A. Yeah, it's a possibility.
Q. Did you see whether the airbags had -- I can't

think of the term -- whether they --
A. Deployed.
Q. Thank you.
Did you see whether the airbags had deployed in his car?
A. I did not see.
Q. Okay. Did you observe any cuts on Hayden's face?
A. I did not visually -- I didn't see any blood coming down, but it was just kind of like little red -- like, little redness, I would say.
Q. In, like, one part of his face or multiple?
A. I would say just kind of like on this side. Like, on the top of the head.
Q. Okay. And they -- but they weren't bleeding?
A. No, not that I could see.
Q. Okay. What was your initial impression of Hayden's mental state when you first talked to him?
A. Well, when he said he hasn't been sleeping for, like, 40-something hours, I thought that was kind of odd. And kind of asking, like, "Why didn't you sleep?"
He just kept saying, "Oh, I was here."
And then that's when I was thinking -- I saw his hand was fidgeting a lot when talking to him. That's just one of the signs of being under the

influence of controlled substance. His mouth was extremely dry. He's slurring his speech.

So I did a test on his eyes to check for full gaze nystagmus on the eyes. And that's when I noticed there was involuntary jerking motion. And that's when I believed he may be under the influence of controlled substance.

Q. Were -- and you said "may be under the influence." Is it sometimes difficult to tell whether somebody is under the influence or suffering from a -- mental health crises or some combination of the two?

A. It can be a combination of the two, but the symptoms that was displaying at that time showed that he may be under the influence of a controlled substance.

Q. When you do a blood draw, for example, or a breathalyzer test, are those instruments meant to sort of weed out someone who might have just, like, a mental health issue versus someone who's under the influence?

MR. INMAN: Objection. Lacks foundation and to the extent it calls for expert opinion.

THE WITNESS: Yeah, those are two different, I would say. Normally when we investigate a DUI, it's not necessarily more like mental state, it's more like what we find "observatives" of symptoms displayed.

BY MS. WILLIAMS:

Q. Okay. I guess -- and forgive me, my question was just not phrased well. So I'm going to try to rephrase it in a way that makes a little bit more sense.

I guess is it true in your experience and in your training that some symptoms of a mental health crisis, for example, talking to one's self, can also be indicative of someone being under the influence, and so sometimes it's hard to tell why that's happening?

A. It could, but I have -- you have to look at the totality of the circumstances. But in this particular instance, there was -- it wasn't the mental state. It was more I'm looking at it as a "he was under the influence of a controlled substance."

Q. Did it seem to you that he was -- well, let me -- let me back up.

Would you agree that there are degrees of -- of intoxication?

A. I -- you mean like alcohol intoxication?

Q. Or drug intoxication. So someone can obviously have one drink and be acting a certain way. If they have six drinks, they're going to seem more intoxicated, right?

A. I'm sorry, you have to ask -- sorry, can you repeat the question so I can --

Q. If someone has one drink --

A. Okay.

Q. -- versus ten drinks, they're probably going to appear different -- differently, right? They're going to seem more intoxicated if they've had ten versus one?

A. Sure, yeah.

Q. Okay. And is that -- is that true as well for use of other drugs?

A. It also depends on what types of drugs and how experienced they are with the drugs. So I don't know.

Q. Can you describe how intoxicated it seemed that Hayden Schuck was?

MR. INMAN: Objection. Vague.

BY MS. WILLIAMS:

Q. In your experience and based on your training?

A. I -- my initial saw of him is that he had blank -- like I said, he had just a symptom, fidgeting, blank stare, mumbling, dry mouth. That's just some indications. And, obviously, we had to do a full-on sobriety test to further see more clues.

Q. Okay. That's helpful.

So are there any other sort of signs that you saw before doing the field sobriety tests that you haven't already mentioned that indicated to you that he may be under the influence of a controlled substance?

A. Those were just -- those were the signs I saw.

Q. Did you notice that he was, like, wobbly when he walked at any point before those tests?
A. Yeah. So only once he get up -- I saw those signs prior to him getting up. Once he start walking to the patrol vehicle, that's when I noticed.
Q. Were his eyes glazed over?
A. Yeah, he couldn't follow my -- my pen with his eyes. He's just staring at me.
Q. Did you feel he was having trouble understanding your instructions?
A. At times, yes. That's why, for each of the sobriety tests, I tell him to ask any questions. And I also demonstrate the test prior to him starting. And if there's any questions, he can ask me.
Q. Did it seem like he didn't understand the instructions after you told them to him in any circumstances?
A. It seemed he understood. And some of the tests he seems like -- "Can you show me again?" And I continue showing him this, a couple tests where I demonstrated, I believe, two or three times.
Q. Okay. Can you give me -- what is the extent of your medical training, if any?
A. Just the academy.
Q. What do you learn at the academy in terms of

medical training?
A. Like, first aid. That's pretty much it, yeah.
Q. Okay. And so it's safe to say you're not a doctor, medical doctor?
A. No.
Q. Me either.
You're not a nurse?
A. No.
Q. Okay. And you're not trained as a paramedic?
A. No, ma'am.
Q. The firefighters that arrived on scene, they were trained as paramedics. Is that your understanding?
A. Yes.
Q. Did you witness the -- the paramedics check Hayden's vitals at any point?
A. I don't recall, but I know that they talked to him.
Q. And did you witness Hayden making any statements about speaking to people that were not present?
A. I don't recall.
Q. Okay. Let's -- let's jump back into the field sobriety tests.
Did Hayden pass any of the tests that you gave him?

A. No.
Q. And so he was unable to complete any of them?
A. Properly, yes. He was unable to complete them properly, yes.
Q. Did you give him multiple tests -- field sobriety tests?
A. Yes.
Q. Do you recall exactly how many?
A. I can look at my report and kind of go through them, because I think that --
Q. Sure.
A. I believe five or six different tests.
Q. Sure. And so we've marked your report as Plaintiff's Exhibit 46.
(Exhibit 46 marked for identification.)
BY MS. WILLIAMS:
Q. Feel free to refresh your recollection. The question is for now just the number of field sobriety tests that you administered.
A. Six tests total.
Q. Would you say that Hayden was close to properly satisfying any of those tests?
A. No.
Q. So in other words -- again, I don't want to put words in your mouth -- but he performed very poorly on

all of them. Would that be fair to say?
A. Yes.
Q. I'm going to point you to another part of your report where you write that -- that "Hayden had nystagmus in both eyes at maximum deviation."
Can you explain what that means?
A. Yeah. When we check for the eyes, at the maximum deviation is we point all the way at the end, like this, but he looks directly to the pens, following his eyes only. And the jerking motion is the indication of nystagmus.
Q. What is your understanding of when nystagmus occurs? Is it with, like, any and all drugs, for example, or only do -- do some drugs cause nystagmus? What's your training on that?
A. It's when they are under the influence of controlled substance or alcohol is when the indications show.
Q. Okay. And so by knowing that he has nystagmus, you can't narrow down, you know, what it is that he's been using. You just know that he's under the influence most likely?
A. Yes.
Q. Okay. In your report as well, did you write that he appeared disoriented?

A. I might have put it somewhere in there, but I don't recall if I add it on there.
Q. Okay.
A. Do you find particular part of it?
Q. I can point you to it. One second.
So on page 5 of 8 --
A. Okay.
Q. -- the third paragraph.
A. Okay, yeah, I did.
Q. Okay. So is it fair to say that you -- that he did appear disoriented?
A. Yes.
Q. Okay. And can you -- at this point, I know it's been a little bit -- but can you elaborate on what you meant by "disoriented"?
A. Yeah. When I asked him the basic questions, he kind of mumbling and that blank stare and not really all there focused. It appeared to me that appeared to be disoriented.
Q. Okay. And did you ask him questions in addition to performing the field sobriety test, like a standardized group of questions, in other words?
A. Yes, I did.
Q. Okay. And are those questions that you ask everyone who you suspect to be under the influence?

A. Yes.
Q. Okay. How did Hayden do in responding to those questions, would you say?
A. There's some questions where he couldn't -- it seems like he's going off and I have to keep bringing him back to the questions. And multiple times I have to repeat to him that he has to answer the question, and then he would say the answer.
Q. Okay. So did it seem like he was just getting sort of distracted, having a hard time understanding? What would you say?
A. I would say, yeah, he was losing focus at times.
Q. Okay. Did you recall whether Hayden was shaking at the time that you were talking to him about these questions?
A. I don't recall, but I know he was moving around. So he could be shaking.
Q. Do you recall whether it appeared that he was having a hard time standing up?
A. Yeah, he was kind of swaying a little bit.
Q. Just one moment.
At that point when you were asking him the standardized questions, were you still concerned that he could possibly have a head injury?

A. I -- sorry, I -- before we start, I request -- we request the medics to come back -- this would be the second time I believe medics actually came back to the scene. And they spoke to him. And I -- if I recall correctly, he said he was fine. He was fine. That's when I performed the field sobriety tests and asked him those questions.

So at that particular time, I wasn't concerning that he may have a head injury at that time, once I start my field sobriety test.

Q. Once you started your field sobriety test, you thought that the paramedics had -- had cleared him?

A. Yeah. And also he verbally say, like, he was fine. So maybe --

Q. Okay.

A. Yeah. I thought he was good enough to do the field sobriety test.

Q. Okay. But you -- again, I don't want to misstate your prior testimony -- but you did not see exactly how the paramedics assessed him; is that right?

A. Yeah, I don't recall, like, how detailed they were. I don't recall that part.

Q. Do you recall off the top of your head or from reading your report some of Hayden's responses to the standardized questions that seemed off or sort of

inappropriate?
A. Whatever he answered, I put it on there, on the question. So I don't -- I have to look back at the questions specifically.
Q. Okay. Well, I -- so I think what I'll ask you to do is if you don't mind reviewing the questions on page 6 of your report and the answers that Hayden gave per your report.
And my question would be: Do any of these stand out as being bizarre or inappropriate responses to the questions that you asked?
A. Yeah. Like, "When did you last sleep?"
"44 hours ago."
That's one big one.
Then the "Did you go to work today?" He keep saying yes, then no, then yes, because he works for himself.
And -- and then also, "Where are you going?"
"To a good place."
That's one that was kind of a little odd.
Q. So when you asked him "Where are you going?" and his response was "To a good place," you found that odd?
A. Yeah, a little.
Q. What about -- was Hayden able to tell you what

time of day it was?
A. He say it was 5:30 p.m. And the actual time was 12:15 p.m. So -- so, no.
Q. And do you recall him having confusion about what time it was with any of the other officers?
A. I don't know if they asked him to -- like, "Do you know what time it is?" I don't recall that. So I don't know.
Q. Do you recall having any difficulty figuring out from Hayden what he had been doing in the time leading up to the accident?
A. Yeah, I had a hard time figuring that out.
Q. And why was it hard to figure out?
A. Because he really didn't give me a straight answer. So...
Q. Do you remember what he said?
A. He just say he was in OB, but then he came down from Orange County. And I asked him, like, "What did you do in OB?" And he said surfing or something like that, but that's pretty much all I get out of him.
Q. Do you recall whether he had said when he had been surfing, like whether it was nighttime or daytime?
A. If I can recall correctly, he said it was morning or something like that.
Q. Okay.

A. But I don't recall specifically the time, but he did say he was surfing. He went to surf.
Q. Okay. And were your questions in that regard, were those on your body-worn camera that you reviewed?
A. I believe so.
Q. When you completed the field sobriety test with him, was your body-worn camera on as well?
A. Yeah, the whole time.
MS. WILLIAMS: Okay. We've been going for -- oh, I guess only 38 minutes. Does anybody need a break, or are we still good?
MS. BERG: I'm good.
MS. WILLIAMS: I'm okay as well. Good.
BY MS. WILLIAMS:
Q. Okay. So I'm going to move on, then.
After the field sobriety tests, what -- what did you do in terms of your investigation?
A. Well, once I complete my field sobriety test on Mr. Hayden, I determined that he possibly under the influence of a controlled substance and I arrest him for that.
Q. And so then physically, where do you place Hayden?
A. Once I arrest him, I put handcuffs on him, check proper tightness, and then I place him in the back

seat of my patrol vehicle.
Q. And did you remain on scene at that point, or did you transport him somewhere?
A. I remain on scene to processing other findings that were involved at the time.
Q. About how long do you think you remained on scene after you placed Hayden in the patrol car?
A. I don't recall.
Q. Was it like a couple hours?
A. No, no. I would say maybe 20 or 30 minutes maybe, perhaps, but I have to, like, watch the exact time frame, but no more than that.
Q. Okay. And what did you do after that, then?
A. I transport Mr. Hayden to our headquarters for processing.
Q. Okay. So you went straight to the station?
A. Correct, our headquarters, yes. Not the western division station; to our headquarters, which is downtown station. That's where we processed all the paperwork prior to booking.
Q. Okay. And why did you transport him to the headquarters?
A. That's our procedure, our policy and procedure.
Q. Okay. So no matter what, when someone's arrested, before booking into the jail, they go to the

headquarters?
A. Yes. Because we have to write our declaration and get approved by the watch commander before booking, which is our probable cause declaration.
Q. Was the watch commander that day Eric Hungarter?
A. No. He is the sergeant who look at the report and approved it.
Q. Okay. The --
A. The watch -- sorry.
Q. Oh, no. You go ahead.
A. The watch commander, he work separately. His sole purpose is to read the declaration, if there's a probable cause for that individual to get booked into the central jail.
Q. Okay. And so would their name be listed on your report or no?
A. No.
Q. Okay. Do you recall who it was that day?
A. No, ma'am.
Q. It changes, right?
A. Yes, every shift, every hour. So...
Q. So when you arrived at the station, what did you first do -- or I'm sorry -- the headquarters?
A. I -- if I recall, I take my laptop out and

start working on the declaration.
Q. Where was Hayden at this time while you were writing your declaration?
A. Back seat of my patrol vehicle.
Q. Okay. And was it, like, a comfortable temperature in the patrol car at the time?
A. I would say so, yes.
Q. Is it your practice to, like, crack the windows for individuals who are inside the cars?
A. In the back seat, I would crack some window. It just depends if they want to.
Q. Okay. About how long does it normally take -- well, let me back up.
About how long did it take you to write the declaration in this case?
A. I don't recall, like, the exact. Because I know while writing declaration, I also went to him and then -- for the consent for the blood draw. And then at one point, I stop my dec, and then I took him to get the blood draw and the detectives from our gun apprehension team also spoke to him. So I can't really say how long, but I still working on the dec while all of that was going on as well. So...
Q. Okay. So you mentioned that you spoke to Hayden at points while you were still writing the

declaration, right?
A. Correct.
Q. What would you say about his -- his mental state at the time that you spoke with him? Had it improved from the time that you saw him in the field, or was it about the same?
A. I would say about the same. Just still kind of having that blank stare and quiet.
Q. Quiet and a blank stare were the -- kind of the main things that you remember from his mental state at that time?
A. Yeah. Uh-huh.
Q. Oh, and was that a yes?
A. Yes, sorry.
Q. Okay. That was another thing I probably should have mentioned is the "uh-huh" is hard to translate in writing.
A. I'm sorry.
Q. So we're supposed to say "yes," but I do the same.
Okay. So when you spoke to Hayden about the blood draw, you requested consent to provide the blood, is that right, from Hayden?
A. That's correct.
Q. And do you recall what his initial responses

were?
A. Yeah, initially, he said, "No, I don't think so." Something along that line. That's when I read him the refusal. If he were not to provide a blood sample, he could lose his driver license privileges. And then after that, I asked him again, and that's when he said, "Yes, yes, do it."
Q. Okay. And, ultimately, like you said, he says yes. But do you recall him speaking to someone who obviously was not in the patrol vehicle named Tati at that time?
A. I don't recall.
Q. Did you -- and you watched the body-worn camera footage to -- to prepare for the deposition. Did that footage include the time when you spoke to him in the car about the consent?
A. Yes.
Q. When -- when did you watch this footage?
A. Yesterday.
Q. Okay. Okay. I may -- I'm going to bring up the -- the footage, if that's okay.
A. Okay.
Q. So I had previously gone over Exhibit 46, the arrest report. I'm going to mention that we have Exhibit 47, Officer Tellam's body-worn camera footage.

I don't think we're going to get into it, but I'm mentioning it on the record so that there's no gap in our exhibits.

But now I'm going to move on to Exhibit 48, which is -- oh, I'm so sorry. We're going to skip that one as well, but I'm going to mention it. So Exhibit 48 was the unknown officer's -- I think it was Officer Manning. You explained his body-worn camera footage that shows the field sobriety tests.

And then now we'll actually get into your body-worn camera footage from the station, which we've marked as Exhibit 49.

(Exhibits 47-49 marked for identification.)

BY MS. WILLIAMS:

Q. Sorry. That was lengthy.

Give me one second to get this up on the screen right behind me.

MS. WILLIAMS: Is it working? Yeah, I think it's going to work. All right.

BY MS. WILLIAMS:

Q. All right. Officer Wong, are you able to see the image behind me --

A. Yes.

Q. -- on the screen?

And do you recognize this as your body-worn camera footage from the headquarters?
A. Yes.
Q. Okay. And is this -- do you recognize this as one of the videos that you watched yesterday?
A. Yes.
Q. Okay. I'm going to skip ahead. Bear with me. I don't know that I have a -- oh, no, I do have a time stamp. One second.
Okay. I'm going to play roughly, I don't know, a minute, and then I'm going to have a couple of questions about what we view.
(Video is played; not reported.)
BY MS. WILLIAMS:
Q. Okay. I'm actually going to pause the video there.
What does Hayden say at that time? Did you hear what -- what he just said?
A. "Tati, what do you say?"
Q. So you -- "Tati, what do you say?"
Is that what you said? I'm sorry, I couldn't hear you.
A. Yes, that's what he said.
Q. Okay. So Hayden -- in response to you asking him about consenting to a blood draw, Hayden responds --

Hayden looks to his left; is that right?
A. Correct.
Q. Is there anyone in your patrol car to his left?
A. No.
Q. Is there anyone named Tati in or near the patrol car?
A. Not that I know of, no.
Q. And so then Hayden says, "Tati, what do you think?" Is that right?
A. I believe he said, "What do you say?"
Q. "Tati, what do you say?"
A. Correct.
(Video is played; not reported.)
BY MS. WILLIAMS:
Q. And based on that interaction, did it appear to you that Hayden was trying to consult with someone who wasn't present?
A. I mean, a lot of his response kind of slow, so I gave him some time to process maybe some of the questions. So... but I was kind of waiting for him to respond, so he said, "Yes."
That's when I said, "Okay."
And then that's when he said, "Let's do it now." So...
Q. Right. And I guess my question isn't so much,

you know, whether he did ultimately say yes so much as, what is your understanding of what he's doing when he says, "Tati, what do you say?" and he looks in a direction where there is no one there? I -- do you --
A. He may be under the influence of a controlled substance. Maybe a little bit of hallucinating, could be. But, again, this was just part -- symptoms of being under the influence of controlled substance, not being able to focus.
Q. Okay. And so -- okay. And so it's fair to say that his reaction was -- was in line with your understanding that he was under the influence?
A. Correct.
Q. And that's because sometimes folks who are under the influence hallucinate?
A. Correct.
Q. Okay. So you mentioned then that you did do the blood draw ultimately; is that right?
A. Correct.
Q. What is the procedure for -- for taking that blood draw? Did you take Hayden somewhere else?
A. Yeah, I took him to the room. I believe it's room 138. It's at the corner. Where there's a blood tech there with him, and then I watch her take his blood.

Q. Do you recall who the blood tech would have been that day?
A. No, but I would mention in my report.
Q. And was there anything out of the ordinary that occurred during that blood draw?
A. No.
Q. Was the standard amount of blood drawn?
A. Yeah. I mean, it's -- I don't -- I mean, they took it, and I just witnessing, make sure they're not tampering with the blood.
Q. Did you see any evidence of tampering?
A. No.
Q. Was it stored properly as far as you know?
A. As far as I know when I was there, yes.
Q. So does the technician take custody of it?
A. Yeah. Once -- once they did their blood draw, I had to sign it. My initial is actually on there, and it's sealed. And that's when I place it into the -- like, a container, like a locked container.
Q. Okay. So your initials are on the vials?
A. Yes.
Q. How many vials were there?
A. Two.
Q. Okay. So you sign your initials on both vials, and then you placed those vials into a locked container;

is that right?
A. Yeah, it's sealed with my sign -- with my initial, I think, like, on each sides of the tube.
Q. And that is exactly what happened in this case, right?
A. Correct.
Q. Okay. So that's just pursuant to normal procedure?
A. Yeah, yes.
Q. And then what happens to that locked container?
A. That's foggy. I don't know. I don't know.
Q. Okay. You don't know if it stays at headquarters or is taken somewhere else?
A. Yeah, I don't know.
Q. Do you know how long blood is typically retained for?
A. I don't know.
Q. Are you aware that -- that the parties have subpoenaed -- or plaintiffs, rather, have subpoenaed the vials of blood?
A. I don't know.
Q. Okay. While Hayden was at headquarters, did he say anything about not feeling well?
A. I don't recall him saying that.
Q. Do you recall him asking for water?

A. I don't recall him asking.
Q. Do you recall him asking for food?
A. No.
Q. Do you recall any other requests that he made or may have made?
A. Yeah, I don't recall.
Q. Okay. Anything else about his behavior or the way that he was presenting that sticks out in your mind that we otherwise haven't talked about at -- while he was at the headquarters?
A. No.
Q. Were there any other moments that you can recall at any point in time while you were with Hayden where it appeared that he was attempting to talk to someone else that wasn't there?
A. I mean, when I opened the car door initially, when I asked him for the blood draw, he was quiet, but then it's like he's mumbling a little bit. So he could be talking to somebody. I don't know.
Q. Okay. And mumbling, is that sort of indicative that somebody might be hallucinating in your experience?
A. Yeah, could be.
Q. Okay. Okay. So then once you're done with your declaration and all of your duties at the headquarters, what did -- what happened next?

A. Yeah, by time -- I think it's second watch -- units are starting to lock down, and I requested a second watch unit to transport Mr. Hayden to central jail.
Q. Oh, okay. So you did not transport --
A. No, I did not.
Q. Okay. So were you done with your shift at that point?
A. So second -- we -- because second watch comes on at -- around 2 o'clock p.m., because they have to process Mr. Hayden. By the time I get done with my report, it'll be really late. So second watch would like to help out. And, normally, we ask them and they would just transport while I go back to the station so I can work on my report.
Q. I see. And so --
A. Because while I'm at the headquarter with just the declaration, that is not the report. That is just a paper to get him into central jail. So I have to come back to the station and then write the whole report.
Q. Okay. And so when you referred to the declaration, is that sometimes also referred to, like, a "probable cause affidavit"?
A. Correct. Sorry, yes.
Q. Okay. Okay. And so as you sit here today, you

are 100 percent sure that you never transported Hayden Schuck to the central jail?
A. That is correct.
Q. Okay. Do you know who the officer was that did?
A. Yes.
Q. What is their name?
A. Officer Pullido.
Q. Can you spell that for me?
A. P-u-l-l-i-d-o.
Q. P-u-l-l-i-d-o?
A. Correct.
Q. Okay. Okay. Let me see. When you -- well, have you ever transported anyone to the central jail for booking?
A. Yes.
Q. In your experience, do the intake nurses ask the transporting officers questions?
A. Yes.
Q. Do they ever ask the -- any other officers that are not the transporting officer questions about someone's arrest?
A. Can you rephrase that question? Sorry.
Q. So -- well, let me just ask you: In this case, did any of the nurses at the San Diego County jail ask

you any questions about Hayden Schuck?
A. I never contacted the nurses at jail, so I would -- we never contacted. So...
Q. So no nurse ever asked you any questions from the San Diego County jail about Hayden Schuck; is that right?
A. I mean, they would have to ask the transporting officer, not me, because I'm at the headquarters.
Q. Right, right. And so the -- I guess -- but, you know, me not knowing anything about the procedure --
A. Okay.
Q. -- right? Like they don't pick up the phone and call you?
A. No.
Q. Nobody picked up the phone and called you at headquarters to ask about the circumstances of Hayden's arrest, right?
A. No.
Q. No nurses from the jail ever did that?
A. Not to me. They might ask the transporting officer.
Q. Right.
A. But not -- I don't know if they did or did not.
Q. Exactly. Okay. And so just for the record so it's super clear, no nurses from the San Diego County

jail asked you any questions about Hayden's arrest?
A. That is correct.
Q. Thank you. Sorry to belabor the point.
Okay. So at that point, once you finish your declaration, you asked the next watch person, Officer Pullido, to transport Hayden. You continue working on your report. Once you're finished with your report, is that the end of your involvement with this case?
A. Yes. Once I finish my report, I submit it. Then the sergeant will look at the report. Satisfied, approved. And that's when I get to go home, yes.
Q. Do you recall what time it was that you asked Officer Pullido to transport Hayden Schuck to the jail?
A. I don't recall. It -- it -- I don't recall.
Q. Do you recall what time you should have been off for your shift? Like, when you should have finished your shift that night.
A. Well, we're the first watch, so we go home at 4 o'clock.
Q. 4 o'clock in the afternoon?
A. Correct.
Q. Did you speak directly to Officer Pullido when you asked him to transport Hayden?
A. Yeah, I believe we made contact.
Q. Do you remember what you told him about the

circumstances?
A. Yes. He asked me normally, you know, "Hey, what's he arrested for?"
And I say, "Hey, this is the charges."
I gave him the declaration -- the probable cause paperwork to get booked into central jail. If there's any property, I would hand that to -- over to him.
Q. Okay. So you gave Officer Pullido the probable cause statement that you had written; is that right?
A. Correct.
Q. Is -- when you transport someone to the jail, are you supposed to give the probable cause statement to the nurse or any intake staff at the jail?
How does that work?
A. Yeah. So once you gets to the central, you bring in your arrestee with you, have them sit down, then you hand the paperwork, which is the probable cause paper, to the intake staff.
Q. Okay. And is the intake staff made up of deputies and nurses as far as you know?
A. I think there it's a civilian staff for the photo taking, for the booking photo. Once the booking photo is completed, we move on into the nurse intake.
Q. Okay. So it's the photo goes first, and that's

just intake staff, civilians that handle that. And then next you take them to see a nurse --
A. Correct.
Q. -- an intake nurse?
A. Correct.
Q. Okay. Did you tell Officer Pullido to relay any information to the nurse?
A. Yes. I believe I told him that he was involved in the collision, to let the nurse know.
Q. Did you describe the severity of the collision to Officer Pullido?
A. If I recall correctly, I said it was a rollover.
Q. A rollover?
A. Yeah.
Q. Did you tell Officer Pullido that Hayden had not yet gone to any hospital?
A. Yes.
Q. Did you tell Officer Pullido that Hayden appeared to be under the influence?
A. I don't recall specifically, but I might have told him that.
Q. Did you -- did you assume that Officer Pullido would have assumed that Hayden was potentially under the influence due to the nature of the charges laid out in

the probable cause statement?
A. Yeah. If he writes the -- if he reads the dec, then, yes, he could assume.
Q. Is he supposed to read the declaration since he wasn't involved in the arrest so that he can answer the nurse's questions?
A. No. I don't -- I don't think you have to read the dec. Normally, the officer just brief him a little bit of what happened.
Q. Okay. And so when the nurse asks, for example, like, you know, is -- "Do you have any reason to believe that this person that you've brought for booking is under the influence," does that officer try to find out the answer to that question?
Because I guess I'm just imagining a scenario where, you know, you have to go home for the end of your shift and then this person -- this Officer Pullido person, for example, is taking Hayden, who he didn't have any experience with before, and then, you know, he's expected to answer questions that he might not have the answers to.
What would you say about that?
A. I mean, for that -- for that particular, I would say, yes, he would be suspected. Because the other officers suspected him to be under the influence

of a controlled substance and then relay that information.
Q. Right. Would you say also in Hayden's specific instance that it was pretty obvious that he might be under the influence of a controlled substance?
A. From my training and experience, I believe so, yes.
Q. Do you believe that Officer Pullido would have had sufficient training and experience to also recognize that, considering how Hayden was acting?
MR. INMAN: Objection to the extent it calls for speculation.
THE WITNESS: I -- I don't know.
BY MS. WILLIAMS:
Q. Would you, in your experience, say that it was obvious to you that Hayden was acting like he was under the influence?
A. If I just put him in the back seat, I don't know. I have to do further testing.
Q. Did you do field sobriety tests because it appeared that he was under the influence?
A. Correct.
Q. Okay. And you mentioned earlier that you didn't feel like his mental state or his condition had improved at the station, right?

A. Correct, yeah. He was not -- he was kind of just the same thing, like, with that blank stare. He was not gaining -- like, focusing.
Q. Did you tell Officer Pullido that -- that he was arrested, though, for driving under the influence? I believe you mentioned that you had told him the charges; is that right?
A. Correct.
Q. Okay. And so Officer Pullido at least knew that he had been arrested for -- on suspicion of driving under the influence?
A. That is correct.
Q. Okay. So -- I'm going to give you a hypothetical. Imagine that you were in Officer Pullido's shoes. You were told that you need to transport someone to the central jail for booking. You're told that they were arrested for driving under the influence and that they also were involved in a rollover collision.
If you were to go and transport that person, the nurse asks you, "Do you have any reason to believe that this person is under the influence of drugs or alcohol," what would your answer be?
A. I would say, "Yes."
Q. Okay. Did you ever talk to Officer Pullido

about his experience with Hayden Schuck?

A. No.

MS. BERG: Do you mind if we take a bathroom break really quick?

MS. WILLIAMS: Yeah.

MS. BERG: I will be very quick.

MS. WILLIAMS: No, no. No reason to be quick. Okay. We'll go off the record.

VIDEOGRAPHER: The time is 3:07. We are off the record.

(Recess)

VIDEOGRAPHER: The time is 3:17. We are on the record.

BY MS. WILLIAMS:

Q. Okay. So I -- I know you didn't transport Hayden Schuck to the hospital, right?

A. Yes, I did not.

Q. But I do want to ask you: Have you ever transported anyone to the hospital before booking?

A. Yes.

Q. And are you -- so you're familiar, then, with the procedure of doing that?

A. Yes.

Q. Can you give me just kind of an overview of what that procedure looks like?

A. If you take somebody to jail and they get a reject and then -- for medical reason or not, we would take the arrestee to the hospital for jail clearance.

And we would tell the nurse, "Hey, this person was involved in a collision and the nurse wanted to check whatever for whatever reason."

And then the nurse at the hospital would do their -- their medical assessing, and I would just stand by to make sure it's safe.

Q. Okay. And when you say you would "stand by" during any sort of medical assessment, do you typically stand by in the exam room where it's happening?

A. No. If -- if -- if I'm a solo officer, if it's an exam room, I technically would go and stand outside and just -- so when they transport the arrestee back to the room, then I would -- just to make sure that nothing go crazy during that little, short transport.

Q. Okay. And so you usually aren't able to hear or see the examination going on?

A. No, normally not, like, when they are working, no.

Q. Is the door to the exam room typically closed?

A. Normally, I would say they were closed. I mean, I don't go often enough to know, but different hospitals might be different maybe.

Q. Okay. Okay. And what -- what kind of details is it -- well, let me back up.
Have you been trained on what information to provide a nurse or a medical professional at a hospital about an arrestee when they are rejected from the jail?
A. We don't -- there's no training, but, I mean, we tell them what their reason for the rejects are. And then -- and then the hospital would ask some more questions if they need to, and I would give them that.
Q. Does the -- does the intake staff at the jail tell you what the reason for the rejection is?
A. Yes.
Q. And so, basically, you just relay that information to the hospital?
A. Correct.
Q. And then if the nurse or whatever other medical professional has follow-up questions, they might ask you for further information about what happened?
A. Yes, ma'am.
Q. Is it -- would it be typical of an officer to follow up with other officers if they don't have the answers to a nurse's questions, for example?
A. Yeah, they can give phone calls to each other.
Q. So, if, for example, Officer Pullido were at the hospital with Hayden Schuck and he needed additional

information from you while you were back at headquarters writing your report, he could have called you?

A. Absolutely, yes.

Q. Do you recall whether he did call you?

A. He called me, I believe, later that -- saying that he was rejected for medical reason and that he transported him to the hospital. But nothing, like, specific details.

Q. When did he call you?

A. I was in my vehicle at the time, so I would say after I left headquarters.

Q. So after your shift was over?

A. I would say, yeah, probably. Yeah.

Q. What was the purpose, as far as you know, for Officer Pullido calling you?

A. He just let me know that -- that my arrestee was rejected for -- for jail. And I just say, "Okay."

Q. Why would you need that information?

A. I don't need that. It's just like a common courtesy, just let the other officer know, like, what happened.

Q. Did Officer Pullido tell you what happened at the hospital?

A. No.

Q. At the point at which he called you, was it

your understanding that they were still at the hospital?
A. Correct.
Q. Okay. Did he tell you why Hayden had been rejected from the jail?
A. I believe because he was involved in a collision, vehicle collision. So for that.
Q. Okay. When you transport someone to the hospital after they're rejected from the jail for medical reasons, are you required to gather any sort of documentation from the hospital?
A. Correct.
Q. Is it SDPD policy and procedure that requires that?
A. I would have to look, but it is the jail policy and procedure. So we have to get the clearance from the hospital and bring that paper back to jail in order to get booked.
Q. So there's a piece of paper that you refer to as a "clearance." Can you describe that to me in a little bit more detail?
A. It would just be a paper provided by the hospital, their findings. And then there would be, like, a stamp that says, "This person has been cleared." People can -- for jail.
Q. When you're at the hospital, do you ask the

staff for that if they don't supply it readily?
A. Yeah, initial -- I mean, once you walked in, they would ask, "Why you bringing this person for?"
And we would say, "For jail clearance," and then they --
Q. Have you ever been in a situation where you've forgotten to get that paperwork or they've forgotten to give it to you and you have gone to the jail without it?
A. No.
Q. What happens if the hospital does not clear someone for booking?
A. That person stay at the hospital.
Q. And what happens if someone refuses medical treatment?
A. I don't know what the hospital protocol is. So I don't know.
Q. Do you know what -- well, have you ever been in a situation where that's happened, where somebody you've taken to the hospital does not complete the treatment or the assessment that the hospital needs to do to clear them for jail?
A. Not that I recall. Normally, they would just give me their clearance.
Q. Have you ever received a document from any hospital saying that an arrestee is AMA status?

A. I've heard of that term, like "AMA," like refusal, but not that I recall from the hospital.

Q. You -- okay. So have you ever had a -- have you ever transported anyone to the hospital that then was AMA status, that they -- they were released against medical advice?

A. Not that I recall. I just know out in the field they do that when the medics arrive and they AMA. But at the hospital, for booking clearance, I don't recall where the arrestee was AMA. I just know that normally they just give me a paper that says this person is good for booking, and that's when I transport.

Q. Okay. If you did -- so this is, again, a hypothetical. But if you were in a situation where you took someone to the jail, they were refused for medical reasons, you took them to the hospital to be cleared, and then the hospital gave you a form that said, you know, "They're being released against medical advice. They didn't complete an assessment to be cleared. We can't say that they're cleared for booking," would you take that form to the jail with you?

A. If -- if they are not cleared for booking, then we would not -- they would not be able to get booked. My understanding is the paper that provided -- and this is for all -- it normally is cleared for booking. So I

don't -- I haven't had one where it's, like, no -- like, "Hey, there's a paper that says not cleared for booking." Then I wouldn't take them for booking if they're not cleared for booking.

Q. What would you do then?

A. So we would wait until the -- the hospital -- until that person is clear. If we have to get -- if we have to wait for four days, we wait for four days. We would have the officer rotate and watch the arrestee.

Q. And is that because the jail is not supposed to book people who haven't been cleared by the hospital if they need to be cleared for medical reasons?

A. That's my --

MR. INMAN: Objection. Lacks foundation.

Go ahead.

THE WITNESS: That's my understanding is. But I don't know their -- their protocol.

BY MS. WILLIAMS:

Q. Your understanding of the policy, though, is that they do need to be cleared by the hospital before they're booked in, right?

A. Yes.

MR. INMAN: Same objection.

THE WITNESS: That's just my understanding, yes.

BY MS. WILLIAMS:
Q. Okay. Let's see.
So when you -- in your experience, when you take someone for booking at the San Diego -- San Diego County jail downtown, is it -- has it been your experience that every single time the nurse at intake asks you questions?
A. Yes.
Q. Do they ask you the same set of questions every time?
A. Yes. There is usually a paper, and they would ask, "Can you read and relay information if that person is under the influence or combative or whatnot." And they might have follow-up questions sometimes.
Q. When you answer those questions, do you sometimes also have additional information that might not be specifically covered by a question?
A. I'm sorry. Can you say that, like --
Q. Are there circumstances where you have information that you feel is relevant that may not be exactly responsive to a question?
A. Oh, yeah, that could be.
Q. And so if you feel like there's some piece of information that's relevant that you haven't provided because it wasn't, you know, exactly responsive to their

questions, would you then just provide that to the
nurse?
A. Yeah. I mean, if -- there could be. Just,
like, a common, like, "Hey, just FYI, this person is
also -- like urinate on themself" or something like
that.
Q. "Is also" -- what was that?
A. Like, might be, like, something where it just,
"Hey, this person might urinate on himself."
Something -- well, just, you know, just to kind of give
the nurse just a common -- let them know ahead before
they go and touch that person and whatnot.
Q. Sure. Okay.
A. It might not be the questions on there. "Hey,
has this person" -- you know. But it's just telling the
nurse, "Hey, this person urinated on himself" so that
the nurse could be, like, "Okay, all right."
Q. Right. Okay. So, like, you know, this person
needs a change of clothes or --
A. Correct.
Q. Okay.
A. Something like that.
Q. So when you go in for the booking process, do
you keep your body-worn camera turned on?
A. No. Because they have the camera in there, and

we don't -- we don't have it on.
Q. Okay.
A. I have it on mine, but it's off.
Q. Right. Okay. Are you allowed to keep it on, or is that a jail policy that you have to turn it off?
A. That's -- that's -- I always have it off and everybody else has it off. So...
Q. Okay. If an officer books someone into jail, do they typically write a report about that booking process?
A. No.
Q. No.
Would they write a report if there was something out of the ordinary, potentially, or is that your understanding that it would just never happen?
A. No, they do. In instance where there's a use of force occur, then they would document that.
Q. Okay. But aside from that, they wouldn't, for example, document the question and answer with the nurse in a report?
A. No.
Q. Okay.
MS. WILLIAMS: I don't know that we have any additional questions for you.
Yeah. Can we go off the record for a few

minutes?

VIDEOGRAPHER: The time is 3:31. We are off the record.

(Recess)

VIDEOGRAPHER: The time is 3:41. We are on the record.

BY MS. WILLIAMS:

Q. All right. So, Officer Wong, what is Officer Pullido's first name? If you know it.

A. If I guess, it's Andrew, but I'm not sure.

Q. Okay. All right. You mentioned taking the declaration or probable cause statement to the nurse at the jail.

Did they receive a copy of it? Is that correct?

A. They get the original.

Q. Okay.

A. So I don't know if they make copy or not, but they -- we hand them the original.

Q. You hand the nurse the original?

A. Well, I give it to Officer Pullido. Officer Pullido, I would assume that he give it to the nurse, the original.

Q. Sure. Sorry. Let me rephrase the question.

So I'm asking, like, in your experience --

A. Oh, okay.
Q. -- and generally speaking.
When you write a declaration and you are the one that's transporting an individual to be booked at the jail, is it true that you take the -- the probable cause statement or declaration and you hand it directly to the nurse?
A. Yes.
Q. Okay. And in this case the declaration that you wrote, did it include information about Hayden potentially being under the influence of a controlled substance?
A. Yes, it should.
Q. Did you describe that he failed the field sobriety test?
A. Yes, it should.
Q. Did you describe that he was -- that he had -- he was exhibiting signs of intoxication?
A. Yes, it should.
Q. Do you recall whether you included that he was in a collision?
A. It should be there. How I got to that point is I respond to the collision. So it should be there, yes.
Q. Right. So what -- am I correct? What you're saying is the reason that you showed up was --

A. Correct.
Q. -- because there was a collision, right?
A. Right, yes. Correct.
Q. So, undoubtedly, that would have been in your declaration?
A. Yes. It's just not in details like a collision investigation. It's just a brief of how I got there, what happened.
Q. So the basic information that there was a collision was in the declaration?
A. Yes.
Q. And the basic information that Hayden appeared to be under the influence of some sort of controlled substance was in the declaration?
A. That is correct.
Q. Okay. And that declaration, like you said, you gave to Officer Pullido, who should have then given it to the nurse?
A. That's correct.
Q. And -- and by "nurse," I'm referring to the nurse at the county jail.
A. That's correct.
Q. Okay. So turning to -- well, actually, let's just stay on this topic.
So, generally speaking, when you yourself book

someone at the -- the jail, do you ever fill out the form for the nurse that has the questions for the officer?
A. No.
Q. So does the nurse always verbally ask you, in your experience, the questions and then take down your answers?
A. Correct.
Q. Okay. Do you ever review the questions and responses before the nurse finalizes that form?
A. I'm sorry. What do you mean by that?
Q. So the nurse asks you a series of questions, right?
A. Yeah. Like I said, there's a paper. And -- and if there's any questions that I need to be -- like, let the nurse know, then I would tell the nurse. And then I'm assuming that the nurse would take down whatever information I gave the nurse.
Q. Okay. So you're kind of motioning as if the questions are, like -- are they posted up somewhere?
A. Yes, they post it where -- where the intake is.
Q. Okay. So there's, like, an intake area of the jail?
A. Yes. So once you walk in, there's a booking photo on the left. Once that's clear, you take to the

intake nurse, which is next -- it's the same room; it's just an open space. And you go in. I believe there's six or seven questions and then you have to answer. Say, "Okay, yes, that person is under the influence," and then the next question. And once -- if there's none of that related to the person, you just say, "No, it doesn't apply to my arrestee."
Q. Okay. So in your experience, the nurses do not read you the questions?
A. No.
Q. Okay. So they just expect the officers to provide the information?
A. Well, they ask the officer, "Can you please read the questions?" And then we would give them the answer.
Q. Okay. And are you allowed to provide additional information if you think it's relevant, like we talked about earlier? You know, say, somebody you're transported has urinated on themselves, is that the time when you would be able to tell the nurse that?
A. Yes, yes.
Q. Okay. And so there's kind of a mutual understanding that that additional information is welcome to the nurses; is that correct?
A. Yes, that's my understanding. Yeah. If we

have -- you have further information about -- that's not on the question, you can just tell the nurse, like, you know, the -- what you feel that's relevant that the nurse should know.
Q. And would you feel that information about someone's health status would be relevant to the nurse at the jail?
A. Yes.
Q. Is there -- you mentioned earlier that -- that the area where the intake is occurring is recorded. Are you saying that there's a camera that you've observed in that booking area where the nurses and where the booking photo station is?
A. I just observed that there's a camera there. I don't know if it's recorded. I just know there's a camera there. Not like specifically at the nurse station, but I just know that there's a camera, like, in that room. There's a big one there. But I don't -- I don't know -- I don't recall there's one specifically at the nurse, pointing at the nurse station.
Q. Okay. But there's a camera in what you referred to as "the open space." That's the intake area?
A. Yeah. The lobby, I would say.
Q. Okay. When you have transported someone to the

hospital for clearance, you mentioned that there's a clearance form that you receive, but do you also receive other documents from the hospital?

A. I -- there's a clearance in, I think, might be like their vitals, like some paperwork that indicate that what the nurse at the hospital did or what the doctor find, and then, obviously, there's a paper that say "clearance."

But like I said, I don't really look into those medical records. I just -- if I get them, I take a quick look that make sure it is -- say that it's clear to book, and then I would just take my -- take him or her to the jail.

Q. And do you bring those documents to the jail with you?

A. Absolutely, yes.

Q. And you give them to the nurse?

A. Correct.

Q. Okay. And so the nurse would receive both a form saying they're cleared to be booked, as well as any other documents that the hospital gives you, right?

A. Correct.

Q. Okay.

MS. WILLIAMS: I think that's it for us. Yeah.

MS. BERG: I don't have any questions.

EXAMINATION

BY MR. INMAN:

Q. Just the other document that's given to you in addition to the clearance, is that the same kind of discharge summary that you or I would receive if we went to the hospital or the doctor?

A. Yeah, similar, I would say. It's just the discharge paperwork.

MR. INMAN: Okay. Nothing further.

VIDEOGRAPHER: Okay. And, Ms. Williams, would you like your video synched with the transcript?

MS. WILLIAMS: Yes, please.

VIDEOGRAPHER: And would any other counsel wish to order the video?

MR. INMAN: Yes. Video and synched with the transcript for the County, please.

MS. BERG: I'll just take -- electronic copy is fine.

VIDEOGRAPHER: This concludes Volume I of the deposition of Borish Wong in the matter of the Estate of William Hayden Schuck et al. versus County of San Diego et al. We are now off the record. The time is 3:51 p.m. Pacific.

(Deposition concluded at 3:51 p.m.)

REPORTER'S CERTIFICATION

I, Natalie M. Khamis, CSR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 12th day of July, 2024.

Natalie M. Khamis

Natalie M. Khamis, CSR,
CSR No. 14260

### Exhibits

**Exhibit 46** 6:11 28:14, 15 40:23

### 1

**10** 13:20
**100** 49:1
**10th** 12:23 16:19
**12:15** 34:3
**1350** 7:11
**138** 44:23

### 2

**2** 48:10
**20** 36:10
**2022** 12:23 13:20
**2024** 7:1,4
**26** 7:1,4
**2:00** 7:2,4

### 3

**30** 36:10
**38** 35:10
**3:07** 57:9
**3:17** 57:12
**3:23-cv-00785-dms-ahg** 7:10
**3:31** 68:2
**3:41** 68:5
**3:51** 7:2 75:22,24

### 4

**4** 51:19,20
**40-something** 19:8 22:20
**44** 33:13
**46** 28:14,15 40:23
**47** 40:25
**47-49** 41:13
**48** 41:4,6
**49** 41:12

### 5

**5** 30:6
**5:30** 34:2

### 6

**6** 33:7
**600** 7:12

### 8

**8** 21:17 30:6

### 9

**911** 13:16
**92101** 7:12

### A

**Absolutely** 60:3 74:16
**academy** 26:24,25
**access** 11:21,24 12:1, 3,12
**accident** 13:21 34:11
**acting** 24:20 55:10,16
**activated** 19:9
**actual** 34:2
**add** 30:2
**addition** 30:21 75:4
**additional** 59:25 65:16 67:24 72:17,23
**administered** 28:19
**advance** 10:15
**advice** 63:6,18
**affidavit** 48:23
**afternoon** 7:3 51:20
**agree** 24:16
**ahead** 15:11 37:11 42:7 64:15 66:11
**aid** 27:2
**airbags** 21:25 22:4
**airplane** 20:4
**alcohol** 24:18 29:17 56:23
**aliases** 8:18
**allowed** 67:4 72:16
**AMA** 62:25 63:1,5,8,10
**amount** 45:7
**Andrew** 68:10
**Angeles** 7:24
**answering** 18:14,16
**answers** 10:21 33:7 54:21 59:22 71:7
**anticipate** 10:9
**apologize** 10:15
**appeared** 29:25 30:18 31:19 47:14 53:20 55:21 70:12
**apply** 72:7
**apprehension** 38:20
**approved** 37:3,8 51:11
**area** 20:25 71:22 73:10, 12,23
**arrest** 35:20,24 40:24 49:22 50:17 51:1 54:5
**arrested** 36:25 52:3 56:5,10,17
**arrestee** 52:17 58:3,15 59:5 60:16 62:25 63:10 64:9 72:7
**arresting** 14:24
**arrive** 63:8
**arrived** 13:8,21 15:17, 18 17:12,15 18:23 20:10 27:11 37:23
**articulate** 20:1
**asks** 54:10 56:21 65:7 71:12
**assessed** 32:20
**assessing** 58:8
**assessment** 58:11 62:20 63:19
**assign** 15:25
**assigned** 14:24 15:2
**assume** 53:23 54:3 68:22
**assumed** 53:24
**assuming** 71:17
**attempting** 47:14
**attorneys** 8:10 18:9
**aware** 21:1,3 46:18

### B

**back** 7:25 12:22 18:7 24:15 27:22 31:6 32:2,3 33:3 35:25 38:4,10,13 48:14,20 55:18 58:15 59:2 60:1 61:16
**backing** 14:2
**based** 25:14 43:15
**basic** 8:13 30:16 70:9, 12
**basically** 59:13
**bathroom** 57:3
**Beach** 15:3
**bear** 10:21 42:7
**beat** 15:2,3,20
**begin** 7:4
**beginning** 10:17
**behalf** 7:14,15,22
**behavior** 47:7
**belabor** 12:15 51:3
**believed** 23:6
**Berg** 7:20 35:12 57:3,6 74:25 75:17

**big** 33:14 73:18

**bit** 12:8 14:2 15:21 17:10 24:3 30:14 31:21 44:6 47:18 54:9 61:20

**bizarre** 33:10

**blank** 19:2 25:16,17 30:17 39:8,9 56:2

**bleeding** 22:15

**blood** 22:9 23:15 38:18, 20 39:22 40:4 42:25 44:18,21,23,25 45:1,5, 7,10,16 46:15,20 47:17

**body-** 12:4

**body-worn** 11:17,20, 24 12:1,17 19:9 35:4,7 40:13,25 41:8,11 42:1 66:24

**book** 64:11 70:25 74:12

**booked** 37:14 52:6 61:17 63:23 64:21 69:4 74:20

**booking** 36:20,25 37:3 49:15 52:23 54:12 56:16 57:19 62:11 63:9, 12,20,22,25 64:3,4 65:4 66:23 67:9 71:24 73:12

**books** 67:8

**Borish** 7:5 8:5,15 75:20

**Boulevard** 21:16

**break** 35:11 57:4

**breathalyzer** 23:16

**Briana** 7:20

**bring** 40:20 52:17 61:16 74:14

**bringing** 31:5 62:3

**broadly** 14:3

**brought** 54:12

**C**

**California** 7:1,9,12

**call** 13:15 15:22 21:6 50:13 60:4,9

**called** 18:3 21:11 50:15 60:2,5,25

**calling** 60:15

**calls** 13:16 23:20 55:11 59:23

**camera** 11:18,20,24 12:1,17 19:9 35:4,7 40:13,25 41:8,11 42:2 66:24,25 73:11,14,16, 17,21

**capacity** 13:8

**car** 13:21 19:21 20:16 22:5 36:7 38:6 40:16 43:3,6 47:16

**cars** 20:11,12 21:8 38:9

**case** 7:8,9 8:11 11:16, 23 15:25 16:3,4 18:12 38:15 46:4 49:24 51:8 69:9

**central** 37:15 48:4,19 49:2,14 52:6,16 56:16

**change** 66:19

**changed** 8:23

**charge** 15:21

**charges** 52:4 53:25 56:7

**check** 16:11 23:3 27:14 29:7 35:25 58:6

**Chinese** 8:20

**circumstances** 24:10 26:17 50:16 52:1 65:19

**citizen** 8:22

**civilian** 52:22

**civilians** 53:1

**clarification** 10:20

**clear** 50:25 62:10,20 64:7 71:25 74:11

**clearance** 58:3 61:15, 19 62:4,23 63:9 74:1,2, 4,8 75:4

**cleared** 32:12 61:23 63:16,19,20,22,25 64:2, 4,11,12,20 74:20

**close** 13:3 28:21

**closed** 58:22,23

**clothes** 66:19

**clues** 25:19

**collision** 14:1 16:6,8, 12 19:21,24 20:7 21:19 53:9,10 56:19 58:5 61:6 69:21,23 70:2,6,10

**collisions** 13:17

**Columbia** 7:12

**combative** 65:13

**combination** 23:11,12

**comfortable** 38:5

**commander** 37:3,5,12

**common** 60:19 66:4,11

**complained** 18:2

**complete** 28:2,3 35:18 62:19 63:19

**completed** 35:6 52:24

**concerned** 21:22 31:24

**concluded** 75:24

**concludes** 75:19

**condition** 55:24

**conduct** 13:18

**confusing** 10:20

**confusion** 34:4

**consent** 38:18 39:22 40:16

**consenting** 42:25

**consult** 43:16

**contact** 17:21 51:24

**contacted** 50:2,3

**container** 45:19,25 46:10

**continue** 26:20 51:6

**controlled** 23:1,6,14 24:13 25:24 29:17 35:20 44:5,8 55:1,5 69:11 70:13

**copy** 68:14,18 75:17

**corner** 44:23

**correct** 9:17 12:25 15:10,12,19 17:16 19:19 21:4 36:17 39:2, 24 43:2,12 44:13,16,19 46:6 48:24 49:3,12 51:2,21 52:11 53:3,5 55:22 56:1,8,12 59:15 61:2,11 66:20 68:15 69:24 70:1,3,15,19,22 71:8 72:24 74:18,22

**Correctional** 7:20

**correctly** 32:5 34:23 53:12

**counsel** 7:16 8:1 75:13

**county** 7:6,22,23 34:18 49:25 50:5,25 65:5 70:21 75:16,21

**couple** 26:20 36:9 42:11

**court** 7:9,14 8:3 9:11, 15 10:11 12:6 18:19

**courtesy** 60:20

**covered** 65:17

**crack** 38:8,10

**crash** 19:22

**crazy** 58:17

**creating** 18:21

**crime** 16:15

**crises** 14:13 23:11

**crisis** 24:6

**custody** 45:15

**cuts** 22:7

**D**

**damage** 20:10

**date** 12:22

**David** 7:13

**day** 15:2 16:19 34:1 37:5,19 45:2

**days** 64:8

**daytime** 34:22
**dec** 38:19,22 54:2,8
**declaration** 37:2,4,13 38:1,3,15,17 39:1 47:24 48:18,22 51:5 52:5 54:4 68:12 69:3,6,9 70:5,10, 14,16
**defendants** 7:23
**degrees** 24:16
**demeanor** 17:18
**demonstrate** 26:13
**demonstrated** 26:21
**department** 12:24 13:2 15:9
**depends** 15:1 25:8 38:11
**deployed** 22:2,4
**deposition** 7:5,11 9:8 11:16 19:14 40:14 75:20,24
**deputies** 52:21
**describe** 13:13 16:3 21:13 25:10 53:10 61:19 69:14,17
**detail** 61:20
**detailed** 32:21
**details** 59:1 60:8 70:6
**detectives** 12:3,11 38:20
**determined** 35:19
**deviation** 29:5,8
**Diego** 7:1,7,12 12:24 49:25 50:5,25 65:4 75:21
**difference** 10:23 11:11
**differently** 25:3
**difficult** 23:9
**difficulty** 34:9
**dining** 11:8,10
**direction** 44:4
**directly** 29:9 51:22 69:6
**discharge** 75:5,8
**disoriented** 29:25 30:11,15,19
**displayed** 23:24
**displaying** 23:13
**distracted** 31:10
**District** 7:9
**division** 36:18
**doctor** 27:4 74:7 75:6
**document** 62:24 67:17,19 75:3
**documentation** 61:10
**documents** 74:3,14,21
**door** 47:16 58:22
**downtown** 36:19 65:5
**draw** 23:15 38:18,20 39:22 42:25 44:18,21 45:5,16 47:17
**drawn** 45:7
**drink** 24:20,25
**drinks** 24:21 25:2
**driver** 16:11 17:4 40:5
**driving** 16:15 56:5,10, 17
**drug** 24:19
**drugs** 25:7,8,9 29:13, 14 56:22
**dry** 23:2 25:17
**due** 53:25
**DUI** 23:22
**duly** 8:6
**duties** 13:7,14,15,22 47:24

**E**

**earlier** 55:23 72:18 73:9
**east** 20:19 21:16
**elaborate** 30:14
**electronic** 75:17
**embankment** 20:24 21:2,15,17
**encountered** 14:5,9, 12,17
**encounters** 16:14
**end** 17:6 29:8 51:8 54:16
**enforcing** 13:19
**Eric** 37:6
**Estate** 7:6 75:20
**estimate** 10:25 11:4,7
**estimation** 10:23
**et al** 7:6,7 75:21,22
**Eventually** 20:15
**evidence** 45:11
**exact** 36:11 38:16
**exam** 58:12,14,22
**examination** 8:7 58:19 75:1
**exhibit** 28:14,15 40:23, 25 41:4,6,12
**exhibiting** 69:18
**exhibits** 41:3,13
**expect** 11:1 72:11
**expected** 54:20
**experience** 14:4 24:4 25:14 47:21 49:17 54:19 55:6,9,15 57:1 65:3,6 68:25 71:6 72:8
**experienced** 25:9
**expert** 23:20
**explain** 29:6
**explained** 41:8
**extent** 23:20 26:22 55:11
**extremely** 23:2
**eyes** 11:5 23:3,4 26:6,8 29:5,7,10

**F**

**face** 22:8,12
**failed** 69:14
**fair** 29:1 30:10 44:10
**familiar** 57:21
**feel** 10:19 26:9 28:17 55:24 65:20,23 73:3,5
**feeling** 46:23
**fence** 20:25
**fidgeting** 22:24 25:16
**field** 25:22 27:22 28:5, 18 30:21 32:6,10,11,17 35:6,16,18 39:5 41:9 55:20 63:8 69:14
**fight** 13:16
**figure** 16:23 20:5 34:13
**figuring** 34:9,12
**fill** 71:1
**finalizes** 71:10
**find** 16:18 23:24 30:4 54:13 74:7
**findings** 36:4 61:22
**fine** 18:13 32:5,14 75:18
**finish** 10:8,17 51:4,9
**finished** 10:10 51:7,16
**firefighters** 27:11
**flipped** 21:1,4,5
**focus** 31:12 44:9
**focused** 30:18
**focusing** 56:3
**foggy** 46:11
**folks** 16:14 44:14
**follow** 26:7 59:21
**follow-up** 59:17 65:14
**food** 47:2
**foot** 11:5
**footage** 11:24 12:17

19:13 40:14,15,18,21, 25 41:9,11 42:2

**force** 67:17

**forgive** 24:1

**forgotten** 62:7

**form** 63:17,21 71:2,10 74:2,20

**found** 33:22

**foundation** 23:19 64:14

**frame** 36:12

**free** 10:19 13:18 28:17

**freeway** 21:17

**full** 23:3

**full-on** 25:18

**FYI** 66:4

G

**gaining** 56:3

**gap** 41:2

**gather** 61:9

**gave** 19:1 27:24 33:7 43:19 52:5,9 63:17 70:17 71:18

**gaze** 23:4

**generally** 13:13 69:2 70:25

**give** 9:22 11:2 26:22 28:5 34:14 41:17 52:13 56:13 57:24 59:9,23 62:8,23 63:11 66:10 68:21,22 72:14 74:17

**glazed** 26:6

**goal** 16:23

**good** 7:3 10:16 11:14 32:16 33:19,22 35:11, 12,13 63:12

**grass** 20:25

**great** 9:2,7 10:6

**ground** 8:13 10:7

**group** 30:22

**guess** 13:12 24:1,4 35:10 43:25 50:9 54:15 68:10

**gun** 38:20

H

**hallucinate** 44:15

**hallucinating** 14:18 44:6 47:21

**hand** 22:24 52:7,18 68:19,20 69:6

**handcuffs** 35:24

**handle** 53:1

**happen** 67:15

**happened** 14:25 17:1,6 19:1,4,17,21,24 20:1 46:4 47:25 54:9 59:18 60:21,22 62:18 70:8

**happening** 24:8 58:12

**hard** 24:8 31:10,20 34:12,13 39:16

**Hayden** 7:6 13:22 16:21 17:14,19 19:21 20:15,22 21:12 25:11 27:18,24 28:21 29:4 31:2,14 33:7,25 34:10 35:19,23 36:7,14 38:2, 25 39:21,23 42:17,24, 25 43:1,8,16 44:21 46:22 47:13 48:3,11 49:1 50:1,5 51:6,13,23 53:16,19,24 54:18 55:10,16 57:1,16 59:25 61:3 69:10 70:12 75:21

**Hayden's** 17:18 20:13 22:7,18 27:15 32:24 50:16 51:1 55:3

**head** 14:10 18:1,2 21:23 22:14 31:25 32:9, 23

**headquarter** 48:17

**headquarters** 36:14, 17,18,22 37:1,24 42:2 46:13,22 47:10,25 50:8, 16 60:1,11

**heads** 20:5

**health** 14:13 23:11,18 24:5 73:6

**Healthcare** 7:21

**hear** 42:18,22 58:18

**heard** 17:25 63:1

**hearsay** 18:4

**helpful** 13:12 25:20

**Hey** 16:17 17:5 18:25 19:3 52:2,4 58:4 64:2 66:4,9,14,16

**high** 8:19

**hit** 20:25

**Hold** 12:6

**home** 11:8,10 51:11,18 54:16

**hospital** 53:17 57:16, 19 58:3,7 59:4,8,14,25 60:7,23 61:1,8,10,16, 22,25 62:10,12,15,19, 20,25 63:2,4,9,16,17 64:6,11,20 74:1,3,6,21 75:6

**hospitals** 58:25

**hour** 37:22

**hours** 19:8 22:20 33:13 36:9

**Hungarter** 37:6

**hypothetical** 56:14 63:14

I

**idea** 20:19

**identification** 28:15 41:14

**identify** 7:16

**image** 41:23

**Imagine** 56:14

**imagining** 54:15

**impression** 22:17

**improved** 39:5 55:25

**inappropriate** 33:1,10

**incident** 12:23 14:8

**include** 40:15 69:10

**included** 69:20

**including** 13:16

**indication** 29:10

**indications** 25:18 29:17

**indicative** 24:7 47:20

**individual** 37:14 69:4

**individuals** 38:9

**influence** 14:6 16:12 23:1,6,9,10,14,18 24:7, 13 25:24 29:16,21 30:25 35:20 44:5,8,12, 15 53:20,25 54:13,25 55:5,17,21 56:5,11,18, 22 65:13 69:11 70:13 72:4

**information** 8:13 17:17 53:7 55:2 59:3, 14,18 60:1,18 65:12,16, 20,24 69:10 70:9,12 71:18 72:12,17,23 73:1, 5

**initial** 22:17 25:15 39:25 45:17 46:3 62:2

**initially** 40:2 47:16

**initials** 45:20,24

**injuries** 14:10

**injury** 18:1 21:23 31:25 32:9

**Inman** 7:22 18:4 23:19 25:12 55:11 64:14,23 75:2,9,15

**inside** 38:9

**instance** 24:11 55:4 67:16

**instructions** 26:10,16

**instruments** 23:16

**intake** 49:17 52:14,19, 20,24 53:1,4 59:10 65:6 71:21,22 72:1 73:10,22

**interacted** 21:12

**interacting** 17:13
**interaction** 43:15
**interesting** 12:2
**interrupt** 10:14
**interview** 16:13
**intoxicated** 24:21 25:4,10
**intoxication** 24:17,18, 19 69:18
**investigate** 13:25 16:8 23:22
**investigation** 15:4,5 16:5,6 19:5,18,23,24 35:17 70:7
**involuntary** 23:5
**involved** 16:9 17:3 20:11,13 21:10 36:5 53:8 54:5 56:18 58:5 61:5
**involvement** 21:19 51:8
**involving** 13:21
**issue** 12:23 23:18

J

**jail** 36:25 37:15 48:4,19 49:2,14,25 50:2,5,19 51:1,13 52:6,12,14 56:16 58:1,3 59:5,10 60:17 61:4,8,14,16,24 62:4,8,21 63:15,21 64:10 65:5 67:5,8 68:13 69:5 70:21 71:1,23 73:7 74:13,14
**jerking** 23:5 29:10
**jump** 10:9 27:22
**June** 7:1,4

K

**Khamis** 7:14
**Kim** 7:13
**kind** 8:12,13 10:22 14:2 15:20,24,25 16:1,16 17:1 19:1,6 20:5,7 22:10,13,20,21 28:9 30:17 31:21 33:20 39:7, 9 43:18,20 56:1 57:24 59:1 66:10 71:19 72:22 75:4
**knew** 56:9
**knowing** 29:19 50:10

L

**lack** 10:8
**Lacks** 23:19 64:14
**laid** 53:25
**laptop** 37:25
**late** 48:12
**Lauren** 7:18 8:9
**laws** 13:19
**leading** 14:8 15:4 16:16 34:11
**learn** 26:25
**left** 43:1,3 60:11 71:25
**legal** 7:13 8:16,17
**length** 11:3,7
**lengthy** 41:16
**license** 40:5
**listed** 14:23 37:16
**lobby** 73:24
**lock** 48:2
**locked** 45:19,25 46:10
**long** 13:1 36:6 38:12, 14,21 46:15
**looked** 17:19
**lose** 40:5
**losing** 31:12
**lot** 22:24 43:18

M

**made** 47:4,5 51:24 52:20
**main** 39:10
**make** 11:11 13:24 16:11 18:15 45:9 58:9, 16 68:18 74:11
**makes** 24:3
**making** 27:18
**Manning** 41:8
**March** 12:23 13:20 16:19
**marked** 28:13,15 41:12,13
**matter** 7:5 36:24 75:20
**maximum** 29:5,8
**means** 16:3 29:6
**meant** 23:16 30:15
**measure** 11:5
**medical** 26:23 27:1,4 58:2,8,11 59:4,16 60:6 61:9 62:13 63:6,15,18 64:12 74:10
**medication** 9:23
**medics** 18:3 21:21 32:2,3 63:8
**memorialize** 16:25
**memorialized** 18:10
**mental** 14:13 22:18 23:11,17,23 24:5,11 39:3,10 55:24
**mention** 40:24 41:6 45:3
**mentioned** 19:16 25:23 38:24 39:16 44:17 55:23 56:6 68:11 73:9 74:1
**mentioning** 41:2
**Michelle** 7:24
**mind** 12:20 33:6 47:8 57:3
**mine** 67:3
**minute** 42:11
**minutes** 35:10 36:10 68:1
**misstate** 32:19
**mistake** 10:15
**mistakenly** 19:18
**moment** 31:22
**moments** 47:12
**morning** 34:24
**motion** 23:5 29:10
**motioning** 71:19
**mouth** 23:1 25:17 28:25
**move** 18:4 35:15 41:4 52:24
**moving** 31:17
**multiple** 22:12 28:5 31:6
**mumble** 19:1
**mumbling** 20:7 25:17 30:17 47:18,20
**mutual** 72:22

N

**named** 40:10 43:5
**names** 8:15
**narrow** 29:20
**Natalie** 7:14
**natural** 10:8
**nature** 53:25
**necessarily** 23:23
**needed** 59:25
**nicknames** 8:18
**night** 9:23 51:17
**nighttime** 34:22
**Nimitz** 21:16
**noises** 20:4
**normal** 46:7
**notice** 26:1
**noticed** 23:4 26:5
**number** 7:10 28:18

**nurse** 27:7 50:4 52:14, 24 53:2,4,7,9 54:10 56:21 58:4,5,7 59:4,16 65:6 66:2,11,16,17 67:19 68:12,20,22 69:7 70:18,20,21 71:2,5,10, 12,16,17,18 72:1,20 73:2,4,6,16,20 74:6,17, 19

**nurse's** 54:6 59:22

**nurses** 49:17,25 50:2, 19,25 52:21 72:8,24 73:12

**nystagmus** 23:4 29:5, 11,12,14,19

**O**

**oath** 9:16,18

**OB** 34:17,19

**object** 18:16

**objection** 23:19 25:12 55:11 64:14,23

**objections** 18:9

**objects** 18:13

**observations** 16:20 17:23

**observatives** 23:24

**observe** 18:23 22:7

**observed** 73:11,14

**obvious** 55:4,16

**occur** 16:12 67:17

**occurred** 45:5

**occurring** 73:10

**occurs** 29:13

**Ocean** 15:3

**odd** 22:21 33:20,23

**office** 15:8

**officer** 8:14 12:24 13:1, 6,8,9,11,13 14:4,6,24 15:8 17:4,5,7,10,13,17, 22 40:25 41:8,22 49:4, 8,21 50:8,21 51:5,13,22 52:9 53:6,11,16,19,23 54:8,13,17 55:8 56:4,9, 14,25 58:13 59:20,24 60:15,20,22 64:9 67:8 68:8,21 70:17 71:3 72:13

**officer's** 11:19 41:7

**officers** 11:25 16:14,20 34:5 49:18,20 54:25 59:21 72:11

**one's** 24:6

**open** 72:2 73:22

**opened** 47:16

**opinion** 23:20

**Orange** 34:18

**order** 61:16 75:14

**ordinary** 45:4 67:14

**original** 68:16,19,20,23

**other's** 10:9

**overdosing** 13:17

**overview** 57:24

**P**

**P-U-L-L-I-D-O** 49:10, 11

**p.m.** 7:2,4 34:2,3 48:10 75:23,24

**Pacific** 7:4 75:23

**pain** 18:2

**paper** 48:19 52:19 61:16,18,21 63:11,24 64:2 65:11 71:14 74:7

**paperwork** 36:20 52:6, 18 62:7 74:5 75:8

**paragraph** 30:8

**paramedic** 27:9

**paramedics** 27:12,14 32:12,20

**part** 16:6,17 19:23 22:12 29:3 30:4 32:22 44:7

**parties** 16:9 17:3 21:10 46:18

**Partners** 7:21

**pass** 27:24

**patrol** 13:6,7,13 26:5 36:1,7 38:4,6 40:10 43:3,6

**pause** 42:15

**pen** 26:7

**pens** 29:9

**people** 10:17 14:5,9,17, 20 15:25 27:19 61:24 64:11

**percent** 49:1

**performed** 28:25 32:6

**performing** 30:21

**person** 15:7 51:5 54:12,17,18 56:20,22 58:4 61:23 62:3,12 63:11 64:7 65:12 66:4, 9,12,15,16,18 72:4,6

**phone** 50:12,15 59:23

**photo** 52:23,24,25 71:25 73:13

**photos** 16:10

**phrased** 24:2

**physically** 20:21 35:22

**pick** 50:12

**picked** 50:15

**piece** 61:18 65:23

**place** 7:11 33:19,22 35:22,25 45:18

**Plaintiff's** 28:14

**plaintiffs** 7:19,25 8:10 46:19

**play** 42:10

**played** 42:13 43:13

**point** 10:14 12:16 17:14 26:2 27:15 29:3,8 30:5, 13 31:23 36:2 38:19 47:13 48:8 51:3,4 60:25 69:22

**pointing** 73:20

**points** 38:25

**police** 12:24 13:11

**policy** 36:23 61:12,14 64:19 67:5

**poorly** 28:25

**possibility** 21:24

**possibly** 31:25 35:19

**post** 71:21

**posted** 71:20

**potentially** 53:24 67:14 69:11

**practice** 38:8

**preface** 10:23

**prepare** 11:16 12:16 40:14

**present** 14:21 27:20 43:17

**presenting** 47:8

**pretty** 27:2 34:20 55:4

**previously** 40:23

**prior** 20:6 26:4,13 32:19 36:20

**privileges** 40:5

**probable** 37:4,14 48:23 52:5,9,13,18 54:1 68:12 69:5

**procedure** 36:23 44:20 46:8 50:10 57:22,25 61:12,15

**proceed** 18:14

**process** 43:19 48:11 66:23 67:10

**processed** 36:19

**processing** 36:4,15

**professional** 59:4,17

**proper** 35:25

**properly** 28:3,4,21 45:13

**property** 52:7

**protocol** 62:15 64:17

**provide** 9:21 10:2 39:22 40:4 59:4 66:1

72:12,16
**provided** 61:21 63:24 65:24
**Pullido** 49:8 51:6,13,22 52:9 53:6,11,16,19,23 54:17 55:8 56:4,9,25 59:24 60:15,22 68:21, 22 70:17
**Pullido's** 56:15 68:9
**purpose** 37:13 60:14
**pursuant** 46:7
**put** 28:24 30:1 33:2 35:24 55:18

**Q**

**question** 10:9,10 17:11 18:12,14 24:1,24 28:18 31:7 33:3,9 43:25 49:23 54:14 65:17,21 67:19 68:24 72:5 73:2
**questions** 10:20 18:17 19:17 26:12,14 30:16, 20,22,24 31:3,4,6,16,24 32:7,25 33:4,6,11 35:3 42:12 43:20 49:18,21 50:1,4 51:1 54:6,20 59:9,17,22 65:7,9,14,15 66:1,14 67:24 71:2,6,9, 12,15,20 72:3,9,14 74:25
**quick** 57:4,6,7 74:11
**quiet** 39:8,9 47:17

**R**

**radio** 21:6
**reaction** 44:11
**read** 11:17 37:13 40:3 54:4,7 65:12 72:9,14
**readily** 62:1
**reading** 32:24
**reads** 54:2
**reason** 9:20 54:11 56:21 57:7 58:2,6 59:7, 11 60:6 69:25
**reasons** 61:9 63:16 64:12
**recall** 14:11,22 15:15, 16 17:24,25 20:17,20 27:16,21 28:8 30:2 31:14,17,19 32:4,21,22, 23 34:4,7,9,21,23 35:1 36:8 37:19,25 38:16 39:25 40:9,12 45:1 46:24,25 47:1,2,4,6,13 51:12,14,15 53:12,21 60:4 62:22 63:2,7,10 69:20 73:19
**receive** 68:14 74:2,19 75:5
**received** 62:24
**Recess** 57:11 68:4
**recognize** 42:1,4 55:9
**recollection** 28:17
**record** 7:4 18:11,19 41:2 50:24 57:8,10,13 67:25 68:3,6 75:22
**recorded** 73:10,15
**records** 74:10
**red** 22:10
**redness** 22:11
**refer** 61:18
**referred** 48:21,22 73:22
**referring** 70:20
**refresh** 28:17
**refusal** 40:4 63:2
**refused** 63:15
**refuses** 62:13
**regard** 35:3
**reject** 58:2
**rejected** 59:5 60:6,17 61:4,8
**rejection** 59:11
**rejects** 59:7
**related** 72:6
**relay** 53:6 55:1 59:13 65:12
**released** 63:5,18
**relevant** 65:20,24 72:17 73:3,6
**remain** 36:2,4
**remained** 36:6
**remember** 15:14 34:16 39:10 51:25
**reminder** 10:16
**repeat** 10:19 24:24 31:7
**rephrase** 24:3 49:23 68:24
**report** 11:17,23 12:17 14:23 16:25 28:9,13 29:4,24 32:24 33:7,8 37:7,17 40:24 45:3 48:12,15,18,20 51:7,9, 10 60:2 67:9,13,20
**reported** 21:9 42:13 43:13
**reporter** 7:14 8:2,3 10:11 12:6
**represent** 7:17
**representing** 7:18 8:10
**request** 32:1,2
**requested** 39:22 48:3
**requests** 47:4
**required** 61:9
**requires** 61:12
**respect** 13:22
**respond** 13:15 43:21 69:23
**responded** 13:24
**responding** 31:2
**responds** 42:25
**response** 33:22 42:24 43:18
**responses** 32:24 33:10 39:25 71:10
**responsibility** 15:3
**responsive** 65:21,25
**retained** 46:16
**review** 12:17 19:13 71:9
**reviewed** 35:4
**reviewing** 33:6
**road** 20:4
**role** 13:4 14:24 15:4,19 16:16
**rolled** 21:7
**rollover** 53:13,14 56:19
**room** 11:6,8,10 44:22, 23 58:12,14,16,22 72:1 73:18
**rotate** 64:9
**roughly** 9:14 11:4 20:19 42:10
**rules** 8:13 10:7

**S**

**s-u-n-g** 9:3
**safe** 27:3 58:9
**sample** 40:4
**San** 7:1,7,12 12:24 49:25 50:5,25 65:4 75:21
**Satisfied** 51:10
**satisfying** 28:22
**scenario** 54:15
**scene** 13:8,10,21,23 14:25 15:7,13 16:11 17:2,13 18:24 27:11 32:4 36:2,4,7
**schizophrenia** 14:15
**school** 8:19
**Schuck** 7:6 13:22 17:4, 14 25:11 49:2 50:1,5 51:13 57:1,16 59:25 75:21
**Schuck's** 20:16
**scratch** 12:20
**screen** 41:17,25

**SDPD** 13:9 14:4 61:12
**sealed** 45:18 46:2
**seat** 36:1 38:4,10 55:18
**sense** 11:11 18:15 24:3
**sentences** 10:9
**separately** 37:12
**sergeant** 37:7 51:10
**series** 71:12
**service** 13:15 15:1
**set** 65:9
**severity** 53:10
**shaking** 31:15,18
**She'll** 7:25
**shift** 37:22 48:7 51:16, 17 54:17 60:12
**shoes** 56:15
**short** 58:17
**shortly** 7:25 15:17
**show** 26:19 29:18
**showed** 23:13 69:25
**showing** 26:20
**shows** 41:9
**sick** 9:23
**side** 22:13
**sides** 46:3
**sign** 45:17,24 46:2
**signs** 22:25 25:21,25 26:4 69:18
**similar** 75:7
**single** 65:6
**sit** 21:20 48:25 52:17
**sitting** 11:3 18:25 21:14,18
**situation** 62:6,18 63:14
**skip** 41:5 42:7
**sleep** 22:21 33:12
**sleeping** 22:19
**slightly** 20:12
**slow** 43:18
**slurring** 20:8 23:2
**sobriety** 25:19,22 26:12 27:23 28:6,18 30:21 32:6,10,11,17 35:6,16,18 41:9 55:20 69:15
**soft-spoken** 12:7 20:3
**sole** 37:13
**solo** 58:13
**someone's** 36:24 49:22 73:6
**sort** 8:12 10:7,8,17 15:18 16:13 18:8,10,19 20:1 23:16 25:21 31:10 32:25 47:20 58:11 61:9 70:13
**Sounds** 11:14
**south** 21:16
**Southern** 7:9
**space** 9:3 72:2 73:22
**speak** 12:8 16:20 51:22
**speaking** 14:20 17:2 27:19 40:9 69:2 70:25
**specific** 55:3 60:8
**specifically** 17:24 33:4 35:1 53:21 65:17 73:16, 19
**speculate** 11:1
**speculating** 11:9
**speculation** 10:24 55:12
**speech** 23:2
**spell** 9:1 49:9
**spoke** 16:9 32:4 38:21, 24 39:4,21 40:15
**stabbing** 13:16
**staff** 52:14,19,20,22 53:1 59:10 62:1
**stamp** 42:9 61:23
**stand** 21:20 33:10 58:8, 10,12,14
**standard** 45:7
**standardized** 30:22 31:24 32:25
**standing** 31:20
**stare** 19:2 25:17 30:17 39:8,9 56:2
**staring** 26:8
**start** 17:11 26:4 32:1,10 38:1
**started** 32:11
**starting** 26:13 48:2
**state** 7:17 22:18 23:23 24:11 39:4,10 55:24
**stated** 21:6
**statement** 52:10,13 54:1 68:12 69:6
**statements** 16:10 27:19
**States** 7:8
**station** 36:16,18,19 37:23 41:11 48:14,20 55:25 73:13,17,20
**status** 62:25 63:5 73:6
**stay** 9:23 62:12 70:24
**stays** 46:12
**Steno** 7:14,15
**stepping** 7:25
**Steve** 7:22
**sticks** 47:8
**stop** 38:19
**stopping** 10:3
**stops** 13:19
**stored** 45:13
**straight** 34:14 36:16
**street** 7:12 20:23
**strike** 18:4
**stuff** 13:17
**submit** 51:9
**subpoenaed** 46:19
**substance** 23:1,7,14 24:13 25:24 29:17 35:20 44:6,8 55:1,5 69:12 70:14
**suffered** 14:9
**suffering** 14:13 23:10
**sufficient** 55:9
**Suite** 7:12
**summary** 75:5
**super** 50:25
**supervising** 13:4 15:19
**supervisor** 15:22
**supply** 62:1
**supposed** 39:19 52:13 54:4 64:10
**surf** 35:2
**surfing** 34:19,22 35:2
**suspect** 16:15 30:25
**suspected** 54:24,25
**suspicion** 56:10
**swaying** 31:21
**swear** 8:2
**sworn** 8:3,6
**symptom** 25:16
**symptoms** 23:13,24 24:5 44:7
**synched** 75:11,15

## T

**T-H-E-N** 9:3
**table** 11:3,6,8,10
**taking** 7:11 9:23 44:20 52:23 54:18 68:11
**talk** 47:14 56:25
**talked** 22:18 27:16 47:9 72:18
**talking** 22:24 24:6 31:15 47:19
**tampering** 45:10,11

**Tati** 40:10 42:19,20 43:5,8,11 44:3

**team** 38:21

**tech** 44:24 45:1

**technically** 58:14

**technician** 45:15

**Tellam** 17:7,10,13,17, 22

**Tellam's** 40:25

**telling** 66:15

**tells** 18:11

**temperature** 38:6

**ten** 9:14 25:2,4

**term** 10:8 22:1 63:1

**terms** 26:25 35:17

**test** 23:3,16 25:19 26:13 30:21 32:10,11, 17 35:6,18 69:15

**testified** 8:6 9:11

**testifying** 9:15

**testimony** 9:21 10:3 32:19

**testing** 55:19

**tests** 25:22 26:2,12,18, 20 27:23,24 28:5,6,12, 19,20,22 32:6 35:16 41:9 55:20

**That'd** 9:2

**themself** 66:5

**thing** 18:7 39:15 56:2

**things** 9:24 12:16 16:1, 7 39:10

**thinking** 22:23

**thought** 22:20 32:12,16

**tightness** 35:25

**time** 13:3,5,18 14:3,6,8 17:14,20,23 19:10 23:13 31:10,15,20 32:3, 8,9 34:1,2,5,7,10,12 35:1,8 36:5,12 38:2,6 39:4,5,11 40:11,15 42:8,17 43:19 47:13 48:1,11 51:12,15 57:9, 12 60:10 65:6,10 68:2,5 72:19 75:22

**times** 9:13 26:11,21 31:6,13

**today** 9:18,21 10:3 19:14 33:15 48:25

**told** 26:16 51:25 53:8, 22 56:6,15,17

**top** 22:14 32:23

**topic** 70:24

**total** 28:20

**totality** 24:10

**totally** 18:13

**touch** 66:12

**traffic** 13:18,19

**trained** 27:9,12 59:3

**training** 24:5 25:14 26:23 27:1 29:15 55:6,9 59:6

**transcript** 75:11,16

**translate** 39:16

**transport** 36:3,14,21 48:3,5,14 51:6,13,23 52:12 56:16,20 57:15 58:15,17 61:7 63:12

**transported** 49:1,14 57:19 60:7 63:4 72:19 73:25

**transporting** 49:18,21 50:7,20 69:4

**treatment** 62:14,19

**trouble** 26:9

**truck** 20:21

**true** 24:4 25:6 69:5

**tube** 46:3

**turn** 67:5

**turned** 66:24

**turning** 70:23

**types** 25:8

**typical** 59:20

**typically** 46:15 58:11, 22 67:9

## U

**uh-huh** 39:12,16

**ultimately** 40:8 44:1,18

**unable** 20:1 28:2,3

**understand** 26:15

**understanding** 12:13 17:9,12 26:10 27:12 29:12 31:10 44:2,12 61:1 63:24 64:16,19,24 67:15 72:23,25

**understood** 26:18

**undoubtedly** 70:4

**unit** 48:3

**United** 7:8

**units** 48:2

**unknown** 41:7

**urinate** 66:5,9

**urinated** 66:16 72:19

## V

**Vague** 25:12

**vehicle** 13:17 20:13,22, 23 21:15 26:5 36:1 38:4 40:10 60:10 61:6

**venued** 7:8

**verbally** 32:13 71:5

**versus** 7:6 23:18 25:2,4 75:21

**vials** 45:20,22,24,25 46:20

**video** 42:13,15 43:13 75:11,14,15

**videos** 42:5

**view** 42:12

**visually** 22:9

**vitals** 27:15 74:5

**Volume** 75:19

## W

**wait** 10:12 64:6,8

**waiting** 43:20

**walk** 20:17,21 71:24

**walked** 26:2 62:2

**walking** 26:4

**wanted** 58:5

**watch** 11:19 36:11 37:3,5,10,12 40:18 44:24 48:2,3,9,12 51:5, 18 64:9

**watched** 11:17 40:13 42:5

**water** 46:25

**ways** 21:13

**Wednesday** 7:1

**weed** 23:17

**western** 36:18

**whatnot** 65:13 66:12

**William** 7:6 75:21

**Williams** 7:18,24 8:8,9 12:10 18:5,6 23:25 25:13 28:16 35:9,13,14 41:15,19,21 42:14 43:14 55:14 57:5,7,14 64:18 65:1 67:23 68:7 74:24 75:10,12

**window** 38:10

**windows** 38:8

**witnesses** 21:8

**witnessing** 45:9

**wobbly** 26:1

**Wong** 7:5 8:5,14,15 9:4,5 41:22 68:8 75:20

**words** 20:8 28:24,25 30:22

**work** 33:15 37:12 41:20 48:15 52:15

**working** 38:1,22 41:19 51:6 58:20

**works** 33:16

**write** 29:4,24 37:2 38:14 48:20 67:9,13 69:3

**writes** 54:2

**writing** 38:3,17,25 39:17 60:2

**written** 52:10

**wrong** 19:20

**wrote** 11:23 12:18 69:10

**Y**

**years** 13:3 14:3

**yesterday** 40:19 42:5

# EXHIBIT 3

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 4

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 5

# SAN DIEGO COUNTY SHERIFF'S DEPARTMENT MEDICAL SERVICES DIVISION

**Operations Manual**

| | | | |
|---|---|---|---|
| SUBJECT: | RECEIVING SCREENING | DATE: | 10/13/2021 |
| CATEGORY: | MEDICAL & PSYCHIATRIC SERVICES | NUMBER: | E.2.1 |
| DISSEMINATION: | MEDICAL SERVICES DIVISION | PAGE: | 1 |

RELATED SECTIONS: DSB P&P: M.9; M.39; MSD S.3
IN COMPLIANCE WITH: CCR TITLE 15 SECTIOINI 1207; NCCHC J-E-02

## PURPOSE

Describe the standard operating procedure for completing a receiving screening.

## STANDARD

Screening is performed on all inmates upon arrival at the intake facility to ensure that emergent and urgent health issues are met.

## DEFINITIONS

*Medical Clearance* – a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require sending the individual to the hospital emergency department (ED).

*Receiving Screening* – a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment.

*Medication-Assisted Treatment (MAT)* – the use of medications in combination with counseling and behavioral therapies to provide a "whole patient" approach to the treatment of substance use disorders.

## PROCEDURE

I. MEDICAL CLEARANCE

A. A registered nurse (RN) will perform a comprehensive clinical assessment at the time of booking prior to acceptance into the detention facility. Medical clearance into the detention facility is incumbent upon the individual's condition at the time of assessment.

B. The RN will not conduct the clinical assessment while an individual is inside a vehicle.

C. Individuals exhibiting signs of excited delirium, disorganization of thoughts, altered mental status and confusion will require medical and possible psychiatric evaluation prior to being accepted into the detention facility.

D. Individuals verbalizing a loss of consciousness at the time of their arrest will need to be cleared at the hospital ED prior to being accepted into the detention facility.

E. Uses of force such as Taser deployment will need to be cleared at the hospital ED prior to being accepted into the detention facility.

F. The RN will generally reject arrestees who are unable to ambulate into the detention facility on their own due to intoxication, drug influence, or other acute medical condition.

G. An individual presenting with the following vital sign readings on two or more occasions during the receiving screening clinical assessment will need to be cleared by a community hospital or medical center's ED prior to being accepted into the detention facility:

1. Sustained heart rate of (less than) < 50 beats per minute.
2. Sustained heart rate of (equal or greater than) ≥150 beats per minute.
3. Elevated systolic blood pressure of (equal or greater than) ≥180 mmHg
4. Low systolic blood pressure of (less than) <80 mmHg
5. Elevated diastolic blood pressure of (equal or greater than) ≥120 mmHg
6. Oxygen saturation of (less than) <93%

H. An individual reported to have ingested "baggies" of illicit drugs will need to be cleared at the hospital ED prior to being accepted into the detention facility.

I. A paramedic's evaluation is not a replacement for a hospital emergency department's evaluation or clearance.

II. RECEIVING SCREENING

A. The RN will ask the arresting officer (AO) a series of questions surrounding the arrest. The AO's observation and engagement are essential in obtaining pertinent history such as any statements expressed by the individual that may be indicative of an injury or risk for self-harm.

B. The clinical assessment includes but is not limited to a series of health questions, a review of available past medical history on record, vital sign measurements, observation and a physical assessment (if necessary).

C. The following physical conditions may necessitate further evaluation at the hospital ED prior to being accepted into the detention facility:

1. Trauma (motor vehicle accident, falls, altercation with head, chest or abdominal injury).
2. Obvious signs of deformity on an extremity to suggest a possible fracture.
3. Signs of bleeding, vomiting blood, bleeding from one or both ears, severe acute epistaxis.
4. Extreme drowsiness and difficult to arouse.
5. Active seizure activity or post seizure activity.
6. Difficulty breathing
7. Ingestion of foreign object.
8. Suicide attempt prior to booking with ligature marks, deep lacerations, or signs of overdose.

D. The following behaviors may necessitate further evaluation at the hospital ED or at the psychiatric hospital of San Diego County prior to being accepted into the detention facility:

1. Thought disorganization
2. Nonsensical communication
3. Altered mental status
4. Confusion
5. Psychosis

E. Individuals requiring a clinical assessment to be performed in the sally port area outside of the detention facility will need to have a booking number assigned for documentation purposes.

F. If an individual is placed in a WRAP restraint, the RN can request for the AO to loosen the restraint to a point that will allow the RN to assess the individual's mobility.

III. GATE REFUSAL (NOT FIT FOR JAIL)

A. The RN will complete the Gate Refusal Form (Appendix A) for individuals identified as needing clearance at the hospital ED prior to being accepted into the detention facility.

B. The AO will be advised to present the Gate Refusal Form to the hospital ED staff for documentation of findings & treatment rendered. The completed Gate Refusal Form is to accompany the individual upon return to the detention facility.

C. The RN will notify inmate processing division (IPD) and sworn staff of the gate refusal determination.

D. In the event an individual refuses treatment or ignores the treatment recommended by the hospital ED provider, a copy of the signed hospital's form indicating that the individual is acting against medical advice (AMA) will accompany the individual upon return to the detention facility. Receiving screening for this individual will follow the procedure for a clinically indicated assessment (CIA) in section IV.C below.

E. If an AMA form is not received, hospital ED records should be requested upon clinical assessment.

F. If AO questions a gate refusal determination, notify immediate supervisor. If needed, the immediate supervisor will contact the facility watch commander.

G. Individuals needing wheelchair accommodation will be redirected for booking to San Diego Central Jail (SDCJ) for males or Las Colinas Detention and Reentry Facility (LCDRF) for females.

IV. ACCEPTANCE INTO THE DETENTION FACILITY (FIT FOR JAIL)

A. Individuals that do not require clearance at the hospital ED will be accepted into the detention facility.

B. The RN will stamp "Medical Cleared" on the Booking Intake/Personal Property Inventory (J-15) form if there are no significant health findings noted during the clinical assessment.

C. All arrestee with mild or moderate clinical signs and symptoms noted during the screening will be identified for Nurse Assessment Protocol (NAP).

<u>The RN will:</u>

1. Place a red wrist band on identified individual
2. Staple the blue "Proceed" slip to the J-15 form
3. Notify the NAP RN
4. Notify the intake deputy
5. Schedule the individual in the electronic medical record under NAP medical encounter; indicating "PROCEED" and additional information as needed.
6. The "PROCEED" individual will be seen by the RN for assessment and evaluation no later than 2 hours from the stamp time noted on the J-15 form

D. All other Individuals identified as needing NAP that do not have a "PROCEED" slip stapled to the J-15 form, will be scheduled to see the RN as a "ROUTINE" in a timely manner not to exceed 10 hours from the time stamped on the J-15 form.

E. The facility charge nurse or designee will monitor the queue for all individuals identified as "PROCEED" to ensure evaluation no later than two hours.

F. The charge nurse or designee will utilize and initial the "PROCEEDS LOG" every two hours beginning at 0600. Example of rounds (06, 08, 10). See APPENDIX B.

G. After providing the NAP screening, the RN will remove the red wristband.

H. The RN will place a pink wrist band for "Inmate Safety Program (ISP)" on individuals at risk for self-harm based on clinical assessment findings or arrest charges and refer to the facility gatekeeper for further evaluation.

I. The RN will immediately notify sworn staff of the need for the facility gatekeeper's evaluation.

J. The facility gatekeeper will evaluate the need for ISP housing placement.

K. The pink wristband will be removed by the facility gatekeeper after the individual is cleared or removed by sworn staff after placement into ISP housing.

*NOTE: Each detention facility will detail specific processes for CIA and ISP evaluations in their respective green sheets.

L. The RN will make a referral to a qualified mental health provider (QMHP) gatekeeper for a priority evaluation prior to housing placement with one of the following conditions:
   1. Client of the Regional Center for Developmentally Disabled (RCC)
   2. History of hospitalization in a psychiatric hospital.
   3. Observed with delusional statements e.g. "I am Jesus", I know you are a CIC agent.
   4. Observed responding to internal stimuli; talking to self
   5. History of psychiatric stabilization unit (PSU) admission, state hospital admission, or ISP placement within the past year.
   6. History of in-custody suicide attempt (ISA).

M. An inventory of the individual's prescription medication (if any) will be completed by the RN and stored in the individual's property.
N. The RN will obtain a signed release of information (ROI) for outside records and medication verification as needed.
O. The RN will note all applicable patient flags including but not limited to pertinent durable medical equipment (DME), disability accommodation or necessary precautionary measures in the health record.
P. Individuals reporting to be a victim of sexual assault will be referred to the QMHP for appropriate intervention and to jail population management unit (JPMU) staff for appropriate housing. The RN will notify the facility watch commander of the reported incident. See MSD.P.18 Prison Rape Elimination Act – Inmate Sexual Abuse for additional information.
Q. Individuals enrolled in a MAT program for opioid addiction prior to incarceration will be referred to NAP for further evaluation. See MSD.A.2 Addicted Arrestee Care or SNP.H.4 Heroin/Opiate Withdrawal for additional information.
R. Advise Reentry Services Division (RSD) of the individual's MAT participation as needed.

V. <u>NURSE ASSESSMENT PROTOCOL</u>
   1. Perform a focused physical assessment based on the individual's clinical presentation.
   2. Initiate appropriate nursing assessment protocol as indicated.
   3. Schedule necessary medical chart review for medication ordering or doctor sick call for further evaluation and treatment.

# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | Case No. 3:23-CV-00785-DMS-AHG |
| | VIDEOTAPED DEPOSITION OF REGINALD BARRETTO, RN |
| | JUNE 6, 2024 |
| Plaintiffs, | 1350 Columbia Street Suite 600 San Diego, California |
| vs. | |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS Mace, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | |

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2 3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of REGINALD BARRETTO, RN

San Diego, California

June 6, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 989177

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al., | ) | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | ) | |
| vs. | ) | |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al., | ) | |
| Defendants. | ) | |

Videotaped Deposition of REGINALD BARRETTO, RN, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 3:01 p.m. and ending at 4:15 p.m., on Thursday, June 6, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

MCKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Sofia L. Rezvani, Esq.
Sofia.rezvani@sdcounty.ca.gov

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

Elijah Ochoa
STENO

seen by psychologists daily; is that right?
A. By the psychiatrist daily, yes.
Q. And then if they are there voluntarily, they are seen once a week?
A. Correct. Yes.
Q. Now, you mentioned that as a detention nurse, you also played -- you held a number of roles, right? You were an intake -- I think you mentioned you did intake, you did second-stage medical, and other assignments; is that right?
A. Correct.
Q. I want to talk to you briefly about the intake process. Can you describe for me what that process is like.
A. It's kind of -- it's been a while since I've been in intake and I know there have been changes, so I haven't been working intake in a while. But at the time or what I remember is that we asked them a few basic questions, do you have any medical issues, do you have any psychiatric issues, do you currently take any medications, are you using drugs, or anything like that, or any injuries that you may have had prior to being arrested. Those are kind of some of the questions we ask. We take a set of vital signs on -- at intake as well. And then we kind of go on with the

03:19:52 booking process after they see the nurses at intake.

03:19:56 Q. Would you say that your role as an intake nurse would be to screen new pretrial detainees for any critical medical needs that they might have?

03:20:13 A. Correct. Being the intake nurse, you want to see -- you want to see if this patient is medically stable to continue on with the booking process. If not, they either need to be medically rejected and be sent out to the hospital to get clearance prior to being booked into jail.

03:20:43 Q. And why is it important that you evaluate that someone is medically stable before they enter the facility?

03:20:51 MS. REZVANI: Objection. Vague and ambiguous.

03:20:53 Go ahead.

03:20:53 THE WITNESS: Well, jail is not a hospital. So there could be things that we may not be capable of finding as they move on to the intake process.

03:21:18 BY MS. ANGELES:

03:21:18 Q. You mentioned the jail is not a hospital, and so what -- you can correct me if I'm wrong -- but you'd say that it's important that in the beginning, you identify the needs of a pretrial detainee so that you can best provide care for a particular individual?

03:21:36 A. Yes. Correct.

03:21:37 Q. Because if their medical needs are such that the jail can't provide them, you want to know that as early as possible?
03:21:47 A. Correct.
03:21:48 Q. Because there might be things that a hospital can do that the jail can't do?
03:21:52 A. Yes.
03:21:53 Q. And if you are concerned that an individual is -- I think, as you described, not medically stable, you can reject them and send them to the hospital?
03:22:07 A. Correct. So we would -- the arresting officer would recommend that this patient doesn't look medically stable, can you tell the arresting officer that this person needs medical clearance at an ER or a hospital prior to being booked in jail.
03:22:31 Q. And I'm sorry. I don't know if I caught that correctly. Did you say that that recommendation would come from the officer or the intake nurse?
03:22:38 A. Can you say the question again.
03:22:44 Q. I thought I heard you say that the recommendation that someone go to the jail comes from the arresting officer, but I might have misheard you. I just wanted to --
03:22:55 MS. REZVANI: Objection. Do you mean to the jail or to the hospital?

MS. ANGELES: To the hospital.
THE WITNESS: Intake nurse would recommend that the patient be sent to the hospital first prior to coming back to being booked in jail.
BY MS. ANGELES:
Q. That clears it up. I just wanted to clear it up. So if an officer brings you an individual who was just arrested and you're working as an intake nurse and you don't believe they are medically stable, you would inform the arresting officer that they can't be cleared for jail and must be taken to the ER?
A. Correct. Yes.
Q. Okay. Is that what's known as a gate refusal?
A. Correct.
Q. Okay. Can you describe for me what happens when someone returns after coming back from the hospital, and say they were gate refused, they go to the ER and then they come back, what kind of process, as an intake nurse, would you do in that hypothetical?
MS. REZVANI: Objection. Vague and ambiguous.
Go ahead.
THE WITNESS: They'd come back and we'd receive the paperwork from that hospital, the intake nurse would look through that paperwork and look to see if

03:24:18 this person was medically -- usually the hospital paperwork will say "fit for jail" or "medically cleared" or they address that specific thing that they were initially rejected in the first place.

BY MS. ANGELES:

Q. And you mentioned that the intake nurse would receive paperwork from the hospital. Where -- how are they provided that paperwork?

A. Usually that would be from the arresting officer -- come from the arresting officer. Sorry.

Q. So was it the arresting officer's responsibility to obtain the hospital records and bring them along with the detainee?

A. Correct. Yes.

Q. What happens if an arresting officer arrives at your facility with no paperwork, what do you do in that instance?

MS. REZVANI: Objection. Incomplete hypothetical.

Go ahead.

THE WITNESS: We can call the -- call the hospital that they came from, ask for the records.

BY MS. ANGELES:

Q. Would you proceed to then clear them for jail as well or would you wait for those records to come?

A. I would probably wait for those records or

03:25:45 speak to somebody at the ER where he was at and try to get more information about what happened if there wasn't any paperwork that came.

03:25:58 Q. And why would you -- why do you feel like those steps would be important to screening someone during intake?

03:26:08 MS. REZVANI: Objection. Vague, ambiguous, calls for expert testimony.

03:26:11 Go ahead.

03:26:12 THE WITNESS: I'd need further -- I'd want to know further information that was done at the ER, whether it's tests that were done, any medical procedures that were done, yeah.

03:26:30 BY MS. ANGELES:

03:26:31 Q. And is it fair to say that that information would be important because if there's any follow-up care or any medication or treatment that needs to occur, you would want to know that so you could include that in their intake screening?

03:26:44 A. Correct. Yes.

03:26:45 Q. If an individual refuses care at the emergency room after being gate refused and then they come back to intake, what steps do you then take as the intake nurse who is trying to receive this individual?

03:27:14 MS. REZVANI: Objection. Vague and ambiguous.

03:27:16 Go ahead.

03:27:17 THE WITNESS: I would call the front desk, the nurse that's on -- that's working -- or the charge nurse that's working and get further advisement on what to do to move forward.

03:27:31 BY MS. ANGELES:

03:27:33 Q. So before proceeding with the screening of this individual or clearing somebody for court, you would -- sorry -- clearing somebody for jail -- excuse me -- you would reach out to the charge nurse for additional guidance?

03:27:49 A. Correct.

03:27:49 Q. And why do you feel -- why would you do that?

03:27:53 A. Well, if -- I'd want to make sure we -- before accepting this person who was just at jail and -- I'd want to make sure that he was medically okay. I mean --

03:28:21 Q. Is there anything else that you might do in this situation?

03:28:24 A. If there was providers on site, we could call the clinic to have this person get looked at.

03:28:37 Q. And when you say "providers," do you mean like a nurse or a doctor or who do you mean?

03:28:44 A. A nurse practitioner or a doctor.

03:28:55 Q. Can you tell me -- I think you also explained

03:29:00 earlier that you, as -- in your role as a detention
03:29:07 nurse, also participated in second -- the second-stage
03:29:13 medical evaluations; is that right?
03:29:15 A. Yes.
03:29:16 Q. Can you describe that process for me.
03:29:18 A. So on second stage, you have -- you have
03:29:27 patients that come in from intake that need like
03:29:34 further medical care or something to follow up from the
03:29:36 intake -- from the intake process. Usually that's
03:29:44 indicated on the little -- the appointment that is made
03:29:50 in the program, in TechCare, which is the program that
03:29:53 we use that put out appointments, and with a little bit
03:29:59 of detail of why this person needs to be seen on the
03:30:03 second stage.
03:30:04 Q. And what are some reasons why an intake nurse
03:30:08 might refer someone to a second-stage medical
03:30:13 evaluation?
03:30:14 A. Like an example?
03:30:15 Q. Yes.
03:30:16 A. One example is that he's diabetic, so he may
03:30:27 need his blood sugar rechecked -- sorry. Going back,
03:30:33 if at intake the blood sugar was high for a diabetic
03:30:38 and it needs to be checked, that's one example, or
03:30:42 abnormal vital signs at intake that need to be
03:30:46 rechecked.

03:30:50 Q. What would be an abnormal vital sign -- if you were an intake nurse, what would be an abnormal vital sign that would cause you to refer someone to second-stage medical?

03:31:05 MS. REZVANI: Objection. Vague and ambiguous, calls for expert testimony.

03:31:09 Go ahead.

03:31:10 THE WITNESS: Elevated blood pressure, and, like I said, blood sugar could be high.

03:31:25 BY MS. ANGELES:

03:31:25 Q. Can you explain the assessment -- the difference in the level of assessment that is made at intake versus the level of medical assessment that is made during a second-stage medical evaluation?

03:31:43 A. Sure. So on second stage it's -- your second stage is like a little bit more in depth, I guess you can say. They -- also they are rechecking whatever was abnormal or what needed further assessment at intake. And the -- you also have access because the third floor is where the doctors are, and you can call up to the clinic and possibly have this patient be looked at for -- by the provider, if needed. We also have medications on the second floor that can be administered as opposed to intake.

03:32:40 Q. You mentioned earlier that as part of the

intake process, you ask individuals about any substance abuse. Can you describe for me some of the questions that you ask during the intake process to evaluate whether someone -- to evaluate any substance abuse concerns?

A. Yeah. Usually ask directly, "Have you used any substances or are you withdrawing from anything?" There's also a question that: Did you ingest anything as far as drugs?

Q. Is there anything else that you do besides the questions that you mentioned to evaluate whether someone is suffering from issues with substance abuse or withdraw?

MS. REZVANI: Objection. Vague and ambiguous.

THE WITNESS: Honestly, I can't remember some of the questions we ask at intake. Can you ask the question one more time?

BY MS. ANGELES:

Q. Sure. And I can actually ask you something more specific.

Are you trained to identify symptoms of withdraw at intake?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: Yes.

BY MS. ANGELES:

Q. And what are those?

A. Symptoms of withdrawal? It could be confused, also diaphoretic if they are withdrawing from substances, abnormal vital signs as far as elevated blood pressure or elevated heart rate, irritable, restless, fatigue.

Q. And why is it important to identify at intake whether someone is having concerns with substance abuse or withdraw?

A. Because it could get worse, like their symptoms could worsen during the course of withdrawing from whatever substances or alcohol.

Q. And when you say "worse," do you mean like it could lead to a serious medical emergency or possibly death?

A. Possibly, yes.

Q. You also mentioned -- strike that.

If you identify someone who is exhibiting symptoms of withdraw or substance abuse, how would that impact your initial intake screening?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: He would be proceeded be up to the second floor for further evaluation or quicker

evaluation.

BY MS. ANGELES:

Q. And when you use the word "proceed," does that indicate that you're referring him to a second-stage medical evaluation?

A. Correct. So like a medical proceed for further evaluation.

Q. If someone isn't identified as a medical proceed, do they ever participate in a second-stage medical evaluation?

A. I'm sorry. I'm trying to -- because at the time there were patients that didn't go through the second stage either because they were healthy or they didn't take any medications, there was no concern. COVID kind of threw it off where everybody actually had to go through there to get swabbed or -- so usually that was done on the second floor.

So to answer the question, no, if they were -- if they didn't have any medical concerns, healthy, not taking any medications, no medical issues, then, no, they weren't -- did not have to be seen on the second floor.

Q. You mentioned that during COVID things changed a little bit and individuals were sent up to be swabbed. Would you consider that a second-stage

be undergoing a mental health crisis?

A. I guess the training from when I first started, orientation, going through the questions and asking those questions and identifying what -- what to look for subjectively and objectively.

Q. So what were the objective factors that you were trained as part of your orientation to look at?

A. I guess the behavior, type of behavior is the -- from intake, is he restless, is he anxious; objective finding as far as withdrawing, being like are they diaphoretic, can you see them actually sweating or having tremors related to withdrawals, are some of the objective.

Q. So if you suspect that someone is in need of a mental health evaluation at intake, what steps do you take at intake for follow-up?

A. I would make an appointment for the QMHP to evaluate. So you can make an appointment on the program for evaluation, adding like a brief sentence about what -- the reason for follow-up.

Q. Is that another reason why you might refer someone to second-stage medical?

A. Yes.

Q. And when you refer someone to a QMHP appointment, how quickly do those appointments

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 18, 2024

Sheri L. Somers
CLR, CSR No. 9734

# EXHIBIT 7

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 1:52:16 PM PDT

## MEDICAL SERVICES - Completed by: Manuel Nozawa RN on 3/10/2022 4:56:42 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | | | | |

☐ Refused

☑ Patient is willing to sign, but is unable to sign

English

**MEDICAL SERVICES**

**Inmates have the right to access medical, dental, and psychiatric care:**

**Emergency: Contact the nearest corrections officer and he/she will call for a nurse.**

**Non-emergency: You may request a Medical/Dental Request Form from the nurse at medication pass. These forms are to request medical assistance and must be turned into the nurse during medication pass for triage (review) of the complaint.**

**Medical/Dental Request Forms: The forms are available from the nurse twice daily. The sick call nurse will triage (review) the forms. The sick call/charge nurse, who will assess your symptoms within 24-72 hours after your form has been picked up, will see you. If he/she cannot address your symptoms or complaints through nursing protocols, you will be referred to the next available physician or physician assistant sick call.**

**Medical Request/Grievance Forms: If you are not satisfied with any aspect of your health care, you have the right to request information or send a grievance to the contracted Medical Services provider, Health Services Administrator, for an investigation and response to your complaint.**

**Medical/Dental Access and Medication Fee Policy Statement:**

**No inmate will be refused medical treatment because of inability to pay. A Medical/Dental Access and Medication Fee may be charged to the Inmate's Trust Account for medical care provided. For non-chronic care requests, the medical access fee process begins with the sick call/charge nurse assessment of the problem. There is no charge for referral to the physician or follow-up care; however, if medication is prescribed or renewed by the sick call/charge nurse or physician, there will be an additional medication fee assessed. If an inmate requests emergency care that is determined not to be an emergency condition, that inmate may be charged a Medical Access Fee for calling a false emergency. The determination of the condition will be made by medical/nursing staff and the inmate will be informed of the assessed charge.**

**Any complaints regarding the Medical/Dental Access and/or the Medication Fee policies should be addressed to Jail Administration.**

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 1:53:37 PM PDT

## GATE REFUSAL - Completed by: Manuel Nozawa RN on 3/10/2022 4:57:41 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | | | | |

**One or more medical or psychiatric conditions have been identified during the intake screening process that raise potential concerns about the patient's medical condition, and the ability to safely provide for the health and welfare of the patient within a correctional environment. Due to the functional restrictions of an outpatient primary care facility, we request further medical review and assessment for the following observed medical conditions**

Situation/Background:

Involved in Motor vehicular accident. Airbag deployed. SDCJ asking for medical clearance to continue Incarceration

### Atypical values

- ☐ Neurologic condition (Altered mental status, affected cognition, r/o head injury or neurologic deficit)
- ☐ Elevated blood pressure (R/O illicit substances, coarctation, stroke, s/s of end organ system damage)
- ☐ Low blood pressure (concern for distributive shock [sepsis, anaphylaxis, adrenal crisis, etc.])

- ☐ Tachycardia/bradycardia
- ☐ Poor oxygen saturation
- ☐ Other concerns:
- ☐ Elevated blood glucose (concern for DKA, HHS)

Other:

☐ **Patient Refused**

| **BP** | **Temp** | **Pulse** | **Resp** | **SaO2** | **BS** | **Pain** | **Height(ft)** |
|---|---|---|---|---|---|---|---|
| / | **Height(in)** | **Weight** | **BMI** | **MAP** | | | |
| | | | NA | | | | |

### Emergency Room

Facility: Provider:
Clinical findings: Discharge diagnosis:

### Discharge summary/Narrative:

☐ Admitted ☐ AMA ☐ Medically/Psychiatrically cleared

Recommendation:

# BOOKING #

# 22709797

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:53 PM PDT

**AUTHORIZATION FOR ROI - ENGLISH** - Completed by: Jameelyn Barrera RN on 3/10/2022 9:15:04 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☑ Not Indicated ☐ Refused

**I authorize (releasing party):**

Name

Address

City/State

Phone

Fax

**To disclose to (receiving party):**

Name

Address

City/State

Phone

Fax

**By paper, oral, and electronic means any and all of my medical records listed below. Mental Health, Alcohol/Drug & HIV information will not be released unless specifically requested.**

☐ All MEDICAL (HIV, Mental, Alcohol) ☐ HIV test results only ☐ MENTAL only
☐ MEDICAL only ☐ Alcohol/Drug abuse only ☐ Other

**PURPOSE for release:**

☐ Continuity of care
☐ Other:

**NOTICE: I understand that the medical information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and no longer protected by federal privacy regulations (HIPAA). I further understand that the Sheriff's Department may not condition treatment on whether I sign this authorization. California law prohibits the person**

**receiving my health information from making further disclosure of it unless another authorization for such disclosure is obtained or unless such disclosure is specifically required or permitted by law.**

EXPIRATION: This authorization will expire automatically in 3 months or on:

**REVOCATION: I may revoke this authorization at any time by notifying the issuing party in writing.**

**COPY: I authorize the use of a facsimile or photocopy of this form. I may receive a copy of this authorization.**

Initial here for copy:

Copy given:

☐ Yes

☐ No

Social Security Number:

AKA:

CDC:

☐ Patient is willing to sign, but is unable to sign.

Patient's Signature (or Other Representative)

**If not signed by patient, specify basis for authority to sign:**

○ Attorney-In-Fact For Health Care (Attach a copy to this authorization)

○ Other (Attach a copy to this authorization):

Attachments:

No Attachments

**Instructions For Completing Release of Information Authorization Form**

**Please read these instructions carefully when completing the Authorization Form. Sheriff's Health Information Management may not be able to disclose your protected health information without a completed authorization form.**

**1) Provide the name and address of the healthcare provider where you want the records to go.**

**Leave blank any fields that are unknown.**

**2) Check "ALL" boxes if you want everything sent. If not, check boxes corresponding to records**

**you want to be sent.**

**3) Check "Continuity of Care" if you are asking that the records be forwarded for purposes of**

continuity of care. If it is for a different reason, please explain.

4) Check "YES" if you would like a copy of this form.

5) Fill in completely the following:

a. Social Security

b. Any AKA or other names

c. Date of Birth (DOB)

d. Signature

e. Today's date

6) Check the appropriate box if you are signing on behalf of someone else. If you are filling the form out for yourself, you don't need to check the box.

Who May Authorize the Request?

Only the patient, or someone legally authorized to act on the patient's behalf (such as an Attorney-inFact or Conservator) may authorize the release of Personal Health Information. Supporting documentation (Durable Power of Attorney for Healthcare or court order reflecting appointment of conservator) must be provided.

Expiration:

This authorization will expire automatically in three (3) months from the date of the signature. The authorization may be revoked at any time with written notification.

Processing Fees:

There is no charge for records sent for continuity of care, but records sent to inmates and others are subject to a processing fee of $15.00, plus $0.10 per page for every page after the first 10 pages, in order to cover clerical costs as well any associated fees with copying. In addition, the cost for film/radiology images to be scanned to a CD is $25.00.

Note: I understand that I have a right to receive the copy of this authorization upon a written request.

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:54 PM PDT

## AUTHORIZATION FOR ROI - SPANISH - Completed by: Jameelyn Barrera RN on 3/10/2022 9:15:12 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☑ Not Indicated ☐ Refused

### Autorizo (parte que entrega):

Nombre y apellido(s)

Dirección

Ciudad/Estado

Teléfono

Fax

### la entrega a (parte que recibe):

Nombre y apellido(s)

Dirección

Ciudad/Estado

Teléfono

Fax

**Se entiende por papel, medio oral y medio electrónico, de todos y cualquiera de mis registros médicos que se incluyen a continuación. La información sobre Salud Mental, Alcohol/Drogas y VIH no se entregará a menos que se solicite específicamente.**

☐ Toda la información MÉDICA (VIH, Salud Mental y Alcohol)
☐ Sólo los resultados de pruebas de VIH
☐ Sólo MÉDICA
☐ Sólo MENTAL
☐ Sólo de abuso de Alcohol/Drogas
☐ Otra

**PROPÓSITO de la entrega:**

- ☐ Continuación de la atención
- ☐ Otro:

**AVISO: Comprendo que la información médica utilizada o entregada en virtud de esta autorización puede estar sujeta a nueva entrega por parte de quien la recibe y ya no estará protegida por las reglamentaciones federales sobre privacidad (HIPAA), (Health Insurance Portability and Accountability Act [Ley de Transferencia y Responsabilidad del Seguro Médico]). Asimismo, comprendo que el Departamento del Sheriff no puede condicionar la atención a si yo firmo esta autorización. Las leyes de California prohíben que la persona que recibe la información sobre mi salud la entregue nuevamente a menos que se obtenga otra autorización para dicha entrega, o a menos que dicha entrega se requiera o permita específicamente por ley.**

VENCIMIENTO: Esta autorización vencerá automáticamente en 3 meses o en:

**REVOCACIÓN: Puedo revocar esta autorización en cualquier momento por medio de notificación escrita a la parte que la emite.**

**COPIA: Autorizo el uso de un facsímil o fotocopia de este formulario. Puedo recibir una copia de esta autorización**

Ponga sus iniciales aquí para recibir una copia:

Copia entregada:

- ☐ Yes
- ☐ No

Número de Seguro Social

Pseudónimo

Número de CDC (Centros para el Control de Enfermedades)

- ☐ El paciente está dispuesto a firmar, pero no puede firmar.

Firma del paciente (u otro Representante)

**Si no está firmado por el paciente, especifique en qué se basa la autorización para firmar:**

- ○ Apoderado para la Atención de la Salud (Adjunte una copia de esta autorización)
- ○ Otro (Adjunte una copia de esta autorización):

Attachments:

No Attachments

**Instrucciones para completar el Formulario de Autorización de Entrega de Información**

**Por favor, lea estas instrucciones con atención cuando complete el Formulario de Autorización. La Administración de Información de la Salud del Sheriff tal vez no podrá entregar la información protegida de su salud sin un formulario de autorización completado.**

**1) Incluya el nombre y dirección del proveedor de atención de la salud adonde quiere que se envíen los**

registros. Deje en blanco los espacios que no sepa completar

2) Marque los cuadros que dicen “TODO” si quiere que se envíe todo. De lo contrario, marque los cuadros que correspondan a los registros que quiere que se envíen.

3) Marque “Continuación de la Atención” (“Continuity of Care”) si está pidiendo que se envíen los registros para fines relacionados con la continuación de la atención. Si es por una razón diferente, explique, por favor.

4) Marque “SÍ” si le gustaría recibir una copia de este formulario.

5) Complete toda la información para los siguientes:

a. Seguro Social

b. Todo pseudónimo u otros nombres

c. Fecha de nacimiento (DOB)

d. Firma

e. Fecha de hoy

6) Marque el cuadro correspondiente si está firmando en nombre de otra persona. Si está llenando este formulario para usted mismo, no es necesario que marque el cuadro.

¿Quién puede autorizar la solicitud?

Sólo el paciente u otra persona autorizada legalmente a actuar en nombre del paciente (tal como un Apoderado o Curador) pueden autorizar la entrega de Información Personal de la Salud. Se deben entregar documentos acreditativos (Poder Duradero para la Atención de la Salud u orden judicial que indique el nombramiento de un curador).

Vencimiento:

Esta autorización vencerá automáticamente a los tres (3) meses de la fecha de firma. La autorización puede ser revocada en cualquier momento por medio de notificación escrita.

Cargos administrativos:

No hay cargo por el envío de registros para la continuación de la atención, pero los registros enviados a reclusos y a otras personas está sujeta a un cargo administrativo de $15.00, más $0.10 por página por cada página después de las 10 primeras páginas, con el fin de cubrir gastos administrativos y otros costos relacionados con el copiado. Además, el costo por películas/imágenes de radiología que se deben transferir a un CD es de $25.00.

Nota: Comprendo que tengo derecho a recibir la copia de esta autorización cuando lo solicite por escrito.

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:54 PM PDT

## MEDICAL CLEARANCE - Completed by: Jameelyn Barrera RN on 3/10/2022 9:21:00 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| 144 / 94 | 97.5 | 118 | 18 | 100 | na | na | 6 |
| **Height(in)** | **Weight** | **BMI** | **MAP** | | | | |
| 2 | 131 | 16.8 | 110.67 | | | | |

### Does the screener observe, or is the inmate demonstrating any of the following?

☐ In need of Emergency Medical Treatment due to injury, excessive bleeding, extreme pain, or unconsciousness?

Describe:

☐ Hallucinating, delusional, nonsensical, unresponsive, confused, paranoid, altered mental status, or inappropriate conduct?

Describe:

☐ Intoxicated, in withdrawal, slurred speech, unsteady gait, stupor, tremulous, sweating, anxious, abnormal breathing, or hyperventilating?

Describe:

☐ Voicing current, or very recent, suicidal thoughts?

Describe:

☐ Disoriented to person, place, time, and/or situation?

Describe:

☐ Head injuries or fainting/passing out in the last 72 hours

### Please provide details of injury and/or symptoms below

Prior to your arrest, did you swallow or hide any drugs in any body cavity?

☐ Yes

- [x] No
- [ ] No Response

Fit to Continue Booking Process?

- [x] Yes
- [ ] No

- [ ] Rec To ISP - Immediate
- [ ] Rec To ISP – Post Screen
- [ ] Rec To Sobering Cell - Immediate
- [ ] Rec To Sobering Cell – Post Screen
- [ ] Gate refusal

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:55 PM PDT

## RECEIVING SCREENING - Completed by: Jameelyn Barrera RN on 3/10/2022 9:25:32 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☑ Patient is willing to sign, but unable to sign

☐ Refused

Current Allergies

No Known Drug Allergy

*****************************************************************************************************************

**Screeners: All questions in this form must be addressed. For questions with a single checkbox, by leaving the checkbox unselected, you are documenting your conclusion that all parameters of the question are false. By selecting the checkbox, you are acknowledging a positive response to the item and further documentation must be provided in the corresponding questions and text boxes.**

*****************************************************************************************************************

**ARRESTING OFFICER QUESTIONS--Select and Document all that apply**

---

Arresting Agency? SDPD - SAN DIEGO POLICE DEPARTMENT

Officer's Name?

Wong

Officer's Badge #?

7277

Is the attending officer aware of any Illness or Injuries?

☐ Yes

☑ No

Is the attending officer aware of any Current/Recent Suicidal Ideation?

☐ Yes

☑ No

Is the attending officer aware of any signs that the patient is under the influence of Drugs or Alcohol?

- [ ] Yes
- [x] No

Is the attending officer aware of any Combative, Assaultive or Extremely Hostile Behavior?

- [ ] Yes
- [x] No

Is the attending officer aware of any Treatment by Medical Personnel in the Field?

- [ ] Yes
- [x] No

Was a PERT Evaluation performed surrounding the arrest?

- [ ] Yes
- [x] No

Do you have any additional information to help us care for the patient's health and safety?

- [ ] Yes
- [x] No

During the initial call, was there any indication of a mental health concern?

- [ ] Yes
- [x] No
- [ ] NA

## GENDER IDENTITY–Select and Document all that apply

Do You Identify as Transgender?

- [ ] Yes
- [x] No

- [ ] Transgender - Male Gender
- [ ] Transgender - Female
- [ ] Transgender - Non-Binary

## CHRONIC CONDITIONS–Select and Document all that apply

### Neurological

- [ ] Seizures

### Respiratory

- [ ] Asthma

### Cardiovascular

☐ Hyperlipidemia ☐ Hypertension

### Endocrine

☐ Diabetes

### Infectious Disease

☐ HIV ☐ Tuberculosis

### Behavioral Health Chronic Care

☐ Mood Disorders ☐ Psychotic Disorders

### Hematology/Oncology

☐ Dialysis

**If the item below is checked, the patient has a pending TB workup from an incarceration within the last 6 months. This patient will be added to the TB Workup queue in Admissions/Discharge, and a Medical Chart Review sick call will be scheduled.**

☐ TB Workup

☐ Other

### GENERAL MEDICAL ASSESSMENTS–Select and Document all that apply

☐ Current medications or treatments

Current Medications:

☐ Yes

☑ No

| Medication | Strength | Filling Pharmacy | Address | Phone Number | Frequency | Last Dose | Last Fill Date |
|---|---|---|---|---|---|---|---|

☑ Past medical or psychiatric hospitalizations?

### List location, time and reason for each

UCSD for MVA clearance 3/10/11- pt refused

☐ Dental issues requiring Dentist Sick Call appointment

### Describe

Does the patient have any active infections or contagious illnesses?

- [ ] Yes
- [x] No
- [ ] No Response

- [ ] General-fever, lethargy, weight loss, loss of appetite, night sweats
- [ ] Skin-Lesions, needle marks, abscesses, bruises, rash, jaundice, lice, trauma, scars, tattos
- [ ] Pulmonary-Persistent cough, coughing up blood

Have you traveled outside of the United States in the past weeks or months?

- [ ] Yes
- [x] No

Does the inmate have issues with mobility (Cane, Wheelchair, Prosthetics, Crutches, Splints)?

- [ ] Yes
- [x] No
- [ ] No Response

- [ ] Crutches
- [ ] Cane
- [ ] Wheelchair
- [ ] Prosthetics

Does the individual have other limitations like hearing, visual, communication?

- [ ] Yes
- [x] No
- [ ] No Response

- [ ] Hearing (Category ADM)
- [ ] Visual (Category ADM)
- [ ] Communications (Category ADM)

Do you have any other medical conditions or problems?

- [ ] Yes
- [x] No
- [ ] No Response

**MENTAL HEALTH SCREENING–Select and Document all that apply**

Is the patient a state hospital returnee?

- [ ] Yes
- [x] No

Was the patient evaluated at the EPU in conjunction with this arrest?

- [ ] Yes
- [x] No

## Mental Health History

Are you a client of the regional center for the developmentally disabled, or have you been in special educational classes in school?

- [ ] Yes
- [x] No
- [ ] No Response

- [ ] PSU
- [ ] In Custody Suicide Attempt
- [ ] History of ISP
- [ ] History of JBCT
- [ ] State Hospital Returnee

Have you ever been a victim of sexual assault while incarcerated or in the community?

- [ ] Yes
- [x] No
- [ ] No Response

## Columbia-Suicide Severity Rating Scale

1) Have you wished you were dead or wished you could go to sleep and not wake up?

- [ ] Yes
- [x] No

2) Have you had any actual thoughts of killing yourself?

- [ ] Yes
- [x] No

3) Have you been thinking about how you might do this?

- [ ] Yes
- [ ] No

4) Have you had these thoughts and had some intention of acting on them?

- [ ] Yes
- [ ] No

5) Have you started to work out or worked out the details of how to kill yourself? Do you intend to carry out this plan?

- [ ] Yes
- [ ] No

6) Have you ever done anything, started to do anything, or prepared to do anything to end your life?

- [ ] Yes
- [x] No

## How long ago did you do any of these?

- ○ Over a year ago?
- ○ Between three months and a year ago?
- ○ Within the last three months?

---

## Additional Suicide Risk Questions

Have you recently experienced a significant loss (relationship, death of a family member/close friend, job, etc.)?

- [ ] Yes
- [x] No
- [ ] No Response

Has a family member or close friend ever attempted or committed suicide?

- [ ] Yes
- [x] No
- [ ] No Response

Do you feel there is nothing to look forward to in the immediate future (inmate expressing helplessness and/or hopelessness)?

- [ ] Yes
- [x] No
- [ ] No Response

## SUBSTANCE USE ASSESSMENTS--Select and Document all that apply

---

History or risk of alcohol or drug withdrawal?

- [ ] Yes
- [x] No
- [ ] No Response

Recent use of alcohol, heroin, prescription pain medications or sedatives?

- [ ] Yes
- [x] No
- [ ] No Response

**Most recent alcohol, sedative, or opiate use:**

○ 5 days or less
○ 6 days or greater

Use of any other illegal drugs?

☐ Yes
☑ No
☐ No Response

Have you been in a detox program or substance abuse treatment program in the last 90 days?

☐ Yes
☑ No
☐ No Response

**MISCELLANEOUS ASSESSMENTS–Select and Document all that apply**

**Does the inmate have any of the following:**

☐ Medicaid/MediCAL
☐ Medicare
☐ Private Health Insurance

Insurance Carrier(s):

Plan Name:

**DISPOSITION/TREATMENT PLAN–Select and Document all that apply**

☑ Medical Sick Call needed

☐ Release signed to obtain all medical records, pharmacy records, substance abuse records

☑ Oral Hygiene Instructions Provided

**Housing Assignment:**

☐ Infirmary/MOB ☐ PSU ☐ OPSD
☐ Med ISO ☐ Med Mainline

Fit to Continue Booking Process?

☑ Yes
☐ No

- [x] Clinically Screened – Cleared to Class
- [ ] 2nd Stage Nurse Evaluation/NAP
- [ ] Rec To ISP
- [ ] Rec To Sobering Cell
- [ ] Gate Refusal

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:55 PM PDT

## GENERAL INFORMED CONSENT - Completed by: Jameelyn Barrera RN on 3/10/2022 9:25:37 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

- [ ] Refused
- [ ] Patient accepts treatment, but declines to sign waiver
- [x] Patient is willing to sign, but unable to sign

English

**The undersigned patient authorizes and requests the San Diego County Sheriff's Medical Services, its physicians, dentists, contracted agents and its medical personnel to administer and perform any and all medical examinations, including photographs, and treatments, dental examinations and treatments, diagnostic procedures to include Telehealth (Medical and/or Psychiatry) Consultation, as deemed advisable or necessary. Further authorize to provide to the Health Information Exchange my medical record(s) in whole or in part for the purpose of continuity of care by other authorized providers or de-identified information for the purpose of studies for the prevention of diseases or illness.**

**The undersigned patient authorizes and requests San Diego County Sheriff's Medical Services Division, mental health personnel to provide evaluation and treatment of emotional and mental health problems. The treatment services requested are Outpatient and Inpatient as indicated.**

**I understand that my participation is voluntary. Confidentiality may be observed except for reference to jail escapes, immediate threats to others, elder/child abuse, loss of consciousness that may impede driving, and homicidal or suicidal expressions. Release of medical information is authorized under Federal Privacy laws for investigations by City, County, State and Federal law enforcement agencies.**

**State laws require clinics and physicians to report certain injuries and illnesses. These include communicable diseases (to prevent spread), injuries which may have been caused unlawfully, and illnesses/conditions which cause lapse of consciousness. Federal law requires reporting of any information of alleged sexual abuse.**

**I UNDERSTAND THAT IF I AM TAKING MEDICATION SHERIFF'S MEDICAL STAFF WILL ATTEMPT TO VERIFY IT WITH MY PHYSICIAN OR PHARMACY. IF I DO NOT RECEIVE IT WITHIN SIX (6) DAYS, OR SOONER IF NEEDED, I AM TO SUBMIT A SICK CALL SLIP STATING I NEED MY MEDICATIONS.**

**I consent to receive verified prescription medications necessary for continuity of my medical/psychiatric care until I am seen by the Sheriff's medical/psychiatric provider.**

**IF I AM REFERRED TO A PHYSICIAN/DENTIST, INCLUDING A SPECIALIST, AND HAVE NOT BEEN SEEN OR MY EVALUATION AND TREATMENT HAVE NOT BEEN COMPLETED, I UNDERSTAND THAT I AM RESPONSIBLE TO FOLLOW UP WITH MY OWN PHYSICIAN/DENTIST UPON MY RELEASE.**

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:56 PM PDT

## STERILIZATION INFORMATION - Completed by: Jameelyn Barrera RN on 3/10/2022 9:25:43 PM PST

| | | | | | |
|---|---|---|---|---|---|
| Patient: | SCHUCK, WILLIAM | #: | 400496356 (22709797) | Class: | 2 |
| DOB: | 1/13/2000 (Age=22) | Sex: | M | Race: | W |
| Housing: | SDCJ-7-D-01-B | Court Date: | 3/24/2022 8:15:00 AM | Type: | |
| Status: | ACTIVE | Booking Date: | 3/10/2022 9:10:43 PM PST | Proj. Rel: | |

☐ Refused

☑ Patient is willing to sign, but is unable to sign

### Notification of Rights Regarding Sterilizing Surgeries

English

---

**This is a summary of your rights outlined in Senate Bill 1135, approved by the governor and put into law September 25, 2014.**

**Sterilizing Surgery is a surgical procedure that permanently ends your ability to have children of which some or all of your reproductive parts are removed or altered.**

**If you are offered a tubal ligation...**

**• You have the right to refuse. Sterilization cannot be used in county jail, juvenile facility, or state prison for the purpose of birth control. This means a sterilizing procedure cannot be used to solely end future chance of pregnancy. Sterilization can only be used in county jail to address health condition (for example, cervical cancer).**

**• If you are diagnosed with a health condition and offered a sterilizing procedure as treatment...**

**Examples of a sterilizing procedure include: a hysterectomy (removal of your uterus), an oophorectomy (removal of your ovaries), and a salpingectomy (removal of the fallopian tube).**

**This is not a comprehensive list so be sure to ask your doctor if the procedure they are recommending is a sterilizing procedure.**

**• Ask to see a second doctor who does not work for the county department overseeing your confinement. You have the right to see a second doctor who does not work for the county jail before deciding that you would or would not want a sterilizing procedure.**

**• Ask for less invasive, less permanent remedies. You do not have to try less invasive, less permanent remedies but less invasive, less permanent remedies than sterilization must be offered to you before you receive a sterilizing procedure. (For example, fibroids can be shrunken or removed during surgery without taking out the uterus.)**

**• Ask for full information about the sterilizing procedure. You must be told the full effects of the sterilizing procedure, including its permanence, side effects, and the impacts it may have on your future health care needs.**

**At this point, if you have refused the less invasive, less permanent remedy, OR if a second doctor that does not work for the county department recommends a sterilizing procedure to take place, AND if you have been given full information about the sterilizing procedure, a doctor may lawfully provide a sterilizing procedure on you.**

**Note: If the sterilizing procedure is needed for the immediate preservation of your life, a doctor may lawfully provide a sterilizing procedure to you without satisfying your rights listed above.**

**If you have a sterilizing procedure while in county jail, a juvenile facility, or state prison...**

**• Ask for psychological and/or medical follow-up care. Sterilizing procedures can impact one's psychological, physical, and emotional wellbeing. You have the right to follow up health care to address your psychological, physical, and emotional wellbeing. You may also need hormone therapy to address surgical menopause and other care to help you recover from the surgery.**

Arjis#:

6337

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:01:56 PM PDT

## MEDICAL SERVICES - Completed by: Jameelyn Barrera RN on 3/10/2022 9:25:48 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☐ Refused

☑ Patient is willing to sign, but is unable to sign

English

**MEDICAL SERVICES**

**Inmates have the right to access medical, dental, and psychiatric care:**

**Emergency: Contact the nearest corrections officer and he/she will call for a nurse.**

**Non-emergency: You may request a Medical/Dental Request Form from the nurse at medication pass. These forms are to request medical assistance and must be turned into the nurse during medication pass for triage (review) of the complaint.**

**Medical/Dental Request Forms: The forms are available from the nurse twice daily. The sick call nurse will triage (review) the forms. The sick call/charge nurse, who will assess your symptoms within 24-72 hours after your form has been picked up, will see you. If he/she cannot address your symptoms or complaints through nursing protocols, you will be referred to the next available physician or physician assistant sick call.**

**Medical Request/Grievance Forms: If you are not satisfied with any aspect of your health care, you have the right to request information or send a grievance to the contracted Medical Services provider, Health Services Administrator, for an investigation and response to your complaint.**

**Medical/Dental Access and Medication Fee Policy Statement:**

**No inmate will be refused medical treatment because of inability to pay. A Medical/Dental Access and Medication Fee may be charged to the Inmate's Trust Account for medical care provided. For non-chronic care requests, the medical access fee process begins with the sick call/charge nurse assessment of the problem. There is no charge for referral to the physician or follow-up care; however, if medication is prescribed or renewed by the sick call/charge nurse or physician, there will be an additional medication fee assessed. If an inmate requests emergency care that is determined not to be an emergency condition, that inmate may be charged a Medical Access Fee for calling a false emergency. The determination of the condition will be made by medical/nursing staff and the inmate will be informed of the assessed charge.**

**Any complaints regarding the Medical/Dental Access and/or the Medication Fee policies should be addressed to Jail Administration.**

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:03:36 PM PDT

## Sick Calls - SCHUCK, WILLIAM 22709797

| Name | Scheduled Date | Reason | Completed Date |
|---|---|---|---|
| QMHP | 3/12/2022 | Pt reports that he has ADHD. Denied AH/VH/SI/HI. During intake, pt making grandiose statements and is not understanding booking process- asking to take photos of his medical records with his phone (which per officers, was 'in pieces' d/t his car accident), and is asking for "$20 to give to the nurse for some water." | |
| Medical Chart Review | 3/15/2022 | Review scanned discharge order from UCSD | 3/15/2022 |
| Medical Doctor Sick Call | 3/16/2022 | Mandown 7th floor | |
| Registered Nurse Sick Call | 3/16/2022 | Wellness check, claimed uses Acid drugs? in the street | 3/16/2022 |
| Dental Sick Call | 1/4/2023 | Dental Sick Call scheduled from Receiving Screening | |

SOAP NOTE BY: Jameelyn Barrera RN POSTED ON 3/10/2022 9:29:14 PM PST Type: RN NOTE

**Subjective**

**Objective**

| BP: | Temp: | Pulse: | Resp: 18 | Wt: 131 | Sa02: | BS: na | Pain: |
|---|---|---|---|---|---|---|---|
| 144/94 | 97.5 | 118 | | | 100 | | |

**Assessment**

**Plan**

covid test done at intake

| Diagnostic Name | Scheduled Date | Doctor |
|---|---|---|
| SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR | 3/10/2022 12:00:00 AM PST | Montgomery, Jon DO |

Addendum:

SOAP NOTE BY: Romeo DeGuzman RN POSTED ON 3/15/2022 8:45:08 AM PDT Type: MEDICAL CLEARANCE

**Subjective**

C/O ADHD, uses Acid drugs? in the street

**Objective**

| BP: | Temp: | Pulse: 76 | Resp: 18 | Wt: | Sa02: | BS: | Pain: |
|---|---|---|---|---|---|---|---|
| 148/96 | 97.8 | | | | | | |

Alert and verbally responsive, not in respiratory distress, afebrile, ambulatory. With difficulty in following direction, disorganized, non sensical, disheveled, with soiled t shirt not wearing pants. With dry blood to T shirt and both lower extrmeties, cleansed with NS. Wound to Right shin healing well, no s/s of infection. Denies taking medication. No suicidal / self harming gestures noted. Going to court this morning per sworn staff. Instructed to notify staff for any changes in health condition

**Assessment**

Altered Thought process

**Plan**

Wound care
Psych eval

| Diagnostic Name | Scheduled Date | Doctor |
|---|---|---|
| SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR | 3/10/2022 12:00:00 AM PST | Montgomery, Jon DO |

Addendum:

Nicholas Kahl NP POSTED ON 3/15/2022 4:12:59 PM PDT Type: NP NOTE

MDCC:
Review scanned discharge order from UCSD

DC summary from UCSD reviewed
Pt sent to UCSD for eval after MVA. Per record "patient refusing medical evaluation, has decision-making capacity".
No new orders.

> ROI for full records:
- please obtain ROI for Full records from ER visit to include all physician notes

Addendum:

Carina Echon RN POSTED ON 3/15/2022 9:42:12 PM PDT Type: RCC

Received court order for referral to jail medical,IP refused MDSC today

Addendum:

SOAP NOTE BY: Emily Lymburn RN POSTED ON 3/16/2022 10:37:10 AM PDT Type: RN NOTE

**Subjective**

Late entry

RNSC
Wellness check, claimed uses Acid drugs? in the street

**Objective**

BP: / Temp: Pulse: Resp: Wt: Sa02: BS: Pain:

Pt. was seen @ approx between 9:30-9:40 (?) for RNSC

Patient observed lying on bed naked, facing the wall with blanket on his side. Respirations even and unlabored, NAD. Patient refused to engage despite multiple tries to talk to him, did not acknowledge staff. Pt. kept moving his lower extremeties but kept facing the wall.
Noted multiple pressure sores on his tailbone, buttocks, elbows and legs.

**Assessment**

Impaired skin integrity
Alteration in helath maintenance

**Plan**

Notified floor deputies # 4324 and 4193 that patient needs to go to the clinic to be seen by medical provider.
Notified clinic RN 6338 that patient needs to be seen ASAP. Patient is also scheduled for LTSC for his sores.

| Diagnostic Name | Scheduled Date | Doctor |
|---|---|---|
| SARS-CoV-2 RNA, Qualitative Real-Time RT-PCR | 3/10/2022 12:00:00 AM PST | Montgomery, Jon DO |

Addendum:

Theresa Currier DO POSTED ON 3/16/2022 10:45:49 AM PDT Type: MD NOTE

MDSC r/t:
MAN DOWN 7th floor
************

Man down on 7th floor was called. Custody reported that CPR had been started.
Medical team arrived with crash cart and oxygen.

Per Deputy, before we arrived:
The deputies report that they went to the patient's cell, to bring him down to medical clinic in order to evaluate his sores on his body. The deputy stated that he did not get a response from the patient inside his cell, so he had the door popped, and found patient non-responsive. They pulled the patient from the cell, found no pulse, started CPR, and they reported giving a total of 2 Narcan by the time we arrived.

9:43 We the medical team, arrived to the scene, and CPR was in progress. Ambu bag with O2 applied, and Oral phar. airway placed in mouth and bagging continued. Narcan #3 was given by custody. AED applied. CPR continued. Pupils were dilated 4mm bilaterally and fixed. AED said NO shock advised. An IV was started in the RIGHT AC. BS check read "error" per nurse.
9:45 O2sat 76%
9:49 O2sat 56% HR 98 with CPR
Narcan given 3 more times, bringing total of 6 Narcans given by 9:48. CPR continued. No shock advised.
9:49 EMS arrived.
EMS continued with machine lucas to provide Chest compressions.
They called the code at 10:18, and stopped CPR.

Addendum:

Frederick Wycoco NP POSTED ON 3/16/2022 11:17:14 AM PDT Type: NP NOTE

NPSC

mandown 7th floor

A 22 y/o male was seen in his housing. Upon arrival pt was already on the floor, unresponsive, pt on ambubag with O2, oral phar airway in his mouth, CPR already in progress and has given 5th dose of narcan. This writer ordered another dose of narcan and start IV line which were carried out by nursing staff, after the 6th narcan 4mg intranasal, pt was still unresponsive, CPR not interrupted --> EMS arrived and took over care.

Skin appeared pale to ashen, has multiple superficial wounds on his lower extremities and arms, with some bruising, please see MD note 3/16/2022 for further assessment

Addendum:

Jennifer Vivona RN POSTED ON 3/16/2022 11:20:15 AM PDT Type: RN NOTE

Abnormal Vital/Reading: pt un responsive

Oxygen Saturation: 56

Addendum:

Serina Rognlien-Hood Suprvising Nurse POSTED ON 3/16/2022 12:02:41 PM PDT Type: RN NOTE

Patient released from custody

Addendum:

Jennifer Vivona RN POSTED ON 3/16/2022 1:00:17 PM PDT Type: RN NOTE

addendum to Man down assessment, RN 6113 was not present on scene the correct arjis is RN 6126

Addendum:

Daniel Santos RN POSTED ON 3/16/2022 1:12:38 PM PDT Type: RN NOTE

Late entry prior to mandown:

I/P's mother had called asking if patient is scheduled for a mental health eval. There is no signed ROI on file during this call. Message was relayed to MHC 6469 and a QMHP visit was already in schedule. Phone number of caller was provided to MHC 6469.

Addendum: Daniel Santos RN on 3/16/2022 1:27:48 PM
Sabrina Schuck/Timothy Schuck (Mother/Father) 949-533-5465

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:06:47 PM PDT

**Progress Notes- ER SENDOUTS DISCHARGE - SCHUCK, WILLIAM 400496356 (22709797)**

Serina Rognlien-Hood Suprvising Nurse POSTED ON 3/16/2022 12:02:41 PM PDT Type: RN NOTE

Patient released from custody

Addendum:

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:02:38 PM PDT

**Vital Signs - SCHUCK, WILLIAM 22709797**

| Date/Time | Blood Pressure | Temperature | Pulse | Respirations | Height | Weight | O2 Sat | Pain | BMI | Mean Arterial Pressure |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/10/2022 9:20:52 PM | 144 / 94 | 97.5 | 118 | 18 | 6ft 2in | 131 lb | 100 | NA | 16.8 | 110.67 |
| 3/15/2022 8:45:11 AM | 148 / 96 | 97.8 | 76 | 18 | 0ft 0in | NA lb | NA | NA | NA | 0 |
| 3/16/2022 11:20:16 AM | NA / NA | NA | NA | NA | NA ft NA in | NA lb | 56 | NA | NA | NA |

Quest Diagnostics

**Report Status: Final**

**SCHUCK, WILLIAM**

| Patient Information | Specimen Information | Client Information |
|---|---|---|
| **SCHUCK, WILLIAM**<br><br>**DOB: 01/13/2000 AGE: 22**<br>Gender: M<br>Phone: 619.615.2450<br>Patient ID: 400496356 | Specimen: EN518697W<br>Requisition: 8394980<br>Lab Ref #: 5633932879E2<br><br>Collected: 03/10/2022 / 21:29 PDT<br>Received: 03/12/2022 / 03:53 PDT<br>Reported: 03/15/2022 / 17:53 PDT | Client #: 88366000 MAIL000<br>MONTGOMERY, JON<br>DOPS-CENTRAL DETENTION<br>Attn: COUNTY OF SAN DIEGO<br>1173 FRONT ST<br>SAN DIEGO, CA 92101-3904 |

**SARS CoV 2 (COVID-19) Tests**

| Test Name | Result | Reference Range | Lab |
|---|---|---|---|
| SARS CoV 2 RNA(COVID 19), QUALITATIVE NAAT | | | EZ |
| SARS CoV 2 RNA | NOT DETECTED | | |

A Not Detected (negative) test result for this test means that SARS-CoV-2 RNA was not present in the specimen above the limit of detection. A negative result does not rule out the possibility of COVID-19 and should not be used as the sole basis for treatment or patient management decisions. If COVID-19 is still suspected, based on exposure history together with other clinical findings, re-testing should be considered in consultation with public health authorities. Laboratory test results should always be considered in the context of clinical observations and epidemiological data in making a final diagnosis and patient management decisions.

REFERENCE RANGE: NOT DETECTED

Please review the "Fact Sheets" and FDA authorized labeling available for health care providers and patients using the following websites: https://www.questdiagnostics.com/home/Covid-19/HCP/QuestLDT/fact-sheet https://www.questdiagnostics.com/home/Covid-19/Patients/QuestLDT/fact-sheet.html

This test has been authorized by the FDA under an Emergency Use Authorization (EUA) for use by authorized laboratories

Due to the current public health emergency, Quest Diagnostics is receiving a high volume of samples from a wide variety of swabs and media for COVID-19 testing. In order to serve patients during this public health crisis, samples from appropriate clinical sources are being tested. Negative test results derived from specimens received in non-commercially manufactured viral collection and transport media, or in media and sample collection kits not yet authorized by FDA for COVID-19 testing should be cautiously evaluated and the patient potentially subjected to extra precautions such as additional clinical monitoring, including collection of an additional specimen.

```
Methodology:  Nucleic Acid Amplification Test
              (NAAT) includes RT-PCR or TMA
```

Additional information about COVID-19 can be found at the Quest Diagnostics website: www.QuestDiagnostics.com/Covid19

Physician Comments:

**PERFORMING SITE:**

EZ QUEST DIAGNOSTICS/NICHOLS SJC, 33608 ORTEGA HWY, SAN JUAN CAPISTRANO, CA 92675-2042 Laboratory Director: IRINA MARAMICA,MD,PHD,MBA, CLIA: 05D0643352



Quest, Quest Diagnostics, the associated logo and all associated Quest Diagnostics marks are the trademarks of Quest Diagnostics.

San Diego County Sheriff's Department
9621 Ridgehaven Ct.
San Diego, CA 92123

3/16/2022 2:03:17 PM PDT

**Inmate:** SCHUCK, WILLIAM
**Patient ID:** 400496356 (22709797)
**DOB:** 01/13/2000 **Race:** W **Sex:** M

**Ordering Provider:** (MONTGOMERY, JON)
**Lab Reference ID:** 6456942
**Report Last Updated:** 3/12/2022 3:50:12 AM PDT

**XR CHEST SINGLE VIEW (71010)**

**Test Status: Final** — **Resulted: 3/12/2022 12:00:00 AM PDT**

**EXAM DATE: 3/12/2022 12:00 AM PDT**

**Reason for Exam:** booking

There is no evidence of an active pulmonary parenchymal or pleural disease process. The cardiovascular silhouette is within normal limits. There is no evidence of active TB.

https://pacs.naphcare.com/system/html5viewer/index.php?entry=1.2.826.0.1.3680043.2.737.7290.2022.3.11.5.20.22&actions=DicomViewer

Signed by Rhee, Richard MD at Mar 12 2022 4:37AM

No Active Disease

| Vendor | Reading Provider |
|---|---|
| | Richard Rhee (1932143559) |

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:02:57 PM PDT

## Treatments - SCHUCK, WILLIAM 22709797

| Name | SIG | Ordered By | Start | Stop |
|---|---|---|---|---|
| DRESSING CHANGE APPLY ANTIBIOTIC | ONCE DAILY | Jon Montgomery DO | 3/15/2022 | 3/21/2022 |

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:02:57 PM PDT

## Treatment Administration - SCHUCK, WILLIAM 22709797

| Name | Username | Date | Type | Reason |
|---|---|---|---|---|
| DRESSING CHANGE APPLY ANTIBIOTIC | romeo.deguzman | 3/15/2022 8:29:29 AM | Administered | |

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:05:34 PM PDT

## LAB STAMP - Completed by: Jameelyn Barrera RN on 3/10/2022 9:29:22 PM PST

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

### Lab

Skin cleansed and dried

- ☐ Yes
- ☑ No

Location of labs drawn

nares

Needle guage size

Number of attempts

Patient tolerated pain

Pressure and dressing applied to site

- ☐ Yes
- ☑ No

Patient advised not to remove dressing for 30 minutes

- ☐ Yes
- ☑ No

☐ Refused ☐ Unsuccessful ☑ Complete

☐ Unavailable

### Sick Call Completion

○ Complete Scheduled Sick Call

Available Sick Calls:

○ Create and Complete Sick Call

Sick Call Types:

○ This visit does not require a sick call

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:05:35 PM PDT

## ER REFERRAL - Completed by: Reginald Barretto RN on 3/16/2022 9:53:20 AM PDT

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

**Mode of Transportation:**

☐ Squad Car ☑ 911/Paramedics ☐ Other (please describe)

Other:

**Chief Complaint:**

Other

Provide Details:

Possible overdose unk substance

Narvan given x

☐ **Patient Refused**

| BP | Temp | Pulse | Resp | SaO2 | BS | Pain | Height(ft) |
|---|---|---|---|---|---|---|---|
| / | | | | | | | 0 |

| Height(in) | Weight | BMI | MAP |
|---|---|---|---|
| 0 | | | |

Current Allergies

No Known Drug Allergy

Current Medications:

No Medications

**Referring Provider:**

**Destination ER/Hospital:**

Name of "Other" Hospital:

**JAIL CLINIC STAFF:**

**Send a printed copy of this form and any relevant progress notes, labs, and studies with EMS or the transporting officer.**

**EMERGENCY DEPARTMENT PROVIDER:**

**For continuity of care, PLEASE GIVE THE OFFICER A COPY OF YOUR EVALUATION AND TREATMENT RECOMMENDATIONS TO RETURN WITH THE PATIENT TO THE JAIL FACILITY.**

**Responsible Party:**

**San Diego County Sheriff's Deparment**

**Billing Address:**

**AmeriChoice**

**P.O. Box 928229**

**San Diego, CA 92192-8229**

****It is necessary that the patient is not made aware of any appointment scheduling information****

*****NOTICE FROM WILLIAM D. GORE, SHERIFF*****

**The above patient is being sent to your facility for medical evaluation and stabilization. Once the inmate/patient is stable and requires admission, we would request that he/she be transferred to our contracted unit at TriCity Medical Center. The TCMC transfer can be initiated by calling TCMC Progressive Care Unit Charge Nurse at (760) 940-7231. For questions, concerns or problems, please contact TCMC Clinical Manager at (760) 802-2689.**

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:05:35 PM PDT

## MANDOWN ASSESSMENT - Completed by: Jennifer Vivona RN on 3/16/2022 11:22:54 AM PDT

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

☑ Primary Survey ☐ Secondary Survey

Time Medical informed: 0940 Arrived at Scene: 0941

Scene is Safe:

☑ Yes

☐ No

Number of patients:

1

**Responders:**

Scene Manager:

Currier DO

Team Leader:

Currier DO

Members:

RN 6338 scribe RN 9033 assist RN 6275 CPR RN 0770 ambu bag RN 6113 o2/ assist RN 5061 IV RN 6562 AED DEP3397 CPR

Spinal Alignment maintained:

☐ Yes

☐ No

Patient Observed/Presentation:

medical responded to 7th floor, @0941, pt laying supine.pt was exposed CPR started by sworn staff, taken over by medical when arrived, unresponsive, pulseless, not breathing, pupils dialated 4mm,

Mechanism of Injury/CC:

unknown

Injury/Signs of Trauma:

no trauma apparent

Sign & Symptoms:

unresponsive, non pulse

Treatment:

CPR initiated by sworn, 2 narcans given by sworn, CPR taken over by RN 6275, oral appliance placed airway patent ambu bag started, 0943 narcan #3 O2 sat 76% @0945, DEP 3397 switched compressions, AED applied no shock advised, 0945 narcan #4, 0946 narcan #5, IV started by RN 5061, NS given, 0948 narcan #6 given. O2 sat 56% paramedics arrived on scene at 0950 and took over care. pt prounounced @1018 via Dr. Matonif @ Palomar Hospital

Oxygen:

- [x] Yes
- [ ] No

AED:

- [x] Yes
- [ ] No

CPR:

- [x] Yes
- [ ] No

IVF:

- [x] Yes
- [ ] No

**Primary Survey:**

Airway: Patent;

- [x] Yes
- [ ] No

Breathing: Equal/bilateral;

- [ ] Yes
- [x] No

Circulation: Pulses, Equal/bilateral;

- [ ] Yes
- [x] No

Skin:

pale, cold

Disability: Orientation;

unresponsive, supine, pulseless

Pupils:

dialated 4 mm

Motor Function:

none

Expose:

yes pt was naked

**Secondary Survey:**

**Vital Signs:**

☐ **Patient Refused**

| **BP** | **Temp** | **Pulse** | **Resp** | **SaO2** | **BS** | **Pain** | **Height(ft)** |
|---|---|---|---|---|---|---|---|
| -1 / -1 | -1 | -1 | -1 | 56 | na | -1 | 0 |
| **Height(in)** | **Weight** | **BMI** | **MAP** | | | | |
| 0 | -1 | NA | -1.00 | | | | |

Head:

WNL

Neck:

WNL

Chest:

caved, d/t CPR in progress

Abdomen/Pelvis:

WNL

Extremities:

multiple wounds noted on BLE

Notes:

CPR initiated by sworn, 2 narcans given by sworn, CPR taken over by RN 6275, oral appliance placed airway patent ambu bag started, 0943 narcan #3 O2 sat 76% @0945, DEP 3397 switched compressions, AED applied no shock advised, 0945 narcan #4, 0946 narcan #5, IV started by RN 5061, NS given, 0948 narcan #6 given. O2 sat 56% paramedics arrived on scene at 0950 and took over care. pt prounounced @1018 via Dr. Matonif @ Palomar Hospital

Disposition:

pt prounounced @1018 via Dr. Matonif @ Palomar Hospital

22709797

# AFTER VISIT SUMMARY

UC San Diego Health

**William Schuck** MRN: 31939359 DoB: 1/13/2000 3/10/2022 Hillcrest Emergency 619-543-6222

## Instructions

Patient refusing medical evaluation, has medical decision-making capacity

No obvious external signs of trauma or illness but occult injury is possible given mechanism

**Follow up with Brian Y Kim, MD**
Why: As needed
Specialty: Family Practice, Sports Medicine
Contact: 101 THE CITY DR
Orange CA 92868
714-456-5705

## What's Next

You currently have no upcoming appointments scheduled.

## Today's Visit

You were seen by Binh Thanh Ly, MD

**Reason for Visit**
MVA

**Diagnosis**
Motor vehicle accident, initial encounter

Blood Pressure 142/102

Temperature 98.1 °F

Pulse 95

Respiration 15

Oxygen Saturation 99%

# Your Medication List

## ASK your doctor about these medications

ASK **amphetamine-dextroamphetamine** 15 MG Extended-Release capsule
Commonly known as: ADDERALL XR

ASK **sulfacetamide** 10 % ophthalmic solution
Commonly known as: Bleph-10
Quantity: 1 bottle
Place 1 drop into right eye every 4 hours.

## Allergies as of 3/10/2022

No Known Allergies

## Be Fast! Know stroke warning signs

## MyChart

Sign up for access to our MyUCSDChart patient web portal. With an account, you can access your health information online, view most lab test results, securely exchange messages with your clinic, request appointments, access our free mobile app, and more.

To sign up for MyUCSDChart, please call Customer Support at 619-543-5220 (24/7)) or visit our web page at myucsdchart.ucsd.edu and click "Sign Up Now". Or, click Create Account if activation code provided below.

Activation code not generated
Current MyChart Status: Active

## Be Fast! Know stroke warning signs (continued)




Remember **BE FAST** for warning signs of stroke. These symptoms may represent a serious problem that is an emergency. Do not wait to see if the symptoms will go away. Get medical help right away. Call 911. Do not drive yourself to the hospital. Get help right away if you or a loved one has any of these signs.

Hang this image on your fridge for quick and easy reference!

## Additional Information

For more information about any of your health conditions, logon to your MyChart and search our Health Library section or visit our website at http://health.ucsd.edu/healthinfo

If you or a loved one would like information on how to quit smoking or about suicide prevention, call:
- California Smokers' and Chewers' Helpline: 1-800-NO-BUTTS
- National Suicide Prevention Lifeline: 1-800-273-TALK (8255)
- San Diego Access and Crisis Line: 1-888-724-7240

### Daily Summary of Test Results Available on MyChart

If you have a MyChart account, you can now receive a single, daily notification of any new test results. Our new Daily Digest makes it easy and convenient for you to receive any new test result notifications once a day between 8 and 10 a.m., Monday through Friday, excluding holidays.

### Prepare for your Care

UC San Diego Health asks all of our patients to have a voice in your medical care by spending a few moments on https://prepareforyourcare.org where you can learn about and complete your advance directives in just a few easy steps.

## Billing and Insurance Information

We're here to help. For billing questions. Call 855-827-3633, 9a.m. to 6 p.m. Weekdays, or email askus@ucsd.edu

## Your feedback is important to us

We strive to provide every patient with an exceptional patient care experience. In the next few days, you may receive an email or phone survey about your most recent visit. Your feedback is important to us, and we ask that you please complete this survey to help us enhance the experience at UC San Diego Health for all of our patients. You may also call our We Listen line at (619) 543-5678 to share compliments, concerns or suggestions. Please call your physician's office for any medical concerns. If you have a medical emergency, call 911. Thank you!

Schuck, William (MRN 31939359)

UC San Diego Health

E0001

Printed 3/10/22 8:48 PM

Preferred Name: WILLIAM
MR#: **31939359**
SCHUCK,WILLIAM
CSN: **66110735186**
DOB: **1/13/2000 M**

**William Schuck**
MRN: **31939359**

Department: **Hillcrest Emergency**
Date of Visit: **3/10/2022**

I acknowledge receipt of these instructions. I understand that my condition may require more care, and that it is my responsibility to arrange for and/or comply with further treatment and self-care instructions as recommended. I further acknowledge that I have been given a copy of this After Visit Summary upon discharge from the hospital.

Signature of patient (or proxy): ____________________

Proxy name: ____________________

Proxy relationship: ____________________

Date: ______________ Time: ______________

Signature of discharging nurse: ____________________

Date: ______________ Time: ______________

If Interpreted : ______________ ☐ Telephonic ☐ Video
Interpreter **OR** ID#

Language:__________ Date: __________ Time: __________

If applicable, I acknowledge receipt of my medications. I understand that my signature indicates that I have received them and am fully responsible for them from this moment on.

03/15/2022 20:19 6196152576 SDCJ CRT PULL PAGE 01/01

BLH 22 101 191 SD/ARST#1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

☒ Central Division ☐ East County Division ☐ North County Division ☐ South County Division ☐ 1st ☐ 4th

PEOPLE vs. SCHUCK WILLIAM STATUS: CUST $ 10000 ☐ SS ☐ CB (Y/N)

CASE # CD293840 PROS. # ACX30101 DOB 011300 BKG # 22709797 CTS: ____ days ____ hrs.

DATE: 03/15/22 AT 08:30 DEPT. # 101 INTERP: ☐ Spanish ☐ Sworn ☐ Oath on File

JUDGE/COMM/TEMP JUDGE: HALGREN, LAURA W. ☐ STIP. FILED REPORTER: Natalie Khamis, CSR #14260

CLERK: C. Hosmer CSR # / COUNTER #:

CHARGE(S): HS11370.1(A) HS11550(E) VC23152(F) HS11350(A) PC25850(A)

FUTURE DATES: ☐ CONFIRMED ☐ VACATED

N. Spaulding w/ L. Fox — S. Franklin

Attorney for the People (DDA/DCA/DAG) ☒ Supervised Cert. Legal Intern — Attorney for Defendant (PD / APD / OAC / Retained / Counseling) ☐ Supervised Cert. Legal Intern

DEFENDANT: ☒ PRESENT ☐ VIA AUDIO VIDEO ☐ SELF REPRESENTED ☐ NOT PRESENT ☐ NOT PRODUCED ☐ FAILED TO APPEAR

Case called for ☐ FTA ☒ Arraignment ☐ Bail Review ☐ Readiness/DWT ☐ Jury Trial ☐ Preliminary Examination ☐ Motion

☐ PC1000 ☐ Full ☐ Limited Protective Order Expires: Protected Party:

☐ Warrant Ordered/Issued on ☐ Held to today ☐ Cleared ☐ Outstanding ☐ Bail Bond # $ forfeited

CASE TRANSFERRED TO DEPT. ____ TIME ESTIMATE: ____

Complaint amended ☐ by interlineation to read:

☐ Amended ☐ Amendment to ☐ complaint filed ☐ charging ☐ adding ☐ VC23103 (a) pursuant to VC23103.5 ☐ VC22107, VC21658(a), PC647(f) as INFRACTION(S) pursuant to PC17(d)(2). ☐ other:

☒ Defendant advised of and waives the right to a separate and conflict-free attorney / interpreter for this court appearance.

☒ Defendant duly arraigned and advised of the constitutional and statutory rights as indicated on the reverse side of this minute order*.

☒ Acknowledgment of advisal of constitutional rights signed and filed. ☐ Defendant has received copy of complaint.

☒ Defendant waives reading of complaint. ☐ Deft. states true name is ____ ☐ on complaint (____ line)

☒ DEFENDANT PLEADS NOT GUILTY and denies any priors/allegations/separate convictions alleged ☐ on amended complaint.

☐ Defendant WAIVES: ☐ time for speedy trial ☐ 10 day/60 day statutory time for preliminary hearing ☐ personal presence ☐ per PC977 ☐ bail review ☐ jury trial ☐ preliminary hearing

COUNSEL ☒ MOTION FOR APPOINTED ATTORNEY ☒ Granted ☒ Public Defender ☐ Alternate Public Defender ☐ Office of Assigned Counsel

Atty: ☐ Re-appointed ☐ Denied ☐ Referred to Near Indigent Panel ☐ Defendant to retain counsel.

☐ Motion for self-representation is ☐ granted ☐ denied. ☐ Faretta/Lopez Waiver signed & filed. ☐ OAC appointed - legal runner/reasonable ancillary services.

CONVICTION ☐ Deft. is sworn and examined. ☐ Defendant withdraws any previously entered plea.

DEFENDANT PLEADS: ☐ GUILTY ☐ NO CONTEST to: ☐ VC23152(a) / (b)

☐ Admits ____ separate conviction(s) alleged/ ____ allegation(s)

☐ Charges contained in amended/amendment to complaint. ☐ VC23103(a) ☐ per 23103.5 ☐ as a lesser included/related offense of

☐ On motion of Court/People/Defendant remaining count(s) ____ is/are DISMISSED. Allegation(s)/Prior(s) remaining is/are STRICKEN ☐ FOJ ☐ VOP

☐ Plea form executed and filed ☐ People vs. West ☐ BAC:

☐ Court finds a knowing and intelligent waiver of constitutional rights and factual basis for the plea.

☐ ADVISALS given by the court: ☐ Theft (PC666) ☐ DUI (VC23593) ☐ Immigration consequences (PC1016.5)

☐ WAIVERS: ☐ Arbuckle ☐ Blakely ☐ Cruz ☐ Harvey ☐ Appeal Rights ☐ Non-Bid. Evidence Disposal ☐ Time for sentencing, see JUDGMENT MINUTES.

☐ PC1210 ☐ Drug Court ☐ accepted ☐ declined.

☐ Stipulated bindover. ☐ Case certified as a general jurisdiction matter. ☐ Complaint deemed the information.

☐ Defendant to provide DNA database samples as directed by Sheriff or Probation Dept. (PC296).

MOTION for ____ by ☐ People ☐ Defendant ☐ with ☐ without objection ☐ GRANTED ☐ DENIED.

PC1000 ☐ Defendant's motion for PC1000 ☐ granted as to count(s) ____ and criminal proceedings suspended for ____ months ☐ denied.

☐ Enroll in and successfully complete the diversion program, including payment of fees and compliance with all orders.

☐ Enroll in ☐ county certified program ☐ S.D. Rescue Mission Program ☐ Other ____. Enroll by ____

☐ Pay $ ____ div. rest. fee (PC1001.90). ☐ Pay $ ____ div. admin fee (PC1001.15, 1001.16). Total due $ ____

☐ Payment due: ____ ☐ Payments set at $ ____ per month starting ____ and on the ____ of each month thereafter until paid in full.

☐ Report immediately to clerk/SAAU for program assignment/enroll-by date/payment date(s). ☐ Def. motion to re-enroll granted – enroll by ____

☐ Defendant has satisfactorily COMPLETED the PC1000 Program. ☐ Previously entered plea to count(s) ____ set aside ☐ count(s) ____ dismissed.

☐ Defendant has FAILED to satisfactorily complete the PC1000 Program. ☐ PC1000 terminated and criminal proceedings reinstated.

☐ Unpaid diversion fees set aside. ☐ Court makes a finding of guilt to the charge(s) pled. ☐ Time waived for sentencing, see JUDGMENT.

REFERRALS Report ☐ immediately ☐ by ____ to ☐ SAAU ☐ Probation Department ☐ Probation to interview.

☐ Pre-sentence ☐ Mini ☐ Supplemental ☐ Psych. ☐ Limited re: Drugs / Alcohol / Domestic Violence / Anger Management / Restitution Report Ordered.

☐ Pre-sentence report waived. ☐ Court Collections ☐ for payment of attorney fees ** $ ____ ☐ Indigent as to attorney fees.

** The court finds that the defendant has the ability to repay the County of San Diego for the costs of court appointed attorney fees.

HEARINGS Set/cont. on motion of ☐ People ☐ Defense ☐ Opposed ☐ Unopposed ☐ By Stipulation. ☐ Statutory time is WAIVED

DEFENDANT IS ORDERED TO APPEAR for ☐ ____ on ____ at ____ in Dept. ____

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Re: Attorney | at | in Dept. | | ☐ Motion/PC1538.5 | at | in Dept. |
| ☐ Arraignment | at | in Dept. | | ☐ Jury / Court Trial | at | in Dept. |
| ☐ Bail Review | at | in Dept. | | ☐ Sentencing | at | in Dept. |
| ☒ Readiness/DWT | 3.24.22 at 8:30 | in Dept. 1103 | | ☐ Prob. Hrg.& Sent | at | in Dept. |
| ☒ Prelim Exam | 3.28.22 at 8:30 | in Dept. 101 | | ☐ PC1000/Drug Ct | at | in Dept. |

Time Estimate: ____ Days remaining: ____ Set with case(s):

MENTAL HEALTH ☐ Proceedings suspended pursuant to PC1368. Mental competency examination on ____ at ____ by Forensic Psychiatry Clinic, Females - Central Division, Hall of Justice, Room 481; Males – Central Detention Facility. Hearing on ____ at ____ in Dept. ____ of the Central Division. ☐ The Sheriff is ordered to transport the defendant to and from the examination and hearing stated above.

OTHER - ☐ Verbal notice of license suspension (DL 310) signed. ☐ Fingerprint form filed.

☐ Book & Release – Report on ____ at ____ to ☐ Central ☐ Vista ☐ Las Colinas Detention Facility.

Protective Order re: Law Enforcement Generated Video is Signed & Filed. THE COURT REQUESTS DEFENDANT TO JAIL MEDICAL TO BE SCREENED FOR MEDICATION

PARTIAL ARRAIGNMENT: CLARIFY ACKNOWLEDGMENT OF RIGHTS & TRUE NAME, DOB AT NEXT HEARING.

CUSTODY STATUS Defendant ☒ REMANDED to custody of Sheriff ☐ without bail ☒ with bail (set at) increased to / reduced to $10,000

☐ PC1275.1 HOLD; ☐ Pretrial Services Report Ordered re: SOR ☐ Refer to CPAC. W/O PREJUDICE

☐ REMAINS AT LIBERTY ☐ RELEASED: ☐ on bail previously posted ☐ after booking ☐ PC1000 - ☐ OR ☐ SUPERVISED OR-comply with PTS conditions

☐ same terms and conditions ☐ to an authorized representative of: ____ on ____ at ____

☐ Release Conditions: ☐ Attend ____ self-help mtgs. per week and submit proof at each court hearing. ☐ Abstain from alcohol.

☐ Not use or possess any controlled substances without a valid prescription. ☐ Not possess narcotic paraphernalia.

☐ Deft. waives 4th amendment rights and agrees to submit person, vehicle, place of residence, property, personal effects to search at any time with or without a warrant, and with or without reasonable cause, when required by a Probation Officer or other law enforcement officer ☐ until revoked. ☐ for the duration of PC1000. ☐ Have no contact with / stay away from: ____ ☐ Protective Order issued.

☐ Previously ordered: ☐ 4th WAIVER ☐ continues ☐ deleted ☐ PROTECTIVE ORDER ☐ continues ☐ deleted.

WARRANT ☐ Arrest ☐ Bench ☐ ____ Warrant ordered ☐ Bail set at $ ____ ☐ No Bail. ☐ Counsel reports no contact with defendant.

☐ Schedule for hearing. ☐ Mandatory appearance. ☐ Night service authorized. ☐ Cash bail may be forfeited. ☐ ISSUED ON: ____

☐ HOLD issuance to DATE ABOVE. ☐ Warrant previously ordered/issued ☐ remains outstanding ☐ rescinded ☐ RECALLED ON: ____

☐ Affidavit requested. Due by: ____

BAIL is ☐ exonerated ☐ forfeited ☐ Fine from bail, refund balance. ☐ Declaration of non-collusion/ re-assumption of liability filed.

☐ Bail forfeiture is set aside and bond is ☐ reinstated ☐ exonerated ☐ upon payment of court cost $ ____ within 30 days ☐ cost waived

☐ Bond #: ____ Bond $ ____ Bond Co. ____

Date: ____ ATTEST A TRUE COPY, Clerk of the Superior Court by ____ Deputy

Distribution by: CTH on 3.15.22 Def. Atty. Pros. Prob. R&R Interpreter Acct. SAAU Other:

SDSC CRM-153 (Rev. 10/19) MISDEMEANOR/FELONY – PRE-DISPOSITION MINUTES

cc: med

SCHUCK, WILLIAM 400496356 (22709797)

Central Jail
1173 Front Street
San Diego, CA 92101
619-6152454

3/16/2022 2:29:30 PM PDT

**EMAR**

| | | | | | |
|---|---|---|---|---|---|
| **Patient:** | SCHUCK, WILLIAM | **#:** | 400496356 (22709797) | **Class:** | 2 |
| **DOB:** | 1/13/2000 (Age=22) | **Sex:** | M | **Race:** | W |
| **Housing:** | SDCJ-7-D-01-B | **Court Date:** | 3/24/2022 8:15:00 AM | **Type:** | |
| **Status:** | ACTIVE | **Booking Date:** | 3/10/2022 9:10:43 PM PST | **Proj. Rel:** | |

**DRESSING CHANGE APPLY ANTIBIOTIC** 3/15/2022 8:00:00 AM - 3/21/2022 11:59:59 PM Montgomery, Jon DO
ONCE DAILY
Allergies:

Allergies:

No Known Drug Allergy

| | Mar | Mar |
|---|---|---|
| **Hours** | **15** | **16** |
| 0800 | X | |
| | | |
| | | |
| | | |

Administered - Romeo DeGuzman RN - 3/15/2022 8:29:29 AM

# Rescue Report - AED Summary

| | |
|---|---|
| AED Serial | D00000056895 |
| AED Model | G5A-80P1 |
| Software Version | 4.18 |
| Hardware Version | 1 |
| Battery Capacity Remaining | 67% |
| Battery Model | XBTAED001A |
| Date of Installation | 5/12/2021 |
| Default Language | en-US 1.1 |
| Alternate Language | es-LA 1.5 |
| AED Manager Version | 2.1.0.6 |

# Rescue Report - AED Snapshot

| | |
|---|---|
| User Defined ID | ---------------- |
| Primary Language | Default Language |
| AED Overall Prompting Level | Advanced |
| Volume Level | Maximum |
| CPR First | Disabled |
| Startup Prompt | Call 911 |
| Time Zone / UTC Offset | (GMT-08:00)Pacific Time (US & Canada) |
| ---------------------------------------- | ---------------------------------------- |
| Same Energy After Conversion | Enabled |
| Maximum Shocks Per Sequence | 1 |
| Shock Energy Protocol (ADULT) | 200VE 300VE 300VE |
| VF/VT Rate (ADULT) | 160 |
| SVT Rate (ADULT) | No Therapy |
| Shock Energy Protocol (PEDIATRIC) | 50VE 67VE 67VE |
| VF/VT Rate (PEDIATRIC) | 180 |
| SVT Rate (PEDIATRIC) | No Therapy |
| ---------------------------------------- | ---------------------------------------- |
| CPR SETTINGS - ADULT | |
| Session Type | Traditional CPR |
| CPR Timeout | 0 |
| CPR Metronome Prompt | Press |
| CPR Metronome Rate | 100 |
| End session when | Sets Complete |
| Number of Sets | 5 |
| Breaths Per Set | 2 |
| Compressions Per Set | 30 |
| ---------------------------------------- | ---------------------------------------- |
| CPR SETTINGS - PEDIATRIC | |
| Session Type | Traditional CPR |
| CPR Timeout | 0 |



CSD000682

# Rescue Report - AED Snapshot

| | |
|---|---|
| CPR Metronome Prompt | Press |
| CPR Metronome Rate | 100 |
| End session when | Sets Complete |
| Number of Sets | 5 |
| Breaths Per Set | 2 |
| Compressions Per Set | 30 |
| ---------------------------------------- | ---------------------------------------- |
| CPR Device SETTINGS | |
| Compression Rate (compressions / minute) | |
| Minimum | 90 |
| Maximum | 110 |
| Compression Depth (inch) | |
| Minimum | 1.5 |
| Maximum | 2.5 |
| ---------------------------------------- | ---------------------------------------- |

# Rescue Report - Rescue Summary

| | |
|---|---|
| Incident ID: | 124_3520_50 |
| Date/Time: | 3/16/2022 9:51:45 AM (+-)DST |
| Rescue Duration: | 00:07:23 |
| Number of Shocks: | 0 |
| Battery Model: | XBTAED001A |
| Date of Installation: | 5/12/2021 |
| Battery Capacity Remaining: | 67% |

# Rescue Report - Incident Information

| | |
|---|---|
| Incident Number | 124_3520_50 |
| Date | 3/16/2022 |
| Last Name | Schuck |
| First Name | William |
| Middle Name | |
| Patient ID | 22709797 |
| Age | 22 |
| Sex | Male |
| Ethnic Origin | |
| Date of Birth | 1/13/2000 |
| Patient's Phone Number | |
| Responder's Name/ID | |
| Responder's Phone Number | |
| Paramedics Name/ID | |
| Phone Number of Paramedics/Hospital | |
| Incident Location | |
| Time (Minutes) from Collapse to Emergency Service Call | |
| Witnessed Cardiac Arrest? | |
| Bystander CPR? | |
| Time (Minutes) From Collapse To CPR | |
| Pulse at Scene | |
| Spontaneous Breathing? | |

# Rescue Report - Rescue Events

| Elapsed Time | Event |
|---|---|
| 00:01.196 | Lid Open |
| 00:01.228 | Pads Off |
| 00:16.072 | Pads Off |
| 00:29.676 | Pads On |
| 00:30.048 | Charge Start |
| 00:31.264 | Analysis Start |
| 00:41.652 | Charge End |
| 00:45.260 | Shock Not Advised |
| 00:45.376 | Analysis End |
| 00:48.968 | CPR Start |
| 03:22.912 | CPR End |
| 03:23.136 | Analysis Start |
| 03:37.132 | Shock Not Advised |
| 03:37.580 | Analysis End |
| 03:41.244 | CPR Start |
| 05:57.488 | CPR End |
| 05:57.700 | Analysis Start |
| 06:11.696 | Shock Not Advised |
| 06:12.132 | Analysis End |
| 06:15.744 | CPR Start |
| 06:22.244 | Pads Off |
| 07:05.488 | Lid Closed |

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 1 / 19






CSD000687

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 2 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 3 / 19















CSD000689

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 4 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 5 / 19












# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 6 / 19






CSD000692

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 7 / 19






CSD000693

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 8 / 19















CSD000694

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 9 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 10 / 19






CSD000696

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 11 / 19






CSD000697

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 12 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 13 / 19















CSD000699

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 14 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 15 / 19






CSD000701

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 16 / 19






CSD000702

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 17 / 19



# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 18 / 19






CSD000704

# Rescue Report - Waveform

Rescue Waveform -- 10 mm/mV, 25 mm/sec, 2 mm/g, Page 19 / 19






CSD000705

# EXHIBIT 8

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 9

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

ESTATE OF SCHUCK, et al., )
)
Plaintiff, )
)
vs. )
)
COUNTY OF SAN DIEGO, )
)
Defendant. )
)
___________________________________________)

VIDEOTAPED DEPOSITION OF MANUAL NOZAWA, JUNIOR, RN

San Diego, California
Wednesday, July 10, 2024

Pages 1 through 88, inclusive

Reported by Adriana S. Angulo, CSR
Certificate No. 13824

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

ESTATE OF SCHUCK, et al., )
)
Plaintiff, )
)
vs. )
)
COUNTY OF San Diego, )
)
Defendant. )
)
_______________________________________)

THE VIDEOTAPED DEPOSITION of MANUAL NOZAWA, JUNIOR, RN, was taken pursuant to Subpoena at McKenzie Scott, 1350 Columbia Street, Suite 600 San Diego, California on Wednesday, July 10, 20224, commencing at 1:10 p.m., before Adriana S. Angulo CSR No. 13824, a Certified Shorthand Reporter in and for the State of California.

A P P E A R A N C E S

For the Plaintiff:

MCKENZIE SCOTT PC
BY: MICHELLE ANGELES, ESQ.
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
mangeles@mckenziescott.com

For the Defendant:

COUNTY OF SAN DIEGO
BY: SOFIA L. REZVANI, ESQ.
AND
BY: CLAYTON CARR, ESQ.
1600 Pacific Highway, Suite 355
San Diego, California 92101
(619) 884-2931
sofia.rezvani@sdcounty.ca.gov

A P P E A R A N C E S (Continued)

For the Defendant: CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP

LOTZ DOGGETT & RAWERS, LLP
BY: KATIE SCHULER, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
kschuler@ldrlaw.com

Also Present:

Tracy Ward-Escobar - Legal Video Technician

So I just wondered if there was a change in the way that you're being reviewed from when you first started until now?

A. I just -- I just didn't want to speculate or --

Q. Okay.

A. That's why I stopped myself.

Q. Okay.

A. I just -- I just, like, can't recall, so I -- I can't recall.

Q. And if you can't recall, that's fine. I just wanted to see if you remembered a specific change that you were referring to, but that's fine.

Okay. So I know you don't remember how often. But do you ever remember being put on probation or being -- receiving any sort of, like, disciplinary issues as part of the review?

A. On the first year, this I know, we put in -- into a probation period for the whole year, but any disciplinary actions, no. I don't -- I don't.

Q. And when you say "the first year," it's like everyone is placed on probation as part of being a new employee, right?

A. Yes.

Q. Beyond that first year, you've never been

13:44:03 put on probation or any sort of disciplinary issues?
13:44:06 A. No.
13:44:06 Q. Have you received any promotions or anything
13:44:10 like that?
13:44:10 A. No.
13:44:10 Q. What was your -- so going to March of 2022,
13:44:19 do you remember working on March 10th of 2022?
13:44:23 A. I can't recall.
13:44:24 Q. You can't recall if you were working that
13:44:27 day?
13:44:27 A. Yes, I can't.
13:44:28 Q. If I showed you your records, would that
13:44:31 help you remember whether you were working on
13:44:34 March 10th of 2022?
13:44:36 A. I'll try.
13:44:41 Q. So I am -- I think this is Exhibit 6.
13:44:56 MS. ANGELES: You guys should all have
13:44:58 gotten the full exhibit emailed.
13:45:00 MS. REZVANI: Yeah.
13:45:15 MS. ANGELES: So I'm going to show you
13:45:17 what's been previously marked as Exhibit 6.
13:45:19 (Exhibit 6 marked for identification.)
BY MS. ANGELES:
13:45:20 Q. In order to have prevented a lot of paper
13:45:25 from being printed, I only printed out a certain

13:45:27 amount of Exhibit 6 that we will be using today.
13:45:29 Can you take a second and look at the first
13:45:36 couple of pages and see if you -- that jogs your
13:45:41 memory of what happened on March 10th?
13:45:44 MS. ANGELES: And here's an extra copy.
13:45:48 MS. REZVANI: If we don't want to -- if
13:45:51 Katie wants a copy.
13:45:54 MS. SCHULER: I have it on my computer.
13:45:56 Thank you.
13:45:57 MS. ANGELES: You can let me know when
13:45:59 you're ready.
13:46:14 MS. REZVANI: It's only the beginning.
13:46:15 THE WITNESS: That's all? This one?
13:46:17 MS. REZVANI: Uh-huh.
13:46:19 So she asked you: Does that refresh your
13:46:21 recollection about whether you worked that day?
13:46:23 THE WITNESS: Yes.
13:46:24 MS. REZVANI: Okay.
13:46:25 BY MS. ANGELES:
13:46:27 Q. What -- looking at these records, do you
13:46:29 know what assignment you had on March 10, 2022?
13:46:32 A. I'm in the intake.
Q. Okay.
THE COURT REPORTER: Please keep your voice
up. It tends to drop at the end of your sentence,

13:46:47 and I need to be able to hear you.
13:46:47 THE WITNESS: Okay.
THE COURT REPORTER: It won't be in the transcript if I can't hear you.
13:46:48 THE WITNESS: Got it. Got it.
THE COURT REPORTER: Thank you.
13:46:49 THE WITNESS: So I was working at the
13:46:50 intake.
13:46:50 BY MS. ANGELES:
13:46:51 Q. So in March of 2022, do you remember what
13:46:54 your typical schedule was? Like how many hours per
13:47:02 day you were working at that time?
13:47:03 A. I can't remember the exact time, but it's
13:47:08 always like 12 hours. If you're -- if you're
13:47:11 scheduled 12 hours, you're going to work there
13:47:14 12 hours.
13:47:14 Q. And do you remember if you were working the
13:47:15 morning shift or the night shift?
13:47:17 A. Morning shift. Morning shift. By the
13:47:19 looks -- by the looks of this, I'm working morning
13:47:22 shift.
13:47:22 Q. Okay. So if you are working the morning
13:47:25 shift, what would typically be your hours? Like,
13:47:28 what time would you come in, and what time would you
13:47:31 leave?

A. We start at 6:00 a.m. to 6:30, 6:30 p.m.
Q. Okay. Were you working overtime in March of 2022?
A. I can't recall if I'm doing overtime or not.
Q. Okay. So can you tell me a little bit about the intake process?
So my understanding is you -- you know, you screen everyone that's going to go into the jail. Can you tell me about what that screening process is like?
A. So at first we ask them -- I can't recall what we ask the deputy, like, is this patient is under the influence of drugs, or he has been in an accident or something like that. And then the officer will answer all those questions.
Secondly, we will take the vital signs. We ask them -- we check their head to toe. Meaning, we check if there's problem with their head, you know, if there's any wounds. Or I ask them if you have been into a vehicle accident, you hit your head with something, or somebody hit your head before coming in here.
We check the eyes if they're pinpointed or dilated.
Q. Okay.

A. And then I ask them if you're having, you know, like, during this time, I ask COVID symptoms, or I ask them the signs -- symptoms of COVID. And then if they have any heart problems, if they have any skin conditions. And then if they're having problem with walking with their knees. Are they having problem urinating or defecating?

So basically, from head to toe, I ask. That's the process.

Q. So you said a couple of things. I kind of want to take it step by step.

A. Okay.

Q. So when somebody is being admitted into jail, there's an arrest. Obviously, you're not involved in that, and then they are transported, in this case, to the San Diego Central Jail by the transport officer or the arresting officer, one of the police officers, right?

Then they bring -- do the police officers then bring the individual to you to be screened?

A. Medical. Uh-huh.

Q. Okay.

MS. REZVANI: Is that a yes?

THE WITNESS: They bring the patient to us to get screened, yes.

13:50:07 BY MS. ANGELES:
13:50:07 Q. So can you tell me about how you know -- is
13:50:12 that immediate, or do they put them on a list?
13:50:15 Like, how do you know? Do they make an appointment?
13:50:16 How does that process work from when --
13:50:17 A. The officer brings --
13:50:18 Q. Yeah.
13:50:19 A. So the officer put -- they -- they go to the
13:50:25 intake screening first, to pictures, take --
13:50:28 Q. Okay.
13:50:29 A. I don't know what they call that,
13:50:31 fingerprint or something. They go there, take a
13:50:35 picture first.
Q. Okay.
13:50:36 A. And then it's going to come up to our list.
13:50:38 We have a booking list. And then they line up,
13:50:41 they -- they have their own line, so we just know,
13:50:45 oh, whose next, and then they're going to come to
13:50:49 us, that's how.
13:50:49 Q. Okay. So let me see if I understand this
13:50:52 correctly. The police officer shows up to the
13:50:54 Central jail.
13:50:54 A. Uh-huh.
13:50:54 Q. They process the individual, meaning they
13:50:56 take their booking photo and their fingerprints, and

13:51:00 then that initiates a list -- or that puts them on
13:51:04 the list --
13:51:05 A. It puts them on the list.
13:51:06 Q. -- for the intake nurse, and then you
13:51:08 have -- you sort of go in order; is that correct?
13:51:11 A. Correct.
13:51:11 Q. So when you call the individual -- the next
13:51:18 person on your list, does the police officer then
13:51:21 escort them to the intake area where you do your
13:51:26 screening?
13:51:27 A. Yes, they escort them.
13:51:29 Q. And what is that -- what is the area that
13:51:31 you conduct your assessment in? Like, what is that
13:51:35 area called?
13:51:35 A. It's called intake area.
13:51:40 Q. Is that all called the intake area, and that
13:51:43 would include where you do your medical assessment?
13:51:46 A. Yes. Intake.
13:51:46 Q. Where is that intake area located within the
13:51:51 Central jail?
13:51:51 A. Located the -- the first floor.
13:52:00 Q. Okay. So the agent or the officer brings
13:52:02 him over to you. And sort of walk me through that
13:52:06 first step. I think you mentioned that you speak
13:52:08 with the deputy or the police officer.

13:52:10 A. So I speak with the officer. I ask him like is -- we have this five question. I can't remember the question from the officer that I ask the -- I can't recall.
13:52:25 Q. Okay.
13:52:25 A. I can't recall the exact, but I know I always ask that to the -- because we have a list there, a paper like that.
13:52:32 Q. Okay. And I see you making sort of a square on --
A. It's --
13:52:37 Q. Are you saying this is hung up on a wall?
13:52:39 A. Yes. It's hung up on the wall, yeah.
13:52:42 Q. Okay. So the questions that you ask the intake -- or as an intake nurse to the police officer, I know you don't remember the specific questions at this point, but those questions that you ask are listed on the wall within the intake area; is that right?
13:52:59 A. Correct.
13:52:59 Q. When you do that process -- right? -- when you're asking the questions from the officer, do you walk through each question one by one?
13:53:15 A. Yes. I told them is there any pertaining to the -- to the patient, you know, when they come.

13:53:26 Q. Okay. So let me clarify because I think that's a little bit different than what I'm asking.
13:53:31 When you go through the questions, do you go, one, you know, was this person involved in, you know -- what was -- let me scratch that.
13:53:42 Let's say -- I know we don't have the questions in front of us, so I'm thinking off the top of my head. Question number one is: What was the type of arrest?
13:53:51 Would you ask number one and then go to number two, or would you say, do any of these pertain to the person and just have the officer look at the questions?
13:54:02 A. I go one by one to the questions.
13:54:04 Q. Okay.
13:54:05 A. 1, 2, 3, 4, 5, and then once he answered no to one, I go to number two and explain to the arresting officer, and then I go to the number three and explain it again until I'm finished.
13:54:18 MS. REZVANI: So be clear at the end of your sentence.
13:54:21 THE COURT REPORTER: Thank you, Counsel.
13:54:21 BY MS. ANGELES:
13:54:22 Q. So just to be clear, you'll read number one completely, wait for a response; is that right?

13:54:28 A. Right. Correct.
13:54:29 Q. And then you'll move on to number two, wait for a response?
13:54:33 A. Correct.
13:54:34 Q. And so on and so forth?
13:54:36 A. Yes. Correct.
13:54:36 Q. Okay. From those questions, you know, depending on whether one of those questions is a yes or a no, do you ask follow-up questions to those, or are you only limited to the questions that are posted?
13:54:54 A. I don't understand your questions.
13:54:57 Q. Sure. Let me give you an example. Say one of the questions is, is this person -- do you believe this person is under the influence of elicited substances?
13:55:06 And the officer responds yes.
13:55:09 Do you move on to the next question, or do you ask a follow-up question related to the elicited substances at that point?
13:55:18 A. At that point, if I were doing the intake, I will stop the officer, and then I'm going to ask the patient, what kind of drugs are you on, so I could help him, you know -- if I could help him -- whatever he's feeling right now, you know.

13:55:43 Q. Okay.
A. Or I could -- if I send him to the hospital, I could put a note like I did here, hey, this patient is under the influence of this X medication. Kindly help him, you know, with this situation.
Q. Okay. So you do have the ability to stop and ask a follow-up question about a particular one if it's appropriate?
A. Yes.
Q. Okay. Is that what you're trained to do as part of the intake process as well?
A. Everybody has their own style. That's -- that's how I complete my questions, you know, like I -- on top of my mind. It's like a mental note to me, like this is how I complete all my question properly. So I guess every nurse has their own style.
Q. Great. And just to be clear, I don't want you to speculate about what other nurses do or don't do. I do just want you to -- when I'm asking you, I'm asking you in your experience and then what you've been trained to do.
So, you know, I don't want you to speculate about what other nurses do, but it sounds like this is something that you do in your practice. But

13:59:51 THE WITNESS: And then I ask them, are you
13:59:53 able to put one hand so they could sign for me.
13:59:56 That's all I ask.
13:59:57 BY MS. ANGELES:
13:59:58 Q. Okay. And when you're doing your
14:00:00 evaluation -- and I want to talk about the next
14:00:05 steps.
14:00:05 Does the officer remain there through the
14:00:07 whole entire thing?
14:00:09 A. Yes.
14:00:09 Q. So I think the next thing that you mentioned
14:00:13 that you do is that you interview the patient or the
14:00:18 individual that was arrested themselves, right?
14:00:22 A. Uh-huh. Yes.
14:00:22 Q. And you ask them also a series of questions;
14:00:26 is that right?
14:00:26 A. Correct.
14:00:27 Q. Are those questions that you ask the person
14:00:32 arrested posted anywhere?
14:00:34 A. I have my own copy. I made my own copy. I
14:00:43 don't recall if there's any posted there, but I have
14:00:46 two screens on my -- on my V-drive. I save a copy
14:00:54 of my -- I call it "cheat sheet" on how to ask
14:00:57 questions, a list of what I ask a question for the
14:01:02 client -- for the patient.

REPORTER'S CERTIFICATE

I, Adriana S. Angulo, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place therein named; that said deposition was reported by me in shorthand and later transcribed under my direction, and the preceding pages contain a true record of the testimony of the witness; and I do further certify that I am a disinterested person and am in no way interested in the outcome of said action, or connected with or related to any of the parties in said action, or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certification null and void.

IN WITNESS WHEREOF, I have hereunto set my hand this 18th day of July 2024.

Adriana S. Angulo
Certificate No. 13824