# EXHIBIT 11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | VIDEOTAPED DEPOSITION OF SERINA ROGNLIEN-HOOD |
| vs. | VOLUME I (Pages 1-240, inclusive) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | MAY 21, 2024<br>1350 Columbia Street<br>Suite 600<br>San Diego, California |

CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

Videotaped Deposition of SERINA ROGNLIEN-HOOD

VOLUME I (Pages 1 through 240, inclusive)

San Diego, California

May 21, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 984981

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al., Plaintiffs, vs. COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al., Defendants. | Case No. 3:23-CV-00785-DMS-AHG |

Videotaped Deposition of SERINA ROGNLIEN-HOOD, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:17 a.m. and ending at 4:24 p.m., on Tuesday, May 21, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
1600 Pacific Coast Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Steven P. Inman, II, Esq.
Steven.inman@sdcounty.ca.gov, Esq.

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

David Kim
STENO

09:46:55 accomplish this morning. So the -- have you had -- I
09:47:02 guess I'll start with asking, have you had sufficient
09:47:08 time, in your mind, to review the nine different topics
09:47:12 of inquiry that are laid out in this deposition notice?
09:47:18 And I can kind of go through those again here.
09:47:42 (Mr. Scott scrolls through the exhibit.)
09:47:42 So having kind of shown you page by page
09:47:46 those nine topics of Exhibit 31, let me just kind of
09:47:51 start slow.
09:47:52 Do you feel that you've had sufficient time
09:47:55 to review the deposition notice itself?
09:47:58 A. Yes.
09:47:59 Q. Now, I don't -- your attorney has made
09:48:06 certain written objections that I respect and don't
09:48:08 want to pretend like they don't exist. And so
09:48:12 acknowledging those, and counsel certainly has an
09:48:14 opportunity to make a further record if he wants to.
09:48:18 But notwithstanding those objections and understanding
09:48:20 those objections, do you otherwise feel prepared to
09:48:26 give us the County's best answer on topics 1 through 9
09:48:31 as they are set forth here in Exhibit 31?
09:48:34 A. Yes.
09:48:34 Q. Now, please don't share with us specific
09:48:39 conversations you had with your attorneys or attorney,
09:48:44 but please tell us generally, what have you done to

09:48:47 sort of prepare yourself to give testimony on behalf of
09:48:54 the County today?
09:48:55 A. I reviewed the time that Mr. Schuck was in
09:49:01 custody, his medical records, reviewed policies, and
09:49:07 just familiarized myself with the case.
09:49:09 Q. You say you reviewed medical records and you
09:49:14 reviewed policies and you familiarized yourself with
09:49:17 the case. I guess we'll look at Mr. Schuck's medical
09:49:23 records that I think I understand generally what you
09:49:25 mean by that. I want to make sure I have a clear
09:49:29 understanding of what policies you're describing.
09:49:32 Can you be more specific about that?
09:49:34 A. Just the receiving policies, the policies on
09:49:39 scheduling for appointments, just the different
09:49:43 policies that might have affected his stay in custody.
09:49:47 Q. And there are different policies that sort of
09:49:51 gather -- govern different topics or scenarios for
09:49:56 incarcerated people; is that right?
09:49:59 A. Yes.
09:49:59 Q. And I think one of them you described was
09:50:02 intake, although I think you used a different word?
09:50:05 A. Yes.
09:50:05 Q. What was that?
09:50:06 A. Receiving screening, we use receiving
09:50:11 screening and intake kind of --

09:50:14 Q. "Receiving" was the word you used?
09:50:16 A. Yes.
09:50:16 Q. And there's a specific policy that governs receiving or intake from a medical point of view; is that right?
09:50:23 A. Yes.
09:50:24 Q. And you reviewed that particular policy?
09:50:26 A. Yes.
09:50:27 Q. You also described a policy, I think you referred to, as referrals kind of as a shorthand. Do I have that right?
09:50:37 A. Yes.
09:50:37 Q. And what's that?
09:50:38 A. It's just a policy -- it's a guideline that when we refer somebody to different entities for medical, mental health, lab and treatment, different areas -- appointment scheduling basically refer -- appointment scheduling.
09:50:57 Q. And then -- so that's the second kind, referrals, as distinct from receiving and intake. Just kind of making a mental list here. That's two so far?
09:51:10 A. Yes.
09:51:10 Q. What other policies and procedures can you recall reviewing in preparation for your testimony here today?

09:51:16 A. Withdrawal policies.
09:51:20 Q. Tell us about that policy.
09:51:22 MR. INMAN: Objection. Overbroad, vague.
09:51:25 BY MR. SCOTT:
09:51:25 Q. You may answer.
09:51:27 A. They are just the policies that we use when we determine that someone may be going through withdrawals.
09:51:34 Q. Meaning like drug or alcohol withdrawals?
09:51:38 A. Yes.
09:51:38 Q. What other policies or procedures other than those three we just discussed?
09:51:46 A. That's all I can think of off the top of my head right now.
09:51:51 Q. And I don't -- I don't mean to press, but I'm just trying to get an idea of it. Did you look like through one big book, for example, that had all of the applicable policies or did you sort of make an effort to select a few policies or how did that work?
09:52:12 A. Well, we have a computer system that has a list of all the policies, and I kind of went through them, kind of looked at any one that may have played -- may have affected this case. Some didn't at all based on the titles -- you know, he's not a pregnant patient, so wouldn't review that one. So just kind of went

through all the policies that we have and would review them if I felt it was -- would affect the case.

Q. Okay. I appreciate that. Now, my understanding is that there's some policies that -- there's different versions over time. There might be one that says it's applicable October of 2021, and then there might be a different version of that policy that says it's applicable October 2023, or something like that. Now, I'm not talking about any particular policy, but you kind of know generally what I'm talking about?

A. Yes.

Q. So with that in mind, did you try to like go back and figure out which policies would have been the governing ones for March of 2022 or did you go with the ones that are in effect today or both or -- you tell us.

A. I kind of looked at both. I started with what's current just to make sure -- because some we may not have updated since then, just depending on the what the policy is, as you probably figured. But there's a date that tells us if we've revised them. So if there was a revision date, then I would go back to review the one that would have been active at the time, if that makes sense.

09:54:00 Q. We talked about receiving and intake as one
09:54:04 of the specific policies you looked at.
09:54:07 A. Yes.
09:54:08 Q. Do you recall whether that particular policy
09:54:10 had changed after Hayden Schuck's death?
09:54:15 A. I would have to double-check that date, yes.
09:54:18 Q. So you don't recall, as you sit here --
09:54:21 A. I don't recall off the top of my head.
09:54:23 Q. Fair enough. Referrals of incarcerated
09:54:26 people for medical care was another policy and
09:54:29 procedure we discussed?
09:54:30 A. Yes.
09:54:31 Q. Do you recall if that one has changed since
09:54:35 Hayden Schuck's death?
09:54:36 A. I believe a couple words have changed on that
09:54:39 one, but I couldn't tell you big things that have
09:54:41 changed on that one.
09:54:42 Q. What do you remember, if anything, about the
09:54:45 words?
09:54:45 A. About putting something in a UMQ, just the
09:54:49 way we order stuff now is a little -- might be a little
09:54:53 bit different.
09:54:53 Q. And what's that, UMQ?
09:54:55 A. A UMQ is just a different place that that
09:54:59 appointment type may have lived for different types of

09:55:02 referrals for off site or on site, and I think that may
09:55:05 have changed. And like I said, don't quote me on that
09:55:07 one either.
09:55:08 Q. The policy we discussed was withdrawals.
09:55:11 A. Yes.
09:55:12 Q. Or -- I think, and to be more specific, does
09:55:17 that policy that you're describing talk about how to
09:55:24 manage and treat inmates who are suffering from
09:55:30 withdrawal symptoms?
09:55:32 A. Yes.
09:55:32 Q. Has that withdrawal policy changed in any way
09:55:37 since Hayden Schuck's death, to your knowledge?
09:55:39 A. Yes.
09:55:40 Q. In what ways?
09:55:41 A. We instituted a MAT program since then.
09:55:47 So --
09:55:47 Q. Is MAT an acronym?
09:55:50 A. Yes. Medically assisted treatment. So we
09:55:56 implemented that. So the way we start withdrawal is
09:56:01 now initiated through a STAT care, which is a --
09:56:07 providers, mid-level or above, that will give us --
09:56:12 give the nurse directions on how to handle somebody
09:56:16 withdrawing based on the answers that we give them.
09:56:19 Q. All right. There's a little bit to unpack
09:56:22 there. First, for the benefit of the court reporter

09:56:24 and all of us, what is STAT care?

09:56:26 A. STAT care is a program -- it's not a program. It's people involved -- it's a group of mid-levels that work for NaphCare that nurses have access to via computer or phone calls, but it's a real life interaction real time that an RN, LVN can reach a mid-level to get treatment guidelines.

09:56:57 Q. You used the word or phrase "mid-level provider" a couple times. What's that?

09:57:04 A. A mid-level for us is a nurse practitioner or above. A nurse practitioner or a physician's assistant, just above our lowly RNs.

09:57:20 Q. I see. I don't think I asked you. Going back to March of 2022, do you have any estimate of how many doctors, I mean physicians, would have been on duty at the men's central jail?

09:57:39 MS. SCHULER: Objection. Calls for speculation.

09:57:41 BY MR. SCOTT:

09:57:41 Q. If you know.

09:57:41 A. I would not know that.

09:57:44 Q. Do you know whether it's more than zero?

09:57:50 MS. SCHULER: Same objection.

09:57:50 THE WITNESS: All I know is there's a provider available. I couldn't tell you was it a mid-level or above, a physician, in the facility, yes.

her nursing judgment doesn't give her anything that's changed in the situation or worsened or needs medical attention, there may not be a medical need to send him back to the hospital when that issue has been addressed.

Q. That answer that you just gave, is that memorialized in any way in the policy itself? Like does the policy account for what happens when an inmate returns from the hospital?

A. I don't believe it's worded like that. It may say "May need to go," but I don't believe it's worded where it addresses if someone has left AMA or it's been addressed, no. I don't believe it's memorialized like that.

Q. Okay. Have you ever been in a position, as Director of Nursing or otherwise, where you train nurses on how to do receiving or intake?

A. Yes.

Q. Tell us about that. How did you find yourself training on that topic?

A. I trained on that topic because I at one time was a preceptor.

Q. What's that?

A. A preceptor is where you train the new nurses that come into the facility on County guidelines and

correctional health, I like to call it. Yes.

Q. And when did you serve as a preceptor?

A. 2010 to probably about 2014, formally, as a preceptor.

Q. Did you conduct trainings during that whole tenure?

A. When you say "conduct trainings," meaning what kind of trainings?

Q. I'm sorry. Trainings of nurses on how to do intake screening.

A. Yes.

Q. What format did those trainings take? Like how -- did you give a lecture or a PowerPoint? Was it more informal than that?

A. By the time I precepted, they had already went through their new-employee orientation up at COC. So it was like on-the-job training, real life training at that point.

Q. And so how would you train nurses on applying the gate refusal policy on an inmate's second presentation to the jail after the hospital, what training would you provide for that scenario, if any?

A. I would tell them to look at the patient, determine has anything changed since he's left, review the notes of why he went the first time, did anything

change, worsen, differ; speak to the patient, ask what's going on, is there something that -- like I said, has something changed that's alarming you, that's -- he would need to go back out for at that point. Because you don't want to get into that ping-pong ball sometimes.

Q. I'm sorry. What do you mean you don't want to get in that ping-pong ball?

A. If a patient leaves AMA or -- and I'm not talking about Mr. Schuck. I'm talking in general --

Q. Before you start again, what's AMA?

A. Against medical advice. We can send a patient back and forth, back and forth to a hospital, they come back to jail, back to a hospital. If they are leaving against medical advice, if there's nothing that the hospital or the emergency room is going to do, there's no point of going back and forth. That's why we -- if we're sending them back out, it's because we can't, we've done it, we'll send them back out after the first time they come back.

But we like to say, "Hey, this is what we're seeing now. Look at this this time." Give them a more focused -- yeah, he was in a motor vehicle accident, but now I'm concerned about what. Does that make sense?

12:28:07 Q. I think so. So let me try and see if I'm understanding. I'm hearing you say that when an inmate receives a gate refusal the first time, it may be because they meet a criteria or A, B, C criteria, and so they are sent to the hospital. With me so far?
12:28:26 A. Yes.
12:28:27 Q. All right. But then sometimes that inmate basically gets pinged back from the hospital right back to the jail, right?
12:28:33 A. Yes.
12:28:33 Q. So in that situation, I'm hearing you say that the training that nurses receive is something different than -- meaning worse than the A, B, or C criteria that sent him the first time. Is that so?
12:28:53 A. It doesn't have to be worse because he was still in a motor vehicle accident. But let's say he came back from a motor vehicle accident and now says, "Nurse, now I have a headache, now I have double vision," or "I'm having chest pain from the set belt," or the nurse notices a bruise from the seatbelt. So it can be the same incident. It's just now what is being presented to us.
12:29:17 Q. Would need to be different in some way?
12:29:20 MR. INMAN: Objection. Overbroad, incomplete hypothetical.

12:29:23 THE WITNESS: Not necessarily.
12:29:26 BY MR. SCOTT:
12:29:26 Q. I'm sorry. I was just trying to understand.
12:29:28 A. Not necessarily different, but a little bit more specific. Because MVA, I was in a motor vehicle accident. He gets -- and I'm generalizing -- he gets to the hospital, he says he's fine. They are going like, okay, he's good. He comes back. Now, "Nurse, I have a headache now from -- and I didn't have this before." So we can say going back out because he was involved in a motor vehicle accident now with a headache or now with this. It's giving that next entity or hospital another piece, something more guided to look at. Abdominal pain maybe from the seatbelt. Because now we've asked more questions to give them more to go on to help them out as well.
12:30:16 Q. What if the situation appears exactly the same as it was, the inmate was sent and is presenting precisely the same way, do the gate refusal criteria continue to apply the same way or does something different happen?
12:30:38 A. The nurse --
12:30:39 MR. INMAN: Objection. Incomplete hypothetical.
12:30:40 THE WITNESS: The nurse would use her nursing judgment and determine -- even if he's not saying

something changed, is she seeing something different? Are the pupils now different? Is bruises popping up? So she can still use the exact same reason and send him back out, but once again, we want to let the receiving hospital emergency room know, please look at -- I know you sent them back already, but now I'm noticing this, even if he doesn't say that. So just a more guided what they should be looking at.

BY MR. SCOTT:

Q. Are nurses discouraged in any way from sending somebody back a second time if the symptoms are the same or if the inmate is presenting the same way?

A. No. No.

Q. And I didn't mean to suggest anything. I'm trying to drill down a little bit on the difference or the specificity that you're talking about in sort of a second gate evaluation.

A. Right. It's like going to the dentist and telling the dentist your teeth hurt, but you don't tell them where. You're not going to -- the dentist is going to tell you, Hey -- I don't know your last name -- Mr. So and so, please tell me, does it hurt on the left side, right side, up or bottom? They need something. It's an emergency department. It's not your primary care physician. So why we will send them

out time and time again for the same issue, we just try to give them a little bit more information. Like I said, what's he presenting with. Now he has a bruise to the abdomen, now he has ringing in his ears. Now -- we just don't want to keep putting motor vehicle accident. Motor vehicle accident: Please assess for head trauma; motorcycle vehicle accident: Please assess for abdominal trauma noted to have seatbelt bruising.

So it's helping them, especially if we know a patient may not want to help themselves sometimes and give that information, we're trying to guide that along to be a good partner with the emergency department and get that person the help he needs based on how he presented the first time.

Q. We were discussing that Mr. Schuck received a gate refusal on March 10 and was sent to UCSD hospital, right?

A. Yes.

Q. And apparently UCSD hospital sent him back to jail also on March 10. Is that so?

A. Yes.

Q. The second time Mr. Schuck arrived at men's central jail on March 10, do you know whether or not he was evaluated for whether there should be a gate

12:33:47 refusal a second time?
12:33:48 A. The receiving screening was done, and while you're doing receiving screening that would have been done, yes.
12:33:55 Q. Who did that screening?
12:33:57 A. The second time?
12:33:58 Q. Yes, ma'am.
12:33:59 A. Jameelyn Barrera.
12:34:01 Q. Do you know whether Nurse Barrera applied the gate refusal criteria that are written down that we discussed already that second time that Mr. Schuck presented to the jail?
12:34:21 A. She should have, yes.
12:34:23 Q. Why do you say she should have?
12:34:25 A. That's our -- even if someone has refused the first time, you can review it and have discretion but made aware of what -- you should always know what your gate refusal criteria is with the information in front of you that you have, make the best decision for that situation.
12:34:51 Q. I want to drill down a little bit more on the discretion that you're describing. I can envision a situation -- and I don't know if this is Mr. Schuck's situation, so I'm talking a little bit more about a hypothetical -- I can envision a situation where an

inmate fits gate refusal criteria the first time they go to jail, and then they are sent to the hospital, and then they come back the second time with precisely the same symptoms that rejected them the first time. In that situation, is it within the nurse's discretion to take the inmate in even though they are exhibiting symptoms that led to the first gate refusal or do they have to apply the policy as it sits and say, no, you fit these gate refusal criteria and therefore you're going back a second time?

A. That question is not as black and white as you asked it because both situations have happened. So it's hard to answer that question in a few words.

Q. When you say "both situations have happened," why don't you tell me what you're thinking of and then we'll go from there.

A. The one that stands out a lot is high blood pressure. If you can imagine, high blood pressure is rampant at intake. We have our criteria for high blood pressure. If the blood pressure is over X, it can be a gate refusal. They go out to the emergency room, emergency room does nothing -- excuse me -- they don't give any medication to bring the blood pressure down. He comes back, the blood pressure is still up. Nurse sends him back to the ED because the nurse wants to see

12:36:49 that number under what our criteria is.

12:36:54 Q. Which is what, for the record?

12:36:57 A. I do not know what it was in 2022 off the top of my head. I want to say 180 over 90, but it's close to there.

12:37:05 Q. Fair enough.

12:37:06 A. So the ED sends them back and says we're still not going to give him anything to bring the blood pressure down. And then his blood pressure is still high. At some point we have to make a judgment, and that's when we ask nurses to say is he symptomatic, does he have a history of high blood pressure, what is his normal. Your normal and my normal are different. Your blood pressure may be high -- now, if his blood pressure is high with a headache, then maybe now we give that information to the ED.

12:37:41 So yes, we'll send them back and forth until we get somewhere, but we also can't force an ED to treat if they don't feel they need to treat because their parameters -- and I don't know what theirs are -- may be different than what ours are. So they are going to clear for incarceration and we're going to be like, nope, go back and forth. And usually phone calls are made at that point, yeah.

12:38:14 Q. You've been using the term "ED." What's

that?

A. Emergency department. They like to be called emergency departments now.

Q. Fair enough. What's your understanding of what happened when Hayden Schuck came back to the men's central jail the second time on March 10?

A. The nurse did his receiving screening, felt that he was cleared for -- to be booked and booked him at that time.

Q. And as you sit here today, how do you know that?

A. Reviewing her notes, she had said clear -- I can't remember which box -- I don't want to misquote the box, but she cleared him to come into custody and then scheduled an appointment.

Q. And you gleaned that from Mr. Schuck's medical records?

A. Yes.

Q. Were there any other sources of information that you're basing that last statement on?

A. That he was in custody.

Q. No. I'm sorry. Just of what happened the second time Mr. Schuck --

A. His medical records.

Q. More specifically, have you ever watched

determination of how -- housing, do they need to be treated -- treatment plans, and stuff like that.

Q. What's the acronym for the qualified mental health professional?

A. QMHP.

Q. In March of 2022, was there a QMHP present during intake screening?

A. There could be. We have the ability to call a QMHP to intake screening on the second floor.

Q. How does that work?

A. We call and say we need a gatekeeper -- that's what we call them -- and then one would come down.

Q. Is there typically a gatekeeper in the form of a qualified mental health provider in the intake screening area if you don't call them?

A. Back in 2022?

Q. Yes.

A. No.

Q. Why not?

A. Staffing issues, space issues, COVID issues back in 2022. There was a lot of different stuff going on back in 2022. The spacing issue, we had to keep everybody six feet apart, and we were already in close quarters. But the ability to call them down was at any

time.

Q. What would have to happen for you to get a qualified mental health provider down to the booking area to evaluate a patient?

A. You would call them on the radio or pick up -- nurses usually pick up the phone. A deputy would call on the radio if they didn't answer where they are at because we know where they are at. If they didn't answer, then a deputy would call them over the radio and they would come down to the second floor.

Q. When are qualified mental health providers on duty at the men's central jail in March of 2022, what hours?

A. That, I do not know off the top of my head, what hours.

Q. Do you know whether there was always a QMHP on duty during regular business hours?

A. When you say "regular business hours," 9:00 to 5:00 regular business hours?

Q. Sure, for starters.

A. Yes, unless someone called in sick or vacation but --

Q. What about 9:00 to 5:00 on weekends?

A. I can't speak for the weekends. I do believe they had one, but I don't want to put that in stone.

Q. So in March of 2022 if an inmate presented to intake and screening after hours, would there be a qualified mental health provider available to see them?

A. No.

Q. So how would a nurse get them seen by a mental health provider if one was not on duty at that time?

A. Should make a schedule -- they would make -- the nurse would make a scheduled appointment.

Q. And how does that scheduling occur?

A. In our electronic health medical record.

Q. And specifically how?

A. She would -- I always say nurses should be she's and doctors should be he's. They would actually get in the system, open it up, pick the type of appointment they would like, QMHP, the date and time, and kind of give a reason. There's a box for reason if you want to put a reason there.

Q. So I'm hearing you say that today if an inmate goes -- or shows up at booking at the central jail, they would see a registered nurse as part of the screening process, but they would also see a qualified mental health provider more or less at the same time; is that true?

A. If they needed one, yes.

Q. If they needed one?
A. Yes.
Q. That's so today?
A. Yes.
Q. So today a qualified mental health provider would still not be present at intake as a matter of course?
A. As a matter of course, they are actually now on the second floor almost overnight every single day. I think there's one night they are not there over night. So now they live there on the second floor.
Q. Meaning they work there and their offices are there?
A. Yes.
Q. Do you know if a qualified mental health provider actually evaluates every inmate that comes into the jail as a matter of course in the booking process today?
A. Not necessarily in the booking process, but it's quicker now.
Q. When you say "quicker," how soon?
A. I believe they are doing it within 14 days -- within 14 days now. It might be seven, but I believe it's 14.
Q. But then it be could like right at the moment

01:00:42 of intake if a nurse decides that that's appropriate today?

01:00:47 A. Yes.

01:00:47 Q. So going back to March of 2022, how was that different?

01:00:52 A. In March of 2022, if it was off hours, she would schedule the appointment unless the person was a danger to themselves or others. Then we would put them in, what we called back then, EOH, advanced {verbatim} observation housing, if they were a danger to themselves or others until they could be seen by a qualified mental health professional.

01:01:20 Q. In March of 2022, what training did a nurse receive on how to evaluate whether an inmate was a danger to themselves or others?

01:01:32 A. We have -- for lack of a better term, we call it gate-keeping training, and it's a template that goes over if they are saying certain words, presenting certain things, if they have certain charges. We tell nurses to err on the side of caution for our EOH program.

01:01:52 Q. Meaning what?

01:01:53 A. We're not trained in mental health like a mental health clinician is. We know blood pressure. So if someone is presenting and saying they are

01:02:05 suicidal, they want to hurt themselves, safe than
01:02:08 sorry, let's go ahead and put them in our EOH program.
01:02:13 They are going to be assessed by a qualified mental
01:02:16 health provider to make that determination of whether
01:02:18 they are just saying it or do they mean it. It would
01:02:24 be hard as a nurse to say -- if someone said they are
01:02:27 suicidal, to make that ultimate decision.
01:02:29 Q. I gather that you had maybe some role in
01:02:37 training intake nurses on sort of this initial
01:02:43 screening prior to March of 2022; is that true?
01:02:45 A. Yes.
01:02:46 Q. And I respect what you just said, that nurses
01:02:51 are not mental health providers, right?
01:02:55 A. Yes.
01:02:55 Q. Nurses don't receive that same kind of
01:02:59 training; is that so?
01:02:59 A. Correct.
01:03:00 Q. I think you said "nurses know blood
01:03:02 pressure." What did you mean by that?
01:03:04 A. We know what those numbers mean and we know,
01:03:05 even if he says he's not -- has high blood pressure;
01:03:10 yes, you do have high blood pressure, you know --
01:03:12 Q. But you're not trained mental health
01:03:16 providers?
01:03:16 A. Correct.

Q. Now, for those reasons, nurses are taught that if there's a question about whether an inmate is suffering from some sort of mental health danger that you should err on the side of caution; is that right?

A. I wouldn't say mental health danger. We're talking about they are suicidal or homicidal.

Q. Help me understand that distinction. Is it only when a nurse hears ideation of wanting to hurt somebody else or wanting to hurt themselves that this kind of err on the side of caution applies or are there other circumstances where you should err on the side of caution kind of in the mental health arena here?

A. The EOH policy is written if they are wanting to hurt themselves. If they are saying it, demonstrating it, if they say they want to hurt others, then that's when we are allowed to put them in our EOH, our advanced observation housing. Those are the two criterias for that housing.

Q. Those criteria specifically are if the incarcerated person might be a danger to themselves, Number 1?

A. Yes.

Q. And Number 2, if they might be a danger to others?

A. Yes.

Q. So the question is, how are nurses taught to evaluate whether an inmate is a threat to themselves, for example?

A. We look at if they say it, if they voice it; we also look at charges -- or we're told the charges; we can look at age; we can look at their behavior, if they are banging their head, and those are the big ones that we look at.

Q. Okay. I'm hearing you say that nurses are taught to look at four big criteria when it comes to evaluating if an inmate is a danger to themselves, for starters?

A. Yes.

Q. And those four major criteria are whether the inmate orally makes statements about hurting themselves or others, Number 1, right?

A. Yes.

Q. Number 2, what the inmate's charges are, that is why they were arrested?

A. Yes.

Q. Third, the inmate's age?

A. Yes.

Q. That is whether they are 20 years old or 80 years old?

A. Yes.

01:05:55 Q. And I say that not to be a wise apple, but as opposed to like the age of their case or something like that.
01:06:03 A. Correct.
01:06:04 Q. And then the fourth factor is the inmate's behavior?
01:06:07 A. Yes.
01:06:07 Q. Are there any other -- is there any other guidance that nurses receive for how to provide mental health screening for inmates at booking?
01:06:28 A. Well, we do mental health screening. We'll ask a series of questions to get a history, and then schedule an appointment appropriately by that way as well.
01:06:40 Q. I totally conflated two things, and I don't want to be sneaky that way. So let me back up.
01:06:48 I had just listed four things, an inmate actually saying it, what the inmate's charges are, inmate's age, and the inmate's behavior, those four things are sort of the main things nurses are taught for whether an inmate is a danger to themselves or others. Is that true?
01:07:08 A. Yes.
01:07:08 Q. Is there any other guidance that nurses receive for determining whether an inmate is a danger

01:07:15 to themselves or others?
01:07:18 A. Experience, but written out, not that I can think of.
01:07:23 Q. Are there any other factors other than those four things we just named that help a nurse determine whether an inmate should be placed in --
01:07:35 A. EOH.
01:07:36 Q. -- in the EOH-type housing cell?
01:07:41 A. Those are the four big ones, yes. I can't recall any other ones.
01:07:45 Q. And then do the nurses have any guidance on how to apply those four factors beyond just the fact that they should look at those four factors?
01:08:02 A. So there is a template they use that kind of guides them through the questions, and then the determination is are they going to place them or not place them. It kind of boils down to one or the other. And usually if a nurse hears someone wants to kill themselves, even if they take it back, we're going to place in EOH.
01:08:28 Q. If a nurse is uncertain about whether an inmate is a danger to themselves or others, they ought to err on the side of caution. Is that so?
01:08:41 A. Yes.
01:08:42 Q. If a nurse is uncertain about whether an

inmate should be placed in EOH or not, they should err on the side of caution, true?

A. If one of those four triggers were triggered, yes.

Q. If a nurse is uncertain about whether an inmate should be placed in a sobering cell, they should err on the side of caution?

A. Nurses don't place in sobering cells. It's a recommendation for nurses to place in sobering cells.

Q. If a nurse is uncertain about whether to recommend placement in a sobering cell, they should err on the side of caution?

A. They can recommend it to sworn, yes.

Q. And they should err on the side of caution in that recommendation?

A. Yes.

MR. SCOTT: I think this is a good time for a break. Let's go off the record, first of all.

THE VIDEOGRAPHER: The time is 1:09. We are off the record.

(Lunch recess.)

THE VIDEOGRAPHER: The time is 1:50. We are on the record.

BY MR. SCOTT:

Q. Good afternoon.

speak -- is that right?

A. Yes.

Q. Or that was true in March of 2022?

A. Yes.

Q. Now --

MS. SCHULER: Object as vague and overbroad. Sorry.

BY MR. SCOTT:

Q. I'd like to understand how the mid-level providers and above participated in the training of the nurses that were employed by the County, if at all.

MS. SCHULER: Object to the extent it calls for speculation.

BY MR. SCOTT:

Q. In your experience.

A. So we would have -- sometimes we would have surprise man-down trainings at facilities where no one knew they were for real or not for real. So it's real -- as close to real life as we can possibly get. So they would attend those. Of course they do new employee orientation with our staff and go through the computer system and they know -- they are shown the protocols nurses can use, different stuff like that, as for joint training.

Q. Okay. So the things that you just described

are circumstances in which CHP employees and County nurse employees would attend the same trainings?

A. Yes.

Q. Are there ever any situations where the CHP doctors or CHP providers are actually training County nurses on anything?

A. Not formally, but if we saw something different or new that a nurse has never seen before, there was a learning -- there could be a learning experience there.

Q. How do you mean?

A. If we got a new type -- not every nurse has seen every type of wound or dealt with every piece of equipment, per se. We read about it, but until you play with it, it's different. So if it was something that a provider -- the nurse may not have used before, that provider was always open to say this is how we do it, this is how I want the dressing to be done, or removing certain types of sutures, they may say use this clipping method or this clipping method, but not no formalized training, but the education was always there.

Q. Did nurses or -- and I'm talking about March of 2022. Did nurses receive ongoing training, to your knowledge?

02:51:54 A. March '22 was that time during COVID. So a
02:52:00 lot of training did stop during the pandemic. We just
02:52:06 couldn't do the training.
02:52:08 Q. How do you mean?
02:52:10 A. So we like to do a lot of on-site training, a
02:52:15 lot of training in smaller classrooms. That was all
02:52:18 kind of -- you couldn't do that. We tried to keep
02:52:23 whoever worked at a facility at that facility because
02:52:27 we didn't want to start mixing different facility
02:52:30 nurses because we didn't want to lose the whole nursing
02:52:33 crew. So with COVID, everything kind of -- all of our
02:52:38 training kind of did scale back, unfortunately.
02:52:42 Q. Are there minimum training requirements that
02:52:45 nurses have to maintain as a matter of their licensing?
02:52:49 A. Yes.
02:52:49 Q. And how does that work?
02:52:51 A. It's through the California Board of Nursing.
02:52:55 We have to submit CEUs, that's continuing education
02:53:00 units, it's every other year to keep our license
02:53:04 current.
02:53:05 Q. The difficulty in some of the training that
02:53:12 you were describing before because of COVID, and how
02:53:16 some of that training fell behind for those reasons, to
02:53:20 your knowledge, did that impact nurses' abilities to
02:53:24 get the training that they needed for licensing

purposes?
A. No.
Q. And why not? How was that able to maintain?
A. CEUs are book credits, not hands-on credits. So it's reading some material, taking a test. It's not actual hands-on material that is needed for those CEUs.
Q. Is the licensing ongoing learning requirements separate from whatever training the County requires of nurses?
A. Well, of course the County requires our CEUs because we have to have a valid nursing license, yes. But we do have other education that we make mandatory for our staff.
Q. Okay. And thank you for that clarification. I gather from your answer that nurses are expected or required to do whatever CEUs are necessary to keep their licenses current certainly?
A. Yes.
Q. But then in addition to that, the County has certain trainings that it expects those nurses to undertake as well?
A. Yes.
Q. Tell me more about those trainings, the other ones. Going back to 2022, what -- well, that's not a good example. Going back prior to the pandemic, what

did that training program look like for nurses?
A. The two big ones we wanted them to keep that they had to do was AMLS.
Q. You and the initials. What is "AMLS"?
A. This is the one that I do not like -- America -- Advanced Medical Life Saving. That's what it is. So it's a little bit beyond basic lifesaving, it's advanced. It talks about airways, how to open airways, the medications that you can give during a code, different stuff like that. So it's a little bit more than your basic CPR.
Q. I was just about to say, that sounds like CPR plus?
A. Yes. And then we do PHTLS, which is pre-trauma hospital -- lifesaving techniques.
Q. There you go again.
A. I know. And that's another one that we do.
Q. And my apologies. I spoke over you. It was 100 percent my fault. You've been being great about not talking over me, and so that's really -- so those two trainings that you just described with both of those acronyms existed before the pandemic?
A. Yes.
Q. Were either of those interrupted by the pandemic?

02:56:19 A. Yes.
02:56:20 Q. One or the other or both?
02:56:21 A. Both.
02:56:21 Q. And what were those?
02:56:23 A. We could not conduct the classes anymore
02:56:26 during the pandemic.
02:56:27 Q. And I heard what you said earlier about the
02:56:31 challenges of meeting inside and being within six feet
02:56:35 of one another. So I understand that in-person
02:56:37 trainings could certainly be challenging during the
02:56:39 pandemic, right?
02:56:40 A. Yes.
02:56:40 Q. What about Zoom, the way that a lot of
02:56:44 business got done during the pandemic, were there ever
02:56:49 any Zoom trainings you can remember?
02:56:49 A. Those have to be hands-on for them to be
02:56:52 accredited because you actually get credit hours for
02:56:55 those, and they have to be hands-on.
02:56:58 Q. I'm hearing you say that for there to be
02:57:03 accreditation, training has to be hands-on and occur
02:57:09 live and in person?
02:57:10 A. Yes.
02:57:10 Q. Now, is the accreditation that you're
02:57:15 describing for nurse licensing or is this accreditation
02:57:19 like the NCCHC accreditation we were talking about

02:57:23 earlier or is it some other kind of accreditation?

02:57:26 A. So the nurses can use the credit hours they
02:57:29 get from PHTLS and AMLS to apply it to their nursing
02:57:33 license. It's considered a CEU. But also we get a
02:57:37 certificate from those entities that says we have
02:57:41 passed it, we are certified in those as well. So it's
02:57:47 twofold. So to get the official certificate saying
02:57:53 that you have passed this, you're certified in it, it
02:57:57 has to be hands-on. But then the nurse can apply those
02:58:01 and use them for her or his credits to keep their
02:58:07 nursing license current, if that makes -- so they can
02:58:10 be used twofold, if that makes sense.

02:58:13 Q. That does make sense. I appreciate it.
02:58:17 How often does the County require nurses to
02:58:23 take those two courses? And these are the courses
02:58:28 still pre-pandemic.

02:58:30 A. I believe they are every two years with a
02:58:34 refresher course, if needed, in between -- at every
02:58:39 year mark. But they are a two-year certification.

02:58:41 Q. So each of those two topics have essentially
02:58:49 two-year terms for the training?

02:58:52 A. Yes.

02:58:52 Q. Or your training is good, your certification
02:58:55 is good for two years?

02:58:57 A. Yes.

Q. How do you know if you need a refresher in between?

A. Refreshers are not required. We like to do refreshers if there's been a change in the subject. If the medical board, the nursing board, if anything has changed in the medical way, like when they changed CPR from chest compressions over rescue breathing, we got everybody back in to get that updated. So depending on what type of changes are made, we'll get them through that yearly refresher course. The yearly refresher course is not mandatory, but we use it based on how much information has changed since the last -- or when they change editions, if that makes sense.

Q. I sincerely apologize for making you do the acronyms again. But could you tell me just one more time those two training programs, and I'll get it right.

A. AMLS.

Q. Is the first?

A. Yes.

Q. And the second is?

A. PHTLS. And I'm dyslexic, so I probably got it backwards, but it is PHTLS.

Q. Thank you for that.

Aside from the AMLS and the PHTLS trainings,

03:00:28 are there additional trainings that the County requires of its nurses on an ongoing basis?
03:00:31

03:00:35 A. Yes.

03:00:35 Q. And what are those?

03:00:36 A. They are -- I could get you guys a list.
03:00:44 Every year they have to do a HIPAA training, we have to
03:00:48 do a ed pass training. So there's trainings that they
03:00:51 have to review yearly and have to sign off for, take a
03:00:56 test or say they read and understand those topics.

03:01:03 Q. Is -- so I'm gathering that there are certain
03:01:09 training topics that are memorialized in a list
03:01:15 somewhere that nurses are responsible for keeping up on
03:01:18 on an annual basis?

03:01:20 A. Yes.

03:01:20 Q. And did I have that right, an annual basis?

03:01:22 A. Or as often as a policy may change as well.

03:01:25 Q. Now, where would you find kind of that
03:01:33 written down, the trainings that are required of a
03:01:38 nurse on an ongoing basis?

03:01:40 A. We keep them in a system called -- some
03:01:44 people call it one thing. It's Elsevier or you might
03:01:48 hear it be called Elsevier. From my understanding,
03:01:52 they are both the same system, but that's where we
03:01:55 store those training modules.

03:01:58 Q. Sounds like we might be having a French

03:02:01 pronunciation and an English pronunciation?
03:02:05 A. Yes.
03:02:05 Q. Could we hazard a guess on the spelling?
03:02:07 A. It's E-l-s-i-v-e-a -- I could get it. I can get it for you.
03:02:16 Q. Okay. And I apologize. I didn't mean to put you on the spot.
03:02:25 Okay. Now, the list of those trainings that you describe -- and again, those are different than the AMLS and the PHTLS trainings we've discussed, right?
03:02:40 A. Yes.
03:02:40 Q. So just give a little bit of a list of some of the topics of training that that might include.
03:02:46 A. It can include man-down training, medication pass training, if there's charting changes -- if like we changed the flow of charting, that will be on there; HIPAA is in there; any time we change a policy or procedure, that's in there; sometimes we go back even to the -- even though it doesn't have to be done yearly, we do a skills day where we have nurses come out and perform different skills, so we'll put the test in there for them to take the test and make sure they comprehend different things we put in there, how to do sleep studies. So it's that way to communicate on a large scale any type of training that we want them to

keep up with.
Q. It sounds like you yourself might have some hand in the training that ultimately nurses receive at the County; is that right?
A. Yes.
Q. How long has that been true?
A. Our training got really beefed up within the last about year, year and a half, yes.
Q. Were you involved in the training of nurses earlier than a year or a year and a half ago?
A. Not as much, no.
Q. What you just described in terms of all the different topics of ongoing training that nurses are responsible for keeping up on, were those -- was that true as of March of 2022 still?
A. We've added some content since March of 2022.
Q. Fair enough. But is it also true that there was other content that was existing in March of 2022 that nurses were expected to keep up on back then?
A. Yes.
Q. Now, how would a supervisor, for example, keep up on whether a nurse was doing the trainings that he or she is expected to keep up on?
A. So we have a training unit. They would assign the training, the supervisor of the facility

03:05:09 would find your staff to do the training. And this
03:05:11 was -- now, this is online training. Because if it was
03:05:14 in person, we'd be there and have them sign a roster.
03:05:18 And then if they did complete it, our training keeps
03:05:23 track of all that and would reach out to the supervisor
03:05:23 and the employee and say, hey, if you don't get this
03:05:27 training done by a certain -- this time frame, you will
03:05:30 not be allowed to show up for work, you'll have to come
03:05:34 up to COC to demonstrate these skills. So just
03:05:37 depending on what the training topic was -- but we have
03:05:41 a training unit that would let that supervisor know who
03:05:46 has not completed that training.
03:05:47 Q. Is that training unit specific to nurses?
03:05:51 A. Yes.
03:05:51 Q. Who runs that unit, if you know?
03:05:54 A. Currently it's Rex Padilla.
03:05:57 Q. Do you know who ran that unit in March of
03:06:01 2022?
03:06:03 A. Christina Clonts.
03:06:04 Q. Spelling of the last name?
03:06:06 A. C-l-o-n-t-s.
03:06:06 Q. Thank you.
03:06:11 A. That one I got.
03:06:14 Q. Well done.
03:06:17 Back in March of 2022, who would have been

responsible -- and you may have answered this already -- for ensuring that a particular line nurse was up on his or her training?

A. Joint between the supervisor and Christina Clonts because Christina is in the training unit, she would have the record -- I don't want to use the word -- as my kids would say, "more easy." It would be more accessible to her than the supervisor.

Q. So Ms. Clonts would be one part of that joint partnership that you described, and the other you described as the supervisor?

A. Yes.

Q. So first generally who is the supervisor for a particular nurse?

A. So each facility has at least one facility supervisor that oversees the general day-to-day operations of that facility.

Q. And is that job title supervising nurse or something like that?

A. We're so unique, yes. It's supervising nurse.

Q. Do you know who the supervising nurse was at the men's central jail in March of 2022?

A. I believe it was Amanda Winey and Lindsay Jameson.

03:07:40 Q. I'll just ask you for your best attempts at spelling.
03:07:42 A. The Jameson is like the liquor. Winey is
03:07:48 W-i -- W-i-n-e-y. And then Lindsay is with an s-a-y.
03:08:05 Q. All right. Going to Topic 2 now of the
03:08:38 deposition notice, and the topic of inquiry is "The
03:08:43 County's receipt of and in response to the findings
03:08:47 about the San Diego County jails made by the California
03:08:52 State Auditor's report as described in the amended
03:08:54 complaint, paragraphs 160 to 165."
03:08:59 Do you see where I read from there?
03:09:01 A. Yes.
03:09:01 Q. Now, do you know what this topic is talking
03:09:07 about? Are you familiar with this California State
03:09:11 Auditor's report that it's talking about here?
03:09:13 A. I'm vaguely familiar with the state auditor's
03:09:16 report, yes.
03:09:17 Q. I heard you say "vaguely," but what do you
03:09:20 know about that?
03:09:21 A. I know they came out and looked at our system
03:09:25 and came back with a report of some of the downfalls
03:09:29 they feel we had.
03:09:30 Q. And when you say "they," you're talking about
03:09:33 the California State Auditor?
03:09:35 A. Yes.

03:09:35 Q. And in your experience, what is the California State Auditor, at least as it relates to this topic?
03:09:47 A. Can you rephrase that question?
03:09:49 Q. That was a weird question.
03:09:51 What's your understanding of the investigation that was done by the auditor?
03:09:56 A. The way I feel about it, the main focus was the in-custody deaths that they came out to look at.
03:10:06 Q. And when you say the in-custody deaths that they came out to look at, were you aware that there were some number of people that had died in San Diego jail custody prior to February of 2022, let's say?
03:10:22 A. Yes.
03:10:22 Q. Now, in your position as a nursing supervisor, did you have information that the number of deaths or the rate of deaths was higher or lower than what would be expected in a jail system of San Diego's size?
03:10:43 MR. INMAN: Objection. Vague, lacks foundation, calls for speculation.
03:10:49 MS. SCHULER: Join.
03:10:50 THE WITNESS: We had the number, but no one ever compared it to what it should, should not be, or a percentage. We had a number.

BY MR. SCOTT:
Q. Okay. I think I understand what you mean, but I'm going to make sure. Now, I want to go back -- and I'm purposefully trying to go back somewhat before Hayden Schuck's death. And I'll also share with you that the audit report is dated February 2022, just for your reference. So I'm going to kind of use February 2022 as a point in time, if that's okay with you?
A. Yes.
Q. So back in February of 2022, I heard you say that as a nursing supervisor, we had a number -- and I put air quotes around that -- but we don't know how it compared. Is that fair?
A. Yes.
Q. Now, the number you're talking about is sort of the raw number of people that died in jail custody?
A. Yes.
Q. So you knew that it was 100 or 500 or two or whatever the actual total number was; is that right?
A. Yes.
Q. And do you have any estimate of sort of what that number level was in early 2022?
A. No. I -- no.
Q. Okay. So different question. But you

remember that you did have that number, whatever that number was, the total number of deaths that the jail had experienced?

A. Well, it wasn't made secret to us, but I don't think any of us tracked it like that. We don't keep as a tally. So it's hard to -- if you were to ask me even today what's the -- how many have we had pass away this year, it's not a number that we want to live with in our head that we go about day to day -- each in-custody death is different to us and is impactful in different ways. So it's not just a number, if that makes sense.

Q. I think so. And let me just kind of use an example. Like in a warehouse or a mine or someplace where people are doing dangerous work, sometimes you'll see a sign that says, "57 days since the last safety incident" or something like that?

A. Yes.

Q. And it's just sort of a thing that's posted and everybody kind of has an eye on it and it's sort of -- it's kind of collectively talked about maybe at meetings, or whatever, that it's been 60 days now since there was a safety incident. You kind of understand the general thing I'm talking about?

A. Yes.

03:13:55 Q. So I suppose, just to use that one example, there could be some sort of like a publicly available number or a sign or some sort of a feed that lets nursing staff know and let's doctors and nurses know how many people have passed in a given year. But I take it there's nothing like that going on?

03:14:24 A. No.

03:14:24 Q. But I'm also hearing you say that it's not like it was a secret. I mean you could find out the number of people that passed if that was of interest to you?

03:14:38 A. You could, yes.

03:14:39 Q. Now, do you ever remember any situations in which that information was sort of given to you without you asking, that is there was like a briefing or there was a training or there was a committee or something where you specifically learned this was the number of deaths in our jail last year?

03:15:02 A. During a supervisor meeting, I know it came up, especially when the auditor report was being generated and was going to come out. At the time our Director of Nursing and our healthcare administer, you know, we had a meeting and they said -- and our previous CMO said that we have X amount of deaths, they are saying it's excessive, you know, just telling us

that we're doing a good job, you know, don't take this number personally -- just making sure that we were going to digest the information correctly.

Q. This meeting that you're talking about, do you remember the meeting being specifically for the purpose of discussing the auditor's report that, I guess, was published in February 2022?

A. It wasn't specific for that, no.

Q. What was -- what kind of meeting was this where this came up?

A. We have periodic supervisor meetings with our Director of Nursing, and it was just one of those meetings and it just coincided -- like I said, they let us know that one was going to be written, and then let us know one was going to come out. So it wasn't called specifically for that, no.

Q. Going back to 2022, how often did you have these supervisor meetings?

A. We try to have them at least monthly, just depending on -- especially -- we try to have them every Friday because of COVID, we would give out COVID numbers and stuff like that. But they were via Teams and then we would try -- try maybe once every three months to get together, if we could.

Q. Does -- so this was during COVID time as

04:15:02 respond?
04:15:04 A. No.
04:15:05 Q. Do you know what that response entailed in
04:15:08 terms of information gathering?
04:15:09 A. No.
04:15:10 Q. And you said that the response, if there was
04:15:16 one, was never shared with you personally?
04:15:18 A. Correct.
04:15:19 Q. Do you know if any response was shared with
04:15:21 other nurses?
04:15:22 A. Not -- none that I supervise at this time,
04:15:29 no.
04:15:29 Q. Were you ever made aware of sort of the
04:15:35 County's official response, if any, to the allegations
04:15:41 made in Figure 5 here?
04:15:44 A. No.
04:15:44 Q. Or do you know if there was an official
04:15:47 response to the allegations in Exhibit 4, Figure 5
04:15:52 here?
04:15:52 A. I'm not aware of those.
04:15:54 Q. Are you aware of any specific training that
04:16:00 was undertaken as a result specifically of this audit?
04:16:05 A. No.
04:16:17 MR. SCOTT: Would you like a short break or are
04:16:19 you --

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 4, 2024

Sheri L. Somers
CLR, CSR No. 9734

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, | )CASE NO.: )3:23-CV-00785-DMS-AHG |
| V. | ) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS | ) |

CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
__________________________________

---o0o---

Deposition of Serina Rognlien-Hood, Volume II, located at 1350 Columbia Street, Suite 600, San Diego, California, commencing at 10:03 A.M. PST on Monday, October 7, 2024, before Nicole O'Neil, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: LAUREN M. MELLANO
1350 COLUMBIA STREET
SUITE 600
SAN DIEGO, CALIFORNIA 92101
619-794-0451
LMELLANO@MCKENZIESCOTT.COM

FOR THE DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, CARINA ECHON, JENNIFER VIVONA, AND THOMAS MACE:

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, SENIOR DEPUTY
LINDSEY M. BURNETTE
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANT CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: KATIE SCHULER
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
KSCHULER@LDRLAW.COM

OTHER APPEARANCES:

LEGAL VIDEOGRAPHER - TRACY WARD ESCOBAR

A. Yes.
Q. That's subsection E of E2.1 under 3 for gate refusal. Is that right?
A. That sounds right, yes.
Q. And I'm sorry. I know you don't have these memorized. We can also pull them up, if there's any question about that. Let me know if you prefer that. I want to make sure that I'm understanding those sections and they sort of, relate, what they kind of, mean in layman's terms.
If I'm understanding right, if someone comes back from the emergency department for the receiving screening and they have a form that says they were AMA, then they are referred for a clinically-indicated assessment, which is referred to as CIA. Is that right?
A. Yes.
Q. And if the form is not received but the receiving screening person, the nurse, knows that they were -- they left the hospital AMA, like in Hayden Schuck's case, there's supposed to be -- they are supposed to follow the procedure for CIA, right, clinically-indicated assessment?
A. Yes.
Q. So what that subsection E is saying that if the AMA form is not received, then you know the CIA still

10:20AM needs to occur, but they also need -- the nurse also
10:20AM needs to request the hospital emergency department
10:20AM records when they do that CIA assessment, right?
10:20AM A. Just an ROI should be completed, yes.
10:20AM Q. And the clinically-indicated assessment, the way
10:20AM that is sort of -- the way that the clinically-indicated
10:21AM assessment begins is with somebody being given a red
10:21AM wristband, right?
10:21AM A. Not necessarily.
10:21AM Q. Can you explain why not?
10:21AM A. A red wristband would be given if it's a medical
10:21AM proceed. A CIA can still happen if they are not a
10:21AM medical proceed.
10:21AM Q. And everyone who is AMA, though, would be --
10:21AM would follow the CIA protocol, regardless of whether they
10:21AM are given a red wristband?
10:21AM A. Yes.
10:21AM Q. And so what -- can you tell me what a medical
10:21AM proceed is then?
10:21AM A. A medical proceed is someone that needs that
10:21AM CIA, but would need it sooner than someone that may not
10:21AM need it. There's a time limit on it, if that makes
10:21AM sense.
10:21AM Q. What's the time limit for the medical proceed?
10:21AM A. I believe it's two hours for the medical

proceed.
Q. Okay. E2 -- E2.1 refers to clinically-indicated assessment in Section 4-C below. 4-C states that, "All arrestees with mild or moderate clinical signs and symptoms would be identified for Nurse Assessment Protocol."
A. Yes.
Q. And so then it says that, "The RN will place a red wristband on that person."
So can you explain to me, I guess, what the difference -- what would have applied in Hayden Schuck's case, I guess? I'm not following why if a CIA refers to that section and that section says that a red wristband would be given and somebody needs to be seen within two hours, I'm not sure I understand how it would be that somebody would have -- be required to undergo a CIA and not have to be seen within two hours.
Does that make sense?
MR. INMAN: Objection. Misstates the evidence.
MS. MELLANO: If I'm wrong, correct me.
THE WITNESS: There's certain conditions, certain symptoms, certain issues, that an incarcerated person could come into custody with, that we want them to have that clinically-indicated assessment, but it doesn't mean it has to be within two hours.

If you have hypertension, I may want you to go see that second nurse just to get focused on your hypertension, but I don't need to see you within two hours, because your blood pressure might have been well when you came into custody. There's no reason to get you up there in two hours, but you probably need to be seen. Where you might have a diabetic that comes in, where their blood sugar may be 350 or 325, and we want to get them insulin onboard. It's mild to moderate, not minimal, if that makes -- it depends on the symptoms of what they are presenting with, what the nurse will be able to do. It kind of, gives that nurse that understanding that this -- this patient is going to need that clinically-indicated assessment, but it doesn't necessarily need to be done in two hours. Right now they are stable. There's nothing that's a rush at that moment.

BY MS. MELLANO:

Q. Okay. And if someone is AMA, how does one determine whether they need to be a medical proceed and be seen within two hours?

A. You would look at the totality of the situation, their vital signs, if they have any -- you know, if they have visible injuries that you can see, if they are complaining of pain. So there are different indications

10:25AM that a nurse can look at to determine if someone should be.

10:25AM Q. In Hayden Schuck's case, Nurse Barrera didn't receive anything back from the emergency department but just knew that he had been released AMA, right?

10:25AM A. Yes.

10:25AM Q. And so is it important also in considering the totality of the circumstances to consider what is unknown?

10:25AM A. It can be, yes.

10:25AM Q. So for example, Nurse Barrera didn't know the extent to which Hayden had been evaluated, if at all, at the emergency department, right?

10:25AM A. Correct.

10:25AM Q. And so the -- Nurse Barrera knew, though, that Hayden had been sent to the emergency department because of an eventual rollover crash. Is that right?

10:25AM A. I'm not sure if she knew it was a rollover crash when he was booked. I don't want to speculate about what information she had. I know she knew he was in a motor vehicle accident.

10:26AM Q. So she basically had MVA, that he was in a motor vehicle accident, not necessarily that the car had rolled?

10:26AM A. Correct.

10:26AM Q. Got you. At that point she would have known that there was at least some potential that he had a serious head injury, right?
10:26AM A. Possibly.
10:26AM Q. Or some sort of, internal injury?
10:26AM A. Possibly.
10:26AM Q. And she did make notes in the medical record saying that he was making statements indicating he wasn't understanding the booking process, right?
10:26AM A. Yes.
10:26AM Q. And he was asking if he could pay the nurse $20 for water?
10:26AM A. I'm not exactly sure on everything he said to her. I know he said some stuff that --
10:27AM Q. Okay. Let's look at -- let's pull up Hayden's records here.
10:27AM A. I don't want to misquote what she wrote in there.
10:27AM Q. That's fair.
10:29AM Do you recognize these as Hayden Schuck's medical records, first of all?
10:29AM A. It's the information that was in his medical records, yes.
10:29AM Q. Sure. But this exhibit, do you recognize as being as we were scrolling -- as being the medical

records that you reviewed?
A. So to be fair, that's not what we review in TechCare. That's what you guys get when it's printed. That's not how the information is presented in the TechCare system itself.
Q. Okay. But you agree that the information that we reviewed would have been the same? The information in this exhibit would have been the same as what --
A. I don't see this exact type of page, if that makes sense. All that information, yes, is in there somewhere.
Q. Okay. For the record this has been previously marked as Exhibit 6.
(Previously marked Exhibit 6 was introduced for examination.)
BY MS. MELLANO:
Q. That first entry there, it says, "QMHP," which is qualified mental health provider, right?
A. Yes.
Q. What this is indicating is that someone has requested that Hayden Schuck see a qualified mental health provider, right?
A. Yes.
Q. It's your understanding that this entry was actually entered by Jameelyn Barrera, the RN who did the

receiving intake?
A. Yes.
Q. Okay. And so the reason that Nurse Barrera put for requesting that be scheduled, is that patient reports he has ADHD. He denied auditory illusions, visual illusions, and suicide intent --
A. Ideations and homicide.
Q. Ideations, that's right, suicidal ideations or homicidal ideations.
"During intake patient made grandiose statements and is not understanding the booking process, asking to take photos of his medical records with his phone, which per officers was in pieces due to his car accident." And is asking for, quote, "Twenty dollars to give to the nurse for some water," end quote.
Does that refresh your recollection about what Nurse Barrera wrote?
A. Yes.
Q. And so going back to these policies, would these constitute mild or moderate clinical signs and symptoms that something may be wrong, especially in combination with the fact that Hayden was AMA and was in a car accident?
A. Possibly, yes.
Q. Okay. And so protocol would be, then, that he

be deemed a medical proceed and be seen, again, by and NAP nurse within two hours, right?

A. Yes. But the nurse also has the discretion to determine if she felt they were mild to moderate symptoms. There's some nursing critical thinking there that they are allowed to make those decisions.

Q. Okay. And so Hayden was not given a red wristband, right?

A. I don't believe so.

Q. He was not -- no NAP or Nurse Assessment Protocol, registered nurse, was notified to see Hayden Schuck within two hours of his receiving screening, right?

A. He was not a proceed, correct.

Q. And so an NAP, Nurse Assessment Protocol, registered nurse, did not see Hayden within two hours?

A. So it should be fair to say that just because you see -- a CIA is the assessment. The NAP is what the nurse can do based on an assessment. Not everyone that is seen for CIA will necessarily get a NAP started. We're kind of, interchanging two different terms.

Q. And so was -- was a clinically-indicated assessment done for Hayden Schuck?

A. I know he did see a nurse on the second floor. I just can't remember the time frame that he saw the

nurse on the second floor.
Q. Well, it certainly wasn't within two hours of his receiving screening, right?
A. Correct.
Q. And I don't think it was even within a day. Is that right?
A. I believe it wasn't, yes.
Q. You believe it was not?
A. Not within a day.
Q. I couldn't hear you very well.
It wasn't within two days, even, was it?
A. I don't believe so.
Q. Do medical staff have the ability to observe folks that have just come in in the holding cells that they are held in before they are transferred to like, a cell by themselves, for example?
A. I'm not sure I understand your question.
Q. Is there a process by which -- so if a nurse has concerns during the receiving screening and wants to observe them further, are they able to watch like, the security cameras of the cells where they go next?
A. So if a nurse has a concern to watch a patient individually, we have a medical holding cell on the second floor where we can place patients. That way they are close. It's not typical that we are going to round

alert and oriented times three. Getting to know who he was, where he was at, get some vital signs done, possibly blood sugar done just to see if they can get a medical understanding of what is going on.

Q. Okay. And, sorry, this is a little bit tangential. Do you have any training regarding ADHD symptoms or signs?

A. No. Not in depth I should say. We all know what it is, but mental health is the ones that handle those -- that population of ours.

Q. Okay. And in Hayden Schuck's case, we kind of, talked about this earlier. We can go through his medical records in more detail too. I'm unclear on whether this Nurse Assessment Protocol was ever followed with respect to Hayden Schuck.

A. So a Nurse Assessment Protocol was not started. A protocol is something that we start based on a clinically-indicated assessment. A protocol -- if you have diabetes, we have a diabetes protocol. If you have hypertension, there's a hypertension protocol. They are kind of, standing orders that a nurse is allowed to start based on her clinical assessment or their clinical assessment.

Q. Okay. And so was there ever a CIA completed then, for Hayden Schuck?

I can't remember when it exactly first appears here. This is from the gate refusal, and it does not have blood pressure. This is the beginning of Jameelyn Barrera's forms that she filled out, right?

A. Yes.

Q. Do you see Hayden's blood pressure listed here?

A. Yes.

Q. Okay. It's 144 over 94?

A. Yes.

Q. And that's considered high, not an emergency, though. Is that -- am I understanding correctly about that?

A. Yes.

Q. His BMI being 16.8, that's quite low for a BMI. Is that also right?

MR. INMAN: Objection to the extent it calls for expert opinion.

MS. SCHULER: Join.

THE WITNESS: I wish mine was 16.8.

It can be low, yes.

BY MS. MELLANO:

Q. And based on -- I'm only asking based on, you know, your position as director of nursing and your experience in the medical field, what -- a low BMI is relevant to someone's healthcare, right?

like, a release of information?

A. I believe there was one in his intake forms. I can't recall off the top of my head what they said.

Q. Let's go through -- I am just going to go back to the beginning. Let me know as I scroll here whether you see anything that would have constituted a release of information.

A. That's a release of information right there.

Q. And it looks like a box was checked off by Jameelyn Barrera on 3-10 -- March, 10th, 2022, that says, "Not indicated."

What does that mean?

A. She felt that there was no information from an outside source that we may need.

Q. And Nurse Barrera knew that Hayden had been discharged AMA, right?

A. Yes.

Q. And so doesn't that mean that she should have ordered the hospital emergency department records?

MR. INMAN: Objection. Incomplete hypothetical. Vague.

THE WITNESS: And I'm -- she might have felt that the record she got back from the hospital constituted the complete care that he got, because it said that he wasn't going to be treated. She may have

11:44AM felt -- I'm not -- I can't say what she felt. She may have thought those were the medical records.
11:44AM BY MS. MELLANO:
11:44AM Q. She did receive records back from the emergency department?
11:44AM A. She received papers back from the emergency department, yes.
11:44AM Q. And how are you sure of that?
11:44AM A. They were scanned into TechCare.
11:44AM Q. When were they scanned in?
11:44AM A. I can't recall the date and time off of the top of my head. I believe he came back with them, because they were scanned very quick after he came into custody.
11:44AM Q. Okay. You are able to tell from these records when they were scanned in?
11:45AM A. I can tell by TechCare when they were scanned in.
11:45AM Q. But not by the printed versions of the records that were given to us?
11:45AM A. No.
11:45AM Q. Is there any way that you would be able to provide that information today about when they were scanned in?
11:45AM A. Not by the information that you have right in front of you.

11:45AM Q. Okay. And do you recall what those records were that were scanned in specifically?

11:45AM A. It was the one from UCSD where it says, "Patient is refusing all medical care, can make decisions." I'm paraphrasing.

11:45AM Q. Let me see if this refreshes your recollection. Would this have been the after-visit summary? Would that have been what Nurse Barrera received?

11:46AM A. Yes.

11:46AM Q. And you know based on your review, that she received those when he came back from the emergency department?

11:46AM A. I don't know if she received them. I know they were scanned in, quickly, close to his booking date and time. They usually come with the arresting officer, because we have to have something back from the emergency department to book them into custody.

11:46AM Q. And this doesn't constitute an AMA form as referred to in the protocols, right, the policies?

11:46AM A. No. It does not.

11:46AM Q. But it at least indicated to Nurse Barrera that he had been released AMA?

11:46AM A. Correct.

11:46AM Q. Here, though, it says, "No obvious external signs of trauma or illness, but occult injury is possible

given mechanism."

That means -- "occult" means hidden, right?

A. Yes.

Q. And so that would have indicated to Nurse Barrera that there could have been some sort of, hidden injury or illness based on the motor vehicle accident at least?

A. Yes.

Q. And the second page is the -- these first two pages rather are the entirety of the documents received by the emergency department?

A. Yes.

Q. Okay. I think we got a little bit sidetracked from what my initial question was. Just going back to Page 6 here of Exhibit 6, Hayden's medical records. Authorization for ROI, Nurse Barrera checked off, "Not Indicated," meaning she did not request that Hayden sign an ROI or Release of Information so she could get additional records from the emergency department or anywhere else.

A. Correct.

Q. Would this authorization also allow nursing staff or medical staff to obtain information from Hayden Schuck's family about his medical care or relay how he was presenting to those family members so that they could

came to be that Nurse Deguzman was even talking to Hayden?

A. No. Not from this note.

Q. Would it have been helpful for Nurse Deguzman to enter information about why it was that he was encountering Hayden for this type of evaluation or treatment?

MR. INMAN: Objection. Vague.

THE WITNESS: Yes.

BY MS. MELLANO:

Q. Okay. And at this point so Nurse Deguzman would have had access to all of these records in TechCare, right?

A. Everything that was put into that point, yes.

Q. He would have been able to see that Nurse Barrera had said that Hayden was unable to understand the booking process, for example?

MR. INMAN: Objection. Misstates evidence.

THE WITNESS: Yes.

BY MS. MELLANO:

Q. And at this point Nurse Deguzman writes in that, "Hayden is suffering from altered thought process," under assessment.

A. Yes.

Q. That he had difficulty following direction?

11:58AM A. Yes.
11:58AM Q. He was disorganized?
11:58AM A. Yes.
11:58AM Q. Do you think that that would refer to disorganized thoughts?
11:58AM MR. INMAN: Objection. Speculation.
11:58AM THE WITNESS: I'm not sure.
11:58AM BY MS. MELLANO:
11:58AM Q. Would it have been helpful to have that described differently by Nurse Deguzman?
11:58AM A. Yes.
11:58AM Q. Nonsensical is how Nurse Deguzman described Hayden?
11:58AM A. Yes.
11:58AM Q. Disheveled as well?
11:58AM A. Yes.
11:58AM Q. Soiled T-shirt?
11:58AM A. Yes.
11:58AM Q. Not wearing pants?
11:58AM A. Yes.
11:58AM Q. Dried blood on both his shirt and lower extremities?
11:58AM A. Yes.
11:58AM Q. And Nurse Deguzman cleaned his wounds?
11:58AM A. Yes.

11:58AM Q. And there's -- under "Objective" there's some vitals listed there, right?
11:59AM A. Yes.
11:59AM Q. That indicates -- that would indicate that Nurse Deguzman took Hayden Schuck's vitals at that time, right?
11:59AM A. Yes.
11:59AM Q. Okay. And at the top of this, it says, "SOAP note by Romeo Deguzman, RN, posted on 3-15-2022 at 8:45 a.m."
11:59AM That is when the SOAP note is created and saved; right?
11:59AM A. Yes.
11:59AM Q. Unless the person entering this note writes within the note at what time these things happened, it's not exactly clear, because the time of the entry of the note is not the same as the time of the treatment given, right?
11:59AM A. Correct.
11:59AM Q. Okay. Obviously at some point before this was when Deguzman saw Hayden, right?
11:59AM A. Yes.
11:59AM Q. And are nurses required to enter these notes as close in time as possible?
12:00PM A. Yes. Unless we indicate differently in our note.

room where Nurse Deguzman had been before he left that door?

A. Yes.

Q. I see. So there's a cuff that goes through the wall of those two rooms?

A. Partition. It's a partition. It's -- it literally is a plexiglass where we can see and talk to the patient. Then there's probably about a foot that's open at the bottom where we can have paper go back and forth for them to sign, for us to take their blood pressure, to do a swab, to check their temperature. There's an opening that we have. We can have contact with our patients.

Q. All right. That makes sense. Before Nurse Deguzman came out of that door, he could have been interacting with Hayden through the plexiglass that also has an opening while Hayden was in that other room, because they are adjoined. There's just a partition.

A. Yes.

Q. Okay. Got you. That is very helpful.

Going back to the jail medical records, then, and specifically Nurse Deguzman's note here, he lists his blood pressure as 148 over 96. And that's on, again, March 15th at 8:45 in the morning, roughly. His blood pressure, in other words, is still high?

A. Yes.
Q. Okay. And the only medical treatment that Nurse Deguzman gave at this time was taking his vitals, presumably, and cleansing his wounds?
A. Yes.
Q. Okay. Under "Subjective," it says, "CO ADHD."
What does CO stand for?
A. Complaints of or complaint of.
Q. Okay. And also that Hayden reported using acid drugs in the street. Is that right?
A. Yes.
Q. At this point Hayden is complaining of feelings of having ADHD, but also having used acid drugs in the street from what you can tell?
A. I don't know if he's feeling the effects of using acid drugs. He might have said just said, "I used acid drugs."
Up there there's no indication that he was having any complaints of them.
Q. Why not?
A. Because usually we would put in there, "Complaint of withdrawal, diarrhea, runny nose, legs hurt."
We would put a symptom, because we have a lot of people that tell us, "Hey, nurse, I used drugs."

And we just put, "Uses drugs," but then -- we would put more -- you're supposed to put what they are telling you they have. I don't know if he just told the nurse, "I use acid drugs. I use acid drugs, plus I have this going on, nurse."

I can't tell from that.

Q. Nurse Deguzman actually did add more in the objective area, you know, despite that Hayden may not have said it. He indicated that Hayden both said that he used acid drugs in the street, but also that he objectively was appearing to not have the ability to follow direction, you know, had a soiled T-shirt, was bleeding, disheveled, et cetera, and had altered thought process.

What would the protocol here have been? What would the proper protocol have been seeing someone in that kind of, state?

MR. INMAN: Objection. Incomplete hypothetical.

THE WITNESS: We don't have a protocol for withdrawal from acid drugs. He could have been scheduled for a doctor sick call to see a provider at that point, based on the totality of what the nurse was seeing at that time.

BY MS. MELLANO:

Q. And why would this not be a situation where

12:10PM someone was taken to see a nurse practitioner or a medical doctor immediately?

12:10PM A. Going off the notes, it appears Mr. Schuck was going to court that morning. Based on what the nurse has saw, he felt that there was no immediate -- that he was stable enough to go to court.

12:11PM Q. Okay. Is that consistent with training and protocol?

12:11PM A. If a patient is stable, yes, we will allow them to go to court.

12:11PM Q. What does stable mean?

12:11PM A. Well, the vital signs. While the blood pressure is rightly high, it's still stable. We don't have a protocol to treat blood pressure if it's not high enough for us to treat at that point. His pulse is within normal range. According to the notes, he appears medically stable.

12:11PM Q. And that's even in consideration with the fact that he didn't have like, a head injury ruled out at the emergency department, right?

12:12PM A. Correct.

12:12PM Q. He didn't have any sort of, injury or illness ruled out at any point?

12:12PM MR. INMAN: Objection. Vague. Overbroad. Calls for speculation.

12:12PM MS. SCHULER: Join.
12:12PM THE WITNESS: It was what the nurse was seeing at that time, that his judgment was that he felt he was stable at that time.
12:12PM BY MS. MELLANO:
12:12PM Q. But Nurse Deguzman didn't rule out a head injury at any point, right?
12:12PM MR. INMAN: Objection, speculation.
12:12PM MS. MELLANO: As far as you know.
12:12PM THE WITNESS: Well, nurses don't diagnose. We wouldn't rule out a head injury, but, no, he did not further report to get looked at for that.
12:12PM BY MS. MELLANO:
12:12PM Q. Then, in other words, Nurse Deguzman didn't have any reason to think that anyone else had ruled out Hayden having a head injury?
12:12PM MR. INMAN: Objection. Vague. Overbroad. Speculation.
12:12PM THE WITNESS: One more time.
12:12PM BY MS. MELLANO:
12:12PM Q. Nurse Deguzman didn't have any reason to think that any other medical provider had already ruled out a head injury?
12:13PM MR. INMAN: Same.
12:13PM THE WITNESS: Yes. He did not -- according to

the notes, what was in there, I wouldn't think he would see that someone would rule out a head injury.
BY MS. MELLANO:
Q. There's nothing in the notes that would have indicated that someone ruled out a head injury?
MR. INMAN: Objection. The notes speak for themselves.
THE WITNESS: Correct.
BY MS. MELLANO:
Q. The same would go for drug intoxication. Nurse Deguzman would not have known based on the notes that anyone had ruled out, one way or the other, whether Hayden was intoxicated, and that's why he was suffering this difficulty following directions, for example?
A. Correct.
Q. Okay. I am going to scroll here down to Page 49 of Exhibit 6.
Did you review this document when you were reviewing Hayden's medical records in TechCare?
A. Yes.
Q. I know it's hard to read. Was the quality better in TechCare?
A. No.
Q. Okay. Can you tell based on this document when it was scanned into TechCare?

question?

BY MS. MELLANO:

Q. It says that she received the court order, right? The court order indicated that Hayden Schuck needed to see medical, but there's no SOAP note there saying that Nurse Echon then took Hayden Schuck to see a nurse practitioner or a doctor or even evaluated for himself, and if that had happened, then she should have entered that, right?

MR. INMAN: Objection. Misstates evidence.

THE WITNESS: She states that he did refuse that MD sick call appointment today.

BY MS. MELLANO:

Q. You didn't read her deposition testimony?

A. No.

Q. Reading that, though -- is it clear to you, though, based just on that note what she is saying is that Hayden Schuck refused medical treatment after the court order was received or earlier?

A. Earlier.

Q. Did you see anything in the records that indicated that Hayden had received medical treatment that day?

A. No.

Q. Because, in fact, you know, the video that we

just watched, right, was from that morning, March 15th, and Nurse Deguzman's note did not indicate that he refused medical treatment, right?

A. Correct.

Q. And so there's nothing to support the idea aside from what she writes, Nurse Echon, that support the idea that Hayden had actually refused medical treatment that day?

A. Correct.

Q. And just because someone -- even if someone had refused medical treatment prior in the day, a court order stating that someone should be seen by medical would have to be followed, right?

MR. INMAN: Objection. Misstates the court order.

THE WITNESS: So it would -- if he would have -- let's just say that the appointment was in there. That would have handled the court order of saying that he needed to be seen by medical staff, so it would have happened. If it came in at 9:00, if he would have seen medical staff that day, that's us saying that, yes, he saw the medical staff. We followed that court order.

BY MS. MELLANO:

Q. And so the county's position is that the court order was followed because at 8:45 in the morning Nurse

Deguzman had already seen him?
A. No. What I am saying, if there was an MD sick call appointment scheduled -- and I don't see one -- but if there was an MD sick call scheduled, and the court order came in that night at 9:45 saying he needed to see medical, she could have said, "Oh, he did see a provider, medical staff." So that court -- we kind of -- that court order was handled. I hope I'm explaining myself correctly.
Q. No. Thank you. And I appreciate it. I'm sorry if I'm misunderstanding.
What I had said previously -- and I think we're saying the same thing -- which is that if a court order comes in and someone had already seen medical that day, then they don't need to see them again pursuant to that court order?
MR. INMAN: Objection. Misstates the court order.
THE WITNESS: It depends on what the court order says. Sometimes the court order will say they need to be seen by medical staff. Well, they were seen by medical staff. It depends on what the court order kind of, says, what has to be done.
BY MS. MELLANO:
Q. Okay. Well, I guess let's look at the court

order, then.

The Court writes in -- the Court refers defendant to -- sorry -- the court writes in, "The Court refers Defendant to jail medical to be screened for medications."

And it says, "Pre-Trial arraignment -- clarify acknowledgement of rights and true name, date of birth, at next hearing," indicating that Hayden was unable to do that at that hearing, right?

MR. INMAN: Objection. Calls for speculation. The document speaks for itself.

THE WITNESS: So medical staff would not do that part of the court order. We would just handle where it's referred to jail medical to be screened for medication.

BY MS. MELLANO:

Q. So jail medical staff would just ignore the rest of this document and only read that one portion and not what's underneath it?

A. We would read the rest. It's not for us to clarify someone's rights, names, and date of birth. That's out of our scope.

Q. Sure. I'm sorry. That's not what I'm asking. What I'm asking is whether medical would have read that portion, and it's on -- I think what you said was "yes"?

A. Yes.

Q. What that would have indicated to somebody reading this, though, is that Hayden was unable to acknowledge his rights through name and date of birth at the hearing, right?

MS. SCHULER: Objection. Lacks foundation. Misstates the document.

MR. INMAN: The document speaks for itself.

THE WITNESS: I'm not sure what happened at court, why that was written on there.

BY MS. MELLANO:

Q. And do you know whether other nursing staff would have known why that was written there?

A. We wouldn't -- we would note what was written and understand what those words mean. We can't -- we're not in court with the patient to understand, was he being defiant? Was he just not answering? It's not for us to understand why that was written per se. Just says the Court had some issues getting him to answer questions, but a lot of things happen at court.

Q. It would have been okay pursuant to policy, practices, and procedures, to not have Hayden see medical again despite that he went to court, and the Court had some reason to order him to see medical, because he had already seen medical earlier in the day?

MR. INMAN: Objection. Misstates testimony.

THE WITNESS: The court order says to talk about medication. At that point, a nurse could go ask about medication. And that -- saying that he doesn't know his name and stuff, a nurse can say, well, he's already scheduled for -- to see mental health. So we were looking at the totality of the situation. He's scheduled to see mental health to deal with the not understanding. And the note appeared that she thought he had seen a doctor earlier in the day but refused, but we could still go ask about medication.

BY MS. MELLANO:

Q. Did anyone go ask him about medication?

A. I'm not sure.

Q. The records don't show that anybody asked him about medication or anything until the next day, right?

A. Correct.

Q. At which point he was not able to respond?

MR. INMAN: Objection. Misstates evidence. Calls for speculation.

MS. SCHULER: Lacks foundation.

BY MS. MELLANO:

Q. Did he respond to anyone the next day about any medication?

MR. INMAN: Same objections.

THE WITNESS: He didn't answer the nurse's

12:29PM questions, no.
12:29PM BY MS. MELLANO:
12:29PM Q. The only thing he did was move his leg, right?
12:29PM A. Correct.
12:29PM MS. SCHULER: Objection. Misstates evidence.
12:29PM MR. INMAN: Join.
12:30PM BY MS. MELLANO:
12:30PM Q. Does that misstate the evidence?
12:30PM A. What's the question?
12:30PM Q. That he didn't respond to the nurse the next
12:30PM morning, the only sign of life that he showed was he
12:30PM moved his legs?
12:30PM A. According to her notes, that's correct.
12:30PM Q. What is the protocol for when a nurse or other
12:31PM medical staff are trained on when they can write that
12:31PM someone refused care?
12:31PM MR. INMAN: Objection. Vague. Incomplete
12:31PM hypothetical.
12:31PM THE WITNESS: A patient -- what was the question
12:31PM one more time --
12:31PM BY MS. MELLANO:
12:31PM Q. I'm just wondering, sometimes we see in medical
12:31PM records that a nurse or other medical staff write that
12:31PM someone refused care, quote, unquote, refused care. I'm
12:31PM wondering if there's some sort of, protocol or policies

12:31PM that apply for when it's appropriate that somebody enter that into someone's medical chart?
12:31PM A. Yes.
12:31PM Q. Okay. Can you explain that for me, please?
12:31PM A. A patient can refuse any routine medical care.
12:31PM We're supposed to get a refusal slip. We would like it
12:32PM to be signed by the person themselves. If not, then a
12:32PM nurse can sign it and a deputy can sign it, and then we
12:32PM enter that into the medical records, saying that that
12:32PM patient refused care for medical services.
12:32PM Q. And is -- what is the reasoning, if you know,
12:32PM behind why a slip needs to be signed when someone
12:32PM allegedly refuses care?
12:32PM A. It's the point where we can also give some
12:32PM education, and say, "You understand you're refusing this
12:32PM appointment or medication," and it's just documentation
12:32PM that they know they are refusing.
12:32PM Q. And do you know if in the morning on March 16th,
12:32PM if Nurse Lymburn had a -- had a refusal signed, a slip
12:32PM signed?
12:32PM A. I don't think so.
12:33PM Q. You didn't see any of those types of slips in
12:33PM Hayden's file?
12:33PM A. No.
12:33PM MS. MELLANO: If we could take a quick break, I

# CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 14th of October, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 12

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs.

CASE NO. 23-cv-00785DMS-AHG

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY;

DEFENDANT MEDICAL PROVIDERS )
DOES 2-3, IN THEIR INDIVIDUAL )
CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
Defendants. )
______________________________)

VIDEOTAPED DEPOSITION OF JAMEELYN BARRERA

Tuesday, May 7, 2024

10:10 a.m.

(Pages 1 through 151, Inclusive)

Volume 1

REPORTED BY:
LEYLA S. JONES, CSR 12750

APPEARANCES:

For Plaintiffs:

MCKENZIE SCOTT
BY: TIMOTHY A. SCOTT, ESQ.
BY: MICHELLE C. ANGELES, ESQ.
1350 Columbia Street, Unit 600
San Diego, California 92101
619.794.0451
tscott@mckenziescott.com
mangeles@mckenziescott.com

For Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, ESQ.
1600 Pacific Highway, Room 355
San Diego, California 92101
619.884.2931
steven.inman@sdcounty.ca.gov

For Defendants Correctional Healthcare Partners and Nicholas Kahl:

LOTZ, DOGGETT & RAWERS
BY: KATIE SCHULER, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
kschuler@ldrlaw.com

Also Present:

ELIJAH OCHOA, VIDEOGRAPHER

09:47 A. They provided the CPR classes when -- whenever we were up for renewal.
09:47 Q. Okay. Anything else?
09:47 A. 2022. They offer AMLS, which is advanced medical life support --
09:47 Q. Uh-huh.
09:47 A. -- and PHTLS, which is pre-hospital trauma life support.
09:47 Q. Okay.
09:48 A. I don't remember when I took -- I did those trainings.
09:48 Q. Okay. But you -- you did complete those trainings?
09:48 A. Yes.
09:48 Q. Anything -- any other trainings that you have done between 2018 and March of '22 related to your role as a detention nurse or a charge nurse?
09:48 A. There's a lot of things. I don't -- I don't know if there's anything specific you're asking about. There's a lot of things that we learn while we're on the job, any new policy/procedures.
09:48 Q. Okay. So there's a lot of on-the-job training? Is that -- is that what you're saying?
09:48 A. Yes.
09:48 Q. Okay. And what does that look like? Do

you shadow -- do you shadow a nurse before you begin or how does that work? Can you tell me a little bit more about the on-the-job training?

A. Gosh, how can I -- like, for an -- for -- this is just an example. We have recently started doing urine drug testing. So that's, like, on the job. Okay, guys. This is how you do it. This is where you document.

Q. Okay. And who teaches you that?

A. We have different modes of training. There's training available via Teams --

Q. Uh-huh.

A. -- and in person training either by the supervisors or the -- there's a training -- there was a training group at the time.

Q. Okay. So when you say training via Teams, what does that mean? Who can -- who holds the training?

A. The -- the coordinators, the training coordinators.

Q. And the training coordinators work for the jail?

A. They work for the Department, yes.

Q. Okay. And then you said there's in-person training, and those trainings are conducted by the

supervisors?
A. Yes, or the training coordinators if they come in.
Q. Okay. And who decides what trainings you have to participate in?
MR. INMAN: Objection. Lacks foundation.
THE WITNESS: I'm sorry. Can you rephrase that question?
BY MS. ANGELES:
Q. Sure. So you -- you earlier said that for -- the one example for exam -- was that you guys were implementing a urinary -- or urine drug test process?
A. Uh-huh.
Q. Who -- how do you find out that this new process is being implemented, I guess, first?
A. Via e-mail.
Q. Okay. And then who instructs you to participate in training?
A. Either the supervisors or their training coordinators.
Q. And are those trainings voluntary or mandatory?
A. It would usually list on the e-mail if it's mandatory or not.

09:51 Q. Was this urine drug testing mandatory or voluntary?
09:51 A. Mandatory.
09:51 Q. What types of trainings are mandatory?
09:52 A. I'm sorry. That's -- there's a lot. So we're trained on the signs and symptoms of opiate withdrawal and overdose. We're trained on withdrawal symptoms of alcohol and benzos. We do hold trainings on, you know, how to respond to emergencies.
09:52 Q. And those are all mandatory trainings?
09:52 A. For the most part, yes.
09:52 Q. Any of those that you listed that weren't mandatory?
09:53 A. I -- I don't believe -- I -- I think they're all mandatory.
09:53 Q. Okay. And these trainings that you just listed, were those trainings completed after March of 2022 or before March of 2022?
09:53 A. Before.
09:53 Q. Have any -- scratch that.
09:53 Have you received trainings in the same subjects after March of 2022?
09:53 A. I believe so.
09:53 Q. And what -- what training was that?

09:53 A. It's like -- kind of like ongoing training. We do have new nurses that come in.
09:54 Q. Uh-huh.
09:54 A. So they'll just reiterate, "Okay. This is what we're looking for. This is what withdrawal looks like, what an overdose looks like."
09:54 Q. Okay. So when a new set of nurses start, you have to participate in their onboard -- onboarding, like, their new training?
09:54 A. No. But how -- we do have staff meetings that they'll integrate that information into. So it's not mandatory for us to participate in their training specifically.
09:54 Q. Uh-huh.
09:54 A. But it's being held in a group setting. I don't know.
09:54 Q. Can you explain that? Can you explain that to me a little bit more?
09:54 A. Like we're in a staff meeting --
09:55 Q. Uh-huh.
09:55 A. -- and we have the new nurses and the nurses that are already trained.
09:55 Q. Okay.
09:55 A. They'll have, like, refresher -- for the new -- older nurses or the trainers, it's more of a

09:55 refresher versus the newer nurses, it's new training
09:55 for them.
09:55 Q. Okay. So let me see if I understand this
09:55 directly.
09:55 You'll have a staff meeting that is just
09:55 dedicated to training?
09:55 A. No.
09:55 Q. Okay. Or that will have training
09:55 incorporated into a staff meeting?
09:55 A. Yes. It's like if we're all here in a
09:55 group and you know how to run a deposition,
09:55 whereas -- Okay. Jamee, this is how a deposition
09:55 happens.
09:55 Q. Uh-huh.
09:55 A. So you're here while I'm being trained, but
09:55 it's not necessarily geared towards you. I don't
09:55 know if that makes sense.
09:55 Q. Okay. So is that a formal training?
09:55 MR. INMAN: Objection. Vague.
09:55 BY MS. ANGELES:
09:55 Q. Would you consider that a formal training,
09:56 what they provide at a staff meeting?
09:56 MR. INMAN: Same objection.
09:56 THE WITNESS: I honestly don't know how to
09:56 answer that.

09:56 BY MS. ANGELES:
09:56 Q. I guess a better way of putting it is: Is your participation in those staff meetings where there is a training component mandatory?
09:56 A. That's -- that's difficult for me to answer. Not -- the components are not necessarily mandatory.
09:56 Q. Uh-huh.
09:56 A. But there is information given and a -- a sign-in sheet for us.
09:56 Q. Okay. And what if you're not scheduled to work on a day that one of these meetings is held?
09:57 A. The staff meeting minutes are usually e-mailed out. And then when we do come back to work, they do ask that we sign acknowledging that we received the information.
09:57 Q. Are you provided an opportunity to ask questions or receive supplemental training on any subjects that are discussed at a staff meeting that you missed?
09:57 A. Yes, yes.
09:57 Q. And how does that process work?
09:57 A. The supervisors generally have, like, an open door: "If you have any questions, please feel free to come see us."

09:57 Q. Okay. So is it fair to say that it's --
09:57 as -- as a detention nurse, it is your
09:57 responsibility to read in detail the staff minute --
09:58 the staff meeting minutes and review them to make
09:58 sure that you have -- are up to date on the latest
09:58 training information?
09:58 A. Yes.
09:58 Q. And the only way that -- and you're
09:58 required to sign the minutes as you -- when you
09:58 receive them?
09:58 A. Yes.
09:58 Q. Is there any follow-up, besides you signing
09:58 those minutes, by supervisors with regards to the --
09:58 to these types of trainings or these staff meetings?
09:58 MR. INMAN: Objection. Calls for
09:58 speculation. Lacks foundation.
09:58 THE WITNESS: I'm sorry. Can you explain
09:58 your -- explain a little more?
09:59 BY MS. ANGELES:
09:59 Q. Sure. So other than you signing this form
09:59 acknowledging that you've received the minutes, is
09:59 there any other follow-up that's related to the
09:59 subject matter of a particular meeting?
09:59 MR. INMAN: Same objections and vague.
09:59 THE WITNESS: No.

10:31 A. Yes.
10:31 Q. And I think you mentioned this earlier, but G sort of has a list of 1 through 6 of vital signs that would require you to reject somebody.
10:31 Is -- and is that -- are those what you would be looking for?
10:31 A. Yes.
10:31 Q. In terms of H, it says, "An individual reported to have ingest the baggies."
10:32 Where would you typically get that information from?
10:32 A. From the patients.
10:32 Q. Okay. Is that something that maybe would be also reported by the arresting officer?
10:32 A. Possibly. But during these intake screens, we just basically speak to the -- the patient.
10:32 Q. Okay. So I know some -- I know that body scans happen of individuals.
10:32 A. Uh-huh.
10:32 Q. Would the body scan happen before your intake or -- the intake process that you participate in or after?
10:32 A. It happens after.
10:32 Q. Okay. So if an arresting officer does the scan and they see baggies, do they -- do they notify

11:36 you, correct?
11:36 A. Correct.
11:36 Q. This is something that was filled out by a Nurse Nozawa? Am I pronouncing his name right?
11:36 A. Yeah, I believe so.
11:36 Q. Now, you have access to -- you had access to this gate refusal form before you proceeded with the intake process for Hayden Schuck; is that correct?
11:36 A. Yes.
11:36 Q. Is there anything about this gate refusal form that you feel like was filled out incorrectly or isn't -- wasn't complete? You can take a moment to look at it.
11:37 A. There are no vital signs. It's incomplete.
11:37 Q. And just for the record, you would -- you would indicate -- you would normally put the vital signs at the bottom portion of -- of this document --
11:37 A. Yes.
11:37 Q. -- is that correct?
11:37 A. Yes, if they were taken.
11:37 Q. And why would you -- is there a reason why somebody wouldn't take vital signs as part of the gate refusal form?

medications that were already given, if any.

BY MS. ANGELES:

Q. So I want to direct you to Exhibit 6 in the -- the medical records, the general medical records. Can you turn to page CSD000646. And if you -- come -- go back one for -- page before that, there is -- this is a receiving screening that was conducted by you? It's on page -- starting on page C644 -- ending in 644. Is that right?

A. Yes.

Q. And we know that because you're name is at the top?

A. Yes.

Q. All right. What is this document known as?

A. The receiving screening?

Q. Uh-huh. Is it just receiving -- it's just known as "receiving screening"?

A. Yes.

Q. Okay. So going back to that page ending in 646, you see at the bottom where it says, I think your notes, "UCSD for MVA clearance 3/10/11 - PT refused"? What does that mean?

A. That the patient had refused treatment at UCSD.

Q. Okay. So that would be -- would you

11:49 consider that a AMA?
11:49 A. Yes.
11:49 Q. Okay. Going back to Exhibit 5, the
11:49 policies and procedures, I want to direct your
11:49 attention to -- to III(D).
11:49 In this case, did you receive a copy of
11:49 this -- of the signed hospital form indicating that
11:50 Mr. Schuck had acted against medical advice?
11:50 A. I'm -- I'm not sure.
11:50 Q. Would that be contained in his medical
11:50 record?
11:50 A. It would -- it should be.
11:50 MR. INMAN: Objection. Calls for
11:50 speculation.
11:50 BY MS. ANGELES:
11:50 Q. If you received it, where would that be
11:50 located?
11:50 A. It would eventually have been scanned into
11:50 TechCare.
11:50 Q. And when you say "eventually," how -- how
11:50 long, typically, would it be for it to be scanned
11:50 in?
11:50 A. Within a day.
11:50 Q. Do you remember in this case receiving that
11:50 document?

12:04 there. Do you remember who he -- he directed the
12:04 $20 -- did he direct that to you, that statement
12:04 that's in there, "$20 to give the nurse for some
12:04 water"?
12:04 Did he ask you that question?
12:04 A. I can't recall if he asked me directly or
12:04 if he asked the officer for the $20.
12:04 Q. Did you give him water?
12:04 A. I believe I did.
12:04 Q. So what does the QMHP stand for or QM --
12:05 yeah -- HP? Sorry. I'm a little dyslexic.
12:05 A. That's for qualified mental health
12:05 provider.
12:05 Q. Okay. And what is their role?
12:05 A. To oversee the mental health and mental
12:05 health wellness for the patient in custody.
12:05 Q. Okay. So it's fair to say that at some
12:05 point during the intake process, you felt like
12:05 Mr. Schuck was suffering from some mental health
12:05 concerns?
12:05 A. Yes, yeah.
12:05 Q. And that is why you entered this
12:05 information?
12:05 A. Yes.
12:05 Q. Okay. Is there a reason why you scheduled

12:06 it for two days later?
12:06 A. I -- I'm not sure. Yeah, I'm not -- I can't recall.
12:06 Q. Is it typically -- does it typically take two days after intake for someone to be evalu -- mental health be evaluated?
12:06 A. I'm not sure what their schedules are like.
12:06 Q. So how do you know what date to pick when you enter in the schedule date or who puts that in there?
12:07 A. So by default, appointments are scheduled seven days out. And if, you know, we -- if, based on our judgment, they need to be seen sooner, we can schedule them sooner.
12:07 Q. Okay. So in this case, you felt like it needed to be sooner than -- than seven days?
12:07 A. Yes.
12:07 Q. And so you picked March 12th?
12:07 A. Yes.
12:07 Q. Which would be two days after his arrest?
12:07 A. Yes. That sounds right.
12:07 Q. And then at the end of this section here, there's a spot for -- it says, "Completed Date."
12:07 Who enters that information?
12:08 A. It's whoever sees the patient and marks it

12:11 Q. Okay. And what does a dead form mean?
12:11 A. They -- it's -- it doesn't go -- it's not sent electronically anywhere. It's not submitted to anyone to release information. It's not used.
12:11 Q. Then why is this in TechCare? Like, what purpose does it serve?
12:12 A. That, I don't have the answer for.
12:12 Q. Okay. You do obtain a release of information; is that right?
12:12 A. Yes.
12:12 Q. And where is that release of information -- where do you get that from if it's not from TechCare?
12:12 A. It's printed using an -- a different application.
12:12 Q. Okay. What application is that?
12:12 A. It's called MedForms.
12:12 Q. And after you print and fill out the release of information for MedForms, where do you save that?
12:12 A. It's eventually scanned into TechCare.
12:12 Q. Okay. Did you see a scanned release of information in the medical records?
12:13 A. I'm sorry. No.
12:13 Q. That release of information form, what

12:13 is -- what purpose does it serve?
12:13 A. It allows us to obtain or provide information.
12:13 Q. Okay. To who?
12:13 A. Depending on who they authorize as releasing and receiving, we can obtain information from the hospital/doctors/family members. Or if they allow us to release information, we can provide that information to anyone who calls into the jail asking about the patient.
12:14 Q. Okay. Do you know if you filled out a release of information in Mr. Schuck's case?
12:14 A. I -- I can't remember if I did or not.
12:14 Q. Is that part of the intake process?
12:14 A. Generally, no.
12:14 Q. Who was responsible for obtaining the release of information?
12:14 A. There's not one specific assignment for that.
12:14 Q. So no one is responsible for obtaining the release of information?
12:14 MR. INMAN: Objection. Misstates testimony.
12:14 THE WITNESS: It would be on a -- like an as-needed basis. If we need the information, we'll

12:15 print it out.
12:15 BY MS. ANGELES:
12:15 Q. Okay. I want to direct you back to page 4 of the gate -- of the policies and procedures, Section III(E) of the -- of the gate refusal section. So it says here, [as read] "If an MAA [sic] form is not received, hospital -- hospital emergency department -- ED records should be received upon clinical assessment."
12:15 Is that an occasion where you would fill out a release of information?
12:15 A. It could be.
12:15 Q. How would you obtain those hospital records?
12:15 A. The authorization would have to be signed by the patients first before we can send a request in.
12:15 Q. And is that authorization form different from the RO -- the request-of-information form that we just discussed that you download from the Med -- MedForms?
12:16 A. No. That is the form.
12:16 Q. So just so I understand, if you don't receive -- if an -- if an AMA form is not received, then you would ask the patient for a release of

information so that you could order the hospital records from the emergency department; is that correct?
A. Yes.
Q. Do you know if you did that in this case?
A. I -- I can't remember if I did or not. I don't know if I did.
Q. Is there anything that would help you in figuring out whether you did or you didn't?
A. Not -- not that I can think of.
Q. Would that be documented anywhere?
A. It may have been documented in TechCare, but I -- I honestly can't remember.
Q. Okay. Is there a form or a section in TechCare that allows you to provide that information?
A. We do have the ability to freehand notes --
Q. Okay.
A. -- if needed.
Q. Did you provide notes in this case?
A. I -- I didn't see any in here.
Q. Okay. Can we turn to page 642 of the medical records, Exhibit 6.
MR. INMAN: Sorry. What was that page number?

MR. INMAN: Same objections.
THE WITNESS: So not all patients who are referred to the NAP RN get a red wristband.
BY MS. ANGELES:
Q. Okay. I guess, why is it important for an individual to have the red -- the red wristband in -- in this situation?
MR. INMAN: Objection. Lacks foundation. Calls for speculation. Object to the extent it calls for expert opinion.
THE WITNESS: The red wristband identifies them as a medical proceed.
BY MS. ANGELES:
Q. Okay. And what does that mean?
A. That would be a patient who needs to be seen by medical sooner rather than later but they're not emergent.
Q. Okay. And it says here that you're supposed to notify a NAP RN.
How do you do that?
A. We call them and they have a log of patients that need to be seen.
Q. Okay. That call to the NAP RN, where would that be documented? So after you make that call, where -- where do you document that?

01:01 to sign.
01:01 BY MS. ANGELES:
01:01 Q. Understood. I guess I just wanted to
01:01 clarify because when we were talking about the
01:02 procedure for obtaining the release of information,
01:02 you mentioned that it could happen at sort of any
01:02 point during the -- the patient's time at -- in
01:02 custody.
01:02 But my understanding of the policy -- and
01:02 you can let me know if you disagree -- is under
01:02 Section N, it -- it says that it's -- the RN
01:02 conducting intake will obtain a release of
01:02 information for outside reference and medical [sic]
01:02 verification. This is a listed policy.
01:02 I guess my question for you is: Is it
01:02 in -- in practice, is that not what occurs and
01:02 that's why your understanding is -- is different
01:02 than what is listed here?
01:02 MR. INMAN: Objection. Argumentative.
01:02 Lacks foundation. Calls for speculation.
01:02 MS. SCHULER: Document speaks for itself as
01:02 the words "as needed" were at the end of that
01:02 sentence, Section N.
01:02 THE WITNESS: I'm sorry. Can you be a
01:03 little bit more specific with the question?

BY MS. ANGELES:
Q. Sure. I'm asking if your understanding of what happens in practice is different than what -- is different than what is written in Section N?
MR. INMAN: Same objections and the document speaks for itself.
MS. SCHULER: Join.
THE WITNESS: I guess what we practice is what the policy is stating.
BY MS. ANGELES:
Q. So then you are required, as an intake nurse, to obtain the ROI?
A. Yes.
Q. Okay. And then the last section at the bottom discusses the nurse assessment protocol.
What is different about the physical assessment that is done by the -- the nurse -- and I think you said they might be on the second floor -- that's done versus the assessment that you make at intake?
A. The nurse on the second floor has -- let's see. They -- that's where our nursing protocols are initiated.
Q. Okay.
A. So during this time, typically on the

01:04 receiving, we do not in -- we don't -- we didn't
01:04 initiate any nursing protocols, and we have the
01:04 second stage nurse do their assessment. They --
01:04 they have the time to do a more in-depth assessment
01:05 with the patient.
01:05 Q. Okay. Just so I -- to see if I understand
01:05 correctly, as an intake nurse, you do a brief
01:05 initial assessment. And when somebody is
01:05 required -- when there's a requirement or you think
01:05 that a further or more in-depth assessment is
01:05 needed, that rule falls under the NAP protocol or
01:05 the nurse assessment protocol highlighted in
01:05 Section V?
01:05 A. Yes.
01:05 Q. And they have a -- equipment maybe that you
01:05 don't have to do -- conduct that more thorough
01:05 assessment of the patient?
01:05 A. Correct, yes.
01:05 Q. If that NAP -- if the NAP protocol does not
01:05 happen, is there a -- a further or a more in-depth
01:06 medical assessment that happens other than your
01:06 initial intake?
01:06 A. No.
01:06 Q. The next section talks about documentation,
01:06 and it says it will be put in the electronic health

A. Yes.

Q. You do not personally scan those documents into the system?

A. No.

Q. And so you would have no idea of knowing when the documents that were received from UCSD regarding Mr. Schuck were scanned into the system, correct?

A. Correct, I wouldn't know.

Q. We talked a lot earlier today about the intake process for Mr. Schuck.

Do you recall a physician or nurse practitioner at all being present during that intake process?

A. No.

Q. The medical sick call list that is documented on Exhibit 6, page CSD000658, that's the sick call list for Mr. Schuck during his incarceration in March of 2022, correct?

A. Yes.

Q. And we -- we spoke a bit about the entry for the qualified mental health practitioner visit that you believe you entered, true?

A. Yes.

Q. Okay. Do you recall scheduling a sick call

visit with a nurse practitioner or physician for Mr. Schuck at all?

A. I do not.

Q. Okay. And had one been scheduled for Mr. Schuck, it would appear on this page?

A. Yes.

Q. Do you personally recall speaking with any physicians or nurse practitioners regarding Mr. Schuck?

A. No.

Q. And then the release of information or ROI that we discussed earlier, is it true that you cannot access any medical records from any outside facilities without a signed ROI or release of information?

A. That's correct.

Q. Okay. And you do not recall seeing any signed releases of information regarding Mr. Schuck in his medical records after your review, true?

A. Correct.

Q. Thank you. No further questions.

MS. ANGELES: No further questions.

THE VIDEOGRAPHER: Before we go off the record, can we get the video and transcript order on the record, please.

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

I, Leyla S. Jones, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: May 22, 2024

Leyla S. Jones CSR No. 12750

# EXHIBIT 13

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: August 20, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Jon Montgomery, DO

CERTIFIED COPY

Reported by:
Susan Swan

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF JON MONTGOMERY, DO

San Diego, California

Tuesday, August 20, 2024

Reported by: SUSAN SWAN, RPR, CRR, CCRR, CSR No. 7338

JOB No. 1087032
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

JON MONTGOMERY, DO, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:09 a.m. and ending at 12:25 p.m. on Tuesday, August 20, 2024, before SUSAN SWAN, RPR, CRR, CCRR, Certified Shorthand Reporter No. 7338.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES:

FOR PLAINTIFFS:

McKENZIE SCOTT PC
BY: MICHELLE C. ANGELES, ESQ.
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
mangeles@mckenziescott.com

FOR DEFENDANTS COUNTY OF SAN DIEGO AND THE INDIVIDUALLY NAMED COUNTY DEFENDANTS:

COUNTY OF SAN DIEGO
OFFICE OF COUNTY COUNSEL
BY: STEVEN P. INMAN, II, ESQ.
1600 Pacific Highway, Room 355
San Diego, California 92101
619.531.6417
Steve.Inman@sdcounty.ca.gov

FOR DEFENDANTS CORRECTIONAL HEALTHCARE PARTNERS AND NICHOLAS KAHL, NP:

LOTZ DOGGETT & RAWERS, LLP
BY: KATIE K. SCHULER, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
Kschuler@ldrlaw.com

Videographer:

Tracy Escobar

develop that curriculum and that education for the training program that's involved?

MS. SCHULER: Vague. Overbroad. Compound.

THE WITNESS: Thank you for asking. That is a very broad question. It may be better to maybe split it up in that the healthcare record is a tool that we have purchased the use of from NaphCare. And so NaphCare would actually be creating the processes and the educational components of how to use that tool because they made it. And so they would be providing that level of service.

And there's also the difference in, once you have the basic introduction to this tool, there is the operational methods of how to use it more effectively.

And yes, I would expect that our providers and our contracted staff, since they deal with that element: Writing notes, submitting referrals, prescription -- all those elements of a clinical encounter, that would be primarily facilitated by them, again, in helping to train their own employees going forward. So there would be a two-part process.

BY MS. ANGELES:

Q. So is there any collaboration -- is there any collaboration between the contractors and the County staff in figuring out how to best use that software?

MR. INMAN: Objection. Vague.
MS. SCHULER: Overbroad. Lacks foundation.
THE WITNESS: Thank you. There's certainly a collaboration. We collaborate daily. We speak all the time. Our in-boxes overflow. There's all collaboration.
It may be a little bit nuanced just to be talking about the use of that healthcare record, or that given tool. But there's certainly collaboration with regards to different processes, procedures, and elements of patient care using that tool.
So collaboration on how to effectively treat a substance use disorder patient, or how to treat a given clinical patient with a given diagnosis, there's going to be collaboration all the time with regards to specific patient requirements.
MS. ANGELES: It might make sense to take a break.
THE VIDEOGRAPHER: The time is 10:09 a.m. Pacific time and we're off the record.
(Recess)
THE VIDEOGRAPHER: The time is 10:20 a.m. Pacific time and we're on the record.
BY MS. ANGELES:
Q. Dr. Montgomery, so we were talking -- we were

methadone. We have incorporated community partnerships with multiple OTP, NTPs in the community to allow for these services.

So that is just part of our ongoing process.
10:31AM We gain new capabilities, new clinics sometimes monthly. So all of those need to be incorporated with these documents.

Q. Got it. So if a new sort of process evolves within that month, then you update the policy as it
10:32AM comes through?

A. That's the goal.

Q. Is it ever a response to sort of an incident? Let's say an incident happens at intake, and then you realize that there needs to be a change in response to
10:32AM an incident.

Does that ever trigger a policy change?

A. Yes. We are always interested in pursuing improvement. So part of any form of quality assurance, quality improvement processes we need to grow.

10:32AM Yes. There's been processes changed from -- we learn from potential poor outcomes -- previous poor outcomes.

Q. And that would be including, like, deaths as well?

10:33AM A. Yes.

Q. And then once a policy is sort of finalized, how is it distributed to the staff? What is your understanding of how it's distributed?
A. Just to clarify. How the staff is informed?
10:33AM Q. Um-hum.
A. Providing -- that's an educational process. And so once a document has been vetted through our chain of command and that our supervisory staff is aware and are in agreeance, that we would provide education and training to our nursing staff. 10:33AM
Depending on what the process is, it may be done administratively through a trainee bulletin, or if it's a very hands-on technical thing, then there may be an actual workshop type of clinical demonstration and practice to ensure that all the staff are knowledgeable 10:34AM about the new process.
Again, this is speaking generalities. But notification is an educational process.
Q. In 2020, the California State Audit Office came out with sort of a report, right? 10:35AM They created an audit of the San Diego jails as well.
Are you familiar with that?
MR. INMAN: Objection. Misstates the dates. Did you say "2020"?
10:35AM MS. ANGELES: Yes. Did I get the date wrong?

MR. INMAN: Well, if you are talking -- I thought that was 2022.
MS. ANGELES: 2022. I apologize.
MS. SCHULER: They reviewed cases up to 2020.
10:35AM BY MS. ANGELES:
Q. Are you familiar with the state audit review?
A. Thank you. Yes, I am familiar.
Q. In response to that state audit, were any policies or changes -- are you aware of any major
10:35AM changes that were made in response to that audit?
A. Thank you for asking. Is that the policies and procedures that were already in -- under consideration and were already evolving at the time that the audit was made.
10:36AM So most of the changes that we were previously discussing with regards to the drug screening, intake management, and medications were already in process prior to the audit. So while they certainly have benefited the organization, they were not a direct
10:36AM result of the audit.
Q. Okay. So I understand that you were already in the process of changing those. So those changes were consistent with the recommendations that the audit -- the recommendations that the auditors had made as well?
10:36AM A. Yes.

Q. And when did those changes occur?
MR. INMAN: Objection. Overbroad.
THE WITNESS: If I recall correctly, I believe that the first part of those corrections were brought on when NaphCare became our comprehensive healthcare contracted partner. And I believe that was in the midpoint and the tail end of 2022.
BY MS. ANGELES:
Q. I want to talk to you a little bit about Mr. Schuck's medical record. I know you had a chance to review it in preparation for your testimony today. I am going to show you what's been previously marked as Exhibit 6.
A. Thank you.
Q. I am going to ask you to turn to page 667. It's actually 668 and 667. I think it's double-sided. I apologize.
A. That's quite all right.
Q. I will give you a second to review both of those pages?
A. Thank you.
Q. So at the top of 666, it has "Ordering Provider: Jon Montgomery."
Were you involved in treating Mr. Schuck on 3-12 of 22?

involved in some of these; is that correct?
A. I don't believe I said "head," but we would have representation from sworn staff to assist in development of policies and procedures.
11:31AM Q. Which policy and procedures, or how do you decide which policy and procedures, like, are relevant to sworn staff?
A. It would not be a matter of picking and choosing which policy and procedure are applicable or eligible. They would be involved -- they need to be knowledgeable and aware of policies and procedures and potential impact on the given facilities. They would be involved in the development for all.
Q. I thought I heard that you said that depending on the policy, they may be involved in some and not in others. They would be involved in all of them?
A. My apology. That potentially was more for the mental health element. Being more specific to that range.
11:32AM Q. So the mental health person, depending on the policy. Got it.
In terms of sworn staff, I understand that's a completely separate entity, but I know that you work -- the medical services department works in collaboration with the deputies quite a bit in terms of they assure

the safety of the nurses and making sure they have access to the individuals and making sure that they are able to get access to them -- they transport them, things like that.

11:33AM Does the medical service department do any training for the sworn staff in any capacity?

A. I believe that we -- yes, they do. We work with them daily, yes. There is always collaboration, but since you mentioned specific training, mental health

11:33AM is a great example of that, Melissa Quiroz could comment on it more in depth.

There is a sizable training curriculum working with sworn staff and mental health, behavioral health, and suicide awareness training.

11:34AM Q. Is that something that's new? Or when did that start?

A. It's been around for a long time. I couldn't say when the actual initiation date was.

Q. Any other training that you can think of that

11:34AM the medical services department provides for the sworn staff?

A. Not offhand. Not specific for training.

Q. Now, I know that there is -- there are some difficulties with HIPAA, obviously, in making the sworn

11:34AM staff known about certain patient's histories and things

like that. But, obviously, it's important for sworn staff -- they are the ones that are sort of doing the visual checks of the individuals.

Is there any sort of collaboration or policies or training about sort of signs and symptoms or medical distress that the medical services -- the training on medical distress or finding symptoms that they should be looking for of when they should get the medical services department involved?

11:35AM A. Great question. On collaborations, that we are always involving them in the MDG process, the Multi-Disciplinary Group process, that's an example for mental health. They would be actually part of the collaborative process for housing, management, and movement for those patients with mental health/behavior health issues in that process, one example.

Also, another example of training process for agonal breathing. So in conjunction with our ongoing efforts for addiction medicine and substance use disorder management, the sworn staff have been trained in the use of Narcan, the signs and symptoms for overdose to facilitate Narcan use, and have been trained in the signs and symptoms of agonal breathing.

Q. And when did that start?

11:36AM A. I don't recall exactly when individuals were

brought into MDG since we have talked about multiple topics. The MDG process has been around for some time, I don't recall exact start date.

The Narcan element, again, I don't recall exact date, but we had discussed previously -- it's been an ongoing process potentially in 2020/2021, potential initial training for Narcan use.

The most recent training with agonal breathing, I don't recall exact dates, but potentially this year.

11:37AM Q. I think I heard you say that they are trained on signs and symptoms of drug withdrawal; is that correct?

A. As part of their training to use and administer naloxone or Narcan, they would be trained for the symptoms of withdrawal. Sorry. Correction. They would be trained for the symptoms of an overdose.

Q. You would agree that an overdose is different than withdrawal?

A. Of course. Yes.

11:38AM Q. Is there any training that is related to identify individuals that might be experiencing withdrawal?

A. Yes. The nursing staff have been trained to conduct their symptom evaluations and assessments utilizing the scales, the CIWA and COWS.

11:39AM

11:40AM

11:40AM

11:40AM

11:41AM

Q. Now, we mentioned that often you identify -- not you, but medical staff identify individuals who are undergoing withdrawal or overdoses at intake because that's sort of when they are interacting with individuals when they are coming to the jail. And sort of after that it's only when they are notified by the individuals themselves or sworn staff, correct?

A. I agree that we had talked earlier that the majority of the patients would present with such signs and symptoms that intake --

(Court reporter clarification)

THE WITNESS: Yes. I'd certainly agree that most likely patients would be -- if they were presenting with such signs and symptoms, they would be presenting at the -- during the intake process.

BY MS. ANGELES:

Q. And the reason I say that is because sort of that's where, like, the most interaction happens in the sense that the nurses aren't typically the ones that are doing the safety checks or interacting with the patients on a day-to-day basis, correct?

MR. INMAN: Objection. Overbroad. Assumes facts not in evidence.

MS. SCHULER: Join.

THE WITNESS: Sorry could you say that again.

You are talking about for an intake process?
BY MS. ANGELES:
Q. No. I am just saying that nurses aren't responsible for conducting safety checks, for example?
11:41AM MR. INMAN: Objection. Vague.
THE WITNESS: I would agree not for safety checks, because that's not their role. Safety and security is provided by deputies, correct.
BY MS. ANGELES:
11:41AM Q. So what I am trying to say is that the nurses aren't seeing the inmates on an hourly basis or a daily basis like the deputies are?
MR. INMAN: Objection. Vague. Overbroad.
MS. SCHULER: Overbroad.
11:41AM THE WITNESS: Well, different parameters, different evaluations is that I can't speak to the time line for deputies' rounds. But the nurses certainly do rounds. They do wellness checks, and many of those processes would be dependent on where an individual is
11:42AM housed, for example.
If they are in, like, medical observation, you would be following up on them more regularly. If they were in an isolation room or if they were in quarantine, they would be evaluated as needed.
11:42AM BY MS. ANGELES:

Q. And I apologize. I know that there are certain sort of areas that are more specialized where individuals that require more specialty care obviously need a little bit more surveillance and those individuals are certainly being monitored more closely.

11:42AM

What I mean is, there isn't nurses on every floor, correct?

A. I would agree. They are not normally on every floor.

11:43AM

Q. They are not located in the housing modules?

MR. INMAN: Objection. Vague. Lacks foundation.

THE WITNESS: It's a good question. But we do have seven different facilities and the layout of those facilities will vary. So we would not normally have staff in every module, or every floor. But they would certainly do rounds, and based on the given facility, that would certainly affect where their offices were, where their clinics were, where their normal seating position would be.

11:43AM

11:43AM

BY MS. ANGELES:

Q. So at the San Diego Central Jail there's like a clinic and that's normally where the nurses are and then they are doing wellness checks when there are appointments and things like that, correct?

11:43AM

A. Yes. If you are discussing Central Jail, that is certainly true. And the nursing tasks do vary significantly. They certainly would spend most of their time between the intake floors and third floor. But they also routinely conduct med passes, so they would have a presence on all floors.

Q. So going back to sort of the collaboration between the medical service department and sworn staff.

You were talking a little bit about the training for overdose. Is there any training that the medical service department does -- do they train, I guess, sworn staff with regards to withdrawal?

A. I can't speak to that directly. I believe that they do, but the sworn training -- they have their own department that conducts that level of training. They could better comment on the specifics of what they are actually educating their people with.

Q. So as far as you know, you don't -- the medical service department does not provide withdrawal training?

A. As far as I am aware, yes, medical services does not provide direct training to them, yes.

Q. And the sworn staff does not have access to TechCare, correct?

A. Uncertain if they would have access to TechCare. If they did, it would be read-only. But the

different processes, different tools is our sworn counterparts would be using JIMS, JIMS information management system. They wouldn't normally be needing to use the electronic records system. There's an interface. They coordinate back and forth.

Q. Does the medical -- does the medical services department use JIMS?

A. Because of the interface, we as medical services would be utilizing the healthcare record, and because there is an interface, they would certainly see and work with JIMS, but wouldn't normally document directly into JIMS.

Q. So if there is a need for communication between the departments, how would that happen? Is there a way for the systems to communicate between each other?

A. Sorry. Could you clarify what you mean by communication with the departments?

Q. Sure. My understanding is that the sworn staff mainly use JIMS?

A. Yes.

Q. And the medical staff mainly use TechCare.

Is there a way that those two systems interact when their medical staff needs to communicate something to sworn staff about a particular patient? Or vice versa, the sworn staff is trying to communicate

something to the medical staff about a particular patient where the two applications can sort of communicate with each other?

A. Thank you for the clarification.

11:47AM Coordination and communication, again, we, being medical services, we work with them hourly. We can't see our patients without direct correlation and communication with our sworn staff.

If you are discussing communications, pick up 11:47AM the phone, or you reach other and you talk to the deputy who happens to be right by you.

If you are talking about processes, the electronic healthcare record system and JIMS, these IT tools are bi-directional, so the data flow goes back and 11:48AM forth. This level of communication would be more for booking number information, for bed space, you know, helping to communicate with sworn automatically that this individual would require lower bunk, or something of the sort.

11:48AM That level of communication as opposed to direct person interaction communication.

Q. Like, for example, if somebody requires, like, a special diet, would that be in MedCare -- or TechCare? Or would that be in JIMS?

11:48AM A. A special diet request, that would be entered

REPORTER'S CERTIFICATION

I, Susan Swan, RPR, CRR, CCRR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 26th day of August, 2024.

Susan Swan

Susan Swan, RPR, CRR, CCRR

CSR No. 7338

# EXHIBIT 14

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 15

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: August 22, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Aaron Boorman

CERTIFIED COPY

Reported by:
Nicole O'Neil

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, | )CASE NO.: )3:23-CV-00785-DMS-AHG |
| V. | ) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2 3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | ) |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
___________________________________

---o0o---

Deposition of Aaron Boorman located at 1350 Columbia Street, Suite 600, San Diego, California, commencing at 10:03 A.M. PST on Thursday, August 22, 2024, before Nicole O'Neil, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: TIMOTHY A. SCOTT
1350 COLUMBIA STREET
SUITE 600
SAN DIEGO, CALIFORNIA 92101
619-794-0451
TSCOTT@MCKENZIESCOTT.COM

FOR THE DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, CARINA ECHON, JENNIFER VIVONA, AND THOMAS MACE:

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, SENIOR DEPUTY
LINDSEY M. BURNETTE
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANT CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: CASSANDRA F. ROBINSON
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
CROBINSON@LDRLAW.COM

OTHER APPEARANCES:

LEGAL VIDEOGRAPHER - JESSICA WEBB

---o0o---

record, the parties have agreed he would speak to safety checks and actions by sworn staff, but the medical care we agreed would be Ms. Rognlien-Hood for the 30(b)(6).

BY MR. SCOTT:

Q. It does say medical care by correctional staff, who are first responders in custody.

With that said, how can Exhibit 20A provide some insight into any care or checks that were provided to Mr. Schuck?

A. I reviewed it primarily to see if the checks were done within the allotted 60-minute time limit. Other than that, there's really no other -- on this Exhibit, 20A there's really no other information in regards to any kind of, medical care or anything else that would pertain to any individual on that floor, because it's just documenting the general information of the check was done, who it was done by, also the logging of information, like you have -- they are currently right now, key-in radio, who had what key, and other general things that just accounting for items on that floor.

Q. So what entries here pertain to Mr. Schuck on Exhibit 20A?

A. I don't think anything pertains, from my recollection of reviewing it, to him exactly on this 20A exhibit.

Q. So this is a 35-page exhibit, just starting with the first page, help us interpret this. How do you read this exhibit?

A. So, basically, what you have here is showing the location of the facility up near the top where it says FAC001, which stands for San Diego Central Jail. Your area is two, which is the floor at the jail. And then you have your -- on this document you have your start date and time and end date and time of when it was ran. And then going through those other areas below there with your type -- activity date and time, it still shows the facility unit, and in the description, and then at the very end it also shows who actually made that log entry. So basically these are all entries made in the area activity, and this report is generated from there. And as stated, you can see that there are the start times for the security checks and any other item that needs to be notated in an area activity log. If you scroll down, you will see the hard counts. You will see supervisor logs. You will see supervisor inspections and items like that, which are just the date of the activities for the deputies in that location.

Q. Is Mr. Schuck named by name anywhere in this document?

A. To my recollection, no.

Q. How do you know that this document pertains to Mr. Schuck at all?
A. From my recollection from reading the information, the information that was provided, he would have been most likely on the second floor during this time.
Q. Do you not know that?
A. No. Because I was not personally there.
Q. How does Exhibit 20A show that -- does Exhibit 20A show if Mr. Schuck was there on any of these days?
A. To my recollection there's no log entry for meals.
Q. Is there a log entry for whether Title 15 safety checks were done?
A. Yes.
Q. And explain to me how that is notated.
A. The 1153 started, was the type.
Q. For example, here on Page 11 of 35 where it says "1153 start," that means that cell checks have been started?
A. Yes.
Q. Does it show somewhere then the cell checks were completed?
A. No.
Q. How can you tell that it was completed?

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken remotely before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [ ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 23rd of August, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 1077442

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: October 4, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# LT. Aaron Boorman - PMK - VOL. II

CERTIFIED COPY

Reported by:
JULIA LENNAN

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck; SABRINA SCHUCK, individually and in her capacity as Successor-in-interest; and TIMOTHY SCHUCK, individually and in his capacity as Successor-in-interest;

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

CASE NO. 3:23-CV-00785-DMS-AHG

DEPOSITION OF PERSON MOST QUALIFIED

LT. AARON BOORMAN

VOLUME 2, PAGES 43 THROUGH 183

SAN DIEGO, CALIFORNIA

FRIDAY, OCTOBER 4, 2024

REPORTED BY: JULIA LENNAN
CSR NO. 12843

JOB NO. 1185500

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck; SABRINA SCHUCK, individually and in her capacity as Successor-in-interest; and TIMOTHY SCHUCK, individually and in his capacity as Successor-in-interest;<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | CASE NO.<br>3:23-cv-00785-DMS-AHG |

DEPOSITION OF LT. AARON BOORMAN, VOLUME 2, taken on behalf of Plaintiffs, on Friday, October 4, 2024, at 10:02 a.m., at 1350 Columbia Street, Suite 600, San Diego, California, before Julia Lennan, California certified stenographic reporter, License No. 12843.

APPEARANCES:

For Plaintiffs:

McKenzie Scott PC
By: Lauren M. Mellano
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
lwilliams@mckenziescott.com

For Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, and Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado:

County of San Diego Office of County Counsel
By: Steven P. Inman, II
1600 Pacific Highway, Room 355
San Diego, California 92101
619.884.2931
Steven.Inman@sdcounty.ca.gov

For Defendant Correctional Healthcare Partners, Inc.:

Lotz, Doggett & Rawers, LLP
By: Katie Schuler
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
kschuler@ldrlaw.com

Also Appearing:

Jessica Brodkin Webb, Videographer

10:44:11 may -- that wouldn't necessarily generate a JIMS
10:44:14 activity -- ISR due to those circumstances.
10:44:20 Q How does one know, on the deputy's side,
10:44:23 whether someone's behavior is due to a medical reason?
10:44:29 A So I would say that's going to delve into
10:44:36 training and awareness of the individual. And I would
10:44:42 say that if an individual was not wanting to do
10:44:47 something, that is much more blatant and aware.
10:44:53 Q Sure.
10:44:54 So you're saying, you know, if an individual
10:44:57 throws themselves to the floor and says, "I don't want
10:44:59 to move to another housing area," it would be reasonable
10:45:02 for that deputy to think, "Oh, this person is not
10:45:05 fainting. They are wanting to refuse to move," right?
10:45:09 A Yes.
10:45:09 Q Okay. But if an individual makes no indication
10:45:14 that they are refusing, no indication that they don't
10:45:19 want to move, but they're, you know, slumping down the
10:45:24 wall, then wouldn't that indicate to a deputy that there
10:45:28 is a potential medical problem?
10:45:31 ATTORNEY INMAN: Objection. Incomplete
10:45:31 hypothetical.
10:45:39 THE WITNESS: I would say it truly does depend
10:45:42 on the circumstances and what that deputy is seeing,
10:45:46 because an individual just dropping down, even without

10:45:53 blatant arguments or anything like that, the totality of
10:46:01 the interaction with the individual would need to be
10:46:05 taken into account.

10:46:06 If it was truly just out of nowhere, it would
10:46:12 be something that the deputy should investigate more on,
10:46:16 because even if it is just out of nowhere, that
10:46:20 individual may -- when the deputies are saying, "Hey,
10:46:25 come on. Get up. What's going on?" may say something
10:46:28 to them or discuss more. And so it would be on that
10:46:32 deputy, on their interaction, to determine what needs to
10:46:38 happen after that.

10:46:38 BY ATTORNEY MELLANO:

10:46:40 Q Okay. And did you read the deposition
10:46:44 testimony by either Deputies Page or Ramirez in this
10:46:48 case?

10:46:48 A No.

10:46:49 Q Okay. But you did review the footage where
10:46:54 Mr. Schuck was falling down on to the ground multiple
10:46:58 times during transport?

10:47:00 ATTORNEY INMAN: Objection. Misstates the
10:47:03 evidence or -- video speaks for itself.

10:47:09 ATTORNEY SCHULER: Lacks foundation.

10:47:10 ATTORNEY MELLANO: To ask him if he reviewed
10:47:12 the video?

10:47:15 ATTORNEY SCHULER: Well, you stated

10:47:21 specifically --
10:47:22 THE STENOGRAPHIC REPORTER: I'm sorry, Counsel. I can't hear you.
10:47:22 ATTORNEY SCHULER: Her question stated specific things that allegedly happened on the video that I think lack foundation.
10:47:26 BY ATTORNEY MELLANO:
10:47:28 Q You reviewed the video of Hayden Schuck being transported from the second floor to the seventh floor, right?
10:47:35 A I saw a segment of him prior to the 7-David module entry gate and just right after, if I recall properly, and that was it.
10:47:48 Q Did you -- what did you -- what did you see during that video?
10:47:54 A I saw two deputies initially escorting an individual towards 7-David, where the individual, close to the door, if I recall properly, went down to a seated position, then was assisted back up and, if I recall properly, went through the actual 7-David door and, a little bit further in, once again went down to a seated position, was assisted up, and then walked a few more steps, before I saw the -- before we turned off the actual video footage.
10:48:41 Q And did Mr. Schuck receive medical care at that

point?
A To my understanding, no, but I did not look any further into that aspect of it.
Q Did deputies do anything to determine his well-being at that point?
A I am unaware what they did in that moment. That would be the discussion amongst the deputies there, the discussion they had with Mr. Schuck, if any. I wouldn't know what they actually did or didn't do or what they asked at that point in time.
Q Did you -- you didn't interview them?
A No.
Q Okay. And did you see anything -- did you review Hayden Schuck's JIMS?
A Yes. So I did go over -- like I said, we did this. I also looked at the ISRs that were generated for him.
Q Were there any ISRs that were generated at the point at which Hayden was going to the ground, at that point when you saw him on the video?
A To my recollection of the three ISRs, no, no ISR was written for that time.
Q Okay. And so as far as you know, having, you know, looked into this to at least some extent, Hayden Schuck was not provided with any sort of medical care?

11:00:23 individual's housing assignment, as well as their
11:00:27 needs -- their service needs while in custody?
11:00:30 A Yes.
11:00:33 Q Okay. And that, you know, despite that those
11:00:37 would be made by mental health professionals who are not
11:00:41 sworn staff, the last line recommends that the Sheriff's
11:00:43 Department should communicate those ratings to all
11:00:47 detention staff overseeing them, right?
11:00:51 A That is correct.
11:00:52 Q Okay. And so is it fair to say that the
11:00:55 Auditor was concerned about continuity of information
11:01:02 amongst mental health professionals and the sworn staff
11:01:07 overseeing the detainees, right?
11:01:11 ATTORNEY INMAN: Objection. Calls for
11:01:12 speculation, and document speaks for itself.
11:01:19 THE WITNESS: I would have to say, with what
11:01:23 they're stating there, that there could have been some
11:01:32 request for a little bit of better communication. But I
11:01:39 think in the totality of their audit, this section was
11:01:45 primarily for mental health and just getting that
11:01:50 individual out there to have a better mental health
11:01:52 assessment prior to entry to the facility. That's what
11:01:59 I would see from it from my perception.
11:02:02 BY ATTORNEY MELLANO:
11:02:02 Q Okay. And based on County training and

11:02:06 policies, substance use disorder is a mental health
11:02:11 issue, right?
11:02:12 ATTORNEY INMAN: Objection to the extent it
11:02:15 calls for expert opinion.
11:02:15 THE WITNESS: Yeah. I don't -- I couldn't tell
11:02:17 you for sure on that.
11:02:18 BY ATTORNEY MELLANO:
11:02:19 Q So County staff are not trained, as far as you
11:02:22 know, that substance use disorder is a mental health
11:02:27 disorder?
11:02:27 A I'm not a hundred percent sure on that. I did
11:02:29 not look into that. I know that we're trained in
11:02:31 regards to substance abuse, but I do got recall any of
11:02:35 the training in regards to what it would be classified
11:02:39 under.
11:02:39 Q Okay. With respect to this recommendation by
11:02:45 the Auditor, the Sheriff's Department concurred with
11:02:48 this recommendation, right?
11:02:53 A I'd have to go through their section again. I
11:02:55 want to say, from my reference of it, that they did
11:03:02 agree that they would like to -- because this is
11:03:07 actually part of the NCCHC standards, and to get that
11:03:12 certification, they would need to accomplish that. And
11:03:20 that means that they would need to enact that process to
11:03:25 get that certification.

11:03:28 Q Okay. So the County -- so the County did want to implement the change that was recommended, right?
11:03:40 A They were already working on -- so -- also, in a conversation I had with Dr. Montgomery in regards to this, since I wasn't involved with any of the drafting or anything like that, his statement in regards to the audit was basically that a lot of the recommendations that were made by the State Auditors were items that we were already discussing with them, telling them that we were looking into doing, prior to the State Audit and in the process of getting these things in place.
11:04:17 Q When was this conversation with Dr. Montgomery?
11:04:22 A I want to say it was yesterday.
11:04:24 Q Oh. And was that in preparation for your deposition?
11:04:25 A Yes. Sorry.
11:04:26 Q That -- you did not mention that, right? I didn't miss that earlier, right?
11:04:32 A I did not.
11:04:32 Q Okay. Is there anyone else that you can think of that you spoke to to prepare for today?
11:04:37 A No.
11:04:38 Q Okay. So it was, like, Sergeant Pike, those other deputies that you spoke of, and Dr. Montgomery?
11:04:43 A Yes.

11:04:44 Q Okay. And so can you -- I guess since we're on the topic, can you speak a little bit more to the conversation with Dr. Montgomery? What was the sort of purpose in having that?

11:04:57 A So, basically, just to find out a little bit more information in regards to this, because I do not have a lot of background into that. I do not -- I did not have the ability to go back and -- knowing the information that happened, because a lot of the information and work that was done on this was done under sheriff's legal.

11:05:22 So just to have an idea -- like I said, I wasn't in a position where I saw the after from this. And there's not a lot of people around anymore that are basically still -- in regards to that. And so he was an individual that I knew was around and could help me understand if there was anything I was missing in regards to policy aspects of it.

11:05:48 Q Okay. And when you refer to, like, "this" or "that," are you referring to Hayden Schuck's death --

11:05:53 A I'm referring to the actual --

11:05:55 Q -- or the audit?

11:05:57 A -- audit. Yes.

11:05:58 Q Oh, okay.

11:05:59 A Yes. Sorry.

11:05:59 Q Okay. So you weren't around when the audit was done?
11:06:05 A Yes.
11:06:05 Q Okay, okay. Sorry. I think I must have just lost you there. I wasn't sure what you were referring to. So I think maybe I was -- I missed something.
11:06:19 But -- so you were speaking with Dr. Montgomery, because he was around during the audit, and you weren't privy to a lot of conversations, maybe, about the audit at the time, even though you were working for the Sheriff's Department?
11:06:33 A Yes. So I was there in regards to gathering information for the auditors. I assisted in basically their interviews of staff. By the time the audit was over, I was still in DSD, in the command area. I wasn't involved with any of the response, but trying to get more information on anything that may have changed due to the State Audit, I figured he was the best resource to get that information from.
11:07:22 Q Okay. And at the time of Hayden's booking, so in March of 2022, had this particular procedure that the Sheriff's Department concurred with -- had that even began?
11:07:41 A To my knowledge, no.
11:07:41 Q Okay. And, to your knowledge -- I mean, Hayden

which we've got marked as 85.

So it says in II(B) that: "Individuals who are severely intoxicated, exhibiting symptoms of alcohol or drug withdrawal, or otherwise urgently in need of medical attention, will be referred immediately for further evaluation, treatment, and/or medical clearance."

If a deputy sees signs of any of those things, what is the protocol?

A So --

ATTORNEY INMAN: Objection. Incomplete hypothetical.

You can answer.

THE WITNESS: So if they do notice those signs, just like any other incident, they can -- they are supposed to act on it. They will get Medical involved with it to elaborate what may be going on. And then through whatever Medical says, or in collaboration with Medical, make determinations of what they may need to do with that individual.

BY ATTORNEY MELLANO:

Q And deputy -- sworn staff, they are trained on what signs to look for to determine whether someone is intoxicated, right?

A Yes.

12:00:31 Q And they're trained on what signs to look for in deciding whether someone is exhibiting signs of withdrawal?
12:00:40 A Yes.
12:00:41 Q Okay. Can hallucinations be a symptom of drug intoxication?
12:00:53 A Yes.
12:00:54 Q Is that part of the training for sworn staff?
12:00:56 A To my recollection or memory from it, yes.
12:00:59 Q Can hallucinations also be potentially a sign of drug withdrawal?
12:01:04 A Yes.
12:01:18 Q Are sworn staff trained that, you know, things can be missed by the nurse, and so it's important to look out for symptoms that maybe should have been caught by the nurse during intake screening but weren't?
12:01:33 ATTORNEY INMAN: Objection. Vague.
12:01:40 THE WITNESS: I wouldn't say in those exact words. I would say in general the training is to see those things and act upon them and seek further aid, if needed.
12:01:55 BY ATTORNEY MELLANO:
12:02:01 Q Are sworn staff trained to look for signs of overdose?
12:02:09 A Yes.

12:19:55 was discussing some of the stuff that he needed to bring
12:20:00 to my attention in regards to our facility.
12:20:03 And, as stated, I had my policy and procedure
12:20:09 and everything, and I was reviewing it, getting ready.
12:20:14 And he's like, "What do you got going on there?"
12:20:18 I was like, "I'm getting ready for a depo for
12:20:20 this."
12:20:20 And then he's like, "Oh." And he just gave
12:20:25 that right off the top.
12:20:26 And, like I said, I didn't delve anywhere
12:20:29 further into it because I didn't feel that it truly was
12:20:34 needed for what I was being deposed for, but I also felt
12:20:39 that, having that conversation, it should at least be
12:20:42 brought up.
12:20:42 Q I see, I see. Okay. Sorry. I do -- now I do
12:20:45 remembering you saying that he was sort of like, "What
12:20:46 are you doing?"
12:20:48 A Yeah.
12:20:48 Q Okay. Thank you.
12:20:58 Okay. And Topic 4, I feel like it's a little
12:21:02 bit similar to some of the other stuff we've already
12:21:06 touched on, but to what extent are sworn staff -- do
12:21:15 sworn staff provide any sort of medical care?
12:21:21 A So we're there to provide basic life support as
12:21:28 needed in those situations where something is urgent or

12:21:33 dire. Basically, we get CPR and first aid training.
12:21:41 Like I said, we have the trainings in regards to what
12:21:44 we're looking for and stuff like that.
12:21:48 We're there to do immediate action as needed
12:21:52 for an individual who's in medical stress. Other than
12:21:59 that, we're there to basically get them to Medical to
12:22:03 get whatever else aid they need.
12:22:07 Q Okay. And so, like, for example, if someone, I
12:22:12 don't know, needs an EpiPen, you would not be able to
12:22:17 administer that; is that right?
12:22:19 A Well, no, because the standards on that is you
12:22:22 shouldn't be administering. It's supposed to be the
12:22:25 person who actually administers it themselves, so.
12:22:27 Q Is that something you learned --
12:22:27 A That's basic first aid.
12:22:29 Q It's a good thing that I don't have an EpiPen
12:22:33 to give anyone, then. Okay. So bad example.
12:22:35 A No. No, still good.
12:22:36 Q Now I've got to think of another one, though.
12:22:40 Okay. So I guess if someone has, like, a wound
12:22:43 that likely requires stitches or something, like, you
12:22:47 would not be the person that would be giving those
12:22:49 stitches, but you might do some wound care to get them
12:22:53 on their way to the Medical Services Department; is that
12:22:55 right?

12:54:19 Q Yes.
12:54:21 A No, none that I'm aware of.
12:54:23 Q And -- because -- so sworn staff are trained,
12:54:27 though, that both intoxication, as well as withdrawal
12:54:30 from drugs or alcohol, are both dangerous -- potentially
12:54:34 dangerous medical issues, right?
12:54:36 A Yes.
12:54:36 Q Okay. And so there's nothing that would be
12:54:39 flagged in JIMS to say, you know, this person -- like,
12:54:41 "Look out for signs of withdrawal with this person,"
12:54:43 because of the type of charge against them?
12:54:50 A To my recollection of policy, no. But that's
12:54:55 where we're talking about, in M.9, the medical eval.
12:55:01 If they deemed that individual may need,
12:55:03 because of those items, either drug withdrawal or
12:55:08 intoxication, further medical attention, they would flag
12:55:12 that individual, and we would be able to expedite them,
12:55:17 as it was stated in M.9.
12:55:20 Q Okay. And so deputies -- sworn staff are the
12:55:26 folks that see the detainees the most often, the most
12:55:31 frequently, consistently, right?
12:55:33 A I would agree with that.
12:55:35 Q Yeah.
12:55:35 And so, I guess -- if there's no flag, I guess
12:55:38 I can see a scenario where somebody might be sort of

deteriorating under the watch of sworn staff, but that they don't really know why because Medical hasn't given them a heads-up that, you know, they might be suffering from intoxication or withdrawal.

Isn't that a risk?

A I can see your thoughts on that, but I also think that stems back to the policy and training of we need to interact and -- we need to act on things and the training of noticing those signs and symptoms, that even if Medical doesn't say this individual needs that, at any point in time a deputy seeing that individual, even though Medical already cleared them, can still be like, "This doesn't look right to me, and I think we need to go further," and then proceed further with that.

At any time in that process, at any time in the facility, at any time under our care, a deputy can basically look at that individual and say, "This isn't right to me. We need to move forward with something else," and proceed that person to some kind of medical staff.

Q Okay. And are you aware that -- in any of the review that you did, did you ever become aware of the fact that Hayden Schuck was hallucinating?

A I'm trying to think, in all the stuff I reviewed pertaining to our information, I don't recall

that. I think the time I did see it is when I was reviewing the Complaint.

Q Okay.

A I think it was in there, there was belief of hallucination or something like that. But I cannot recall any other document, off the top of my head, about hallucinations.

Q Okay. Do you recall there being allegations that Hayden had unexplained, like, wounds on his body?

A So in review of the medical examiner's report, I did note that it did mention sores, I think he said, on the buttocks region. I think there might have been another location, but I can't recall exactly where.

Q Okay. What is the policy -- I'm getting a little off topic. Sorry. It's kind of disorganized, but what is the policy with respect to when a detainee has a mattress in their cell?

A So in housing, mattresses are provided, plain and simple. That's part of BSCC standards, Title 15 stuff, that they will provide a mattress in housing.

Q Okay. And -- but -- so Hayden Schuck was not in housing until he was moved to 7-D, right?

A That is correct.

Q Okay. And so from March 10th -- the night of March 10th, until the night of March 15th, he was not in

12:59:00 housing?
12:59:01 A Correct.
12:59:03 Q And as a result there was no requirement that he have a mattress in his cell from March 10th to March 15th?
12:59:12 A That is correct.
12:59:13 Q Okay. And are you aware of whether he had a mattress in his cell when he arrived to Module 7-D?
12:59:23 A That, I do not know.
12:59:25 Q Do you remember reviewing video of that area and seeing somebody bring him a mattress at about 4:00-something in the morning?
12:59:35 A No. I did not review any of that video, that I recall, no.
12:59:38 Q Okay. But you -- I -- so, correct me if I'm wrong, but I was under the impression that you reviewed all of the interactions between the deputies and Hayden Schuck during his time in Module 7-D.
12:59:50 Is that not right?
12:59:51 A I watched all the 11-53s and some intermittent stuff that popped up as they were moving to each 11-53.
01:00:01 Q Okay. And so you roughly just, like, moved the timestamp to the timestamps of the 11-53s; is that right? Or you just kind of --
01:00:12 A Correct. We went off of the Area Activity Log

through the depositions processing supervisor, if I recall properly. They'll make note of it, and then they'll bring that to the attention of sworn staff.

At that point we review it, make sure what it is, what they're requesting, if it's something that we can even do. Because sometimes we get requests that we can't do in the jails from the court.

And then after we determine that it's all good to go, in that sense, it would have been notifying the deputies or being in contact with the deputies who knew where he was or worked on the floor he was, and recommend that, basically, "Hey, we need to have him go see Medical really quick, per this court order."

BY ATTORNEY MELLANO:

Q Okay. And so in this case do you know when sworn staff became aware of that court order?

ATTORNEY SCHULER: Same objections.

ATTORNEY INMAN: Join.

THE WITNESS: So from those two reports -- I don't remember which one it was -- I think it stated it was close to either 4:00 or 5:00 o'clock in the afternoon. I'm not a hundred percent sure.

BY ATTORNEY MELLANO:

Q Okay. I mean, was it your understanding that sworn staff knew that the court had ordered this at the

01:08:14 hearing?
01:08:14 A From the --
01:08:16 ATTORNEY SCHULER: Objection. Lacks foundation. Misstates testimony -- or misstates evidence.
01:08:18 ATTORNEY INMAN: Join.
01:08:18 THE WITNESS: From the information that I reviewed, I don't think I'd be able to extrapolate that, and I don't have any other information that I could have -- that I know of that I could have researched to find that out.
01:08:29 BY ATTORNEY MELLANO:
01:08:29 Q Okay. So you don't know if, like, the sworn staff that were the transporting officers, for example, that were at the courthouse -- you just don't know whether they knew about this court order or not?
01:08:40 ATTORNEY SCHULER: Same objections.
01:08:41 THE WITNESS: So the transporting officers from court?
01:08:42 BY ATTORNEY MELLANO:
01:08:42 Q Uh-huh.
01:08:43 A That, I would have no idea, because they're in a whole separate facility. Depending on how the in- -- how individuals come back -- they either come back on the bus -- or, actually, that time, it would have all

01:08:56 been bus or van. But they would have not been relaying
01:09:05 that at the court.

01:09:05 Like I said, the court order would have came to
01:09:08 the facility at some point in time, through the court.
01:09:10 And at that point it would have been disseminated to
01:09:13 wherever it deemed to need to go.

01:09:15 Q Okay. Well -- so if an officer knows and hears
01:09:20 in court that someone is ordered to receive further
01:09:26 medical attention when they're transported back to jail,
01:09:29 and that officer tells sworn staff at the jail about
01:09:33 this court order, regardless of whether they have a
01:09:36 paper copy of this court order, wouldn't protocol then
01:09:40 require the sworn staff to get that detainee medical
01:09:43 attention?

01:09:45 ATTORNEY INMAN: Objection. Improper
01:09:46 hypothetical. Misstates evidence.

01:09:48 ATTORNEY SCHULER: Join.

01:09:49 THE WITNESS: I would have to say if a court
01:09:52 deputy came over and informed deputies at the jail that
01:10:00 it was requested that this individual be seen, at that
01:10:04 point in time, I would say we're looking at the deputy's
01:10:16 perception of what's going on, assessing the individual.

01:10:20 In my -- in that circumstance it would possibly
01:10:29 be a good idea, but there's nothing that stipulates that
01:10:34 they have to take that individual right away.

01:10:35 BY ATTORNEY MELLANO:
01:10:36 Q Okay. So if -- so -- let me know if I'm understanding you incorrectly, but it sounds like what you're saying is that if sworn staff become aware that the court has ordered someone to have further medical treatment, they don't have to take that person right away to see Medical --
01:10:57 ATTORNEY INMAN: Same objections.
01:10:57 BY ATTORNEY MELLANO:
01:10:58 Q -- necessarily?
01:11:00 ATTORNEY INMAN: Same objections.
01:11:01 THE WITNESS: At that point we're dealing with a court order that we do not have. So we're also just dealing with the information that someone from the courthouse is bringing over to us.
01:11:13 And if we're assessing that individual and we're seeing that they're presenting in a way that doesn't need extra medical attention, there's nothing glaring, we don't know what that medical order was for.
01:11:33 Because they can say -- come over and say, "This person is going to be referred to Medical," but that could be for an appointment. That could be for an outside appointment. It all depends on the information that's passed, I guess I would say.

01:13:16 be referred to Medical or mental health pursuant to
01:13:22 policy?
01:13:22 ATTORNEY INMAN: Objection. Incomplete
01:13:22 hypothetical.
01:13:25 THE WITNESS: I wouldn't say a hundred percent
01:13:28 on that. I think it also depends on other things that
01:13:32 they're presenting. Because we do get other individuals
01:13:37 in our facility that may not actually have any kind of
01:13:41 mental health or medical issues that act in a way that
01:13:48 they're not going to give you that information.
01:13:49 I think it's encompassing about the whole
01:13:55 totality of the individual and what you see and access,
01:13:57 where you need to take it.
01:13:59 BY ATTORNEY MELLANO:
01:13:59 Q Okay. Which medical records govern when
01:14:22 someone is supposed to summon emergency medical care for
01:14:27 detainees?
01:14:29 A So that would be, like -- your M.5 and M.6, if
01:14:34 I recall properly, are your two main ones.
01:14:38 Q Okay, okay. So M.5 is for medical emergencies;
01:15:02 is that right?
01:15:04 A To my recollection, that is, yes.
01:15:34 Q Okay. And so how does a sworn staff member
01:15:40 know whether something is a medical emergency?
01:15:43 A So that would be based off of, I think, like we

01:15:48 sort of discuss -- I think was earlier -- the training
01:15:53 that we receive. Your CPR and first aid sort of gives
01:15:57 you an idea of that. There's also trainings that come
01:16:03 out in regards to medical emergencies.
01:16:09 There are -- annually we do training that deals
01:16:17 with person down that sort of corresponds to those
01:16:27 instances where you may see someone who's in medical
01:16:31 distress or in need of medical attention, and how you
01:16:34 react to that incident.
01:16:36 Q Okay. And so are sworn staff trained on, like,
01:16:42 a specific set of symptoms that, then, that would be
01:16:46 indicative of a medical emergency?
01:16:52 A To my recollection, there is sort of -- there
01:16:54 is a list in the training. I probably won't go them
01:17:00 all, but it deals with, you know, agonal breathing,
01:17:07 inability to move. That's probably worded differently.
01:17:11 But it touches on things that would be out of
01:17:15 my norm that are something that could lead to a medical
01:17:19 emergency, that we need to be able to see and know to
01:17:21 interact and get that individual the help they need.
01:17:24 ATTORNEY MELLANO: Okay. I'm going to mark
01:17:44 this exhibit here. Hold on.
01:18:12 I think we have -- I think we're going to have
01:18:16 some gaps, because I think some of these are not -- I'm
01:18:18 not going to use, which I'll just have to figure out

01:18:22 later. But -- do we have -- I'm so sorry. Do we have
01:18:37 76 already? It's not what --
01:18:41 ATTORNEY INMAN: 76.
01:18:41 ATTORNEY MELLANO: I think we --
01:18:41 ATTORNEY INMAN: Oh, 76.
01:18:43 ATTORNEY MELLANO: Yeah.
01:18:43 ATTORNEY INMAN: Yeah.
01:18:43 ATTORNEY MELLANO: I don't think so, right? We
01:18:46 did 79.
01:18:48 ATTORNEY INMAN: I missed the --
01:18:50 ATTORNEY MELLANO: That's okay.
01:18:50 Do you mind just lifting up the other one,
01:18:53 because I don't think -- I think that's 78 underneath
01:18:54 there, right?
01:18:55 Okay, okay. Then I'm going to mark this as 76.
01:19:07 It's Bates 1578.
01:19:10 (Exhibit Number 76 marked)
01:19:11 BY ATTORNEY MELLANO:
01:19:12 Q Do you recognize that document?
01:19:15 A Yes.
01:19:15 Q Okay. And it's a training bulletin, right?
01:19:21 A That is correct.
01:19:21 Q How do those get disseminated?
01:19:27 A So at the time, and I think currently, these
01:19:35 would have gone out in one of two ways, or both ways,

01:19:38 via email and also through the Learning Management
01:19:42 System.
01:19:46 Q Okay. And so would all sworn staff receive
01:19:50 this at the Central Jail?
01:19:52 A Yes.
01:19:52 Q Okay. And it looks like this one is from
01:19:55 June 2021.
01:19:58 Is that right?
01:19:59 A Yes. That's what's on there.
01:20:01 Q That would likely be the date that it was
01:20:04 disseminated?
01:20:05 A I would say probably the date it was created,
01:20:09 not exactly the date it was disseminated, always.
01:20:12 Q Okay.
01:20:13 A It could be one and the same, though.
01:20:15 Q Okay. Safe to assume that it would probably
01:20:17 have been disseminated around the same time after it was
01:20:20 created; is that right?
01:20:20 A Correct.
01:20:21 Q Okay. And so this is not, you know, limited to
01:20:26 medical staff, right? This is -- sworn staff would
01:20:29 receive and be expected to review this?
01:20:32 A Yes.
01:20:32 Q Okay. And so this Signs & Symptoms of
01:20:35 Withdrawal, right?

01:20:37 A That is correct.
01:20:38 Q And it lists common signs?
01:20:41 A Yes.
01:20:44 Q And it also states that withdrawal symptoms can
01:20:47 be life-threatening?
01:20:50 A Yes. It does.
01:20:51 Q Okay. And some of the -- some of the symptoms
01:20:56 and signs would include restlessness, right?
01:21:02 A Yes.
01:21:03 Q Dilated pupils?
01:21:05 A Yes.
01:21:06 Q Hot and cold flushes?
01:21:09 A Yes.
01:21:10 Q It could affect level of consciousness?
01:21:13 A Yes.
01:21:22 Q Anxiety? Insomnia?
01:21:26 A I'm missing it.
01:21:28 Q In the middle there.
01:21:30 A Oh, in the middle in the overlap?
01:21:31 Q Yes.
01:21:31 A Yes. That one is in the overlap.
01:21:33 Q So that one would be for -- it could be
01:21:35 indicative of opioid or alcohol withdrawal?
01:21:38 A Correct.
01:21:40 Q Or those, I guess I should say.

01:21:42 And anxiety and insomnia are indicative of
01:21:45 either of those types of withdrawals?
01:21:49 A Correct.
01:21:49 Q And same with hallucinations and
01:21:53 disorientation?
01:21:54 A Correct.
01:21:55 Q Okay. All right. And is high blood pressure
01:21:59 also a symptom of withdrawal from alcohol?
01:22:03 A Yes. It is there, listed.
01:22:04 Q Okay. And so are these some of the things,
01:22:07 then, that sworn staff should be on the lookout for,
01:22:12 with all detainees?
01:22:14 A Correct.
01:22:14 Q Okay. And because those could be symptoms that
01:22:20 are indicative of withdrawal, that means they could be
01:22:23 life-threatening, right?
01:22:27 ATTORNEY INMAN: Objection. Overbroad. Vague.
01:22:31 THE WITNESS: Correct.
01:22:31 BY ATTORNEY MELLANO:
01:22:32 Q So sworn staff should know that, you know, even
01:22:35 if a person maybe looks okay, like, hallucinations could
01:22:41 be indicative of withdrawal, right?
01:22:43 A They could be, yes.
01:22:44 Q And withdrawal is life-threatening?
01:22:48 A Yes.

01:23:04 Q This also quotes Policy and Procedure M.5, which states that: "All staff shall be responsible for taking appropriate action in recognizing, reporting, or responding to an inmate's emergency medical needs. In any situation requiring medical response, emergency medical care shall be provided with efficiency and speed, without compromising security."
01:23:35 Is that your knowledge of M.5 as it was at the time of Hayden's death?
01:23:43 A Yes.
01:23:43 Q Okay. And the next line of M.5 says: "If the inmate's condition is believed to be life-threatening, sworn staff shall immediately notify on-duty health staff and provide basic life support and/or first aid."
01:24:03 Is that your understanding of M.5 at the time of Hayden Schuck's death?
01:24:10 A Yes.
01:24:10 Q Okay. And so from this, the County's position at the time of Hayden Schuck's death would have been that, you know, symptoms such as hallucinations could have been indicative of a severe life-threatening condition and would have warranted sworn staff notifying health staff, right?
01:24:37 ATTORNEY INMAN: Objection. Vague. Overbroad. Misstates the document.

01:24:49 THE WITNESS: Could you repeat the question one last time?
01:24:52 ATTORNEY MELLANO: Can we have it read back.
01:25:23 (Record read)
01:25:25 ATTORNEY INMAN: Same objection, the incomplete hypothetical.
01:25:40 THE WITNESS: With what it's saying, yes, dealing specifically with alcohol or opioid withdrawal signs and symptoms.
01:25:55 So if there was the knowledge or possible knowledge of the individual being in withdrawal or possibility of the individual coming in or being there for reasons of either alcohol or opioid use, then yes, those signs should have been noted, and the individual should have been taken to Medical.
01:26:30 BY ATTORNEY MELLANO:
01:26:30 Q Okay. So if I'm hearing you correctly, what you're saying is that someone does not need to be taken to Medical if they're presenting with hallucinations, unless they -- there's possible knowledge that they could have used alcohol or opioids?
01:26:52 A No. In fact, with hallucinations, yes. There should have been some kind of medical intervention, either it be medical or mental health.
01:27:03 ATTORNEY MELLANO: Okay. Thank you.

01:36:35 bad, while I'm organizing, if people want to do --
01:36:41 THE VIDEOGRAPHER: Would you like me to go off
01:36:43 record?
01:36:44 ATTORNEY MELLANO: No. I'm okay. Thank you,
01:36:45 though.
01:38:26 Okay. Perfect.
01:38:37 Okay. I'm just going to hand you these four.
01:38:41 So those are -- so it's going to be Exhibit 77, which is
01:38:50 Bates 1382, which is Class 20.1. It's a training.
01:38:57 And I'm not going to ask you any questions
01:38:58 about these. I just -- and then 83 is Bates 1451, and
01:39:04 it's Class 20 -- oh, no, no.
01:39:08 Did I give you 82 as well?
01:39:10 THE WITNESS: You did.
01:39:10 ATTORNEY MELLANO: Okay. Sorry.
01:39:11 82 -- sorry, Steve -- Class 6.1. It's
01:39:16 Bates 1674.
01:39:18 83 is Bates 1451. It's Class 20.6.
01:39:27 84 is 1433, Class 20.5.
01:40:01 (Exhibit Numbers 77, 82, 83, 84 marked)
01:40:01 BY ATTORNEY MELLANO:
01:40:01 Q Okay. Have you seen these before?
01:40:08 A So starting with Number 77, the Class 20.1,
01:40:14 yes. I presented with this for review, and I reviewed
01:40:19 it for here.

01:40:21 Q Oh, okay.
01:40:23 So is this -- it looks like -- so the instructor here is listed as the mental health clinician of San Diego Sheriff's Department; is that right?
01:40:36 A That's what they have listed, yes.
01:40:38 Q Would this have been a training that was provided to other mental health clinicians, or would this have been a training that was provided to sworn staff?
01:40:49 A This would be a presentation that went to sworn staff.
01:40:52 Q Okay. And was this a training that you received in your capacity as a sworn officer? Do you recall?
01:41:08 A I cannot recall off the top of my head if I was actually present for one of these trainings.
01:41:16 Q That's okay. That's not really what you're here for today anyway, huh?
01:41:20 Okay. And so, I guess -- you know, I mainly wanted to confirm that this was a training that was provided to sworn staff, as opposed to medical staff.
01:41:30 But it looks like -- so the objectives here, though, are to recognize trends in substance abuse, right? That's one of the first objectives on the first page?

01:41:42 And please don't worry. I'm not going to -- I literally mainly wanted to confirm that these were actually given to sworn staff, as opposed to Medical. So I'm not trying to quiz you on anything that's in it.

01:41:57 Is there something that you wanted to volunteer, though? It looks like --

01:42:01 A No. I was just looking at the page where I think you said page 1, because it says: "Recognizing recent trends in substance abuse."

01:42:07 Q Oh.

01:42:08 A So I was just confirming.

01:42:08 Q Sure, sure. I guess it is later as well. I was actually looking at the very -- cover page --

01:42:16 A Got it.

01:42:16 Q -- here. There's obje- -- the four objectives are listed a little bit easier to --

01:42:21 A Correct.

01:42:21 Q -- reach.

01:42:22 Okay. And so the second is to distinguish between different street drugs, but the third is to classify symptoms to specific types of substances used, right?

01:42:39 A Yes.

01:42:40 Q And so, not only are sworn staff supposed to look out for, you know, sort of general indices that

01:42:50 somebody might be unwell but they're supposed to know
01:42:55 what symptoms might indicate that someone might be under
01:42:58 the influence or withdrawing from certain types of
01:43:01 drugs; is that right?
01:43:04 A So from this training, I mean, that is one of
01:43:07 the points. I'd have to delve more into the actual
01:43:13 section of that to see how in-depth they go, but in
01:43:18 generality, yes.
01:43:19 Q Okay. And then 20.1.4 of the objectives
01:43:31 states: "Recognize medical symptoms that resemble the
01:43:36 effects of substance abuse."
01:43:40 And is it true that sworn staff should know,
01:43:46 based on policies and procedures, training, that some
01:43:51 symptoms might be indicative of substance use, that
01:43:57 might also be indicative of, like, a mental health
01:43:59 issue? Like, there's a lot of overlap there; is that
01:44:02 fair to say?
01:44:04 A I would agree with that statement.
01:44:05 Q Okay. And would it be the County's position
01:44:09 that it's important to kind of assume the worst, in the
01:44:18 sense that, you know, maybe someone has a symptom that's
01:44:24 sort of their baseline and maybe isn't something to be
01:44:28 too, too concerned about, but for someone else -- well,
01:44:32 actually, you know what? I'm going to scratch this
01:44:34 whole question, because I'm phrasing it really poorly.

01:44:38 Okay. Would it be the County's position that it's important to assume that if you don't know why someone is presenting a certain way, that it could be a serious issue, and to send someone -- err on the side of caution and send someone to Medical, even if that symptom might be indicative of something that's not as serious?

01:45:05 A I'd say yes.

01:45:06 Q Okay.

01:45:07 A It's better to err on the side of caution.

01:45:12 Q Sure.

01:45:12 And I guess -- just a hypothetical, if someone is presenting as having hallucinations, for example, that could be a sign of withdrawal, like we talked about earlier, or even intoxication, right?

01:45:27 A Correct.

01:45:28 Q Okay. And so if somebody has those symptoms, it also could mean that they have bipolar disorder, and they're actually maybe not in urgent need of care, right?

01:45:41 A I would agree with that.

01:45:43 Q Okay. And so it would be important to determine why that person is having that symptom, because on one hand, it might not be a huge, huge deal, but on the other hand, it could be a life-threatening

01:45:57 problem.
01:45:57 ATTORNEY INMAN: Objection. Vague. Overbroad,
01:45:58 and object to the extent it calls for expert opinion.
01:46:01 THE WITNESS: I would say yes, it would be a
01:46:07 good idea to err on the side of caution and at least
01:46:10 touch base with Medical.
01:46:11 BY ATTORNEY MELLANO:
01:46:18 Q Okay, okay. And then so -- for the -- so that
01:46:22 was -- Exhibit 77 was Class 20.1. I'm going to move on
01:46:28 to Exhibit 82, Class 6.1.
01:46:39 So I just want to confirm with you, this would
01:46:41 be a training that would have been provided to sworn
01:46:45 staff, right?
01:47:12 A I would say that it appears it would be. I am
01:47:15 unfamiliar with this one.
01:47:16 Q Okay, okay. Let's move on, then, especially if
01:47:58 you're not sure.
01:48:05 20.6 is Exhibit 83.
01:48:12 Are you familiar with this training?
01:48:28 Actually, I'm sorry. Let's go back to 82. I'm
01:48:30 so sorry.
01:48:31 So on the first page of 82, that cover page,
01:48:34 the objective says: "This course block will cover the
01:48:39 following instructional learning objectives, as outlined
01:48:43 in the BSCC Adult Corrections Officer Core Course

01:48:47 Curriculum."
01:48:47 Would that -- is that clear enough to you, then, that it would have been given to sworn staff, as opposed to, like, Medical?
01:48:54 A Yes.
01:48:55 Q Okay.
01:48:56 A That actually is -- yes. So I would say it was.
01:49:00 Q Okay, okay. And so then we had moved on to 83.
01:49:16 And this one would also apply to sworn staff, right?
01:49:29 A I haven't personally seen or reviewed this one, but just glancing at it and going over some of the topics in it, it appears that it would have been given to sworn staff.
01:49:43 Q Okay. On the first page, it says: "You are a deputy at a San Diego Central Jail who has been selected to attend a statewide problem-solving commission."
01:49:55 Would -- is -- would that have been the context of this training, then, as far as you know? And if you don't know, that's okay.
01:50:09 A Where was that again?
01:50:10 Q It says: "You are a deputy at a San Diego Central Jail." It's, like, right under the instructor note.

01:50:24 A Is that on page 1?
01:50:25 Q Yeah, the very first page. I think, for some reason, it's labeled 14, but -- I guess this is a scenario, though, but -- yeah. I guess this is a scenario. I'm sorry. Let me just stop that.
01:50:39 So I'm assuming, though, if you're imagining being a deputy, this would be a training for sworn staff, but --
01:50:45 A Yes.
01:50:47 Q Okay. But if you're not familiar with it, I'm not going to bug you with further questions about it.
01:50:55 Okay. So the last one, then, is 84. It's Class 20.5.
01:51:08 Are you familiar with this one?
01:51:14 A I'm not familiar with this exact training, per se. But looking at the training notes for what we're discussing, I'm guessing it deals with stuff that deputies would be doing. So it appears it would be a training that would be given to sworn staff.
01:51:39 Q Okay. And is that based, in part, on the objective that says, similar to the other one, that it was -- it's part of the Adult Corrections Officer Course Curriculum?
01:51:50 A Yes, based off the objectives and also looking down the training notes. Just things that they discuss,

01:51:57 I would say that this is designed for sworn staff.
01:52:02 Q Okay, okay. Did you review the CLERB report in
01:52:33 Hayden Schuck's case?
01:52:34 A I did not.
01:52:36 Q You did not? Oh, okay.
01:52:37 Are you familiar with what CLERB is?
01:52:39 A Yes.
01:52:39 ATTORNEY MELLANO: Okay. I think, just for the
01:52:47 sake of not having a gap, would you guys care -- I mean,
01:52:51 I'm not going to ask any more questions about it, but
01:52:52 I'm just going to mark this as Exhibit 66.
01:52:53 Is that okay?
01:52:53 ATTORNEY INMAN: Mark it for identification?
01:52:53 ATTORNEY MELLANO: Yeah. I'm just going to
01:52:57 mark the CLERB report as Exhibit 66 for identification.
01:53:01 (Exhibit Number 66 marked)
01:53:01 ATTORNEY MELLANO: And then I think we're all
01:53:03 good. I don't think I have any further questions.
01:53:08 ATTORNEY INMAN: Okay. Just a few.
01:53:11 ATTORNEY MELLANO: Okay.
01:53:11
01:53:11 EXAMINATION
01:53:11 BY ATTORNEY INMAN:
01:53:12 Q The training bulletin that you were shown that
01:53:16 was marked as Exhibit 76, do you know whether that

01:53:24 listed symptoms of any drug withdrawal other than opioid
01:53:27 and alcohol?
01:53:32 A From looking over it again, no. It looks like
01:53:37 it stipulates opioids and alcohol and their overlap.
01:53:41 Q And you testified about when court orders are
01:53:46 received for medical care.
01:53:48 In a situation where a court order was received
01:53:53 that was to screen for medication, based on your
01:53:58 knowledge and experience, do you believe sworn staff
01:54:01 would have been advised of an order to screen for
01:54:07 medications?
01:54:08 A For something along those lines, I highly doubt
01:54:12 it. It probably would have went directly to Medical,
01:54:16 because it sounds like that's more of, like, a
01:54:19 chart-check situation, maybe.
01:54:20 Q Okay. If a deputy were present for security
01:54:27 during a medical visit, do you believe it would be
01:54:30 appropriate for the deputy to take notes regarding the
01:54:34 inmate's health condition?
01:54:37 A No.
01:54:38 Q And why is that?
01:54:40 A Because you'd be looking at sort of grounds of
01:54:43 HIPAA violations.
01:54:45 Q And, in fact, we looked at the policy that says
01:54:51 that the responses to intake questions go into the

REPORTER S CERTIFICATE

I, Julia Lennan, Certified Shorthand Reporter, CSR No. 12843, certify:

That the foregoing proceedings were taken before me at the time and place herein set forth, at which time the witness was put under oath by me; that the proceedings were recorded stenographically by me and were thereafter transcribed into typewriting; that a review of the transcript by the deponent was not requested; and that the foregoing is a true and correct transcript of the proceedings.

I do further certify that I am in no way interested in the outcome of this action or connected with or related to any of the parties in this action or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript, other than by order of the Court, renders this reporter's certificate null and void.

In witness whereof I have subscribed my name this 16th day of October 2024.

JULIA LENNAN,CSR NO. 12843

# EXHIBIT 16

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: October 7, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Rita Diaz

CERTIFIED COPY

Reported by:
Nicole O'Neil

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST,
PLAINTIFFS,

V.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS

)CASE NO.:
)3:23-CV-00785-DMS-AHG

CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)

---oOo---

Deposition of Rita Diaz located at 1350 Columbia Street, Suite 600, San Diego, California, commencing at 2:00 P.M. PST on Monday, October 7, 2024, before Nicole O'Neil, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: LAUREN M. MELLANO
1350 COLUMBIA STREET
SUITE 600
SAN DIEGO, CALIFORNIA 92101
619-794-0451
LMELLANO@MCKENZIESCOTT.COM

FOR THE DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, CARINA ECHON, JENNIFER VIVONA, AND THOMAS MACE:

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, SENIOR DEPUTY
LINDSEY M. BURNETTE
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANT CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: KATIE SCHULER
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
KSCHULER@LDRLAW.COM

OTHER APPEARANCES:

LEGAL VIDEOGRAPHER: TRACY WARD ESCOBAR

02:27PM Q. And an ISR would be reflected in JIMS if they exist?
02:27PM A. If there's a medical need that the individual has to move to an ISO medical cell, yes.
02:27PM Q. Are you familiar with how often safety checks must be conducted for detainees in the various types of cells?
02:27PM A. Are you talking about when they are in actual safety cells or --
02:27PM Q. Sure. Just by way of example. Like, is that something that you are trained on?
02:28PM A. Yes. I mean, I read the policy. It's not something directly associated with my assignment now.
02:28PM Q. Okay. And so if someone is in, for example, like, a medical observation bed, how often must they be checked on by sworn staff?
02:28PM A. The checks in medical, I believe, are every 30 minutes.
02:28PM Q. Okay. And is that for sworn staff or medical staff or both to do those checks?
02:28PM A. Definitely for medical. For sworn I'm not sure.
02:28PM Q. Okay. And then regarding like, sobering cells, for example, when is it appropriate for someone to be placed in a sobering cell?
02:28PM A. Sobering cell would be for someone that is under

02:41PM Q. Do you recall how long it took for Hayden Schuck to have an interview with a JPMU deputy?
02:41PM A. Based on what I saw in JIMS it took about three days, two to three days.
02:41PM Q. Oh, really. Let's go to Hayden's JIMS, then.
02:41PM MS. MELLANO: This has been previously marked as Exhibit 12.
02:42PM (Previously marked Exhibit 12 was introduced for examination.)
02:42PM BY MS. MELLANO:
02:42PM Q. Do you recognize this as Hayden Schuck's JIMS?
02:42PM A. Yes.
02:42PM Q. And do you see his housing -- I guess -- I don't know what to call -- his housing interview with JPMU?
02:42PM A. It's not on this page. It's on the second page.
02:42PM Q. Do you see it here?
02:42PM A. Yes. Where it says, "Classification Update."
02:42PM Q. Okay. And does it say security level changed from -- and then there's like two spaces there -- to two?
02:42PM A. Correct.
02:42PM Q. Okay. And so that indicates that's the time when he was classified for housing?
02:42PM A. More or less, yes.
02:42PM Q. Okay. And the person who did that was Deputy Page. Is that correct?

A. Yes.
Q. Did you read anything more about -- about what Deputy Page's interaction was like with Hayden?
A. Based on JIMS there's no information on the interaction that he would have had with the individual. I did make -- I did see that he requested an OP step-down evaluation for the individual.
Q. I'm sorry. What is that?
A. An OP step-down evaluation. OPSD. It's the Outpatient Step-Down Program that you referred earlier.
Q. Can you remind me? I'm not sure --
A. It's the Outpatient Step-Down Program. And it's something -- it's one of our procedures in JPMU. It falls on everybody. Anybody sworn or medical can request the assessment, but it is specifically one of our duties is when we are classifying an individual and based on our interaction we feel that perhaps they would benefit from either a mental health assessment or they are displaying some sort of, odd behavior, we would request that mental health conducts an OP step-down evaluation.
Q. What would that evaluation consist of?
A. If deemed that they would be in OP step down, they would move them to a housing unit designated for OP step down with individuals with similar characteristics.
Q. And would they then be monitored more frequently

10th to March 15th, what's the frequency of safety checks for them?

MR. INMAN: Same objection.

THE WITNESS: They are in a regular holding cell. They do a check every hour.

BY MS. MELLANO:

Q. And is it your understanding from what you've reviewed that Hayden was in a regular holding cell?

A. Correct.

Q. When Hayden met with Deputy Page for classification purposes, are you aware of whether a qualified mental health provider was present?

A. No.

Q. Meaning you don't know whether they were, or they were not?

A. I'm not aware.

Q. Do you know whether that would have been pursuant to policy in 2022?

A. No.

Q. Meaning it was not required?

A. It was not required.

Q. And is that required now?

A. No.

Q. Was a nurse required to be present for the JPMU interview in 2022?

03:38PM BY MS. MELLANO:
03:38PM Q. I'm going to go to the sobering cells J.2 policy and procedure. I notice there's a section about capacity here. A limit of eight incarcerated persons per cell in a sobering cell. Was that in effect in March of 2022? Do you know?
03:39PM A. It was.
03:39PM Q. There could be eight people in a sobering cell, then?
03:39PM A. Correct.
03:39PM Q. How it is determined whether someone should be placed in a sobering cell?
03:39PM A. It's going to be somebody that demonstrates being under the influence of alcohol or controlled substance or drugs that would benefit from more of a protective environment for their safety and for the safety of others.
03:39PM Q. Okay. And who does that evaluation or who can?
03:40PM A. At any time any sworn staff can make that assessment.
03:40PM Q. Okay. And medical staff can make that assessment as well?
03:40PM A. Medical can say the individual is demonstrating certain medical -- either, you know, like, how can I say? Like their blood pressure or something -- they could say

like -- medical is not going to say put this individual in a sobering cell. They can make an assessment based on medical and how they present and relay that information to sworn, and then we would together make an assessment if we will put them into a sobering cell. Typically, medical is not saying this guy has to go into the sobering cell.

Q. They can't just like, decide that and have someone take them there? The sworn has to weigh in?

A. Correct.

Q. How long are individuals usually in sobering cells?

A. It depends. It varies.

Q. And how are deputies trained or sworn staff trained regarding whether someone is a potential threat to their own safety?

A. We have training annually that goes out to everybody, and sobering cell and safety cells are one of those trainings.

Q. And would sort of, confusion or inability to understand what's going on, would that constitute a potential threat to someone's safety?

A. Can you ask that question, again?

Q. Sure. If someone's exhibiting signs of like, confusion, like, they are unable to sort of, understand

basics about what is going on in their processing, for example, based on the training that folks receive, would that constitute a risk that someone is a threat to their own safety, like unable to care for themselves?

A. One thing on its own might not raise to the level of that. It would have to be the totality of the circumstances. It's on a case by case.

Q. Okay. But would that be potentially a risk?

A. It could be one factor to consider if an individual would need to go into a sobering cell or a safety cell.

Q. If somebody is having trouble understanding the booking process, for example, and making statements that don't really make sense, and there's reason to believe that they are under the influence, would that be sufficient for a sworn staff member to decide this person needs to go to a sobering cell for awhile?

A. It would depend on the case by case, but it could potentially rise to that level, yes.

Q. We talked a little bit about this earlier, but the medical flags entered in TechCare are available to sworn staff in the medical instructions part of JIMS?

A. If they transfer to JIMS, yes. We don't have access to TechCare.

Q. Right. Right. Okay. In March of 2022, what

# CERTIFICATE OF REPORTER

---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken remotely before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [  ] was [ x ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e).)

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 19th of October, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 1077468

# EXHIBIT 17

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 18

# Deposition Transcript

Case Number: 3:23-cv-00785-DMS-AHG
Date: March 28, 2025

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Deputy Kyle C. Holman

CERTIFIED COPY

Reported by:
Cherie J. Anderson

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3:23-CV-00785-DMS-AHG

\- - -

ESTATE OF WILLIAM HAYDEN SCHUCK, :
by and through his successors-in-:
interest Sabrina Schuck and :
Timothy Schuck, et al., :
:
Plaintiffs, :
:
vs. :
:
COUNTY OF SAN DIEGO, et al., :
:
Defendants. :

---

VIDEOTAPED DEPOSITION OF DEPUTY KYLE C. HOLMAN

---

DATE TAKEN: Friday, March 28, 2025

TIME BEGAN: 10:31 a.m. Pacific

TIME ENDED: 12:26 p.m. Pacific

LOCATION: Conducted via videoconference

REPORTED BY: Cherie J. Anderson, RMR, RPR, CRR
Steno
315 West 9th Street, Suite 807
Los Angeles, CA 90015
(310) 573-8380
NV FIRM# 108F

APPEARANCES:

McKENZIE SCOTT PC
BY: LAUREN M. MELLANO, ESQUIRE
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
lmellano@mckenziescott.com
(Appearing via videoconference)
Representing the Plaintiffs

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN II, ESQUIRE
1600 Pacific Highway, Room 355
San Diego, California 92101
(619) 884-2931
steven.inman@sdcounty.ca.gov
(Appearing via videoconference)
(Present with Deponent)
Representing the Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado

LOTZ DOGGETT & RAWERS LLP
BY: KATIE SCHULER, ESQUIRE
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
kschuler@ldrlaw.com
(Appearing via videoconference)
Representing the Defendants Correctional Healthcare Partners, Inc. and Nicholas Kahl

ALSO PRESENT REMOTELY:

Diogo Rosenblatt-Silva, Videographer

10:35:55 give me, you know, the length of that.
10:35:59 Does that make sense?
10:36:01 A Yes, ma'am.
10:36:02 Q Okay. All right. I think I'll jump right in
10:36:11 then. So what did you do to prepare for your
10:36:13 deposition today, if anything?
10:36:17 A I met with county counsel sitting right next
10:36:20 to me twice at San Diego Central Jail.
10:36:23 Q Okay. And did you review any documents? And
10:36:27 that would include video or audio.
10:36:30 A Yes, ma'am.
10:36:31 Q Okay. What did you review?
10:36:35 MR. INMAN: I'm going to object with respect
10:36:37 to work product as to the -- identifying what
10:36:41 documents or video that I showed you.
10:36:44 But the witness can answer generally about
10:36:46 what documents he reviewed in preparation for the
10:36:48 deposition today and what documents or video without
10:36:53 specifying whether they were selecting by Counsel or
10:36:55 on your own.
10:37:00 THE WITNESS: Like, give, like, specifics?
10:37:03 Is that what you're saying?
10:37:04 MR. INMAN: No. I'm just saying, don't say
10:37:05 what I chose for you to review versus what you
10:37:07 reviewed on your own. Just say generally

you became concerned for Hayden's health. Right?
A Are you referencing when I escorted him to the second-floor medical staff?
Q Yes.
A I'm sorry. Can you repeat your question?
Q Well, I was just confirming that that was March 15th, 2022.
A Yeah. I'm sorry, ma'am. Yes, that is the correct date.
Q Okay. Well, so whose idea was it then to bring him to Medical?
A I don't recall which deputy specifically stated it first, but it was a mutual agreement between the deputies conducting the 11-53 that we should take Schuck to Medical.
Q Okay. And so who were the deputies that were conducting the 11-53 then?
A I believe it was myself, Sergeant Nesmith, Corporal Gonzalez, Deputy Moreno.
Q Okay. And is it -- okay. Go ahead. Sorry. I didn't mean to interrupt you.
A I just -- that's my best recollection was four deputies were conducting the walk.
Q Okay. And is it typical that there would be four sworn staff members doing an 11-53?

10:45:47 Q Okay. So you were the first person to do an 11-53 on his cell at that time?
10:45:59 A During that shift, yes.
10:46:01 Q Yes. During that check. Okay. And -- okay. So please describe then what you saw at that time.
10:46:10 A After I approached the cell, I saw that the IP in question was talking to himself, he wasn't wearing pants, and there was food smothered around the walls and windows of the cell.
10:46:26 Q Okay. And was there food -- so it was on the windows and the walls of the cell. Anywhere else? Was it on his body as well or on the floor?
10:46:38 A His clothes -- T-shirt that he was wearing appeared to be soiled with some unknown substance. But yeah, there was food on the floor as well.
10:46:53 Q Okay. And did his shirt appear to be wet?
10:46:56 A I don't recall that.
10:46:58 Q And I know there was mention in your email -- and we can go over that in more detail later, but in your email, you mentioned feces. Can you describe in more detail what you saw in that regard.
10:47:13 A So I mentioned the word fecal matter and feces in the email you're referencing solely because of the smell of the cell just because it had a -- essentially an odor inside. So that's the only

reason I put the word feces was just the smell of the cell.

Q Okay. And you had written that it appeared to be fecal matter. Can you describe what you saw that appeared to be fecal matter?

A It's not so much what I saw. Like I said, it was what I smelled inside the cell. It smelled fairly pungent, so I figured maybe it could have been fecal matter, but I only wrote that strictly because of the smell. It's not that I physically saw it.

Q Okay. Okay. And what did you overhear him saying to himself, if anything?

A I don't recall any specific statements he was making to himself; I just remember that he was talking to himself.

Q Okay. Did you -- what did you do next after witnessing those -- making those observations?

A We escorted him to the second-floor medical staff and secured him in a medical chair unit to get him medically evaluated.

Q And sorry to be -- I'm sure this is annoying, but I would like to go through it in as much detail as possible. So were you by yourself when you did the 11-53 at first?

A No, ma'am. I believe I was with several other

10:57:22 A I said, "No, ma'am."
10:57:24 Q Oh, okay. Okay. And why did you decide to take Hayden to see Medical right then as opposed to, you know, putting in some sort of referral or request for him to be seen at a later time? Can you walk me through that decision?
10:57:53 A Because Medical is right down the hall. No harm in getting him medically checked out.
10:58:00 Q Okay. Were you concerned that his symptoms were indicative of anything in particular based on your training and experience?
10:58:12 A No. Based off my training, I feel that he was not in any sort of medical distress. I just wanted to get him medically cleared before sending him down for court.
10:58:20 Q Okay. And previously you said that you didn't know whether he was going to court before. So now it's your position that you did know that before?
10:58:29 A At a certain point, we were aware that the IP in question was scheduled for court, but I don't have a definitive answer on when we came to that realization.
10:58:38 Q Okay. And so, you know, correct me if I'm wrong, but it sounds like what you just said was that you didn't believe he was in medical distress, but

10:58:46 you took him to see Medical, and I'm not sure I quite understand why that would be then.
10:58:53 A Well, we just wanted to get him medically cleared before he went to court.
10:58:58 Q Okay. And so you're pretty confident now that you took him -- in deciding to take him to Medical, you weighed the factor of knowing that he was going to court? You took that into account? That was part of the reason why you took him to Medical?
10:59:18 A We took him to Medical because we wanted to get him medically cleared before going to court because he wasn't wearing pants; he was talking to himself; the cell was in disarray. So we wanted to verify whether this was a mental issue or something else.
10:59:32 Q Okay. And so is it fair to say that you were concerned that he was in medical distress then, based on your training and experience?
10:59:43 A I took him to Medical so a medical provider can make that decision.
10:59:47 Q Sure. Did you take everyone on the floor that day to see Medical before going to court?
10:59:54 A If they -- if they are scheduled for court on the second floor, which is still the booking process, they have a face card assigned to that IP. If the IP

11:00:07 requires second-stage medical, they see a nurse on
11:00:11 the second floor. If they are stamped as medically
11:00:13 cleared, they do not see a nurse on the second floor.
11:00:15 But they would only see a nurse before going
11:00:17 to court if, say, the inmate has complaints of
11:00:22 needing medication or anything like that.
11:00:24 But no, not every inmate who is scheduled for
11:00:27 court in the morning goes to Medical prior to going
11:00:29 to court.
11:00:30 Q Okay. So there were reasons why you took
11:00:32 Hayden Schuck to see Medical; he wasn't scheduled to
11:00:36 see Medical otherwise?
11:00:39 A No. He was not scheduled in JIMS or TechCare
11:00:43 to see Medical that day. We took him to Medical
11:00:47 because he was talking to himself, the cell was in
11:00:50 disarray, and he was not wearing pants. So we wanted
11:00:53 to get him checked out by the nurse to make sure he
11:00:57 was medically cleared to go to court.
11:00:59 Q Have you been trained that -- that a symptom
11:01:01 of intoxication can be disordered thinking or
11:01:05 delusions?
11:01:07 A Yes.
11:01:07 Q Have you been trained that those are also
11:01:09 potential symptoms of withdrawal?
11:01:13 A Yes, potential symptoms. Yeah.

11:01:15 Q Have you been trained that diarrhea is a symptom of withdrawal?
11:01:20 A Yes.
11:01:31 Q Were you concerned that he would not be, you know -- he wouldn't appear -- that he would appear unkempt at court if he wasn't taken to Medical?
11:01:48 A The whole reason we took him to Medical was to make sure he was medically fit to go to court for the day. It would be up to the medical provider's decision whether or not he was medically fit to go to court.
11:01:59 Q Okay. You -- did you help transport Hayden to Medical?
11:02:14 A I used a technique called arm guidance. I just gently placed my hand on his tricep or elbow area to help guide him to Medical.
11:02:24 Q Is there a reason that he wasn't placed in clothes prior to leaving his cell?
11:02:35 A No reason. We just wanted to get him to Medical as soon as possible.
11:02:42 Q Why as soon as possible?
11:02:48 A Because we wanted to make sure he was medically fit for court.
11:02:55 Q Because at that point you knew he was going to court prior to transporting him?

11:09:04 Hayden Schuck was being brought to see him?
11:09:09 A I don't recall who said that.
11:09:12 Q Do you recall telling Nurse DeGuzman anything
11:09:14 about what you observed?
11:09:18 A No. I don't recall.
11:09:21 Q I mean, would you have told Nurse DeGuzman
11:09:25 what you observed since you were the one who looked
11:09:27 into the cell?
11:09:30 A Usually the nurse would ask us, you know,
11:09:33 what's this IP's name; why is he here. And they
11:09:38 would generally just look -- the IP's wear a colored
11:09:42 wrist band. We would give them the booking number,
11:09:44 the last name of the IP. They would look them up in
11:09:48 TechCare on their computer in JIMS, and they would go
11:09:52 from there based off the medical history.
11:09:54 Q Is it -- I mean, is it important, based on
11:09:56 your training and experience, to relay any
11:10:00 information that you've witnessed regarding
11:10:02 someone's, you know, potential symptoms of medical or
11:10:05 mental issues?
11:10:09 A It could be important if an IP was
11:10:11 experiencing those symptoms.
11:10:15 Q And so, I mean, do you believe that you told
11:10:19 Nurse DeGuzman what you saw?
11:10:21 A I don't recall if I did or not.

11:41:26 A So the second floor does not have a control deputy, but the situation is fine to have four of us there because all other IPs on the floor are secured in cells.
11:41:38 Q Okay. And I'm sorry if I asked this already, but now I can't recall the answer, but why -- why was Hayden transported without pants on?
11:42:04 A I don't recall a specific reason why we moved him without pants on, but it looks like he might be handcuffed behind his back, so this way he doesn't have the ability to, like, put pants on, but we were just taking him to Medical.
11:42:20 Q Can you recall whether you asked him to put pants on while he was still in his cell or tried to help him put pants on before he left the cell?
11:42:29 A No. I do not recall.
11:42:40 Q How did you know that his -- well, did you know that his clothing -- his other clothing was soiled?
11:42:46 A I could tell it was soiled just by looking at it.
11:42:48 Q What did you see on it?
11:42:52 A Discoloration.
11:42:54 Q What color?
11:42:58 A As you can see his shirt, which is meant to be

11:58:46 A Yes, ma'am.
11:58:47 Q Okay. And who are they?
11:58:55 A The deputy on the left would be Gonzalez, the deputy on the right arm would be Calvert, and behind them all would be me.
11:59:02 Q Okay. And so you said Gonzalez and Calvert are on the right and left. Right?
11:59:11 A Yes, ma'am.
11:59:13 Q And they're both holding on to Hayden. Is that right?
11:59:16 A Yes. They are guiding him using arm guidance.
11:59:20 Q Is there a reason why they're using arm guidance when, for example, this unknown deputy in the front here -- or, I guess, in the back, I guess -- farthest away from the camera -- does not use arm guidance?
11:59:37 A Well, it's because he already has the inmate -- sorry -- the IP secured up -- up facing a wall. On the second floor, there's a lot of long hallways and tight corners. So we could not see around that corner who was there. Sometimes it's professional staff; sometimes it's medical staff; sometimes deputies have their backs turned on the corner.
11:59:57 And, also, because we're using -- utilizing

12:19:28 their side, but the waist chain is not connected to
12:19:30 the leg chains.
12:19:31 Q Okay. Are all detainees transported to court
12:19:36 in that way, restrained in that way?
12:19:41 MR. INMAN: Objection. Lacks foundation.
12:19:42 Overbroad.
12:19:43 Q If you know.
12:19:46 A When IPs go to court, if they are -- sometimes
12:19:51 they are chained with someone next to them. If they
12:19:54 have another IP attached to them, they do not receive
12:20:00 leg restraints. If they are leaving the facility by
12:20:03 themselves, they are secured in leg -- both leg and
12:20:05 waist restraints.
12:20:07 Q Okay. Okay. And I have a quick follow-up
12:20:15 question about something we talked about earlier.
12:20:19 The material that was smeared on the walls and the
12:20:22 window of the cell, what did it look like?
12:20:32 A Just looked like mush, rotten food.
12:20:37 Q Why did it look like rotten food? What made
12:20:40 it look like rotten food?
12:20:44 A Discolor- -- discoloration that was congealed
12:20:47 and turned to mush.
12:20:50 Q Okay. And I mean, is it safe to say that the
12:20:54 jail wasn't serving rotting food to detainees?
12:20:57 A Yes. We do not serve rotten food to IPs.

12:21:03 Q Okay. Okay. And what -- so, like, what color
12:21:09 was it, if you recall?
12:21:12 A I recall seeing a lot of dark reds, browns,
12:21:20 yellows.
12:21:23 MS. MELLANO: Okay. Okay. I don't think I
12:21:26 have any more questions for you. I appreciate your
12:21:30 time. I'm not sure if others might have some
12:21:32 questions, but thank you.
12:21:38 MR. INMAN: Mr. --
12:21:43 THE COURT REPORTER: I'm sorry?
12:21:45 MR. INMAN: Steve Inman. I have a few
12:21:46 questions.
12:21:48 - - -
12:21:48 EXAMINATION
12:21:48 - - -
12:21:48 BY MR. INMAN:
12:21:48 Q Now, you testified earlier that you did not
12:21:50 believe that Schuck was in medical distress. Tell me
12:21:52 why you didn't believe he was in medical distress.
12:21:55 A So I didn't believe the IP in question was in
12:21:58 medical distress because when I contacted him he was
12:22:00 awake, conscious, breathing. He was talking.
12:22:05 Q Did the -- when Schuck was changing into the
12:22:08 jail blues in the strip-search room, can you describe
12:22:14 if he had any trouble getting dressed or how that

# CERTIFICATE OF REPORTER

I, Cherie J. Anderson, Registered Merit Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken remotely before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate, and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on this 28th day of March 2025, at Wilmington, New Hanover County, North Carolina.

Cherie J. Anderson, RMR, CRR
My Commission expires
December 22, 2026

# EXHIBIT 19

# Deposition Transcript

Case Number: 3:23-cv-00785-DMS-AHG
Date: March 28, 2025

**In the matter of:**

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Emilio A. Gonzalez

CERTIFIED COPY

Reported by:
Cherie J. Anderson

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
3:23-CV-00785-DMS-AHG

- - -

ESTATE OF WILLIAM HAYDEN SCHUCK, by and through his successors-in-interest Sabrina Schuck and Timothy Schuck, et al.,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO, et al.,

Defendants.

---

VIDEOTAPED DEPOSITION OF EMILIO A. GONZALEZ

---

DATE TAKEN: Friday, March 28, 2025

TIME BEGAN: 1:04 p.m. Pacific

TIME ENDED: 1:43 p.m. Pacific

LOCATION: Conducted via videoconference

REPORTED BY: Cherie J. Anderson, RMR, RPR, CRR
Steno
315 West 9th Street, Suite 807
Los Angeles, CA 90015
(310) 573-8380
NV FIRM# 108F

APPEARANCES:

McKENZIE SCOTT PC
BY: LAUREN M. MELLANO, ESQUIRE
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
lmellano@mckenziescott.com
(Appearing via videoconference)
Representing the Plaintiffs

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN II, ESQUIRE
1600 Pacific Highway, Room 355
San Diego, California 92101
(619) 884-2931
steven.inman@sdcounty.ca.gov
(Appearing via videoconference)
(Present with Deponent)
Representing the Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado

LOTZ DOGGETT & RAWERS, LLP
BY: KATIE SCHULER, ESQUIRE
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
kschuler@ldrlaw.com
(Appearing via videoconference)
Representing the Defendants Correctional Healthcare Partners, Inc. and Nicholas Kahl

ALSO PRESENT REMOTELY:

Diogo Rosenblatt-Silva, Videographer

# I N D E X

| EXAMINATION | PAGE |
|---|---|
| By Ms. Mellano | 6 |

(No exhibits marked.)

13:19:37 very beginning would be great.
13:19:41 A I don't remember if I was the first one at the
13:19:44 cell, if I was by myself or with other people. I
13:19:47 just remember him in his cell and him being escorted
13:19:49 out of his cell to Medical.
13:19:52 Q Okay. And do you remember -- so you don't
13:19:57 remember whether it was just you escorting him or do
13:19:59 you remember other people being involved in opening
13:20:02 the door and escorting him?
13:20:04 A Well, from the video that I saw, I saw that it
13:20:06 was me and Deputy Holman.
13:20:09 Q Okay. And --
13:20:10 A [Inaudible].
13:20:12 MS. MELLANO: Did -- he said "escorting him."
13:20:15 Q Is that right?
13:20:18 A That's correct.
13:20:20 Q Did you see video of you doing the initial
13:20:24 11-53 safety check of his cell, though?
13:20:31 A Not of the 11-53. I have -- I remember what
13:20:34 the cell looked like when we escorted him out of the
13:20:39 cell to take to Medical.
13:20:40 Q Okay. That's great. Can you describe to me
13:20:43 what it looked like.
13:20:46 A The cell was a mess. There was food on the
13:20:50 walls, on the floor, and a kind of terrible smell.

13:20:58 Q Okay. What did it smell like?
13:21:06 A I don't recall the smell, but I just remember it being a terrible smell.
13:21:10 Q Okay. If there had been food on the walls when you did the check about an hour earlier, would that be something that you would have taken note of, either in writing or, you know, responded to, like taking some action in response to?
13:21:29 A No.
13:21:30 Q Did you say "no"?
13:21:32 A No.
13:21:35 Q Okay. Sorry. The audio is just a little tricky, and so I apologize if I have to kind of follow up. It's -- you know, when you say "no," sometimes it can sound like "yeah." So anyway, if I follow up, I'm not trying to be annoying. I just want to make sure that we have that correct for the court reporter.
13:21:55 Okay. And so if I'm understanding you correctly, you said if there had been food on the walls during the previous 11-53 when you checked on Hayden Schuck, you wouldn't necessarily have done anything about it.
13:22:11 So I guess my follow-up question then would be, well, why -- why was he taken to Medical the

13:23:44 provide them. I don't know what else he would have put on the wall.

13:23:49 Q Okay. And what did it look like?

13:23:55 A It was brown like it had been there for a while.

13:24:06 Q Have you ever heard of or seen a detainee smear feces on the wall?

13:24:13 A I have, yes.

13:24:14 Q Okay. And did you see a food tray in his cell?

13:24:24 A Yeah, I remember there being multiple food trays in there.

13:24:28 Q And why would that be? Aren't those typically taken out of the cell to be cleaned up?

13:24:35 A No. They can sit in there for half a shift.

13:24:40 Q And why would there be three food trays if it was just half a shift? They wouldn't receive that many meals, right, during that time?

13:24:51 A Sometimes they're given out extras. I'm not sure why he had so many in there.

13:24:55 Q Okay. And what type of food was -- was served that would look like what food was on the walls?

13:25:04 A Oatmeal.

13:25:06 Q Oatmeal?

13:25:08 A Yeah. Again, I don't remember what type of

# CERTIFICATE OF REPORTER

I, Cherie J. Anderson, Registered Merit Reporter, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken remotely before me on the date and at the time and location stated on page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate, and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on this 7th day of April 2025, at Wilmington, New Hanover County, North Carolina.

Cherie J. Anderson, RMR, CRR
My Commission expires
December 22, 2026

# EXHIBIT 20

# (VIDEO MANUALLY LODGED WITH THE COURT)