# EXHIBIT 21

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: June 6, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Romeo Deguzman, RN

CERTIFIED COPY

Reported by:
Sheri Somers

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY | Case No. 3:23-CV-00785-DMS-AHG<br><br>VIDEOTAPED DEPOSITION OF ROMEO DEGUZMAN, RN<br><br>JUNE 6, 2024<br><br>1350 Columbia Street<br>Suite 600<br>San Diego, California |

(#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

Videotaped Deposition of ROMEO DEGUZMAN, RN

San Diego, California

June 6, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938229

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al., | ) |
| Plaintiffs, | ) Case No. 3:23-CV-00785-DMS-AHG |
| vs. | ) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al., | ) |
| Defendants. | ) |

Videotaped Deposition of ROMEO DEGUZMAN, RN, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:11 a.m. and ending at 2:48 p.m., on Thursday, June 6, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
1600 Pacific Coast Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Steven P. Inman, II, Esq.
Steven.inman@sdcounty.ca.gov

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

Elijah Ochoa
STENO

09:33:35 screening? Sorry. I don't --
09:33:38 Q. Sure. Do you remember what assignment you had on March 15 of 2022?
09:33:47 A. Medical screening, screening somebody.
09:33:57 Q. And what is medical screening?
09:33:59 A. Medical screening is -- it's a place in second floor where we see the patients, patient coming from the first floor. It's like a part of booking process.
09:34:23 Q. Is this -- is the medical screening different from the intake process?
09:34:30 A. Yes.
09:34:31 Q. Can you describe for me what you do as part of the medical screening or which patients you see?
09:34:41 A. After they see -- after the booking -- after the patient admitted to the jail for booking on first floor, and then after that they will go to booking and then medical screening.
09:35:14 Q. So is this what is referred to as "second stage medical"?
09:35:20 A. Second stage medical.
09:35:21 Q. So is it true that you perform a medical evaluation of individuals who have been referred to you by the intake nurse?
09:35:41 A. Yes.

09:35:45 Q. How quickly do you typically see patients after you've had a patient referred to you from intake?
09:35:58 A. It depends.
09:36:00 Q. Can you give me an estimate?
09:36:13 A. Sometimes within an hour, sometimes right away, sometimes -- I cannot tell how much really. Sometimes two days. But usually -- you're talking about now or before? Because sometimes it depends on the situation, it depends on the -- how busy are the deputies or the nurses.
09:36:54 Q. And just so that we're on the same page, when I'm asking you questions, I'm specifically asking questions, unless I tell you otherwise, of what the policy or the procedures were in March of 2022. Okay?
09:37:13 So in March of 2022, you explained that it could be right away, hours, or even days that you could see someone after they were referred from intake; is that correct?
09:37:34 A. Yeah. Because we -- at intake, sometimes we don't see inmate -- every inmate that go to -- from intake, we don't see everybody. Sometimes it's faster if we have like a proceed -- proceed, we have something like that. Intake nurse will write down "proceed." And if it's proceed, it will be seen right away, something like -- as soon as possible. I don't know.

I cannot tell you exactly what they put in. I cannot say that, but -- and there's also medical screening, the nurse will stamp "medical screening." So if the nurse type medical screening, he will be seen.

Q. I'm sorry. I don't think I understood that last part.

A. Medical screening, we have a stamp that we -- because in the pink slip that we have, we have to say medical, medical clear, proceed, and medical screening. So we have to treat -- not everybody seen at medical screening. So sometimes you will not be seen at medical screening. Is it clear? First is like proceed, second is medical screening, and the third one is medical clear.

Q. Okay. So let me -- let's take one of each of those one by one.

So I believe you explained -- you can correct me if I'm wrong -- that not everyone who goes through intake is seen by the medical screening department?

A. That's right.

Q. So does that mean that if someone isn't referred to medical screening by intake, that they don't participate in a second stage medical evaluation?

A. Can you repeat the question.

Q. If the intake nurse does not refer the

09:40:00 patient for a second stage medical evaluation, does
09:40:06 that mean that they don't receive a medical screening
09:40:11 evaluation?
09:40:13 A. No. It doesn't mean that the patient are
09:40:17 healthy, you know, or being prepared already by the
09:40:23 nurse because at intake we can do -- I think that we do
09:40:28 the initial assessment, and from intake the nurse can
09:40:34 decide if the patient have no -- if the patient can be
09:40:39 proceed, medical screen, or medically cleared. So it
09:40:47 depends on the nurse that's working there.
09:40:49 Q. So let's take those each one by one. So when
09:40:53 the intake nurse indicates that someone is a proceed,
09:41:00 what does that mean?
09:41:02 A. It means to say that we will notify the --
09:41:07 need immediate follow-up.
09:41:12 Q. You said they would notify who?
09:41:15 A. The deputy and the medical screening nurse,
09:41:18 and we write it down in the papers.
09:41:24 Q. And I believe you said that they would be
09:41:26 seen immediately?
09:41:27 A. Immediately, but not really at that moment.
09:41:30 But, you know, we give them first priority.
09:41:34 Q. Okay. And what does that mean, typically
09:41:37 within how much time is a proceed seen?
09:41:41 A. It depends.

Q. Is there a policy related to when a proceed should be seen?

A. I think we have policy, but I cannot answer -- I don't know -- I cannot provide you right now. I don't know. I think we have policy for that because -- we have policy.

Q. So do you know what the policy or the procedure is for that in terms of timing of when a proceed should be medically screened?

A. Not specifically, but that's the way I understood it.

Q. I think the second category you mentioned was medical screening?

A. That's right.

Q. When an intake nurse identifies the patient as medical screening, what does that mean?

A. The nurse need to do another evaluation at medical screening to follow up.

Q. Okay. And when does that medical screening occur?

A. Before they go to classification, before they finish their --

Q. So is that typically hours, days?

A. Sometimes one day -- it depends. I cannot really say a specific time, but --

09:43:30 Q. Sure.
09:43:30 A. -- but not right away. They will be seen.
09:43:33 Q. Sure. And so I guess my question is, in March of 2022, can you give me an estimate of the time frame where -- you know, about X amount of hours to about X amount of hours that someone in a medical screening would be seen?
09:43:59 A. I can't remember. I don't want to speculate on that day, but I don't remember. I don't remember how fast, you know --
09:44:09 Q. And I'm not asking you about a particular date. I just wanted you to give me an estimate in your experience in that time period. In March or the spring of 2022, what was the maximum amount of time that you remember someone waiting to get a medical screening when a nurse has identified the patient as -- in the medical screening category that you mentioned?
09:44:40 A. Average is one day. I don't want to speculate. I'll just give you an estimate. I don't know if the estimate is accurate. It's only an estimate.
09:44:54 Q. And that's fair. So there may be a couple examples where it is more than one day or you know for sure that it's typically one day maximum?
09:45:03 A. Yeah, average. The next day, one day.

09:49:26 Q. You are?
09:49:29 A. Yes.
09:49:30 Q. So on March 15, you know you were assigned to medical screening. Do you remember any other assignments that you had?
09:49:41 A. I don't remember what other assignment I had. I can't remember now.
09:49:46 Q. Okay. Do you remember on March 15 how you came to encounter Mr. Schuck?
09:49:54 A. Yes.
09:49:59 Q. Can you tell me about that?
09:50:01 A. The deputy asked me to -- told me that the patient will go to court, and from I remember, he asked me to check his wound and prepare the patient to go to court.
09:50:27 Q. I'm sorry. I didn't catch that last part.
09:50:33 A. And prepare the patient because he's going to court.
09:50:37 Q. What do you mean by "prepare the patient," what does that mean?
09:50:45 A. Because when I observe -- when the patient was presented to me by the deputy, he was -- I still remember -- he was not wearing pants, he's not organized -- like the shirt was wet and with wound on his lower leg.

09:53:28 you mentioned that Mr. Schuck was not wearing pants?
09:53:33 A. That's what I remember.
09:53:35 Q. And I just want to confirm to make sure that
09:53:38 I didn't miss anything that you said.
09:53:41 So he was not wearing pants, correct?
09:53:44 A. Yes.
09:53:45 Q. And that you said there was a streak of black
09:53:49 on his shirt; is that correct?
09:53:52 A. Yes. A small stain.
09:53:56 Q. Do you know what that was, what the black
09:54:00 was?
09:54:02 A. What black? Blood?
09:54:04 Q. The black streak, was it --
09:54:06 A. I'm sorry. I said "blood streak."
09:54:09 MR. INMAN: Blood.
09:54:10 THE WITNESS: Blood.
09:54:10 BY MS. ANGELES:
09:54:12 Q. Blood stain. I'm sorry.
09:54:12 A. I'm so sorry.
09:54:13 Q. No. I apologize. I'm sorry. Let me just
09:54:17 get that straight.
09:54:18 So you said a streak of blood?
09:54:21 A. Blood, yeah.
09:54:22 Q. Was the blood fresh or wet?
09:54:27 A. Because the -- because the shirt was wet, so

10:09:20 A. Yes.
10:09:20 Q. Besides cleaning his wound, what else did you do to prepare Mr. Schuck for court?
10:09:28 A. I gave him -- I gave him clothes to wear, new piece of clothes so he can wear it.
10:09:47 Q. Anything else?
10:10:03 A. What do you mean anything else?
10:10:05 Q. Did you provide any -- did you do anything else to prepare Mr. Schuck for court?
10:10:10 A. I don't think that I gave anything.
10:10:13 Q. Did you provide any additional medical care for Mr. Schuck on March 15 of 2022?
10:10:24 A. As a -- like medical care, like aside from dressing change or what?
10:10:34 Q. So you've mentioned that you cleaned his wounds and you gave him clean clothes. Did you provide any additional care on that date?
10:10:43 A. The only thing that I -- you know, I asked -- I asked -- I did my assessment. That's what we do regularly. I asked him how he's doing, you know -- if he has any medical problem, if he's taking medication, if he's -- you know, like my assessment. I did my assessment.
10:11:16 Q. Can you describe your assessment for me?
10:11:19 A. He's alert and responsive, he's not in

10:11:32 respiratory distress; I saw him walking, he's ambulatory; and I asked him if he has like medical issue, he denies; did he have psychiatric issues, he said ADHD; and I asked him if he's using drug on the street and he said acid. But that's the only thing that he said. I said I want to -- give me more information about it.

So what I did, I use my observation, be objective based on my experience and based on my knowledge. He's a little bit disorganized because he's supposed to be -- he's doing what he's not supposed to be doing, he's naked, and I saw the appearance of clothes and everything, and he's talking nonsensical. I can't really understand what he's trying to say. Because of being uncooperative, he doesn't want to say much more.

And since -- so I scheduled him to -- I scheduled him for psych -- he's already scheduled. I reviewed this one, and he's already scheduled for psych. And since he take -- he said he takes acid in the street but he doesn't want to give more information about the acid, when, how much, everything.

So based on my objective assessment, he was not exhibiting any -- any signs of withdrawal of drugs. So I scheduled him for housing unit rounds or RN sick

call, and I -- because of his altered talk, I scheduled him for psychiatric evaluation. And I scheduled him also for wound care -- you know, wound care, so it will be taken care of, the wound, every day. And with the notes and he was -- he has records from the hospital that he was -- what do you call it? -- he was evaluated in the hospital. So I report him to the doctor.
Q. Okay. So I kind of want to go through -- sort of piece that out a little bit. You covered a lot.
So you first discussed that you conducted your assessment. Can you tell me, when you conduct an assessment, the things that you are looking for?
A. Of course I have to gather information about -- I have to stamp his -- you know, medical or psychiatric issue, and I did also vital signs, which is very important. I did the vital signs, from what I remember.
Q. Okay. When you take vital signs, what does that mean?
A. So we have to get the pulse rate, blood pressure, temperature, the respiration.
Q. When you were conducting this assessment, where were you?
A. When doing vital signs?

10:15:55 Q. When you were conducting this assessment on Mr. Schuck, where were you guys located? Were you in the clinic?
10:16:02 A. Medical screening. At the time when I was doing my assessment, I was in medical screening.
10:16:07 Q. And medical screening is located, I think you said, on the second floor?
10:16:14 A. Yes.
10:16:14 Q. So there's like a specific office or medical screening room that you conducted this evaluation at?
10:16:24 A. Yeah. There's a cubicle.
10:16:27 Q. Okay. So can you describe what you did? Did you -- did the officers present Mr. Schuck at your cubicle?
10:16:43 A. Yeah. I think he was placed there.
10:16:48 Q. Okay. So on March 15, the deputies bring Mr. Schuck to the medical screening cubicle; is that right?
10:16:59 A. Yes.
10:17:00 Q. You conduct your assessment at the cubicle on the second floor?
10:17:06 A. Yes.
10:17:06 Q. Your assessment was to ask a series of questions, correct?
10:17:14 A. Yes.

10:17:15 Q. Get Mr. Schuck's vital signs?
10:17:18 A. Yes.
10:17:20 Q. Which includes his pulse, blood pressure, and I --
10:17:27 A. Temperature.
10:17:28 Q. And temperature. Anything else?
10:17:30 A. Respiration.
10:17:36 Q. Respiration. Anything else?
10:17:39 A. That's it.
10:17:40 Q. So besides asking these questions and taking his vital signs, did you do anything else?
10:17:46 A. I did -- after I stop my assessment, I referred him to the doctor, to -- I saw disoriented, referred to psychiatrist or mental health clinician, I scheduled him for wound care for dressing change, and I scheduled him for housing unit rounds for wellness check.
10:18:21 Q. Okay. So I just want to make sure that I have all of your actions that -- you conducted an assessment, which was your observations, his vital signs, and then based off your assessment and his vital signs, you referred him to a doctor; is that correct?
10:18:40 A. Yes.
10:18:40 Q. You referred him to a mental health specialist?

10:37:02 is different than withdrawal from the opiates.
10:37:05 BY MS. ANGELES:
10:37:06 Q. Let me ask you a more specific question.
10:37:08 What have you been trained to observe in
10:37:11 terms of withdraw?
10:37:13 A. We have to observe -- we have to ask first if
10:37:23 you're taking drugs like that, so you withdraw. So we
10:37:29 have like nausea and vomiting. So we have nausea and
10:37:36 vomiting, diarrhea, something like anxiety, joint
10:37:51 pains -- joint pain or -- are we talking what kind of
10:37:57 drugs, what do you want me to --
10:37:59 Q. I'm just asking you, in your training and
10:38:02 experience, what are the signs and symptoms of
10:38:06 withdraw?
10:38:06 A. Okay. Let me just -- like opiates
10:38:10 withdrawal, like what I said, like throwing up, nausea,
10:38:14 vomiting, diarrhea, you know, anxiety. It's a lot of
10:38:22 reason, something like that.
10:38:23 Q. Any other symptoms that you have been trained
10:38:29 to observe as signs of withdraw?
10:38:33 A. What do you mean?
10:38:34 MR. INMAN: Objection. Vague, overbroad.
10:38:38 THE WITNESS: Aside from withdrawal?
10:38:40 BY MS. ANGELES:
10:38:41 Q. Have you been trained to identify signs of

A. Okay.
Q. Do you see at the top of the page there's an entry on 3-10, March 10, from Jameelyn Barrera? Do you see that?
A. Yes.
Q. Okay. And you see here that that indicates also a blood pressure of 144 over 97?
A. Uh-huh.
Q. Is that a normal blood pressure?
MS. SCHULER: Objection. The document says 144 over 94, not 97.
MS. ANGELES: And I apologize. I misspoke. That's correct.
BY MS. ANGELES:
Q. 144 over 94.
MR. INMAN: Objection. Vague.
BY MS. ANGELES:
Q. And I can restate the question.
So do you see here the blood pressure reading from March 10 that states it was 144 over 94?
A. Uh-huh, yes.
Q. Do you see that?
A. Yeah.
Q. Okay. Is that a normal reading?
MR. INMAN: Objection. Vague.

12:03:33 MS. SCHULER: Calls for expert opinion.
12:03:36 MR. INMAN: Join.
12:03:37 THE WITNESS: It's not normal.
12:03:39 BY MS. ANGELES:
12:03:40 Q. Okay. When you saw Mr. Schuck on 3-15, had
12:03:47 you reviewed Ms. Barrera's notes?
12:03:55 A. Yes. And I saw that, yeah.
12:03:58 Q. So you had saw that there was an abnormal
12:04:03 reading?
12:04:03 MR. INMAN: Objection. Document speaks for
12:04:07 itself, vague; and object to the extent it calls for
12:04:10 expert opinion.
12:04:14 THE WITNESS: Answer?
12:04:15 MR. INMAN: Go ahead.
12:04:16 THE WITNESS: You know, I can see -- I can see
12:04:18 that only the blood pressure, obviously that's not
12:04:25 normal.
12:04:25 BY MS. ANGELES:
12:04:27 Q. I just want to make sure that we're clear.
12:04:30 My question to you is not what the document says today
12:04:34 or what you see today. But do you remember that on
12:04:38 March 15, you reviewed his medical history and do you
12:04:43 remember seeing Ms. Barrera's -- the vital signs that
12:04:49 were entered by Ms. Barrera that were indicated in this
12:04:52 page, do you remember reviewing those?

12:08:31 A. No. I think this is the only thing.
12:08:33 Q. And we see that it was scheduled for the
12:08:37 12th. When do typically the mental health evaluations
12:08:45 occur, the date that they are scheduled or days after?
12:08:51 A. I can't answer that. I don't know
12:08:54 really the -- they have different -- maybe you can ask
12:08:57 the mental health clinician, they can answer you really
12:09:02 well about that one. At that time I don't know why was
12:09:07 the reason. Why, you know -- like what you're asking.
12:09:12 Q. Okay. If you -- can you make another request
12:09:19 for a mental health -- can you make another request, an
12:09:23 additional request, for him to be evaluated by a mental
12:09:26 health professional?
12:09:26 A. I think that one is enough already. Because
12:09:31 that specialty, that physical -- it depends on the
12:09:35 situation, they will not be seen on that date. Even
12:09:39 the doctor, even the dental, we have a lot -- because
12:09:43 we have a lot scheduled like dental, even though you're
12:09:47 scheduled on the 15th, they will -- a lot of things
12:09:52 happen. Maybe -- it could be movement -- a lot of
12:09:59 things. I don't know. But for sure they will not be
12:10:02 seen -- a lot of things they will not be seen on the
12:10:05 exact date.
12:10:06 Q. Right. My question for you is, do you, is a
12:10:10 nurse, have the ability to add an additional request

for him to be seen by a mental health professional?

A. I can -- I can override one, I can do another -- for what, another mental evaluation? If I see the patient is already scheduled and then that's what -- during that time, the best thing that I think that is good, it's already scheduled, he will be sooner or later.

Q. And I understand why you decided not to do anything additional. My question is, did you have the ability to do something additional? Did you have the ability to make another entry to schedule another appointment?

A. Yes.

Q. And you also have the ability to reach out to an on-call quality -- sorry -- qualified mental health professional as well, correct?

A. Yes.

Q. Meaning that if you see a psychological emergency or something -- someone that's concerning, you have the ability to have the mental health professional see someone more rapidly than a sick call schedule?

A. Yes.

Q. Okay. I want to direct your attention to page 666 -- sorry -- 667.

01:23:58 Q. Okay. And then I'm going to replay just a little bit of that portion again.
01:24:11 (Audio is being played.)
01:24:30 So I started that at 15:08 and stopped at 15:14, for the record.
01:24:36 So you say a couple things. You mentioned, "It's unpredictable, I don't know what they are taking inside or outside." What are you discussing there when you're saying those statements?
01:24:49 A. Just a general statement, something like a lot of dying -- I can't explain. I don't know what's going on. That's why I said, what's going on. A lot of people dying here. I don't know what's -- we try our best, people die, you know -- I said -- I don't know. I can't explain. I can't say verbal -- I don't know. I can't explain. I don't know. But what I know, we're trying our best with the patient and something happened. That's the only thing that I can tell.
01:25:28 Q. I guess I'm just trying to understand your statement. When you say "it's unpredictable," what about your job is unpredictable?
01:25:39 A. Because a lot of -- unpredictable, sometimes come here -- because based on my experience -- talking about based on my experience. They are healthy, then

died; they come here healthy, walking, and then died. I don't know. Something like I have maybe a lot of experience like that, sometimes maybe emotionally -- I don't know. I can't explain. If I have an answer, I will tell you. I don't know. I feel like emotionally affected for -- I can't believe. I really -- I don't know what to say. Like to help, based on me -- not only me. Everybody is working together for the benefits of the inmate. I don't know what happened. That's what I said. I can't believe -- I was shocked during that time because it just happened that time. I'm like what's going on. It should be -- somebody that's happening like that, I don't feel good.

Q. So you mentioned something that sometimes people come in healthy and then they die. Do you know if Mr. Schuck came in healthy?

A. From what I know, he was not in distress. He was not in distress. It's like mentally, he needed psych, he's not healthy mentally from what I see.

Q. What is medical distress for you?

A. Something like having a difficulty breathing, like seizing like that, you know, really stress.

Q. You also make a statement that says something like, "I don't know what they are taking inside, outside." What are you referring to when you make that

01:27:45 statement?

01:27:45 A. I'm talking about generally. Because when I
01:27:48 say how you feel, something like that, generally I'm
01:27:50 talking about generally. I don't know. Because
01:27:53 there's a lot of incident -- I don't know -- something
01:27:57 like inside, outside, you know, I don't know what's
01:28:01 going on. That's why I said I don't know what's going
01:28:04 on. Any reason that I can say -- but the only thing I
01:28:08 can say is I don't know what happened. I cannot
01:28:11 explain. I cannot explain really because I see it all
01:28:16 time, but I don't know beyond that. I cannot explain
01:28:22 beyond what's going on in the -- I can explain what I
01:28:26 was doing, but I said -- I don't know. That's the only
01:28:31 thing. I cannot explain.

01:28:32 Q. So you just said, "I see it all the time."
01:28:35 What do you see all the time?

01:28:37 A. Maybe something like -- not all the time, but
01:28:41 something I witnessed -- you know, not witnessing, but
01:28:44 I hear it, but I was not there in the presence of
01:28:49 something like -- because every time that we have death
01:28:51 in the jail, there's an alert news -- the computer
01:28:57 telling us what's going on, and then we're talking --
01:29:04 we don't really involved with the situation, but our
01:29:08 mind is like trying to figure out what happened. I
01:29:12 don't know. We're thinking -- we don't know what is

01:29:16 right or what's wrong because there's an investigation. That's the only thing that I can say. I cannot explain.

Q. Okay. I just want to make sure I understand what you just explained. So you said, when you explained it, you see it all the time, you were referring to deaths because even though you may not respond to a particular death, you see alerts or bulletins about deaths that occur at the jail; is that right?

A. Yeah, in every jail.

Q. In every jail?

A. Yeah.

Q. And I'm guessing that's concerning or alarming to you?

A. Just what I've said, it's alarming not only to me. It's alarming to everybody. We're trying our best. We're trying our best. But I don't know -- that's what I said. I don't know what's -- beyond that. I cannot speak beyond that. The only thing that I can say is what --

Q. And you can correct me if I'm wrong, but I think I heard you say that you guys see the alerts and then you begin speaking with other folks about what you see or what you've heard. When you're talking about

01:30:33 that, is this in a formal meeting or are you talking about informally with your colleagues, you're sort of talking about the latest death or the latest news that you heard?

A. It's informal. Because when you go to jail, you say, don't you know somebody happen -- because something like -- it's normal people talking, but maybe nosy or what do you call -- what's going on outside, you know. You see? You understand what I mean? It's not formal, and we don't know what is right or wrong. What is really the truth. We don't know what the truth -- it's only hearsay and something like --

Q. Okay. So you don't receive -- when you see these alerts, you don't receive any additional information about what happened or what could be learned about a particular example that you see on the alerts?

MR. INMAN: Objection. Overbroad.

THE WITNESS: No. If you're not involved, they're not going to call you, they are not going to let you know -- you're not involved.

BY MS. ANGELES:

Q. And when you say, "I don't know what they are taking inside or outside," are you referring to illicit substances or what are you referring to?

01:31:53 A. No. I'm looking for a generalized -- I don't know what's going on. Something like make expression of this patient, my experience in the jail system. I'm just talking generally. I can say a lot in person, nobody jump -- I don't know. It's like even though -- it's only my expression, you know, something like -- but the truth is I don't know. That's why I'm still saying I don't know. I don't know. I don't know what kind of word I'm going to use, that's why -- but I really don't know.

01:32:25 Q. So you don't know what you meant by taking --

01:32:28 A. That's right.

01:33:05 Q. I'm going to pull up what been -- what I'm marking as Exhibit 16-HH. I believe it's been previously marked.

01:33:12 (Exhibit 16-HH was marked for identification.)

01:33:13 It's a video. I'm going to play a portion of it. And I'm going to begin at minute 7:01. So seven minutes and one second.

01:33:59 (Video is being played.)

01:34:07 So stopping at seven minutes and 11 seconds, Mr. DeGuzman, do you see yourself on the screen?

01:34:15 A. Yes.

01:34:15 Q. And can you identify for the record where you

are in the video and what you're wearing?
A. I don't know what I'm going to do with this -- I think I'm in the medical screening. My first time to see this one. Let's see where I'm going. I'm going to the left side.
Q. I guess I'm just saying for the -- as we see this image, is it fair to say that you're in the middle towards the bottom --
A. Yeah.
Q. -- the figure?
A. Yeah, going -- going to do strip search.
Q. Are you wearing the white jacket?
A. Yes, a white coat.
Q. White coat. Is that khaki pants?
A. It's like a uniform, I was wearing my uniform.
Q. Okay. So as we see this video, 16-HH, at minute 7:11, is it fair to say that we see you towards the middle at the bottom of the screen wearing a white coat?
A. Yes.
Q. Okay. Now, looking at this area, do you recognize where you are in the jail? Do you know where this hallway is?
A. Yes. It's in the hallway. It's the medical

screening area, but if you will look on the left side, it's going to the -- the stair going to the tenth floor, and on the left side -- on my left is where the holding cell where they do the -- yeah.

Q. Okay. And so --

A. It's in the hallway going to medical screening.

Q. So as we look at this video, is it fair to say that this is a video of the hallway on the second floor where medical screening is located?

A. Yes.

Q. Earlier you described a cubicle?

A. Yes.

Q. Where is that cubicle located in this video?

A. I think where the deputies are, you know, in the door, inside that room.

Q. So I'm going to rewind the video to 6:51, and I think we're going to see you come out of a door, but I'm going to go ahead and play it.

(Video is being played.)

So stopping at seven minutes and five seconds, did we just see you walking out of the door?

A. Yes, ma'am.

Q. Is the door that you came out of the medical screening room or the one where the officers are

01:37:15 standing?
01:37:16 A. No. That's the door going to the medical
01:37:19 screening room, and then on the next door is where is
01:37:23 the cubicle --
01:37:26 Q. Okay.
01:37:26 A. -- where the patients sit down.
01:37:29 Q. So there's two doors for -- that are a part
01:37:33 of medical screening?
01:37:34 A. One door is like to enter going to medical
01:37:39 screening, and there's like three doors for medical
01:37:48 screening cubicle, where the nurse and patient sit
01:37:55 down.
01:37:56 Q. Okay. So let me see if I understand this
01:38:01 correctly. Is the door that's slightly ajar at minute
01:38:08 7:05 where the medical screening office is or does that
01:38:12 also contain cubicles as well?
01:38:15 A. No. That's going to medical screening. We
01:38:19 call it office medical screening area.
01:38:20 Q. So it's more where the computers and
01:38:23 administrative portion is; is that fair to say?
01:38:28 A. Yes.
01:38:29 Q. And on the screen we see three officers in
01:38:32 front of the door next to the door that is ajar, and
01:38:39 you're saying the next three doors over contain
01:38:43 cubicles; is that right?

A. That's right.
Q. And those are sort of examination areas?
A. No. They are where they sit down, the patients, where we can do the screening -- where we can do the vital signs.
Q. Can you describe for me -- because we don't have an actual video of the medical screening area -- what that area looks like? Can you describe it for me?
A. Looks like -- if you will go farther, there's -- on my back there's like a strip area, and then there's a holding cell, on the left there's a sobering cell, and then on the right side is like a cubicle where the nurses sit down and do the evaluation, and there's a lot of empty room going there.
Q. So in that cubicle where the medical screening happens, what kind of things would we find in there, what kind of equipment would be found in the medical screening cubicle?
A. We have -- of course we have for vital signs, but -- medical screening cubicle?
Q. Yes.
A. Just my cubicle? Because there's a wall, like a glass wall division, we have a table like this, stainless table between, facing with the inmate. The

01:40:23 nurse facing the inmate, and there's a glass window and
01:40:29 then a small area, like maybe 2 by 6 open window, you
01:40:38 know, so we can the vital signs and so we can talk to
01:40:42 the patient. And we have the vital signs equipment on
01:40:46 that area, on that cubicle.

01:40:50 Q. Okay. So let me see if I understand this
01:40:52 correctly. In the cubicle room, the medical screening
01:40:56 room, there is a stainless steel table. On that table
01:41:01 there is a glass that separates the medical staff from
01:41:04 the patient?

01:41:05 A. That's right.

01:41:06 Q. On each side is there sitting, some sort of
01:41:11 chair or bench or something?

01:41:13 A. Yeah, there's a chair.

01:41:14 Q. Okay. Are there multiple areas for inmates
01:41:17 to sit or is it just one patient at a time?

01:41:20 A. One patient at a time.

01:41:22 Q. Okay. And I heard you say there's like a gap
01:41:28 in the glass so that you're able to take a patient's
01:41:33 vitals?

01:41:33 A. Yeah. There's a small opening.

01:41:35 Q. Is there room for you to do a more thorough
01:41:41 examination beyond just vitals in that medical
01:41:44 screening room?

01:41:45 A. Yeah. We can go on the -- you know, on the

other side. We can -- what do you call it? -- we can go out and check the patient, open the door and we can check the patient there.

Q. Okay. So you can go on the patient's side and then perform any sort of evaluation that you want?

A. That's right.

Q. Is there a camera located in that medical screening room?

A. I think so. I know there's a camera there, but I don't know where is that pointing at. Like this one, this camera where -- in the sick room.

Q. Yeah. In the room, have you seen a camera in there?

A. I do not remember. I know we have camera, but I don't know where they are pointing at.

Q. Okay.

A. I have to double-check it.

Q. So playing the video again starting at seven minutes and six seconds.

(Audio is being played.)

So stopping the video now at 7:25, we see you come out of the door, walk towards the camera, and then go to the bottom left corner, and then we see you go off the screen; is that correct?

A. Yeah.

01:43:52 Q. Do you remember what was happening at this time and what you were doing?
01:43:57 A. Looked like that I went there to get the new clothing. That's what I see. And then I have to ask the deputy to change it.
01:44:10 Q. So at this point at this -- at this point in the video, had you already done your evaluation of Mr. Schuck, had you already done your vitals check?
01:44:26 A. I don't remember. But, you know, my assessment is continuous, every time that I observe -- it's not one see, one chart, one see, one chart -- you know, I don't know if I'm charting that one at the time. I can't remember. But for what I know, I want to take care of the patient. Maybe I did the vital signs first. I can't remember. But on that video it looked like I went to that area where I can get new clothing so we can replace --
01:44:58 Q. Okay. Just to be clear, the room that you come out of is not where you perform the medical examinations, correct?
01:45:08 A. What do you mean?
01:45:11 Q. So let me rewind back a little bit.
01:45:20 A. That room --
01:45:22 Q. So I'm going to rewind so you can see a little bit more context. So I'm starting this video at

A. Based on my statement, I was assigned for AMBU bagging -- I mean I did an AMBU bag for bleeding.
Q. And I'm playing the video again at 15:45.
(Video is being played.)
Stopping the video at 16:14. What we just observed on the video, does that help you remember what you did on March 16 of 2022?
A. I don't remember. That's good that I see it, you know, now I can see it, but recollection-wise --
Q. Is this video consistent with what you remember happening on March 16 of 2022?
A. Yeah. It looks like me, I just remember it's me.
Q. Okay. So after Mr. Schuck passed away, we already discussed you were interviewed by two detectives. Did you participate in any other meetings with anybody at the jail in relation to Mr. Schuck's death?
A. I don't think so. I don't remember if we have a meeting. I don't remember.
Q. Besides communications with your attorney, did you discuss Mr. Schuck's death with anyone?
A. No. I'm not really trying to discuss that.
Q. At any point formally or informally, did you have a meeting to discuss what happened in Mr. Schuck's

case?

A. I -- aside from the investigation, I don't remember.

Q. Is there anything that you wish you would have reviewed prior to giving your testimony today?

A. No. I think we talk about everything. If you will tell me something, I can -- maybe I can answer you. But at this time, I have no other farther that I can remember.

MS. ANGELES: I don't think I have any other questions.

MS. SCHULER: Could we take a short break.

THE VIDEOGRAPHER: We are off the record. The time is 2:30 p.m. Pacific time.

(Recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:38 p.m. Pacific time.

EXAMINATION

BY MS. SCHULER:

Q. Good afternoon, Mr. DeGuzman. As I mentioned off the record, my name is Katie Schuler. I represent Correctional Healthcare Partners and NP Nicholas Kahl. Plaintiffs' counsel was very thorough in asking you questions about this incident, and so I don't have too

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 18, 2024

______________________________
Sheri L. Somers
CLR, CSR No. 9734

# EXHIBIT 22

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 23

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 24

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 25

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 26

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 27

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 28

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: May 15, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# DEPUTY ALAN GRIFFITH

CERTIFIED COPY

Reported by:
Sheri L. Somers
CSR No. 9734

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | VIDEOTAPED DEPOSITION OF DEPUTY ALAN GRIFFITH |
| vs. | MAY 15, 2024 |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | 1600 Pacific Highway<br>Room 355<br>San Diego, California |

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2 3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of DEPUTY ALAN GRIFFITH

San Diego, California

May 15, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938235

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al., Plaintiffs, vs. COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al., Defendants. | Case No. 3:23-CV-00785-DMS-AHG |

Videotaped Deposition of DEPUTY ALAN GRIFFITH, taken on behalf of plaintiffs, at 1600 Pacific Highway, Room 355, San Diego, California, beginning at 9:05 a.m. and ending at 11:48 a.m., on Wednesday, May 15, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

COUNTY OF SAN DIEGO
1600 Pacific Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Sofia L. Rezvani, Esq.
Sofia.rezvani@sdcounty.ca.gov

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

Elijah Ochoa
STENO

10:00:52 would not transport him because we have too many
10:00:55 inmates or IPs onboard to be able to put all our focus
10:01:00 and attention on one particular inmate.
10:01:03 Q. So you asked if he was being combative
10:01:06 meaning like violent or --
10:01:07 A. Violent, yes.
10:01:08 Q. -- or whether he posed a threat to other
10:01:12 inmates?
10:01:12 A. Yes. And they said, "No, he's just being --
10:01:15 he's acting odd and weird and not following
10:01:17 instructions."
10:01:17 Q. So he wasn't being violent. He was just
10:01:22 being weird. That was your understanding?
10:01:23 MS. REZVANI: Objection. Misstates testimony.
10:01:24 BY MR. SCOTT:
10:01:25 Q. Is that your understanding?
10:01:26 A. I was told that he was acting odd, weird, and
10:01:30 not following instructions.
10:01:32 Q. Did you yourself experience Mr. Schuck not
10:01:36 following instructions?
10:01:38 A. I would say not -- not putting -- not at the
10:01:47 court because I had such a brief contact with him.
10:01:50 Q. What about later?
10:01:51 A. Later on there was things that I had to
10:01:57 reiterate or assist him with.

Q. Like what?
A. Like just when I'd walk him, I would put a -- instead of just walking him, "Go down this way," I would keep a hand on his arm so that he wouldn't wander off, basic -- just making sure that he went where he needed to go.
Q. Was your experience that when you didn't have your hand on him, he would tend to wander off?
A. A little bit. He would kind of drift a little bit, but not -- nothing -- nothing huge, just enough that -- after I was briefed on him being not able to follow instructions, that kind of gave me a little concern so that I would make sure that I would get him where he needs to go.
Q. What did you mean when you said he would drift a little bit but wouldn't really wander?
A. He was just kind of looking around, and if he would stop or anything, I would just -- "We're going this way," and he would go and I would just keep my hand on his wrist or -- as a guidance.
Q. You said -- and I don't want to put words in your mouth. So please correct me if I'm wrong. I thought I heard you say that there were times that Mr. Schuck seemed unable to follow instructions?
A. Either unable or not comprehending maybe.

10:03:44 Q. Is not comprehending different than not being able to follow instructions, in your mind?

A. No. I mean I would tell him to do things and generally he would do them. Sometimes he would look at me. I would ask him to do stuff or ask him a specific question, and he would try to talk back but I didn't understand what he was saying. So it was more that I wanted to make sure that he got where he needed to go.

Q. What kind of words was he saying to you?

A. I couldn't understand what he was saying. I would talk to him and he would look at me and he would respond, but I didn't understand.

Q. I mean was he using like words in the English language?

A. Nothing that I could really understand. It was a mumble or -- you know, it wasn't anything that I could say that he's trying to tell me this.

Q. We do have a video camera here and the court reporter, I guess, will just do the best she can. Can you kind of, just for us, say the -- sound the way he sounded when he was talking to you?

A. I mean I don't remember exactly what he was saying or sounding. I would ask him something and he would turn around and he would just mumble, if you had somebody that you couldn't understand at all, just --

10:05:25 it wasn't legible to me.
10:05:29 Q. And I'm just talking about my own experience. I have heard people talk where they are so drunk that you can barely understand them. I have heard people that just had their wisdom teeth out and you can't understand them, and all kinds of other situations as well. Can you analogize it to any situation like that in your life such that you couldn't understand Mr. Schuck?
10:05:59 MS. REZVANI: Objection. Calls for speculation.
10:06:02 You can answer.
10:06:03 BY MR. SCOTT:
10:06:03 Q. And to be real clear for the record, the question I'm asking you is to relate what you saw with your own eyes to another experience in your life so that we can better understand what you saw, yourself, that day.
10:06:15 MS. REZVANI: If you can.
10:06:17 THE WITNESS: I think you hit -- kind of closer to like a mumble, like almost like somebody having wisdom teeth, you know, or a cotton ball in their mouth or something, it was kind of like that, that I couldn't -- they are trying to say something that I didn't understand. I guess that would be the closest that I can actually say.

10:13:59 If you know.
10:14:00 THE WITNESS: I don't know how long. It wasn't -- it wasn't a real long time. It was enough to get the information over, couple minutes maybe.
10:14:11 BY MR. SCOTT:
10:14:11 Q. Okay. And now tell us, as completely as you can, the entirety of the information that you delivered to Deputy Valbuena in this oral briefing.
10:14:22 A. If I remember everything -- I don't remember everything from two years ago, but I did tell him that the appearance was cut short, he was acting odd and weird, he was cross-chained for that reason, and then about me trying to speak with him, that I was not able to really talk with him. I mean ask him a question, him looking at me. And said, You know, I think he needs to go see medical.
10:14:59 Q. You told Deputy Valbuena specifically this man needs to see medical?
10:15:05 A. Yes.
10:15:06 Q. And what was Deputy Valbuena's response, if any?
10:15:11 A. Deputy Valbuena, he agreed with me and he said -- he asked me if I would walk with him and take him up to the second floor. He said, "On the second floor is medical observation."

10:50:10 And he said, "Yeah, he'll see medical there."
10:50:12 Q. When you told Deputy Valbuena that he needs to see medical, were you conveying to Deputy Valbuena that like Mr. Schuck needs to go on a sign-up sheet to see medical at some undetermined time in the future or were you more of the mind that he needs to see a doctor or a nurse right now?
10:50:38 A. My -- the way I believe I was telling him is he needs to be seen by medical sometime soon. Whether that was like immediately right now, no, it wasn't like I need him -- a nurse down here right now, no. But he needs to be assessed and seen within a reasonable time.
10:51:06 Q. Which in your mind at the time was what?
10:51:08 A. Would be within the hour. That's what I would believe.
10:51:14 Q. Do you feel like you communicated to Deputy Valbuena your belief that this man needed to be seen by a medical professional within a reasonable period of time, meaning an hour or so?
10:51:26 A. A reasonable amount of time. With what I told him and what he's seen and me helping him take him up to the second floor, I believed that's what was going to be happening.
10:51:40 Q. I'm hearing you say that -- obviously you didn't call 911 or suggest that it was an active

We don't want him wandering off. Because I brought him in just myself and I had a loose grip on him. It wasn't the walking part that -- I mean he could walk, but I needed to guide him. I wasn't lifting up on him or anything like that, but I was guiding him so that he would go where we wanted him to.

Q. So help us understand what "guiding" means if not physically lifting him.

A. If you have like -- in his case where he's handcuffed, just having a grasp on his forearm or by the elbow and, hey, we're going to go this way and kind of motion -- turn to this direction or that direction. So yeah, he could stand and walk. Would he go where we wanted him to go? Would I want him to be running around? No. But he could walk, he could stand.

Q. What would happen if you weren't physically guiding him by his arm or his -- like you just described?

MS. REZVANI: Objection. Incomplete hypothetical, calls for speculation.

You can answer.

BY MR. SCOTT:

Q. I'm asking about in your own experience, what actually happened when you were not physically guiding him?

A. He would either wander off, but -- but the way he was walking, I wouldn't want him to just go wandering off. I wouldn't want him to trip and fall or anything like that, but he was able to walk with us when I walked him. So --

Q. I'm trying to understand what you mean when you say "wandering off," what were those circumstances like?

A. If I'm not holding him and he's walking, he could turn around, start walking our way, walk this way, walk that way, to the left or right, down a corridor. He wasn't -- he wasn't following instructions like -- if we brought an inmate in and said, "Hey, walk down that red line and stop at the end," I wouldn't have him do that because I don't think he would.

Q. Okay. Now, this particular -- since you brought up the red line, there is actually a physical red line marked on the floor of the jail here, right?

A. Yes.

Q. And I understand the purpose of that line to be for inmates to literally walk the line, as the saying goes; is that right?

A. That's what I use it for. I don't know if they have another use for it, but it's usually -- it

helps them, hey, just go down that red line and stop at the end.
Q. And when inmates are being moved from place to place in a correctional setting, they are very quickly taught to follow instructions and walk the line when they are told to walk the line; isn't that so?
A. Yeah. Yeah. They -- it's there to assist them so they know where they are going and to follow instructions.
Q. But I'm hearing you say that in your experience, Hayden Schuck was physically incapable of, quote-unquote, walking the line without some physical guidance on his arm?
MS. REZVANI: Objection. Misstates testimony.
THE WITNESS: I had him walking -- I assisted him because I just didn't trust that he would do that. Due to my briefing, the way he was communicating, I wanted to make sure he was going to go where we needed him to go.
(Exhibit 16-S was marked for identification.)
(Video is being played.)
BY MR. SCOTT:
Q. Okay. 16-S, like "Sam," do you recognize this view?
A. I think that's -- I think that's the first

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 28, 2024

____________________________________________

Sheri L. Somers
CLR, CSR No. 9734

# EXHIBIT 29

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

Case No. 3:23-cv-00785-DMS-AHG

MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF ALLAN M. VALBUENA

San Diego, California

Thursday, May 30, 2024

REPORTED By:

NATALIE M. KHAMIS
CSR No. 14260
JOB No. 968520
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Case No. 3:23-cv-00785-DMS-AHG

Plaintiffs,

vs.

COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT

MEDICAL PROVIDERS DOES 2-3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Deposition of ALLAN M. VALBUENA, taken on behalf of Plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California 92101, beginning at 9:07 a.m. and ending at 1:45 p.m. on Thursday, May 30, 2024, before NATALIE M. KHAMIS, Certified Shorthand Reporter No. 14260.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES:

FOR PLAINTIFFS:

McKenzie Scott PC
By: Timothy A. Scott
Attorney at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
tscott@mckenziescott.com

FOR PLAINTIFFS:

McKenzie Scott PC
By: Michelle C. Angeles
Attorney at Law
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
mangeles@mckenziescott.com

FOR DEFENDANTS CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

Lotz, Doggett & Rawers, LLP
By: Katie K. Schuler
Attorney at Law
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
kschuler@ldrlaw.com

FOR DEFENDANTS COUNTY OF SAN DIEGO AND ALLAN M. VALBUENA:

County of San Diego
By: Steven P. Inman II
Attorney at Law
1600 Pacific Highway, Suite 355
San Diego, California 92101
619.884.2931
steven.Inman@sdcounty.ca.gov

Also Present:

David Kim, Videographer

09:10 A. Yes.
09:10 Q. Do you work there today?
09:10 A. Yes.
09:10 Q. Is your -- have you received any promotions?
09:10 A. No.
09:10 Q. Did you receive any specific training when you first started at the jail as opposed to at the academy? And I'm describing any formal courses of training before starting work at the jail.
09:11 MR. INMAN: Objection. Vague. Overbroad.
09:11 BY MR. SCOTT:
09:11 Q. You may answer.
09:11 A. I'm sorry, sir. What was the question again?
09:11 Q. Yes.
09:11 When you first started at the Men's Central Jail, did you receive any formal training before starting work?
09:11 A. Yes, I --
09:11 MR. INMAN: Same objections.
09:11 MR. SCOTT: What was that, please?
09:11 MR. INMAN: Same objections.
09:11 You can answer.
09:11 THE WITNESS: Oh, okay. We started -- I went through phase training. I believe at the time there was two-phase training. Just regular operations of the

09:11 jail. You know, security, how to transport, move
09:11 inmates from one -- IPs from one module to another.
09:11 They need to be taken down to medical. Certain duties
09:12 as a -- as a detentions deputy, feeding them -- feeding
09:12 the inmates and all that stuff, yes.
09:12 BY MR. SCOTT:
09:12 Q. You used the phrase "IP" before. Is that
09:12 incarcerated person?
09:12 A. That's correct.
09:12 Q. Have you ever heard the phrase "in your custody
09:12 is in your care"?
09:12 A. That's -- that's our -- that's what we do, you
09:12 know. All IPs are our responsibilities once they're in
09:12 custody, I guess.
09:12 Q. Well, what do you mean by that?
09:12 A. They are in our care, sir. So for -- like I
09:12 mentioned, when it comes to food, keeping the security
09:12 of the inmates, as well as the staff. That's what I
09:12 mean about that.
09:12 Q. Is that something that's part of your training
09:12 with the San Diego Sheriff's Department?
09:12 A. Yes. Interphase training and it's reiterated
09:13 throughout time over there.
09:13 Q. That specific phrase, "in your custody is in
09:13 your care," has been reiterated as part of your

training?
A. Definitely.
Q. In your mind, does that phrase, "in your custody, in your care," also include an inmate's access to medical care when appropriate?
A. Yes.
Q. Have you been taught as a sheriff's deputy that inmates or incarcerated persons have a constitutional right to medical care when appropriate?
A. Yes.
Q. In particular, when there's a serious medical need or a risk of -- of death even?
A. Yes, yeah.
Q. Okay. And I don't mean to --
A. No, no, the -- it's -- yeah.
Q. No, please.
A. Yeah, it's -- what was I going to say? No. Go ahead, sir.
Q. Okay.
A. I lost my train of thought.
Q. No, that's okay. I appreciate you.
Have you ever had your deposition taken before, sir?
A. No, this is my first time.
Q. Okay. Fair enough. And it's -- it's natural

09:17 what happened, would you please let us know that so that
09:17 we can reschedule this?
09:17 A. It's no problem, sir.
09:17 Q. Okay. Because we'd be happy to --
09:17 A. I'm fine.
09:17 Q. -- I mean it. We can -- you know, we've got to
09:18 get you right physically and get you back here and it
09:18 wouldn't be any trouble for us.
09:18 Okay. So it's your --
09:18 A. I'm not medicated in any way. You know, my
09:18 back is bothering me. That's all.
09:18 Q. Okay. Fair enough.
09:18 Like I said, I don't mean to pry, but I do want
09:18 to make sure we've got a solid witness and a good
09:18 record. So I think -- I feel good about that, and with
09:18 that, I'm ready to proceed, if you are. Okay?
09:18 A. I'm ready.
09:18 Q. All right. Thank you, sir.
09:18 Now, let me ask you: Have you ever reviewed
09:18 any written materials associated with this case, ever?
09:18 And I want to exclude from that category any specific
09:18 communication coming from your attorney in this case.
09:18 So --
09:18 A. No.
09:18 Q. Okay. So you -- and I want to make a clear

record.

A. Yeah.

Q. And so you have never read, like, an incident report pertaining to the Hayden Schuck case, to your knowledge?

A. No, sir.

Q. Have you ever seen any video footage pertaining to the Hayden Schuck matter, to your knowledge?

A. No.

Q. Have you ever -- again, setting aside your attorney that's here or any other attorney from the County, have you ever spoken to another human being about the Hayden Schuck matter?

A. No.

Q. And now I want to break that question into two.

A. Uh-huh.

Q. Because I just asked you a series of questions about document review and talking to people about the Hayden Schuck case and you said, no, no, no --

A. Yeah.

Q. Please. Would you like to clarify something?

A. Yeah, to -- other than that, there was a deputy that told me -- he just asked me. He said, "Were you given a phone call?"

I think it is -- this is like two years ago,

09:46 Q. Okay.
09:46 A. I'm good, sir.
09:47 Q. Would you like to take a break?
09:47 A. I'm fine. I'll let you know if I have to stand up.
09:47 Q. Would you, please?
09:47 A. Yes.
09:47 Q. Okay. And we'll take it any time you like, I promise.
09:47 A. Yeah.
09:47 Q. All right. You understand as you sit here today that you were a deputy that received Mr. Schuck as he came back from court on March 15, 2022. Is that right?
09:47 A. Yes.
09:47 Q. Now, do you understand that it was Deputy Griffith who was a transport officer bringing Schuck from court to the Men's Central Jail?
09:47 A. Yes, that's correct.
09:47 Q. So in a manner of speaking, Griffith was kind of handing him off to you?
09:47 A. Yes. Checking him in, yes.
09:47 Q. And you work at the jail?
09:47 A. Yes, that's correct.
09:47 Q. But Deputy Griffith worked transport sort of

09:47 between jails --
09:47 A. Yes.
09:47 Q. -- and court, right?
09:47 A. That's correct, yeah.
09:47 Q. So what do you remember Deputy Griffith saying to you, if anything, about Mr. Schuck when the two of
09:48 them arrived that day?
09:48 A. I remember he -- I think by the time I contacted him, Mr. Schuck had slid down the wall right there were -- where they were at. I don't quite remember where I was coming from, maybe just escorting another IP back to their cell, and that's where I met up with them.
09:48 Mr. Schuck is sitting on the -- on the -- on the floor. Obviously, we need to send him up to his -- to his holding cell. Just ask him; do a quick assessment: "Hey, what's wrong with you?"
09:48 You know, I remember asking him -- you know, it's not normal for anyone to just sit there. So I was trying to find out what's going on with him. I remember him saying he was thirsty. I was like, "Well, you can't sit down here, you know. I could take you back to your holding cell and -- and get some water there."
09:49 And so we escorted -- we escorted him up, helped him up. Because he sat down. He had his legs

and waist chains on; we didn't want him falling over.
So me and Deputy Griffith just escorted him up to the second floor, and, you know, put him in the holding cell and chained him. Put him in the holding cell, say, "Hey, the water is right there, my man."
And just having to be a deputy there. I said, "Hey." I let him know -- I said, "Just got my -- need to get looked at." Because he -- he's -- he said he's feeling thirsty. You know, probably feeling the effects of, you know, the detox or whatnot, so...
And that was it, sir. After we closed the door, I had to go back down to my workstation, because, you know, we have to offload the buses.
Q. What did you mean when you said -- when you closed the door? What door are you talking about?
A. Oh, the holding cell where we -- we put IP Schuck in.
Q. Okay. So I'm -- so the door that you're talking about shutting was on the second floor?
A. That's correct, yeah.
Q. Okay. So -- I'm sorry, start us again.
You and Deputy Griffith are now getting off the elevator on the second floor at the Men's Central Jail?
A. Yeah.
Q. And you're going to put Mr. Schuck back in his

09:50 holding cell?
09:50 A. I'm sorry. Can you repeat the question?
09:50 Q. Yeah.
09:50 So I want you in your mind's eye to sort of
09:51 picture you and Deputy Griffith with Mr. Schuck inside
09:51 the elevator, okay?
09:51 A. Uh-huh.
09:51 Q. And as I understand your testimony, the doors
09:51 open and you're on the second floor. Is that right?
09:51 A. No. We called -- we came from -- sorry. I'm
09:51 just trying to go by -- I'm speaking as I remember it in
09:51 my head.
09:51 Q. Sure.
09:51 A. Yeah. We start off on the first floor where
09:51 they come in. I remember I met up with them; IP Schuck
09:51 was on the floor.
09:51 Q. So let me -- so let me just pause you: When
09:51 you first laid eyes on Mr. Schuck, what part of the
09:51 building was this? First floor?
09:51 A. It was on the first floor.
09:51 Q. And what specific part of the first floor?
09:51 A. It was towards the -- our office where the
09:51 sally port is, where they enter and they come out for
09:51 court or any transport.
09:51 Q. So near a sally port?

09:51 A. Yes.
09:51 Q. And near where the buses drop off inmates?
09:52 A. That's correct, yes.
09:52 Q. And when you first saw the person you later learned was Hayden Schuck, he was slumped down on the ground?
09:52 A. He wasn't. He was leaning up -- sitting down. He was leaning on the wall at the end of the hallway from the -- from the sally port.
09:52 Q. Was he seated on his bottom?
09:52 A. Yes.
09:52 Q. Were his legs stretched out in front of him?
09:52 A. Kind of like Indian style. His legs were up.
09:52 Q. Was he sitting cross-legged, or were his legs sort of --
09:52 A. I don't remember those -- the details, sir. I just -- I know his -- his legs weren't underneath him. He was leaning up against the wall, probably stretched out or cross-legged.
09:52 Q. Based on your observations, did it seem like Mr. Schuck was unable to stand up or simply that he was just sitting down?
09:53 A. My observation, he was fine. He was talking. Again, I asked him what was going on with him. He mentioned he was thirsty and, you know, just tired, I

09:53 guess, but -- I shouldn't say -- you know, that specifically I remember him saying he was thirsty. I was like, "Okay, you can't sit down here, you know. You have to go back to your holding cell."

09:53 That's when we asked him to get up. And he -- we just held him on both sides. I believe Deputy Griffith held him on one side, and I held him on the other and, you know, escorted him back up to the second floor where he came from in the morning.

09:53 Q. Did I hear you say that when you first saw Mr. Schuck sitting down, you asked him what was wrong or words to that effect?

09:53 A. Yeah, I did say, "What's going on with you?" because he's just sitting down on the floor.

09:53 Q. And was that unusual?

09:53 A. Well, yeah, because that -- where he was sitting down at, sir, is when they come in and they

09:54 pretty much walk up to their -- to the elevator well, where they get sent up to their housing. So for him to sit there -- plus, there will be other inmates waiting -- IPs waiting to come in off the bus. So for him to come in -- and he just kind of sat down there.

09:54 So, obviously, I said, "What's wrong with you?" You know, I made sure he was okay. You know, there was nothing medically or anything else going on with him, so

-- but he -- he was fine. He responded to my questions. And asked him to get up and I said, "Hey, we'll take you back upstairs."

We just held him on both sides, he got up on his own power, and we walked him up to the second floor.

Q. I'm hearing you say that one of the reasons that you asked him, "What's going on?" or if he was okay is because he was sitting in an area that's really not where you would sit. Is that a fair statement?

A. Yeah.

Q. He was sitting on a place where the incarcerated person is supposed to, quote, unquote, walk the line?

A. Walk through, yes. Walk through there. He sat down, yeah.

Q. So -- so rather than walking the line as an in-person custody, he was sort of, like, just sitting down on the line?

A. He sat down, yes.

Q. Which isn't what you do when you're in.

Jail, right?

A. Yeah. In a holding cell or... you know.

Q. In fact, to just sort of sit down on the line like that during a transportation means one of a couple things potentially for a deputy, right? It could mean

09:55 that that inmate is being uncooperative and is sort of
09:55 willfully disobeying an order to move. That's one
09:55 scenario, right?
09:55 A. Yes.
09:55 Q. A second scenario or another scenario is that
09:55 the inmate is having some sort of medical distress,
09:55 right?
09:55 MR. INMAN: Objection. Improper hypothetical
09:55 and calls for speculation.
09:55 MS. SCHULER: Lacks foundation.
09:55 BY MR. SCOTT:
09:55 Q. So those are two reasons why an incarcerated
09:56 person might be sort of squatting down on the line
09:56 rather than walking the line during the transport.
09:56 Can you think of other scenarios that might be
09:56 in play as a trained correctional deputy?
09:56 MR. INMAN: Same objections. Vague and
09:56 overbroad. Improper hypothetical. Calls for
09:56 speculation.
09:56 BY MR. SCOTT:
09:56 Q. You can answer.
09:56 MR. INMAN: If you can. If you can think of
09:56 any other.
09:56 THE WITNESS: Yeah, those would be it. Someone
09:56 being noncompliant, don't want to transfer, which falls

under noncompliant. Or someone is actually feeling something -- you know, they're having trouble walking, or they feel that they -- they can't walk or whatever.

BY MR. SCOTT:

Q. So putting yourself now back in the position you were in on March 15th as the out-of-court deputy, you saw Mr. Schuck sitting someplace that inmates aren't supposed to sit, right?

A. True.

Q. And I'm hearing you say that that meant one of two things: Either he's being noncompliant or there's some sort of a medical issue. Is that fair?

A. That's fair.

MR. INMAN: Objection. Calls for speculation. Lacks foundation.

BY MR. SCOTT:

Q. Is that a fair statement, sir?

A. I think we covered that on the last questions.

Q. So because of that, you asked him, "Hey, what's going on?" Right?

A. I did.

Q. And -- and what specifically do you remember him saying in response?

A. All I really remember is he was like -- he was thirsty. That's what he told me.

09:57 I was like, "Well, you know, there's plenty -- there's water in your holding cell. You can't stay down here. We'll take you back up to your holding cell." And that's when we escorted him back up to the second floor.

09:57 Q. Did you think that Mr. Schuck was being noncompliant at that point?

09:57 A. No, sir. Because we asked him to -- to "Come on, we'll help you up," you know, because he was sitting down, "We'll help you up." Because had -- you've seen them -- I don't know if you've seen them in waist chains and leg chains. It's tough to get up from there. He was sitting down, so we helped him up. And then we just kind of guided him to the second floor, because we didn't want him, you know, falling over, because he had his legs and waist chains on.

09:58 Q. When he said that he was thirsty, that was in response to you saying, "Hey, what's going on"?

09:58 A. Yeah.

09:58 Q. You understood that answer to be his explanation for why he was sitting on the floor?

09:58 MR. INMAN: Objection. Calls for speculation.

09:58 BY MR. SCOTT:

09:58 Q. Was that how you took it?

09:58 A. Yeah. You know, I want to make sure that he

walking up there, and I just told the deputies that he needs to see medical.

Q. So as best you can, tell us exactly what you remember telling that unknown deputy on the second floor about Mr. Schuck and his condition.

A. Along those lines, sir. Said, "He sat down on the floor." You know, "He said he was thirsty"; "I brought him in." Those are definitely -- and I remember, "He needs to see medical."

Q. So you remember telling the deputy that Mr. Schuck sat down on the walk from the bus to jail, number one, right?

A. Yes.

Q. You told --

A. Let me take that back. No, I do not, sir. Again, I'm not -- now you're asking me the questions over and over again. I just took moments -- I just brought him up. Told him, said, "Hey, he said he was feeling thirsty." You know, I told him to see -- he probably needs to see medical. I didn't know if he was still suffering from detox or whatnot, so -- but I remember saying that to the -- I remember giving him a brief on Mr. Schuck before I left the second floor and go back to my -- to my workstation.

Q. And in that briefing, you now recall that you

10:06 did not say that Mr. Schuck sat down during the walk?
10:07 A. I can't tell you for -- for sure if I remember. Because if I gave the --
10:07 Q. But you did tell the deputy that Mr. Schuck said he was thirsty?
10:07 A. That's correct.
10:07 Q. And you remember telling the deputy that this man needs to see medical?
10:07 A. Yes, that's correct.
10:07 Q. Why did you say, "This man needs to see medical"?
10:07 A. You know, I just couldn't remember -- probably because he had sat down or he had shown possible signs of detoxing. Because I did -- there was a reason why he sat down on the floor, with my experience and training. So the deputy was there. I said, "Hey, you know, this guy probably needs to check -- get seen by medical. Right now, he's saying he's thirsty," so...
10:07 Q. In your experience and training, what are some of the signs of detox?
10:08 A. Dehydration, normally feeling weak.
10:08 MR. INMAN: Objection. Vague. Overbroad.
10:08 Go ahead. Sorry to interrupt.
10:08 THE WITNESS: That's it, yeah.

BY MR. SCOTT:
Q. In your experience and training, detoxification -- detoxification, meaning withdrawal from drugs or alcohol, right?
A. That's correct.
Q. And those symptoms can include dehydration and muscle weakness. Is that right?
A. That's -- yeah.
MR. INMAN: Objection. Calls for expert opinion.
BY MR. SCOTT:
Q. Again, asking just about your experience as a deputy. Are there other signs and symptoms that you've been trained upon or that you've witnessed yourself regarding withdrawal?
MR. INMAN: Objection. Vague and overbroad.
THE WITNESS: Just through experience, what I've seen. You know, working on intake in the second floor. Some of the signs I see, maybe that's -- that's what I noticed possibly. But I can't tell for sure. I'm not --
BY MR. SCOTT:
Q. Did it seem to you that Mr. Schuck may have been experiencing detoxification or withdrawal?
A. Again, sir, it's just my -- what I saw, other

than him saying he was thirsty, and that's what I relayed, you know, to the deputies: "Maybe get him checked out."

All the others -- after that brief, that short time I had contact with him from escorting him from the first floor to the second floor, I really, you know, did not -- to me, he was fine. You know, just escort him. We escort people all the time feeling weak. He was fine to me from the time I had escorted him from the first floor to the second floor.

Q. Did you say anything else to the deputy on the second floor about Mr. Schuck?

A. I don't remember anything else, sir, other than what I had -- I already told you.

Q. The cell that you put Mr. Schuck in, what kind of a cell was it?

A. It's a -- it's a holding cell for -- for inmates that are going through the processing for -- booking processing still. So they're probably waiting to -- I'm not -- I didn't look at his card. I don't know exactly what part of process he was in, waiting.

For on the second floor before he was actually sent up to housing.

But first and second floor at CJ is normally our processing station. From the time they get booked

in, fingerprinted, medically cleared, classified, that all happens on the first and second -- second floor mainly. And then they get sent up to housing.

I don't know what part of the processing he was in before they sent him out to court.

Q. What did you mean when you said you didn't check his "card"?

A. They have a -- when they get booked in, they have a card that kind of follows them around, to make sure all the checks -- they are fingerprinted; they are booked; they are seeing medical. It's kind of like a little checklist in the back.

I just know Mr. Schuck came from that holding cell, according to the notes I had in my office. And that's where we escorted him back up to.

Q. What notes did you have in your office?

A. It's pretty much a checklist of -- of people going off the facility, where they went, what courthouse they went. And so when they come back, we know where to send them back to, whether it's the second floor to the eighth floor.

Q. So, basically, where to put the inmates back after they come back from court?

A. Yeah, the roster, I guess, is what you call it.

Q. Does that roster have any other information

information. Is that correct?

A. Yeah, we -- also a common courtesy, you know, say, "Hey, this guy's coming from court" -- whether there was a -- hey, coming from court or not, that's what I do, yeah.

Q. Why is that a common courtesy?

A. For me? Just let them know. Just so they know, hey, I'm not just leaving an IP there for no apparent reason. You know, because I'm not working that floor. And say, "Hey, this guy came from court, this and that. He needs to see medical."

Q. What about, specifically, the information that the man needs to see medical? Did you feel like you sort of had a duty to deliver that information to the deputy that was on the floor?

A. What I remember, sir, that's part of my pass-down to him.

Q. And did you believe that, that Mr. Schuck needed to see medical?

A. Yeah, I wouldn't have said it, you know.

Q. And what did you mean when you said, "He needs to see medical"? Like, in your mind, what did you see happening after that?

A. You know, the guy was complaining about being thirsty. Again, I -- that's exactly what I meant, see

medical. I don't know if he had seen medical yet at that point. Again, I don't know what process -- part of the processing he was in, so...

Q. So in your experience as a detentions deputy, what does it mean to, quote, unquote, see medical at the Men's Central Jail?

A. It could be anything, sir. It could be explaining about a toothache, a -- a wound on their leg or finger, they need to see medical. "Hey, this guy needs to see medical." Because we don't -- we don't -- we don't, I guess, have medical down there on the first floor. We do on the outside now.

But, you know, so the second floor does have medical. If they needed anything that related to Band-Aids and being looked at, second floor would have had it.

Q. What medical facilities or services are available on the second floor, to your knowledge?

A. They go for a blood sugar check, blood pressure check. There's an X-ray on that floor. There's nurses available on that floor. They pass out meds, whether it's detox meds or whatnot or high blood pressure meds.

Q. Do you know whether nurses make regular rounds on that floor?

A. I don't exactly know what their schedule, sir.

10:42 I know they just -- they are there. They are there, available.
10:42 Q. Are there medical services available on the third floor of the Men's Central Jail?
10:42 A. Yes.
10:42 MR. INMAN: Objection. Calls for speculation.
10:42 BY MR. SCOTT:
10:42 Q. What do you know about that?
10:42 MS. SCHULER: Same objection.
10:42 THE WITNESS: Our medical clinic is on the third floor, yeah.
10:42 BY MR. SCOTT:
10:42 Q. And what's there, in your experience?
10:42 A. Pretty much the same as the second floor. You know, they -- there would be -- I don't know what their schedule is. It will be -- we'll have NPs or doctors probably available on that floor.
10:43 Q. What's an "NP"?
10:43 A. Nurse practitioner.
10:43 Q. Did Hayden Schuck say any words to you other than "I'm thirsty"?
10:43 A. No, sir. No. I don't remember anything other than that, you know. It was pretty -- again, like I said, he was -- when I saw he was sitting down against the wall, I asked him, "Hey."

A. Not -- at least not within the time frame of the March 22nd.
Q. Were you ever part of any process designed to determine how Mr. Schuck died?
A. No.
Q. To your knowledge, anyway.
A. No, sir.
Q. Other than this lawsuit?
A. No.
Can you repeat the question? I want to make sure I answer.
Q. Yeah.
To your knowledge, have you ever participated in any sort of a process designed to learn how Hayden Schuck died?
A. Oh, no.
Q. Other than this lawsuit, of course.
A. Yeah. No.
Q. Has it ever been suggested to you by anyone that you could have done anything better in your interactions with Mr. Schuck?
A. No, sir.
Q. Has a supervisor from the sheriff's department ever discussed with you your -- your actions or -- or any inactions that took place on March 15, 2022?

A. No.
Q. Can you ever remember a time where you have had a meeting with any supervisor at the sheriff's department to review any in-custody death?
A. No.
Q. Was Hayden Schuck's death the first in-custody death that you have personally experienced at the Men's Central Jail?
A. I wouldn't say so. I think there was -- there was one, but there's years before that. And -- I believe -- I was working on the fourth floor. That was it, yeah. If anything, it -- I was on the floor working where there was an in-custody death, and -- and that was it, you know. I haven't heard anything from those.
Q. You described being taken to the 10th floor and speaking to -- to Deputy Sheriff's Association lawyers or a lawyer at that time for that prior death?
A. Yes, it was the one -- I believe that was the one for the fourth floor, where -- I think just to -- for the purpose of, you know, making sure everything is -- the scene is quarantined. They just took us all off the floor and had us on standby to be talked to.
Q. What do you remember about how that incarcerated person died on the fourth floor, the manner of death?

10:51 you know, pertains to policy changes that need to be looked at and procedures, but, no, I wasn't any part of any -- of any investigation or anything for that -- that specific one.

10:51 Q. What do you mean when you're -- when you talk about changes to policy and procedures?

10:51 A. Just -- main what I remember is training, you know, making sure that when we're doing security checks, that we're -- we're doing them in accordance with policy. Checking the wrist band, get -- confirming the face to the wrist band, making sure everyone is good, nothing -- no one is injured, and not suffering from any type of medical distress. And doing the same thing with the walks through, after security checks throughout the day, sir. That's much embedded on us.

10:52 Q. What is comparing the face to the wrist band? What is that process?

10:52 A. That's mainly on your -- during the hard count. Just -- we're just doing -- when we're doing count once a day, confirming that the -- the incarcerated persons and where they're at, that's who they are.

10:52 Q. Earlier this morning, you were talking about a card that sort of follows the inmate in custody.

10:52 Do you remember that?

10:52 A. I do.

10:52 Q. And it had certain checklists on it?
10:52 A. That's correct, yes.
10:52 Q. And this card kind of helps make sure that the inmate has seen medical when they're supposed to see medical and is seeing a mental health provider when they're supposed to see a mental health provider and things of that sort. Is that right?
10:52 A. It depends what -- what's on the -- I haven't looked at the card in a while, sir. But there -- it is a checklist as they go through the process through booking.
10:53 Q. But are those the sorts of things that would appear on that card, what I just described?
10:53 A. Yes.
10:53 Q. Obviously, not every inmate would be scheduled to go to medical or a mental health provider, but certainly some are, right?
10:53 A. Yes, they're all screened through medical when they first go through booking.
10:53 Q. But I'm hearing you say that when an inmate is scheduled to see a mental health provider, then that fact will be reflected on this inmate card that you're talking about. Is that so?
10:53 A. No, sir, I did not say that. It's just a -- that card has a checklist. Specifically for mental

10:56 of when Mr. Schuck needed to say -- to see medical? Did
10:56 you say one way or the other?
10:56 A. No, I don't remember that.
10:56 Q. What was your expectation in terms of when
10:56 Mr. Schuck would see medical?
10:56 A. Nothing, really. Just I'm passing the word to
10:56 the -- to the deputy that was -- that was there with us.
10:56 And they were working that floor and, you know, let him
10:56 know that, "Hey, he's going to have to see medical."
10:57 Q. Did -- did you personally want Mr. Schuck to be
10:57 seen that day if it was in your control to do that?
10:57 A. Yeah, I -- he should have -- you know, he --
10:57 not "should have." But if I was working that floor
10:57 or -- then I would have, yeah, had him checked out, but
10:57 not right there and then. Just my assessment of him,
10:57 just escort him up to -- to me, he was fine, sir.
10:57 That's what I felt. He was fine. Nothing -- yeah.
10:57 Q. Do I -- I gather from that last answer that
10:57 during at least some portions of your ten or so years at
10:57 the Men's Central Jail, you have actually served as a
10:57 housing deputy. Is that true?
10:57 A. That's correct.
10:57 Q. And a housing deputy is somebody that would
10:58 actually monitor the housing floors and modules of those
10:58 floors of the Men's Central Jail and conduct Title 15

checks hourly and make sure inmates receive their food as scheduled and things like that. Is that also --
A. Yeah.
Q. And so in -- in your experience as a housing deputy, you have also received some training, I assume, on certain circumstances in which an inmate needs to be immediately taken to see medical, right?
A. Yes.
Q. And there are, in fact, some circumstances where, as a housing deputy, you look in and you see something in the cell that then prompts action on your part, specifically taking an inmate to go see a doctor or a nurse. Is that so?
A. That's correct.
Q. And you've actually gotten some specific training on what to look for in that regard. Is that true?
A. Or experience, yes. Some things to look at.
Q. And what are those things?
A. Just any signs of trauma, you know, as we're conducting our 11-53s. Signs of possible altercation inside a cell. Make sure inmates are in there and responding, you know. So when we're conducting the 11-53s.
Q. What are signs of trauma in the way that you

just described it?

A. Sometimes the inmates will -- the IPs will get in an altercation, you know. If I see someone with a -- which I didn't see before -- I noticed he's got a fresh black eye or something, I was like, "Hey." That would prompt me to pop the door open and take him out and question him more.

Q. If you see an inmate in what appears to be medical distress, you should take him to the medical clinic. Is that a true statement?

A. I would, yes.

Q. In fact, it's jail policy and procedure to do that. Isn't that so?

A. Yes, sir.

Q. Now, how can you tell as a deputy whether an inmate is in, quote, unquote, medical distress?

MR. INMAN: Object to the extent it calls for an expert opinion.

You can answer.

THE WITNESS: Again, signs of trauma that I physically see; nonresponsive, that's obviously a big one. Say, "Hey, what's going on here?" People are having seizures. Yeah, definitely immediate. I would call the -- if I can, put the IP on a wheelchair and bring them down to the -- to medical. That's what I do

right there and then, everything stops. Or if it's something I could call medical up to the floor and they will respond, so...

BY MR. SCOTT:

Q. Does a detention deputy have the ability to bring a nurse either to the inmate or bring an inmate to a nurse virtually any time the inmate seems to be in distress while they're at the San Diego County jail?

A. Yeah, definitely. That's -- that's the deputy's -- if that's what they see is necessary. Again, sir, it's either we bring the IP to the nursing staff or we call them over if we couldn't transfer -- move the IP to the nurse station.

Q. Now, I'm asking you what may be a different question.

I believe I heard you say before that if you were a housing deputy and had seen Mr. Schuck looking the way that he looked during the walk back from court, you would have reacted a certain way.

Can you -- can you tell us about that?

A. I didn't --

MR. INMAN: Object to the extent misstates testimony and incomplete hypothetical.

THE WITNESS: I don't believe I said that, sir. You know, the -- each individual is different, you know.

At the time when I had contact with Mr. Schuck, I didn't find it -- at the time I didn't think there was any type of medical emergency and I felt he was fine at the time I had contact with him. And that's why we did what we did. We just helped him get up to the second floor and offered him the water fountain where he said he was thirsty. And put him in that holding cell.

BY MR. SCOTT:

Q. Now, I think you -- you said that you wouldn't have told the deputy that that man needed to see medical unless you meant it, right?

A. Yes, yeah.

Q. Did you do anything to follow up to see if Mr. Schuck did, in fact, go see medical after that?

A. I did not, sir.

Q. Is there anything that you could have done as a deputy to follow up to see if he saw medical?

A. No, no. With the -- again, if -- after he was on the second floor, my permanent workstation was on the first floor. So my 11-53s were conducted on that floor. So I wouldn't have been -- I wouldn't have been doing the security checks on the first and the second floor.

Q. Okay.

MR. SCOTT: All right. Why don't we go off the record here for two minutes, and I'm going to see if I

policy and procedure that would have applied in March of 2022?

A. I do not, sir.

Q. Based on your own training and experience, do you know whether this particular policy has been revised or changed in any way since it existed here in October of 2020?

A. I do not.

Q. Have you ever received any training regarding this particular policy and procedure?

A. Yes, I have. There -- I just don't know if I have looked at the -- I'm trying to remember this, the current one.

Q. What training do you remember receiving on this particular policy and procedure -- and I'm looking here at Exhibit 21 -- Policy Number J7?

A. So it refer -- it's referring to an inmate that is mentally disabled. They're not -- at the time, sir, the -- again, I didn't notice he was -- anything that he would -- he would be mentally disabled or not able to speak for himself, so he was -- the short contact with him, he responded to my question. I did a quick assessment, made sure he was fine. That was it. Yeah.

Q. Okay. I'm hearing you say that -- that in your experience with Hayden Schuck, it didn't appear to you

11:08 that he qualified as a -- as a gravely mentally disabled person to which this policy would necessarily apply?
11:09 A. I didn't see that at all at that time, sir.
11:09 Q. Okay.
11:09 A. But...
11:09 Q. Well, and I accept your answer, and that's what I was hearing from you. I didn't -- I didn't want to put words in your mouth.
11:09 My question is a little bit different, though. I'm asking about this policy just more generally, kind of apart from the Hayden Schuck case just for a moment.
11:09 Can you tell us about any training that you have ever received on, you know, identifying a mentally disordered inmate or how to identify a gravely mentally disabled inmate as it's described in this policy here?
11:09 A. Other than what's laid out here, I never worked specifically as a PSU deputy or -- or a -- but we do experience a lot of this in the facility, and a lot of it is just through training. And noticing the signs of -- you know, if -- if an incarcerated person is not responding well to normal questions.
11:10 Q. And in that case, what do you do if an incarcerated person is not responding well to questions --
11:10 A. Then at that point, sir, we would refer them to

a mental health clinician to get a better assessment.

Q. Is that what you've been taught as a detentions deputy?

A. Yeah, that's -- yeah, that's how -- pretty much how we've been doing it since I've been working there. That's something that's not within the norms of an incarcerated person. We'll ask them for their professional opinion.

Q. Now, what kind of things do you have in mind when you're saying a person is not responding -- not responding well or not responding to regular questions such that you would want to do a mental health referral?

A. It's just if asked a question, for example, they're completely off the grid with their answers. You know, I could be talking about anything from fingerprinting and be talking about something else. That's all I meant by that.

Q. Okay. Okay.

Can you think of any specific training that you've received on when to refer an inmate for mental health evaluation? Or is this more in the spirit of on-the-job training?

A. Nothing specific off the top of my head or quoting any specific numbers or policy. But, yes, yeah, when it's something that's not within norm that's

possibly dealing with, we always refer to the clinicians making an assessment.

Q. If you see an inmate who seems to be having delusions or hallucinations, would you generally have that inmate evaluated by a mental health professional?

MR. INMAN: Objection. Incomplete hypothetical. Overbroad and vague.

THE WITNESS: If I did, I probably would.

BY MR. SCOTT:

Q. I mean, like if an inmate is telling you that they're Spider-Man, you know, and they're trying to climb the elevator wall, for example -- and I'm just giving you a couple of facts there -- but would that be the kind of thing that you have been taught should prompt a mental health referral?

MR. INMAN: Same objections.

THE WITNESS: Like I said, sir, if it was something within not norm for me, as far as being able -- being -- worked as an intake deputy, that I see could be leading towards something like this, then I would just -- I would go ahead and refer them.

BY MR. SCOTT:

Q. Well, why don't we -- why don't we take the Hayden Schuck example. You know, let's say that if he was in the elevator between the first floor and the

11:13 second floor and he started saying he was Spider-Man and tried to climb up the wall on you, what would you have been taught to do at that point as a detentions deputy?

11:13 A. Yeah, but none of that had happened, sir. Like I said, my short interaction with him was I wanted to make an assessment because he was sitting down. "Hey, why are you" -- he's thirsty. I said, "Well, let's go. We got to get you to your holding cell because there's water there."

11:13 Q. I'm hearing you say that he did not say that in your presence and I'm accepting your answer.

11:13 A. Yeah.

11:13 Q. I'm asking you a hypothetical question.

11:13 If Hayden Schuck had claimed to be Spider-Man and tried to climb the elevator wall, what would you have done in your training and your teachings as a detentions sheriff deputy?

11:14 A. He tried to --

11:14 MR. INMAN: Objection. Too much talking over each other.

11:14 Wait for him to finish and then I'm going to make my objection and then you can answer.

11:14 THE WITNESS: Sorry.

11:14 MR. INMAN: Sorry, Mr. Schuck [sic].

11:14 MR. SCOTT: I'll just ask the question again,

sir, and we'll let your attorney make the objection and then we'll let -- and then you can go ahead and answer.

BY MR. SCOTT:

Q. If you and Deputy Griffith observed Hayden Schuck claiming to be Spider-Man and trying to climb the wall of the elevator as you were taking him to the second floor, what does San Diego jail policy and procedure dictate that you do then, if that were the case, as a sheriff's deputy, if anything?

MR. INMAN: Objection. Vague. Overbroad. Incomplete hypothetical.

BY MR. SCOTT:

Q. You can answer, sir.

A. But he did not, sir. That's what I'm saying.

Q. I hear you. I'm asking you to assume for the sake of argument that he did hypothetically. What, if anything, would policy and procedure --

A. If he started --

Q. -- call upon you to do?

A. If he started climbing the wall, sir, for his own safety, I would have kept him on his legs and waist chains until he was seen by the mental health clinician.

Q. Would you have taken him immediately to a mental health clinician?

A. Again, for his own safety, if he started -- as

soon as I chain him he started climbing the walls, I probably would have done that right there and then.

Q. Is it -- have you been trained that inmates who are suffering from severe mental health problems can, in some circumstances, be a risk to themselves and others? And it's because of that risk that it's important for them to be seen by a mental health professional right away, if possible?

MR. INMAN: Objection. Vague. Overbroad. Object to the extent it calls for expert opinion.

BY MR. SCOTT:

Q. Is that how you've been taught?

A. Yes, we were -- we were told to look out for -- for individuals that could be a threat for -- to themselves. And it all depends with what they're doing at the time, what signs are shown, what is being said.

Q. But certainly claiming to be Spider-Man or hallucinations about things that aren't there might, in your experience as a deputy, be the kinds of things that would make you want to take them to see a mental health professional right away. Is that a true statement?

MR. INMAN: Objection. Incomplete hypothetical. Vague. Overbroad.

THE WITNESS: It all depends with the situation, sir. That's all I was saying. You know,

whatever I'm seeing right there, I react -- I would react to it. At the time, there was nothing out of the ordinary with Mr. Schuck that would have prompted me to -- that would do that.

BY MR. SCOTT:

Q. Okay. I'm showing you Exhibit 16M, like "Mary," and pushing "play".

MR. SCOTT: I guess it's buffering.

(Video is played; not reported)

(Exhibit 16M previously marked for identification.)

BY MR. SCOTT:

Q. All right. I'm starting with a still frame of Exhibit 16M, like "Mary."

Do you recognize the view that's depicted on the screen here?

A. It's -- it looks like it's -- that's court holding cell 5. And this is the second floor, where the old court holding cells were at before they got rid of the bridge.

Q. So, more generally, is this what appears to be a screenshot of surveillance video from the Men's Central Jail in San Diego?

A. Yes, sir.

Q. Maybe I'll just start -- let it play. It's now

11:53 and taken him up to medical myself. Like I said, I found no reason for Mr. Schuck to be unable to move on his own power or answer the questions that were being asked and everything was -- was okay at the time I had contact with him.

11:53 Q. Setting aside Mr. Schuck in March of 2022, all I want to ask you is a general principle. If you see an incarcerated person who is unable to walk under their own power, should you take that person to medical right away?

11:53 A. It depends what -- what -- what their problem is. If, you know, say, "Hey, I can't" -- "I can't walk because I'm on a wheelchair" when I've seen them walking just a couple of minutes ago. It depends what the situation is, sir. We made an assessment. If it's a -- I feel at that point, you know, it's a medical distress or if the individual is in medical distress, yeah, we take them up, yeah.

11:54 Q. Okay. What if you're not sure if the person is in medical distress or not? Are you taught to err on the side of going to medical if you're in doubt?

11:54 A. Yes.

11:54 Q. If in doubt, it makes you go to medical --

11:54 A. Yes.

11:54 Q. -- is that a true statement?

A. Yes.
Q. You're not a doctor or a nurse, right?
A. No. Exactly, no.
Q. So if it's a gray area, if it's borderline about whether the inmate is in medical distress, you err on the side of getting them to the medical clinic. Is that true?
A. Yes, sir.
Q. That's what you've been taught?
A. Yes.
Q. Is that what San Diego policy says?
A. That's -- that's what we have been taught and that's experience also, you know. I'm not a magician and know some -- I can't -- I can't weed through some of these.
Q. All right. Showing you now 16S, like "Sally."
Do you recognize this view?
A. Yes. This is the camera leading to the staff elevator, I believe.
(Exhibit 16S previously marked for identification.)
BY MR. SCOTT:
Q. Which floor?
A. First floor.
Q. Men's Central Jail?

additional or different about any interactions you had with Deputy Griffith specifically?

A. No, not specifically. No, sir.

Q. Okay. Showing you now Exhibit 4 from an earlier deposition. Exhibit 4 is entitled "San Diego County Sheriff's Department." It's an auditor report from the State of California, according to the seal at the top right corner. And the subtitle says, quote, "It has failed to adequately prevent and respond to the deaths of individuals in its custody," end quote, and it's dated February 2022.

(Exhibit 4 previously marked for identification.)

BY MR. SCOTT:

Q. I have now shown you just the first page in its entirety, the cover page that includes all that information.

To your knowledge, have you ever seen this document before?

A. I would not say I read through the entire thing, sir, but I believe it was -- it was emailed to us, if I'm not mistaken.

Q. Okay. Now, I'm going to just continue to go through page 2 and -- well, actually, let me do this: I'm going to stop at this letter. It appears to be a

cover letter dated February 3rd, addressed to the governor of the state of California and the president pro tem of the senate and so forth from the Acting California State Auditor Michael Tilden.

Do you see just what I'm putting on the screen?

A. Yeah.

Q. Do you ever remember seeing this letter before in the context of this auditor report?

A. I don't know if I read through the letter itself, but I know it was discussed and it was talked about us by -- during the briefing.

Q. What specifically was talked about during a briefing?

A. Just -- just overall to -- to -- from what I remember, that's in custody, you know, to kind of mitigate or to prevent -- for the incidents to reoccur, anything that we could do to -- in our power to -- to make sure that, you know, that is prevented.

Q. The incidents that you're talking about, are those in-custody deaths?

A. Yes, sir.

Q. So I'm hearing you say that you received some information at a briefing about in-custody deaths in the San Diego jail?

A. Yeah. During our morning briefs, you know,

they -- they send information out like this. And they'll briefly discuss it in -- in our briefings before we start our shift.

Q. Generally, do you ever remember the topic of the -- the numbers or the rates of in-custody deaths being a topic of discussion at those morning briefings ever?

A. No, I don't recall specific numbers, sir. I just know it was discussed with us.

Q. But I think my question was a little different.

Do you remember at morning briefings the issue of in-custody deaths? Or maybe more specifically the rates of in-custody deaths at the Men's Central Jail?

A. No, I don't remember anything about specific rates of deaths at central jail.

Q. What about just deaths generally as an issue?

A. We were -- were told we do have deaths in custody, and that's something that they are working -- or within our briefings, we're reminded to make sure that, you know, we're paying close attention with everything that we have to do. That the inmate's safety is paramount and, you know, that our job is part of it. Make sure everyone is safe, secure, and -- you know, safe.

Q. When do you remember first receiving a briefing

the ability to make an assessment if we think that that's something required, a medical emergency right there and then, that we -- we call for the paramedics to come in so the IP could be transported to the hospital.

Q. It appears that this report was made public in February of 2022. We've heard from other witnesses that it may have been shared with people from the County in 2021. And, in fact, the report is dated 2021.

Do you have a memory of when you first heard about this -- this state auditor's report about the San Diego jails?

A. Like I said, sir, exactly right about the time -- I'm not sure. I'm not sure. I know changes were being implemented along the way probably that -- that came about because of the report.

Q. Because of this specific report?

A. I'm not sure. Because of the report of the in-custody deaths, so...

Q. Do you remember any particular training resulting from -- from the California auditor's report?

MR. INMAN: Objection. Lacks foundation.

THE WITNESS: None specific, no.

BY MR. SCOTT:

Q. Do you know if any particular changes to policy and procedure resulted from the California auditor's

13:07 report?
13:07 A. None specific, sir, other than -- you know, no, I don't think I do.
13:07 Q. I want to show you -- actually, let me do this.
13:07 The second paragraph of this cover letter on the report says that from 2006 to 2020, 185 people died in San Diego County jails, one of the highest totals among counties in the state.
13:07 My question to you is: Did anyone from the sheriff's department ever share with you as a deputy this alleged fact that -- that the San Diego jails' death rates is one of the highest totals among counties in the state?
13:08 A. I've heard -- I don't remember exactly if it was briefed via email, but, yes, we've -- we've seen that -- I've seen that, I should say; not "we." I've seen that report, I don't remember exactly when, but there is -- there was that -- that -- that concern of -- of the in-custody deaths.
13:08 Q. And, specifically, the rate of those deaths compared to other counties in the state of California?
13:08 A. Yes, sir.
13:08 Q. Do you remember anything that the sheriff's department or any leadership at the County did that you were aware of in response to these findings about the --

13:32 mark on there until they're taken off. So specifically for the hands, no, sir.
13:32 Q. Do you remember Mr. Schuck having discolored wrists now that you sit here?
13:32 A. No, I can't tell you for certain that I remember that.
13:32 Q. Do you remember whether Mr. Schuck had any bed sores?
13:32 A. No.
13:32 Q. Do you know what bed sores are?
13:32 A. Yeah, for people that are laying around too long. It's mainly for old -- older people.
13:33 Q. Have you ever seen inmates with bed sores?
13:33 A. Yes. Yes, I have on the -- on our medical -- our medical floor.
13:33 Q. Have you received any training on what you're supposed to do as a deputy if you notice an inmate in general population who seems to have bed sores?
13:33 A. Not that I could recall. But, you know, any -- any wounds is not a good thing. So if I did see him with anything, sir, I probably would have taken him to medical for that, you know.
13:33 Q. Did you consider taking Mr. Schuck and putting him in his -- in that court holding cell on the second floor and taking him to medical?

A. I don't know if I -- I don't remember telling him. I don't know if he overheard key discussions.

Q. Okay. So other -- so -- so that's kind of one thing and let's set that to the side, whether or not you told the deputy that Hayden Schuck had died.

Setting that one to the side, is there anything else in Deputy Griffith's report that you personally disagree with?

A. That's what he saw, sir. That's what he had put on there. So, again, I'm just speaking from what I know and what I remember.

Q. Understood.

A. Yeah.

Q. And so my question more specifically is whether there's anything that is in conflict with your own personal experience.

A. I don't remember -- I think you mentioned earlier he said, Deputy Griffith, had told me that he needed to go see medical. I don't remember that. Maybe I just missed it.

Q. So to be clear --

A. A lot of things were discussed today, so I'm like -- I'm trying to think back. As of right now, there's nothing I can think of.

Q. Okay. Well, I think we're almost done, but

that really is the -- the question is: Is there anything, you know, document-wise that could be shown to you or is there anybody that, you know, you should have talked to or that we could have you talk to that would help you remember better what happened with Hayden Schuck?

A. Yeah, after -- really, after my contact with him at that March 15th, it really left my mind. Because we had people going in and out of there daily. And not up until the -- I got the subpoena stating that I need to come in as a witness that -- I didn't really think about this.

Q. All right. What I'm hearing is that your memory on this topic is as good as it's going to get. Is that fair?

A. Yes, sir.

Q. And I -- is it fair to say that we shouldn't expect your memory to get any better in the future on these topics?

A. I have told you everything that I could remember, sir.

Q. Okay. So that's a no?

A. Yeah.

Q. All right. Having seen everything you saw here today, is there anything that you would have done

REPORTER'S CERTIFICATION

I, Natalie M. Khamis, CSR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 11th day of June 2024.

Natalie M. Khamis

Natalie M. Khamis, CSR,
CSR No. 14260

# EXHIBIT 30

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 31

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 32

# (VIDEO MANUALLY LODGED WITH THE COURT)

EXHIBIT 33

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

DEPOSITION OF JESSICA RAMIREZ

SAN DIEGO, CALIFORNIA

MAY 8, 2024

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

VIDEO RECORDED DEPOSITION OF JESSICA RAMIREZ, commencing at the hour of 2:28 p.m., Wednesday, May 8, 2024, at 1350 Columbia Street, Suite 600, San Diego, California, 92101, before Kaylee G. Wood, Certified Shorthand Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of California.

APPEARANCES

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: MICHELLE C. ANGELES, ESQ.
TIMOTHY A. SCOTT, ESQ.
1350 COLUMBIA STREET, SUITE 600
SAN DIEGO, CA 92101
(619) 794-0451
TSCOTT@MCKENZIESCOTT.COM
MANGELES@MCKENZIESCOTT.COM

FOR THE DEFENDANTS, COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, AND CARINA ECHON, JENNIFER VIVONA, THOMAS MACE, AND JEFF AMADO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, ESQ.
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: SAUL LOPEZ, ESQ.
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
SLOPEZ@LDRLAW.COM

ALSO PRESENT:

DAVID KIM, VIDEOGRAPHER

Q. Okay. Please continue.

A. So we would have as classification -- they do their fingerprints, booking, photo all on the first floor. Second floor is second stage medical, strip, X-ray, and classification. And there are many holding cells on the second floor, and we would have IPs everywhere pending a COVID test or this one tested positive for COVID, this one's now what we would call an SPY [sic] which is suspected person under -- I don't remember what the I is.

MR. INMAN: Investigation?

THE WITNESS: Investigation. Thank you.

MR. SCOTT: Thank you, Mr. Inman, for the record.

A. And you can't mix any of them, so it was a mess.

Q. What do you mean when you say you can't mix any of them, it was a mess?

A. I can't put new bookings in with someone who just tested for COVID so now this entire cell that would normally hold 15 to 20 people is only holding one person. And then as for housing you would have a cell of -- at the time we had three bunks per cell. If one of the cellmates tested positive for COVID, now that cell is on quarantine. So I can't add anyone to that

A. Yes.
Q. Okay. And the answers that you give here this afternoon will sort of be in the context of how things were in March of 2022 unless you tell me otherwise. Is that fair?
A. Yes.
Q. Okay. So just please assume any question I'm asking you about procedures or systems are from that time period involving this case unless I specifically ask you otherwise, okay?
A. Yes.
Q. All right. So that was helpful in terms of what happens on the first floor. You were saying that on the second floor an inmate would experience some other things during processing into the jail to include second stage medical and then some other things. What were the other things besides second stage medical that happen on level two?
A. Strip-search.
Q. A strip-search?
A. X-ray, classification, and then there are the sobering and safety cells on the second floor.
Q. Okay. So when an arrested person or a detained person clears booking and goes to the second floor of the men's central jail, every -- every inmate

then contacts a mental health clinician which we named the gatekeeper, and that individual would come and evaluate the IP, incarcerated person, for whatever issue they were going through, and the mental health clinician decides whether or not they fit the inmate safety program.

Q. If an inmate does fit the inmate safety program, what does that look like? What would an inmate experience inside the ISP or the inmate safety program?

A. There's EOH --

Q. What's that?

A. -- which is enhanced observation housing where they're given a safety garment which is a no-tear gown, but they're placed in a cell. And then there's two checks every 30 minutes, so every 15 minutes there's a check, and they're allotted dayroom, shower, a little bit more normal. If the mental health clinician deems that they're above that, which would be high risk, then they would go into a safety cell which is a padded cell with a Turkish toilet in the floor.

Q. What's a Turkish toilet?

A. It's a hole with a grate in the floor for them to use the restroom. And they are in the safety cell for approximately two to four hours until the

02:57
02:57
02:58
02:58
02:58

mental health clinician comes and evaluates them again.
Q. All right. I'm hearing you describe two different kinds of housing or two different housing arrangements, different than sort of general mainline housing that are available for inmates that are suffering from mental health issues. Is that fair in terms of a broad statement so far?
A. Yes.
Q. And those two enhanced kind of housing, if that's okay to use that word, are EOH and safety cells, is that right?
A. Yes.
Q. EOH is enhanced observation housing?
A. Yes.
Q. And then safety cells are the padded cells with the Turkish toilet in the center that you just described, is that right?
A. Yes.
Q. Both of those kinds of housing, the EOH and the safety cell, are designed in part to provide more observation of inmates that are suffering from mental distress, is that right?
A. Yes, that is deemed from a mental health clinician.
Q. So a mental health clinician has to sort of

refer or recommend a patient to be placed in one of those two settings, is that right?
A. A nurse would refer to the mental health clinician, and then the mental health clinician evaluates, so --
Q. Who makes the ultimate decision about whether an inmate is placed in an EOH or a safety cell?
A. Mental health clinician.
Q. Does an inmate have to see a mental health clinician before they can be placed in one of those areas?
A. Yes.
Q. That was true in March of 2022?
A. Yes.
Q. What if a mental health provider isn't available but a nurse wants somebody assessed for the inmate safety program?
A. There is a 24-hour mental health clinician.
Q. What do you mean?
A. For the inmate safety program there has to be a mental health clinician working.
Q. Is there a mental health clinician on staff at all times at the men's central jail?
A. Yes.
Q. Or was that true in March of 2022?

A. Yes, I believe so.
Q. Now, does that mean that there was a psychiatrist or psychologist actually on premises 24 hours a day in March of 2022?
02:59 A. The mental health clinician and the psychiatrist are different.
Q. Okay.
A. The mental health clinicians do work the 24-hour, but the psychologist and the psychiatrist come
03:00 in during normal day shift hours.
Q. All right. Help us understand that distinction between the mental health clinicians and the psychiatrists. And I may be screwing that up, but can you describe that difference you just described?
03:00 A. Well, a doctor can prescribe medication. A mental health clinician cannot.
Q. Please correct me if I'm wrong. I'm just trying to see if I've got it. There are mental health clinicians on-site at the men's central jail 24 hours a
03:00 day?
A. Yes.
Q. At least in March of 2022, is that so?
A. Yes.
Q. But a mental health clinician is not
03:00 necessarily a psychiatrist who could prescribe drugs,

for example?
A. Yes.
Q. That's correct?
A. Yes.
03:00 Q. Is there always a psychiatrist or somebody that can prescribe drugs, using that definition, at the men's central jail during regular business hours, to your knowledge?
A. Yes.
03:01 Q. If an inmate is -- appears to be having some sort of a mental health crisis, to your knowledge, do deputies have the ability to get that inmate to one of these mental health providers or psychiatrists if it was during business hours right away if necessary?
03:01 A. Yes.
Q. How would that work, in your experience, if a deputy sees someone who seems to be struggling, what would be the process for getting somebody right away in front of a --
03:01 (Reporter clarification.)
Q. -- mental health provider?
MR. INMAN: Objection. Incomplete hypothetical. Overbroad.
A. Can you specify what incident this would be
03:02 in?

A. I believe it's in policy.
Q. In policy, you said?
A. Mm-hmm.
Q. Does that also have a basis in state statute, if you know?
03:07
A. No.
Q. You don't know one way or the other?
A. I don't know. Sorry. I do not know.
Q. Do you know what Title 15 safety checks are?
03:07 A. Yes.
Q. What is that?
A. An 1153?
Q. Yes.
A. So every 60 minutes inmates need to be checked.
03:07
Q. When you say that under an 1153 or analyst -- what is an 1153 or how -- how do you use that language?
A. An 1153 is the term to conduct a safety check of housing which is once in a 60-minute period.
03:08 Q. Is it your understanding that that 60-minute check is required by law?
A. Yes.
Q. Is it your understanding that those checks are designed in part for inmate safety?
03:08 A. Yes.

Q. Are there circumstances under which inmates are required to receive more frequent checks than 60 minutes?
A. Yes.
03:08 Q. What are those circumstances?
A. Sobering cell would be once every 30 minutes.
Q. Is it your understanding that the law requires inmates to be checked under Title 15 every 30 minutes if they're in a sober cell?
03:08 A. Yes.
Q. Was that true in March of 2022?
A. Yes.
Q. Where were the sobering cells in the men's central jail in March of 2022?
03:09 A. Second floor.
Q. Is that the floor where you worked sometimes?
A. Yes.
Q. How would an inmate find themselves placed in a sobering cell kind of through a regular second level
03:09 booking?
A. During the booking process on the first floor, the deputies would deem them under the influence for whatever symptoms, activity, behavior, their charges, and then they bring them up through the
03:09 elevator and place them in a sobering cell.

of the inmate elevator.
Q. What are those used for?
A. Holding cells.
Q. Were those used as holding cells in March of 2022?
A. Yes.
Q. Do you know why it was called the back 40?
A. No.
Q. Do you know if Hayden Schuck ever was housed -- and I don't mean housed in the kind of semipermanent sense, but do you know if Hayden Schuck ever stayed in what was known as the back 40 at the men's central jail?
A. Yes.
Q. Do you know how long he stayed there?
A. I do not.
Q. How do you know that Hayden Schuck stayed in the back 40 for some period?
A. Because I escorted him from that cell to the seventh floor.
Q. Was that on March 15, 2022?
A. I don't remember the date.
Q. Was it on whatever day you saw yourself on video?
A. Yes.

A. No.
Q. -- if an inmate was moved to medical?
A. No.
Q. Okay. When you got Hayden Schuck from the back 40, do you know why he was in the back 40?
A. I do not.
Q. Do you know if he was in a sobering cell at any time?
A. I believe he was, but I didn't place him in a sobering cell, so I don't know that for a fact.
Q. What makes you believe that he was in a sobering cell?
A. Memory. I believe that that's where he came from.
Q. I understood you to say that when you moved Mr. Schuck from the second floor back 40 -- or from the second floor to 7 David, you got him from a cell that was in what we're describing as the back 40, is that right?
A. Yes.
Q. Were the sobering cells in a different place than the back 40 though?
A. Yes.
Q. So how did you know that at some point -- or why do you believe that at some point Mr. Schuck was

somewhere other than the cell in the back 40 where you got him from?

A. Based on when we moved him and his behavior.

Q. What do you mean by that?

03:24 A. He was able to follow directions, but he was acting very childlike. When my partner told me we needed to move him upstairs he canoed to us.

Q. What do you mean?

A. As in like pretended he was canoeing while
03:25 sitting on the bench. So I believed he may still be under the influence. As for how long he was back there, I do not know. How long he was in the sobering cell, I do not know. What I briefly remember from this incident from over two years ago, I believe he came
03:25 from the sobering cell but we wanted to move him upstairs so that he wasn't just sitting in the cell.

Q. What I'm trying to figure out is how you heard or understood or believe that he had come from a sobering cell, because if I'm understanding you
03:26 correctly, it was your belief that prior to being in a cell in the back 40 he was in a different cell, like a designated sobering cell. Am I understanding that correctly?

A. Yes.

03:26 Q. So your belief was that at some period of

time he was in a designated sobering cell which would be in, like, a different part of the jail --

A. Of the -- of the --

Q. -- than the back 40?

03:26 A. Yes, on the second floor.

Q. When you got him from your cell -- or from his cell in the back 40, I just heard you say that you thought he might still be under the influence, is that right?

03:26 A. Possibly or if that was his norm. We weren't sure, but he had been down there, from what I was told, a couple days. And it was our Friday so we assumed we should move him upstairs. He was, I believe, placed on what we have in JPMU, the -- a list for mental health 03:27 clinicians whereas classification deputies, if something odd happened during classification interview I can place this individual on this list and then medical health clinicians look at it every day and then it will stay during my classification. For example, 03:27 not that I'm speaking about Schuck. I'm just giving an example.

Q. Right. No. Understood.

A. He licked the window and made a lot of comments about Satan and angels.

03:27 Q. Right.

A. I would like him evaluated. And then the mental health clinician will see that and wherever he went to housing, she will go schedule him and see him for housing because if we -- the amount of incarcerated persons that come through with odd behavior, there's not enough mental health clinicians in the county hired with the sheriff's department to see every single one every single time there's something odd. So we had made for classification a sheet specifically for us for when we're having issues with housing -- or classifying people to go directly to the QMHP.

Q. Was that a system that you and your colleagues came up with kind of independently or was that something that was sort of passed down from supervisors?

A. It was in place when I came to classification.

Q. And help me understand a little bit more in detail how that system worked.

A. It's an Excel spreadsheet, and then we place their information, their charges, their booking date and whatever pertinent information on why we believe they need to be seen and then the mental health clinician looks at it on their end.

Q. And what's the name of that Excel

spreadsheet?
A. QMHP sheet, I believe, at that time.
Q. QPMH [sic] sheet?
A. Qualified mental health provider.
03:29 Q. So there was a spreadsheet where a classification deputy could list inmates or detainees that you all wanted a mental health provider to take a look at?
A. Yes.
03:29 Q. And that was maintained, like, on a Microsoft Excel spreadsheet on a computer?
A. Yes.
Q. And where -- do you know where -- does that file save to, like, a central drive or, like, a cloud or do you know? 03:29
A. At the time?
Q. Yes, ma'am.
A. The San Diego Central sheriff folder for --
Q. Do you know whether the information on that Excel spreadsheet, the qualified mental health provider sheet, made its way into the JIMS system in any way? 03:30
A. No.
Q. You seem pretty sure about that.
A. Because during that time there was a lot of spreadsheets because of COVID, so classification had a 03:30

ton. We had the QMHP spreadsheet. I had my quarantine spreadsheet. There was nothing in JIMS at that time as a classification deputy that I could do to schedule anyone medically. That was our way of having that branch with medical.

03:30

Q. What do you mean, there was no way in JIMS to schedule that medically?

A. I'm not a medical professional so I have nothing to do with an inmate's medical information, nor can I schedule them. I can request it through a nurse, but I can't schedule them.

03:30

Q. Understood. Why couldn't you request a mental health evaluation through the JIMS system?

A. It's not available at that time.

03:30

Q. And just for the record what is the JIMS system generally? What purpose does it serve otherwise?

A. Jail inmate management system.

Q. Yes.

03:31

A. It's our -- there's a lot of abbreviations in here.

Q. There are.

A. There is the housing floor sheets, so that's available in there. You can see inmate's charges. The classification queue is in there. The classification

03:31

questions are in there. You could see court dates. You could see releases. You -- how far do you want me to go with this?

Q. So it's the -- JIMS stands for jail inmate management system?

A. Yes.

Q. And all of the different things you described are available within that software suite, is that right?

A. Within JIMS.

Q. And it sounds like there's a whole bunch of other information available in JIMS too?

A. Yes.

Q. Is JIMS supposed to be sort of the centralized management portal for you to do your job in terms of inmate information?

A. Yes.

Q. So why were there all these spreadsheets that you were describing on the site?

A. Because of COVID.

Q. Help us understand that link.

A. So JIMS had the basic floor sheets, but for COVID we had quarantine, the SPY, what type -- it was our way of managing since there was nothing available in JIMS because when JIMS was made we had never had

anything like COVID. And JIMS was well before my time, so I'm not really sure what year. But there was nothing in there to manage the population the way we needed it, and so we adapted and made spreadsheets and that's how classification organized what inmates were where, what cells were available, what housing units were quarantined, what housing units were now used as tuberculosis, booking times, booking dates.

Q. Okay. I'm going to try to put on the screen Exhibit 21.

(Whereupon, Exhibit 21, San Diego Sheriff's Department Policies and Procedures, was marked for identification.)

Q. Exhibit 21 seems to be a two-page document. Are you able to see it on the screen there in front of you?

A. Yes.

Q. Do you recognize Exhibit 21?

A. Do you -- like, have I seen it recently?

Q. Have you seen it ever?

A. No.

Q. I'll represent to you that Exhibit 21 was provided to us in discovery as one of the policies and procedures that the San Diego Sheriff's Department had at one time. It's my belief anyway that this was the

applicable policy for the subject matter in March of 2022. And so with that in mind, I'll ask you -- direct your attention to where it says Roman numeral number one, identification of mentally disordered inmates. Now, I respect that you just said you haven't seen this document before, but do you see where I'm referring to, kind of where I'm directing your attention?

A. Yes.

Q. Identification of mentally disordered inmates?

A. Mm-hmm.

Q. In describes a procedure where if an inmate appears to be a danger to themselves or others or if they appear gravely mentally disabled the inmate shall be removed from the mainline population. It goes on to say, gravely mentally disabled shall refer to any inmate who does not appear able to appropriately utilize the food, clothing, and/or shelter provided by the detention facility.

Did I read that correctly, first of all?

A. Yes.

Q. All right. Do you know whether or not that was the procedure and policy that was in place at the men's central jail in March of 2022, at least the portions I just read?

A. I believe so. This is for when we do our EPU runs which is the emergency psychiatric unit of San Diego County, so when they go to CMH, county mental health. We use the term gravely mentally disabled on the fill-out sheet to admit the inmate to CMH meaning that there's no reason for us to keep them longer in custody but we don't feel its safe to release them to the streets. So this is where this comes in and that's why we use that.

Q. I'm hearing you say that this procedure applies only to a PSU setting? Is that what you said?

A. No.

Q. Okay.

A. Okay.

Q. Forgive me. I'm probably messing it up so please straighten me out.

A. When I started it was called county mental health, the state hospital downtown on Rosecrans. Now I believe it's called -- I'm sorry.

THE WITNESS: What was the E?

Q. Mr. Inman is not under oath.

A. Sorry. Emergency psychiatric unit I believe is what EPU is. When an inmate, like I said, is being released from custody and we no longer have any lawful reason to detain them but we don't feel it is safe for

them to be on the streets, we will write a 5150 hold which is a gravely mentally disabled, drive them to county mental health, drop them off, stay during their intake process, and then they take over control of the inmate and admit them. And then we leave.

Q. So that's in a context of an inmate who is sort of done with their lawful stay at the county jail but seem to still be suffering mental health problems?

A. Yes, that we feel that if we were to place them on the street they would not be able to find food, clothing, or shelter.

Q. Okay. Does this policy apply in any way to an inmate who is still sort of lawfully in custody?

A. No, because it says, needing transportation to access mental health care.

Q. Okay. To your knowledge, are there any policies or procedures that apply to a situation where a deputy observes an inmate who seems to be having some sort of mental health crisis, who appears, quote, unquote, gravely mentally disabled?

MR. INMAN: Objection. Overbroad.

A. I need you to specify gravely mentally disabled because gravely mentally disabled for us, we have to be very specific on CMH on why we're bringing this individual to them. In the jail what are you --

come out for lunch for several days, every single day I would log, she did not come out for breakfast meal. I went to speak to her. She didn't want to get out of bed. She has not -- she hasn't been to the shower. Her hygiene is suffering. She's not intaking food in one or two days. Then a mental health clinician would come see them. It is not immediately like, you're deemed gravely disabled. Like, you have to display that you are gravely mentally disabled.

Q. Multiple events over a period of time? Is that the key?

A. Yes.

Q. And where does that requirement come from, to your knowledge?

A. From the psychiatrist telling us that.

Q. As a correctional deputy have you ever received any training about the risk that drug overdose may pose to inmates in custody?

A. Yes.

Q. Tell us about that.

A. Well, we have first aid training and a basic CPR training. I have taken the 11550 class which is symptoms of being under the influence of different types of drugs. Not everyone gets that. It's an after the academy class, but --

have an opportunity to look at the video that you were just referring to?

A. The video she had in front of me.

Q. Okay. She was showing it to you sort of in real time as you were being interviewed?

A. It was on a laptop on the table.

Q. Was it sort of still frame as you were starting your conversation?

A. Yes.

Q. Okay. Thank you for clarifying that. I'm going to move it forward to 7 minutes here.

Okay. I'm going to pause it 7 minutes and 30 seconds. I'm paraphrasing admittedly, but you just said to the homicide detective that -- words to the effect of not knowing if this was his norm and wanting to get him up to a floor, and admitting that -- I'm paraphrasing. Can you elaborate a little bit on your thought process as you were describing it to the detective?

A. Those face cards I explained to you --

Q. Yes.

A. -- will tell us how long someone's been on that floor. So that's where we discovered he had been on the floor a couple days, and when we went to move -- we found a bed for him. When we went to move him and

04:08
04:08
04:08
04:09
04:09

he was still -- well, I don't know, still. He was acting either under the influence or possibly this is his norm as in he has a mental disability. I don't know this individual before this day. I have never had any interactions with him. I don't know if he has any disabilities. We deal with that daily. So he was able to follow minor instructions. He cuffed up when we told him to. He was not angry or violent, and we escorted him upstairs.

Q. When -- you've used the term a couple times, this is his norm. What do you mean by that?

A. Well, there's mental health issues on the streets. That's all over the news. So you don't -- if you don't know an individual personally you don't know if they have -- like, is this his mental state? Does he possibly have a mental state of, for example, a 4-year-old? He was acting very childlike. I don't know. So we didn't want to keep him on the floor on a bench when we could possibly give him a bed.

Q. I'm hearing you say that you yourself made certain observations about Hayden Schuck based on what you witnessed of his behavior, is that right?

A. Yes.

Q. And what specifically about his behavior, if anything, caused you any concern?

A. Not concern, just possibly that it was more of a mental disability, not necessarily under the influence. He followed instructions, like I said. His skin tone was dry. He wasn't flush or anything out of the ordinary. He wasn't bleeding. He was breathing. Visually to me he looked fine except the fact that he had abnormal behavior of a -- I'm just going to keep explaining it, childlike. He pretended to be canoeing on the bench. He pretended that he was on the phone with his mom when I was like, come over here so we can cuff you up. And then he -- okay and hangs up with his mom on the phone, but it's like a hand phone.

And then he followed instructions, stood up, placed his hands behind his back, let him place handcuffs on him and we did that for his safety and ours based on I don't know him and he could be unpredictable. He could not. That's how we move inmates in the jail.

Q. Are inmates always handcuffed when they're moved between floors?

A. Not all. Generally if we deem them unpredictable, it's a safety. Let's control him and prevent any issues.

Q. Is the norm for inmates not to be handcuffed when moved between floors?

A. 7 David was overflow of medical issues, like for example, MRSA, if they needed to be -- whatever. Someone who didn't quite fit administrative segregation but wasn't getting along with other IPs in a module, it's an overflow unit, a temporary housing to find better housing.

Q. So 7 David was an overflow unit?

A. At the time.

Q. Overflow module?

A. Mm-hmm.

Q. And some of the purposes for this overflow module included borderline ad seg cases?

A. That's not what I said.

Q. Okay. How did you say it?

A. There could be ad seg inmates in there. Generally they were all single celled but it could be anything from someone who is on quarantine for a medical issue, someone who has crutches but isn't working out in the medical dorm. It's an overflow unit. It's a temporary housing for us to find another housing unit for you at that time.

Q. What about inmates that were being held in sobering cells like detoxing? Would any of them be held on 7D?

A. There's no sobering cell in housing.

Q. Okay. So at that time in March of 2022, 7 David was being used for mental health overflow, medical issue overflow, and ad seg overflow, all of those things?

04:13 A. Yes.

Q. Was it also being used for just regular housing for anybody?

A. No. Generally if someone was in there it's because there was a reason for them to be in there.

04:13 Q. Now, Title 15 requires deputies to go by and look in on an inmate every 60 minutes at least, right?

A. Yes.

Q. And more often sometimes if they're in some of the other kinds of cells that we already talked

04:14 about, right?

A. Yes.

Q. So when a correctional deputy in March of 2022 is up on the 7th floor and doing their Title 15 60-minute checks, is there a way for them to know

04:14 why a particular inmate that they're checking on is in 7 David at that particular time?

A. That would be the floor deputy's responsibility.

Q. And how is that -- how is that responsibility

04:14 carried out?

A. In JIMS you have your floor sheets of who's in what unit. Every floor is an Adam through Edward. So 7 Adam was protective custody. 7 Baker was protective custody. At that time I don't remember what 7 Charlie was. It changes frequently. 7 David was an ad seg unit, but based, again, on COVID all of our housing units were changing daily on what they were.

If one had low numbers and we were able to flip-flop it into something else, that's what it would be. Classification was extremely fluid during COVID, so I can't give you -- one day it could have been overflow and the next day it could have been COVID housing. This is years ago.

Q. So like, putting yourself in the shoes of a correctional deputy who's, you know, on the 7th floor and doing these 60-minute Title 15 checks, is there any way for that deputy as he's looking into a particular cell on 7 David to tell this particular inmate is here because of a mental health separation or this inmate is here for quarantine or this inmate is here as ad seg? Is there any way for them to tell?

A. By being familiar with their floor sheet.

Q. And how does the correctional deputy become familiar with the floor sheet?

A. The JIMS management system.

about that?
A. I do not.
Q. Did inmates at that time have any sort of bracelet or any sort of a visible coding that would allow a deputy just to see kind of at a glance why the inmate was in 7 David?
A. A wristband?
Q. Yeah, or something like that.
A. Inmates have wristbands. It is very common for them to take them off.
Q. Okay. Going back to March of 2022, did those wristbands -- would those wristbands have told a correctional deputy why an inmate was placed on 7 David?
A. No.
Q. Would there be anything other than the JIMS -- going into the JIMS system that would help a deputy understand why an inmate was on 7 David?
A. No.
Q. Don't [sic] inmates who are separated because of mental health issues required to have more frequent safety checks than other inmates?
A. If they are admitted into the psychiatric stabilization unit under Title 24 which is under a psychiatrist, yes. For the rest of the population, no.

A. As in policy? What rule are you stating?
Q. Well, I'm asking you. Was that policy and procedure in March of 2022?
A. Yes.
04:32 Q. When Mr. Schuck said that he was Spiderman and he was climbing the walls of the elevator, I think we had just agreed that you thought that either he was mentally disabled in some fashion or he was actively under the influence of drugs, is that right?
04:32 A. Possibly under the influence of lingering drugs, yes.
Q. He was maybe one of those two things?
A. Yes.
Q. If he was maybe under the influence of drugs, 04:32 why did you not choose to send him to medical at that point?
A. Because to me he was not in an emergency.
Q. What would in your mind constitute an emergency?
04:32 A. His skin tone was dry. He wasn't red or pale. He was breathing fine. He was speaking to me. He was following instructions. He wasn't bleeding. There was no obvious signs of trauma, which is the basic medical training that I have. He was following 04:33 directions. He, to me, didn't necessarily seem under

the influence of what the normal symptoms of drugs are, which is why I was -- the other option of this may be his norm of a mental disability and therefore we didn't want to keep punishing him to be downstairs without a bed if this is -- if he's actually someone who's mentally disabled. Why not get him a bed? Why not get him access to a shower, access to a dayroom, access to a phone? And then that we can place him on the list and he can be seen by the mental health clinician.

04:33 Q. You used the word punishing him. What did you mean by that?

A. That's the wrong word. I apologize.

Q. And I'm actually giving you a chance to explain. I don't want you to misspeak. What --

04:33 A. I didn't want him to be uncomfortable necessarily. The second floor is made for booking, classification, and on to housing. We don't want to keep people there longer than we need to.

Q. Why not?

04:34 A. It's uncomfortable.

Q. Why is it uncomfortable?

A. Because there's no -- it's not cell living. It's not meant to be -- it's holding cells. It's not meant to be --

04:34 Q. So there's no showers on those --

Q. Do you know if Hayden Schuck ever got a bedroll?
A. I don't, but his bedroll would have been given by the housing deputies.
04:35 Q. So is it fair to say that based on your experience and working on the second floor in March of 2022 that you're reasonably confident Hayden Schuck would not have had access to a mattress during his stay on the second floor?
04:35 A. Yes.
Q. And likewise, he would not have had access to a shower?
A. Yes.
Q. What would his day have been like during that
04:35 period of time? And let's assume he's not going back and forth to court for any reason. Let's assume he's just sort of waiting for housing. What does that look like for an inmate at that time?
A. Sitting in a holding cell.
04:36 Q. And what does a holding cell look like?
A. It's a square with benches and a bathroom in it.
Q. Benches and a bathroom?
A. Yes.
04:36 Q. Did you say that bathroom is behind kind of

like a half privacy wall?
A. Yes.
Q. And what are those benches like?
A. Metal.
04:36 Q. Do you know if inmates were given blankets while they were waiting on the second floor during that time?
A. No.
Q. How were inmates fed during that time?
04:36 A. From the cell door, from the housing deputies.
Q. And how would that work?
A. The floor deputies would roll the --
(Reporter clarification.)
04:36 A. -- chow cart to each cell and hand out pack lunches.
Q. What are in those pack lunches?
A. A sandwich, a cookie, a milk, and an apple.
Q. How many times a day does that happen?
04:37 A. Three.
Q. Is there a system to keep track of whether the inmate consumes the sandwich and the apple and the cookie?
A. No.
04:37 Q. Do you know why not?

A. No.
Q. What's your understanding of how long Mr. Schuck was on the second floor before he was moved up to 7 David?
04:37 A. A couple days.
Q. What is a couple in your mind?
A. I'm not sure the exact time frame.
Q. The camera here suggests that it was March 15th that he was moved to 7 David. Does that comport
04:37 with your memory?
A. That's what the camera says. My memory, no.
Q. Okay. Do you remember though that at the time Mr. Schuck was being moved to the seventh floor he had been on the second floor for some period of time?
04:38 A. Yes.
Q. A period of time that seemed longer than you wanted it to be? Is that a fair statement?
A. Yes.
Q. And why is that or have we already discussed
04:38 that?
A. When we brief, like I explained to you, we have face cards and it will say, like, how long an individual has been waiting for housing, and during COVID -- the time frames changed. So at this point I'm
04:38 going to say five days. I don't know if that's the

that decision?
A. Yes.
Q. So at some point you and Deputy Page agreed on this course of action of moving Mr. Schuck from the 2nd floor to the 7th floor?
A. Yes.
Q. What were your other options at that point in terms of what to do with Mr. Schuck on your Friday?
A. I did not have any other options that I could see.
Q. What about referring him to the 3rd floor for medical treatment, for example?
A. You can request for him to be scheduled for medical.
Q. Do you know whether that had happened for Mr. Schuck?
A. Medical or mental health clinician?
Q. Either one.
A. He was put on the QMHP list.
Q. Do you know when he was put on that list?
A. That evening.
Q. The evening of the 15th?
A. Yes.
Q. Did you put him on that list?
A. No.

Q. Who put him on that list?
A. I believe Deputy Page.
Q. Was it as a result of what you had witnessed?
A. Yes.
Q. Prior to that do you know whether Mr. Schuck was on that medical provider list?
MR. INMAN: Objection. Calls for speculation.
Q. Or mental health provider list?
A. No.
MR. INMAN: Objection. Calls for speculation.
Q. Was it among your responsibilities to check that spreadsheet each day to see if people including Mr. Schuck were on it from the second floor?
A. It's not responsibilities. It's -- if someone was classified you will have that Classifications deputy ARJIS and say, like, this person's good to go. So if Schuck had already been classified we wouldn't have needed to check that list because it would have been taken care of by another classification deputy.
Q. This mental health provider spreadsheet I think we agreed before was sort of to the side of the JIMS system, is that right?

A. Yes.
Q. Is it correct that a deputy would be unable to access this spreadsheet that you're talking about through the regular JIMS system?
04:42 A. I believe it was classification deputies and the mental health clinicians that had access along with the professional staff of the mental health clinicians. But for who had direct access to it, I do not know.
Q. What about sort of the boots on the ground,
04:42 for lack of a better phrase, the correctional deputies that would be doing regular Title 15 checks?
A. I don't control access to the folders in the SDCJ share drive, so I have no idea who could have access.
04:43 Q. Do you have any reason to think that as a matter of course correctional deputies were trained to go in and look at those spreadsheets before starting their shift each day?
A. No.
04:43 Q. That wasn't standard operating procedure, to the best of your knowledge?
A. Yes.
Q. To the best of your knowledge, was there a system for the deputies who were responsible for safety
04:43 checks to know if an inmate was on that spreadsheet

waiting to see a mental health provider?
A. I don't understand the question.
Q. So putting yourself in the shoes of a correctional deputy who is looking in on Mr. Schuck -- and this could be either on the second floor while he was there or up on the 7th floor while he was there -- a correctional deputy doing a 60-minute Title 15 cell check, is there any way for them to know whether that person that they're checking on, Mr. Schuck, is on that spreadsheet waiting to see a mental health provider?
A. No.
Q. Wouldn't it be useful information for a deputy to know that the person they're checking on is waiting to see a mental health provider?
A. Sure.
Q. And why would that be?
A. To give them knowledge, like you said.
Q. Was there any system in place at the time for correctional deputies to receive sort of passed-down briefing on an inmate like Hayden Schuck who was experiencing mental health difficulties?
A. Yes.
Q. And what was that system?
A. The team briefing.
Q. What is the team briefing?

A. So day shift and night shift brief on their floor and what events occurred that day and if there's anyone that would stand out, if anything different happened, it's all verbal. It's a brief.
04:45 Q. So it's an oral system?
A. Yes.
Q. Is that oral briefing system written down anywhere, the fact that it is an oral system and how to do the oral system?
04:45 A. No.
Q. Did you ever receive any training on how to do that oral briefing system?
A. From watching other deputies.
Q. Did you receive any formal training that had
04:45 materials in it?
MR. INMAN: Objection. Vague.
A. You're trained to accept the brief from your partner before you leave, so that's the training.
Q. When you say accept the brief, what does that
04:45 mean to accept the brief?
A. To get a brief of what you're relieving.
Q. Basically to listen to what the prior deputy says?
A. Yes.
04:45 Q. And give us an example of what that briefing

might sound like from a previous deputy.
A. Okay. So for example, you want a line deputy's perspective?
Q. Yes, please.
A. Okay. So for Colinas if I was working in a similar unit, let's -- an administrative segregation unit, there would be who came out for showers, who hasn't had a shower, who maybe had a breakdown today, who's having off behavior, mental health clinician came and saw this person, just what happened during your day. If you had to rule violation report anybody, if there was any inmate status reports written, so-and-so flooded her cell, that would be something that would be documented. FYI, partner, her water's off, she flooded, there's an inmate status report about it.
Q. Now, when you say documented, do you mean creating a written document?
A. Yes. For turning off water you have to have an inmate status report.
Q. Okay. What about all of the other stuff that you were just talking about?
A. No. Those are just day-to-day daily operations of the jail.
Q. Are you aware of any reason that this briefing system is not put in writing?

A. On why it's not?
Q. Yeah.
A. I -- no.
Q. So on March 15th you had seen Mr. Schuck claiming to be Spiderman and canoeing and talking on an imaginary phone, right?
A. Yes.
Q. Did you then orally brief anybody on the behavior that you'd seen before the next shift?
A. It's common for me to let the deputies know what we're bringing them. As for who exactly I would have spoken to or Deputy Page would have, I can't tell you that. I don't remember. But we would have briefed the floor deputies, we're bringing you this one because of whatever, he's scheduled for mental health clinician. That's generally how I would run myself during classification.
Q. Okay. Let me ask a little bit more specifically about Hayden Schuck. Do you recall briefing anybody else on his behavior about claiming to be Spiderman?
A. I cannot give you a definitive yes on that. So no.
Q. Do you know whether you told anybody that Mr. Schuck was pretending to row a canoe?

A. No.
Q. Do you know if you told anybody that Mr. Schuck was pretending to talk on an imaginary phone?
04:48 A. No.
Q. Do you know whether you told anybody that you thought Mr. Schuck might be mentally disabled or might possibly be under the influence of drugs aside from Deputy Page?
04:49 A. We would have briefed those floor deputies on what we were bringing, but as for what verbatim was said I can't remember.
Q. Do you have a specific memory of having a conversation with anybody, any particular deputy in
04:49 this kind of a pass-down?
A. No.
Q. Do you know who was your successor or who relieved you on duty?
A. For classification?
04:49 Q. Yeah. Like, do you know who took the next shift?
A. I can't remember what deputies were working then.
Q. Okay. I'm showing 16G.
04:50 (Whereupon, Exhibit 16G, Video, was marked

A. Yes.
Q. All right. So what do you remember about him and needing to urinate?
A. Just had to pee.
04:52 Q. What do you remember happening?
A. He wanted to pee right there.
Q. How did he express that to you?
A. He started moving his pants down.
Q. In what way?
04:53 A. Moving his hips back and forth so they'd fall off.
Q. Was he saying anything?
A. I have to pee.
Q. I think we established that he was handcuffed. Do you recall if his hand -- if he was handcuffed in front or behind?
04:53
A. Behind.
Q. What do you mean when you say wiggling his pants off?
04:53 A. Moving his hips back and forth, side to side.
Q. And that was sufficient to make his pants fall off?
A. Yes. Jail clothing is not tight.
Q. Okay. And what happened after that?
04:53 A. Then he dropped his weight and went to the

floor and said he was going to pee right there. And Deputy Page and I told him no, no, no, no. We're going to get you to your cell. Just hold it. Just hold it. Stand up. We'll get you to your bathroom. And then we
04:54 got him to his feet. He stood up on his own, and we walked him into the module.

Q. Okay. And then what happened next?

A. And then as we're getting to the cell he wiggled his hips again and his pants started to fall,
04:54 and approximately 3-ish feet to the cell he starts peeing into the cell.

Q. Like, a stream of urine was going into the cell from outside of the cell?

A. Yes.

04:54 Q. Was he -- and I'm sorry to be so explicit, but was he, like, holding his penis while he was urinating --

(Reporter clarification.)

Q. You got to give me a beat.

04:54 A. Sorry.

Q. The question was, while, as you say, Mr. Schuck was urinating from outside of his cell to inside of his cell, was he holding his penis to do that or were his hands still handcuffed behind him?

04:55 A. He was still handcuffed and we were uncuffing

him.
Q. You were in the process of uncuffing him?
A. Yes.
Q. When his pants fell down because he was wiggling his hips?
A. Yes.
Q. And then did he start peeing, like, as soon as the pants fell down or before they fell down or do you recall?
A. It's as we're walking up to the cell his penis is exposed. However, I didn't see it, and I start seeing urine. And I was like, wait a second, wait a second. His pants then, I believe, fall to his ankles as we're trying to uncuff him and then we're like, okay, okay, go. Then he takes a step inside and then goes to the bathroom and starts peeing.
Q. Do you remember if he kind of finished peeing where he had started peeing?
A. No. He was continuing to pee as we shut the door.
Q. So he was -- and I take it he was not peeing in the toilet?
A. I don't remember.
Q. Well, the toilet is kind of towards the back of the cell, isn't it?

A. He stepped into the cell and was peeing. So whether or not he was making it into the toilet or not, I don't know. I didn't keep watching.
Q. Is it fair to say that at least when he started urinating he was just kind of urinating on the floor of his cell?
A. Yes.
Q. And again, I'll ask, were you able to tell if he got any urine on his clothes or not before he was able to get his hands uncuffed?
A. I do not know.
Q. You don't know one way or the other?
A. No.
Q. So what did you guys do then, you and Deputy Page?
A. We secured the cell and left the floor.
Q. Did you go back to try to clean up the urine or get somebody else to clean up the urine?
A. No.
Q. Why not?
A. The housing deputies were there I believe, and that's when we generally -- I don't know exactly who we spoke to and I can't give you what deputy -- I don't even know what deputy that is. It's not common practice for classification to escort one individual.

We generally send up a group of individuals. So if we're bringing one person, it's generally because this person needs to go to a specialized separated unit.

Q. Okay.

A. So they would have been like, why did you bring me this guy? Okay, well, hey, he's been downstairs, we put him on the QMHP list, and he needs a bedroll. And then we would have exited -- that would have been our brief. Like, this is what we brought you. This is what he needs. We're leaving.

Q. But you don't know if that happened?

A. It happened. I just don't know to who.

Q. How do you know it happened?

A. Because I don't leave a floor without briefing a deputy.

Q. But to be fair do you have a specific memory of the conversation?

A. No.

Q. Nor of who it was to?

A. No.

Q. Or specifically what you said?

A. Specifically, no.

Q. Do you recall whether you passed on the fact that Mr. Schuck had urinated on the floor of his cell?

A. The deputies were standing right there when

we were uncuffing him.
Q. Do I understand that to mean that you assumed that they saw what you saw?
A. Yes.
04:58 Q. And what was your assumption of what they were going to do about it?
A. I don't know.
Q. I mean, is it okay to allow an inmate to just have urine on the floor of their cell like that without
04:58 anybody cleaning it up?
A. I mean, Schuck could have cleaned it up.
Q. I remember you saying before that you thought that it was possible that Mr. Schuck was developmentally disabled or it was possible that he was
04:59 under the influence of some sort of drug, right?
A. Mm-hmm, mm-hmm.
Q. Did either of those two possibilities give you any concerns about whether he was able to, you know, clean up after his own bodily functions?
04:59 A. No.
Q. Why not?
A. Didn't cross my mind.
Q. Did it occur to you that his behavior might suggest that he might not be able to take care of
04:59 himself?

A. At that time we weren't sure.
Q. You thought it was possible he might not be able to take care of himself?
A. I don't know.
04:59 Q. Or you didn't know at that time?
A. Right.
Q. And so you sort of closed the door and then left your shift not knowing one way or the other?
A. Yes.
05:00 Q. Okay. I'm going to go to -- oh, I'm sorry. I don't think we -- we weren't quite done with 16G. I'm fast-forwarding to 40 -- 39 seconds here. All right. All right. I'm pausing it at minute and four seconds. Mr. Schuck went from walking to now where
05:00 he's on the ground. Do you agree with that?
A. Yes.
Q. Is a segment that we just watched, does that include the portion where you testified he said he needs to pee right now?
05:01 A. Yes.
Q. Do you remember if he -- strike that question.
I'm playing the video at one minute and eight seconds. What's happening now?
05:01 A. He's saying he has to pee.

Q. It appeared to me that Mr. Schuck was starting to lean back and that Deputy Page put his hand on Mr. Schuck's shoulder as if to keep him from falling backwards, but I want to ask you if you saw the same thing, so I'll back up to 54 seconds. Okay. Pausing at a minute and 12 seconds, do you have a memory, an independent memory of we just watched on the screen?
A. Spiderman.
Q. What do you mean?
A. He thinks he's Spiderman.
Q. How do you know he thinks he's Spiderman?
A. His right leg is up on the railing like I told you before.
Q. As you were interacting with Mr. Schuck right then while he was claiming to be Spiderman, do you know whether he was already on a spreadsheet waiting to see a mental health clinician?
MR. INMAN: Objection. Calls for speculation.
A. I don't.
Q. And so I -- that's really the question. Did you know at that time while you were escorting him whether he was on the spreadsheet or not?
A. No. It would have been after.
Q. So similar question: Did you, like, sort of

Those are the ones that strip him. As for classification we're the last stage in it which is housing.

Q. How does a floor deputy know if an inmate is experiencing withdrawal from drugs, for example?

A. I don't -- visually, they ask them, medical.

Q. Can inmates withdrawling from drugs be a serious medical issue?

A. Yes.

MR. INMAN: Objection. Vague.

A. Yes.

Q. Why so?

MR. INMAN: Object to the extent it calls for an expert conclusion -- expert opinion.

Q. In your knowledge as a deputy?

A. It depends on what they're withdrawling from.

Q. How so?

(Reporter clarification.)

A. Give me something that they would withdrawl from.

Q. Well, my original question was, can withdrawling from drugs be a serious medical issue? And I think your answer was yes?

A. Yes.

Q. So my follow-up question is, under what

circumstances might that be true?
A. Well, I'm not a medical professional.
Q. Understood.
A. But the basic knowledge I have of the CPR and first aid training we go through, dehydration would be number one factor.
Q. Why is dehydration a number one factor or a risk factor I guess in a withdrawal scenario?
MR. INMAN: Object to the extent it calls for an expert opinion.
Q. To your knowledge.
A. In my experience when you're withdrawling you are vomiting and having a lot of diarrhea, therefore difficult to keep fluids inside, therefore easy to become dehydrated quickly.
Q. Is it important for an inmate who's suffering withdrawal of the kind you just described -- vomiting, diarrhea, so forth -- to be under some sort of medical supervision if possible?
MR. INMAN: Objection to the extent it calls for expert opinion.
A. At that time?
Q. Yes.
A. No.
Q. Why do you say at that time no?

A. There were no protocols for withdrawling at that time.
Q. What do you mean?
A. An inmate would let medical know that they were withdrawling from medication. They would schedule them for RN sick call and they would be checked in on by a nurse but they would still go to housing and then --
Q. Is it --
A. And then they would what we, quote, unquote, kick it on their own.
Q. Kick drugs on their own?
A. Yes.
Q. Has that changed?
A. Yes.
Q. When did that change?
A. I don't have the exact date.
Q. Was it after Hayden Schuck's death?
A. No, not immediately.
Q. So had this policy ever changed prior to Hayden Schuck's death?
A. No.
Q. Okay. So the policy did change after Hayden Schuck's death, just not right away?
A. The department has implemented the MAT

program, which I don't know the -- I can't remember the exact meaning for MAT, but it's those who are on opiates. So they will go -- all of those will go into a certain unit and be observed.

05:16 Q. Observed by whom?

A. Nursing staff and a specific deputy.

Q. Is that observation available 24 hours a day?

A. I believe so. I'm not part of the MAT program, so I don't know.

05:17 Q. So prior to the MAT program in March of 2022, what was the policy and procedure for an inmate who was suffering from drug withdrawals?

A. They were scheduled for RN sick call.

Q. Anything else?

05:17 A. Nope.

Q. What if an inmate who is suffering from withdrawals was being housed on the second floor pending housing in a housing unit? How would they then receive a sick call from an RN for withdrawal symptoms?

05:17 A. So you'd have to ask medical on that, but medical runs a list and they have those that are scheduled for withdrawal. And then they go to all the different floors and find those specific incarcerated persons and they evaluate them.

05:18 Q. So the medical unit has a list of people that

they understand to be suffering from withdrawal?
A. Yes.
Q. And then medical goes around and sort of treats them each day?
A. Yes, roving sick call nurse.
Q. And I know you're not administering the care, but just from your observations and your own training and working there, what's your understanding generally of what the nurses do during this roving sick call for inmates suffering from withdrawal?
A. Vitals, evaluation. If there's a medication needed, not -- I don't know specifically what medications are given out, but --
Q. In March of 2022 how did an inmate get themselves on that withdrawal list so that an RN would come check on them?
A. During their medical screen.
Q. And how would that occur?
A. We're not -- we don't stand by and ask -- and sit there and listen to what they speak to the nurse. So it would be -- they would express to the nurse -- I mean, I'm speculating at this point. They would express to the nurse, I'm kicking heroin, I use it so many days, whatever, how many times a day. And then that's -- now you're going to need to ask a nurse what

their protocol is on that.
Q. Fair enough. So I'm hearing you say that in the booking process if an inmate self-reports that they anticipate withdrawling a nurse at that point will get them on this withdrawal RN sick call list, is that right?
A. Yes.
Q. And I keep saying RN. That's registered nurse, is that right?
05:19 A. Yes.
Q. Okay. What happens if that inmate doesn't share with the RN at booking that -- or the intake nurse at booking that they anticipate withdrawals?
MR. INMAN: Objection. Lacks foundation.
05:20 Calls for speculation. Sorry.
Q. Let's say they keep it to themselves or let's say they just don't know that they're going to suffer withdrawals and they start suffering withdrawals later. Is there any way that that inmate ends up on that RN
05:20 roving sick call sheet?
MR. INMAN: Same objection.
Q. If you know.
A. They -- we have medical requests. They fill that out. They put their chief complaint, and then
05:20 they stick it in the medical box, and the only person

who can take those out is a nurse.
Q. In March of 2022 if an inmate was in the back 40 on level two pending housing, would they be able to do a sick call?
A. No.
Q. Why not?
A. Because they don't have access to it.
Q. So then if an inmate is in the back 40 and they start suffering withdrawals, how do they get on the withdrawal list?
MR. INMAN: Objection. Lacks foundation. Calls for speculation.
A. They could bring -- they could request it.
Q. Well, but I thought you said they don't have access to sick call?
A. They could verbally tell a deputy.
Q. So they would need to orally say to a deputy, I'd like to be on the medical withdrawal list?
A. Yes.
Q. What if they don't know that there's a medical withdrawal list?
A. I don't know.
Q. Are you aware of any other ways other than what we just talked about that an inmate who was in the back 40 withdrawling from something could get on the

withdrawal RN roving sick call list?
MR. INMAN: Objection. Lacks foundation. Calls for speculation.
A. No.
05:21 Q. And was that true for the duration of your time at men's central jail on the second floor while you worked there?
A. Yes. The holding cells don't have anything that housing has, which is, for example, forms,
05:22 grievances, inmate stationary, medical requests. Those items are on housing floors.
Q. Do you know what bed sores are?
A. Yes.
Q. Have you ever seen bed sores on inmates,
05:22 like, during your job?
A. Who have come into custody, yes.
Q. Do you know what bed sores look like?
A. Yes.
Q. Did you see whether Hayden Schuck had any bed
05:22 sores on March 15th?
A. I did not strip --
MR. INMAN: Calls for speculation.
I need to speak. Just wait before you answer, okay?
05:22 A. No.

professional if you had decided that it was serious enough to do that?

A. He was not displaying signs of self-harm or wanting to hurt others and was not violent. That would require an immediate, like, QMHP.

Q. But let's say hypothetically he was. Let's say -- and I understand that you're saying that it wasn't like that, but let's say that it was hypothetically. Could you have taken him right then and there to go see a mental health provider under those circumstances?

A. That changes things. If you're telling me hypothetically that he's now all of a sudden self-harming --

Q. Right.

A. -- that's different.

Q. So that's the question. Under those circumstances would you have been able to get him immediate psychiatric care?

A. The mental health clinician, the evaluation for the ISP program.

Q. Like, right then within the hour?

A. Yes.

Q. And would that have been you taking him to a different floor or would -- or would the mental health

provider have come to him on the 7th floor under that hypothetical situation?

A. You call for the QMHP, and you either -- it -- where they're at. If they ask you to bring them to them or they'll come to you. It's different based on whatever incident you're in. It's different for each situation.

Q. Okay. Hypothetically you could have called a mental health provider to come evaluate Hayden Schuck on March 15th before you ended your shift, is that true?

A. Hypothetically if he was saying that he was in -- wanting to self-harm or harm others, which he did not say, yes, then it would have been a call to the QMHP. But he did not.

Q. Hypothetically could you have also chosen to take him directly to a medical care provider if he was saying something like that that alarmed you?

A. I mean, we could hypothetical all day. So yes, he could have seen a QMHP if he was displaying signs of self-harm or wanting to harm himself.

Q. Okay. Did anyone from the sheriff's department ever review these videos with you that we've seen here today other than the homicide detective?

A. No.

Q. Are you aware of any training or any teaching that was done at the sheriff's department as a result of Hayden Schuck's death?
A. No.
05:28 Q. Did you learn at some point that Hayden Schuck died the day after your interaction with him?
A. Yes.
Q. When did you learn that?
A. I don't remember. I don't remember if I read
05:28 it on the morning reports or if I was working overtime the next day. I don't remember. We had a lot of overtime during COVID.
Q. What do you remember about learning about his death?
05:29 A. Just that he died.
Q. How did you hear that?
A. I don't remember.
Q. What did you do after learning that Hayden Schuck had died?
05:29 A. Nothing.
Q. Did you think back to the interactions that you had had with him on March 15th when you learned that he died?
A. No.
05:29 Q. Have you ever spent any time kind of mentally

reviewing or thinking about the decisions that you made on March 15th with Hayden Schuck?

A. Before today, yes. Like, as in the day of today, yes. But no, I don't feel like I did anything wrong.

05:29

Q. Okay. And what did you mean when you said before today?

A. Like, as in the date of your deposition is now today and it will be at 15 -- 13 whatever Columbia, yes, on my drive here I'm trying to recollect what happened. And that's it.

05:30

Q. Okay.

A. Otherwise I don't really think about this event.

05:30

Q. Okay. I just want to make sure I'm getting it right. On the drive to the deposition here this afternoon you were giving some thought to the Hayden Schuck case and the fact you were going to be deposed, what you were going to say, I suppose?

05:30

A. Yes.

Q. And I don't want to know where you live or anything like that, but it's, like, a 30-minute drive to my office from where you live at?

A. I work at the COC, so from here to there.

05:30

Q. How far is the COC from here?

A. Like, 20 minutes.

Q. Okay. So you spent 20 minutes thinking about Hayden Schuck's death as you're driving to this deposition this very afternoon. We agree on that?

05:30 A. Yes.

Q. Have you spent any time thinking about the decisions you made or whether you could have done something differently prior to today?

A. No.

05:30 Q. And nobody from the county has ever spent any time with you reviewing those decisions or suggesting maybe there might have been other ways to handle that situation?

A. No.

05:31 Q. And I recognize and appreciate that hindsight, you know, is 20/20. But with that understood, do you feel like you should have done anything different as you sit here today?

A. No.

05:31 Q. Do you feel like there's any lessons to be learned from Hayden Schuck's death?

MR. INMAN: Objection. Vague. Overbroad.

A. I mean, I'm sad that he passed away, but at the end of the day I'm not a doctor so I don't know why

05:31 he passed away. To this day I don't know. I don't

know what occurred. I don't know what happened. It's -- I've been on this department since 2011. I've seen a lot of death. So I've seen a lot of things. You don't think much about things. Otherwise they consume you.

Q. When you say you've seen a lot of death, I assume you mean at the jail?

A. Well, just in this department or vaguely. Like, this job is not easy, so anywhere. Your partners get killed all the time. This job hardens you a little, so I can't be soft after every single thing that happens. I'm not going to sit here and beat myself up, but during my job I make sure that I do my job the correct way, give empathy, give compassion. If someone needs it, they get it. I did not feel that Schuck was in a medical emergency. Otherwise I would have acted on it. So no, I don't feel like I could have done anything better. I didn't feel that he was in a medical emergency at that time. Otherwise I would have acted.

Q. Okay. All right. I appreciate that. Why don't we take five minutes? I'm going to look at my notes and see if I've got any follow-up questions but we're pretty close here. So let's go off the record, please.

I have.

MR. INMAN: Okay. I just have a few. Or did you want to go?

MR. LOPEZ: I don't have any questions.

05:49 EXAMINATION BY COUNSEL FOR THE DEFENDANTS,
COUNTY OF SAN DIEGO, ET AL.

BY MR. INMAN:

Q. Do you have an explanation as to why you hadn't seen that policy before that Mr. Scott showed 05:49 you earlier? I believe it was J7 from October 2020.

A. When you're on training you're required to read all PNP green sheets of whatever facility you're at, but after that you just have training bulletins which are put on during briefing and generally the TOs 05:49 and corporals of the team give you a summary. So I won't actually see necessarily that training bulletin. It's a summary that's briefed to us during briefing training.

Q. You wouldn't actually see the green sheet but 05:49 you'd see the training bulletin or --

A. Either one. They give us updates on green sheets, updates on training bulletins, updates on policy. Like, that's how we get it at that time. But when you're a brand-new deputy you are required to read 05:50 them. So that was 2020. I was hired in 2011.

Q. Okay. So how do you believe that you learned of the updates to the policy?
A. Through briefing training.
Q. Okay. Is there any newer methods for keeping up to date on policy changes?
A. The learning management system which is now you're individually assigned training. You have to go in. You have to open it up. It's stamped with your account and the time and the length of time that you were on it.
Q. Okay. We talked about Mr. Schuck's behavior. Childlike behavior is how you describes it, canoeing, faking talking on the phone with his -- using the hand phone, and pretending he was Spiderman. How typical is that to see in the jail, inside the jail, that type of behavior?
A. Common.
Q. Would you see -- would you -- do you think it's -- so -- well, do you see behavior like that every day?
A. When I was in the jail?
Q. Yes, as a line deputy.
A. It's not abnormal to. I mean, depending on certain units you'll have more of it.
Q. There -- you were asked about whether or not

you saw -- could see if Schuck was on the list for the qualified mental health provider. Do you have access to TechCare on the sworn side?

A. No. That's through medical.

05:52 Q. Through medical? So the list where people are given appointments with a qualified mental health provider in TechCare is separate from the list that Deputy Page would have used to request a qualified mental health provider?

05:52 A. Yes. TechCare is for medical staff.

Q. Okay. And why is it -- do you have an understanding as to why sworn staff is not given access to TechCare?

A. We're not nurses. I don't know.

05:52 Q. Okay. When you spoke about dehydration and other -- vomiting, did you have a particular drug in mind or what were you referring to there?

THE WITNESS: I'm sorry. What was your name?

MR. SCOTT: Mr. Scott.

05:53 A. Mr. Scott had -- when I had asked him a specific drug that I could give him symptoms of, he said heroin.

Q. Okay. Do you know whether -- do you know one way or the other whether cocaine withdrawal can cause

05:53 those same symptoms?

A. Dehydration.

Q. And diarrhea and vomiting, cocaine?

A. I would say yes, like -- I can't see the book in my head right now of the exact symptoms of withdrawal from every single drug, but --

Q. But they're different for each drug?

A. No. They're generally dehydration, some type of body visual sickness of vomiting or --

MR. INMAN: Okay. No further questions.

MR. SCOTT: I don't have any further questions. I would like a copy and a copy of the video synced, please.

COURT REPORTER: And would either of you like copies?

MR. INMAN: Same, yeah.

MR. LOPEZ: Same for us.

MR. INMAN: Transcript and video synced.

THE VIDEOGRAPHER: Video as well?

MR. LOPEZ: Same, yes.

MR. SCOTT: All right. We can go off the record.

THE VIDEOGRAPHER: This concludes Volume I of the deposition of Detective Jessica Ramirez in the matter of The Estate of William Hayden Schuck, et al., versus County of San Diego, et al. We are now off the

: : : CERTIFICATE OF REPORTER : : :

I, Kaylee Lachmann, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, No. 14348, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taking down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X ) Reading and signing was requested.

(   ) Reading and signing was waived.

(   ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated: This 24th day of May, 2024

at San Diego, California.

KAYLEE G. WOOD

CSR NO. 14348

# EXHIBIT 34

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: June 17, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Justin Page

CERTIFIED COPY

Reported by:
Nicole O'Neil

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, | )CASE NO.: )3:23-CV-00785-DMS-AHG |
| V. | ) |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2–3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | ) |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
___________________________________

---o0o---

Deposition of Justin Page located at 1350 Columbia Street, Suite 600, San Diego, California, commencing at 2:13 P.M. PST on Monday, June 17, 2024, before Nicole O'Neil, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: MICHELLE C. ANGELES
1350 COLUMBIA STREET
SUITE 600
SAN DIEGO, CALIFORNIA 92101
619-794-0451
MANGELES@MCKENZIESCOTT.COM

FOR THE DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, CARINA ECHON, JENNIFER VIVONA, AND THOMAS MACE:

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: SOFIA L. REZVANI
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
SOFIA.REZVANI@SDCOUNTY.CA.GOV

FOR THE DEFENDANT CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: SAUL LOPEZ, ESQ.
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
SLOPEZ@LDRLAW.COM

OTHER APPEARANCES:

LEGAL VIDEOGRAPHER - ELIJAH OCHOA

Q. And prior to 2013, did you work in corrections?
A. No.
Q. Did you work in any sort of law enforcement capacity?
A. No.
Q. So as part of your -- when you first started in 2013, you mentioned that prior to that, you went to the academy.
A. Yes.
Q. How long did you -- how long -- how long were you at the academy?
A. The academy was 16 weeks.
Q. After the academy when you started at George Bailey, what sort of training or how long was your training for the role as a detentions deputy?
A. I believe we had two types of phased training. I believe each type of phased training was around 21 days. If you break that down in our schedule, that's around three months.
Q. So is it fair to say that the two phases are a total of 42 days together -- adding together?
A. Back then I believe so.
Q. And then those 42 days are spread amongst three months. Is that what I'm understanding?
A. Yes.

Q. Beyond the three-month training that you receive at the beginning, has there been -- was there any other training that you received during your four years as a detention deputy while you were in that position?
MS. REZVANI: Objection. Vague and ambiguous.
Go ahead.
THE WITNESS: We do have, I believe, around 24 hours of training through our training unit every year.
BY MS. ANGELES:
Q. And when you were a training officer, a deputy training -- a detentions deputy training officer at George Bailey and a corporal, was your role to train the detention deputies?
A. Yes.
Q. And in that capacity, how often were you training individuals?
A. It varied. When a new academy graduated, we got a list of trainees. They were divided amongst the training officers and corporals at the time. So it varied to whatever sergeant assigned us the training.
Q. Okay. If I'm understanding this correctly, you would get assigned specific deputies to train, and then you would train them throughout the whole period. Would that be the whole three months?
A. Typically a phase. You take one phase. Then

they would move on to a different training officer for their other phase.

Q. As a training officer, if you feel like someone is not understanding -- let's say the phase one training -- what steps can you take to make sure that an individual is getting up to speed, if you feel like they are not really hitting those marks in terms of training?

A. We have -- well, typically we notate the deficiency. From there we would devise a plan on how to get this person more training, and we would execute the plan and see if they improved and kind of, keep working at it.

Q. And when you say, "notate the deficiency," where do you notate those deficiencies?

A. It would be a daily evaluation.

Q. So each candidate or trainee, I should say, gets a daily evaluation?

A. Yes.

Q. And where are those daily evaluations kept?

MS. REZVANI: Objection. Calls for speculation. If you know.

THE WITNESS: I believe they go into their station file.

BY MS. ANGELES:

Q. I guess I should be more specific. You as a

training officer after -- when you're conducting these daily evaluations, where do you go to input that information, like what system are you using to input that information?

A. So, I mean, it's a form we go over with the trainee. We both sign the form, and then it goes to the training sergeant.

Q. When you say, "form," you're talking about a physical form or an electronic form?

A. Back then it was a physical form, printed out.

Q. And did you receive any training on how to conduct your role as a training officer?

A. We did go through a -- I'm not sure on how many hours or days -- we did go to a jail training officers school.

Q. Do you remember when you attended the jail training officer's school?

A. I don't have a specific year, no.

Q. Would it be probably at the beginning of your --

A. It would be most likely 2017 or 2018.

Q. Do you remember approximately how long that program or that training -- that school lasted?

A. I don't remember.

Q. So we've been talking a whole lot about your

role as sort of, the detentions deputy. In terms of when you transitioned to the classifications unit, what I understand is you were -- sort of, held similar positions at sort of, the baseline level and the training level, and then the corporal level. In terms of the way that you conduct training, is the training model similar to what detentions does, or does classifications have a completely different training system?
A. It's -- I mean it's a different role. I would say it's different.
Q. Do they have phases in the same way that you would have phases as a detentions deputy?
A. No. It's 28 days for classification.
Q. Any other training as a classifications deputy that you would have besides the 28 days?
A. No.
Q. And as a classifications training officer, is your training different than you would have as a deputy training officer?
A. Like as far as like, from --
Q. Do you go to like, a jail training officers school? Or how does that training work?
A. No. We do not.
Q. What training, if any, do you receive to do your role as a classifications training officer?

A. We had the 28 days, successfully pass, then gaining experience in classification.

Q. Is there a certain amount of experience that you need to be promoted to become a training officer in the classifications unit?

A. I don't think so.

Q. I think you mentioned earlier that you have to do a year before of train -- as a training officer before you can be promoted to a corporal?

A. Yes.

Q. How often are you reviewed as a classifications officer?

A. A training officer or --

Q. Let's start with the baseline classifications officer.

A. You get a yearly eval.

Q. As a training officer?

A. Training officer -- I believe they require monthly evals.

Q. Who are the evaluations done by?

A. Our training sergeant.

Q. And then when you -- how often do you get reviewed as a corporal?

A. Once a year.

Q. And who conducts that review?

issues, enemies in jail. And then we go through their education history. What was the last grade in school you completed? I believe that's around all of our questions.

Q. You mentioned that you ask about disabilities. Is there anything else that you ask related to sort of, their medical -- any medical concerns or medical distress?

A. No. As far as their disabilities that require an accommodation, if they say, yes, then we defer them back to medical. We just want to make sure that medical has addressed those disabilities. We're not necessarily assessing for those disabilities.

Q. So anyone that you feel like, might have a medical disability or medical concern, you refer them to the medical department?

A. If they say, "Yes, I have a disability that requires an accommodation," I will ask them if they talked to the nurse about it and whether they say, "yes" or "no," that's where we go from there.

Q. What if someone expresses a need for a low bunk instead of a high bunk or something like that?

A. That will go back to medical.

Q. Let's say someone doesn't express a specific disability, but you know that someone is in medical distress or might have a medical concern from your

observations and your interactions, what steps, if any, can you take in that context?

MS. REZVANI: Objection. Calls for speculation. Vague and ambiguous. Incomplete hypothetical.

You can answer.

THE WITNESS: If someone is in medical distress, we typically expedite them back to the nurses. If I think someone needs to see medical right away, they are going back to the nurses. If they can walk, if we can get them over there in a wheelchair, if we need to bring the nurses to them, we can use all those avenues.

BY MS. ANGELES:

Q. What I'm hearing you say if you believe there's any sort of, medical concern or medical distress that needs to be evaluated sooner than later, you can either take them to the medical clinic or you could ask for a nurse to attend to them in the classifications area where you are at. Is that correct?

A. Yes.

Q. What about mental health? As part of your evaluations in terms of classifications, do you ask any questions related to mental health?

A. No. No set questions.

Q. And similar to medical distress. If you feel that someone is undergoing a mental health crisis or has

some mental health concerns during your interaction, how do you refer them for help, or what do you do in that context?

A. Currently the process is to e-mail a group of mental health clinicians, and they will set the evaluation and kind of, go from there.

Q. You said, "currently," was that process different at a certain point?

A. Yeah.

Q. When did that change?

A. It's changed as certain mental health nurses have come and gone. We've had some leave and some come in, so each mental health clinician kind of, has their own preference. I can't really estimate the date.

Q. Do you remember in March of 2022, what the process was in terms of mental health?

A. Yeah. If we kind of see -- we saw somebody exhibit signs of maybe, psychological stress or having some type of psychological event, we would normally put them on a spreadsheet, and it would just be their name, their booking number and why. And then the mental health clinician at the time had access to the spreadsheet, and she could determine when she can evaluate this person.

Q. When you say, "she," was it just one mental health clinician?

would average around 110 hours, so around 55 hours a week, give or take.

Q. So your shift would be about -- trying to do the math. Was it an eight-hour shift or was it longer?

A. It was 12 hour.

Q. If you worked mandatory overtime, you would have to work an additional two, 12-hour shifts per pay period?

A. Yeah. Additional 25 hours.

Q. Beyond the mandatory overtime, did you work any additional overtime?

A. It's possible based on the needs of staffing.

Q. Do you remember if in March of 2022, you were working more than the mandatory overtime?

A. I don't know. I don't recall.

Q. Do you remember who your supervisor was back in March of 2022?

A. As far as like, first line supervisors?

Q. Like who would you report to?

A. I had Sergeant Mark Faustino and Sergeant Tyson.

Q. We talked a little bit about your training generally, but I want to transition to talk to you about specific training in different areas. And this could be -- when I'm asking these questions, it could also be related to training that you received as a detention deputy and then also as a classifications officer.

As a deputy, your role is to make sure that the incarcerated people are safe and secure?
A. Correct.
MS. REZVANI: Objection. Vague and ambiguous. Go ahead.
THE WITNESS: Yeah, yes.
BY MS. ANGELES:
Q. Have you heard of "in your custody is in your care" -- have you heard that before?
A. No, not specifically.
Q. As a deputy you're responsible for the individuals that you monitor, correct?
MS. REZVANI: Objection. Vague and ambiguous.
Go ahead.
THE WITNESS: Responsible as in?
BY MS. ANGELES:
Q. Sure. As the detentions deputy you would be assigned to, let's say, a particular module; correct?
A. Not necessarily.
Q. Or a special area of the jail?
A. You typically were assigned -- depending on where you were, you were assigned to floors or a housing unit.
Q. Let's say you're assigned to a floor as the detentions deputy, you're responsible for the individuals

that are housed on that particular floor, correct?
A. When you say, "responsible" --
Q. For their safety and their security during your shift.
A. We're looking for medical distress or if they are fighting, or doing anything illegal. Those are kind of, the things that we're kind of, trying to prevent.
Q. And you're required by law, right, like Title 15 -- to conduct Title 15 safety checks, correct?
A. Yes.
Q. And the reason you are required to do those checks so you are regularly monitoring the individuals on that floor, correct?
MS. REZVANI: Objection. Vague and ambiguous. Calls for a legal conclusion.
You can answer.
THE WITNESS: Yeah. We're looking for other things such as signs of possible escape, contraband, the safety of them, anybody in medical distress.
BY MS. ANGELES:
Q. With regards to mental distress, you mentioned that's one of the things that you're looking for in your care of individuals and specifically during safety checks. Is that correct?
A. I said, "medical distress."

Q. In terms of medical distress, what sort of things are you looking for?

A. Talking, breathing, kind of, specifically acting normal, maybe if they are profusely sweating, just looking for things that might be out of the ordinary, maybe if they are hyperventilating.

Q. If someone is dealing with like, a medical concern that needs monitoring, is there a system set up for communications set up between you and the medical staff as far as monitoring any concerns in terms of medical issues?

A. As far as like -- I'm kind of confused on what your question is.

Q. Sure. My understanding is the nurses aren't doing safety checks around regularly, correct?

A. No.

Q. You as a deputy are often the individual who is going to see sort of, any changes of behavior or any changes in someone's demeanor, because you are conducting these hourly safety checks. Is that right?

MS. REZVANI: Objection. Calls for speculation.

You can answer.

THE WITNESS: It kind of depends on how often -- when you're assigned to a housing floor, you don't know every individual. You might not even get to speak to

every individual when you're going through there. I mean, there's only so many deputies compared to a much larger amount of incarcerated individuals. You are not really going to know what their normal behavior is.

BY MS. ANGELES:

Q. Understood. My understanding is that you also have a system of communication between deputies, correct?

A. We use a radio.

Q. And you use JIMS, correct?

A. We use JIMS.

Q. The reason you use JIMS is because like you said you are only monitoring certain individuals from your shift?

A. Yeah. Well, yes.

Q. Let's say there's 12 individuals on your floor, and you're working your 17 to 5:30 shift. You are only interacting with those 12 individuals. Obviously, I understand there's movement and people could shift around. Let's say there's 12 people on the floor. You are assigned to the floor for your 12-hour shift. You're only responsible for really, those 12 people as a detentions officer, correct?

MS. REZVANI: Objection. Vague and ambiguous. Calls for speculation.

You can answer.

THE WITNESS: I mean, I guess what I was trying to say is the amount of people on the floor, you have over -- we have hundreds potentially. You're trying to look out for the safety and security of that group.

BY MS. ANGELES:

Q. Okay. After you conduct your safety checks, you are supposed to log those in JIMS, correct?

A. I believe you log the start time, yeah. I'm not sure if you log the end time.

Q. Are you supposed to log any observations that you note of any particular individuals?

A. Yeah.

Q. And why is that important?

A. It depends on your interaction with the individual. It could be anywhere from a behavioral ISR or just kind of, notating this individual's behavior was a certain way or if another individual indicated that they had a medical concern and kind of, what you did with that medical concern. So if you brought them in to see the nurses, the nurses said they were cleared, then you bring them back, you would notate that in JIMS.

Q. Okay. If I'm understanding this correctly, if you did anything related to medical, you would log that in JIMS, correct?

A. Yeah.

Q. If there was any observations that you made that were related to mental health, would that also be logged in JIMS?
A. Yes. Depending on the interaction.
Q. Any safety concerns, you would log those in JIMS?
A. Can you clarify "safety concerns"?
Q. Let's say you see broken glass or you find somebody with a weapon.
A. Yeah. I mean, we would typically handle the situation, and then that would be notated in some type of report.
Q. If somebody was using drugs, would that be something that would be noted in JIMS?
A. Like --
MS. REZVANI: Objection. Calls for a hypothetical.
You can answer, if you understand.
THE WITNESS: I'm not sure if I understand the question.
BY MS. ANGELES:
Q. Sure. If you find illicit substances in someone's cell, would you document that in JIMS?
A. Yes.
Q. If someone expresses to you they are under the

influence -- or you believe they are under the influence of a substance, would that be something you would notate in JIMS?

A. Yeah. That would be something that we would have medical respond to or get that person assessed by medical.

Q. And separately would you put that in JIMS?

A. Yes.

Q. And the reason why you place it in JIMS is because you rely -- as a deputy, you rely on JIMS for information about particular incarcerated people?

MS. REZVANI: Objection. Vague and ambiguous. Calls for speculation.

You can answer.

THE WITNESS: Yeah. I mean, we put it in JIMS for kind of, a trail of documentation. If somebody has questions on an individual, you can kind of, pull up and see what the interactions have been.

BY MS. ANGELES:

Q. So if you come in on your shift and you have any sort of, questions or concerns about a particular individuals, and you want to look up that person's history, where would be the first place that you would go to sort of, learn more about that individual?

A. Their incident history.

Q. Is that incident history located in JIMS, or is that a completely different system?

A. It's in JIMS.

Q. Would medical or mental health concerns also be reflected in incident history?

MS. REZVANI: Objection. Calls for speculation.

Only if you know.

THE WITNESS: I believe it kind of, depends on the interaction.

BY MS. ANGELES:

Q. I guess I'm trying to understand what kind of information is available to you in the incident history.

A. In regards to like --

Q. Let's put it this way.

What have you been trained to put into the incident history?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: If I have somebody that's expressing, you know, they have something wrong with them medically, I bring them to medical, I get them assessed. And whatever happens with that interaction, I put that -- I write a little report and put that into JIMS. If I -- yeah, I mean, as far as medical, that's what it is. If somebody is acting up, we have rule violation

reports. We have people that are placed into administrative separation, people that are classified as assaultive or escape risk. All that information is available in JIMS information such as that.

BY MS. ANGELES;

Q. If you had a concern about somebody's mental or medical sort of, condition, and you wanted to see whether they had been treated or not, is this -- is the incident history somewhere you would go to check if they had been seen by a nurse at a certain point during their time in custody?

A. No. The nurses have a separate system.

Q. Do you have access to that system?

A. No.

Q. As an officer, if you wanted to know whether they had seen or referred to a nurse before, where would you go to learn that information?

A. I would have to call a nurse and ask them to look up any pertinent history.

Q. I'm not trying to trick you. I understand there's individuals working different shifts. You might observe a concern on Monday, like you mentioned earlier that you put somebody on the list, let's say to see a mental health professional. And let's say you see that person on Friday, and you see some of the similar

behavior, and you want to know whether what you did on Monday -- you want to follow through and say, "I wonder if that person actually was seen. If not maybe I want to put in another request."

How would you check whether that request that you made on Monday, that someone actually followed through with it?

MS. REZVANI: Objection. Calls for hypothetical.

You can answer.

THE WITNESS: I would call medical and see if there's anything scheduled and if not, ask them to schedule something else or maybe a follow up.

BY MS. ANGELES:

Q. If they had not been treated, do you have the ability to make an additional request?

MS. REZVANI: Objection. Calls for hypothetical.

Go ahead.

THE WITNESS: I can request it. It's up to the collaboration of medical and mental health to kind of, figure out what they are going to do.

BY MS. ANGELES:

Q. Do you as deputies receive any training about when to follow up with medical about medical concerns?

MS. REZVANI: Objection. Calls for speculation. Vague and ambiguous.

You can answer.

THE WITNESS: I don't really understand like, the specific of the question.

BY MS. ANGELES:

Q. Sure. There's a medical service department.

A. Right.

Q. And then there's the detentions department.

A. Yeah.

Q. And I understand that the medical services department is responsible for providing the medical treatment at the facility. Right?

A. Yes.

Q. And you are responsible as the deputy -- as the detentions deputy, for monitoring the individuals that are currently housed at the jail, right?

A. Yeah.

Q. And if -- these two parties have to work in conjunction, right?

A. Yes.

Q. You escort the nurses down to see the individuals, right?

A. Yes.

Q. You make requests for the nursing staff to come

see them, right?
A. Yeah.
Q. Because the nursing staff isn't on the floors, they might not see if someone is undergoing a seizure or undergoing a heart attack. You may be the first point of contact for those medical issues. Is that right?
A. Yeah.
Q. And so there needs to be a system for communication between these two departments, because you work in conjunction. Is that fair to say?
A. Yes.
Q. As a deputy, have you received any training in regards to how to handle medical care and to ensure that individuals are receiving medical care?
MS. REZVANI: Objection. Vague and ambiguous.
You can answer.
THE WITNESS: Are you asking if we have basic first-aid classes or --
BY MS. ANGELES:
Q. Right. Any sort of training that you've received to ensure that the medical services department -- you're properly communicating or that the department or you as deputies -- are communicating with the medical services department, that you know how to respond to medical emergencies or medical distress, that

you are properly communicating anything related to the communication and the medical care that needs to be provided? I'm not talking about what you know that the nurses do. I'm talking about how you facilitate in that role.

A. You're asking if I've had training on how we communicate with the nurses?

Q. Yes.

A. No.

Q. Have you received any training on when to communicate with the nurses?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: As far as --

BY MS. ANGELES:

Q. When it's important for you to communicate your observations.

MS. REZVANI: Same objections.

Go ahead.

THE WITNESS: I mean, if -- as a deputy you are trained in first aid and CPR. So that's -- if we see things that are kind of, outside of the norm or maybe we think needs to be tended to immediately, then, yeah, we call the nurses, whether it's the radio, the phone, asking them to respond.

BY MS. ANGELES:
Q. Are you trained to follow up on reported concerns?
MS. REZVANI: Objection. Vague and ambiguous.
Only if you know.
THE WITNESS: Maybe if somebody is voicing another concern, then, yes. But if -- you're asking if -- if you're asking if we put a request in this day, would we follow up later on?
BY MS. ANGELES:
Q. Do you refer every individual who asks to see a doctor or a nurse -- do you refer them to the medical services department every time?
A. In what way?
Q. If somebody asks to see a doctor or nurse, do you send them to the clinic every time?
A. No.
Q. How are you trained of when you should and shouldn't?
A. If it's life threatening. If it needs immediate attention, then we get the nurses involved immediately. If it's something that is not life threatening, it doesn't need immediate concern or doesn't need immediate attention, then we refer them to put a request into medical.

Q. It is fair to say that you triage how you prioritize who you should refer?

MS. REZVANI: Objection. Calls for speculation. Vague and ambiguous.

You can answer, if you have an answer.

THE WITNESS: We base it on if it needs immediate attention or doesn't need immediate attention.

BY MS. ANGELES:

Q. I think I heard you say that if it is life threatening or needs immediate attention you refer to a nurse immediately?

A. Yes.

Q. Are you trained on how to identify whether a medical concern is life threatening or it needs immediate attention?

A. Through our first aid and CPR classes, we get trained every two years on that. Every two years since I've graduated the academy, I've had that. Based on that training, that's how I determine if something needs immediate attention or not.

Q. So the medical services department has never said, if you see X, please report that immediately or if you see Y -- like, they haven't given you a protocol or list of symptoms -- if you see as a deputy while you're on the floor -- that should be referred immediately to

the medical services department?

A. Not that I know of.

Q. And is that the same for sort of, mental health in terms of evaluating whether someone needs immediate attention to mental health concerns? Have you been trained in how to identify which individuals need to be seen immediately and which ones you can sort of, wait for?

A. As far as mental health, if they are threatening their life or others, that's an immediate concern. We get that assessed immediately.

Q. What are you looking for to make that determination if they are a threat to themselves?

A. Statements, typically. Statements or actions.

Q. Anything else?

A. I mean, their behavior as far as like, say if they are trying to harm themselves or, you know, they cut themselves, or whatever that behavior could be. It's something that we think that they are threatening their life or somebody else's life, we may get them assessed at that point.

Q. What about if they are not eating?

MS. REZVANI: Objection. Calls for hypothetical. Calls for speculation.

If you have an answer.

THE WITNESS: If they are not eating, I would refer them to the nursing staff.

BY MS. ANGELES:

Q. If they are not eating, is that something that you log in JIMS?

A. Yes.

Q. What about symptoms of withdrawal? Are you trained to identify symptoms of withdrawal?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: No.

BY MS. ANGELES:

Q. Are you trained to identify individuals who may be under the influence of illicit substances?

A. Yeah. I mean, we receive training --

Q. I'm sorry. I didn't hear.

A. Yes.

Q. What training is that? What do you get trained on?

A. Me personally I've received one eight-hour course, probably over six years ago at least. It was just basic for when they are under the influence.

Q. And you said "me," does that mean it's not standard for everyone who is a deputy to take that course?

A. I don't know.

Q. Was it a part of your general training to fulfill your role as a deputy?

MS. REZVANI: Objection. Calls for speculation. Only if you know.

THE WITNESS: I don't remember any type of that training in the academy.

BY MS. ANGELES:

Q. I'm just trying to indicate whether when you took this eight-hour course, if it's something you did on your own because you wanted to learn it, or was it mandated by the sheriff's department for your job?

A. It was a training course from the sheriff's department. I don't know that it was mandated for us to do our job, though.

MS. ANGELES: I think we can take a break.

MS. REZVANI: Sure.

VIDEOGRAPHER: We're off the record. The time is 3:20 Pacific Time.

(Brief Recess)

VIDEOGRAPHER: We are back on record. The time is 3:28 p.m. Pacific Time.

BY MS. ANGELES:

Q. Deputy Page, I wanted to continue with directing back to March of 2022. I know I took a path to talk

is it reflected?
A. This would indicate his initial.
Q. It's not an update.
A. No.
Q. This would be his initial classification?
A. Yes. This is just basically -- this is just telling us that his classification level was changed from nothing to a two.
Q. So if I'm getting it correctly, you classified him or did his classification on March 13th at 3:05 or that's when you entered it into the JIMS system?
A. That's when I -- I say that's when I entered into JIMS, because I didn't conduct his interview in front of the computer. Whenever I got to enter it into the JIMS, that's the time.
Q. Typically, how long after you've conducted an interview do you enter the information into JIMS? I know it varies. You can give me an estimate?
A. It varies. It really depends on how busy we are, what we are doing.
Q. What is the expectation that you enter the information by what time? Can you do it days after? Supposed to be within the same day?
MS. REZVANI: Objection. Vague and ambiguous. Calls for speculation.

Only if you know.

THE WITNESS: I mean, the expectation would be by end of shift.

BY MS. ANGELES:

Q. By end of shift. Is that what you are trained to do?

A. There's no specific guidelines.

Q. So where do you -- when you say, "It's expected to be done by end of shift," how do you -- how did you learn of that expectation, or who informed you of that?

A. I think that's kind of, a general expectation that we have of each other, I guess.

Q. When you trained new classification deputies, do you tell them as part of -- as the training officer that they should input the information into JIMS by the end of their shift?

A. It depends. It depends on the situation. I mean, if it's a situation where we cannot properly -- you conducted the interview, but you cannot properly classify them, then there could be a variation to that expectation. But if you conduct the classification and you got the information you needed, we would enter that end by the end of shift.

Q. Just so I understand sort of, the rule or the expectation is within 24 hours -- obviously there may be

exceptions to that depending on complications or you know, things like that?

A. Yeah.

Q. So kind of, walk me through the classifications process. On March 13th, then, would Mr. Schuck have -- would you have known where he could be housed in terms of his security level?

A. In terms of his security level? Yes.

Q. Why wouldn't he, then, on March 13th be housed since he was already classified?

A. Well, COVID protocols. We had a five to seven-day quarantine. I'm not sure which one was in effect at that time. And then with those COVID protocols, there was a kind of -- there wasn't as much availability of space. All the cells were kind of used, and he didn't have an available bed at that time.

Q. Do you remember classifying Mr. Schuck?

A. Yes.

Q. Can you talk to me about what you did?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: Do you have any specifics?

BY MS. ANGELES:

Q. Yeah, sure. You had to get him for an interview to conduct that interview. Do you -- as the

classification deputy, do you go to their cell to get them? Does someone bring them to you? How does that work?

A. Because he was in court holding, I went to him and conducted the classification.

Q. Looking at the map you made, do you remember what cell you brought him from, what area of your map you retrieved him from?

A. Specifically, no.

Q. Do you know if it was towards the front or towards the back looking at your map?

A. It was probably in this area. I don't know what area you want --

MS. REZVANI: Go ahead and circle it.

BY MS. ANGELES:

Q. So probably kind of, close to where we were looking at 14-L on the video earlier, that area?

A. Yeah.

Q. But you are unsure the cell you particularly picked him up from was one reflected on the video or not?

A. Yeah. I don't remember specifics.

Q. After you go get Mr. Schuck, what do you do? Like, where do you place him?

A. I didn't move him. He remained in that cell.

Q. And you conducted your interview there?

A. Right at the cell, yes.

Q. What, if anything, did you observe about Mr. Schuck or did you remember about your interview with Mr. Schuck?

A. The specific things, due to the length of time, I don't recall, however, I do remember some odd behavior. Specifically I can't recall what that was. I believe -- it was just the odd behavior, specifically.

Q. Okay. And you don't remember specifics about the odd behavior, but you remember him exhibiting odd behavior?

A. Yeah.

Q. Is there a reason why you remember he was showing odd behavior?

A. Yeah. I did request what is called an outpatient psychiatric stepdown unit evaluation.

Q. Can you repeat that again for me?

A. Outpatient psychiatric stepdown unit evaluation.

Q. What is that?

A. It's a program run by mental health that have more available services for individuals experiencing a psychiatric event or issues.

Q. Walk me through the process of making that request.

A. What do you want to know?

Q. Sure. So you referred him. What do you -- you know he's -- you know that he's experiencing odd behavior. What do you do with that information?

A. Like we discussed earlier, I entered it in on that spreadsheet we talked about.

Q. When you were talking about that spreadsheet, that's specifically for this program that you are discussing?

A. Yes.

Q. Is another word for that like, a qualified mental health professional or provider, or is that a different thing?

A. I think all mental health conditions are considered qualified mental health providers.

Q. So you put him on that list, and then that's the extent of sort of, what you did with that information?

A. Yeah. I believe I notated it -- I believe I notated it in his classification evaluation.

Q. Would that information show up in JIMS?

A. Yeah. His evaluation is on JIMS.

MS. ANGELES: I'm going to show you what has been previously marked by Deputy Ramirez as Exhibit 20-A and 20-B.

(Previously marked Exhibits 20-A and 20-B were introduced for examination.)

BY MS. ANGELES:

Q. Can you tell me what -- let's start with -- 20-A is?

A. This looks like an area activity log.

Q. Can you tell me what that is?

A. That is all of our events such as safety checks, count, get logged in in this particular log.

Q. I know you mentioned an incident report earlier. Is that different than what we're seeing here?

A. Yes.

Q. And looking at 20-B, is that the same or a different date? Is this also an activity summary report?

A. Yes.

Q. So you mentioned that your classifications evaluation would be placed in JIMS. This area activity summary report is also part of JIMS. Is that right?

A. Yes.

Q. Will your classification evaluation show up on this area activity summary report?

A. No.

Q. Would it show up on the incident report that you mentioned?

A. Would it show up on the incident report?

Q. You mentioned there's an incident section of JIMS that you would refer maybe, to look up particular

information?

A. No. It wouldn't show up on there.

Q. Is the classification evaluation it's own sort of category on JIMS?

A. Yeah.

Q. We were looking at Exhibit 12 earlier, the one right above you. Would your classification evaluation be linked to this? I know it's sort of, a list, or would that be in a completely different section as well?

A. When I went through my classification, entered in all my requirements, that's what you see here. This classification update here.

Q. Okay.

A. It logs it into its history, but it's not linked, so to speak.

Q. So you mentioned that you also put in information about your observations with odd behavior into JIMS. That wouldn't be reflected here in the inmate history summary report?

A. I mean, my note was just that he was referred for the program -- or referred for that evaluation, I believe.

Q. You didn't document any of your observations of that interaction?

MS. REZVANI: Objection. Misstates prior

testimony. Where is that note, that's she's asking?

THE WITNESS: That's in the evaluation update, I guess.

BY MS. ANGELES:

Q. I guess I just want to understand what it is that you put in the evaluation, because I think right now you said you put in the evaluation that you referred him to an appointment, but I thought I understood that earlier you had also indicated in the evaluation some of the things that you observed about Mr. Schuck's behavior. Is that -- I may have misunderstood. I'm just trying to clarify what you put in your evaluation.

A. Are you talking about the spreadsheet, or are you talking about -- I'm talking about -- this is located on JIMS. It was a simple note that an evaluation was referred.

Q. Okay.

A. When we talked earlier about the spreadsheet, that's when we kind of, put what we observed during our interaction.

Q. I'm just trying to understand the full extent of information that exists out there about your interaction with Mr. Schuck.

A. Right.

Q. And so just let me see if I understand

correctly. After you interviewed Mr. Schuck in relation to his medical health, the two things you did was make a request on the spreadsheet that you described. Is that right?

A. Yes.

Q. And then you also entered information related to your interaction into your classifications evaluation?

A. I wouldn't say it's related to my interaction. It's just notating that I requested an evaluation.

Q. Okay. In your classifications evaluation, did you indicate any additional information about Mr. Schuck's demeanor or odd behavior, other than you say that you made a request for him to be seen?

A. On JIMS?

Q. Yes.

A. No.

Q. So your -- so just to sort of, close the loop on that. There was no documentation about your specific observations of his sort of odd behavior, what you heard or what you saw on that particular day anywhere?

A. In JIMS, no.

Q. Is there anywhere in any system where that would be documented?

A. If the -- I mean, if that spreadsheet still exists somewhere, it's possible, but I don't know if it

does. I don't know if that's been --
Q. In that spreadsheet is there a space for you to document specific like, details about your concern?
A. Yeah. There's a kind of -- just quick little explanation on why you requested the evaluation.
Q. What information do you typically put in there?
A. Typically, is not a thing. It's just behavior being notated during the interview.
Q. That would include any sort of outlandish statement, let's say?
MS. REZVANI: Objection. Calls for hypothetical.
THE WITNESS: It's possible.
BY MS. ANGELES:
Q. Were you trained on what to include or what information was important to include on this spreadsheet?
MS. REZVANI: Objection. Vague and ambiguous.
THE WITNESS: No.
BY MS. ANGELES:
Q. So it was up to you to determine sort of, what you thought might be important information for the qualified mental health professional to know prior to seeing him?
A. Yeah.
Q. Okay. Do you remember being interviewed about

Q. And it has the date at the bottom of May 24th of 2023?
A. Yes.
Q. And then it has the Bates stamped or ending in 107 and then the second page would be 108. Is that right?
A. Yes.
Q. Okay. Do you remember there being an audio recording associated with this interview?
A. I believe it was recorded, yes.
Q. Did the agents tell you it was being recorded?
I'm going to play you a portion of that statement.
(Audio recording playback)
Q. Do you recognize your voice in this audio?
A. Yes.
Q. Is this a fair representation of what you remembered your interview being approximately a year ago in May of 2023?
A. Yes.
Q. I just want to go through some of the things that you mentioned. I'm going to start the audio at 7:17.
(Audio recording playback)
Q. You said to the officers that the process has

changed, obviously, since you were conducting this interview in May of 2023, but that in March of 2022, the prior clinician's practice was not to evaluate people until they were already in the housing.

When you say, "the prior clinician," who is it, specifically, that you're referring to?

A. I can't remember her name. There's been multiple.

Q. Were you referring to like, the head clinician? Was there one clinician at the time?

A. I believe there were multiple. I can't really remember.

Q. When you're talking about, "She won't see them," it sounds like you're speaking about someone specific.

A. Okay.

Q. I'm just trying to understand if there was, you know -- if there was more than one person or if at the time there was one person or someone who made that decision that you are sort of, referring to?

A. I mean, due to the length of time it's been and the amount of turnover we've had in mental health, it's kind of, hard. I can't specifically remember who it was.

Q. Do you remember if that clinician was part of the sheriff's department or if they were a third party contractor?

A. I don't know.
Q. Who belonged to some agency or something?
A. I don't know.
(Audio recording playback)
Q. So, again, you say, "solely her judgement." It sounds like it's one individual. Do you have a description of that person?
A. I can't remember who it was or if it was one person. It's been long time.
Q. Okay. Besides his -- your interaction with him on the 13th for his classification, did you interact with Mr. Schuck at any other point in March of 2022?
A. Yes.
Q. When was that?
A. I'm looking at the report. It was March 15th of 2022.
Q. Can you tell me about your interaction with Mr. Schuck on March 15th of 2022?
MS. REZVANI: Objection. Calls for a narrative.
Go ahead.
THE WITNESS: Just my entire interaction with him?
BY MS. ANGELES:
Q. Sure. How did you first go to interact with him? Or why did you interact with him on March 15th of

2022?

A. We had set housing for him if a bed became available or a cell became available for him, and then we went to the court holding cells where he was located. And once again he kind of exhibited some odd behavior. He -- I believe he was handcuffed due to his odd behavior. Deputy Ramirez and I escorted him to the seventh floor. And he had -- while waiting for another administrative separation inmate to go inside their cell and secure the door, we were waiting outside the module. And Schuck dropped his weight to the floor or attempted to sit down on two occasions. He was breathing, talking, conscious, on both occasions. After the incarcerated person inside of the module went inside their cell, we entered the module with Schuck and then the -- took the handcuffs off him and placed him into his cell.

Q. And that cell was on the seventh floor?

A. Yes.

Q. Now you said that he was exhibiting odd behavior. Do you remember anything about his demeanor at that point?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: What do you mean by "demeanor"?

///

BY MS. ANGELES:

Q. And you said his behavior was odd. Do you remember him saying anything that was -- stood out to you?

A. The only thing I can remember -- and I don't remember exactly when he said -- it is that he needed -- he needed to use the bathroom.

Q. Anything else that you remember about your interaction with him?

A. He was fidgety.

Q. What do you mean by that?

A. Like moving his body back and forth, not completely still when he's standing.

Q. Do you remember discussing anything with Deputy Ramirez about Mr. Schuck?

MS. REZVANI: Objection. Vague and ambiguous.

Go ahead.

THE WITNESS: That I can remember? No.

MS. ANGELES: Now you mentioned earlier that you watched some videos in relation to your interactions with Mr. Schuck. I kind of, want to go through those at this point. These have already been previously marked. I will try to go in the order of timing.

I will start with Exhibit 16-J.

(Previously marked Exhibit 16-J was introduced

A. Indicating to the deputy controlling the elevator that we're going to seventh floor.

(Video recording playback)

Q. Watching that interaction stopping at 1:17 with Mr. Schuck, was there anything about your interactions -- watching this video -- your interaction on this elevator that you remember now after reviewing it?

A. No. Just, I mean, it kind of, exhibits him being fidgety like I talked about.

Q. Do you remember him saying anything at this point?

A. Like I said earlier, I don't know when he said he wanted to pee, but it was -- I don't know where it happened chronologically. It could have been in the elevator. It could have been later on or earlier. I don't know.

MS. ANGELES: I'm going to go to 16-H.

(Previously marked Exhibit 16-H was introduced for examination.)

BY MS. ANGELES:

Q. I will start at :23.

(Video recording playback)

Q. What do we see here on 16-H?

A. Deputy Ramirez and myself escorting Schuck out

of the elevator into the seventh floor.

Q. Is this the same elevator that we just saw in the last, Exhibit 16-I?

A. Yes.

Q. What floor are you on now?

A. Seven.

MS. ANGELES: 16-F.

(Previously marked Exhibit 16-F was introduced for examination.)

BY MS. ANGELES:

Q. I will fast forward to :32.

(Video recording playback)

Q. What are we looking at here at :33 seconds?

A. Deputy Ramirez and I escorting Schuck into what's called the seventh floor staging area.

Q. Playing again at :33.

(Video recording playback)

Q. Where are you walking towards? You go off camera. We see you and Deputy Ramirez going off camera with Mr. Schuck. What area are you headed to?

A. Module 7 David, 7-D.

Q. And we saw at the beginning at :37, you exiting that video. Is that the area where the elevator is located that you were coming off of in Exhibit 16-H?

A. When we were coming off the elevator? Say that

again.
Q. There's a door here on the left-hand side of the screen.
A. Right.
Q. That you guys came in from. Is that area where the elevator is located that you had just come out of on 16-H?
A. Yes.
Q. I appreciate you going through this with me. It helps me orient in terms of where these videos are.
MS. ANGELES: Now going to 16-G.
(Previously marked Exhibit 16-G was introduced for examination.)
BY MS. ANGELES:
Q. I will start at :43 seconds.
(Video recording playback)
Q. Stopping at :45 seconds. What area are we looking at in 16-G?
A. The first door -- the door on the left-hand side that is -- that enters into module 7-D or 7 David, and the door on the right-hand side would be 7-E.
Q. Just for the record, you see the ladder on the screen? There's a ladder close to that door. Right here.
A. Okay.

Q. Do you see the ladder?
A. Yes.
Q. Is that the door that you were saying goes to the E module?
A. Yes.
Q. And the one on the other side goes into D module?
A. Yes.
Q. D as in "dog."
A. Yes.
Q. I will play a few seconds. As I'm playing if you can describe sort of, what we are seeing. I will start the video again at :45.
(Video recording playback)
A. Like I said earlier we're waiting for the individual on the inside of the module to go inside his cell. That's based on protocol. Schuck drops his legs to the floor. Tries to sit down.
Q. Stopping at 1:11.
There's an officer sort of, behind, Officer Ramirez. Do you know what deputy that is?
A. No.
Q. Playing again at 1:11.
(Video recording playback)
A. Again, we get Schuck up to his feet.

Q. Stopping the video at 1:22. We see Mr. Schuck kind of, hunched over as you were sort of, lifting him up. Do you remember anything about this interaction?
A. Other than him expressing that he needed to use the restroom, I don't -- I can't remember.
Q. Did you think he was in medical distress?
MS. REZVANI: Objection. Calls for expert testimony.
Go ahead.
THE WITNESS: No.
(Video recording playback)
BY MS. ANGELES:
Q. We see Mr. Schuck, again, kind of, lean his head forward again and then all of a sudden drop to the floor. Can you describe what's happening or what you remember about this interaction?
A. Once again he dropped his weight to the floor. I do remember him breathing, conscious, talking.
Q. If you felt Mr. Schuck needed medical care, what, if anything, could you do at that moment?
A. At that point in time we would call for medical. Have medical respond to --
Q. And looking at the time on the video, this is at approximately 2021 which is about 8:21 at night. Is there medical staff available to provide aid at that

time?
A. Yes.
Q. And is it fair to say that if you needed someone to come and assist with Mr. Schuck's medical care at that time, you could get someone pretty quickly to come down and see him?
MS. REZVANI: Objection. Vague and ambiguous. Go ahead.
THE WITNESS: Yes.
BY MS. ANGELES:
Q. You mentioned earlier another option you had that when you think someone needs medical care, you can take them to the medical clinic. Is that right?
MS. REZVANI: Objection. Misstates testimony.
THE WITNESS: Yes.
BY MS. ANGELES:
Q. At 8:21 in the evening is the medical clinic available to you for you to bring individuals to?
A. Yes.
Q. It's open 24 hours?
A. We have 24-hour medical at SDC Jail.
(Video recording playback)
Q. We see a door open. Where are you entering at this point at minute 1:45?
A. 7-D, 7 David.

Q. Did you do anything, or do you remember doing anything?
A. I don't remember.
Q. Since Mr. Schuck's death, have you thought about your interaction with him?
MS. REZVANI: Objection. Vague and ambiguous.
If you understand the question.
THE WITNESS: Have I thought?
BY MS. ANGELES:
Q. Yeah. Have you reflected on your interactions with Mr. Schuck?
MS. REZVANI: Same objections.
THE WITNESS: I don't really know how to answer that. Yes, because I'm here, and having to go through a homicide interview, so, yes.
BY MS. ANGELES:
Q. Other than preparing for and participating in this deposition and participating in this interview, do you remember any other instances where you sort of, reflected or thought about your interactions with Mr. Schuck?
MS. REZVANI: Same objections.
THE WITNESS: Not that I can recall.
BY MS. ANGELES:
Q. Have you in your 11 years of working with the

sheriff's department been involved with someone who passed away?

MS. REZVANI: Objection. Vague and ambiguous. Go ahead.

THE WITNESS: Yeah.

BY MS. ANGELES:

Q. About how many times?

A. I mean, it could be multiple. I don't have a number.

Q. Less than five?

A. Could be.

Q. More than five?

A. Probably say between, you know, maybe 10 and under, somewhere around there.

Q. Maybe more than five but less than 10?

A. Yeah.

Q. At any point after Mr. Schuck's death, besides the interviews that -- that were conducted a year after in May of 2023 that we've discussed today with the detectives, did you meet with anyone from the San Diego Sheriff's Department to discuss what happened with Mr. Schuck's death?

MS. REZVANI: Objection. May call for attorney/client privilege, but if you remember any of the interviews or the meeting that we had.

MS. ANGELES: To clarify I don't want you to talk about any conversations with your attorneys. I'm sort of, looking to see if you had spoken with any other deputies or staff at the San Diego Central Jail about the Schuck incident?
THE WITNESS: Not that I can recall.
BY MS. ANGELES:
Q. So you didn't participate in any sort of, debrief or anything like that?
A. Huh-uh.
Q. The only meeting that you had, other than with your attorneys, which we don't want to get into, was an interview that we discussed that happened in May of 2023?
A. Yes.
Q. At no point has anyone tried to ask you any questions about -- anyone from the San Diego Sheriff's Department, tried to ask you about your interactions or what could be learned from your experience with Mr. Schuck?
MS. REZVANI: Objection. Vague and ambiguous.
If you know.
THE WITNESS: Not that I can recall.
BY MS. ANGELES:
Q. Is there anything that you wish you would have done differently either on March 13th of 2022 or March

15th of 2022 as we sit here now, two years later?

MS. REZVANI: Objection. Vague and ambiguous.

If you have an answer.

THE WITNESS: I don't have an answer to that.

BY MS. ANGELES:

Q. There's nothing you would -- looking at the video today and reflecting on what you did during your classifications interview, is there anything that you would change about the way you interacted with Mr. Schuck?

MS. REZVANI: Vague and ambiguous. Argumentative.

If you have a response.

THE WITNESS: I don't have a response.

BY MS. ANGELES:

Q. You don't have a response because you wouldn't do anything differently, or you can't think of anything?

MS. REZVANI: You can clarify.

THE WITNESS: I wouldn't do anything differently.

MS. ANGELES: I'm sorry?

THE WITNESS: No. I wouldn't do anything differently.

BY MS. ANGELES:

Q. Is there anything that you wish you could review

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [  ] was [ X ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 18th of June, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 10774

# EXHIBIT 35

# Deposition Transcript

Case Number: 23-cv-00785-DMS-AHG
Date: May 8, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# CARINA ECHON

CERTIFIED COPY

Reported by:

Kaylee G. Wood
CSR No. 14348, RPR, CRR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

DEPOSITION OF CARINA ECHON

SAN DIEGO, CALIFORNIA

MAY 8, 2024

REPORTED BY KAYLEE G. WOOD, RPR, CRR, CSR NO. 14348

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO, et al.,<br><br>Defendants. | Case No. 23-cv-00785-DMS-AHG |

VIDEO RECORDED DEPOSITION OF CARINA ECHON, commencing at the hour of 10:21 a.m., Wednesday, May 8, 2024, at 1350 Columbia Street, Suite 600, San Diego, California, 92101, before Kaylee G. Wood, Certified Shorthand Reporter, Registered Professional Reporter, and Certified Realtime Reporter in and for the State of California.

APPEARANCES

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: MICHELLE C. ANGELES, ESQ.
1350 COLUMBIA STREET, SUITE 600
SAN DIEGO, CA 92101
(619) 794-0451
MANGELES@MCKENZIESCOTT.COM

FOR THE DEFENDANTS, COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, AND CARINA ECHON, JENNIFER VIVONA, THOMAS MACE, AND JEFF AMADO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, ESQ.
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANTS, CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: SAUL LOPEZ, ESQ.
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
SLOPEZ@LDRLAW.COM

ALSO PRESENT:

DAVID KIM, VIDEOGRAPHER

A. Yes.
Q. You see the entry right below where it says, type, RN note?
A. Yes.
12:10 Q. Is that normally what you would put for your type of note?
A. Yes.
Q. Okay. Okay. And so going back to the contents of this entry, do you remember entering this?
12:10 A. Yes.
Q. Can you tell me what happened?
A. Once we received the court order we put a note, something like that, received court order for referral to jail medical which is also written in the
12:11 court order itself.
Q. Okay. Let me kind of go through bit by bit. So you said we received court order. When you say we, who do you mean?
A. Medical.
12:11 Q. And how is that court order received?
A. It's -- sometimes it's faxed to us. Most of the time they use the tube system.
Q. Excuse me. What was that?
A. It's a tube system. It's from second floor.
12:11 They tube it up to third floor.

Q. When would you -- when would you look at a court order?
A. It depends upon the situation. If let's say -- can I give an example?
12:16 Q. Sure, yes.
A. Let's say the court order says patient is referred to medical for immediate medical attention. Then I will look for the court order and, you know, find out what information are there so I can, you know,
12:16 get more information from the patient, and it's additional information for me. When I see the patient what are the information or what am I looking for? It's just additional information for me.
Q. Okay. So it's important to document any
12:17 important observations or things noted in the court order in the SOAP notes because there's no guarantee that somebody providing care in the future will review the court order prior to -- prior to providing care?
A. Yes.
12:17 Q. Okay. In this record it says, IP refused MDSC today.
What does that mean?
A. I misread that part. When I'm reading the notes from the doctor that says, patient refusing
12:18 medical evaluation, has decision-making capacity, I

thought it was the MD sick call at that day, but it was at UCSD.

Q. I'm sorry. Can you explain that?

A. When I was entering my progress notes for the court order I misread that part that -- the entry above my -- that -- from Nicholas Kahl, it says, patient refusing medical evaluation, has decision-making capacity. I thought that the patient refused the MD sick call at jail. It was from UCSD, not in jail.

Q. Got it. So let me see if I understand this correctly. You -- on 3/15 of 2022 you received a court order from the judge ordering medical to provide medical care to Hayden Schuck because of a concern that he observed in court?

A. To screen for medication.

Q. For medication. Basically he asked that medical see him, correct?

A. For medication screening.

Q. To do some sort of medical evaluation?

A. It's -- it's not -- how do I say it? It's -- to me it's, like, what medication the patient needed.

Q. Sure, but you would need to make an assessment of the patient to evaluate what medication that patient needs, correct?

A. Yes, yes.

Q. If he had refused medical care, refusals are supposed to be documented?
A. Yes.
Q. So there would be documentation of that refusal in TechCare?
A. Yes.
Q. You made this note just based off of the progress notes and not any other refusal that you observed in the TechCare, correct?
A. I misread the entry of Kahl. I thought he refused MD sick call with NP Kahl that day, but it was at UCSD.
Q. So as far as you know, no one saw Hayden Schuck after he got back from court?
MR. INMAN: Objection. Vague. Overbroad.
A. I don't know.
Q. No one saw -- looking at the progress notes, no one saw Hayden Schuck the evening of 3/15?
MR. INMAN: Objection. Calls for speculation. Vague. Overbroad.
A. Based on the documentation, no.
Q. So in your capacity as a nurse if you were trying to evaluate what has been done or what hasn't been done and looking at Mr. Schuck's record and the progress notes here, is there anything here to indicate

that he was seen in the evening of 3/15?
A. None.
Q. After you received this court order who did you provide that court order to?
12:29 A. It's scanned in his records.
Q. When would it have been scanned?
A. That night.
Q. And that would have been scanned by the office administrator?
12:29 A. The office assistant.
Q. Oh, the office assistant. Is there anything else that you did in relation to Hayden Schuck on 3/15 of 2022?
MR. INMAN: Objection. Vague.
12:30 A. I just reviewed the court orders and noted that there's one scheduled the following day already, that he will be seen by the nurse for housing unit rounds.
Q. And just so it's clear, you didn't indicate
12:30 in your progress notes that you refuse -- or that you reviewed and saw that he was scheduled for an appointment and that's why you didn't schedule another one?
A. I did not indicate there.
12:30 Q. Right. You only indicated that he refused

Q. So is the end of shift report used to communicate any events that happened during a particular --

A. Yes.

01:42 Q. -- the prior shift to the -- somebody coming in on the next shift?

A. Yes.

Q. Is that -- does that summarize -- does the end of shift summarize all the medical events that happened the entire shift regardless of the unit? 01:42

A. It's like -- not the entire unit. It's like -- how do you say this? Like, unusual occurrence.

Q. Unusual occurrence?

A. Yes.

01:42 Q. Like deaths?

A. Yes.

Q. And what did the end of shift report include?

A. Pertaining to the patient?

Q. Pertaining to Hayden Schuck's death.

01:43 A. It will be just passed down as we have a death in custody.

Q. And that's the extent of information that you're provided?

A. Yes.

01:43 Q. Did anyone interview you or question you

about Hayden Schuck and his medical care?

MR. INMAN: Objection. Overbroad.

A. None.

Q. Did anyone ask you about what you did on 3/15 after Hayden Schuck passed away -- after Hayden Schuck's death on 3/16?

MR. INMAN: Same objection and object to the extent that it would call for attorney-client communications. And instruct the witness not to answer with respect to any communications that were with an attorney.

Q. And just so it's clear, I'm not asking you to divulge anything that your attorney has advised you. My understanding is that whenever there is a death there is an internal investigation that's done where nurses and deputies are interviewed and questioned about -- you know, trying to figure out what happened. Were you questioned at all about your work in Hayden Schuck's medical care?

A. No.

Q. At any point did you have a meeting to discuss Hayden Schuck's medical care?

A. No.

Q. There was no -- so at no point there wasn't a meeting or a debrief that you had where you guys tried

to discuss what could be learned from Hayden Schuck's time at the jail?

A. It always happens after the man down on the shift that it happened, the debriefing.

Q. So let me see if I understand this. As soon as the man down or the death occurs the debrief happens soon after that?

A. Yes.

Q. The debriefing -- and there's only one debrief?

MR. INMAN: Objection. Lacks foundation. Calls for speculation.

Q. From your understanding?

A. Yes.

Q. Have you been involved in debriefs before?

A. Yes.

Q. When have you been involved in debriefs?

A. I can't remember the year and date.

Q. About how many have you been involved in?

A. Maybe three, four.

Q. Were those all a debrief related to an in-custody death?

A. No. There's some that's after man down, so all the staff that provided care need to gather together. We need to refresh, you know, who did -- who

provided the intervention because -- for the purpose of documentation.

Q. And when you say man down, can you explain what that means?

01:47 A. It's a medical emergency.

Q. So after every medical emergency there is a debrief?

A. Yes.

Q. Out of the three to four debriefs that you

01:47 participated, how many of those were related to a death?

A. Three.

Q. Three?

A. Three.

01:47 Q. Were any of those deaths related to overdose?

MR. INMAN: Objection. Lacks foundation. Calls for speculation.

A. No.

Q. Were any of those deaths related to

01:47 dehydration?

MR. INMAN: Same objections.

A. No.

Q. Were any of those deaths related to complications with withdrawal?

01:47 MR. INMAN: Same objections.

A. I will alert the deputy that there is some kind of substance there, but I'm not familiar what. I mean, if they're inside the cell then I will alert the deputies and ask them to check.

01:55 Q. You would report it?

A. Yes.

Q. And if someone's going under -- undergoing overdose, you're trained on how to treat someone with Narcan, for example?

01:55 A. Yes.

Q. And so it's important to note observations throughout the duration of someone's time at the county jail because what is learned on one day might be able to help a nurse on a separate day on how to treat

01:56 somebody?

A. Yes.

Q. And likewise, it's important for the deputies to also inform you of their observations because sometimes they are interacting with the patient and the

01:56 nurses are not?

A. Yes.

Q. You rely on those deputies to inform you of any observations that they make that would give you -- that would help you in your medical care, correct?

01:56 MR. INMAN: Objection. Vague. Overbroad.

Q. You rely on the deputies -- the information provided by the deputies in deciding what type of care you're going to provide a particular patient, correct?
MR. INMAN: Objection. Overbroad. Vague. Argumentative.
01:57
Q. You can answer.
A. Yes.
Q. Is there anything that you wish you would have been able to review, any policies, medical documents, anything that you can think of that would -- that you would -- that you wish you could have reviewed before your testimony today?
01:57
A. None.
Q. Is there anything that you want to clarify or add to your testimony today?
01:57
A. No.
Q. Is there anything about Mr. Schuck's time between March 22nd -- or March 10th of 2022 to March 16th, any information that you wish to share about Mr. Schuck today?
01:58
A. None.
MS. ANGELES: Okay. No further questions.
MR. LOPEZ: I don't have any questions. Thank you.
01:58
MR. INMAN: Just take a five-minute break

: : : CERTIFICATE OF REPORTER : : :

I, Kaylee Lachmann, a Certified Shorthand Reporter, holding a valid and current license issued by the State of California, No. 14348, duly authorized to administer oaths, do hereby certify:

That the witness in the foregoing deposition was administered an oath to testify to the whole truth in the within-entitled cause;

That said deposition was taking down by me in shorthand at the time and place therein stated and thereafter transcribed into typewriting, by computer, under my direction and supervision.

( X ) Reading and signing was requested.

( ) Reading and signing was waived.

( ) Reading and signing was not requested.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither counsel for nor related to any party in the foregoing depositions and caption named nor in any way interested in the outcome thereof.

Dated: This 22nd day of May, 2024

at San Diego, California.

Kaylee Wood

KAYLEE G. WOOD

CSR NO. 14348

# EXHIBIT 36

# (VIDEO MANUALLY LODGED WITH THE COURT)

# EXHIBIT 37

# (VIDEO MANUALLY LODGED WITH THE COURT)