# EXHIBIT 38

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: July 5, 2024

In the matter of:

# ESTATE OF SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

# Loraine Gallegos

CERTIFIED COPY

Reported by:
Adriana S. Angulo

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

ESTATE OF HAYDEN SCHUCK, et al., )

Plaintiff, )

vs. )

COUNTY OF San Diego, )

Defendant. )

VIDEOTAPED DEPOSITION OF LORAINE GALLEGOS

San Diego, California
Friday, July 5, 2024

Pages 1 through 79, inclusive

Reported by Adriana S. Angulo, CSR
Certificate No. 13824

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

CASE NO. 3:23-CV-00785-DMS-AHG

| | |
|---|---|
| ESTATE OF HAYDEN SCHUCK, et al., | ) |
| Plaintiff, | ) |
| vs. | ) |
| COUNTY OF San Diego, | ) |
| Defendant. | ) |

VIDEOTAPED DEPOSITION OF LORAINE GALLEGOS, was taken pursuant to Subpoena, at 1350 Columbia Street, Suite 600, San Diego, California, on Friday, July 5, 20224, commencing at 9:07 a.m., before Adriana S. Angulo, CSR No. 13824, a Certified Shorthand Reporter in and for the State of California.

# A P P E A R A N C E S

For the Plaintiff:

MCKENZIE SCOTT PC
BY: MICHELLE ANGELES, ESQ.
1350 Columbia Street, Suite 600
San Diego, California 92101
(619) 794-0451
mangeles@mckenziescott.com

For the Defendant:

COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, ESQ.
AND
BY: LINDSEY BURNETTE, ESQ.
1600 Pacific Highway, Suite 355
San Diego, California 92101
(619) 884-2931
steven.inman@sdcounty.ca.gov

A P P E A R A N C E S (continued)

For the Defendant: CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP

LOTZ DOGGETT & RAWERS, LLP
BY: KATIE SCHULER, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
kschuler@ldrlaw.com

Also Present:

Elijah Ochoa - Legal Video Technician

09:44:22 Q. So that -- you would have received that training prior to March of 2022, you think?
09:44:29 A. Yes.
09:44:29 Q. Have you ever had any disciplinary issues while you've been at the San Diego Central Jail?
09:44:47 A. No.
09:44:48 Q. You've never been put on probation or performance improvement plan?
09:44:54 A. No.
09:44:54 MR. INMAN: Objection to the extent it calls for privacy.
BY MS. ANGELES:
09:45:01 Q. Have you ever received any promotions?
09:45:03 A. They don't promote. No.
09:45:07 Q. So you -- do you remember working on March 16th of 2022?
09:45:27 A. Not the specific date.
09:45:33 Q. Okay.
09:45:34 A. Yes. I was working because it was a Wednesday.
09:45:41 Q. And I guess I could say, do you remember working the day that Hayden Schuck passed away?
09:45:47 A. Yes.
09:45:48 Q. And why do you remember that day?
09:45:52 A. Because I was given a release of information

for him.

Q. I'm going to is you to repeat that a little bit louder your voice dropped.

A. Because I was given a release of information for him.

Q. And who provided you a release of information?

A. It was on the cart.

Q. And what is a release of information?

A. A form that the incarcerated person would sign, if they allow us to release any information about them to the requesting party.

Q. And so on -- I know you don't remember the specific date, but Hayden Schuck died March 16th of 2022.

On that day you remember receiving a release of information form on your cart.

Was there anything in relation to that release of information that was included about Mr. Schuck?

A. It was just a release for his parents that was requesting information.

Q. And were they requesting, if you know, information about his -- Hayden -- Mr. Schuck's medical history or mental health history?

Do you know specifically what they were looking for?
A. No.
Q. So the information that you had was the form, the release of information form, and then a note saying -- from his parents?
A. Yes.
Q. Anything else that you learned about Mr. Schuck or about the request?
A. No.
Q. And what -- what role were you playing, I guess? What were you assigned to that morning when you showed up to work?
A. 7th floor med pass.
Q. And is the 7th floor a regular housing floor, or does it house a specific population?
A. It houses a specific population.
Q. And if you know, what population is that?
A. It's the ad seg in the protective custody.
Q. Do you know if Mr. Schuck was in ad seg or protective custody at all?
A. No. No.
Q. You don't know?
A. No.
Q. So you were assigned to do 7th floor med

09:49:05 pass.

09:49:06 As part of that role, is it typical for you to also get releases of information signed?

09:49:19 A. Yes.

09:49:19 Q. After you get that release of information signed, what do you do with that form?

09:49:28 A. We give it to the office assistant.

09:49:32 Q. Okay. Do you know what they do with that form?

09:49:35 A. They scan it into the record.

09:49:38 Q. And that release of information form, what kind of information do you need to get from the patient?

09:49:52 A. A signature.

09:49:53 Q. Just a signature and that's it?

09:49:56 A. Yes.

09:49:56 Q. Do you have to advise them about what the release of information is?

09:50:03 A. Yes.

09:50:04 Q. So on March 16th of 2022, you were told to see Mr. Schuck just to obtain this release of information?

09:50:21 Were you told to see him for any other purpose?

09:50:23 A. No.

09:50:23 Q. Did you know anything about Mr. Schuck prior to going to see him?
09:50:30 A. No.
09:50:30 Q. So tell me about you trying to obtain this release of information from Mr. Schuck.
09:50:40 MR. INMAN: Objection. Vague.
09:50:41 THE WITNESS: Can you clarify, like --
09:50:44 BY MS. ANGELES:
09:50:45 Q. Sure.
09:50:45 Like what did you -- what do you remember doing, or what do you remember about your interaction with him?
09:50:49 A. Walking up to his door.
09:50:52 Q. Okay.
09:50:52 A. And calling his name and asking if he would like us to release information to his parents.
09:51:05 Q. And when you said you were calling his name, were you calling him by his last name? His first name?
09:51:14 A. Initially the last name.
09:51:17 Q. Okay.
09:51:18 A. And then his first and last name.
09:51:20 Q. And about how many times do you think you remember calling out his name?
09:51:28 A. I don't recall.

09:53:01 to you?
09:53:02 A. Yes.
09:53:02 Q. Did you ask Mr. Schuck to turn around?
09:53:08 A. I don't recall.
09:53:09 Q. Did you ask Mr. Schuck to come to the door?
09:53:14 A. Yes.
09:53:15 Q. Did he come to the door?
09:53:19 A. No.
09:53:21 Q. When you went to see Mr. Schuck, I presume
09:53:31 you were with a deputy?
09:53:34 A. Yes.
09:53:35 Q. Do you remember that deputy's name?
09:53:36 A. I don't recall.
09:53:37 Q. Do you recall if the deputy opened the door
09:53:46 for you to speak to Mr. Schuck?
09:53:47 A. No.
09:53:47 Q. Do you recall if the deputy opened the food
09:53:50 slot or the food door, the chow door, in order for
09:53:55 you to speak to Mr. Schuck?
09:53:57 A. Yes.
09:53:57 Q. You do remember that?
09:53:58 A. Yes.
09:53:59 Q. Did you speak to Mr. Schuck through that
09:54:03 slot, the food slot?
09:54:07 A. Yes.

09:54:07 Q. Did you knock on the door?
09:54:12 A. I don't recall.
09:54:13 Q. Do you remember if the deputy said anything
09:54:21 to Mr. Schuck?
09:54:22 A. Yes.
09:54:24 Q. What did the deputy say?
09:54:26 A. His name.
09:54:27 Q. Anything else?
09:54:30 A. Not that I can recall.
09:54:34 Q. Did you and the deputy talk about
09:54:41 Mr. Schuck?
09:54:41 A. Yes.
09:54:43 Q. And what was that conversation about?
09:54:45 A. To -- I -- to try to get him up to get the
09:55:01 paper signed, and that I was going to have a nurse
09:55:07 talk to him.
09:55:10 Q. Is this what you told the deputy?
09:55:13 A. I don't remember.
09:55:17 Q. Okay. So my question is, did you -- do you
09:55:23 remember exchanging, or having a conversation,
09:55:26 exchanging words with the deputy who was with you
09:55:29 that day?
09:55:30 A. Yes.
09:55:30 Q. And do you remember exactly what you were
09:55:37 talking about, or what you said to him?

09:55:40 A. No. I don't remember.
09:55:41 Q. Do you remember what, if anything, the
09:55:45 deputy said to you during that conversation?
09:55:48 MR. INMAN: Objection to the extent it calls
09:55:51 for hearsay.
09:55:53 THE WITNESS: No.
09:55:53 BY MS. ANGELES:
09:55:53 Q. So you remember talking to the deputy about
09:55:56 Mr. Schuck, but you don't remember what exactly was
09:56:01 said?
09:56:01 A. That I wanted him to be seen by a nurse
09:56:13 because he had wounds on his back.
09:56:17 Q. Okay. And you remember saying that to the
09:56:22 deputy?
09:56:23 A. Yes.
09:56:23 Q. Okay. So tell me about the sores that you
09:56:28 observed.
09:56:29 A. There were multiple sores on his back and
09:56:36 they were red.
09:56:42 Q. Excuse me.
09:56:43 Let me see if I heard you correctly.
09:56:48 You observed multiple sores on Mr. Schuck's
09:56:54 back and they were red?
09:56:55 A. Yes.
09:56:55 Q. About how big were these sores?

09:56:59 A. I can't tell you from the distance I was. I couldn't give you a size of it.
09:57:05 Q. Were they bigger than a quarter or smaller than a quarter?
09:57:09 A. About a quarter.
09:57:12 Q. And why -- why did the sores stand out to you?
09:57:30 A. Because I wanted to make sure he was getting treated for them.
09:57:35 Q. Is there a place where you could verify if somebody is getting treatment for wounds?
09:57:50 A. Yes.
09:57:51 Q. Where would you check?
09:57:54 A. Tech care.
09:57:56 Q. And in Mr. Schuck's instance, did you check tech care to see if he was assigned wound care?
09:58:05 A. No.
09:58:05 Q. Did the wounds look like they had been treated at all?
09:58:12 A. I couldn't tell you from the distance.
09:58:15 Q. The wounds didn't have, like, bandages or anything like that?
09:58:22 A. No.
09:58:22 Q. Were the wounds bleeding or exerting any sort of liquid from them?

09:58:32 A. No.
09:58:33 Q. So they were, like, dry wounds?
09:58:37 A. I couldn't tell you if they were dry or not.
09:58:43 Q. So from your interaction from Mr. Schuck, is there anything else that you remember about that interaction that you haven't mentioned at this point?
09:58:57 A. No.
09:58:58 Q. So let me see if I understand sort of the order of how things happened.
09:59:08 You go to see Mr. Schuck for the purpose of reviewing the release of information form. You knock and you call out to him, you're unclear on how many times you did that, but you call his name -- first name, last name -- and then he doesn't respond.
09:59:31 When you're calling out to him, is he looking at you?
09:59:35 A. No.
09:59:36 Q. Okay. How was -- where is he positioned?
09:59:40 A. He was facing the wall.
09:59:42 Q. Was he sitting up? Lying down? Standing?
09:59:46 A. Lying down.
09:59:48 Q. And he -- was he laying down -- like where was he laying down?

10:00:57 A. I don't recall.
10:00:58 Q. Did you see like any urine in the room?
10:01:06 A. I don't recall.
10:01:07 Q. On the bed, did you see any stains --
10:01:13 A. No.
10:01:14 Q. -- on the blanket or anything like that?
10:01:17 A. No.
10:01:17 Q. Okay. So you see him laying on the bed,
10:01:26 he's not facing you, and he's naked.
10:01:29 At any point were you able to see his face?
10:01:34 A. I don't recall.
10:01:36 Q. Do you remember seeing his eyes?
10:01:42 A. I don't. No.
10:01:46 Q. No, you don't remember, or do you -- or no,
10:01:49 you didn't?
10:01:50 A. No, I don't remember.
10:01:51 Q. Okay. Did you hear Mr. Schuck make any
10:02:02 noises?
10:02:04 A. I remember him mumbling.
10:02:13 Q. Did it sound like he was mumbling words, or
10:02:18 did it just sound like -- did it just sound like a
10:02:23 sound, like a --
10:02:26 A. A sound.
10:02:26 Q. And did he mumble in response to your
10:02:32 questions or to you speaking to him?

10:02:34 A. I don't remember.
10:02:37 Q. Okay. When was he mumbling, do you remember at what point in your interaction he was mumbling?
10:02:49 A. When we were trying to get his attention.
10:02:51 Q. Could you hear what the mumbles were?
10:02:58 A. No.
10:02:59 Q. Did you ask the deputy to maybe open the door so you guys can hear Mr. Schuck better?
10:03:06 A. No.
10:03:06 Q. Is that something you could have done?
10:03:09 A. Yes.
10:03:14 Q. Is there a reason why you didn't in Mr. Schuck's case?
10:03:21 A. There was a nurse on the floor.
10:03:23 Q. Okay.
10:03:28 A. And -- yeah.
10:03:29 Q. And what -- why is that important?
10:03:34 A. Because I went to her for his wounds.
10:03:38 Q. So I don't want to put words in your mouth but I asked, you know, why you didn't go inside to try to speak to Mr. Schuck or listen to his mumbles. And I think you mentioned because there was a nurse on that floor, and you went to that nurse.
10:04:01 Were you looking, or were you going to that nurse to ask for her to provide treatment, or what

10:04:09 exactly did you tell her to do with Mr. Schuck?
10:04:12 A. To evaluate his wound.
10:04:14 Q. Did you tell her that he was mumbling
10:04:23 something?
10:04:23 A. I don't remember.
10:04:23 Q. But besides telling her to evaluate his
10:04:33 wounds, did you tell her anything else?
10:04:35 A. The release of information form.
10:04:38 Q. What did you tell her about the release of
10:04:41 information form?
10:04:42 A. That I couldn't get him to sign it, and I
10:04:46 asked her to offer it for him to sign.
10:04:49 Q. So you asked her to try to get it signed?
10:04:56 A. Yes.
10:04:57 Q. Okay. Did you tell her that Mr. Schuck
10:05:02 refused to sign it?
10:05:04 A. I don't recall.
10:05:06 Q. Did you tell her that you asked him to move
10:05:13 his leg?
10:05:14 A. I don't recall.
10:05:15 Q. Did you describe the wounds to her?
10:05:26 A. Yes.
10:05:27 Q. Did you describe any other concerns to
10:05:34 Mr. Schuck to the nurse?
10:05:35 A. No.

Q. Do you remember what nurse this was, or what her name, or what his name was?

A. Emily.

Q. Do you know what her last name one?

A. Lymburn.

Q. And what did Ms. Lymburn say to you? Did she ask you any questions about Mr. Schuck?

A. She said that he was on her list to be seen, and she will offer the release of information to him.

Q. Did she tell you why Mr. Schuck was on her list?

A. No.

Q. And when you say "her list," what role, or what was your understanding of Ms. Lymburn's role that day?

A. RN --

MR. INMAN: Objection. Lacks foundation.

THE WITNESS: RN sick.

THE COURT REPORTER: Can you repeat that, please.

THE WITNESS: RN sick call.

BY MS. ANGELES:

Q. And what is your understanding of what an RN sick call nurse does?

10:06:46 A. (Indiscernible crosstalk.)
10:06:46 MR. INMAN: Same objection.
10:06:47 THE WITNESS: (Inaudible) the patient.
THE COURT REPORTER: Can you repeat the last
10:07:01 answer.
10:07:01 THE WITNESS: Evaluate the patient.
10:07:02 BY MS. ANGELES:
10:07:02 Q. Is that why you went to her specifically
10:07:04 since you know that she is responsible for
10:07:07 evaluating patients on that particular floor?
10:07:11 A. Yes.
10:07:15 MS. ANGELES: So I think we've been going
10:07:16 for an hour. I think it makes sense to take a
10:07:20 break.
10:07:21 THE VIDEOGRAPHER: We are off the record.
10:07:22 The time is 10:07 a.m. Pacific time.
10:20:45 (A Recess is taken.)
10:20:45 THE VIDEOGRAPHER: We are back on the
10:20:51 record.
10:20:52 The time is 10:20 a.m. Pacific time.
10:20:55 BY MS. ANGELES:
10:21:00 Q. Ms. Gallegos, before we went on our break,
10:21:03 we were talking about March 16, 2022, when you went
10:21:12 to see Mr. Schuck on the 7th floor module. And you
10:21:15 were just done explaining, correct me if I'm wrong,

10:28:14 you're asking for a further assessment, either from
10:28:17 a registered nurse, a doctor, or nurse practitioner,
10:28:24 you make that -- when you make that request
10:28:26 verbally, do you document, or are you trained to
10:28:31 document that interaction, the request that you made
10:28:36 anywhere?
10:28:38 MS. SCHULER: Same objections.
10:28:39 THE WITNESS: If we do, like, schedule them
10:28:43 for a sick call, we'll put it in our sick call that
10:28:47 what we -- why they're -- why we're requesting the
10:28:49 sick call.
10:28:50 BY MS. ANGELES:
10:28:51 Q. Okay. So in the instance here where you
10:28:56 asked Nurse Lymburn to treat Mr. Schuck, is there a
10:29:04 reason why you didn't also document that
10:29:08 conversation in tech care?
10:29:11 A. He was already scheduled to be seen by a
10:29:15 nurse.
10:29:15 Q. Is there a reason why you didn't document
10:29:20 the things that you observed about Mr. Schuck and
10:29:24 his demeanor?
10:29:24 A. No.
10:29:27 Q. Is that something that you are trained to
10:29:34 do?
10:29:34 A. Yes.

10:29:36 Q. And why -- if you know, why are you trained to document your observations?

10:29:43 A. So we can follow a process to see if, like, the process of healing, for instance, for a wound, from when it started to the process of each step of it.

10:29:57 Q. So I hear you say to follow a process.

10:30:01 Is that to ensure continuity of care?

10:30:05 A. Yes.

10:30:06 Q. Because you might not be the nurse that sees, let's say, Mr. Schuck a week later?

10:30:13 A. Yes.

10:30:13 Q. Right. And sometimes you, or nurses generally, or the medical staff generally, rely on notes to know what happened or what didn't happened in a particular case?

10:30:24 A. Yes.

10:30:25 Q. So without those notes and without having a one-on-one conversation, is there anyway -- any other way someone notice find out what's going on with a particular patient?

10:30:37 MR. INMAN: Objection. (Inaudible.)

10:30:38 THE COURT REPORTER: Can you repeat your objection?

10:30:40 MR. INMAN: Argumentative. Vague.

10:39:46 and then a laptop, or some sort of computer.
10:39:53 What kind of access or what information do
10:39:56 you have access to in that system?
10:39:58 A. The -- their medication list and previous
10:40:07 meds that they were on, their schedule, if they have
10:40:12 a wound care, or if they have a -- or a sick call.
10:40:19 Q. Okay. So one second.
10:41:03 So in the computer system, do you have
10:41:07 access to the entirety of tech care on this system?
10:41:12 A. No.
10:41:13 Q. Just limited information that you mentioned?
10:41:17 A. Yes.
10:41:17 Q. And in this cart, did you have what you
10:41:26 would need to treat someone for a wound care?
10:41:29 A. No.
10:41:29 Q. Is this cart just medication?
10:41:32 A. Yes.
10:41:32 Q. I'm going to play again at 1:24, an hour
(inaudible.)
10:41:52 THE COURT REPORTER: An hour and?
10:41:52 MS. ANGELES: 24 minutes.
10:42:04 (Audio plays.)
BY MS. ANGELES:
10:42:05 Q. Stopping at 1:24:39, we see you looking into
10:42:11 a door, and Deputy Amado is to your left, and you

10:42:19 look in.
10:42:20 At this point it looks like you and Deputy Amado -- and you can correct me if I'm wrong -- are speaking to each other?
10:42:28 Do you remember what you were talking about at this time?
10:42:32 A. He was asking what his first name was.
10:42:35 Q. And I see you kind of lifted up a form.
10:42:38 Are you looking at the form to figure out what his name is?
10:42:41 A. Yes.
10:42:41 Q. And at this point, has Deputy Amado opened up the food flap, the little window where you can put food through?
10:42:54 A. No.
10:42:55 Q. Playing again at 1:24:39.
10:43:01 (Video plays.)
10:43:32 Q. So stopping at 1 hour and 25 minuted and 30 seconds.
10:43:36 We saw you at Mr. Schuck's door for sometime, and at this point in the video, you're away from the door walking towards your cart.
10:43:45 Do you know what you're doing at this moment? Do you remember?
10:43:50 A. I don't recall.

Q. Playing again at 1:25:03.

(Video plays.)

Q. Pausing again at 1:25:14.

We see you walk towards the direction of the camera and then you go off camera.

Do you remember where you're going at this moment?

A. To talk to Emily.

Q. And where was Emily located at this point?

A. The module over.

Q. And how did you know that?

A. I saw her on the floor already.

Q. You had seen her on the floor on the -- in the other module earlier?

A. I can't recall if it's a module.

Q. So you had seen her earlier.

Did you know where she was headed?

A. She was on the floor, but I wasn't sure where she was headed.

Q. Did you know if she was headed to module 7D, or she was assigned to module 7D?

A. No.

Q. And at this moment, why were you heading to talk with Nurse Lymburn?

A. About the wounds on his back that I saw.

10:45:18 Q. So at this point you -- a minute -- one hour and 25:14, from what we saw -- when we saw you at the door, you had already observed everything that you testified to earlier today?
10:45:33 A. Yes.
10:45:33 Q. So starting the video again at 1:25:14.
10:45:41 (Video plays.)
10:45:56 Q. It looks likes you come back to the door, peek in, and you still have the form.
10:46:00 Were you successful in finding Nurse Lymburn?
10:46:11 A. Yes. But I don't think at that time I saw her yet.
10:46:15 Q. Okay. So it's possible that at this point you walked away but you're not sure why?
10:46:20 A. Yeah.
10:46:21 Q. And we see you go back to your computer at minute -- or sorry at hour 1:25, 40 seconds.
(Video plays.)
10:46:45 Q. Do you remember if you were looking information up related to Mr. Schuck, or what are you doing at this point?
10:46:52 A. I don't recall.
10:47:01 (Video plays.)
10:47:02 Q. Stop- -- pausing the video again at an hour,

10:54:16 And what did you hear being said over the radio?
10:54:23 A. There was a man down in 7D.
10:54:29 Q. When you heard that, did you know that that was in relation to Mr. Schuck?
10:54:36 A. No.
10:54:36 Q. When did you learn that the man down was related to Mr. Schuck?
10:54:41 A. After I asked who it was.
10:54:43 Q. And who did you ask about that?
10:54:47 A. I don't recall.
10:54:48 Q. What if anything did you do when you learned that it was Mr. Schuck?
10:54:59 A. Nothing.
10:55:02 Q. I know you participated in an interview with detectives that same day.
10:55:19 Was that because they initiated that interview?
10:55:27 A. Yes.
10:55:27 Q. And what I mean by that is, you didn't go to anyone and say, "Hey, I just saw him this morning, you know, I was involved in his care"? You know, there was no one that you notified about what you had done that morning?
10:55:42 A. I did notify that I did come into contact

that morning.
Q. You did notify?
A. Yes.
Q. Who did you notify?
A. Either the charge nurse or the desk nurse.
Q. And why did you do that?
A. Because they asked us if there is anybody that came in contact with him prior to the incident.
Q. When they say "prior to the incident," is it your understanding that that would apply -- that they're asking about anyone that saw Mr. Schuck that day or in the days prior?
A. That day.
Q. So beyond the charge nurse and the detectives, did you tell anyone else that day what you did in relation to Mr. Schuck?
A. No.
Q. After your interview -- or scratch that.
At any point after Mr. Schuck's death, did you meet with anyone from the medical services department to figure out what happened to Mr. Schuck?
A. No.
Q. Did you talk with anyone, any of your coworkers or anyone, to try to figure out what

10:57:19 happened to Mr. Schuck?
10:57:20 A. No.
10:57:20 Q. Did anyone talk to you about what you could
10:57:28 learn from this experience?
10:57:29 A. No.
10:57:30 Q. Did you try to talk to anyone about what you
10:57:36 could learn about this experience?
10:57:37 A. No.
10:57:38 Q. As you sit here today, looking back at, you
10:57:45 know, the video and your review of what you did in
10:57:49 relation to Mr. Schuck's care, is there anything
10:57:52 that you would do differently?
10:57:54 A. No.
10:57:54 Q. Is there anything that you wish that you
10:58:03 would have reviewed in preparation for your
10:58:07 testimony today that you haven't had a chance to
10:58:09 review?
10:58:09 A. No.
10:58:09 Q. Anything that you want to add or clarify
10:58:16 about your testimony today?
10:58:18 A. No.
10:58:18 Q. Or anything you want to talk about that we
10:58:23 haven't talked about today --
10:58:26 A. No.
10:58:26 Q. -- in relation to Mr. Schuck?

REPORTER'S CERTIFICATE

I, Adriana S. Angulo, Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place therein named; that said deposition was reported by me in shorthand and later transcribed under my direction, and the preceding pages contain a true record of the testimony of the witness; and I do further certify that I am a disinterested person and am in no way interested in the outcome of said action, or connected with or related to any of the parties in said action, or to their respective counsel.

The dismantling, unsealing, or unbinding of the original transcript will render the Reporter's Certification null and void.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of July 2022.

Adriana S. Angulo
Certificate No. 13824

# EXHIBIT 39

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: May 22, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

## DEPUTY JEFF AMADO

CERTIFIED COPY

Reported by:

Sheri Somers
CSR No. 9734, CLR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | ) | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | ) | VIDEOTAPED DEPOSITION OF DEPUTY JEFF AMADO |
| vs. | ) | MAY 22, 2024 |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | ) | 1350 Columbia Street Suite 600 San Diego, California |

CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2–3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES,

Defendants.

Videotaped Deposition of DEPUTY JEFF AMADO

San Diego, California

May 22, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 965076

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al., | ) | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | ) | |
| vs. | ) | |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al., | ) | |
| Defendants. | ) | |

Videotaped Deposition of DEPUTY JEFF AMADO, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 1:06 p.m. and ending at 3:43 p.m., on Wednesday, May 22, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
1600 Pacific Coast Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Sofia L. Rezvani, Esq.
Sofia.rezvani@sdcounty.ca.gov

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

David Kim
STENO

01:30:58 Q. Sitting on a stool?
01:31:00 A. Inside his cell.
01:31:03 Q. And what was he doing?
01:31:04 A. Just sitting there.
01:31:05 Q. Did you say anything to him?
01:31:07 A. I don't recall.
01:31:10 Q. Do you remember if he said anything to you?
01:31:13 A. I don't recall.
01:31:14 Q. Do you remember anything else that you saw during the first safety check?
01:31:21 A. No.
01:31:21 Q. Do you remember how long the first safety check took?
01:31:27 A. No.
01:31:27 Q. How were you trained to carry out a safety check when you do one?
01:31:33 A. Well, during a safety check you have to stop at every cell, look inside, make sure three things, no obvious signs of medical distress, no destruction to jail property, and no criminal activity. I usually stop at each cell, make sure everyone is okay.
01:31:52 Q. So --
01:31:52 MS. REZVANI: Make sure you speak clearly.
01:31:55 THE WITNESS: Sorry.
///

BY MR. SCOTT:

Q. I heard you say that there's three main things that you look for when you're doing a safety check?

A. Yes.

Q. The first was no obvious signs of medical distress?

A. Correct.

Q. The second was no destruction of jail property?

A. Yes.

Q. And the third was no criminal activity?

A. Correct.

Q. And you're taught to look for each of those three things?

A. Yes.

Q. As to the first one, when you say that you're looking for obvious signs of medical distress, what's your understanding of why you're looking for those signs?

A. I'm looking for those signs, making sure that they are able to keep up themselves and at least show that -- if they are not able -- they are not breathing or having difficulty, I would take them down to the nurses or call medical up there to check on them.

Q. Okay. I'm hearing you say that if you look in and you see somebody having trouble breathing, you would want to take them to medical right away; is that right?
A. Yes.
Q. And I gather from that answer that you would have the ability to take an incarcerated person to medical right away if there was an urgent need to do so?
A. Yes.
Q. Would you have to do a bunch of paperwork or get a bunch of permission or anything before taking an inmate who couldn't breathe to medical?
A. No.
Q. You could just do that under your own discretion like right that second, if necessary?
A. Correct.
Q. Would you have to call what's called a "man down" in order to get immediate medical care for an inmate?
A. Yes.
Q. Now, there -- let me make sure we're understanding each other. There's a procedure called "man down," like when an inmate is down and then -- kind of what it sounds like, when they are down and

they can't seem to help themselves for some reason; is that right?
A. Right.
Q. They seem to be having some sort of an episode or medical incident?
A. Correct.
Q. And then you or somebody in your position gets on the radio and calls a certain code and says "man down"; is that right?
A. Correct.
Q. And then sort of everybody -- and I mean "everybody," like nurses and available deputies show up as soon as they are able to, right?
A. Yes.
Q. And somebody brings what's called a "crash cart," right?
A. Correct.
Q. And so all of that kind of happens and comes to the inmate when there's a man down, right?
A. Correct.
Q. So a little bit different question. If you see an inmate who seems to really be having a tough time medically, can you take that inmate to medical without calling a man down, just like that?
A. Yes.

01:34:48 Q. So you don't have to have a crash cart and somebody race to the cell to get immediate medical care, do you? You can sort of just take the inmate and maybe you cuff them, maybe you don't, but you just sort of walk the inmate down to the medical clinic, right?

01:35:04 A. Yes.

01:35:05 Q. And you can do that any time you want basically?

01:35:08 A. Yes.

01:35:08 Q. Okay. And as far as you know, all the other deputies are taught that they can do the same thing?

01:35:13 A. Correct.

01:35:13 Q. In fact, they should do the same thing if an inmate is presenting an obvious medical need?

01:35:21 A. Yes.

01:35:22 Q. And it's important for deputies to do that because the inmates can't take themselves to medical without permission, right?

01:35:29 A. Yes.

01:35:30 Q. And in fact sometimes inmates can put in a sick call, but that can take a period of time, correct?

01:35:36 A. Correct.

01:35:36 Q. And so the medical staff kind of relies on the deputies to keep an eye on the inmates and to bring them immediately if there's some sort of urgent medical

01:35:48 issue; is that right?

01:35:49 A. Yes.

01:35:50 Q. And you've been taught that anyway, yes?

01:35:52 A. Yes.

01:35:53 Q. Now, why is it important for deputies to
01:35:57 monitor inmates for signs of obvious medical distress?

01:36:03 MS. REZVANI: Objection. Vague.

01:36:05 Go ahead, if you have an answer.

01:36:11 THE WITNESS: I don't have an answer.

01:36:12 BY MR. SCOTT:

01:36:14 Q. Has the County or the sheriff's department
01:36:17 taught you why you're doing these safety checks and why
01:36:21 it's important to sort of be vigilant in doing that?

01:36:24 A. Yes.

01:36:25 Q. What's the "why"? What's the reason for
01:36:27 doing that?

01:36:28 A. Make sure that the inmate's okay while they
01:36:33 are in jail.

01:36:35 Q. So general safety, correct?

01:36:37 A. Yes.

01:36:37 Q. And their health?

01:36:39 A. Correct.

01:36:40 Q. And after all, inmates, though incarcerated,
01:36:45 are still human beings with rights, correct?

01:36:47 A. Correct.

01:36:48 Q. And it's your sworn obligation to uphold those rights, correct?
01:36:52 A. Yes.
01:36:52 Q. Including the right to medical care when it's necessary?
01:36:55 A. Yes.
01:36:55 Q. And you took an oath to do that?
01:36:58 A. Right.
01:36:58 Q. And you took that oath seriously, I assume?
01:37:01 A. Yes.
01:37:01 Q. And you received certain training from the San Diego sheriff's department on how to carry out that oath, right?
01:37:08 A. Yes.
01:37:08 Q. And how to ensure that inmates receive medical care when they need it in custody, right?
01:37:14 A. Yes.
01:37:14 Q. Now, you would agree with me that correctional officers aren't usually nurses or doctors, right?
01:37:23 A. Correct.
01:37:23 Q. And nobody is expecting you to give medical care, right?
01:37:26 A. Yes.
01:37:27 Q. But the doctors and nurses are relying on the

01:37:31 deputies to look and -- look in on the inmates and
01:37:36 monitor them, right?
01:37:37 A. Yes.
01:37:37 Q. And to communicate with the nurses and
01:37:40 doctors, right?
01:37:40 A. Yes.
01:37:41 Q. And certainly to physically take the inmates
01:37:44 to receive care whenever that's necessary, right?
01:37:47 A. Correct.
01:37:47 Q. Are you also taught to err on the side of
01:37:51 taking an inmate to get care if you're not sure?
01:37:57 A. Usually if the person needs help, I'll call
01:38:02 medical or a nurse up there to observe them because
01:38:05 usually they do med pass, I'll have the nurse check on
01:38:08 the person first.
01:38:09 Q. Let me -- when you were describing the three
01:38:14 things that you look at during a cell safety check --
01:38:14 A. Yes.
01:38:17 Q. -- the first was obvious signs of medical
01:38:22 distress. So -- and I accept that answer. Your job,
01:38:24 as you're looking in the cell, is are there signs of
01:38:29 obvious medical distress, right?
01:38:31 A. Correct.
01:38:31 Q. So my question, though, is a little bit more
01:38:34 detailed. What guidance or training -- let's set aside

training.

What guidance have you been given on how to identify serious medical distress or obvious signs of medical distress?

MS. REZVANI: Objection. Vague.

If you have an answer.

THE WITNESS: Usually I look if they are having seizures, difficulty breathing, unresponsive.

BY MR. SCOTT:

Q. So certainly if somebody was having a seizure, then you would want to take them to medical right away?

A. Usually I'll have medical come up.

Q. You would have medical come to them?

A. Yes.

Q. You said if they were unresponsive you would have medical come up?

A. Yes.

Q. Why is that?

A. They could be overdosing and not responding to my information or talking to them or they are not able to walk on their own two feet.

Q. So am I hearing you say that if you're doing a safety check and an inmate appears to be unresponsive, it's your responsibility to call medical

01:41:27 care; is that right?
01:41:27 A. Yes.
01:41:27 Q. If an inmate can't walk as they are coming
01:41:31 back from court, the deputy would be expected to summon
01:41:32 medical care; is that right?
01:41:32 A. Yes.
01:41:32 Q. Or take the inmate directly to medical care
01:41:37 maybe in that circumstance; is that right?
01:41:40 A. Correct.
01:41:42 Q. In fact, have you ever been a transportation
01:41:45 deputy?
01:41:46 A. I've transported inmates to the hospital and
01:41:50 back from the hospital to jail.
01:41:52 Q. What about to and from jail?
01:41:55 A. I've only done it once.
01:42:05 Q. What do you remember about the second safety
01:42:08 check that you did on Hayden Schuck before his death?
01:42:15 A. I don't recall.
01:42:16 Q. You don't remember anything in particular?
01:42:17 A. No.
01:42:18 Q. Or what he looked like or what you saw or
01:42:21 anything?
01:42:21 A. No.
01:42:21 Q. Was there a third safety check before the
01:42:26 time that you found Hayden dead?

01:42:27 A. Yes.
01:42:27 Q. Do you remember anything about that third safety check?
01:42:31 A. The last safety check, I remember looking inside his cell and I asked him -- I remember he was laying on his bunk with his back facing towards the window, and I just asked him if he was okay, and he looked towards me just nodding and then turned back.
01:42:49 Q. So when you say he looked towards you and was nodding -- you're on camera so it's okay to sort of demonstrate, if that's okay. Can you do with your head what he was doing with his?
01:43:01 A. Yes. He looked back, I asked if he was okay, and he just turned away from me.
01:43:08 Q. The camera will speak for itself, of course, but I kind of saw you nod your head once?
01:43:14 A. Uh-huh.
01:43:15 Q. Is that the way you remember it?
01:43:17 A. Yes.
01:43:17 Q. Did you say anything else to Hayden during that third check?
01:43:21 A. No.
01:43:21 Q. Do you remember him saying anything at all to you?
01:43:25 A. No.

01:43:25 Q. What happened after he nodded?
01:43:30 A. After he had nodded that he was okay, I started continuing my safety check on the other cells.
01:43:36 Q. Do you recall how long that third check took?
01:43:39 A. I don't recall how long.
01:43:42 Q. I want to go back to an earlier question to make sure I had the whole answer.
01:43:50 We were talking about obvious signs of medical distress?
01:43:53 A. Yes.
01:43:54 Q. And you shared with us that if somebody is having a seizure or if somebody appears to be unable to breathe, that that would count, certainly, and you would summon medical care in that situation; is that correct?
01:44:07 A. Yes.
01:44:07 Q. So those are kind of like two examples of obvious medical distress, as I take it?
01:44:12 A. Yes.
01:44:13 Q. My question, I guess, is a little bit different. I want you to put yourself -- well, you're a training officer, right?
01:44:21 A. Yes.
01:44:21 Q. So I take it that you would have had to either explain or supervise more junior deputies in

these very same safety checks, right?

MS. REZVANI: Objection. Calls for speculation.

Go ahead.

THE WITNESS: Yes.

BY MR. SCOTT:

Q. So I want you to put yourself in a position that you are, as a training officer, and imagine that a deputy says to you -- or imagine first that you just got done saying to the deputy, "All right. You're looking for obvious signs of medical distress first, and then we'll get to jail property and we'll get to criminal activity."

Are you with me so far in this hypothetical?

MS. REZVANI: Objection. Calls for a hypothetical.

But go ahead. Do you understand?

THE WITNESS: Can you repeat the question again?

BY MR. SCOTT:

Q. Yeah. So you're training the deputy on how to do cell safety checks, and you say to the cell -- you say to the deputy, "First thing you're looking for are obvious signs of medical distress."

You with me so far?

A. Yes.

Q. Then the deputy says to you, "Well, Amado,

what do you mean? What's obvious medical distress? Can you give me a little more guidance, sir?" Maybe he doesn't call you "sir," but he's like, "Help me out here, man. What do you mean by 'obvious signs of medical distress'?" What do you say to the guy?

MS. REZVANI: Objection. Calls for a hypothetical, calls for expert testimony.

But you can answer if you have an answer.

THE WITNESS: So I would tell them, if they are having a seizure, they are not responsive to you, or obviously them not breathing.

BY MR. SCOTT:

Q. So then in our little hypothetical here, the deputy says, "All right, Amado, so if he's having a seizure, I'm going to call medical; and if he's not responding to me, I'm going to call medical. Is there any other way I can tell if somebody is in obvious medical distress?"

MS. REZVANI: Same objections.

Go ahead, if you know.

BY MR. SCOTT:

Q. And what do you say?

A. I would tell them, "I need you to open the cell, step inside, and make sure that they respond to you."

Q. How come you've got to open the cell and step inside?

A. Because sometimes they just stay in their bunk and they don't hear you.

Q. If there's some question about whether the inmate is responsive or not, should you go in the cell or is it okay just to go on by?

MS. REZVANI: Objection. Vague, calls for speculation, calls for a hypothetical.

If you have an answer.

THE WITNESS: Can you repeat your question?

MR. SCOTT: Could we have that read back, please.

(Whereupon the record was read as follows:

Q. If there's some question about whether the inmate is responsive or not, should you go in the cell or is it okay just to go on by?)

THE WITNESS: For me I usually like them to respond.

BY MR. SCOTT:

Q. You like the inmate to respond?

A. Yes.

Q. Meaning what?

A. I actually talk to them or just like move their feet --

01:47:43 (Reporter clarification.)
01:47:46 Like kick it.
01:47:48 Q. And if you're not able to get some sort of a response or if it's ambiguous, then what do you do next?
01:47:55 A. Usually if it's ambiguous, I'll pop the cell door open, I'll go inside and shake them and say, "Are you okay?", and they'll respond to me.
01:48:06 Q. Were you taught to do that when it's ambiguous if an inmate is responsive or not?
01:48:12 A. Yes.
01:48:12 Q. And is that the way that you teach other deputies, if you're not sure, if it's ambiguous, go ahead and pop the cell door and go in and check?
01:48:22 A. Yes.
01:48:23 Q. Why is it important to do that?
01:48:25 A. For their safety.
01:48:26 Q. Inmate's safety?
01:48:27 A. Yes.
01:48:28 Q. To make sure that they are actually okay and not just unable to respond to you?
01:48:32 A. Yes.
01:48:33 Q. What do you remember about when you found Mr. Schuck dead?
01:48:59 MS. REZVANI: Objection. Vague, calls for a

narrative.

You can explain.

THE WITNESS: I remember after finishing the last walk, I was at the staging area where the computers are, and then another deputy came onto the floor and went to Mr. Schuck's cell, and I remember him calling me over the radio to respond over to that cell. I responded to the cell, and we went inside, we saw Mr. Schuck not responding to us; I did a sternum rub, nothing; I believe someone checked his pulse, no pulse; brought him down to the floor and took him outside and began CPR.

BY MR. SCOTT:

Q. Did you try to get a response from him that last time or was it apparent that it was kind of past that already?

A. The last time before my last walk or the last time --

Q. No. I'm sorry. That last time where it turned out he was dead.

A. Yeah. So we entered his cell, I nudged him on his arm, is he okay, nothing; did a sternum rub, no response; and I believe someone did -- checked for his pulse, and there was no pulse.

Q. Going back to the check before, so I guess

01:50:28 that would be your third check of Mr. Schuck that day?
01:50:31 A. Yes.
01:50:32 Q. Did you pop the cell door that time?
01:50:35 A. No.
01:50:35 Q. And why not?
01:50:37 A. Because when I asked him if he was okay, he
01:50:41 looked back at me and nodded.
01:50:43 Q. And that nod was sufficient to make you feel
01:50:46 that he was responsive?
01:50:47 A. Yes.
01:50:47 Q. Is there anything else that he did that you
01:50:52 remember leading you to believe that he was responsive?
01:50:58 A. I remember seeing him sitting on a stool, and
01:51:01 I remember when I took the nurse over there for him to
01:51:04 sign paperwork, and he walked away from us. He didn't
01:51:10 sign it.
01:51:10 Q. Was that -- when you went over with the nurse
01:51:12 to sign paperwork, was that one of the same times of
01:51:15 those three safety checks or was that a different time?
01:51:18 A. That was in the middle -- like after a safety
01:51:21 check.
01:51:22 Q. And tell us about that with the paperwork.
01:51:25 A. I remember I was escorting a nurse that
01:51:28 needed him to sign documents. So we went to his cell
01:51:33 door, we had the food flap open, I asked -- I called

01:51:37 for Mr. Schuck's to come to the door, and the nurse was
01:51:40 telling him that he had to sign some paperwork, and he
01:51:44 walked away from us.

01:51:45 Q. You say he walked away from you?

01:51:48 A. Yes.

01:51:48 Q. Where was he standing originally?

01:51:50 A. Almost towards the cell door, probably in the
01:51:55 middle and just turned around.

01:51:57 Q. And then where did he go?

01:51:59 A. He just walked back towards the back of the
01:52:02 wall in the cell.

01:52:03 Q. And then what did he do?

01:52:05 A. Then after that, I don't recall.

01:52:09 Q. Which visit was that -- or which safety check
01:52:14 when you saw him standing?

01:52:16 A. I don't recall.

01:52:17 Q. Was that the same safety check or a different
01:52:21 safety check than when you saw him sitting on a stool?

01:52:27 A. I believe it was a different safety check.

01:52:30 Q. Now, when you say he was sitting on a stool,
01:52:34 what kind of stool?

01:52:36 A. So inside their cells, there's a metal stool
01:52:42 with a little table in front of it.

01:52:44 Q. And he was sitting on it?

01:52:46 A. Yes.

BY MR. SCOTT:

Q. And sir, you understand you're still under oath?

A. Yes.

Q. And I should have said before, I heard you when you said that you haven't testified in a deposition before, and so for that reason I'll want to clarify. You understand that the deposition is still sworn testimony just the same as you would give in a courtroom?

A. Yes.

Q. And I should have asked you before. Is there any reason that you can't give your best testimony today? Do you have any memory problems or any exterior pressures in your life that would make it hard to give us your best testimony here today?

A. No.

Q. Now, we just got done with a break, and it sounds like you had an opportunity to speak with your attorney and you wanted to clarify something. So by all means, what did you want to clarify in terms of your earlier testimony here this afternoon?

A. I just want to correct, when you said "omission," I didn't understand what you meant. Looking over my report with the investigator, there was

02:12:51 one part that I didn't tell them during my last walk
02:12:56 seeing Mr. Schuck look back at me and nodding.
02:12:59 Q. Okay. So I want to make sure that we're
02:13:03 putting a little bit more detail on that. And this is
02:13:06 probably a good opportunity to show you Exhibit 36.
02:13:06 (Exhibit 36 was marked for identification.)
02:13:10 Do you see Exhibit 36 on the screen in front
02:13:14 of you?
02:13:14 A. Yes.
02:13:14 Q. It's a three-page document. Have you seen
02:13:19 this document before?
02:13:20 A. Yes.
02:13:20 Q. What is it, please?
02:13:22 A. It's my report to investigators when they
02:13:27 asked me questions.
02:13:28 Q. Do you understand this to be the -- a written
02:13:32 version of the recorded statement that you gave to
02:13:36 homicide detectives after William Schuck's death?
02:13:41 A. Yes.
02:13:41 Q. And before we were talking and you said that
02:13:45 you had done your best to give those homicide
02:13:50 detectives your full version of events at the time,
02:13:54 right?
02:13:54 A. Correct.
02:13:55 Q. And I think you had said, yeah, you had

02:13:58 thought you had done that, to the best of your
02:14:00 knowledge?
02:14:00 A. Yes.
02:14:00 Q. But it sounds like maybe there was something
02:14:03 that you didn't say to the detectives that you now
02:14:05 remember; is that right?
02:14:06 A. Correct.
02:14:06 Q. And what is the thing that you now remember
02:14:10 that you did not say to the homicide detectives before?
02:14:13 A. The thing I do remember is during my last
02:14:16 walk when I talked to Mr. Schuck saying if he was okay,
02:14:19 and him looking back at me and nodding his head.
02:14:23 Q. Okay. So I want to make sure we have a clear
02:14:27 record, and then we'll move on.
02:14:30 You gave a statement to homicide detectives
02:14:34 on March 16 of 2022; is that right?
02:14:39 A. Correct.
02:14:39 Q. And the reason you gave the statements was
02:14:44 because Hayden Schuck had just died during your watch
02:14:48 on the seventh floor there, right?
02:14:50 A. Correct.
02:14:51 Q. And you were the housing officer on duty
02:14:55 during that death?
02:14:55 A. Yes.
02:14:57 Q. And because of that fact, the homicide

detectives wanted to ask you what you knew about Mr. Schuck, right?

A. Yes.

Q. And specifically what you knew about the circumstances of his death, right?

A. Yes.

Q. And maybe even how he had been faring in custody before he was found unresponsive, right?

A. Correct.

Q. And so you did give a statement to the homicide detectives?

A. Yes.

Q. And you tried to be as complete and thorough as you could?

A. Yes.

Q. And in fact you were as complete and thorough as you could?

A. Yes.

Q. And you told them about the three safety checks that you did on Mr. Schuck, right?

A. Yes.

Q. Before his death?

A. Right.

Q. And you described what you saw during each of those three safety checks to the homicide detectives,

right?

A. Yes.

Q. But on March 16 when you described that third safety check, you did not tell the homicide detectives this fact about Mr. Schuck turning back and looking at you and nodding, right?

A. Correct.

Q. And now you agree today that, in all fairness, that's a fairly important fact, right?

A. Yes.

Q. Because it kind of suggests that Mr. Schuck was responsive enough to nod at you, right?

A. Yes.

Q. Because we know that -- we know from your testimony earlier this afternoon that if Mr. Schuck had been nonresponsive, it was your duty to get medical to come see him, right?

A. Yes.

Q. So if, hypothetically, Mr. Schuck had been nonresponsive and you had simply looked at him and made the decision to keep on going past with your safety checks, that that could subject you to some trouble, right?

MS. REZVANI: Objection. Calls for speculation, incomplete hypothetical, vague and ambiguous.

02:16:56 If you have an answer.
02:16:57 THE WITNESS: Yes.
02:16:58 BY MR. SCOTT:
02:17:00 Q. Potentially you could get in trouble for that?
02:17:03 A. Correct.
02:17:03 Q. And during this interview on the 16th, you simply didn't share that important fact that Mr. Schuck looked back and nodded with the homicide detectives, did you?
02:17:20 A. No.
02:17:21 Q. Earlier this afternoon you told us under oath that the statement that you gave to the homicide detectives was complete, thorough, and accurate, right?
02:17:32 A. Correct.
02:17:32 Q. And then at about 2:00 we took a break, right?
02:17:36 A. Yes.
02:17:37 Q. And I don't want to know what was said, but you had the opportunity to speak to your attorney, right?
02:17:43 A. Yes.
02:17:43 Q. And so here at 2:10, you're sharing with us that you remember now that you didn't tell the homicide detectives about this key fact, right?

02:22:48 Q. And you shared that in the context of preparing for this deposition here today?
02:22:52 A. Yes.
02:22:53 Q. Prior to meeting with your attorney, had you ever told another human being this key fact?
02:23:00 A. No.
02:23:01 Q. Had you ever done a supplemental recording?
02:23:05 A. No.
02:23:05 Q. Had you ever made a note in an electronic system?
02:23:09 A. No.
02:23:09 Q. Had you ever made a note to yourself?
02:23:12 A. No.
02:23:12 Q. Did you ever report this new fact to like a supervisor?
02:23:17 A. No.
02:23:17 Q. What about the homicide detectives?
02:23:20 A. No.
02:23:20 Q. Why not?
02:23:21 A. I don't know why.
02:23:26 Q. Well, if I understand you correctly, you remembered this key fact within two weeks of Mr. Schuck's death, right?
02:23:35 A. Yes.
02:23:35 Q. And you knew that it was in fact a key fact,

02:23:39 right?
02:23:39 A. Yes.
02:23:40 Q. And you also knew that you had not shared it with the homicide detectives, right?
02:23:45 A. Correct.
02:23:45 Q. So didn't you have a duty, at least in your mind, to be as thorough and complete with the homicide detectives as you could be?
02:23:54 MS. REZVANI: Objection. Calls for speculation, vague and ambiguous.
02:23:58 BY MR. SCOTT:
02:23:58 Q. I'm asking if you felt that way. Did you feel a duty to be honest and complete with the homicide detectives?
02:24:04 MS. REZVANI: Same objections.
02:24:07 If you have an answer.
02:24:07 THE WITNESS: I have no answer.
02:24:09 BY MR. SCOTT:
02:24:09 Q. I'm sorry?
02:24:10 A. I don't have an answer for that.
02:24:12 Q. Did you ever share this new key fact with the homicide detectives?
02:24:20 A. No.
02:24:20 MS. REZVANI: Objection. Asked and answered.
///

02:24:22 BY MR. SCOTT:
02:24:23 Q. Even to this day?
02:24:24 A. No.
02:24:24 Q. Why not?
02:24:25 A. I don't know.
02:24:27 MS. REZVANI: Objection. Asked and answered.
02:24:28 BY MR. SCOTT:
02:24:28 Q. I respect that last objection, but I'm afraid we sort of talked over each other, and so I'm just going to ask one more time, and understand that there's an objection --
02:24:47 MS. REZVANI: It's okay.
02:24:44 MR. SCOTT: -- and we'll have a clear record.
02:24:48 BY MR. SCOTT:
02:24:48 Q. Why didn't you ever tell the homicide detectives this key fact?
02:24:52 MS. REZVANI: Objection. Asked and answered.
02:24:55 If you have an answer.
02:24:57 THE WITNESS: I don't have an answer.
02:24:59 BY MR. SCOTT:
02:25:13 Q. When you first started working at the jail, was there a specific training program that you went through when you first started at the jail, and I mean as opposed to the academy?
02:25:28 MS. REZVANI: Objection. Asked and answered.

02:25:30 Go ahead.
02:25:30 THE WITNESS: What do you mean by "training program"?
02:25:32 BY MR. SCOTT:
02:25:32 Q. Well, like when you first got on-site, did you have to do any particular modules or any classes or anything before you could get started working at the jail or was it sort of all on-the-job training once you got there?
02:25:51 A. We had to do testings during the academy.
02:25:55 Q. Okay. Was there any separate testing or anything that you did when you got to the jail?
02:26:01 A. No.
02:26:02 Q. What kind of ongoing training was required of you as a detentions deputy?
02:26:15 MS. REZVANI: Objection. Vague.
02:26:16 Go ahead.
02:26:17 THE WITNESS: We do learning modules.
02:26:20 BY MR. SCOTT:
02:26:20 Q. You have to do learning modules?
02:26:22 A. Correct.
02:26:23 Q. What are learning modules?
02:26:24 A. It's updated policies or skills that we forget and have to relearn.
02:26:32 Q. How are these learning modules done?

02:26:38 A. It's done online.
02:26:40 Q. Like on a computer?
02:26:41 A. Yes.
02:26:43 Q. How often do you have to do them?
02:26:48 A. It depends on how many modules they send us.
02:26:53 Q. What do you mean? Who sends you these modules?
02:26:58 A. I don't know.
02:26:58 Q. How do you receive them?
02:27:00 A. So we get an e-mail saying that you have a new learning module, and then you open up -- it's called LMS, the learning module system, and we see it there and we open it.
02:27:14 Q. Okay. When you -- do these learning modules typically have some sort of test at the end?
02:27:25 A. No.
02:27:27 Q. So what is the format, is it like a PowerPoint or do you like click through slides or how does it work?
02:27:36 A. It depends on the module itself. Some are PowerPoints, some are slides, or some are like policies you just read over.
02:27:44 Q. I see. So it kind of depends on whatever the new training is?
02:27:48 A. Yes.

02:27:48 Q. But it's always sort of delivered through the computer screen one way or the other?
02:27:55 A. Yes.
02:27:55 Q. And then you said there's generally not some sort of a comprehensive test at the end of those learning modules?
02:28:03 A. Majority of it don't have any tests. Every now and then they'll be one test a module.
02:28:10 Q. Are there any particular learning modules that are emphasized more than others? Are there some that are like, these you can't miss you've got to do these every year?
02:28:29 A. Can you say the question again?
02:28:31 Q. Yeah. Are there any particular learning modules that are mandatory every year?
02:28:36 A. Yes.
02:28:37 Q. Can you give us some examples of those?
02:28:43 A. Some would be like updated P&P's or there's one for driving.
02:28:54 Q. And that's every year?
02:28:56 A. Yes.
02:28:57 Q. I'm going to show you another exhibit here. I'm going to show you Exhibit 4. I'll start asking you some questions and we'll see if the screen catches up.
02:30:17 Do you ever remember hearing talk about an

02:33:06 A. Okay. I'm done.
02:33:08 Q. Okay. You testified that you have never seen this auditor's report before. Have you ever seen this letter that accompanied it before?
02:33:21 A. I don't know.
02:33:23 Q. Different question. When you were a detentions deputy from 2019 to present, had you ever heard that there was an audit conducted by the State of California on the men's central jail -- or excuse me -- on the San Diego County jails regarding in-custody deaths?
02:33:48 A. I don't know.
02:33:49 Q. That's not something that like a supervisor ever shared with you or other deputies, to your knowledge?
02:33:56 A. I don't recall.
02:33:57 Q. There's a statement in this letter that says that from 2006 to 2020, 185 people died in San Diego County jails and that that is one of the highest totals among counties in the state.
02:34:19 Do you ever remember that information being shared with you while you were a detentions deputy?
02:34:28 A. No --
02:34:29 MS. REZVANI: Objection. Vague and ambiguous, calls for speculation.

02:36:39 A. I'm sorry. I don't recall.
02:36:41 Q. You don't remember ever hearing anything like that, here's a problem with in-custody deaths and here's what we're going to do about it?
02:36:51 A. No.
02:36:51 Q. Or anything remotely like that?
02:36:53 A. No.
02:36:53 Q. Do you ever -- I'm almost done. But do you ever remember anyone in San Diego County talking about inmate deaths as a problem at all?
02:37:06 MS. REZVANI: Objection. Vague and ambiguous.
02:37:09 THE WITNESS: No.
02:37:09 BY MR. SCOTT:
02:37:10 Q. And I mean specifically the number of them.
02:37:13 A. No.
02:37:13 Q. Or the frequency of them?
02:37:16 A. No.
02:37:16 Q. I want to go back to March 16 to when you first started on duty. Do you remember when you started your shift that day?
02:37:42 A. Yes.
02:37:45 Q. What time did you start your shift?
02:37:47 A. We start at 6:00.
02:37:49 Q. In the morning?
02:37:49 A. 6:00 a.m.

seventh floor?

A. No.

Q. Was there any other kind of housing other than what would be considered general population or main line housing on the seventh floor on March 16, 2022?

A. Seventh floor is usually protective custody. So it's usually PC's that are housed on that floor. I don't recall if D Mod was specifically just for medical.

Q. So back in March of 2022, was the seventh floor used primarily for protective custody; is that what you're saying?

A. Yes. It's still kind of used as protective custody as well.

Q. Today in 2024, the seventh floor is for protective custody?

A. Yes.

Q. I want to make sure that we're getting the facts right because this was March of 2022, which was, I guess, about two years into the pandemic. Does that sound about right to you?

A. Yes.

Q. So back then was the seventh floor primarily used as a protective custody unit?

02:44:16 A. I believe modules A, B, and C were, but Module D, I think they were housing people from medical. I just can't recall.
02:44:26 Q. And what module was Mr. Schuck in, if you remember?
02:44:30 A. He was in Module D, 7 David.
02:44:43 Q. 7 David. What was your understanding of Mr. Schuck's classification as an inmate on March 16, 2022?
02:44:49 A. I don't know.
02:44:49 Q. What kind of a band did he have on?
02:44:52 A. I don't recall what kind of band he had.
02:44:54 Q. Do you remember seeing the band when you looked into the window?
02:45:00 A. I don't recall.
02:45:02 Q. Are you supposed to look specifically for the band to see what kind it is?
02:45:07 A. Yes.
02:45:08 Q. But you don't remember if you did that or not?
02:45:11 A. I don't recall what color of band he had.
02:45:14 Q. Do you remember whether you looked?
02:45:17 A. I don't recall -- I don't recall the color, but I know if I was working that day, I looked.
02:45:28 Q. Would you have had any other way to know why

02:45:33 Mr. Schuck was housed on the seventh floor other than the color of his wrist band?
02:45:40 A. I could look through his history on why they placed him there.
02:45:47 Q. You could have looked through his history of why he was placed there?
02:45:51 A. Yes.
02:45:51 Q. How would you have done that?
02:45:53 A. Through -- through -- it's called JIMS. I don't know the name of it, but --
02:46:05 Q. The Jail Information Management System, I think, does that sound right?
02:46:11 A. Yes.
02:46:11 Q. So you could have looked in that database -- which I assume is on a computer?
02:46:16 A. Yes.
02:46:17 Q. -- to see if there were any notes or information about Mr. Schuck?
02:46:21 A. Correct.
02:46:21 Q. Is that something that you do as a matter of course before you start doing rounds on a housing floor?
02:46:30 A. No.
02:46:30 Q. Why not?
02:46:37 A. There's so many people on the housing floor,

there's not enough time for me to look at why each person is technically there. So besides doing safety checks, I'm helping the nurses or whoever comes on my floor.

Q. So do you have -- so when you go and you see an inmate -- I guess in this case, Mr. Schuck -- do you know whether, when you did your first safety check on March 16, 2022, whether that was the first time you had ever laid eyes on him?

A. Yes.

Q. You think it was likely the first time you had ever laid eyes on him?

A. Yes.

Q. So you see this man that you've never seen before in your life, right?

A. Uh-huh.

Q. You have a distinct memory of this?

A. Yes.

Q. And you're looking -- you're now doing your first safety check of this person you've never seen before, correct?

A. Okay.

Q. He's on the bottom floor of the tier, right?

A. Yes.

Q. In 7 David, right?

02:47:42 A. Yes.
02:47:43 Q. And you're doing your Title 15 checks, right?
02:47:47 A. Yes.
02:47:47 Q. And you look in and you tell us that you see that he's naked from head to toe, right?
02:47:55 A. Yes.
02:47:55 Q. And you have no information about this man whatsoever so far, right?
02:48:00 A. Yes.
02:48:00 Q. And you also see that he has sores all over his body, right?
02:48:06 A. Correct.
02:48:07 Q. And you said that he then was sitting on a stool but then turned away from you; is that right?
02:48:17 A. So I remember him sitting on the stool. When I told you he turned away from me is when he was with the nurse to sign medical paperwork.
02:48:28 Q. What was he doing when he was sitting on the stool?
02:48:32 A. I don't recall what he was doing on the school or why he was sitting on the stool.
02:48:37 Q. Do you remember questioning why he was naked?
02:48:40 A. No.
02:48:40 Q. Do you remember questioning why he had all those sores on his body?

02:48:47 A. No.
02:48:48 Q. But you knew that this wasn't a psych ward,
02:48:51 right?
02:48:51 A. Correct.
02:48:52 Q. And you knew it wasn't like a suicide watch
02:48:57 cell, right?
02:48:57 A. Correct.
02:48:58 Q. And you knew it wasn't a cell where you put
02:49:01 people if they are coming down from drugs or alcohol,
02:49:05 right?
02:49:05 A. Correct.
02:49:07 Q. So why didn't you call for medical aid right
02:49:14 then when you saw a naked man with sores on his body
02:49:18 without knowing anything about why?
02:49:21 A. So working in the jail, it's very common to
02:49:25 see people naked in their cell, and some people that
02:49:28 are in the jails do have sores.
02:49:35 Q. Are there any other reasons that you didn't
02:49:38 summon medical care?
02:49:40 A. So I didn't call for medical to come up, but
02:49:44 there was a medical personnel that was on the floor and
02:49:47 I had them check Mr. Schuck.
02:49:50 Q. What do you mean when you say you had them
02:49:53 check Mr. Schuck?
02:49:54 A. Well, so during that day there was a medical

want to dwell on, right?
A. Yes.
Q. I assume that you would also agree that any in-custody death could potentially be an opportunity to learn for the future?
MS. REZVANI: Objection. Calls for speculation.
If you have an answer.
THE WITNESS: I don't have an answer for that.
BY MR. SCOTT:
Q. Has anyone from the County or the jail ever taught you or other deputies, to your knowledge, that an in-custody death is an opportunity to learn and get better?
MS. REZVANI: Objection. Vague and ambiguous.
If you know.
THE WITNESS: No. They just taught us how to respond to it, a critical incident.
BY MR. SCOTT:
Q. Back to an earlier question, do you ever remember participating in a meeting, the purpose of the meeting being reviewing an in-custody death and learning what could be done better?
A. No.
Q. Do you ever remember receiving a training about an in-custody death where that was the goal,

02:55:43 here's what happened, here's what went wrong, here's how we can do better?

02:55:48 A. No.

02:55:48 Q. Do you ever remember being part of a committee with the similar goal of preventing in-custody deaths?

02:55:55 A. No.

02:55:56 Q. Do you ever remember receiving any feedback other than the conversation you had with the homicide detectives about your performance prior to Hayden Schuck's death?

02:56:10 A. No.

02:56:11 Q. Did you get any feedback from the homicide detectives about your performance prior to Hayden Schuck's death?

02:56:19 A. No.

02:56:19 Q. Did anybody tell you that you did anything wrong vis-a-vis Hayden Schuck?

02:56:27 A. No.

02:56:27 Q. Did anyone ever tell you that you did anything right in terms of the Hayden Schuck case?

02:56:33 A. No.

02:56:34 Q. So you didn't get any feedback one way or the other?

02:56:39 A. Correct, I didn't get any feedback.

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 5, 2024

Sheri L. Somers
CLR, CSR No. 9734

EXHIBIT 40

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: May 15, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

## EMILY LYMBURN, RN

CERTIFIED COPY

Reported by:

Sheri L. Somers
CSR No. 9734

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST, | Case No. 3:23-CV-00785-DMS-AHG |
| Plaintiffs, | VIDEOTAPED DEPOSITION OF EMILY LYMBURN, RN |
| vs. | MAY 15, 2024 |
| COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER, INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL | 1600 Pacific Highway<br>Room 355<br>San Diego, California |

CAPACITY; NICHOLAS KAHL,
NP, IN HIS INDIVIDUAL
CAPACITY; DEFENDANT MEDICAL
PROVIDERS DOES 2-3, IN
THEIR INDIVIDUAL
CAPACITIES; DEFENDANT
DEPUTY SUPERVISOR DOES 1-6,
IN THEIR INDIVIDUAL
CAPACITIES,

Defendants.

Videotaped Deposition of EMILY LYMBURN, RN

San Diego, California

May 15, 2024

Reported by:
Sheri L. Somers
CSR No. 9734

Job No. 938244

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY, et al.,<br><br>Defendants. | Case No. 3:23-CV-00785-DMS-AHG |

Videotaped Deposition of EMILY LYMBURN, RN, taken on behalf of plaintiffs, at 1600 Pacific Highway, Room 355, San Diego, California, beginning at 1:33 p.m. and ending at 5:15 p.m., on Wednesday, May 15, 2024, before Sheri L. Somers, CSR No. 9734.

APPEARANCES:

For Plaintiffs:

McKENZIE SCOTT PC
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
619.652.9964 fax
By: Timothy A. Scott, Esq.
Tscott@mckenziescott.com
Michelle C. Angeles, Esq.
Mangeles@mckenziescott.com

For Defendant COUNTY OF SAN DIEGO:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
1600 Pacific Coast Highway, Room 355
San Diego, California 92101
619.515.6706
619.531.6005 fax
By: Sofia L. Rezvani, Esq.
Sofia.rezvani@sdcounty.ca.gov

For Defendant CORRECTIONAL HEALTHCARE PARTNERS, INC., AND NICHOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
101 West Broadway, Suite 1330
San Diego, California 92101
(619) 233-5565
By: Katie Schuler, Esq.
Kschuler@ldrlaw.com

The Videographer:

Elijah Ochoa
STENO

01:54:11 evaluate. So I go with whatever they say.
01:54:14 Q. Is there training or a policy, that you're aware of, of what information a staff member is supposed to include for a sick call request?
01:54:33 A. Please clarify.
01:54:34 Q. Sure. So you mentioned that as a nurse, right, who responds to the sick calls, you rely on TechCare, right?
01:54:46 A. Yes.
01:54:46 Q. And you rely on the sick call notes?
01:54:49 A. Yes.
01:54:50 Q. But those notes sometimes don't come from the patient, right? They come from either another staff member or a deputy, correct?
01:54:58 A. That is correct.
01:54:59 Q. My question for you is, as a nurse, right, if you are making an observation and you want to put in a sick call request, have you received training on what you're supposed to include so that a nurse who is actually responding knows what they are responding to?
01:55:28 A. I think that's common sense. I don't think you need to have training. Because when I do that, when they put something in there, it doesn't matter if it's the inmate, the patient who requested it or a staff member, I look beyond their chart. Because most

of the time they would put in multiple requests for the same thing. So I would normally basically triage it if they have been seen or not for the same condition. Sometimes they would be seen the same day by the doctor and sometimes they've been seen like two or three days before by the doctor and we just had to -- we had assignment today, but they've been seen two or three days prior by the doctor for the same condition.

Q. So I think you said that it's common sense what someone would put in the notes. What would be your -- what would you think is important to put in your notes about your observations that you've made about someone?

MS. REZVANI: Objection. Calls for speculation, vague and ambiguous.

If you have an answer.

THE WITNESS: Can you clarify again.

BY MS. ANGELES:

Q. Sure. What do you put -- what do you feel is important to put in your notes, in a sick call note?

A. If I am putting the sick call note for somebody to see?

Q. Uh-huh.

A. Or the note after I've seen them?

Q. The note for somebody else to go see the

01:57:01 patient.

01:57:01 A. Of course I would put there what I needed to
01:57:04 get done. Like I said, if there's a wound, "Please
01:57:08 check the wound, take a photo, evaluate and treat as
01:57:12 indicated," things like that.

01:57:14 Q. Okay. Anything else that you feel would be
01:57:19 important to include in a sick note?

01:57:23 A. I don't understand what you're -- like what
01:57:31 are you trying to get to for me to answer your
01:57:34 question?

01:57:34 Q. I'm just trying to understand how you do your
01:57:37 job.

01:57:39 A. Okay.

01:57:39 MS. REZVANI: What kind of information would you
01:57:41 put on the slip? Date, time, any descriptive?

01:57:48 THE WITNESS: Like I said, the very common thing
01:57:52 that I would -- I myself would put there, say I've had
01:57:57 somebody with -- who says there's a history of diabetes
01:58:09 or hypertension and they -- when they were in front of
01:58:13 me, they would deny it. So I will schedule like an RN
01:58:19 sick call for -- basically check on that person, like a
01:58:21 wellness check, history of hypertension but denies at
01:58:29 medical screening. So just check and make sure they
01:58:32 are okay.

///

01:58:34 BY MS. ANGELES:

01:58:34 Q. And just to be clear, I think we touched on this a little bit, but I just want to make sure that I have your answer correct. You haven't received training on what you're supposed to include in a sick call request?

01:58:47 MS. REZVANI: Misstates testimony. You can answer if you have an answer.

01:58:52 THE WITNESS: We have trainings. I don't understand your question because if -- if -- are you talking about if I'm the one who saw the patient and I want to put in --

01:59:07 BY MS. ANGELES:

01:59:07 Q. Right now we're talking about making requests for a sick call.

01:59:11 A. Okay. Is the staff making the request or the inmate making the request?

01:59:17 Q. You as a staff member.

01:59:21 A. Okay. So I would put in whatever needs to be checked, whatever needs to be addressed.

01:59:26 Q. And my question would be, have you received training on what you're supposed to include?

01:59:36 A. We got oriented. I don't know if you consider that training, but we had orientation on how to do it.

Q. Tell me about that.
A. It's basically you answer the slip, you address what's on the slip.
Q. So I think, just to be clear right now, what we're talking about is not when the patient makes a request, but when you either have a concern about something that you see or you've heard and you want somebody else in the future to go visit this patient.
A. Okay.
Q. I'm asking for what training you received on how to make that request and document that request.
A. We get orientation.
Q. Okay. So what does that mean?
A. You address what's --
Q. Let me put it this way: Can you describe what instructions you were provided during your orientation as to how to do that aspect of your job?
A. If I'm the one putting the sick call request?
Q. Yes.
A. If -- say sometimes they get irritated when you're talking to them, the patients, and you know they would not answer you, that you wouldn't get anything, they are not redirectable, you would schedule a follow-up, and that would be an RN sick call, to just make sure the patient is well, just to make sure they

are okay, medically stable.

Q. And what information were you told or instructed to put in your request?

A. What would you like to be addressed.

Q. My question is --

A. No. That's my answer. Whatever you want to be addressed, that's what you put in the request.

Q. Okay. And so tell me more details about that.

A. It's not -- sometimes it's not very thorough. Like I said, if you just want to get a wound check, so you just put, "Please check the wound, take a photo of the wound." If they are like -- they deny that they are diabetics and then you just ask somebody else to make sure -- you know, maybe they'll be in a better mood the next day, that they will answer better, that they will be able to reply to the questions clearer.

Q. Okay. Now, moving on to the other aspect of your job is you answering these calls, right?

A. Okay.

Q. You mentioned that you rely on the TechCare notes to make an assessment on who to see first, who to see second, who to see third, or maybe who -- not even to see that particular day, right, how to triage the number of sick calls that you may have on a particular

02:02:48 shift?

02:02:49 A. That is correct.

02:02:50 Q. Is it fair to say, then, your ability to make
02:02:54 that assessment is dependent on how good your
02:02:57 colleague's notes are or the notes are in TechCare?

02:03:02 A. Both. Because like I said, when I triage, I
02:03:06 look at the chart, if they have been seen before, or if
02:03:09 it's ongoing, and then I base it off of that.

02:03:14 Q. And say there's only one entry.

02:03:19 A. Then I will go check on the patient. I don't
02:03:25 understand.

02:03:25 Q. I guess what I'm saying is if -- my
02:03:27 understanding is -- and you can correct me if I'm
02:03:30 wrong -- is the way that you decide on how important it
02:03:35 is or how urgent a particular medical need is for a
02:03:40 patient is based off of their complete medical record,
02:03:43 right?

02:03:43 A. There's also a choice. If it's a priority,
02:03:50 if you're going to make an appointment, if I'm
02:03:53 scheduling it, there's a priority and there's just a
02:03:56 routine. So if you want to see -- have them seen
02:04:00 earlier, you click on the priority.

02:04:02 Q. So then that would help you, as the nurse,
02:04:06 deciding who to see first and second is if the nurse
02:04:09 before you put in whether it was a priority or not?

02:04:12 A. That is correct.
02:04:13 Q. If they just include a routine, then you would treat it as a routine?
02:04:18 A. That is correct.
02:04:19 Q. And then if you have all routine visits, you have to rely on the specific information that the previous nurse included to make your evaluation; is that correct?
02:04:31 A. Not just the previous nurse. Like I said, I write -- I read -- I read the previous charts, whatever notes that they have in there, to see, like I said, if this is ongoing or it's the first time or if they've been seen before, if I need to address it again.
02:04:50 Q. And I apologize if I misstated that. What I mean is you have to rely on the rest of the medical record.
02:04:57 A. That is correct.
02:04:57 Q. So if there's a limited medical record, then you have limited information to make that assessment?
02:05:03 A. That is correct.
02:05:04 Q. Now, in March of 2022, if you remember, were you working mandatory overtime? I don't know if it helps, but I know this was during COVID time.
02:05:25 A. I don't remember that part.
02:05:28 Q. Do you remember who your supervisor was at

02:07:53 Q. And that was -- and just so I'm correct, the visit that you said that you did before as part of the housing unit -- being a part of the housing unit role, that was done prior to his death on the same day, correct?
02:08:07 A. I saw him that morning, the day of his death.
02:08:13 Q. Can you talk to me about what you remember about that visit?
02:08:18 A. I went to his cell, I saw him naked, and I saw some sores in his body. But he was facing the wall, so I basically just saw his behind.
02:08:40 Q. And I apologize. I should have asked you this earlier. In preparation for your testimony today, did you review anything to prepare?
02:08:48 A. Yes.
02:08:48 Q. What did you review?
02:08:49 A. My notes.
02:08:52 Q. And what notes are those?
02:08:54 A. The note that I said that -- how I saw him, how I described him.
02:09:02 Q. Are you talking about the notes that you made in his medical file?
02:09:05 A. That's correct.
02:09:06 Q. So just to be clear, you didn't keep your own separate notes of the event?

Q. Let me play you a portion and --

A. Okay.

Q. And I'm going to fast-forward to minute 3:32 of Exhibit 26.

(Audio is being played.)

Does that seem like an accurate reflection of your interview on that day?

A. Yes.

Q. So there's a couple things that you mention to the officer. One being that he was on your list for withdraw. Can you explain to me what that means.

A. It's the exact term that they had on the RN sick call was wellness check, and it says, "Uses acid." That's the only thing that's there. So we're just checking if he's going through withdrawal from it, make sure he's okay.

Q. Okay. So when you say he's on my list for withdraw, you're just referring to what you read in the sick call notes?

A. The RN sick call, yes.

Q. There isn't an actual list of individuals for a withdrawal list?

A. No.

Q. Do you remember from the sick call notes who he made the comment about acid to?

02:22:29 have to be seen within four hours. If they are not
02:22:34 proceeded, they are not a medical proceed, I don't know
02:22:35 how long that's going to take because we just see them
02:22:36 as the deputies bring them to us.
02:22:39 Q. Let me see if I understand this correctly.
02:22:42 So the deputies participate in intake. Is there a
02:22:47 nurse that also participates in intake?
02:22:50 A. Yes. We are the ones who evaluate them if
02:22:53 they need to be evaluated more. We're the one who
02:22:57 decide if they are going to do second floor or second
02:23:02 stage screening. But we are not the ones moving the
02:23:06 patients. The deputies move the patients.
02:23:08 Q. Got it. So let me see if I understand this.
02:23:12 As part of intake, the intake nurse decides whether
02:23:16 someone should go to the second stage?
02:23:19 A. That is correct.
02:23:19 Q. Do they decide how quickly that second stage
02:23:22 assessment needs to be made?
02:23:24 A. Like I said, if they feel that there's
02:23:27 something that needs to be addressed, we -- it's called
02:23:31 medical proceed -- they get proceeded, they have to be
02:23:36 seen by the second stage or medical screening within
02:23:40 four hours -- two to four hours.
02:23:42 Q. Two to four hours. And if they are not a
02:23:46 medical proceed, is there -- typically how long do they

02:30:12 MR. SCOTT: Excuse me. Don't do speaking objections. Don't do that.
02:30:14 MS. REZVANI: I can get my objections on the record. I'm going to keep doing that if the testimony is misstated and she's asking a question about that.
02:30:24 Go ahead. Only if you know.
02:30:27 THE WITNESS: I forgot the question already. Can you ask it again?
02:30:30 BY MS. ANGELES:
02:30:30 Q. Sure. I can replay your statement.
02:30:30 A. Okay.
02:30:33 Q. Do you remember you saying to the officer that you were responding for concern of withdraw?
02:30:39 A. Yes. Now that you played it, yes.
02:30:42 Q. Okay. When you respond to a patient because you have concerns that someone is potentially suffering from withdraw, what are you looking for?
02:30:54 A. It depends what kind of withdrawal they are having, if it's alcohol or opiates or benzos. But acid is not any of those. So normally if it's not any of those that I mentioned, they normally -- according to the patients I've asked before, when they withdraw they just go to sleep, they sleep and sleep, and when they are awake, they just get irritable.
02:31:22 Q. I'm sorry. So let me see if I understand

02:31:27 this correctly. When you respond to a call for
02:31:36 withdraw, you're only looking for symptoms that are
02:31:40 related to the substance that you think is involved?

02:31:44 A. I have to look for the specific symptoms
02:31:48 that -- to see what withdrawal symptoms they are
02:31:52 having. And then at the same time we would ask them
02:31:55 what they used, what they drank, when's the last time
02:31:58 they drank, and what is the normal withdrawal symptoms
02:32:04 that they have.

02:32:05 Q. As a medical professional, what is your
02:32:09 understanding of withdrawal symptoms?

02:32:12 A. If they show signs of -- like I said, it
02:32:16 depends. Alcohol, normally they would have seizures,
02:32:20 they would be shaking, they would be sweating; if
02:32:24 opiates, it's -- they'll be throwing up, they'll be
02:32:30 having diarrhea, they'll be sweating, they'll be very
02:32:34 uncomfortable. Their eyes would be -- withdrawals.
02:32:43 Sometimes the eyes in overdose -- in overdose they are
02:32:51 pinpoint, but withdrawals normally is just sweating,
02:32:55 shaking, seeing things that aren't there,
02:33:01 hallucinating. Like I say, those are a combination of
02:33:05 opiates, benzos, and alcohol.

02:33:07 Q. What about cocaine?

02:33:08 A. Cocaine? It's basically just like meth.
02:33:17 They just go to sleep.

02:33:19 Q. Any other symptoms that you're looking for with someone who is withdrawing from cocaine?
02:33:26 A. They'll be thirsty. So we try to push fluids on them.
02:33:32 Q. And when you say "push fluids on them," what do you mean by that?
02:33:38 A. We encourage them to drink, we give them water, sometimes Gatorade.
02:33:44 Q. How do you know when to push fluids on to someone?
02:33:50 A. When we do intake, we ask them if they are using any street drugs, if they are drinking alcohol, and then we base our recommendations -- we send an alert to the providers, their medical providers, and they will order whatever needs to be ordered.
02:34:16 Q. So are there ever occasions that you've come across during your time at the San Diego Central Jail where you have observed symptoms of withdraw without someone reporting it at intake or at a medical assessment?
02:34:40 A. Yes.
02:34:41 Q. Can you describe what you observed in that situation or those situations?
02:34:45 A. They'll be shaking, they'll be sweating, throwing up, diarrhea.

BY MS. ANGELES:
Q. Can you tell me about that training.
A. We have -- we used to have -- not we used to have -- we have protocols that we follow. So over time from working there, I see it from experience, and at the same time it's written down. It's like -- we have a guidance that tells you what to look for, and if it shows that and at the same time your assessment of the patient, then you go from there.
Q. So when you say "it shows that," are we talking about withdraw?
A. Yes, the withdrawal symptoms.
Q. And so you said a couple of things; that you're given documentation or materials? When are you given those materials?
A. During training.
Q. During training?
A. Orientation.
Q. Now, you said you started your -- you started working at the San Diego Central Jail in 2017, correct?
A. That is correct.
Q. Is that when you received your orientation?
A. Yes.
Q. Since 2017, have you received additional training on withdraw?

02:37:18 A. Day-to-day experience.
02:37:21 Q. Have you received any other documentation or
02:37:26 handouts -- I think you described those as you
02:37:29 receiving sort of documentation and handouts as part of
02:37:33 your orientation. Since then have you received any
02:37:36 other training materials beyond the ones you received
02:37:39 at orientation?
02:37:40 A. We have trainings, like micro trainings that
02:37:42 we do, and we do like continuing education that we have
02:37:47 to do. That will be considered training.
02:37:52 Q. What is a micro training?
02:37:54 A. It's like a video, like what you showed me.
02:37:58 We have an educator in the county that makes it, and
02:38:04 they do multiple topics, and then she sends it out and
02:38:12 we watch it.
02:38:15 Q. Is one of those topics on withdraw or drug
02:38:20 use?
02:38:20 A. Most likely. There's a lot. So --
02:38:24 Q. When you say "most likely," do you have a
02:38:26 memory of getting trained on --
02:38:29 A. We have multiple, but it's different kinds
02:38:35 of -- how would I say it? -- different instances, I'd
02:38:44 say, of the withdrawals or the medications and the
02:38:51 processes.
02:38:55 Q. And I'm sorry. Are you saying processes of

withdraw?

A. No. It's -- I can't remember how -- we've had -- NaphCare took over from us. So our process was different back in 2017 compared to now. So for that switch, we had to have trainings.

Q. Okay. And when did that switch happen?

A. I don't recall.

Q. Do you remember participating in these trainings prior to March of 2022?

A. I don't recall.

Q. So do you know what your training on withdraw was in March of 2022?

A. Look for signs and symptoms of withdrawals and then apply the protocol.

Q. And when you say -- so you can correct me if I'm wrong. My understanding of your training is in 2017, shortly after starting, you received your orientation training, correct?

A. That's correct.

Q. And as part of your orientation, you received what I imagine is a lot of substantive training on how to do your job?

A. That's correct.

Q. And since then, right, since 2017, since your orientation, you receive ongoing training?

02:40:21 A. That's correct.
02:40:22 Q. And that training has --
02:40:25 A. Evolved.
02:40:26 Q. -- evolved. You mentioned that now your
02:40:30 training is done by video.
02:40:32 A. Yes.
02:40:33 Q. How long have you been doing video training?
02:40:36 Would you say the past year? the past two years? the
02:40:39 past five years?
02:40:44 A. If I would guess, maybe four, five years.
02:41:00 Q. And you mentioned that you have these
02:41:05 examples or processes?
02:41:09 A. Yes.
02:41:10 Q. Are those having to do specifically with
02:41:14 withdraw or are they just hypothetical situations of a
02:41:19 particular incident that you have to learn about?
02:41:21 A. When we first started -- when I first
02:41:27 started, we have the capacity to start them on
02:41:31 withdrawal meds if they are withdrawing.
02:41:35 Q. And that has changed?
02:41:37 A. Yes. Now the medical providers have to start
02:41:41 it.
02:41:42 Q. When did that change?
02:41:44 A. When NaphCare took over. I don't remember
02:41:54 when they took over.

02:41:56 Q. Okay. So prior to NaphCare, you were able to make an assessment about withdraw and refer someone to medication?
02:42:06 A. And give -- start the medication, the withdrawal medication.
02:42:11 Q. Give them the medication?
02:42:12 A. Yes.
02:42:13 Q. Since NaphCare, you now have to work with a doctor?
02:42:18 A. Medical providers.
02:42:22 Q. So have you been trained -- as part of that process, have you been trained -- or what training have you received on how to initiate that process?
02:42:35 A. We had to go to COC. Are you familiar with COC?
02:42:43 Q. I am not.
02:42:43 A. What does COC stand for? County Operations Center.
02:42:46 MS. REZVANI: Operations --
02:42:49 THE WITNESS: Something. Anyways, we have -- we all have to go through training where it's -- I don't remember if it's a whole day or half a day, but since it was a new process, we all had to go through with that.
///

BY MS. ANGELES:

Q. And were you taught how to identify people who were undergoing withdraw during that training or just how to refer someone to the medication program?

A. We already know how a person or what a person looks like when he's withdrawing. So it's basically just the new system, that instead of us giving the medication, it will be the provider. We just have to provide all the information for them so they can provide the appropriate medications.

Q. So is it fair to say that you were trained on the symptoms of withdraw in 2017, and then since then it's been updates on how to process people who need to go into various medical treatment programs for substance abuse?

A. That is correct.

Q. Is that the same -- would you say that's the same for identifying people who are undergoing overdose?

A. Yes. You don't want them to go -- overdose. You want to stop it while they are withdrawing.

Q. Overdose is different from withdraw, correct?

A. That's correct. That's correct.

Q. Were you trained -- as part of your orientation, were you trained on how to identify

individuals who are undergoing -- or who are overdosing?

A. Yes.

Q. After your orientation training, have you received any other follow-up training on individuals who are overdosing?

A. Can you rephrase that?

Q. Sure. So you mentioned that in terms of withdraw, you received your initial training in 2017 and since then it's been more focused on sort of the process of referring people to different programming and how to sort of document it in the new systems. Would you say it's the same or -- overdosing as you initially got trained on how to identify people who are undergoing overdose, and then the training has mainly focused after your orientation on the processes and systems -- new systems that are in place?

A. I'm still not grasping it. So you're asking if the training for overdose and withdrawal has been continuous; is that correct?

Q. Sure. You can answer that.

A. Yes. It is continuous because, like I said, it's an evolving process. We try to prevent overdosing so --

Q. So when you say it's an evolving process, do

you mean that your training is evolving or the information that you received is evolving?

A. The processes because since NaphCare took over, we have more providers that does the MAT program and also the -- we're basically more proactive in preventing withdrawals. And so far we barely have any overdoses now. So I don't know if that has a correlation, but like I said, we are more proactive with the withdrawals now.

Q. And when have you started seeing those changes? You said you're hardly seeing overdoses. When do you feel like you started to see that change happen?

A. Well, a lot of things happened with COVID. Of course we had barely any -- we weren't taking as many people then. But just recently since NaphCare took over, maybe there was -- of course there's a learning curve there, and then it finally settled down.

Q. So would you say the last six months? the last year?

A. I never really pay attention, but I know we don't have many man downs now.

Q. When would you say was the last man down that you remember?

A. Well, there's different kinds of man downs,

If you can answer.

THE WITNESS: Dehydration can be a sign of -- hold on. I have to think about that.

BY MS. ANGELES:

Q. Okay.

A. I have to think what you're asking me. So repeat it again.

Q. Dehydration is a symptom of withdraw, correct?

A. It can be.

Q. It can be?

A. It can be.

Q. And people die from dehydration?

A. They can die from dehydration.

Q. Okay. So it's important that you do an assessment of someone who is potentially undergoing withdraw because it could be life-threatening?

MS. REZVANI: Objection. Calls for speculation, vague and ambiguous, calls for expert testimony.

If you have an answer.

THE WITNESS: Say it again. She said a lot of things, so it just --

MS. REZVANI: Don't pay attention to me.

THE WITNESS: I lose my train of thought. Ask it again, please.

03:04:55 BY MS. ANGELES:
03:04:55 Q. One of the reasons why you check on people who are suspected of withdraw is because it can be serious or life-threatening?
03:05:03 A. That is true.
03:05:08 Q. Now, I want to go back to, I think, what you mentioned -- one of the things that you mentioned during your interview to Officer Wilson is that you were conducting a wellness check. Can you explain to me what that means, what you do when you conduct a wellness check?
03:05:29 A. Just to make sure that they are medically stable.
03:05:35 Q. Okay. What are some of the things that you look for to make sure that someone is medically stable?
03:05:41 A. That they are breathing, that they are alive, not in any kind of distress, and most of the time we take their vitals if they let us.
03:06:00 Q. How do you figure out -- how do you evaluate whether someone is in distress? What are some of the things that you are looking for?
03:06:09 A. You would see them. If they are in respiratory distress, then you can see them not breathing, or they can be pale and blue, they are not responsive.

03:07:50 Q. Now, in this case you, I think, were briefly discussing earlier your memory of the event. You explained that you went to Mr. Schuck's cell because you were looking for -- he was on your withdraw list, you had concerns about withdraw; that you had learned that he had mentioned acid to a different nurse and that his mom had made a phone call, and so you were also getting a report of investigation.

03:08:30 A. Release of information.

03:08:31 Q. Release of information. I apologize.

03:08:33 Is there any other reasons or any other concerns as to why you were responding to Mr. Schuck on that day that you haven't mentioned?

03:08:41 A. No.

03:08:41 Q. Can you tell me a little bit about what happened on that day.

03:08:47 A. I came in because, like I said, he was on my list, and we saw him laying down, and I tried to engage him, he would not respond to me, but I told him, "Move your leg" just to see for like a sign of life, just to make sure that he's able to follow directions, and he did that.

03:09:20 Q. Okay. So the list that he was on -- and I believe you said this earlier -- was the sick call list that was assigned to you for that day?

03:09:32 A. That's correct.
03:09:33 Q. And do you remember if he was the first
03:09:37 person that you saw that day or the last person or
03:09:40 where he fell on your list?
03:09:43 A. I would not recall -- couldn't recall.
03:09:46 Q. I guess do you remember if he was a priority
03:09:51 call for you?
03:09:52 A. I don't recall. But all I can recall is
03:09:55 after I saw him and he would not respond to me, I had
03:10:00 another person on my list that I need to see in that
03:10:02 module, and then after I saw that person, I went down
03:10:06 to the clinic. But before that, I told the floor
03:10:10 deputies that he needs to go down to the clinic at the
03:10:16 same time.
03:10:16 Q. Let me just back up a little bit.
03:10:18 A. Okay.
03:10:19 Q. So you also said that -- you said "we saw."
03:10:22 Who do you mean by "we"? Who else was with you?
03:10:25 A. The deputy.
03:10:26 Q. Do you remember who that deputy is?
03:10:31 A. Mace.
03:10:33 Q. And Deputy Mace, was he the floor deputy or a
03:10:37 deputy that works with you as part of the medical
03:10:40 department?
03:10:41 A. He's the floor deputy.

03:10:47 Q. Do you remember when you were at the door
03:10:51 with Deputy Mace him saying anything to Mr. Schuck?
03:10:57 A. We would normally call their first name or
03:11:02 their last names, whichever they -- see which one he
03:11:06 would respond to.
03:11:07 Q. When you say "we would normally," is that
03:11:10 part of your normal routine when making these calls?
03:11:13 A. Yes.
03:11:13 Q. Do you have an independent memory of what you
03:11:16 did that day with Mr. Schuck?
03:11:22 MS. REZVANI: Objection. Vague and ambiguous.
03:11:25 THE WITNESS: Which part are you asking about, me
03:11:30 going to his cell and calling him?
03:11:33 BY MS. ANGELES:
03:11:33 Q. Sure. You said we normally say things. Do
03:11:36 you remember exactly what you said to Mr. Schuck that
03:11:38 day while you were at his door?
03:11:43 A. Not necessarily, but I would normally say, in
03:11:47 things like that, it's like -- I introduce myself.
03:11:50 I'll say, "I'm the nurse. I'm here to do a wellness
03:11:54 check, and would you come to the door, see us." And I
03:12:01 would try to say that multiple times.
03:12:03 Q. And when you talk to the patient, you're
03:12:07 talking to them through the window or through the food
03:12:10 hole?

A. The food flap -- I'm talking about the food flap. Normally through the glass -- I don't know if you can see, there's glass there. So we would talk to them through the glass first, make sure they are not assaulted -- we don't open the flap right away because we don't know how they are. You can open it and you can get gas. So the flap has to be closed first.

Q. Okay. And I see you pointing to the screen. It might help for us to go through the video. I know that you mentioned that you reviewed your video in preparation for your deposition today. Let me show you Exhibit 17-E.

(Exhibit 17-E was marked for identification.)

You see it here on the screen? Do you recognize what is on the screen?

A. Yes.

Q. What are we looking at?

A. It says right there Module 7D.

Q. And where is Module 7D located?

A. On the seventh floor.

Q. And is that a part of the San Diego Central Jail?

A. Yes.

Q. Was that the floor that you were assigned to the day -- on March 16 of 2022?

03:13:35 A. It's one of the floors I'm assigned to. I don't remember if that was the only floor I was assigned to.

03:13:42 Q. Sure. And I can -- we can certainly go through that.

03:13:48 So I'm going to fast-forward to minute eight -- let's see -- I apologize. I'm just getting -- pulling up the video. I apologize. This is going to be Exhibit 17-F.

03:14:56 (Exhibit 17-F was marked for identification.)

03:15:00 And just for the record, this is also Module 7 that is currently on the screen that we were seeing in Exhibit 17-E; is that right?

03:15:11 A. Yes. It says Module 7D on the screen.

03:15:17 Q. And we see here on the annotation that it's March 16 of 2022. Do you see that on the screen?

03:15:28 A. Yes.

03:15:29 (Video is being played.)

03:15:29 Q. I'm pausing Exhibit 17-E at minute -- at 1:31:05, which is 9:13 a.m. on March 16 of 2022. Do you see that on the screen?

03:16:30 A. Yes.

03:16:30 Q. Do you see yourself on the screen?

03:16:32 A. Yes.

03:16:32 Q. And for the record, can you identify what

you're wearing?
A. A white lab coat.
Q. Are those purple pants?
A. Yes, I think it's a purple pants.
Q. And it looks like you're holding on to sort of like an IV?
A. It's a blood pressure machine.
Q. A blood pressure machine. And who is that with you on the screen?
A. I think it's Mace. Everybody's got a mask on.
Q. I'm going to play from 1:31:05.
(Video is being played.)
So it looks at 1:31:27, I paused there, and that's 9:14 a.m. with 13 seconds. And it looks like you went to the window and then kind of stepped away, and now we see Deputy Mace closer to the window. From looking at that minute or so that we observed, is your -- do you have any memory of what you might have said, if anything, to Mr. Schuck on that date?
A. Just what -- like I mentioned, I introduced myself and I said I was here for a wellness check.
Q. Now, in this video, what did you observe when you looked through the window?
A. Him laying down on his left side facing the

03:18:36 wall, he was naked, and I saw sores on his body -- some
03:18:44 parts of his body, and he was really skinny.
03:18:50 Q. You mentioned earlier that before you can
03:18:57 open the food, I think you called it --
03:19:00 A. The flap.
03:19:01 Q. -- flap -- the food flap, that you need to
03:19:03 make sure that the individual inside isn't violent or
03:19:09 aggressive, right?
03:19:10 A. That's correct.
03:19:11 Q. Was there any concern, from what you observed
03:19:14 in that moment, that Mr. Schuck was a concern of any
03:19:19 sort?
03:19:22 MS. REZVANI: Vague and ambiguous.
03:19:25 If you have an answer, go ahead.
03:19:27 THE WITNESS: We've had certain patient -- not
03:19:29 him -- but from experience, they'd be laying down, and
03:19:34 as soon as you open up, they get up and throw the pee,
03:19:37 or whatever, poop to you. So we have to be very
03:19:41 careful. And if -- I've never seen him before. I
03:19:45 don't know him. I don't know if the deputies know him.
03:19:49 So it's just one of those precautions that we take.
03:19:53 BY MS. ANGELES:
03:19:56 Q. Was there anything that you remember about
03:19:58 Mr. Schuck that was a concern for you that he was
03:20:01 violent or dangerous?

A. Like I said, it's the first time I'm meeting him. So I wouldn't know. I don't have any -- I've never encountered him. I've never met him before, so I wouldn't know.

Q. And I'm not asking you about your prior experiences with him.

A. Okay.

Q. I'm asking about what you observed through that window, if there was anything that you observed about him that was a concern for you that he was violent or dangerous at that moment?

A. At that moment, no.

Q. Was there a reason why you guys didn't open the food --

A. Food flap.

Q. -- flap -- I keep wanting to call it a lap -- food flap to speak with him?

A. He can hear us because he would follow the directions we were telling him.

Q. What directions were you giving him?

A. I told him to move his leg.

Q. Is it typical for you to tell someone to move their leg?

A. Yes. If they do not engage, we want to make sure they are alive and breathing. So we have to check

03:31:44 Q. Did Deputy Mace do all of your rounds with you that day?
03:31:48 A. I don't remember.
03:31:49 Q. Is it typical for one deputy to do all of your rounds with you?
03:31:54 A. It depends because there -- I think -- from what I understand, they have different tasks. So if another task was due, they can switch. So it's not all the time the same.
03:32:10 Q. So if he switches tasks, then he would hand over the list to the next deputy; is that right?
03:32:17 A. That is correct.
03:32:18 Q. So restarting the video at 1:32:43.
03:32:39 (Video is being played.)
03:32:39 And it looks like you're -- stopping the video at 1:33.01, it looks like you're speaking to who I believe you think is Officer Amado. Do you remember what you're saying to him?
03:32:58 A. According to this, what I told him was -- my notes that I told him to bring the patient to the clinic.
03:33:07 Q. So this is the officer that you remember telling that Mr. Schuck needed to go to the clinic?
03:33:20 A. Yes.
03:33:20 Q. Do you remember telling him why you thought

03:33:26 he needed to go to the clinic?
03:33:27 A. Because his presentation, he was really skinny and he had a lot of wounds.
03:33:32 Q. Just so that I'm clear, can you explain to me sort of the words that you used to tell Officer Amado your concern or why he needed to go to the clinic?
03:33:44 A. I said he didn't look good.
03:33:47 Q. Anything else that you remember you said?
03:33:49 A. No. That's it.
03:33:51 Q. So just to make sure that I have everything correct, you told Officer Amado, who is reflected here on the video -- he's a heavier set guy right in front of Hayden Schuck's cell at minute 1:33:01 -- that Mr. Schuck needed to go to the clinic because he didn't look well?
03:34:19 A. That's correct.
03:34:20 Q. Did you give Officer Amado any instructions about when he should go to the clinic?
03:34:32 A. I don't recall.
03:34:33 Q. Did you tell Officer Amado that it was urgent?
03:34:38 A. I don't recall.
03:34:41 Q. Do you remember if you explained to him that it would be a routine call versus a priority call?
03:34:53 A. I don't recall.

03:34:55 Q. Is that something you would typically tell a deputy?

03:35:00 A. That they need to go to the clinic, that's a routine -- if we see that they need to go to the clinic to be further assessed by a medical provider, I would normally tell them to bring the person to the clinic.

03:35:15 Q. And do you typically tell them when you expect that to happen?

03:35:19 A. A lot of things factor into it. If there's a lot of things going on, it's -- we give it -- how would I say -- hold on. I told him he needs to go to the clinic and he didn't look good.

03:35:48 Q. Did you express any other concerns to Officer Amado?

03:35:52 A. None that I recall.

03:35:54 Q. From your knowledge, did Officer Amado take Mr. Schuck to the clinic after you told him to?

03:36:07 MS. REZVANI: Objection. Calls for speculation.

03:36:11 Only if you know.

03:36:11 THE WITNESS: I don't know.

03:36:16 BY MS. ANGELES:

03:36:16 Q. And I'm going to continue to play at 1:33:01.

03:36:16 (Video is being played.)

03:36:34 So stopping at 1:33:15. We see you walking away on the screen, correct?

03:39:44 THE WITNESS: He followed my direction.
03:39:46 BY MS. ANGELES:
03:39:46 Q. I just want to clarify that you said when he ignored you or when he refused care, that that's what we're talking about.
03:39:55 A. Okay.
03:39:55 Q. So you didn't open the door?
03:40:01 MS. REZVANI: Objection. Asked and answered.
03:40:04 Go ahead.
03:40:04 THE WITNESS: We did not.
03:40:05 BY MS. ANGELES:
03:40:06 Q. You didn't -- is there a reason why you didn't check his wounds at that moment?
03:40:11 MS. REZVANI: Objection. Asked and answered.
03:40:14 Go ahead.
03:40:14 THE WITNESS: If he was going to the clinic, they can get a better picture, they can get a better -- they can see him better. He can get evaluated there closer.
03:40:28 BY MS. ANGELES:
03:40:32 Q. Is there any other reasons why you referred him to the clinic other than the wounds?
03:40:39 A. Because I can see he's really malnourished, skinny.
03:40:49 Q. What else about him, beyond his being thin or skinny, told you he was malnourished or what made you

testimony.

Go ahead if you know.

THE WITNESS: I don't know.

BY MS. ANGELES:

Q. In your medical experience, do you know what a twitch is?

A. I have seen a twitch from --

Q. Do you know what a tremor is?

A. I know what a tremor is.

Q. Is a tremor or a twitch consistent with somebody who is also undergoing withdraw?

MS. REZVANI: Objection. Vague and ambiguous.

If you have an answer, go ahead.

THE WITNESS: Tremor, yes.

BY MS. ANGELES:

Q. And a tremor doesn't require the whole body to shake?

MS. REZVANI: Objection. Calls for expert testimony, misstates prior testimony, vague and ambiguous.

If you understand the question.

THE WITNESS: I understand it. I don't recall -- I don't remember -- tremors is a sign of withdrawal --

MS. REZVANI: Don't speak out loud because she's taking everything down.

03:46:24 THE WITNESS: I see.
03:46:24 BY MS. ANGELES:
03:46:24 Q. Okay. I think you mentioned a tremor might
03:46:28 be a sign of -- or related to meth use. I think you
03:46:32 said that it may be tied to meth, right?
03:46:35 A. Twitching.
03:46:38 Q. Twitching. Can you describe how a tremor is
03:46:41 different than a seizure?
03:46:43 MS. REZVANI: Objection. Calls for expert
03:46:45 testimony.
03:46:46 If you have an answer, go ahead.
03:46:48 THE WITNESS: From what I've observed, seizure,
03:46:54 his whole body would be shaking.
03:46:57 BY MS. ANGELES:
03:46:57 Q. And what about a tremor?
03:47:00 A. Tremor would be -- from what I've seen, are
03:47:05 the hands because we normally see -- so far from what
03:47:10 I've seen is when they have their hands outstretched,
03:47:16 they would be tremulous.
03:47:22 Q. How would you describe a twitch?
03:47:34 MS. REZVANI: Wait. Did you say how would you
03:47:37 describe a twitch or the twitch?
03:47:43 MS. ANGELES: A twitch.
03:47:44 THE WITNESS: A twitch is like a one-time thing,
03:47:47 seizure is continuous.

03:47:49 BY MS. ANGELES:
03:47:49 Q. And just to be clear then, a twitch could be a body part or does it also require the whole body?
03:47:59 A. I've seen the whole body before, I've also seen just a body part. So it depends on the person, I guess.
03:48:08 Q. And you're trained to identify twitches?
03:48:15 MS. REZVANI: Objection. Calls for speculation.
03:48:19 Only if you know.
03:48:21 THE WITNESS: I have seen it.
03:48:25 BY MS. ANGELES:
03:48:25 Q. I guess it's important to note because it could be a sign of withdraw, right, twitches?
03:48:34 A. I don't recall seeing that as a withdrawal symptom. I've seen that as a person is under the influence of meth, but not withdrawal.
03:48:45 Q. What about tremors?
03:48:46 A. Tremors is -- I've seen that on people who are withdrawing from alcohol and opiates.
03:48:56 Q. And what about seizures?
03:48:58 A. What about them?
03:48:59 Q. What is that associated with --
03:49:00 A. Alcohol.
03:49:01 Q. -- in terms of drug and alcohol abuse?
03:49:04 A. I've seen it -- well, I haven't seen it, but

03:49:06 I've heard of it in alcohol withdrawals.
03:49:10 Q. So is it fair to say that substances,
03:49:16 including drugs and alcohol, can cause a person's body
03:49:20 to move in different ways?
03:49:24 A. Specific drugs, yes.
03:49:25 Q. I want to move on to a little bit later this
03:49:43 same day.
03:49:44 A. Okay.
03:49:45 Q. Was this the only video that you were able to
03:49:50 review or did you also review the video of the
03:49:55 man down?
03:49:55 A. I saw the video of the man down.
03:49:58 Q. So from the video -- can you explain to me
03:50:03 what you remember about when you responded to the
03:50:07 man down call?
03:50:09 A. I didn't know that it was him. I was -- I
03:50:19 just saw the people coming with a crash cart, so of
03:50:24 course I had to join and respond, and I had to help
03:50:26 out. And I was going to check his blood sugar, and I
03:50:33 got an error from the first time, and then I was going
03:50:36 to retake it but I was asked to help with the IV. And
03:50:43 then after that, when I was going to retake his blood
03:50:49 sugar, I don't think I was able to get any more
03:50:53 results.
03:50:54 Q. So let's take that -- let's back up a little

guess I'm not clear on where you were at when --

A. I was in the elevator.

Q. Okay. So you were in the elevator. And where were you coming from?

A. Can I explain to you what I did just so you'll understand it?

Q. Sure.

A. So after these housing rounds, I went down to the clinic --

Q. Let me stop you there. When you say "down to the clinic," what floor --

A. This is seventh floor. I went down to the third floor to tell the deputies that he needed to come down. After I told them, I grabbed some of the things that I needed to finish my housing rounds. So I went back up to the seventh floor and did whatever I need to. So as I was going back to go down to chart, waiting for the elevator, the crash cart came with the rest of the staff.

Q. Let me see if I understand this correctly. So after you saw Mr. Schuck, you went and saw one more patient --

A. Yes.

Q. -- and then you came back to the third floor; is that correct?

A. That's correct.
Q. And the third floor is the medical floor?
A. That's correct.
Q. What did you do on the medical floor?
A. I told the clinic that Schuck needs to come down to be seen by the doctor.
Q. Who at the clinic did you tell that Mr. Schuck needed to go to medical?
A. The nurse clinic, Vivona, Jennifer Vivona.
Q. And I think you said earlier that you also told Officer Amado, correct?
A. Yes.
Q. So you informed Officer Amado and Nurse Vivona that Mr. Schuck needed to go to the clinic?
A. That's correct.
Q. Did you tell anyone else that Mr. Schuck needed to go to the clinic?
A. Well, with Amado, Mace was there. So both of them. And then Vivona was there as well as the other clinic deputies, and I saw that she sent one of the deputies to go up and get him.
Q. And what deputy was that?
A. I don't recall, but I think it was Cortez. I don't remember.

how you're supposed to respond to a man down?

A. We first make sure that the patient is not in distress or check if he's in distress, look for signs and symptoms of distress, and then apply what needs to be done.

Q. Okay. So then I think you mentioned that you followed and administered -- I guess what role did you play in the man down?

A. Take his blood sugar.

Q. How did you know to do that?

A. It's one of those things that we have to do if there's a man down.

Q. Did anyone tell you to do that?

A. I don't remember. Everybody picks their own -- what needs to be done.

Q. Is it one of those things that's just -- it's sort of everybody is kind of moving and you respond in the moment?

A. That's correct.

Q. And I'm going to show you Exhibit 17-F, and then fast-forward to minute -- I'm sorry.

(Video is being played.)

You were saying -- who is this on the screen?

A. That is Cortez.

Q. And we're at minute 10:15 -- or minute 10:11.

Is this Cortez that you see at the bottom of the screen?

A. Yes.

Q. He has sort of a shaved head?

A. Yes.

Q. And just for the record, this is the same officer that you remember speaking to when you went up to the third floor clinic and spoke with Nurse Vivona?

A. It's Nurse Vivona who told him. I did not speak to him.

Q. And I apologize. This is the same officer that you saw Nurse Vivona instruct to go check in on Mr. Schuck?

A. Yes.

Q. And for the record, this is 9:37 a.m. So about 20 minutes after you had seen Mr. Schuck?

A. We left his door at 9:15. So about 15 minutes.

Q. Yeah. And this is 9:37. So I'm going to fast-forward a little bit.

(Video is being played.)

What do you see reflected on the screen at minute 13:08?

A. I see a body on the floor with two deputies standing over.

04:14:22 Q. Anything else about the man down and what we observed on the video that you remember that you haven't mentioned today?
04:14:31 A. No. That's all I can remember.
04:14:35 Q. I did want to go back a little bit to the sores that you mentioned that you observed on Mr. Schuck's body.
04:14:57 Do you remember how big they were?
04:15:00 MS. REZVANI: Objection. Vague and ambiguous.
04:15:02 If you can describe.
04:15:04 THE WITNESS: Probably quarter size.
04:15:11 BY MS. ANGELES02:
04:15:12 Q. Do you remember how many quarter-sized wounds you saw?
04:15:17 A. I don't remember.
04:15:19 Q. And I think you mentioned to the officer that -- I think you mentioned that they are pressure sores. What do you mean by that?
04:15:34 A. It's in the bony prominence. When they keep laying on that side or -- they keep putting pressure on it, then it becomes pressure sores because there's no flesh, there's no insulation, there's no cushion. So if it's -- if your knuckle is always like this, so over time it develops a sore.
04:16:00 Q. I think you mentioned that you believe these

04:16:07 sores were two to three days old. How do you know that?

04:16:12 A. It scabbed over.

04:16:17 Q. So what do the scabs tell you about --

04:16:23 A. It's not a new wound.

04:16:26 Q. How do you know it's not older than two or three days?

04:16:30 A. I thought I said "approximately." So from what I've seen, even on your wound, after two to three days, it forms a scab.

04:16:45 Q. Is it common to see scabs on individuals like the ones that you saw on Mr. Schuck?

04:16:57 A. On skinny people in nursing home, yes.

04:17:02 Q. In the jail setting?

04:17:04 A. I've never seen anybody with that.

04:17:08 Q. So I'm assuming you worked at a nursing home before?

04:17:16 MS. REZVANI: Objection. Misstates testimony.

04:17:19 THE WITNESS: Yes.

04:17:23 BY MS. ANGELES:

04:17:29 Q. I think you also mentioned to the officer in your interview that you looked up Mr. Schuck in the computer, in the TechCare system, and that you learned some things about him. I'm happy to play that clip for you if you don't remember.

04:17:52 A. Okay.
04:17:52 Q. So I am pulling up exhibit -- I believe it's 26 -- and I am going to fast-forward to minute 14:39. To be safe, we'll do 14:30, and I'm going to play a couple seconds of it.
04:18:41 (Video is being played.)
04:18:41 Were you able to hear in Exhibit 26 that you mentioned you looked up Mr. Schuck in the computer? Do you remember saying that?
04:19:28 A. Yes, after you played that.
04:19:30 Q. When did you look him up in the computer?
04:19:34 A. I mentioned that -- I looked him up before going up to see him because that's my normal practice.
04:19:52 Q. So before you went to see him, you knew that he had been gate refused and that he had been in a car accident?
04:20:02 A. That's -- you just reminded me. I don't remember.
04:20:09 Q. I guess I just wanted to clarify. It's your practice to look up each individual prior to doing the sick calls?
04:20:18 A. That's correct.
04:20:19 Q. And is that because you want to learn as much information about them before you see them?
04:20:24 A. That's correct.

05:07:31 little bit earlier about -- by Mr. Wilson and maybe
05:07:35 another officer?
05:07:35 A. Yes.
05:07:36 Q. It looks like Reporting Officer Blumenshine.
05:07:45 Beyond that interview that we reviewed today, were you
05:07:49 interviewed by anyone else regarding Mr. Schuck's case?
05:07:53 A. No.
05:07:54 Q. And I should clarify, I don't mean to include
05:07:59 your attorneys.
05:08:01 A. No.
05:08:02 Q. Have you done any other briefing related to
05:08:08 Mr. Schuck's death?
05:08:09 A. No.
05:08:10 Q. Has anyone asked you what could have been
05:08:14 done different?
05:08:15 A. No.
05:08:15 Q. Have you ever discussed what could have been
05:08:19 learned from Mr. Schuck's death?
05:08:21 A. No.
05:08:22 Q. At any point did you and any of the staff
05:08:35 meet to discuss and try to figure out what happened --
05:08:39 A. Not that I know of.
05:08:41 Q. -- with Mr. Schuck?
05:08:43 A. Not that I know of.
05:08:45 Q. Since Mr. Schuck's death, have you reflected

05:08:52 on what has happened?
05:08:53 MS. REZVANI: Objection. Vague and ambiguous, calls for speculation.
05:08:57 If you understand the question, you can answer it.
05:08:59 THE WITNESS: Of course I did.
05:09:06 BY MS. ANGELES:
05:09:06 Q. And tell me about that.
05:09:08 MS. REZVANI: Objection. Calls for a narrative, vague and ambiguous.
05:09:12 If you want to give her a response.
05:09:14 THE WITNESS: He is somebody's son, somebody's brother, somebody's -- and I have kids of my own. So I always provide care like they are family because I know -- I don't want my family to be treated -- mistreated, I'd say. So I provide the most care that I can provide, the best that I can. And to me I know that I did the right thing.
05:09:49 MS. ANGELES: I don't have any other questions.
05:09:52 MS. REZVANI: I have a few just to clarify a few things.
05:09:55 EXAMINATION
05:09:55 BY MS. REZVANI:
05:10:03 Q. Nurse Lymburn, I want to take you back to your chart, and we're looking at -- I believe this is

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 29, 2024

______________________________
Sheri L. Somers
CLR, CSR No. 9734

# EXHIBIT 41

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG

Date: May 17, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

## THOMAS MACE

CERTIFIED COPY

Reported by:

Nicole O'Neil
CSR No. 10774

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN INTEREST, PLAINTIFFS, V. COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; DEFENDANT MEDICAL PROVIDERS DOES 2 3, IN THEIR INDIVIDUAL CAPACITIES; DEFENDANT DEPUTY | CASE NO.: 3:23-CV-00785-DMS-AHG |

INDIVIDUAL CAPACITIES, )
)
DEFENDANTS. )
)
)
)
___________________________________

---o0o---

Deposition of THOMAS MACE located at 1600 Pacific Highway, Room 355, San Diego, California, commencing at 9:04 A.M. PST on Friday, May 17, 2024, before NICOLE O'NEIL, Certified Shorthand Reporter 10774, in and for the State of California.

STENO
Concierge@Steno.com
(888)707-8366 APPEARANCES VIA STENO CONNECT

FOR THE PLAINTIFFS:

MCKENZIE SCOTT PC
BY: TIMOTHY A. SCOTT
MICHELLE C. ANGELES
1350 COLUMBIA STREET
SUITE 600
SAN DIEGO, CALIFORNIA 92101
619-794-0451
TSCOTT@MCKENZIESCOTT.COM
MANGELES@MCKENZIESCOTT.COM

FOR THE DEFENDANTS COUNTY OF SAN DIEGO, WILLIAM GORE, KELLY MARTINEZ, BARBARA LEE, JON MONTGOMERY, JAMEELYN BARRERA, ROMEO DEGUZMAN, EMILY LYMBURN, CARINA ECHON, JENNIFER VIVONA, THOMAS MACE, AND JEFF AMADO:

OFFICE OF COUNTY COUNSEL
COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, SENIOR DEPUTY
1600 PACIFIC HIGHWAY, ROOM 355
SAN DIEGO, CA 92101
(619) 884-2931
STEVEN.INMAN@SDCOUNTY.CA.GOV

FOR THE DEFENDANT CORRECTIONAL HEALTHCARE PARTNERS, INC. AND NICOLAS KAHL, NP:

LOTZ, DOGGETT & RAWERS, LLP
BY: KATIE SCHULER
101 WEST BROADWAY, SUITE 1330
SAN DIEGO, CA 92101
(619) 233-5565
KSHULER@LDRLAW.COM

OTHER APPEARANCES:

LEGAL VIDEOGRAPHER - ELIJAH OCHOA

---o0o---

have access to things in our normal life, they should still have access to those things inside.

Q. Have you been taught specifically that incarcerated persons still have a right to medical care?

A. Yeah, of course.

Q. Have you been taught that incarcerated persons have a right to assistance if they are in medical distress?

A. Of course.

Q. That is sort of, part of their legal rights that you described already?

A. Yes. Just being a good human being in general.

Q. Well said.

What specific training do you remember receiving on how to conduct safety checks, like a cell check?

A. Approach the cell, look in, and see if you can identify anything that looks odd. On training they say, anything you have the spidey sense. You know, the hair on the back of the neck stands up. Does something feel weird? Does it smell weird? Are you hearing things that are weird? Can you see them? Are they laying normally? Are they breathing?

Q. Why is it important -- if it's important to kind of, use those spidey senses as you describe it?

A. Because sometimes you can see a small clue, the

way the room is disheveled or if somebody may be having mental health issues if they are drawing all over their walls, if their toilet is not flushed or the trash is amassing in the room, those type of things. Being able to really accumulate all the information using your senses about the smells, what you are seeing and hearing. It's important to make a determination if that person needs some kind of intervention for their own help if they are not making their decisions on their own.

Q. Why is that important?

A. Because someone who is suffering from a mental health crisis sometimes can't make those good decisions and may be forced to get the help they need.

Q. Can it be dangerous if a person doesn't have the ability?

A. Of course, yeah. By law I'm not allowed to force anybody to get medical care, but if he's gravely disabled and not making good decisions, calling 911 and forcing them to go and at least try to get care at the hospital is something that we do on a regular basis.

Q. What about if an inmate doesn't seem to be like, actively dying, but seems to be having some real medical trouble, and I understand I'm being kind of vague. Is there any sort of, in between where you can sort of, take them to, you know, see the medical clinic or something

like that?
A. That's at my discretion.
Q. Tell us about that.
A. If I see someone -- and it's like, "I've had diarrhea for three days," or it's, "Hey, I think my finger is broken. It's facing left."
That's my discretion whether they go down to medical clinic or not. On day shift there's always clinic deputies down there. All's I have to do is use my radio and say, "Hey, I'm sending this guy down," and put them on the elevator.
Night shift is a little bit more difficult, because there's no clinic deputy. I have to escort the person down there, but it's up to me who I spend my time helping, if that makes sense.
Q. Is it -- so sounds like you have a fair bit of discretion in terms of who you might send on kind of, an immediate or urgent basis to the medical clinic?
A. Right. There are people that are scheduled to see the nurse or doctor or nurse practitioner or whatever is working that day. Then there are people who throughout the day will approach me and like, "Hey, I've had this cut on my arm for three days it's looking kind of red. Can I get it cleaned?"
"Yeah. Let's go." You send them down the

elevator to go get care.
Q. I assume you can't just let someone wander off by themselves and escort themselves down on the elevator to medical?
A. No. It's a secure area. We have professional staff coming on and off the housing floors on a regular basis. Everybody who leaves the housing module is escorted. Mainland inmates we have a one-to-five ratio. People who are assaultive or are in administrative separation, it's a one-to-one or two-to-one ratio.
Q. These ratios in the procedures that you just described, was that true in March of 2022?
A. To the best of my recollection, yes.
Q. And the reason I ask is because March of 2022 is during the pandemic -- or sort of the tail end of the pandemic, I suppose. I want to ask was -- would you have still been able to get an incarcerated person to the medical clinic on an urgent basis in March of 2022?
A. Yes. Absolutely. There were no restrictions for me moving people around the facility as I saw fit if I chose to do so.
Q. What about like, a social pressure or professional pressure? Would you ever be concerned about over referring inmates to the clinic? Or do you ever get the sense that might be frowned upon for any reason?

A. No. I pride myself in having a good working relationship with the people who are in jail, and I have to see them every day. I have to have conversations with them. I see them at their worst. I see them at their best. I get to take them to see their family for social visits. For me it's like I don't see it like -- they are just other guys in there who can't get to where they need to be on their own. It doesn't bother me to do the little bit extra, five minutes of dropping someone in the elevator if I have to.

Q. Were you aware of any bed shortages or any logistical issues with the third floor medical clinic that would have prevented an incarcerated person from receiving care in March of 2022?

A. Not that I can recall specifically for that day.

Q. For which day?

A. March 16th.

Q. What about that week?

A. Not that I can recall.

Q. Or that spring? Do you have any recollection of issues like that?

A. Typically if medical -- in the medical clinic I would call and say, "Hey, I'm going to send someone down."

The only reason we wouldn't be able to would

Q. And that might be from floor to floor or from cell to cell or what have you. Is that right?

A. Yes.

Q. If you're -- I'm asking kind of, about your training and your experience -- if you're escorting an incarcerated person, and it appears to you that that incarcerated person cannot walk under their own power, would that be one of those circumstances where you would want to refer someone to medical immediately?

MR. INMAN: Objection. Incomplete hypothetical.

MR. SCOTT: You can answer.

THE WITNESS: Typically, when I see people come to jail, they are at their worst. They are under the influence of drugs or alcohol or they are coming down from the influence of drugs or alcohol. It's not uncommon for people -- either just, like, "Yeah. I can't. I'm too tired," or, you know, they are not all -- they are just waking up.

Like, "Hey, come on. We're moving cells." Everyone comes out -- little stumble.

Most the time I'm like, "Bro, get up. Are you good?"

If someone is just refusing to walk or won't walk, it's not uncommon to be like, "Okay. Go sit down."

And then we come back with a chair and roll

them. That's not an immediate sign -- to me at least -- an immediate sign of like, he needs care right now, people do that all the time in jail. They just say, "I can't walk. I'm tired. My legs hurt. I've been sleeping on the floor."

I go, "Let's go."

After a couple of minutes of being patient, they stand up and move.

BY MR. SCOTT:

Q. You said an inmate being unable -- saying they are unable to walk happens all the time, in your words. Can you elaborate on that a little bit? What do you mean by "all the time"?

A. People move from cell to cell quite often. And from place to place quite often. Typically, early in the morning, for court -- 4:00 or 5:00 in the morning. I'm waking them up out of a dead sleep. "I can't right now. I'm tired."

"I can't right now. I'm tired," that doesn't imply a physical inability to walk. It's a refusal to do so. That's what I mean by, it happens all the time. It's very obvious when someone can't walk because they have medical issues and when someone is refusing to move because they don't want to.

Q. Got it. Okay. It's one situation, for example,

in the morning or for whatever reason the inmate is like, "I can't," but it really kind of seems like, "I won't," is what you are hearing. Is that a fair statement?

A. That can apply to anytime during the day. For me, in my experience, it has always been early mornings, going to court, or, you know, odd times where they are supposed to have a social visit, or they are supposed to -- and they are like, "No. I can't right now," or that type of stuff.

Q. Let's set aside sort of, the early-morning-I-can't pattern, if you will.

I want you to now envision -- let's say an afternoon. You're transporting an inmate between floors, and the inmate just seems to be pulling down on your arm or just unable to walk, it seems to you. What are you trying to do then?

A. I'm going to step back and look at the big picture. You know, what's his general physical condition? How does he appear? Is he disheveled? You know, does his eyes look okay? Are they dinner plates or are they dilated, or does he have something wrong with his body? Is there something wrong with his legs?

I ask him, "Hey, dude, are you good? What's wrong?"

If he had any specific complaints, we would

address those things. If any of those things sounded like he needed care, then immediately, of course.

If it's just like, "I'm weak, I'm tired. I'm shot out, because I've been doing drugs for six months and now I'm coming down."

I'm like, "You just can't walk? Okay. Well, chill. I will get you a wheelchair." And I will get a wheelchair and roll them back to the cell.

If someone -- you have to speak up. If I ask you, "Hey, bro, are you good? Do you need something from me, man?"

You have to speak up and ask for what you need.

Q. What do you mean?

A. Sometimes, in my experience, incarcerated will be less likely to ask you directly for help, because it looks like -- like we talked about earlier -- the peer thing. Their peers look down on them coming to us for help or asking us for things, because it looks like quote, unquote, telling or snitching or whatever the case may be.

Q. I want to try and understand. How is, you know, an inmate potentially just asking for medical assistance or asking for safety assistance -- how does that look like a snitch?

A. If you sit down on the ground, and I said to

you, "Are you good?"

And you say, "I can't walk. My legs hurt."

"Well, wait, what's going on?"

"I can't walk."

"Well, what's going on? Tell me what's going on."

"I can't walk."

"Okay, bro, here's a wheelchair. Let's go back to your cell. I just asked you three or four times what's going on. You've got to tell me."

"I've got a sore on the back of my leg. I can't bend my knee. I think it's MRSA."

"Okay. Let me see."

Then we are going.

If a guy -- in response to your last question, if the guy comes to the door and beats on the module gate, "Dep, I need help."

Everyone goes. There are rules for them. They can't talk to me unless there's someone standing next to them that's called a shadow.

Q. What do you mean?

A. People in jail have rules, politics. They can't -- you can't come to talk to me unless someone of the same race is standing next to him to listen to what he's asking for or what he's saying, to make sure he's

not telling, to make sure he's not asking for inappropriate things.

If someone were to come up to me individually and ask to be pulled aside, that could be dangerous for them.

Q. How do you know that?

A. Experience in jail.

Q. Is that like, sort of specialized knowledge that you've acquired or something --

A. Just general deputy stuff. The longer you work in a facility, the more you pick up on the jail politics and how you can be manipulated into doing things that you may not do otherwise.

Q. Like what?

A. Letting people out for cleaning for six-and-a-half hours. We run our regular dayrooms. And they are out for five or six hours, and then, "Oh, hey, we will clean the module."

"Okay. I will get you a cleaning cart."

Then you want nine cells open, and you need four hours to mop 400 square feet, you know, so --

Q. Got it. I want to go back.

When did you first start working at the sheriff's department?

A. I was hired from the academy August 13th,

2020 -- or 2021 maybe. I don't remember the exact year.
Q. What did the academy consist of?
A. It was four months of Title 15, Title 24. We did a lot of classes on addressing mental health issues. We ran scenarios of stuff that would happen in the facility. We learned about the color-coding system of the wristbands. We had some classes on JIMS like -- the Jail Information Management System -- kind of gave us the general layout of that, report writing, and then the defensive tactics and emergency vehicle operations.
Q. You said you got a lot of training on mental health issues. What did you mean by that?
A. At the time when I started the -- I believe the state and county, in general, started really spending a lot of time focusing on making sure that there were adequate mental health services in the facility, like people had access to ask for things. Were there enough counselors and doctors or nurses, or whatever? And we had quite a few classes on identifying someone who is in like, a mental health crisis and how it can be dangerous for us and the things that we can do to make it not dangerous. That's what I mean by that.
Q. I am hearing you say that you received some training on identifying people who may be suffering from mental health distress or mental health crisis?

A. Yes.
Q. Specifically people in custody?
A. Yes.
Q. And one of the reasons for that training was because people in custody experiencing mental health distress could pose safety risks to officers?
A. Yeah.
Q. In some certain sense?
A. You are correct. And also, it could stop us from using force on someone when all they needed was help.
Q. What do you mean?
A. If someone who is mentally ill or struggling or they may be agitated -- they may have -- for instance, someone with Huntington's Disease may have rapid-body movements or slurred speech, and you may think they are having -- like they are intoxicated or they are trying to pull away from you. But if you are able to identify through questions that they are actually having some kind of diagnosis that makes -- that's normal for them.
You know, if a guy -- I'm escorting guy and holding him, and he's like, "argh," and pulling away. He's going to the floor. Right? Like that's safe for me. I'm going to control him.
If I know he has Huntington's and he's pulling

away and making weird noises, that's normal for him. I will treat him accordingly. That's what I mean by that.
Q. Have you ever been taught that incarcerated people suffering from mental health problems may pose a risk to themselves?
A. Yes, absolutely.
Q. What were you taught?
A. People who are either in an acute mental health crisis because of the situation that brought them to jail or have chronic long-term diagnosis, sometimes when they are not well medicated or not getting the counseling they need can make -- you have internal stimuli, like they hear voices or sounds or external stimuli, they see things. And typically those stimuli are not good. They are typically feeding negative thoughts, they are going to hurt themselves or hurt someone else.
Q. Can that be dangerous?
A. Yes.
Q. According to your training experience?
A. Yes.
Q. Is an inmate's danger to themselves one of the reasons that it's important for correctional officer's to look for signs of mental health distress?
A. Yes.
Q. Is it also important for correctional officers

to be vigilant in looking for signs of medical distress?
A. Yes, of course.
Q. And that vigilance is part of the Title 15 cell checks?
A. Yes.
Q. And part of a correctional officers sworn duties?
A. Yes.
Q. And it's, I think, based on what you were saying before kind of, part of what an officer owes inmates who are otherwise unable to care for themselves?
A. I personally put in the category of like, I'm a good human being, and this is my job. If this wasn't my job and I saw you somewhere and you looked the same, I would still help you.
Q. Let me drill down a little bit more specifically on the training that you remember about identifying signs of mental health distress.
What specific courses, if any, do you remember receiving at the academy on that topic? I don't mean like the PowerPoint or the name of the course, but kind of, what can you tell us about the courses you took?
A. We have programs at the facility called the Detention Safety Program, and then there are lots of other forms people can fill out for help, but like I said

before, sometimes people don't ask for help.

The idea behind those classes for us was that there was a mental health professional -- I believe her name was Brook Johnson -- came to the class and taught about how to identify people who may be struggling. It could be from, they went to court and found out that they are getting sentenced to 20 years, or that my wife will not stick around, they got a bad phone call, mom died or -- I need to be able to identify somebody with their head in their hands or maybe their eyes are bloodshot and red, and they look disheveled like they've been crying, those type of things.

He may not ask me for help, but if I say, "Hey, are you good?" He may then open up.

Or I say, "Hey, can I take you to talk to somebody?"

He's like, "Okay."

He doesn't have to say anything to me. That's -- those courses were more designed for that.

Later in my career, I did receive PERT training, Psychiatric Emergency Response Team training, so I'm a PERT deputy. I've had more advanced training on identifying mental health stuff than other deputies do.

Q. PERT for the record is P-E-R-T?

A. Correct.

Q. And again that's for?
A. Psychiatric Emergency Response Team.
Q. What training did you receive as part of the PERT team?
A. I went to a three-day course, eight hours each day, 24 hours of training, and there are multiple presentations by different speakers who specialize in different things from in the medical field, to mental healthcare, to the county program, and state hospitals. People who are inflicted with those mental health conditions and their experience with law enforcement and how they feel that if law enforcement had been trained better, what would have changed.
There's a lot of discussion with other deputies and police officers from across the country about their experience with mental health stuff, and it's just a good little like, conference. Everyone got together, and there was a lot of speakers to kind of, converge.
Q. Do you remember when that happened?
A. I believe it was last year. I don't think -- I don't know the exact date.
Q. So like 2023?
A. Yeah. It's post Mr. Schuck's passing.
Q. What about prior to Mr. Schuck's passing? Did you receive any training from the San Diego Sheriff's

Department on identifying inmates in mental health distress?

A. Just the classes they've provided in the academy and any trainings that we did after -- we do line-up trainings and briefings. A training officer or corporal will be assigned a topic.

"Hey, make a PowerPoint about this."

We will spend 10 minutes going over something that's new in policy or something that we've identified that the team doesn't do great and needs to do better. It's just like, once or twice a week, we do a line-up training. Some of those are on -- you know, in the cell you can identify someone that maybe needs to get ISP or DSP, Detention Safety Program evaluation by a qualified mental health professional to let them determine if there's something more that's going on. Maybe they will talk to them more than you. That type of stuff.

Q. Do you have a specific memory about seeing a PowerPoint training at a line-up training?

A. No.

Q. About mental health referrals?

A. No.

Q. It's just that's where training like that would have occurred if it did?

A. Yes.

Q. But you don't know if it did?

A. I don't recall a specific event or a specific PowerPoint addressing mental health concerns.

Q. What about medical referrals more generally? If you see somebody in medical, as opposed to psychiatric distress?

A. Those are the fundamental basics of the job. You know, those are things that we do on a daily basis. We do trainings more on stuff that we feel like the nuances could get better, but, in general, just taking people to medical or when the clinic list shows up, sending those people down the elevator. We don't do trainings on that. You get the list. You send your people down.

Q. I guess I don't mean so much the procedure of, you know, who gets on the list, or, you know, how you get to the elevator. I guess, I mean more guidance on the discretion that you were describing before of, I can take an inmate to medical in my discretion, more or less, when I think it's appropriate. My question is more designed to learn if you received any training on how to use that discretion?

A. Not that I can specifically recall.

Q. Do you remember receiving any training at the academy about that kind of discretion when to refer an

inmate to medical?
A. Not that I can recall.
Q. I'm made to understand that there are like, online training modules that you're expected to keep up on as a deputy?
A. Yes. Learning management system.
Q. The learning management system?
A. Yes, sir.
Q. Do you know whether the learning management system includes any modules on when and whether and the factors to consider in sending an inmate to medical?
A. I know the detention's training unit has made videos on observing someone in a mental or medical crisis during a safety check and what the steps are. It's one of those videos that's very formatted, you know, use your radio. It's like, very basic, but I wouldn't say that that's about discretion. This is how you get the resources to you to get help, but it's not about the discretion and making the choice to use your resources, if that makes sense.
Q. Tell me your best memory. What do you remember about that video, in particular?
A. I can't remember his name. He's a corporal now. He works in the background investigation department. He was on the video. He's doing a walk at Las Colinas

facility in one of the administrative separation modules. He's walking with his radio in his hand, and he stops. He is like, "Hey, hey, hey."

And nobody responds.

And he says, "Can I have medical staff --" to the whatever module they are in.

And then it's just like -- then the video I think turns to like, medical staff responding or something like that. That's kind of, the last bit of my memory. I remember him walking and identifying something wasn't right and then calling for medical staff.

Q. You remember because you remember from your job or your life -- the person who appeared in the training video?

A. Yes. Personal family connection. He cuts my aunt's hair. His wife cuts my aunt's hair. I was going through the background process. He reached out, "Hey, my wife knows your aunt. If you need something, hit me up." That's why I remember him.

Q. Of course.

A. Deputy Peters. Corporal Peters. There it is.

Q. Very good. When is last time you remember seeing that video, more or less?

A. I couldn't give you a fair estimate.

Q. Do you know if you first saw it when you were

employed at the San Diego Sheriff's Department?

A. I can't recall.

Q. And by that, I mean like, post-academy?

A. I can't recall. I couldn't put a time frame on it. I watch 50 LMS videos a week. All of them are trainings on, you know, updates for policy, you know, time changes, or how you serve food, or that type of stuff. I couldn't put a time frame on when I watched it.

Q. A similar question, but the topic now is withdrawal from drugs and/or alcohol.

Have you ever received any training on the dangers of, if any, that withdrawing from drugs and alcohol can pose to incarcerated people?

A. We spoke about that a lot in the academy, specifically the dangers of like, alcohol and drug withdrawal and people -- the danger to them as far as not being able get well without medication. And I don't remember any exact training like, any videos or classes that we took. But I do remember talking about like, the symptoms of someone being unwell, you know, shaking, you know, sweating, diarrhea, throwing up, maybe having -- being a little bit feverish, sleeping in odd positions, because they are uncomfortable, moaning and groaning and making noises, that type of stuff.

Q. And then have you actually experienced people

Q. Are deputies taught to consult the JIMS system periodically throughout the day for any reason?

A. Yes. We run reports daily for visits and scheduled court appearances. People who may have a razor restriction or have a previous suicide attempt, or lower bunk or lower tier restrictions for housing. We use that system a lot to help us get people into the right cell.

Q. When you say you run reports daily, do you run daily reports for each inmate, or do you find yourself using the system daily?

A. We run daily reports for the housing floor. You know, I'm running the report to show a list of people who had previous suicide attempts so I'm aware of these people. People who have lower bunk or lower tier, so I see if this gentleman has moved himself from the bottom to the top, do I need to make him come back down because he has seizures?

It's never an individual person that I'm singling out to run that report on.

Q. Do you remember whether you ran a housing report for the seventh floor before you started your shift on March 16th, 2022?

A. I don't recall doing that. I was on Phase 2. I was the new guy, so I'm sure I did.

Q. What does that mean you were on Phase 2 as the

new guy so you are sure you did?

A. I was on training. I had only been on the job for, I think, a few months at that time, three months. I was still being directly supervised by training officers. Deputy Amado was my training officer. He was writing daily evaluations on my performance and giving me feedback on what I could do better.

Q. Why does that lead you to believe that you ran a housing report for this seventh floor?

A. Because I was learning, and that's how we teach is by doing. Show me one time. I do it one time. I show somebody. And that's how you retain the information, and that's how we train people there. You are the new guy on the floor. You are on training. You are doing all of the things. You are running all the reports. You are pulling all of the people out of the cell. That's for experience. That's what I mean by that.

Q. What did you learn from running the housing report, specifically about Hayden Schuck?

A. I don't recall anything specific about Mr. Schuck.

Q. Would the housing report have told you his housing classification?

A. Yes.

encountered him when you began your shift early in the morning on March 16th, 2022. Is that right?
A. I don't believe I encountered him until I went with the nurse.
Q. Fair enough. You started your shift in the early morning of March 16th, 2022.
A. Correct.
Q. And you saw Hayden Schuck at some point that morning?
A. Correct.
Q. Was that the first time you have a memory of ever seeing Hayden Schuck?
A. Yes.
Q. Do you know whether or not you interacted with him on March 15th, 2022?
A. To the best of my recollection, no.
Q. When you began your shift as a housing deputy on March 16th, 2022, would you have received an oral pass down briefing of the kind that you've already described for us today?
A. Yes.
Q. Do you have a specific memory of receiving that pass down briefing?
A. No.
Q. Who would have given you that pass down

briefing?
A. The floor deputies from the previous team.
Q. And as you sit here today, do you know who that was?
A. It would have been Team 4. I don't know what deputies were working.
Q. Do you remember who was on Team 4 at that time?
A. No.
Q. How do you know it was Team 4?
A. Teams one and two, one's will be on day, two's on night. Three on days, four is on nights. Then we switch. One is on nights, two is on days. Three's on nights, four's on days.
We rotate every three months. We always switch with the same team.
Q. Do you remember receiving any specific information about Hayden Schuck on March 16th, 2022?
A. No.
Q. I'm talking about during the pass down briefing?
A. No.
Q. Or at any other time before you first saw him that day?
A. Other than his name being on the list that the nurse provided me, no.
Q. Did the nurse say anything to you when you

learned that he was on that list?
A. Not that I can recall.
Q. Was it just literally the fact that his name was on the list, the first you heard of Hayden Schuck?
A. Yes.
Q. We have learned in this case that on March 15th, Hayden Schuck went to court.
Did the homicide detective or anybody ever share that with you, that Hayden Schuck went to court on 3-15-22?
A. Not that I can recall.
Q. Different question.
As the housing deputy on March 16th, 2022, did you know that Hayden Schuck had gone to court the day before?
A. No.
Q. Had anyone ever shared with you that Hayden Schuck had his court appearance cut short on March 15th, 2022?
A. No.
Q. You didn't know about that when you were doing your safety checks on March 16th?
A. No.
Q. Correct?
A. Correct. I didn't know.

Q. We have heard that on March 15th, 2022, Mr. Schuck was claiming to be Spiderman and was attempting to climb the wall of the elevator while being moved to or from court. Had you ever heard that?

A. No.

Q. Had anybody ever shared that with -- that fact with you, if that was true, prior to you interacting with Mr. Schuck on March 16th?

A. No.

Q. I saw a reaction in your face. Is that something you would have wanted to know, if that was true?

A. I mean, it's not uncommon for people to be unwell in jail. And just because he may have been suffering from external stimuli or internal stimuli that caused him to quote, unquote, crawl the wall like Spiderman -- or however it was described -- that doesn't necessarily mean he's at risk for hurting himself or others. He's allowed to be unwell. He's allowed to be unwell if he doesn't want to take meds. That wouldn't have immediately made me like, "Yeah. Yeah. I need to know that."

That's the type of thing if I'm going to pull you out of your cell, I want my partner to tell me, "Yeah, he does things like that."

clinic. If he yells and screams and turns on me, I will shut the door, you know. If he -- if it had been me, I may have asked a couple more questions.

Q. I will move on here, but I just want to make sure I've understood your answer and then we'll move on.

In your training and experience as a correctional officer, if you saw an inmate who was urinating on himself or urinating not in the toilet, that would at least generally cause you to want to follow up to see if he was okay?

A. Yeah. I would simply ask, "Hey, bro, why are you peeing on the floor?"

Q. And the reason that you would ask a question like that would be to investigate if perhaps they were having some sort of mental health issue or if there was some other reasonable explanation for their behavior?

A. Correct.

Q. Because if it was the former, if they had a mental health issue, it would be part of your duties to follow up and see if they needed care?

A. Correct.

Q. Because an inmate with mental health issues could potentially be a danger to themselves?

A. Correct.

Q. Or others?

A. Correct.
Q. If nothing else some inappropriate urination like that merits some sort of follow up?
A. Not always, because it's not uncommon for people to be unwell there. It's a terrible thing to say, but it's not uncommon for people who come into jail to be unwell, to be -- having lived on the streets, or coming off of drugs, or having the worst day of their life, you know, got a DUI or crashed a car and hurt somebody or something. It's not unwell for people to be at their worst when I see them.
Like I said, it's a discretion thing, the overall context, like, the cell, the behavior to and from, like, a general demeanor, can he hold a conversation? Is he asking for food when we get off the elevator? Like, there's a host of things that you have to kind of make -- and for each person that's different. Make your decision. Use your discretion. Am I going to follow through or send e-mails, or is he good? You know, that type of stuff.
Q. Do you ever remember there being urine on the floor of Hayden Schuck's cell on March 16th?
A. I do not recall that.
Q. Do you remember there being urine on himself?
A. I do recall that.

Q. Do you know why Mr. Schuck was on the second floor, if that was true?
A. No.
Q. Why did you understand that the nurse needed to see Mr. Schuck on the 16th?
A. I was just told to follow up, just to follow up with him.
Q. As you and the nurse were getting ready to go see Mr. Schuck, did you have any information available to you -- or did you have any information at that time, as to whether Mr. Schuck had been withdrawing from drugs or not?
A. No.
Q. Did you have any information available to you about whether Mr. Schuck had used drugs in custody?
A. No.
Q. Do you know whether Mr. Schuck had been in a sobering cell at any point?
A. No.
Q. Do you know whether he had received any medical care, thus far, in his stay on March 16th?
A. No.
Q. Did you know the reason that he was sent back from court, if that was true?
A. No.

Q. What else did the nurse say to you before you went to see him, if anything?

A. I can't recall.

Q. When you and the nurse approached the cell, what's the first thing that happened?

A. I can't recall. Typically, due to my training, I would walk in first just to make sure the area is safe. And then I will usually, "Hey, nurse is here. Come on up."

And you like, let them know, hey, we're here. It's a nurse. They want to talk to you.

Because sometimes they don't want to come up to talk to me, but of course they want to talk to her. If you say, "The nurse is here," they usually come up.

Q. I'm hearing you describe kind of, a general practice.

A. Yeah.

Q. We can get to that, and I do want to hear about that. Before that, though, can you tell us what you specifically remember about the Hayden Schuck interaction with you and the nurse and him? And then we'll go into sort of, general practice.

What specifically do you remember, if anything?

A. I remember knocking on the door and not getting a response right away and then knocking on the door again

and like, listening, and then knocking on the door, again and looking at the nurse. And then she started talking. I don't remember what she said. And then I hit the door again, and it's like, "Hey, fuck off." "Hey, fuck you," or something to that affect, and he rolled over in the bed and kind of like -- and that was it.

Q. Okay. Do you remember Mr. Schuck saying anything other than, hey F you or F off?

A. No.

Q. Do you remember the nurse saying anything else to Mr. Schuck other than what you've just said?

A. I can't recall any specifics.

Q. Do you remember having any other interactions with Mr. Schuck before you eventually responded to the man down call that involved him?

A. Other than the interactions with the nurse, no.

Q. You touched on earlier Mr. Schuck's physical appearance as you and the nurse were looking at him. What do you remember?

A. I remember he was laying on top of his blankets naked, and he had -- what looked like bed sores on his back or his bum and lower back.

Q. So you were able to discern that he was naked?

A. Yes.

Q. And you said he was on top of his blankets?

A. Yes.
Q. Did he have any additional blankets or sheets on top of him?
A. Not that I can recall.
Q. So you remember mattress, blankets, and then Mr. Schuck naked?
A. I remember him laying on top of a green garment. That's what I remember. I don't remember if had more blankets or a mattress. I remember the color green underneath him. We have green -- thick green blankets.
Q. You were able to tell he was naked, you said?
A. Yes.
Q. From the waist down?
A. I think he was fully naked.
Q. So no shirt or sweatshirt on the upper portion of his body?
A. No clothes at all.
Q. And again, no blanket or sheets over the top of him either?
A. Not that I can recall.
Q. You said he was facing the wall away from you?
A. Yes.
Q. So his back and buttocks would have been pointed toward you?
A. Correct.

Q. Was he sort of laying on his side?

A. He was on his -- like, left arm underneath him. Right arm over the top, so his back was -- his upper body was turned flat with the bed, but his buttocks and his hip were turned sideways -- like, laying sideways but upper body twisted down like he was using his arms as a pillow almost.

Q. Okay. I think maybe what I will do since you were doing a nice job of using your body there, I'm going to slide over here behind the camera and just ask you to sort of be Mr. Schuck.

A. Okay.

Q. And it doesn't need to be super elaborate, but if you could just kind of, show us as best you can the way his body was positioned when you were trying to get his attention.

A. If the camera is me looking through the cell window, here's the wall. His upper body is turned and away from me so I can't see his face. He's using his hands as a pillow. I can see his back and buttocks, just like that.

Q. And his upper back as well?

A. Yeah.

Q. What about his legs and feet?

A. I don't recall anything specific about legs or

feet.

Q. Do you recall if they were extended out flat verses pulled up into fetal position, for example?

A. I don't recall.

Q. And what do you remember about the bed sores that you mentioned before?

A. I remember they were scabbed. They were about golf-ball sized. It looked like they had been scabbed and then broken open. Like, it looked like they were partially scabbed, but then had been rubbed. You know what I mean? Like -- it was on -- it was on the portion of the back where you sit down or when you lay down, you are touching it all time. It looked like something he had been dealing with, like it was existing and he had been fighting with it for a minute.

Q. And I understand you to be using a colloquialism when you say "a minute"?

A. For awhile, like for a period of time he had been struggling with the same issue.

Q. What did you do, if anything, after Mr. Schuck said what he said to you?

A. Deferred to the nurse and said, "What do you want to do?"

Q. What did she say?

A. I don't recall what she said.

Q. Do you remember the nurse giving Mr. Schuck any particular instructions?

A. No.

Q. Do you remember her saying like, you know, "Move your foot if you're okay," or anything like that?

A. I remember her saying -- now that you said that, I remember her saying, "I can't leave until I know you're okay."

And he like kicks his foot a little bit, and then she's like, "All right, if he doesn't want to go."

And then after she left Deputy Cortez came like, minutes later.

Q. Okay. And where do you remember the "F you" or "F off" falling in the timeline with him kicking his foot?

A. The "F you" or "F off" was to me with the initial banging on the door. Me saying, "Hey, come on up. Come up to the door. The nurse wants to talk to you," and then I got the, "Hey, fuck you, fuck off."

And then I looked at her, and sometimes when they hear a female voice or a professional staff member's voice, their demeanor changes, and they are willing to come up and talk. When she spoke and said to him like, "Hey, I can't leave unless I see that you're okay. Can you just move and let me know you are good?"

He kicked his foot a little bit, and that was it.

Q. Did he say it out loud? Did he say, "F off" out loud?

A. My ear was pressed against the crack of the door, so I heard it. I don't know if it was loud. I don't know if she heard it or not.

Q. Do you remember anything else about your interaction with Mr. Schuck?

A. Until his cell door was open, no.

MR. SCOTT: I'm showing what was marked in a previous deposition as Exhibit 9.

(Previously marked Exhibit 9 was introduced for examination.)

BY MR. SCOTT:

Q. I'm showing you the front page. I'm now on the third page. Do you recognize Exhibit 9, Page 3, that's on the screen here?

A. Yes.

Q. What do you see, please?

A. Seventh floor David module, looks like Mr. Schuck laying on the ground there in front of the cell in the dayroom.

Q. I've been clicking through the pictures. I'm now at Page 36 of Exhibit 9.

Have you been recognizing these as they go by as photographs of seventh David?
A. Yes, sir.
Q. Backing up a couple of photographs, I'm now looking at Page 53 and 54 of Exhibit 9.
Did those appear to be like, a shower stall?
A. Yes.
Q. And there's a shower stall, I guess, within seven David?
A. There's two. Top tier and bottom tier.
Q. I see. Do you know if there's showers on the second floor?
A. I'm trying to think if there's an area to shower on the second floor. No.
Q. Do you know when an inmate is in a keep separate -- like you talked about in this back 40 on the second floor, do you know if there are mattresses available there?
A. Second floor is not a housing floor. We don't give mattresses or blankets.
Q. What about toiletries?
A. Of course. Hygiene kits, toilet paper. Hygiene kits consist of like, deodorant, toothpaste, toothbrush, a comb, and some like, body wash/shampoo.
Q. Inmates housed on the second floor receive

those?
A. They can ask for them if they need it. Every cell has toilet paper in it, but I'm not going to hand out a hygiene kit to every person. If someone says, "Hey, I want to wash my face," I will hand them one.
"I need a toothbrush to brush my teeth."
I'm going to give them a hygiene kit. That's not something we give to them until we get to the housing floor.
When they get to the housing floor, inside their mattress or their blanket is a hygiene kit and all this stuff rolled up, like a -- like a little starter kit. Like, this is everything you need to get yourself ready, brush your teeth, comb your hair, take a shower and all that type of stuff.
Q. An inmate housed temporarily on the second floor, though, doesn't receive that starter kit yet?
A. Correct.
Q. An inmate housed on the second floor would have to ask for the hygiene kit?
A. Yes.
Q. And, I guess, would have to know to ask to get a hygiene kit?
A. Yes.
Q. And also be able to ask for a hygiene kit?

A. Yes.
Q. I'm showing you Page 112 of Exhibit 9.
Do you see what appears to be Mr. Schuck's feet and legs in this photograph?
A. Yes.
Q. Did you see what appears to be some sores on his legs and his feet?
A. Yes.
Q. Are those the kind of sores that you were describing seeing when he was laying in his cell?
A. No.
Q. What do you mean?
A. Those are smaller in size. They don't look to be like, pressure sores. They look to be like, something maybe he has picked at.
The sores I was describing on his back looked like, to be pressure sores, like he was wearing something or something was pushing against his back that caused it.
Q. Okay. Stopping here at Page 114.
Do you see how there appears to be some sort of a sore or some sort of blemish on Mr Schuck's forehead?
A. I can see a black spot there, yes.
Q. And do you see there appears to be like, somewhat -- appears to be bruising and other blemishes on his forehead that I'm gesturing to?

A. Yes.
Q. Do you remember seeing those when Mr. Schuck turned and said what he said to you?
A. No.
Q. Do you remember seeing the sores that we're now seeing on Mr. Schuck's arm and hand? And I'm looking at Page 116. Do you remember noticing those when he was in his cell?
A. No.
Q. And I'm looking at Page 118, and this is a better view of the sores on Mr. Schuck's face.
Do you see sores on Page 118 as we're looking at it here?
A. Yes.
Q. Do you remember seeing those sores when you looked in on Mr. Schuck on March 16th?
A. No.
Q. Were you looking for things like that?
A. Yes.
Q. But you didn't see any?
A. No.
Q. If you had noticed these sores, what would you have done?
A. Asked him about it.
Q. Why?

A. To make sure he was taking care of it or getting the help he needed.
Q. I'm pausing at Page 171 of Exhibit 9.
Do you recognize this as Hayden Schuck's cell?
A. Yes.
Q. How does this compare to how it looked when you and the nurse looked in on him earlier that morning?
A. I don't recall seeing a mattress at all when I first went. I don't know if he was laying on top of it or if the blankets were on top of it, but this is a pretty fair representation of what I remember seeing, just a little bit of trash on the ground. It looks pretty clean.
Q. Showing you now Page 173 of Exhibit 9.
What do you see here?
A. The ceiling of a cell.
Q. There appears to be some sort of gobs of something on the ceiling. Do you see that?
A. Yes.
Q. Do you know what that is?
A. Oftentimes people who don't want the lights on will wet toilet paper, throw it at the light to block the light out to make it darker in their room.
Q. Do you know if that's what was happening here?
A. I don't know.

A. Yes.
Q. Did you tell the homicide detectives on March 16th that Hayden Schuck had told you to "F off"?
A. I don't think so, specifically. I think they questioned me more about conversations that I had with Hayden. I didn't have any conversations with him. I didn't pull him out of the cell. I didn't have any exchanges with him. He barely looked at me and told me to "F off."
When they are asking me like, "Hey, did you have any conversations with him?"
"No, like, I didn't talk to the guy. He told me to F off, but that's it."
I don't remember telling them that. I just remember answering like, that I didn't have any conversations with him.
Q. Just to be clear and then I will move on, did you tell the homicide detectives that Hayden had said, "F off" or "F you"?
A. I don't believe so.
Q. Why not?
A. I couldn't give you a fair answer. There was a lot going on that day. It's the first time I had ever watched anybody pass away. And having to see that and then having to go sit in a room like this and be

A. No.
(Video footage playback)
Q. Just to make sure we have the record. I've paused again at 1:32.58. Do you have any memory of any of the interactions that we witnessed between you and the nurse that we just got done watching?
A. Not specific conversations.
Q. And thank you for the clarification. That was my question. Do you remember anything said one way or the other?
A. The gist of the conversation, like, "Hey, what to you want to do?"
Not like specific words that were exchanged between us, no.
Q. I'm hearing the gist of what you were saying to the nurse was, "What do you" -- nurse -- "want to do about this situation?"
A. Yeah. For me, although I worked in the medical field for a little bit, I don't have the level of medical training that some of the other people do. Even if in my mind I think somebody is good or if I think they are hurt, the nurse may feel completely different. And their opinion on a medical side is more important than mine, because they are able to draw from their knowledge and experience. That's why I always defer to them.

Naloxone in the housing modules around that time. But I don't -- nothing specifically other than geared towards Fentanyl and how we respond to those types of emergencies.

Q. So certainly the rise of Fentanyl has made overdose deaths both more frequent and sort of, a more immediate risk. Is that a fair statement?

A. Yes.

Q. And I take it you've received some training on being vigilant for Fentanyl use and overdose and responding to it?

A. Yes.

Q. Including tools like Narcan that you just described?

A. Yes.

Q. Understanding that answer about Fentanyl, do you remember any specific training that you received as a deputy about the rate or the number of inmate deaths generally?

A. No.

Q. Or the way that the rate of those deaths compared to other jails, for example?

A. No.

Q. And I said, "training," but what about, you know, briefings or correspondence or information of any

kind from the sheriff's supervisors?
MR. INMAN: Objection. Calls for hearsay.
THE WITNESS: Not that I can recall.
BY MR. SCOTT:
Q. That's true for 2022, the period of time we were just talking about?
A. Yes, sir.
Q. Is that also true up to today?
A. I wouldn't attribute it as to true until today.
Q. Tell me about that.
MR. INMAN: Objection to the extent it calls for hearsay.
THE WITNESS: As I've got more time on the department and I've become a more valued member of the team, my experience, I've been in like some TO meetings and stuff where we talk about how we improve as a team. And a lot of times that has to do with how we can just go the extra mile more often. And we've talked quite a bit about how if we address the small things they don't turn into big things. And that was in reference to, you know, some of the people who have passed away may have been sick when they were on the outside. And then when they came in and the nursing staff says, "Yeah. He's sick. He needs to be followed up. Well, why can't he get antibiotics?"

We just talk about like, what could we do to make it better and we kind of, throw ideas out and brainstorm.

BY MR. SCOTT:

Q. Okay. Could you please turn to Page 19 of Exhibit 4 there? This is a different figure. This is Figure 5. Do you see Figure 5?

A. Yes.

Q. Is it true that you've never seen Figure 5 before today?

A. That's true.

Q. Please take a moment and read each of those four bullet points or each of those four boxes, if you would.

Have you had a chance to see each of those four bullet points or four red X's that's in Figure 5?

A. Yes.

Q. And I know you're only seeing this today for the first time. Do you see how they sort of, describe four specific topics?

A. Yes.

Q. And maybe it would even be fair to say four specific criticisms that this particular document is presenting?

A. Yes.

MR. INMAN: Object to characterization and

document speaks for itself.
THE WITNESS: Yes.
BY MR. SCOTT:
Q. To your knowledge was bullet point 1 here, Figure 5 -- the substance of it -- ever shared with you as a deputy before Hayden Schuck's death?
A. No.
Q. What about the second bullet point?
A. No.
Q. Or the third?
A. No.
Q. What about the fourth bullet point of Figure 5?
A. No.
Q. And when I say, "that information shared with you," I want to be as broad as possible. Were there any trainings that you remember being a part of where any of the items were discussed as opportunities for improvement?
MR. INMAN: Objection. Vague.
MR. SCOTT: I'm talking about before Hayden Schuck's death.
MR. INMAN: Objection. Vague.
THE WITNESS: Not that I can recall.
BY MR. SCOTT:
Q. Any committees you remember being a part of?

A. Not that I can recall.
Q. What about online trainings of what we described before?
A. Not that I can recall.
Q. Or like, in-classroom lectures?
A. Not that I can recall.
MR. SCOTT: Lastly, I would like to show you what's also already in evidence as Exhibit 21.
We can go off the record for a moment.
VIDEOGRAPHER: We're off the record. The time is 1:25 p.m. Pacific Time.
(Brief Recess)
VIDEOGRAPHER: We are back on the record. The time is 1:26 p.m. Pacific Time.
MR. SCOTT: All right. Sir, I'm showing what we've marked in an earlier deposition as Exhibit 7.
(Previously marked Exhibit 7 was introduced for examination.)
BY MR. SCOTT:
Q. It's a 55-page PDF document that I will represent to you is sort of a combination of different policies and procedures from the San Diego Sheriff's Department. Is that what it looks like to you?
A. Yes.
Q. Now have you ever seen -- I'm just going to

pause here -- actually, that's not a good example.
I will pause here as an example at Page 24 of Exhibit 7. And this particular -- well, you tell us, what is this particular policy and procedure here on Page 24 of Exhibit 7?
A. Policy in regards to the use of sobering cells.
Q. Have you ever seen this particular policy before?
A. Yes.
Q. Under what circumstances?
A. On training we're required to read every policy and procedure and have our training officers sign off that we've read it, and then at any time that there's an update to any word we get a learning management system update that tells us we have to reread it, and it will highlight any changes that have happened to that policy.
Q. Okay. Was that the state of affairs that that training procedure that you just described -- I said, "training," but that policy update procedure that you just described, was that the state of affairs when you first started working at the men's Central Jail?
A. I'm sorry. Can you clarify that --
Q. Yeah. The way that you just described those training updates and the policy updates, was that how it was the first day when you first started work at the

men's Central Jail?
A. To the best of my recollection, yes.
Q. And, again, that was approximately 2021?
A. Yes.
Q. When you first started at the jail, did you receive the policies and procedures sort of, like all in one bundle or booklet or document in some way?
A. We're given access to what's called the intranet. It holds all the updated policies and procedures for all of the facilities including Central Jail.
Q. So "intra" like, i-n-t-r-a --
A. Correct.
Q. -- net as opposed to internet.
A. Correct.
Q. Meaning, I assume, it's internal for the county or the sheriff as opposed to the worldwide web?
A. Correct. It has all of our forms and anything that we need to -- like, any resources that we needed had that there.
Q. So you say you receive access to the intranet, and within the intranet it has the policies and procedures?
A. Yes.
Q. And you're expected to go in and read all of

those policies and procedures?
A. Yes.
Q. How is that monitored, if at all?
A. By a training officer.
Q. And how does the training officer ensure that a new deputy has, in fact, read the policies and procedures?
A. By knowing them themselves and asking questions about the specifics of the policy afterwards. If I say to you, "Hey, I read this. Can you sign it?"
"Okay. I'm going to ask you a few questions."
Asks me a few question about the nuances of the policy and if I don't get them right, you're going to tell me to reread it.
Q. Was that your experience with the policies and procedures at the men's Central Jail?
A. Yes.
Q. In the example that you just gave, you sort of like, slid an imaginary stack of papers across the table. Were you physically given paper copies of policies and procedures?
A. No. We're given a training binder with things that need to be signed off by our TO and training markers that are required to be met. And that's what I was signifying sliding across the table was him not signing

my binder because I didn't read it.
Q. Thank you for that clarification.
Who was your TO or training officer?
A. During this point in time it was Deputy Amado.
Q. The same Deputy Amado that we've seen on some of the video here?
A. Yes.
Q. Did -- do you have a memory of Deputy Amado presenting you with the binder that included the paperwork where he would have to sign off on whether you read the policies and procedures?
A. No.
Q. Do you know if that happened?
A. He did not give it to me. An administration deputy gave it to me during orientation.
Q. I see. Did you have an interaction with your Training Officer Amado about the policies and procedures?
A. On a daily basis, yes.
Q. I guess I meant that more in the spirit of him, you know, kind of, quizzing you about the nuances or, you know, asking a few things before signing off like we were talking about before?
A. Yes.
Q. Did that happen between you and him?
A. Yes.

Q. Do you remember what he asked you about?
A. No.
Q. And you said that you continue -- well, let me back up.
Did you, in fact, go in and read all of the policies and procedures when you first started the job?
A. Yes.
Q. Were there a lot of them?
A. Yes.
Q. Is there any like, you know, testing or, you know, any -- anything like that after you are done reading them?
A. Yes. At the end of Phase 2, you are given what's called a "phased exam." It's 100 questions, and it quizzes you on policy and procedure and how well you know the facility and how to get around. And you have to pass, I believe, with a 90 percent or higher to finish that phase.
Q. That's called a phase exam?
A. Phase exam.
Q. Are there a number of different phases?
A. There are two phases, first phase and second phase.
Q. What's the first phase?
A. First phase is you're directly observed by a

training officer and shadowed 100 percent of the time. That's 28 days long. Second phase is 21 days, and you will be working on the same floor -- or same general area as your training officer, but they don't need to shadow you. That's 21 days, minimum of 14, if you are doing what your TO can to expedite you.

Q. Were you in Phase 1 or Phase 2 when Hayden Schuck died?

A. Phase 2.

Q. You were in Phase 2?

A. Yes, sir.

Q. The test that you were just describing about policies and procedures, did you say that's administered at the end of Phase 1 or the end of Phase 2?

A. To be 100 percent honest, I think it depends on the TO. I believe I took mine at the end of Phase 1 when I was a trainee, but I give mine to my trainees after Phase 2.

Q. Do you know whether you had already done your Phase 1 test before Hayden Schuck died?

A. Yes. I took it with Corporal Gallegos who was my Phase 1 TO.

Q. And once you read the policies and procedures online on the intranet, do you -- are you required to go back and ever read them again?

A. If there's updates or changes to post orders or green sheets, then yes.
Q. How does that work?
A. It's assigned to us. We get an e-mail that says, "You've been assigned this learning management system training."
We go to the intranet. There's a section for LMS, and it lists all the things that we're assigned, and we go through and register for them and take the classes or videos. Some of those include testing afterwards.
Q. Do you remember receiving any of those LMS updates in the spring of 2022?
A. Not specifically.
Q. Different question.
The items that we discussed in Figure 5 there, do you remember ever receiving any LMS updates or training materials of that kind to address those topics, and I mean ever?
A. Yes.
Q. When did that happen?
A. We on a regular basis talk about safety checks and getting CPR going, make the notifications, get the calls, get them out of the cell. Get them taken care of. We consistently speak about good checks. When something does happen, make sure you get all the notification out

MR. INMAN: Just a few while we're on the topic.

EXAMINATION

BY MR. INMAN:

Q. Can you describe for me the training, if any, you received about conducting safety cell checks in the academy?

A. During the academy, they give us the fundamental entry level, you know, the times that you have to meet, how you are going to log the check into JIMS appropriately, you know, making sure you give everybody their title. It's not Amado and Mace. It's Deputy Amado and Deputy Mace. When you're observing people in their cell, what you are looking for, you know, any signs of criminal activity. Does someone look like they may not be comfortable in there and don't want to talk about it? You know, is the cell in good working order? Is there anything that a maintenance request needs to be put in for? Do they get hot water? Does the toilet flush? Those type of things.

Q. Mr. Scott asked you about the interview you did with homicide after Mr. Schuck's death, and I know you testified that you didn't specifically tell them the word that he -- words that he used, but do you have a recollection of whether you told them whether or not he accepted or refused medical care?

CERTIFICATE OF REPORTER
---o0o---

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations do hereby certify:

That the foregoing proceedings were taken remotely before at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Before completion of the deposition, review of the transcript [  ] was [ X ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto. (Fed. R. Civ. P. 30(e)).

IN WITNESS WHEREOF, I have this date subscribed my name.

DATED: 25th of May, 2024.

Nicole O'Neil

Nicole O'Neil, CSR No. 1077470

# EXHIBIT 42

# Deposition Transcript

Case Number: 3:23-CV-00785-DMS-AHG
Date: June 25, 2024

In the matter of:

# ESTATE OF SCHUCK v COUNTY OF SAN DIEGO, et al.

# DEPUTY ALEXANDER CORTEZ

CERTIFIED COPY

Reported by:
Susan Swan

Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED DEPOSITION OF DEPUTY ALEXANDER CORTEZ

San Diego, California

Tuesday, June 25, 2024

Reported by: SUSAN SWAN, RPR, CRR, CCRR, CSR No. 7338

JOB No. 1025047
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY, AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,

Plaintiffs,

vs. No. 3:23-CV-00785-DMS-AHG

COUNTY OF SAN DIEGO, ET AL.,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of

DEPUTY ALEXANDER CORTEZ, taken on behalf of plaintiffs, at 1350 Columbia Street, Suite 600, San Diego, California, beginning at 9:04 a.m. and ending at 11:47 a.m. on Tuesday, June 25, 2024, before SUSAN SWAN, RPR, CRR, CCRR, Certified Shorthand Reporter No. 7338.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

APPEARANCES:

FOR PLAINTIFFS:

McKENZIE SCOTT PC
BY: MICHELLE C. ANGELES, ESQ.
1350 Columbia Street, Suite 600
San Diego, California 92101
619.794.0451
mangeles@mckenziescott.com

FOR DEFENDANTS COUNTY OF SAN DIEGO AND THE INDIVIDUALLY NAMED COUNTY DEFENDANTS:

COUNTY OF SAN DIEGO
OFFICE OF COUNTY COUNSEL
SOFIA L. REZVANI, ESQ.
1600 Pacific Highway, Room 355
San Diego, California 92101
619.515.6706
Sofia.Rezvani@sdcounty.ca.gov

FOR DEFENDANTS CORRECTIONAL HEALTHCARE PARTNERS AND NICHOLAS KAHL, NP:

LOTZ DOGGETT & RAWERS, LLP
BY: BRIANA L. BERG, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
Bberg@ldrlaw.com

Videographer:

David Kim

had any instances where a supervisor has informed you of any errors or incomplete entries that you've made in JIMS?

A. Yes.

10:21AM Q. Tell me about that.

A. I made errors of logging a safety check on the wrong floor. Only because at the time I was deployed to a different floor the past week and then it gets confusing when you are assigned to a different floor. I 10:21AM am not sure exactly which floor it was. It was quite some time since then. But it was one of the instances I recall, not logging on a correct floor. I logged myself on, for example, the fourth floor rather than if I was working the fifth. The fifth floor.

10:22AM Q. Are you typically informed of any errors within the same shift? Or when does that conversation happen?

A. That conversation happens usually within the shift. The supervisors review the JIMS' entries and lets us know if we're late or missing a walk -- a "walk" 10:22AM means a security check. And "late" means you exceeded the one hour that you are required to do your safety checks.

Q. Meaning that you took longer than the hour that you were supposed to take to do safety checks; is that 10:22AM right?

A. Correct. Yeah.

Q. And is that information related to your performance, let's say, missing a walk or being late? Is that documented anywhere in relation to you?

10:23AM MS. REZVANI: Objection. Calls for speculation. Only if you know.

THE WITNESS: I am not sure.

BY MS. ANGELES:

Q. Like, for example, if there becomes a pattern 10:23AM where you miss a number of walks or are late, if you know, is there a way a supervisor can tell how many instances you, as a deputy, had failed to miss a walk -- miss a walk or been late?

MS. REZVANI: Objection. Vague and ambiguous. 10:23AM Asked and answered. You can answer.

THE WITNESS: If they do an audit, then, I am sure there could be a way they could review it via video, co-witnessing the entries that they make in the computer.

10:23AM BY MS. ANGELES:

Q. And what do you mean by an "audit"?

A. Where a supervisor can go into their office, they have a computer they can log in to that has access -- I don't know how long historically that's 10:24AM saved -- but they could review video footage of the

You mentioned earlier that there are certain things that you are informed about in your briefing and then there are certain things that you rely on JIMS for.

A. Um-hum.

Q. Would any maintenance issues fall into -- would that be covered in a briefing? Or would that be typically found just in JIMS?

A. I think a combination of both.

Q. So it's typical in your practice to pass on information about any maintenance issues as part of your briefing?

A. I think it's important to.

Q. Are you trained to inform the officers in your briefing about maintenance issues with particular cells?

A. Yes. In addition to that, we have the ability to, in JIMS, log events of mechanical failures in the jail. It notifies maintenance department.

We can put in an entry, for example, if the toilet is not flushing, you can put what floor it's on, the module it's in, and also which cell is affected. Then hit "submit," and then it would go to the maintenance queue and they would see exactly -- if a light needs replacement -- we have night lights in the cell. We want to be able to see inside at night because we turn the main lights off at nighttime when they

sleep, the incarcerated sleep. We want to make sure the night light is functioning properly, so we let maintenance know. That's also entered into JIMS.

Q. So if you come on, let's say, a shift and you were not briefed on a maintenance issue -- let's say there was an issue with the chow door, the food slot on a particular door, and you come on your shift and you are having problems with one, and you weren't briefed about it, would you go into JIMS then to verify whether that was already reported and put on the maintenance log? Or what would you do in that situation?

A. Correct. I would look in the JIMS. That log will still be there. If maintenance hasn't printed it yet, it would still be in the queue. You also have the ability to call maintenance.

There's a phone tree distribution by every phone on the housing floor that has the maintenance phone numbers. You can also call them, make sure that the entry was made or what time they will be coming so that you can set the time aside in your day. That way, the incarcerated are not out and the maintenance have a clear path to affected area.

Q. So when maintenance actually needs to come do work, do they coordinate with you as deputies to get that scheduled and taken care of?

# REPORTER'S CERTIFICATION

I, Susan Swan, RPR, CRR, CCRR, a Certified Shorthand Reporter in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 10th day of July, 2024.

Susan Swan

Susan Swan, RPR, CRR, CCRR
CSR No. 7338

,

EXHIBIT 43

| | |
|---|---|
| **DATE:** | **February 17, 2022** |
| **NUMBER:** | **I.64.C.1** |
| **SUBJECT:** | **SAFETY CHECKS OF HOUSING UNITS AND HOLDING CELLS** |

PROCEDURE

A minimum of two (2) deputies will enter the modules of housing floors, Floors 4-8, while incarcerated persons are present in the dayroom. Upon verification of all incarcerated persons being secured in their assigned cells, a minimum of one (1) deputy can perform a safety check.

On Floors 1-3 and holding cells maintained by those assigned to specialized positions, a minimum of one (1) deputy can perform the safety checks.

**HIGH RISK SECURITY LEVEL HOUSING UNITS (ADMINISTRATIVE SEGREGATION)**

Absent exigent circumstances, when deputies need to enter a high-risk security level housing module (e.g., safety check, medication pass, laundry, inspections, etc.) and an incarcerated person is in the dayroom, the incarcerated person will be ordered to lockdown prior to the module gate or crossover doors being opened.

**LOGGING AND CONDUCTING SAFETY CHECKS**

Responsibility for logging and performing safety checks will be as follows:

A. 1st Floor– The assigned intake control deputy will be responsible for initiating and logging safety checks. The assigned intake deputies will be primarily responsible for conducting the safety checks. The 1st floor court deputy will be responsible for initiating, logging, and conducting safety checks of the court holding areas on the 1st floor. The specific housing unit descriptor will no longer be necessary.

B. 2nd Floor – The assigned 2nd floor deputies (search, medical screening, and release) will be responsible for initiating, logging and conducting safety checks of the 2nd floor. Deputies assigned to the Central Command Center (CCC) will assist with initiating safety checks and can be asked to make log entries if other 2nd floor deputies are away from their workstations.

C. 3rd Floor MOB/PSU/CLINICS – The assigned PSU control deputy will be responsible for initiating and logging safety checks for PSU, MOB, and 3rd floor clinics. The assigned PSU or MOB deputies will be primarily responsible for conducting the safety checks. Safety checks shall not exceed thirty (30) minutes.

D. 4th Floor Video Courts – The assigned video court deputy will be responsible for initiating, logging, and conducting safety checks of the 4th floor video court holding areas. Upon completion of their shift until the start of the next shift, the 4th floor housing deputies will be responsible for completing the safety checks of the video court holding area. The specific housing unit descriptor will no longer be necessary.

E. 5th Floor Pro Per Classrooms/Law Library – The assigned pro per deputy will be responsible for initiating, logging, and conducting safety checks of the 5th floor classrooms and law library (including 5 mezzanine). Upon completion of their shift, the pro per deputy will log, "AREA CLRD OF INMATES," and safety checks will not be required in this area until the start of the next pro per deputy shift.

F. Housing Units – The assigned housing deputies will be responsible for initiating, logging and conducting the safety checks. The housing control deputy will assist with initiating safety checks and can be asked to make the log entries if the housing deputies are away from their workstations.

G. Kitchen – The assigned kitchen deputy will be responsible for initiating and logging safety checks of the 9th floor. The key control deputy will assist with initiating safety checks and can be asked to make the log entries if the kitchen deputy is away from their workstation. Upon completion of their shift, the key control deputy will log, "AREA CLRD OF INCARCERATED PERSONS," and safety checks will not be required in this area until facility workers are present in the kitchen.

| | |
|---|---|
| **DATE:** | **February 17, 2022** |
| **NUMBER:** | **J.1.C.1** |
| **SUBJECT:** | **SAFETY CELLS; DEFINITION AND USE** |

PROCEDURE

Safety cells are located on the 2nd and 3rd floors at the San Diego Central Jail (SDCJ). The safety cells on the 3rd floor should only be used if the safety cells on the 2nd floor are full or at the watch commander's discretion. The medical screening deputy and the psychiatric stabilization unit deputy are responsible for checking the safety cells on their assigned floors; however, any deputy may assist with the safety cell checks.

Medical staff will attempt to check the incarcerated persons vitals prior to being placed into the safety cell. Although every attempt will be made to check an incarcerated persons vitals, should an incarcerated person be too uncooperative or combative to safely do so, the observations/actions shall be notated in the Safety Cell Placement and/or Safety Cell Update ISRs.

The incarcerated persons name, booking number and time of placement will be placed on the observation log located outside the safety cell door. The deputy initiating the placement will be responsible for this entry. At each safety cell check the deputy will offer the incarcerated person water unless they are sleeping. An entry on the observation log will need to reflect if water was offered, given, refused, or if the incarcerated person was asleep.

All articles of clothing are removed as a safety precaution and will be placed in a brown paper bag labeled with the incarcerated persons name and booking number on it if not already dressed in jail issued clothing. The brown paper bag will be placed inside one of two safety cell lockers located outside the safety cells. The locker number will correspond to the safety cell location listed on the observation log. The placement deputy will be responsible for making sure the incarcerated persons property is placed in the appropriate locker. Articles of value removed from the incarcerated person will be inventoried and noted on a second inventory slip or given to the arresting officer.

A copy of the safety cell placement report and any safety cell update reports will be placed on the clip board next to the cell. When the incarcerated person is cleared from the safety cell, the report(s) and the paper observation log will be placed in the incarcerated persons custody record.

When a late safety cell check is observed and/or conducted, the deputy shall notify the watch commander or designee. The supervisor notified of the late safety cell check will initial and ARJIS next to the late entry on the (J-19). This entry can be entered immediately or when the supervisor conducts a required log review.

| | |
|---|---|
| **DATE:** | FEBRUARY 16, 2022 |
| **NUMBER:** | J.2 |
| **SUBJECT:** | SOBERING CELLS: DEFINITION AND USE |
| **RELATED SECTIONS:** | I.52, MSD S.5; TITLE 24 |

PURPOSE

To provide guidelines on the use of sobering cells in Sheriff's detention facilities.

POLICY

Sobering cells shall only be used for the holding of incarcerated persons who are a threat to their own safety or the safety of others and require a protective environment due to their state of intoxication (e.g., under the influence of drugs, alcohol, etc.). This excludes incarcerated persons who have life threatening withdrawal symptoms or need long-term detoxification. Sobering cells shall never be used for disciplinary purposes.

PROCEDURE

I. CAPACITY

Sobering cell capacity is governed by Part 2, Section 1231.2.4 of Title 24 - Minimum Standards for Local Detention Facilities. Each facility shall draft a green sheet outlining the capacities of its sobering cells that should include:

A. A minimum of 20 square feet of floor area per person.

B. Limit of eight incarcerated persons per cell.

II. PLACEMENT

A. An incarcerated person placed into a sobering cell shall have all property removed, including jewelry, shoes, belts or any other article of clothing that could be used as a weapon or used to damage the cell. Jewelry and body adornments shall be removed in compliance with Detention Services Bureau Policies and Procedures (DSB P&P) section Q.55. Clothing articles, such as pants, shirts, skirts or dresses that must be removed due to their construction, shall be replaced with appropriate jail-issued clothing.

B. The steps outlined above are not for the purpose of conducting a visual inspection. If a deputy has reasonable suspicion to believe an incarcerated person is concealing drugs or weapons in a manner that would not be detectible by a pat down search, they must follow the steps outlined in DSB P&P I.52.

C. Regardless of the incarcerated person's booking status, their property shall be inventoried, placed in a property bag, labeled and retained in the property room.

D. Matches or igniters of any type, cigarettes, pencils, etc., are strictly prohibited in sobering cells.

III. REPORTS

A. A Jail Information Management System (JIMS) incident report, utilizing the "SOB" (sobering cell placement) incident code, shall be written for each incarcerated person placed in a sobering cell.

1. The incident report must clearly articulate the reasons for placement in the sobering cell.

2. The report shall also indicate if any force was used.

B. The need for continued retention must be documented by sworn staff in a JIMS incident report, utilizing the "SOU" (sobering cell update) incident code every six hours until the incarcerated person is cleared from the sobering cell. Health staff will provide input to the deputy responsible for writing the sobering cell update in JIMS.

IV. OBSERVATION

A. An Observation Log (J-19A) form shall be maintained adjacent to the sobering cell. All checks, observations, assessments and reviews conducted by sworn and health staff will be documented on the J-19A form by filling out applicable fields (e.g., ARJIS, date, time, incarcerated person's behavior, etc.).

B. A nurse's assessment must be obtained, as soon as possible, or no later than 30 minutes after the initial placement. After the placement time, health staff will check the incarcerated person a minimum of every four hours in accordance with Standardized Nursing Procedure SNP.A.3. If the incarcerated person remains in the sobering cell up to 12 hours from the time of the initial placement, health staff shall conduct an immediate assessment in accordance with Medical Services Division Operations Manual Section MSD S.5.

C. Sworn staff shall observe any incarcerated person in a sobering cell at least every 20 to 30 minutes. Staff will document their observed behavior and time of observation on the J-19A form.

D. Each on-coming watch commander shall review documentation of observations and the incarcerated person's condition at the beginning of each shift. The watch commander shall document their review of the J-19A form by signing their initials, the date and the time.

E. An incarcerated person shall be released from the sobering cell when they appear able to continue with processing.

F. If it is observed by sworn or health staff that an incarcerated person's medical and/or mental status is declining, the watch commander will ensure the incarcerated person is promptly evaluated by health staff, and as soon as possible receive a psychiatric evaluation.

G. For a placement greater than 24 hours, the watch commander will:

1. Ensure a medical assessment is obtained by a medical doctor and/or psychiatrist, who will be physically present, to determine if the incarcerated person should remain in the sobering cell.

2. Confer with the medical doctor and/or psychiatrist to determine if the incarcerated person's condition warrants a transfer to an emergency department, Medical Observation Housing or Psychiatric Stabilization Unit for further treatment and observation.

V. NUTRITIONAL REQUIREMENTS

A. Deputies are responsible for providing meals during normal mealtimes.

B. Meals provided to incarcerated persons in the sobering cell will consist of a sack lunch and a beverage, served in a disposable container.

C. No metal is permitted inside the sobering cell.

D. All offerings of meals will be documented on the J-19A form.

VI. SANITATION

Sobering cells shall be cleaned and disinfected immediately after every use, or in the event of constant use at least once each shift. In the event an incarcerated person soils (i.e., urinates, vomits, etc.) the sobering cell, it shall be cleaned and disinfected as soon as safely possible.

VII. FIRE SAFETY

A. Some sobering cell materials are flammable, and when ignited, produce potentially lethal toxic smoke. Because of the great potential for injury and the loss of life represented by fires started in sobering cells, extreme care must be exercised to ensure that no matches or lighters enter sobering cells.

B. Personnel responding to a fire in a sobering cell should be aware of the toxicity of the smoke and shall use a self-contained breathing apparatus when suppressing the fire or evacuating incarcerated persons. They shall immediately call the fire department of jurisdiction. Caution should be exercised when opening the door of an involved sobering cell to rescue its occupant(s).

C. A fire hose or an extinguisher, of the appropriate type, shall be mounted within 20 feet of every sobering cell.

| | |
|---|---|
| **DATE:** | **February 17, 2022** |
| **NUMBER:** | **I.64.C.1** |
| **SUBJECT:** | **SAFETY CHECKS OF HOUSING UNITS AND HOLDING CELLS** |

PROCEDURE

A minimum of two (2) deputies will enter the modules of housing floors, Floors 4-8, while incarcerated persons are present in the dayroom. Upon verification of all incarcerated persons being secured in their assigned cells, a minimum of one (1) deputy can perform a safety check.

On Floors 1-3 and holding cells maintained by those assigned to specialized positions, a minimum of one (1) deputy can perform the safety checks.

## HIGH RISK SECURITY LEVEL HOUSING UNITS (ADMINISTRATIVE SEGREGATION)

Absent exigent circumstances, when deputies need to enter a high-risk security level housing module (e.g., safety check, medication pass, laundry, inspections, etc.) and an incarcerated person is in the dayroom, the incarcerated person will be ordered to lockdown prior to the module gate or crossover doors being opened.

## LOGGING AND CONDUCTING SAFETY CHECKS

Responsibility for logging and performing safety checks will be as follows:

A. 1st Floor– The assigned intake control deputy will be responsible for initiating and logging safety checks. The assigned intake deputies will be primarily responsible for conducting the safety checks. The 1st floor court deputy will be responsible for initiating, logging, and conducting safety checks of the court holding areas on the 1st floor. The specific housing unit descriptor will no longer be necessary.

B. 2nd Floor – The assigned 2nd floor deputies (search, medical screening, and release) will be responsible for initiating, logging and conducting safety checks of the 2nd floor. Deputies assigned to the Central Command Center (CCC) will assist with initiating safety checks and can be asked to make log entries if other 2nd floor deputies are away from their workstations.

C. 3rd Floor MOB/PSU/CLINICS – The assigned PSU control deputy will be responsible for initiating and logging safety checks for PSU, MOB, and 3rd floor clinics. The assigned PSU or MOB deputies will be primarily responsible for conducting the safety checks. Safety checks shall not exceed thirty (30) minutes.

D. 4th Floor Video Courts – The assigned video court deputy will be responsible for initiating, logging, and conducting safety checks of the 4th floor video court holding areas. Upon completion of their shift until the start of the next shift, the 4th floor housing deputies will be responsible for completing the safety checks of the video court holding area. The specific housing unit descriptor will no longer be necessary.

E. 5th Floor Pro Per Classrooms/Law Library – The assigned pro per deputy will be responsible for initiating, logging, and conducting safety checks of the 5th floor classrooms and law library (including 5 mezzanine). Upon completion of their shift, the pro per deputy will log, "AREA CLRD OF INMATES," and safety checks will not be required in this area until the start of the next pro per deputy shift.

F. Housing Units – The assigned housing deputies will be responsible for initiating, logging and conducting the safety checks. The housing control deputy will assist with initiating safety checks and can be asked to make the log entries if the housing deputies are away from their workstations.

G. Kitchen – The assigned kitchen deputy will be responsible for initiating and logging safety checks of the 9th floor. The key control deputy will assist with initiating safety checks and can be asked to make the log entries if the kitchen deputy is away from their workstation. Upon completion of their shift, the key control deputy will log, "AREA CLRD OF INCARCERATED PERSONS," and safety checks will not be required in this area until facility workers are present in the kitchen.

| | |
|---|---|
| **DATE:** | MAY 26, 2022 |
| **NUMBER:** | J.4 |
| **SUBJECT:** | ENHANCED OBSERVATION HOUSING (EOH): DEFINITION AND USE |
| **RELATED SECTIONS:** | I.52, J.1, J.5, M.25, MSD S.10 |

## PURPOSE

To set forth procedures ensuring incarcerated persons who meet the criteria as outlined in Detention Services Bureau Policies and Procedures (DSB P&P) section J.5, are housed in Enhanced Observation Housing (EOH) to prevent self-harm and suicides.

## POLICY

Incarcerated persons who have been determined by the facility gatekeeper to warrant placement in the Detentions Safety Program (DSP) because they present an increased risk for suicide and who do not require placement in a safety cell as outlined in DSB P&P J.1, shall be temporarily housed in EOH for the purpose of receiving closer observation and assessment for permanent housing (refer to DSB P&P J.5). The recommending staff will notify the watch commander of the placement. Incarcerated persons in EOH shall be closely monitored and directly observed by sworn staff at random intervals not to exceed 15minutes between checks. Such observations shall be documented in the Jail Information Management System (JIMS).

Incarcerated persons in Book and Release (B&R) status will not be placed in EOH. EOH is not to be used for punishment or as a substitute for treatment.

## DEFINITION

EOH can be single cells, multiple occupancy modules, or medical isolation for temporary housing. EOH provides close observation and assessment of incarcerated persons who may be at an elevated risk for suicide. (Refer to DSB P&P section J.5 for additional definitions).

## PROCEDURE

I. PLACEMENT

A. When placement into EOH is deemed necessary during the intake process, a deputy will remain with the incarcerated person and escort them through the booking process prior to being placed in EOH. The incarcerated person will be given the opportunity to use the telephone per section 851.5 of the Penal Code.

B. An incarcerated person placed into EOH shall have all their personal clothing, wristband, jewelry and other property removed. Jewelry and body adornments shall be removed in compliance with DSB P&P Q.55. Personal property and clothing taken from an individual shall be inventoried, placed in a property bag, labeled and retained in the property room. For security purposes, deputies will remain with the person during the process to ensure all items listed above are removed.

1. All incarcerated persons placed in EOH will be issued a safety garment, two safety blankets, and shower shoes.

2. A safety garment is the only item of clothing the person may possess while in EOH. Shower shoes may be removed if they are used for any purpose other than as footwear. Documentation in an incident report is needed if shower shoes are not given. All safety garments shall be cleaned and disinfected after use. If the person is housed in EOH for more than 48 hours, the safety garment will be exchanged for a clean safety garment.

3. Showers, dayroom, television, and social phone calls will be offered in accordance with Title 15 guidelines.

4. Hygiene items will be provided as needed by the housing deputy and immediately collected after use.

5. Access to personal property, recreation yard time or social visits is not permitted.

6. Access to reading material (books, magazines, newspapers) is permitted. Staff must ensure magazines or other reading material is free of staples or bindings of such nature.

7. Professional visits and phone calls shall be permitted in accordance with DSB P&P sections N.5 and P.15. Incarcerated persons shall be dressed in clothing normally issued to incarcerated persons to attend professional visits (no safety garments).

8. Persons housed in EOH with low-risk designation may attend court. Incarcerated persons shall be dressed in clothing normally issued to incarcerated persons to attend court (no safety garments). Persons deemed high risk will not attend court. Notification to the court will be made per DSB P&P section M.44.

C. EOH is available at Las Colinas Detention and Reentry Facility, Vista Detention Facility, San Diego Central Jail and George Bailey Detention Facility.

1. Incarcerated persons housed at other facilities who are determined to warrant EOH housing shall be transferred to an EOH-enabled facility.

2. Each EOH-enabled facility will designate and identify an appropriate housing area within the facility for placement of the EOH unit.

II. DOCUMENTATION

A JIMS incident report utilizing "EOH" (enhanced observation housing) as the primary incident type code shall be written for each incarcerated person placed into EOH.

1. The incident report must clearly articulate the reasons for placement in EOH. Depending on the reasons for placement, the following additional incident type codes shall be used.

a. Based on the facility gatekeeper's assessment, for placement due to homicidal reasons, the additional type code 1 shall be "ZTH" (ISP Type-Homicidal). A recommendation for a single cell, multiple occupancy modules, or medical isolation EOH housing will be made.

b. Placement due to self-injury reasons the additional type code 1 shall be "ZTS" (ISP Type-Self-Injury).

c. When staff determines the placement was due to either verbal or written communication, the additional type code 2 shall be "ZMV" (ISP Method-Verbal).

d. When staff determines the placement was due to active behavior, the additional type code 2 shall be "ZMA" (ISP Method-Active).

2. A JIMS incident report utilizing "EOU" (enhanced observation update) as the primary incident type code shall be documented by sworn staff at least every 24 hours or after each Qualified Mental Health Provider (QMHP) assessment to document the continued need or clearance from ISP housing.

III. TRANSFERS

In the event an incarcerated person is transferred from one facility to another for placement into EOH, the following procedures will be followed:

1. Placement into EOH during the intake process, refer to the aforementioned subsection I.

2. The deputy from the originating facility will articulate in a JIMS incident report the reason for the EOH placement and will transport the incarcerated person to the new facility. The originating facility's watch commander will approve the incident report and contact and brief the watch commander or designee at the receiving facility.

3. Deputies assigned to the receiving facility will assume custody of the individual at intake/processing and will coordinate with the facility charge nurse to have the person medically assessed prior to placement into EOH. A supplemental incident report will be written documenting placement and of the assessment by facility health staff.

IV. MONITORING

A. Deputies will closely monitor and directly observe incarcerated persons in EOH at random intervals by conducting an EOH welfare check. EOH welfare checks shall not exceed 15 minutes between checks.

1. Deputies should be cognizant of the person’s physical condition that may require medical attention. Health staff must be notified immediately if the person exhibits any signs of medical distress, including agitated psychosis and/or agitated delirium. A medical doctor shall be contacted for an opinion anytime the person's status or condition warrants an evaluation.

2. Modification to the documentation of EOH welfare checks and/or information

identifying EOH units shall be outlined via a facility green sheet.

B. Each incarcerated person shall have a nursing assessment within 30 minutes of placement into EOH. A nursing assessment shall be completed at least every 24 hours thereafter or when clinically indicated (refer to Medical Services Division Operations Manual section MSD.S.10 for further details).

C. Within 24 hours of placement into EOH, and every 24 hours thereafter, an incarcerated person shall have a mental health consultation/evaluation by a QMHP to determine the person's need for mental health services and their suitability for continued retention in the DSP (refer to Medical Services Division Operations Manual section MSD.S.10 for further details).

D. At least once per shift, the watch commander will observe incarcerated persons in EOH and document such in the JIMS Area Activity Log.

V. LOGGING EOH WELFARE CHECKS IN JIMS

A. At the start of an EOH welfare check, the deputy will document the check in JIMS utilizing the "EOH WELFARE CHECK" event type. The description field of the entry shall include the name(s) and/or ARJIS(s) of the sworn staff conducting the check. Once all necessary fields are complete, the sworn staff making the log entry will immediately close the "EOH WELFARE CHECK" entry prior to deputies conducting the check.

B. At the conclusion of the EOH welfare check, an entry may be logged in JIMS using the event type "EOH NOTES" if there was anything encountered during the EOH welfare check. Items that necessitate documentation include, but are not limited to:

1. Incarcerated person in medical distress (e.g., asthma attack, chest pain, etc.)
2. Incarcerated person suffering medical trauma (e.g., bleeding, ligature marks, etc.)
3. Criminal activity (e.g., drug usage, fighting, etc.)
4. Facility damage (e.g., broken fixtures, graffiti, etc.)
5. Maintenance issues (e.g., clogged toilet, constantly running water, etc.)
6. Different or additional sworn staff conducted the EOH welfare check
7. Anything that delayed the start or completion of the EOH welfare check.

C. In the event an EOH welfare check requirement cannot be met, the deputy of the affected area shall document an explanation in the "EOH NOTES" log entry and immediately notify the responsible supervisor. Upon notification or as soon as practicable, the supervisor shall notate in a "SUPERVISOR'S LOG REVIEW" entry in JIMS, indicating they are aware the EOH welfare check was not conducted within the required timeframe

VI. NUTRITIONAL REQUIREMENTS

A. All food and water shall be served in soft, disposable containers.

B. Deputies are responsible for providing meals during normal mealtimes. The deputy providing the meal must ensure there are no items that the incarcerated person may use to inflict injury, such as plastic utensils, plastic bags or cellophane wrappers. Disposable cardboard utensils are the only utensils authorized in EOH.

C. Any refusals of meals will be documented in the incarcerated person's JIMS history.

VII. REMOVAL

A. Incarcerated persons can be moved from one housing assignment to another within the DSP based on the observations and direction of the facility gatekeeper. An incarcerated person that becomes actively self-harming or actively assaultive may be moved from EOH to a safety cell.

B. When the medical or mental health condition of an incarcerated person would be threatened by continued retention in any DSP housing, the incarcerated person shall immediately be removed and transported to an emergency department. If a watch commander removes an incarcerated person from DSP housing under such exigent circumstances and without consultation with a QMHP, the watch commander is required to articulate why the incarcerated person was removed in a JIMS incident report.

C. If an incarcerated person is removed from EOH for the purpose of release from custody, the watch commander will consult with a QMHP to determine whether the incarcerated person is likely to pose a threat to themselves or others. If the incarcerated person does not pose a threat, they will be released following established release procedures. If the incarcerated person is actively expressing suicidal ideations, the incarcerated person will be transported to the Emergency Psychiatric Unit at San Diego County Psychiatric Hospital (EPU) in compliance with DSB P&P J.7.

VIII. SANITATION

EOH units, to include single cells, multiple occupancy modules, or medical isolation shall be cleaned and disinfected using facility approved disinfectants or diluted bleach solution after every use and every 24 hours when occupied.

| | |
|---|---|
| **DATE**: | MAY 27, 2022 |
| **NUMBER**: | M.13 |
| **SUBJECT**: | HEALTH STAFF |
| **RELATED SECTIONS**: | Entire DSB "M" Section |
| **IN COMPLIANCE WITH**: | CAC Title 15, Sec. 1203, 1205, 1215, Prison Rape Elimination Act of 2003 |

PURPOSE

To define health staff positions.

POLICY

Health staff members shall comply with all State of California mandated license and certification requirements for their positions. The Sheriff's Medical Services Division further defines medical treatment as medical, psychiatric or dental.

Health staff members shall receive special training on the mandated requirements outlined in the Prison Rape Elimination Act of 2003. This training will include, but will not be limited to, the reporting of a sexual assault, the emergency treatment and the preservation of evidence when encountering a sexual assault victim, and the medical and psychological follow-up care that shall be afforded.

PROCEDURE

I. The Medical Services Administrator is responsible for the overall administration and coordination of the delivery of health care services within the detention facilities.

II. Detention facility qualified health providers (QHP) (e.g., physicians, nurse practitioners) are primarily responsible for the medical treatment, planning, and referral to any necessary outside medical service when deemed necessary. QHPs are also responsible for providing emergency medical care and will determine additional treatment or referral to an emergency department, if needed. In the event an incarcerated person claims they have been sexually assaulted while in custody, they will be referred to a forensic medical facility.

III. Detention facility dentists are responsible for evaluation, treatment and referral related to in-custody dental care.

IV. Detention facility psychiatrists and psychiatric nurse practitioners are responsible for the evaluation and treatment of suspected mental disorders.

V. Within their respective scopes of practice detention facility registered nurses and licensed vocational nurses are responsible for responding and rendering emergency care and referral, logistical support of all patient/doctor activity, screening interviews, administration of medications, implementation of all physician's orders and treatment, and special programs

VI. Detention facility qualified mental health providers (QMHP) are responsible for providing mental health interventions and case management services to incarcerated persons with

suspected or diagnosed mental health disorders. In the event an incarcerated person claims they have been sexually assaulted while in custody, they will provide mandated crisis intervention and follow-up care outlined in the Prison Rape Elimination Act of 2003.

VII. Detention facility medical clerical staff handles clerical work generated by incarcerated person's activity and movement within the detention facility system, as well as specific medical activity procedures.

| | |
|---|---|
| **DATE:** | MAY 23, 2022 |
| **NUMBER:** | Q.1 |
| **SUBJECT:** | INTAKE INFORMATION |
| **RELATED SECTIONS:** | M.9, Q.5, Q.7 |

PURPOSE

To establish uniform handling of required documentation for accepting arrested persons into Sheriff's detention facilities.

POLICY

All law enforcement agencies must use a Booking Intake/Personal Property Inventory (J-15 form) to book arrested persons into any Sheriff's detention facility. In addition, a Probable Cause Declaration (PCD) form, which establishes probable cause for warrantless arrests, shall be completed prior to booking.

Detentions Processing Division (DPD) staff will be responsible for making the initial determination of the acceptance of an arrested person into a Sheriff's detention facility. Acceptance will be in accordance with the established San Diego County Sheriff's Department Booking Acceptance Criteria. If an appeal of this decision is made, the watch commander will make the final determination. All arrest documentation will be verified prior to accepting the individual into custody.

PROCEDURE

I. Felony/misdemeanor field arrests: Arresting agencies must present a properly completed J-15 form for every arrested person delivered to a detention facility for booking. If the arrest is for new criminal charges requiring arraignment in court, a completed PCD must be presented prior to acceptance of the arrested person.

II. Felony/misdemeanor warrant arrests: If the arrest is for an outstanding warrant, the warrant or warrant abstract must be presented prior to acceptance of the arrested person.

III. Prior to accepting an arrested person into a Sheriff's detention facility, the arrested person shall be medically screened by the facility registered nurse.

   A. The registered nurse conducting the screening shall complete the first stage screening questions so that the arrested person can be properly classified in the Jail Information Management System.

   B. After completing the questioning, the registered nurse conducting the screening shall determine if the individual is "Fit for Jail."

IV. Any medical/mental health information obtained during the screening process shall be treated as confidential unless the information is necessary for the protection of the welfare of incarcerated persons, of others, management of the detention facility, or maintenance of facility security and order.

# EXHIBIT 44

# Deposition Transcript

Case Number: 23-cv-00785-DMS-AHG

Date: May 7, 2024

In the matter of:

# ESTATE OF WILLIAM HAYDEN SCHUCK, et al. v COUNTY OF SAN DIEGO, et al.

## SVEN SODERBERG

CERTIFIED COPY

Reported by:

Leyla S. Jones
CSR No. 12750

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF WILLIAM HAYDEN SCHUCK, BY AND THROUGH HIS SUCCESSORS-IN-INTEREST SABRINA SCHUCK AND TIMOTHY SCHUCK; SABRINA SCHUCK, INDIVIDUALLY AND IN HER CAPACITY AS SUCCESSOR-IN-INTEREST; AND TIMOTHY SCHUCK, INDIVIDUALLY AND IN HIS CAPACITY AS SUCCESSOR-IN-INTEREST,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF SAN DIEGO; BILL GORE, IN HIS INDIVIDUAL CAPACITY; KELLY MARTINEZ, IN HER INDIVIDUAL CAPACITY; CORRECTIONAL HEALTHCARE PARTNERS; JON MONTGOMERY, DO, IN HIS INDIVIDUAL CAPACITY; JAMEELYN BARRERA, RN, IN HER INDIVIDUAL CAPACITY; ROMEO DEGUZMAN, RN, IN HIS INDIVIDUAL CAPACITY; EMILY LYMBURN, RN, IN HER INDIVIDUAL CAPACITY; CARINA ECHON, RN, IN HER INDIVIDUAL CAPACITY; DEPUTY SUPERVISOR DOES 1-6, IN THEIR INDIVIDUAL CAPACITIES; JENNIFER VIVONA, RN (#6338), IN HER INDIVIDUAL CAPACITY; THOMAS MACE, DEPUTY (#4193), IN HIS INDIVIDUAL CAPACITY; JEFF AMADO, DEPUTY (#4324), IN HIS INDIVIDUAL CAPACITY; SVEN SODERBERG, DEPUTY (#3397), IN HIS INDIVIDUAL CAPACITY; NICHOLAS KAHL, NP, IN HIS INDIVIDUAL CAPACITY; | CASE NO. 23-cv-00785DMS-AHG |

DEFENDANT MEDICAL PROVIDERS )
DOES 2-3, IN THEIR INDIVIDUAL )
CAPACITIES; DEFENDANT DEPUTY )
SUPERVISOR DOES 1-6, IN THEIR )
INDIVIDUAL CAPACITIES, )
)
Defendants. )
______________________________)

VIDEOTAPED DEPOSITION OF SVEN SODERBERG

Tuesday, May 7, 2024

2:32 p.m.

(Pages 1 through 126, Inclusive)

Volume 1

REPORTED BY:
LEYLA S. JONES, CSR 12750

APPEARANCES:

For Plaintiffs:

MCKENZIE SCOTT
BY: TIMOTHY A. SCOTT, ESQ.
BY: MICHELLE C. ANGELES, ESQ.
1350 Columbia Street, Unit 600
San Diego, California 92101
619.794.0451
tscott@mckenziescott.com
mangeles@mckenziescott.com

For Defendants County of San Diego, William Gore, Kelly Martinez, Barbara Lee, Jon Montgomery, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado:

OFFICE OF COUNTY COUNSEL, COUNTY OF SAN DIEGO
BY: STEVEN P. INMAN, II, ESQ.
1600 Pacific Highway, Room 355
San Diego, California 92101
619.884.2931
steven.inman@sdcounty.ca.gov

For Defendants Correctional Healthcare Partners and Nicholas Kahl:

LOTZ, DOGGETT & RAWERS
BY: KATIE SCHULER, ESQ.
101 West Broadway, Suite 1330
San Diego, California 92101
619.233.5565
kschuler@ldrlaw.com

Also Present:

ELIJAH OCHOA, VIDEOGRAPHER

some situations?

A. Yes, not necessarily for them --

Q. I see.

A. -- but for other inmates because --

Q. I heard reference in some of the materials to "the back 40" as a physical location in the men's central jail.

Does that mean anything to you?

A. The back 40? It could be on the second floor where the old court side -- section was. But as far as I know, we're not -- we weren't allowed to use that to put people because historically, sometimes they would not know that they were back there.

Q. Uh-huh.

A. And so -- and we were using that also for video -- video court. So we would actually bring people down and keep them in those housing cells for video court. I don't know when that started. During COVID sometime. So those back 40s were meant for video court --

Q. Okay.

A. -- inmates.

Q. You said, "Those back 40s." Is --

A. Well, that area is -- because there's a

STATE OF CALIFORNIA )
)
COUNTY OF SAN DIEGO )

I, Leyla S. Jones, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in any way interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name.

Dated: May 22, 2024

Leyla S. Jones CSR No. 12750

EXHIBIT 45

Videotaped Deposition of

# Timothy Schuck

May 02, 2024

Estate of William Hayden Schuck, et al.

vs.

County of San Diego, et al.

aptus. COURT REPORTING

www.aptusCR.com | 866.999.8310

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Estate of William Hayden Schuck;
Sabrina Schuck; Timothy Schuck,

Plaintiffs,

vs. No. 23-cv-00785-DMS

County of San Diego; Bill Gore, in
his individual capacity; et al.,

Defendants.

VIDEO DEPOSITION of TIMOTHY SCHUCK

San Diego, California

May 2, 2024

Pages 1 - 78

Reported by:
Veronica S. Thompson
California CSR 6056, RPR, CRR, CCRR

Job No. 10140542

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Estate of William Hayden Schuck;
Sabrina Schuck; Timothy Schuck,

Plaintiffs,

vs. No. 23-cv-00785-DMS

County of San Diego; Bill Gore, in
his individual capacity; et al.,

Defendants.

---

The video deposition of TIMOTHY SCHUCK was taken on behalf of Defendants at 1350 Columbia Street, Suite 600, San Diego, California 92101, beginning at 1:03 PM PDT and ending at 2:55 PM PDT on Thursday, May 2, 2024, before Veronica S. Thompson, CSR 6056.

APPEARANCES

For Plaintiffs:

McKenzie Scott PC
By: Timothy A. Scott, Esq.
By: Michelle Angeles, Esq.
1350 Columbia Street, Suite 600
San Diego, California 92101
619-794-0451
tscott@mckenziescott.com
mangeles@mckenziescott.com

For County of San Diego Defendants:

Office of County Counsel
By: Sofia L. Rezvani, Sr. Deputy County Counsel
1600 Pacific Highway, Room 355
San Diego, California 92101
619-531-4860
steven.inman@sdcounty.ca.gov
sofia.rezvani@sdcounty.ca.gov

For Defendant Correctional Healthcare Partners Inc.:

Lotz Doggett & Rawers LLP
By: Cassandra F. Robinson, Esq.
101 West Broadway, Suite 1110
San Diego, California 92101
619-233-5565
crobinson@ldrlaw.com

Also present:

Sabrina Schuck

Videographer:

Matthew Villareal, Aptus Court Reporting

unseeable from where we sit in a courtroom.

**Q. So at no point during the court proceeding were you able to see him?**

A. No.

**Q. If he spoke, could you hear him?**

MR. SCOTT: Object to the form of the question.

THE WITNESS: I heard him speak once, yes.

BY MS. REZVANI:

**Q. Okay. Do you remember what he said?**

A. I remember what he said; it just wasn't him that said it. He said, "I'm fine. I'm good. Don't worry about me. I'm fine. I'm good. Don't worry about me."

**Q. And when you say it wasn't him that said it, what do you mean by that?**

A. He sounded different.

**Q. Different how?**

A. It's hard to describe. Just -- I don't know how. I just know that he was not okay.

**Q. Okay. Was he -- well, strike that.**

**Were you there when the judge made his ruling that he wanted Hayden to be checked for medications?**

A. That's not the way I remember it.

**Q. How do you remember it?**

A. I remember the appointed lawyer stopping the timeline of things because he had met with Hayden and was alarmed, silenced, awestruck. Said he was like talking to a wall. He said, you know, "You could put a picture of him on a wall and have a better conversation."

**Q. How did you learn about this -- about the attorney's impressions of him?**

A. He told us.

**Q. Okay. When did he tell you this?**

A. On a break when we had a call with -- a speaker phone call with my wife on.

**Q. Was that the same day as the court hearing?**

A. Yeah, all.

**Q. All of this was the same day?**

A. Uh-huh.

**Q. Okay. And I -- correct me. Did you just say that the appointed lawyer stopped the proceeding? Is that what you -- what did you mean by that?**

A. He asked the judge for a sidebar, and he walked up, and the other side walked up, and I couldn't hear anything they were saying.

They talked for five minutes and came back, and that's when -- what I recall is the judge ordering a right-away medical evaluation.

**Q. Did the judge say -- well, let me ask you.**
**Did the judge use those words: medical evaluation?**
A. That's my recollection.
**Q. And did he say -- just from what you recall, did he say what type of evaluation he needed?**
A. Who's "he"?
**Q. The judge. I'm sorry.**
A. It was a lady.
Medical evaluation --
**Q. Okay. Anything --**
A. -- is all I remember.
**Q. Anything else you remember hearing the judge say before the proceeding was over?**
A. She went on and answered for him because he was not coming to the microphone saying like -- something like, "I know I'm answering for this client that we're going to have this date for the next" -- I don't know -- the --
**Q. The next proceeding?**
A. Right.
**Q. Okay. So they -- so the judge set the next date. Anything else that you remember? Okay.**
A. No.
**Q. When the hearing was over, was that when you**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed by me; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [x] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

In witness whereof, I have this date subscribed my name.

Dated: May 13, 2024

Veronica S. Thompson

Veronica S. Thompson
California CSR 6056, RPR, CRR, CCRR