# EXHIBIT 46

# *San Diego County Sheriff's Department*

It Has Failed to Adequately Prevent and Respond to the Deaths of Individuals in Its Custody

*February 2022*

REPORT 2021-109



**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814

**916.445.0255** | TTY **916.445.0033**

For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact our* Public Affairs Office *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternative format reports available upon request | Permission is granted to reproduce reports

**Michael S. Tilden** *Acting State Auditor*

February 3, 2022
***2021-109***

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor



621 Capitol Mall, Suite 1200 | Sacramento, CA 95814 | 916.445.0255 | 916.327.0019 fax | www.auditor.ca.gov

## Selected Abbreviations Used in This Report

| | |
|---|---|
| ADP | average daily population |
| BSCC | Board of State and Community Corrections |
| CDCR | California Department of Corrections and Rehabilitation |
| CLERB | Citizens' Law Enforcement Review Board |
| POBR | Public Safety Officers Procedural Bill of Rights |

# Contents

Summary 1

Introduction 7

Chapter 1
The San Diego County Sheriff's Department Did Not Take Sufficient Steps to Prevent the High Number of Deaths in Its Jails 13

Chapter 2
Neither the Sheriff's Department nor CLERB Has Taken Adequate Action in Response to the Deaths of Incarcerated Individuals 33

Conclusions and Recommendations 53

Appendix A
In-Custody Deaths in California's 15 Largest Counties 59

Appendix B
Scope and Methodology 61

Responses to the Audit
Board of State and Community Corrections 65

California State Auditor's Comments on the Response From the Board of State and Community Corrections 71

Citizens' Law Enforcement Review Board 75

California State Auditor's Comments on the Response From the Citizens' Law Enforcement Review Board 79

California Department of Justice 81

San Diego County Sheriff's Department 83

California State Auditor's Comments on the Response From the San Diego County Sheriff's Department 115

Blank page inserted for reproduction purposes only.

# Summary

## Results in Brief

In accordance with federal constitutional law, the San Diego County Sheriff's Department (Sheriff's Department) has a responsibility to provide adequate medical care for individuals while they are in its custody. Nonetheless, from 2006 through 2020, a total of 185 people died in San Diego County's jails—more than in nearly any other county across the State. Some of these individuals were in custody for only a few days to a few months; others were waiting to be sentenced, set to be released, or about to be transferred to different facilities. Although any death is a tragedy, the high rate of deaths in San Diego County's jails compared to other counties raises concerns and suggests that underlying systemic issues with the Sheriff's Department's policies and practices have undermined its ability to ensure the health and safety of the individuals in its custody.

Significant deficiencies in the Sheriff's Department's provision of care to incarcerated individuals likely contributed to the deaths in its jails. For example, studies on health care at correctional facilities have demonstrated that identifying individuals' medical and mental health needs at intake—the initial screening process—is critical to ensuring their safety in custody. Nonetheless, our review of 30 individuals' deaths from 2006 through 2020 found that some of these individuals had serious medical or mental health needs that the Sheriff's Department's health staff did not identify during the intake process. Some of these individuals died within four days of their arrest. Moreover, in one case we reviewed, an incident between two cellmates resulted in one's death. In this instance, the intake nurse did not identify that the perpetrator had a history of mental health issues. Had the perpetrator's mental health issues been identified properly at intake, the department's staff might have placed this individual in a different cell, leading to a different outcome.

When we evaluated the intake practices of three comparable counties, we found that the counties had procedures that are more comprehensive. For example, the San Diego Sheriff's Department relies on registered nurses to perform the mental health portion of its intake screening, even though these nurses may not specialize in mental health care. In contrast, the Riverside County Sheriff's Department's policy requires that a mental health clinician evaluate every individual at intake. Implementing similar policies could help the San Diego Sheriff's Department to more effectively identify mental health needs early.

***Audit Highlights . . .***

*Our audit of the San Diego County Sheriff's Department's response to deaths of individuals in its custody highlighted the following:*

*» Until the Sheriff's Department implements meaningful change to improve its provision of medical and mental health care in its detention facilities, it will continue to jeopardize the safety and lives of individuals in its custody.*

- *We found multiple instances of individuals who requested or required medical and mental health care and did not receive it at all or in a timely manner.*
- *In our review of deaths that occurred in the department's custody, deputies performed inadequate safety checks to ensure the well-being of those individuals.*

*» Some of the Sheriff's Department's policy deficiencies are the result of statewide corrections standards that are insufficient for maintaining the safety of incarcerated individuals.*

- *The Board of State and Community Corrections should require mental health evaluations to be performed by mental health professionals at intake, and it should clarify and improve procedures for safety checks.*

*» The entities responsible for investigating in-custody deaths are not doing so in a thorough, timely, or transparent manner.*

- *The department's Critical Incident Review Board should consistently review deaths by natural causes, increase public transparency, and take substantive steps to prevent similar future deaths.*

*continued on next page . . .*

- *CLERB should prioritize the investigations of all deaths that occur in the department's custody and complete those investigations within the one-year statutory limit.*

In addition, the Sheriff Department's staff did not always provide consistent follow-up care to individuals who requested or previously received medical or mental health services. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not always follow up consistently—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

For example, one individual urgently requested mental health services shortly after entering the jail. However, the nurse had not identified any significant mental health issues at intake and determined that the individual did not qualify for an immediate appointment. The individual died by suicide two days later—only four days after entering the jail. Although the Sheriff's Department's policy indicates that a face-to-face appraisal with an incarcerated individual should take place within 24 hours of a mental health care request to determine the urgency of that request, the department has not always had this policy. Further, this policy only applies to mental health requests and not medical health care requests. Thus, the Sheriff's Department does not ensure that it provides prompt care for all types of needs.

In addition to providing adequate health care, performing safety checks is a key component of ensuring the well-being of individuals in detention facilities. Conducting these checks—which state law requires hourly through direct visual observation—is the Sheriff's Department's most consistent means of monitoring for medical distress and criminal activity. Nonetheless, in our review of 30 in-custody deaths, we found instances in which deputies performed these checks inadequately. For example, based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module. When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours. Although the Sheriff's Department's assistant sheriff of detentions indicated that the department has a process for periodically monitoring whether staff members adequately perform safety checks, it is not documented in policy. In contrast, the Riverside County Sheriff's Department has a formal policy that requires supervising staff to regularly review videos of safety checks being performed, and it is thus in a better position to assess the quality of safety checks.

The problems we identified with the Sheriff's Department's policies are in part the result of statewide corrections standards that are not sufficiently robust. The Board of State and Community Corrections

(BSCC) establishes in regulation the minimum standards that local detention facilities must follow. Every local jail system throughout the State uses these standards to create policies for inmate safety and care. However, some of the standards are insufficient for maintaining the safety of incarcerated individuals. For example, they do not explicitly require that mental health professionals perform the mental health screenings during the intake process. Further, they do not describe the actions that constitute an adequate safety check: rather, they simply state that safety checks must be conducted at least hourly through direct visual observation. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of individuals in custody in all counties.

In addition to its failure to adequately prevent the deaths of individuals in its custody, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action related to preventing deaths. The Sheriff's Department's internal entity for reviewing critical incidents, such as in-custody deaths, and identifying corrective measures—the Critical Incident Review Board—has not always taken substantive steps to prevent similar future deaths in the cases we examined. The primary focus of this board is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. Further, this board generally does not review deaths from natural causes, which represented nearly half of the deaths of individuals in the custody of the Sheriff's Department during the 15-year period of our review. We are concerned that the Sheriff's Department considers the Critical Incident Review Board's reviews to be confidential under the attorney-client privilege and does not have a process to report the results publicly. Consequently, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future.

The Sheriff's Department has also not implemented certain key recommendations from external oversight entities. From 2006 through 2020, multiple external entities—including the San Diego County Grand Jury—have made recommendations to the Sheriff's Department in areas related to inmate safety. Although the Sheriff's Department implemented several of these recommendations, it did not take action on others, even though they were critical to improving the safety of individuals in its custody. For example, it did not implement recommendations that involved enhancing its safety checks and improving the way it communicates incarcerated individuals' mental health needs to its staff.

To restore public confidence in county law enforcement, San Diego County voters approved the Citizens' Law Enforcement Review Board (CLERB) in 1990, a citizen-governed board. CLERB is responsible for reviewing complaints of misconduct and investigating deaths arising in connection with the actions of officers employed by the Sheriff's Department or Probation Department. However, CLERB has failed to provide effective, independent oversight of in-custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. CLERB has not independently interviewed witnesses or visited the initial scenes of the deaths. Further, it has not consistently performed thorough investigations, and it relies largely on the reviews the Sheriff's Department conducts.

Moreover, CLERB failed to review dozens of deaths in the Sheriff's Department's jails. State law generally requires that CLERB's investigations be performed within a year of discovery of the death or misconduct. Because CLERB did not consistently prioritize its investigations of deaths over other complaints of misconduct, it did not review 13 cases involving deaths in the Sheriff's Department's jails within the required time limit. Further, CLERB did not investigate an additional 40 deaths because it did not believe its rules and regulations required it to review natural deaths. As a result, it did not identify any weaknesses in the Sheriff's Department's policies or processes that may have contributed to these deaths nor develop any recommendations to address these weaknesses. Although CLERB currently reviews natural deaths, it lacks specific language in its rules and regulations requiring it to do so, thus raising concerns about whether its staff could exclude those reviews in the future.

Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes. Until the Sheriff's Department makes such changes, the weaknesses in its policies and practices will continue to jeopardize the health and lives of the individuals in its custody.

## Summary of Key Recommendations

### *Legislature*

The Legislature should amend state law to require the Sheriff's Department to revise its policies to align with best practices related to performing intake health evaluations (including requiring that mental health professionals perform mental health evaluations), providing follow-up medical and mental health care, conducting safety checks, and addressing the other deficiencies that we identify in this report.

The Legislature should amend state law to require BSCC to amend its regulations to ensure that county sheriff departments have mental health professionals perform incarcerated individuals' mental health evaluations at intake and have staff conduct safety checks that are sufficiently detailed to determine that incarcerated individuals are alive.

The Legislature should amend state law to require the Sheriff's Department's Critical Incident Review Board to review natural deaths and develop a process to make public the facts discovered and recommendations made in response to all in-custody deaths.

### *CLERB*

To ensure that it completes investigations of all deaths that occur in the Sheriff's Department's custody within the one-year time limit, CLERB should revise its rules and regulations by May 2022 to prioritize these investigations above all other investigations.

CLERB should revise its rules and regulations by May 2022 to include investigating natural deaths as part of its responsibilities.

## Agency Comments

Although the Sheriff's Department generally agreed with our recommendations, it questioned our audit approach and disagreed with our findings and conclusions. BSCC disagreed with our findings and recommendations but indicated that it would discuss whether amendments to its regulations are warranted. The Department of Justice and CLERB agreed with our recommendations.

Blank page inserted for reproduction purposes only.

# Introduction

## Background

The mission of the San Diego County Sheriff's Department (Sheriff's Department) is to provide high‑quality public safety services necessary to make San Diego the safest urban county in the nation. As the text box describes, the Sheriff's Department operates a system of seven detention facilities. It also operates patrol stations, a crime laboratory, and an array of support operations. The Sheriff's Department's fiscal year 2020–21 adopted budget includes more than 2,000 employees who work in its detention facilities, including correctional staff (sworn staff), medical and mental health care staff (health staff), and administrative staff. In this report, we refer to all of these staff members collectively as *detention staff*.

**The Sheriff's Department's Detention Facilities**

- The department operates a system of seven detention facilities throughout San Diego County.
- Three of the detention facilities both process (book) individuals entering the jail system and house them.
- The other four facilities house individuals who are transferred after being booked.
- During our audit period from 2006 through 2020, the seven facilities collectively housed an average of about 5,200 individuals daily (average daily population) and booked an average of about 85,000 individuals annually.

Source: Sheriff's Department documents and BSCC data.

San Diego County residents elect a sheriff to a four‑year term to serve as the chief executive of the Sheriff's Department. The current elected sheriff has been in office since 2009. Under the elected sheriff's guidance, the department must follow standards for jail conditions and treatment of incarcerated individuals set in regulation by the Board of State and Community Corrections (BSCC). The board also establishes local corrections training requirements and performs inspections of local detention facilities, to which the Sheriff's Department is subject.

Deaths can happen in detention facilities for various reasons. The California Department of Justice asks counties to classify in‑custody deaths into seven main categories: natural death, homicide by law enforcement, homicide by other inmate, suicide, accidental death, pending investigation, or cannot be determined/other. Regardless of the category, different entities in San Diego County have responsibilities to prevent, respond to, and investigate deaths of incarcerated individuals, as we discuss below.

## The Sheriff's Department's Role in Preventing and Responding to the Deaths of Incarcerated Individuals

As Figure 1 shows, the incarceration process starts when a law enforcement officer arrests an individual in San Diego County and brings him or her to a jail for processing, which is also known as *booking*. One of the most important steps in the intake process that follows is the individual's health screening. This screening is the Sheriff's Department's first opportunity to identify an individual's

> **Examples of Housing Types in the Sheriff's Department's Facilities**
>
> - **Safety Cell/Enhanced Observation Housing:** Temporary housing units constructed to maximize safety by removing physical features that could be used to inflict harm. These units are recommended for individuals who are actively self-harming, assaultive, or at risk of suicide. Staff closely monitor individuals at random intervals.
> - **Medical Observation Beds:** Beds located close to a nursing station for individuals whose condition necessitates hourly monitoring by health staff.
> - **Segregation Housing:** Housing areas where individuals are placed in cells isolated from the general population and receive services and activities apart from others. Staff may place individuals in this housing for their own safety, staff safety, facility security, or pending a disciplinary action hearing.
> - **Mainline Housing:** Housing areas for individuals who are classified as general population and therefore do not need to be isolated from others for security reasons or for medical or mental health reasons.
>
> Source: Sheriff's Department policies and state law.

medical and mental health needs. After this health screening, the next major step is classification, which determines an individual's housing assignment. As the text box shows, the Sheriff's Department has various types of housing in its facilities. An individual's housing assignment is critical to safety and care because it indicates to detention staff whether that individual has special needs or characteristics that warrant precaution.

To determine an initial housing assignment, sworn staff interview the individual; review the person's current booking information, complete criminal history, and past incidents in custody; and consider any information or instructions provided by health staff members regarding restrictions related to medical or mental health needs. The department may subsequently change an individual's housing assignment if circumstances require reclassification.

When individuals are in custody, the Sheriff's Department is responsible for providing basic health care services and for performing safety checks at least every hour to provide for their health and welfare. Incarcerated individuals may request medical or mental health attention, or dental care, as needs arise. Providing care on an ongoing basis and performing adequate safety checks are vital to ensuring the safety of incarcerated individuals.

When an individual dies in the custody of the Sheriff's Department, its homicide unit (homicide unit) investigates the death and assists the San Diego County Medical Examiner's Office (Medical Examiner's Office) by attending the autopsy and answering any questions surrounding the circumstances of the death. The Medical Examiner's Office, an agency independent of the Sheriff's Department, investigates all deaths of persons in custody. The Medical Examiner's Office's main function is to determine the manner of death—such as accidental—and the cause of the death—such as by drug overdose.

The Sheriff's Department also performs other internal reviews of in-custody deaths. For instance, within 30 days following a death, it must review the circumstances surrounding the incident and pertinent medical and mental health services and reports (30-day medical review). It must also complete a critical incident review for all deaths except natural deaths. Most of these reviews could result in the Sheriff's Department taking corrective action, such as

changing policies or initiating employee discipline. We discuss the Sheriff's Department's internal reviews in detail later in this report.

**Figure 1**
**The Sheriff's Department's Booking Process**

1. After an individual is arrested, the arresting officer transports him or her to one of the Sheriff's Department's three booking facilities.

2. A registered nurse performs a preliminary medical and mental health screening during the intake process to determine whether the individual is medically fit for booking and to identify whether there are any known illnesses and medications. If the individual is experiencing a medical or mental health emergency that cannot be managed by the Sheriff's Department, he or she may be sent to the hospital. Individuals in need of further evaluation or more urgent medical care will receive a secondary nurse assessment within a few hours of their first screening.

3. Based on the intake assessment, a nurse can write a mental health referral or schedule a medical follow-up with a doctor, as needed, at a later date.

4. The individual proceeds to classification, which determines his or her housing assignment.

Source: Sheriff's Department policies and procedures.

## The Citizens' Law Enforcement Review Board's Responsibilities Related to the Deaths of Incarcerated Individuals

The Citizens' Law Enforcement Review Board (CLERB) is a key county entity that provides external oversight when an incarcerated individual dies in San Diego County. San Diego County voters amended the county charter in 1990 to require the County Board of Supervisors (county board) to establish CLERB to investigate complaints against officers employed by the Sheriff's Department and Probation Department. CLERB's mission is to increase the accountability of and public confidence in peace officers employed by the San Diego County's Sheriff's Department and the Probation Department. As the text box describes, CLERB is responsible for achieving its mission by conducting independent, thorough, timely, and impartial reviews of complaints of misconduct, among other things. This audit focuses only on CLERB's investigations of deaths in the Sheriff's Department's jails. The San Diego County Charter establishes CLERB's power to subpoena, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent to its investigations.

### CLERB's Responsibilities

Investigating complaints against peace officers that involve the following allegations:

- Use of excessive force, discrimination, or sexual harassment towards members of the public.
- The improper discharge of a firearm.
- Illegal search or seizure.
- False arrest.
- False reporting.
- Criminal conduct or misconduct.

Reviewing, investigating, and reporting on the following incidents, regardless of whether a citizen files a complaint:

- The death of any individual arising out of or in connection with actions of peace officers.
- Incidents involving the discharge of a firearm.
- Use of force by peace officers resulting in great bodily injury.
- Use of force by peace officers at protests or other events protected by the First Amendment.

Source: CLERB rules and regulations.

CLERB currently consists of 11 board members nominated by San Diego County's chief administrative officer and appointed by the county board for three-year terms. Serving without compensation, CLERB members must be qualified electors of San Diego County, possess reputations for integrity and responsibility, and demonstrate an active interest in public affairs and service. County rules prohibit its employees or individuals employed as peace officers from serving. CLERB makes advisory findings on complaints and recommendations for policy and procedure changes to the sheriff, chief probation officer, and the county board. CLERB has also established rules and regulations to further facilitate its operations, which the county board has approved.

CLERB's staff support the CLERB members by conducting complaint investigations, preparing written reports with findings and recommended policy changes, and transmitting the final reports to the Sheriff's Department, Probation Department, and the county board. CLERB's staff currently includes five special investigators, one supervising special investigator, an administrative secretary, and an executive officer. CLERB members appoint its executive officer, to whom they have delegated most of their authority over the other staff.

CLERB's executive officer must possess a bachelor's degree and five years of management-level experience. CLERB's special investigators must have five years of experience performing investigations for a law enforcement agency, district attorney's office, or other governmental agency or organization.

### The Attorney General's and County Board's Oversight of the Sheriff's Department

The county board is the governing body of San Diego County and is composed of an elected supervisor from each of the county's five districts. State law gives the county board the authority to supervise the official conduct of all county officers, as well as officers of all districts and other subdivisions of the county, including CLERB. However, the county board's oversight of the county sheriff has limitations, as Figure 2 shows. The California Constitution and state law provide that the county sheriff is an elected county official with certain independent functions and duties with which the county board cannot interfere. Nonetheless, state law establishes the county board's budgetary authority over the Sheriff's Department, and it also exercises some oversight—albeit minimal—through its establishment and oversight of CLERB.

Although the county board has limited oversight of the sheriff, the state constitution designates the State's attorney general as the chief law officer of the State. Specific statutes describe the attorney general's authority. For example, state law requires the Sheriff's Department to report to the attorney general all facts concerning the death of an individual while in its custody within 10 days of that death. To ensure uniform and adequate enforcement of the laws of the State, the attorney general may also call into conference all of the sheriffs, district attorneys, and chiefs of police in the State for the purpose of discussing the duties of their respective offices. Further, the attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution. Finally, when necessary for the public interest, the attorney general is authorized to direct sheriff activities related to the investigation or detection of crime within a county.

**Figure 2**
**The County and State Have Oversight of the Deaths of Incarcerated Individuals**

## COUNTY BOARD OF SUPERVISORS



State law gives the county board the authority to supervise the conduct of all county officers, including CLERB members.

**However, the California Constitution and state law give the sheriff independent functions and duties with which the county board cannot interfere.**

*State law provides the county board with authority to approve the Sheriff's Department's budget, but it otherwise has **limited authority** over the Sheriff's Department.*

### CITIZENS' LAW ENFORCEMENT REVIEW BOARD

- Eleven-member citizens' board established by voter-approved proposition in 1990 (members appointed by county board).
- CLERB special investigators—who must have at least five years of investigative experience—review in-custody deaths and complaints of misconduct by officers of the Sheriff's Department.
- CLERB makes **advisory** findings and recommendations related to death cases—**however, the Sheriff's Department ultimately decides whether to take action.**
- The board submits investigative reports to the county board and the Sheriff's Department.

### SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

The Sheriff's Department performs various internal reviews after an incarcerated individual's death.

- Its homicide unit investigates all types of deaths in jails.
- Its Critical Incident Review Board reviews suicides, homicides, and accidental deaths, but not natural deaths.
- Its medical staff performs an assessment of care provided before each death.

## THE STATE ALSO HAS OVERSIGHT ...

### ATTORNEY GENERAL

- The California Constitution designates the State's attorney general as the chief law officer of the State.
- The attorney general may bring a civil action to eliminate the pattern or practice of conduct by law enforcement officers that deprives any person of rights protected by law or the constitution.
- Sheriff's departments must report in-custody deaths to the attorney general within 10 days. The California Department of Justice collects and posts to its website data pertaining to these in-custody deaths.

Source: California Constitution, San Diego County charter, state law, CLERB's rules and regulations, and Sheriff's Department policies.

# Chapter 1

## THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT DID NOT TAKE SUFFICIENT STEPS TO PREVENT THE HIGH NUMBER OF DEATHS IN ITS JAILS

### Chapter Summary

From 2006 through 2020, a total of 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with the way the Sheriff's Department provides care for and protects incarcerated individuals that likely contributed to deaths in its jails. These deficiencies related to its provision of medical and mental health care, as well as its performance of checks to ensure the safety and health of individuals in its custody. When we evaluated the policies of three comparable counties, we found that some have adopted procedures that could address weaknesses we identified at the San Diego Sheriff's Department. That said, the problems we identified with the Sheriff's Department's policies are in part the result of certain statewide corrections standards that are not robust or specific enough, leaving the establishment of effective practices to the discretion of the individual counties. Given that the annual number of incarcerated individuals' deaths in county jails across the State increased from 130 in 2006 to 156 in 2020, improving the statewide standards is essential to ensuring the health and safety of incarcerated individuals in all counties.

### In the Past 15 Years, More Individuals Died While in the San Diego Sheriff's Department's Custody Than in the Custody of Nearly Any Comparable County in the State

State data on deaths in custody at county jails show that San Diego County reported the second-highest number of in-custody deaths over the past 15 years.[1] It followed only Los Angeles County, which is significantly larger. Further, there continues to be a substantial number of deaths in San Diego County's jails, as Figure 3 shows. Many of the individuals who died were in the Sheriff's Department's

[1] State law requires a law enforcement agency or an agency in charge of a correctional facility, including county sheriff's departments, to report any case in which a person dies in its custody to the Office of the Attorney General within 10 days after the death. We present an interactive dashboard for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

custody for only a few days to a few months before their deaths. Some of these individuals were awaiting trial, or scheduled to be released or transferred to state hospitals.

**Figure 3**
There Continues to Be a Substantial Number of Deaths in San Diego County's Jails




Source: California Department of Justice in-custody death data, BSCC data, and Sheriff's Department information.

* We use the Sheriff's Department's information on in-custody deaths in 2021 because it was not included in the California Department of Justice data, which is as of May 2021. We use ADP information from the Sheriff's Department for 2021 because BSCC did not have complete ADP data for 2021.

In comparison to similar counties, more individuals died in the San Diego Sheriff's Department's custody in the past 15 years as Figure 4 shows. We identified the Alameda County Sheriff's Office (Alameda Sheriff's Office), Orange County Sheriff's Department (Orange Sheriff's Department), and Riverside County Sheriff's Department (Riverside Sheriff's Department) as comparable considering their size, geographical location, and other factors. The text box shows the average daily population (ADP) and bookings from 2006 through 2020 for each of these four counties.[2] From 2006 through 2020, 185 incarcerated individuals died in the San Diego Sheriff's Department's jails, in comparison to 99 in the jails of the Alameda Sheriff's Office, 111 in Orange Sheriff's Department's jails, and 104 in Riverside Sheriff's Department's jails. More recently, from 2016 through 2020, 72 people died while in the care of the San Diego Sheriff's Department, whereas 25 people died in the care of the Alameda Sheriff's Office, 46 in Orange Sheriff's Department, and 37 in Riverside Sheriff's Department. Even when considering each of these counties' jail systems' ADP and number of bookings, the rate of deaths reported by the San Diego Sheriff's Department still exceeded that of the comparable counties. In fact, we reviewed data from the 15 largest counties in the State and found that the rate of deaths in San Diego County was among the highest.[3] Although any death is a tragedy, the high rate of deaths at San Diego County compared to other counties is particularly concerning.

**Average Annual ADP and Bookings From 2006 Through 2020**

| | ADP | BOOKINGS |
|---|---|---|
| Alameda Sheriff's Office | 3,325 | 51,842 |
| Orange Sheriff's Department | 5,877 | 59,263 |
| Riverside Sheriff's Department | 3,668 | 54,025 |
| San Diego Sheriff's Department | 5,162 | 85,631 |

Source: BSCC data and San Diego Sheriff's Department bookings data.

When we reviewed the manner of death, the San Diego Sheriff's Department had a notably higher number of suicides and natural deaths than the comparable counties, as Table 1 shows.[4] Alarmingly, a total of 52 individuals in the San Diego Sheriff's Department's jails died by suicide over the past 15 years, which is more than twice the number in each of the comparable counties. Additionally, more individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of each of the comparable counties, raising concerns about its ability to provide adequate safety and medical care to those it incarcerates. Natural deaths can include deaths from pre-existing

2 The ADP represents the number of incarcerated individuals housed in a jail system for any given day over a period of time and is used to determine whether a jail is operating at or near capacity. Bookings represent the total number of individuals who were processed through the county jail system.

3 Appendix A provides the number and rate of deaths in the 15 largest counties in relation to their ADPs and bookings.

4 We present an interactive dashboard for viewing data on the age, race, and gender of the individuals who have died in each county detention facilities system at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

medical conditions and deaths resulting from inadequate care. After adjusting the comparisons based on each county's ADP, the San Diego Sheriff's Department still has historically had the highest rate of natural deaths and suicides.

**Figure 4**

**Over the Past 15 Years, More Individuals Died in San Diego County's Jails Than in Those of Comparable Counties**




TAKING INTO CONSIDERATION THE NUMBER OF BOOKINGS AND THE ADP AT EACH COUNTY JAIL SYSTEM, SAN DIEGO STILL HAD THE HIGHEST RATE OF DEATHS, BOTH IN THE PAST 15 YEARS AND IN THE MOST RECENT FIVE YEARS.

Source: California Department of Justice in-custody death data and BSCC data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Based on data the Sheriff's Department provided, in the most recent three years—2018 through 2020—the percentage of deaths of Black individuals in the Sheriff's Department's custody was disproportionately higher than their overall composition of the jail population. White individuals died at proportionally higher rates in 2007, 2009 through 2014, 2016, 2017, and 2020. In 2006, 2008, and 2015, the percentage of deaths among Hispanic individuals exceeded their population percentage. Although racial bias was not the focus of this report, our review of the Sheriff's Department's policies and procedures identified widespread deficiencies in its policies and practices for ensuring the health and safety of the individuals of all races and ages in its care.

**Table 1**

**More Individuals in San Diego County's Jails Died by Suicide or Natural Causes Than Individuals in the Custody of Comparable Counties**

| MANNER OF DEATH | SAN DIEGO | ALAMEDA | ORANGE | RIVERSIDE |
|---|---|---|---|---|
| **Total Deaths by County Sheriff's Department From 2006 Through 2020** | | | | |
| Accidental | 31 | 19 | 13 | 21 |
| Homicide (by law enforcement) | 4 | 0 | 1 | 2 |
| Homicide (by other inmate) | 8 | 4 | 4 | 6 |
| Natural | 88 | 52 | 77 | 51 |
| Suicide | 52 | 22 | 14 | 23 |
| Other | 2 | 2 | 2 | 1 |
| **Totals** | **185** | **99** | **111** | **104** |

Source: California Department of Justice in-custody death data.

We present interactive dashboards for viewing statewide data and additional detail regarding deaths in county detention facilities at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Note: In San Diego County, accidental deaths mainly included drug overdoses. The two deaths shown as other include one pending investigation and one undetermined manner of death.

We also found that sheriff's departments did not report some deaths that occurred after incidents in jails because the individuals were released before their deaths. For example, we found instances in which the coroner or medical examiner's offices described individuals dying in hospitals after incidents in the county jails, such as attempted suicide or medical emergencies. However, the respective counties did not report these deaths to the attorney general because the state law requiring reporting of in-custody deaths requires sheriff's departments to report only those individuals who died while in custody at the time of death and not individuals who died after having been released.[5]

[5] For example, state law allows sheriff's departments to compassionately release individuals from custody who would not reasonably pose a threat to public safety, and the incarcerated individual upon diagnosis by the examining physician, is deemed to have a life expectancy of six months or less.

**Example of a Death That State Law Does Not Require to Be Reported**

July 1–An individual attempted suicide in a county jail but initially survived. The individual was transported to the hospital.

July 10–The sheriff's department compassionately released the individual from custody.

July 15–The individual later died in the hospital as a result of the injuries from the attempted suicide.

Source: Records from sheriff's departments.

The text box provides an example in which sheriff's departments would not need to report a death to the attorney general. Consequently, sheriff's departments may be underreporting to the attorney general and to the public the number of deaths occurring from incidents in the jails.

## The Sheriff's Department's Failure to Consistently Provide Adequate Care Likely Contributed to Its In‑Custody Deaths

We selected 30 individuals who died in the Sheriff's Department's jails from 2006 through 2020, weighted toward deaths that occurred in the last four years. Our selection included natural deaths, accidental deaths, suicides, and homicides.[6] Our review of the associated case files identified numerous problems with the Sheriff's Department's care of these individuals, starting with the inadequate health screenings it performed upon their initial arrivals through its insufficient responses to their medical emergencies, as Figure 5 shows. The deficiencies we identified in these areas for all types of deaths—including deaths classified as natural—suggest that the problems with the Sheriff's Department's care for incarcerated individuals are systemic.

The assistant sheriff of detentions at the Sheriff's Department asserted that the department is aware that its policies are not followed all of the time and recognizes that employees make mistakes, but it holds employees accountable when violations are discovered and makes every effort to provide additional training to prevent a recurrence. However, as the cases in our review show, failing to follow policies even in limited instances can result in the loss of life.

When we evaluated the policies at the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department, we identified instances in which these entities have procedures that are more robust than those of the San Diego Sheriff's Department. If the San Diego Sheriff's Department followed these procedures, it could better ensure the health and safety of the individuals in its custody.

6 To comply with audit standards, we did not select cases involved in active litigation, including cases related to COVID‑19, in order to avoid interfering with ongoing legal proceedings. Although the Sheriff's Department had reported one death in 2020 and one death in 2021 that were related to COVID‑19, it indicated that the manner of death has not yet been determined for 11 other cases in 2021, as of January 2022.

**Figure 5**
**Significant Deficiencies in the Sheriff's Department's Policies and Procedures Likely Contributed to the Deaths of Individuals in Its Custody**

| | |
|---|---|
| INSUFFICIENT HEALTH EVALUATIONS AT INTAKE | Health staff did not always properly identify incarcerated individuals' medical and mental health needs at intake. Consequently, some of these individuals did not receive proper care, likely contributing to their deaths. |
| INCONSISTENT FOLLOW-UP CARE | Detentions staff did not consistently follow up after individuals received or requested medical or mental health services, even though they often had serious needs that, when unmet, may have contributed to their deaths. |
| INADEQUATE SAFETY CHECKS | Sworn staff did not always adequately check on incarcerated individuals. Some individuals were found hours after their deaths, negating the opportunity for lifesaving measures. |
| UNNECESSARY DELAYS IN PERFORMING LIFESAVING MEASURES | Sworn staff's and medical personnel's slow response time to administer aid during medical emergencies may have contributed to unnecessary delays in lifesaving measures. |

Source: The Sheriff's Department's jail records, surveillance videos, medical records, medical examiner reports, and homicide investigation documents related to a selection of 30 deaths of incarcerated individuals.

### *The Sheriff's Department Did Not Ensure That It Identified Individuals' Medical and Mental Health Needs at Intake*

Because the Sheriff's Department did not always properly identify the medical and mental health needs of individuals in our review at intake, some of them did not receive the care they required. Studies on health care at correctional facilities indicate that identifying individuals' health needs at intake is critical to ensuring their safety in custody. For example, one of the keys to identifying potential suicidal behavior is through inquiry during the intake screening.

In at least eight of the 30 cases we reviewed, individuals had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake. Five of these individuals died within four days of their arrest. For example, in one case, an intake nurse determined that an individual needed to have a secondary nurse evaluation because the individual exhibited possible symptoms of drug withdrawal. However, there is no evidence in the case records that the intake nurse communicated this conclusion to other staff. The case records and video surveillance indicate that the individual died 24 hours after completing booking from complications resulting from a drug overdose without having seen another health professional.

***In some cases, the Sheriff's Department did not promptly and properly identify individuals' mental health needs, because mental health professionals generally do not participate in its intake health screenings.***

In some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. Registered nurses perform the medical and mental health screenings at intake—asking both mental health and medical questions. These nurses are trained medically but do not necessarily specialize in mental health, which means that they may miss key signs of mental health needs. According to policy, if the registered nurse identifies an individual as having mental health needs at intake, the nurse refers the individual for further evaluation by a qualified mental health professional. However, even if the nurse identifies a need for a further mental health assessment, the Sheriff's Department's policy may not require the individual to receive that assessment sooner than 30 days after intake, depending on the severity of an individual's symptoms. We noted one county had adopted more robust intake screening practices. Unlike the San Diego Sheriff's Department, the Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early.

The San Diego Sheriff's Department is currently advertising to hire additional mental health staff, and its director of mental health indicated that the Sheriff's Department is aiming to have a qualified mental health professional, such as a mental health clinician or a psychologist, complete the mental health evaluations at intake. The county board approved additional funding in June 2021 for the Sheriff's Department to hire a substantial number of additional nurses and mental health professionals.

In addition, the Sheriff's Department's intake nurses sometimes have not obtained complete medical and mental health history information on individuals. Although they may ask the individuals to sign a release of information that provides the department access to their medical and mental health records, individuals can refuse to sign. Historically, Sheriff's Department nurses have not had

immediate access to county health records, which could be key to identifying health needs at intake. For example, the text box describes a case involving two cellmates that resulted in one's death. In this instance, a different outcome might have resulted had staff identified the perpetrator's mental health history at intake.

The Sheriff's Department entered into an agreement in September 2021 with the county Health and Human Services Agency to share behavioral health and medical information. The assistant sheriff of detentions stated that the Sheriff's Department is in the process of getting access to this information. However, the Sheriff's Department does not currently plan to require its intake nurses to look up each individual in the system. We believe this should be a standard step in the intake process to better ensure that the Sheriff's Department has a more comprehensive health history for each individual who comes into its care. In fact, the Riverside Sheriff's Department's policy requires mental health staff to review Riverside County's electronic health record system to determine whether an incarcerated individual has a history of receiving behavioral health care in Riverside County.

**In-Custody Death: *Case Example 1***

An intake nurse did not identify an individual's mental health needs and did not have access to the individual's mental health history. Once incarcerated, that individual killed their cellmate.

After the cellmate's death, the Sheriff's Department discovered the perpetrator's history of mental illness. Had staff known about this history, they likely would have placed the perpetrator in a different cell, where they could better meet the individual's mental health needs and better ensure others' safety.

Source: Records from the Sheriff's Department.

### *The Sheriff's Department Did Not Consistently Follow Up With Individuals Who Needed Medical and Mental Health Services*

Our case review found that Sheriff's Department staff did not always follow up after individuals previously received or requested medical or mental health services, even though these individuals often had serious needs that, when unmet, may have contributed to their deaths. Best practices stress that timely treatment and follow-up are important components of any health care system. Although the reasons that the Sheriff's Department did not consistently follow up—such as poor policies and communication—varied by case, they represent deficiencies in its medical and mental health care system that it needs to address.

In some of the cases we reviewed, individuals reported to health staff that they were experiencing persistent symptoms, yet they did not receive timely evaluations from a physician. For example, in two cases involving natural deaths, individuals reported symptoms multiple times over the course of one to three weeks. Although these individuals were treated for a number of other medical and mental health issues, medical records show that they did not receive prompt attention from a physician for the symptoms that related to their deaths. Nurses originally assessed and treated

these individuals for these symptoms. However, these individuals' medical conditions worsened, and medical records show that they did not receive a physician's evaluation before dying. Guidelines from the National Commission on Correctional Health Care (National Commission)—an organization that establishes standards for health services in correctional facilities—state that generally if an incarcerated individual reports to the nurse for evaluation more than twice for the same complaint and has not seen a physician, the individual should be scheduled to do so. However, this did not happen in these two cases. The Sheriff's Department's handling of these cases raises concerns over its follow-up process for individuals experiencing persistent symptoms.

In other cases, potential deficiencies in the Sheriff's Department's policies related to mental and behavioral health treatment resulted in individuals not receiving services or needed follow-up. For example, in one case, an incarcerated individual who had previously threatened suicide was released from a safety cell placement and enhanced observation housing. Although placement in a safety cell indicates that individuals are a danger to themselves or others, the Sheriff Department's policy at that time did not specify time frames for ongoing follow-up after such placement. In this case, mental health staff followed up only once with the individual after release from enhanced observation housing, and they assessed that the individual was low-risk. Two weeks after the individual's discharge from enhanced observation housing and about 12 days after the individual's lone follow-up encounter with a mental health clinician, the individual died by suicide.

Subsequently, the Sheriff's Department revised its policy in 2019 for follow-up care after release from a safety cell, but studies suggest that its revised policy may still be inadequate. Its revised policy delineates the follow-up process for individuals after discharge from a safety cell or enhanced observation housing at a variety of intervals depending on certain conditions—every 24 hours, every three to seven days, and every seven to 14 days. Individuals may continue to receive follow-up care at one of these intervals if certain conditions are met, including if it is their first time in detention, if they have recently attempted suicide, or if they have been charged with certain types of crimes. Although these follow-ups can decrease in frequency, all of these individuals must have a follow-up at least every 90 days. However, all individuals who have been placed into a safety cell or enhanced observation housing have demonstrated that they have significant mental health needs. While this policy is an improvement over its past policy, the Sheriff's Department should reconsider the minimum ongoing follow-up required. Reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly rather than every 90 days, leads to faster recovery and is more effective.

***While the Sheriff's Department's revised policy for the follow-up process after an individual's discharge from a safety cell is an improvement over its past policy, the department should reconsider the minimum ongoing follow-up required.***

Moreover, although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy. As the case example in the text box describes, in one of the cases we reviewed the department's weak policy likely contributed to the individual's death by suicide, and the department revised this policy several months later. However, the revised policy still only requires a 24-hour face-to-face appraisal for mental health requests, not medical health care requests. Therefore, inmates with urgent medical needs may not get prompt care. Best practices indicate that a face-to-face appraisal should apply to all nonemergency health care requests.

### In-Custody Death: *Case Example 2*

**Day 1:** At an intake screening, a nurse determined that an individual was mentally stable but initiated a referral for mental health services.

**Day 2:** The individual urgently requested mental health services. Staff denied the request, stating that the individual would be seen as soon as their referral was processed.

**Day 4:** The individual died by suicide without having seen a mental health professional.

Source: Records from the Sheriff's Department.

When we evaluated the policies of other counties, we identified a number of improvements the Sheriff's Department should make to its policies and protocols related to following up on individuals' medical and mental health care needs. For instance, the Orange Sheriff's Department has a policy for assigning a behavioral health acuity level rating (acuity level rating) to each person who sees a mental health clinician during intake or whose mental health status alters during their stay in custody, necessitating a mental health assessment. This acuity level rating, which rates the severity of mental health needs, helps to inform housing location, the provision of mental health services, and discharge planning for when people leave custody. Such a system could help to identify mental health needs, track those needs, and communicate this information to appropriate staff to ensure that these needs are met, likely reducing the risk of death to the individual or others.

In addition, all three comparable counties have stronger policies for instances when incarcerated individuals refuse medical or mental health care. For some of the cases we reviewed, these refusals were frequent, despite the individual's need for consistent care. The San Diego Sheriff's Department and the three comparable counties have policies that require detention staff to witness and document an individual's refusal to accept medical treatment or care. However, the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department also require a health staff member to witness and sign the refusal. In contrast, San Diego allows a single sworn staff member to be the only signer if health staff are unavailable to serve as the second witness to the verbal refusal of care. Consequently, we identified several instances in which sworn staff were the only witnesses when incarcerated individuals refused to sign the refusals. Because follow-up care is important, it is critical that the desire to refuse care be shared with health staff who are in a better position

to ask appropriate questions, explain the adverse consequences to health that may occur as a result of the refusal, and assess whether an individual has critical health needs that should be addressed.

The chief medical officer of the Sheriff's Department asserted that many of the issues we identified through our review are case-specific and should not be used to draw generalizations about the department's provision of health care. He also stated that the Sheriff's Department has made a significant number of improvements to its health care system in recent years, such as adding an electronic medical record system and increasing physician and nursing support. He explained that the Sheriff's Department is in the process of obtaining accreditation from the National Commission. To attain accreditation, the Sheriff's Department must meet certain standards related to health care services and support, governance and administration, personnel and training, and other areas.

When the National Commission reviewed the Sheriff's Department's jails in 2017, it found that they did not meet many of its standards, particularly those related to mental health. The chief medical officer indicated that the Sheriff's Department plans to contract with an outside health care organization to consolidate current services and expand its capabilities for the provision of comprehensive health care services, which may help it meet the requirements for accreditation. He further stated that the Sheriff's Department is participating in a university research study that could lead to some facilities receiving accreditation sooner. Nonetheless, the department may be a couple of years away from obtaining full accreditation for all of its facilities.

***Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals.***

Although seeking accreditation from the National Commission may address some of the problems we identify in this report, the Sheriff's Department should not wait to implement key changes that would improve the safety of incarcerated individuals. We are concerned that this trend will continue if the Sheriff's Department fails to quickly implement significant changes. In fact, the Sheriff's Department indicated that the number of in-custody deaths increased to 18 in 2021—the highest in 15 years.

### *The Sheriff's Department Performed Insufficient Safety Checks*

Performing safety checks is the Sheriff's Department's most consistent means of monitoring for medical distress and crime occurring in its jails. According to state law, local detention facilities must conduct safety checks at least hourly through direct visual observation of all incarcerated individuals. They must also have a written plan to document routine safety checks. Nonetheless, in our

review of 30 in-custody deaths, we found that sworn staff did not always perform safety checks adequately. As a result, they did not realize several individuals had died until hours afterward.

In fact, in several of the cases in our review for which the Sheriff's Department has video files of safety checks, we found instances when sworn staff performed checks inadequately for the purpose of ensuring the safety of the individuals involved. Department policy requires that staff who are conducting safety checks look for any obvious signs of medical distress, trauma, or criminal activity. Although some video files were unavailable or incomplete for the 30 cases we reviewed, we reviewed the safety check logs and available video surveillance footage of sworn staff conducting checks.

Based on our review of video surveillance footage, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked through the housing module, as we describe in the text box. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier, as detention staff described some of these individuals as stiff and cold to the touch.

> **In-Custody Death: *Case Example 3***
>
> **2 a.m.** Deputy quickly walked past each cell and glanced twice into the individual's cell but moved on after the second glance.
>
> **3 a.m.** Deputy stopped briefly at the individual's cell, glancing through the window for a split second.
>
> **4 a.m.** Deputy walked quickly past the individual's cell without breaking stride, glancing through the window for less than a second.
>
> **5 a.m.** Deputies found the individual unresponsive in their cell during a safety check, with signs of having died several hours earlier.
>
> Source: Records from the Sheriff's Department.

In another example, the Sheriff's Department's records indicate that a deputy did not perform a required safety check in a housing area, in part because of poor communication between this deputy and the station deputy. One hour after the deputy should have performed this check, sworn staff found an individual in this housing area unresponsive after attempting suicide. A physician pronounced this individual deceased at the scene after staff and paramedics were unsuccessful at saving the individual's life.

Sworn staff conducted safety checks inadequately in part because of weaknesses in the Sheriff's Department's policy. Its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, as described in the case example above, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

The Sheriff's Department's assistant sheriff of detentions indicated that the department's policy is sufficient but that individual sworn staff members do not always follow it. The department's safety check policy requires supervisors to review logs to ensure safety checks

were logged and conducted at varying intervals within the required time periods, but it does not stipulate that this review should include examining video surveillance to confirm checks were conducted in a timely and appropriate manner. The assistant sheriff of detentions indicated that the department has an informal process for assessing the quality of safety checks, which can include watching video footage. However, the Sheriff's Department has not documented this assessment process in its policy, and establishing an informal practice does not ensure that each facility's management team will consistently verify the quality of safety checks.

The State and Orange Sheriff's Department have more robust policies or additional detail in their policies that may be more effective in ensuring that incarcerated individuals are alive and well. For example, the California Department of Corrections and Rehabilitation (CDCR) requires staff who perform hourly checks to count a living, breathing person whom they see in person. Further, the Orange Sheriff's Department requires staff who conduct safety checks to be close enough to each individual to ascertain the individual's presence and apparent physical condition. According to Orange Sheriff's Department's assistant sheriff of detentions, a safety check must be performed from a sufficiently close vantage point to determine the person's presence in their assigned location and whether the individual's visible physical condition indicates the need for medical treatment or signs of being in medical distress. The detail described in these requirements could provide clearer expectations to San Diego Sheriff's Department's sworn staff for what constitutes an adequate safety check, especially during the night.

In addition, the Riverside Sheriff's Department has a formal policy that requires regular video review of safety checks. For example, supervisors from each shift must randomly review two safety checks conducted during the prior shift. Establishing a similar process could help the San Diego Sheriff's Department to identify sworn staff who do not consistently conform to policy when conducting their checks so that it can designate them for further action, such as additional training or disciplinary measures. Until it strengthens its safety check policy and formalizes a process for ensuring that sworn staff adhere to this policy, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies or other crises.

***Until it strengthens its safety check policy and formalizes its process, the San Diego Sheriff's Department risks further instances of delayed responses to medical emergencies.***

### *The Sheriff's Department Did Not Always Provide Prompt Lifesaving Measures to Unresponsive Individuals*

In slightly less than a third of the 30 cases we reviewed, issues with the response time of sworn staff or medical staff may have resulted in unnecessary delays in performing lifesaving measures. The early moments in a medical emergency are critical. A 2020 study found that

one of the top five predictors of survival in a cardiac arrest occurring away from a hospital was someone performing cardiopulmonary resuscitation (CPR) immediately.[7] In addition, a 2021 study found that for each five-minute delay in calling emergency medical services, the odds of surviving a cardiac arrest decreased by 41 percent.[8] Nonetheless, in some of the cases we reviewed, sworn staff failed to begin CPR immediately or before the arrival of medical staff, or were slow to respond to the scene of the medical emergency.

In a number of instances, sworn staff either did not perform or delayed lifesaving measures. Generally, Sheriff's Department's policy directs that sworn staff immediately provide basic life support, such as CPR, to an unresponsive individual, unless they observe certain obvious signs of death. In some of the cases we reviewed, Sheriff's Department sworn staff did not begin CPR because they thought the individual was dead. However, when department medical staff arrived minutes later, they began lifesaving measures, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

In contrast to the Sheriff's Department, CDCR requires its custodial staff to provide immediate life support to incarcerated individuals until medical staff arrive. It revised its policy in response to a 2005 California district court order requiring it to do so. The Sheriff's Department's chief medical officer acknowledged that sworn staff are trained to be first responders and agreed that they should begin CPR while waiting for health staff to arrive.

***The Sheriff's Department's chief medical officer agreed that sworn staff should begin CPR while waiting for health staff to arrive.***

In addition, in some of the cases we reviewed, we noted a delay in the response time of sworn and medical staff when an individual was in medical distress. Sheriff's Department policy requires that all detention staff are responsible for recognizing, reporting, and responding to an incarcerated individual's emergency medical needs. The policy specifically requires that if an individual's condition is believed to be life-threatening, sworn staff must immediately alert on-duty health staff, provide basic life support and first aid care, and place a 911 request for a paramedic emergency response. In one case we reviewed, the homicide unit's investigation reported that an incarcerated individual indicated to a deputy that they were experiencing shortness of breath. The individual had recently been seen by health staff several times for these symptoms. According to the investigation, the deputy was somewhat familiar with the individual's medical conditions but indicated he was not aware of certain treatment the individual

7 Study from the *Scandinavian Journal of Trauma, Resuscitation and Emergency Medicine.*

8 Study from the *American Journal of Emergency Medicine.*

### In-Custody Death: *Case Example 4*

**6:51 a.m.** After the individual informed deputy about experiencing shortness of breath, deputy escorted the individual to a different area instead of medical clinic and then left area.

**6:52 a.m.** Individual collapsed in that area.

**6:54 a.m.** Deputies entered area to check on the individual.

**7:00 a.m.** Medical staff arrived. They began lifesaving measures within a few minutes.

**7:10 a.m.** Emergency medical personnel arrived.

**7:33 a.m.** Paramedics transported the individual to the hospital, where a doctor pronounced the individual deceased.

Source: Records from the Sheriff's Department.

previously received related to shortness of breath. Nevertheless, the deputy indicated that he believed that the individual was experiencing anxiety and escorted the individual to a different area instead of the medical unit. Shortly afterward, the individual collapsed and sworn staff did not respond for a couple more minutes, as the case example in the text box describes. A health staff member finally arrived several minutes later and began lifesaving measures within a few minutes. The individual was pronounced deceased shortly after arrival to the hospital.

In another example, our review of video surveillance footage—in combination with the homicide unit's investigative report containing statements from involved staff and inmate witnesses—found that the first deputy did not arrive at the scene of the incarcerated individual in medical distress until about five minutes after another incarcerated individual went to alert staff. Sheriff's Department medical staff did not arrive until five minutes after that. Paramedics—who are trained in advanced cardiac life support measures—did not arrive for another five minutes—a total of approximately 15 minutes after sworn staff were first alerted. According to the chief medical officer, some type of communication shortcoming may have delayed the arrival of medical staff, but the exact cause is unknown. However, the initial delay followed by the slow response time of medical staff may have been detrimental to the individual's likelihood of survival. In the Sheriff's Department's interviews of witnesses, other incarcerated individuals commented on the slow response of department staff.

The last two examples we describe emphasize the need for the Sheriff's Department to take action to ensure that it promptly responds to emergencies. Specifically, sworn staff need additional training for immediately starting CPR and how to properly alert medical staff.

## The Sheriff's Department's Inadequate Policies Are in Part the Result of Weaknesses in Statewide Corrections Standards

As Figure 6 shows, weaknesses in statewide corrections standards likely contributed to the problems we identified with the Sheriff's Department's policies. The BSCC establishes in regulation the minimum standards for jail conditions and treatment of incarcerated individuals that local detention facilities must follow. Every local jail system in the State uses these standards as a basis to create policies for inmate safety and care, although counties may choose to make their policies more robust. However, some of these standards may not be adequate for ensuring incarcerated individuals' health and safety.

Further, BSCC's inconsistent continuing education requirements may not be sufficient to ensure that sworn staff adequately care for incarcerated individuals. Given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

**Figure 6**
**Poor Statewide Standards Contributed to Inconsistencies in the Sheriff's Departments' Policies**




Source: State regulations and policies at Alameda, Orange, Riverside, and San Diego sheriff's departments.

***The Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.***

Although the Sheriff's Department's policies generally align with BSCC's standards related to health, safety, and personnel training, those standards are not specific enough in certain areas to ensure inmate safety. For example, BSCC's standards do not explicitly require that a mental health professional should perform mental health screenings. As a result, the San Diego Sheriff's Department's, Alameda Sheriff's Office's, and Orange Sheriff's Department's policies allow medical nurses and health clinicians rather than mental health professionals to perform mental health screenings at intake. In these counties, the health staff generally will refer an incarcerated individual for a mental health evaluation if they observe general signs necessitating the referral or if the individual self-reports mental health concerns. In contrast, the Riverside Sheriff's Department's policy requires a mental health professional to conduct the mental health screening in all instances, which is a best practice.

In another example, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. The four counties we reviewed based their policies on different interpretations of this standard, as Table 2 shows. The Alameda Sheriff's Office and Riverside Sheriff's Department require hourly direct visual observation of incarcerated individuals, but their policies do not expand much further on the standard. As we discuss previously, the San Diego Sheriff's Department's policy provides more detail, defining what staff should look for during the direct visual observation. The Orange Sheriff's Department's policy is more robust than the minimum standard: it directs sworn staff to be close enough to each individual to ascertain their presence and apparent physical condition. Moreover, CDCR requires its staff to count living, breathing individuals whom they see in person. This count is an hourly check that is the equivalent to what BSCC's standards refer to as a safety check. Although BSCC is currently revising the safety check standard, its proposed revision still does not specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

Additionally, state law does not require that BSCC have medical or mental health professionals on its board, despite its responsibility for creating standards in these areas. The qualifications for almost all of the board member positions are related to law enforcement in a detention setting. State law requires BSCC to seek the advice of medical and mental health professionals when establishing minimum standards and when reviewing and making revisions every two years. However, because the standards have so much

impact on the lives of incarcerated individuals, we believe that having medical and mental health representation on the board is critical. Similar boards in other states, such as the New York City Board of Corrections and the Texas Commission on Jail Standards, have medical experts serving as members.

**Table 2**
**A Lack of Specificity in Statewide Standards Has Resulted in Inconsistencies Among Counties' Policies**

| ENTITY WITH POLICY | SAFETY CHECKS POLICY EXCERPT |
|---|---|
| BSCC | Safety checks shall be conducted at least hourly through **direct visual observation** of all incarcerated individuals. Observation through a video camera alone does not constitute a safety check. |
| Alameda Sheriff's Office | Supervision of all incarcerated individuals shall include **direct visual observation** of each incarcerated individual by a deputy at random times each hour. |
| Orange Sheriff's Department | A safety check is a **direct visual observation** of each incarcerated individual located in an area of responsibility every hour. **Safety checks must be conducted from a location which provides a clear, direct view of each incarcerated individual. Staff shall be close enough to each incarcerated individual to ascertain his or her presence and apparent physical condition.** |
| Riverside Sheriff's Department | Security checks shall be completed to ensure there is **direct visual supervision** of all incarcerated individuals housed within a jail facility every hour. |
| San Diego Sheriff's Department | Sworn staff will conduct safety checks of incarcerated individuals every hour through **direct visual observation** without the aid of audio and video equipment. Safety checks of incarcerated individuals consist of looking at the incarcerated individuals for **any obvious signs of medical distress, trauma, or criminal activity.** |

Source: State law and policies from the Alameda, Orange, Riverside, and San Diego sheriff's departments.

In addition, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. BSCC's regulations require only 24 hours annually of continuing professional education training for adult correctional officers, supervisors, and managers, even though it requires 40 hours of continuing training for probation officers and juvenile correctional supervisors and managers. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Based on our review of how San Diego Sheriff's Department's sworn staff responded to medical, mental health, and safety needs, we recommend increasing the number of training hours to align with similar professions to allow sheriff's departments to better protect and keep incarcerated individuals safe. Further, BSCC

does not require that any of the 24 hours of training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Without such a requirement, law enforcement staff may not be sufficiently prepared to provide care to and properly monitor individuals with mental health needs.

In response to our concerns that some of its standards are not robust enough to ensure the safety of incarcerated individuals in local detention facilities across the State, BSCC's deputy director of Facilities Standards and Operations told us it is the responsibility of each individual county to establish policies that exceed the minimum standards, should they decide to do so. Further, she said that BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, this approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. An alternative approach could be for BSCC to establish separate standards for counties with smaller incarcerated populations, and set higher standards for counties with larger incarcerated populations. For example, BSCC could create more stringent requirements for the larger counties in the State, such as those with ADPs of more than 1,000 individuals. This threshold would include the county jail systems housing more than 80 percent of the State's jail population in local detention facilities. Further, some solutions—such as more robust safety checks—do not require significant resources. Improving statewide standards and training requirements is essential to ensuring the health and safety of incarcerated individuals in all counties.

# Chapter 2

## NEITHER THE SHERIFF'S DEPARTMENT NOR CLERB HAS TAKEN ADEQUATE ACTION IN RESPONSE TO THE DEATHS OF INCARCERATED INDIVIDUALS

### Chapter Summary

The Sheriff's Department has not consistently taken meaningful action in response when in‑custody deaths have occurred. Specifically, its reviews of in‑custody deaths have been insufficient and have lacked transparency. As a result, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously and making every effort possible to prevent similar deaths in the future. In addition, CLERB—a citizen‑governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in‑custody deaths. In violation of its own rules and regulations, CLERB's investigations of the deaths of individuals in the Sheriff's Department's custody have not been independent, thorough, or timely. Moreover, CLERB failed to investigate nearly a third of the deaths of incarcerated individuals in the past 15 years, meaning that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

### The Sheriff's Department Has Not Consistently Implemented the Meaningful Changes Necessary to Respond to the Deaths of Individuals in Its Custody

The Sheriff's Department has not responded to incarcerated individuals' deaths in a manner that demonstrates its commitment to improving health and safety at its detention facilities. Every death of an individual in its custody should require a thorough review to determine whether changes to its processes are warranted. Nonetheless, the department's reviews of deaths are insufficient and have not always led to meaningful corrective action. Further, although the Sheriff's Department has implemented some key recommendations provided by external entities, it did not implement others that are critical to improving the safety of incarcerated individuals. San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that highlighted many of the same problems we have identified related to inadequate safety checks and medical and mental health care.

***San Diego County has paid millions of dollars in settlements related to deaths in the Sheriff's Department's jails that related to inadequate safety checks and health care.***

### *The Sheriff's Department's Processes for Investigating and Reviewing In-Custody Deaths are Ineffective, Structurally Problematic, and Lacking in Transparency*

The Sheriff's Department has not performed adequate reviews or implemented sufficient changes in response to the deaths of incarcerated individuals. As we show in Figure 7, the department conducts up to four different reviews: a 30-day medical review, a Critical Incident Review Board review, a homicide death investigation, and an internal affairs investigation. However, because all of these reviews are generated from within the Sheriff's Department, they may be viewed by the public as lacking objectivity. Further, we identified deficiencies in certain reviews that call into question their ability to prompt meaningful change to prevent additional deaths.

One of the Sheriff's Department's reviews—the 30-day medical review—involves reviewing the circumstances surrounding the incident and pertinent medical and mental health services and reports. According to state law, the Sheriff's Department must review every in-custody death within 30 days to determine the appropriateness of clinical care; to assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study. To fulfill this requirement, Sheriff's Department policy states that the medical services administrator, in consultation with the chief medical officer, is responsible for reviewing all in-custody deaths within 30 days. In practice, the chief medical officer—who is a licensed physician—indicated that he currently conducts the reviews with input from other health staff regarding the individuals' clinical histories. Although the chief medical officer is also required to review suicide deaths, the department's policy has specified since late 2018 that the chief mental health officer will also present findings on suicides.

However, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices were warranted. The documents we obtained for most of these 22 cases were either presentation slides or meeting agendas. Neither type of document included findings about the cases or recommended changes to policies, procedures, or practices. For some of the more recent cases in 2019 and 2020, the Sheriff's Department provided us with the chief medical officer's and medical staff members' typed notes, which included conclusions about the medical care its staff had provided to the incarcerated individuals, as well as some recommendations. However, most of these reviews did not document whether the recommendations led to the department taking action, or whether the recommendations had been implemented.

***Most of the Sheriff's Department's reviews of in-custody deaths did not document whether recommended changes to policies, procedures, or practices had been implemented or led to the department taking action.***

**Figure 7**
**The Sheriff's Department's Internal Reviews Have Not Led to Meaningful Action in Response to Individuals' Deaths**

**Sheriff's Department's Reviews of In-Custody Deaths**

**30-DAY MEDICAL REVIEW**

- Performed by Sheriff's Department medical staff within 30 days of the death as required by state law.
- For suicides, mental health staff also review the deaths.
- No requirement for a formally documented report.
- Does not consistently document findings and recommendations and does not document follow-up to any recommendations.

**CRITICAL INCIDENT REVIEW BOARD REVIEW**

- Entity within the Sheriff's Department, so it is not independent.
- Staff present facts of the cases to Sheriff's Department's management and legal counsel.
- All reports are considered attorney-client privileged and are nondiscloseable.
- Purpose of board is to assess legal liability.
- Has not consistently taken meaningful corrective action and does not review natural deaths.

**HOMICIDE INVESTIGATION**

- Investigations performed by Sheriff's Department staff.
- Presents facts of the case to the Critical Incident Review Board but is rarely involved in developing policy recommendations.

**INTERNAL AFFAIRS INVESTIGATION**

- Becomes involved generally based on complaints of alleged misconduct.
- Has reviewed very few cases involving in-custody deaths.

Source: Sheriff's Department's policies and procedures and other documentation related to these reviews.

We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1. The chief medical officer agreed that the reviews, if properly documented, could be useful as an educational and quality assurance tool. However, he indicated that he would

have reservations about formalizing these reports in a written format without some form of protection against using these documents as evidence in litigation. He stated that without such protection, staff members would be reluctant to point out any form of mistake or error, leading to lost learning opportunities. Regardless of the department's position, we believe the reviews should be formalized for internal use to help the department better track its identification of deficiencies and recommendations for improvements to its clinical care. Other counties we reviewed have policies for documenting these 30-day reviews.

In addition to the 30-day medical review, in-custody deaths—except natural deaths—are also subject to review by the Critical Incident Review Board, which is the Sheriff's Department's internal review committee. The board consists of three voting members—commanders from the Law Enforcement, Court Services, and Detention Services bureaus—and two nonvoting members—the chief legal advisor and a commander from the human resources bureau. The stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals.

Moreover, the board is an entity within the Sheriff's Department, so it is not independent. The Sheriff's Department's investigators present to the board the facts and circumstances related to an in-custody death. According to department policy, the board then carefully reviews the incident from multiple perspectives, including training, tactics, policies, and procedures. Its ultimate goal is identifying problem areas and recommending remedial actions—such as posting a training bulletin or changing a policy—so that potential liability can be avoided in the future. According to policy, if the board votes to determine that any policy violations exist, it will forward the case to Internal Affairs.

***After the Critical Incident Review Board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with policies and practices.***

However, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Of the 18 cases we reviewed for which the department held a Critical Incident Review Board meeting, the board reported taking action related to 13. However, only six resulted in substantive actions, such as changes to policy and procedures or training, related to preventing inmate deaths. The remaining seven resulted predominantly in minor administrative actions or recommendations for training that would not have far-reaching effects on the welfare of individuals in custody.

Moreover, even though the board discussed critical issues in some meetings, it ultimately concluded them without making recommendations for addressing these issues. For example, in

six of the 18 cases, the board indicated that the events surrounding the deaths in question could merit changes to policy and procedures; however, it did not recommend any related actions. According to the assistant sheriff of detentions, the Sheriff's Department may make immediate changes to policies following a death if it identifies a need, so additional recommendations from the board are sometimes unnecessary. However, the minutes of the Critical Incident Review Board meetings do not always discuss these types of policy changes. We question why the review board did not discuss the need for changes in some instances or discuss whether any changes made address the problems identified.

Further, the Critical Incident Review Board generally does not review natural deaths. Instead, it primarily reviews suicides, homicides, and accidental in-custody deaths. According to the Sheriff's Department's chief legal advisor, the board does not review natural deaths in part because the risk of legal liability in those incidents is low. He further stated that because the Medical Examiner's Office has made a determination that an individual's death was from natural causes, it rules out other human factors. However, we found in our review of 30 case files that the Medical Examiner's Office typically reviews events preceding individuals' deaths and their medical records, but it does not make conclusions about the appropriateness of care provided by the Sheriff's Department. We find the Sheriff's Department's decision not to hold critical incident reviews for natural deaths concerning given that these deaths accounted for nearly 50 percent of all deaths in the department's facilities in the period of our review. Further, as we note in Chapter 1, we identified significant deficiencies in the Sheriff's Department's handling of care leading to all types of deaths, including natural deaths. By not requiring the Critical Incident Review Board to review these cases, the department is not doing everything it can to protect incarcerated individuals.

Finally, the Critical Incident Review Board is not transparent. It does not make its reports and investigations public. The board's reports are classified as attorney-client privileged, meaning that they are confidential and cannot be disclosed without the Sheriff's Department's consent. The purpose of attorney-client privilege is to ensure that clients can fully disclose information to their lawyer without fear that it will be revealed to others, enabling them to receive competent legal advice. Although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.

***By keeping the findings and recommendations of the Critical Incident Review Board confidential, the Sheriff's Department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents.***

Although the Sheriff's Department's homicide unit is rarely involved in developing policy recommendations, it typically presents facts about in-custody deaths to the Critical Incident Review Board. The homicide unit investigates deaths that occur in custody by, in part, inspecting the scene of the incident, interviewing any witnesses and detention staff, and reviewing video surveillance and reports written by sworn staff. Even though the information that the homicide unit presents to the Critical Incident Review Board is a key component of the Sheriff's Department's review of in-custody deaths, the Critical Incident Review Board ultimately decides whether to take further action.

The Sheriff's Department's internal affairs unit may also investigate detention staff—including health staff—for alleged misconduct related to an in-custody death. The internal affairs unit receives complaints that are initiated by a member of the community or by the Sheriff's Department. The Critical Incident Review Board can also initiate an internal affairs investigation if it votes that a policy violation may have occurred.

***The Sheriff's Department's internal affairs unit indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.***

However, the Sheriff's Department has performed very few such investigations. Specifically, it reported to us that it conducted only four internal affairs investigations related to the 30 cases we reviewed, even though we identified a number of potential violations or concerns in some of the other 26 cases that could justify further investigation. Further, internal affairs indicated that it investigated staff conduct related to only 21 of the 185 in-custody deaths that occurred from 2006 through 2020.

Thus, the Sheriff's Department does not complete internal affairs investigations frequently enough for it to provide significant value. Although internal affairs indicates that its investigations are generally complaint-driven, the small number of investigations related to death cases—coupled with the lack of meaningful changes arising from the 30-day medical review and the Critical Incident Review Board meeting—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

### *The Sheriff's Department Has Not Implemented Key Recommendations From External Entities Related to Incarcerated Individuals' Welfare and Safety*

The Sheriff's Department has not implemented a number of key recommendations from external entities that are essential for ensuring the welfare and safety of incarcerated individuals, as Table 3 shows. We reviewed recommendations from 2006 through 2020 that the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention

consultant (consultant) made to the Sheriff's Department.[9] Many of these recommendations were in response either to a specific death or to the general health and safety conditions of the jails. When we looked at recommendations that pertained to the safety of incarcerated individuals, the Sheriff's Department had implemented a number of them. For example, it modified a use-of-force policy to prevent compromising an incarcerated individual's ability to breathe and revised its intake screening to include additional questions related to suicide prevention. However, some of the recommendations that the Sheriff's Department failed to fully implement are connected to problems we identify in this report.

**Table 3**
**The Sheriff's Department Has Not Implemented Certain Key Recommendations From External Entities**

| ENTITY PROVIDING RECOMMENDATION | EXAMPLE OF RECOMMENDATION | CURRENT IMPLEMENTATION STATUS |
|---|---|---|
| San Diego County Grand Jury–2014/2015 | The Sheriff's Department deputy detention staff has an imbalance in experience levels and facility assignments, such as too many inexperienced staff at one facility. Develop and implement a staff rotation policy for all detention facilities. | Not implemented |
| Consultant reviewing suicide prevention practices–2018 | Given the strong association between in-custody suicide and segregation housing and consistent with national correctional standards, it is strongly recommended that the Sheriff's Department give strong consideration to increasing deputy rounds of such housing units from 60-minute to 30-minute intervals. | Not implemented |
| CLERB–2018 | Sheriff's Department staff did not have pertinent information about an incarcerated individual's previous suicide attempt and allowed that individual access to something that resulted in self-harm and ultimately suicide. The Sheriff's Department should revise its policy to use identifying wristbands to indicate a prior suicide attempt. | Not implemented |
| Disability Rights California–2018 | Revise policies to allow individuals in Enhanced Observation Housing to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs. | Not implemented |

Source: San Diego County Grand Jury reports from 2006 through 2019, a consultant's report on suicide prevention practices, CLERB investigations and recommendations from 2006 through 2020, and a Disability Rights California report.

Specifically, the Sheriff's Department did not implement recommendations related to safety checks, intake screenings, and suicide prevention efforts—the last of which is particularly concerning given the department's high rate of suicides compared to other counties. For example, in response to a specific death, CLERB recommended in 2020 that the Sheriff's Department require additional steps in safety checks of individuals residing in special mental health housing to ensure that they are alive and well, such as requiring nurses to accompany deputies on each round to ensure incarcerated individuals' safety. However, the department stated it would not implement this recommendation because it

9 We discuss CLERB's process for investigating deaths in the sections that follow.

believed that its current policies were adequate. Additionally, San Diego County contracted with a consultant in 2018 to assess suicide prevention practices within the Sheriff's Department's jail system. One of the consultant's recommendations was for the Sheriff's Department to consider increasing safety checks of individuals who are housed in isolated housing units from every 60 minutes to every 30 minutes, given the association between suicide and isolated housing placement. However, the department responded that making this change was not feasible because of the physical layout of its jail facilities, the number of inmates, and the required staffing.

The Sheriff's Department's justifications for choosing not to implement crucial recommendations have not always addressed the underlying issues involved and do not offer alternatives for addressing the concern. For example, following another death, CLERB recommended in 2018 that the Sheriff's Department provide identifying wristbands to individuals with prior suicide attempts. In its response, the department indicated it would not implement this recommendation because doing so would violate individuals' privacy and be contrary to best practices for suicide prevention. However, the Sheriff's Department did not address or offer an alternative solution to the underlying problem, which is that sworn staff may not be familiar with the mental health histories of the individuals they oversee. As we discuss in Chapter 1, another county has addressed this problem by assigning individuals with mental health needs an acuity level rating that could help communicate this information to sworn staff.

*Although the department's policies and procedures related to facility maintenance generally align with state standards, it has not yet replaced the surveillance system at its largest detention facility, even though its age is a major safety issue.*

Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014 the San Diego County Grand Jury recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021 the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe.

Lastly, many of the lawsuits we reviewed that San Diego County settled have highlighted some of the same problems at the Sheriff's Department that we have identified related to inadequate safety checks, mental health treatment, and medical care. From 2006 through 2020, there were 22 lawsuits filed related to the deaths of incarcerated individuals at the Sheriff's Department's detention facilities. San Diego County has settled 11 of these, for a total cost of $9.2 million.[10] Payments for these cases ranged from $10,000 to $3.5 million for an average of $838,000 per settlement. Table 4 compares San Diego County's settlements to those in the other three counties we reviewed. By not promptly addressing the underlying issues on which both litigation and external recommendations have focused, the San Diego Sheriff's Department continues to place the individuals in its custody at risk.

**Table 4**
**Settlements Related to In-Custody Deaths Varied Among the Comparable Counties**

| SETTLEMENTS RELATED TO IN-CUSTODY DEATHS (2006–2020) | ALAMEDA | ORANGE | RIVERSIDE | SAN DIEGO |
|---|---|---|---|---|
| Number of settlements | 15 | 9 | 7 | 11 |
| Settlement amount (total) | $17,863,000 | $7,799,000 | $3,871,000 | $9,223,000 |
| Settlement amount (average) | $1,116,000 | $867,000 | $553,000 | $838,000 |
| Range of settlements | $10,000 to $5 million | $200,000 to $2.75 million | $46,000 to $975,000 | $10,000 to $3.5 million |

Source: Court documents from each of the four counties.

## CLERB Has Failed to Provide Effective Oversight of the Deaths of Individuals in the Sheriff's Department's Custody

Despite its mission to increase public confidence in county law enforcement officers, CLERB has failed to provide effective, independent oversight of the deaths of individuals in the Sheriff's Department's custody. In violation of its own rules and regulations, CLERB's investigations are not independent, timely, or thorough, as Figure 8 shows. Our review found that CLERB rarely independently interviews witnesses or visits the initial scenes of the deaths, has not consistently prioritized cases involving deaths, and has sometimes failed to thoroughly investigate or follow up on discrepancies it discovers in the course of its investigations of deaths. CLERB's failure to conduct adequate investigations has resulted in a lack of independent scrutiny of dozens of deaths of incarcerated individuals, calling into question its effectiveness as a key oversight body for San Diego County law enforcement.

[10] The other 11 lawsuits are either ongoing or have been appealed.

**Figure 8**
**CLERB Has Failed to Provide Adequate Oversight of the Deaths of Individuals in the Sheriff's Department's Custody**

CLERB's rules and regulations require it to be:

| | |
|---|---|
| INDEPENDENT | Relies primarily on evidence provided by the Sheriff's Department, rather than independently interviewing witnesses or visiting the initial scene of the death. |
| TIMELY | Has not always prioritized conducting investigations of death cases. |
| THOROUGH | Does not always thoroughly investigate death cases or follow up on key discrepancies that arise during the investigation. |
| ETHICAL | We did not identify concerns with the investigations we reviewed being conducted in an unethical manner. |
| FAIR/IMPARTIAL | We did not identify concerns with the investigations we reviewed being unfair or biased. |

Source: CLERB's rules and regulations, county policies, and analysis of CLERB investigations.

### *CLERB Does Not Conduct Independent Investigations*

San Diego County voters established CLERB to provide independent oversight of the county's law enforcement agencies. However, CLERB's investigations of in-custody deaths are not independent. In particular, it does not conduct interviews with Sheriff's Department sworn staff or visit the initial scene of the death. Rather, it relies almost entirely upon documents that the Sheriff's Department provides. The county charter—as well as its own rules and regulations—establishes CLERB's power to issue subpoenas, administer oaths, and require the attendance of witnesses and the production of books and papers pertinent

to its investigations. CLERB's rules and regulations further state that its investigations may include interviewing witnesses and subject officers, examining the scene, and reviewing and preserving other physical evidence. However, in practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.

***In practice, CLERB's investigations of in-custody deaths reflect neither its authority nor its stated processes.***

We reviewed a selection of six CLERB investigations of incarcerated individuals' deaths in the Sheriff's Department jails occurring from 2016 through 2019 that had investigations performed in 2017 through 2020. We found that for all of these cases—which, in total, included dozens of potential witnesses—CLERB investigators referenced conducting an interview of an incarcerated individual in only one instance. They did not independently interview staff from the Sheriff's Department in any of the six cases, although in a few limited instances, they used written questionnaires to obtain information from sworn staff about their involvement in an incident leading up to an incarcerated individual's death.

CLERB uses these questionnaires in lieu of performing in-person interviews as the result of an agreement it reached with the Sheriff's Department and the Deputy Sheriff's Association of San Diego County (labor organization). However, this agreement has hindered CLERB's independence and undermined voters' approval of CLERB's creation. As we show in Figure 9, the erosion of CLERB's independence began in the 1990s. According to its current executive officer, CLERB was concerned at that time that its investigations were one-sided and lacked legitimacy without participation by Sheriff's Department sworn staff. According to CLERB annual reports and internal documents, CLERB attempted to interview Sheriff's Department sworn staff in the course of its investigations to seek their perspective. Although both San Diego County's Administrative Code and CLERB's rules and regulations entitle CLERB to complete and prompt cooperation from the Sheriff's Department, the sworn staff members refused to participate in interviews with CLERB investigators. In response, CLERB exercised its power to subpoena and administer oaths by calling sworn staff members to testify in public hearings. However, CLERB documents indicate that the sworn staff continued to refuse to answer any questions, invoking their Fifth Amendment right against self-incrimination.

**Figure 9**
**CLERB's Ability to Conduct Independent Investigations Has Been Eroded Over Time**




Source: Proposition voter materials, agreement documents, legal documentation, and CLERB's investigations documentation.

Faced with the prospect of more costly litigation and continued legal challenges, CLERB discussed a framework with the Sheriff's Department and the labor organization in 1998 that ultimately led to an agreed-upon process for CLERB investigators to question Sheriff's Department sworn staff through interviews or written questionnaires (1998 agreement). Further, in 2003, CLERB adopted a waiver form for sworn staff, allowing them to opt out of in-person interviews with CLERB investigators altogether (2003 waiver form).

The 1998 agreement and 2003 waiver form constitute CLERB's current process for involving Sheriff's Department sworn staff in its investigations. Consequently, CLERB investigators do not conduct independent interviews of sworn staff but rather request

responses from specific department employees through a written questionnaire. This approach has hindered CLERB's ability to perform independent investigations.

CLERB's executive officer acknowledged that having its investigators conduct independent interviews would be preferable but also asserted that they are generally able to obtain necessary information through the questionnaire process. However, we question this position. Although written responses may provide some pertinent information, they do not allow investigators to assess the credibility of a witness or to ask immediate follow-up or clarifying questions. In fact, CLERB's current process allows department staff up to 14 days to respond to the questionnaires. CLERB's executive officer indicated that investigators generally submit another questionnaire with the same turnaround time if they have any subsequent inquiries or clarifying questions to the responses from the initial questionnaire. Such protocol is counterintuitive to the nature of an investigation, which requires interactive communication and prompt responses.

Moreover, although the Sheriff's Department generally notifies CLERB of in-custody deaths, it does not do so until after various department entities have processed the scene. As a result, CLERB investigators are not able to be present at the initial scene of the death. Instead, shortly after receiving notification of an in-custody death, CLERB issues a subpoena to the Sheriff's Department for the homicide unit's investigation file. The Sheriff's Department forwards it to CLERB once it has completed its criminal investigation, usually about two to eight months after the death occurs. As a result, CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual, severely limiting their ability to conduct an independent and thorough investigation. In fact, when we reviewed a selection of CLERB's investigations, we found that its investigators either did not visit the scenes of the deaths at all or did not do so until more than a year after the death occurred.

***CLERB's investigators generally do not learn about potential witnesses or have the opportunity to visit the scene until months after the death of an incarcerated individual.***

Without the ability to independently interview witnesses or the opportunity to visit the initial scenes of the deaths, CLERB must conduct its investigation based primarily on information that the Sheriff's Department's internal investigators provide, such as photographs and videos. For the cases we reviewed, CLERB's investigators' only other sources of evidence were statements from the decedents' families, reports from the medical examiner, and—in only one case—a direct interview with an incarcerated individual who was a witness.

***CLERB's nearly exclusive reliance on evidence provided by the Sheriff's Department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement.***

San Diego County voters established CLERB in response to perceived inadequacies in the Sheriff's Department's internal investigations, yet CLERB's nearly exclusive reliance on evidence provided by the department precludes its investigators from reaching independent conclusions on in-custody deaths and providing truly external oversight of county law enforcement. For CLERB to carry out this function, its processes must change and the Sheriff's Department must fully cooperate.

CLERB's members and its executive officer are currently pursuing several policy changes to increase its independence, including issuing a policy recommendation in October 2021 to the Sheriff's Department requesting that it allow a CLERB staff member with extensive death investigation experience to be present at the initial scene of the death. However, CLERB's recommendations to the Sheriff's Department are advisory and require the Sheriff's Department's approval for implementation. CLERB's members and executive officer are also working with the county board to expand CLERB's authority to investigate complaints against non-sworn staff, including medical personnel. However, such an expansion of CLERB's authority requires approval by the county board. Furthermore, although these changes would increase the independence of CLERB's investigations, they would not enable CLERB's investigators to directly interview sworn staff, which we believe is critical.

### *CLERB Failed to Investigate 57 In-Custody Deaths From 2006 to 2017*

CLERB failed to investigate a significant number of deaths of individuals in Sheriff's Department custody. For example, CLERB failed to investigate 13 deaths of incarcerated individuals from 2011 through 2016 because it misinterpreted a state-mandated deadline for completing its investigations and did not properly prioritize its caseload. The Legislature established a one-year statute of limitations for investigations of law enforcement misconduct when it amended the Public Safety Officers Procedural Bill of Rights Act (POBR) in 1997. As the Introduction explains, CLERB is responsible for investigating complaints, as well as deaths arising out of or in connection with actions of peace officers, which can include deaths in custody. As a result of the amendment to POBR, CLERB must complete its investigations within one year after it receives a complaint against a peace officer or notification of an in-custody death.[11]

[11] POBR requires the investigation to be completed within one year of discovery of the alleged misconduct, and the one-year deadline may be suspended under certain circumstances, such as when the misconduct is the subject of a criminal investigation. Because the Sheriff's Department performs a criminal investigation of every in-custody death, CLERB's one-year time frame to complete its investigation does not start until after the Sheriff's Department completes its investigation.

Nevertheless, CLERB did not realize until 2010 that the one-year time frame applied to its investigations of complaints, at which time it started to dismiss cases for expiration of this time limit. In fact, from 2010 through 2016, CLERB reported that it had to dismiss nearly 100 complaints against county law enforcement members because it did not complete its investigations within the required time frame. Although CLERB did not report that any of these 100 complaints involved in-custody deaths, its failure to conduct these investigations demonstrates that it has struggled to effectively perform its duties in a timely manner.

Further, CLERB's records and San Diego County Grand Jury documents indicate that CLERB staff were not aware that the POBR statute of limitations also applied to its investigations of in-custody deaths until 2017. Consequently, it did not always prioritize these cases, and it reported that its backlog of open investigations of deaths steadily increased from seven cases in 2010 to 46 cases by 2016. After CLERB learned in 2017 that the one-year time limit also applied to investigations of deaths, it had to dismiss 22 of these cases because they had exceeded the time limit. Of these 22 deaths, 13 occurred while the individuals were in custody at Sheriff's Department detention facilities.[12] Because of CLERB's failure to investigate these 13 deaths, it did not have the opportunity to identify problems with the Sheriff's Department's policies and procedures and to make policy recommendations that could have helped prevent future in-custody deaths.

CLERB did not investigate an additional 40 in-custody deaths classified as natural from 2006 through 2016 because it was not conducting investigations of this type during that time. According to CLERB's current executive officer, it did not review deaths classified as natural during this period because its former executive officers generally interpreted its jurisdiction over in-custody deaths to exclude these types of deaths. In fact, CLERB's rules and regulations do not clearly specify whether CLERB should investigate natural deaths. However, the concerns we discuss with the Sheriff Department's inadequate prevention of natural deaths underscore the importance of CLERB providing external oversight of these cases. Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice in the future.

*Since 2017 CLERB has been consistently reviewing natural deaths. However, the lack of specificity in its rules and regulations could result in CLERB reverting to its past practice of not reviewing natural deaths in the future.*

In addition, CLERB did not investigate four other in-custody deaths—two that were classified as accidental, one as homicide by law enforcement, and one as suicide—from 2009 through 2011. CLERB's executive officer said that it did not investigate these deaths because

12 The remaining nine deaths occurred in San Diego County law enforcement areas and probation facilities.

the Sheriff's Department failed to inform CLERB of their occurrence. Although the Sheriff's Department indicated that it did not have information on notifications for this period, we find the lack of review of these cases concerning. In 2011 CLERB made a policy recommendation requesting that the Sheriff's Department include it in all in-custody death notifications. Although the Sheriff's Department declined to modify its policies to include CLERB in its initial death notifications, which includes the county district attorney and Medical Examiner's Office, it did direct a specific unit to inform CLERB of all in-custody deaths, usually within a few days of their occurrence. However, as we discuss above, when the Sheriff's Department does not notify CLERB of deaths immediately, CLERB investigators do not have the opportunity to visit the initial scenes of the incidents shortly after the death occurred.

As we show in Figure 10, CLERB failed to investigate a total of 57 deaths of incarcerated individuals in Sheriff's Department jails from 2006 through 2017—nearly a third of all its in-custody deaths in the past 15 years. This is unacceptable given that CLERB is a key county entity outside of the Sheriff's Department that reviews in-custody deaths. Although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases.

**Figure 10**
**CLERB Did Not Investigate Nearly a Third of All In-Custody Deaths in the Past 15 Years**




Source: California Department of Justice in-custody death data, CLERB list of investigations, and CLERB investigative reports.

Despite CLERB's efforts since 2017 to ensure that it appropriately prioritizes and fully investigates in-custody deaths, it has still struggled to complete its investigations in a timely manner. As we previously explained, CLERB investigators generally begin investigating an in-custody death after the Sheriff's Department's homicide unit has completed its own investigation and forwarded the homicide investigation file to CLERB. Upon receipt of the homicide investigation file, CLERB must complete its investigation within one year to meet the POBR time limit. However, our review of the six in-custody death investigations found that CLERB investigators did not begin their casework until an average of seven months after they received the homicide investigation file from the Sheriff's Department. As we note earlier, the Sheriff's Department usually does not provide the file to CLERB until two to eight months after the death of an incarcerated individual. Consequently, CLERB investigators did not complete their investigations of the cases we reviewed until an average of nearly a year and a half after the death occurred.

CLERB's executive officer indicated that CLERB staff have not historically prioritized beginning investigations of deaths, but he has made recent efforts to ensure that staff start their investigations as soon as they receive a homicide file. Although CLERB's policy does not provide instruction for how quickly the staff must start working on investigations of deaths, the executive officer told us that his goal is for these investigations to be complete within 90 days of CLERB receiving the homicide investigation file. To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.

***To make relevant recommendations and hold individuals accountable for wrongdoing, CLERB must take steps to complete its investigations of in-custody deaths in a timely manner.***

### *CLERB Did Not Always Thoroughly Investigate In-Custody Deaths*

CLERB's rules and regulations require its investigations to be thorough. However, in some of the cases we selected, CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations. For example, in one case, an altercation between two cellmates resulted in the death of one of the individuals. However, the investigator did not appear to scrutinize or independently verify evidence, such as the victim's mental health history, that might have affected their classification status. Without this information, the investigator could not sufficiently determine whether the Sheriff's Department had violated policies or procedures by housing these individuals in the same cell. Consequently, the investigator found that there was no evidence to support an allegation of a procedural violation, misconduct, or negligence on the part of the Sheriff's Department.

When failing to thoroughly examine all the evidence in a case, CLERB investigators may miss important opportunities to identify deficient policies and practices and to make recommendations to improve the safety of incarcerated individuals. CLERB's executive officer explained that because CLERB investigators are often working against the POBR statute of limitations, they do not consistently follow up on discrepancies they discover in the course of their investigations. However, we find this explanation problematic given the critical nature of the investigations. Further, as we previously discuss, investigators often failed to begin their investigations until months after receiving the homicide files. By starting their investigations sooner, they could increase the time available to them.

*CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death.*

Although CLERB developed policies and procedures in August 2021 that outline specific documents—such as medical records—investigators should obtain in the course of an in-custody death investigation, we believe further action is necessary. Specifically, CLERB should develop a comprehensive training manual for its investigators that includes guidance for evaluating the circumstances leading up to the death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment. Such changes could help ensure that its investigations are complete and thorough.

## Until Recently, the County Board Provided Insufficient Oversight of CLERB

The county board has a number of responsibilities related to CLERB. It appoints CLERB members and can remove individual members by a majority vote at any time. The county board also establishes CLERB's duties and approves its rules and regulations. However, despite its critical role in overseeing CLERB, the county board rarely discussed in-custody deaths or raised concerns about CLERB, based on its meeting minutes from 2006 through 2019, including after CLERB dismissed 22 death cases in 2017.

The county board has only recently begun to discuss in-custody deaths. Its current chair stated that the board's composition changed recently and that it now has an increased interest in addressing deaths in San Diego County jails. In 2020 the county board approved changes intended to strengthen CLERB's oversight of the Sheriff's Department and Probation Department, including increasing the number of investigative staff. It also approved a request for CLERB to revise its member nomination process to make it more transparent and better incorporate community input.

Although the current county board has recently been more engaged in monitoring in-custody deaths, CLERB has not effectively communicated the pressing issues related to deaths in county jails to the county board. The county charter requires CLERB to prepare an annual report for the county board, the sheriff, and the county probation officer that summarizes its activities and recommendations, including the tracking and identification of trends with respect to complaints received and investigated. Even though CLERB has included in its annual reports year-to-year comparisons of the number of new death cases and complaints, its reports lack critical information that would enhance their usefulness. For example, the reports summarize information on the causes of death and certain categories of allegations of misconduct but do not include any significant discussion or analysis that might point to deficiencies in the Sheriff's Department policies or practices. Further, they do not include any demographic information related to deaths that CLERB investigates.

Although CLERB's reporting and recommendation practices generally align with requirements in its rules and regulations, it could make its annual reports and recommendations more useful. Other law enforcement oversight entities in the State include more robust information in their annual reports, such as comprehensive analyses and discussions of overall trends in discrimination, misconduct, and excessive force allegations, as well as demographic information. Additionally, as an advisory board, CLERB's primary means of improving the safety of incarcerated individuals and providing oversight of in-custody deaths is the recommendations for policy or procedural changes that it makes to the Sheriff's Department based on the deficiencies it detects in the course of its investigations. However, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department.

CLERB's executive officer indicated that he would like to include more analyses of overall trends in the annual report but explained that he has prioritized other issues, such as resolving the case backlog and developing training materials for new investigators. As a key oversight entity for county law enforcement, CLERB must improve its reporting and analyses to better inform county leadership and the public. Even more importantly, it must make recommendations that address systemic issues to help prevent deaths of incarcerated individuals.

***CLERB must improve its reporting and analyses to better inform county leadership and the public.***

Blank page inserted for reproduction purposes only.

# Conclusions and Recommendations

The San Diego Sheriff's Department has a constitutional responsibility to provide adequate medical care to the individuals whom it incarcerates. Nonetheless, more people have died while in its custody over the past 15 years than in nearly any other county in the State—an average of about one death per month. Our audit found that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies likely contributed to these deaths. The high rate of deaths in San Diego County jails compared to other counties' jails suggests that these systemic deficiencies have undermined the Sheriff's Department's ability to ensure the health and safety of the individuals in its custody. We are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic problems. Although external entities—such as CLERB and the San Diego County Grand Jury—have made recommendations in the past to address some of the deficiencies we describe, the Sheriff's Department has not implemented a number of them.

No single entity has sufficient oversight authority over the Sheriff's Department to require it to make meaningful changes. Absent explicit legislative direction, neither the county board nor the State's attorney general is well positioned to compel the Sheriff's Department to implement the recommendations we include in this report. Given the ongoing risk to incarcerated individuals' safety, we believe that the Legislature should direct the Sheriff's Department to implement the changes we detail below.

## Recommendations

### *Legislature—All Sheriff's Departments and the California Department of Justice*

To ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility and subsequently die in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner. The California Department of Justice should annually publish this information on its website.

***Legislature—San Diego Sheriff's Department***

To ensure that the San Diego Sheriff's Department identifies individuals' medical and mental health needs at intake, the Legislature should require it to revise its policies to better align with best practices, as follows:

- Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity level rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity level rating it assigns to individuals to all detention staff overseeing them.

- Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.

To ensure that the Sheriff's Department provides the necessary medical and mental health care to individuals incarcerated in its facilities, the Legislature should require it to do the following:

- Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.

- Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request.

- Revise its policy to require more frequent psychological follow-up after release from the inmate safety program, including at least monthly check-ins.

- Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.

To ensure that sworn staff properly perform safety checks, the Legislature should require the Sheriff's Department to do the following:

- Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.

- Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff members perform.

To ensure that department staff promptly respond to unresponsive individuals, the Legislature should require the Sheriff's Department to revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow. The Legislature should also require that the Sheriff's Department provide sworn staff with additional training for starting CPR immediately and how to properly alert medical staff.

To ensure that the Sheriff's Department properly assesses the reasons for each in-custody death and makes prompt changes as necessary in response, the Legislature should require it to revise its policy to specify the following:

- Staff will provide a written report of each 30-day medical review to its management.

- When warranted, the report should specify recommendations for changes to prevent further deaths.

- The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and identify issues that require further study.

To improve oversight of in-custody deaths and encourage meaningful action to prevent future deaths, the Legislature should require the Sheriff's Department to revise its policy to require that the Critical Incident Review Board review natural deaths.

To increase the transparency of the Sheriff's Department's reviews of in-custody deaths, the Legislature should require the Sheriff's Department to either make public the facts it discusses and recommendations it decides upon in the relevant Critical Incident Review Board meetings or to establish a separate public process for internally reviewing deaths and making necessary changes.

To ensure that the Sheriff's Department provides complete and prompt assistance to CLERB's investigations, the Legislature should require the Sheriff's Department to do the following:

- Revise its policy to include CLERB in its immediate death notification process.
- Revise its policy to allow a CLERB investigator to be present at the initial death scene.
- Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.

The Legislature should implement the recommendations related to the Sheriff's Department described above in a manner consistent with the form of governance applicable to San Diego County.

***Legislature—BSCC***

To ensure that standards of care for incarcerated individuals are adequate and consistent across the State, the Legislature should amend state law to require BSCC to amend certain regulations to address the following:

- County sheriff's departments with jails that have an average daily population of more than 1,000 must have a mental health professional perform mental health evaluations at intake.
- Safety checks must include a procedure for checking to see that each individual is alive.

To ensure the involvement of experts in the areas of medical and mental health care in approving BSCC's regulations and training standards related to the health and safety of incarcerated individuals, the Legislature should change the composition of BSCC to include a medical professional and a mental health professional.

To ensure that BSCC's regulations, guidance, and training align with medical and mental health care best practices, the Legislature should require BSCC to evaluate and update all of its regulations and training as needed once its composition includes a medical professional and a mental health professional.

To ensure that all local correctional officers in the State receive sufficient continuing professional education, the Legislature should require BSCC to amend its regulations to require that local correctional officers working in local detention systems with an

average daily population of more than 1,000, complete 40 hours of training annually and that at least four of those hours relate to mental and behavioral health.

### *CLERB*

To ensure its investigations are independent, timely, and thorough, CLERB should do the following by May 2022:

- Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.
- Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.
- Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department, to thoroughly review deputy statements and reports from the homicide investigation file, and to request interviews with relevant detention staff and other witnesses in all instances in which they identify discrepancies or missing information.

To ensure that it fully investigates all in-custody deaths, CLERB should revise its rules and regulations by May 2022 to include the following:

- Prioritization criteria for investigating in-custody deaths above all other investigations.
- Clarification that its investigations of in-custody deaths includes those classified as natural deaths.

To ensure that it provides effective oversight of the deaths of individuals in the Sheriff's Department's custody, CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies

and procedures. Based on these trends, it should also identify policy recommendations for improving the safety of the individuals in the Sheriff's Department's custody. To increase transparency, CLERB should include these trends and analyses in its annual reports starting with its 2021 report, which it should publish in 2022.

We conducted this performance audit in accordance with generally accepted government auditing standards and under the authority vested in the California State Auditor by Government Code sections 8543 et seq. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on the audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

February 3, 2022

# Appendix A

## In-Custody Deaths in California's 15 Largest Counties

The Joint Legislative Audit Committee (Audit Committee) directed us to compare the in-custody death rate in San Diego County to the rates in other comparable California counties for the past 15 years—2006 through 2020. Table A.1 presents the rate of deaths per average daily population (ADP) in each of these county sheriff jail systems from 2006 through 2020. As we previously explain, the ADP represents the number of incarcerated individuals housed in a jail system on any given day over a period of time.

**Table A.1**
**In-Custody Deaths and ADPs From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | ADP 15-YEAR AVERAGE (2006–2020) | TOTAL DEATHS | AVERAGE DEATHS PER YEAR | AVERAGE DEATHS PER 1,000 ADP |
|---|---|---|---|---|
| **San Diego** | **5,162** | **185** | **12.33** | **2.39** |
| Fresno | 2,752 | 86 | 5.73 | 2.08 |
| Ventura | 1,537 | 47 | 3.13 | 2.04 |
| Kern | 2,266 | 69 | 4.60 | 2.03 |
| Alameda | 3,325 | 99 | 6.60 | 1.98 |
| Contra Costa | 1,446 | 43 | 2.87 | 1.98 |
| Riverside | 3,668 | 104 | 6.93 | 1.89 |
| San Francisco | 1,492 | 39 | 2.60 | 1.74 |
| San Joaquin | 1,367 | 34 | 2.27 | 1.66 |
| Los Angeles | 17,044 | 421 | 28.07 | 1.65 |
| San Bernardino | 5,490 | 124 | 8.27 | 1.51 |
| Santa Clara | 3,732 | 84 | 5.60 | 1.50 |
| Orange | 5,877 | 111 | 7.40 | 1.26 |
| Tulare | 1,510 | 26 | 1.73 | 1.15 |
| Sacramento | 4,008 | 62 | 4.13 | 1.03 |

Source: California Department of Justice in-custody death data and BSCC data.

We present information on additional counties in our interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html.

Table A.2 presents the rate of deaths per the number of individuals booked in each county sheriff's jail system from 2006 through 2020. The number of bookings is the total number of individuals who were processed through the jail system.

**Table A.2**
**In-Custody Deaths and Bookings From 2006 Through 2020**

| COUNTY SHERIFF'S DEPARTMENT | TOTAL BOOKED | AVERAGE BOOKED PER YEAR | TOTAL DEATHS | TOTAL DEATHS PER 100,000 BOOKED |
|---|---|---|---|---|
| Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| Fresno | 551,624 | 36,775 | 86 | 15.59 |
| **San Diego** | **1,284,462** | **85,631** | **185** | **14.40** |
| Kern | 520,074 | 34,672 | 69 | 13.27 |
| Riverside | 810,376 | 54,025 | 104 | 12.83 |
| Alameda | 777,627 | 51,842 | 99 | 12.73 |
| Orange | 888,951 | 59,263 | 111 | 12.49 |
| Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| Ventura | 424,978 | 28,332 | 47 | 11.06 |
| San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| Tulare | 333,941 | 22,263 | 26 | 7.79 |

Source: California Department of Justice in-custody death data, BSCC data, and San Diego Sheriff's Department bookings data.

# Appendix B

## Scope and Methodology

The Audit Committee directed the California State Auditor to conduct an audit of the San Diego Sheriff's Department to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps taken by the Sheriff's Department to address these deaths. The table below lists the objectives that the Audit Committee approved and the methods we used to address them.

### Audit Objectives and the Methods Used to Address Them

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | Reviewed and evaluated the laws, rules, and regulations related to detention facilities and significant to the audit objectives. |
| 2 | Evaluate the Sheriff's Department's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals. | • Interviewed staff and reviewed the Sheriff's Department's documented policies and procedures regarding personnel training, facility maintenance and safety, and the provision of health care to incarcerated individuals. Determined whether those policies and procedures meet the requirements established by BSCC and state law, including reviewing BSCC's biennial inspections.<br>• Reviewed the Sheriff's Department's policies and procedures, in combination with reviewing in-custody deaths under Objective 3, to determine whether its policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to incarcerated individuals.<br>• Reviewed BSCC's board composition and whether BSCC's standards are strong enough to ensure the safety of incarcerated individuals.<br>• Interviewed staff of BSCC regarding its review process to update and revise standards. |
| 3 | To the extent possible, for a selection of in-custody deaths from the past 15 years—including suicides, murders, and in-custody or in-transit deaths—determine the following:<br>a. The circumstances, such as the cause for each death.<br>b. Whether correctional facility staff followed applicable policies and procedures related to in-custody safety.<br>c. Whether the Sheriff's Department reviewed the circumstances of these deaths and took corrective action to improve in-custody safety. | • Using a complete list of in-custody deaths in the Sheriff's Department's jails, selected 30 deaths for review from 2006 through 2020 taking into consideration factors such as gender, race, age, location of death, type of death, and date of death. The Sheriff's Department did not report any in-transit deaths related to its jails. In accordance with audit standards, we did not select cases involved in active litigation in order to avoid interfering with ongoing legal proceedings.<br>• For the selection of 30 in-custody deaths, reviewed jail files, medical records, and other relevant reports to determine the circumstances around each death—including the cause of each death, such as suicide, homicide, or natural death.<br>• For the selection of 30 in-custody deaths, reviewed case file documentation to determine whether detention staff followed applicable policies and procedures related to the safety of and the provision of health care to incarcerated individuals.<br>• For the selection of 30 in-custody deaths, reviewed investigative reports from various entities and units to identify whether the Sheriff's Department reviewed the circumstances of each death. Evaluated whether it took appropriate corrective action to improve in-custody safety in response to the death. |

*continued on next page . . .*

| AUDIT OBJECTIVE | | METHOD |
|---|---|---|
| 4 | To the extent possible, evaluate available demographic information—including the race and age of the incarcerated individuals—and identify any relevant trends for all in-custody deaths from the past 15 years. Compare the in-custody death rate in San Diego County to the rates in other comparable California counties. | • Identified three comparable county sheriff's departments—the Alameda Sheriff's Office, Orange Sheriff's Department, and Riverside Sheriff's Department—considering relative size, geographical location, and other factors.<br>• Interviewed staff at each county's sheriff's department to understand its policies and practices as well as to identify challenges with ensuring the health and safety of incarcerated individuals.<br>• For comparative analysis to identify best practices, obtained and reviewed policies and procedures related to in-custody health care and detention facilities from the three comparable sheriff's departments, along with the policies at CDCR.<br>• For all deaths of incarcerated individuals from 2006 through 2020 at the San Diego Sheriff's Department and the three comparable county sheriff's departments, compared the number and types of deaths, and interviewed staff knowledgeable about the data.<br>• Obtained data from the California Department of Justice and BSCC, including race of incarcerated individuals, age of incarcerated individuals, and the frequency and cause of death. We used these data to create interactive dashboards that present this information. We present those interactive dashboards at https://www.auditor.ca.gov/reports/2021-109/supplemental.html. We did not identify any notable trends in the deaths of incarcerated individuals by age but include information about their ages in an interactive dashboard. |
| 5 | Review allegations from the past 15 years that led to wrongful death suits and determine the number of settlements, the average settlement amount, and, to the extent possible, how settlement awards compare to similar settlements from other comparable counties in California. | • Obtained and reviewed documentation from San Diego County and each of the three comparable counties to identify all settlements related to deaths in detention facilities from 2006 through 2020. For all settlements, we determined the average settlement award and the type and circumstances of the death.<br>• Interviewed staff at the comparable counties regarding the total number of settlements in response to in-custody deaths.<br>• Compared the settlements in San Diego County to the three comparable counties. |
| 6 | To the extent possible, determine which policies specified in settlement agreements or in grand jury recommendations have been implemented and which have not. As part of this determination, also identify whether the Sheriff's Department has suspended, revoked, or amended any such policies in a manner inconsistent with past settlement agreements or grand jury recommendations. | • Identified recommendations regarding policy changes from various entities, including the San Diego County Grand Jury, from 2006 through 2020. For key recommendations related to in-custody health and safety, we determined whether the Sheriff's Department implemented the recommendations. If it did not, we documented and evaluated its rationale.<br>• Reviewed current policies and determined that the Sheriff's Department has not suspended, revoked, or amended its policies in a manner inconsistent with past recommendations we reviewed.<br>• Determined that the county's settlement agreements generally did not include recommendations. |
| 7 | Evaluate the extent to which CLERB has provided recommendations to the Sheriff's Department regarding in-custody safety and followed up to determine whether the Sheriff's Department has implemented those recommendations. | • Reviewed recommendations from CLERB to the Sheriff's Department from 2006 through 2020 and identified key recommendations related to the safety of incarcerated individuals.<br>• Reviewed policies and other relevant documents to determine whether the Sheriff's Department implemented key recommendations from CLERB. |

| AUDIT OBJECTIVE | | METHOD |
|---|---|---|
| 8 | Evaluate CLERB's review of in-custody death cases in 2017 and assess whether CLERB had sufficient staff and resources to perform its oversight role appropriately. | • Obtained a complete list of death cases CLERB investigated from 2006 through 2020 and compared it to the lists of deaths from the Sheriff's Department and Medical Examiner's Office. Although we found that CLERB did not investigate 57 deaths during this period, as we discuss beginning on page 46, the list of investigations it did perform was sufficient for our purposes. Using the list, we selected six cases from 2016 through 2020 for review based on factors such as the year the investigation was performed, type of death, and result of investigation.<br>• For the six selected cases, reviewed the full investigative file to determine whether CLERB's staff followed its rules and regulations and other relevant standards when investigating the cases.<br>• CLERB's rules and regulations require its investigations to be ethical, fair, and impartial. CLERB follows the county's Conflict of Interest Code and Incompatible Activities Rules, which require its members and certain staff members to disclose certain income, employment, economic interests, and gifts. CLERB also has its staff members review and sign the county's code of ethics. We did not identify concerns with the ethics, fairness or impartiality of the CLERB investigations we reviewed.<br>• Interviewed staff and reviewed documentation to determine why CLERB summarily dismissed 22 death cases in 2017 and whether staff appropriately prioritized death cases.<br>• We did not evaluate CLERB's investigators' caseloads and staffing because we found issues with the thoroughness and prioritization of its investigations.<br>• Reviewed the county board's oversight of CLERB and whether it took action to increase oversight in response to increases in deaths of incarcerated individuals. |
| 9 | Review and assess any other issues that are significant to the audit. | None identified. |

Source: Audit workpapers.

### *Assessment of Data Reliability*

The U.S. Government Accountability Office, whose standards we are statutorily obligated to follow, requires us to assess the sufficiency and appropriateness of computer-processed information we use to support our findings, conclusions, and recommendations. In performing this audit, we relied on electronic data files that we obtained from the California Department of Justice related to in-custody deaths in jails of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department from 2006 through 2020. To evaluate the data, we reviewed existing information about the data, interviewed staff knowledgeable about the data, and performed testing of the data. Specifically, we compared data from the counties and the California Department of Justice to data we obtained from the Medical Examiner's Office and coroner's office in each respective county.

Although the state law requiring reporting of in-custody deaths does not require sheriff's departments to report deaths after an individual is released from jail, as we discuss on page 17, we found

that the data supporting the number of in-custody deaths from the California Department of Justice related to the San Diego Sheriff's Department and the Orange Sheriff's Department to be sufficiently reliable for our audit purposes. We found some inaccuracies in the categorization of manner of death, but the inaccuracies do not change our conclusion, and therefore the data are sufficiently reliable for our audit purposes. We performed limited testing of the Alameda Sheriff's Office's and the Riverside Sheriff's Department's data and found them to be of undetermined reliability because of how the counties record and track the information. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

In addition, we obtained data from BSCC related to the ADPs and annual bookings of the San Diego Sheriff's Department, the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. We used these data to identify and compare the number of in-custody deaths at each department, taking into consideration the number of individuals incarcerated in its jail facilities. We interviewed staff knowledgeable about the data and performed general testing of the data. We found the data to be of undetermined reliability because the data are self-reported from each county to BSCC. However, we found that the San Diego Sheriff's Department overreported to BSCC the bookings data for 2006 through 2010. Therefore, we obtained additional data from the Sheriff's Department to more accurately reflect bookings in our analyses. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.

Lastly, we obtained statewide data from the California Department of Justice and BSCC related to in-custody deaths and ADP for presentation on our interactive dashboards. We found the data to be of undetermined reliability because the data are self-reported by each county. The dashboard is for informative purposes only; we do not present findings, conclusions, or recommendations on it.

BSCC CALIFORNIA BOARD OF STATE AND COMMUNITY CORRECTIONS

January 14, 2022

Honorable Michael S. Tilden*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

**SUBJECT: RESPONSE – SAN DIEGO COUNTY SHERIFF'S DEPARTMENT AUDIT REPORT 2021-109**

Dear Mr. Tilden,

The Board of State and Community Corrections is required to establish minimum standards for local detention facilities. (Pen. Code, § 6030.) Providing for safe and constitutional facilities is central to the Board's regulations, which are continuously examined and revised on a biennial basis. The Audit of the San Diego County Sheriff's Department (Report 2021-109) focuses on deaths in custody, which is a topic of utmost concern that merits serious attention. Having not been given an opportunity to review the findings in San Diego as part of this response, we are unable to comment on whether the deaths in custody in San Diego County were caused by the county adhering to BSCC regulations that were deficient or whether other operational or personnel issues may have contributed to the audit findings. The Board will undertake a review once the unredacted findings are available to determine to what extent the Board's existing regulations merit revision. However, we disagree with the Auditor's conclusions that the Board's existing training standards are inadequate and that the BSCC's regulations for the operation of adult local detention facilities that are proposed to be revised are insufficient for maintaining the safety of people who are incarcerated.

**Mental Health Screenings** (1)

The Auditor states the Board's standards are insufficient to maintaining the safety incarcerated individuals, specifically citing that the regulations "do not explicitly require that mental health professionals perform mental health screenings." We assume the Auditor is referring to "intake screenings," where Section 1207 of Title 15 of the California Code of Regulations provides:

> With the exception of inmates transferred directly within a custody system with documented receiving screening, a screening shall be completed on all inmates at the time of intake. This screening shall be completed in accordance with written procedures and shall include but not be limited to medical and mental



* California State Auditor's comments begin on page 71.

> health problems, developmental disabilities, tuberculosis and other communicable diseases. The screening shall be performed by licensed health personnel or trained facility staff, with documentation of staff training regarding site specific forms with appropriate disposition based on responses to questions and observations made at the time of screening. The training depends on the role staff are expected to play in the receiving screening process.

This regulation is aligned with National Commission on Correctional Health Care (NCCHC) J-E-02 which allows for "receiving screening to be conducted by health-trained correctional staff members when health staff are not on duty." NCCHC standards are nationally recognized as best practice.

In addition, Sections 1206 and 1209 of Title 15 of the California Code of Regulations detail requirements of additional mental health screenings that may occur after the initial screening at intake. These requirements do require licensed medical and mental health care professionals to conduct mental health screening and require facilities to provide care for persons with mental health needs.

The Auditor appears to recognize that it may be impractical or impossible for all local detention facilities to have mental health professionals on staff 24/7 for intake, so the report recommends that facilities with average daily populations of 1,000 be required to have these requirements because counties with smaller incarcerated populations have "less risk." While larger counties may be able to provide a higher level of service than other counties, establishing lesser standards for smaller counties is problematic and would create additional inequities within county criminal justice systems.

② **Safety Checks**

The Auditor argues that the current safety check regulation (and proposed revisions) are insufficient to protect the safety and welfare of inmates. The Auditor points to the fact that some counties' policies are more detailed than the Board's regulations. In addition, the Auditor notes the California Department of Corrections and Rehabilitation (CDCR) requires its staff to count "living, breathing" individuals. The fact that some counties may elect to explicitly detail what goes into a safety check in its policies does not mean the Board's minimum standards do not provide for adequate safety. The Board's regulations are designed to give counties flexibility to address their needs while adhering to constitutional standards. In addition, it is important to note that the requirements for counting individuals in the CDCR Department of Operations Manual (§§ 52020.5.5 and 52020.5) are not "safety checks." They are merely instructions on staff to ensure a proper population count.

Section 1027.5 of Title 15 of the California Code of Regulations requires a written plan at each facility that includes documentation of safety checks. Title 15 section 1006,

Tilden, Michael
Page 3

Definitions, provides detail for how safety checks must be conducted and defines both direct visual observation and safety checks:

> "Direct visual observation" means direct personal view of the inmate in the context of his/her surroundings without the aid of audio/video equipment. Audio/video monitoring may supplement but not substitute for direct visual observation.
>
> "Safety checks" means direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates.

As part of the most recent regulation revisions adopted at the most recent BSCC board meeting, the Board revised section 1027.5 to require enhancements to safety checks, which, once approved by the Office of Administrative Law, will read, as follows:

§ 1027.5 Safety Checks.

The facility administrator shall develop and implement policy and procedures for conducting safety checks that include but are not limited to the following:

Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.

(a) There shall be no more than a 60- minute lapse between safety checks.
(b) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently as outlined in the relevant regulations.
(c) Safety checks shall occur at random or varied intervals.
(d) There shall be a written plan that includes the documentation of all safety checks. Documentation shall include:
  (1) the actual time at which each individual safety check occurred;
  (2) the location where each individual safety check occurred, such as a cell, module, or dormitory number; and,
  (3) Initials or employee identification number of staff who completed the safety check(s).
(e) A documented process by which safety checks are reviewed at regular defined intervals by a supervisor or facility manager, including methods of mitigating patterns of inconsistent documentation, or untimely completion of, safety checks.

In this revision, the regulation will explicitly require that safety checks "determine the safety and well-being of individuals." The BSCC revised regulation exceeds many other states' safety check regulations, and is aligned with best practices for safety checks.

Tilden, Michael
Page 4

In short, safety checks allow for potential interventions when people are in distress, but it is also important to balance the needs of people who are incarcerated from overly intrusive and unnecessary checks. Counties have been subject to litigation over allegations of failing to conduct adequate safety checks and also for unnecessarily interrupting sleep as part of rigorous safety check programs. The Board's regulation and proposed revision strikes the appropriate balance in providing for the safety of people who are incarcerated and meeting county operational needs.

③ **Training Standards**

The Auditor states that the BSCC's training standards are insufficient for maintaining the safety of incarcerated individuals. The Auditor solely relies on the total increase in the number of deaths in county jails from 2006 to 2020 to conclude training is insufficient. Based on the information provided in the redacted report, the BSCC is unable to determine whether a lack of specific training caused any of the deaths examined in San Diego and to what extent additional training requirements would have been beneficial or prevented these situations. Instead, the report states that "weaknesses in statewide corrections standards likely contributed to the problems we identified with (redacted) policies" without any specific detail. Without a clear nexus between a deficiency in the training standards and a bad outcome such as a preventable death, it is incorrect to assume that higher standards will better ensure the health and safety of incarcerated individuals.

The Auditor states that the Board's continuing education requirements across job classifications (adult correctional officer, juvenile correctional officer, and probation officer) are inconsistent and recommends that the adult correctional officers should receive 40 hours of annual training on par with probation officers. In addition, the Auditor recommends that agencies with average daily populations of 1,000 or more should require 4 hours of mental health training annually.

The characterization of the continuing education requirements as inconsistent is incorrect. BSCC sets standards for adult corrections officers, juvenile corrections officers, and probations officers and their managers and supervisors. Those jobs are not interchangeable nor are their training requirements. The "inconsistencies" noted in the report are deliberate decisions based on the differences in positions. Requiring the same number of hours across all classifications is arbitrary and not based on job-specific requirements. Furthermore, the number of required hours for the adult corrections officer is on trend nationally and exceeds the number of continuing education hours required by the California Commission on Peace Officer Standards and Training for other peace officer positions.

The report recommends that continuing education include a minimum of 40 hours training annually and at least four hours of mental health training for adult corrections officers for agencies with an ADP of 1,000. First, it should be noted that the BSCC standards already require 21 hours of Behavioral Health training for every officer upon

Tilden, Michael
Page 5

hire. It includes training in suicide prevention, stigma and bias, trauma, emotional survival, interventions and resources, and recognizing signs and symptoms of mental illness and trauma.

Second, we question the premise that more hours of annual training, regardless of the topic or need, will always yield better results. Continuing education hours are deliberately left to the discretion of the agency so that they can identify the specific training needs of an employee, including performance management, and to support organizational priorities or training gaps. Training is not a static need and it should remain flexible to ensure critical gaps are addressed. Training is a critical tool that can improve employee performance and organizational success. However, it is only effective when used appropriately. Problems must be assessed to determine if training can be an effective part of the solution. Culture, ineffective policies, and employees deliberately acting outside of policy are some examples of when training is not an appropriate solution. The portions of the audit we were able to review do not provide an assessment that shows that what was at issue in San Diego was a training failure that will improve by mandating four hours of mental health training each year for all adult corrections officers.

Finally, as with the recommendation to have lesser screening standards for smaller counties, we also disagree with setting lesser training standards for correctional officers in smaller counties.

To be sure, the BSCC continually evaluates the need for entry-level training and annual training. We will take the recommendation under advisement when evaluating the next revision of our training standards to determine whether adding annual mental health training would be beneficial.

In closing, the BSCC appreciates the Auditor's review of its standards and recommendations. At the time of responding to the draft audit, the Board itself has not had the opportunity to meet and discuss. We will discuss the final report with the Board upon release and whether amendments to the BSCC regulations are warranted.

Sincerely,

Kathleen T. Howard

KATHLEEN T. HOWARD
Executive Director

Blank page inserted for reproduction purposes only.

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE BOARD OF STATE AND COMMUNITY CORRECTIONS

To provide clarity and perspective, we are commenting on the BSCC's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response. Rather than comment on all of the individual areas of its response that we believe are deficient or misleading, we have summarized our comments according to the respective sections in its response.

We stand by our recommendation that the Legislature should amend state law to require sheriff's departments with larger jail populations to have mental health professionals perform mental health evaluations at intake. We based this recommendation on the problems identified in our review of the San Diego Sheriff's Department and the variation of policies among the three comparable counties. As we state on page 20, in some of the cases we reviewed, the Sheriff's Department did not promptly and properly identify individuals' mental health needs because mental health professionals generally do not participate in its intake health screenings. In contrast, we noted that one county has adopted more robust intake screening practices, as we state on page 20. For example, Riverside Sheriff's Department policy requires that a mental health clinician evaluate every individual before being housed, which could help to more effectively identify mental health needs early. ①

Further, BSCC infers our recommendation is to establish lesser standards of mental health staffing for smaller counties. On the contrary, we did not propose any changes to these standards for smaller counties, but instead recommend that BSCC should raise the standard for the larger counties, as we describe on page 32.

BSCC suggests that counties electing to have more robust safety checks policies does not mean that its minimum standards are inadequate. We disagree. As we state on page 30, BSCC's standards do not describe the actions that constitute an adequate safety check. Instead, the standards simply state that safety checks must be conducted at least hourly through direct visual observation of all inmates and that observation through a video camera alone is not sufficient. Consequently, we found the four counties we reviewed based their policies on different interpretations of this standard. Further, as we state on page 25, based on our review of video of San Diego Sheriff's Department, we observed multiple instances of sworn staff who spent no more than one second glancing into an individual's cell, sometimes without breaking stride as they walked ②

through the housing module. Staff later discovered individuals unresponsive in their cells, some with signs of having died several hours earlier.

Further, as we state on page 25, we concluded that sworn staff conducted safety checks inadequately in part because of weaknesses in the San Diego Sheriff's Department's policy. In particular, its safety check policy does not require sworn staff to determine whether individuals are alive and well by taking steps such as by observing the rise and fall of their chest. We recognize that acquiring proof of life in some situations is difficult and that waking up incarcerated individuals every hour could be detrimental to their well-being. However, a safety check that does not involve any meaningful observation of an individual is ineffective and inadequate.

Moreover, BSCC asserts that our report references a CDCR policy that merely serves as instructions for a proper population count. However, CDCR's policy is a requirement for an hourly check that is equivalent to what BSCC refers to as a safety check. We revised the report text on page 30 to be more explicit that the CDCR policy is for an hourly check of incarcerated individuals.

Finally, BSCC states that its proposed regulations exceed the standards in other states and are aligned with best practices. However, it falls short of the State's best practice. For example, as we state on page 30, CDCR requires its staff during its hourly checks to count a living, breathing individual whom they see in person. BSCC's proposed regulations are insufficient because, as we state on page 30, it fails to specify that a safety check must include verifying that an individual is alive, which is essential to ensuring the safety of incarcerated individuals across the State.

(3) Our recommendation to increase the required number of continuing education hours for local correctional officers is based on concerns observed in our review of how San Diego Sheriff's Department sworn staff responded to medical, mental health, and safety needs. Further, as we state on page 29, given the increase in the annual number of in-custody deaths across the State from 130 in 2006 to 156 in 2020, improving statewide standards related to health and safety and training requirements is essential to ensuring the health and safety of incarcerated individuals.

BSCC's statement that its standards require 21 hours of behavioral health training is misleading because this training pertains only to initial hires. The point of continuing education is to provide local correctional officers with ongoing training to expand their

foundation of knowledge to promote health and safety within the jails and to stay up-to-date on new information that would help in that effort.

We stand by our conclusion that the continuing education requirements are inconsistent. As we state on page 31, BSCC's required training hours for sworn staff working in local detention facilities do not align with their standards for similar positions. Requiring fewer hours for adult corrections personnel does not make sense when thousands of individuals are incarcerated in these facilities and the number of individuals who have died has increased over the past 15 years. Further, BSCC does not require that any of the annual training cover topics pertaining to mental health, even though best practices suggest staff should receive at least four hours of mental health training annually. Increasing the number of training hours to align with similar professions, including mandating mental health training hours, could allow sheriff's departments to better protect and keep incarcerated individuals safe.

Similar to our recommendation for having mental health professionals perform mental health assessments at intake, BSCC should increase the required continuing education hours for counties that house the majority of individuals in the county jail systems. Moreover, contrary to BSCC's assertion, we did not propose any changes to these standards for smaller counties but instead recommend that it should raise the standard for the larger counties, as we describe on page 32.

Blank page inserted for reproduction purposes only.

**BOARD MEMBERS**
SUSAN N. YOUNGFLESH
Chair
EILEEN DELANEY
Vice Chair
ROBERT SPRIGGS JR.
Secretary
BUKI DOMINGOS
NADIA KEAN-AYUB
BONNIE KENK
MARYANNE PINTAR
TIM WARE
GARY I. WILSON

**EXECUTIVE OFFICER**
PAUL R. PARKER III

# County of San Diego

## CITIZENS' LAW ENFORCEMENT REVIEW BOARD

555 W BEECH STREET, SUITE 220, SAN DIEGO, CA 92101-2938
TELEPHONE: (619) 238-6776 FAX: (619) 238-6775
www.sdcounty.ca.gov/clerb

January 14, 2022

Michael S. Tilden, CPA*
Acting California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

RE: Response to California State Auditor's Draft Report 2021-109: San Diego County Sheriff's Department

Dear Mr. Tilden:

The Citizens' Law Enforcement Review Board (CLERB) welcomes the opportunity and has authorized me to respond to the California State Auditor's (CSA) draft report, titled, "San Diego County Sheriff's Department," in which analyses and recommendations about CLERB were documented.

CLERB's responses to your specific recommendations, of which the CSA proposes completion by May 2022, are set forth below:

- **Recommendation One: Discuss and modify its current agreement with the Sheriff's Department and the labor organization to allow CLERB's investigators to conduct independent interviews of Sheriff's Department sworn staff.**

  Agree. In the last quarter of 2021, the current CLERB Executive Officer (EO), the Deputy Sheriff's Association (DSA) President, DSA Counsel, and CLERB Outside Counsel met to discuss the agreement for the purpose of conducting in-person interviews with Sheriff's Department sworn staff. Additional discussions are forthcoming.

- **Recommendation Two: Develop a comprehensive training manual for its investigators that outlines standard procedures for investigations. The manual should include a specific section dedicated to investigations of in-custody deaths, including guidance for evaluating the circumstances leading up to an in-custody death, such as the decedent's mental health history and the appropriateness of the decedent's housing assignment.**

  Agree. While it is true that there does not exist a physical stand-alone comprehensive training manual, new CLERB Special Investigators are currently provided with copies of CLERB's internal documented policies and procedures (P&P), database user guide, investigative report templates, and a comprehensive resource manual containing the following materials: (1)
  - County structure
  - CLERB historical perspective
  - County Charter, Section 606
  - County Administrative Code, Section 340
  - CLERB Rules and Regulations
  - Civil Service Commission Rule XV
  - Case Law Including and impacting CLERB



* California State Auditor's comments begin on page 79.

- Public Safety Officer Procedural Bill of Rights (POBOR)
- Statutes Pertaining to Peace Officer Records
- San Diego County Grand Jury Reports Pertaining to CLERB
- Ralph M. Brown Act
- San Diego County Operational Plan Pertaining to CLERB

The P&P, user guide, report templates, and topics contained within the resource manual are thoroughly discussed and reviewed with the trainee during his/her training program. These materials will be incorporated into the referenced stand-alone training manual, which will also include evaluations of a trainee's performance and documentation as to his/her progress, or lack thereof.

The comprehensive training manual will also include a specific section dedicated to investigations of in-
① custody deaths. Despite the current absence of the stand-alone training manual, trainees are specifically instructed, during their training programs, to evaluate the circumstances leading up to an in-custody death, and to include a review of the decedent's mental health history and the appropriateness of the decedent's housing assignment. In addition to these critical topics, trainees are also instructed to evaluate the timeliness and thoroughness of welfare checks conducted on the decedent by deputies and assess whether deputies appropriately determined that a life-threatening emergency existed and responded accordingly.

- **Recommendation Three: Create policies and procedures to require its investigators to finish casework on in-custody death investigations within three months of receiving the homicide investigation file. These policies and procedures should also require investigators to attempt to independently verify any information they receive from the Sheriff's Department; to thoroughly review deputy statements and reports from the homicide investigation file; and to request interviews with relevant detentions staff and other witnesses in all instances where they identify discrepancies or missing information.**

Agree. The current CLERB EO directed that the completion of in-custody death investigations within three months of receiving the homicide investigation file would take effect when CLERB filled its third and final CLERB Special Investigator vacancy. As that vacancy was filled on January 10, 2022, this mandate will now be incorporated into existing CLERB Policy #300.5, entitled, "Death Investigations."
② The independent verification of information received from the Sheriff's Department and the already existing practices of thoroughly reviewing deputy statements and reports from the homicide file and requesting interviews from witnesses, when contact information is known and time constraints do not exist, will be codified into P&P.

- **Recommendation Four: CLERB should revise its rules and regulations to include prioritization criteria for investigating in-custody deaths above all other investigations.**

③ Agree. The Policy Statement in CLERB Policy #300.5, entitled, "Death Investigations," issued by the current EO on August 27, 2021, indicates that it is the policy of CLERB "that death cases will take priority over any other CLERB case." During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented this practice, and all death cases were made the highest priority. During his absence from September 2018 to November 2020, for unknown reasons, death cases were not handled as the highest priority. To ensure that the investigation of death cases remains the highest priority after any future executive management changes, a five-tiered case categorization system should be documented in the Rules and Regulations, with "Category I" being the highest priority and "Category V" being the lowest priority. Death investigations should be classified as "Category I."

- **Recommendation Five: CLERB should revise its rules and regulations to include clarification that its investigations of in-custody deaths includes those classified as natural deaths.**

Agree. During the current EO's previous tenure as EO from June 2017 to September 2018, he implemented the practice of invoking CLERB's jurisdiction on every in-custody-related death, to include

those that the Medical Examiner's Office determined to be due to natural causes. To ensure that the investigation of all in-custody-related deaths continue after any future executive management changes, CLERB's Rules and Regulations should not only be revised to clarify that in-custody natural deaths are within CLERB's jurisdiction, but that all deaths occurring in the custody of the Sheriff's Department or related to instances or occurrences within the Sheriff's Department detention facilities are within CLERB's jurisdiction. As these proposed Rules and Regulations changes may first require the amendment of the County Charter and/or the County Administrative Code, the CLERB EO will need to work with CLERB's legal counsel to pursue implementation of this recommendation.

- **Recommendation Six: CLERB should perform an analysis of overall trends related to these deaths, including demographic information, and determine whether the trends suggest deficiencies in the Sheriff's Department's policies and procedures. It should also identify policy recommendations for improving the safety of individuals in the Sheriff's Department's custody. CLERB should include these trends and analysis in its annual reports starting with its 2021 report.**

  Agree. The current EO has prioritized in-custody death investigations and the analysis of overall trends related to the deaths, to include demographic information. Upon his return to CLERB in late 2019, he authored CLERB's 2020 Annual Report and provided a detailed breakdown of the 18 death cases CLERB opened in 2019 and the 15 death cases CLERB opened in 2020 (this breakdown is documented on pages 10 and 11 of the Annual Report). In addition, he provided a list of all death cases opened by CLERB in 2019 and 2020 and closed by CLERB in 2019 and 2020. The list included the decedent's name, type of death, detention facility/patrol area, and cause of death (this list is documented on pages 28 thru 33 of the Annual Report). After the finalization of the 2020 Annual Report and its presentation to the Board of Supervisors, the current EO committed to expanding the reporting to include an analysis of overall trends related to deaths, including demographic information, in the 2021 Annual Report.

  CLERB has averaged 10 policy recommendations per calendar year over the past three years. The (4)
  majority of the recommendations pertained to the Sheriff's Department's detention facilities. Finally, it should be noted that CLERB will, for the first time in its 30-plus year history, conduct detention facility inspections in 2022. The scope of the inspections will be specifically tailored to each detention facility based upon the complaints received from its inmates, great bodily injuries received from deputies' uses of force, and deaths occurring at or stemming from incarceration within it.

We look forward to updating the CSA on progress made within six months. Our commitment to continuing the proactivity started at the end of 2020 to improve upon the invaluable civilian oversight role we provide to the public, the Sheriff's Department, and the County is unwavering. The implementation of the CSA recommendations will assist with CLERB's provision of independent, timely, full, and thorough investigations into in-custody deaths which may, in turn, prevent future deaths.

Thank you for the opportunity to provide this response and for the professionalism and courtesy shown by your staff throughout this process.

Sincerely,

Paul R. Parker III
Executive Officer, CLERB

cc: CLERB Members
Shiri Hoffman and Aurelia Razo, Senior Deputies County Counsel
James Sandler; Sandler, Lasry, Laube, Byer & Valdez LLP

Blank page inserted for reproduction purposes only.

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE CITIZENS' LAW ENFORCEMENT REVIEW BOARD

To provide clarity and perspective, we are commenting on CLERB's response to our audit. The numbers below correspond to the numbers we have placed in the margin of its response.

Although CLERB states that it provides various materials and training to its staff, we found some cases in which CLERB's investigators did not appear to consider all the circumstances leading up to the deaths, did not examine all the relevant Sheriff's Department policies, and did not follow up on discrepancies they discovered in the course of their investigations, as we discuss on page 49. Accordingly, our recommendation is for CLERB to develop a comprehensive training manual to ensure that its investigations are complete and thorough. ①

Contrary to its response, we found that CLERB did not always independently verify information from the Sheriff's Department. As we note in the example on page 49, when investigating an altercation between two cellmates resulted in the death of one of the individuals, we found the CLERB investigator did not appear to scrutinize or independently verify evidence that could have sufficiently determined whether the Sheriff's Department's actions violated policies or procedures. Further, we question CLERB's statement that it thoroughly verifies deputies' statements. As we state on page 43, CLERB did not independently interview staff from the Sheriff's Department in any of the six cases we reviewed. ②

As we state on page 48, although CLERB recently added policies and procedures establishing its prioritization of death cases over all other cases, it did not do so until August 2021. Moreover, because policies can easily be changed when leadership changes, it is important that CLERB include requirements in its rules and regulations for how it prioritizes cases. ③

CLERB's statement that it has averaged 10 policy recommendations per calendar year is primarily referring to the recommendations it makes based on individual cases. As we state on page 51, CLERB generally makes recommendations based on individual cases rather than on trends it identifies through analysis of its investigations. Making recommendations based on trends could help resolve more systemic concerns at the Sheriff's Department. ④

Blank page inserted for reproduction purposes only.

***Rob Bonta***
***Attorney General***

***State of California***
***DEPARTMENT OF JUSTICE***

1300 I STREET
SACRAMENTO, CA 95815-4524
Public: (916) 210-5000
Fax (916) 227-3079
Email: Joe.Dominic@doj.ca.gov

January 14, 2022

Michael S. Tilden, CPA
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Re: Draft Audit Report - California State Auditor Report 2021-109; San Diego County Sheriff's Department –Inmate Custody Death

Dear Mr. Tilden,

The Department of Justice (DOJ) appreciates the opportunity to review the above-mentioned draft audit report.

*The audit recommends that to ensure that all sheriff's departments accurately report deaths that occur from incidents or conditions in county jails, the Legislature should amend state law to require sheriff's departments to report to the attorney general individuals who are released from custody after being transported directly to a hospital or similar medical facility, and subsequently dies in the facility. It should also amend state law to require sheriff's departments to provide the attorney general with all facts concerning the death, such as the cause and manner."*

DOJ supports increased transparency of data reporting. As the audit notes, there is currently no statutory requirement in place to require sheriff's departments to report individuals released from custody after being transported directly to a medical facility who subsequently dies in the facility. Express authority from the Legislature and funding is needed to implement this new data reporting recommendation. Furthermore, should the Legislature implement the recommendation requiring sheriff's department disclose the cause and manner of the death, DOJ will work with the Legislature to ensure that any policies comply with all applicable confidentiality laws.

If you have any questions or concerns regarding this matter, you may contact me at the telephone number listed above.

Sincerely,

2022.01.14 16:46:08
-08'00'

Joe Dominic, Chief
California Justice Information Services Division

January 14, 2022
California State Auditor Report 2021-109
Page 2

For ROB BONTA
Attorney General

cc: Venus D. Johnson, Chief Deputy Attorney General
Chris Prasad, CPA, Director, Office of Program Oversight and Accountability

San Diego County Sheriff's Department
Post Office Box 939062 • San Diego, California 92193-9062
*William D. Gore, Sheriff*

January 14, 2022

Ms. Elaine M. Howle*
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, California 95814

State Auditor Howle:

Attached please find the response from the San Diego County Sheriff's Department in reference to your draft audit report on the San Diego County jails.

Sincerely,

William D. Gore, Sheriff

*Keeping the Peace Since 1850*

* California State Auditor's comments begin on page 115.

**Preliminary Comment**

1 **THE CALIFORNIA STATE AUDITOR DID NOT PROVIDE SUFFICIENT OPPORTUNITY FOR THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT TO REVIEW AND RESPOND TO THE AUDIT**

2 [redacted] the San Diego Sheriff's Department received a draft copy of the State Auditor's Report 2021-109 [redacted] for the stated purpose of allowing the Department to review and respond to the audit. The Sheriff's Department was afforded less than five (5) days to review and respond to the draft report, as the audit was received late in the morning on Monday and the response was due back by 5:00 p.m. on Friday.

[redacted]

[redacted]

The 2018 revision of *Government Auditing Standards*, commonly referred to as generally accepted government auditing standards (GAGAS), is effective for performance audits beginning on or after July 1, 2019, such as the instant engagement. GAGAS section 9.50 provides that "Auditors should obtain and report the views of responsible officials of the audited entity concerning the findings, conclusions, and recommendations in the audit report, as well as any planned corrective actions." The highly redacted version of the draft report,
3 coupled with the short time afforded for review and response, and the lack of supporting documentation, makes it difficult for the Sheriff's Department, as the audited entity, to submit a meaningful, comprehensive response to the draft report.

Accordingly, the Sheriff's Department reserves the right to submit a more comprehensive
1 response after the final report and any supporting documentation and information are published, as none of the supporting documentation and information was included with the draft report transmission.

## Introduction

The gravity and seriousness of in-custody deaths and the importance of identifying and improving deficiencies when they occur is not lost on the San Diego Sheriff's Department. We have been transparent in our response to the Joint Legislative Audit Committee's recommendation that the California State Auditor review in-custody deaths in San Diego County. During the audit, we cooperated fully and provided complete access to our records, facilities, and personnel.

The Sheriff's Department was pleased to see that the auditors' findings confirm that the ④ Department's policies and procedures align with the minimum standards established through state law and other applicable guidance. That said, while the Sheriff's Department appreciates the work and recommendations of the auditors, the Department maintains concerns regarding ⑤ the findings, as well as the conclusions and recommendations contained in the draft report and the way the audit was conducted.

### I. THE AUDIT FAILED TO CONFORM WITH GENERALLY ACCEPTED GOVERNMENT AUDITING STANDARDS ⑥

California Government Code section 8546.1(c) requires that the State Auditor "complete any audit in a timely manner and pursuant to the 'Government Auditing Standards' published by the Comptroller General of the United States." While the State Auditor recognizes that the instant engagement is undertaken pursuant to GAGAS, it failed to conform to the requisite standards.

#### A. The auditors failed to comply with reporting standards for performance audits ⑥

GAGAS section 9.03 provides, "[w]hen auditors comply with all applicable GAGAS requirements, they should use the following language, which represents an unmodified GAGAS compliance statement, in the audit report to indicate that they conducted the audit in accordance with GAGAS:

> We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

The section 9.03 compliance statement is notably absent from the draft report.

In the event auditors do not comply with all applicable GAGAS requirements, section 9.05 provides, "they should include a modified GAGAS compliance statement in the audit report. For performance audits, auditors should use a statement that includes either (1) the language in paragraph 9.03, modified to indicate the requirements that were not followed, or (2) language indicating that the auditors did not follow GAGAS."

Similarly, a section 9.05 alternate compliance statement is also absent from the draft report.

⑥ **B. The auditors have declined to adopt the GAGAS report quality elements of accurate, objective, complete, convincing, and timely in developing and writing the audit report**

Chapter 9 of the GAGAS addresses the reporting standards for performance audits such as the instant engagement. GAGAS section 9.17 provides that "[t]he auditor may use the report quality elements of accurate, objective, complete, convincing, clear, concise, and timely when developing and writing the audit report as the subject permits." For purposes of the instant engagement, the auditors failed to adopt the report quality elements of accurate, objective, complete, convincing and timely in developing and writing the audit report.

⑦ a. **Accuracy**

Section 9.17(a) regarding report quality element "Accurate" states, in pertinent part, "[a]n accurate report is supported by sufficient, appropriate evidence with key facts, figures, and findings being traceable to the audit evidence. Reports that are fact-based, with a clear statement of sources, methods, and assumptions so that report users can judge how much weight to give the evidence reported, assist in achieving accuracy."

Consistent with this standard, the Auditor makes recommendations to the legislature for policy revisions "to better align with best practices, as follows." There is no data or evidence cited to support the best practices recommendations. Data and evidence-based approaches to medical, mental health and correctional care policies are necessary to ensure the best health and safety outcomes for incarcerated individuals. In other sections, the auditor states "[r]eports and studies related to mental health indicate that..." There is no reference to which studies and reports are being relied upon for the assertions.

The audit states, "that deficiencies in the Sheriff's Department's policies and practices related to intake screenings, medical and mental health care, safety checks, and responses to emergencies *likely contributed to these deaths*," the report is devoid of any evidence that the deaths were cause by a failure of the department's policies or practices.

While no death is acceptable, the Sheriff recognizes that some incarcerated individuals have pre-existing conditions, age or other maladies which lead to natural death. These deaths made up nearly half of all the deaths that occurred during the 15-year audit period. The report does not explain if a failure on the part of the department caused the death or if those individuals could have died in the community from the same pre-existing condition.

The Sheriff's Department has implemented extensive programs, training, and policies to prevent suicide in the jails. The jails disproportionately house individuals suffering from mental illness, and substance use disorder. The identification of individuals who wish to do themselves harm is one key to prevention and removing the ability to commit self-harm is the second. Individuals bent on harming themselves creates obstacles to identification and prevention. Similarly, substance use disorder is an enormous driver for behavior. It could be argued that in-custody individuals are even more driven to use substances to alleviate the strain and monotony of incarceration. The Sheriff's Department has created extensive layers and policies to interdict and prevent contraband from being smuggled into the jail system. We have instituted the use of naloxone to save lives when someone is successful in circumventing those interdiction efforts. While the Sheriff's Department can always do better, the audit does little to document or provide context for those efforts and the complexity of keeping individuals safe from themselves.

b. **Objectivity** ⑥

Section 9.17(b) regarding report quality element "Objective" states, in pertinent part, "[o]bjective means that the presentation of the report is balanced in content and tone. A report's credibility is significantly enhanced when it presents evidence in an unbiased manner and in the proper context. This means presenting the audit results impartially and fairly. The tone of reports may encourage decision makers to act on the auditors' findings and recommendations. This balanced tone can be achieved when reports present sufficient, appropriate evidence to support conclusions **while refraining from using adjectives or adverbs that characterize evidence in a way that implies criticism or unsupported conclusions.**" (Emphasis added).

Despite the fact that section 9.17(b) specifically counsels against using such adjectives and adverbs, the draft report is replete with such unsupported criticism (e.g. "*likely* contributed to the deaths," "*inadequate* response to deaths," "*might* have placed this individual," "lack of *effective* independent oversight," "*meaningful* changes," "*meaningful* corrective action," "few *substantive* steps," "have not consistently led to *significant* corrective action," "failure to *adequately* prevent the deaths," "*could* help," and "*could* be useful"). Use of such terms, in contravention of the GAGAS guidance, calls into question and undercuts the objectivity of the engagement and the resulting instant report.

Section 9.17(b) goes on to provide, "[a]udit reports are more objective when they demonstrate that the work has been performed by professional, unbiased, independent, and **knowledgeable** personnel." (Emphasis added). As discussed more fully below, the auditors lack the requisite knowledge, skills and abilities necessary to competently conduct the instant engagement.

6 c. **Completeness**

Section 9.17(c) regarding the report quality element "Complete" states, in pertinent part, "complete means that the report contains sufficient, appropriate evidence needed to satisfy the audit objectives and promote an understanding of the matters reported. **It also means the report states evidence** and findings **without omission of significant relevant information** related to the audit objectives. Providing report users with an understanding means providing perspective on the extent and significance of reported findings, such as the frequency of occurrence relative to the number of cases or transactions tested and the relationship of the findings to the entity's operations." (Emphasis added).

8 The auditors' summary of the event outlined in Case Example 4 illustrates the omission of significant relevant information in an effort to paint a picture that deputies stood idly by while CPR was medically indicated for the incarcerated individual. Based on our review of Case Example 4, we believe the auditors are referring to Sheriff's case number [redacted]

2 [redacted]

8 [redacted]

The auditors' description of the event depicted in the chart above misleads the reader, is an example of the lack of completeness and objectivity that is present in the draft report and fails to meet the report quality elements outlined in GAGAS sections 9.17(b) and 9.17(c).

d. **Convincing** ⑥

Section 9.17(d) regarding report quality element "Convincing" states, in pertinent part, "convincing means that the audit results are responsive to the audit objectives, that the findings are presented persuasively, and that the conclusions and recommendations flow logically from the facts presented. **The validity of the findings, the reasonableness of the conclusions, and the benefit of implementing the recommendations are more convincing when supported by sufficient, appropriate evidence.**"

While the draft report speaks to best practices, the draft contains no such policies, best practices, or sample language, nor the jurisdiction(s) where such best practices were or are being implemented. As discussed in Section C. below, while good intentioned, best practices suggested by auditors without the requisite knowledge, skills, and abilities, may violate the constitutional rights of incarcerated individuals, cause harm to the mental health of incarcerated individuals and ultimately result in increased liability to the County. By not including copies of the best practices referenced throughout the draft report, it is difficult for the Sheriff's Department to ascertain whether the suggested best practices comport with state law, Title 15 regulations and the constitutional rights guaranteed to incarcerated individuals.

The draft report does contain one table (Table 2) with excerpts of safety check policies, however, while excerpts from the BSCC policy and the Sheriff's Department policy are unredacted, the policies and names of the three other entities are redacted in their entirety. ③

[redacted] ②

3 **i. The Auditor Improperly Redacted Public Documents and Refused to Provide the Documents to the Sheriff's Department Necessary for the Department to Provide a Meaningful Response**

2 [redacted]

For purposes of an engagement under GAGAS, the terms "auditee" and "audited entity" are interchangeable. GAGAS section 1.27(e) defines an "audited entity" as "[t]he entity that is subject to a GAGAS engagement, whether that engagement is a financial audit, attestation engagement, review of financial statements, or performance audit."

The Joint Legislative Audit Committee (JLAC) charged the auditor with conducting an audit of the San Diego Sheriff's Department and the County of San Diego Citizens Law Enforcement Review Board (CLERB). The auditor confirmed the scope of its engagement in the document entitled 2021-109 Audit Scope and Objectives, identifying the audited entities as the San Diego County Sheriff's Department and the CLERB. No other agencies were identified as audited entities (or auditees).

9 Based upon the GAGAS standards, and the JLAC referral, Alameda, Orange County, and Riverside are not auditees. However, even if they were, the information relied upon should have been given to the Sheriff's Department, as the auditee, to respond to the draft report, because it is public information.

The Sheriff's Department must meet Title 15 standards for its detention facilities, as do other local detention facilities throughout the State of California. For the redacted policy excerpts to be relevant to the auditors' engagement, the redacted excerpts are presumably from other law enforcement agencies in the state.

Policies of a California law enforcement agency are public record. Senate Bill 978 (SB 978) added section 13650 to the Government Code, which requires "...each local law enforcement agency shall conspicuously post on their Internet Web sites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public if a request was made pursuant to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code)." As such, each California law enforcement agency is required to publicly post, on its website, all its policies and procedures, such as its detention facilities safety check policy.

It is well settled that a governmental agency cannot shield records that are subject to public disclosure simply by putting those publicly available records in a file it stamps "confidential." Therefore, the auditor should have provided the policies which it relied on in creating its report. (10)

Similarly, it was improper for the auditor to redact and withhold from disclosure settlement information it obtained, admittedly, from publicly available court documents regarding the three selected counties it designated as comparable counties. (10)

(2)

[redacted]

e. **Timeliness**

Section 9.17(g) regarding report quality element "Timely" states, in pertinent part, "[t]o be of maximum use, providing relevant evidence in time to respond to officials of the audited entity, legislative officials, and other users' legitimate needs is the auditors' goal. Likewise, **the evidence provided in the report is more helpful if it is current."**

11 While it is certainly helpful from a historical perspective to discuss changes in policies or procedures, it is unclear whether the auditors' findings and conclusions are based on the policies and procedures as they existed at the time of the incident under review or present-day policies and procedures. For example, the draft report states, "...although the Sheriff's Department's policy indicates that a nurse should conduct a face-to-face appraisal with an incarcerated individual within 24 hours of a mental health care request to determine the urgency of that request, it has not always had this policy." The Sheriff's Department believes this change in policy was a positive step, but it is unclear whether the auditors' findings and recommendations are based on current policies and procedures, or policies and procedures that were in place at the time of the incident under review.

6 **C. The Auditors' Lack of Requisite Knowledge, Skills and Abilities Necessary to Conduct the Instant Engagement Raise Ethical and Competence Issues under the Generally Accepted Government Auditing Standards**

Chapter 3 of the GAGAS sets forth fundamental ethical principles for auditors in the government environment.

Section 3.04 relating to ethical principles provides that "[p]erforming audit work in accordance with ethical principles is a matter of personal and organizational responsibility." The section goes on to clearly state that ethical principles apply in "taking on only work that the audit organization is competent to perform..."

To ensure that an audited entity is afforded a fair, unbiased and meaningful audit, Chapter 4 of the GAGAS requires that the auditors collectively possess the competence needed to address the engagement objectives and perform their work in accordance with GAGAS. The knowledge, skills, and abilities needed when conducting an engagement in accordance with GAGAS include the understanding necessary to proficiently apply a. GAGAS; b. standards, statutory requirements, regulations, criteria, and guidance applicable to auditing or the objectives for the engagement(s) being conducted; and c. ***techniques, tools, and guidance related to professional expertise applicable to the work being performed***. (Emphasis added). (GAGAS section 4.07).

GAGAS section 4.08 provides, "[a]chieving the knowledge, skills, and abilities needed to conduct a GAGAS engagement may include: a. having prior experience in the subject matter or type of engagement; b. completing [continuing professional education] related to the subject matter or type of engagement; and c. obtaining degrees or certifications relevant to the subject matter or type of engagement."

The instant engagement requires knowledge, skills, and abilities regarding varied areas in the detentions or corrections environment including, but not limited to, detentions custodial operations, detentions medical services and detentions mental health functions.

This knowledge is so important that state law requires that a deputy complete an introductory training course by the Commission on Peace Officer Standards and Training, additional training by the Board of State and Community Corrections, and specialized training for custodial personnel of local detention facilities pursuant to Title 15 of the California Code of Regulations. In addition to this initial 16 weeks of academy training, deputies are next assigned to phase training where they are paired up with seasoned training officers before they can function on their own. After these initial academy and training phases, detentions deputies are required by state law to complete a minimum of 24 hours of annual training to maintain their proficiency and certification.

The professional qualifications necessary for detentions medical doctors, registered nurses, licensed vocational nurses, and mental health clinicians must satisfy not only the educational requirements of their field which often includes many years of studies, and successfully passing the tests required by their licensing authority, but also continuing professional education in order to maintain their license or certification.

Additionally, the field of corrections is a highly regulated field of law comprised of state and federal Constitutional standards and laws, as well as case law issued by the U.S. Supreme Court, federal, and state courts. Changes in department policies can impact an inmate's constitutional rights, and a lack of knowledge regarding correctional law can lead to flawed policies and constitutional violations. [redacted] ②

The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions custodial operations would be satisfied by either an auditor, or a specialist[1] engaged

---

[1] "Some engagements may necessitate the use of specialized techniques or methods that call for the skills of specialists. *Specialists do not include individuals with special skill or knowledge related to specialized areas within the field of accounting or auditing*, such as income taxation and information technology. *Such individuals are considered auditors*." (Emphasis added). GAGAS section 4.13.

"The competence and qualifications of specialists significantly affect whether their work will be adequate for the engagement team's purposes and will meet GAGAS requirements. Competence of specialists relates to the nature and level of expertise. Qualifications of specialists relate to their professional certifications, reputations, and previous work in the subject matter. Other relevant factors include the ability of specialists to exercise competence in the circumstances of the engagement and the effects that bias, conflict of interest, or the influence of others may have on the specialists' professional judgment." GAGAS section 4.14.

"Sources that may inform the auditors' assessment of the competence and professional qualifications of a specialist include the following: *a. the professional certification, license, or other recognition of the competence of*

to assist the audit team, who was certified by the State of California, Bureau of State and
② Community Corrections (BSCC), Standards and Trainings for Corrections (STC). [redacted] it does not appear that any of the audit team members possess such training or certification.

It is further generally recognized that the function of providing medical services in the correctional setting is different than in a public setting. According to the American Academy of Family Physicians, "[i]nmates in correctional facilities have significantly higher rates of disease than the general population, and ... tend[] to suffer in greater numbers from infectious disease, mental health problems, and substance use and addiction." The requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions medical services would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is, or was, a medical doctor or registered nurse in a detentions or corrections environment. In our discussions with the auditors, it does not appear that any of the audit team members possess such training or experience.

Similarly, the requisite knowledge, skills, and abilities necessary to render an informed opinion regarding detentions mental health functions would be satisfied by either an auditor, or a specialist engaged to assist the audit team, who is or was a qualified mental health provider
② (QMHP) or mental health clinician (MHC) in a detentions or corrections environment. [redacted] it does not appear that any of the audit team members possess such training or experience.

By way of example, the Sheriff's Department was previously reviewed by subject matter experts who possessed the requisite knowledge, skills, and abilities necessary for the scope of their

---

*the specialist in his or her field, as appropriate*; b. the reputation and standing of the specialist in the views of peers and others familiar with the specialist's capability or performance; *c. the specialist's experience and previous work in the subject matter; d. the auditors' assessment of the specialist's knowledge and qualification based on prior experience in using the specialist's work; e. the specialist's knowledge of any technical performance standards or other professional or industry requirements in the specialist's field (for example, ethical standards and other membership requirements of a professional body or industry association, accreditation standards of a licensing body, or requirements imposed by law or regulation)*; f. the knowledge of the specialist with respect to relevant auditing standards; and g. the assessment of unexpected events, changes in conditions, or the evidence obtained from the results of engagement procedures that indicate it may be necessary to reconsider the initial evaluation of the competence and qualifications of a specialist as the engagement progresses." (Emphasis added). GAGAS section 4.15.

engagement. One review was conducted by Mr. Lindsey Hayes[2], the other review was conducted by the National Commission on Correctional Health Care (NCCHC)[3].

[redacted] ②

[2] Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives (NCIA) and is nationally recognized as an expert in the field of suicide prevention within jails, prisons, and juvenile facilities. He has been a consultant to the U.S. Justice Department's Civil Rights Division in its investigations of conditions of confinement in both adult and juvenile correctional facilities throughout the country. He has also been appointed as a Federal Court Monitor in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as an expert witness/consultant in litigation cases involving the suicide of incarcerated individuals, and his expertise has allowed him to conduct training seminars and assessments of adult and juvenile suicide prevention practices within correctional facilities throughout the country.

Hayes is a published author with over 60 publications in the area of suicide prevention within adult and juvenile correctional facilities and has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In...National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2009).

Hayes has reviewed over 3,000 cases of suicide in jail, prison, and juvenile facilities throughout the country over the past 30 years. He was awarded the National Commission on Correctional Health Care's Award of Excellence in 2001, for his contribution in the field of suicide prevention in correctional facilities. His work has been cited in several state and national correctional health care standards, and numerous suicide prevention training curricula, including the National Institute of Correction (NIC).

[3] The National Commission on Correctional Health Care (NCCHC) is a non-profit 501(c)(3) organization whose mission is to improve the quality of health care in jails, prisons, and juvenile confinement facilities. The NCCHC establishes standards for health services in correctional facilities, produces resource publications, conducts educational conferences, offers a certification for correctional health professionals and a voluntary accreditation program for institutions that meet their standards. The NCCHC is supported by numerous major national organizations in the fields of health, law, and corrections.

The NCCHC has a multidisciplinary governing structure, which addresses the complexities of correctional health care, and whose standards for health services in correctional facilities is widely recognized. NCCHC's standards address areas of care and treatment, health records, administration, personnel and medical-legal issues; and offer voluntary health services accreditation based on its standards. NCCHC also hold conferences with educational programs that address topics such as mental health and substance abuse services. The NCCHC publishes periodicals such as the *Journal of Correctional Health Care* and *CorrectCare*, which are the leading periodicals in this field. The NCCHC offers consultation and assistances to facilities with issues preparing for accreditation, developing policies and procedures, and assessing alternative solutions to problems.

In order to demonstrate that the auditors assigned to this engagement possessed the requisite knowledge, skills, and abilities in detentions custodial operations, detentions medical services and detentions mental health functions, as required by GAGAS, the Sheriff's Department requests that the State Auditor include in its final report the curricula vitae for each auditor and specialist assigned to the instant engagement, including any relevant continuing professional education regarding the subject matter of the engagement.

## II. THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT HAS TAKEN APPROPRIATE AND REASONABLE MEASURES TO PREVENT AND RESPOND TO DEATHS OF INDIVIDUALS IN CUSTODY

(7) **a. The Auditor's Conclusion That the In-Custody Deaths Were the Result of Inadequate Medical Care is Misleading**

While the first sentence of the draft report begins with the recognition that the Sheriff's Department is responsible for providing medical care to individuals in its custody, the next sentence goes on to state: "Nonetheless, from 2006 through 2020, 185 people died in San Diego County jails – more than in nearly any other county across the state." The transition from (7) the statement that the Sheriff's Department is responsible for providing adequate medical care to the statement that "nonetheless" 185 people died in San Diego County jails is misleading and implies that the deaths were the result of inadequate medical care.

The draft report does not identify which deaths were the result of "inadequate" medical care. Natural deaths comprise nearly half, the highest percentage, of in-custody deaths identified by (2) the auditors. [redacted] the draft report does not identify what medical care was inadequate, nor does it identify what medical care the Sheriff's Department should have provided that would have avoided individuals from dying of natural causes, such as heart disease, cancer, chronic lower respiratory disease (COPD, emphysema, chronic bronchitis), and stroke. Just as individuals with these conditions die from their conditions in the community setting, incarcerated individuals with these conditions often die from their conditions while in custody, not as the result of incarceration or the medical care they receive while incarcerated but as a natural and expected progression of their condition.

Similarly, while accidental deaths account for 31 of the total in-custody deaths during the audited period, the draft report does not identify any medical care that was "inadequate" resulting in an individual's death. As the auditors are aware, most of the accidental deaths were the result of individuals overdosing on drugs, not due to "inadequate" medical care. In response to the opioid epidemic, the San Diego Sheriff's Department was one of the first departments in the state to equip not only its detentions medical staff but also detentions

deputies with NARCAN® (naloxone HCL) nasal spray to combat the surge in opioid overdoses. To ensure immediate availability of this highly effective opioid antagonist, NARCAN is not only available in detentions medical areas and in deputy control stations but detentions deputies are also required to carry NARCAN on their person during their shifts. During calendar years 2020 and 2021 alone, Sheriff's Department employees in the jails responded to 314 incidents of suspected opioid overdose deploying 848 doses of NARCAN and saving countless lives. In conjunction with its community partners, the Sheriff's Department also makes this lifesaving drug available to incarcerated individuals upon their discharge from Sheriff's custody.

**b. The Number of In-Custody Deaths Experienced by the San Diego Sheriff's Department is Consistent with its Position of Having the Second Highest Number of Total Bookings and Overall Deaths in California Counties** ⑫

The San Diego Sheriff's Department's position as having the second highest number of in-custody deaths of counties in the state is consistent with its position as having the second highest number of bookings of counties in the state. As demonstrated by Table 1 below, the trend is consistent for at least the top six counties, exhibiting that as the number of bookings goes up, so do the number of in-custody deaths. Additionally, as demonstrated by Table 2 below, as the second most populous county in the state, the County of San Diego also maintains the position as having the second highest number of deaths in the community.

**i. Table B is intentionally misleading**

The auditors chose to include a table in APPENDIX A which they identify as focusing on two primary categories, "In Custody Deaths and Bookings From 2006 Through 2020." In so doing, they state that the table "presents the rate of deaths per the number of individuals booked in each of the county sheriff's jail systems from 2006 through 2020." They go on to state that "[t]he number of bookings is the ***total number*** of individuals who were processed through the jail system." (Emphasis added). However, when the auditors sort the chart, they don't sort it by the column entitled "Total Booked", or even the "Total Deaths" column, both of which would clearly show the correlation between the two (see resorted Table 1 below), but instead they chose to sort by the "Total Deaths per 100,000 Booked" which makes the first three columns appear to have no correlation.

② [redacted]

However, the exact same data sorted by the "Total Number of Bookings" column, *or* the "Total In-Custody Deaths," column **clearly** shows a correlation between bookings and the number of actual deaths for the six counties with the most bookings in the State of California.

⑬ **Table 1**

| | County Sheriff's Department | Total Number of Bookings | Average Bookings Per Year | Total In-Custody Deaths | Deaths per 100,000 Bookings |
|---|---|---|---|---|---|
| 1 | Los Angeles | 1,970,654 | 131,377 | 421 | 21.36 |
| 2 | San Diego | 1,284,462 | 85,631 | 185 | 14.40 |
| 3 | San Bernardino | 1,027,195 | 68,480 | 124 | 12.07 |
| 4 | Orange | 888,951 | 59,263 | 111 | 12.49 |
| 5 | Riverside | 810,376 | 54,025 | 104 | 12.83 |
| 6 | Alameda | 777,627 | 51,842 | 99 | 12.73 |
| 7 | Sacramento | 733,275 | 48,885 | 62 | 8.46 |
| 8 | Santa Clara | 682,010 | 45,467 | 84 | 12.32 |
| 9 | Fresno | 551,624 | 36,775 | 86 | 15.59 |
| 10 | Kern | 520,074 | 34,672 | 70 | 13.46 |
| 11 | Ventura | 424,978 | 28,332 | 47 | 11.06 |
| 12 | San Joaquin | 392,895 | 26,193 | 34 | 8.65 |
| 13 | Contra Costa | 370,299 | 24,687 | 43 | 11.61 |
| 14 | San Francisco | 353,521 | 23,568 | 39 | 11.03 |
| 15 | Tulare | 333,941 | 22,263 | 26 | 7.79 |

### ii. The top 5 counties with the most deaths countywide are also the same

As jails are a microcosm of the communities in which they are located, it should come as no surprise that as deaths in the community increase, deaths in-custody will increase as well. This is particularly true for in-custody deaths due to natural causes, suicide, and accidental deaths due to overdose. As greater numbers of individuals in a community are sick, experience suicidal ideations or are afflicted by substance use disorders, those increased numbers can be expected to replicate themselves in the detention systems serving those communities. As reflected in Table 1 above, the number of in-custody deaths experienced by the Sheriff's Department is not disproportionate to the number of deaths experienced in the San Diego County community regardless of custody status (See Table 2). ⑫

**Table 2** ⑬

**Deaths in California Counties From 2006 Through 2020**

| | County | Est. County Population (2020) | Average County Population (2006-2020) | Total Deaths (2006-2020) | Average Deaths Per Year | Deaths per 100,000 Population |
|---|---|---|---|---|---|---|
| 1 | Los Angeles | 10,135,614 | 9,991,660 | 939,073 | 62,605 | 626.6 |
| 2 | San Diego | 3,331,279 | 3,181,752 | 320,562 | 21,371 | 671.7 |
| 3 | Orange | 3,180,491 | 3,084,349 | 292,178 | 19,479 | 631.5 |
| 4 | Riverside | 2,440,719 | 2,251,242 | 224,078 | 14,939 | 663.6 |
| 5 | San Bernardino | 2,175,424 | 2,079,014 | 206,764 | 13,784 | 663.0 |
| 6 | Sacramento | 1,553,157 | 1,457,469 | 170,958 | 11,397 | 782.0 |
| 7 | Santa Clara | 1,945,166 | 1,848,744 | 157,224 | 10,482 | 567.0 |
| 8 | Alameda | 1,663,114 | 1,568,059 | 144,734 | 9,649 | 615.3 |
| 9 | Fresno | 1,020,292 | 955,030 | 104,127 | 6,942 | 726.9 |

This data table reports the annual number of deaths that occurred in each County regardless of the place of residence (by occurrence).

### iii. The Comparator Counties Selected by the Auditors Do Not Accurately Reflect the Relevant Peer Group Departments ⑭

Considering county size, geographic location and "other factors" the auditors selected the Alameda County Sheriff's Office, Orange County Sheriff's Department and Riverside County Sheriff's Department as comparator departments. From the report, it is unclear how geographic location factored into the selection of the Alameda Sheriff's Office as a comparator department as the county seats of San Diego County and Alameda County are approximately 490 miles from each other. Similarly, the auditors' selection of similar *counties*, based on what appears to be total county population, rather than similar *booking numbers* is inappropriate. It is unclear how total county population factored into the selection of the Alameda Sheriff's

Office as a comparator department when the County of Alameda has less than half the average county population of San Diego County.

The comparator peer group should be based on the total number of individuals encountered (booked) by each department rather than county population. As reflected in Table 3 below, an analysis of the departments, based on total number of bookings, reveals that the statistically relevant departments are the Los Angeles Sheriff's Department, San Bernardino Sheriff's Department and Orange County Sheriff's Department. The San Diego County Sheriff's Department's total bookings for the reviewed 15-year period are within 65% of what the Los Angeles County Sheriff's Department booked for the same period. Similarly, San Bernardino and Orange County Sheriff's Departments booked at least 65% of the total number of bookings that the San Diego County Sheriffs' Department booked.

However, the Riverside County Sheriff's Department and Alameda Sheriff's Office, each booked <u>**less**</u> than 65% of the total number of bookings that the San Diego County Sheriff's Department booked for the same time. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, in favor of Riverside County and Alameda County, the auditors excluded the only other departments in the state that booked in excess of 1,000,000 individuals during the audit period. By excluding the Los Angeles Sheriff's Department and San Bernardino Sheriff's Department, the auditors also excluded the other two departments with the highest number of in-custody deaths in the state during the audit period in favor of departments having the fifth and sixth highest number of in-custody deaths.

⑬

**TABLE 3**

**Top Three Counties With Total Bookings Within 35 Percent of San Diego County Bookings**



### c. The San Diego Sheriff's Department's Review of In-Custody Deaths Exceeds the Standards Set by the State of California ④

The Auditor's stated purpose[4] for the instant engagement is, in pertinent part, to "[e]valuate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. *To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance*. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates." (Emphasis added).

The auditors' findings confirm that the San Diego Sheriff's Department not only meets the minimum standards established through state law and other applicable guidance but, in fact, exceeds those requirements regarding its review of in-custody deaths.

#### i. The Auditor's Conclusion that the Department's Review of In-Custody Deaths has been Insufficient is Misplaced ⑮④

The auditors' findings confirm that the Sheriff's Department meets and exceeds the minimum state standards for review of in-custody deaths.

As noted by the auditors, state law requires the Sheriff's Department to conduct a clinical care review within thirty (30) days of every death. The Sheriff's Department meets this requirement by conducting a Mortality/Morbidity Review. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to comply with applicable law with either the timeliness or the substance of the Department's reviews.

Except in the case of a suspected homicide, no other review or investigation is required. In the case of an in-custody death in which homicide is suspected, the Sheriff is statutorily required to

---

4 **2021-109 AUDIT SCOPE AND OBJECTIVES**
**San Diego County Sheriff's Department**

The audit by the California State Auditor will provide independently developed and verified information related to the death of inmates in the custody of the San Diego County Sheriff's Department (San Diego Sheriff). The audit's scope will include, but not be limited to, the following activities:

1. Review and evaluate the laws, rules, and regulations significant to the audit objectives.

2. Evaluate the San Diego Sheriff's policies and procedures on personnel training, facility maintenance and safety, and the provision of health care to inmates. To the extent possible, determine whether these policies and procedures align with minimum standards established through state law and any other applicable guidance. As part of this evaluation, also determine whether any of these policies delay or otherwise impair the ability of medical personnel to provide appropriate medical care to inmates.

investigate the death. That investigation is conducted by the Sheriff's Homicide Unit. The auditors' findings did not reveal any failure on the part of the Sheriff's Department to investigate any in-custody death in which homicide was suspected.

No other reviews by the Sheriff's Department are mandated by state law for in-custody deaths.

While no other reviews are mandated, the Sheriff's Department created and implemented its own multilayer review above and beyond the minimum state standards for review of in-custody deaths.

Although not required for in-custody deaths where homicide is not suspected, the Sheriff's Department, as a matter of practice, conducts an investigation by the Homicide Unit into every in-custody death, not just those deaths where homicide is suspected.

In addition to the Homicide Unit investigation, the Sheriff's Department created its own Critical Incident Review Board (CIRB). The CIRB's role is not limited to reviews of in-custody deaths but includes the review of a variety of critical incidents including uses of force, pursuits, K-9 deployments, overdoses, and other significant events. In-custody deaths due to natural causes are generally not reviewed by the CIRB, unless other issues are identified, as deaths due to natural causes are more appropriately reviewed by the statutorily mandated thirty (30) day Mortality/Morbidity Review conducted by the Department. A further discussion regarding the recommendation that the CIRB review natural deaths is discussed below.

If the CIRB or any member of the Sheriff's Department believes an in-custody death implicates potential misconduct or a failure to meet standards on the part of an employee, the CIRB or any member of the Sheriff's Department can file a Department Generated Complaint requesting that Internal Affairs investigate the matter.

Penal Code section 832.5 requires every law enforcement agency in the state to establish a procedure to investigate complaints lodged *by members of the public* against personnel of the agency. In addition to investigating complaints from members of the public, the Sheriff's Department investigates "department generated" complaints, which can be lodged by any member of the department, in the same manner as it investigates a complaint by a member of the public. If there is potential misconduct or a failure to meet standards on the part of an employee related to an in-custody death, the Sheriff's Department does not wait for a member of the public to file a complaint but can and does initiate an Internal Affairs investigation based on a department generated complaint.

As the auditors' findings make clear, the reviews conducted by the Sheriff's Department not only meet the minimum standards established by the state, the multilayered approach adopted by the Sheriff's Department far exceeds those minimum standards. Any deficiencies in the state's minimum standards regarding the review of in-custody deaths is most appropriately

addressed to the Legislature and/or the BSCC, not to the Sheriff's Department as the audited entity.

### ii. The Critical Incident Review Board's Roles of Preventing Future Litigation and Improving the Health and Welfare of Incarcerated Individuals are Not Mutually Exclusive ⑯

The auditors stated there should be more transparency regarding the process and findings of the Sheriff's CIRB Board. The CIRB reviews occur within the confines of the attorney-client relationship and are not reported out publicly. Every governmental entity, even those such as the State Legislature or a Board of Supervisors, both of which are subject to the *Brown Act's* open meeting requirements, are afforded the opportunity to engage in candid conversations with its counsel within the confines of the attorney-client relationship.

Notwithstanding the auditors' particular concern regarding the existence of the attorney-client privilege, the CIRB's role of preventing future litigation compliments rather than undercuts the Department's goal of improving the health and welfare of incarcerated individuals entrusted to the care and custody of the Sheriff. As items of concern are identified during a critical incident, such as an in-custody death, the CIRB review is focused with an eye towards what changes have already been implemented by the chain of command to remedy any deficiencies before the matter made it to the CIRB for review, as well as any changes the chain of command may not have already identified and/or implemented to minimize the risk of a recurrence. If the CIRB identifies any best practices or changes not previously identified and implemented by the chain of command prior to its review, the CIRB is empowered to make such recommendations.

As it relates specifically to in custody deaths, the CIRB concentrates not only on the death itself, but also considers the handling of the inmate from the time the inmate was originally booked. The Board looks to determine whether any warning signs existed, whether appropriate and timely safety checks occurred, and whether there were any risk reduction lessons that could be derived from the incident.

While the focus of the CIRB may be risk management, the mechanism by which risk management is ultimately accomplished is clearly through the promotion of best practices and policies that improve the health and welfare of incarcerated individuals and holding staff accountable.

While the Auditor was "particularly concerned" that the Sheriff's Department does not publicly report out its CIRB discussions, all Sheriff's Department policies, procedures, training, and education materials are published on the Sheriff's Department's website. Any changes to Sheriff's policies, procedures, training, or education, whether recommended by the CIRB or implemented by management prior to or without the need for a CIRB review, are published and available for the public to access on the Sheriff's Department's website. In addition to the

attorney-client privileged nature of the CIRB discussions, the Sheriff's Department would also be prohibited by state statutory and constitutional privacy considerations from disclosing any discussions by the CIRB regarding employee misconduct or Internal Affairs investigations.

⑰ **d. In Addition to Its Own Internal Reviews, the Sheriff's Department is Already Subject to Independent Oversight by Multiple External Organizations**

Local detention facilities are subject to a myriad set of regulations and laws based on statutory law, constitutional guarantees, and case law. In order to ensure county detention facilities, comply with these requirements, the BSCC promulgates regulations under Title 15 of the California Code of Regulations, establishing statewide standards for detention facilities. In
④ order for facilities to maintain their certification to operate, counties are subject to bi-annual inspections by the BSCC. The auditors' findings confirm that the Sheriff's Department meets the standards established by the BSCC under Title 15.

In addition to the bi-annual inspections by the BSCC, pursuant to its authority under Penal Code section 919, the San Diego County Grand Jury conducts an annual inspection of the Sheriff's Department detention facilities.

The San Diego County Citizens Law Enforcement Review Board, pursuant to its County Charter authority, is also empowered to, and does, investigate in-custody deaths.

⑰ **e. In its continuing efforts to enhance medical and mental healthcare, and exceed the standards set by the State of California, the Sheriff's Department engaged reviews by multiple separate external entities specializing in correctional healthcare**

The Sheriff's Department was reviewed by two entities in pursuit of enhancing system operations related to medical and mental health care. These included a look at suicide prevention practices by nationally recognized expert, Mr. Lindsay Hayes, and a preliminary review by the National Commission on Correctional Healthcare (NCCHC). Both entities produced reports for the Sheriff's Department that have been used to enhance policies and procedures to align with best practices and meet recommendations. The reports are available on the Sheriff's Department public website at www.sdsheriff.gov.

## III. RECOMMENDATIONS ⑤

### a. Intake Screening

*CSA Recommendation:*

*Revise its intake screening policy to require mental health professionals to perform its mental health evaluations. These evaluations should include a mental health acuity rating scale to better inform individuals' housing assignments and service needs while in custody. The Sheriff's Department should communicate the acuity rating as it assigns to individuals to all detentions staff overseeing them.*

The Sheriff's Department concurs with the auditor's assessment that Qualified Mental Health Providers (QMHP) are the more appropriate staff to conduct the mental health screening portion of the intake process. The Medical Services Division (MSD) received funding for additional staffing in July 2021 and is currently in the process of recruiting and hiring from a limited pool of candidates. Additional staffing will allow us to provide a comprehensive screening process utilizing the electronic health record, in accordance with National Commission for Correctional Health Care (NCCHC) standards. Some identified QMHP staffing duties would be to conduct the Behavioral Health (BH) screening, complete a risk/needs assessment, to include substance use disorder (SUD). The assessment would determine a behavioral health acuity rating, schedule psychiatric appointments, schedule follow up QMHP appointments, assess for the need of placement into our Inmate Safety Program (ISP) and obtain Release of Information authorizations. QMHPs and nursing staff working in collaboration at the initial intake assessment and throughout a patient's incarceration promotes a comprehensive whole person model of care.

Ongoing effective communication between medical staff and sworn staff is paramount in ensuring the safety and wellbeing of our patients. Our plan is to implement bidirectional communication with our Jail Information Management System to ensure sworn staff are aware of the mental health recommendations. All staff are responsible for the appropriate and timely care of our patients. Further analysis will need to be done to evaluate the impact this acuity rating system would have on our system of jail classification and housing needs.

*CSA Recommendation:*

*Create a policy requiring health staff to review and consider each individual's medical and mental health history from the county health system during the intake screening process.*

San Diego County does not have an interconnected health information exchange. Hospital centers and medical systems independently manage their data systems and may or may not voluntarily participate or contribute to a health information exchange. Our health staff currently have access to the following county databases:

i. **Health and Human Services Agency – Cerner Community Behavioral Health (CCBH)**

Cerner Community Behavioral Health is a behavioral health-specific electronic health record that specializes in the delivery of community mental health, inpatient mental health, outpatient mental health, substance use disorder and developmental disabilities care. Although there may be some patients who are not in the database and do not have data entered, we continue to review and enter data referencing our patient encounters while in our care.

As of April 2021, all QMHPs (mental health clinicians, psychologists, psychiatrists, psychiatric technicians) have "read" access to Cerner Community Behavioral Health (CCBH). QMHPs can review records at any point in the patient's stay. The planned integration of a QMHP into the intake process for behavioral health screening will fulfill this recommendation. In addition to having access to review community behavioral health records, the Sheriff's Detention Services Bureau contributes to this community database by recording and entering mental health care provided while the patient is in our custody as part of the county's continuum of care. The Sheriff's Medical Services Division intends to adhere to the NCCHC standards for the referral process.

ii. **Health and Human Services Agency – San Diego Immunization Registry**

The San Diego Immunization Registry (SDIR) is a County system that offers Sheriff's Department health staff the ability to verify a patient's vaccination status. SDIR is limited to vaccinations given in San Diego County. If a patient receives an immunization outside of San Diego County or opts to "lock" their record, health staff will not have the ability to verify vaccination status. Currently we have sufficient access to SDIR.

iii. **San Diego Health Connect**

San Diego Health Connect was originally designed to allow for medical information to be exchanged between community clinics. The database only covers medical (not mental

health/behavioral health issues) and each patient must consent to participate. Very few patients are registered in the system, and the system is undergoing restructuring.

### b. Medical & Mental Health Follow-Up

*CSA Recommendation:*

*Revise its policy to require that nurses schedule an individual for an appointment with a doctor if that individual has reported to the nurse for evaluation more than twice for the same complaint.*

The Sheriff's Department concurs with the auditors' assessment that a revision is necessary to address the process for medical/mental health referral after two requests. The Sheriff's Medical Services Division intends to implement a health care requests and services process in accordance with NCCHC standards. Patients will be referred to a provider to be evaluated. When a patient presents for health care services more than two times with the same complaint and has not seen a provider, they will receive an appointment to do so. Some mental health patients need assistance with advocating for their medical care. Regular follow-up and ongoing engagement with QMHPs is essential to identifying patients who face these challenges.

*CSA Recommendation:*

*Revise its policy to require that a nurse perform and document a face-to-face appraisal with an individual within 24 hours of receipt of a request for medical services to determine the urgency of that request. Revise its policy to require that a member of its health staff witness and sign the refusal form when an individual declines to accept necessary health care.*

The Sheriff's Department concurs a timely medical response to patient concerns is extremely important, and that repetitive patient refusals or an abject delay in follow-on scheduling of medical care are concerning issues and could potentially precipitate an adverse condition or event. We are committed to the health and well-being of our patients, and are developing safeguards to ensure a timely, efficient re-engagement of both medical and mental health services.

The Sheriff's Department is currently focused on a more nursing centric model. For health staff, we are in the process of embedding nursing staff at the ward level, assigning nursing staff to most housing units in support for the Primary Care nursing model. Nurses will be there to perform face-to-face assessments of their assigned patients (on the floors and during sick call)

and involved in counseling and advocacy efforts for every refusal. We have worked with our contracted medical providers to develop daily rounds in designated modules to address acute and ongoing assessments for specified patients. We continue to pursue accreditation from the NCCHC which requires a face-to-face assessment withing 24 hours of a medical request being filed (NCCHC Standards J-E-07).

*CSA Recommendation:*

*Revise its policy to require more frequent psychological follow up after release from the inmate safety program to at least monthly check-ins.*

The Sheriff's Department will reevaluate our policies on psychological follow-up. Our current Inmate Safety Program policy reflects the recommendations from Mr. Lindsey Hayes regarding our follow up protocol. Mr. Hayes is nationally recognized as an expert in the field of suicide prevention within custodial settings and has served as a Federal Court Monitor. While placement into any of our Inmate Safety Program specialized housing requires a mental health response and establishes a basis for continued follow-up; the Sheriff's Department's current planned expansion and hiring of additional mental health professionals will allow for more frequent encounters and the investment of time necessary for higher quality mental health care.

⑱ Mr. Hayes specifically states, "it is recommended that the follow-up schedule be simplified and revised as follows: follow-up within 24 hours, again within 72 hours, again within 1 week, and then periodically as determined by the clinician until release from custody." As a nationally recognized expert, SDSD has adhered to Mr. Hayes' recommendation.

**c. Safety Checks**

*CSA Recommendation:*

*Revise the safety check policy to include the requirement for staff to check that an individual is still alive without disrupting the individual's sleep.*

The Sheriff's Department will reevaluate current policy and incorporate best practices. SDSD is exploring technologies to assist with monitoring a "proof of life" for all incarcerated individuals with minimal sleep interruption through staff contact. The Sheriff's Department is evaluating industry capabilities, and in the process of developing a more robust facility Wi-Fi system

capable of supporting technological advancements in monitoring the welfare of our population. The Sheriff's Department's planned integration of Bodyworn Cameras (BWC) into the custodial setting will greatly assist in showing the point of view each deputy has during the safety checks.

*<u>CSA Recommendation</u>:*

*Develop and implement a policy requiring that designated supervising sworn staff conduct audits of at least two randomly selected safety checks from each prior shift. These audits should include a review of the applicable safety check logs and video footage to determine whether the safety checks were performed adequately. In addition, the policy should require higher-ranking sworn staff to conduct weekly and monthly audits of safety checks. The policy should also require each facility to maintain a record of the safety check audits that staff perform.*

Sheriff's Department line supervisors conduct electronic log reviews every shift. This review includes ensuring the timeliness of safety checks in accordance with established Policy & Procedures. The Sheriff's Department's current practice requires supervisors conduct video audits of random safety checks and will formalize this into policy.

**d. <u>Sworn Discovery of Medical Emergency</u>**

*<u>CSA Recommendation</u>:*

*Revise its policies to require that sworn staff members immediately start CPR without waiting for medical approval, as safety procedures allow.*

Sworn staff does not require approval from medical to start CPR. Current DSB P&P M.5 I.B. states, "When the severity of the medical emergency requires it, and as soon as it is safe to do so (unless death is obvious, such as decapitation, obvious rigor mortis, etc.), deputies acting as first responders will provide basic life support and first aid. Upon arrival, facility health staff will assess the severity of the inmate's injury/distress, provide first-aid, and may assist or take over cardiopulmonary resuscitation (CPR) responsibilities as directed and/or needed." This policy in its current form has been in effect since January 2012. (19)

The Sheriff's Detention Services Bureau In-Service Training Unit distributed a training bulletin on Signs of Medical Distress and Life-Threatening Emergencies on June 18, 2021. The purpose of the training bulletin was to familiarize staff with signs of death or near death and appropriate actions of sworn staff when observing such signs of medical distress. Per DSB Policy and

Procedure section M.6, "Any life-threatening medical emergency shall trigger a 911 request for a paramedic emergency response team. Sworn and health staff shall initiate emergency response and basic lifesaving measures until relieved by the paramedic emergency response team."

**e. <u>In-Custody Death Follow-Up</u>**

*<u>CSA Recommendation</u>:*

*Staff will provide a written report of each 30-day medical review to its management.*

The Sheriff's Department concurs with this recommendation.

*<u>CSA Recommendation</u>:*

*When warranted, the report should specify recommendations for changes to prevent future deaths.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case.

*<u>CSA Recommendation</u>:*

*The 30-day medical review should determine the appropriateness of clinical care; assess whether changes to policies, procedures, or practices are warranted; and to identify issued that require further study.*

The Sheriff's Department concurs with this as it relates to the perspective of the Chief Medical Officer or the Director of Mental Health's review of the case. There are other processes currently in place to look for policy, training, or accountability issues following critical incidents.

### f. Critical Incident Review Board

*CSA Recommendation:*

*Revise its policy to require that the Critical Incident Review Board review natural deaths.*

In July of 2021, the Division of Inspectional Services (DIS), Sheriff's Legal Affairs, and CIRB board members evaluated potential updates to policy and procedures section 4.23 – Department Committees and Review Boards. This assessment included reviewing in-custody deaths deemed natural by the Medical Examiner's Office, as the auditors recommend. This, along with other changes are anticipated to be in a pilot phase beginning February 2022. Historically, if a natural death is deemed to have potential issues of any nature it may be presented to CIRB at the discretion of the board members. Also, the Chief Medical Officer and appropriate medical staff conduct a mortality/morbidity review of each in-custody death for their determination of any changes that are needed related to medical care for incarcerated individuals.

*CSA Recommendation:*

*Require the Sheriff's Department to make public the facts it discusses and recommendations it decides upon in the Critical Incident Review Board meetings to establish a separate public process for reviewing deaths and making necessary changes.*

CIRB presentations allow the Sheriff's legal advisor and the various commands the ability to review critical incidents to identify issues that should be addressed in various areas, including, but not limited to, training, policies, procedures, staffing, and equipment. The confidential environment provided by the CIRB is essential to the free exchange of ideas, and concerns, in anticipation of future litigation because of a given incident, and in order to avoid future litigation through implementation of best practices. Effectiveness and thoroughness of presentations would likely be diminished if the attorney-client privilege is removed, or information is required to be disclosed during pending, or anticipated litigation. Much of the information presented in CIRBs is intended for individuals who have a vast familiarity and understanding of law enforcement or detention operations, department policies, and state and federal laws, and may contain confidential information including criminal history, medical history, and peace officer personnel records. ⑯

## g. Citizen's Law Enforcement Review Board Integration

*CSA Recommendation:*

*Revise its policy to include CLERB in its immediate death notification process.*

*Revise its policy to allow a CLERB investigator to be present at the initial death scene.*

The Sheriff's Department is currently evaluating a process to integrate the CLERB investigator into the initial notification and response to in-custody deaths, to include a scene walkthrough and incident brief.

*CSA Recommendation:*

*Revise its policy to encourage its staff to cooperate with CLERB's investigations, including participating in interviews with CLERB's investigators.*

The CLERB has subpoena powers for in person sworn staff interviews. In 2003, the CLERB discontinued issuing Sheriff's Department sworn staff interview subpoenas and opted for written responses due to Public Safety Officers Procedural Bill of Rights (POBAR) conflicts where ultimately the interviews did not benefit the CLERB's investigations. The CLERB continues to
⑳ have subpoena powers. This recommendation should be re-directed to the CLERB for its review to change its current practice and exercise its authority to issue subpoenas to Sheriff's sworn staff.

## IV. CONCLUSION

⑤

The Sheriff's Department takes seriously its responsibility to maintain a safe and healthy environment in the county jails.

The Sheriff's Department has welcomed and consistently made itself available for, and cooperated with, reviews by numerous entities including the Disability Rights California, Lindsay Hayes, the NCCHC, the San Diego County Grand Jury, and the Citizens Law Enforcement Review Board. We did the same with the California State Audit. After every review, the Department seriously considers every recommendation and implements those that are appropriate and possible, given existing laws, infrastructure, staffing limitations, and best practices. During the 15-year audit period the Department has taken numerous steps towards providing the best care for those detained in the jail system. To date, the following improvements have been made: ⑰

- Changing our pharmacy business processes
- Implementing a new electronic health record system
- The continuous review and updates to both Detentions Services and Medical Services policies and procedures.
- Increased medical service provider coverage
- Enhanced communication and collaboration between medical and sworn staff which includes the:
    - Implementation of a medical "scene manager" to ensure relevant communication during critical incidents
    - Issuance of facility communication equipment in the nursing stations to expedite response
    - Development of collaborative training between sworn and health staff related to health emergencies
- Developing and mandating an 8-hour suicide prevention training and a 2-hour refresher training
- Enhancing our suicide assessment and monitoring
- Enhancing the continuity of care for inmates removed from suicide precautions; and
- Enhancing the quality assurance process for intake screening related to suicide prevention

We recognize that we cannot rest on the things that we have done. As the Sheriff's Department shared with the auditors, the Department is pursuing accreditation by the National Commission on Correctional Health Care (NCCHC). The Sheriff's Department currently meets the standards established by the State of California, final accreditation by the NCCHC would add yet another layer of continuing, independent, external oversight. However, our goal is to

exceed all standards. We strive to provide a better than community standard in the medical and mental health care of incarcerated individuals.

The San Diego Sheriff's Department recognizes that comparisons will be made among counties in California. We regularly confer with other counties in the state and across the country to identify best practices. We remain focused on what we can improve and are committed to do so. It is with this attitude that the San Diego County Sheriff's Department will go forward in assessing the recommendations made by the auditor in the draft report.

Sincerely,

William D. Gore, Sheriff

# Comments

## CALIFORNIA STATE AUDITOR'S COMMENTS ON THE RESPONSE FROM THE SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

To provide clarity and perspective, we are commenting on the Sheriff Department's response to our audit. The numbers below correspond to the numbers we have placed in the margin of the Sheriff's Department's response. In certain areas of its response, we have summarized our comments according to the respective sections in its response rather than comment on all of the individual areas of its response that we believe are deficient or misleading.

We provided the Sheriff's Department five business days to review and provide a formal response to the draft audit report, which is our standard practice for all audited entities. As part of our audit process and in accordance with generally accepted government auditing standards, we also met with the staff of the Sheriff's Department, including the Sheriff and other executive management personnel, on numerous occasions during the audit to ensure they were fully briefed on our findings, conclusions, and recommendations. ①

We have redacted portions of the Sheriff's Department's response containing information that is deliberative in nature or reflects confidential discussions not used in support of the audit report. Additionally, some of the redacted text contains excerpts from the draft report. In accordance with Government Code sections 6254, 8545, and 8545.1, it was necessary for us to make these redactions to protect our confidential work and because the improper disclosure of draft audit documents is a misdemeanor. ②

The Sheriff's Department states that the highly redacted version of the draft report made it difficult for it to submit a meaningful, comprehensive response. On the contrary, the report that we provided contained all findings, conclusions, and recommendations pertaining to the Sheriff's Department—all of which we had previously shared with its management on numerous occasions. The sections we redacted pertained to other audited entities, such as CLERB, which were not relevant for the Sheriff's Department's response. Further, because state law makes it a crime to improperly disclose ongoing audit information, when the California State Auditor's Office sends draft sections of an audit report to an audited agency for its comment, we redact from the draft those provisions that concern the other agencies being audited. Moreover, the Sheriff's Department misunderstands the purpose of an audit report, which is to summarize the results of our audit work that the Audit Committee directed us to perform. Our working ③

papers contain the documentation and analyses that support the findings, conclusions, and recommendations in the audit report. Additionally, Government Code section 8545, prohibits the public release of any work papers pertaining to an audit that has not yet been completed. Until the audit report is published, we are required to hold any supporting work papers in strict confidence.

④ Although we concluded that the Sheriff's Department's policies generally align with BSCC standards, we found significant deficiencies that we discuss throughout the report. Moreover, as we state on page 32, BSCC designs the standards to be a minimum that all counties can achieve, regardless of variation in resources at the local level. However, we found that BSCC's approach enables counties that house large numbers of incarcerated individuals to provide lower levels of care. Therefore, to improve the level of care in local detention facilities, we made recommendations to address weaknesses in the Sheriff's Department's policies and procedures as well as in BSCC's standards.

⑤ The Sheriff's Department's concerns related to our findings and conclusions contradicts its agreement with our recommendations. Under generally accepted government auditing standards, which we are required to follow, the findings and conclusions of an audit form the basis for recommendations.

⑥ The Sheriff's Department incorrectly states that we do not comply with audit standards, which it asserts on pages 85 through 96. We conducted this audit in accordance with generally accepted government auditing standards, which we are required to follow, and the California State Auditor's thorough quality control process. In following audit standards, we are required to obtain sufficient and appropriate audit evidence to support our conclusions and recommendations. As with all of our audits, we engaged in extensive research and analysis for this audit to ensure that our report presented a thorough and accurate representation of the facts, and included all relevant information. We stand by the statements in our report, which are based on sufficient and appropriate evidence. Further, as with all of our audits, our public report includes the required statement indicating that we performed this audit in compliance with audit standards.

Moreover, as part of our adherence to audit standards, our staff possess the collective knowledge, skills, and abilities to conduct performance audits, including those of local law enforcement entities.

⑦ The Sheriff's Department's comments questioning the accuracy of our report are unfounded. As we state on page 13, the high rate of deaths in San Diego County's jails compared to other

counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. Throughout Chapter 1 we provide numerous examples of deficiencies in the department's policies and procedures that likely contributed to the deaths of some incarcerated individuals and how these policies and procedures do not align with certain best practices used by comparable counties and other entities. Specifically, in the examples on pages 21 through 24, we describe how the Sheriff's Department did not consistently follow up with individuals who needed medical and mental health services, and that lack of attention may have contributed to their deaths. Finally, although the Sheriff's Department indicates that our audit does little to document or provide context of its efforts to respond to deaths, we describe on page 39 the improvements the Sheriff's Department has made. Because we found that weaknesses continue to exist in the Sheriff's Department's policies and procedures, we made recommendations to address those weaknesses.

Because the Sheriff's Department's response included specific details about an in-custody death, such as the case number and a more detailed description of the incident, we redacted this text because it contained confidential information and to protect the privacy of the individuals involved. We clarified our report to make it clear that our concern in this case is related to timeliness of its response to the emergency and not the issue of who provided CPR. ⑧

The Sheriff's Department incorrectly states that it was not given information about the Alameda Sheriff's Office, the Orange Sheriff's Department, and the Riverside Sheriff's Department. The draft report that we sent to the San Diego Sheriff's Department contained primarily publicly available information for these counties to provide context for the Sheriff's Department's findings. ⑨

When multiple entities are examined in an audit, the California State Auditor's Office is required under state law to maintain confidentiality with each of those entities. Maintaining confidentiality among multiple subjects of an audit is essential to ensuring the integrity and quality of the evidence upon which the audit's conclusions are based. Moreover, based on its misunderstanding of state law, the Sheriff's Department wrongly asserts that our office was required to provide it with supporting documentation pertaining to other auditees because they are public records. Government Code section 8545 prohibits the public release of any work papers or documents pertaining to an audit that has not yet been completed. Until the audit report is published, any supporting documents are held in strict confidence. ⑩

⑪ The Sheriff's Department's concern regarding which version of policies and procedures we based our findings on is unfounded. Our analysis included identifying the policies applicable at the time of the incident we reviewed and determining whether they were subsequently updated to address our concerns. For example, as we state on page 23, we identified a weak policy for mental health services that contributed to an individual's death by suicide and determined that the Sheriff's Department subsequent revision to that policy did not fully address our concerns.

⑫ The Sheriff's Department's approach does not allow for a fair comparison between counties. In Table A.2 on page 60, we present the rate of in-custody deaths based on the relative size of 15 counties. We believe that this objective presentation allows a reader of the report to compare the counties in a more meaningful way. Nevertheless, in both presentations, the Sheriff's Department is among the highest in number and rate of deaths in its jails.

⑬ Table 1, Table 2, and Table 3 on pages 98 to 100 were created by the Sheriff's Department and are not part of our report. We do not attest to the accuracy of the information the Sheriff's Department presents.

⑭ We stand by our selection of the comparable counties referenced in our audit. As we state in the Scope and Methodology on page 62, we selected these counties considering relative size, geographical location, and other factors. We also used professional judgement in selecting a large county in a different region to obtain broad perspective. Our selection of counties satisfied the audit objectives and resulted in sufficient and appropriate evidence to support our findings, conclusions, and recommendations.

⑮ We stand by our conclusion that the Sheriff's Department's reviews of in-custody deaths are insufficient. As we state on page 34, the Sheriff's Department did not sufficiently document the results or recommendations from its 30-day medical reviews. For 22 of the 30 cases we reviewed, the Sheriff's Department was unable to provide us with documentation from these reviews that detailed any findings or conclusions about the clinical care given, identified whether any concerns required further study, or stated whether changes to policies, procedures, or practices are warranted. We believe that if the Sheriff's Department properly documented the 30-day medical reviews, it could better identify and track instances when it did not provide sufficient medical and mental health follow-up care before an individual's death, such as those we discuss in Chapter 1.

Further, as we discuss on page 38, the Sheriff's Department does not complete internal affairs investigations related to in-custody deaths frequently enough for it to provide significant value. The small number of these investigations related to deaths—coupled with the lack of meaningful changes arising from the Critical Incident Review Board meeting and the 30-day medical review—calls into question the Sheriff's Department's commitment to protecting individuals in its custody.

The Sheriff's Department mischaracterizes our point about its Critical Incident Review Board. To clarify, as we state on page 36, the stated purpose of the board is to consult with the department's legal counsel when an incident occurs that may give rise to litigation. Therefore, it appears that its primary focus is protecting the Sheriff's Department against potential litigation rather than focusing on improving the health and welfare of incarcerated individuals. ⑯

Further, after the board meets to discuss in-custody deaths, it has not always taken meaningful action to prevent deaths, even when it identifies problems with its policies and practices. Specifically, as we state on page 36, even though the board discussed critical issues in some meetings, it did not always make recommendations for addressing these issues.

Moreover, as we discuss on page 37, although we do not disagree with having a confidential forum to discuss potential litigation matters, we are concerned that the Sheriff's Department does not have a separate public process to demonstrate that it is addressing deficiencies in its policies, procedures, and practices after in-custody deaths occur. By keeping its findings and recommendations confidential, the department risks conveying to the public that it is not taking these deaths seriously, investigating them thoroughly, or acting to prevent future incidents. Further, the Sheriff's Department is disingenuous in its response that it provides all changes to policies, procedures, training, or education on its website. The policies posted on its website do not communicate changes it made in response to in-custody deaths. Having its policies available online in their entirety without specifically identifying those changes that it made in response to in-custody deaths is not transparent in this respect.

Even though the Sheriff's Department was reviewed by external entities, we found it has failed to implement key recommendations from external entities, including recommendations from the San Diego County Grand Jury, CLERB, Disability Rights California, and a suicide prevention consultant, as we describe on page 38. Some of the recommendations that the Sheriff's Department failed to implement are related to weaknesses in its policies and ⑰

procedures that we identify in this report. Accordingly, we are concerned about whether the Sheriff's Department will make meaningful changes to address these systemic weaknesses.

⑱ The timeframes that the Sheriff's Department refers to are unrelated to our recommendation. Our recommendation is for the Sheriff's Department to update the minimum ongoing follow-up in its policy from 90 days to at least monthly. As we state on page 22, reports and studies related to mental health indicate that more frequent psychological follow-up, such as check-ins performed weekly to rather than every 90 days, leads to faster recovery and is more effective for individuals with mental health needs.

⑲ Although the Sheriff's Department asserts that its current policy appropriately addresses safety concerns regarding sworn staff administering CPR to incarcerated individuals, we had concerns with this policy during our audit. As we state on page 27, in some instances, sworn staff did not perform lifesaving measures because they thought the individual was dead. However, when department medical staff arrived minutes later, they immediately began lifesaving measures on the individual, including CPR. This fact calls into question the ability of sworn staff to assess whether unresponsive individuals might benefit from such potentially lifesaving measures.

⑳ We explain on pages 42 through 45 our concerns with CLERB not directly interviewing sworn staff. Our recommendation to the Sheriff's Department to encourage its staff to cooperate with CLERB's investigations aligns with our recommendation on page 57 to CLERB.

# EXHIBIT 47

# SUICIDES IN SAN DIEGO COUNTY JAIL
## A System Failing People with Mental Illness

Disability Rights California
*California's protection & advocacy system*



April 2018
A Disability Rights California Investigation Report

**Report prepared by:**
Aaron J. Fischer, Litigation Counsel
Rebecca Cervenak, Staff Attorney
Kim Swain, Managing Attorney

With special thanks to: Hayley Jones, DRC Legal Secretary

**DRC Subject Matter Experts**
Karen Higgins, M.D. Robert Canning, Ph.D., CCHP

An accessible electronic version of this report is available at: http://www.disabilityrightsca.org/JailsReports/SDsuicideReportAccessible.pdf

A print copy of this report is available at: http://www.disabilityrightsca.org/JailsReports/SDsuicideReport.pdf

For more information about Disability Rights California, visit our website at: www.disabilityrightsca.org

Cover Photo: Mental Health Enhanced Observation Housing (EOH) Unit at the Las Colinas Detention and Reentry Facility

# TABLE OF CONTENTS


I. EXECUTIVE SUMMARY .......... 4

II. A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS .......... 6

A. Inmate Suicides: A Crisis by Any Measure .......... 6

B. Repeated Calls for Action .......... 9

III. SCOPE OF DRC INVESTIGATION AND EXPERTS .......... 10

A. DRC Investigation Process .......... 10

B. Expert Analysis on San Diego Jails' Suicide Crisis .......... 10

IV. DRC FINDINGS AND RECOMMENDATIONS .......... 12

A. San Diego County Should End Its Over-Incarceration of People with Mental Illness and Improve Its System of Community-Based Mental Health Services. .......... 12

B. San Diego County Should Address Systemic Deficiencies Illustrated by the High Rate of Inmate Suicides. .......... 15

1. Screening for Suicide Risk and Related Mental Health Needs .......... 15
2. Clinical Assessment and Intervention .......... 16
3. Staff Communication .......... 16
4. Addressing the Heightened Risks of Restrictive Housing .......... 17
5. Supervision of At-Risk Inmates .......... 18
6. Timely Emergency Response .......... 19
7. Suicide Prevention Training .......... 19
8. Internal Review of Inmate Suicides .......... 19
9. Quality Improvement Program .......... 20

C. San Diego County Should Provide Adequate Treatment and Services to Inmates with Mental Health Needs. .......... 20

1. Overview of San Diego County's Jail Mental Health System .......... 21
2. Safety Cells .......... 22
3. Psychiatric Security Units (PSU) .......... 23
4. Enhanced Observation Housing (EOH) Units .......... 25
5. Lack of Mental Health Treatment Programs .......... 26
6. Undue and Excessive Solitary Confinement .......... 28

D. San Diego County Should Establish Meaningful Independent Oversight of Jail Conditions and Treatment of Inmates. .......... 31

V. SUMMARY OF RECOMMENDATIONS .......... 34

ENDNOTES .......... 37

DRC Experts' Report on Suicides at San Diego County Jail .......... Appendix A

-Karen Higgins, M.D., Robert Canning, Ph.D., CCHP

# I. EXECUTIVE SUMMARY

San Diego County faces a crisis in its jail system. It has the highest reported number of suicides in a California jail system over several years – more than 30 suicide deaths since 2010. The inmate suicide rate has been many times higher than the rate in similarly sized county jails in California, the State prison system, and jails nationally. This is a crisis demanding meaningful action.

While the County reported just one inmate suicide in 2017, which is a welcome decrease compared to previous years, the system remains deeply challenged. The incidence of inmate suicide attempts and serious self-harm remains extremely high - a rate of approximately two (2) per week. The frequency of suicide attempts indicates that the County must improve its treatment of people with mental health needs.

Recognition that San Diego County has a problem with suicides and other deaths at the jail is not new. There has been a steady drumbeat of calls to action, from the County's grand juries, the media, and people who have been incarcerated at the jail and their loved ones.

As the designated protection and advocacy system charged with protecting the rights of people with disabilities in California, Disability Rights California (DRC) opened an investigation into conditions at the San Diego County jails in 2015. We conducted tours of the County's jail facilities, and completed extensive interviews with Sheriff's Department leadership, jail staff, and jail inmates. We have reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Our investigation focuses on four interconnected aspects of San Diego's County jail and mental health systems. We provide specific Recommendations regarding each.

**Over-Incarceration of People with Mental Health Needs.** First, we found that there is an extremely high number of jail inmates with significant mental health treatment needs. The County's mental health care system, both inside and outside of the jail, has long operated in a way that leads to the dangerous, costly, and counter-productive over-incarceration of people with mental health-related disabilities. This includes a historical failure to provide sufficient community-based mental health services and supports that help individuals with mental health needs to thrive and avoid entanglement with the criminal justice system and incarceration. There is an urgent need for a better approach. We found that the County's recently developed Mental Health Services Act Plan and related initiatives – including increased community based-services and diversion/reentry efforts – provide a reason for optimism. Of course, the County's efforts will be

judged on outcomes in the months and years ahead.

**Deficiencies in Suicide Prevention.** Second, our two subject matter experts, who reviewed inmate suicide cases as well as relevant policies, identified significant deficiencies in the County's suicide prevention practices. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP, have considerable expertise in suicide prevention and mental health treatment in detention facilities. They have completed a detailed written report (Appendix A), which identifies twenty-four Key Deficiencies in the County's system and provides forty-six (46) Recommendations to address those deficiencies. While we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously, there remain many aspects of the system's treatment of people at risk of suicide that require urgent action.

**Failure to Provide Adequate Mental Health Treatment.** Third, we found that the County's jail system subjects inmates with mental health needs to a grave risk of psychological and other harms by failing to provide adequate mental health treatment. Making matters worse, the County subjects inmates to dangerous solitary confinement conditions that take an enormous toll on individuals' mental health and well-being. A substantial number of the suicides in San Diego County's jails have occurred in designated segregation units and other units with solitary confinement conditions. Even with committed jail leadership and staff efforts to reduce solitary confinement and improve conditions, insufficient staffing and lack of other critical resources have caused these problems to persist.

**Lack of Meaningful, Independent Oversight.** Fourth, we found that the existing systems of jail oversight have failed. The time has come for the County to create an independent and professional oversight entity to monitor jail conditions, suicide prevention and mental health treatment practices, and other jail operations. A truly effective independent oversight entity, building on the models developed in Los Angeles County, Santa Clara County, Sonoma County, and other jurisdictions across the country, would enhance the County's efforts to address its historical challenges in its jails, help to achieve and solidify system improvements, and strengthen the trust of the community through greater transparency.

We have found that the County's jails have the great advantage of committed mental health staff and a number of strong leaders within the Sheriff's Department. They will need sustained investment and support from the County – along with true transparency and accountability – to achieve a durable solution to the inmate suicide crisis, the deficiencies in mental health treatment inside the jail, and the over-incarceration of people with mental health needs.

# II. A TROUBLED HISTORY OF SUICIDES IN THE COUNTY JAILS

## A. Inmate Suicides: A Crisis by Any Measure

San Diego County Jail has had one of the highest incidences of suicides in a California county jail system over several years – more than 30 suicide deaths since 2010.[1] By any measure, the number of suicide deaths in San Diego County's jails over a period of many years indicates a crisis demanding meaningful action.

DRC investigated inmate suicides during the three-year period from 2014 to 2016. Seventeen (17) people died by suicide in a San Diego County Jail facility during this time period. Among those deaths:

- Fourteen (14) people (82.3%) had a clear history and indication of mental health needs. Several had attempted suicide in the past, sometimes while in the community and often during earlier periods of incarceration.
- Nine (9) people (52.9%) were in jail on non-violent charges, including several cases involving only drug-related offenses.
- Fifteen (15) people (88.2%) were in jail awaiting trial. (One other was in jail for a brief "flash incarceration" related to a probation violation.) These individuals were not in jail because of a criminal conviction at the time of their death. They maintained the presumption of innocence embedded in our laws.
- At least six (6) people (35.3%) were housed in designated solitary confinement housing at the time of their suicide. Several more were in units that we observed to have solitary confinement conditions.
- At least four (4) people (23.5%) had one or more serious medical conditions at the time of their suicide death.
- San Diego County's inmate suicide rate has been staggeringly high compared with national, statewide, and local data. In 2016, the County's jail inmate suicide rate was approximately 93.8 per 100,000, similar to the rates for 2015 and 2014 (120.3 and 106.2 per 100,000, respectively).[2] The average annual inmate suicide rate for San Diego County during this three-year period (107 per 100,000) is more than double the jail inmate suicide rate nationally for 2014 (50 per 100,000), the last year for which complete data is available.[3]




From 2014 to 2016,

the seventeen (17) inmate suicide deaths in San Diego County far outpaced other large California county jail systems. For example, the Orange County Jail system had one suicide and the Riverside and Sacramento County Jail systems each had three (3) suicides during this three-year period.[4]

Even the Los Angeles County Jail system, which has an inmate population more than three (3) times larger than the San Diego County Jail population and a history of significant problems related to inadequate suicide prevention and treatment of people with mental health needs, had eight (8) suicide deaths during this three-year period, less than half as many as San Diego County.[5]

San Diego County's jail inmate suicide rate has also vastly exceeded (by a factor of 5) the annual inmate suicide rate in California's State prison system (21.8 per 100,000 from 2013 to 2016).[6] While local jails generally have higher inmate suicide rates than state prisons, we note that California's prison system has itself been under federal court supervision based in part on the prevalence of inmate suicides.

Detention in San Diego County Jail facilities appears to increase the risk of suicide significantly for San Diego County residents. The jail system's inmate suicide rate has been nearly eight (8) times higher than the overall suicide rate for San Diego County (13.1 out of 100,000).[7]

As of this writing, San Diego County has reported one jail inmate suicide during 2017. Another inmate suicide reportedly occurred in March 2018. While this is a decrease in the number of suicide deaths compared to previous years, it does not establish that the County has achieved an enduring solution. Suicide rates are most meaningful when viewed over a sustained period of time. Although the number of inmate suicides in a given year is no doubt an important indicator as to the adequacy of a system's policies and practices, it is not the sole barometer by which a system's adequacy should be measured.

There are additional reasons for caution with respect to the reported decrease in inmate suicides. First, the County has had other periods with few or no suicides, only to see a return to previous levels. For example, a seven-and-one-half month period without a San Diego jail inmate suicide death (January 2015 - August 2015) was followed



by a spate of suicide deaths in late 2015 and into 2016.Second, our investigation revealed that there continue to be a significant number of inmate suicide attempts and serious acts of self-harm. We reviewed 73 San Diego County Sheriff's Department incident reports that document distinct "Suicide Attempts" which occurred between the beginning of January 2017 and September 11, 2017. Many of these incidents were very serious and required emergency medical care. They include dozens of attempted hangings and self-strangulations, many jumps off the top tiers of jail housing units, and attempted overdoses. Such incidents occurred at a rate of approximately two (2) per week, which is consistent with the rate of "suicide attempts" reported for previous years – 107 in 2016, and 82 in 2015.

The County has stated to DRC that it began utilizing new definitions for "Suicide Attempt" and "Non-Suicidal Self Injury" in 2017. Under these definitions, the County determined that just 10 of the 73 incidents reported as "Suicide Attempts" were in fact suicide attempts under the new definition.

However such incidents are categorized, the continued frequency of inmate suicide attempts and serious acts of self-harm indicates that the treatment of people with mental health needs requires significant improvement.

## Suicide Rate Calculations

In examining suicide rates, DRC follows the methodology for calculating annual mortality rates, per 100,000 inmates, which is used by the United States Department of Justice. Experts in the field have found that this methodology is useful and "enhances our understanding of the jail suicide problem."[8]

The County has suggested an alternative method of calculating inmate suicide rate, which considers the estimated "racial distribution" of the inmate population in San Diego County's jails and in other county jail systems. The basis for this methodology is that San Diego County has an uncommonly high percentage of white inmates, who are statistically at higher risk of suicide compared to African American and Latino inmates.

The fact that San Diego County may have a higher-than-average number of inmates at elevated risk of suicide only *adds* urgency to the need for action. As Raymond F. Patterson, M.D., a national expert in forensic psychiatry and correctional suicide prevention, has written:

> "If [a detention system] do[es] in fact house groups of persons who tend to have higher rates of suicide, [the system] is therefore on notice of this elevated suicide risk factor and has a duty to address that risk in its suicide prevention efforts. Awareness of a higher propensity to suicide among certain groups requires greater vigilance on the part of [the system], not a reason for acquiescence."[9]

Whatever the methodology for evaluating suicide rates, the number of suicides in San Diego County's jails in recent years is a cause for extreme concern.

## B. Repeated Calls for Action

Local advocates and media have called attention to the dangerous conditions and large number of suicides and other deaths in San Diego County Jail facilities. There is an extensive public record documenting the tragic loss of lives, systemic failures, and inadequacy of oversight.[10] Families of those who have died have filed lawsuits alleging that the County and jail staff acted with deliberate indifference to inmates' serious mental health, medical, and related needs.[11]

Under the leadership of Dr. Alfred Joshua, the chief medical officer, the Sheriff's Department implemented a new Inmate Safety Program in 2015. This program included a number of changes to policy and training, and created new "Enhanced Observation Housing" (EOH) units for individuals meeting criteria indicating possible suicide risk. In spite of these efforts, the number of suicides remained high through 2016. (As discussed in Section IV.C.4, we have serious concerns regarding the harsh conditions and lack of mental health treatment in the EOH units.)

In Spring 2017, a San Diego Grand Jury issued a report regarding the alarmingly high inmate suicide rate. The Grand Jury found that "46 people have committed suicide in San Diego County jails in the past 12 years," noting that the County's inmate suicide rate is "the highest in all of California's large county jail systems."[12]

The Grand Jury recognized a number of steps the Sheriff's Department has taken in response to the inmate suicide crisis, including the addition of EOH units, Safety Cells (which, as we discuss later, are essentially small, empty padded rooms), and medical isolation cells, with related updates to policies and procedures.[13]

At the same time, the Grand Jury found that the Sheriff's Department continues to have inadequate suicide prevention training for jail staff, problematic gaps in personnel, and deficiencies in oversight. The Grand Jury concluded that "increased efforts in suicide prevention are required."[14]

On June 29, 2017, Sheriff Gore filed a Response to the Grand Jury's report. He promised a comprehensive suicide prevention policy, additional suicide prevention training, and formation of a Suicide Prevention Response & Improvement Team (SPRIT) to update policies and oversee staff training.[15]

Through our investigation, we are convinced that the Sheriff's Department has begun to take the issue of suicide prevention seriously. However, there remain many aspects of the system's treatment of people who have mental health needs, or who are at risk of suicide, that require urgent action. Individuals with mental health needs continue to suffer in San Diego County's jails, and remain at extraordinary risk of harm.

# III. SCOPE OF DRC INVESTIGATION AND EXPERTS

## A. DRC Investigation Process

Disability Rights California (DRC) is the state's designated protection and advocacy system, charged with protecting the rights of people with disabilities in California.[16] DRC has the legal authority to inspect and monitor conditions in any facility that holds people with disabilities.[17]

Pursuant to this authority, DRC opened its investigation into San Diego County Jail based on reports from advocacy groups and community members, individuals with disabilities who have been incarcerated in the County's jails, as well as public and media reports regarding conditions in the County's jail system.

DRC toured four San Diego County Jail facilities that contain units designated for inmates with mental illness: (1) Central Jail, (2) George F. Bailey Detention Facility, (3) Vista Detention Facility, and (4) Las Colinas Detention and Reentry Facility. We toured facilities on May 5 and 6, 2015 and returned for follow-up inspections on November 2 and 3, 2016. We viewed areas accessible to inmates, including the booking/intake area, holding cells, sobering cells, safety cells, health care treatment areas, recreational and program areas, visitation areas, and housing units. During the tour, staff provided information and answered questions about the facilities and programs. We spoke with scores of inmates in the housing units, either at cell-front or face-to-face in common areas. We also conducted confidential interviews with numerous inmates throughout our investigation.

DRC reviewed publicly available documents and obtained records from the Sheriff's Department through California Public Records Act requests, DRC's access authority[18], and signed releases from inmates. We reviewed thousands of pages of relevant policies and procedures, Sheriff's Department records, and individual inmate records.

Based on our initial inspection of the facilities, and pursuant to our protection and advocacy system authority, we found probable cause to conclude that prisoners with disabilities are subjected to abuse and/or neglect in the San Diego County Jail.[19] We continued our investigation, leading to this report.

## B. Expert Analysis on San Diego Jails' Suicide Crisis

While the recent investigation efforts of the Grand Jury and other entities have been admirable and provide important recommendations, we determined that the County's inmate suicide crisis and related issues with inadequate mental health treatment warranted an independent, in-depth expert assessment.

DRC retained two subject matter experts to review inmate suicide cases going back to 2014 as well as relevant policies and procedures. These experts, Karen Higgins, M.D., and Robert Canning, Ph.D., CCHP ("DRC Experts"), have considerable experience and expertise in mental health treatment and suicide prevention in detention facilities.

Dr. Higgins served as the lead psychiatrist for the Denver City and County Jail system. She has also served as the statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). She has played leading roles in the development of policies related to correctional mental health care and suicide prevention.

Dr. Canning served as CDCR's statewide Suicide Prevention Coordinator for more than a decade, chairing the statewide suicide prevention committee, designing mental health and suicide prevention trainings, leading suicide prevention policy reforms, and building CDCR's quality improvement systems.

Dr. Higgins and Dr. Canning offer an important and independent perspective on San Diego County Jail's system. Their report (Appendix A) identifies twenty- four (24) Key Deficiencies and provides forty-six (46) Recommendations to address those deficiencies. See Section IV.B, below.

Dr. Higgins and Dr. Canning also completed two detailed reports on recent individual inmate suicides. These two reports, provided confidentially to the County, offer a model structure for the County to use to strengthen its own internal critical incident and suicide review processes for the future.

# IV. DRC FINDINGS AND RECOMMENDATIONS

## A. San Diego County Should End Its Over-Incarceration of People with Mental Illness and Improve Its System of Community-Based Mental Health Services.

As is the case in many counties, the jail facilities in San Diego County were not designed to provide adequate treatment to inmates with mental health needs.[20]

Yet, San Diego County incarcerates an enormous number of people with mental illness. The Sheriff's Department has reported that approximately 40% of the jail population has a mental illness.[21] That means there are some 2,000 people with mental illness in the County's jails at any one time, many of whom have very significant treatment needs.

The disproportionately high number inmates with mental health needs is of a problem that begins outside the jail system. Far too many people with serious mental health needs are ending up in San Diego County's jails. The County's recent planning and funding priorities for mental health services appear to take this challenge head-on, after years of lack of attention and investment. Of course, the County's efforts will be judged on outcomes.

By providing appropriate mental health services and taking proactive steps to keep people with mental health needs out of jail, communities can lower incarceration and recidivism rates and improve people's lives. When effective, such efforts are good for families, constitute smart utilization of public monies, and in fact enhance public safety.

*DRC emphasizes three strategies for counties to end the* dangerous, *costly, and counter-productive over- incarceration of individuals with mental health needs:*

1. *Ensure a robust community mental health system that supports people with mental illness in ways that keep them out of the criminal justice system in the first place.*
2. *Divert individuals with mental illness who come into contact with law enforcement away from jail and into appropriate placements with services.*
3. *Help individuals with mental illness safely and successfully reenter their communities after being incarcerated, with effective continuity-of-care and services to assist with housing, food, and other basic needs.*

In 2017, the County created a jail-based mental competency *restoration* program at the Central Jail, to provide restoration of competency services to inmates with pending criminal charges who are found "Incompetent to Stand Trial" (IST). The new program is a response to the lack of available beds in the state hospital system and resulting delays in providing court-ordered treatment to the IST population.

The County has not, however, taken similar steps to create capacity for a community-based restoration of competency program. Jail-based programs are compromised by their non-therapeutic carceral setting, and can themselves be dangerous places.[22] In contrast, community-based programs offer a cost- efficient, effective means of restoring IST patients to competency, while reducing unnecessary incarceration and improving mental health outcomes.[23]

Historically, San Diego County's efforts with respect to community-based mental health services have fallen short. The County failed to invest available state funding for mental health services, including over $100 million of Mental Health Services Act (MHSA) funding in 2017, with an additional $42 million in reserves.[24]

In June 2016, a Grand Jury documented the County's under-utilization of MHSA monies. The Grand Jury recommended that the County "appropriate a larger percentage of MHSA funds each year in order to improve services to a larger number of seriously mentally ill and at-risk county residents."[25]

The last few months have shown some reason for optimism, with the County taking steps to substantially increase investment. In October 2017, the County approved its Mental Health Services Act Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20 ("San Diego MHSA Plan").[26] This plan would represent a major investment, nearly $570 million, in community- based mental health services and housing.[27] It includes over $33 million for mental health programs targeted to help youth and adults entangled in the criminal justice system.[28] The plan marks an important step toward addressing the overrepresentation of people with mental health needs in the criminal justice system and subjected to incarceration.

The San Diego MHSA Plan provides for increased outreach to people with mental health needs in jail and links to community-based services, including Full Service Partnership (FSP)[29] and Assertive Community Treatment (ACT)[30] programs, mental health and substance abuse treatment, health care, and housing. Additional programs are aimed at diversion from jail, reducing recidivism, and court-sponsored alternatives to incarceration. Examples include the Collaborative Behavioral Health Court and ACT program, the Psychiatric Emergency Response Team (PERT), the Serial Inebriate Program (SIP), and Courage to Call, a veteran peer support program.[31]

The County appears to be exploring other programs to decrease the number of people with mental health needs in jail. In July 2017, the Board funded an alternative custody and community transition pilot program designed for people with mental health needs and co-occurring substance abuse disorders incarcerated for non-violent misdemeanor offenses. The program is designed to link participants with community-based mental

health treatment and reentry services, with the goal of reducing recidivism. The pilot program is funded to serve 24 individuals at a time.[32]

The County's plans also recognize the importance of better data collection and outcome-based program evaluation. For example, the County recently passed a resolution supporting *Stepping Up: A National Initiative to Reduce the Number of People with Mental Illness in Jails,* which encourages development of a data-driven plan to achieve reductions in the number of people with mental illness in jail.[33]

Implementation of the *Stepping Up* Initiative and programs included in the MHSA Plan remain in the early stages, and should move forward expeditiously. These efforts will require sustained funding in the months and years to come, adequate transparency, and self-critical analysis of progress and of where additional resources may be needed.

## RECOMMENDATIONS

### Ending Over-Incarceration of People with Mental Illness and Strengthening Community-Based Mental Health Services

**Recommendation 1.** Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.** Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.** Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.** Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities, housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.** Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

## B. San Diego County Should Address Systemic Deficiencies Illustrated by the High Rate of Inmate Suicides.

The DRC Experts, Dr. Higgins and Dr. Canning, reviewed jail policies as well as individual records for all suicides that occurred between December 2014 and the end of 2016. They identified twenty-four (24) "Key Deficiencies" in San Diego County Jail's system, covering nine (9) components of an effective correctional suicide prevention program. They provide forty-six (46) Recommendations to improve the County's suicide prevention and related mental health treatment delivery efforts. Their full Report is attached as Appendix A.

The DRC Experts found that San Diego County must improve its Jail Suicide Prevention efforts in nine (9) areas:

1. Screening for Suicide Risk and Related Mental Health Needs
2. Clinical Assessment and Intervention
3. Staff Communication
4. Addressing the Heightened Risks of Restrictive Housing
5. Supervision of At-Risk Inmates
6. Timely Emergency Response
7. Suicide Prevention Training
8. Internal Review of Inmate Suicides
9. Quality Improvement Program

The DRC Experts commended the County for some of its recent efforts to revamp its mental health and suicide prevention policies and practices. They have encouraged the County to continue to strengthen those efforts, while taking steps to address the identified Key Deficiencies, summarized here.

### 1. Screening for Suicide Risk and Related Mental Health Needs

Screening for suicide risk and related mental health needs is a critically important part of any suicide prevention program. Effective screening to determine if a person might be at risk of suicide is essential at the time of jail booking, as the initial period of detention carries heightened risk of suicide. Screening is also necessary at particular high-risk moments during a person's incarceration.

The DRC Experts identified problems with the County's suicide risk screening procedures at booking, at key transition events that carry elevated risk (e.g., placement in solitary confinement), and at other high-stress, high-risk moments (e.g., inmates receiving "bad news" about their criminal court case, moving to prison, or being extradited).




In one tragic and illustrative case reviewed by the DRC experts, an inmate arrived at the jail with symptoms of florid psychosis and mania. He was not referred for admission to the Psychiatric Security Unit. He was instead placed in an Administrative Segregation unit. He died by suicide a few days later without receiving an adequate screening for suicide risk.

## 2. Clinical Assessment and Intervention

Jails must effectively identify and monitor inmates' mental health needs and timely provide clinically indicated treatment, both in the event of an acute psychiatric episode and on an ongoing basis.

The DRC Experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.

The experts also found that San Diego County Jail inmates do not receive an adequate individualized mental health treatment plan, a violation of state law[34], and do not have access to care that can prevent decompensation and reduce the risk of suicidal thinking and behavior.

## 3. Staff Communication

Communication between and among custodial staff and health care professionals working in the jail is another important aspect of suicide prevention. The DRC Experts found that San Diego County has lacked an effective system for custodial staff, mental health staff, and other health care staff to communicate about an inmate's decompensating condition, potential risk of suicide or self-harm, and mental health treatment needs.

In one case, a man died by suicide the day before his transfer to another state to face criminal charges. The DRC Experts found that custody staff knew he had made a credible suicide attempt a few weeks earlier, and that he was experiencing considerable stress about being extradited. Yet the inmate's treatment record did not reflect any sense of heightened risk requiring closer observation, monitoring, and clinical follow-up. The DRC Experts determined that this suicide death may have been preventable had there been better communication among custody and mental health staff

about the inmate's situation.

### 4. Addressing the Heightened Risks of Restrictive Housing

The placement of inmates, particularly those with mental health needs, in segregated or restrictive housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.[35] At least six (6) inmates died by suicide in the last four years were housed in designated solitary confinement units in San Diego County Jail, and several more were housed in units with solitary confinement conditions.






The experts found that San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to and during placement in solitary confinement. This means that jail staff may be placing inmates who are at greatest risk of suicide in solitary confinement without identifying and considering those risks.

In one case, an inmate was housed in Administrative Segregation for over four months. The DRC Experts found that this inmate appeared to suffer the ill effects of prolonged isolation and had significant symptoms of mental illness that were not detected by staff. After a series of emergency placements in the jail's "Safety Cell," the inmate was again placed in Administrative Segregation, where he spent the last six weeks of his life before hanging himself.

The DRC Experts also identified problems with custodial practices in monitoring inmates in solitary confinement to ensure that those inmates are safe and not engaging in self-harming behavior. They found failures to monitor inmates' safety and cases of malfunctioning communication equipment in the segregation units. In some cases, the result was delays in discovering and

responding to inmates' ultimately fatal suicide attempts.

DRC observed video footage of one troubling suicide attempt in an Enhanced Observation Housing (EOH) Unit, which houses inmates at risk of suicide with solitary confinement conditions (as discussed in Section IV.C.4). Inmates are monitored by overhead video camera and per Department policy, should receive in-person checks at least once every 15 minutes. The video shows the inmate standing naked on the cell's desk, praying and preparing to jump, for over 14 minutes. He then dove head-first onto the floor. Four more minutes passed before custody staff appeared and summoned emergency medical care. Had the policy regarding in-person checks been followed, or the surveillance video been monitored, staff could have intervened prior to the inmate's jumping, and there would likely have been a more timely discovery and emergency response.

The extreme isolation and deprivations of solitary confinement increase suicidal ideation and self-harming behavior. Records indicate that such conditions contributed to inmates attempting suicide. In one suicide case, an inmate housed alone in Administrative Segregation was allowed just one hour out of his cell every 48 hours. He requested psychiatric services but two days later, he still had not been seen by mental health staff. He asked a deputy through the cell's intercom when he would get out of his cell and into the dayroom. He was told that he must remain in his cell. Forty-five minutes later, he was found hanging in his cell. Prior to hanging himself, he had urinated on the floor, stuck food and feces on the ceiling, and scrawled a suicide note on the cell walls using his own blood.

### 5. Supervision of At-Risk Inmates

When an inmate has suicidal thoughts, or engages in suicidal or self-harming behavior, staff must adequately supervise the inmate to ensure that the individual is safe.

The DRC Experts found several deficiencies regarding supervision of such inmates. For example, the experts found problematic the County's policies directing that custodial staff, rather than clinical staff, have final decision-making authority about where to house inmates identified as at risk of suicide.

Custody staff too often interfere with clinical decision-making regarding inmates with acute mental health needs. In one case, an inmate was booked while having acutely manic and psychotic symptoms. He had been hospitalized twice shortly before his incarceration and had been off his medications for several days prior to arrest. There was a two-day delay before he received a psychiatric evaluation and medications. The inmate made repeated statements about hurting himself, and he refused to take medications when they were finally ordered. A nurse practitioner

recommended that the inmate be placed in a Safety Cell based on his condition. However, a sergeant refused to move him. He remained in an Administrative Segregation cell, where he died by suicide that evening.

### 6. Timely Emergency Response

When an inmate engages in a serious suicide attempt, the facility staff's emergency response will often determine if the person lives or dies. The DRC Experts found, in nearly half the emergency responses to lethal suicide attempts they reviewed, poor coordination of lifesaving efforts, delays in starting CPR, and/ or malfunctioning medical equipment. They cited several troubling examples among recent suicide deaths.

In one case, medical staff were unable to initiate life-saving efforts due to malfunctioning automated external defibrillator (AED) equipment.

In a second suicide case, deputies waited seven minutes after discovering an inmate hanging in his cell, and then prevented nursing staff from evaluating the inmate's condition or using the AED.

In yet another case, the DRC Experts observed video of approximately 11 deputies standing at the scene of a suicide attempt for several minutes without initiating life-saving measures.

The DRC Experts also found that San Diego County Jail lacks an adequate program of drills for medical emergencies, including those stemming from serious suicide attempts.

### 7. Suicide Prevention Training

Custodial, medical, nursing, and mental health staff need strong training on the signs of mental illness and suicide risk, and on responding to inmates who are potentially at risk of suicide.

While the County has in recent months taken affirmative steps to enhance its suicide prevention training program in the wake of the Grand Jury's 2017 findings, the DRC Experts found that the County's training program is not well coordinated, tracked, or evaluated.

The DRC Experts found additional deficiencies with respect to the training of mental health clinicians. For example, records indicate that clinicians frequently use "contracts for safety," which ask patients to agree verbally or in writing that they will not engage in self-harm. According to suicide prevention experts, this practice has not been shown to decrease the risk of suicide attempts or to provide protection for clinicians. In fact, San Diego County Jail clinicians used these "contracts for safety" with multiple inmates who subsequently died by suicide while in custody.

### 8. Internal Review of Inmate Suicides

All inmate suicide deaths and medically serious suicide attempts should

be subject to a rigorous review process, with the objective of identifying necessary improvements that can be made to enhance suicide prevention and inmate safety moving forward.

The DRC Experts found that the County's internal suicide review process, including as proposed in its recently revised Suicide Prevention Policy, is inadequate. They found that the policy does not sufficiently outline an internal review process, and that it fails to identify how findings and corrective action plans will be acted upon.

It is problematic that the Sheriff's Department Critical Incident Review Board does not conduct a formal review of all serious suicide attempts. This is a missed opportunity to learn from experience and to strengthen policy, procedure, and training moving forward.

The DRC Experts also expressed concerns about the San Diego County Citizens' Law Enforcement Review Board (CLERB), finding that it does not serve a meaningful or sufficient role in the provision of external, independent oversight with respect to suicide prevention. (We strongly agree with this finding, and recommend a new model of independent oversight. See Section IV.D.)

### 9. Quality Improvement Program

Jail systems with a robust continuous quality improvement (CQI) program will be in the best position to identify problems and implement effective solutions, including with respect to suicide prevention. The DRC Experts found that the County has begun to take positive steps in this area, but that important work remains.

### RECOMMENDATIONS

**Improving Suicide Prevention in Jails**

**Recommendation 6.** Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.** Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

## C. San Diego County Should Provide Adequate Treatment and Services to Inmates with Mental Health Needs.

Our investigation found that there are a large number of San Diego County Jail inmates with significant mental health needs. With few exceptions,

enhanced mental health treatment programming is provided only to those with critically acute needs. In many cases, inmates remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates. Only when they reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care. Such a system is cruel and counterproductive, and does not meet constitutional and legal requirements.

The County must take reasonable steps to ensure that it safeguards the rights of inmates with mental illness under the United States Constitution, the Americans with Disabilities Act, and other relevant laws. The County's compliance with state regulations – including Title 15 of the California Code of Regulations regarding jail operations – is important, but it does not demonstrate compliance with Constitutional and other legal requirements.[36]

### 1. Overview of San Diego County's Jail Mental Health System

The Sheriff's Department utilizes a partnership of County staff and contract health professionals to provide mental health services. Liberty Healthcare Corporation, a private contractor, assists in the hiring of staff and management of the mental health programs. Of course, it remains the County's responsibility to ensure that inmates are provided adequate care based on individual clinical needs.

The jail system has two units, called Psychiatric Security Units, that have on-site mental health clinicians and daily treatment programming, serving up to thirty (30) men and thirty-two (32) women with the most critically acute mental health conditions.

The County's jails also rely heavily on Safety Cells and Enhanced Observation Housing (EOH) units to manage inmates identified as acting out or at risk of self-harm or suicide. These are severe and punitive-feeling placements, without meaningful treatment. They raise serious concerns.

There are other designated mental health "cluster" units that house people with mental illness. In general, these units do not provide meaningful treatment programming.

A Jail-Based Mental Competency Program, a 25-bed program at the Central Jail for inmates deemed Incompetent to Stand Trial (IST), opened in March 2017. DRC did not tour or assess this program.





## 2. Safety Cells

We have significant concerns about the County's placement of large numbers of inmates in the jails' "Safety Cells."

By policy, Safety Cells are used for people who: (1) verbalize suicidal ideation or make suicidal gestures and are belligerent or intoxicated; (2) are combative or violent to a point that they may injure themselves, other patients or staff; or (3) are unable to function in the regular or specialized housing areas due to behavior which jeopardizes their safety.

These Safety Cells are extraordinarily harsh settings. They are small, windowless rooms with rubberized walls. There is no furniture or bedding, leaving the individual to sit or lie on the floor. Safety Cell doors contain a food slot and a small viewing window that faces a hallway. Cells have a ceiling light that is illuminated 24/7, and a camera for remote observation by custody staff.

The cells are completely barren, with no sink, toilet, or running water. Inmates defecate and urinate in a grate on the ground. In June 2017, a Grand Jury evaluation of jail conditions found a "very strong" smell of urine surrounding the Safety Cells.[37]

Inmates placed in these Safety Cells are stripped naked and given only a "safety smock" made from heavy tear-free material fastened with straps or Velcro. The garment is open at the bottom, and no underwear is provided. Inmates receive no books or any other personal property while in a Safety Cell.

Placements in a Safety Cell are approved by the Watch Commander, in consultation with medical staff. An initial medical assessment must be done within 30 minutes after medical staff is notified. Department policies require observation of inmates placed in Safety Cells by custody staff at least twice

every 30-minute period and by medical staff every four (4) hours. The jail's policy is for a mental health consultation to occur within 12 hours of placement, and a medical evaluation every 24 hours.

There is no time limit for how long an inmate may be kept in a Safety Cell. Record reviews show that many inmates are held in Safety Cells for much longer than 24 hours, and in some cases up to four days. Many inmates cycle in and out of Safety Cell placement multiple times. In 2017, inmates were placed in a Safety Cell more than 6,700 times.

### 3. Psychiatric Security Units (PSU)

The County has two jail-based inpatient mental health units, known as Psychiatric Security Units (PSU), at the Central Jail (30 beds for men, including four beds in "observation cells") and at the Las Colinas Detention and Reentry Facility (32 beds for women, plus six nearby beds in "observation cells"). Strikingly, these two units make the Sheriff's Department the County's largest provider of inpatient psychiatric services.

We observed a high level of acuity among the patients in these inpatient units, with some placed in troubling solitary confinement conditions.



At the same time, we found that the PSUs do have some positive treatment programming. For example, at Central Jail, the PSU has clinical staff on-site, along with deputy staff that receive specialized mental health training. The PSU has operated weekly "Love on a Leash" therapeutic programs with specially trained dogs.

At Las Colinas, the PSU has considerable treatment and programming space. Therapeutic programming has included yoga and arts/crafts. Patients receive weekly multi-disciplinary treatment group meetings and regular clinical contact.

The County Jail's PSUs are the only units we observed that provide enhanced mental health treatment to inmates. They are available only to

inmates demonstrating an extremely high level of acuity.






A deeply problematic practice impacting access to treatment in the PSU is the inappropriate influence of custody staff, often contrary to mental health providers' clinical recommendations. For example, we received multiple reports that custody staff unilaterally place patients in the PSU's "observation units," which amount to a solitary confinement setting without access to the PSU's treatment programming. Inmates in these cells have been observed, by us and by others, smearing food, feces, and urine on the walls and floor.

Custody staff have in some cases prevented PSU patients from having social visits or accessing the outdoor area for recreational activity, overruling clinicians' judgment as to what is safe and clinically appropriate based on the





patient's individual circumstances. Such disregard of clinical judgment is deeply counterproductive to treatment efforts.

The DRC Experts also found problematic the number of inmates in mental health crisis who are not referred for placement in the PSU. There are large numbers of inmates cycling in and out of Safety Cells, many remaining in those cells for extended periods of time. But Safety Cells are harsh, barren, and isolating. They are not designed to provide clinical evaluation or treatment.

Inmates exhibiting suicidal or self-harming behavior, or other manifestations of acute mental illness, should be timely assessed for placement in the PSUs.

The County should ensure that these units are being fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

### 4. Enhanced Observation Housing (EOH) Units

With the County's development of the Inmate Safety Program in 2015 came the creation of Enhanced Observation Housing (EOH) units. These units, located at four jail facilities (Central, Las Colinas, George Bailey, Vista), are designated for observation and assessment of inmates who may be at elevated risk for suicide. Even though EOH inmates, in contrast to inmates in Safety Cells, generally have access to a toilet, they too endure conditions of extreme isolation and deprivation.

We observed and met with several inmates in EOH units. Consistent with County policy, all clothes and underwear are taken away, and inmates receive a safety smock, two blankets, and shower shoes. However, we reviewed multiple records documenting that EOH inmates were left naked, with no safety smock, and in some cases not even provided a blanket. Some are forced to sleep on a thin mat placed on the floor. Many inmates complained about being cold, even with the smock and blankets.

Inmates have no access to personal property, television, recreation yard time, or visits from family. Inmates in the EOH units eat from paper trays and a paper safety spoon, and in some cases are restricted to eating without any utensil.

Inmates in the EOH units with individual cells complained about extremely limited time outside their cell and excessive isolation. Mental health staff appear to recognize the extreme conditions in the EOH units. In one inmate's chart we reviewed, a psychiatrist recommended that the facility "discontinue EOH as the isolation is inhumane and likely to compromise [this inmate] psychologically." We learned that some inmates deny having suicidal thoughts so they can get out of the EOH unit, or avoid placement there, given the harsh conditions.



The number of inmates who pass through the EOH unit, with all its deprivations, is remarkable and far beyond

what we have observed in other jails. In 2016, the County logged 5,269 EOH placements. The rate was similar in 2017, based on partial data provided to us. In hundreds of cases, the inmate spent three days or more in the EOH unit, including a substantial number with lengths of stay of one week or more.

Inmates in EOH units are given a risk designation of either "high" or "low." When we toured the facility in November 2016, mental health clinicians evaluated inmates every 24 hours if they were designated as "low" risk. We were alarmed to see that for inmates designated as "high" risk, clinicians would evaluate them only every 48 hours, on the purported basis that they needed more time to "cool down." We understand that the Department recently updated their policies to ensure that all inmates are seen at least every 24 hours.

Still, there is no limit as to how long an inmate can be held in EOH housing. Frequently, the inmate charts we reviewed simply noted "Continue to Observe (CTO)," with no clinical justification or plan for treatment. Mental health staff who cover the EOH units spend their time evaluating and re-evaluating potential suicide risk, but little to no time engaging with inmates to reduce that risk.

We are well aware of the County's important objective to prevent inmate suicide deaths, and that removal of clothing, property, and privileges can reduce the opportunities that an inmate may have to engage in self- harming behavior. That being said, we found extremely disturbing the levels of deprivation and isolation for so many individuals, without access to any therapeutic or recreational activities. These individuals, remember, have been specifically identified as having potential mental health needs. They require frequent assessment and sustained therapeutic intervention. While the County has taken steps to better assess inmates' suicide risk, more must be done to provide necessary treatment.

### 5. Lack of Mental Health Treatment Programs

Through our investigation, a major theme that emerged was that inmates do not have timely access to adequate mental health care, including counseling, psychiatric medications, and other treatment programming.

The County has recently created designated mental health "cluster" units, which seem to provide some benefit to inmates with mental health needs who may be vulnerable to abuse or exploitation in general population units.

However, these designated mental health units lack formal treatment programming. Written guidelines for the largest such unit, at Central Jail, confirmed these limitations, stating that it "had no additional staff, doesn't provide additional treatment, or different follow-up guidelines. . . . [The unit] is simply psychiatric housing where inmates are less subjected to stigma if

acting in a manner that would reveal their thought process impairments."

Mental health staff leadership shared with us that increased access to structured individual and group treatment activities would be beneficial to their patients, but that there is insufficient mental health staffing and related resources to deliver such a program.

Access to mental health treatment remains extremely limited outside the inpatient PSUs. It generally consists of medication management and brief, non-confidential "check-ins" with mental health staff, often through a cell door. Non-confidential clinical contacts undermine treatment, as prisoners are reluctant to disclose sensitive information about their mental health history or current situation. What is more, effective communication through the thick metal cell doors is extremely difficult – people must speak very loudly to be heard at all. (We observed psychiatrists meeting with some patients privately outside of their cell, which is a positive practice.)

Many inmates on the jail's mental health caseload expressed to us an interest in group or individual out-of-cell therapeutic activities. In one case, a patient's record documented that he requested to discontinue his antidepressant medication and try counseling. Instead, mental health staff increased his medication dosage and ignored his request for counseling.

The lack of access to mental health treatment activities and appropriate levels of care violates minimum standards of care for inmates with mental health needs.[38] The National Commission on Correctional Health Care has adopted a standard requiring that "[r]egardless of facility size or type, basic on-site outpatient [mental health] services include, at a minimum, individual counseling, group counseling and psychosocial/psychoeducational programs."[39]

The County has reported that the jail system has recently increased mental health staffing. Any increase is a step in the right direction. It is clear that a significant increase in staffing and related resources is necessary to deliver meaningful treatment, including structured individual and group treatment programming, to the approximately 2,000 people with mental health needs inside the jails.

## The Veterans Moving Forward Program

One notable exception to the lack of mental health programming in the San Diego County jails is the Veterans Moving Forward Program at Vista. The unit is decorated with artwork and displays flags representing each branch of service. Up to 64 inmates who are veterans participate in the program, which covers substance abuse, stress management, yoga, career planning, mentoring, financial planning, and journalism. A counselor from the Veterans Administration is assigned to the unit.

The Veterans Moving Forward Program excludes inmates with serious medical conditions and non-veterans. Many inmates, both veterans and non-veterans, would benefit from this sort of program but are unable to participate due to the lack

of capacity and restrictive criteria.

We also found that inmates have faced significant delays in receiving prescribed psychiatric medications. Such delays can be dangerous and lead to mental health decompensation. The jail adopted a new pharmacy system in the summer of 2017. We received reports, confirmed by the County, of problematic delays between prescription and arrival of a medication for patients. The County has indicated that such problems have been addressed through the use of local pharmacies, particularly for urgent prescriptions. However, we continue to receive reports that medications are delayed.

Overall, the DRC Experts found that the County's jail mental health program "remains fragmented and without good continuity of care." They recommend development of a consolidated mental health treatment program that offers an appropriate spectrum of levels of care.

Specifically, the DRC Experts recommend creation of an "intermediate" level of mental health care, with sufficient capacity to ensure timely access for those individuals who need enhanced treatment programming. The program would serve patients "stepping down" from Safety Cell, EOH, or PSU admissions, as well as patients with a mental health condition that makes it difficult for them to function in a general population jail setting. The program would require a substantial increase in mental health clinician staffing to provide a structured treatment program that includes individual and group therapy to meet the clinical needs of the inmate population. Treatment must be provided pursuant to individualized treatment plans, as required by Title 15 of the California Code of Regulations (Section 1210). The DRC Experts found the jail's treatment plans to be consistently inadequate. This was consistent with our review of dozens of inmates' jail mental health records.

DRC strongly encourages the County to implement an enhanced and structured outpatient treatment program. It would have enormous benefit with respect to the safety and well-being of inmates, jail operations, and reentry efforts. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.[40]

### 6. Undue and Excessive Solitary Confinement

Our investigation uncovered significant problems regarding the use of solitary confinement, particularly for inmates with mental health needs. Solitary confinement is generally defined as a placement in which inmates are held in their cells, alone or with a cellmate, for 22 to 24 hours per day.[41] San Diego County Jail inmates may be held in these conditions, for example, in maximum security units, Administrative Segregation units, "Keep Separate All" units, EOH units, or disciplinary units.

There is growing consensus that the isolation of prisoners with mental

illness should be avoided due to serious psychological and physical risks of harm.[42] Solitary confinement is an extremely dangerous place for someone with mental health needs. At least six (6) jail inmates died by suicide in segregation units in recent years, a group that includes individuals with a known history of mental illness and suicide attempts. Several other inmates died in units with solitary confinement conditions.

Jail staff report that their goal is to meet the requirements of Title 15, a state regulation that mandates at least three (3) hours per week of exercise time in a space designed for recreation.[43] Segregated inmates are also typically scheduled to receive 50-60 minutes per day out of their cells to shower and use the phone. They spend the remaining 1,380-1,390 minutes of their days inside their cell. This is an extreme level of isolation.

We found that "lockdowns" are remarkably common in San Diego County's jails. During lockdowns, inmates in an entire unit or portion of a facility can be confined to their cells. The number of inmates reporting extended periods of cell confinement during lockdowns was astonishing. We saw multiple records showing inmates subjected to long-term lockdown conditions.

## The Experience of Being on "Lockdown"

*One inmate filed a grievance after her unit faced the tenth lockdown in two weeks. She wrote:*

> This treatment is worse than people treat…animals. You guys are messing with our mental state… We are on lockdown with no explanation as to why. We barely get to come out as is and to be completely locked away and ignored by officers is unnerving. Being locked in jail inside a box inside of another box can do things to a person's mental state.

We also received information regarding a problematic practice that staff referred to as "Bypass." Under this practice, jail staff would not document the lockdown of individual inmates – including many with mental illness. In other words, people outside of designated segregation units were held in solitary confinement conditions without it being tracked anywhere in the system. The County has indicated that this practice has been ended.

One positive practice we learned about was a segregation placement email alert system, which notifies mental health staff when any inmate is placed in a segregation unit or individual cell lockdown. We urge the County to build on this practice, which started in September 2017. There should be a documented process for mental health staff to recommend against segregation placements for inmates at risk of psychological harm or suicide in such conditions, and for such a recommendation to be followed absent a specific security risk. Jail leadership has indicated that such a process occurs on an *ad hoc* basis, and that they would consider formalizing it with proper

documentation.

Jail leadership shared with us their perspective that the creation of the mental health "cluster" units has helped to reduce the number of people with mental illness in segregation units. We have not seen data to support this statement. And we remain deeply concerned about the lack of treatment, recreation, and other programming provided to inmates in the mental health "cluster" units.

We urge the County to continue to take affirmative steps to reduce the use of solitary confinement, and to eliminate the practice for inmates with mental illness. The County should track and analyze data on segregation placements, lengths of stay, and outcomes for inmates – particularly those with mental illness.

## RECOMMENDATIONS

### Improving Mental Health Treatment and Ending Harmful Use of Solitary Confinement

**Recommendation 8.** Substantially increase mental health staffing and related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.** Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically- driven treatment.

**Recommendation 10.** Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.** Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.** Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.** Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.** Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.** Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.** Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.** Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## D. San Diego County Should Establish Meaningful Independent Oversight of Jail Conditions and Treatment of Inmates.

The time has come for San Diego County to create a meaningful, professional, and independent oversight entity to monitor and report on jail conditions, including as to mental health care and suicide prevention.

Even as San Diego County has begun to tackle the challenges of reducing the number of suicides in its jails and addressing the mental health treatment of people in the community and those who end up in jail, such efforts are unlikely to lead to a durable solution on their own.

The need for stronger independent oversight is clear.

**First, the sheer number of people dying in San Diego jails demands better oversight**. The County's recent track record includes an extraordinarily high number of deaths – more than 30 inmate suicides since 2010, and many other inmate deaths. Several inmate deaths (suicide and non-suicide) have led to lawsuits costing the County millions of dollars. The situation has led to a lack of trust in the jail system across the community.[44]

**Second, even with the efforts by Dr. Joshua and others in the Sheriff's Department, there remain significant challenges regarding jail suicide prevention and mental health care.** Among those challenges, the DRC Experts found that the County's internal suicide review process is undeveloped. Independent oversight can play an important and complementary role in strengthening internal review efforts, identifying the Department's need for

additional resources, and helping the County achieve and solidify progress.

**Third, the County's Citizens' Law Enforcement Review Board (CLERB) does not provide adequate or effective oversight**. The County's citizenry has long recognized the value of independent oversight of the jail system. The public voted to establish the Citizens' Law Enforcement Review Board (CLERB) in 1990 to independently investigate citizen complaints against Sheriff's deputies and probation officers, as well as deaths of jail inmates.[45]

But the CLERB has proven ineffective. The CLERB is sparsely staffed, with just three employees: an executive officer, an investigator, and an administrative assistant.[46] The CLERB is composed of eleven volunteers, who are not required to have previous special training or experience in investigations or other relevant topics.[47] The CLERB does not control its budget. It cannot hire additional investigative staff itself, even if needed to complete its work.

The CLERB has failed to keep up with the demands of its mission. Despite its authority to "annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations" on issues that include "detention, care, custody, training, and treatment" of inmates,[48] the CLERB has *never* inspected the County's jail facilities in its more than 25 years.

The CLERB has also proven unable to complete its individual case investigations. At the beginning of 2011, the CLERB had six open death investigations.[49] That number grew to 19 by the end of 2014,[50] then to 35 in December 2015,[51] and to 46 by the end of 2016.[52] By October 2017, the CLERB had 59 open death investigations – including one dating back six years. Many of these long-delayed and unfinished death investigations are inmate suicides.

Given its tremendous backlog, the CLERB announced on November 11, 2017, that it was summarily dismissing eight (8) suicide death cases and fourteen (14) other cases of people dying in detention or while being taken into custody. The CLERB's stated reason for this action was that the investigation was not completed within the statutory one-year time limitation for imposing officer discipline for misconduct.[53] The CLERB asserted that this meant it lacked jurisdiction and could not complete its investigation.[54] (Oddly, the County's own web site for CLERB states that "death cases and other complex investigations often take more than one year to complete."[55])

In any event, CLERB's failure to complete its investigations means that these deaths will not face independent scrutiny.

The community response has been one of severe disapproval. One local editorial board called the CLERB's decision to summarily dismiss these cases "outrageous" and "insulting to victims' family members," noting that it "only reduces the likelihood of improved responses and practices" in the future.[56]

Even with the reported addition of a newly funded CLERB Investigator

position as of March 2018, it is DRC's assessment that the CLERB will not be able to adequately fulfill its mission as the County Jail system's sole oversight entity.

## Benefits of Effective Independent Oversight:

- *Public identification of problems with conditions and operations and timely solutions, resulting in jail facilities that are safer, operated in conformance with the Constitution, other laws, and up-to-date correctional practices.*
- *Early detection of issues that may have been overlooked inside jail facilities before they become major problems.*
- *Cost-effective and proactive means to avert lawsuits challenging the legality of conditions of confinement or the treatment of prisoners.*
- *Independent input on the need for funds requested by Sheriff's Department and other public officials.*
- *Better-informed policy decisions.*[57]

California counties like Los Angeles, Santa Clara, and Sonoma, the California State prison system, the City and County of Denver, and King County (Washington State) have implemented or are implementing a professional entity that provides independent oversight of jail operations. The Los Angeles County Office of Inspector General, created in 2014, provides an especially useful model.[58] Santa Clara County recently approved the creation of a county Office of Correction and Law Enforcement Monitoring, along with an accompanying community advisory committee,[59] based on expert recommendations.[60]

A professional, independent oversight entity would offer a critical benefit that CLERB has not – a proactive method to evaluate and improve systemwide practices in the County's jails, going beyond a mere after-the-fact investigation of individual deaths.

It may be that the CLERB can play some positive and important role in monitoring the San Diego County Jail system moving forward. It can enhance the work of a professional oversight entity, similar to other systems like Denver's, which provides for complementary roles by the Office of the Independent Monitor and a Citizen Oversight Board. But on its own, the CLERB cannot provide adequate oversight that ensures effectiveness, transparency, and accountability in the operation of San Diego County's jails, or pave the way for necessary systemic improvements.

Meaningful, professional, and independent oversight would enhance the County's efforts to address its historical weaknesses and challenges in its jails, help to achieve and solidify improvements, and strengthen the trust of the community through greater transparency. This, more than anything, may be the key to achieving a system that meets legal and constitutional standards, and that properly cares for people with mental health needs.

## RECOMMENDATION

### Meaningful, Independent Oversight of Jail System

**Recommendation 18.** The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

## V. SUMMARY OF RECOMMENDATIONS

### 1. End Over-Incarceration of People with Mental Illness, Strengthen Community-Based Mental Health Services

**Recommendation 1.** Fully implement the County's three-year Mental Health Services Act (MHSA) Plan, with adequate transparency as to spending and program outcomes.

**Recommendation 2.** Focus investment on community-based services and treatment programming that help individuals with mental health needs to thrive and to avoid incarceration and entanglement with the criminal justice system.

**Recommendation 3.** Develop capacity for community-based competency restoration programs for individuals found Incompetent to Stand Trial (IST), so that they can receive treatment in the least restrictive setting appropriate and do not languish unnecessarily in jail.

**Recommendation 4.** Strengthen reentry programming for individuals with disabilities to ensure continuity of care, including with respect to medication and other treatment, and access to job opportunities,

housing, food, and other basic needs for successful reintegration into the community.

**Recommendation 5.** Ensure that the County's mental health programs are subject to rigorous data collection and self-critical analysis of progress and where additional resources may be needed.

### 2. Improve Suicide Prevention Practices

**Recommendation 6.** Develop a plan for timely implementation of the DRC Experts' forty-six (46) Recommendations to address deficiencies in San Diego County Jail's suicide prevention policies, practices, and training.

**Recommendation 7.** Strengthen the County's internal review process and quality improvement program to ensure implementation of necessary changes to enhance suicide prevention and inmate safety.

### 3. Improve Mental Health Treatment, End the Harmful Use of Solitary Confinement

**Recommendation 8.** Substantially increase mental health staffing and

related resources to ensure that individuals with mental illness in the jail receive clinically indicated treatment.

**Recommendation 9.** Ensure that the inpatient Psychiatric Security Units (PSUs) are fully and appropriately utilized, and that all patients in the PSU receive meaningful, clinically-driven treatment.

**Recommendation 10.** Greatly reduce the use of "Safety Cells" for individuals with mental health needs. Inmates placed in Safety Cells as a result of behaviors related to mental health symptoms should not be housed there for longer than six (6) hours. At that point, if there is no less restrictive housing appropriate, they should be considered for placement in inpatient care (including the PSU).

**Recommendation 11.** Revise policies and practices for the Enhanced Observation Housing (EOH) units to make them less harsh and inhumane, with a greater focus on delivery of treatment designed to reduce the risk of suicide and mental health decompensation.

**Recommendation 12.** Revise policies to allow individuals in EOH to have access to social visits, increased out-of-cell time, and recreational activities, and to possess clothes and certain personal property, based on individualized clinical assessments of their condition and safety needs.

**Recommendation 13.** Implement a consolidated mental health treatment program that offers a spectrum of levels of care. The program should include the creation of an "intermediate" level of mental health care for individuals who need enhanced treatment programming. The Intensive Outpatient Program at Sacramento County Jail offers one useful model.

**Recommendation 14.** Provide a written individualized treatment plan for each person requiring mental health services at the jail, as required by Title 15, Section 1210 of the California Code of Regulations. Ensure that clinically indicated treatment prescribed in the treatment plan is provided.

**Recommendation 15.** Reduce the use of solitary confinement segregation housing, and take affirmative steps to eliminate solitary confinement placements for individuals with mental illness at risk of harm in such a setting, absent exceptional and exigent circumstances.

**Recommendation 16.** Track and analyze data on all segregation housing placements and lockdowns, including lengths of stay and outcomes for inmates – particularly those with mental illness. Take corrective action to eliminate unnecessary segregation placements and lockdowns as part of ongoing quality improvement efforts.

**Recommendation 17.** Reduce the harsh isolation conditions in segregation and other restrictive housing units. Provide individuals in such units a minimum of four (4) hours per day of out-of-cell time, along with access to treatment, recreation, and other activities necessary to ensure their health and well-being.

## 4. Ensure Meaningful Independent Oversight of Jail System

**Recommendation 18.** The County should establish a professional independent oversight entity that has the authority and duty to monitor the treatment of inmates with mental health needs, suicide prevention, and other aspects of jail operations affecting inmates with disabilities, with periodic reporting to the Board of Supervisors and regular outreach to the public.

# ENDNOTES

1 State of California, Department of Justice, Death in Custody & Arrest-Related Deaths Data, 2005-2016 (April 2017), **https://openjustice.doj.ca.gov/data** [hereinafter "Cal. DOJ Death Data"]; San Diego County Grand Jury 2016/2017, *Amended Grand Jury Report, Examining the Issue of Suicides in San Diego Jails*, at 1, (May 4, 2017), **https:// www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/2016-2017/ SuicidesinSanDiegoJails.pdf** [hereinafter "Grand Jury 2017 Suicide Report"]. **"Return to Main Document"**

2 Suicide rates calculated using the average daily population as reported in: Jail Profile Survey, January 2002–December 2016, Board of State and Community Corrections, **http://www. bscc.ca.gov/s_fsojailprofilesurvey.php**; Cal. Board of State and Community Corrections (BSCC), Jail Population Trends, **https://public.tableau.com/profile/kstevens#!/vizhome/ ACJROctober2013/ADPRatedCapacity**. **"Return to Main Document"**

3 Margaret E. Noonan, Bureau of Justice Statistics United States Department of Justice, *Mortality in State Prisons, 2001-2014 - Statistical Tables* (Dec. 15, 2016), **https://www.bjs. gov/index.cfm?ty=pbdetail&iid=5866.** **"Return to Main Document"**

4 Cal. DOJ Death Data. **"Return to Main Document"**

5 Id. **"Return to Main Document"**

6 Coleman v. Brown, Case No. 2:90-cv-0520-KJM-DB, *The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation at 21*, Lindsay M. Hayes, M.S., Docket No. 5672, Sept. 7, 2017. **"Return to Main Document"**

7 Kenny Goldberg, Following 2014 Decline, Suicide Rate In San Diego County Holds Steady, KPBS (Sept. 7, 2016), **http://www.kpbs.org/news/2016/sep/07/suicides-san-diego- county-so-help-seeking-behavior/**, citing *San Diego County Suicide Prevention Council, Annual Report to the Community 2017 at 1* (Sept. 1, 2017), **http://www.sdchip.org/wp- content/uploads/2015/12/SPC-Report-Card-2017-FINAL_9-1-17.pdf.** **"Return to Main Document"**

8 Lindsay Hayes, *National Study of Jail Suicides: 20 Years Later at 46*, National

Center on Institutions and Alternatives (2010). **"Return to Main Document"**

9 See Coleman v. Brown, Case No. 2:90-cv-00520-LKK-JFM, *Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2012 - June 30, 2012 at 15, Docket No. 4376, Mar. 13, 2013*. The federal court in the Coleman case agreed: "Where, as here, defendants know that they house prison inmates at risk for suicide, they are required to take all reasonable steps to prevent the harm of suicide." Coleman v. Brown, 938 F.Supp.2d 955, 975 (E.D. Cal. 2013). **"Return to Main Document"**

10 Kelly Davis & Dave Maass, *Suicide in the cell*, San Diego City Beat (Apr. 24, 2013), **http:// sdcitybeat.com/news-and-opinion/news/suicide-cell/**; Dave Maass & Kelly Davis, *How many inmate deaths is too many*, San Diego City Beat (Mar. 27, 2013), **http://sdcitybeat. com/news-and-opinion/news/many-inmate-deaths-many/**; Editorial: *Too many dead inmates in San Diego jails*, San Diego City Beat (May 8, 2013), **http://sdcitybeat.com/ news-and-opinion/many-dead-inmates-san-diego-jails/**; Kelly Davis & Dave Maass, *Death's in the Details*, San Diego City Beat (June 12, 2013), **http://sdcitybeat.com/news- and-opinion/news/death-s-details/**; Kelly Davis, *Watchdog weighs in, sort of*, San Diego City Beat (July 31, 2013), **http://sdcitybeat.com/news-and-opinion/news/watchdog-weighs-in-sort/**; Kelly Davis, *10 more dead inmates*, San Diego City Beat (Oct. 16, 2013), **http://sdcitybeat.com/news-and-opinion/news/10-dead-inmates/**; Kelly Davis, *An interview with the sheriff's chief medical officer,* San Diego City Beat (July 16, 2014), **http://sdcitybeat.com/news-and-opinion/news/interview-sheriff-s-chief-medical- officer/**; Kelly Davis, *San Diego County sets a dubious record for jail deaths*, San Diego City Beat (Dec. 22, 2014), **http://sdcitybeat.com/news-and-opinion/news/san-diego-county-sets-dubious-record-jail-deaths/**; Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego (May 14, 2015), **https://www. nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved-Ones- Die-In-Jail-303822051.html**; Kelly Davis, *Solitary in California Jails Still Hellish Despite State Reform*, The Intercept (Oct. 29, 2015) **https://theintercept.com/2015/10/29/ solitary-in-california-jails-still-hellish-despite-state-reforms/**; Kelly Davis, *Suicides still plague the county jails*, San Diego Union Tribune (Dec. 16, 2015), **http://www. sandiegouniontribune.com/news/watchdog/sdut-jail-suicides-2015dec16-htmlstory. html**; Kelly Davis, *Jail death from excess water drinking raises questions*, San Diego Union Tribune (May 23, 2016), **http://www.sandiegouniontribune.com/news/watchdog/ sdut-nunez-**

water-death-2016may23-story.html; Lisa Pickoff-White & Julie Small, *When Jail Becomes a Death Sentence*, KQED News (Aug. 22, 2016), https://ww2.kqed. org/news/2016/08/22/when-jail-becomes-a-death-sentence/; Kenny Goldberg, *Following 2014 Decline, Suicide Rate In San Diego County Holds Steady*, KPBS (Sept. 7, 2016), www.kpbs.org/news/2016/sep/07/suicides-san-diego-county-so-help-seeking-behavior/; Kelly Davis, *People are still dying in the San Diego county jails*, San Diego City Beat (Nov.14, 2016); Rebekah Kearn, http://sdcitybeat.com/news-and- opinion/news/people-still-dying-san-diego-county-jails/; *San Diego County Lashed for Jail Suicides*, Courthouse News Service (Nov. 15, 2016), https://www.courthousenews. com/san-diego-county-lashed-for-jail-suicides/; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017), https://www.voiceofsandiego.org/topics/public-safety/two-men-at-obvious- risk-of-suicide-two-deaths-and-investigators-just-cleared-both-cases/; Dana Littlefield, *San Diego County jails make changes to treat mentally ill inmates, curb suicides*, San Diego Union Tribune (Apr. 29, 2017), http://www.sandiegouniontribune.com/news/ public-safety/sd-me-jail-health-20170429-story.html; Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16, 2017). **"Return to Main Document"**

11 Kelly Davis, Marine's widow sues over jail death, San Diego Union Tribune (Apr. 13, 2015), http://www.sandiegouniontribune.com/news/watchdog/sdut-lawsuit-jail-should-have-prevented-suicide-2015apr13-htmlstory.html; Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego, (May 14, 2015), https:// www.nbcsandiego.com/news/local/Families-Struggle-to-Get-Information-After-Loved- Ones-Die-In-Jail-303822051.html. **"Return to Main Document"**

12 Grand Jury 2017 *Suicide Report at 1*. **"Return to Main Document"**

13 Id. at 2. **"Return to Main Document"**

14 Id. at 5. **"Return to Main Document"**

15 San Diego County Sheriff's Department, *Response to the San Diego County Grand Jury Report: "Suicides in San Diego Jails"* Dated May 4, 2017 (June 29, 2017), http://www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/201

6-2017/ SuicidesinSanDiegoJails_response1.pdf. "Return to Main Document"

16 42 U.S.C. § 10801, et seq.; 42 C.F.R. § 51; Cal. Welf. & Inst. Code § 4900 et seq. "Return to Main Document"

17 42 U.S.C. § 10805(a)(3); 42 C.F.R. § 51.42 (b); Cal. Welf. & Inst. Code § 4902(b)(2). "Return to Main Document"

18 42 U.S.C. § 10805(a)(4)(B)(iii). "Return to Main Document"

19 Cal. Welf. & Inst. Code § 4900(h); 42 U.S.C. §§ 10802(1) & (5); 42 C.F.R. § 51.2; Cal. Welf. & Inst. Code §§ 4900 & 15610.07. "Return to Main Document"

20 Mental Health Services Oversight & Accountability Commission (MHSOAC), *Together We Can, Reducing Criminal Justice Involvement for People with Mental Illness at 2* (Nov. 2017), http://mhsoac.ca.gov/document/2017-12/criminal-justice-and-mental-health- project-report [hereinafter "MHSOAC Report"]. "Return to Main Document"

21 See also Dana Littlefield, *Back Story: How San Diego County treats mentally ill inmates in jail*, San Diego Union Tribune (Apr. 19, 2017), http://www.sandiegouniontribune.com/ news/public-safety/sd-me-jails-backstory-20170429-story.html. "Return to Main Document"

22 *Inmate found dead of apparent suicide at West Valley Detention Center*, Inland Valley Daily Bulletin, (Feb. 27, 2017), https://www.dailybulletin.com/2017/02/27/inmate-found- dead-of-apparent-suicide-at-west-valley-detention-center/ (suicide of inmate while in San Bernardino County Jail's competency restoration program). "Return to Main Document"

23 Disability Rights California, *Placement of Individuals Found Incompetent to Stand Trial: A review of competency programs and recommendations*, http://www.disabilityrightsca. org/pubs/CM5201.pdf; Nicole R. Johnson, et al., *Outpatient Competence Restoration: A Model and Outcomes, 5 World J. Psychiatry 2 at 229* (July 22, 2015), http://www. wjgnet.com/2220-3206/full/v5/i2/228.htm; W. Neil Gowensmith, et al., *Lookin' for Beds in All the Wrong Places: Outpatient Competency Restoration as a Promising Approach to Modern Challenges, Psychology, Public Policy, and Law at 9* (June 6, 2016), http://dx.doi.org/10.1037/law0000088. "Return to Main Document"

24 Lisa Halverstadt, Fact Check: *More than $100M for Mental Health is Sitting in the Bank,* Voice of San Diego (Nov. 3, 2017), **https://www.voiceofsandiego.org/topics/ government/fact-check-100m-mental**; Lisa Halverstadt, *County Finds Early Struggles as it Tackles the Hardest Problem in Homelessness*, Voice of San Diego (Jan. 31, 2017), **https://www.voiceofsandiego.org/topics/government/county-finds-early-struggles- tackles-hardest-problem-homelessness/**. **"Return to Main Document"**

25 San Diego Grand Jury 2015/2016, *The Mental Health Services Act in San Diego County, Unspent Funds, Ongoing Needs* (June 9, 2016), **http://www.sandiegocounty.gov/ content/dam/sdc/grandjury/reports/2015-2016/MHSAinSanDiegoCountyReport.pdf**. **"Return to Main Document"**

26 County of San Diego MHSA *Three-Year Program and Expenditure Plan: Fiscal Years 2017-18 through 2019-20* (Oct. 10, 2017), **https://www.sandiegocounty.gov/content/dam/sdc/ hhsa/programs/bhs/homepage/MHSA/MHSA%20CERTIFIED%203%20Year%20 Plan%20FY%2017_20%20.pdf** [hereinafter "San Diego MHSA Plan"]. **"Return to Main Document"**

27 Id. at 8. **"Return to Main Document"**

28 Id. at 22. **"Return to Main Document"**

29 *Full Service Partnership (FSP) programs advance goals to reduce institutionalization and incarceration, reduce homelessness, and provide timely access to help by providing intensive wraparound treatment, rehabilitation, and case management services. Services provided may include mental health treatment, housing, medical care, and job- or life- skills training. San Diego MHSA Plan at 20*; see also Cal. Code Regs., tit. 9, § 3200.130 ("Full Service Partnership"). **"Return to Main Document"**

30 *Assertive Community Treatment (ACT) programs provide an array of services to individuals in the community that include intensive case management, mental health services, vocational services, integrated services for mental health and substance abuse issues, peer counseling/support, and housing services.* **"Return to Main Document"**

31 San Diego MHSA Plan at 444. **"Return to Main Document"**

32 *Addressing Mental Health Needs of Offenders With an Alternative*

*Custody and Reentry Pilot Program, County of San Diego Board of Supervisors, July 18, 2017 Meeting Agenda at 2* (July 18, 2017), **https://content.govdelivery.com/attachments/ CASAND/2017/07/12/file_attachments/845965/18%2BJul%2B2017 _Regular_agenda. pdf**. **"Return to Main Document"**

33 *The Stepping Up Initiative, Fact Sheet*, **http://www.counties.org/sites/main/files/file-attachments/stepping_up_two-pager_final.pdf**; see also National Association of Counties (NACO), *Stepping Up Initiative Overview and Resources*, **http://www.naco.org/resources/signature-projects/stepping-initiative**; Risë Haneberg, et al., *Reducing the Number of People with Mental Illnesses in Jail, Six Questions County Leaders Need to Ask* (Jan. 2017), **https://stepuptogether.org/wp-content/uploads/2017/01/Reducing- the-Number-of-People-with-Mental-Illnesses-in-Jail_Six-Questions.pdf**; *Stepping Up Initiative, Resources Toolkit*, **https://stepuptogether.org/toolkit**. **"Return to Main Document"**

34 Cal. Code Regs, tit. 15, § 1210. **"Return to Main Document"**

35 National Research Council, *The Growth of Incarceration in the United States: Exploring Causes and Consequences at 183-87* (2014). Washington, DC: The National Academies Press, **https://doi.org/10.17226/18613**. **"Return to Main Document"**

36 See, e.g., Hernandez v. County of Monterey, 110 F.Supp.3d 929, 945 (N.D. Cal. 2015) (holding that compliance with California's Title 15 regulations does not prevent finding of constitutional violations in jail system: "[T]he Supremacy Clause makes it very simple: the Constitution controls."). **"Return to Main Document"**

37 San Diego County Grand Jury, *Adult Detention Facilities at 2* (June 1, 2017), **http:// www.sandiegocounty.gov/content/dam/sdc/grandjury/reports/ 2016-2017/ AdultDetentionFacilitiesReport.pdf.** **"Return to Main Document"**

38 Brown v. Plata, 563 U.S. 493, 516 (2011); Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). **"Return to Main Document"**

39 National Commission on Correctional Health Care (NCCHC), *Standards for Health Services in Jails (2014), Standard J-G-04*. **"Return to Main Document"**

40 Ellen Garrison, *As Need Skyrockets, Sacramento Jail to Expand Aid to*

*Mentally Ill*, Sacramento Bee (Mar. 23, 2017), **http://www.sacbee.com/news/local/crime/ article140363113.html.** **"Return to Main Document"**

41 See, e.g., United States Department of Justice, *Investigation of State Correctional Institution at Cresson at 5* (May 13, 2013), **http://www.justice.gov/crt/about/spl/ documents/cresson_findings_5-31-13.pdf** ("[T]erms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others. … An isolation unit means a unit where either all or most of those housed in the unit are subjected to isolation."); Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005) (describing solitary confinement as limiting human contact for 23 hours per day); Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day). **"Return to Main Document"**

42 United States Department of Justice, *Reports and Recommendations Concerning the Use of Restrictive Housing – Final Report at 99* (January 2016); National Commission on Correctional Health Care, *Position Statement - Solitary Confinement (Isolation)* (2016); American Bar Association, *Standards for Criminal Justice: Treatment of Prisoners* (3d ed. 2011), Standard 23-2.8 *Segregated Housing and Mental Health*; American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012).

43 Cal. Code Regs., tit. 15, § 1065. **"Return to Main Document"**

44 Doug Porter, *County Jail Deaths Don't Matter in San Diego*, San Diego Free Press (Nov. 16, 2017) (since March 2015, San Diego County has paid more than $6 million in settlements relating to fatalities while in custody), **https://sandiegofreepress. org/2017/11/county-jail-deaths-dont-matter-in-san-diego/**; Kelly Davis, *County settles jail meth death for $2.3 million*, San Diego Union Tribune (Aug. 30, 2016), **www. sandiegouniontribune.com/news/watchdog/sdut-bernard-victorianne-settlement- 2016aug30-story.html**; Kelly Davis, *Two Men at Obvious Risk of Suicide, Two Deaths – and Investigators Just Cleared Both Cases*, Voice of San Diego (Mar. 27, 2017); Tom Jones, *Families Struggle to Get Information After Loved Ones Die In Jail*, NBC San Diego (May 14, 2015), **https://www.nbcsandiego.com/news/local/Families-Struggle-to-Get- Information-After-Loved-Ones-Die-In-Jail-303822051.html**. **"Return to Main Document"**

45 San Diego County Charter, Section 606, http://www.sandiegocounty.gov/clerb/docs/ Section606.pdf. "Return to Main Document"

46 Citizen's Law Enforcement Review Board (CLERB), Frequently Asked Questions, *CLERB FAQs: What is the Review Board?*, http://www.sandiegocounty.gov/content/sdc/clerb/ faqs/faqs_page.html. "Return to Main Document"

47 CLERB FAQs: *What is the Review Board?*; CLERB FAQs: *How can I become a Review Board Member?* "Return to Main Document"

48 CLERB *Rules and Regulations*, Section 4.7(d). "Return to Main Document"

49 Kelly Davis, *Police Oversight Group is Drowning in Death cases*, Voice of San Diego (Jan. 30, 2017), https://www.voiceofsandiego.org/topics/public-safety/police-oversight-group- is-drowning-in-death-cases/. "Return to Main Document"

50 CLERB, *Investigation Workload and Classification Report* (Dec. 2014), https://www. sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2014/ 1214workload.pdf. "Return to Main Document"

51 CLERB, *Investigation Workload and Classification Report* (Dec. 2015), https://www. sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2015/ 1215workload.pdf. "Return to Main Document"

52 CLERB, *Investigation Workload & Classification Report* (Dec. 2016), https://www. sandiegocounty.gov/content/dam/sdc/clerb/docs/workloads/2016/ 1216workload.pdf. "Return to Main Document"

53 CLERB *Findings* (Nov. 2017), https://www.sandiegocounty.gov/content/dam/sdc/clerb/ docs/findings/2017/1117findings.pdf (citing Cal. Gov't Code § 3304(d)). "Return to Main Document"

54 Id.; Editorial: *San Diego County panel's dismissal of death investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017), www.sandiegouniontribune.com/opinion/ editorials/sd-law-enforcement-review-board-death-investigations-20171115-story. html. "Return to Main Document"

55 CLERB, Frequently Asked Questions, *How long does an investigation take to complete?* https://www.sandiegocounty.gov/content/sdc/clerb/faqs/faqs_page.html.

"Return to Main Document"

56 Editorial: *San Diego County panel's dismissal of death investigations an outrage*, San Diego Union Tribune (Nov. 15, 2017), www.sandiegouniontribune.com/opinion/editorials/sd- law-enforcement-review-board-death-investigations-20171115-story.html. "Return to Main Document"

57 American Bar Association, Resolution 104B, *Effective Monitoring of Correctional and Detention Facilities* (2008), https://www.americanbar.org/content/dam/aba/directories/ policy/2008_am_104b.authcheckdam.pdf. "Return to Main Document"

58 L.A. County Ordinance 2014-0034, https://oig.lacounty.gov/Portals/OIG/Reports/ Certified%20OIG%20Ordinance.pdf. "Return to Main Document"

59 Robert Salonga, *Reform-inspired jail oversight, building plan approved in Santa Clara County*, San Jose Mercury (Jan. 23, 2018), https://www.mercurynews.com/2018/01/23/ reform-inspired-jail-oversight-building-plan-approved-in-santa-clara-county. "Return to Main Document"

60 Memorandum *Re: Final Recommendations of the Blue Ribbon Commission on Improving Custody Operations* (Apr. 12, 2016), http://sccgov.iqm2.com/Citizens/Detail_Meeting. aspx?ID=7189; Aaron B. Zisser, *Santa Clara County Jail Grievance and Complaint Process: Expert Consultant's Review and Recommendations for the Blue Ribbon Commission on Improving Custody Operations at 34-38* (Finding 9: Independent Oversight) (Feb. 27, 2016), http://www.sanjoseinside.com/wp-content/uploads/2016/02/Zisser-Final- Report.pdf. "Return to Main Document"

# Appendix A

# DRC EXPERTS' FINDINGS AND RECOMMENDATIONS REGARDING SUICIDES IN SAN DIEGO COUNTY JAIL FACILITIES, MENTAL HEALTH AND SUICIDE PREVENTION POLICIES AND PROGRAMS

Karen Higgins, M.D.

Robert D. Canning, Ph.D., CCHP

## I. INTRODUCTION

Suicide among persons held in correctional facilities is a significant public health problem which is complicated by the legal constraints placed upon correctional systems nationally. Although significant progress has been made in the last forty years, suicide remains the number one cause of death in American jails. Improvements in jail mental health service delivery systems continue to be needed to further decrease the rate of jail suicide deaths. In addition, changes in the conditions of confinement for inmates with mental health disabilities and needs, improved staff training, and facilities improvements can also contribute to reducing the suicide rate in jails.

DRC engaged us to review suicide deaths in the San Diego County Jail system from December 2014 through 2016, and to evaluate the adequacy of mental health services, emergency responses, and the system's overall suicide prevention program. Our review found that disjointed policies addressing suicidal inmates, lapses in continuity of mental health care, poor emergency response, inconsistent monitoring, and some physical plant issues contributed to the suicide deaths we reviewed.

Spurred by the high number of suicide deaths and the scrutiny they brought, the San Diego County Sheriff's Department ("Department") has made significant efforts to revamp its mental health policies and practices to allow consistency in treatment and better coordination between custodial and medical/mental health staff. These efforts should continue and be strengthened, to address the historically high number of inmates who make serious suicide attempts in the County's jails.

## II. BACKGROUND

The San Diego County Jail system has seven facilities. From 2010 to the end of 2016, the average daily population of the jail system rose from 4,646 inmates to 5,362, an increase of 15 percent. The County's Grand Jury found that the jail system has had 46 inmate suicide deaths in the 12 years ending in 2016, with almost 50 percent occurring from 2013 through 2016. The recent spike in inmate suicide deaths has brought increased scrutiny to the jail system's procedures and particularly its mental health system. It is important to understand why rates have increased so dramatically over this

period and to take proactive steps to prevent future suicides.

Taking a broad view, after the California legislature enacted Criminal Justice Realignment (AB109) in 2011, the state transferred jurisdiction for many inmates from state prisons to county jails. San Diego has seen a relatively small net increase in average daily population in its jail facilities: from 5,087 inmates in 2012, the first full year after AB109 took effect, to 5,362 inmates in 2016.

Jail suicide deaths typically occur soon after an individual's entry into the jail system. San Diego County Jail's experience appears to be no exception. Of the 17 suicides occurring in the San Diego Jail system from the beginning of 2014 through the end of 2016, 11 occurred within six days of the inmate's entry.

All suicide deaths since 2014 were of male inmates and occurred in three facilities: Central Jail (seven), Vista Detention Facility (six), and George Bailey Detention Facility (four). One inmate died by suffocation, three jumped from a second tier and died from massive head injuries, and the remaining 13 died of asphyxiation by ligature hanging. Eight of the inmates were housed in dormitories or multiple-person cells, and eight were housed in single cells.

One inmate died in a holding cell.

Four inmates who died by suicide were housed in segregated housing (including one who was housed as psychiatric "overflow" in a segregated housing unit).

We understand that, as of this writing, there was one confirmed suicide death in San Diego County Jail facilities in 2017. This is a decrease from recent years, which is a positive development. Nevertheless, it is important for the system to engage in a meaningful analysis of its policies, to learn from the suicides that have occurred in recent years, and to continue to take proactive steps where necessary.

## III. QUALIFICATION OF EXPERTS

**Karen Higgins, M.D.**

Dr. Higgins is a board-certified, General and Forensic psychiatrist who has been involved with correctional care services since 2001. From 2001 to 2004, she served as the lead psychiatrist for the Denver City and County jail systems. Within that time, she was a key participant in their mental health system, including suicide prevention. In addition, for more than six years, Dr. Higgins served as both the Statewide Senior Supervising Psychiatrist, and then the Statewide Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR). During this time, Dr. Higgins

oversaw for program development at 33 prisons serving 150,000 inmates; acted as the subject matter expert for the Department on psychiatric and mental health related issues; played a key role in the development of Departmental policies and procedures related to mental health care and suicide prevention; was a member of the Departmental suicide prevention committee, which involved review of many psychological autopsies of inmate suicide deaths; worked with the California Attorney General on legal matters related to inmate care; and supported numerous Departmental quality of care improvement initiatives.

**Robert D. Canning, Ph.D., CCHP**

Dr. Canning has been involved in correctional suicide prevention work for more than 12 years. From 2005 to 2015, he was the suicide prevention coordinator for the CDCR. He was the Department's subject matter expert on correctional suicide prevention and in this role contributed to the Department's ongoing mental health litigation. He chaired the statewide suicide prevention committee, designed trainings for clinicians, wrote and oversaw the implementation of many policies and procedures about suicide prevention, and conducted quality improvement programs to improve screening of inmates. He redesigned the Department's suicide risk assessment documentation and designed and implemented a self-harm surveillance system that has received national attention. As part of his work for CDCR, Dr. Canning has conducted over 35 psychological autopsies of inmate suicide deaths.

Dr. Canning has made presentations on suicide prevention in correctional settings at national meetings of the National Commission on Correctional Health Care (NCCHC) and the American Association of Suicidology (AAS). He recently co-authored a chapter on suicide prevention in correctional settings for the *Oxford Handbook of Prisons and Imprisonment*. He is an active member of the AAS and is one of five instructors of its two-day course on suicide risk assessment and management, entitled Recognizing and Responding to Suicide Risk (RRSR). Dr. Canning has taught the RRSR course to over 1,000 clinicians in both the U.S. and Canada. Finally, he has acted as a forensic expert on jail suicide to Los Angeles County.

Dr. Canning received his doctorate in Clinical Psychology in 1993 and completed a National Institute of Mental Health fellowship in psychiatric epidemiology in 1995. He has been licensed to practice in California since 1997 and prior to joining the CDCR worked for the Veterans Administration Northern California Health Care System and the U.C. Davis Medical Center.

## IV. EXPERTS' ASSIGNMENT AND SCOPE OF REVIEW

DRC engaged us to review and analyze (1) individual suicide cases at the San Diego County Jail, with a focus on suicide deaths since December 2014, and (2) the jail's policies and procedures related to mental health care and suicide prevention. Our task was to prepare a report identifying systemic deficiencies in the provision of mental health care and suicide prevention, with recommendations for improvements.

We reviewed medical, mental health, and custodial records of all San Diego County Jail inmates who died by suicide since December 2014. Video of inmate housing units was viewed to observe the circumstances of the suicides, including emergency response and custodial welfare checks. Coroner reports, homicide investigation reports, and other documents (such as court proceedings and police reports for each inmate) were also reviewed. The suicide deaths served as an important starting point for our findings and recommendations throughout the report.

In addition to the records of the inmates who died by suicide during the review period, we reviewed policies and procedures of the Medical Services Division (MSD) and the Detention Services Bureau (DSB). Through DRC, we requested from the Sheriff's Department updated policies and procedures regarding mental health care and suicide prevention, and we have reviewed all materials that were provided. "Green sheets" (facility-specific procedures) were reviewed, as were a variety of training documents pertaining to suicide prevention. We have also reviewed relevant media reports, San Diego County Grand Jury reports (and the County's response), and Citizens' Law Enforcement Review Board (CLERB) reports.

On September 29, 2017, we participated in a two-hour conference call with custodial, mental health and medical staff from San Diego County (and its contractor Liberty Health), legal counsel for the County, and DRC, to discuss aspects of mental health care and suicide prevention in the jails and to clarify particular policies and practices. We did not conduct a site visit as part of this review.

All of the suicide deaths reviewed were of male inmates. Although the context of many findings and recommendations applies to issues identified in the male facilities, they should be applied equally to the treatment of female inmates in the San Diego County Jail system.

## V. EXPERTS' ANALYSIS

Our findings and recommendations are based on materials received as of November 2017. Policy changes occurring after that date will not be reflected in our report.

Our analysis is divided into nine requisite components of a successful

comprehensive correctional suicide prevention program,[1] and contains findings and recommendations to improve the Department's suicide prevention and mental health treatment delivery efforts. The components covered by this review are:

1. Screening for Suicide Risk and Related Mental Health Needs
2. Clinical Assessment and Interventions
3. Communication
4. Restrictive Housing and Monitoring of Inmates
5. Levels of Supervision of At-Risk Inmates
6. Emergency Response
7. Staff Training
8. Review of Suicide Deaths and Serious Suicide Attempts
9. Quality Improvement

Below, we provide our analysis. For each review component, we identify Key Deficiencies that were apparent through our review of suicides and relevant policies. We then provide specific Findings and Recommendations for systemic improvements addressing Key Deficiency areas.[2] In addition, we have completed two detailed individual reviews of recent suicides at the San Diego County Jail, to be provided directly to the County. These individual reviews may serve as models for the County's own quality improvement efforts moving forward.

---

1 Hayes, Lindsay. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons*. National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017, and Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford Handbook of Prisons and Imprisonment*. New York City: Oxford University Press. "Return to Main Document"

2 Inmate names are not provided in this report. References to specific cases will be identified in a separate version of this report that is provided to the County. "Return to Main Document"

### 1. SCREENING FOR SUICIDE RISK AND RELATED MENTAL HEALTH NEEDS

Screening for suicide risk and related mental health needs is an important part of any suicide prevention program. In jails, thorough screening upon entry ("booking") is extremely important. Research shows that almost one-quarter of jail suicides occur in the first 24 hours of incarceration and an additional quarter within 14 days.[3] Of the 12 suicide deaths that occurred at San Diego County Jail from December 2014 through 2016, eight (67%) occurred within 10 ten days of booking.

In addition to screening at the time of booking, screening should be administered for all inmates at important transition moments throughout their confinement. Screening should be administered by medical or mental health staff. (Trained custody staff can effectively administer appropriate initial booking screening with standard scoring that provide clear guidance for referral and further assessment.)

For many inmates, the initial period of incarceration is a period of extremely high risk. As time passes in jail, the risk of suicidal behavior tends to decrease but may rise quickly and suddenly due to transitions that inmates encounter – court dates, visits, receipt of bad news, transfers to other housing units or facilities, and placement in segregated settings. Thus, screening should occur at significant transition moments, the results of which should be available to clinical staff to track changes over time. A process for recurrent screening based on individual circumstances and events is important because research suggests that many individuals who die by suicide communicate their intent in the period before their deaths.[4] That is to say, warning signs of suicide risk and related psychiatric distress are often identifiable with effective screening.

Screening should be systematic and use standardized questionnaires. They should be short, valid, and target psychological symptoms and risk factors most appropriate for the correctional settings in which they are used.[5] Staff should be trained to ask questions clearly and uniformly, and forms should be available in English, Spanish, and other languages. Staff should not rely only on verbal responses, but should be trained to document contextual factors such as behavior and appearance, the inmate's attention to the questions, information from arresting officers, family members, friends,

---

3 Hayes, Lindsay M. (2010). National study of jail suicide: 20 years later. *Journal of Correctional Health Care, 18*, 233-245. "Return to Main Document"

4 Ibid. "Return to Main Document"

5 Maloney, M.P., Dvoskin, J., and Metzner, J.L. (2015). Mental health screening and brief assessments. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry*. New York: Oxford University Press. "Return to Main Document"

or other individuals associated with the inmate, and other factors that provide important information about suicide risk. Finally, documentation of adequate screening is also legal documentation for the protection of both the facility and staff.

## KEY DEFICIENCIES: SCREENING

1. The initial booking screening questions are poorly worded, are not designed in a way that effectively elicits important information, and lack important elements, such as inquiry regarding history of psychiatric hospitalization.
2. The system has lacked an adequate policy or procedure for conducting a suicide risk/ mental health screening for individuals at transition events that carry elevated risk, such as when they are placed in segregation or moved to a new facility.
3. The system has lacked an adequate procedure for screening inmates returning from court (where they may have received bad news), moving to prison, or being extradited. These are events that may elevate an inmate's risk of suicide.

## FINDINGS AND RECOMMENDATIONS: SCREENING

**FINDING 1.1.** Of the twelve (12) San Diego County Jail inmates who died by suicide from December 2014 through 2016, we identified a number of problems with the initial suicide risk screening and referral process. For example, one had a 24-hour delay before his initial screening. Of the six inmates who screened positive for mental health problems during their initial screening, one had no referral for further evaluation.

Six inmates denied any mental health problems during their initial screening. Among this group, one inmate had indicators that would have warranted a mental health referral, yet we found no record of a referral being made.

One particularly troubling case stood out. The inmate had a diagnosis of bipolar disorder and was screened, but even though he demonstrated signs and symptoms of florid psychosis and mania, he was not referred for evaluation and admission to the Psychiatric Security Unit. He was placed in a Safety Cell, was later released to general population, and died on Day Six of his confinement while still floridly psychotic and manic, despite a request to custodial staff earlier in the day for safety cell placement. Jail staff did not complete a separate assessment of suicide risk despite this inmate's extreme mental state and need for evaluation and treatment. Individuals suffering from bipolar disorder have some of the highest rates of suicide compared to other mental disorders. The inmate's documented mental health history and his symptomology at the jail were such that he should have received urgent psychiatric attention and been referred for inpatient care.

***RECOMMENDATION:*** *The Department should adopt a standardized screening measure such as the Brief Jail Mental Health Screen*[6] *and augment it with a suicide risk screening measure such as the Columbia-Suicide Severity Rating Scale*[7] *or a series of suicide-specific questions (current suicidality, past attempts, etc.).*

***RECOMMENDATION:*** *Suicide prevention policies and procedures should contain a specific section devoted to screening – including guidance on measures, locations, and times. The section should explain when and who administers screening in the range of potential situations. This section will guide staff actions and decrease the number of "false negative" screenings, which are the ones most costly to a system.*[8] *The policies should include a checklist with criteria that guides staff when to refer for evaluation by the jail's designated "Gatekeeper" (generally, a Registered Nurse or mental health clinician) and guides Gatekeepers on when to refer for further evaluation by the mental health program.*

**FINDING 1.2.** We identified four suicide deaths for which the inmates screened positive for drug and/or alcohol withdrawal but were not targeted for a more comprehensive suicide risk assessment. There is evidence showing that such inmates are at increased risk of suicide and self-harm. These individuals should have been further assessed.[9]

***RECOMMENDATION:*** *New arrivals withdrawing from alcohol and/or drugs should be specifically assessed for psychiatric disorders and suicide risk. While the Jail's policy (MSD.S.10) lists "Intoxication/Withdrawal Symptoms" as among "Other Risk Factors That Could Cause Circumstantial Concerns," review of the jail's recent suicide deaths indicate the need for revision of this policy to ensure that such symptoms trigger a comprehensive suicide risk assessment.*

**FINDING 1.3.** The San Diego County Jail system lacks an effective quality improvement program with respect to mental health/suicide risk screening.

***RECOMMENDATION:*** *Because mental health and suicide risk screening is a component of effective quality improvement programs in health care settings,*

---

6 The screener can be obtained from: https://www.prainc.com/?product=brief-jail-mental-health-screen. "Return to Main Document"

7 The C-SSRS can be obtained from http://cssrs.columbia.edu/the-columbia-scale-c-ssrs/cssrs-for-communities-and-healthcare/#filter=.general-use.english. "Return to Main Document"

8 In general, screening measures should err on the side of false positives since it is less costly to complete an extra evaluation than deal with the aftermath of a preventable suicide death. Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) The Oxford Handbook of Prisons and Imprisonment. New York City: Oxford University Press. "Return to Main Document"

9 Rivlin, A., Ferris, R., Marzano, L., Fazel, S., and Hawton, K. (2013). A typology of male prisoners making near- lethal suicide attempts. Crisis, 13, 335-347. "Return to Main Document"

*procedures should be developed to track both when screening occurs and the results of the screening. Rates of screening and referrals should be a key indicator in the Department's quality improvement program.*

## 2. CLINICAL ASSESSMENT AND INTERVENTION

Treatment planning and management of prisoners potentially at risk of suicide relies on effective clinical assessment. Effective clinical assessment of suicide risk requires clinicians to 1) gather data on risk and protective factors and warning signs; 2) perform a suicide inquiry in which they ascertain the extent of planning, intent, and the quality and character of suicidal ideation, if present; 3) come to a judgment of risk with a rationale for this level; and 4) develop a treatment plan for management of the suicidal patient. Each assessment (especially those conducted in response to a crisis evaluation) should include a short-term "safety plan" that emphasizes enhancement of protective factors, reduction of acute and/ or modifiable risk factors (possibly housing issues or issues involving recent transfers), and treatment of current distress and agitation. These safety plans can be modeled after brief interventions used in emergency departments in the community[10], but should be specifically tailored to correctional settings. Treatment planning should include specific timeframes for review and updating. Referrals for mental health treatment should have specific timeframes for response by mental health staff.

It is important for jail staff – custodial, mental health, and medical – to monitor and treat identified mental health problems. This requires staff to provide clinically indicated treatment and to respond quickly and effectively to crises as they arise. Even after an inmate's crisis subsides, there is a continued need to address mental health treatment needs. An inmate should be transitioned into a structured mental health program that addresses their level of symptoms and functioning in the correctional environment. In addition, if an inmate is assessed to be at elevated suicide risk, they should continue to be evaluated for this risk as they continue in confinement, with an individualized treatment plan and safety plan.

## KEY DEFICIENCIES: CLINICAL ASSESSMENT AND INTERVENTION

1. Although inmates are often referred for further mental health and suicide risk evaluations after positive screening results, it is not clear from the records or the County's policies and procedures what (if any) criteria have been used or what timeframes have been required for referrals and evaluations.
2. The documentation of risk evaluations has been poor and inconsistent, hindering effective treatment and continuity of care among providers and between jail facilities.
3. Mental health staff do not adequately consider previous risk evaluations and changes to inmates' conditions during the course of confinement.
4. Inmates who have required mental health treatment and remained in custody

[10] Stanley, Barbara and Brown, Gregory K. (2012). Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk. *Cognitive and Behavioral Practice 19*. 256-264.

"Return to Main Document"

for significant periods do not have individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

## FINDINGS AND RECOMMENDATIONS: CLINICAL ASSESSMENT AND INTERVENTION

**FINDING 2.1.** The San Diego County Jail policies do not provide adequate guidance, including clear timelines, regarding the evaluation process for inmates who screen positive for mental health needs or suicide risk at booking. For example, in one case reviewed, the inmate was brought to the jail after a serious suicide attempt. Though he was seen for further evaluation after the initial screening, it was unclear who performed the evaluation or what the rationale for it was.

***RECOMMENDATION:*** *Policies and procedures should provide specific timelines for referral and completion of evaluations after referral. For instance, the policy should establish timelines for response to referrals – standard guidelines, for example, may be for evaluations that are "emergent" to be completed within four hours, "urgent" within 24 hours, and "routine" referrals within five business days. Data about these referral timelines and completion rates should be reviewed regularly to gauge access to care as part of a quality improvement program.*

**FINDING 2.2.** The quality of suicide risk evaluations varied among the records reviewed. Although the policies provide criteria for categorizing an inmate as "High" risk for suicidal behavior, we found that risk factors were not adequately documented, even as several inmates had a clear history of suicidal behavior and/or a known psychiatric history.

***RECOMMENDATION:*** *To improve the quality of suicide risk evaluations, the Department should create a standardized suicide risk evaluation form or template in the electronic record. This would facilitate improved documentation by mental health clinicians with respect to their risk assessments. This form or template should include the following sections:*

1. *The reason for evaluation along with time, date, and location*
2. *Sources of information*
3. *Discrete sections for Warning Signs such as the AAS' IS PATH WARM, and acute and chronic (or static) risk factors*
4. *Protective factors*
5. *Questions about planning or a desire for death*
6. *A mental status exam*
7. *Judgment of risk and a rationale for the judgment*
8. *A safety plan that addresses modifiable risk factors and warning signs.*

**FINDING 2.3.** Mental health staff do not clearly or adequately document inmates' suicide risk levels. In some cases, the assigned suicide risk levels were problematic. For example, one inmate was incorrectly rated as "Low" risk just two days after a serious suicide attempt. In addition, the jail system's two-level stratification of risk ("High" or "Low" risk) is inconsistent with common practice. Many healthcare systems (e.g., California Department of Corrections and Rehabilitation, United States Department of Defense, U.S. Department of Veterans Affairs) use at least a three-level stratification – such as Low, Medium, High – or four-part – such as Low, Medium, High, Extreme.

***RECOMMENDATION:*** *Because a judgment of risk drives treatment decisions (i.e. what to do), the County should utilize a three-level rating system that more realistically describes the continuum of risk and will allow clinicians to devise treatments that better fit the needs of the patient. The addition of a "Medium" risk level will alert other staff that a patient's risk for suicidal behavior is significant and requires more attention and alertness.*

**FINDING 2.4.** We could identify no standardized procedure for placing, monitoring, and releasing inmates from various levels of suicide monitoring. For instance, one inmate who died by suicide had four Safety Cell placements based on suicide risk over a period of four months. Each time, he was released without adequate documentation of the clinician's judgment of risk and the rationale for the decision. The situation for another inmate's two Safety Cell placements prior to his suicide was similar.

***RECOMMENDATION:*** *The Department should ensure adequate and consistent documentation of suicide risk assessments when adjusting an inmate's level of observation.*

**FINDING 2.5.** The San Diego County Jail's policies for addressing inmate medication refusals are vague and inadequate. In at least one reviewed case, the inmate's refusal of psychiatric medication was not addressed in a timely fashion.

***RECOMMENDATION:*** *The Department should implement procedures, with specific timelines, for when an inmate refuses prescribed psychiatric medications.*

**FINDING 2.6.** We identified deficiencies with the process and setting of clinical contacts for prisoners at risk of suicide. Although a number of inmates we reviewed were seen by mental health staff, it was unclear if there was a standard interval between mental health visits, or if they were done on an ad hoc basis, or if they were simply up to the individual clinician's discretion. A substantial number of mental health clinical visits appear to have been conducted inside the housing units, including at cell-front. This setting does not provide adequate auditory and visual privacy and confidentiality necessary for meaningful clinical interactions.

***RECOMMENDATION:*** *The Department should establish standard intervals for mental health visits, which can be made more frequent pursuant to individual clinical*

*need.*

**RECOMMENDATION:** *Because interviewing inmates at cell-front decreases the chance for a frank and open conversation with a patient, the Department should provide confidential treatment space for inmates being followed by mental health.*

**FINDING 2.7.** We have significant concern about the lack of required follow-up for prisoners identified as at risk of suicide after they are discharged from the San Diego County Jail's Inmate Safety Program (ISP), including from the Psychiatric Security Unit, Safety Cells, and Enhanced Observation Housing (EOH). The use of specific risk factors to determine follow-up processes for such inmates is questionable in our estimation. Although we understand the rationale, we believe that the program runs the risk of false negatives, which are much costlier than false positives when it comes to suicide attempts and deaths. Prisoners who have required placement in the Inmate Safety Program based on an identified risk of self-harm should, as a rule, be provided clinical follow-up and, as appropriate, clinically indicated treatment interventions.

**RECOMMENDATION:** *The ISP Follow Up Protocol should provide that all inmates released from EOH should be seen by a mental health clinician within 24 hours of release and have their safety plan reviewed and updated if necessary.*

**RECOMMENDATION:** *Decisions regarding clinical follow-up after release from the Inmate Safety Program (including EOH) should not be left to a "clinician's discretion." We believe a best practice is to have a specific follow-up schedule that all clinicians follow, e.g. daily clinical "check-ins" for five days after a housing change, followed by weekly check-ins for two weeks.*

**RECOMMENDATION:** *Inmates who are being followed by the mental health program after release from the Inmate Safety Program (including EOH) should have specific timeframes for clinical contacts outside the specific follow-up procedure. This would allow for a more in-depth interview to cover treatment plans and medication compliance, for instance.*

**FINDING 2.8.** Four inmates who died by suicide suffered differing levels of drug/alcohol withdrawal symptoms, but only two inmates were housed in Medical Observation Beds (MOB). The policy on MOB placement for patients "experiencing severe symptoms" of drug withdrawal does not mention concurrent treatment by psychiatry except in passing. The section notes that these inmates "should be considered a high risk for suicide" but notes only that nurses will round "once a shift" on the MOB. That is, there is a significant gap in the provision of mental health treatment and suicide prevention monitoring for prisoners at risk who are also experiencing withdrawal symptoms.

**RECOMMENDATION:** *We recommend a higher level of observation, including clinically indicated mental health treatment, for inmates experiencing both mental health problems and withdrawal symptoms.*

**FINDING 2.9.** The Inmate Safety Program policies lack sufficient direction regarding the timeframes for assessment and release from the Enhanced Observation Housing (EOH) units. It is essential that inmates placed in EOH be reviewed and transferred to less restrictive settings at the earliest time appropriate based on their condition.

***RECOMMENDATION:*** *Policies should give specific direction to staff about the criteria for placing and assessing inmates in EOH units. For instance, we believe this type of housing is appropriate for inmates voicing suicidal thoughts and deemed at medium or high risk of acting on these thoughts in the very short-term (minutes to hours). We recommend that the schedule for re-assessment of inmates in EOH should not be categorical, but based on evaluations conducted by mental health professionals at regular intervals. While we commend the Jail for recently modifying its policy to ensure that all EOH prisoners are re-assessed for suicide risk, at a minimum, at least once in each 24-hour period, when clinical presentation dictates closer monitoring, clinicians must make a judgment of current risk including any changes since the last assessment. Decisions to transfer an EOH inmate to either general population or a mental health housing unit must take into account past behavior, current symptoms, and the context of confinement (charges, court date, pending transfer, etc.), and must include a written safety plan.*

***RECOMMENDATION:*** *Stays in the EOH should not exceed 48 hours. If the inmate is not stabilized within that time period, they should be evaluated for referral to inpatient psychiatric treatment (i.e., the Psychiatric Security Unit). However, if the placement in EOH housing extends beyond 48 hours, the withholding of out-of-cell time, personal property, social visits, and clothing should be based on individualized clinical assessment and safety concerns.*

**FINDING 2.10.** Inmates who have required mental health treatment and remained in custody for significant periods did not have documented, individualized mental health treatment plans in their charts or access to an adequate level of mental health care programming.

The Department is making efforts to improve how inmates are evaluated and at elevated risk for suicide are monitored, but overall the mental health program remains fragmented and without good continuity of care, which can lead to poor outcomes. For instance, as noted above, it was unclear to us why some inmates would be placed in Safety Cells and some in EOH. Further, based on our experience with suicidal inmates in correctional settings, we did not understand why inmates deemed at high risk of suicide were not more often evaluated for placement in the Jail's inpatient level of care unit.

***RECOMMENDATION:*** *The Department should take steps towards development of a consolidated mental health treatment environment which combines the Safety Cell program, Enhanced Observation Housing, and an enhanced outpatient mental health program.*

*Many systems have adopted a "level of care" system to provide mental health services and to clarify hand-offs and treatment programs. The Department appears*

*to have created categories of mental health needs, but without formalizing a system in policy and procedure that provides for an appropriate spectrum of levels of care. The PSU is the highest level of care. There are mental health "cluster" units, as on the sixth floor at the Central Jail, but without formal treatment programming. There is also the Detention Outpatient Psychiatric Services (DOPS), which appears to include the lion's share of inmates requiring some level of ongoing mental health attention.*

*It would be useful and important to create an "intermediate" level of care, located in enough San Diego County Jail facilities to ensure timely access for those with mental health needs that warrant enhanced treatment programming. The program would serve as a "step-down" for people with recent Safety Cell, EOH, or PSU admissions, as well as for people with a serious mental illness that makes it difficult for them to function in a general population jail setting. The program would have sufficient mental health staffing to provide a structured treatment program that includes individual and group therapy, guided by individualized treatment plans (as required by Title 15, Sec. 1210 of the California Code of Regulations) that identify mental health problems, treatment goals, and a plan to accomplish those goals.*

### 3. COMMUNICATION

Communication between and among correctional staff and other professionals working in the jail environment is an important aspect of suicide prevention. Suicide prevention expert Lindsay Hayes lists three categories of communication: (1) getting information about the inmate's behavior at the time of arrest and transport; (2) communication between correctional staff and clinical staff about changes in an inmate's status and condition; and communication between all staff and inmates who may be suicidal. Poor communication practices can result in poor outcomes. Hayes recommends a multidisciplinary approach to working with suicidal individuals that notes:

> Poor communication between and among correctional, medical, and mental health personnel, as outside entities…is a common factor found in the reviews of many custodial suicides. Communication problems are often caused by lack of respect, personality conflicts, and boundary issues. Simply stated, facilities that maintain a multidisciplinary approach avoid preventable suicides.[11]

## KEY DEFICIENCIES: COMMUNICATION

1. The San Diego County Jail system has lacked an effective way for custodial staff and mental health staff to communicate about important changes in an inmate's status (e.g. results of court proceedings, "bad news," impending transfers, etc.).
2. The lack of standardization in clinical documentation has hampered effective communication between treating clinicians and other health

[11] Hayes, L. (2017). *Guide to Developing and Revising Suicide Prevention Protocols within Jails and Prisons*. National Commission on Correctional Health Care, http://www.ncchc.org/other-resources. Accessed October 21, 2017. "Return to Main Document"

care staff.

## FINDINGS AND RECOMMENDATIONS: COMMUNICATION

**FINDING 3.1.** Several inmates who died by suicide in jail had significant events (“bad news”) during their incarceration that may have significantly increased their suicide risk. Inmates may have multiple court dates with mixed results and many are sentenced to terms either locally or in state prisons. These developments can have a significant impact on an inmate’s psychological state and contribute to elevated risk of suicide or self-harm. For instance, one hanged himself a few days before he was to transfer to state prison. Another committed suicide the day before his transfer to another state to face criminal charges. This case was particularly egregious because it was known among staff that he had made a credible suicide attempt in a similar manner just two weeks earlier, and that he was experiencing considerable stress about being extradited to another state to face criminal charges. Yet, as the date of his extradition approached, the clinical record did not reflect any sense that this could be a period of heightened risk requiring closer observation, monitoring, and clinical follow-up. From our review, this was a suicide death that with adequate communication was preventable. Our review of San Diego County Jail policies and procedures found no specific mechanism for communication in these kinds of situations.

***RECOMMENDATION:*** *Communication and coordination among custodial staff and health care staff regarding inmates at risk of suicide and psychiatric decompensation need improvement. Custodial staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff. Multidisciplinary teams should meet on a regular basis to discuss the status of inmates with significant mental health needs or who demonstrate significant suicide risk factors.*

**FINDING 3.2.** Mention of significant events was scant in the treatment records we reviewed. Given the vulnerability to external events that many inmates experience (and their inability to control many of them), evaluations of risk should include information about such events and how they may impact the inmate’s risk.

***RECOMMENDATION:*** *Treatment plans should include substantive discussion, including potentially a specific section, regarding significant events that could affect the inmate’s treatment needs and/or risk of suicide.*

### 4. RESTRICTIVE HOUSING AND MONITORING OF INMATES

The housing placement of inmates can have profound impacts on their mental well-being and produce changes in their risk of self-injury and suicide. Our experience with jail and prison facilities, along with extensive research, has shown that placement in segregated housing increases the risk of suicidal and self-harming behavior, isolates individuals, and impedes normal interpersonal interactions that are essential to psychological health and adequate treatment.

Policies and procedures should take this known risk into account and include mental health and suicide risk information when housing decisions are made. Housing inmates in isolated settings may increase their sense of hopelessness and desperation, increasing the potential for suicidal thinking and behavior. In addition, the housing of individuals with intellectual disabilities in such settings can trigger suicidal thoughts and behavior. Placing inmates with mental illness in solitary confinement-type housing (i.e. housing situations where an inmate is limited to a few hours of out-of-cell time or less per day, has reduced privileges, and has minimal opportunity for normal social interactions) can exacerbate symptoms and lead to negative outcomes. The placement of inmates with mental illness or elevated suicide risk in solitary confinement settings should be avoided whenever possible. When such placements are deemed necessary, adequate monitoring and enhanced mental health treatment are essential.

In addition, the monitoring of inmates in housing units, particularly units with solitary confinement-type conditions, is a standard custodial practice. Adequate welfare and/ or safety checks involve observing inmates and noting their status and welfare. Inmates housed in segregated housing are often monitored at more frequent intervals than those in general population settings.

The construction of jail cells in segregation units should account for the risk presented by attachment points – such as ventilation grates and bed frames – that are commonly used for hanging attempts.

## KEY DEFICIENCIES: RESTRICTIVE HOUSING

1. San Diego County Jail lacks an adequate process to screen inmates for increased suicide risk prior to placement into Administrative Segregation (AdSeg) or Keep Separate All (KSA) housing.

2. Security/welfare checks of inmates in housing units were observed to be inadequate. In several cases, they were poorly performed and in others they were not completed in a timely fashion.

3. San Diego County Jail lacks an effective system to monitor and to provide necessary treatment of inmates on the mental health caseload who are housed in AdSeg or KSA housing, increasing the risk of suicide and psychological deterioration in these settings.

## FINDINGS AND RECOMMENDATIONS: RESTRICTIVE HOUSING

**FINDING 4.1.** There is not an adequate process for mental health screening before inmates are placed into AdSeg or KSA housing, which are known to carry significant risks for people with mental illness.

***RECOMMENDATION:*** *Given the harsh setting and restrictions inherent in restrictive housing units and the impact this may have on inmates, the Jail should institute screening of all inmates prior to their placement in such units. This screening could be included with a medical screening completed by nursing staff. The screening would ask simple questions addressing current distress and thoughts of suicide, and*

*provide an opportunity for mental health staff to identify treatment needs and to provide input into housing decisions.*

**FINDING 4.2.** Inadequate security/welfare checks (also known as "proof of life checks") were observed via video review in a number of cases in which inmates died by suicide. In at least one case, hourly safety checks were not completed pursuant to Jail policy during the time period the inmate died by suicide. In video and record reviews of at least three inmates who died, checks were completed inadequately – either not completed timely or in manner that failed to meaningfully assess the welfare of the inmate. For instance, in one case, the video showed two deputies enter the housing unit and separate to allow one to check the upper tier and one the lower. The deputies completed their checks of 40 cells in 17 seconds, far too quickly to complete meaningful checks. The deputy checking the upper tier did not stop except at the first cell and did not appear to take enough time to establish that the inmates in each cell were alive and safe.

***RECOMMENDATION:*** *The Department should provide annual training for sworn staff that includes reminders about the requirement for assuring the welfare of inmates during security/welfare checks.*

***RECOMMENDATION:*** *The Department should implement a method to track and audit the timeliness and adequacy of security/welfare checks, such as reviewing videos.*

**FINDING 4.3.** The San Diego County Jail lacks adequate policies or procedures for monitoring and treatment of inmates with mental illness in restrictive housing. Policies lack direction regarding how mental health information should be incorporated into housing decisions. For example, one inmate was housed in AdSeg for over four months, but his segregated housing status was not mentioned in his clinical documentation. This inmate, who appeared to suffer the ill effects of prolonged isolation, had significant symptoms of mental illness that were not detected by staff until he voiced suicidal ideation two months after his incarceration. After several more Safety Cell placements and adjudication of his criminal charges, he professed to have safety concerns and was housed in AdSeg for the last six weeks of his incarceration and life. He hanged himself several days before he was to be transferred to state prison.

***RECOMMENDATION:*** *The Department should implement procedures that ensure appropriate monitoring of inmates in segregated housing units to timely identify inmates with deteriorating mental health, and implement a program that delivers necessary treatment for inmates on the mental health caseload in restrictive housing units.*

**FINDING 4.4.** The suicide death of one inmate revealed that monitoring panels in control booths were at times set to mute and staff did not adequately monitor alert lights in the control booths. In this case and others, such practices can result in staff missing emergencies and calls for help from

inmates.

***RECOMMENDATION:** The Jail should train all housing staff to properly maintain alert systems and monitors in housing unit control booths, and to respond appropriately when alerted.*

**FINDING 4.5.** Eight inmates died by hanging from December 2014 through 2016. In all of these cases, ligatures were attached to ventilation grills or looped around beds that had a separation from the cell wall.

***RECOMMENDATION:** The Department should take affirmative steps to address the known risk of suicide attempts associated with the presence of attachment points in cells, particularly in segregated housing. This may include retrofitting cell ventilation grates and beds (so that the bed is flush against the cell wall) and avoiding attachment points in future construction, such that ligature material cannot be passed through gaps for suicide attempts by hanging.*

## 5. LEVELS OF SUPERVISION OF AT-RISK INMATES

Adequate monitoring of suicidal inmates is a crucial component of a comprehensive suicide prevention program. As the World Health Organization has recognized: “The level of monitoring should match the level of risk. Inmates judged to be actively suicidal require constant supervision. Inmates who have raised staff suspicions of suicide but who do not admit to being actively suicidal, may not require constant supervision but will need to be observed more frequently.”[12]

### KEY DEFICIENCIES: SUPERVISION

1. The Department’s policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk. The policy should provide for constant observation of inmates at high risk whenever clinically indicated.

2. The Department’s policies and procedures for monitoring inmates in Safety Cells and EOH are unclear and at times give conflicting guidance for staff, which can lead to poor decision-making and poor continuity of care for at-risk inmates.

3. Monitoring schedules for the County’s jail facilities do not match the system-wide policies and procedures manual, which creates confusion and inconsistency in practices.

4. The Department’s policy and practices do not ensure that health care staff have authority to determine the appropriate level of care and observation (absent clear and documented security concerns), with custodial staff primarily authorized to make such decisions. This is problematic. Decision-making regarding the level

12 World Health Organization. (2007). Preventing Suicide in Jails and Prisons. World Health Organization & International Association for Suicide Prevention. Geneva, Switzerland. “Return to Main Document”

of suicide risk for inmates is the responsibility of the mental health and medical programs. Although safety and security need to be taken into account, the welfare of inmates is a top priority.

## FINDINGS AND RECOMMENDATIONS: SUPERVISION

**FINDING 5.1.** The Department's policies lack sufficient clarity about the levels of risk and the levels of observation specified for each level of risk.

***RECOMMENDATION:*** *Levels of observation for suicidal inmates should progress from the highest level of observation – constant, direct, visual observation (also called 1:1 or Suicide Watch) – and be stepped down from that level. Inmates requiring 1:1 observation are inmates who are currently attempting to harm themselves, or who express suicidal thoughts with a well-developed plan and available means, and continue to espouse the intent to carry out their plan. This most intense level of observation is reserved for those inmates who are at the gravest risk and need immediate psychiatric inpatient care (either in the PSU or offsite inpatient facility).*

***RECOMMENDATION:*** *Inmates requiring a less stringent level of observation are those inmates who may have stated suicidal thoughts and/or intentions but do not have the means or well-developed plan, but are agitated and in great distress. These inmates, still at high risk, should be placed on Suicide Precaution, which requires staggered 15-minute checks (rather than "twice in every 30 minute period" as appears to have been the practice at some San Diego County jail facilities).13 Staggered 15 minute checks means that an inmate must be observed at least once in every 15-minute interval and there should never be more than 15 minutes between observations. In practice, inmates housed in Safety Cells or the EOH for suicidal thinking or behavior should always be placed on Suicide Precaution status unless they are being evaluated for referral to the PSU, in which case they should be placed on continuous visual observation until transferred.*

***RECOMMENDATION:*** *Decisions to move an inmate from a higher level of observation to a lower one should always require a clinical assessment of current risk and a justification by a mental health clinician.*

**FINDING 5.2.** Recent proposed changes to the suicide prevention policy specifying three levels of Suicide Watch and certain frequencies of monitoring/observation represent a positive step by the Department. The policy should continue to be refined to provide adequate clarity regarding applicable criteria for the levels of risk and observation.

***RECOMMENDATION:*** *Policy should provide clear guidance regarding the criteria for levels of risk and observation. Policy should also provide for constant, visual observation (also called 1:1 observation) when clinically indicated. For instance, in the proposed policy we reviewed, the observation schedules for inmates identified as "Level I" is the same as that for inmates identified as "Level II," and neither provide for constant visual observation. The policy should specify observation levels based*

*on risk and housing (e.g., inmates who are voicing suicidal thoughts and intention to act, and are housed in Safety Cells, should be on 1:1 Observation, while inmates housed in EOH and having intermittent suicidal thoughts should be on Suicide Precaution).*

***RECOMMENDATION:*** *Inmates placed in safety cells should be re-evaluated for stepdown or inpatient placement no more than 12 hours after placement.*

**FINDING 5.3.** Individual facility policies regarding monitoring of inmates at elevated risk of suicide are in some cases inconsistent with the Department's system-wide policies. For example, the Department's policies specify that sworn staff will monitor inmates in Safety Cells a minimum of twice per 30 minutes, yet the "Green Sheets" for the Las Colinas Detention and Reentry Facility and the Vista Detention Facility do not.

***RECOMMENDATION:*** *The Department must ensure that all facilities' Green Sheets are consistent with system-wide policies and procedures for monitoring inmates housed in Safety Cells and EOH.*

**FINDING 5.4.** The Department's policies do not provide health care staff a sufficient role in some decisions regarding release from EOH or Safety Cell Housing of inmates evaluated for increased risk of self-injury. DSB Policy Section J.1 states that "[e]very four hours, the watch commander or designee will evaluate the inmate for continued retention in a safety cell." In another section regarding removal of inmates from Safety Cells, the watch commander is to consult with a mental health provider "to determine whether the inmate, if removed from the safety cell, is likely to pose a threat to himself/herself or others." Additionally, Sections J.4 (Enhanced Observation Housing) and J.5 (Inmate Safety Program) note that custodial personnel make the decision about housing inmates in either setting – albeit with input from a Gatekeeper.

***RECOMMENDATION:*** *Decisions regarding housing of inmates at elevated risk for suicidal behavior should primarily be the responsibility of medical and mental health staff, unless safety and security override these concerns (e.g., an agitated, violent, and suicidal patient). Where such safety and security concerns exist, custodial staff should consult with medical/mental health staff when making housing decisions.*

## 6. EMERGENCY RESPONSE

When a medical emergency occurs inside a jail, the level of training and response of custodial and medical staff will often determine if an inmate lives or dies. National correctional standards acknowledge that a facility's policy regarding intervention should be threefold. First, all staff who come in contact with inmates should be trained in standard first aid procedures and CPR. Second, any staff member who discovers an inmate attempting suicide should immediately survey the scene to ensure the emergency is genuine, alert other staff to call for medical personnel, and begin standard first aid and/or CPR. Third, staff should never presume that the inmate is dead but rather should initiate and continue life-saving

measures until relieved by medical personnel.[13]

**KEY DEFICIENCIES: EMERGENCY RESPONSE**

1. Almost half of the emergency responses to lethal suicide attempts from December 2014 through 2016 featured poor coordination of lifesaving efforts, delays in starting CPR, or malfunctioning equipment.

2. The Department does not appear to have a program of drills to improve readiness and response in the case of medical emergencies.

**FINDINGS AND RECOMMENDATIONS: EMERGENCY RESPONSE**

**FINDING 6.1.** Review of records and video footage of suicide deaths of seven inmates (58.3% of those reviewed) demonstrated serious problems with emergency response. In one case, health care staff were unable to utilize the automated electronic defibrillator (AED) due to malfunctioning equipment. In another case, there was a nearly seven-minute delay in using the AED prior to the arrival of the paramedics. Deputies discovered one inmate hanging in his cell but waited seven minutes to cut the inmate down and then prevented nursing staff from evaluating the inmate's condition or using the AED. There were two cases involving a delay in starting cardiopulmonary resuscitation (CPR), in one case for several minutes while approximately 11 deputies stood around without initiating life-saving measures.

Good coordination between custodial and medical staff is important because brain damage from asphyxiation can occur within 4 minutes, with death often resulting within 5-6 minutes. Timely initiation of effective life-saving measures can save lives. This did not occur in many San Diego jail suicide cases.

Our review found that not all staff understand their role in emergency responses to suicide attempts. Language in the Department's policies for Medical Emergencies is not clear. For example, it states that medical personnel "may assist or take over CPR responsibilities" (emphasis added). The policy language should be changed to give medical personnel the responsibility of emergency response when they arrive on scene.

***RECOMMENDATION:*** *All staff should be thoroughly trained, including periodic refresher training, in their specific emergency response roles:*

a. *Sworn staff should not assume an inmate is dead, but should start lifesaving measures except in well-delineated circumstances (electrocution, etc.)*

---

[13] Hayes, L. (1995). *Prison Suicide: An Overview and Guide to Prevention*. United States Department of Justice, National Institute of Corrections. Washington, DC. "Return to Main Document"

b. *Any staff member should sound the alarm and notify 911.*

c. *Sworn staff should be trained on how to use emergency equipment such as AEDs and cut down tools.*

d. *Sworn staff should continue lifesaving measures until relieved and/or directed by medical staff.*

e. *Medical staff should assume control of the emergency response as soon as they arrive on the scene.*

f. *Declaration of death is the responsibility of a licensed physician.*

***RECOMMENDATION:*** *Multi-disciplinary drills should be regularly conducted in housing units to assure that emergency response readiness is maintained and that staff understand their roles.*

***RECOMMENDATION:*** *Emergency response equipment should be audited regularly and maintained in working condition.*

## 7. STAFF TRAINING

"The framework for a comprehensive suicide prevention program includes substantial staff training."[14] All custodial, medical, nursing, and mental health staff should undergo systematic and ongoing training on the signs of mental illness and elevated suicide risk. All staff who have significant contact with inmates "should be trained to recognize verbal and behavioral cues that indicate potential suicide."[15]

We reviewed numerous San Diego County Jail materials related to suicide prevention, including PowerPoint presentations, handouts, brief trainings, scenarios, lesson plan, and booklets.

### KEY DEFICIENCIES: STAFF TRAINING

1. The Department's training programs for custodial and medical/mental health staff is not well coordinated. It is not clear what the training schedule is, what the training requirements are, how training records are kept, and how trainings should be evaluated.

2. Training for mental health clinicians on principles of suicide risk assessment and treatment should adhere to accepted clinical standards, with reference to the professional literature about risk assessment and the treatment of suicidal patients.

### FINDINGS AND RECOMMENDATIONS: STAFF TRAINING

**FINDING 7.1.** Currently there is no consolidated training program that encompasses all aspects of suicide prevention, including suicide warning

[14] Metzner, J. and Hughes, K. (2015). Suicide risk management. In R.L. Trestman, K.L. Appelbaum, and J.L. Metzner (Eds.) *Oxford Textbook of Correctional Psychiatry*. New York: Oxford University Press. "Return to Main Document"

[15] Ibid. "Return to Main Document"

sign awareness, how to work with inmates with mental illness, principles of suicide risk assessment, correctional suicide prevention, treatment of suicidal inmates, and emergency response.

***RECOMMENDATION:*** *The Department should implement a training program that includes modules for custody cadets, custodial staff, and medical/mental health staff (including contract staff). Policies should be written that cover training for all staff and that includes timeframes, content requirements, and evaluation strategies. In addition, a system should be put in place that tracks trainings and ensures that all staff are current on required trainings.*

**FINDING 7.2.** Generally, the training materials we reviewed indicate that there are gaps in the training for medical and mental health staff, who must be prepared to assess suicide risk and identify appropriate interventions.

***RECOMMENDATION:*** *The Department's training unit should be charged with developing a set of curricula covering all aspects of mental health treatment and suicide risk assessment and treatment.*

***RECOMMENDATION:*** *All staff who have regular contact with inmates should be required to have standard first aid cardiopulmonary resuscitation (CPR) training and be trained in the use of various emergency equipment (cut down tools, automated external defibrillators (AEDs), etc.). This will help ensure that staff understand their roles in emergency response and can respond appropriately.*

***RECOMMENDATION:*** *The Department should use a standardized and best practice training protocol for sworn staff, such as that developed by Lindsay Hayes.*[16]

**FINDING 7.3.** Review of the suicides between December 2014 and 2016 revealed both strengths and weaknesses in clinical documentation, which could be improved with training and the use of guidelines for documentation. Risk assessments were often brief and did not include important information about the inmates, such as history of suicidal behavior or protective factors, and were often shortened to "Denies SI."

The records of multiple inmates revealed poor staff practices, such as the use of "contracting for safety." This practice has not been shown to decrease the risk of suicide attempts or to provide any protection for clinicians and should be discouraged by medical and mental health staff.

***RECOMMENDATION:*** *Mental health staff should have specific suicide risk assessment training that adopts best practices in training, such as the Recognizing and Responding to Suicide Risk course from the American Association for*

---

16 Hayes, L. (2016). Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities. Available from the National Center on Institutions and Alternatives. http://www.ncianet.org/criminal-justice- services/suicide-prevention-in-custody/publications/training-curriculum-and-program-guide-2016. "Return to Main Document"

*Suicidology.[17] The training should be included in onboarding for new employees and should be required periodically for current staff.*

## 8. REVIEW OF SUICIDE DEATHS AND SERIOUS SUICIDE ATTEMPTS

All suicide deaths and medically serious suicide attempts should be subject to a rigorous review process to identify any improvements that can be made to suicide prevention and patient safety. Review should cover medical and custodial procedures, training protocols and records, and mental health treatment (if any), and should lead to recommendations for changes in policy, procedure, and training. The review should be grounded in the principles of a "just culture" – a review that "balances the need for an open and honest reporting environment with the end of a quality learning environment and culture… Just culture requires a change in focus from errors and outcomes to system design and management of the behavioral choices of all employees."[18]

## KEY DEFICIENCIES: REVIEW OF SUICIDES

1. The existing suicide review process as proposed in the recently developed Suicide Prevention Policy is incomplete and requires improvement.
2. The reports issued by the San Diego County Citizens' Law Enforcement Review Board (CLERB) do not serve a meaningful or sufficient role in reviewing suicide deaths and serious suicide attempts at the Jail. The CLERB has a narrow mandate for investigation and can, at best, only provide limited insight to problems of patient care and emergency response.
3. We identified a number of problems with respect to the accuracy and quality of CLERB reports regarding suicide deaths at the Jail.

## FINDINGS AND RECOMMENDATIONS: REVIEW OF SUICIDES

**FINDING 8.1.** The proposed suicide review process is inadequate. It does not address what elements of the death will be examined and by whom. In addition, although the proposal designates the organizational bodies who are to review the death, it does not identify how any findings and corrective action plans will be acted upon and how proposed corrective actions will be enforced.

***RECOMMENDATION:*** *The suicide review process should be designed to include all stakeholders and fit within the Department's quality improvement program. It should have a mechanism to make sure suggested improvements are completed, and lay out in detail the structure of the review (content, timeline for review, and approval).*

***RECOMMENDATION:*** *The policy should lengthen the preliminary review period from*

---

17 See Recognizing and Responding to Suicide Risk for Correctional Clinicians. American Association for Suicidology. http://www.suicidology.org/training-accreditation/rrsr-c. "Return to Main Document"

18 Boysen, P.G. (2013). Just culture: A foundation for balanced accountability and patient safety. *The Ochsner Journal, 13*: 400-4006. "Return to Main Document"

*24 to 72 hours to provide sufficient opportunity to address the complexity of these incidents and the organization in which they occur.*

**FINDING 8.2.** The CLERB reports provide limited utility in reviewing suicide deaths and guiding corrective action to avoid repeated problems. The CLERB does not adequately address the appropriateness of mental health treatment and suicide prevention policy or practices. This is a role that the Department must take on itself.

***RECOMMENDATION:*** *The Department should implement a robust process for review of suicide deaths and serious suicide attempts that involves a generally accepted methodology (e.g. psychological autopsy or root cause analysis). Both the psychological autopsy and root cause analysis have substantial support for their use in quality improvement and as responses to suicide deaths in custody. (The Department has indicated that a psychological autopsy was completed for at least one recent suicide, but we were not provided a copy of that report.)*

## 9. QUALITY IMPROVEMENT

The purpose of continuous quality improvement (CQI) programs is to improve health care by identifying problems, implementing and monitoring corrective action, and studying its effectiveness. Key components of CQI include identification of key indicators and processes, a system to collect data about these components, an analytical strategy for the data, and a way to feed the findings back into everyday practice to improve care. The CQI program must be systematic and include all aspects of care.

## KEY DEFICIENCIES: QUALITY IMPROVEMENT

1. The Department has taken some positive steps regarding quality improvement but does not yet have a fully functioning or effective quality improvement program.

## FINDINGS AND RECOMMENDATIONS: QUALITY IMPROVEMENT

**FINDING 9.1.** The Department does not have a functioning quality improvement program. As discussed in this report, there is a need for improved quality improvement processes regarding mental health/suicide risk screening, clinical assessments, individual suicide and suicide attempt reviews, and other aspects of a correctional mental health care and suicide prevention program.

***RECOMMENDATION:*** *The Department should ensure that it has an effective system to track clinical data within the mental health and medical systems in the jail system. In addition, the Department should develop a system to track important custodial indicators related to suicide prevention. This tracking should be part of a larger quality improvement program.*[19]

---

19 See Section IV.B.3 in Canning, R.D. & Dvoskin, J.A. (2017). Preventing Suicide in Detention and Correctional Facilities. In J. Wooldredge and P. Smith (Eds.) *The Oxford*

**FINDING 9.2.** We were encouraged to see that the Department is taking steps to implement and enhance its Suicide Prevention Response & Improvement Team (SPRIT) to monitor suicide attempts and also evaluate suicide deaths.

***RECOMMENDATION:*** *The policy should describe the composition of the SPRIT and its responsibilities and reporting structure. The SPRIT should be part of the Department's larger quality improvement program and should have primary responsibility for the oversight of the Department's programs to prevent suicide.*[20]

## 10. CONCLUSION

The San Diego County Jail has made notable improvements in its suicide prevention program in the last two years. We believe the recommendations we have outlined will solidify these gains and go a long way to prevent more suicides in San Diego County Jail facilities.

Respectfully submitted,

Karen Higgins, M.D.
Robert Canning, Ph.D., CCHP

April, 2018

*Handbook of Prisons and Imprisonment*. New York City: Oxford University Press. "Return to Main Document"

20 Ibid. Section IV.B.2. "Return to Main Document"

EXHIBIT 48











EXHIBIT 49

**From:** Inman, Steven
**To:** Inacio, Jonathan_SDSO; Mascareno, Diego_SDSO; Brock, Christopher_SDSO; Neal, Mark_SDSO; Uk, Vina_SDSO; Jackson, Shane_SDSO; Jordan, Jacob_SDSO; Studebaker, Cole_SDSO; Valenzuela, Adrian_SDSO; Reis, John_SDSO; Romans, Blade_SDSO; Lira, Gilberto_SDSO; Costa, Todd_SDSO; Stovall, Kurt_SDSO; Peraza III, Rudy_SDSO; Rink, Nathanael_SDSO; Stinson, Aaron_SDSO; Logan, Conner_SDSO; Gonzalez, Emilio_SDSO; Moreno, Andy_SDSO; Kliebenstein, Jason_SDSO; Holman, Kyle_SDSO; McAnany, Patrick_SDSO; Gustafson, Mark_SDSO; Jamerson, Christopher_SDSO; Viladiu, Jason_SDSO
**Cc:** Boorman, Aaron_SDSO; Rezvani, Sofia; Burnette, Lindsey; Thell, Az
**Subject:** Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 8:40:00 AM
**Attachments:** CSD706 Schuck Booking 22709797.pdf
**Importance:** High

---

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov



DEPUTY K. HOLMAN
3.28.25
**Exhibit 99**
Cherie J. Anderson

# San Diego Sheriff's Department
# Inmate Detail Report

## PERSONAL

**Last:** SCHUCK
**First:** WILLIAM
**Middle:**
**Sex:** M
**DOB:** 01/13/2000
**Age:** 22
**Birth Place:** LAKE FOREST, US
**SSN:**
**RI System #:** 22070021430
**Gang Flag:**
**Inmate Loc.:** IN - IN
**DNA Status:** None
**Citizenship:** UNITED STATES
**Foreign Notify:** N
**Language:** ENGLISH
**English Ability:** Good
**Race:** WHITE
**Hair:** BLONDE
**Eyes:** GREEN
**Height:** 602
**Weight:** 155.00 lbs.



JIM#: 400496356
BK#: 22709797
CLASS: 0 NOT CLASSIFIED

**Arr. Agency:** San Diego Police Department
**Arr. Location:** NIMITZ BLVD & INTERSTATE 8 RAMP
**Officer:** WONG
**Officer ID:** 7277
**Arr. Date:** 03/10/2022
**Agency Case #:** 22010489
**Custody Days:** 2
**Booking Date:** 03/10/2022
**Booking Time:** 21:10:43
**Jail:** SDCJ San Diego Central Jail
**Area/HU/Cell:** 2/BKG/A
**Holds:**
**Arrest Type:** FIELD ARREST
**Date Released:**
**Release Type:**
**Proj. Release Date:**
**Sentenced:** No
**Bail Status:** Eligible For Release, Bail Amount: $10,000

**Remarks (1st Arr):** VEHICLE LOCATION SOUTH OF INTERSTATE 8 EAST RAMP & NIMITZ BLVD

## CHARGES

| Arr# | Arrest Date | Chg | Section Code | Description | Court Case | Bail Amount | Dispo Type | Dispo. Date/Time | ROC |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 03/10/2022 | 1 | 11550(E) HS | USE CNTL SUB:POSS FIREARM | | $10,000.00 | | | ARR |
| 1 | 03/10/2022 | 2 | 32310(C) PC | LARGE CAPACITY MAGAZINE MANUFACTURE, IMPORT, SALE, LEND, GIVE, BUY, RECEIVE | | $0.00 | | | ARR |
| 1 | 03/10/2022 | 3 | 25400(C)(6) PC | CONCL LOADED FIREARM UNREG | | $0.00 | | | ARR |
| 1 | 03/10/2022 | 4 | 29180(2)(A) PC | FAIL TO AFFIX REG NUMBER TO FIREARM | | $0.00 | | | ARR |
| 1 | 03/10/2022 | 5 | 25850(C)(6) PC | UNLST REG OWNR HNDGUN | | $0.00 | | | ARR |
| 1 | 03/10/2022 | 6 | 11350(A) HS | POSSESS NARCOTIC CNTL SUB | | $0.00 | | | ARR |
| 1 | 03/10/2022 | 7 | 23152(F) VC | DUI:DRUGS | | $0.00 | | | ARR |

## COURT

| Appearance | Destination Court | Date | Time | Arrest |
|---|---|---|---|---|
| 1 | SDF* | 03/14/2022 | 13:30:00 | 1 |

**From:** Brock, Christopher
**To:** Inman, Steven
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 9:55:52 AM

---

Good morning,

I have no memory of the IP in question. If I can assist in the future in any way, please let me know.

Regards,
Sgt. Brock

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Costa, Todd
**To:** Inman, Steven
**Subject:** [External] Re: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 9:13:04 AM

Hello, I have no memory of this inmate.

Deputy Costa

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40:10 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek

to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Gustafson, Mark
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 6:14:26 AM

I have no memory of this individual.

-Deputy Gustafson

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me

and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Holman, Kyle
**To:** Inman, Steven; Boorman, Aaron_SDSO
**Subject:** [External] !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Monday, September 23, 2024 2:49:52 PM

---

Good Afternoon,
I am sending this email as a response to the Case surrounding IP Schuck.

I remember contacting Schuck on the backside on the 2nd floor by himself inside a cell. I remember the cell being covered in food and possible fecal matter. Corporal Gonzalez and myself made the decision the remove Schuck from the cell and get him medically evaluated on the 2nd floor. After being medically cleared, Corporal Gonzalez and I provided Schuck with clean jail issued blue clothing as his jail clothing appeared to be soiled and covered in food and feces. As he was changing into new clothes, I was notified that IP Schuck was also scheduled for court in San Diego and was needed on the 1st Floor for out Courts. Corporal Gonzalez and I sent Schuck to the 1st floor for court.

This is all the contact I remember with IP Schuck.

Sincerely,
Deputy Holman #4244

**From:** Inacio, Jonathan
**To:** Inman, Steven
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 5:52:41 PM

Good evening,

No Memory.

Respectfully,

Deputy Inacio

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Jackson, Shane
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 6:43:21 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

Good evening,

I have No memory of Mr.Schuck

Very Respectfully,

**Shane Jackson**
Deputy Sheriff
*SDCJ Team 1*
Email:Shane.Jackson@sdsheriff.org
Phone: 619-615-2599
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF’S OFFICE**

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az

- SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Jordan, Jacob
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 4:37:56 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

Good Evening,

Doesn't look familiar, No Memory of individual.

Respectfully,

**Jacob Jordan**
Corporal
*Las Colinas Detention &*
*Reentry Facility*
Email: jacob.jordan@sdsheriff.org
Phone:619-661-3181 |
Mailstop: **S-287**
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S OFFICE**

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Importance:** High

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>; Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email**

**because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Kliebenstein, Jason
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 6:22:01 AM

---

No Memory

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek

to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Lira, Gilberto
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 12:54:39 AM

---

Good morning,

No memory.

Respectfully,
G. Lira

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Mascareno, Diego
**To:** Inman, Steven; Boorman, Aaron_SDSO
**Subject:** [External] !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 9:54:50 AM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

Good mooring,

Regarding the email about MR. Shuck, I unfortunately have no memory of the mentioned individual.

Please let me know if you need anything from me.

V/R,

**Diego Mascareño**
Deputy Sheriff
*San Marcos Station*
Email: diego.mascareno@sdsheriff.org
Phone: (858) 239- 3819| Mobile: **619-208-7447**
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S OFFICE**

**From:** McAnany, Patrick
**To:** Inman, Steven
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 12:56:50 PM

---

Sir,

At this time:

“No Memory.”

Respectfully,

Patrick McAnany
Deputy Sheriff
SDCJ Team #2

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Moreno, Andy
**To:** Inman, Steven
**Subject:** [External] RE: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 4:25:02 PM

No memory.

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Importance:** High

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>;

Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Neal, Mark
**To:** Inman, Steven; Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Friday, September 20, 2024 11:38:45 AM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

Good morning,

Regarding Schuck, I have no memory of the aforementioned IP.

Respectfully,

**Mark A Neal**
Deputy
*San Diego Central Jail, Team 2*
Email: mark.neal@sdsheriff.org
Phone: 619-615-2599
Cell: 951-795-9709
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Peraza III, Rudy
**To:** Inman, Steven; Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Saturday, September 21, 2024 6:26:41 AM

---

I have no memory of him.

--Peraza

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a

response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Rink, Nathanael
**To:** Inman, Steven
**Subject:** [External] Re: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 3:46:43 PM

---

No memory

Get Outlook for iOS

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42:20 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>;

Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Romans, Blade
**To:** Inman, Steven; Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Thursday, September 19, 2024 9:36:54 AM

No memory

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Stinson, Aaron
**To:** Inman, Steven
**Subject:** [External] Re: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 8:56:26 PM

---

Evening,

Sorry for the late response. I do not recognize the above individual.

Respectfully,

Aaron Stinson

Get Outlook for iOS

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42:20 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO

<Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>; Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II

Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Stovall, Kurt
**To:** Inman, Steven
**Subject:** [External] RE: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 3:49:14 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

I have no memory of William Hayden Schuck.

V/r,

**Kurt R Stovall**
Deputy
*Las Colinas Detention and Reentry*
*Facility/Team 4*
Email: kurt.stovall@sdsheriff.org
Phone: 619-258-3181 | Cell: 619-243-9850
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Importance:** High

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>; Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me

and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Studebaker, Cole
**To:** Inman, Steven
**Subject:** [External] Re: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 6:19:25 PM

---

Good evening,

Sorry for missing your last email(s)! Phase training has been extraordinarily busy and I completely missed it. The only recollection I have of Shuck was that he seemed to be relatively normal and cooperative with the booking process. I was surprised to hear of his unfortunate passing but he seemed completely normal throughout all of my interactions with him.

Again, apologies for the late response.

Best regards,

Deputy Studebaker

Get Outlook for iOS

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42:20 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469

Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>; Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Valenzuela, Adrian
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Date:** Thursday, October 3, 2024 8:32:04 PM

---

Good evening,

Sorry for the late response. I have no memory of him.

Respectfully,

Deputy Valenzuela

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, October 3, 2024 3:42 PM
**To:** Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>
**Subject:** !!EXTERNAL MAIL!! FW: Schuck: 11-53 Information
**Importance:** High

Good afternoon. I am following up on the email below. We are in need of your response for proceedings in this case tomorrow morning. Could you please kindly respond this afternoon or this evening?

Thank you.

Best,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

---

**From:** Inman, Steven
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan_SDSO <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego_SDSO

<Diego.Mascareno@sdsheriff.gov>; Brock, Christopher_SDSO <Christopher.Brock@sdsheriff.org>; Neal, Mark_SDSO <Mark.Neal@sdsheriff.org>; Uk, Vina_SDSO <Vina.Uk@sdsheriff.org>; Jackson, Shane_SDSO <Shane.Jackson@sdsheriff.org>; Jordan, Jacob_SDSO <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole_SDSO <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian_SDSO <Adrian.Valenzuela@sdsheriff.gov>; Reis, John_SDSO <John.Reis@sdsheriff.org>; Romans, Blade_SDSO <Blade.Romans@sdsheriff.org>; Lira, Gilberto_SDSO <Gilberto.Lira@sdsheriff.gov>; Costa, Todd_SDSO <Todd.Costa@sdsheriff.org>; Stovall, Kurt_SDSO <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy_SDSO <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael_SDSO <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron_SDSO <Aaron.Stinson@sdsheriff.org>; Logan, Conner_SDSO <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio_SDSO <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy_SDSO <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason_SDSO <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle_SDSO <Kyle.Holman@sdsheriff.org>; McAnany, Patrick_SDSO <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark_SDSO <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher_SDSO <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason_SDSO <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron_SDSO <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia <Sofia.Rezvani@sdcounty.ca.gov>; Burnette, Lindsey <Lindsey.Burnette@sdcounty.ca.gov>; Thell, Az <Az.Thell@sdcounty.ca.gov>
**Subject:** Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II

Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM

**From:** Viladiu, Jason
**To:** Inman, Steven
**Cc:** Boorman, Aaron_SDSO
**Subject:** [External] RE: !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Date:** Saturday, September 21, 2024 1:18:59 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png
image005.png
image006.png

---

Good afternoon,

I have a vague recollection of escorting William Schuck to his cell on the 7th floor, module D. I don't recall specifics about his condition at the time.

**Jason J. Viladiu**
Deputy
*Alpine Station*
Email: Jason.Viladiu@sdsheriff.org
Phone:619-659-2600|Mobile:619-310-1321
www.sdsheriff.net
**SAN DIEGO COUNTY**
**SHERIFF'S DEPARTMENT**

---

**From:** Inman, Steven <Steven.Inman@sdcounty.ca.gov>
**Sent:** Thursday, September 19, 2024 8:40 AM
**To:** Inacio, Jonathan <Jonathan.Inacio@sdsheriff.gov>; Mascareno, Diego <Diego.Mascareno@sdsheriff.gov>; Brock, Christopher <Christopher.Brock@sdsheriff.org>; Neal, Mark <Mark.Neal@sdsheriff.org>; Uk, Vina <Vina.Uk@sdsheriff.org>; Jackson, Shane <Shane.Jackson@sdsheriff.org>; Jordan, Jacob <Jacob.Jordan@sdsheriff.org>; Studebaker, Cole <Cole.Studebaker@sdsheriff.gov>; Valenzuela, Adrian <Adrian.Valenzuela@sdsheriff.gov>; Reis, John <John.Reis@sdsheriff.org>; Romans, Blade <Blade.Romans@sdsheriff.org>; Lira, Gilberto <Gilberto.Lira@sdsheriff.gov>; Costa, Todd <Todd.Costa@sdsheriff.org>; Stovall, Kurt <Kurt.Stovall@sdsheriff.org>; Peraza III, Rudy <Rudy.PerazaIII@sdsheriff.org>; Rink, Nathanael <Nathanael.Rink@sdsheriff.gov>; Stinson, Aaron <Aaron.Stinson@sdsheriff.org>; Logan, Conner <Conner.Logan@sdsheriff.gov>; Gonzalez, Emilio <Emilio.Gonzalez@sdsheriff.org>; Moreno, Andy <Andy.Moreno@sdsheriff.gov>; Kliebenstein, Jason <Jason.Kliebenstein@sdsheriff.org>; Holman, Kyle <Kyle.Holman@sdsheriff.org>; McAnany, Patrick <Patrick.McAnany@sdsheriff.org>; Gustafson, Mark <Mark.Gustafson@sdsheriff.org>; Jamerson, Christopher <Christopher.Jamerson@sdsheriff.org>; Viladiu, Jason <Jason.Viladiu@sdsheriff.org>
**Cc:** Boorman, Aaron <Aaron.Boorman@sdsheriff.org>; Rezvani, Sofia - SDC <E101271@sdcounty.ca.gov>; Burnette, Lindsey - SDC <Lindsey.Willard@sdcounty.ca.gov>; Thell, Az - SDC <athell@sdcounty.ca.gov>
**Subject:** !!EXTERNAL MAIL!! Schuck: 11-53 Information
**Importance:** High

Good afternoon,

I am an attorney at County Counsel assigned to defend the County and multiple deputies and nurses in a lawsuit pertaining to the March 2022 death of William Hayden Schuck at Central Jail. The SDSO has designated Lt. Boorman as a person most knowledgeable to testify regarding multiple topics, including safety checks that Schuck received at Central Jail. He and I are working together with Sheriff's Legal to compile information regarding the safety checks. **You are receiving this email because you were assigned to a floor where deputies performed safety checks on Schuck from March 10, 2022 to March 16, 2022** (he was in a holding cell on the 2nd floor for several days and was then housed in Module 7D).

Could you please look at Schuck's photo in the attached booking record and respond directly to me and Lt. Boorman (to us only) regarding any memory you have of seeing Schuck and anything you observed. If you have no memory at all of him, please respond with "No Memory." Please provide a response no later than Monday, September 23. If we do not hear from you by that date, we will seek to contact you through other means so that we can obtain a response from each person.

Thank you for your assistance in compiling this information.

Best regards,
Steve Inman

Steven P. Inman, II
Senior Deputy County Counsel
Office of the County Counsel - County of San Diego
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
Cell: (619) 884-2931 | Steven.Inman@sdcounty.ca.gov

**Warning: External Email.** Exercise caution when opening links or attachments. Report SPAM