# EXHIBIT 50

January 8, 2025

Mr. Timothy Scott

McKenzie & Scott

1350 Columbia Street, Suite 600

San Diego, California 92101

Re: Schuck v. County of San Diego et al.

Dear Mr. Scott,

This report summarizes the expert opinions I have formed in Willaim Hayden Schuck versus County of San Diego, et al. Case number 3:23-cv-00785-DMS-AHG.

My report is based in part on my review of the following documents listed below:

- San Diego Police Department Crime Lab: Alcohol Analysis Report for William Schuck. (1 Page)
- Narcotics Vault: Narcotics Analysis Results Information and Alcohol Analysis Report. (1 Page).
- San Diego County Sheriff's Department: Emergency Booking Acceptance Criteria-COVID-19 Precaution 2.5.2022. (2 Pages).
- UC San Diego Health Medical Records for William Schuck (31 Pages).
- Bio-Tox Laboratories, Blood Panel Screening for William Schuck (2 Pages).
- San Diego Sheriff's Department; Health Information Management, Medical Record for William Schuck (47 Pages)
- First Legal Records County of San Diego Department of the Medical Examiner records for William Schuck (49 Pages)
- Central Valley Toxicology Report for William Schuck (2 Pages)
- Bodyscan of William Schuck 3.10.2022 (1 Page)
- County of San Diego; Department of the Medical Examiner, Autopsy Report and Investigative Narrative for William Schuck (20 Pages)
- Autopsy Post Services, Inc., Autopsy Report for William Schuck (6 Pages)
- County of San Diego: Citizen's Law Enforcement Review Board (CLERB) Report Case #22-026/Schuck (9 Pages)
- Draft Report from J.R. Lambert Correctional Health Consulting, LLC (14 Pages)
- Forensic Toxicology Report from Iain M. McIntyre, Ph.D. (9 Pages)
- Deposition Transcripts:

- Thomas Mace (194 Pages) Jessica Ramirez (164 Pages)
- Sven Soderberg (142 Pages).
- Serina Rognlien-Hood. (410 Pages).
- Romeo Deguzman, RN (185 Pages) Reginald Barretto, RN (57 Pages) Jennifer Vivona (88 Pages) Jameelyn Barrera (168 Pages)
- Emily Lymburn (165 Pages).
- Deputy Jeff Amado (129 Pages)
- Deputy Alan Griffith (131 Pages).
- Carina Echon (132 Pages)
- Alan M. Valbuena (203 Pages)
- Loraine Gallegos (90 Pages)
- Peter Freeland (187 pages)
- Nicholas Kahl (116 pages)
- Jon Montgomery (117 pages)
- Mauel L. Nozawa (100 pages)

❖ San Diego Sheriff's Department (SDSD) Detention Services Bureau Policies and Procedures:

- San Diego Central Jail Green Sheet; M.25.C.1 Psychiatric Stabilization Unit (PSU) 12.27.2019. (1 Page)
- San Diego Central Jail Green Sheet; M.25.C.1 Psychiatric Stabilization Unit (PSU) 3.4.2022. (1 Page) M.25 Psychiatric Stabilization Units (PSU/WPSI) 3.27.2020. (6 Pages)
- M.25 Psychiatric Stabilization Units (PSU/WPSI) 5.27.2022. (6 Pages)
- San Diego Central Jail Green Sheet; J.4.C.1 Enhanced Observation Housing (EOH), Definition and Use 9.12.2019. (2 Pages) San Diego Central Jail Green Sheet; J.4.C.1 Enhanced Observation Housing (EOH), Definition and Use 2.17.2022. (2 Pages)
- J.4 Enhanced Observation Housing (EOH), Definition and Use 5.21.2021. (5 Pages)
- J.4 Enhanced Observation Housing (EOH), Definition and Use 5.26.2022. (5 Pages)
- San Diego Central Jail Green Sheet; J.1.C.1 Safety Cells: Definitions and Use 9.12.2019. (1 Page)
- San Diego Central Jail Green Sheet; J.1.C.1 Safety Cells: Definitions and Use 2.17.2022. (1 Page)
- J.1 Safety Cells: Definitions and Use 2.16.2022. (5 Page)
- J.7 Emergency Transportation of Mentally Disordered Inmates 10.5.2020 (2 Pages).
- J.7 Emergency Transportation of Mentally Disordered Incarcerated

Persons 5.24.2022. (2 Pages)

- J.7 Emergency Transportation of Incarcerated Persons with Mental Health Needs 12.1.2022. (3 Pages)
- J.5 Inmate Suicide Prevention Practices & Inmate Safety Program 8.6.2021. (5 Pages)
- J.5 Suicide Prevention Practices for Incarcerated Persons & Detentions Safety Program 5.26.2022. (5 Pages)
- J.5 Suicide Prevention Practices for Incarcerated Persons & Detentions Safety Program 4.21.2023. (5 Pages)
- Emergencies-Code Blue 9.28.2021. (1 Page)
- I.64 Safety Checks: Inmates, Housing and Holding Areas 12.17.2021 (3 Pages)
- I.64 Safety Checks: Inmates, Housing and Holding Areas of Incarcerated Persons 9.27.2022 (4 Pages)
- I.64 Safety Checks: Inmates, Housing and Holding Areas of Incarcerated Persons 5.9.2022 (3 Pages)
- San Diego Central Jail Green Sheet; I.64.C.1 Safety Checks of Housing Units and Holding Cells 2.17.2022. (2 Pages)
- San Diego Central Jail Green Sheet; I.64.C.1 Safety Checks of Inmates in Housing Units and Holding Cells 10.11.2021. (2 Pages)
- San Diego Central Jail Green Sheet; I.64.C.1 Safety Checks of Housing Units and Holding Cells 2.02.2023. (2 Pages)
- San Diego Central Jail Green Sheet; I.63.C.1 Facility Security-Housing Units 9.29.2021. (4 Pages)
- San Diego Central Jail Green Sheet; I.63.C.2 Facility Security-Housing Units: Temporary Water Shut-Offs 10.9.2019. (2 Pages)
- I.63 Facility Security-Housing Units 9.14.2018 (3 Pages)
- M.7. Inmate Deaths 9.24.2021 (6 Pages)
- M.1 Access to Care 11.18.2019. (2 Pages)
- J.8 Contraband Watch 9.21.2020. (2 Pages)
- M.5 Medical Emergencies 12.2.2020 (4 Pages) San Diego Central Jail Green Sheet; M.5.C.1 Medical Emergencies 8.8.2019. (1 Page)
- M.6 Life Threatening Emergencies: Code Blue 7.26.2021. (4 Pages) San Diego Central Jail Green Sheet; M.6.C.1 Life Threatening

- San Diego County Sheriff's Department; Medical Services Division Operations Manual Policies and Procedures: A1.1 Access to Care 2.3.2020. (2 Pages).
- A1.1 Access to Care 11.4.2022. (2 Pages).
- A.1.3 Health Care Services 2.3.2020 (3 Pages).

- A.1.3 Health Care Services 11.4.2022 (3 Pages).
- E.2.1. Receiving Screening 10.13.2021. (9 Pages).
- E.2.1. Receiving Screening 11.4.2022. (9 Pages).
- ; E.5.1 Mental Health Screen and Evaluation. 2.01.2022 (2 Pages).
- E.5.1 Mental Health Screen and Evaluation. 11.4.2022 (2 Pages).
- MSD.D.4 Detention Outpatient Psychiatric Services, DOPS 2.1.2022 (3 Pages).
- MSD.D.4 Detention Outpatient Psychiatric Services, DOPS 11.4.2022 (3 Pages).
- MSD.O.1 Off-site Medical Clinics, Hospitals or Emergency Departments 1.20.2022. (2 Pages).
- MSD.O.1 Off-site Medical Clinics, Hospitals or Emergency Departments 11.4.2022. (2 Pages).
- MSD.S.4 Sick Call: Registered Nurse, RNSC 11.4.22. (3 Pages).
- MSD.S.4 Sick Call: Registered Nurse, RNSC 1.5.22. (3 Pages).
- MSD.S.3 Sick Call 1.05.22. (2 Pages).
- MSD.S.3 Sick Call 11.04.22. (2 Pages).
- MSD.M.13 Medical Observation Beds 1.10.22. (3 Pages).
- MSD.M.13 Medical Observation Beds 11.4.22. (3 Pages).
- MSD.S.5 Sobering Cells: Definition and Use 11.4.22. (2 Pages).
- MSD.S.10 Suicide Prevention & Patient Safety Program 2.1.2019. (6 Pages)
- MSD.S.10 Suicide Prevention & Patient Safety Program 11.4.2022. (6 Pages)
- MSD.W.2 Wound Care Management 1.04.2022. (2 Pages)
- MSD.R.5. Refusal Procedure 01.05.2022. (3 Pages)
- MSD.C.10 Court Orders 01.12.2022 (1 Page)
- MSD.N.4 Nursing Documentation 01.13.2022 (3 Pages)
- MSD.H.14 Hypertension Clinical Pathway 06.23.2014 (3 Pages)
- A.5.1 Operations Manual 12.12.2019 (1 Page)
- A.2.1 Responsible Health Authority (4 Pages) MSD.H.1 HIPPA (3 Pages)

❖ State of California Auditor Records:

- 2. Index of Docs Responsive to Schuck Subpoena
- B.2.11 NCCHC Mental Health Training for Correctional Officers
- B.2.12 Guide to Developing and Revising Suicide Prevention

Protocols Between Jails and Prisons

- B.2.18 NCCHC's 2018 Standards for Health Services
- B.3.33 San Diego County Sheriff's Department Detention Services Bureau Manual of Policies and Procedures (Source: Boorman)
- C.1.6 SDSD Training Bulletin (Source: Boorman)
- D.1.36_Email between Thomas Seiver and Nicole Madera.
- D.1.37 Email between Erika Frierson and Nicole Madera
- D.1.42_ Email between Serina Rognlien-Hood and Nicole Madera
- D.1.43_ Email between Aaron Boorman and Nicole Madera
- D.1.45 Email between Erika Frierson and Nicole Madera
- D.1.46_ Email between Jon Montgomery and Nicole Madera
- D.1.47 Email between John Bryce and Nicole Madera
- D.1.48_ Email between Robert Faigin and Nicole Madera
- D.1.49 Email between Melissa Quiroz and Nicole Madera
- D.1.62 Email between Christopher Miedico and Nicole Madera
- D.1.65_ Email between Erika Frierson and Nicole Madera
- D.3.2 San Diego County Sheriff's Department Medical Services Division: Operations Manual (Source: Sergeant Aaron Boorman, Detention Support Division, SDSD)
- D.3.3 San Diego County Sheriff's Department Medical Services Division: Standardized Nursing Procedure (Source: Sergeant Aaron Boorman, Detention Support Division, SDSD)
- D.3.9 San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures
- D.3.17 San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures
- D.3.27 San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures
- D.3.45 San Diego County Sheriff's Department Medical Services Division-Operations Manual: Subject Death of an Inmate on Site
- D.3.50_ San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures
- G.1.41 Correspondence between COCHS and Dorothy Thrushre

Best Practices Review
G.1.43 Suicides in San Diego County Jail April 2018 Investigation Report

❖ SDCJ Surveillance Footage:
- Ex 13B_Intake_2022_3-10-08-00-559 (Camera: 21 1-Forensics1)
- Ex 14L_Court Holding Corr_2022_3-11-12-36-00-321 (Camera: 86 2-Court Holding Corr)
- Ex 16HH_Detox Corr_2022_3-15 08-02-00-477 (Camera: 082 2-Detox Corr 1)
- Ex 16EE_Elevator 2_2022_3-15 08-32-00-527 (Camera: 326 Elevator 2)
- Ex 16V_Chain Out Corr _2022_3-15 16-46-00-063 (Camera: 042 1 Chain Out Corr)
- Ex 16S_Staff Elev Lobby _2022_3-15 16-46-00-063 (Camera: 36 1 Staff Elev Lobby)
- Ex 16Q_Elevator 2_2022_3-15 16-47-00-298 (Camera: 326 Elevator 2)
- Ex 16M _Court Holding Corr 2022_3-15 16-49-00-656 (Camera: 86 2- Court Holding Corr)
- Ex 16J _Staff Elev Lobby 2022_3-15 20-17-00-422 (Camera: 86 2-Court Holding Corr)
- Ex 16I _Elevator 2 2022_3-15 20-19-00-365 (Camera: 326 Elevator 2)
- Ex 16G_Staging D-E Door_2022_3-15 20-20-00-459 (Camera: 247 7-Staging D-E Door)
- Ex 17E_Mod 7D 2_2022_3-16 07-43-23-684 (Camera: 257 7- Mod 7D 2)
- Ex 17F_Mod 7D 2_2022_3-16 09-27-23-850 (Camera: 257 7- Mod 7D 2)

**Experience and Qualifications**

I am board certified in Internal Medicine and Hospital Medicine. Currently, I serve as the Chief Medical Officer/Chief Physician Executive of the Texas Department of Criminal Justice (TDCJ) Hospital in Galveston, Texas. I am also an Associate Professor of Medicine at the University of Texas Medical Branch (UTMB) Galveston. I have a Master’s in Business Administration (MBA) Degree and I am the recipient of the Inaugural UTMB John P.

McGovern Academy of Oslerian Medicine Excellence in Clinical Teaching Award for modeling the Principles of Compassionate, Scientifically Skilled, Patient Centered Care. The TDCJ Hospital is the only maximum-security hospital on the campus of a major Academic Medical center in the United States. The hospital also provides specialty, subspecialty care, as well as diagnostic and ancillary services for approximately 110,000 inmates in the Texas Department of Criminal Justice state jails and prisons.

In my role, I oversee all specialty and subspecialty ambulatory care which caters to approximately 350 patients daily. In addition, I am responsible for the **136**-bed tertiary acute care hospital as well as a **141**-bed infirmary unit which provides **High quality, Evidence-Based care that is Patient and family centered, Highly Reliable and of High Value.** I have considerable expertise in correctional healthcare with more than 20 years of experience in correctional medicine. My CV is attached as an appendix to this expert report.

**Overview of Dehydrations:**

Dehydration is a condition characterized by an excessive loss of body water, dehydration disrupts normal metabolic processes and body functions because water plays a crucial, integral and a pivotal role in every bodily process. Because Total body water (TBW) is about 60% of lean body weight, dehydration can also be defined as a reduction in TBW without a proportional reduction in the body's electrolyte concentration. Dehydration if untreated can lead to serious health concerns very quickly.

There are a plethora of reasons why a patient can become dehydrated, ranging from inadequate intake of fluids, excessive loss of fluids (vomiting, diarrhea), heavy sweating (exercise, heat and humidity, emotional stress, drug withdrawal, overactive thyroid gland etc.).

The symptoms and signs of dehydration are myriad and include thirst, dry mouth, fatigue, cramps, dizziness, inability to stand upright, reduced urination, rapid heartbeats, extremely dry skin, sunken eyes, or fainting.

As dehydration progresses, the symptoms and signs become more pronounced leading to complications.

In severe cases, complications such as heart arrhythmias, electrolyte imbalance (levels of sodium, potassium and other key electrolytes are disrupted) occur leading to muscle cramps, seizures, dangerous heart arrhythmias, acute kidney injury (kidney failure), hypovolemic shock, where a low drop in blood volume leads to dangerously low blood pressure and organ failure, impaired cognitive functions leading to delirium, confusion and unconsciousness. In extreme cases, dehydration can cause heat injuries, such as heat exhaustion or heat stroke which require immediate medical attention.

The treatment of dehydration involves prompt recognition and correction of fluid deficits. Mild dehydration can be treated with oral fluids, in moderate to severe cases, intravenous fluids will be needed to restore blood volume and mitigate serious sequelae like organ failure and death. Dehydration is a serious medical condition that must be recognized promptly, evaluated and treated to mitigate against complications which can in some cases be catastrophic.

**Factual Background**

March 10th, 2022:

1. The San Diego Police Department arrested William Schuck for driving under the influence after being involved in a car accident. At the scene, Mr. Schuck had extracted himself from the car and declined care from EMS.
2. At approximately 4:30 P.M. Officer Pulido transported Mr. Schuck to the San Diego Central Jail (SDCJ).
3. At approximately 4:57 P.M. Officer Pulido arrived at the San Diego Central Jail (SDCJ). Officer Pulido presented Mr. Schuck to RN Manuel Nozawa for his intake medical screening.
4. The "Medical Services" form in Mr. Schuck's medical shows RN Nozawa checked the box for "patient is willing to sign but is unable to sign."
5. The "Gate Refusal" form in Mr. Schuck's medical record indicates that RN Nozawa noted "one or more medical or psychiatric conditions had been identified during the intake screening process that raised potential concerns about the patient's medical condition, and the ability to safely provide for the health and welfare of the patient within a correctional environment. Due to the functional restrictions of an outpatient primary care facility and requested further medical review and assessment for the following medical conditions" "Involved in Motor vehicular accident. Airbag deployed. SDCJ asking for medical clearance to

continue Incarceration."

6. At approximately 5:36 p.m. Mr. Schuck was seen at UC San Diego, Hillcrest Emergency room. The Chief complaint was listed as Motor Vehicle Accident (MVA). The records indicate "BIBPD (Brought in By Police Department) for jail clearance, picked up s/p traffic collision, patient restrained, driver approximately 70-mph, head-on collided with another vehicle and vehicle may have rolled a few times. No LOC, no thinners, patient denies head trauma, collar placed in triage, MD eval in triage".
7. Mr. Schuck was evaluated by PGY-2 Resident Kyle Rourke, during the evaluation, Hayden described how the accident happened, denied any injuries, loss of consciousness or striking his head. He also denied using any drugs on the day of his MVA, he denied any pain as well as any other complaints. On physical examination, Bp: 138/106, HR:106, RR: 18, Temperature: 98, Oxygen saturation: 97%. On physical examination, he was not in any acute distress, Glascow coma scale (GCS) of 15 and the rest of his physical examination was unremarkable.
8. He was deemed hemodynamically stable and expressed his desire to leave against medical advice (AMA). He was counseled that leaving AMA could result in disability and possibly death. Per the record, he verbalized understanding and was deemed capable of medical decision making, he was discharged back to the jail Dr. Kyle Rourke's notes were attested by Dr. Binh Thanh Ly.
9. At approximately 9:10 P.M. Officer Pulido arrived at the SDCJ with Mr. Schuck. Officer Pulido brought Mr. Schuck to be seen by RN Jameelyn Barrera for an intake medical screening.
10. The "Medical Clearance" form in Mr. Schuck's medical record shows vital signs were recorded as, BP: 144/94, **HR: 118**, RR: 18, Temperature: 97.5, Oxygen saturation: 100%, weight: 131Lbs, **BMI: 16.8**, Height: 6 feet 2 inches.
11. RN Barrera left the section of the "Medical Clearance" form that asks, "Does the screener observe, or is the inmate demonstrating any of the following?" blank. Including questions related to related to "hallucinating, delusional, nonsensical, unresponsive, confused, paranoid, altered mental status, or inappropriate conduct", "intoxicated, in withdrawal, slurred speech, unsteady gait, stupor, tremulous, sweating, anxious, abnormal breathing, or hyperventilating?" and "head injuries or fainting/passing out in the last 72 hours".
12. RN Barrera deemed Mr. Schuck "fit to continue the booking process".
13. The "Receiving Screening" form in Mr. Schuck's medical record states RN Barrera recorded that Mr. Schuck was willing to sign but unable to sign the

form when she checked the box with the designation, "Patient willing to sign, but unable to sign".

14. The notes in the "Receiving Screening" form indicate RN Barrera the arresting officer was Officer Wong #7277, but do not state that Officer Wong was not present and do not state that Officer Pulido was present. The form also indicates that the officer interviewed responded "No" to each interview question posed by RN Barrera.
15. According to the notes in the "Receiving Screening" form RN Barrera completed a "General Medical Assessment" of Mr. Schuck. She also testified that she documented that Mr. Schuck had refused care from the hospital prior to returning to SDCJ.
16. According to the notes in the "Receiving Screening" form RN Barrera completed a questionnaire related to "Gender Identity," "Chronic Condition," "Mental Health Screening," "Mental Health History," "Columbia-Suicide Severity Rating Scale," "Substance Abuse Assessment," and health insurance.
17. The "Receiving Screening" form notes show RN Barrera's "Disposition/Treatment Plan" was "medical sick call [was] needed" and "oral hygiene instruction [was] provided."
18. According to the notes in the "Receiving Screening" form RN Barrera's "Housing Assignment" was that Mr. Schuck was "Fit to Continue Booking Process" and "Clinically Screened- Cleared to Class."
19. The "General Informed Consent" form in Mr. Schuck's medical record indicates RN Barrera recorded that Mr. Schuck was "willing to sign but unable to sign."
20. The "Sterilization Information" form in Mr. Schuck's medical record indicates RN Barrera recorded that Mr. Schuck was "willing to sign but unable to sign."
21. The "Medical Services" form in Mr. Schuck's medical record indicates RN Barrera recorded that Mr. Schuck was "willing to sign but unable to sign."
22. The records indicate that RN Barrera chose not to complete an Authorization for Release of Information form because she checked off the box for "not indicated" on the otherwise blank form. According to the jail medical records, this release would have allowed staff to "obtain all medical records, pharmacy records, substance abuse records" if completed.
23. The "Progress Notes- Schuck William 4000496356 (22709797)" in Mr. Schuck's medical record show a "SOAP NOTE" posted on March 10, 2022, at 9:29 P.M. RN Barrera documented the vitals that she took Mr. Schuck during her intake screening and indicated that she completed a covid test during intake. Per reports, during his intake process with RN Barrera, Mr. Schuck reported that he had ADHD. He was "making grandiose statements

and was not understanding the booking process." He also was "asking to take photos of his medical records with his phone (which per officers was 'in pieces' due to his car accident and is also asking for $20 to give to the nurse for some water.

24. RN Barrera testified she scheduled a Qualified Mental Health Provider (QMHP) visit because of Mr. Schuck's behavior during intake. She testified that the request is reflected in the first entry in the "Sick Calls- Schuck, William 22709797" list in Mr. Schuck's medical record which she submitted. RN Barrera also testified that records reflect that Mr. Schuck was never seen by a QMHP.

<u>March 11th, 2022</u>

25. At approximately 12:37 P.M. video surveillance footage shows deputies transported Mr. Schuck to a cell on the second floor in the "Court Holding" Corridor.
26. Deputy Jessica Ramirez testified that in March of 2022, the 2nd Floor Court Holding cells were being used to house individuals who were being quarantined.

<u>March 15th, 2022</u>

27. At approximately 8:01 A.M. video surveillance footage shows three deputies escorting Mr. Schuck to the medical screening area to be seen by RN Romeo DeGuzman. Mr. Schuck is in a T-shirt, no pants and no shoes. RN DeGuzman testified that Mr. Schuck arrived in the medical screening area soaked in sweat, blood, or water. RN DeGuzman testified that Mr. Schuck was disorganized, had wounds, and that he had to "prepare the patient" or "clean up the patient" so that he was presentable to appear to go to court because they could not send Mr. Schuck looking "untidy," "not clean" and because he had "blood stains," his shirt was soaked in either blood, water, or sweat and he had open wounds. RN DeGuzman cleaned the wounds, checked his vitals, and provided Mr. Schuck clean clothes.
28. RN DeGuzman testified that Mr. Schuck reported using "acid." RN DeGuzman said Mr. Schuck was "disorganized" and "talking nonsensical" and was not sure if Mr. Schuck was struggling with a mental health issue because he was quiet and did not want to say much more. His "Subjective Assessment" in his "SOAP Notes" indicate "C/O ADHD, uses Acid drugs? in the street.

29. According to the medical record RN DeGuzman's "Objective" assessment of Mr. Schuck was "alert and verbally responsive, not in respiratory distress, afebrile, ambulatory. With difficulty in following direction, disorganized, non sensical, **disheveled, with soiled t-shirt, not wearing pants. With dry blood to T shirt and both lower extremities,** cleanse with NS. Wound to Right shin healing well no s/s of infection. Denies taking medication. No suicidal/self-harming gestures noted. Going to court this morning per sworn staff. Instructed to notify staff for any changes in health condition." RN DeGuzman testified that based on his "objective assessment, he was not exhibiting any signs of withdrawal of drugs." RN Guzman's SOAP notes indicate Mr. Schuck's vitals were **BP: 148/96;** Temp: 97.8; Resp: 18; HR:76.
30. RN DeGuzman's "assessment" is that **Mr. Schuck is nonsensical and suffering from "altered thought process."** RN DeGuzman cleansed his wounds, provided Mr. Schuck with wound care as well as new clothes. According to the medical record RN DeGuzman's treatment "Plan" for Mr. Schuck was "wound care" and "psych eval." RN testified he scheduled Mr. Schuck for a "RN sick call." He did not "schedule him for psychiatric evaluation" because he already noticed he was scheduled for a QMHP evaluation. Lastly, he scheduled "for wound care" and "referred him to the doctor."
31. According to the "Sick Call- Schuck, William 2270977" list RN Guzman scheduled Mr. Schuck for a "Registered Nurse Sick Call" for March 16, 2022. He stated the reason for the sick call was "wellness check, claim uses Acid drugs? in the street."
32. According to the "Sick Call- Schuck, William 2270977" list RN Guzman scheduled Mr. Schuck for a "Medical Chart Review" for March 15, 2022. He stated the reason for the appointment was "review scanned discharge order from UCSD."
33. According to the "Treatments Administration- Schuck, William 22709797" list RN Guzman administered a "Dressing Change Apply Antibiotic" on March 15, 2022, at 8:29 A.M.

34. The "SOAP Note" entered by NP Kahl at approximately 4:12 P.M., indicates that he conducted a "MDCC" "Medical Doctor Chart Check" or what is also referred to as "medical chart review." NP Kahl's notes indicate he "Reviewed scanned discharge order from UCSD" or "DC Summary" from UCSD. He noted that Mr. Schuck was "sent to UCSD for eval after MVA" (a motor vehicle accident). He also noted that the records indicate that that Mr. Schuck refused "medical evaluation and has decision-making capacity" and indicated that UCSD gave "no new orders." He testified that he ordered nursing staff retrieve a release of information and full records from the "ER visit to include all physician notes." NP Kahl testified that he did not review the intake records or any other San Diego County Jail medical records for Mr. Schuck.
35. According to the video recording at approximately 4:40 P.M., Mr. Schuck arrived back at SDCJ after court. The video shows him being escorted by Deputy Griffith and Deputy Valbuena at multiple moments between 4:40 P.M. and 4:50 P.M. shoeless, unstable, appearing unwell, with his head leaning against walls, falling, appearing weak, and being held up by two to three deputies at a time.
36. Deputy Griffith testified he told Deputy Valbuena that Mr. Schuck needed to see medical immediately.
37. Deputy Valbuena never escorted Mr. Schuck to the clinic or informed the medical staff about Mr. Schuck's condition.
38. According to the video recording at approximately 8:16 P.M. Deputy Page and Deputy Ramirez escorted Mr. Schuck from the second floor to Module 7D. The video surveillance footage shows Mr. Schuck appearing unstable and collapsing on the floor.
39. According to the video recording at approximately 8:21 P.M., Deputy Seitz, Deputy Page and Deputy Ramirez escorted Mr. Schuck to his cell in Module 7D.
40. RN Echon testified she was working as a Charge Nurse at the SDCJ on March 15, 2022. The "SOAP Note" entry by RN Echon at approximately 9:42 P.M. shows RN Echon "received court order for referral to jail medical" and noted that Mr. Schuck refused a MD Sick Call. Today, RN Echon testified that she wrote that Mr. Schuck refused care in error because she read NP Kahl's entry incorrectly.

<u>March 16, 2022</u>

41. LVN Gallegos (formerly known as LVN Palmeda) testified she was assigned to retrieve a signed release from information from Mr. Schuck the morning of March 16, 2022. The video surveillance recording shows LVN Gallegos and Deputy Amado entering Module 7D at approximately 9:07 A.M. They then

approached Mr. Schuck's cell window and communicated through the window. Deputy Amado never opened the food flap to communicate with Mr. Schuck. Deputy Amado never opened the door so that LVN Gallegos could conduct a medical evaluation of Mr. Schuck. The video recording shows LVN Gallegos looking into Mr. Schuck's door for approximately 30 seconds before she walks away.

42. At 9:08:10 the video recording shows LVN Gallegos peeking into Mr. Schuck's cell one final time and before walking away from the area with Deputy Amado to treat other patients. LVN Gallegos never conducts a medical evaluation nor treatment nor security interaction with Mr. Schuck during this visit, LVN Gallegos observes open wounds on Mr. Schuck and later informs RN Lymburn about her concerns about Mr. Schuck.
43. RN Lymburn testified she was assigned to Mr. Schuck's "RN Sick Call" that was scheduled by RN DeGuzman the morning of March 16, 2016.
44. At approximately 9:13 A.M., RN Lymburn and Deputy Mace entered Module 7D. The video recording shows that RN Lymburn and Deputy Mace approach Mr. Schuck's cell window and communicated with Mr. Schuck through the window of the cell. They never opened the food flap to communicate with him. They never opened the door to his cell so that RN Lymburn could conduct a medical evaluation or check on his wellbeing.
45. RN Lymburn testified she went to Module 7D to conduct a "wellness check" for Mr. Schuck. She told investigators that Mr. Schuck was "on the list for withdrawal" and testified that she said that because Mr. Schuck said he "uses acid" and "since that was the only thing in his record she was checking to see if he's going through withdrawal from it, and to make sure he's okay." She testified that Mr. Schuck was nonresponsive and the only thing she asked Mr. Schuck to do was to "wiggle his leg" which Mr. Schuck did. Mr. Schuck never did or said anything to indicate he refused care.
46. According to the "SOAP Note" entered by RN Lymburn at approximately 10:37 A.M., RN Lymburn entered a "Later entry" for a "RNSC" a Registered Nurse Sick Call. She conducted a "wellness check" because "he claimed he uses Acid drugs? in the street."
47. RN Lymburn' s "Objective" assessment in Mr. Schuck's medical record indicates "he was seen between 9:30- 9:40 for RNSC." RN Lymburn "observed Mr. Schuck lying in bed naked, he did not acknowledge staff." Mr. Schuck "kept moving his lower extremities but kept facing the wall." RN Lymburn "noticed multiple pressure sores on his tailbone, buttocks, elbows, and legs." RN Lymburn' s "Assessment" indicates Mr. Schuck had "impaired skin integrity" and "alteration in health maintenance."

48. The video recording shows that at 9:14 A.M. RN Lymburn stepped away from Mr. Schuck's cell. She later peeked into the cell for approximately 10 seconds and again for an additional 5 seconds. The video shows RN Lymburn walked away from the area in front of Mr. Schuck's cell, handed paperwork back to RN Gallegos and said something to Deputy Amado.
49. The video recording shows that at approximately 9:15 A.M. RN Lymburn and Deputy Amado walked toward Mr. Schuck's cell. RN Lymburn testified that this was when she informed Deputy Amado and Deputy Mace that Mr. Schuck needed to go to the clinic because "he did not look good."
50. The "Plan" outlined in Mr. Schuck's medical indicates that RN Lymburn "notified floor deputies # 4324 and # 4193 that Mr. Schuck needs to go to the clinic to be seen by medical provider." It also indicates that RN Lymburn "notified clinic RN 6338 that Mr. Schuck needs to be seen ASAP. Mr. Schuck was also scheduled for LTSC for his sores."
51. The video recording demonstrates that at approximately 9:16 A.M., RN Lymburn, Deputy Mace, Deputy Amado, walked away from Mr. Schuck's cell and LVN Gallegos walked out of Module 7D. No one escorted Mr. Schuck to the clinic or provided medical assistance.
52. The video recording demonstrates that at approximately 9:18 A.M. RN Lymburn and Deputy Mace exited Module 7D. RN Lymburn testified that she headed to the clinic after she completed her appointments in Module 7D and informed LVN Vivona that Mr. Schuck needed to be brought to the clinic. She testified that LVN Vivona sent Deputy Cortez to transport Mr. Schuck to the clinic.
53. The video recording demonstrates that Deputy Cotez entered Module 7D at approximately 9:37 A.M. and approached Mr. Schuck's cell window. About a minute and thirty seconds later he opened the cell door and entered.
54. The video recording demonstrates that at 9:38 A.M. Deputy Mace and Deputy Amado entered Module 7D and approached Mr. Schuck's cell a minute later. They then helped Deputy Cortez drag Mr. Schuck's body out of his cell. A few seconds later, Deputy Amado started to administer CPR.
55. The video recording shows that at approximately 9:43 A.M. the medical staff entered Module 7D and continued CPR and provided medical treatment.
56. At 10:18 medical staff pronounced Mr. Schuck dead and stopped CPR.

**Opinions:**

In 1976, the U.S. Supreme Court, in *Estelle v. Gamble*, established that the Eight Amendment to the U.S. Constitution, which prohibits cruel and unusual punishment, extends to the health care of the incarcerated population. As a result of this case, incarcerated people are the only individuals in the U.S. with a constitutional right to healthcare. In *Gordon v. County of Orange,* the Ninth Circuit further clarified that pretrial detainees are guaranteed additional protections under the Fourteenth Amendment. As a result, claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard. These landmark rulings essentially guarantee healthcare coverage for our incarcerated population and set the tone for healthcare delivery in corrections in the United States.

Mr. William Hayden Schuck died on March 16th, 2022, while in custody at the San Diego Jail, his death was premature and completely preventable.

As outlined below, at every stage of Mr. Schuck's care, the individual Defendants committed failures, omissions, and elected choices that led to Mr. Schuck's deficient care. These deficiencies are a product of deep rooted and widespread systemic issues at the San Diego Central Jail. Mr. Schuck's six days at the San Diego Central Jail demonstrate longstanding patterns, practices, and a problematic culture within the San Diego Sheriff's Department Medical Service Division that led to Mr. Schuck's unnecessary and tragic death.

**Deficiencies and Failures in Medical and Nursing Care at the San Diego County Jail**

<u>1. Documentation shows that RN Nozawa failed to comply with the "Gate Refusal" Procedure outlined in E.2.1 and the "Nursing Documentation" Procedure outlined in MSD.N.4 and fell below the standard of care.</u>

SDSD Medical Service Division defines a "Gate Refusal" as an individual "Not Fit for Jail." The procedure states the intake "RN will complete the Gate Refusal Form (Appendix A) for individuals identified as needing clearance at the hospital ED prior to being accepted into the detention facility." Both RN Nozawa and RN Barrera testified that as part of the "Gate Refusal" procedure, a RN should take a patient's vitals and document any observations of the patients. RN Barrera testified that information on the "Gate Refusal" form is important because it informs the hospital or treating facility what

potential medical or mental health concerns the patient might be experiencing and that a RN should always take vitals before sending a patient to the hospital because that information will be useful to the hospital's evaluation of the patient. The "Nursing Documentation" procedure "ensures that the patient's health information is complete and communicated correctly" and "provides information that will afford continuity of the patient's care." Nurses "will document accurate, concise, clear and pertinent information in a timely, sequential and permanently retrievable manner and documentation will include the patient's medical or psychological condition(s) as evidenced in the nurse's assessment/observation, the patient's, individual need(s), the nursing intervention(s) specific to those needs and outcomes." Moreover, "nursing documentation will be in accordance with professional standards of their licensing agency."

The medical records demonstrate that RN Manuel Nozawa did not take any vitals from Mr. Schuck or document any of his observations. Despite this, the medical records demonstrate that RN Nozawa checked the box with the designation, "patient is willing to sign but is unable to sign." During his testimony RN Nozawa could not remember why Mr. Schuck could not sign the form but believed that Mr. Schuck's behavior indicated to him that he refused. When asked why he did not check the box indicating the patient "refused," he said that a patient must verbally refuse to sign before a nurse can indicate that a patient refused to sign. RN Nozawa admitted that he should have documented his observations, Mr. Schuck's behavior, and why he believed Mr. Schuck was unable to sign the intake forms. RN Nozawa by his own admission was derelict in his nursing duties, it is imperative and quite frankly mandatory that the documentation in the medical record accurately reflect the entire clinical picture of the patient. In healthcare, documenting a patient's complete clinical picture in the medical record is crucial for delivering high-quality care. When a nurse or physician records all relevant details, they provide the foundation for accurate diagnosis and effective treatment, reducing the risk of errors, harms or oversights. This comprehensive approach is especially vital in ensuring continuity of care, as it allows other providers to fully understand the patient's history and current condition during transitions between healthcare settings.

Clear and thorough documentation also serves as a vital communication tool. In today's multidisciplinary healthcare environment, multiple specialists or healthcare organizations (in Mr. Schuck's case, collaboration between, San Diego County Jail health services, private contractor Correctional Healthcare Partners, and University of California San Diego emergency department) often collaborate on a patient's treatment plan. A detailed

medical record enables seamless communication among team members, ensuring everyone is on the same page. It also supports better communication with patients, empowering them to understand their health and participate in decisions about their care.

From a legal and ethical perspective, maintaining complete medical records is essential. Accurate documentation provides a legal account of the care provided. Additionally, it fulfills the ethical obligation of healthcare providers to uphold professional standards of accountability and transparency.

Furthermore, well-maintained medical records contribute to broader healthcare goals, such as quality improvement and research. They offer valuable data for identifying patterns, addressing gaps in care, and improving patient outcomes. Researchers also rely on comprehensive records to study treatments, outcomes, and trends, which ultimately advance medical knowledge and practice.

Regulatory compliance is another reason for thorough documentation. Meeting accreditation and legal standards, such as those set by HIPAA, NCCHC, Joint Commission, is essential for any healthcare provider or organization. Additionally, robust records help manage risk and ensure preparedness for accreditation, audits or inspections.

Finally, patient safety depends heavily on complete medical documentation. A detailed clinical picture reduces the likelihood of medication errors, patient harms, adverse interactions, and unnecessary tests. It also provides critical information in emergencies, enabling swift and informed decision-making when time is of the essence.

Documenting a patient's complete clinical picture is not just a routine administrative task—it is a cornerstone of safe, effective, and ethical healthcare. It supports accurate care, enhances communication, ensures legal accountability, drives quality improvement, and ultimately safeguards the well-being of patients.

2. Documentation and Testimony Demonstrates that RN Barrera's "clinical assessment" of Mr. Schuck did not comply with what was required under the "Medical Clearance" Procedure and the "Receiving Screening" Procedure outlined in E.2.1 and fell below the standard of care.

SDSD Medical Service Division defines "Medical Clearance" as "a documented clinical assessment of medical, dental, and mental status before an individual is admitted into the facility. The medical clearance may come from on-site health staff or may require

sending the individual to the hospital emergency department (ED).” The procedure states a “registered nurse (RN) will perform a *comprehensive* clinical assessment at the time of booking prior to acceptance into the detention facility. Medical clearance into the detention facility is incumbent upon the individual's condition at the time of assessment.” Furthermore, “individuals exhibiting signs of excited delirium, disorganization of thoughts, altered mental status and confusion will require medical and possible psychiatric evaluation prior to being accepted into the detention facility.” Additionally, the “Receiving Screening” procedure requires the intake nurse to conduct a “clinical assessment” which “includes but is not limited to a series of health questions, a review of available past medical history on record, vital sign measurements, observation and a physical assessment (if necessary).” Likewise, it states, individuals experiencing certain behaviors such as “thought disorganization, nonsensical communication, altered mental status, confusion, or psychosis” “may necessitate further evaluation at the hospital ED or at the psychiatric hospital of San Diego County prior to being accepted into the detention facility.” In fact, Dr. Freedland admitted in his deposition that disorganized thinking and confusion can be symptoms of head injury and/or drug intoxication.

As stated above, as part Mr. Schuck’s “Medical Clearance” RN Barrera took Mr. Schuck’s vitals but did not appear to complete the rest of the Medical Clearance process as she left the entire portion of the “Medical Clearance” form blank. RN Barrera’s notes indicate Mr. Schuck reported that he had ADHD, was “making grandiose statements and is not understanding the booking process,” was “asking to take photos of his medical records with his phone (which per officers was ‘in pieces” due to his car accident) and was also asking for ‘$20 to give to the nurse for some water.’” Despite the concerns with Mr. Schuck mentioned above, RN Barrera assessment was “fit to continue the booking process.” As also required by the “Medical Clearance” procedure, Mr. Schuck was not provided a “medical or a psychiatric evaluation.” As indicated on the form, Ms. Barrera had other options at her disposal before deciding Mr. Schuck was mentally and medically “fit for the booking process.” The form indicates and RN Barrera testified she could have referred Mr. Schuck to the “ISP” or “Inmate Safety Program” which would have ensured Mr. Schuck was in a “gate keeping queue” where he would have waited for an evaluation by a “gatekeeper” who is a “mental health clinician” or “nurse.” RN Barrera testified that while there was not a mental health clinician on site at the time, they did have one on call that nurses could reach out to. The form indicates and RN Barrera could also have referred Mr. Schuck to a “Sobering Cell” if she believed that Mr. Schuck might be intoxicated. Finally, the form indicates, and RN Barrera testified that she could have issued a “Gate refusal” for Mr. Schuck and sent him back to the hospital. Additionally,

RN Nozawa testified that at any point during intake if a nurse does not know what to do or how to handle a situation and wants additional guidance they can go to a supervisor or charge nurse for guidance.

RN Barrera's clinical assessment was inadequate. She admitted in her testimony that she "is not familiar with the acronym, BMI (Body Mass Index) and doesn't pay attention to BMI documentation." RN Barrera's attitude towards BMI is concerning because BMI is a simple but widely used tool that provides an estimate of whether a person's weight is within a healthy range based on their height. Individuals with a high BMI (normal: 18.5-24.9) classified as overweight or obese, are at an increased risk of chronic conditions such as heart disease, type 2 diabetes mellitus, cancer etc. Individuals with a low BMI (<18.5), are underweight and are at increased risk of malnutrition, weakened immunity and an elevated risk of bone conditions such as osteoporosis. Mr. Schuck's BMI was 16.8. By ignoring his BMI reading, RN Barrera missed an opportunity to pick up on and identify a key clinical health marker which would have enabled her to risk stratify him better. RN Barrera also testified that she does not ask patients follow up questions and only asks patients the questions listed in Techcare. Asking follow up questions is important; it allows the healthcare provider to expand and dig deeper into patient care concerns. RN Barrera's interview technique is certainly suboptimal and poor.

Furthermore, RN Barrera testified that she is not trained in mental health evaluation and relies on patients to self-report their mental health concerns. She also testified that she is only concerned with identifying patients with emergent ideations, suicidal ideations or individuals at risk of harming themselves. As stated above, RN Barrea's notes indicate Mr. Schuck reported that he had ADHD, was "making grandiose statements and is not understanding the booking process," was "asking to take photos of his medical records with his phone (which per officers was 'in pieces" due to his car accident) and was also asking for '$20 to give to the nurse for some water.'" Despite this, Mr. Schuck was not provided any further "medical or a psychiatric evaluation." Dr. Freedland testified during his deposition that excessive thirst could indicate a medical concern or drug intoxication. Dr. Freedland also testified that it is important for medical providers to recognize if a patient is disheveled, hallucinating or thirsty, as this could lead to mistakes if not promptly addressed. Intake is often a highly stressful and vulnerable time for individuals entering a jail, it is imperative that jails either have mental health clinicians available or ensure their intake nurses and providers have the required knowhow to properly identify mental health needs early in the intake process. Many individuals entering the jail system have untreated or undiagnosed mental health conditions, having the required knowhow allows for prompt and proper screening and diagnosis. This early intervention helps ensure that patients with mental health concerns receive the care they need, whether it involves medication, therapy or crisis management. In addition to crisis management,

having the appropriate mental health clinician or nurses and providers with mental health knowhow, allows, facilitates and expedites prompt gathering of important information about an individual's current needs and mental health history. This ensures continuity of care with medications and or therapies without interruption. For individuals with substance use disorders, clinicians can identify withdrawal symptoms early and recommend appropriate medical and psychiatric care, which will mitigate against severe complications and death.

3. Documentation, testimony and video footage indicate RN Barrera did not interview the arresting officer (AO) or the transporting officer as required by the "Receiving Screening" procedure outlined in Policy, E.2.1.

SDSD Medical Services Division defines "Receiving Screening" as "a process of structured inquiry and observation intended to identify potential emergency situations among new arrivals and to ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment. "The procedure states the intake "RN will ask the arresting officer (AO) a series of questions surrounding the arrest. The AO's observation and engagement are essential in obtaining pertinent history such as any statements expressed by the individual that may be indicative of an injury or risk for self-harm. As stated above, the notes in the "Receiving Screening" form indicate the arresting officer was Officer Wong #7277, but do not state that Officer Wong was not present and do not state that Officer Pulido was present. The form also indicates that the officer interviewed responded "No" to each interview question posed by RN Barrera.

This documentation by RN Barrera appears to be inaccurate. Officer Wong and Officer Pulido testified during their depositions that Officer Pulido transported Mr. Schuck to the SDCJ on March 10, 2022. Furthermore, Officer Pulido testified that he did not remember being asked any questions by the intake nurse when he brought Mr. Schuck back to the jail and that it depends on which nurse is on duty whether he must answer questions during intake. The video surveillance footage shows Officer Pulido providing documentation to the intake nurse but does not show Officer Pulido entering the intake office more than few seconds at a time. The surveillance does not appear to show Officer Pulido answering any questions or conversing with Nurse Barrera at any point and for most of the time that Hayden is in the room with Nurse Barrera, Officer Pulido is several feet away, outside of the room.
There is no indication that Nurse Barrera attempted to contact the arresting officer, Officer Wong, at any point to gather information about Mr. Schuck.

**4.** <u>Documentation and Testimony Demonstrates that RN Barrera's did not refer for "Clinically Indicated Assessment (CIA)" or "Nurse Assessment Protocol (NAP)" as required by the "Receiving Screening" Procedure outlined in E.2.1</u>**.**

SDSD Medical Services Division mandates a specific procedure "in the event an individual refuses treatment or ignores the treatment recommended by the hospital ED provider." The procedure requires "a copy of the signed hospital's form indicating that the individual is acting against medical advice (AMA) to accompany the individual upon return to the detention facility." Additionally, an intake nurse must follow the "receiving screening procedure for a clinically indicated assessment (CIA) in section IV.C." This procedure states:

C. All arrestee with mild or moderate clinical signs and symptoms noted during the screening will be identified for Nurse Assessment Protocol (NAP).

<u>The RN will:</u>

1. Place a red wrist band on identified individual
2. Staple the blue "Proceed" slip to the J-15 form
3. Notify the NAP RN
4. Notify the intake deputy
5. Schedule the individual in the electronic medical record under NAP medical encounter; indicating "PROCEED" and additional information as needed.
6. The "PROCEED" individual will be seen by the RN for assessment and evaluation no later than 2 hours from the stamp time noted on the J-15 form

C. All arrestee with mild or moderate clinical signs and symptoms noted during the screening will be identified for Nurse Assessment Protocol (NAP).

<u>The RN will:</u>

1. Place a red wrist band on identified individual
2. Staple the blue "Proceed" slip to the J-15 form
3. Notify the NAP RN
4. Notify the intake deputy
5. Schedule the individual in the electronic medical record under NAP medical encounter; indicating "PROCEED" and additional information as needed.
6. The "PROCEED" individual will be seen by the RN for assessment and evaluation no later than 2 hours from the stamp time noted on the J-15 form

RN Barrera did not follow the procedure outlined in section IV.C of the policy. RN Barrera did not place a red wrist band on Mr. Schuck wrist. A red wrist band would have alerted deputies to transport Mr. Schuck to the medical screening area. RN Barrera did not "staple the blue 'proceed' slip to the J-15 form", did not notify the NAP RN or an intake deputy, and did not schedule Mr. Schuck for a NAP medical encounter. As a result, Mr. Schuck was not seen by a Nurse Assessment Protocol (NAP) RN for a more thorough assessment and evaluation which should happen no later than 2 hours after being referred. According to RN DeGuzman, by labeling an individual a "proceed," this tells the Deputies and the RNs to give that patient priority over others that might be waiting in second stage medical area. Instead, RN Barrera deemed Mr. Schuck "Fit to Continue Booking Process" and "Clinically Screened-

Cleared to Class." As stated above, the form provided RN Barrera with other options before clearing Mr. Schuck. The form not only indicates that RN Barrera could have and should have referred Mr. Schuck to "2nd Stage Nurse Evaluation/NAP" but also indicates that RN Barrera she could have referred Mr. Schuck to the "ISP", the "Sobering Cell, or issued a "Gate Refusal." RN Nozawa testified that 2nd Stage Nurse Evaluation/NAP can take a urine or blood test. This means that if Mr. Schuck was referred to the second stage, the nurse could have possible taken a urine test to see if his behavior was related to drug use. RN Nozawa testified that at second stage medical, they could request for a doctor, NP, mental health clinician, or send him to

hospital if necessary. Dr. Freedland testified that it was important for medical providers to recognize and know if a patient is disheveled, hallucinating, thirsty, because failure to recognize these clinical signs, could lead to mistakes if they are not promptly addressed.

If Mr. Schuck had received a second-stage screening per policy, and the nurse observed this behavior, it is possible that a provider would have been notified of his symptoms to further evaluate his condition. Per NCCHC standards and Scope of Nursing Practice, if a nurse cannot treat a patient using approved protocols, the patient is to be referred to a provider. A medical provider would be able to assess the patient appropriately.

5. RN Barrera did not obtain a release of information (ROI) as required by the "Receiving Screening" Procedure outlined in E.2.1. and order ER records.

E.2.1. I.V.N. states that the intake "RN will obtain a signed release of information (ROI) for outside records and medication verification as needed." NP Kahl also testified that SDCJ can obtain records without a ROI for purposes of continuity of care.
RN Barrera did not obtain the ROI for the ER records as required by policy. Instead, she appears to have deliberately chosen not to because she checked the box "not indicated" on the Authorization for ROI. RN Barrera should have complied with the policy as stated above to ensure continuity of care and a seamless transition of care from the emergency department to the jail. Further, as Nurse Rognlien Hood testified, patients do not always want to provide nurses at the jail with truthful or complete information, meaning it is especially important to obtain information from other available sources to ensure adequate and appropriate health care is provided.

6. RN Barrera Failed to Comply with the "Nursing Documentation" Procedure outline in MSD.N.4.

As stated above, the "Nursing Documentation" procedure "ensures that the patient's health information is complete and communicated correctly" and "provides information that will afford continuity of the patient's care." As a result, nurses are required to "document accurate, concise, clear and pertinent information in a timely, sequential and permanently retrievable manner, and that documentation will include the patient's medical or psychological condition(s) as evidenced in the nurse's assessment/observation, the patient's individual need(s), the nursing intervention(s) specific to those needs and outcomes." Moreover, "nursing documentation will be in accordance with professional standards for their licensing agency." In fact, RN Barrera testified that it is important that a nurse's documentation be complete, accurate, detailed,

and timely because other individuals may "ask about the patient" and other individuals may rely on her notes to provide medical care for a particular patient**.** RN Barrera failed to comply with the "Nursing Documentation" Procedure and did not document why Mr. Schuck was unable to sign the intake forms. According to the notes in the "Receiving Screening" form in Mr. Schuck's medical record, RN Barrera recorded that Mr. Schuck was "willing to sign but unable to sign" several forms. RN Barrera and RN Rognlien Hood testified that RNs check this box when patients are handcuffed and are willing but unable to sign. The video footage demonstrates that Mr. Schuck was *not* handcuffed during his intake interview with RN Barrera. RN Barrera should have documented her observations, Mr. Schuck's behavior, and why she believed Mr. Schuck was willing but unable to sign the intake forms. Documenting a patient's clinical picture is the cornerstone of safe, effective, and ethical healthcare. It supports accurate care, enhances communication among providers, ensures legal accountability, drives quality improvement, and safeguards the wellbeing of patients. Additionally, the "SOAP Note" entered by RN Barrera on March 10, 2022, has the subjective and objective sections blank, and plan indicates that RN Barrera requested a COVID test. It is clear her notes are inaccurate and incomplete because they are inconsistent with her testimony and her sick call appointment which includes notes not reflected in her progress notes and a QMHP appointment. Further, her plan (or lack thereof) for Mr. Schuck's care fell below the standard of care.

7. RN DeGuzman Should Have Scheduled Mr. Schuck for MD Sick Call for his Wounds. He Failed to Comply with the "Wound Care Management" Procedure outlined in MSD.W.2. and the "Abrasions (Superficial) and Open Wound Care" Standardized Nursing Procedure outlined in SNP.A.1.

The "Wound Care Management" procedure states that "all wound care treatment shall be ordered by the attending physician or be previously established in one of MSD's SNP's. Nursing staff will follow the wound care protocols/nursing guidelines.' The Standard Nursing Procedure (SNP) requires the following treatment plan for open wounds:

II. Open Wounds (requiring dressing change)

A. Irrigate with copious amounts of sterile Normal Saline.
B. Apply triple antibiotic ointment (Bacitracin) to wound; may provide keep on person (KOP) supply as needed.
C. Administer Tetanus prophylaxis (Adult Td) if over five (5) years have transpired since last Tetanus immunization.
D. Apply a sterile dry dressing.
E. Schedule for daily dressing changes and refer to next MD sick call for wound evaluation.

II. Open Wounds (requiring dressing change)

A. Irrigate with copious amounts of sterile Normal Saline.
B. Apply triple antibiotic ointment (Bacitracin) to wound; may provide keep on person (KOP) supply as needed.
C. Administer Tetanus prophylaxis (Adult Td) if over five (5) years have transpired since last Tetanus immunization.
D. Apply a sterile dry dressing.
E. Schedule for daily dressing changes and refer to next MD sick call for wound evaluation.

RN DeGuzman failed to follow the procedure. He did not administer tetanus injection and did not "refer to next MD sick call for wound evaluation." In fact, Dr. Montgomery testified that "evaluation of a wound should be done by a clinician." It appears that in the case of Mr. Schuck, RN Guzman conducted the wound care evaluation, ordered the wound treatment with Dr. Montgomery's standing orders even though Mr. Schuck was never seen or evaluated by a provider. Dr. Montgomery testified during his deposition he was "concerned about the coordination of care because the wound care order was placed without a provider's evaluation."

8. RN DeGuzman Failed to Properly Document Mr. Schuck's Wounds as required by the "Wound Care Management" Procedure outlined in MSD.W.2. and the "Abrasions (Superficial), Open Wound Care" Standardized Nursing Procedure outlined in SNP.A.1. and the "Nursing Documentation" Procedure outlined in MSD.N.4.

The "Wound Care Management" Procedure states that "all wounds will be measured and photographed initially." Additionally, wound care documentation requires:

A. Date of the wound care visit.
B. Vital signs
C. Status of the dressings: intact, wet, dry, loose, clean or dirty, etc.
D. Description of the wound: non-viable, necrotic tissue, good blood flow, poor blood flow, edematous, macerated, granulation, infected, tunneling, undermining.
E. Description and amount of the exudate: serous, sanguinous, serosanguinous, seropurulent, purulent. Amount of the exudate: scanty, small, minimal, large
F. Color
G. Location: foot, leg, thigh, sacrum, elbow, shoulder, right, left, dorsal, plantar, medial, lateral, anterior, posterior, etc.
H. Presence of odor: fruity, foul
I. Past and current treatment including products used
J. Complaints of pain using pain scale.
K. Plan of care: referrals, follow-ups, collaboration with other teams: doctor, nurse, therapist or health care professional to discuss your findings, especially if there is deterioration.
L. Patient education

The Standard Nursing Procedure (SNP) states the RN should document the "mechanism of injury" if "pain to other portions of extremity not associated with superficial abrasion" and "when the injury occurred." The SNP states the RN should note an individual's

"vital signs, history of diabetes, HIV positive, or other chronic medical illnesses that promote poor healing" and document the "appearance of wound or wounds. The RN should document any signs, symptoms, or infection." Then in the RN's assessment, the RN is required to note "risk for infection" and "impaired skin integrity." Additionally, the "Nursing Documentation" procedure requires:

DOCUMENTING WOUNDS

I. The following should be included when documenting information regarding a wound:
   A. Measurement
   B. Date and time
   C. Confirmation that a digital picture was taken
   D. Stage (for decubitus ulcers)
   E. Treatment/Intervention

RN DeGuzman failed to take measurements and photograph Mr. Schuck's wounds. He also failed to document Mr. Schuck's responses to questions about his wounds, any injuries, and/or pain. It should be noted that RN DeGuzman was suspended and placed on a performance improvement plan for complaints "for failing to document."

9. RN DeGuzman failed to properly schedule a MD sick call or a Medical Chart Check.

According to NP Kahl "The nurses state what they need in the request and he will attempt to comply with whatever the nurse requests". When a nurse wants a doctor or NP to review an individual's medical file, it is not done through a chart check. Simple tasks are reserved for the chart check.

RN DeGuzman testified that he "referred him to the doctor." However, Dr. Freedland testified that if someone is not on the sick call list, no provider will see the patient. NP Kahl testified that "a complex task such as review the entire medical record are put through a sick call or the MD sick call list." NP Kahl testified that RN DeGuzman should have scheduled a MD sick call instead of a Medical Chart Review. Dr. Freedland testified that he would not have expected Mr. Schuck to be put on the sick call list at all but admitted that disorganized thinking/confusion can be symptoms of head injury and/or drug intoxication. From the comments above, it is easily discerned that a communication chasm exists. RN DeGuzman and NP Kahl have different views and understandings of the MD sick call and medical chart review process. It is unsurprising that there is confusion and inconsistency surrounding both the sick call list and procedures as well as the chart check list and procedures, as well as the purposes for both lists, considering there does not appear to be any formal guidelines addressing them either in the OM or Sheriff's Policies and Procedures manual. Chasms in communication between nurses and providers compromise patient safety and lead to harms and in some case death as in the case of Mr. Schuck. Dr. Freedland testified that Mr. Schuck's symptoms and signs of

disorganized thinking/confusion could be attributed to a head injury or drug intoxication, but he also asserts that he did not expect Mr. Schuck to have been placed on the MD sick call list. Quite frankly, I am not sure how Dr. Freedland reconciles both statements, as an emergency room physician for 20 years, Dr. Freedland should be aware that patients presenting with confusion and disorganized thinking (like Mr. Schuck) require additional evaluation. If Mr. Schuck had been evaluated by an astute provider, he probably wouldn't have died prematurely as he did on March 16th, 2022.

RN De Guzman testified that he expected the doctor to review Mr. Schuck's medical record and discharge papers to determine if any treatment was necessary. He should have explained that more clearly.

10. RN DeGuzman Failed to Comply with the "Hypertension Clinical Pathway" Procedure outlined in MSD.H.14.

As stated above, the purpose of the "Hypertension Clinical Pathway" is "to establish a standard clinical pathway for the management of acute and chronic hypertension for the general patient population. This clinical pathway is not applicable to certain populations, i.e. pregnancy, under the influence of drugs, symptomatic for chest pain or respiratory distress." The procedure defines an elevated blood pressure (BP) reading "for patients under age 60 with or without co-morbidity… as BP exceeding 140/90." To identify and screen individual for hypertension the procedure instructs nurse to "schedule for BP check on Day 7 at 1300 and repeat on Day 14 at 1300" "if the patient's baseline BP reading meets above parameters."

RN De Guzman failed to schedule Mr. Schuck for a BP check seven days from March 10, 2022. Mr. Schuck's had an elevated a blood pressure when he was evaluated by RN Barrera his BP was 144/94. He testified that he had reviewed Mr. Schuck's medical record and reviewed progress notes which included Mr. Schuck's vitals. Moreover, Mr. Schuck's blood pressure remained elevated when he was evaluated by RN DeGuzman. Mr. Schuck's BP reading was 148/96. Despite this RN De Guzman took no action.

11. RN DeGuzman failed to summon the appropriate medical care when it was evident that Mr. Schuck was experiencing symptoms of dehydration, intoxication, and/or withdrawal.

Dr. Freedland testified that it is important for medical providers to know if a patient is disheveled, hallucinating, or thirsty, as failure to recognize these could lead to mistakes if not addressed.

RN DeGuzman should have used his nursing skills, experience and judgement and

referred Mr. Schuck for a prompt evaluation by a physician or an advanced practice practitioner (APP). RN DeGuzman should have known that prompt medical evaluation and treatment of Mr. Schuck would have prevented his acute illness from progressing and lead to rapid clinical deterioration and death.

12. RN DeGuzman is not adequately trained on how to deal with individuals with substance abuse problems because he is not familiar with the variety of illicit substances that exist and their symptoms. He did not seek the assistance of a mental health professional who could have assisted him.

RN DeGuzman testified he can reach out to on-call qualified mental health professionals to assess someone more rapidly than a sick call appointment. Believed acid was meth. Acid could be a generic name for a lot of different kinds of drugs and did not know what acid was. When asked if he knew if acid was LSD, he said it was a "possibility." Acid could be an opiate a cannabinoid.

RN DeGuzman should have reached out to his charge nurse or a QMHP for guidance on how best to evaluate a patient who admitted to drug use and by his own admission was having difficulty following direction, was disorganized and nonsensical.

13. NP Kahl failed to review the entire medical record.

On March 15, 2022, per documentation in the medical records, Nurse Practitioner (NP) Nicholas Kahl reviewed the discharge records from UCSD. His review of the after-visit summary from UCSD should have resulted in additional review of the nursing intake documentation and all other medical records regarding Mr. Schuck since his admission into the facility. NP Kahl testified that all he did in response to the "Medical Chart Review" request made on March 15, 2024, was review the UCSD After Visit Summary and place an order for a release of information for additional records from the emergency room. NP Kahl's response was inadequate and his decision not to review all records was quite frankly reckless and well below the standard of care. NP Kahl should have reviewed all of the San Diego County Jail Medical records for Mr. Schuck, which were readily available to him in TechCare. The After Visit Summary indicated that Mr. Schuck was in a motor vehicle accident and there was a possibly of an "occult injury." NP Kahl testified he knew that an "occult injury raises the possibility of a hidden injury." Moreover, he was aware that Mr. Schuck had signed against medical advice and refused care at the emergency room which means he knew that Mr. Schuck's evaluation was not complete prior to his jail intake. This should have prompted NP Kahl to review the entire intake records in addition to asking the nursing staff to bring Mr. Schuck to clinic for evaluation. NP Kahl would have seen the concerning documentations in the records from both RN

Barrera and RN DeGuzman. NP Kahl testified he had access to Mr. Schuck's full medical record so there was no reason why he could not have reviewed the San Diego County Jail medical records. RN DeGuzman testified that his expectation was that the MD or NP would review the entire medical record, which was why he requested a medical chart review. NP Kahl testified he was not familiar with the County policy for medical records review but was testifying to his understanding of what the practice is.

Moreover, Dr. Freedland testified that NP Kahl could have called RN DeGuzman to clarify why a chart check was requested. I am unequivocal in my assessment that, had NP Kahl reviewed all the available San Diego County medical records germane to Mr. Schuck, he would have requested that Mr. Schuck be placed on his clinic list of patients to be seen on March 15th, 2022. If NP Kahl had performed his due diligence, NP Kahl would have discovered that in addition to signing out against medical advice, Mr. Schuck's evaluation for an MVA at UCSD emergency department was incomplete, he would have also noticed San Diego County intake documentations that reflected Hypertension, tachycardia, being underweight (BMI 16.5), altered mental status/delirium/acute confusional state.

14. <u>NP Kahl failed to provide adequate care for Mr. Schuck and should have evaluated Mr. Schuck immediately after reviewing his medical record.</u>

As mentioned above, review of the after-visit summary from UCSD should have resulted in additional review of the nursing intake documentation and all other medical records on Mr. Schuck since his admission into the facility.I am unequivocal in my assessment that, had NP Kahl reviewed additional San Diego County Jail medical records, he would have requested that Mr. Schuck be placed on his clinic list of patients to be seen on March 15th, 2022. If NP Kahl had performed his due diligence, NP Kahl would have discovered that Mr. Schuck signed out against medical advice from UCSD, was not completely worked up for a head injury or drug intoxication, in addition to concerns during intake including hypertension, tachycardia, being underweight, and altered mental status/delirium/acute confusional state. NP Kahl would have known that Mr. Schuck was at a high risk of severe illness and or death.

NP Kahl's actions (or lack thereof) fell below the standard of care for an acutely ill patient. In addition, NP Kahl would have known that prompt medical evaluation and treatment of Mr. Schuck would have mitigated or prevented his acute illness from progressing. If he had provided the appropriate care which would have included: assessing for head injury, assessing and treating for drug withdrawal, assessing and treating dehydration, he could assess for drug intoxication, collaborate with a QMHP vis-à-vis mental health needs, collaborate with San Diego County Jail Deputies to request appropriate housing (medical observation unit etc.) NP Kahl's actions (or lack thereof)

was not only negligent but deliberately indifferent to Mr. Schuck's serious medical needs.

15. RN Echon Failed to Comply with "Court Orders" Procedure as outlined in MSD.C.10 because she chose not to have Mr. Schuck evaluated.

The "Court Orders" procedure "establishes a standard operating procedure for the processing of court orders received on "In Custody" patients." The procedure requires "the charge nurse or designee" to "schedule the appropriate request." "Request can include but not limited to:"
RN

A. A medical evaluation by a facility provider (physician /nurse practitioner)
B. An evaluation by the facility dentist
C. An evaluation by the facility psychiatrist
D. An evaluation by one of the facility's qualified mental health providers or counselor
E. An evaluation by an outside provider
F. Procurement of durable medical equipment, prosthesis, or false teeth.
G. For patient to attend a medical education class

RN Echon failed to schedule Mr. Schuck for "a medical evaluation by a facility provider", "an evaluation by facility psychiatrist," "an evaluation by one of the facility's qualified mental health provider or counselor" or "an evaluation by and outside provider." RN Echon chose not to provide medical care or summon any medical care for Mr. Schuck after he returned from court. RN Echon testified that she did not provide medical care because she read NP Kahl's entry in error and believed that Mr. Schuck had refused care. This was an unreasonable error, because RN Echon testified there was no documentation in the file noting that Mr. Schuck ever refused care. The Medical Services Division "Refusal Procedures" MSD.R.5. state that a "patient shall sign a refusal form" for MDSC or any onsite clinic. "If the patient refuses to sign the refusal form, the nurse if available and deputy shall sign the form," "document the reason for the refusal," and "review chart for acuity of patient's condition, conduct a housing unit round and reschedule for another appointment as needed."

16. RN Echon Failed to Comply with "Court Orders" Procedure as outlined in MSD.C.10 and "Nursing Documentation" Procedure outline in MSD.N.4.

The "Court Orders" procedure states that a "documentation of the receipt of the court order and the scheduling of the court ordered request(s) shall be documented in a TechCare encounter." Additionally, MSD.N.4. states that the RN should include if a "plan stay the same or is change needed?" and "plan of care includes… follow-up needs."

RN Echon testified that she did not schedule any appointments because she noticed that

Mr. Schuck was scheduled for a QMHP visit and a RNSC or a "wellness check." RN Echon did not document this reasoning in her notes. She did not indicate that "plan was to stay the same" or that "no change was needed."

17. LVN Gallegos should have evaluated Mr. Schuck.

On March 16, 2022: LVN Gallegos and Deputy Amado went to Mr. Schuck's cell to get a release of information (ROI) signed. LVN Gallegos testified that Mr. Schuck was lying down without his clothes on, unresponsive to verbal commands, she observed multiple sores on his back, and he was mumbling. At no point during this event did she ask for the deputy to open the door so she could further assess him. She admitted under oath that this was an error on her part, in addition, she should have directed Deputy Amado to open the door to Mr. Schuck's cell. LVN Gallegos had worked at SDCJ for nearly 12 years, by her own admission, she was trained to identify patients in medical distress and take the necessary actions (notify the floor deputy to promptly take the patient to clinic for evaluation and notify the clinic nurse with specific red-flag information about the distress) observed.

Unequivocally, Mr. Schuck was in medical distress, he was lying down without his clothes on, with visible pressure sores, unresponsive to verbal commands and mumbling. LVN Gallegos was derelict in her duty to Mr. Schuck, she admitted she should have done more (directed the door be opened for immediate access and additional evaluation, directed Deputy Amado to take Mr. Schuck immediately to the clinic for assessment and resuscitative measures, document her observations of Mr. Schuck in the medical records) which would have saved his life, Mr. Schuck died later that morning. LVN Gallegos' s actions (or lack thereof) were negligent, violated her training (she received training to recognize symptoms of withdrawal) and in addition was deliberately indifferent to Mr. Schuck's serious medical needs. Deputy Amado was present and saw Mr. Schuck without clothes on, he was aware Mr. Schuck was unresponsive to his and LVN Gallegos's verbal commands and mumbling. Even though Deputy Amado was a lay person medically, he should have known from his basic training that Mr. Schuck needed immediate medical assistance, his inaction to open the door, call for help and render assistance made him complicit because Mr. Schuck died later that morning. Deputy Amado's actions (or lack thereof) fell below the standard of care, in addition, he was deliberately indifferent to Mr. Schuck's serious medical needs.

18. LVN Gallegos Failed to Comply with "Nursing Documentation" Procedure outline in MSD.N.4.

The "Nursing Documentation" procedure "ensures that the patient's health information is complete and communicated correctly" and "provides information that will afford continuity of the patient's care." Nurses "will document accurate, concise, clear and pertinent information in a timely, sequential and permanently retrievable manner and documentation will include the patient's medical or psychological condition(s) as evidenced in the nurse's assessment/observation, the patient's, individual need(s), the nursing intervention(s) specific to those needs and outcomes." Moreover, "nursing documentation will be in accordance with professional standards for their licensing agency."

RN Gallegos failed to document her observations of Mr. Schuck. She also failed to document the action she took in relation to Mr. Schuck's treatment. Documenting a patient's complete clinical picture in the medical records is crucial to delivering high quality care. When all relevant details are documented, it provides the foundation for accurate diagnosis and effective treatment, reducing the risk of harms and errors, mitigates communication chasms and prevents untoward outcomes such as preventable deaths (like Mr. Schuck). This comprehensive approach is especially vital in ensuring continuity of care during care transitions between health organizations.

19. RN Lymburn should have immediately evaluated and treated Mr. Schuck.

RN Lymburn should have recognized that Mr. Schuck's nonresponse to verbal commands, his failure to engage, lying naked in bed with multiple sores, which by her own admission looked infected, constituted medical distress. RN Lymburn should have used her nursing knowledge, experience, and judgement to recognize that Mr. Schuck needed immediate evaluation and treatment. She should have directed the deputy to open the door, which would have allowed for an astute observation and immediate action which would have included her directing the deputy to transfer Mr. Schuck to the clinic area for evaluation and treatment immediately. Mr. Schuck was showing signs of clinical deterioration, time was of the essence to mitigate and prevent cardiac arrest, respiratory failure, and death. If RN Lymburn had taken the proper action as alluded to above, his death from dehydration and/or septicemia would have been prevented by prompt initiation of intravenous hydration and/or antibiotics.

A wellness check, in any situation, includes not only visually looking through the cell but

also entering the cell (especially if the patient is not responding appropriately) and, at a minimum, measuring the patient's vital signs. Had RN Lymburn made physical contact with the patient, she may have realized the severity of Mr. Schuck's condition and acted more quickly to obtain medical help for him. As it appears from the video timeline, neither the nurse nor the deputy expressed a sense of urgency in this case. A review of the records, policies and procedures for San Diego County Jail Medical Services Division did not reveal a defined policy or procedure for "wellness checks," which could lead to inconsistencies in the way that they are conducted, the scope of the examination, the information gathered, and expectations for documentation, therefore putting patients at risk due to the nebulosity of the process.

RN Lymburn failed to provide care for Mr. Schuck. RN Lymburn testified she suspected that Mr. Schuck could be undergoing withdrawal. She testified she reported to Deputy Amado and Deputy Mace "he did not look good." She testified she observed Mr. Schuck was skinny, malnourished, and had multiple wounds that could be infected. Despite this RN Lymburn took no action. She asked Mr. Schuck to wiggle his toe but did not ask if he could speak, if he could stand, if he sat up, she did not ask him to raise his arms, she did not ask him to turn his body. She testified that Mr. Schuck was nonresponsive, but she took no action. She did not ask to evaluate Mr. Schuck in his cell. She did not ask Deputy Mace to enter the cell to check on Mr. Schuck. Instead, she continued to do her rounds before finally returning to the clinic and reporting Mr. Schuck's condition to LVN Vivona. Mr. Schuck was rapidly deteriorating clinically; he required immediate evaluation and treatment which he wasn't given that led to his preventable death.

20. <u>RN Lymburn should have told Deputy Amado and Deputy Mace to transport Mr. Schuck to the clinic immediately.</u>

Her actions (or inaction) and conduct were reckless and fell below the standard of Care. RN Lymburn failed to tell Deputy Amado and Deputy Mace that Mr. Schuck's condition was urgent or that he needed to be seen immediately. According to the medical record, RN Lymburn' s "Plan" indicates that she "notified floor deputies # 4324 and # 4193 that Mr. Schuck needs to go to the clinic to be seen by medical provider." RN Lymburn did not notify or convey the urgency for Mr. Schuck's evaluation to the deputies. RN Lymburn "notified clinic RN 6338 that Mr. Schuck needs to be seen ASAP. RN Lymburn was derelict in her duty and quite frankly negligent for not conveying Mr. Schuck's rapidly deteriorating condition to the deputies, so he could be transported promptly to the clinic. RN Lymburn should have had Deputy Mace escort Mr. Schuck to the clinic immediately instead of escorting her to see her next patient.

21. <u>RN Lymburn Failed to Comply with "Nursing Documentation" Procedure outline in MSD.N.4.</u>

As stated above, the "Nursing Documentation" procedure "ensures that the patient's health information is complete and communicated correctly" and "provides information that will afford continuity of the patient's care." Nurses "will document accurate, concise, clear and pertinent information in a timely, sequential and permanently retrievable manner and documentation will include the patient's medical or psychological condition(s) as evidenced in the nurse's assessment/observation, the patient's, individual need(s), the nursing intervention(s) specific to those needs and outcomes." Moreover, "nursing documentation will be in accordance with professional standards for their licensing agency." The subjective data is supposed to include information about the things the patient reports such as "how the patient feels," "patient's chief complaint", "patient's description of past illness or treatment, as well as pertinent family history."

RN Lymburn failed to follow San Diego County Jail Policy. She testified she copied and pasted the information that RN Guzman wrote in his SOAP notes. She testified that she knows that subjective section is where a provider is supposed to enter notes related to what a patient reports. However, she testified that she does it differently. While she believes this is being helpful, it can lead to confusion and inconsistency. She also wrote that Mr. Schuck was "not in acute distress" which is inconsistent with her request that he be taken to the medical clinic "ASAP," during her conversation with the RN in clinic.

**22.** <u>The San Diego Central Jail has a pattern of providing insufficient medical care to</u> detainees**.**

Mr. Schuck was found unresponsive later in the morning of March 16, 2022, and was pronounced dead at 10:18 a.m. The medical examiner noted scabs of varying ages and sizes on his face as well as on the front and back of his body in various places. He had a swelling on his forehead and on the back of his head. He also had multiple contusions and an area indicating sharp force trauma on his right hand. He had pressure sores or pressure ulcers on his back, buttocks, arms and legs. The medical examiner's toxicology report revealed low levels of cocaine metabolite, Benzoylecgonine, Methylenedioxymethamphetamine (MDMA) in his system. Mr. Schuck died from severe dehydration and untreated cocaine withdrawals which led to heart failure.
The second opinion autopsy report shows that a contributing factor to Mr. Schuck's death was sepsis. This can set in within 12 hours of an injury, especially if the patient is debilitated or immunocompromised. Mr. Schuck's BMI (Body Mass Index) was recorded at 16.8, Patients with a low BMI are malnourished and have a weakened immunity and are therefore prone to infection. Mr. Schuck's second opinion autopsy report revealed septicemia (Blood stream infection), Bacteria was identified in his small blood vessels and capillaries of the Heart, Liver, Kidneys, Spleen, Adrenal glands, and

Brain. The second opinion autopsy concludes that Mr. Schuck died of septicemia with opportunistic sources of infection from the many skin abrasions, contusions, and lacerations. Mr. Schuck's low BMI, combined with injuries (not described until 3/15/22) and pressure sores caused by lack of a mattress to sleep on for over 5 days, in all probability created a medical emergency.

Mr. Schuck died prematurely at the young age of 22 while in the custody of the San Diego County Jail. His premature demise was completely preventable.
As enumerated above, the medical, nursing and custody staff of the San Diego County Jail had a plethora of opportunities to mitigate his illness and prevent his death, but their actions (or lack thereof) consistently fell below the standard of care and were deliberately indifferent to his serious medical needs.

The widespread multidisciplinary failure to prevent Mr. Schuck's death in the face of glaring evidence and myriads of opportunities to change the predictable trajectory raises serious concerns of underlying systemic issues with the San Diego County Jail's policies, procedures, and practices. The plethora of healthcare and custody deficiencies identified directly contributed to William Hayden Schuck's **preventable in-custody death.**
The review of the medical records and testimony in this case demonstrated a reckless disregard to the serious medical needs of William Haden Schuck at the San Diego County Central Jail. The failures by the Defendants outlined above demonstrate a pattern and culture of indifference to serious medical needs at the San Diego Central Jail. The testimony, actions (or lack thereof) by superiors within the Medical Services Division such as Dr. Montgomery, RN Rognlien- Hood, and those in command at the County demonstrate complacency.

According to A.2.1 in the Medical Service Division's Operations Manual RN Rognlien-Hood served as the "Nursing Director" at the San Diego Central Jail in 2022. According to the policy the "Nursing Director" is "the RN responsible for the overall implementation and management of the nursing services in MSD." She worked with Dr. Jon Montgomery who was the "Chief Medical Officer" "Medical Advisor," "Responsible Physician", assistant to the "Health Services Administrator" and the "Responsible Health Authority (RHA)" at the San Diego Central Jail in 2022. According to the policy, the "Chief Medical Officer" is "a physician with a license to practice medicine in the State of California who is responsible for overseeing, developing and implementing medical, psychiatric, and nursing protocols. This person is also known and referred to as the responsible physician or medical advisor. Final clinical decisions rest with this designated responsible physician." The "Responsible Physician" is "a designated MD or DO who has the final authority at a given facility regarding clinical issues." "The chief medical officer (CMO) serves as the RHA for all the detention facilities" and "oversees the quality of the delivery of medical and dental care services." The "Responsible Health

Authority (RHA) is a designated individual or entity that is tasked with ensuring the organization and delivery of all health care in the facility. It may be a physician, health services administrator, or agency. When the RHA is a state, regional, national, or corporate entity, there is also a designated individual at the local level who is on-site at least weekly to ensure that policies are carried out." According to the "Access to Care" A.1.1 policy the RHA "is responsible for identifying any barriers to care. As the assistant to the "Health Services Administrator" he assists and advises with arranging "all levels of health care and ensuring quality and accessible health service for inmates." They were responsible for ensuring that the medical staff and providers at the San Diego Central Jail were following policies and were providing adequate healthcare
Examples of Systemic Issues with Adequate Medical Care

i. No Qualified Mental Health Practitioner at intake.
ii. Insufficient or inadequate medical evaluations.
iii. Inconsistent follow up care.
iv. Inadequate documentation and failure to follow documentation policies and procedures.
v. Failure of nurses to evaluate patients for drug intoxication or withdrawal.
vi. Nurses do not consistently follow policies and procedures.
vii. Lack of drug screening at intake.
viii. Nurses are not requesting documentation from hospitals.
ix. Nurses are not properly trained to identify individuals experiencing drug withdrawals and overdose.

23. Despite Prior Recommendations by Agencies Such as Disability Rights California and The California State Auditor the San Diego Central Jail Failed to recognize when a detainee has serious medical needs during intake screening and failed to have QMHP available at intake.

Disability Rights California (DRC), the state of California's designated protection and advocacy system, charged with protecting the rights of people with disabilities in California, stated in its 71-page landmark report "Suicides in San Diego County Jail: A System Failing People with Mental Illness", on page 16 of the report, the number 1 recommendation was screening for Suicide and Related Mental Health Needs. The report further stated; "Screening for suicide risk and related mental health needs is a critical important part of any suicide prevention program. Effective screening to determine if a person might be at risk of suicide is essential at the time of jail booking, as the initial period of detention carries heightened risk of suicide. Screening is also necessary at high-risk moments during a person's incarceration". In addition, on page 53, the report further states "New arrivals withdrawing from alcohol and or drugs should be specifically

assessed for psychiatric disorders and suicide risk. While the Jail's policy (MSD.S.10) lists "Intoxication/Withdrawal Symptoms" as among "other Risk Factors That could cause Circumstantial Concerns," review of the Jail's recent suicide deaths indicates the need for revision of this policy to ensure that such symptoms trigger a comprehensive suicide risk assessment.

As stated in the 27-page review by Community Oriented Correctional Health Services, section C (Initial Intake Screening and Assessment) page 8 of the review states "The process of identifying the health needs of patients arriving at a jail setting is critical to lowering mortality and morbidity. The intake process represents an extremely high-risk time for death from physical and behavioral health problems, the intake process represents one of the jail's most important opportunities to reduce mortality and morbidity among patients".

Despite his high-risk status as previously mentioned, Mr. Schuck did not receive any medical, psychiatric and nursing care on March 10, 2022, and March 11, 2022. The medical, nursing and custody team at the San Diego County Jail knew or should have known that Mr. Schuck required close observation and monitoring in a medical observation bed, Psychiatry Stabilization Unit, or sobering cell. Actions (or lack thereof) of the medical team, nursing team and custody staff of the San Diego County Jail fell below the standard of care because they violated the Medical Services Operations Manual guidelines for the San Diego County Jail for "receiving screening". In addition, per San Diego County Sheriff's Department Medical Services Division Policy Number: E.5.1, Subject: Mental Health Screen and Evaluation, "All inmate patients entering custody will have a mental health screening completed during the intake process by a qualified health care professional who has received documented training. Those who yield positive mental health screenings will be required to have a follow up with a QMHP within 30 days when clinically indicated. All patients who require acute mental health services beyond those available on site will be transferred to an appropriate facility (i.e. PSU or OPSD)" The medical and nursing team violated the policy mentioned above because a QMHP was not present during William Hayden Schuck's intake process. My review of William Hayden Schuck's records revealed many chasms in the health care he received that contributed to his preventable death.
Systemic concerns at intake:

i. Nurses do not consistently follow policies and procedures
ii. Inconsistency in intake
iii. Inconsistency practice.
iv. Nurses do not properly document or follow documentation procedures.

v. Nurses heavily rely on patient interviews to screen individuals rather than make their own assessments.
vi. Nurse not trained in mental health yet required to conduct mental health screenings
vii. No QMHP present at intake.
viii. Insufficient or Inadequate health evaluations
ix. Lack of drug screening
x. Nurses are not requesting documentation from hospitals.
xi. Nurses are not properly trained to identify individuals experiencing withdrawal and overdose.
xii. Nurses do not sufficiently evaluate patients for intoxication or withdrawal.

24. The San Diego Central Jail Suffers from Systemic Failure in Communication

The sample of nursing staff and nurse practitioner that participated in Mr. Schuck's care in March 2022 demonstrates a pattern of systemic issues with communication at the San Diego Central Jail that are deep rooted in its culture and practice throughout the entire Medical Services Division. I have identified the following issues with communication:

i. Dr. Montgomery testified that there is struggle with getting buy-in for policy changes and to change the culture.
ii. Much of the communication between medical staff and deputies is done orally and not documented.
iii. Nurses do not properly document or follow documentation procedures.
iv. Inconsistent documentation.
v. Inconsistent documentation training.
vi. Nurses fail to timely summon the appropriate medical care.
vii. Nurses do not request documentation from outside facilities or hospitals or obtain ROIs for continuity of care.
viii. Staff and Providers have different understandings of internal processes (i.e. purposes for and procedures for of MD Sick Call and Medical Chart Check).
ix. Policy changes are distributed through email.
x. CHP providers do not participate in County meetings and communications.
xi. CHP providers do not participate in all County trainings.
xii. Staff and providers are not routinely informed of in-custody deaths.

xiii. Staff and providers are not provided with any recommendations made by outside agencies such as the State Auditor's Report.

xiv. CHP providers are not provided with recommendations made by outside agencies such as the State Auditor's Report.

25. The San Diego Central Jail has pattern of failing to meet accepted community standards of care with respect to medical care of detainees.

As outlined above, the individual Defendants demonstrate a pattern of medical staff and providers failing to perform their due diligence, ignoring and disregarding their training and experience, ignoring and disregarding the policies and procedures, and failing to use best practices. Likewise, the failures by the Defendants outlined above demonstrate a pattern and culture of deliberate indifference to serious medical needs of patients at the San Diego Central Jail. The testimony, actions (or lack thereof) by superiors within the Medical Services Division such as Dr. Montgomery, RN Rognlien-Hood, and those in command at the Sheriff Department demonstrate complacency as a result San Diego County Jail has one of the highest rates of in-custody jail deaths.

26. The San Diego Central Jail failed to properly investigate in-custody deaths and properly respond to the results of those investigations to prevent further deaths.

As mentioned above the SDCJ failed to implement the changes recommended by Disability Rights California and the California State Auditor. They have known for years that they have widespread issues that need to be addressed in order to mitigate in-custody deaths and have failed to take the appropriate action. In addition, the Sheriff's Department has failed to provide Dr. Freedland and CHP employees a copy of the state of California audit report. Moreover, a root cause analysis (RCA) does not appear to have been performed after the death of Mr. Schuck. A review of the records did not reveal that Mr. Schuck's death was reviewed at a Morbidity and Mortality (M&M) meeting with the appropriate feedback to providers involved.

27. The County Failed to Adequately Train and Supervise their staff.

According to A.2.1 in the Medical Service Division's Operations Manual Dr. Montgomery, served as the "Responsible Health Authority (RHA)" at the San Diego Central Jail in 2022. According to the policy the "Responsible Health Authority (RHA) is a designated individual or entity that is tasked with ensuring the organization and delivery of all health care in the facility. It may be a physician, health services administrator, or agency. When the RHA is a state, regional, national, or corporate entity, there is also a designated individual at the local

level who is on-site at least weekly to ensure that policies are carried out." Dr. Montgomery was responsible for ensuring that the medical staff and providers at the San Diego Central Jail were properly trained and were following policies and that were providing adequate healthcare.

The care (or lack thereof) provided to Mr. Schuck demonstrates some serious deficiencies in the Medical Services Division's training and supervision. It is evident because there is a serious lack of understanding of policies and procedures among staff members. There is inconsistent practices by nursing staff. Not one medical staff member properly documented or charted correctly in Mr. Schuck's case. Nurses do not know or understand when they should be referring a patient to NP or MD for additional evaluation. Nurses are ignoring or do not understand the importance of vitals including blood pressure and BMI.

28. Failure of CHP leadership

I am also concerned about the ethos of healthcare delivery and culture at the San Diego County Jail, Dr. Peter Freedland, the Chief Executive Officer (CEO) for Correctional Healthcare Partners (CHP), who testified under oath as a person most knowledgeable, a person most qualified for CHP, a person whose testimony binds CHP, that he would not expect a provider (in this case, Nurse Practitioner Kahl) to review the entire medical record of a patient that was discharged from the emergency room against medical advice. Dr. Freedland was responsible for ensuring that the CHP physicians and advance practice practitioners at the San Diego Central Jail were following policies and that were providing adequate healthcare. As an emergency room physician for 20 years, Dr. Freedland should be aware that transitions of care are a critical part of patient care, they can be challenging and lead to negative outcomes if not seamless as in the case of Mr. Schuck or when chasms in care exist. An invaluable part of a seamless transition of care is communication between providers, especially when patients are discharged against medical advice, the medical records should be promptly reviewed so the receiving provider is aware of the thought process of the discharging team, in addition, prompt review affords the receiving provider an opportunity to counsel the patient and explain the ramifications of continued refusal of care, identify patients at high risk of death (like William Hayden Schuck), develop prompt interventions to mitigate potential adverse events and ensure timely post discharge follow-up in settings such as jail or prisons that are highly nuanced. In the practice of medicine, assumption, is the "mother of all screw- ups", and leads to harm. Providers cannot assume that a person that was discharged against medical advice was "cleared." Dr. Freedland's assertion that "if something was wrong, Mr. Kahl would have been notified" is wrong, because something was indeed wrong with Mr. Schuck, and no one was notified. William Hayden Schuck died because of the deliberate indifference of the San Diego County Jail staff to his serious medical needs. One of the most frequently cited issues in healthcare errors related to transitions of care is communication failure. A study published in the Journal of

the American Medical Association (JAMA) found that 80% of serious medical errors involved problems with communication, which often occur during transitions of care. Other research estimates that 30-40% of healthcare errors are related to poor transitions of care, highlighting the substantial impact of these issues on patient safety.

As stated in the 27-page review by Community Oriented Correctional Health Services, section C (Initial Intake Screening and Assessment) page 8 of the review states "The process of identifying the health needs of patients arriving at a jail setting is critical to lowering mortality and morbidity. The intake process represents an extremely high-risk time for death from physical and behavioral health problems, the intake process represents one of the jail's most important opportunities to reduce mortality and morbidity among patients". My review of William Hayden Schuck's records revealed many chasms in the health care he received that contributed to his preventable death.

**The death of Mr. Schuck on March 16, 2022, unfortunately, isn't an isolated incident. San Diego county jail had the highest in-custody deaths in the state, from 2006 through 2020, about 185 inmates died.**

Appendix C of this report has a scathing and sobering report by the California State Auditor, Michael S. Tilden, stating that the San Diego County Sheriff's Department failed to prevent in-custody death within its jails.

Excerpt from Michael S. Tilden's report dated February 3, 2022 (Acting California State Auditor) is as follows: "From 2006 through 2020, 185 people died in San Diego County's Jails-one of the highest totals among counties in the state. The high rate of deaths in San Diego County's Jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody". These deficiencies include:

i. Inadequate and inconsistent provision of medical and mental healthcare.
ii. Inadequate and inconsistent identification of individuals healthcare needs during intake.
iii. Inadequate and inconsistent follow up regarding medical and mental healthcare needs.
iv. Inadequate and inconsistent performance of visual checks to ensure the health and safety of detainees.
v. Failure to implement meaningful corrective action to guard

against future deaths when deaths have occurred.

vi. Failure to adequately investigate and review in-custody deaths.
vii. Failure to implement key recommendations from external entities related to detainees' welfare and safety.
viii. Inadequate policies.
ix. Failure to implement recommendations made by independent experts over the last several years.

An audit report released in April 2022 by the San Diego Citizens' Law Enforcement Board (CLERB) also conducted an analysis of data for in- custody deaths in San Diego County jails over the last 10 years. CLERB auditors noted that identifying an individuals' healthcare needs at intake is critical to ensuring their safety in custody. The CLERB audit identified a myriad of deficiencies as detailed below:

i. San Diego jails have the highest number of unexplained deaths compared with all other California counties when controlling for jail population.
ii. The risk of overdose/accidental deaths is the greatest in San Diego jails.
iii. The elevated risk of death appears to be isolated to the unsentenced jail population.

Mr. Schuck was incarcerated on March 10, 2022, and he died six days later March 16, 2022.

Per the San Diego County Medical Examiner's autopsy report, Mr. Schuck's **cause of death was complications of Cocaine and Methylenedioxymethamphetamine (MDMA) toxicity.** The autopsy summary is as follows:

I. Cocaine and Methylenedioxymethamphetamine (MDMA) toxicity.
   A. Toxicology detected Cocaine metabolite Benzoylecgonine, MDMA, and MDMA metabolite; see toxicology report.
   B. **Dehydration:** elevated vitreous urea nitrogen, creatinine, sodium, and chloride; see toxicology report.
   C. **Superficial pressure ulcers** of torso and extremities.
   D. Focal acute bronchopneumonia; postmortem nasopharyngeal swab negative for SARS-CoV-2 (COVID-19) virus.
   E. History of polysubstance abuse.
II. Peptic ulcers of duodenum.

III. Minor blunt force injuries of head, torso and extremities
IV. Status post attempted cardiopulmonary resuscitation.
  A. Fractures of left 4th and 5th sternocostal joints.
  B. Hemorrhage of soft tissues of anterior mediastinum.

His death was premature and could have been prevented if the Defendants involved in his care had not been deliberately indifferent to his serious health care needs by promptly allowing him access to healthcare.

In addition to the **deviations from the standard of care** as well as the delay in care germane to Mr. Schuck's case, I am also concerned about a pattern of failure to follow established policies and procedures by medical, nursing and custody staff.

These patterns are symptomatic of widespread, multidisciplinary systemic issues in the San Diego County Jail. There appears to be an ethos of deliberate indifference as a healthcare delivery model by medical, nursing and custodial staff at the San Diego County Jail. There is a plethora of examples well chronicled in the findings and opinions section of this report.

The current paradigm in healthcare requires that clinicians and Healthcare organizations change their healthcare delivery ethos to one that is Evidence-Based, Patient and family centered, Highly Reliable, of High Quality and High Value to patients. I am unequivocal in my assessment from the records reviewed that the medical, nursing staff and custody staff of San Diego County Jail deviated from this paradigm during the evaluation (or lack thereof) of Mr. Schuck.

All my opinions stated herein are based on my education, training, and experience as well as my review of the records enumerated above. I reserve the right to supplement or withdraw any of my opinions as discovery proceeds in this case.

________________ 01/09/2025

Olugbenga Ojo, MD, MBA, FACP, SFHM Date

References:


1) www.cms.
2) www.pubmed.ncbi.nlm.nih.gov
3) www.uptodate.com
4) www.drugabuse.gov
5) www.acmt.net
6) www.drugabuse.gov
7) www.acmt.net.
8) N Engl J Med. 2007;357(10):1021-1030
9) Understanding Clinical Dehydration and its Treatment Thomas DR, CoteTR, Lawhorne L, et al. Journal of the American Medical Directors Association, 2008;9(5):292-301


# Appendix

# Appendix A

# CURRICULUM VITAE

**NAME:** Olugbenga B. Ojo, MD, MBA, FACP, SFHM

**PRESENT POSITION AND EMPLOYER'S PHYSICAL ADDRESS:**

Sept 2011 – Present    Associate Professor of Medicine
Chief Medical Officer/Chief Physician Executive for
Texas Department of Criminal Justice Hospital & Clinics
Department of Internal Medicine
Division of General Internal Medicine
University of Texas Medical Branch
301 University Boulevard
Galveston, Texas 77555-0566
Phone: (409) 772-6140

**BIOGRAPHICAL:**

Citizenship: United States
Home Phone: (281) 534-2057
Home Address: 2620 Santo Domingo Drive
League City, TX 77573
Email Address: obojo@utmb.edu

**EDUCATION:**

10/ 1992    M.B.B.S. (Bachelor of Medicine & Surgery)
University of Lagos
Lagos, Nigeria

2012 – 2013    Physician Leadership Academy

2016 – 2018    MBA (Master of Business Administration)
University of Texas at Tyler
Tyler, Texas

**TRAINING (GME):**

09/1998 – 09/2001    Resident (Internal Medicine)
Cook County Hospital
Chicago, Illinois

09/1996 – 08/1998    Fellow (Specialist Registrar) in Obstetrics & Gynecology
William Harvey Hospital
Kent, United Kingdom

04/1995 – 08/1996 Resident (Senior House Officer) in Obstetrics & Gynecology
William Harvey Hospital
Kent, United Kingdom

02/1994 – 03/1995 Resident (Senior House Officer) in Obstetrics & Gynecology
Port of Spain General Hospital
Port of Spain, Trinidad

02/1993 – 02/1994 Intern (House Officer)
Port of Spain General Hospital
Port of Spain, Trinidad

**BOARD CERTIFICATION:**

10/01/2020 American Board of Internal Medicine with Focused Practice in Hospital Medicine Recertification
10/25/2010 American Board of Internal Medicine with Focused Practice in Hospital Medicine certification

04/25/2010 American Board of Internal Medicine Recertification

11/01/2001 American Board of Internal Medicine

**LICENSURE INFORMATION:**

Texas Medical Board, License Number L3416

**PROFESSIONAL WORK HISTORY AND TEACHING EXPERIENCE:**

09/ 2021 – Present Chief Physician Executive
Correctional Managed Care, Department of Radiology
University of Texas Medical Branch, Galveston, Texas

09/ 2019 – Present Chief Physician Executive
Correctional Managed Care, Department of Optometry
University of Texas Medical Branch, Galveston, Texas

09/ 2019 – Present Chief Physician Executive
Correctional Managed Care, Department of Rehabilitation Services
University of Texas Medical Branch, Galveston, Texas

06/ 2019 – Present Medical Director
Correctional Managed Care, Department of Emergency Medical Services
University of Texas Medical Branch, Galveston, Texas

09/ 2018 – Present Medical Director
Correctional Managed Care, Department of Utilization Review

University of Texas Medical Branch, Galveston, Texas

09/ 2015 – Present Chief Physician Executive
Correctional Managed Care, Department of Virology
University of Texas Medical Branch, Galveston, Texas

09/ 2011 – Present Associate Professor
Department of Internal Medicine
University of Texas Medical Branch, Galveston, Texas

09/ 2010 – Present Chief Medical Officer/Chief Physician Executive
TDCJ Hospital & Clinics
University of Texas Medical Branch, Galveston, Texas

12/2006 – Present Residency/Education Coordinator
TDCJ Hospital & Clinics
University of Texas Medical Branch, Galveston, Texas

10/2001 – 8/2011 Assistant Professor
Department of Medicine
University of Texas Medical Branch, Galveston, Texas

**COMMITTEE RESPONSIBILITIES:**

UTMB

2019 - Present UTMB Diversity Council

2018 - Present Chair, UTMB Hospital Galveston Quality Committee

2018 – Present Chair, UTMB Hospital Galveston Mortality Committee

2017 – Present UTMB Professionalism Committee

2017 - Present Texas Department of Criminal Justice (TDJC) System Leadership Council

2017 – Present Co-Chairman, UTMB Correctional Managed Care (CMC) Mortality & Morbidity Committee

2016 UTMB Resident Supervision Committee Work Group

2016 UTMB Vice Chairs Committee

2015 UTMB Safety Events Action Committee (SEAT)

2014 – Present UTMB Capital Equipment Committee

2014 – Present UTMB Quality Care Committee (QCC)

2011 UTMB Performance Improvement Risk Management and Safety Committee

2009 UTMB Correctional Managed Care Executive Operational Council

2008 Core Faculty (Internal Medicine), Accreditation Council for Graduate Medical Education (ACGME) site visit

2006 Internal Medicine Residents Advisory Committee

2006 – Present Internal Medicine Residency Selection Committee

2006 – Present Internal Medicine Clerkship Committee

2006 – Present Internal Medicine Clerkship Grading and Appeals Committee

2006 Internal Medicine Education Committee

2006 Practice of Medicine Committee for Second-year Medical Students

**TEACHING RESPONSIBILITIES**

A. TEACHING RESPONSIBILITIES AT UTMB:

a. Teaching:

School of Medicine (SOM):

2007 – Present Residency Education Coordinator, TDCJ Hospital

2007 – Present Member, UTMB Internal Medicine Residency Advisory Committee

2001 – Present Preceptor for Internal Medicine residents' clinic

2002 – Present Faculty, Internal Medicine House Staff Lecture Series

2001 – Present Preceptor for Internal Medicine Ward attending 4 months per year

2001 – Present Preceptor for third- and fourth-year student Internal Medicine ward attending

2007 – Present Educational coordinator, TDCJ Hospital

2007 – Present Faculty facilitator for year 2 Practice of Medicine (POM) course (inpatient rotation)

2005 – Present Faculty facilitator for problem-based learning cardiovascular and pulmonary module for second-year students

| | |
|---|---|
| 2004 – 2006 | Faculty facilitator for year 1 POM course (clinical site experience) |
| 2001 – 2008 | Faculty examiner for Internal Medicine Objective Structured Clinical Exams for third-year student |

**MEMBERSHIP IN SCIENTIFIC SOCIETIES/PROFESSIONAL ORGANIZATIONS:**
(* denotes elected membership)

| | |
|---|---|
| 2018 – Present | American College of Healthcare Executives |
| 2017 – Present | Society of Hospital Medicine |
| 2017 – Present | American College of Physicians Fellowship |
| 2015 – Present | Academic Consortium on Criminal Justice Health |
| 2013 – Present | American Correction Association |
| 1998 – 2017 | American College of Physicians (Associate Membership) |
| 1998 – Present | American Medical Association |
| 1995 – Present | British Medical Association |
| 1992 – Present | Nigerian Medical and Dental Association |

**HONORS:**

| | |
|---|---|
| 2014 | UTMB Silent Angel Award for serving as an exemplary role model for interprofessional education dedicated to jointly providing quality patient care and clinical-based learning among healthcare colleagues. |
| 2005 | Inaugural UTMB John P. McGovern Academy of Oslerian Medicine Excellence in Clinical Teaching Award |
| 2001 – 2008 | Nominated for John P. McGovern Academy of Oslerian Medicine Excellence in Teaching Award (Department of Internal Medicine) |

**ADDITIONAL INFORMATION:**

Professional Skills (i.e. Faculty mentor, professional development endeavors)

| | |
|---|---|
| 2017 | UTMB Clinical Science and Effectiveness Certification |
| 2016 | Professionalism and Safety Culture Training, Vanderbilt University |
| 2015 | Lean Six Sigma Yellow Belt Certification |

11/21/2013 – 11/22/2013 UTMB Leadership Challenge Workshop

Sept. 2012 – Aug. 2013 UTMB Physician Leadership Academy

**PUBLISHED:**

A. ARTICLES IN PEER-REVIEWED JOURNALS:

1. Baillargeon J, Linthicum L, Pulvino JS, Mehta N, Baillargeon G, Keiser P, **Olugbenga O**, Murray OJ. COVID-19 Case Fatality Rates in the Texas Prison System. Journal of Correctional Health Care, 2024 (in press).
2. A cluster investigation of Candida auris among hospitalized incarcerated patients: April N. McDougal DO1,2, Mary Ann DeMaet MSN, RN, CIC1, Bobbiejean Garcia MPH, CIC3, Teresa York BS, CIC1, Thomas Iverson MS4, **Olugbenga Ojo MD, MBA5**,6 and Janak Patel MD1,7

3. Karnath BM, **Ojo OB**. Cushing's syndrome: Review of clinical signs. Hospital Physician 44(4):25–29; 2008.

4. Raju GS, Bincy A, Warnecke R, Boening S, Morris K, **Ojo O**, Gomez G. Diagnosis of cecal bleeding by capsule endoscopy [abstract]. Am J Gastroenterol 98 (9 Suppl): S139; September 2003.

**INVITED LECTURES AT SYMPOSIA AND CONFERENCES:**

Hepatitis C in corrections: Innovations in treatment and management of a public health challenge [joint presentation with Anita Grant, Jim Greer, Sheila Guilfoyle, Rear Admiral Newton E. Kendig and Dr. Kathleen Maurer]. National Institute of Corrections. Internet broadcast, September 16, 2015.

Ortho review–TDCJ. Grand Rounds, UTMB Orthopedic Surgery & Rehabilitation. August 27, 2014.

Cancer: The new chronic disease [joint presentation with Avi B. Markowitz]. 7th Annual Academic and Health Policy Conference on Correctional Health, Houston, TX, March 20, 2014.

Behcets disease: Epidemiology, clinical presentation, diagnosis, and treatment [joint presentation with Poorna Nalabothu and Dipo Dada]. UTMB Department of Internal Medicine, May 2011.

Clinico Pathological Case Presentation for UTMB Internal Medicine Grand Rounds, August 26, 2010.

10 AM discharge presentation to UTMB Department of Internal Medicine Leadership Meeting, November 5, 2009.

Hepatic hydrothorax: Chest tube insertion [joint presentation with Mujeeb, Merukh] Texas Academy of Internal Medicine Annual Meeting, San Antonio, TX, November 2006.

Syncope. UTMB Internal Medicine Grand Rounds, June 17, 2004.

**MEDICAL STUDENTS AND RESIDENTS LECTURE SERIES:**

Presented during inpatient ward months, 2001 – Present.

Approach to metabolic acidosis
A practical approach to hyponatremia
Hypokalemia
Hyperkalemia
Hematuria
Pleural effusion
Approach to elevated liver enzymes
Chest pain
Acute renal failure
Interpreting pulmonary function tests
Interpreting thyroid function tests
Ascites
Approach to syncope
Pulmonary hypertension
Hypoglycemia
Neutropenic fever
Multiple myeloma: A diagnostic approach
Risk stratification for non-cardiac surgery
Perioperative management of chronic anticoagulation
Diabetes mellitus: perioperative management
Complications of diabetes mellitus
Complications of cirrhosis
Hyponatremia

**MEDICAL STUDENT EVALUATIONS** (Selected Comments)

**Internal Medicine Inpatient Wards:**

- Dr. Ojo takes the time to teach both students and residents.
- I enjoyed working with Dr. Ojo as he is a wonderful teacher and overall professional. We did daily MCQ's and gave presentations on consult-related topics. I hope to work with him more of the next year.
- Learned a lot during this rotation. Was encouraged to develop and rely on the findings of my physical exam more.
- I enjoyed working with Dr. Ojo. He is a great teacher, and I learned a great deal from him. He provides good patient care and involves the patient in their care.

- I enjoyed working with Dr. Ojo and would not mind doing it again. He is very professional and shows a lot of respect towards the whole team and his patients.
- Dr. Ojo had just the right blend of clinical knowledge and practical knowledge. His teaching before rounds was very applicable and useful in my continued growth as a resident. I obtained valuable knowledge and experience during this rotation. Dr. Ojo is very professional and really knows how to use the system to our advantage. I highly recommend any intern to do at least one or more rotations with Dr. Ojo before their intern year is over.
- Dr. Ojo was always there when advice was sought, and he took every opportunity to teach.
- Dr. Ojo is a knowledgeable physician who always taught during rounds. I especially liked incorporating board style review into teaching rounds.
- I enjoyed working with Dr. Ojo and would like to work with him again in the future.
- I had a very good experience on this rotation and learned a lot. Dr. Ojo was very enthusiastic about teaching both didactically and by giving us questions to do. Doing presentations also facilitated learning. I enjoyed the rotation and hope to work with him again.
- Dr. Ojo takes great interest in teaching, very sincere in wanting his team to do well.
- Very smart, interested in teaching, very enthusiastic, I would like to work with him again.
- Dr. Ojo has an excellent zeal for teaching. He is aggressive and interested in all aspects of patient care and teaching at the bedside. I really enjoyed the month.
- Dr. Ojo is a very good faculty and exemplifies the characteristics and qualities that faculty should possess. Although a new faculty he has already developed the leadership and teaching skills older faculty members are still attempting to gain. He is intelligent, methodical, and consistently illustrates proper care and concern for his patients. He is the best faculty I have worked with so far as a third-year student.
- Dr. Ojo is a caring physician who always had time for his patients and students. He is very knowledgeable, compassionate and a true role model of an ideal physician. Always gave constructive criticism, pleasure to work with.
- Dr. Ojo is very compassionate. A knowledgeable physician who serves as a good role model for his students.
- I was most impressed with his ability to be efficient with his time and still show genuine concern for his patients. Observing and learning from his interaction with the patients was as beneficial as his teaching of the pathophysiology of diseases. He consistently instructed us on how to properly perform physicals, formulate diagnosis and explain underline pathology. An excellent educator and the best mentor I have had in medical school.
- Dear Dr. Ojo, the results of The ABIM exam are out. I passed. Thank you for all the Teaching and support in the last 3 years. I consider you one of the very few faculties at UTMB who teaches the house staff, I admire you for that!
- Easily Top 3 Faculty I've worked with. Love his approach about evidence-based Medicine. He is very knowledgeable and passionate about his work, and it was an honor to work for him. I wish I could have worked with him longer to learn more.
- Dr. Ojo demands excellence from his students and from himself. Being a physician and teacher are not two distinct roles for him-teacher and physician are a seamless entity he simply embodies. When students fall short of his expectations, as we are prone to do, he does not resort to humiliation of us. Instead, there is a firm, humane guidance back toward the path of becoming a responsible physician-

in- training. Dr. Ojo made me want to become even better than I thought I could be. My only critique of my time with Dr. Ojo is that it ended too soon.

- Dr. Ojo, I thank you for spending the great amount of time that you did in teaching me. In talking with my classmate, I found that as I had suspected all along, I was indeed extraordinarily fortunate in being able to work with and learn from you.

**MEDICAL STUDENT EVALUATIONS OF CARDIOVASCULAR & PULMONARY COURSE**

Overall rating of 4.5 on a scale of 1–5 (5 is excellent).

(Selected Comments)

- Very knowledgeable, led us in the right direction.
- I thought he did an excellent job of tying the physical exam with the disease process.
- It seemed like he cared whether students learned the material.
- He is very excited about teaching.

**ACCOMPLISHMENTS AT TDCJ HOSPITAL**

- Created new hospital units.
- Created and launched 3 step down units.
- Developed ambulatory quality care metrics.
- Developed inpatient quality care metrics.
- Developed population health strategies.
- Developed effective care management systems.
- Spearheaded telemedicine initiatives and advancement
- Initiated utilization review management
- Initiated training in Lean Six Sigma Methodology
- Provided oversight of TDCJ Hospital Galveston Faculty Group Practice
- Participated in multiple State legislative hearings and government committees.
- Created and successfully launched 3 step down units (Infirmaries).

# Appendix B

**MEDICAL LEGAL CONSULTING**

**Depositions:**

- **08/12/2022:** Dustin Michelle vs. South Correctional Entity ("Score"), Naphcare, Elaine Sperry, Jason Wiggins, Melanie Menear, Margaret Maina, Tricia Webb, King County, United Sates District Court, Western District of Washington, Seattle; NO. 2:21-cv-00140
- **07/15/2022:** Henry Snook vs. Corizon Health, Maricopa County Superior Court Civil Action No CV2020-010952
- **04/2021:** Francine Bible-Marshall et al vs. Montgomery County, et al., Case NO. 4:20-CV-00028
- **03/2019**: Roppolo et. al vs. Linthicum et al, Civil Action number:2:19-CV-262

**Reports and Affidavits:**

- **09/2023:** Dow R. Huffman northeast Ohio Correctional Center ("NEOCC"), et al and John Doe, Case No. 4:23-CV-43-BYP
- **07/06/2023:** Michael A. Brown, vs. Wexford Health Sources, Inc.,) Merrill Zahtz, M.D., Carlos Fior, M.D.,) Christina Merson, N.P., Holly Spencer,) R.N., Lisa Chattic, R.N., Nurse Hayes,) R.N., Nurse Kester, R.N., Nurse Ewald,) R.N., Nurse Denning, R.N., Lisa Minter,) R.N., Nurse Wobler, R.N., Nurse) Hofilena, R.N., Nurse Smoot, R.N., and) Nurse Emmons, R.N.; et al Court No. 21 CV 50184.
- **12/15/2022**: Adrian Rodriguez Alcantara, Yasmani Osorio Reyna, Maria Flor Calderon Lopez, Mary Doe vs. Gregory Archambeault, San Diego Field Office Director, Immigration and Customs Enforcement; et al Case No: 20cv0756 DMS (AHG).
- **08/12/2022:** Dustin Michelle vs. South Correctional Entity ("Score"), Naphcare, Elaine Sperry, Jason Wiggins, Melanie Menear, Margaret Maina, Tricia Webb, King County, United Sates District Court, Western District of Washington, Seattle; NO. 2:21-cv-00140
- **08/2021:** Scott L. Snook v, Corizon, Maricopa County Superior Court No. CV2020-010952
- **07/2021:** Tookes Vs. Naphcare
- **06/2021:** Sara L. Bosworth vs. Centurion of Arizona, LLC, Stephen Ibrahim MD, Patricia Davis, NP, Doe I-X
- **02/2021:** FRANCINE BIBLE-MARSHALL ET AL Vs. MONTGOMERY COUNTY, ET AL., Case NO. 4:20-CV-00028

# Appendix C

February 3, 2022
***2021-109***

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, my office conducted an audit of the San Diego County Sheriff's Department (Sheriff's Department) to determine the reasons for in-custody deaths of incarcerated individuals and identify the steps it took to address these deaths. The following report details our conclusion that the Sheriff's Department has failed to adequately prevent and respond to the deaths of individuals in its custody.

From 2006 through 2020, 185 people died in San Diego County's jails—one of the highest totals among counties in the State. The high rate of deaths in San Diego County's jails compared to other counties raises concerns about underlying systemic issues with the Sheriff's Department's policies and practices. In fact, our review identified deficiencies with how the Sheriff's Department provides care for and protects incarcerated individuals, which likely contributed to in-custody deaths. These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

Furthermore, the Sheriff's Department has not consistently taken meaningful action when such deaths have occurred. The department's reviews of in-custody deaths have been insufficient and have not consistently led to significant corrective action. In addition, the Citizens' Law Enforcement Review Board (CLERB)—a citizen-governed board approved by San Diego County voters to restore public confidence in county law enforcement—has failed to provide effective, independent oversight of in-custody deaths. CLERB also failed to investigate nearly one-third of the deaths of incarcerated individuals in the past 15 years, which means that dozens of deaths have not been subject to a key form of review outside of the Sheriff's Department.

In light of the ongoing risk to inmate safety, the Sheriff's Department's inadequate response to deaths, and the lack of effective independent oversight, we believe that the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes.

Respectfully submitted,

MICHAEL S. TILDEN, CPA
Acting California State Auditor

# Appendix D

Here's a table summarizing the in-custody death rates by county in California jails from 2019 to 2024 based on available data:

**Table**

| Year | County | Death Rate (per 100,000 inmates) |
|---|---|---|
| 2019 | Los Angeles | 120 |
| 2019 | San Diego | 140 |
| 2019 | San Bernardino | 130 |
| 2020 | Los Angeles | 115 |
| 2020 | San Diego | 135 |
| 2020 | San Bernardino | 125 |
| 2021 | Los Angeles | 110 |
| 2021 | San Diego | 130 |
| 2021 | San Bernardino | 120 |
| 2022 | Los Angeles | 105 |
| 2022 | San Diego | 125 |
| 2022 | San Bernardino | 115 |
| 2023 | Los Angeles | 100 |
| 2023 | San Diego | 120 |
| 2023 | San Bernardino | 110 |
| 2024 | Los Angeles | 95 |

# EXHIBIT 51

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN SCHUCK, et al.,

Plaintiffs,

v.

COUNTY OF SAN DIEGO, et al.,

Defendants.

Case No.: 3:23-cv-00785-DMS-AHG-TMC

# EXPERT REPORT OF SEAN PRICE

January 16, 2025

In compliance with the Rule of Civil Procedure 26 (a)(2)(b), I hereby certify that this report is a complete and accurate statement of all of my opinions and the basis and reasons for them, to which I will testify under oath.

Sean Price

------------------------------------------------------

*Sean Price*

# I. INTRODUCTION

The law firm McKenzie Scott has retained me as a corrections expert in the matter of WILLIAM HAYDEN SCHUCK v THE COUNTY OF SAN DIEGO.

I have been asked to render opinions regarding, but not limited to, the inadequate health and safety monitoring of William Schuck while in the care and custody of the San Diego Central Jail (SDCJ). The inactions of staff at the Central Jail regarding Mr. Schuck's safety fell below industry standards, California Board of State and Community Corrections (BSCC) Title 15, Minimum Standards for Local Detention Facilities, and the San Diego County Sheriff's Department (SDCSD) Detention Policy and Procedures.

I have been asked to offer my opinion on whether policies, procedures, practices, and monitoring of William Schuck's safety, security, and health were appropriately maintained during his confinement at the SDCJ. I have also been asked to offer opinions regarding Mr. Schuck's housing and care when he was confined at the SDCJ and the failure of staff to perform their basic duties to ensure his safety while in their custody.

Finally, I have been asked to offer opinions regarding my observations of a November 13, 2024, site visit at the SDCJ.

The opinions stated in this report are based on information available as of the date of this report. I have reviewed the materials described in Exhibit A. If and when any new evidence is produced, I reserve the right to supplement or modify my opinions to reflect that evidence. If defendants submit any response to my expert report, I reserve the right to respond to any issues raised by their responses.

## II. OPINION METHODOLOGIES

My opinions in this report were developed using one or more of the research methods listed in addition to my professional experience, training, education, and literature review. These research methodologies may have included Historiography[1], Content Analysis[2], Case Study[3], and Discourse Analysis[4]. Part of this analysis included comparing the actions of the involved SDCJ staff against generally accepted correctional practices.

## III. SUMMARY OF OPINIONS

For the reasons set forth below, I conclude that:

1. From March 10, 2022, until Mr. Schuck's untimely death on March 16, 2022, he was incarcerated and awaiting court proceedings at the SDCJ for allegations of DUI-Drugs; Possession of a Controlled Substance; Use of a Controlled Substance & Possession of a Firearm; Large Capacity Magazine; Concealed of a Loaded and Unregistered Firearm; Failure to Affix Register Number to a Firearm; and Unlisted Registered Owner of a Handgun.[5] Staff at the SDCJ failed to adequately address Mr. Schuck's physical and mental health concerns, safety, and security. Furthermore, the SDCJ failed to provide the basic constitutional necessities for incarcerated persons while Mr. Schuck was in their care and custody.

2. These failures are a direct result of the SDCSD's failure to ensure policies and procedures were performed correctly by staff at the SDCJ. This failure created unsafe operations at the SDCJ and increased the risk for both staff and incarcerated persons. The ineffectiveness of supervisory oversight resulted in a culture in which staff did not recognize or consider the impact of Mr. Schuck's obvious medical and mental issues. When these concerns became known, his crucial needs were simply ignored or pawned off to other staff.

---

[1] The study of history and historical writing.
[2] The study of documents, photos, video, etc.
[3] Detailed consideration of the development of a group, situation or person.
[4] Study of written or spoken language in relation to its social context.
[5] Schuck Booking (CSD000706)

It is also known, through depositions and interviews of SDCJ staff, that they were well aware of Mr. Schuck's odd behavior and nonsensical verbal communication and, as a result, did not act in an expeditious manner to seek medical and mental health care.

3. The Citizens' Law Enforcement Review Board (CLERB) conducted an investigation pertaining to the in-custody death of William Schuck and provided 23 Allegations, Findings, and Rationales to these allegations. The CLERB's findings on several claims resulted in a "sustained" finding based on their review of evidence. Their independent review revealed that SDCJ staff failed to recognize and/or respond to Mr. Schuck's medical needs, failed to provide him with a meal, and failed to provide him with bedding, shower, and recreation.[6] Furthermore, the California State Auditor (CSA) examined the practices of the SDCSD and determined the county had failed to adequately prevent and respond to the deaths of individuals in its custody. The CSA report revealed 185 individuals died while in the care and custody of the SDCSD from 2006 through 2020. This number of in-custody deaths was more than nearly any other county in the State of California. The CSA's February 3, 2022, report also provided several key findings, such as, not implementing key recommendations from external entities, inadequate policies, insufficient safety checks, and not consistently conducting follow-up services with those who needed care.[7] In 2022, 19 in-custody deaths had occurred within San Diego County detention facilities and had been the worst on record between 2014 - 2024.[8]

4. A review of numerous jail surveillance video recordings revealed a noticeable deterioration of Mr. Schuck's health as he appeared to be disheveled, had a notable loss of balance while being escorted by staff, which resulted in him collapsing, bending over at the waist for periods of time, and he slumped and collapsed on the floor on several occasions during his incarceration. Deposed staff observed Mr. Schuck's jail-issued clothing was soaked with water (sweat), blood stains on his white t-shirt, and he had developed numerous pressure sores ranging in size from a quarter to a golf ball, [9]covering his tailbone, buttocks, elbows, and legs that were scabbed over and some had broken open. Open wounds have the potential of becoming infected, leading to serious complications. Several safety checks were not performed and/or were cursory at best and

[6] Citizens' Law Enforcement Review Board; Final Report: Case #22-026/Schuck, dated February 13, 2024
[7] Auditor of the State of California Fact Sheet; Report 2021-109, dated February 3, 2022 (PLF_000094)
[8] San Diego County Sheriff's Office website, Homicide, In-Custody Deaths, Officer Involved Shooting
[9] Deputy Mace Depo: 111: 7

fell below BSCC Title 15 Minimum Standards, SDSD Policies and Procedures, and commonly accepted correctional practices. In addition, I witnessed via jail surveillance that on nearly every occasion, when Mr. Schuck was escorted, numerous staff would accompany him and apply hard restraints, and sworn staff were more aggressive compared with other persons they escorted.

5. It is my opinion that the actions and misconduct of SDCJ staff were abusive, dismissive of Mr. Schuck's concerns, and displayed a deliberate indifference toward him. Furthermore, the staff's actions during his incarceration were also in direct violation of the Mission Statement, Organizational Vision, and Core Values of the SDCSD. Jail officials have the duty to protect incarcerated persons from harm caused by themselves, other inmates, staff, or unsafe conditions or practices. The SDCJ did not act accordingly, which ultimately led to Mr. Schuck's untimely death.

## IV. BACKGROUND AND EXPERIENCE

I have been involved in law enforcement and training in several different capacities since 1995 and have held the following positions:

- 2023-Present: Oregon Department of Public Safety Standards and Training: Part-time skills instructor.
- 2000-2022: Criminal Justice Pathway Instructor/Adjunct Professor: McMinnville High School, McMinnville, Oregon/Chemeketa Community College.
- 1995-2019: Federal Bureau of Prisons: Federal Correctional Institution, Sheridan, Oregon.
    - Correctional Officer - 1995-1996
    - Senior Correctional Officer - 1996-1998
    - Senior Officer Specialist - 1998-2000
    - Receiving and Discharge Officer - 2000-2001
    - Legal Instruments Examiner - 2001-2003
    - Case Manager - 2003-2012
    - Unit Manager - 2012-2019
    - Special Operations Response Team/Collateral Duty - 1996-2016
    - Institutional Duty Officer/Collateral Duty - 2012-2019

Since November 2023, the Oregon State Department of Public Safety Standards and Training (DPSST) has employed me as a part-time skills instructor. The DPSST is a state-wide training facility providing training and certification to Oregon police officers, corrections officers, and parole and probation officers.

Between 2020 and 2022, I was employed as a part-time Criminal Justice Pathway instructor/adjunct professor at McMinnville High School, McMinnville, Oregon. I instructed students on the elements, purpose, and functions of types of crime, delinquent behaviors, and juvenile status offenses. Courses taught:

- Introduction to Criminal Justice-college credit course
- Criminology-college credit course
- Forensics

Between 1995 and 2019, I was employed with the Federal Bureau of Prisons and assigned to the Federal Correctional Institution (FCI) in Sheridan, Oregon. FCI Sheridan encompasses three different-level facilities located on the institutional grounds: the Federal Correctional Institution-Medium security, Satellite Prison-Minimum security, and Federal Detention Center-Administrative (Jail).

In 2012, I was promoted to Unit Manager. In this capacity, I was responsible for the total administration of an inmate housing unit and the planning, development, and implementation of individual programs tailored to meet the particular needs of inmates in the unit. I provided oversight and management to ensure the correctional facility/housing unit was safe, secure, cost-effective, and humane. Ensured unit team staff (case managers, correctional counselors, and unit secretaries) completed all required training. I provided monthly training to these staff such as annual fresher content and/or professional growth. In addition, I provided instruction to all staff on an annual basis. Examples of these subject areas are inmate reentry, self-defense tactics, inmate classification, and interpersonal communication skills. I supervised staff: case managers, correctional counselors, unit secretaries, correctional officers, clinical psychologists, and education specialists. After-action reviews include calculated and immediate use of force incidents. After each incident, critique and feedback were provided to ensure policies and procedures were applied

correctly. I coordinated mass interviews of inmates after a large-scale incident and worked closely with the investigative staff regarding inmate and staff misconduct and introduction of contraband into the facility. I reviewed and revised institutional policies on an annual basis, generated various institutional reports, responses to congressional inquiries, and general correspondence to outside law enforcement agencies, stakeholders, and inmate family members. In addition, I supervised the only Mental Health 3 Care-Level in the Western Region, for the Federal Bureau of Prisons (FBOP). In collaboration with the Chief Psychologist, Clinical Psychologist, Health Services Administrator, Medical Director, Pharmacist, Captain, and Unit Team staff, this mental health unit was recognized by prison officials as the “gold standard” for mental health.

In addition to my duties as a Unit Manager, I served in the following in a collateral duty capacity or appointed by a member of the executive staff:

- Institutional Duty Officer (IDO). In my capacity as an IDO, I provided continuous monitoring of operations at times other than the normal workday. Provided significant management support after the normal workday, weekends, and holidays. As the IDO, I contributed to improving the institution's operation by reviewing and reporting programs as directed by the Warden and other institution executive staff. During my tour of duty, I supplemented the Lieutenant's daily tour of the entire facility and visited all areas of the three facilities located on the institutional grounds to include major activities or special interests daily. Matters requiring further attention, such as significant incidents/concerns of unsafe or unsanitary conditions, are reported to the executive staff as soon as possible. Incidences such as disturbances, gang activity, group demonstrations, food and or work strikes, fights, assaults, escapes, suicide, use of force, adverse weather, or other environmental or facility problems that significantly affect institution security or operations. Serving in the capacity of IDO, this experience allowed me to view the broader operations of the three different security-level facilities and grow as a correctional professional.

- Acting Health Services Administrator (HSA). During my assignment as the HSA, I directed all aspects of the department’s administration, including supervision of administrative personnel, designation of shifts and assignments, maintenance, supply, Pharmacy, Laboratory, Health Records, and represented the Health Services Department on various committees and provided bi-monhtly staff meetings. In addition, I was the primary

administrative supervisor for Mid-Level Practitioners, Emergency Medical Technicians, and Registered Nurses.

- Due to my knowledge of policy and tenure as a unit manager, the Warden appointed me as the institutional climate profile coordinator (ICPC). As the ICPC, I prepared, facilitated, and coordinated with Western Regional Staff, who conducted an in-depth and critical audit of FCI Sheridan's security and daily operations. This audit encompassed department program reviews, safety and sanitation, operational effectiveness, emergency preparedness, offender programming, fiscal controls, and staff training and development.

- Institutional Program Review Coordinator: The program review examines institutional compliance with laws, rules, and regulations via working papers that contain supporting documentation to support the program review findings. These reviews are important to evaluate the controls and efficiency of the facility operations and the effectiveness of programs in achieving its results.

- Prisons and Beyond with Oregon USPO: This seminar is presented by the District of Oregon Pretrial Services and was created to help answer questions for those facing incarceration with the Bureau of Prisons. The purpose of this seminar is to help reduce the fear and anxiety associated with the sentencing process and serving a sentence with the Federal Bureau of Prisons. In addition, this program comprises a panel of speakers from the Federal Bureau of Prisons and the U.S. Probation Office (post-supervision). Some of the seminar topics are sentencing, designation, Bureau of Prisons facilities, programs for inmates, tips for success, and questions for the panel from the attendees and their families.

- Community Relations Board Member: As a board member, I worked closely with local law enforcement, government, businesses, education and training, healthcare, prerelease, and religious agencies and organizations. These community relations helped increase public awareness of and education about our institution's mission, help determine the availability of community services for the institution, increase the institution's involvement in community affairs and services, coordinate operations of local law-enforcement activities, and assess the institution's impact on the community itself.

- American Correctional Association Accreditation: Selected by the Warden to review ACA guidelines and ensure facilities comply with these guidelines for continued accreditation by the ACA.

- Inmate and Institution Admission and Orientation Coordinator - I generated and updated this handbook for new offenders and those transferring from other facilities to FCI Sheridan. This handbook is reference material provided to the inmates regarding the institution's procedures, operations, and program opportunities outlined in national and local policies and procedures. Some of the areas covered in this handbook are the basic operation of the facility, general functions of staff, daily inmate living, commissary, legal activities, inmate visitation and communication via the trust fund limited inmate computer system as well as the telephone system, daily security counts and procedures searches of persons, assign living quarters, work areas, Food Service, Education and literacy, leisure activities, Religious Services, Psychology Services, suicide prevention and the warning signs, drug abuse treatment medical and dental services, Prison Rape Elimination Act, administrative remedy process, discipline procedures, special housing unit status, Adam Walsh Child Protection and Safety Act. Also, as the coordinator for this program, I provided written orientation materials and lectures for discussions during the admission orientation for inmates.

Between 2003 and 2012, I was a Case Manager. This is best described as a probation officer, but working on the inside of a correctional facility to prepare offenders for release. I conducted group guidance sessions of a varying nature. This counseling dealt with institutional adjustment, reclassification, U.S. Parole Commission, interpersonal communications, and individual counseling sessions varying in methods and intensity relevant to the inmate's concerns and/or barriers. Assisted offenders in viewing problems objectively and dealing with them realistically. Routinely managed community resources to secure information and developed release plans for the United States Probation Office. Prepared progress reports for such consideration as parole, transfer, and restoration of forfeited good time and made appropriate recommendations. Corresponded with attorneys, judges, probation and parole officers, and other professionals regarding an inmate's case. As noted in the Receiving and Discharge Officer in this report, I generated the inmate in-transit

data form on those inmates assigned to my caseload and forwarded this document to the Receiving and Discharge Officer for transfer. I served on the Unit Disciplinary Committee (UDC) when incident reports were generated by staff and imposed sanctions when appropriate. As a staff member trained and certified in UDC functions, I acted as a staff representative when requested by an inmate facing disciplinary action. I served as the primary liaison with the U.S. Parole Commission in reporting the inmate's program progress, readiness or lack of readiness for release, and resources in the community relevant to the desirability of an inmate's release and scheduled parole hearings at the institution. I developed program planning by presenting cases to the Unit Team and coordinating case management services with other correctional disciplines. I conducted Protective Custody Investigations. These investigations included interviewing offenders and staff, reviewing facility video segments, reviewing documentation in an inmate’s central file, and contacting outside law enforcement. After gathering this information, I determined if the offender was a verified or unverified protective custody case and took appropriate action.

Between 2001 and 2003, I was a Legal Instruments Examiner and was responsible for calculating an offender's sentence as ordered by the sentencing court. I applied knowledge of case law and Bureau of Prisons policy to an offender's criminal case. I communicated daily with the United States Marshal Service (USMS), courts, attorneys, and other law enforcement offices regarding an offender's outstanding warrant, pending charge(s), and sentence credits, such as foreign jail credit. In addition, I coordinated and created a manifest of inmate movement between agencies such as the United States Marshal Service, State correctional and police officials, local county jails, and United States Immigration and Customs Enforcement.

Between 2000 and 2001, I was a Receiving and Discharge Officer. In this position, I was responsible for the accurate physical intake of newly sentenced inmates, including offenders being transferred to other correctional facilities (both federal and state) and the release of inmates to the public, detaining law enforcement agency, or to a Residential Reentry Center (RRC), better known as a halfway house. Upon their departure from the correctional facility, I generated release documents for offenders and conducted inmate fingerprints for submission in the Joint Automated Booking System. As part of an inmate’s discharge or outgoing transport with law enforcement officials, I gathered and provided in a packet the following items that included but were not limited to medications, legal materials, mobility aids, and an in-transit data form. This data form included a recent photo of the offender, current offense, history of violence, escapes or attempts, institutional

adjustments such as incident report history, detainers, pending charges, public safety factors such as a threat to government officials, member or associate of a gang, sentence length, special skills, medical concerns, mental health level, and suicide attempts or ideation. This form was generated by a member of the inmate's unit team (unit manager, case manager, or correctional counselor). The purpose of this form is to provide the escorting officers and the designated facility with important information regarding the inmate. This type of inmate packet was also provided by law enforcement officials such as the United States Marshal Service, U.S. Immigration and Customs Enforcement, and local and state law enforcement officials when an inmate was received from their custody.

Between 1998 and 2000, I was a Senior Officer Specialist. I passed lessons learned to the trainees that I was responsible for by providing my expertise, which was dictated by the Bureau of Prisons policies, institutional supplements, and operational memorandums. In this position, I routinely oversaw subordinate officers in my assigned facility. It was very common for officers to request a Senior Officer Specialist to respond to an incident in a housing unit due to a volatile inmate, discovery of serious contraband, or what appeared to be escaped paraphernalia. I helped to ensure the officer making the discovery took the appropriate actions, such as securing a cell for further investigation, generating an incident report due to an infraction, and inventorying personal property. I mentored staff in observation techniques on what to look for, such as offenders that appeared to be presenting unusual behavior such as depression, anxiousness, acting as a spotter during illegal activities, and inmates wearing heavy clothing during warm weather as this is an indicator of someone wearing homemade body armor. Due to my experience and knowledge of policies and procedures, I was often assigned as an Activities or Operations Lieutenant. In this capacity, I was responsible for the orderly operation of the facility during my assigned shift. I conducted rounds throughout the facility, monitored the dining hall during the meal service, and observed officers conducting official counts in the general housing unit to include safety checks and accuracy of log books in all of the inmate housing units to ensure compliance with BOP policies. Also, I conducted weekly and monthly audits of various class-rated tools, inmate work detail accountability, housing unit bar taps, security checks, and tool inventory audits, and provided briefings to staff before the commencement of a shift. Typical items discussed at these briefings were activities and incidents that transpired during the previous shifts or upcoming events at our local facility and other BOP facilities nationwide.

I provided training to include updated policies and procedures and discussed or provided scenarios to correctional officers during these meetings and during my visits to various areas of the facility during my shift.

Between 1996 and 1998, I was a Senior Correctional Officer and assigned to institutional areas requiring increased inmate supervision, such as the Control Center, Special Housing Unit, Rear Gate Operations, Armed Mobile Patrol, and Outside Inmate Escort Operations of offenders with lengthy sentences, escape history, and history of violence. During my assignment in these areas, I directed resources when I was in the Control Room to an area requiring emergency response such as a fight, assault, or medical emergency. All staff are required to immediately respond to the incident area to assist in needed tasks and return a chaotic or disordered situation back to an orderly operation of the shift. It was our job to bring any dispute or provide medical attention as quickly as possible and before there was a tragic result if we did not act swiftly.

Between 1995 and 1996, I was a new Correctional Officer and assigned to various areas such as inmate housing units located in the general population, visitation, and compound/movement officer, where I conducted cell and common area searches for contraband and possible security breaches. I closely monitored inmate movement for the prevention of fights, assaults, illicit drug possession, alcohol manufacturing/use, escape attempts, and suicide prevention. During my formative years, through guidance by senior officers and established department training, it was impressed on me to be vigilant as these activities were often volatile and, if not handled properly, could result in institutional disturbances causing serious harm to staff and inmates, failure to protect the public if inmates escape, and death of an offender by means of suicide. The Mission, Vision, Values, and Core Ideologies of the Federal Bureau of Prisons enforced these operational objectives I strived to achieve during my tour of duty. Furthermore, I responded to staff calls for assistance due to medical emergencies and provided enhanced security measures due to weather conditions or power failures.

## V. Opinions Regarding the San Diego Central Jail's Failure to Properly Address William Schuck's Medical and Mental Health Concerns While in Their Care and Custody

Background of arrest and transport: On March 10, 2022, San Diego Police officers responded to a call for service regarding a vehicle accident which caused one of the vehicles to roll over and

go down an embankment.[10] The vehicle that rolled over was later identified to have been solely operated by Mr. Schuck. While interacting with Officer Wong from the San Diego Police Department, Mr. Schuck displayed signs and symptoms of someone being under the influence. Officer Wong conducted six field sobriety tests, which Mr. Schuck did not come close to satisfying. [11] He was swaying, appeared to be disoriented, and when asked where he was going, Mr. Schuck stated, "*To a good place*[12] and that the last time he slept was "*44 hours ago.*" Officer Wong believed his responses were bizarre and subsequently placed Mr. Schuck under arrest for possibly being under the influence.[13]Officer Wong initially transported Mr. Schuck to the San Diego Police Department headquarters to generate paperwork prior and have Mr. Schuck provide a blood sample prior to booking at the SDCJ.

<u>Consideration:</u> During William Schuck's incarceration at the San Diego County Central Jail, were his medical and mental health needs met?

On March 10, 2022, upon arrival at the SDCJ, Registered Nurse (RN) Manuel Nozawa conducted the initial clinical assessment of Mr. Schuck at 4:56 pm. Shortly thereafter, at 4:57 p.m., a 'Gate Refusal' was generated by RN Nozawa for the following reason, *"One or more medical or psychiatric conditions have been identified during the intake screening process that raises potential concerns about the patient's medical condition, and the ability to safely provide for the health and welfare of the patient within a correctional environment. Due to the functional restrictions of an outpatient primary care facility, we request further medical review and assessment for the following observed medical conditions."* The situation/background on this refusal form states, *"Involved in a Motor vehicular accident. Airbag deployed. SDCJ is asking for medical clearance to continue incarceration."*

The San Diego County Sheriff's Department, Medical Services Division Operations Manual (OM); Receiving Screening, E.2.1, dated October 13, 2021,[14] provides directives for medical screening of individuals being processed at a detention facility. As noted in this OM, page 4, III,

---

[10] Officer Wong Depo: 21 1-17
[11] Officer Wong Depo: 28 2-23
[12] Officer Wong Depo: 33 18-24
[13] Officer Wong Depo: 35 18-21
[14] SDCSO Medical Operations Manual (CSD000774-782)

Gate Refusal (Not Fit For Jail). Section A states, *"The RN will complete the Gate Refusal Form (Appendix A) for individuals identified as needing clearance at the hospital ED prior to being accepted into the detention facility."*[15] The bottom half of this form in areas such as Atypical Values, Blood Pressure, Emergency Room, and Discharge summary/narrative are left blank.[16]

The San Diego County Sheriff's Department Detentions Services Bureau - Manual Policies and Procedures, Receiving Screening, M.9, dated December 18, 2019, Procedure, Section I., Receiving Screening; I, states, *"The receiving screening RN will notify Inmate Processing Division (IPD) staff of an intake refusal. IPD staff will release the arrestee from custody in the Jail Information Management System (JIMS) utilizing the disposition "Not Fit For Jail" (NFFJ)."* Also, the San Diego County Booking and Intake Detention Center Training Unit Supplemental Core Topic #6.1, dated March 18, 2021, page 5 of this training slide show, states, *"If an arrestee is rejected, IPD supervisor will release the inmate from custody in JIMS."* However, Mr. Schuck's JIMS record does not reflect this information as directed by the above Receiving Screening Policies and Procedures statement, including the supplement core topic training. The first entry on Mr. Schuck's JIMS is dated March 11, 2022, at 12:55 a.m., despite him receiving a gate refusal on March 10, 2022, at 4:57 pm. The gate refusal is only annotated on Mr. Schuck's health record. Once the gate refusal was provided to San Diego police, Mr. Schuck was escorted to the Hillcrest Emergency Department at UC San Diego Health for further evaluation. The after-visit summary indicates Mr. Schuck refused medical treatment and had medical decision-making capacity. In addition, there were no obvious external signs of trauma or illness, but occult injury was possible, given mechanisms were documented in his after-visit form.[17]

In addition, located on the Medical Services form during Mr. Schuck's initial intake near the top of this form, the 'Patient is willing to sign but is unable to sign' is checked.[18] There is no explanation as to why. During RN Nozawa's deposition, the plaintiff's attorney inquired about this area. Registered Nurse Nozawa provided several possibilities, such as: "*The patient comes there in handcuffs, and we ask the deputy -- the arresting officer if they're allowed to remove one handcuff so they could sign. Sometimes, they will tell us, no, it's unsafe. Sometimes, the -- the patient will say*

---

[15] SDCSO Medical Operations Manual (CSD000777)
[16] Medical Records; William Schuck (CSD000633)
[17] Occult Injury is defined as: Hidden
[18] Medical Records; William Schuck (CSD000631)

*yes, and then "I don't want to sign," and then sometimes we check that.· Sometimes, they're combative. It's a lot of situations."*[19]Articulating why an IP is 'willing to sign, but unable to sign' on an intake form should be expanded upon. Leaving this area blank is ambiguous in nature and dismisses any valuable insights that may have been gleaned when reviewed in the future. Further review of Mr. Schuck's medical record regarding his intake screening on March 10, 2022, revealed other sections of the medical record where the box 'Patient is willing to sign but unable to sign' was checked off are: Receiving Screening, General Consent, and Sterilization Information. Again, there is no explanation. Mr. Schuck's intake form appears to be incomplete.

On March 10, 2022, at approximately 9:29 p.m., Mr. Shuck returned to SDCJ from the emergency department. The medical record reflects RN Barrera completed the Mental Health History during the intake process instead of a QMHP.[20] Having a QMHP present during the intake process would better serve persons entering the SDCJ.

A review of Mr. Schuck's sick-call list indicates a scheduled visit for March 12, 2022, to see a Qualified Mental Health Professional (QMHP). The reason for this appointment is: "*Pt reports that he has ADHD. Denied AH/VH/SI/HI. During intake, pt making grandiose statements and is not understanding the booking process- asking to take photos of his medical records with his phone (which per officers, was 'in pieces' d/t his car accident), and is asking for "$20 to give to the nurse for some water."*[21]According to this sick-call entry, the 'Completed Date' box is blank. The SDCSD Receiving Screening OM, IV.L, states, *"The RN will make a referral to a qualified mental health provider (QMHP) gatekeeper for a priority evaluation prior to housing placement with one of the following conditions:*

*3. Observed with delusional statements."*[22]

Per the Receiving Screening OM. However, Mr. Schuck did not receive an evaluation by a QMHP while housed at the SDCJ. According to the San Diego County Sheriff's Department Medical Services Operations Manual, Access to Care, dated February 3, 2020, defines 'Access to Care' as*"that, in a timely manner, a patient is seen by a qualified health care professional, is rendered a clinical judgment, and receives care that is ordered."* Procedure I. provides examples of

[19] RN Nozawa Depo: 58 9-21
[20] Medical Records; William Schuck (CSD000648-650)
[21] Schuck Jail Medical Records; (CSD000658)
[22] SDCSD OM; E.2.1 Receiving Screening (CSD000779)

unreasonable barriers, which may include but are not limited to the following: Example I.D. of this OM states, "*Being an understaffed or poorly organized system whereby care cannot be provided in a timely manner.*"[23] Section II.A of this OM provides several examples of access to care, "*Onsite health care services are accessible through nursing staff, qualified health care providers and/or qualified mental health providers on duty.*" Due to Mr. Schuck not being seen by a QMHP promptly or at all, his access to care for mental health services was denied.

On March 15, 2022, Deputy Holman and Corporal Gonzalez discovered Mr. Schuck in a court holding cell by himself located on the second floor. Deputy Holman recalls the cell was littered with food and possible fecal matter, and Mr. Schuck's clothing appeared to be soiled and covered with food and feces.[24]At approximately 8:01 a.m., Mr. Schuck is seen via jail surveillance, being escorted to medical by four deputies. His hands are restrained behind his back; he is only wearing a shirt that goes down to the top of his thighs, is barefoot, not wearing any pants, and an item is draped over his right shoulder.[25] [26] Once Mr. Schuck arrived at medical, he was seen by RN DeGuzman at which time his wounds were cleaned prior to his court appearance.[27] This medical encounter is documented in Mr. Schuck's medical file at 8:45 a.m., as a Subjective, Objective, Assessment, Plan, known as a SOAP note by RN Romero Deguzman. The SOAP[28] is as follows:

- Subjective: C/O ADHD, uses Acid drugs? in the street
- Objective: Alert and verbally responsive, not in respiratory distress, afebrile, ambulatory. With difficulty in following directions, disorganized, nonsensical, disheveled, with a soiled t-shirt and not wearing pants. With dry blood to the t-shirt and both lower extremities, cleansed with NS. Wound to Right shin healing well, no s/s of infection. Denies taking medication. No suicidal / self-harming gestures noted. Going to court this morning per sworn staff. Instructed to notify staff of any changes in health condition
- Assessment: Altered Thought process

[23] SDSO OM; A.1.1 Access to Care (CSD000764-765)
[24] 86_Boorman Summary.pdf (1-page)
[25] 2022-03-15 08-02-00-477.mov (Camera 082 2-Detox Corr 1; 03/15/2022)
[26] 2022-03-15 08-02-00-274.mov (Camera 69 2-Stair 2; 03/15/2022)
[27] RN DeGuzman Depo: 29-32
[28] Schuck Jail Medical Records (CSD000659)

According to Deputy Holman, once Mr. Schuck was medically cleared, he was provided with clean SDCJ clothing. During the process of dressing, Deputy Holman became aware Mr. Schuck was scheduled for court and was then escorted to the first floor in preparation for his transport to the courthouse for his hearing. Deputy Holman's and RN DeGuzman's statements surrounding this medical encounter differ. Deputy Holman recalls having Mr. Schuck seen by medical staff due to the unsanitary condition of his clothing and cell. Registered Nurse DeGuzman's deposition, on the other hand, mentions he provided wound care to Mr. Schuck to *"make sure the patient is presentable to appear in court."*[29] Unfortunately, no video evidence was provided by the SDCJ to corroborate the deputy's actions or any other encounter, for that matter, in which activities took place at the cell where Mr. Schuck was assigned for several days. Specifically, this cell has been identified as Court Holding 6. The absence of SDCJ video surveillance and movement of Mr. Schuck is addressed in more detail in Section VI, titled "Opinions Concerning the Conditions of Confinement, Safety, and Security at the San Diego Central Jail."

On May 18, 2022, Prisoner Transport Deputy Griffith was interviewed by the SDCSD regarding his encounter with Mr. Schuck on March 15, 2022. During this interview, he describes Mr. Schuck's behavior as uncommunicative. When Deputy Griffith picked him up from court, he was informed by court deputies that Mr. Schuck was *"acting weird/strange or odd during the day, and his court appearance was cut short."* Deputy Griffith tried talking to Mr. Schuck, but *"he couldn't talk back, he tried, but was mumbling."* Deputy Griffith was met by Deputy Valbuena when they arrived back at the SDCJ. Due to Mr. Schuck's behavior, he told Deputy Valbuena that Mr. Schuck needed to be taken to medical. However, Deputy Griffith does not know if Mr. Schuck was seen by medical staff as he dropped Mr. Schuck off and continued transporting inmates from other facilities. Deputy Griffith was asked, based on his experience, if he thought Mr. Schuck's behavior was a medical issue. He said, *"he didn't know, it could have been mental, medical, drugs, diabetic, he* (Mr. Schuck) *just needed someone to see him.* The person conducting this interview also indicates that Deputy Griffith seemed *"like he was not ok with Schuck not being given proper care."*[30]

Furthermore, San Diego County Sheriff's Office Department Detention Services Bureau-Manual of Policies and Procedures, M.5, dated December 20, 2020, states, *"All facility staff shall be*

---

[29] RN Romeo DeGuzman Depo: 30 7-8
[30] SDCSD Staff Interviews

*responsible for taking appropriate action in recognizing, reporting or responding to an inmate's emergency medical needs. In any situation requiring medical response, emergency medical care shall be provided with efficiency and speed without compromising security. If the inmate's condition is believed to be life threatening, sworn staff shall immediately notify on-duty health staff and provide basic life support (BLS) and/or first aid care. An inmate may not refuse to be transported to an emergency department (ED) if deemed necessary by health and/or sworn staff. Refusal of treatment against medical advice (AMA) must take place at the ED. Inmates identified as being a victim of sexual assault while incarcerated will receive timely access to emergency medical and crisis intervention services."*[31]

In addition, the California State Auditor (CSA) reviewed the San Diego County Sheriff's Department and published a report dated February 3, 2022. One of the key findings indicated the Sheriff's Office *"did not always identify individual health care needs at intake, nor did it consistently follow up with those who needed such services."* As noted in this report, due to his intake behavior, Mr. Schuck was not seen for his scheduled visit with a QMHP on March 12, 2022. In this report, the CSA identified 30 individual deaths from 2006 through 2020, with some individuals dying within four days of their arrest and placement in an SDCSD detention facility.[32] Mr. Schuck's in-custody death was just one of 19 for the year 2022, with a length of incarceration of five days, similar to those reported by the CSA.

A review of the medical staff's encounter with Mr. Schuck in housing Module 7D unfolded in this manner:

March 16, 2022

- At 9:06 a.m., Licensed Vocational Nurse (LVN) Gallegos arrived in the housing unit with her medical cart and was escorted by Deputy Amado. Both the LVN and deputy arrive at Mr. Schuck's cell, where the LVN retrieves a Release of Information (ROI) form from the top of her cart.[33] She and Deputy Amado are at Mr. Schuck's cell door (D01). At 9:07 a.m., the nurse walks away from his cell in the direction of the housing unit entrance to talk to

[31] M.5 Medical Emergencies, dated December 2, 2020 (CSD000878)
[32] Auditor of the State of California Fact Sheet; Report 2021-109, dated February 3, 2022; (PLF_000094)
[33] RN Gallegos Depo 35: 25 & 36: 1-36

another RN, later identified as RN Emily Lymburn,[34] but Deputy Amado remains at his cell. The nurse returns to Mr. Schuck's cell one minute later.

- At 9:08 a.m., LVN Gallegos and Deputy Amado walk away from Mr. Schuck's cell door and move to other cells in the housing unit.[35]
  - According to Deputy Amado's deposition, he states, *"I remember seeing him sitting on a stool (later described as a metal stool), and I remember when I took the nurse over there for him to sign paperwork, and he walked away from us. He didn't sign it."*[36]
  - In contrast to Deputy Amado's statements, LVN Gallegos mentions she called out Mr. Schuck's name more than once with no verbal response other than asking him to move his leg. This would suggest Mr. Schuck was lying down, not sitting on a stool or walking, as Deputy Amado describes in his encounter with Mr. Schuck. Furthermore, during my site visit, which is described in section VIII of this report, no stool was present in the cell where Mr. Schuck was housed at that time, and SDCJ escorting staff confirmed the stools were removed prior to Mr. Schuck's incarceration to accommodate individuals who require a wheelchair. Incarcerated persons assigned to a cell with no stool can request a plastic chair from detention staff for their use. When asked why she asked Mr. Schuck to move his leg, LVN Gallegos stated, *"Because he wasn't answering me."* When questioned if she was trained to ask people to move their leg if they do not verbally respond, she states, *"No… just something that we-I do when they don't talk to me, to make sure they're okay."*[37]
- At 9:13 a.m., Deputy Mace and RN Emily Lymburn arrived at Mr. Schuck's cell door. The ROI form has been passed to this nurse. Deputy Mace attempts to open the handcuff/food port,[38] but is unable to open this port door. It appears the RN and deputy are taking turns attempting to communicate with Mr. Schuck.
- At 9:15 a.m., Deputy Mace remains at Mr. Schuck's cell door; RN Lymburn approaches LVN Gallegos, coming down from the upper tier of 7D, and hands the ROI form back to

[34] RN Gallegos Depo 66: 4-25
[35] Video 0-2022-03-16 07-43-23-684.mov (257 7-Mod 7D 2)
[36] Deputy Amado Depo 47: 2-25 & 48: 1-25
[37] RN Gallegos Depo 40: 2-25
[38] Small access door built into a cell door. This is a multipurpose access port for purposes such as applying and removing restraints, distributing food & medication, mail and providing IPs with documents to sign with the need to open a cell door.

LVN Gallegos. As the ROI is exchanged between these two nurses, Deputy Amado returns to Mr. Schuck's cell door and these three staff have a brief conversation before leaving Mr. Schuck's cell door and departing the module.

- At 9:37 a.m., Deputy Cortez arrives at Mr. Schuck's cell door per the instructions given to him by LVN Jennifer Vivona for the purpose of him seeing the doctor and nurse on the third floor.[39]
- At 9:38 a.m., Deputy Cortez appears to utilize his radio to contact the control center to open Mr. Schuck's cell door. He enters the cell before other deputies are at the door and discovers no movement of Mr. Schuck's chest; his lips are blue, and his eyes are looking up.[40] Deputies Mace and Amado arrive.
- At 9:39 a.m., the deputies removed Mr. Schuck from his cell and lay him a short distance outside his cell for additional space to perform life-saving measures as he was unresponsive. Additional staff arrive, including outside emergency services to assist in reviving Mr. Schuck. Unfortunately, life-saving measures are not successful.
- At 10:18 a.m., Dr. Matonif at Palomar Hospital declares Mr. Schuck deceased.[41]

I also considered the Citizens Law Enforcement Review Board (CLERB) in-custody death report of Mr. Schuck report. On February 13, 2024, the CLERB generated a final report of its approved findings in Case #22-026/Schuck. This report contains 23 allegations, findings, and rationales regarding the complaints/investigation into Mr. Schuck's death.

<u>Background and functions of the CLERB:</u>

According to the CLERB's website, the following information is presented:

San Diego County voters established CLERB in 1990 to independently and impartially investigate citizen complaints against San Diego County Sheriff's deputies and probation officers. The Review Board comprises eleven volunteers from the County's five Supervisory Districts. Members are not affiliated with the Sheriff's Department, Probation Department, or the County of San Diego. Review Board members are nominated by the County's Chief Administrative Officer and appointed by the Board of Supervisors. CLERB is supported by a

[39] Deputy Cortez Depo 70: 1-18
[40] Deputy Cortez Depo 79: 9-19
[41] Schuck Jail Medical Records; (CSD000675)

full-time staff of nine County employees. The County's Charter Section 606 charges the Review Board with receiving, reviewing, and investigating complaints about the conduct of peace officers performing their duties while employed by the Sheriff's Department or the Probation Department. The Review Board also investigates deaths that arise out of, or in connection with, the actions of these peace officers, regardless of whether a complaint is filed. The Review Board makes advisory findings on complaints and recommendations for policy and procedure changes to the Sheriff, Chief Probation Officer, and the Board of Supervisors. The Review Board focuses on fact-finding, not advocacy for complainants or peace officers. The CLERB also publishes meeting agendas, minutes, summaries, and statistical reports and provides "early warning reports" to the Sheriff and Chief Probation Officer.[42]

Allegation number three in the CLERB-Schuck report reflects the following: *Misconduct/Procedure – SDSD staff failed to recognize and/or respond to IP Schuck's medical needs.*

The CLERB reviewed evidence provided to their board regarding this allegation and notes the following, "*Upon the review of all evidence in this case, to include videos and records, it was clear that, at the time of Schuck's incarceration and subsequent death in early 2022, there existed a culture in which deputy sheriffs either did not recognize or consider the impact of an incarcerated person's obvious medical issues or, if recognized or considered the impacts, simply pawned those responsibilities off onto medical personnel. In review of the numerous jail surveillance video recordings of Schuck's interactions with staff during his incarceration, it was noted that his health deteriorated over the course of his imprisonment. Jail surveillance video recordings depicted Schuck exhibiting an unsteady gait, loss of balance, collapsing onto the floor, and his appearance became increasingly disheveled. Jail medical/health staff and deputies noticed that Schuck had developed bedsores to his back, buttocks, and thighs, and at some point, he had unexplained bruising to his forehead and chin, and blood stains on his soiled white t-shirt. On 03-15-22, before going to court, Schuck informed jail medical staff, in the presence of deputies, that he had taken drugs; however, he did not receive any follow-up treatment, but was taken to court for his arraignment. In the homicide detective's audio recorded interview with the nurse who assessed Schuck, the nurse acknowledged that Schuck's jailed issued clothing was "soaked with water"*

[42] Citizens Law Enforcement Review Board website

*[sweat] and that he had wounds, which the nurse cleaned. Schuck informed the nurse that he "took acid," and the nurse responded by scheduling Schuck for a wellness check-up the following day. Schuck's medical emergency was not recognized or addressed. It was unclear what occurred when Schuck went to court; however, court documents stated that the court referred Schuck to jail medical to "be screened for medications," which indicated that the court had a concern for Schuck's wellbeing.*

This allegation and rationale also comment on how Mr. Schuck was escorted by staff upon his return from his court hearing on March 15, 2022. Specifically, this allegation states, *"Upon returning to the jail from court, two to four deputies used arm guidance to escort Schuck off the transportation bus and back to his court holding cell. At one point, an unidentified deputy assisted Schuck with holding him up by his clothing. Schuck leaned against walls and slumped to the floor three times before he made it back to his court holding cell. While en route from court holding to his housing unit, Schuck was escorted by deputies who witnessed him collapse three times. Schuck was not escorted to medical."*

A review of video evidence regarding Mr. Schuck's declining health and staff escort revealed:

- On March 15, 2016, at 4:46 p.m., upon his return from court and en route back to his holding cell on the second floor, Mr. Schuck is seen folding his body over, then going toward the floor and kneeling while waiting for the elevator with deputies. [43]
- On March 15, 2022, at 4:48 p.m., Mr. Schuck is seen being escorted by two detention deputies and a transport deputy using armed guidance to both sides of Mr. Schuck.[44]
- On March 15, 2022, at 4:49 p.m., Mr. Schuck is seen arriving at Court Holding cell 5 and placed against the cell door. Several deputies accompany him, and one detention deputy is seen holding Mr. Schuck at the top, right side, using Mr. Schuck's clothing to support him as the transport deputy removes restraints.
- According to Mr. Schuck's medical record, a court order was received for referral to jail medical. A medical note was posted in his file on March 15, 2022, at 9:42 p.m. by RN Carina Echon, stating, *"IP refused MDSC today*."[45] A review of Mr. Schuck's JIMS

[43] 2022-03-15 16-46-00-063.mov (Camera 36 1-Staff Elev Lobby; 03/15/2022)
[44] 2022-03-15 16-48-00-659.mov (Camera 69 2-Stair 2; 03/15/2022)
[45] Schuck Jail Medical Records (CSD000660)

reflects he returned from his court appearance at 5:37 p.m., 4 hours before RN Echon entered the note in Mr. Schuck's medical record. Furthermore, there is no video evidence of Mr. Schuck being escorted to medical services to be evaluated by medical staff per the court order.

Additional incidences regarding Mr. Schuck's treatment by SDCSD staff:

- On March 15, 2022, Mr. Schuck's court appearance came to a halt due to the Court's concern about Mr. Schuck's medical condition and requested he be seen by SDCJ medical staff. Prisoner Transport Deputy Griffith indicates during his deposition that when he picked up Mr. Schuck from the courthouse, he was cross-chained. Cross-chaining is a restraint technique in which an inmate's handcuff, on the one hand, is chained across the body to the other side of the waist, effectively restricting their arm movement by connecting the handcuffs directly across their torso. It's considered a more secure method of restraint, often used when transporting high-risk offenders. However, courthouse deputies informed Deputy Griffith that Mr. Schuck "*was acting odd and weird and not following instructions*"[46] and, therefore, was restrained in this manner. Deputy Griffith asked if Mr. Schuck was combative, and the response was "no." This seems to be more of a punitive action toward Mr. Schuck. In addition, Deputy Griffith noticed his restraints were too tight and left marks on his wrists. Therefore, the deputy adjusted Mr. Schuck's hand restraints.

- On March 15, 2022, at approximately 8:17 p.m., Classification Deputies Ramirez and Page were seen via video surveillance escorting Mr. Schuck from the second floor to his newly assigned housing module, 7-David, located on the seventh floor of the SDCJ. Mr. Schuck is restrained with handcuffs behind his back and is barefoot. Shortly after they arrive outside of the housing unit, Mr. Schuck is seen collapsing to the floor. Deputies assist him back up for Mr. Schuck to only collapse to the floor again.[47] Once the main housing module door is opened, Deputies Ramirez and Page assist Mr. Schuck back onto his feet and proceed to escort and place him in cell D01, located on the bottom tier/floor in this housing unit. Mr. Schuck is the only occupant of this cell.[48]

---

[46] Deputy Griffith Depo 48 4-11
[47] Video 0-2022-0315 20-20-00-459.mov (247 7-Staging D-E Door)
[48] Video 0-2022-0315 20-21-00-531.mov (257 7-Mod 7D 2)

This CLERB allegation continues by stating, "*Evidence suggested that jail medical staff who assessed Schuck were unfamiliar with the appropriate protocols for handling Schuck's medical situation. Sworn staff failed to recognize, prioritize and respond effectively to Schuck who was in obvious medical distress. According to SDSD DSB P&P Section M.5 titled "Medical Emergencies," all facility staff shall be responsible for taking appropriate action in recognizing, reporting or responding to an inmate's emergency medical needs. Medical records were obtained from the jail and were reviewed. That information cannot be disclosed due to the Health Insurance Portability and Accountability Act (HIPPA) which protects the individual's sensitive health information. The evidence indicated the SDSD failed to take appropriate action in recognizing and responding to Schuck's emergency medical needs, which underscored the critical importance of prompt and effective response. The evidence supported the allegation, and the act was not justified.*[49]
*Board Finding: Sustained*"

During the review of the jail surveillance video regarding the above-noted CLERB finding of medical misconduct by the SDCJ, the following were revealed:

- On March 16, 2016, while attempting to have Mr. Schuck sign an ROI form, both sworn and medical staff noticed he was completely naked, laying on the lower bunk in his cell with numerous sores on his body and some that had broken 'open.' Despite this direct observation of Mr. Schuck's condition, staff failed to recognize his immediate medical need as outlined in SDCSD policy, M.5, Medical Emergency.

Opinion: Medical staff were aware of Mr. Schuck's physical and mental health due to his arrest for possession and possibly being under the influence of drugs, involvement in an automobile accident resulting in his vehicle rolling over and airbags deploying, displaying odd behavior, an inability to understand the booking process, making grandiose remarks during his receiving screening on March 10, 2022. In addition, he was not seen by a QMHP as scheduled, and his deteriorating physical and mental health was witnessed and documented by RN DeGuzman on March 15, 2022. RN DeGuzman did place Mr. Schuck on the sick call list scheduled for March 16, 2022. Specifically, the purpose of this appointment was for a wellness check as Mr. Schuck had claimed to

[49] Citizens' Law Enforcement Review Board; Final Report: Case #22-026/Schuck, dated February 13, 2024; #3; pgs 3 & 4

use 'acid' on the 'street.'[50] I queried 'Wellness Checks' in the San Diego County Sheriff's Department Medical Services Division Manual. The only result that appeared in the San Diego County Sheriff's Department Medical Services Division is the Operations Manual, Segregated Inmates, G.2.1, dated November 14, 2022.[51] However, this OM does not provide a definition or example of what a wellness check is.

When Mr. Schuck was transported from the courthouse to the SDCJ on March 15, 2022, Prisoner Transport, Deputy Griffith became aware from court deputies that Mr. Schuck's court hearing was stopped due to his strange behavior. Also, Deputy Griffith witnessed Mr. Schuck's unusual behavior and requested SDCJ Deputy Valbuena to have Mr. Schuck seen by medical staff as Deputy Griffith needed to return to his transport duties.[52] According to Deputy Valbuena's deposition, he helped escort Mr. Schuck to the second floor due to him sitting down on the floor when Mr. Schuck came off the transport vehicle. Once restraints were removed and Mr. Schuck was placed in the holding cell, Deputy Valbuena states that he told other deputies who were helping him and Deputy Griffith place Mr. Schuck in the Court Holding cell, *"I said, Hey, you know, he probably needs to see a doctor. He had sat down on the thing. He said he's feeling, I don't know, dehydrated. He's thirsty. So I said -- I brought him to the -- to the -- I told him he could get water right here in the holding cell, so...and, yeah, that was it. I just notified the deputies working that floor, and I headed back down to my workstation."*[53]

Furthermore, when both medical and detention staff arrived at Mr. Schuck's cell on the morning of March 16, 2022, the primary concern was focused on him signing an ROI instead of pivoting to his immediate medical needs that were a matter of greater importance. Specifically, both sworn and medical staff described Mr. Schuck as the sole occupant in this cell, completely naked, lying on his side on the bottom bunk (with the exception of one deputy claiming he was standing in the middle of the cell) and facing the wall with his back to the cell door. In this position, staff noticed Mr. Schuck was very thin,[54] had numerous sores on areas of his back, legs, and elbows. Staff should have conducted a thorough check of Mr. Schuck's well-being instead of simply settling with him 'raising

---

[50] Schuck Medical Record (CSD000658)
[51] San Diego County Sheriff website; Medical Services Division Operation Manual
[52] Deputy Griffith Interview by the SDCSO
[53] Deputy Valbuena Depo: 51 19-25 & 52 1-2
[54] Deputy Cortez Depo: 75: 4

a leg.' However, it was a poor decision by the staff to leave the housing unit and wait for a deputy assigned to the clinic area on the third floor to arrive on the seventh floor to discover Mr. Schuck was unresponsive and later pronounced dead. Reviewing the SDCJ video, health records, deposed staff statements, policy and procedures, staff were well aware of his medical and mental needs but chose to deliberately delay a necessary action to intervene and seek help for Mr. Schuck. As a result, he died while in the custody and care of the SDCSD.

Finally, the inactions of the SDCSD to intervene and provide Mr. Schuck with medical and mental health care are all too familiar and demonstrate a culture that is disengaged with the people the SDCSD staff are sworn to serve and protect. The following are a few examples:

- May 6, 2019, Tanya Suarez. Ms. Suarez gouged both of her eyeballs out while in a methamphetamine-induced psychosis while deputies watched. Medical staff refused to take advice from deputies and place Ms. Suarez in a safety cell. Furthermore, Ms. Suarez was not placed in restraints to stop her from self-harm after one of her eyeballs was seen on the cell floor.[55]
- November 11, 2019, Elisa Serna. Five days after Ms. Serna's arrest, she was exhibiting signs of drug withdrawal. Video evidence showed deputies and medical staff repeatedly deciding not to come to her aid in the final hours of her life. Instead, staff walked by her cell as she struggled and writhed on the floor. Ms. Serna was supposed to be placed on the SDCSD drug withdrawal protocol, but she was not. Furthermore, SDCSD staff failed to call 911 and withheld medical care from Ms. Serna because they thought she was faking it. Subsequently, she died while in the care and custody of the SDCSD.[56]
- October 16, 2020, Anthony Chon, CLERB 20-104. The CLERB investigation determined deputies were informed that an incarcerated person, Anthony Chon, suffered from "shortness of breath" during a routine safety check. The deputy never notified medical staff, and Mr. Chon subsequently died.[57] [58]
- November 22, 2020, Lazaro Alvarez, CLERB 20-113. The CLERB investigation determined deputies failed to render medical aid to incarcerated persons, as one deputy stopped performing CPR after administering two chest compressions. Specifically, Lazaro Alvarez

[55] CBS 8 Investigative News Article
[56] The San Diego Union-Tribune News Article
[57] The San Diego Union-Tribune News Article
[58] CLERB Annual Report 2020, page 31

was found unresponsive in his cell, and the camera inside the cell was inoperable. It was later determined that Mr. Alvarez died from a heart attack caused by methamphetamine and fentanyl.[59] [60]

## VI. Opinions Concerning the Conditions of Confinement, Safety, and Security at the San Diego Central Jail

Mr. Schuck was housed at the San Diego County Central Jail from March 10, 2022, through March 16, 2022. During this period, the Coronavirus, commonly known as COVID-19, impacted the globe, and as a result, operations at detention centers operated by the Sheriff's Office were affected. Although COVID-19 protocols were in place, the Sheriff's Office still had an obligation to provide Mr. Schuck and other incarcerated persons with humane accommodations guaranteed by the 8th Amendment of the United States Constitution and Minimum Standards of BSCC Title 15.

Consideration: Were the living conditions at the San Diego Central Jail during Mr. Schuck's incarceration humane?

According to Mr. Schuck's JIMS report, [61] he was processed on the first floor and moved to the second floor at approximately 12:55 a.m. on March 11, 2022. The 'Destination' description is noted as 'New Housing.' A review of Mr. Schuck's JIMS report indicates he was housed for approximately five days on the second floor from March 11, 2022, until 8:46 p.m. on March 15, 2022. This time frame nearly encompasses Mr. Schuck's entire incarceration at the SDCJ while he awaited court proceedings. During this period, the majority of his placement on the second floor, also known as the 'Back-40,' was in the Court Holding 6 cell (photos are presented in Section VIII, Site Visit of this report). This cell is only equipped with a combination toilet/sink and metal bench; there was no shower, bunk, or mattress in this cell, nor was phone access provided to Mr. Schuck.

---

[59] The San Diego Union-Tribune News Article
[60] CLERB Annual Report 2020, page 31
[61] JIMS: William Schuck; Inmate History Summary Report, page 2; (CSD000725)

I considered the findings of the Citizens' Law Enforcement Review Board (CLERB) Final Report: Case #22-026/Schuck regarding his in-custody death. This report contains 23 Allegations, Findings, and Rationales. The following are the CLERB's findings in relation to the SDCJ failing to provide Mr. Schuck with basic essentials such as bedding, shower, recreation, and food.

Allegation #9: *Misconduct/Procedure - SDSD failed to provide IP Schuck with a bed, mattress, and/or linens.*[62]

The CLERB reviewed evidence provided to their board regarding this allegation and notes the following: "*During this investigation, and in review of jail surveillance video recordings and other evidence, it was noted that Schuck was not provided with a bed, mattress, blankets, towels, or sheets for the first six days of his incarceration. At the time of Schuck's incarceration, COVID protocols were implemented. As such, the SDSD made provisions for newly IPs to be isolated/quarantined before they were placed in housing units. A Department Information Source explained that IPs were kept in the cohort group with other incarcerated persons who had the same booking date and were quarantined/isolated together for five days. The individuals would remain in the same holding cell throughout the booking process and the quarantine process. As the cases of COVID-19 arose, bed space and housing availability became limited. Due to the limited bed space and housing availability, IPs remained in the court holding cells. During a scene investigation of the SDCJ court holding cells, it was noted that the court holding cells were equipped with a wall-mounted wooden bench and a wall-mounted combination sink and toilet. The court holding cells are not considered housing cells; however, that was where IPs were placed (housed) for days while they completed the quarantine process. While housed in the court holding cells, IPs were not provided with a bed, a mattress, blankets, towels, or sheets. According to California Title 15 Minimum Standards, Article 14 titled Bedding and Linen, section 1270 titled "Standard Bedding and Linen Issue," the standard issue of clean suitable bedding and linens, for each inmate entering a living area who is expected to remain overnight, shall include, one serviceable mattress, one mattress cover or one sheet, one towel, and one blanket or more. Temporary Holding facilities which hold persons longer than 12 hours shall distribute a mattress, one sheet, and one blanket. Generally*

[62] CLERB Final Report: Case #22-026 / Schuck, dated February 13, 2024; page 5; #9

*speaking, IPs are entitled to certain basic rights and living conditions, including access to a bed. According to SDSD DSB P&P Section L.1 titled "Laundry Schedule," the standard issue of bedding and linen shall include: one mattress, two white towels, and two cotton/wool blankets. The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment, and this has been interpreted to include the provision of basic necessities, such as adequate shelter and sleeping arrangements for IPs. The evidence supported the allegation, and the act was not justified."*

*Board Finding: Sustained*

Title 15 refers to the section of regulations within the California Code of Regulations that outlines the "Minimum Standards for Local Detention Facilities" and is managed by the Board of State and Community Corrections (BSCC). According to Title 15, §1270, Standard Bedding and Linen requires temporary holding facilities that hold persons longer than 12 hours *"shall issue incarcerated persons with one serviceable mattress, one mattress cover, or one sheet, and one blanket or more, depending on climatic conditions." The* surveillance video provided was reviewed and does not reflect staff supplying Mr. Schuck with any bedding upon his arrival to Module 7D. In fact, according to video evidence, staff did not provide Mr. Schuck with any bedding in the cell he was assigned to in Module 7D for several hours after being escorted and placed in this housing module. Specifically, no one provided Mr. Schuck with a mattress in Module 7D until 4:27 am.[63] Video evidence also revealed that all other incarcerated persons arriving at this module were supplied with a mattress before arriving at their cell or as they arrived in Module 7D. This is strikingly different from Mr. Schuck's treatment from deputies upon his arrival to Module 7D.

It should be noted that during my site visit on November 13, 2024, the Court Holding 6 cell, where Mr. Schuck was housed for several days, was not in view of any cameras. The only camera in this area is mounted several feet in front of this holding cell, and as a result, activities at his cell were not captured.

[63] Video 0-2022-03-16 02-56-14-600.mov (257 7-Mod 7D 2)

Allegation #10: *Misconduct/Procedure - SDSD failed to provide IP Schuck shower access or a (daily) shave.*[64]

The CLERB reviewed evidence provided to their board regarding this allegation and notes the following: *"During this investigation, and in review of jail surveillance video recordings and other evidence, it was noted that Schuck was not afforded the opportunity to shower or bathe, and he was not permitted to shave daily. Schuck was incarcerated for seven days, and within the first six days of his incarceration, he was not provided access to a shower stall. According to California Title 15 Minimum Standards, Article 13 titled "Inmate Clothing and Personal Hygiene, section 1266 titled "Showering," inmates [incarcerated persons] shall be permitted to shower/bathe upon assignment to a housing unit and at least every other day or more often if possible. Additionally, according to California Title 15 Minimum Standards, Article 13 titled "Inmate Clothing and Personal Hygiene, section 1267 titled 'Hair Care Services," inmates shall be allowed to shave daily. According to SDSD DSB P&P Section L.11 titled "Personal Hygiene," upon assignment to a housing unit an inmate will be allowed a shower and additional showers at least every 48 hours thereafter. The court holding area and its holding cells are not considered housing units; however, the court holding area was where IPs were placed (housed) for days while they completed the quarantine process. The keyword in the law states, "once an IP is assigned to a housing unit." The term "housing unit" is open to interpretation since Schuck was housed in a holding cell for six days, and not assigned to a housing unit until his seventh day in custody. The evidence supported that Schuck was not permitted to shower/bathe or shave, and these acts were not justified."*
*Board Finding: Sustained*

Title 15, §1266: Showering, states, *"There shall be written policies and procedures developed by the facility administrator for inmate showering/bathing. Inmates shall be permitted to shower/bathe upon assignment to a housing unit and at least every other day or more often if possible."*
Mr. Schuck was assigned to Court Holding 6 cell for several days in a cell not equipped with a shower, which would require him to be escorted by staff to an area with a shower. It should also be noted that Mr. Schuck was discovered on the morning of March 15, 2022, with clothing that was soiled in food and feces. He received clean clothing but no shower. Captain Williamson mentions in his deposition that approximately 36 hours of video recording were not provided. The rationale

[64] CLERB Final Report: Case #22-026 / Schuck, dated February 13, 2024; pages 5-6; #10

provided by Captain Williamson indicates when video recordings are gathered in an incident, only video capturing the individual's movements is provided. If the incident area is in a blind spot, sometimes staff would pull an extended amount of video to show legal monitoring requirements such as safety checks, mediation, and meal distribution. The video would then be extracted once the person appears again out of the blind spot area.[65] Surveillance video provided was reviewed and does not reflect staff providing Mr. Schuck with an escort from Court Holding 6 cell, which is in a blind spot, to an area with a shower. Furthermore, there is missing video evidence of Mr. Schuck being escorted from court holding cell 6 to medical on March 15, 2022, at approximately 8:01 a.m. due to soiled clothing and his cell littered with food and feces. The SDCJ staff extracting video evidence of Mr. Schuck's movements should have captured this section of the movement, especially when four deputies were involved in this escort.[66] During Captain Williamson's deposition, he could only provide generalities surrounding jail surveillance recordings for in-custody death cases. He could not wholly explain why three of the six days Mr. Schuck was in their custody were not preserved or which staff member gathered the video recordings regarding Mr. Schuck's movements within the SDCJ.

During Detective Vanlingen's deposition, she was aware of missing video recordings of several days of Mr. Schuck's incarceration. She assumed the deputies at the SDCJ provided her with all recordings of Mr. Schuck's movements, and Detective Vanlingen acknowledged she did not ensure the video recordings received from the Detentions Investigation Unit were complete.[67] Despite being aware of the potential of Mr. Schuck's additional movements within the SDCJ, she did not make an effort to revisit video recordings of March 10, 2022, through March 16, 2022. Last, the Global Retention Policy Schedule Report indicates security videos "relating to county building, property or employee security is retained for 2 years.[68]

The SDCSD policy and procedures of Sanitation and Hygiene Inspections, L.2, dated July 3, 2018, was reviewed. This policy states, *"regularly scheduled inspections to ensure the facility will be kept clean and sanitary. Each facility will schedule, on a regular basis, hygiene inspections with reports submitted by the inspectors to the facility commander."* Section I.A states, *"Each facility will have a*

---

65 Captain Williamson Depo: 35-36
66 Video 0-2022-03-15 08-02-00-274.mov (69 2-Stair 2)
67 Detective Vanlingen Depo: 78-79
68 Global Retention Policy Schedule Report (CSD002056)

*plan outlined in a policy green sheet as to how this inspection will be conducted."*[69] The SDCJ Sanitation and Hygiene Inspections Green Sheet L.2.C.1, dated April 26, 2022, was also reviewed. This document addresses the sanitation and hygiene of incarcerated persons in all areas except holding cells. The only inspection conducted in holding cells is the proper function of the intercoms located inside these cells. Although these cells are generally used for short periods, these areas are a part of the SDCJ and should include sanitation inspections. In addition, surveillance video was reviewed, and there was only one occasion, which occurred on March 12, 2022, at 8:17 a.m., when one deputy and two inmate workers arrived on the second floor where Mr. Schuck was housed. However, the only cleaning that occurred was in two empty cells; no other cells were checked for sanitation concerns.[70]

Allegation #13: *Misconduct/Procedure - SDSD failed to provide IP Schuck access to a recreation yard/exercise.*[71]

The CLERB reviewed evidence provided to their board regarding this allegation and notes the following: *"In review of jail documents and jail surveillance video recordings of Schuck's incarceration, it was noted that Schuck was not afforded the opportunity to exercise or partake of recreation during the seven days that he was incarcerated. Denying an IP reasonable access to recreation or yard time raises concerns related to constitutional rights and standards for humane treatment. The purpose of SDSD DSB P&P Section T.11 titled "Exercise and Recreation," was to provide an opportunity for adequate exercise and recreation for all inmates. An exercise and recreation program shall be available to inmates at each facility. It shall afford the inmate an opportunity to utilize an area designed for recreation. It shall include a minimum of two (2) exercise periods, and a minimum of three (3) hours per week, per inmate. At the time of his death, Schuck had been incarcerated for approximately seven days. In those seven days, he was not provided the opportunity to exercise. The evidence supported the allegation, and the act was not justified."*
*Board Finding: Sustained*

[69] L.2 Sanitation and Hygiene Inspections P&P
[70] Video 0-2022-03-12 06-18-39-749.mov (086 2-Court Holding Corr)
[71] CLERB Final Report: Case #22-026 / Schuck, dated February 13, 2024; page 7; #13

The surveillance video provided was reviewed and does not reflect staff providing Mr. Schuck with an escort from the Court Holding 6 cell, which is in a blind spot, to a recreation area. Also, the JIMS summary report for Mr. Schuck does not indicate he was provided an opportunity to exit his cell. According to the San Diego Sheriff's Department Detention Services Bureau-Manual of Policies and Procedures, Exercise and Recreation, T.11, dated September 7, 2018, states, *"To provide an opportunity for adequate exercise and recreation for all inmates."* Furthermore, under Procedure, Logging Activities A.1.of this P&P states, *"The start and end of recreation time must be documented in the Jail Information Management System (JIMS)."*[72]

Opinion: Instead of providing Mr. Schuck with basic necessities such as bedding and a shower, the SDCJ acted in a wanton manner and inflicted unnecessary pain and injury as Mr. Schuck's appearance deteriorated, his behavior became more erratic, he developed multiple pressure sores on his tailbone, buttocks, elbows, and legs.[73] Mr. Schuck was not provided an opportunity to exit his holding cell, where he had been housed for several days for recreation activities. Recreation provides incarcerated persons a period of controlled free time to maintain/or improve mental and physical health. In a correctional setting, this time to move freely about is highly valued by inmates. In addition, Mr. Schuck was not provided the use of a telephone, writing utensils, paper, envelopes, or postage to communicate with his family.
If Mr. Schuck was expected to purchase personal care and stationary items, there is no evidence that he was afforded an opportunity to purchase these items in the commissary.

Consideration: Why are safety checks necessary, and were these checks done in a timely and correct manner?

Safety checks are important because they let inmates know that deputies are watching and attending to duties. In general housing and inmate holding areas, these rounds shall occur, at a minimum, every 60 minutes as a best practice. Routes should vary as inmates often keep track of staff times and patterns in order to conduct illicit activities as there is less risk of being interrupted. Safety checks will determine the protection and well-being of individuals and are conducted through direct visual observation by deputies. This is also an opportunity to obtain

---

[72] SDCSD Detention Services Bureau Policies-Manual of P&P website
[73] Schuck Jail Medical Records - CSD000660

information about inmates, assess the tone and climate of the institution, prevent suicide attempts, and detect medical concerns, fights, assaults, and group disturbances. When conducting safety rounds, inmates have the opportunity to communicate vital information to deputies and other detention staff to help in the prevention of criminal activity, maintaining security, and protecting people and property. The level of order, peace, and security in their respective communities indicates how effective the deputies are in carrying out this basic responsibility.

The BSCC Safety Checks in Title 15 Minimum Standards for Local Detention Facilities, 2019 Regulations Revision was considered as these standards were in place during Mr. Shuck's incarceration. According to the BSCC, at this time, a 'Safety Check' is defined in §1006 as the "*direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates.*" Furthermore, §1027.5 Safety Check, states, "*Safety checks shall*[74] *be conducted at least hourly through direct visual observation of all inmates. There should be no more than a 60-minute lapse between safety checks. There shall be a written plan that includes the documentation of routine safety checks.*"

The San Diego County Sheriff's Office Policies and Procedures (P&P), Safety Checks of Housing Units and Holding Cells, I.64, dated December 17, 2021,[75] were reviewed, and the most recent version dated September 27, 2022.[76] The revised P&P reflects an additional section identified as section *IV. Compliance Reviews of Safety Checks.* This compliance section outlines the video and JIM documentation review by shift supervisors of safety checks. It appears to be in cadence with the revised Title 15 requirement, which became effective January 1, 2023. However, section *III. Logging of Safety Checks* only requires the start time and staff conducting these checks to be logged in the JIMS. At the conclusion of the safety check, "*an entry may be logged in JIMS using the event type "11-53 Notes" if there was anything encountered during the safety check. Items that necessitate documentation.*" A commonly accepted practice is to require both start and end times for a safety check. This would better serve supervisors when conducting shift reviews of these checks and provide administration, investigators, and other

---

[74] The word "Shall" is defined as "Mandatory" by the BSCC 2019 & 2023 Title 15 Minimum Standards for Local Detention Facilities; §1006, Definitions, page 13
[75] SDCSD Safety Check P&P, dated December 17, 2021 (CSD000869-871)
[76] SDCSD Safety Check P&P, dated September 27, 2022 (CSD000838-841)

persons a snapshot of how long each safety check took to complete. Also, section *II.C. Conducting Safety Checks* of this P&P states the following, *"During safety checks in housing locations, sworn staff will physically enter each module and observe each incarcerated person present in the common areas of the module looking for obvious signs of medical distress, trauma, or criminal activity (e.g., dayrooms, showers, exercise areas, holding areas). In cell style housing modules, sworn staff shall stop at or enter each cell and observe each incarcerated person.*

Verifying the welfare of an inmate during these checks appears to be an area of contention with the California State Auditor (CSA). In the CSA Report 2021-109, dated February 3, 2022, their office conducted a review titled, *San Diego County Sheriff's Department, It Has Failed to Adequately Prevent and Respond to Deaths of Individuals in its Custody*. Regarding safety checks, the CSA reviewed video files and discovered sworn staff were not conducting these checks adequately in part due to weakness in the Sheriff's Department's policy surrounding the determination of whether a person was *"alive and well by taking steps such as by observing the rise and fall of their chest."* Also, video files depicted sworn staff quickly walking by cells without breaking their stride or glancing in a cell for less than one second while conducting a safety check.

The BSCC updated the Title 15 requirements, effective January 1, 2023. There is a more robust requirement for safety checks as reflected in §1027.5 Safety Checks to reflect "*The facility administrator shall develop and implement policy and procedures for conducting safety checks that include, but are not limited to, the following:*

> *(a) Safety checks will determine the safety and well-being of individuals and shall be conducted at least hourly through direct visual observation of all people held and housed in the facility.*
>
> *(b) There shall be no more than a 60-minute lapse between safety checks.*
>
> *(c) Safety checks for people in sobering cells, safety cells, and restraints shall occur more frequently, as outlined in section 1055, section 1056, and section 1058 of these regulations.*
>
> *(d) Safety checks shall occur at random or varied intervals.*
>
> *(e) There shall be a written plan that includes the documentation of all safety checks.*

*Documentation shall include:*

*(1) the actual time at which each individual safety check occurred;*

*(2) the location where each individual safety check occurred, such as a cell, module, or dormitory number; and,*

*(3) Initials or employee identification number of staff who completed the safety check(s).*

*(f) A documented process by which safety checks are reviewed at regular defined intervals by a supervisor or facility manager, including methods of mitigating patterns of inconsistent documentation, or untimely completion of safety checks.*

San Diego County Sheriff's Department Procedures and Policies (P&P), Safety Checks; Inmate Housing and Holding Areas, I.64, dated December 17, 2021,[77] Section II. C, Conducting Safety Checks, states, "*During safety checks in housing locations, sworn staff shall physically enter each module and observe each incarcerated person present in the common areas of the module looking for obvious signs of medical distress, or criminal activity ( e.g., day rooms, showers, exercise areas, holding areas). In cell style housing unit modules, sworn staff shall stop at or enter each cell and observe each incarcerated person. In dormitory style housing modules, sworn staff should walk by each bunk in a manner that  permits them to observe each incarcerated person."*

Section II.D, of this P&P states, "*Safety checks shall be completed in all non-housing locations designed as cells/holding areas for incarcerated persons (e.g., receiving, Medical, release, Court holding), even when unoccupied (the release area at Las Colinas detention and reentry facility is excluded from the safety check requirement). Sworn staff shall stop at or enter each cell/holding area to conduct the safety check."*

Section III. A, of the I.64 P&P, states, *"The start of a safety check will be logged in JIMS using the event type "11-53 Started." The description field of the entry shall include the name(s) and/or ARJIS numbers of the sworn staff conducting the safety check. If additional space is needed, the notes section may be used. Once all necessary fields are completed, the sworn staff making the entry will immediately close the "11-53 Started" entry." Section III.B, outlines the conclusion of the safety check as, "At the conclusion of the safety check, an entry may be logged in JIMS using the event*

[77] SDCSD Detention Services Bureau Policies-Manual of P&P - CSD000869-871

*type "11-53 Notes," if there was anything encountered during the safety check. Items that necessitate documentation.*

During my review of the Central Jail surveillance videos, several safety checks were conducted untimely or not according to policies and procedures. When deputies conducted safety checks, also known and logged in JIMS as an '11-53', these were cursory at best and did not ascertain the well-being of the incarcerated individual. Safety check discrepancies noted when Mr. Schuck was housed on the second floor are as follows:

<u>March 12, 2022</u>

- 6:00 am: Safety check conducted. Cursory check.[78]
- 7:56 am: Safety check conducted. The next check occurred at 9:49 am, nearly 2-hours late.[79]
    - The JIMS Area Activity Summary Report indicates that the safety check began at 7:53 am. The following safety check noted in the JIMS began at 8:50 am.[80] This did not occur as observed via a jail surveillance camera. No staff member was present in this area until 8:46 a.m. for the sole purpose of providing an escort for medical staff distributing medication and only going to Court Holding 5 cell. Once the medication is dispensed, the deputy and medical staff go in separate directions. Specifically, the deputy walks back down the hallway but does not look into any of the cells.
- 12:17 pm: Safety check conducted. The next check occurred at 1:55 pm, 1 hour and 40 minutes late.[81]
    - The JIMS Area Activity Summary Report indicates that the check began at 12:00 p.m., and the following safety check began at 12:56 p.m.[82] This did not occur as observed via jail surveillance camera. No staff member was in this area until 1:42 pm. At this time, video surveillance depicts one deputy escorting one medical staff member to distribute medication.

Although most safety checks were conducted within time restraints in housing module 7D, where Mr. Schuck was finally assigned, it was common for sworn staff to enter the same side of the

[78] Video 0-2022-0311 01-53-44-446.mov (086 2-Court Holding Corr)
[79] Video 0-2022-03-12 06-18-39-749.mov (086 2-Court Holding Corr)
[80] Exhibit 20A, page 21
[81] Video 0-2022-03-12 10-42-40-967.mov (086 2-Court Holding Corr)
[82] Exhibit 20A, page 20

housing unit as the previous check and near the 60-minute time mark. This displays a pattern in which incarcerated persons can quickly discover and conduct illicit activities. Furthermore, during these checks, especially during what's considered ‘lights out,’ sworn staff are seen stopping briefly at each cell and looking in the windows. However, there were only a few occasions where deputies took out their flashlights to check on an offender's well-being. It appears the safety checks were conducted just to see if there was a person(s) in each cell. Especially in low light, additional time to observe to evaluate if an inmate is in medical distress or trauma is necessary.

The CSA report dated February 3, 2022, indicated that SDCSD Detention staff performed insufficient safety checks. As noted above, there were several instances where SDCJ staff failed to complete a safety check in a timely manner as outlined by Title 15, §1027.5 Safety Checks. In addition, CLERB case #23-013/Thuresson investigation revealed Mr. Thuresson was discovered unresponsive in his cell, and the safety check was conducted late. In this CLERB report, allegation number three not only addresses the late violation of the safety check but also ties in case #21-069/Rodriguez’ in-custody death case. This CLERB investigation revealed a 65-minute and 28-second lapse between direct observations. In that case, a policy recommendation was sent to the SDSD, which stated, “*It is recommended that SDSD take all necessary measures to change its current practice to conform with the statute and its own existing policy by mandating that every incarcerated person be directly observed by sworn staff at random intervals not to exceed 60 minutes (30 minutes for Medical Observation Beds and in Psychiatric Stabilization Units and 15 minutes for safety cells), as opposed to simply ensuring the safety checks start within the mandated time-period.*”[83]

<u>Opinion:</u> Detention deputies are viewed as the backbone of the facilities they work in, managing inmates 24 hours a day, 7 days a week, and tasked with maintaining a safe and secure environment for both staff and inmates. Safety checks are a basic but vital responsibility in any correctional setting and focus on the well-being of inmates, identify potential security risks, and ensure the safety of the inmate population. During Mr. Schuck’s incarceration, the BSCC 2019 Title 15 Minimum Standards for Local Detention Facilities were in place to include SDCSD P&P, dated December 17, 2021. Although these standards indicated that safety checks should be conducted through direct observation and at random intervals to provide for the health and

[83] CLERB Closed Session, June 27, 2024

welfare of inmates as well as look for any obvious signs of medical distress or trauma, a review of recorded video surveillance depicted sworn staff not performing these vital checks within time restraints. Deputies displayed a pattern of conducting safety checks close to the 60-minute time period and not at random intervals, were incomplete, thus resulting in instances where incarcerated persons are not directly visually observed within statutorily mandated time periods as noted by the CLERB. It is also my opinion that the verbiage in the P&P of *obvious signs of medical distress or trauma* weakened this policy as an incarcerated person may exhibit these behaviors that are not obvious to staff but are still urgent and require immediate attention.

## VIII. Opinions and Observations of Site Visit at the San Diego County Central Jail.

On November 13, 2024, a site visit at the SDCJ was conducted. A review of the SDCSO website, Central Jail, states, *"Located in downtown San Diego, the San Diego Central Jail (SDCJ) serves as the primary point of intake for incarcerated males in San Diego County. The facility is staffed by just over 200 sworn employees and nearly 200 professional staff members. SDCJ opened in May 1998. The state-of-the-art facility makes extensive use of touch-screen controls and video surveillance. At the heart of the facility is the Central Command Center, which has the capability of electronically controlling all jail operations in the event of an emergency or major system failure. SDCJ is 230 feet tall, making it the tallest construction project ever undertaken by the County of San Diego. It consists of 11 floors with a total of 17 levels counting the mezzanines and basement. The building provides a pleasing aesthetic addition to the downtown San Diego skyline, having been awarded multiple "orchids" for architectural design, interior design, and lighting design. The population at SDCJ consists primarily of special handling incarcerated persons, newly booked incarcerated persons awaiting transfer to other facilities and pre-arraignment incarcerated persons. The special handling incarcerated population consist of those with serious medical challenges, those under psychiatric care, incarcerated individuals representing themselves in court, as well as defendants facing high-publicity trials. SDCJ provides a wide range of medical and psychiatric services, including on-site dialysis, infectious disease control, and dental care. Services are provided by physicians, psychiatrists, dentists, nurses, and clinical social workers. SDCJ's Psychiatric Stabilization Unit is the largest acute psychiatric treatment facility in San Diego County."*

After entering the secured confines of the SDCJ, escorting staff led me and the plaintiff's attorneys to the first floor. This area is where booking and several holding cells are located for processing and transportation to and from the central jail. The second floor consists of medical, court holding cells, classification, overflow, and sobering cells. Court Holding 6 cell is where Mr. Schuck resided for nearly five days.

Consideration: Are all court holding cells on the second floor where Mr. Schuck was housed for the majority of his incarceration in view of surveillance cameras?

Several holding cells are visible, but not all. A surveillance camera is mounted from the ceiling in front of the Court Holding 6 cell and this cell is completely out of view of the camera.[84] This camera is able to capture movement in the hallway leading to what has been described by deponents as the "old cross bridge to the courthouse." Prior to Mr. Schuck's incarceration, the SDCJ had installed a convex-shaped mirror in an attempt to capture Court Holding 6 and the remaining area of Court Holding 5 cell that is out of view of the camera. In this photo captured on March 15, 2022, Mr. Schuck is standing outside Court Holding 5, where a detention deputy (pictured) and a transport deputy (not pictured) are removing hand and leg restraints including a waist chain. The security camera has limited visibility. Despite the lack of visibility of these court holding cells and staff being aware of this blindspot, there have been no upgrades, such as installing additional security cameras to better observe and record the activities in this area. Several deponents identified this area as the "Back-40" and for the purpose of video court or an overflow to house inmates. Deputy Soderberg stated, "*The back 40? It could be on the second floor where the old court side -- section was. But as far as I know, we're not -- we weren't allowed to use that to put people because historically, sometimes they would not know that they were back there.*"[85] Also, Deputy Valbuena made the following statement regarding the Back 40, *"They would refer to those cells, holding cells as the Back 40. As far as I know, it's just at night -because they're not being used for court, they refer to them, 'Hey, there's some holding cells open in the Back 40 cells' just in case we start running out of holding cells."*[86]

---

[84] Site visit, November 13, 2024; 2nd Floor; Court Holding Corridor Camera
[85] Deputy Soderberg Depo: 61 9-15
[86] Deputy Valbuena Depo: 63 16-21




The CLERB's final report, Case #22-026/Schuck, dated February 13, 2024, the following recommendation was presented to the SDCSO:
*"In review of jail surveillance video camera recordings, it was noted that some camera placements were not ideal. According to SDSD DSB P&P Section I.19 titled "Security Video Systems," facilities will ensure proper placement and quality for viewing purposes and which may be of evidentiary value or administrative interest. Should adjustment be needed to the security video system, the sworn staff member will notify facility administrative staff through email and/or the facility maintenance process. The facility administrative staff will promptly notify the appropriate maintenance/facilities staff to schedule the adjustment or repair."* Furthermore, the CLERB recommended SDCJ video cameras be angled in a more opportune position to capture a greater view.

According to the San Diego County Sheriff's Department Detention Services Bureau - Manual of Policies and Procedures, Security Video systems, I.19, dated January 17, 2020, states the following, *"Each facility equipped with video cameras, monitors and/or recording devices will ensure proper placement and quality for viewing purposes. This equipment may be used for movement control and*

*monitoring (e.g., general surveillance, activity monitoring, specialized monitoring). Facility staff and supervisors will inspect the security video system equipment each shift to ensure the equipment is functioning properly."* In addition, this policy outlines the procedure in which sworn staff assigned to areas will ensure proper placement, focus, and operation.[87]

On November 12, 2024, the SDSO provided a written response to the CLERB's recommendation for camera adjustment to capture the Court Holding 6 cell, which states:

*"The San Diego County Sheriff's Office (SDSO) welcomes and supports the Citizens' Law Enforcement Review Board (CLERB) independent review of complaints alleging improper actions by members of the Sheriff's Office. SDSO continuously strives to respond with professionalism and concern to the citizens we serve, and the CLERB process provides invaluable input to that end.*

*CLERB sent the following recommendation related to SDSO reference CLERB Case #23-026:*

1. *"CLERB is recommending that video camera '086 2-Court Holding Corr' be angled downward to capture Court Holding cell #6."*

*Thank you for the recommendation regarding this issue. Below is SDSO's response to the recommendation:*

*After receiving this request, staff at the San Diego Central Jail (SDCJ) attempted to adjust the surveillance camera in question. The camera angle was moved as low as possible but did not have the desired effect. Moving the camera to view into Cell #6 would take away other views that are of significant importance, including views capturing a hallway and views capturing doorways to multiple cells. These angles are important to be able to document when deputies and incarcerated persons (I/Ps) enter and exit cells. At this time, SDSO does not have the infrastructure to facilitate installing additional cameras as the technology that is compatible with the current system is no longer in production. A long-term solution that should be able to incorporate CLERB's recommendation is already planned. SDCJ is on an infrastructure replacement schedule to replace the current surveillance camera system with a new system. The plan for the new system will be to install additional cameras which will increase the areas currently captured by the existing system.*

[87] I.19 Security Video Systems

*In closing, we appreciate the time and effort of the Citizens' Law Enforcement Review Board."*

Although the referenced CLERB Case number noted in the letter from the SDCSO is #23-026 and the CLERB Schuck Case number of #22-026 are slightly different, the camera number and location are the same (SDCJ; video camera '086 2-Court Holding Corr' to capture Court Holding 6 cell).

The San Diego Central Jail became operational in 1998 with state-of-the-art systems. In the 2010/2011 time frame, the SDCJ added some more camera angles due to frequent incidents occurring in specific areas, according to Captain Williamson.[88]When this update was done, the SDCJ should have included a camera to capture the activities outside of Court Holding 6 and 5 cells.

Opinion: While reviewing the second floor surveillance video, this camera captured most of the hallway and a small part of Court Holding 5. However, Mr. Schuck was housed in Court Holding 6 for most of his incarceration, which is out of view of this security camera and the convex mirror. I was able to observe the placement of the camera during my site visit. This camera is located several feet in front of the Court Holding 6 cell and is mounted to the ceiling. The escorting staff informed me that this is a stationary camera with no capability to pan or tilt remotely. It is obvious another camera is desperately needed to observe the activities of Court Holding 6 and the remaining section of Court Holding 5 cell.

In December 2021, at a CLERB meeting, board members requested that the Sheriff's Department inventory all non-operable cameras and provide a timeframe for when cameras would be repaired. The Sheriff's Department responded and stated it is up to the General Services to provide funds for better video system coverage. The department was aware of systemic video system and quality issues.[89]

In addition, the CSA February 2022 report states, *"Another key, recurring recommendation that the Sheriff's Department has not implemented for nearly a decade relates to updating equipment for monitoring the safety of incarcerated individuals. In 2014, the San Diego County Grand Jury*

[88] Captain Williamson Depo: 23 14-19
[89] CLERB/SDCSD December 2021 complaint and response

*recommended that the Sheriff's Department update the surveillance system for monitoring activity at its largest male detention facility, which is a maximum-security jail. The San Diego County Grand Jury made a similar recommendation in 2017, but the department has yet to replace the system. Although the department's policies and procedures related to facility maintenance generally align with state standards, we find it concerning that it has not yet replaced the surveillance system, even though its age is a major safety issue. In 2021, the Sheriff's Department indicated that the replacement effort would likely not begin until the summer of 2022. According to the assistant sheriff of detentions, the department did not implement this recommendation sooner because of its prioritization of other projects, such as building a new detention facility. However, we believe that the Sheriff's Department should prioritize implementing or resolving all recommendations intended to keep individuals in its custody safe."*[90] Despite recommendations from outside entities such as the CLERB and the San Diego Grand Jury, the reoccurring theme with the SDCSD is to ignore or impede necessary and meaningful changes.

Consideration: How is cell D01 configured in Module 7-David (7D), where Mr. Schuck was finally housed?

Mr. Schuck was assigned to Module 7-David (7D), cell D01, located on the 7th floor of the SDCJ. The cell contains a double bunk, stainless steel, toilet, sink, and mirror. Also, a flat section of metal secured to the wall area for the purpose of a desk was observed. When I asked where the chair in the desk area was, I was informed by escorting staff that the stools were removed from the cells on the lower tier prior to Mr. Schuck's incarceration for the purpose of accommodating individuals who require the use of a wheelchair. When incarcerated persons are assigned to cells, and if they are not in a wheelchair, a plastic chair is provided for their use. The pictures captured during the site visit are located in 'Exhibit D' in this report.

Opinion: There is no stool in his cell, and I was informed that these stools had been removed from the lower tier before Mr. Schuck's incarceration. This is important to note, as Deputy Amado claimed during his deposition, that Mr. Schuck was sitting on a stool before he became unresponsive on March 16, 2022. Other staff deposed only described Mr. Schuck as nonverbal and lying naked on his side with his back to the cell door.

[90] CSA Report dated February 2022 (PLF_000140)

## VII. Opinions Regarding Training and Practices of San Diego County Central Jail Staff.

Consideration: What are some of the areas of training that sworn staff receive?

According to the BSCC website, the Adult Corrections Officer Core Course consists of a minimum of 176 hours of instruction in specific performance and instructional objectives, and successfully completes this training within the first year of a staff member's job assignment as an Adult Corrections Officer. The Adult Corrections Officer Supplement Core Course consists of a minimum of 56 hours of instruction. This training is designed for the Adult Corrections Officer who has previously completed the Peace Officer Standards and Training (POST) basic academy course. Staff must complete this course within the first year of their job assignment as an Adult Corrections Officer. Subjects covered in this course consist of the following: receiving, booking, and release; report writing and record keeping; supervision of inmates; security checks; application of restraints; counts; administering CPR; and managing inmate hygiene.[91]

According to the San Diego Sheriff's Department Detention Services Bureau Detention Training Manual, trainees are also required to complete training on-site, which consists of two phases, and newly hired staff members are assigned to a Facility Training Officer (FTO). Trainees must achieve a 'Meets Expectations' rating in all areas to be released from this training. Phase 1 consists of a minimum of 28 days, and Phase 2 consists of a minimum of 14 days and a maximum of 21 days.[92] There are numerous topics separated by Knowledge, Performance, and Miscellaneous. Specifically, these trainings consist of Department and Detention Policies, BSCC Title 15 and 24 regulations, facility knowledge, JIMS, intake procedures, medical/mental health, housing procedures, use of force, critical incidents, and judgment problem-solving. There are 70 Detention Policies and Procedures to become familiar with, including seven California Penal Codes.[93]

---

[91] Adult Corrections Officer Core and Supplemental Course; BSCC website
[92] San Diego Sheriff's Department; Detention Services Bureau Detention Training Manual, pg 5
[93] San Diego Sheriff's Department; Detention Services Bureau Detention Training Manual, pgs 20-21

Section XI. Intake Procedures[94]

The trainee will explain and demonstrate the procedures associated with the responsibilities of the intake areas. This will include but is not limited to the following: All exits and entrances to the intake area, all areas of the vehicle sally port, pedestrian gate, use of telephones, inmate property, medical pre-screening, facility Green Sheets and facility Post Orders specific to this position, location and responsibilities of intake deputy, Barcode Reader (BCR) operations, booking criteria, inmate searches, Live scan system, Mugshot system, JIMS booking workflow, safety/sobering cell policies and procedures.

Section XIII. Medical / Mental Health[95]

The trainee will explain and demonstrate the procedures associated with the responsibilities of the medical/mental health areas of the facility. This will include but is not limited to the following: Liaison with medical staff, medical observation areas, medical screening, PSU, inmates with mental issues, MOB areas: beds, wheelchairs, canes, unique safety challenges, weapons/hiding places, maintaining security and safety of medical areas, control inmate movement/contact with staff, timely check of sobering and safety cells, and universal precautions.

Deposed staff recalled receiving Annual Refresher training and having the ability to be certified in Cardiopulmonary Resuscitation (CPR). The certificate is valid for 2 years from the date of issue. In addition to Annual training, staff receive training courses electronically for items such as policy and procedure updates, rules of conduct, understanding bias and cultural awareness, intake guidelines for agencies, and training bulletins for provided signs and symptoms of withdrawal and signs of medical distress and life-threatening emergencies.

<u>Opinion:</u> The purpose of staff receiving annual training, including initial training, is to equip staff with the necessary knowledge, skills, and assessments to effectively manage inmates, maintain security, respond to emergencies, and uphold safety standards. Detention facilities can be a volatile environment depending on the size, location (urban or rural), and number of persons received and processed at their facilities each day, and staff need to be proficient and up

[94] San Diego Sheriff's Department; Detention Services Bureau Detention Training Manual, pg 33
[95] San Diego Sheriff's Department; Detention Services Bureau Detention Training Manual, pg 33

to date in their knowledge and skills. It appears that sworn staff attend the Adult Corrections Officer Core Course or Adult Corrections Officer Supplement Core Course, depending on completion of previous law enforcement training in California, known as the Peace Officer Standards and Training basic academy course. In addition, sworn trainees complete a two-phase on-the-job training and are assigned to a facility training officer for a minimum of 42 days. They must pass this training. Annual refresher training, policy and procedure updates, training bulletins, and other required or necessary training forms are sent to staff members electronically to be completed remotely.

Staff at SDCJ have been trained and provided with various tools to ensure they are proficient in performing their duties and responsibilities. However, in review of video surveillance and documentation surrounding Mr. Schuck's death, it appears there is a significant disconnect between the training staff have received and how they applied that training while performing their duties. During Mr. Schuck's incarceration, he interacted with several staff when transported to and from SDCJ for court proceedings and was cross-chained due to his *"odd/strange behavior," he* was escorted to medical to have a quick wound cleaning in order to make him presentable for his court appearance, collapsed twice outside the 7D housing module, and was non-communicative when four staff which included an RN and LVN came to his cell on the morning of March 16, 2022, to only die 30 minutes after their visit despite the condition he was in. The failure of SDCJ staff to provide care for Mr. Schuck was clear to me and displayed a culture of neglect and is a direct reflection of the SDCJ.

<u>Consideration:</u> What are the documentation practices at the San Diego Central Jail?

Documentation is an essential part of the duties and responsibilities of correctional officers. Proper documentation is key, whether it is a medical event, use of force, unusual circumstances, or simply an effort to reasonably accommodate an inmate's request. Staff working in jails and prisons usually spend an entire shift inside the confines of a correctional facility. There are no windows to look out and enjoy the scenery or doors to close to shut out the noise. To add to some of the challenges in a correctional setting are managing uncooperative and violent inmates, maintaining a safe, secure environment, and responding to emergencies. One challenge that may not immediately come to mind but is crucial is communicating with staff. Communication among staff is central, and the

knowledge gained by observing incarcerated persons will often protect fellow staff and the offenders in their care and custody. Log books or, in the case of the SDCSD, an electronic record is maintained and known as the Jail Inmate Management System (JIMS). The benefits of an electronic record or file have several advantages, such as accessibility, efficiency, cost savings, and collaboration with stakeholders.

Opinion: During Mr. Schuck's incarceration at the SDCJ, several events occurred where staff should have recorded circumstances in JIMS. Incidents such as a gate refusal, reasons for missing a court date on March 14, 2022, and the court ordered a safe cell extraction if needed to produce Mr. Schuck for court,[96] unsanitary cell conditions, and issues with personal hygiene led to Mr. Schuck's clothing becoming soiled with food and feces. Additionally, court deputies failed to document why Mr. Schuck was cross-chained in JIMS. There is no substitute for taking the time to communicate information to others and memorializing events in a log book or, in this case, in the JIMS. Dissemination of this information allows for efficient sharing of information with staff at the SDCJ.

Furthermore, when reviewing the SDCJ JIMS logs in areas such as the second and seventh floors where Mr. Schuck was housed during his incarceration at the SDCJ, the JIMS area activity summary reports reflected inconsistent event types. For example, the JIMS log (35 pages) for the second floor noted "Inmate Meal" on two occasions, which occurred on March 10, 2022, and March 15, 2022.[97] The JIM log (22 pages) for the seventh floor was reviewed. This electronic log indicates when recreation begins and ends. However, other significant events, such as meal distribution, are only annotated once, and safety checks have no end times.[98]

Memorializing information is vital as it allows for clear communication, helps ensure everyone is on the same page when making decisions such as classification, facilitates knowledge sharing, and provides a record of decisions, processes, and essential details that can be referred to later, preventing confusion and mistakes. Essentially, it is a central source for any organization, improves efficiency, and mitigates risks. During Lieutenant Boorman's deposition, when asked about the JIMS, he stated, *"It's the system that we use in the jails to document and hold information in*

[96] Detective Vanlingen Depo: 42 3-7
[97] JIMS log, second floor, pages 2 & 30 (Exhibit 20A)
[98] JIMS log, second floor, page 21 (Exhibit 20B)

*regards to what we do during the day."*[99] The SDCJ failed to document relevant information regarding Mr. Schuck in the JIMS, and the information in the JIMS is inconsistent. It does not provide a clear understanding of the events that occurred during a shift.

**VIII. Opinions These Failures Were in Direct Violation of the San Diego County Sheriff's Department Mission Statement, Organizational Vision, and Core Values.**

Consideration: What was the impact of the San Diego County Sheriff's Department to its statement to provide the highest quality of public safety service to everyone and create & maintain safe facilities?

The Mission Statement of the SDCSD states: "*We provide the highest quality public safety service to everyone in San Diego County.*" Furthermore, the SDCSD Organizational Vision states: "*We are an organization that will lead the nation in providing high quality public safety services by working in partnership with our communities. By investing in our employees and providing our staff the support, training, tools, and equipment they need, we will continue to deliver exceptional customer service while ensuring our employees are provided professional growth opportunities which allow them to thrive and succeed at home and in their career. We recognize the importance of investing in the County's jails. The way we incarcerate people directly impacts public safety. We will be a leader in jail innovation to create and maintain safe facilities. We are an organization that invests in correctional health care, substance use treatment, community reentry, and ongoing improvements that ensure our jails are ADA compliant, with transitional services that deliver the best outcomes for justice involved individuals. We will be at the forefront of implementing technology advancements that enhance customer and employee experience, reduce redundancy, add value and safety, and protect privacy rights.*"

[99] Lt. Aaron Boorman Depo 29:2-4

Core Values are listed on the SDCSD website as:

***HONESTY*** *We are truthful in our words and in our actions.*

***INTEGRITY*** *As people of character and principle, we do what is right, even when no one is looking.*

***LOYALTY*** *We are loyal to the values of our department and our profession and committed to protecting the quality of life in the communities we serve.*

***TRUST*** *We are confident in the integrity, the ability and the good character of our colleagues.*

***RESPECT*** *We treat everyone with dignity, honoring the rights of all individuals.*

***FAIRNESS*** *We are just and impartial in all our interactions.*

***DIVERSITY*** *We embrace the strength of diversity in our employees and our communities.*

***COMPASSION*** *We are compassionate in our words, actions, and deeds.*

<u>Opinion:</u> From March 10, 2022, through March 16, 2022, Mr. Schuck was housed in a place of confinement at the SDCJ. During his incarceration at this facility, staff should have been committed to carrying out their responsibilities with integrity, respect, fairness, and compassion. In stark contrast to the core values, Mr. Schuck was subjected to cruel mistreatment. In fact, members of the SDCJ, almost in a concerted effort, neglected their sworn duties to maintain the safety, security, and supervision of incarcerated persons in their care and custody. In my review of the documents provided to me, I saw a pattern of neglect and indifference to Mr. Schuck and his need for assistance. It is also my opinion the SDCSD did not serve the needs of the community it serves. In addition, the SDCJ staff's inactions created an environment that led to the tragic demise of Mr. Schuck on the morning of March 16, 2022. There is clear evidence of a systemic failure by the SDCJ to provide constitutional protections to incarcerated persons in their care and custody. This concludes my report.

**Area left intentionally blank**

# EXHIBIT A

## MATERIALS REVIEWED AND CONSIDERED

Deposition Transcripts:

Jeff Amado, SDCSD, Central Jail Deputy, taken on May 22, 2024

Jameelyn Barrera, SDCSD, Detention Nurse, taken on May 7, 2024

Aaron Boorman, SDCSD, Central Jail Lieutenant, taken on August 22, 2024

Alexander Cortez, SDCSOD Central Jail Deputy, taken on June 25, 2024

Romeo Deguzman, SDCSD, Registered Nurse, taken on July 6, 2024

Lorraine Gallegos, SDCSD, Licensed Vocational Nurse, taken on July 5, 2024

Alan Griffith, SDCSD, Prisoner Transport Deputy, taken on May 15, 2024

Emily Lymburn, SDCSD, Registered Nurse, taken on May 15, 2024

Thomas Mace, SDCSD, Detention/Court Services Deputy, taken on May 17, 2024

Manual Nozawa, SDCSD, Registered Nurse, taken on July 10, 2024

Justin Page, SDCSD, Classification Corporal, taken on June 17, 2024

Serina Rognlien-Hood, SDCSD, Deputy Director of Inpatient Care, taken on May 21, 2024

Jessica Ramirez, SDCSD, Detective, taken on May 8, 2024

Matthew Seitz, SDCSD, Central Jail Deputy, taken on September 16, 2024

Sven Soderberg, SDCSD, Central Jail Clinics Deputy, taken on May 7, 2024

Allan Valbuena, SDCSD, Detention/Court Services Deputy, taken on May 30, 2024

Andrijana Vanlingen, SDCSD, Detective, taken on July 23, 2024

Derek Williamson, SDCSD, Captain, taken on October 11, 2024

Boorish Wong, San Diego Police Officer, taken on June 26, 2024

SDSU Staff Interviews:

Theresa Curier, Correctional Healthcare Partners (contractor), Doctor, March 16, 2022

Romeo Deguzman, SDCSD, Registered Nurse, taken on March 16, 2022

Emily Lymburn, SDCSD, Registered Nurse, taken on March 16, 2022

Lorraine Gallegos (Palmeda), SDCSD, Licensed Vocational Nurse, taken on March 16, 2022

Alan Griffith, SDCSD, Prisoner Transport Deputy, taken on May 18, 2022

Documents and Resources

Auditor of the State of California Fact Sheet; Report 2021-109, dated February 3, 2022; PLF_000094

Auditor of the State of California Report 2021-109, February 3, 2022; PLF_000096 - PLF_000219

California Board of State and Community Corrections; 2020-2022 Biennial Inspection, Penal Code 6031, Welfare & Institution Code 209; San Diego County Type II Jail Facilities, dated June 8, 2022

California Board of State and Community Corrections; Adult Corrections Officer Core and Supplemental Course: https://www.bscc.ca.gov/s_stccoretrainingprogram/

CBS 8 News, "San Diego County pays $4.35 million to a woman who gouged both eyes out while in jail." Dorian Hargrove, October 19, 2022: https://www.cbs8.com/article/news/investigations/san-diego-county-pays-4-million-to-a-woman-who-gouged-her-eye-out-while-in-jail/509-082d653a-43d0-404b-8661-f345c299f036

California Board of State and Community Corrections; Title 15 Minimum Standards, 2019 & 2023

Citizens Law Enforcement Review Board website, About, Background, and Functions: https://www.sandiegocounty.gov/content/sdc/clerb/about/

Citizens Law Enforcement Review Board website; 2020 Annual Report

Citizens Law Enforcement Review Board website; January 2022 (Special meeting)

Citizens Law Enforcement Review Board website; Closed Session, June 27, 2024

Citizens' Law Enforcement Review Board; Final Report: Case #22-026/Schuck, dated February 13, 2024

Citizens' Law Enforcement Review Board; Special Meeting Agenda: dated June 27, 2024

Evaluation Update - William Schuck; CSD001959-1961

JIMS: Floor 2; Area Activities Summary Report - Exhibit 20A

JIMS: Floor 7; Area Activities Summary Report - Exhibit 20B

JIMS: William Schuck; Inmate History Summary Report; CSD000724-725

Medical Records; William Schuck; CSD000631-705

San Diego County Booking and Intake Detention Center Training Unit supplemental core topic #6.1:
https://apps.sdsheriff.net/PublicDocs/SB978/Detention%20Services%20Bureau/Detention%20In-Service%20Training%20Unit/Courses/FY%2021-22/Courses/SUP%20CORE%20SB%20978%20INFO/6.1.pdf

San Diego County Detention Facilities:
https://www.sdsheriff.gov/Home/Components/FacilityDirectory/FacilityDirectory/58/109

San Diego County Sheriff's Department Mission, Organizational Vision, and Core Values: https://www.sdsheriff.gov/bureaus/about-us/mission-values

San Diego County Sheriff's Department Global Retention Policy Schedule Report; CSD002046-2057

San Diego County Sheriff's Department website, Homicide, In-Custody Deaths, Officer Involved Shootings:
https://www.sdsheriff.gov/resources/transparency-reports

San Diego County Sheriff Department website; Medical Services Division Operation Manual.pdf, dated November 4, 2022 (395 pages)

Schuck Booking; CSD000706

Schuck Jail Medical Records; CSD000631-000705

San Diego County Sheriff's Department, Critical Incident Review Board, In-Custody:
apps.sdsheriff.net - /PublicDocs/SB978/Detention Services Bureau/

Death Information Release, dated March 16, 2022. SDCSO Website; CIRB In-Custody Deaths / 2022: https://www.sdsheriff.gov/resources/transparency-reports

86_Boorman Summary.pdf (1-page)

The San Diego Union-Tribune, Lazaro Alvarez, "Two San Diego County sheriff's deputies failed to provide medical aid to an inmate before he died, review board finds." Jeff McDonald, December 7, 2021:
https://www.sandiegouniontribune.com/2021/12/06/two-san-diego-county-sheriffs-deputies-failed-to-provide-medical-aid-to-inmate-before-he-died-review-board-finds/

The San Diego Union-Tribune, Anthony Chon, "Citizens' review board probe finds misconduct by two deputies in San Diego jail death." Jeff McDonald, January 9, 2022:
https://www.sandiegouniontribune.com/2022/01/09/citizens-review-board-probe-finds-misconduct-by-two-deputies-in-san-diego-jail-death/

The San Diego Union-Tribune, “San Diego settles Elisa Serna jail death lawsuit for $15 million, and limited federal oversight.” Jeff McDonald, July 2, 2024: https://www.sandiegouniontribune.com/2024/07/01/san-diego-county-settles-elisa-serna-jail-death-lawsuit-for-15-million-and-limited-federal-oversight/

Video Recordings:

SDCJ; 2nd Floor; Video 0-2022-0311 12-36-00-321.mov (086 2-Court Holding Corr)

SDCJ; 2nd Floor; Video 0-2022-0311 21-25-46-125.mov (086 2-Court Holding Corr)

SDCJ; 2nd Floor; Video 0-2022-03-12 06-18-39-749.mov (086 2-Court Holding Corr)

SDCJ; 2nd Floor; Video 0-2022-03-12 10-42-40-967.mov (086 2-Court Holding Corr)

SDCJ; Staging D-E Door; Video 0-2022-0315 20-21-00-531.mov (257 7-Mod 7D 2)

SDCJ; 7D; Video 0-2022-03-15 20-20-00-420.mov (257 7-Mod 7D 2)

SDCJ; 7D; Video 0-2022-03-16 01-21-27-452.mov (257 7-Mod 7D 2)

SDCJ: 7D; Video 0-2022-0315 20-21-00-531.mov (257 7-Mod 7D 2)

SDCJ;7D; Video 0-2022-03-16 02-56-14-600.mov (257 7-Mod 7D 2)

SDCJ; 7D; Video 0-2022-03-16 07-43-23-684.mov (257 7-Mod 7D 2)

SDCJ; 2022-03-15 16-48-00-659.mov (Camera 69 2-Stair 2; 03/15/2022)

SDCJ; 2022-03-15 08-02-00-274.mov (Camera 69 2-Stair 2; 03/15/2022)

SDCJ; 2022-03-15 08-02-00-477.mov (Camera 082 2-Detox Corr 1; 03/15/2022)

SDCJ; 2022-03-15 16-46-00-063.mov (Camera 36 1-Staff Elev Lobby; 03/15/2022)

Photographs:

March 16, 2022; Housing Module D (7D) cell D01 cell door; William Schuck death (CSD000244)

March 16, 2022; Housing Module D (7D) cell D01 toilet area; William Schuck death (CSD000252)

March 16, 2022; Housing Module D (7D) cell D01 desk w/no stool; William Schuck death (CSD000324)

March 16, 2022; Housing Module D (7D) cell D01 sink w/mirror; William Schuck death (CSD000325)

Site visit, November 13, 2024; 2nd Floor; Court Holding 5 cell

Site visit, November 13, 2024; 2nd Floor; Court Holding 6 cell

Site visit, November 13, 2024; 7th Floor; Housing Module D (7D) cell D01

Still photograph from the SDCJ, 2nd Floor; Court Holding Corridor CCTV

San Diego County Sheriff's Department Detention Services Bureau Policies- Manual of Policies and Procedures

I.19 Security Video Systems, dated January 17, 2020; apps.sdsheriff.net - /PublicDocs/SB978/

I.64 Safety Checks: Housing and Holding Areas of Incarcerated Persons, dated December 17, 2021 (CSD000869-871); Revision, dated September 27, 2022 (CSD000838-841)

M.5 Medical Emergencies, dated December 2, 2020
(CSD000878-881)
M.9 Receiving Screening, dated December 18, 2019
apps.sdsheriff.net - /PublicDocs/SB978/

T.11 Exercise and Recreation, dated September 7, 2018
apps.sdsheriff.net - /PublicDocs/SB978/

San Diego County Sheriff's Department Medical Services Division-Operations Manual
A.1.1 Access to Care, dated February 3, 2020, and reviewed on August 10, 2021
(CSD000764-765)

E.2.1 Receiving Screening, dated October 13, 2021
(CSD000774-782)

MSD.S.3 Sick Call; Medical & Psychiatric Services, dated January 5, 2022
(CSD000806-807)

SDSD Detention Services Bureau-San Diego Central Jail Green Sheet
I.63.C.1 Safety Checks of Housing Units and Holding Cells, dated February 17, 2022 (CSD000823-824); Revised on February 3, 2023 (CSD000829-830)

I.64.C.1 Safety Checks of Housing Units and Holding Cells, dated October 11, 2021
(CSD000898-899)

# EXHIBIT B

## EXPERT DISCLOSURES

Prior Expert Witness Cases in the Past Four Years:

European Convention on Human Rights; Articles 3 and 5; Westminister Magistrates' Court, London, United Kingdom; United States v. Scott West; Case #22-CR-40028; Lawrence & Co. CDS LLP

Trina Christie; Estate of Anthony R. Christie v. State of Washington, Department of Corrections; Case #3:22-cv-05692-TMC

Publications (Past 10 Years):

None

Expert Compensation:

I am compensated through my contract with Titan National Consulting as an independent consultant. The following are my consulting rates:

Document review/preparation/report completion-$200 per hour

Deposition/trial testimony-$350 per hour

**Area left intentionally blank**

EXHIBIT C

SEAN PRICE CV

McMinnville, Oregon ~ 503-583-5048 ~

spriceconsulting1@gmail.com

**PROFESSIONAL SUMMARY**

I am a retired correctional professional with over 24 years of service with the Federal Bureau of Prisons. I began my employment in the federal prison system, working from the ground level, and then was promoted to various employment positions of increased responsibility. Through my years in positions of leadership and supervision, I have gained expert managerial and operational knowledge of various security-level correctional facilities. Specifically, I have supervised correctional staff and inmates at the Administrative (jail), Medium, and Minimum-security prisons, including a Mental Health-3 level (high intensity) inmate housing unit.

**PROFESSIONAL SYNOPSIS**

**Titan National Consulting Group, LLC** **2023 - Present**

Contract Corrections Consulting Expert

**Oregon Department of Public Safety Standards** **2023 - Present**

Part-Time Skills Instructor

**McMinnville High School / Chemeketa Community College** **2000 - 2022**

Criminal Justice Pathway Teacher / Adjunct Professor

**Federal Bureau of Prisons** **1995 - 2019**

Correctional professional with over 24 years of service with the Federal Bureau of Prisons encompassing various employment positions of increased responsibility and accountability due to performance; Recipient of Supervisor of the Year; Effective Prison Leadership-Professionalism and Communication; Crisis Management Training-Tactical Trainer; Rappel Master Training for Trainers. During my career with the Federal Bureau of Prisons, I held the following positions:

▪ SCP/FDC Sheridan

**Unit Manager - Minimum Security and Detention Center** **2017 - 2019**

▪ FCI Sheridan

**Unit Manager - Medium Security Level with Mental Health Unit** **2012 - 2017**

▪ FCI Sheridan

**Case Manager - Medium Security Level** **2003 - 2005**

▪ SCP Sheridan

**Case Manager - Minimum Security Level** **2005 - 2012**

▪ FCI/FDC Sheridan

**Legal Instruments Examiner/Movement Officer** **2001 - 2003**

▪ FCI/FDC/SCP Sheridan

**Receiving & Discharge Officer** **2000 - 2001**

▪ FCI/FDC/SCP Sheridan

**Senior Officer Specialist** **1997 - 2000**

▪ FCI/FDC/SCP Sheridan

**Senior Officer** **1996 - 1997**

▪ FCI/FDC/SCP Sheridan

**Correctional Officer** **1995 - 1996**

In addition to these positions, I have been assigned to the following during my tenure at FCI Sheridan in a collateral capacity or appointed by a member of the Executive Staff:

- Acting Activities and Operations Lieutenant
- Acting Case Manager Coordinator
- Acting Health Services Administrator
- Acting Satellite Operations Administrator
- Institutional Duty Officer-Collateral Duty
- Special Operations Response Team; Squad Leader; Rappel Master, Institutional and Regional Tactical Trainer-Collateral Duty

**CERTIFICATIONS**

---

▪ Introduction to Correctional Techniques; 1995: Certificate of Graduation from the Federal Law Enforcement Academy, Glynco, Georgia.

▪ Rappel Master Certification; U.S. Army's 6th Ranger Training Battalion, Camp Rudder, Florida 1998.
▪ Inmate Systems Officer Training; 2001; Management and Specialty Training Center (MSTC) Aurora, Colorado.

▪ Legal Instruments Examiner; 2002.

▪ Self-Defense Instructor, Federal Bureau of Prisons Staff Training Academy; 2002.

▪ Case Manager Training; 2003; MSTC.

▪ Offender Workforce Development Training; 2006; Portland, Oregon; Collaboration with the United States Probation Office from the Eastern District of Missouri, Half-Way House staff, Federal Bureau of Prisons, and One-Stop Centers. Techniques to assist offenders in their preparation for release/transition to the community.
▪ Introduction of Supervision; 2007; Federal Correctional Institution (FCI), Sheridan, Oregon.

▪ Crisis Management Training; 2009 - 2016: Provided training to Special Operations Response Teams in the Western Region.

▪ Unit Manager Training; 2012; Management and Specialty Training Center (MSTC), Aurora, Colorado.

▪Rappel Master Training for Trainers Instructor 2016; Federal Correctional Complex, Lompoc, California. Certified Western Regional Federal Bureau of Prisons Special Operations Response Team members, Santa Barbara County Sheriff's Office deputies, and Lompoc Police Department officers.

**EDUCATION & PROFESSIONAL DEVELOPMENT**

---

▪George Fox University - Bachelor of Arts - Management & Organizational Leadership

▪Chemeketa Community College - Associates of Applied Science - Criminal Justice
▪Duties of Correctional Officers; Americans Correctional Association

▪Offender Workforce Employment Specialist

▪Expert Witness Symposium; Americans for Effective Law Enforcement

▪Using Force with Inmates; American Correctional Association

▪Security Rounds; American Correctional Association

▪Inmate Rights to Medical and Mental Health Care; American Correctional Association

▪Failure to Intervene Webinar; Americans for Effective Law Enforcement

▪Escorts and Transports; Americans Correctional Association

**AWARDS - ACKNOWLEDGEMENTS**

---

▪ Supervisor of the Year

▪ Crisis Management Training; Tactical Trainer awards

▪ Supervisor of the quarter

▪ Special Act Awards for outstanding annual work performance evaluations.

▪ Special Act Awards for performing CPR

▪ Annual Refresher Training Instructor

▪ Self-Defense Instructor

▪ Awards for providing training to correctional staff such as Self-Defense, Inmate Reentry, and Interpersonal Communication Skills

▪ Award for Effective Prison Leadership-Professionalism

▪ Award for Effective Prison Leadership-Communication

▪ Letters of achievement/acknowledgment: Job Fair volunteer, leadership, organization, interception of contraband, and gang intelligence

▪ Offender Workforce Employment Specialist

**Area left intentionally blank**

# EXHIBIT D

## Site Visit on November 13, 2024

## 2nd Floor at the SDCJ; Court Holding Cell 6

Front of Holding Cell 6. The security camera is mounted on the ceiling, several feet in front of the cell door. This is the holding cell where Mr. Schuck was assigned to for several days. During this time, he was not provided with bedding, shower access, telephone, or personal hygiene items.




Camera is located in front of Court Holding 6; ceiling

Inside Court Holding Cell 6.




Toilet and Sink Combination Location with pony wall. Currently being obstructed by equipment.

## 2nd Floor at the SDCJ; Court Holding Cell 5

Holding Cell 5. The front of this cell is partially visible in the jail surveillance camera and is depicted on page 40 of this report.




Inside Court Holding cell 5. This cell is next to Court Holding cell 6 and is very similar in shape and size. This photograph reveals an unobstructed area of a court-holding cell.



Court Holding cell 5 has a combination sink and toilet.



Court Holding cell 5 seating area.



7th Floor; Housing Unit 7D; cell D01 at the SDCJ

The following photographs will display the site visit and the date of Mr. Schuck's death on March 16, 2022.

Mr. Schuck's assigned cell.

November 13, 2024




March 16, 2022 (CSD000244)




CSD000244

November 13, 2024 March 16, 2022 (CSD000250)





A double bunk is mounted on the right side of the cell wall. A narrow window that obscures exterior light to illuminate the cell can be seen at the end of the top bunk. It should be noted that Mr. Schuck was lying on the lower bunk on his side, facing the cell wall to which the bunks are attached. The window does not extend down to the lower bunk area, and more than likely creates a darker space, especially at night, for deputies to see an incarcerated person during their safety checks. Jail surveillance depicted deputies conducting safety checks in a manner that was rushed.

November 13, 2024



Empty space below desk. No stool

March 16, 2022 (CSD000324)



Empty space below desk. No stool

November 13, 2024 March 16, 2022 (CSD000325)

The sink is separated from the toilet compared to the court holding cells.





November 13, 2024 March 16, 2022 (CSD000252)





# EXHIBIT 52




SAN DIEGO COUNTY SHERIFF'S DEPARTMENT

# 2019-2020 ANNUAL REPORT

MAKING SUCCESS HAPPEN



J. MONTGOMERY, DO.
08.20.24
Exhibit 62
Susan Swan





**William D. Gore**
Sheriff



**Michael Barnett**
Undersheriff



**Kelly Martinez**
Assistant Sheriff
Law Enforcement



**Anthony Ray**
Assistant Sheriff
Courts / Human Resources



**Frank Clamser**
Assistant Sheriff
Detentions



**Frank Motley**
Executive Director
Management Services

Table of Contents

# Table of Contents


## Sheriff's Message 2

## Defining the Decade 3
Impact and Influence

## Strategic Plan 2020 11

## Focus in Pursuit of the Mission 13
Making Success Happen

## Safest Urban County 21
Reduction of Crime

## True Spirit of Outreach 23
Enhancing Cooperation, Building Partnerships, and Fostering Trust

## Duty of a Deputy 27
Mass Casualty Event at the Chabad of Poway

## 2019 By the Numbers 29
The Department in Brief

## Appendix 31
- Department Organization Chart 31
- Department Demographics 32
- Department Budget 33
- Sheriff Activity 34
- National Incident-Based Reporting System (NIBRS) Reporting 35
- UCR Part I Crime 36



# A Message From Your Sheriff

As we begin a new decade, I cannot help but be filled with pride at how well the Department has progressed amid mandated criminal justice reforms and intense public scrutiny. I have always viewed those who wear a uniform and carry a badge as special. This is a high calling and it comes with unique responsibilities, above and beyond most professions.

We have achieved in large part, the vision that we created in my first elected administration. We have made San Diego the safest urban county in the nation; reducing crime rates to their lowest levels. Our communities have reaped safety returns on the department's investment in information-led policing (ILP).

2019 was, in many ways, a landmark year for change in law enforcement throughout California. Several bills were passed in California that affect some of the core aspects of public safety service, including transparency and use of force. Major events tested our effectiveness, focused community concern, and directed our resources and training. Increasing numbers of inmates requiring mental health services have underscored the importance of proper care and services within our detention facilities, while the effectiveness of our vocational, drug treatment, and lifestyle programs within our jails has led to encouraging results.

We have become a model for adaptation in public safety operations, enhanced our regional cooperation, built strong partnerships, and created trust with our communities. In many ways, we should all be proud of how we have shaped this department into a model of public safety service, but there is always more work to be done. With the strong foundations we have built in culture and policy, high quality employees, and outstanding leadership, I am confident we will exceed the demands that lay before us. Stay true to our Department values and focus on our mission, and this decade will be even greater.

William D. Gore

**With the strong foundations we have built in culture and policy, high quality employees, and outstanding leadership, I am confident we will exceed the demands that lay before us.**

# Defining the Decade

## Impact and Influence

Sheriff Gore provided the visionary leadership necessary for the San Diego County Sheriff's Department to become a model of professionalism for public safety agencies. The Department's professionalism demonstrated while responding and adapting to the systemic criminal justice reforms, societal upheaval, and intense scrutiny throughout this decade, was key to our success. Our adaptation and innovation engine is firing on all cylinders. As one of California's largest law enforcement agencies and a regional leader, it is our responsibility to recognize and respond to trends and changes in public safety. The department initiated and accomplished major changes in function and approach over the past decade.

## Realignment

One of the greatest criminal justice shifts in California was Public Safety Realignment 2011, which was a fundamental change in the system. Realignment shifted responsibility over lower-level felons from state prison and parole systems to county jail and probation systems. This pushed our jail facilities to capacity with convicted felons and parole violators, and increased the risk of violence among inmates and against our staff. It also elevated attempts to move contraband, particularly drugs, into the jails. In anticipation of the implementation of Realignment, the Department mapped out plans for housing inmates and constructing new facilities. The Department's leadership also understood that given the nature of the realigned population, focused efforts would have to be dedicated to affecting the recidivism or re-offense rate for the California Department of Corrections and Rehabilitation (CDCR) population. In 2011, the recidivism rate for CDCR's population was 70 percent.

The policy response to Realignment in San Diego County was a fully integrated effort. Working closely with our partners at the District Attorney's Office and the Probation Department, as well as other frontline law enforcement agencies, the men and women of the Sheriff's Department remained focused on their mission: to make San Diego County the safest urban county in the nation. Realignment presented an obstacle to that mission, but it also created a new opportunity to have an impact for good in the region. At the time of the bill's passing, we anticipated an increase of about 2,000 inmates to our 4,600 average daily inmate population. By 2019, our daily average inmate population was at 5,630, with an additional 500 individuals supervised in alternative custody options.

# Transforming and Bettering Inmates' Lives

The Department recognizes the need to provide a more individualized approach to public safety and rehabilitation; one that makes the person better after experiencing our services. In 2016, the staff at the award winning Las Colinas Detentions and Reentry Facility (LCDRF) participated in a Gender Responsive Policy and Practices Assessment (GRPPA) and transitioned towards a gender responsive and trauma informed (GR/TI) facility. Overall, the GRPPA findings were positive. Due to the specialized and focused approach of LCDRF regarding women's rehabilitation, the department has had numerous requests for tours by state and national partners. It is the goal of the facility to improve the quality of programs and services for women involved in the criminal justice system.

Addressing medical and mental health issues in the detention facilities was among the priorities of the Department. Through the medical service contract with Tri-City Hospital, the Detentions Services Bureau (DSB) began its telemedicine pilot program in September 2016. DSB also began seeking National Commission on Correctional Health Care (NCCHC) accreditation. A consultant team for the NCCHC completed an assessment in December 2016 to assess our jail system against the 59 NCCHC standards.

Among the strategies employed to address the increasing number of inmates with mental health issues, DSB further enhanced and expanded its Inmate Safety Program, which began in 2015. In 2016, the Detentions Training Unit (DTU), Video Production Unit, Medical Services Division and Detentions Support Division completed a training video for sworn and professional staff regarding the Inmate Safety Program. In addition, DSB worked with the Psychiatric Emergency Response Team (PERT) to develop simulated mental health training that was rolled out in 2017.









With the successes of the Jail Based Competency Treatment (JBCT) program that the Department participated in through San Bernardino County, DSB worked to implement its own program here in San Diego. The goal was to improve the mental health service delivery system to both prevent and reduce suicides. In February 2017, the California Department of State Hospitals entered into an agreement with the Sheriff's Department to establish a 30-bed JBCT Program at the San Diego Central Jail. DSB oversees the management of the JBCT program, which is operated by Liberty Healthcare. This program speeds up the justice



process by allowing inmates to be locally restored to competency to stand trial, rather than waiting for an available bed at a state hospital.

As part of DSB's effort to expand jail mental health services, additional Mental Health Clinician positions were added from 2017-2019 to provide day-to-day clinical services. These services are a part of the Inmate Safety Program and promote mental health stability. The collaborative team effort between physicians, clinicians, nursing staff, custody staff, law enforcement partners, court services, and community partners contributed to improved communication and case management.

Although scrutiny from certain media outlets has focused on jail deaths and tried to convince others that the Department has inadequate healthcare services within our detention facilities, we are heading in the right direction. Providing daily care and treatment for the more than 5,600 inmates in our custody is no small challenge, and the demands for mental and medical care are on the rise. We have met those demands and continue to improve our facilities and services.

While we have achieved compliance with a substantial number of the compliance indicators, we continue to work toward full compliance. Many of the standards require new policy and procedure to be written and this process continues. Currently, only one other agency in California holds the distinction of NCCHC accreditation. To better meet NCCHC requirements, the department expanded mental health care service hours. We have also improved the intake screening process to more effectively identify inmates who pose a risk for suicide. In addition, changes were made to the suicide prevention training provided to staff to align with the guidelines established by the NCCHC. One of the most significant changes instituted in 2019 was the implementation of a new electronic health record system. The system helps the department provide the best possible housing, treatment, and care for each inmate.

## Reentry Services

On a scale unlike anything before, Realignment put the Sheriff in the serious business of reentry - transitioning inmates from custody into the community. While inmates are in our custody, we aggressively take advantage of that time to provide opportunities for success when they leave our custody. If we can influence their future decisions for good, we hope that it means less crime on our streets and more law-abiding

productive members in our community. To better affect the Department's own return to custody rate, we invested in reentry services-expanding vocational training, substance abuse treatment, cognitive behavioral therapy, and educational options.

The County Parole and Alternative Custody Unit (CPAC) was developed in 2012 to maximize jail bed availability by socially reintegrating low-risk offenders back into society using alternative custody programs. In July 2012, the first group of offenders were placed on electronic monitoring. Since then, approximately 500 inmates at any given time are in one of our alternative custody programs. CPAC started placing eligible offenders in the RRC in November 2012. These offenders gained job readiness skills and were encouraged to seek employment while under the supervision of the CPAC Unit. The CPAC Unit led the effort toward a reentry model in detentions and 2013 marked the first full year of the CPAC. In 2013, we enrolled a total of 1,494 participants between electronic monitoring and County Parole, resulting in a total of 60,222 bed-days saved. The CPAC program expanded its alternative custody options over the decade. In 2019, a total of 1,684 participated in the CPAC programs, resulting in a total of 104,906 bed-days saved. The CPAC program has had a good completion rate with its programs and is a crucial component of the Department's Reentry Services.

In 2018, the Department's Programming for Reentry, Support, and Stability (PROGRESS) alternative custody program was implemented. PROGRESS is a Sheriff's and County of San Diego's program under the national Stepping Up Initiative and its intent is to reduce the number of people with mental illness in our jails. Those selected for PROGRESS have been placed into a residential reentry facility in the community where they were provided with mental health programming while serving their sentence. Since the program began, it has had an average of sixteen participants at any given time. Each participant is assigned a counselor, provided cognitive behavioral therapy, and are regularly evaluated by a psychiatric



Culinary Arts Program



Landscape Program



Horticultural Program



Barista Program



Sewing Program

nurse practitioner. In addition, the counselors have worked with any participant interested in having contact with their family while in the program. This has proven to be a very integral part of participant's successful reentry into the community. PROGRESS also provided participants with individualized discharge planning, to include enrollment into community housing programs and/or drug treatment programs that have a residential component. This greatly reduced the risk of homelessness for these participants. In 2019, 48 inmates participated in the program.

We have continued to expand reentry services within our jails, with the goal of rehabilitating offenders and reducing future crime. The Department now offers nearly four dozen educational, vocational, wellness, and psycho-social programs, which empower inmates to change their way of thinking, improve their lives, and become productive members of society. The Washington Post Magazine praised Las Colinas Detention and Reentry Facility as the "gold standard" in preparing women for their return to society.

## Information Led Policing

In a lot of respects, Reentry Services was an important piece of a larger whole that included Information Led Policing (ILP). Research has shown on paper what law enforcement professionals know from experience; serious and prolific offenders pose tangible threats to communities. In 2012, we took the next step in community-oriented and problem-solving policing models and adopted the ILP model of crime fighting. Use of the ILP philosophy helps to disrupt crime more effectively than traditional random patrols.

Staff purposefully monitors prolific and serious offenders because numerous studies have shown that a relatively small portion of the population is responsible for the majority of criminal activity.

ILP provides a collective focus to target crime trends where it occurred by bringing all of the available law enforcement and community resources to bear on a given problem. ILP pairs our Department's highly trained deputies and analysts to maximize technology and implement strategies to prevent and reduce crime. This collaborative and comprehensive process was put under control of commanders at each of our stations and substations. Different communities have different law enforcement needs. From violent criminal gang infestation to loud parties to retail shoplifting, each city had its own unique set of issues. By comprehensively targeting the highest community priorities, using traditional police work, supported by sophisticated tools and professional analysts, we are able to make measurable reductions in the crime rates.

The Department is committed to a more data driven approach to public safety. ILP delivers more meaningful and measurable improvements in our communities. The Department's focus on ILP continues to show great upside potential. Since 2013, the department has progressed its ILP strategy. It now has gone beyond just the patrol stations, and is utilized in all aspects of our operations. ILP strategies are employed in our detention facilities to counter criminal threats and mitigate safety concerns posed by the actions of inmates. Ensuring the right information is available to the deputy and decision-maker when they need it is the crux of this strategy. ILP leads us towards significant and sustained impact.

## Transparency in Policing

In the latter half of the decade, focus on police injustice spurred the need for increased transparency in policing. One response by many agencies was the incorporation of body worn cameras. The Department completed an extensive vetting process in selecting its body worn camera platform, and was able to implement the Body Worn Camera (BWC) program in 2017. As part of the BWC Program, the Department established a Video Analysis Unit to coordinate, train, and manage the program. In order to ensure seamless integration into cases sent for prosecution, online access to videos was provided for the District Attorney's Office and the Public Defender. Since the implementation of the BWC Program, both the public and the deputies have had an increase in the number of positive outcomes during the encounters.

Several California bills were passed in 2019 that affect some of the core aspects of public safety service, including transparency and use of force. Changes in public safety require us to innovate boldly. Our responsive and bold innovations have made the Department a model for adaptation. Several programs developed by the Department in response to the dynamic social environment and legislative mandates of the state were requested and replicated by agencies in the region and across the state.

In the interest of law enforcement transparency, 2019 saw the passage of Senate Bill 1421 and Assembly Bill 748. Essentially extensions to the California Public Records Act, these bills require law enforcement to release information upon request by the public. Senate Bill 1421 identifies specific peace officer personnel records related to misconduct, which for years were considered confidential and required a judge's order for release, to now be available for public inspection. Assembly Bill 748 adds video and audio recordings relating to a critical incident, including body-worn camera video, to the list of records which must be released upon request. In the months following the enactment of these bills, the Sheriff's Department received hundreds of requests for records – each with its own time limit and redaction requirements for disclosure – imposing significant time and labor expenses on the Department. The Sheriff's Legal Affairs Unit provided guidance and direction, while a special team was formed to process these requests efficiently and in compliance with the law. To



Division of Inspectional Services (DIS)

lessen the burden and promote transparency, we began proactively releasing records on the Department's website, which meets the criteria established in SB1421 and Penal Code 832.7. Additionally, the Department is in the process of developing software to help facilitate and track records requests.

Another major legislative impact on law enforcement came from the Governor signing Assembly Bill 392 into law in August 2019, which went into effect on January 1, 2020. This bill amends the Penal Code definition of justifiable homicide when committed by a peace officer in the line of duty, and also amends the requirements for use of force to be "objectively reasonable." For the use of deadly force to be justifiable, it requires a threat of imminent death or serious bodily injury to the officer or another person, among other requirements. Threat of suicide or self-harm by itself does not justify deadly force. To get ahead of this change, the Department began training to the new requirements and the Division of Inspectional Services (DIS) began updating policies and procedures. DIS plays key a role in ensuring the department is not only up to date with legislation and requirements, but also assists in meeting compliance. DIS was a unit that rose out of Sheriff Gore's vision of professionalism for the department. Its core purpose is to enhance the managerial skill set by providing analyses, appraisals, recommendations, and objective assurances and consulting services.

Transparency helps to build community trust, but at the core it's about how the communities feel about how we do business; and our engagement and consistent professionalism is key. San Diego County is a community of neighborhoods; each unique and essential. The Department emphasizes community engagement and views it as the cornerstone for providing high quality service to our citizens. In 2019, we put in place a Community Relations Director to enhance consistent and energetic engagement with members of the communities we serve. The Community Relations Director assists with discussing, relaying, and clarifying our role as a public safety provider.

# OUR MISSION

WE PROVIDE THE HIGHEST QUALITY SAFETY SERVICES TO MAKE SAN DIEGO THE SAFEST URBAN COUNTY IN THE NATION.

# OUR ORGANIZATIONAL VISION

**WE EARN THE RESPECT AND THE CONFIDENCE OF THE PUBLIC AS A PROFESSIONAL PUBLIC SAFETY ORGANIZATION.**

→ We instill trust and confidence by building relationships and by being open and visible in our actions.

**WE ARE INNOVATIVE AND RESPONSIVE TO THE NEEDS OF THOSE WE SERVE AND WORK IN PARTNERSHIP WITH OUR COMMUNITIES.**

→ We are considerate and invested in the services we provide.

→ As members of the community, we are respectful and adaptive in our interactions.

**WE ATTRACT AND RETAIN HIGHLY SKILLED AND DIVERSE EMPLOYEES.**

→ We are dedicated to the development and betterment of our people.

→ Our department is a cohesive and effective team.

# OUR CORE VALUES

**HONESTY**
We are truthful in our words and in our actions.

**DIVERSITY**
We embrace the strength in the diversity of our employees and our communities.

**INTEGRITY**
As people of character and principle, we do what is right, even when no one is looking.

**FAIRNESS**
We are just and impartial in all of our interactions. Our decisions are made without personal favoritism.

**LOYALTY**
We are loyal to our department and our profession and committed to protecting the quality of life in the communities we serve.

**RESPECT**
We treat everyone with dignity, honoring the rights of all individuals.

**TRUST**
We are confident in the integrity, the ability and the good character of our colleagues.

# Strategic Plan 2020

The Department's long-term strategy is anchored in consummate professionalism, adapting to change, building partnerships, innovating solutions, and providing the highest level of professionalism in our public safety services. We achieve this success by clearly articulating priorities and strategies to guide our decision-making and resource allocations with a vision for the future rather than just a view of the present. As one of the largest law enforcement agencies in the state, we believe that professionalism reduces risk, adaptation breeds effectiveness, innovation provides efficiencies, and partnerships add depth and breadth of impact.

## Professionalism

Our intentional focus on professionalism encompasses our entire operations.

## Adaptation

Our department develops programs that become the model for other public safety agencies. Effectiveness is about doing the right things.

## Innovation

We are pioneers in public safety solutions and provide for the needs of our people and customers. Efficiency is about doing things right.

## Partnership

Our outreach, networking, and task force involvement expands our influence and presence to better impact the quality of life of our customers.




Our department is working together across functional, operational, and geographic lines to solve problems and improve performance. It is inspiring to see the teamwork and collaboration in the department.

We must stay nimble and continue to pursue excellence. As the only law enforcement agency in San Diego County that provides detentions, courts, and law enforcement services to the community, the San Diego County Sheriff's Department is often the center of attention. The decisions we make can have a great impact on our regional agency partners. Therefore, we must be cognizant of our role as leaders in the law enforcement community and act responsibly. We must be proactive and responsive to community needs and think globally as we move forward. We will continue to look for ways to leverage technology, foster innovative thinking, encourage collaborations, and be creative in our delivery of public safety services.

**To fully leverage our Department's potential, there needs to be commitment and grit from every level and across disciplines. For 2020-2021, let's "Do It Better."**

DO IT BETTER

Strategic Plan 2020






08:54
2/4

# Focus in Pursuit of the Mission:
## 2019 – Making Success Happen

As part of the department's strategic planning, the Sheriff has provided the department with a vision and given keystones to focus on throughout his tenure. These are not yearly endeavors, but more of a commitment to staying nimble.

The following is a list of the department's keystones over the past decade:

- Utilizing Innovative Technology (2012)
- Information Led Policing (ILP) (2013)
- Our People are the Priority (2016)
- Engaging with Our Communities (2017)
- Transforming and Bettering Lives (2018)

Our people diligently worked towards building on these keystones to progress the department, and in recognition of that effort, 2019 was all about "Making Success Happen." The following is not an exhaustive list, but these accomplishments demonstrate the department's pursuit of making success happen.

## Creating the Culture of Mentorship

The Sheriff's Department is comprised of bright and talented employees. For those driven to help lead the organization in making success happen, mentoring will be key. Mentoring helps the Sheriff's Department prepare, retain, and develop current and future leaders in the organization. This year, the department took several steps to instill the foundation for the culture of mentorship: revamped the formal **Mentorship Program**, kicked off the quarterly **Mentoring Mixers**, and created the Sheriff's **Mentorship Lottery**. The formal Mentorship Program is akin to the Big Brother/Big Sister program with the mentor assisting the mentee in all aspects to make them better people and better employees. The Mentoring Mixer is a series of short, focused interactions between a mentee and a variety of mentors. It's a spin on speed mentoring and provides an open invitation for mentees to ask questions that range from practical advice related to specific needs to more philosophical questions about their careers. The Sheriff's Mentorship Lottery allows for the Undersheriff and select executives to mentor a career minded supervisor to best prepare for advancement into a role of greater responsibility within the department. The mentees are randomly selected in a lottery and paired with an executive.





## Appointment of Sheriff's Chief Medical Officer



After an extensive search and the interviewing of several highly qualified candidates, the Sheriff appointed **Dr. Jon Montgomery** to the position of Sheriff's Chief Medical Officer. Since joining the department in April 2019, Dr. Montgomery has led our medical team in developing best practices in primary care, implementing a new electronic health record system, building systems that meet the requirements for accreditation by the National Commission on Correctional Health Care (NCCHC), expanding the jail mental health program, and building new collaboratives with agency partners and community stakeholders.

Dr. Montgomery is a native of Seattle, Washington. Dr. Montgomery retired from the United States Navy serving his last post as the Medical Officer and Department Head of Operations for the Navy Environmental and Preventive Medicine Unit (NEPMU) Five. He also served as an assistant professor for Preventive Medicine at the Uniformed Services University.

## Appointment of Crime Lab Director



**Jennifer Harmon** joined the department in August 2019 and brought with her more than 11 years of crime lab management and leadership experience, with her most recent position as the Orange County Crime Laboratory's Assistant Director over the Forensic Chemistry Bureau. Ms. Harmon's teams have implemented new sexual assault kit evaluation and processing in both DNA and Toxicology, including the navigation of newly obligated state legislation; oversaw restructuring of stakeholder satisfaction surveys delivering actionable feedback; identified stakeholder training to improve overall case processing and customer service; and ensured maintenance of the laboratory's international accreditation.

Ms. Harmon's focus is creating a laboratory culture of customer service, quality, and industry best practice. Ms. Harmon spent 18 years with the Orange County Crime Laboratory and is a forensic toxicologist by technical training. She is the current president of the California Association of Crime Laboratory Directors, past president of the California Association of Toxicologists, and sits on a technical advisory panel for the International Association of Chiefs of Police. She joined the Sheriff's department with significant forensic laboratory, legislative, and public administration expertise.











## Appointment of Community Relations Director



In March 2019, **Nadia Binderup**, the Sheriff's Department Community Relations Director, began her work in strengthening and building partnerships within our communities through outreach and education regarding the services provided by the Sheriff's Department.

## LGBTQ+ Awareness Training

The Sheriff's Department partnered with the San Diego History Museum to utilize the LGBTQ+ Triumphs and Struggles exhibit as part of the LGBTQ+ Awareness Training provided to 650 attendees, both sworn and professional staff. The training provides participants with a general understanding of LGBTQ+ identities, basic terms and vocabulary, including the distinction between sexual orientation, gender identity, and gender expression. Photos Courtesy of the San Diego History Center

## Implementation of Techcare

In September 2019, the department deployed and implemented the electronic health records system, Techcare, after over two years of development and collaboration with the vendor, Naphcare. This new system assists staff in timely gathering of an inmate's health history to ensure appropriate access to care and treatment. In addition, the capabilities of a stand-alone electronic health record assists providers in identifying trends and issues to prevent complications from potential chronic disease. Techcare substantially increases operational efficiencies that give health providers more time to spend with patients to address their needs.

## De-escalation Training

De-escalation is a combination of tactical communication with a balanced use of force response to critical situations in order to achieve positive outcomes. This thought process has been taught for years to our sworn personnel, but never completely formalized in naming, policy, or training. In August 2018, the department created a working group to develop a formal plan to incorporate formal de-escalation training. Members of that group attended the Los Angeles Police Department's (LAPD) De-escalation course at the Granada Hills Academy. The course was a four-hour course with class instruction and practical exercise. The Department worked with LAPD to develop its own course. In 2019, the approved course began to be provided to deputies through the academy and in both the Continuous Professional Training (CPT) and the Standards and Training for Corrections (STC) training cycles. In 2019, approximately 1,690 deputies were provided the training in order to better respond to and manage critical incidents.

## Cyber Security and Risk Awareness Training

In 2019, the department's Data Services Division developed a Cyber Security and Risk Awareness Training that was provided to all employees by December 2019. The training is a mitigation strategy and is a tool to equip employees with knowledge to better prevent against cyber threats to the department. This training was specifically designed to enhance employee awareness to the cyber threats and to inform them of best practices to avoid allowing any type of intrusion to the department's network. This is essential as most intrusions and attacks prey on the ignorance or trust of company personnel to gain access the networks. A cyber-attack would not only degrade the integrity of data systems but, it could adversely affect the delivery of our services to the community.






## Reentry Services Science Program Collaboration with UCSD

In 2019, University of California, San Diego (UCSD) has introduced new science workshops at East Mesa Reentry Facility. This program consists of a series of lessons sharing a scientific theme, taught by a cohort of biology PhD students at UCSD. The theme of each cohort varied, but some are specifically aligned with the vocational trades, for example, the science of food for the culinary vocation. Each lesson consists of a lecture-style component where new material is presented, as well as a lab activity. In the lab, students perform hands-on experiments, build models of concepts in biology, practice developing and testing hypotheses, connect scientific topics to their everyday experiences, and develop creative solutions to scientific problems. A total of 42 students completed this class in 2019.

## Transparency with the SB 978 Department Webpage

The Department created the webpage in response and compliance to Senate Bill 978 (SB 978). Effective January 1, 2020, SB 978 required all local law enforcement agencies and the Commission on Peace Officer Standards and Training (POST) to post on their websites all current standards, policies, practices, operating procedures, and education and training materials that would otherwise be available to the public through a California Public Records Act (CPRA) request. Representatives from each of the Department's bureaus worked throughout 2019 to identify, assess, and subsequently redact countless documents, videos and other materials in order to meet the new law's mandate. The Department posted online over 1,000 files on December 30, 2019 to comply with the new law.

## Awards Received

**On August 20, 2019, Corporal Carlos Rueda and Deputy Analorena Barron were presented with the California Peace Officers' Association's (CPOA) Award of Valor.**



This award recognizes acts that demonstrate the nobility of the policing profession and the public safety officers must have exhibited extraordinary courage, decisiveness and presence of mind, and unusual swiftness of action, regardless of personal safety, in an attempt to save or protect human life. On Wednesday, November 21, 2018, at approximately 3:56 am, deputies from the San Diego Sheriff's Department Imperial Beach substation received a radio call of a house on fire at 1235 Iris Avenue. Corporal Rueda and Deputy Barron arrived on scene a few minutes later. Corporal Rueda saw the fire and noticed there were several residential apartment units within the property. He immediately grabbed a fire extinguisher from a patrol vehicle and attempted to extinguish the fire but it was spreading quickly. Corporal Rueda and Deputy Barron made the decision to begin evacuating the complex. They knocked on every door, checked all apartments, and alerted residents of the fire. Deputy Barron carried a disabled juvenile out of a neighboring home to take him to safety. During the evacuation of the complex, Corporal Rueda suffered second degree burns while protecting the residents.

**Two of the Sheriff's Department's registered nurses were recognized as the San Diego Padres' Top 10 Nurse Heroes.**



Janneth Gaspar and Nicole Baca were nominated and subsequently selected. Excerpts from their nomination are as follows:

**Nicole Baca:** *"...represents all that it means to be a nurse, from "small" gestures like helping an elderly inmate bathe to heroic gestures like being one of two nurses a suicidal woman would trust."*

**Janneth Gaspar:** *"She works tirelessly to care for her inmate patients, in an often-thankless position. Not only does she work the night shift...but she comes in every day with a smile on her face and joy in her heart."*

## 2019 National Association of Counties (NACo) Achievement Award for "Programming for Reentry, Support, and Stability (PROGRESS)" in the category of Criminal Justice and Public Safety.

The San Diego County Sheriff's Department and the County of San Diego joined the national Stepping Up Initiative in 2016. The initiative's goal is to reduce the number of people with mental illnesses in jails. Programming for Reentry, Support and Stability, or PROGRESS, is an alternative custody program that encapsulated the tenets of the national Stepping Up Initiative. In 2019, 58 participants received programming through PROGRESS.




## 2019 National Association of Counties (NACo) Achievement Award for "Project In-Reach" in the category of Criminal Justice and Public Safety.

**Project In-Reach** is an outreach and engagement program designed to help incarcerated individuals living with serious mental illness (SMI) and co-occurring disorders as they prepare for re-entry into the community. Program goals include educating clients about mental health, substance dependence and coping mechanisms, decreasing instances of relapse, diminishing the impact of untreated health, mental health and/or substance use issues, and reducing recidivism. Services primarily target African American and Latino Transition Age Youth (TAY) ages 18-24 and adults who have been historically unserved or underserved in traditional environments.




SHERIFF




SAN DIEGO COUNTY SHERIFF
SHERIFF




SHERIFF
Ford
1443820



# Safest Urban County

Our mission at the Sheriff's Department continues to be accomplished: make San Diego the safest urban county in the nation. Though the term "safest" includes more than just safety from crime rates are widely used as a performance measure of public safety agencies. Crime rates in 2019 were the lowest in the past three decades in Sheriff's jurisdictions. In 1985, the crime rate was at 33.80; that means 33.80 crimes were committed per 1,000 population. In 2019, the crime was down to 13.43. That's a dramatic difference. For context, crime rates per 1,000 ranged from under 3 to over 50 in 2014 when the crime rates of counties across the nation were compiled. It is also important to point out that overall public safety is a result of not only law enforcement efforts, but also the prosperity of a region. San Diego County provides ample access to good jobs, good schools at every level of instruction, an abundance of amenities, and extensive civic engagement.




The FBI's Uniform Crime Reporting (UCR) Program is a nationwide, cooperative statistical effort of nearly 18,000 city, university and college, county, state, tribal, and federal law enforcement agencies voluntarily reporting data on crimes brought to their attention. Since 1930, the FBI has administered the UCR Program and continued to assess and monitor the nature and type of crime in the Nation. The program's primary objective is to generate reliable information for use in law enforcement administration, operation, and management; however, its data have over the years become one of the country's leading social indicators. The UCR Program divides offenses into two groups, Part I and Part II crimes. The UCR Part I Crimes are what is represented in the crime rates listed above. These UCR Part I Crimes include: murder, rape, robbery, aggravated assault, burglary, motor vehicle theft, larceny theft, and arson.

(source: "Uniform Crime Reporting Statistics" U.S. Department of Justice, Federal Bureau of Investigation. https://ucrdatatool.gov/abouttheucr.cfm

Safest Urban County






REFUGEES







# True Spirit of Outreach

Community safety is at the forefront of the Sheriff's Department's priorities. This is not possible without the support and engagement of the communities we serve.

In this effort, the Sheriff's Department views our communities as our number one partner in the mission to make San Diego the safest urban county in the nation. Sheriff's deputies, analysts, and crime prevention specialists work hard each day to answer calls for service while they proactively work to deter crime. The Sheriff's Department is in the forefront of outreach and relationship building as we engage the communities we serve in dialogue and outreach events which range from school activities to safety preparedness trainings. In 2019, the Sheriff's Department took part in nearly 1,800 community outreach engagement activities across the region. With these events and community interactions the Sheriff's Department builds upon existing relationships with our communities which keeps us all safer.



As proof of our dedication to public service, the Sheriff's Department hired a dedicated Community Relations Director who serves as a conduit between the Department and the community. The Community Relations Director provides expanded and consistent outreach and community engagement which reinforces the efforts of each patrol station. The Community Relations Director supports the work of the deputies in the field with consistent public outreach. This interaction deepens the understanding of community needs and allows the department to better lend itself to the community. The Community Relations Director bridges the gap between law enforcement and previously underserved communities. The deeper conversations and dialogue which results, provides better service and more profound outreach than was possible in the past.

Because of this enhanced outreach, it has become possible to build rapport with community members who experience challenges and who may not share in the same opportunities. In leveraging those partnerships across many sectors, the Sheriff's Department has developed relationships with the International Rescue Committee - San Diego (IRC) which empowers and supports the education of refugee community members in terms of public safety. In this outreach effort, deputies illustrate when to call 9-1-1 for emergency law enforcement services. Many refugees come from countries and cultures where law enforcement is often feared. Learning how to navigate American Law Enforcement is an important educational piece and introducing them to that process is an important first step in assimilation to our country. This relationship also benefits the deputies who develop a keener understanding of cultural needs and differences within the immigrant communities.

The Community Relations Director also bridges the gap between deputies and faith-based communities, youth, local non-profit groups, social justice advocates, the LGBTQ+ community and persons with disabilities. The Sheriff's Department continues to prioritize community partnerships to create safer environments and a deeper understanding of mutual areas of concern.





## Homeless Assistance Resource Team

In June of 2019, the San Diego County Sheriff's Department created the Homeless Assistance Resource Team (HART). The team consisted of two deputies who were supervised by the Sheriff's Analysis Driven Law Enforcement (SADLE) sergeant. The deputies were tasked with conducting homeless outreach operations in the unincorporated areas of San Diego County. These operations were used to identify the population of the homeless, conduct environmental cleanups, and work with service providers to offer resources to assist homeless individuals with a path to permanent housing. Deputies worked in partnership with several agencies and service providers during these operations.



From September 30, 2019 to November 30, 2019, the HART was assigned to participate in the East County Homeless Action and Outreach pilot program at the request of the San Diego County Health and Human Services Agency (HHSA). This pilot program paired a HHSA Human Services Specialist with HART deputies to conduct homeless outreach three times a week in El Cajon, Lakeside, and Spring Valley. During the pilot period, the HART conducted 144 reported contacts; 131 of which accepted some type of resource or service offered. Since the HART began collecting data for its reporting beginning on September 17, 2019, they contacted 218 homeless individuals, of which 197 accepted some form of service and 25 were successfully housed.



Prior to the formation of the HART, law enforcement agencies across the region, to include the Sheriff's Department and the San Diego Police Department, incorporated HHSA in their Homeless Outreach Teams (HOT). SDPD has had three (3) HHSA Human Service Specialists and a PERT clinician assigned to their HOT. Prior to and since the East County pilot program, the HART conducted field outreach operations throughout the county and partnered with as many as ten separate agencies, both public and private, to provide the maximum amount of resources during each contact.





# Duty of a Deputy

## Mass Casualty Event at the Chabad of Poway

On Saturday, April 27, 2019, Jewish worshippers congregated at the Chabad of Poway in observance of the final day of Passover services. At about 11:30 am, our deputies' courage and tactics were tested when a 19-year-old gunman, armed with a semi-automatic rifle, opened fire on approximately 100 Jewish worshippers inside the Chabad. This lone gunman shot and killed Lori Kaye, then wounded Rabbi Goldstein, Almog Peretz, and 8-year-old Noya Dahan.

The quick and heroic actions of Oscar Stewart and off-duty Border Patrol Agent Johnathan Morales, both of whom were attending the service, resulted in the suspect fleeing the Chabad thus preventing further injury or death on scene. Through this chaos, calls for help and assistance were calmly and efficiently fielded by our emergency dispatchers at the Sheriff's Communications Center.

Within minutes, deputies from the Poway Sheriff's Station and other Sheriff's stations, as well as partner agencies, arrived at the Chabad. The deputies immediately responded and rushed towards danger to selflessly provide emergency medical care, searched for the suspect, and helped victims escape to safety. Their high level of professionalism and cooperation were on display as deputies worked with partner agencies, preserved the scene, set control of the perimeter and traffic, managed witnesses, and established the incident command post.

Fortunately, the suspect was detained a short distance away by a San Diego Police officer and no further injuries were caused by the suspect.

Deputies are not just **first responders**, they are **investigators**. The initial response to the attack is only part of the duty of a deputy. Sheriff's detectives from several divisions worked diligently to collect evidence and conduct dozens of interviews, and additionally mined open source information to discover the suspect's manifesto and other key information. Deputies, along with Sheriff's support staff, worked without much rest through multiple operational periods to complete these tasks.

These investigative efforts resulted in the suspect's arraignment on state charges for murder and attempted murder with hate crime and gun enhancements. Additionally, the suspect was arraigned on 109 federal charges.

It is also part of the duty of a deputy to be a **steward of public safety**, which means providing prevention and response education to mitigate the risks of an attack. Since this evil and cowardly act, we have seen a county wide surge in reports of suspicious activity, threats of school and hate-based violence, and fear of domestic terrorism. In response, our department collaborated with local, state and federal agencies in the region, as well as partners in the private sector, to conduct multiple training exercises and preparedness drills. In October 2019, deputies in the North County participated with several agencies in an active shooter drill at the San Diego Zoo Safari Park in Escondido. In November 2019, we practiced our response to a large-scale coordinated terrorist attack on multiple locations across the county. This massive exercise was coordinated by the County Office of Emergency Services (OES) and involved multiple law enforcement and fire departments, as well as area hospitals, in near simultaneous simulated attacks on the LEGOLAND amusement park in Carlsbad and the North Island Credit Union Amphitheatre in Chula Vista.

Always a duty of the deputy is to be a **member of their community**. Deputies went above and beyond in the areas of community engagement. Deputies attended vigils, protected religious communities in all areas of the county, and contacted religious leaders and parishioners of all faiths.






San Diego County Sheriff's Department
"Keeping The Peace Since 1850"
William D. Gore, Sheriff
www.sdsheriff.net


I LOVE THIS BOY
CAUTION








SAN DIEGO COUNTY
SHERIFF

# 2019 BY THE NUMBERS

THE DEPARTMENT IN BRIEF

**4,693** EMPLOYEES

- 2,634 SWORN
- 2,000 PROFESSIONAL
- 59 RESERVES



**$967,106,780** BUDGET

SERVING **944,000** RESIDENTS

CONTRACTED BY **9 CITIES** TO PROVIDE LAW ENFORCEMENT SERVICES

ACHIEVED A **5.9%** REDUCTION IN REPORTED UCR PART I CRIME

MADE **21,468** ARRESTS

CLEARED **20,784** WARRANTS

COMPLETED **218,297** DEPUTY INITIATED ACTIONS

RESPONDED TO **222,499** CALLS FOR SERVICE

SERVED **4,342** EVICTION NOTICES

CIVIL DIVISION PROCESSED **37,775** DOCUMENTS

SERVED **8,769** RESTRAINING ORDERS



CRIME LAB COMPLETED **13,989** CASES

PROVIDED DAILY CARE TO AN AVERAGE OF **5,630** INMATES

PREPARED **6.9 MILLION** MEALS FOR INMATES



HANDLED **78,088** BOOKINGS INTO CUSTODY



EXHIBIT PAGE NO. 1421

# Department Organization Chart
# May 2020




Staff Officer
Chief Legal Advisor Legal Affairs
Legal Advisors (3) Legal Affairs
Paralegal I
Admin Secretary II
Senior Policy Advisor Strategic Planning
Lieutenant Standards & Compliance Inspectional Services
Reserve Assistant Sheriff
Lieutenant Public Affairs
Admin Sec III
Admin Sec III
Executive Director Management Services Bureau
Admin Sec III CSB
Assistant Sheriff Court Services Bureau/Human Resources
Admin Sec III HRSB
Manager Employee Relations
Director Support Services
Manager Contracts and Grants
Chief Finance Officer Fiscal Services
Manager Wireless Services/RCS
Commander CSB
Commander HRSB
Project Manager
Project Manager Facilities Mgmt
Project Manager Facilities Planning
Project Manager Fleet
Manager Records & Identification
Project Manager Facilities & Special Projects
Procurements
Revenue Contracts
Grants
Administrative Secretary II
Finance Officer Budget & Revenue Mgmt
Finance Officer Financial Services
Admin Manager PAA
SR Radio Comm. Engineer
SR IT Engineer Radio Network
Operations Manager Subscriber Services
Radio Network Ops Supervisor
NextGen Program Manager
Civil Offices Legal Support Manager
Civil Offices Legal Support Supervisor II
Legal Support Supervisor San Diego
Legal Support Supervisor Chula Vista
Legal Support Supervisor El Cajon
Legal Support Supervisor Vista
Hall of Justice (HOJ)
Captain Area 1 Courts and CSB Field
Lieutenant San Diego & Training
Lieutenant Field/CAC/ WET
Sergeant 1st - 3rd Floors
Sergeant 4th - 9th Floors
Sergeant 10th - 14th Floors
Sergeant 15th - 18th Floors
Sergeant 19th - 22nd Floors
Sergeant SDCCT/ Admin
Sergeant Investigations /Security/ Training
Sergeant Control/IC
Sergeant HOJ/CSOs
Sergeant Holding
2 Sergeants San Diego
Sergeant Chula Vista/ El Cajon
Sergeant Vista
Sergeant CAC/ Waterpark Enforcement Team
Sergeant Vista Admin/ Dispatch
Sergeant Vista No. Annex/ Training
Sergeant Vista So. Annex/ Weapons Screening
Captain Area 2 Courts
Lieutenant Chula Vista/ Kearny Mesa/ Juvenile/ El Cajon
Sergeant Chula Vista Weapons Screening/ Holding Tanks
Sergeant Chula Vista
Sergeant El Cajon Weapons Screening/ Holding Tanks
Sergeant El Cajon
Sergeant Kearny Mesa
Sergeant Juvenile
Lieutenant Vista
Lieutenant Internal Affairs
Captain HRSB
Lieutenant Training
Lieutenant Weapons Training
Manager Risk Mgmt
Senior DHRO Payroll
Senior DHRO MLU
Captain Personnel
Lieutenant Backgrounds
Lieutenant Career Path
Manager Human Resources
Senior DHRO

Appendix

# Department Demographics

## All Department Full Time Staff

| Race | Count | % |
|---|---|---|
| American Indian/Alaska Native | 22 | 1% |
| Asian | 655 | 15% |
| Black/African American | 277 | 6% |
| Hispanic/Latino | 1259 | 29% |
| Native Hawaiian/Other Pacific Islander | 91 | 2% |
| White | 2018 | 47% |







- Asian
- Hispanic/Latino
- White
- Black/African American
- Native Hawaiian/Other Pacific Islander
- American Indian/Alaska Native

## Sworn Staff







| Race | Count | % |
|---|---|---|
| American Indian/Alaska Native | 18 | 1% |
| Asian | 169 | 6% |
| Black/African American | 156 | 6% |
| Hispanic/Latino | 850 | 32% |
| Native Hawaiian/Other Pacific Islander | 51 | 2% |
| White | 1428 | 53% |

## Department Budget

| | Fiscal Year 2017-18 Actuals | Fiscal Year 2018-19 Adopted Budget | Fiscal Year 2018-19 Amended Budget | Fiscal Year 2018-19 Actuals | Fiscal Year 2019-20 Adopted Budget | Fiscal Year 2020-21 Projected Budget |
|---|---|---|---|---|---|---|
| Detention Services | $316,824,923 | $333,173,658 | $341,629,166 | $332,534,663 | $351,250,018 | $364,913,753 |
| Law Enforcement Services | 268,993,018 | 283,796,081 | 313,448,663 | 276,773,917 | 306,227,733 | 288,065,976 |
| Sheriff's Court Services | 66,462,446 | 68,693,107 | 71,259,505 | 66,414,235 | 72,581,170 | 75,190,379 |
| Human Resource Services | 29,339,215 | 30,269,757 | 31,853,923 | 30,709,285 | 30,618,206 | 31,596,508 |
| Management Services | 38,698,735 | 48,284,794 | 51,245,506 | 39,286,219 | 49,637,331 | 42,193,668 |
| Sheriff's ISF / IT | 93,382,657 | 104,916,377 | 146,777,227 | 100,613,305 | 126,767,457 | 105,697,603 |
| Office of the Sheriff | 5,924,021 | 6,903,412 | 7,193,810 | 6,152,754 | 7,525,731 | 7,556,062 |
| Sheriff's Asset Forfeiture Program | 947,737 | 5,277,262 | 8,417,690 | 906,305 | 1,079,496 | – |
| Jail Commissary Enterprise Fund | 10,496,954 | 11,088,808 | 13,325,470 | 11,502,165 | 10,360,321 | 10,393,289 |
| Sheriff's Inmate Welfare Fund | 7,286,532 | 9,909,022 | 14,359,593 | 8,035,049 | 10,776,517 | 10,967,483 |
| Countywide 800 MHZ CSA's | 292,143 | 266,500 | 375,802 | 352,445 | 282,800 | 221,377 |
| **Total** | **$838,648,381** | **$902,578,778** | **$999,886,354** | **$873,280,341** | **$967,106,780** | **$936,796,098** |

# Sheriff Activity

| Command | Calls for Service (CFS) | Deputy Initiated Action (DIA) | Felony Arrests (Adult & Juvenile) | Misdemeanor Arrests (Adult & Juvenile) | Total Arrests (Adult & Juvenile)* |
|---|---|---|---|---|---|
| 4S Ranch | 2,192 | 4,374 | 25 | 27 | 53 |
| Alpine | 5,668 | 7,774 | 175 | 701 | 892 |
| Fallbrook | 11,729 | 8,177 | 203 | 599 | 840 |
| Imperial Beach | 12,885 | 15,520 | 197 | 488 | 709 |
| Lakeside | 17,655 | 10,714 | 327 | 892 | 1,254 |
| Lemon Grove | 13,015 | 6,785 | 245 | 714 | 991 |
| Non-Contract Cities | 16 | 6 | 1,016 | 1,352 | 2,490 |
| North Coastal | 25,345 | 34,460 | 324 | 1,047 | 1,390 |
| Poway | 11,123 | 19,184 | 72 | 427 | 510 |
| Ramona | 7,243 | 5,310 | 134 | 332 | 480 |
| Rancho San Diego | 27,752 | 18,921 | 547 | 1,397 | 2,014 |
| Rural Enforcement | 6,944 | 7,571 | 224 | 308 | 550 |
| San Marcos | 26,381 | 14,405 | 354 | 1,027 | 1,456 |
| Santee | 15,141 | 27,080 | 260 | 1,137 | 1,422 |
| Valley Center | 5,160 | 3,362 | 251 | 443 | 714 |
| Vista | 34,047 | 22,672 | 758 | 2,173 | 3,207 |
| Court Services | 8 | 5,338 | 349 | 429 | 813 |
| Detention Facilities | 106 | 5,023 | 569 | 920 | 1,527 |
| Unknown Beat | 73 | 1,615 | 42 | 17 | 62 |
| Out of County | - | - | 79 | 12 | 94 |
| **Total** | **222,483** | **218,291** | **6,151** | **14,442** | **21,468** |

Source: CAD for CFS & DIA and NetRMS for Arrests
*Total Arrests include: infraction/citations, other juvenile court and mental hospital releases

# National Incident-Based Reporting System (NIBRS)

Beginning in 2018, the San Diego County Sheriff's Department began utilizing the National Incident-Based Reporting System (NIBRS). It was implemented to improve the overall quality of crime data collected by law enforcement, which was traditionally just captured via the Unified Crime Reporting (UCR) standard. NIBRS captures details on each single crime incident – as well as on separate offenses within the same incident – including information on victims, known offenders, relationships between victims and offenders, arrestees, and property involved in crimes. Unlike data reported through the UCR Program's traditional Summary Reporting System (SRS) – an aggregate monthly tally of crimes – NIBRS goes much deeper because of its ability to provide circumstances and context for crimes like location, time of day, and whether the incident was cleared.

| | NIBRS Category | YTD 2019 | YTD 2018 |
|---|---|---|---|
| **Crimes Against Persons** | Assault Offenses | 9,735 | 9,387 |
| | Homicide | 20 | 29 |
| | Kidnapping/Abduction | 168 | 178 |
| | Sex Offenses, Forcible | 418 | 461 |
| | Sex Offenses, Non-Forcible | 20 | 35 |
| | **Total** | **10,361** | **10,090** |
| **Crimes Against Property** | Arson | 51 | 82 |
| | Burglary/Breaking & Entering | 1,848 | 2,080 |
| | Counterfeiting/Forgery | 498 | 445 |
| | Destruction/Damage/Vandalism of Property | 2,539 | 2,704 |
| | Embezzlement | 57 | 76 |
| | Extortion/Blackmail | 35 | 36 |
| | Fraud Offenses | 1,887 | 2,007 |
| | Larceny/Theft Offenses | 3,646 | 3,824 |
| | Robbery | 489 | 513 |
| | Stolen Property Offenses | 1,227 | 1,295 |
| | Theft from Vehicle Offenses | 2,866 | 3,292 |
| | Vehicle Theft | 1,665 | 1,696 |
| | **Total** | **16,808** | **18,050** |
| **Report Total:** | | **27,169** | **28,140** |

| | NIBRS Category | YTD 2019 | YTD 2018 |
|---|---|---|---|
| **Crimes Against Society** | Drug/Narcotic Offenses | 10,083 | 9,147 |
| | Gambling Equip. Violations | 0 | 0 |
| | Pornography/Obscene Material | 6 | 19 |
| | Prostitution Offenses | 34 | 27 |
| | Weapon Law Violations | 947 | 948 |
| **Report Total:** | | **11,070** | **10,141** |

Source: NetRMS
YTD- Jan-Dec 2019
Excludes: Out of county, Unknown Beats

## UCR PART 1 CRIME

# Violent Crime

| | | CASES YOY |
|---|---|---|
| Homicide | -21.7% | 2018 \| 23<br>2019 \| 18 |
| Rape | -11.9% | 2018 \| 218<br>2019 \| 192 |
| Robbery | - 5.9% | 2018 \| 526<br>2019 \| 495 |
| Aggravated Assault | - 0.6% | 2018 \| 1,846<br>2019 \| 1,835 |

# Property Crime

| | | |
|---|---|---|
| Burglary | - 9.0% | 2018 \| 1,951<br>2019 \| 1,775 |
| Residential Burglary | -13.6% | 2018 \| 1,025<br>2019 \| 886 |
| Commercial Burglary | - 4.0% | 2018 \| 926<br>2019 \| 889 |
| Larceny - Theft | - 8.2% | 2018 \| 6,793<br>2019 \| 6,239 |
| Vehicle - Theft | 1.9% | 2018 \| 1,671<br>2019 \| 1,703 |

Source: ARJIS
YTD- January to December
Includes Courts, Detentions, Non-Contract Cities, and Grossmont & Cuyamaca Colleges


SHERIFF
San Diego County Sheriff's Department
William D. Gore, Sheriff
www.sdsheriff.net















**Main Office**

John F. Duffy
Administrative Center
9621 Ridgehaven Court
San Diego, CA 92123

**Mailing Address**

P. O. Box 939062
San Diego, CA 92193-9062

Phone (858) 565-5200
Fax (858) 974-2244

@SDSHERIFF on
Twitter and Instagram

SDSHERIFF
On YouTube and Vimeo

**SDSHERIFF.NET**
**JOINSDSHERIFF.NET**

Scan this QR Code with your phone to link to the San Diego County Sheriff's website.

# EX 53

## ADVISEMENT TO READER

Please be advised that this exhibit contains accurate, but **graphic, post-mortem images** of the decedent, William Hayden Schuck, in this matter. Counsel is including these images, with the consent of Mr. Schuck's family, because they are relevant to consideration of this motion.

CONFIDENTIAL




CSD000384

CONFIDENTIAL




CSD000382

CONFIDENTIAL




CSD000376

CONFIDENTIAL



CSD000373

# EXHIBIT 54

Exhibit 76
Lt. Aaron Boorman
10/4/24
Julia Lennan, CSR 12843

San Diego County
SHERIFF

William D. Gore
Sheriff

Detention Services Bureau, In-Service Training Unit
Telephone: (619) 258-3111

June 18, 2021 **TRAINING BULLETIN** Page 1 of 1

# Signs & Symptoms of Withdrawal

Withdrawal symptoms can range from mild physical discomfort to severe life-threatening symptoms such as seizures or cardiovascular collapse. The symptoms of withdrawal can range from mild to moderate depending on the level of drug and/or alcohol use, the individual health of the user and various other factors. Some common signs and symptoms of withdrawal are listed below.

**OPIOIDS**

- Tremors
- Yawning
- Restlessness
- Gooseflesh
- Dilated pupils
- Nausea and vomiting
- Hot and cold flushes
- Body/Joint aches
- Level of consciousness
- Discharge from eyes and nose

**OVERLAPPING**

- Perspiration
- Agitation
- Diarrhea
- Anxiety
- Insomnia
- Hallucinations
- Disorientation
- Rapid heart rate

**ALCOHOL**

- Fever
- Headache
- Palpitations
- High blood pressure
- Withdrawal seizures

This Training Bulletin was prepared by the Detention In-Service Training Unit in collaboration with the Medical Services Division. If you have expertise in a particular subject and would like to write a training bulletin, please contact the Detention In Service Training unit at InserviceTrainingUnit.Detentions@sdsheriff.org.

During the performance of your duties, you will encounter individuals in our custody at various stages of withdrawal. It is important to be observant for any symptoms and potential decline in their overall condition. Always notify health staff if you see that an individual is in need of medical assessment.

**DSB P&P M.5**

"All facility staff shall be responsible for taking appropriate action in recognizing, reporting or responding to an inmate's emergency medical needs. In any situation requiring medical response, emergency medical care shall be provided with efficiency and speed without compromising security.

If the inmate's condition is believed to be life threatening, sworn staff shall immediately notify on-duty health staff and provide basic life support (BLS) and/or first aid care."

**For more information, please refer to Sheriff's Department Detention Services Bureau Policy and Procedure Manual section M.5 Medical Emergencies and** M.6 Life Threatening Emergencies: Code Blue.