1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

ESTATE OF WILLIAM HAYDEN
SCHUCK, by and through his successors-
in-interest Sabrina Schuck and Timothy
Schuck; et al.,

                          Plaintiffs,

v.

COUNTY OF SAN DIEGO; et al.,

                          Defendants.

Case No.:  23-cv-785-DMS-AHG

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY
JUDGMENT**

Following the death of William Hayden Schuck ("Schuck") in San Diego Central Jail on March 16, 2022, Schuck's parents, Sabrina and Timothy Schuck, on behalf of Schuck's estate and in their individual capacities as Schuck's next of kin, sued the County of San Diego ("the County"), Correctional Healthcare Partners ("CHP"), and employees of the two entities for constitutional and state-law violations.  Pending before the Court are County Defendants'[1] Motion for Summary Judgment, (County MSJ Mot., ECF No. 109),

---

[1] "County Defendants" are the County of San Diego, William Gore, Kelly Martinez, Jon Montgomery, Jessica Ramirez, Justin Page, Allan Valbuena, Jameelyn Barrera, Romeo DeGuzman, Emily Lymburn, Carina Echon, Jennifer Vivona, Thomas Mace, and Jeff Amado.

and Defendants CHP and Nicholas Kahl's Motion for Summary Judgment, (CHP MSJ Mot., ECF No. 110).  Plaintiffs filed Oppositions, (County Opp'n (ECF No. 125), CHP Opp'n (ECF No. 121)), and Defendants filed Replies, (County Reply (ECF No. 136), CHP Reply (ECF No. 138)).  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** County Defendants' Motion and **GRANTS IN PART** and **DENIES IN PART** Defendants CHP and Kahl's Motion.

## I.    BACKGROUND

### A. The County and CHP

The County operates multiple jails within its territory.  In 2022, the California State Auditor issued a report documenting that from 2006–20, 185 in-custody deaths occurred in County jails.  (County Opp'n Ex. 46 at 1).  Eighteen deaths also took place in 2021, the year before Schuck's death.  (*Id.* at 14).  The number of detainee deaths in San Diego County has historically been higher than in comparable counties, including Alameda, Riverside, and Orange.  (*Id.* at 16).  At the time of Schuck's death, Sheriff Kelly Martinez was the Sheriff and Dr. Jon Montgomery was the Chief Medical Officer for the County's Sheriff's Department.  (TAC, ECF No. 78 at 6–7); (County Opp'n Ex. 52 at 1, 14).  Just prior to his death, Sheriff William Gore was the Sheriff and Sheriff Martinez was the Undersheriff.  (TAC 6); (County Opp'n Ex. 52 at 1).

In October 2020, CHP contracted with the County to provide medical services in County jails.  (CHP MSJ Ex. M at 45); (*see generally* CHP Opp'n Ex. 1).  Pursuant to the contract, CHP "provide[s] on-site physicians" for "sick call and specialty clinic services." (*Id.* at 24–25); (CHP MSJ Ex. M at 17–18).  It also "works closely" with the Sheriff's Department to ensure that medical care in County jails conforms with "acceptable standards." (CHP Opp'n Ex. 1 at 27).  CHP employees are responsible for treating patients on their sick call and chart check lists.  (*Id.* at Ex. 2 at 19–21, 98); (CHP MSJ Ex. W at 51–53).  While sick calls and chart checks are practices that have existed for many years, they do not appear to be governed by formal guidelines.  (CHP Opp'n Ex. 2 at 19–21; Ex. 19 at

28).   During March 2022, the month of Schuck's incarceration and death, Dr. Peter Freedland was the president and CEO of CHP.  (*Id.* at Ex. 2 at 16).

**B. Schuck's Incarceration**

On the morning of March 10, 2022, Schuck was involved in a rollover motor vehicle accident.  (County MSJ Ex. A at 32); (CHP MSJ Ex. F at 676); (County Opp'n Ex. 1 at 18–19).  At the scene of the accident, police arrested him for driving under the influence of a controlled substance and for carrying several firearms.  (CHP MSJ Ex. A at 741, 746–47; Ex. B at 1–2).  While Schuck seemed well enough to perform the field sobriety tests, he failed several of them.  (County MSJ Ex. A at 32); (CHP MSJ Ex. A at 746–47).  As he sat in the back of a police car during his arrest, Schuck appeared disoriented: he had bulging eyes, held his face between his legs, and spoke to a girlfriend who was not present.  (County Opp'n Ex. 3 at 1:12:24 P.M.–1:12:52 P.M.).

Following his arrest, Schuck was transported to San Diego Central Jail.  Schuck's transporting officer described his behavior as "erratic" and "consistent with someone under the influence of methamphetamines."  (*Id.* at Ex. 1 at 24).  Nurse Manuel Nozawa "gate refused" Schuck at the jail, finding that he needed medical clearance first.  (*Id.* at Ex. 7 at 633); (County MSJ Ex. B at 633).  As a result, Schuck went to the emergency department at the University of California, San Diego ("UCSD") Hospital.  However, beyond an initial physical examination by Dr. Kyle Rourke, Schuck refused treatment and left UCSD against medical advice.  (CHP MSJ Ex. F at 676).  Dr. Rourke documented that Schuck demonstrated sufficient understanding to refuse treatment.  (*Id.* at Ex. G at 36).

In Schuck's UCSD After Visit Summary ("AVS"), Dr. Rourke wrote that Schuck had been involved in a motor vehicle accident; "refus[ed] medical evaluation, [but] ha[d] medical decision-making capacity"; and had "[n]o obvious signs of trauma or illness but occult injury [was] possible given mechanism."  (*Id.* at Ex. F at 676).  Dr. Rourke was not "overtly concerned" about an occult injury but noted its possibility because he had wanted to notify jail staff that if Schuck started presenting abnormal symptoms, he should be evaluated for one.  (*Id.* at Ex. G at 23–24, 43).  The AVS also stated Schuck's vital signs.

3

At the time of his visit, his pulse was 95 and his blood pressure was 142/102. (*Id.* at Ex. F at 676). According to the American Heart Association ("AHA"), Schuck's blood pressure was "high" and amounted to Hypertension Stage 2. (CHP Opp'n Ex. 23). However, it did not alarm Dr. Rourke because, typically, traumatic injuries result in lower blood pressure and the stress of the emergency room elevates blood pressure. (CHP MSJ Ex. G at 44; Ex. AF at 5).

After refusing treatment, the police brought Schuck back to San Diego Central Jail. He arrived wearing an unbuttoned shirt and no shoes. (County Opp'n Ex. 8 at 9:09:28 P.M.–9:09:43 P.M.). Nurse Jameelyn Barrera cleared him for booking. (*Id.* at Ex. 7 at 642–43). Nurse Barrera noted that Schuck made "grandiose statements" and did not understand the booking process. (*Id.* at 658). For instance, he asked to take photos of his medical records with his phone even though it had shattered during his motor vehicle accident. (*Id.*). He also asked for twenty dollars to give to the nurse for water. (*Id.*). She scheduled him to see a qualified mental health practitioner ("QMHP") as a result. (*See id.*). Despite his behavior, Nurse Barrera felt Schuck was fit for booking because she did not see obvious signs of trauma, broken bones, or bleeding. (County MSJ Ex. D at 116).

Later that evening, while in a holding cell, Schuck continued to demonstrate odd symptoms. At 10:07 P.M., he picked up a discarded milk carton off the floor and drank from it. (County Opp'n Ex. 14 at 10:07:39 P.M.–10:07:59 P.M.).

Because of the COVID-19 pandemic, Schuck was unable to move to a regular housing unit. Instead, he was placed in the "Back 40," which was historically not used for housing because "sometimes [jail staff] would not know that [detainees] were back there." (*Id.* at Ex. 44 at 61). The holding cells in the "Back 40" contained metal benches and a bathroom. (*Id.* at Ex. 33 at 88–89). When detainees stayed in the "Back 40" during the time of Schuck's incarceration, they generally were not given a mattress, blanket, or access to a shower. (*Id.*). No evidence suggests that Schuck received these necessities.

On the morning of March 15, 2022, four deputies saw Schuck in his cell talking to himself and not wearing pants. (*Id.* at Ex. 18 at 13, 15; Ex. 20 at 8:01:45 A.M.–8:01:59

A.M.). The cell was a "mess," with food "smothered" on the walls, windows, and floor. (*Id.* at Ex. 18 at 15; Ex. 19 at 16). There was also a brown substance that gave off a "terrible smell." (*Id.* at Ex. 18 at 15–16; Ex. 19 at 19). The smell made the deputies think it was fecal matter. (*See id.*). The deputies brought Schuck to Medical because they "wanted to get him medically cleared before sending him down for [his court appearance]." (*Id.* at Ex. 18 at 23–24).

At Medical, Nurse Romeo DeGuzman evaluated Schuck. (*Id.* at Ex. 21 at 29); (County MSJ Ex. F at 29). When the deputies presented Schuck to Nurse DeGuzman, he was wearing a wet shirt smeared with blood and no pants. (County Opp'n Ex. 21 at 29, 31). He also had a wound on his lower leg. (*Id.* at 29). Nurse DeGuzman thought Schuck was "alert," "responsive," "ambulatory," and "not in respiratory distress." (County MSJ Ex. F at 41–42). However, he simultaneously observed that Schuck was "disorganized," "nonsensical," "uncooperative," "naked," "not healthy mentally," and had an elevated blood pressure of 148/96. (County Opp'n Ex. 7 at 659; Ex. 21 at 42, 124). Schuck also reported to Nurse DeGuzman that he had used acid in the streets. (*Id.* at Ex. 7 at 659). Nurse DeGuzman asked Schuck a series of questions, took his vital signs, referred him to a mental health clinician, requested a medical chart review of his AVS from UCSD, and placed him on the sick call list for a wellness check. (County MSJ Ex. F at 44–45); (County Opp'n Ex. 7 at 658; Ex. 21 at 44–45).

Schuck then went to court for his arraignment. (CHP MSJ Ex. O at 1). Public Defender Stephen Trenholme represented him. (County MSJ Ex. W at 2). Public Defender Trenholme requested the court to make a referral within the jail for medical attention. (*Id.*). The judge agreed, "refer[ring] [Schuck] to the jail mental health unit as soon as possible to determine if medications [were] appropriate." (*Id.* at 3). The resulting court order stated that the court "refers [Schuck] to jail medical to be screened for medications." (*Id.* at Ex. AC at 85, Dep. Ex. 18); (County Opp'n Ex. 7 at 679).

Later in the afternoon, at 4:12 P.M., Nurse Nicholas Kahl completed the "medical chart review" requested by Nurse DeGuzman. (CHP MSJ Ex. V at 660). Nurse

5

DeGuzman's request was for an advanced practitioner to "[r]eview [the] scanned discharge order from UCSD." (*Id.* at Ex. K at 658). Nurse Kahl reviewed the AVS and documented that "no new orders" had been placed by Schuck's treating doctor at UCSD. (*Id.* at Ex. V at 660). He also requested that nursing staff obtain a release of information ("ROI") for Schuck's "full" records from his UCSD visit, including "all physician notes," because, besides the AVS, none of Schuck's other UCSD medical records were accessible to him. (*Id.* at Ex. V at 660; Ex. W at 79). Nurse Kahl did not review Schuck's jail medical records because he thought that reviewing a detainee's medical file occurred through a sick call, not a chart check. (CHP Opp'n Ex. 3 at 70, 83).

At around 5:30 P.M., Deputy Alan Griffith brought Schuck back to the jail from court. (CHP MSJ Ex. O at 1); (County MSJ Ex. G at 54). When Deputy Griffith retrieved Schuck, he was told that Schuck was acting "odd, weird, and not following instructions." (County Opp'n Ex. 28 at 48). He observed that Schuck "drift[ed]" and "wander[ed] off." (*Id.* at 49). When Schuck spoke, Deputy Griffith could not understand him: he "mumble[d]," sounding like somebody who had their "wisdom teeth [out]" or a "cotton ball in their mouth." (*Id.* at 51). Deputy Griffith brought Schuck to Deputy Allan Valbuena, the deputy responsible for the receipt of detainees returning from court. (County MSJ Ex. G at 54–55); (County Opp'n Ex. 29 at 39). During their initial exchange, Deputy Griffith told Deputy Valbuena that Schuck's court appearance was "cut short"; that Schuck was "cross-chained" because he was "acting odd and weird"; and that Schuck "need[ed] to go see [M]edical." (*Id.* at Ex. 28 at 57); (County MSJ Ex. G at 57). According to Deputy Griffith, he communicated to Deputy Valbuena that Schuck needed to be seen "soon" or "within a reasonable time," which he considered to be "within the hour." (County Opp'n Ex. 28 at 72).

Deputy Valbuena saw Schuck sitting on the floor in a place where detainees do not normally sit. (*Id.* at Ex. 29 at 40, 45, 47). When Deputy Valbuena asked Schuck what was wrong, Schuck said he was thirsty. (*Id.* at 40, 43, 47). Deputy Valbuena asked Deputy Griffith if he would walk with him to bring Schuck to the second floor. (*Id.* at Ex. 28 at

57).  Deputy Griffith agreed, and the two guided Schuck to his holding cell.  (*Id.* at Ex. 29 at 40–41, 45, 48).  During this escort, Schuck appeared to be "walking just fine."  (County MSJ Ex. H at 49).  Deputy Valbuena then notified a deputy on the second floor that Schuck "probably" needed to see Medical.  (County Opp'n Ex. 29 at 54–55); (County MSJ Ex. G at 59–60).  He made this recommendation because he thought that Schuck "had shown possible signs of detoxing," including dehydration and weakness.  (County Opp'n Ex. 29 at 41, 54–55).  The deputy acknowledged Deputy Valbuena's request.  (County MSJ Ex. G at 60).  After dropping Schuck off, Deputy Valbuena did not check whether Schuck received the medical attention he suggested.  (County Opp'n Ex. 29 at 84).

At around 8:15 P.M., Deputy Jessica Ramirez and Deputy Justin Page escorted Schuck from his holding cell in the "Back 40" to a housing module on the seventh floor, called "7 David" ("7D").  (*Id.* at Ex. 33 at 48, 50); (County MSJ Ex. K at 12–13).  Deputy Ramirez thought that Schuck "[v]isually . . . looked fine" because he "wasn't flush," "wasn't bleeding," and "was breathing."  (County Opp'n Ex. 33 at 67).  Deputy Page thought similarly, finding nothing remarkable about his appearance.  (County MSJ Ex. L at 75).  However, they observed him acting "childlike" and demonstrating "abnormal behavior": he pretended to row a canoe and to call his mom with a hand phone while in his cell.  (County Opp'n Ex. 33 at 66–67); (County MSJ Ex. K at 51, 66–67).  Deputy Ramirez and Deputy Page handcuffed Schuck to bring him to 7D.  (*Id.* at 67).  Although handcuffs are not required to move detainees between floors, they used them because Schuck's unpredictability raised safety concerns.  (*Id.* at Ex. K at 67; Ex. L at 74).  In the elevator, Schuck claimed to be Spiderman and attempted to climb the walls.  (*Id.* at Ex. K at 79).

While walking to the housing module, Schuck ended up on the ground twice.  (*Id.* at 79–80, 102–03); (County Opp'n Ex. 32 at 8:20:10 P.M.–8:21:10 P.M.).  According to Deputies Ramirez and Page, Schuck claimed he needed to urinate.  (County MSJ Ex. K at 102–03; Ex. L at 76).  After he was back on his feet, the Deputies walked him to 7D and dropped him off.  (*Id.* at Ex. K at 103); (County Opp'n Ex. 33 at 105).

7

Roughly an hour later, at approximately 9:30 P.M., Nurse Carina Echon received the court order from Schuck's arraignment that day. (*Id.* at Ex. 7 at 660; Ex. 35 at 69). Nurse Echon reviewed the court order and found that it only required Schuck to be screened for medication, not to be seen promptly by a doctor. (County MSJ Ex. I at 81); (County Opp'n Ex. 35 at 74). She then went to Schuck's profile and saw that he already had a sick call scheduled. (County MSJ Ex. I at 81). As a result, she did not take further action. (*Id.* at 75); (County Opp'n Ex. 35 at 80). Nurse Echon did not detail her thought process in her progress notes. (*Id.*).[2]

On the morning of March 16, 2022, Deputy Jeff Amado and Deputy Thomas Mace conducted several safety checks on Schuck. (County MSJ Ex. M at 27; Ex. N at 16). At around 9:05 A.M., Deputy Amado went with Nurse Loraine Gallegos to Schuck's cell. (County Opp'n Ex. 36 at 9:07:00 A.M.–9:07:15 A.M.; Ex. 38 at 41; Ex. 39 at 47–48). Nurse Gallegos brought an ROI form for Schuck to sign so his parents could receive his medical information. (*Id.* at Ex. 38 at 35–37). When Nurse Gallegos called Schuck's name, he did not come to the door. (*Id.* at 41). She noticed that Schuck had quarter-sized, red sores on his back. (*Id.* at 43–44). She also remembered that he was facing the wall, lying down, and mumbling while she was trying to get his attention. (*Id.* at 45, 47). Deputy Amado, by contrast, recalled Schuck standing in his cell and walking away from them. (*Id.* at Ex. 39 at 48). They left his cell a little more than a minute later. (*Id.* at Ex. 36 at 9:07:00 A.M.–9:08:20 A.M.).

Nurse Gallegos then spoke with Nurse Emily Lymburn about evaluating Schuck's wounds and getting him to sign the ROI form. (*Id.* at Ex. 38 at 48–50). At 9:13 A.M., Nurse Lymburn and Deputy Mace went to Schuck's cell to conduct a wellness check and to obtain his signature. (*Id.* at Ex. 36 at 9:13:40 A.M.–9:13:55 A.M.; Ex. 40 at 66, 70);

---

[2] Her notes also included an incorrect comment that Schuck refused his jail sick call because she misread Nurse Kahl's entry, which discussed Schuck's refusal of treatment at UCSD. (County Opp'n Ex. 35 at 74, 79).

(County MSJ Ex. O at 12). The purpose of the wellness check was to determine if Schuck was going through withdrawal. (*Id.* at 65); (County Opp'n Ex. 40 at 37). According to Deputy Mace, Schuck was facing the wall, naked, and covered in bed sores during the wellness check. (*Id.* at Ex. 41 at 108–09, 111). The sores "looked like they had been scabbed and then broken open," as though Schuck had been "struggling with [them]" for a "period of time." (*Id.* at 111). When Deputy Mace initially "banged on the door," he remembered Schuck saying "fuck you" or "fuck off" to get him to leave. (*Id.* at 108, 112).

Nurse Lymburn also observed that Schuck was "naked," "skinny," and "laying down on his left side facing the wall." (*Id.* at Ex. 7 at 660; Ex. 40 at 70–71). While she found Schuck's "[r]espirations [were] even and unlabored," he also did not engage with or respond to her. (*Id.* at Ex. 7 at 660; Ex. 40 at 65). Nurse Lymburn asked him to move his leg as a "sign of life," and he did so. (*Id.* at Ex. 40 at 65). Because he followed directions by moving his leg, Nurse Lymburn decided against opening the food flap to converse with him further. (*Id.* at 72).

After leaving Schuck's cell, Nurse Lymburn checked on one more patient in her housing module. (*Id.* at 66, 95–96). She then went to the clinic on the third floor to get medical attention for Schuck. (*Id.*). Nurse Lymburn told Nurse Jennifer Vivona that Schuck needed to see Medical "now" because his wounds "didn't look good" and he "wasn't answering her questions." (*Id.* at 96); (County MSJ Ex. P at 54). Nurse Vivona sent Deputy Alexander Cortez to bring Schuck from 7D to the clinic. (*Id.*).

At 9:37 A.M., Deputy Cortez arrived at Schuck's cell. (County Opp'n Ex. 37 at 9:37:00 A.M.–9:37:05 A.M.). He called out to Schuck three or four times, but Schuck did not respond. (County MSJ Ex. Q at 74). Because Schuck was not responsive, Deputy Cortez used his radio to request that Deputies Amado and Mace assist him inside Schuck's cell. (*Id.* at 76). They pulled his body out of 7D at 9:39 A.M. (County Opp'n Ex. 37 at 9:38:40 A.M.–9:39:50 A.M.). Despite their attempt at lifesaving measures, Schuck was pronounced dead at 10:18 A.M. (*Id.* at Ex. 37 at 9:39:50 A.M.–9:42:15 A.M.; Ex. 50 at 36). Schuck's autopsy revealed that he died from complications relating to cocaine and

methylenedioxymethamphetamine ("MDMA") toxicity. (*Id.* at Ex. 50 at 44). Following Schuck's death, the jail staff involved received no feedback, guidance, training, or discipline by the County. (*Id.* at Ex. 21 at 154–55; Ex. 29 at 17–18, 73–74; Ex. 33 at 129–33; Ex. 34 at 88–90; Ex. 35 at 100–01; Ex. 38 at 73–74; Ex. 39 at 90; Ex. 40 at 140–41).

## C. Procedural History

On April 28, 2023, Plaintiffs initiated this action. (ECF No. 1). After several rounds of motions to dismiss, Plaintiffs filed their Third Amended Complaint ("TAC") on August 12, 2024. (*See generally* TAC). The TAC asserts nine causes of action: (1) violation of the Fourteenth Amendment for deliberate indifference under 42 U.S.C. § 1983 (against Individual Defendants); (2) violation of the Fourteenth Amendment's substantive due process protections under 42 U.S.C. § 1983 (against Individual Defendants); (3) violation of the Fourteenth Amendment for deliberate indifference under 42 U.S.C. § 1983 (against Defendants County and CHP); (4) violation of the Fourteenth Amendment's substantive due process protections under 42 U.S.C. § 1983 (against Defendants County and CHP); (5) violation of California Civil Code § 52.1; (6) violation of California Government Code § 845.6 for failure to summon medical care; (7) negligence; (8) negligent training and supervision; and (9) wrongful death. (*Id.* at 34–51). Defendants move for summary judgment on all claims. (*See generally* County MSJ Mot.); (*see also* CHP MSJ Mot.).

## II.    PRELIMINARY MATTERS

There are three matters the Court must address before evaluating the substance of Defendants' Motions. First, Plaintiffs have moved to strike County Defendants' lodgment of and related declaration about a voicemail from Public Defender Trenholme. (Mot. to Strike, ECF No. 120). Second, the parties dispute whether several videos produced in discovery of Schuck's time in jail should be publicly filed. (Public Filing Mot., ECF No. 122). Third, Plaintiffs do not oppose the dismissal of all claims against Nurse Vivona and the dismissal of their § 1983 claims against Nurse Barrera. (County Opp'n 19, 32).

### A. Motion to Strike

Plaintiffs request that the Court strike exhibits relating to Public Defender Trenholme's voicemail for lack of authentication and failure to produce in discovery. (Mot. to Strike 2).  In support of their Motion for Summary Judgment, County Defendants lodged a voicemail that Public Defender Trenholme left for Steven Houk, the Claims and Investigator Supervisor at the Office of County Counsel.  (County MSJ Houk Decl.).  In that voicemail, Public Defender Trenholme read from notes he took during Schuck's arraignment about Schuck's behavior.  (*See id.*); (Strike Opp'n, ECF No. 133).  County Defendants also filed a declaration from Investigator Houk about the circumstances of the voicemail.  (*See generally* County MSJ Houk Decl.).

### a. Authentication

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  Because "[a]uthentication is a condition precedent to admissibility," the Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."  *Id.* (internal quotation marks omitted) (collecting cases).  To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a); *see also United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002) (for authentication of audio tapes, party seeking to introduce evidence bears burden of demonstrating "that the proffered tape is a true, accurate[,] and authentic recording of the conversation between the parties").  A telephone call may be authenticated by evidence "that a call was made to the number assigned at the time to . . . a particular person, if circumstances, including self-identification, show that the person answering was the one called."  Fed. R. Evid. 901(b)(6).

The Court finds there is enough evidence to authenticate Public Defender Trenholme's voicemail.  In his declaration, Investigator Houk stated that he received a voicemail from Public Defender Trenholme after he contacted the Office of the Public

Defender to reach him. (County MSJ Houk Decl.). In the voicemail itself, Public Defender Trenholme not only self-identifies by stating his name, but confirms this sequence of events. (*See id.*). Further, Public Defender Trenholme's email to Plaintiffs and his voicemail to Investigator Houk include similar statements by Public Defender Trenholme that he is available predominantly in the evening because he is in court all day. (*See id.*); (Mot. to Strike Ex. A); Fed. R. Evid. 901(b)(4) (distinctive characteristics of evidence is sufficient for authentication). Therefore, the Court declines to strike Public Defender Trenholme's voicemail (and related exhibits) on authentication grounds.[3]

### b. Failure to Produce in Discovery

Under Federal Rule of Civil Procedure 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The party facing sanctions bears the burden of demonstrating the late disclosure was substantially justified or is harmless." *Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032, 1045 (S.D. Cal. 2019), *aff'd,* 814 F. App'x 194 (9th Cir. 2020) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001)).

Plaintiffs contend that County Defendants should have produced the voicemail in response to broad discovery requests for information related to Schuck's incarceration and death. (Mot. to Strike 2–4). The Court agrees. Even accepting County Defendants' representation that Public Defender Trenholme is not a "County employee," (Strike Opp'n 2), the voicemail appears responsive to several of Plaintiffs' discovery requests, including

---

[3] Plaintiffs' argument that "the voicemail is not a proper substitute for testimony via declaration under penalty of perjury or an affidavit under oath" is also unavailing. (Mot. to Strike 5). At the summary judgment stage, "a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). Rather, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Est. of Hernandez-Rojas v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014). Plaintiffs' argument is premised on the form of the voicemail, not its substance.

Request for Production 4 ("All Documents, Information, and Communications related to William Hayden Schuck's incarceration and death at the County jail."), Request for Production 47 ("All Documents, Information, and Communications related to any witness statements, including spontaneous statements or statements made in interviews, reports, or complaints, relating to William Hayden Schuck's health or medical condition."), and Request for Production 48 ("All Documents, Information, and Communications related to any witness statements, including spontaneous statements or statements made in interviews, reports, or complaints, relating to William Hayden Schuck's death."), (Mot. to Strike 2–3). *See also Ruiz v. RSCR Cal., Inc.*, 683 F. Supp. 3d 1079, 1090 (C.D. Cal. 2023) (granting request to strike exhibits because it was "not disputed that Plaintiff requested information about Defendant's policies and procedures related to any medical and/or personal leaves in its interrogatories and requests for document production"). Ultimately, observations from Public Defender Trenholme that Schuck appeared only mentally, not physically, unwell are relevant to Schuck's medical condition in the days leading up to his death.

County Defendants have not demonstrated that their failure to produce is substantially justified or harmless. In terms of substantial justification, County Defendants state that they did not know about the existence of the voicemail during the discovery period. (County Opp'n 2). They fail, however, to explain *why* they did not know about the voicemail, considering that it was left by Investigator Houk on the County's shared drive. (*See id.*). Regarding harmlessness, County Defendants assert that Plaintiffs could have contacted Public Defender Trenholme before filing their Opposition. (*See id.*). Although true, the fact that Plaintiffs could have refuted the evidence at the last moment does not show a lack of harm: to the contrary, the late disclosure prevented Plaintiffs from thoroughly investigating the voicemail, deposing Public Defender Trenholme about his notes, or asking other witnesses about Schuck's condition at his arraignment. *See Algaier v. Bank of Am., N.A.*, 2015 WL 5944177, at *7 (E.D. Wash. Oct. 13, 2015), *aff'd,* 691 F. App'x 497 (9th Cir. 2017) ("Moreover, this failure is not harmless: discovery has now

13

closed and trial is nearly one month away. As such, Defendants have lost the opportunity to investigate these documents, question Plaintiffs about these letters in a deposition, or prepare an adequate defense."); *see also Chisholm*, 383 F. Supp. 3d at 1045 (finding harm from failure to disclose until summary judgment stage because "the untimely disclosure deprived 7-Eleven of the opportunity to ask Plaintiff, or any of the other deposed witnesses, about the document"). As such, the Court **GRANTS** Plaintiffs' Motion to Strike Public Defender Trenholme's voicemail and Investigator Houk's related declaration (ECF Nos. 109-7, 109-9).

**B. Motion to Permit Public Filing of Video Evidence**

Plaintiffs would like to publicly file several videos of Schuck while in custody in support of their Oppositions to Defendants' Motions for Summary Judgment. (Public Filing Mot. 2). County Defendants oppose the public filing of Exhibits 17, 20, 23, 24, 27, and 32 because they jeopardize the safety and security of detainees and jail staff. (Public Filing Opp'n, ECF Nos. 132, 134).

"Courts have long recognized 'a general right to inspect and copy public records and documents, including judicial records and documents.'" *Rieckborn v. Velti PLC*, 2014 WL 4964313, at *1 (N.D. Cal. Oct. 3, 2014) (quoting *Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 597 (1978)). However, "[t]his right is not absolute. To balance the competing interests of the public's right of access against litigants' need for confidentiality, a party seeking to file under seal materials related to dispositive motions must provide 'compelling reasons' to do so." *Id.* (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). Under this standard, "a party seeking to seal materials must 'articulate compelling reasons supported by specific factual findings,' providing the court with 'articulable facts' identifying the particular interests favoring secrecy and showing how those interests outweigh the 'strong presumption' favoring disclosure." *Id.* (quoting *Kamakana*, 447 F.3d at 1178–81). A summary judgment motion is a dispositive pleading, and the "'compelling reasons' standard is invoked even if the dispositive motion, or its

attachments, were previously filed under . . . protective order." *Kamakana*, 447 F.3d at 1179.

The "compelling reasons" standard applies because a summary judgment motion is a dispositive motion that is "more than tangentially related to the underlying cause of action." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1099 (9th Cir. 2016); *see also Kamakana*, 447 F.3d at 1179. The Court finds that County Defendants have met their burden: they identified a compelling justification for sealing—security—and narrowly tailored their request only to those exhibits "contain[ing] video of hallways, entrances, and exits that are not viewed by the public and disclose the locations and camera angles of the cameras in those areas." (Public Filing Opp'n 1); *Ortiz v. City & Cnty. of San Francisco*, 2020 WL 2793615, at *8 (N.D. Cal. May 29, 2020) (sealing jail surveillance video that shows layout of jail, entry and exit points, and angles of cameras). As a result, the Court **DENIES** Plaintiffs' Motion to publicly file Exhibits 17, 20, 23, 24, 27, and 32.[4]

### C. Dismissals

Plaintiffs no longer appear to move forward with their claims against Nurse Vivona. (County Opp'n 32) ("Plaintiffs do not oppose dismissal of Nurse Vivona."); (*see generally id.*) (presenting no evidence and making no arguments with respect to Nurse Vivona's conduct). They also do not oppose the dismissal of their § 1983 claims against Nurse Barrera. (*Id.* at 19, 32). The Court therefore **DISMISSES** Nurse Vivona from this case and **DISMISSES** Plaintiffs' § 1983 claims against Nurse Barrera.

## III.    LEGAL STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The moving party must identify

---

[4] The public filing of Exhibits 25, 30, 36, and 37 is no longer opposed by County Defendants. The Court **GRANTS** Plaintiffs' Motion as to these exhibits.

the pleadings, depositions, affidavits, or other evidence that it "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

The burden then shifts to the opposing party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324. The opposing party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, to avoid summary judgment, the opposing party cannot rest solely on conclusory allegations. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Instead, it must designate specific facts showing there is a genuine issue for trial. *Id.*; *see also Butler v. San Diego Dist. Att'y's Off.*, 370 F.3d 956, 958 (9th Cir. 2004) (stating if defendant produces enough evidence to require plaintiff to go beyond pleadings, plaintiff must counter by producing evidence of his own). "The district court may not weigh the evidence at the summary judgment stage but should focus on whether there are any triable issues of fact." *France v. Johnson*, 795 F.3d 1170, 1177 (9th Cir. 2015), *as amended on reh'g,* (Oct. 14, 2015).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy[,] and inexpensive determination of every action." *Celotex*, 477 U.S. at 327. "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.*

# IV.    DISCUSSION

## A. 42 U.S.C. § 1983

### a.  Individual Defendants

Plaintiffs' first and second causes of action are for violation of the Fourteenth Amendment's Due Process Clause under 42 U.S.C. § 1983. (TAC 34–37). Plaintiffs bring their first cause of action as successors-in-interest and their second cause of action as individuals. (*See id.*).

"Traditionally, the requirements for relief under [§] 1983 have been articulated as: (1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). "Individuals in state custody have a constitutional right to adequate medical treatment." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 667 (9th Cir. 2021) (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). For pretrial detainees, this right arises under the Due Process Clause of the Fourteenth Amendment. *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)). The Ninth Circuit applies an "objective deliberate indifference" standard to Fourteenth Amendment claims alleging a pretrial detainee received deficient medical care. *Gordon v. Cnty. of Orange* (*Gordon I*), 888 F.3d 1118, 1124–25 (9th Cir. 2018). Under this standard, pretrial detainees alleging that jail officials failed to provide constitutionally adequate medical care must show:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125) (alteration in original).

The parties dispute the second, third, and fourth factors under *Gordon*. As for the second, there is a "substantial risk of . . . serious harm" if there is a "serious medical need, such that a failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Gordon I*, 888 F.3d at 1125; *Russell v. Lumitap*, 31 F.4th 729, 739 (9th Cir. 2022) (internal quotation marks omitted). This includes the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014)). Conditions causing death are serious medical needs. *Id.* ("Russell's aortic dissection was indeed a 'serious' medical need, as it resulted in his death.").

"To satisfy the third element [of *Gordon*], the plaintiff must show that the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Sandoval*, 985 F.3d at 669 (quoting *Gordon I*, 888 F.3d at 1125). This means "that the defendant disregarded an excessive risk to the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021) (internal quotation marks and brackets omitted). "A defendant can be liable even if he did not actually draw the inference that the plaintiff was at a substantial risk of suffering serious harm, so long as a reasonable official in his circumstances would have drawn that inference." *Russell*, 31 F.4th at 739.

The fourth factor is causation. To succeed on a § 1983 claim, the plaintiff "must demonstrate that [the defendant's] conduct was both the actual and proximate cause of their claimed deprivation." *Chaudhry v. Aragon*, 68 F.4th 1161, 1172 (9th Cir. 2023). "The proximate cause question asks whether the unlawful conduct is closely enough tied to the injury that it makes sense to hold the defendant legally responsible for the injury." *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067, 1076 (9th Cir. 2018). Whether proximate cause exists turns on foreseeability. *Id.* Intervening causes "break the chain" of proximate

causation and preclude § 1983 liability.  *See Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) ("Applying these principles to this case, we must determine whether, as a matter of law, Stanewich's private actions were intervening causes which preclude any County liability for alleged negligent hiring or supervision.").

The Court will now examine the relevant facts with respect to each individual Defendant.

### i. DeGuzman

According to County Defendants, Nurse DeGuzman did not act with deliberate indifference towards Schuck because he treated Schuck when he was alert, responsive, and ambulatory; cleaned Schuck's wounds; and made sure that Schuck was scheduled for a mental health evaluation.  (County MSJ Mot. 11).

Plaintiffs, however, put forth evidence painting a more concerning picture of Schuck's condition at the time of Nurse DeGuzman's examination.  Nurse DeGuzman examined Schuck after four deputies found Schuck talking to himself and not wearing pants.  (County Opp'n Ex. 18 at 13, 15; Ex. 20 at 8:01:45 A.M.–8:01:50 A.M.).  He was covered in food and what seemed to be fecal matter based on the "terrible" odor of the substance.  (*Id.* at Ex. 18 at 15–16; Ex. 19 at 16–17); (County MSJ Ex. E at 15–16).  The deputies brought Schuck to Nurse DeGuzman for medical examination to "verify whether [his behavior] was a mental issue or something else."  (County Opp'n Ex. 18 at 24); (County MSJ Ex. E at 18).  Upon Schuck's arrival, Nurse DeGuzman observed that Schuck was wounded; was wearing a soiled shirt and no pants; and was disheveled, disorganized, nonsensical, and difficult to follow.  (County Opp'n Ex. 7 at 659; Ex. 21 at 29, 42).  Schuck reported that he had used acid, and Nurse DeGuzman documented that Schuck had elevated blood pressure.  (*Id.* at Ex. 7 at 659).  By the time Schuck arrived in court later that morning, his condition was such that the judge ordered he be screened for medication.  (*Id.* at Ex. 45 at 33).

Notably, Nurse DeGuzman scheduled Schuck for wound care, psychiatric evaluation, and housing unit rounds.  (County MSJ Ex. F at 45).  However, considering

Schuck's appearance and behavior, it is disputable whether Nurse DeGuzman should have taken more immediate action. While Nurse DeGuzman testified that Schuck's vital signs were stable, a reasonable jury could find that his symptoms were nonetheless significant enough for Nurse DeGuzman to have contacted an on-call QMHP or other medical professional for additional evaluation. (*Id.* at Ex. F at 42); (County Opp'n Ex. 21 at 108). Therefore, Nurse DeGuzman is not entitled to summary judgment on Plaintiffs' deliberate indifference claims. *See Sandoval*, 985 F.3d at 670 (no summary judgment because jury could conclude that detainee's shakiness, fatigue, and disorientation indicated substantial risk of harm and defendant nurse's limited action of administering blood test was akin to reckless disregard); *see also Morton v. Cnty. of San Diego*, 2024 WL 5126281, at *22 (S.D. Cal. Dec. 16, 2024) ("As to whether Alto took measures to abate Mr. Morton's suicide risk, County Defendants rely on the fact that Mr. Morton was already placed on CIWA protocol, had received withdrawal mediation and was being monitored for withdrawal symptoms, and that Alto confirmed that a psychiatric evaluation had been scheduled . . . However, . . . the fact that these measures were in place merely bear on the objective reasonableness of Alto's decision. In light of the evidence discussed above, a reasonable jury could find that, despite the fact that these procedures were in place, it was objectively unreasonable to classify Mr. Morton as a low risk for suicide.").

### ii. Valbuena

County Defendants assert that Deputy Valbuena did not act with deliberate indifference because he told the second-floor deputy to take Schuck to Medical for evaluation. (County MSJ Mot. 12). In County Defendants' view, it was reasonable for Deputy Valbuena to let the second-floor deputy handle Schuck's medical needs because Schuck "appeared fine," with no physical symptoms. (*Id.*).

Upon review of the record, the distinction between Schuck's mental and physical wellness is not as clearcut as County Defendants describe it. When Deputy Griffith transported Schuck from court, he wandered, drifted, and appeared unable to follow directions. (County Opp'n Ex. 28 at 49). Schuck also had difficulty communicating—he

"mumble[d]" to the point where anything he said "wasn't legible to [Deputy Giffith]." (*Id.* at 50–51). Deputy Griffith compared Schuck's speech to that of someone who had their wisdom teeth out or a cotton ball in their mouth. (*Id.* at 51). When Deputy Valbuena first saw Schuck, he was sitting on the floor in an inappropriate place and complaining that he was thirsty. (*Id.* at Ex. 29 at 40, 43, 45–48). Although Deputy Valbuena testified that Schuck appeared "fine," a reasonable jury could conclude that Schuck's strange behavior was evidence of a larger—and imminently serious—medical issue. (*Id.* at 43). As such, County Defendants have not shown that Deputy "Valbuena saw nothing to indicate that Schuck was in medical distress." (County Reply 8).

There are other facts that raise doubt about the reasonableness of Deputy Valbuena's conduct as well.[5] First, Deputy Griffith told Deputy Valbuena that Schuck needed to be evaluated. (County Opp'n Ex. 28 at 57, 72). From Deputy Griffith's perspective, he communicated to Deputy Valbuena that a medical visit should occur "soon," meaning "within the hour." (*Id.* at 72). Second, Deputy Valbuena had subjective awareness; he thought that Schuck might have been detoxing or withdrawing due to his dehydration and muscle weakness. (*Id.* at Ex. 29 at 54–57). He also knew that, in borderline cases, deputies should err on the side of caution and bring an inmate to receive medical attention. (*Id.* at 119–20). Third, Deputy Valbuena did not check whether Schuck received medical care after dropping him off on the second floor. (*Id.* at 84).

Viewing the evidence in Plaintiffs' favor, there is a genuine dispute of material fact about whether Schuck's erratic behavior should have prompted Deputy Valbuena to ensure swift medical attention. Deputy Valbuena is not entitled to summary judgment.

---

[5] The Court does not find direct evidence contradicting Deputy Valbuena's testimony that he told a second-floor deputy to take Schuck to Medical. (County MSJ Ex. H at 51); (County Opp'n Ex. 29 at 54–55). To the contrary, Deputy Griffith testified that he overheard Deputy Valbuena's interaction with the deputy. (County MSJ Ex. G at 59–60). Even assuming Deputy Valbuena relayed this message, there is still a genuine issue of material fact about whether he acted reasonably under the circumstances.

### iii. Echon

County Defendants move for summary judgment on Plaintiffs' deliberate indifference claims against Nurse Echon because she never treated Schuck. (County MSJ Mot. 12). They particularly rely on the fact that Nurse Echon's role is limited in this action to reviewing the court order from Schuck's arraignment, which referred Schuck to Medical. (County MSJ Ex. I at 75–76); (County Opp'n Ex. 35 at 69).

Considering Nurse Echon's minor role in Schuck's treatment, the facts do not show deliberate indifference. Contrary to Plaintiffs' contention that "[Nurse] Echon did not schedule [Schuck] to be seen by a doctor because she misread the medical record and thought that [Schuck] refused care," she testified that she did not schedule an appointment for Schuck because he already had a nurse sick call registered for the next day. (County Opp'n 24); (County MSJ Ex. I at 75–76, 81); (County Opp'n Ex. 35 at 80). In other words, she took no action because the appointment had already been scheduled. To Plaintiffs' point, Nurse Echon acknowledged that she made a mistake in noting that Schuck refused medical care at the jail. (*Id.* at 73–74). However, her testimony does not imply that her mistake was the reason why she did not refer him to Medical.

 Further, there were no facts from which Nurse Echon could conclude that Schuck required immediate medical attention. The court order provided no sense of urgency. It stated only: "The court refers Defendant to jail medical to be screened for medications." (County MSJ Ex. AC at 85, Dep. Ex. 18). It did not state that Schuck exhibited concerning symptoms while in court or mandate that Schuck be seen promptly. The framing of the order is significant because in Nurse Echon's experience, court orders expressing urgency "always [use] the word ASAP or immediately." (*Id.* at Ex. I at 112). Although Nurse DeGuzman's entry described Schuck as being "disorganized, nonsensical, [and] disheveled," Nurse Echon had no reason to find that Schuck was at a substantial risk of harm, especially since the entry was made thirteen hours prior and Schuck had appeared at

court in the interim.  (County Opp'n Ex. 7 at 659–60).[6]  Notably, Nurse Echon never saw or observed Schuck.  (County MSJ Ex. I at 82).  She thus lacked personal knowledge about the severity of his condition.

Without an indication of immediacy from the court, no reasonable juror could conclude that Nurse Echon perceived a substantial risk of harm and acted unreasonably. She responded to the court order by ensuring that Schuck was scheduled for an evaluation the next day.  Accordingly, the Court enters summary judgment in favor of Nurse Echon on Plaintiffs' deliberate indifference claims.

### iv.  Ramirez and Page

County Defendants argue that, although Schuck exhibited odd behavior, neither Deputy Ramirez nor Deputy Page acted deliberately indifferent because they did not observe him in physical distress.  (*See* County MSJ Mot. 13).

As discussed above, the Court is reluctant to accept County Defendants' strict binary between Schuck's medical and physical symptoms.  There are facts showing that Schuck displayed disorientation and abnormal behavior.  When Deputies Ramirez and Page arrived at Schuck's holding cell to transport him to the seventh floor, he acted "childlike," pretending to canoe while sitting on the bench and to call his mom with his hand.  (County MSJ Ex. K at 51, 66–67); (County Opp'n Ex. 33 at 66–67).  As a result of this behavior, the Deputies found Schuck "unpredictable" and decided to handcuff him.  (*Id.* at 67). During the transport, Schuck claimed to be Spiderman and climbed the walls of the elevator.  (*Id.* at 85); (County MSJ Ex. K at 79).  He also fidgeted and moved his body back and forth.  (County Opp'n Ex. 34 at 76).

County Defendants discount these facts by pointing to the Deputies' assessment that Schuck "followed instructions," had "dry" skin tone, "wasn't flush," lacked visible injuries or dilated pupils, and was "breathing, talking, [and] conscious."  (County MSJ Ex. K at 66;

---

[6] Nurse DeGuzman also reported that Schuck was "[a]lert and verbally responsive, not in respiratory distress, afebrile, ambulatory."  (County Opp'n Ex. 7 at 659).

23-cv-785-DMS-AHG

Ex. L at 75–76); (County MSJ Mot. 12). They also rely on mental health disabilities being common in jails. (County MSJ Ex. Z at 56) (testimony by doctor that "nationally in the United States, close to 37 percent of incarcerated individuals have a mental health disorder"); (*see also id.* at Ex. K at 6) (testimony from Deputy Ramirez that "there's mental health issues on the streets"). However, a reasonable jury could conclude that these facts do not offset Schuck's other symptoms indicating severe cognitive decline—a mental state described by Deputy Ramirez as being akin to that of a four-year-old. (County Opp'n Ex. 33 at 66); *see Morton*, 2024 WL 5126281, at *22 ("Thus, although Mr. Morton presented to Alto as hopeful and denied suicidal ideations, Alto was also aware that in the last 12 hours he had expressed feeling suicidal and presented with several other risk factors for suicide. Therefore, based upon the totality of the record, a reasonable trier of fact could find that Alto's decision to designate Mr. Morton as a low risk for suicide was objectively unreasonable and placed Mr. Morton at a substantial risk of serious harm.").

Further, the circumstances of Schuck finding himself on the ground are disputed. According to County Defendants, Schuck "dropped his weight" and "went down to the ground" in a "controlled manner" because he needed to urinate. (County MSJ Mot. 5) (citing County MSJ Ex. K at 102–03; Ex. L at 73–76); (County Reply 6) (citing County Opp'n Ex. 32). From Plaintiffs' perspective, Schuck collapsed twice and needed the Deputies to physically lift him to his feet. (County Opp'n 13) (citing County Opp'n Ex. 32). The video evidence reasonably supports both narratives—and is therefore a jury question. On the one hand, Schuck appears to lower himself to the ground slowly, ending up in a seated position. (County Opp'n Ex. 32 at 8:20:10 A.M.–8:20:55 A.M.). This could suggest deliberateness on his part, supporting the Deputies' testimony that Schuck dropped his weight. On the other hand, before arriving on the ground, Schuck was unsteady on his feet. (*See id.*). Specifically, he hung his head, bent sharply at his waist, and looked wobbly. (*See id.*). This could imply that Schuck felt disoriented, fatigued, or dizzy, which prompted his body to slow to minimize the impact of his fall. A jury could thus conclude that Schuck fell and that such an episode of physical distress was illustrative of a substantial risk of

harm that made it unreasonable for Deputies Ramirez and Page to leave him in his cell alone.[7]  (*Id.* at Ex. 33 at 108).

Ultimately, County Defendants have failed to show no genuine dispute of material fact about the conduct of Deputies Ramirez and Page.   Summary judgment is not appropriate.

### v.  Lymburn

County Defendants characterize Nurse Lymburn's actions as objectively reasonable—and therefore suitable for resolution on summary judgment—because after she evaluated Schuck, she went to the clinic and told Nurse Vivona that Schuck needed to be brought down from his cell and evaluated "now." (County MSJ Mot. 11); (County MSJ Ex. P at 54).  In response, Plaintiffs point to the fact that Nurse Lymburn knew that Schuck was exhibiting withdrawal symptoms and still waited twenty minutes to go down to the clinic and tell Nurse Vivona that he needed medical attention. (County Opp'n 25); (County Opp'n Ex. 40 at 66, 95–96).

The Court finds that Nurse Lymburn's decision to see another patient in her housing module before personally seeking medical attention for Schuck raises a triable issue of fact about the reasonableness of her conduct.  (*See id.*).  Viewing the evidence in Plaintiffs' favor, this decision meant the difference between life and death for Schuck.

Nurse Lymburn testified that she knew Schuck was at risk of withdrawal because her sick call list stated that he had "use[d] acid." (*Id.* at 37).  She thus needed to "check[] if he[] [was] going through withdrawal from it." (*Id.*).  When she saw Schuck, he was naked and had sores on his tailbone, buttocks, elbows, and legs. (*Id.* at Ex. 7 at 660; Ex. 40 at 32).  He faced the wall and did not engage with Nurse Lymburn, even though she attempted to engage with him.  (*Id.* at Ex. 7 at 660; Ex. 40 at 65).  The only response he

---

[7] Even if a jury credits the former narrative, it could still reasonably treat Schuck's decision to sit down in the middle of a hallway while he's being transported to another destination as evidence of confusion and cognitive impairment that was symptomatic of a larger issue.  Schuck displayed sufficient disorientation for a jury to find that he could not independently see to his needs and wellbeing.

gave was moving his leg.  (*Id.* at Ex. 40 at 65, 72).  Ultimately, by the time help arrived at Schuck's cell, Schuck was dead.  (*Id.* at Ex. 37 at 9:38:00 A.M.–9:40:00 A.M.).

Looking at the totality of the record, particularly Schuck's minimal responsiveness, Nurse Lymburn's knowledge that Schuck was likely experiencing withdrawal, and Nurse Lymburn's understanding that withdrawal could be "life-threatening," a reasonable jury could find that Nurse Lymburn acted with deliberate indifference.  (*Id.* at Ex. 40 at 63, 65).  The Court declines to grant summary judgment in favor of Nurse Lymburn on Plaintiffs' deliberate indifference claims.  *See M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1078 (N.D. Cal. 2014) (denying summary judgment on deliberate indifference claim because there was "sufficient evidence for a jury to conclude that Sancho was subjectively aware of the risk of alcohol withdrawal, but failed nevertheless to fill out a CIWA form, initiate the CIWA protocol, or otherwise ensure Harrison would receive medical help").

### vi.  Amado and Mace

County Defendants argue that Plaintiffs cannot show deliberate indifference by Deputies Amado and Mace because they conducted their safety checks in accordance with stated policies and saw no evidence giving them reason to believe that Schuck was at a substantial risk of harm.  (County MSJ Mot. 14).

Deputies Amado and Mace were responsible for safety checks on Schuck the morning of his death.  (County MSJ Ex. M at 27).  While deposed, Deputy Amado stated that he conducted three safety checks on Schuck.  (*Id.*).  During these checks, Deputy Amado observed that Schuck was naked, not "very responsive," and had sores on his buttocks and legs.  (*Id.*).  However, Deputy Amado claims to have seen signs that Schuck was not in medical distress.  Between the three occasions, Deputy Amado saw Schuck standing, sitting on his stool, and nodding in reply to Deputy Amado's asking if he was okay.  (*Id.* at 27, 40).  Later in the morning, Deputy Mace also checked on Schuck.  (*Id.* at Ex. N at 108).  Like Deputy Amado, Deputy Mace noted that, although Schuck was naked and had sores on his back and buttocks, he was reactive: at one point, Schuck said "fuck you" or "fuck off" to get Deputy Mace to leave.  (*Id.* at 15, 18, 108).

Plaintiffs raise doubt as to whether Schuck acted in line with the Deputies' testimony on the morning of his death.  First, there are contemporaneous images of Schuck's cell without a stool, which discredits Deputy Amado's statement that he thought Schuck was medically stable because he observed him sitting on one.  (County Opp'n Ex. 48 at 245–50).  Second, Deputies Amado and Mace failed to mention that Schuck interacted with them to homicide detectives.  (*Id.* at Ex. 39 at 56) (Deputy Amado did not tell detectives that Schuck looked back and nodded his head); (*Id.* at Ex. 41 at 136) (Deputy Mace did not tell detectives that Schuck said "fuck you" or "fuck off").  Third, Nurse Gallegos and Nurse Lymburn had different recollections of Schuck's actions when they went to his cell with Deputy Amado and Deputy Mace, respectively.  (*Id.* at Ex. 38 at 45, 47; Ex. 40 at 65).[8] These are material facts—they go to the heart of County Defendants' argument that Schuck appeared stable, and that Deputies Amado and Mace had no facts from which to discern that he was at a substantial risk of harm.  Without these facts, a reasonable jury could conclude that Schuck was unresponsive to the Deputies, which is a clear sign of medical distress.[9]  Therefore, Deputies Amado and Mace are not entitled to summary judgment. *See Dau v. Cnty. of Imperial*, 2013 WL 2295463, at *8 (S.D. Cal. May 24, 2013) ("These factual disputes about the situation confronting the officers on the morning of Ms. Dau's death preclude entry of summary judgment in favor of Defendant Murguia.").

### vii.  Kahl

Defendants CHP and Kahl assert that Plaintiffs cannot establish the second, third, and fourth factors of their deliberate indifference claims against Nurse Kahl.  (*See* CHP MSJ Mot. 11–17).  With respect to the second factor, Defendants CHP and Kahl contend

---

[8] Whereas Deputy Amado testified that Schuck walked away from him and Nurse Gallegos during their visit, Nurse Gallegos recalled Schuck lying down.  (County Opp'n Ex. 38 at 45, 47; Ex. 39 at 48).  Shortly thereafter, during Schuck's wellness check, Nurse Lymburn testified that Schuck did not engage with her. (*Id.* at Ex. 40 at 65).  Deputy Mace, by contrast, remembered Schuck saying "fuck you" or "fuck off" so that they would leave him alone.  (*Id.* at Ex. 41 at 108, 112).
[9] Notably, Deputy Amado subjectively considers unresponsiveness a sign of distress.  (County Opp'n Ex. 39 at 43) (explaining in deposition that "obvious signs of medical distress" include when detainee is "not responsive to you").

that "Nurse Kahl's involvement in Schuck's care and treatment was limited to a chart check" and that this chart—Schuck's AVS from UCSD—had no facts suggesting that Schuck was at a substantial risk of harm. (*Id.* at 11). Plaintiffs respond that the AVS included concerning information about Schuck's health indicating a substantial risk of harm. (CHP Opp'n 15–16). Plaintiffs further respond that Nurse Kahl knew that Schuck was at risk because his training and experience would have made him aware that drugs and alcohol were involved in Schuck's motor vehicle accident and that there is a high rate of in-custody deaths at County jails. (*Id.* at 16–17).

Like Nurse Echon, Nurse Kahl never treated or interacted with Schuck.[10] The only facts available to Nurse Kahl were in Schuck's medical records. Nurse Kahl became involved with Schuck's care on March 15, 2022 because Nurse DeGuzman requested a "medical chart review" by Nurse Kahl to "[r]eview [the] scanned discharge order from UCSD" dated March 10, 2022. (CHP MSJ Ex. K at 658). The AVS alerted Nurse Kahl that: (1) Schuck had been in a motor vehicle accident; (2) Schuck had "medical decision-making capacity" and "refus[ed] medical evaluation"; and (3) Schuck had "[n]o obvious external signs of trauma or illness but occult injury [was] possible given mechanism." (*Id.* at Ex. F at 676). It also documented Schuck's vital signs, including his high blood pressure and pulse. (*Id.*).

The Court finds that the AVS was insufficient to put Nurse Kahl—or any reasonable nurse—on notice that Schuck was at a substantial risk of harm. *Russell*, 31 F.4th at 739. Plaintiffs isolate statements in the AVS that Schuck was in a motor vehicle accident, left UCSD against medical advice, and possibly suffered from an occult injury. (CHP Opp'n 15–16). The surrounding context, however, mitigates any inference of substantial harm that could be drawn from these statements.

---

[10] This is significant. What drives the analysis for many of the individual Defendants is that they witnessed Schuck display concerning symptoms.

First, the observation that Schuck had "decision-making capacity" when he refused medical evaluation intimates that Schuck was of sound mind and understood the consequences of his actions. Because this chart functioned as Nurse Kahl's limited insight into Schuck's condition, he did not have the benefit of seeing the plethora of strange symptoms that Schuck exhibited in real time. There was no indication in the AVS that Schuck made a plainly foolish or dangerous decision; to the contrary, Schuck's examining doctor, Dr. Rourke, wrote that there were "[n]o obvious external signs of trauma or illness." (CHP MSJ Ex. F at 676). Thus, although Schuck's decision to leave UCSD against medical advice demonstrates a lack of caution on his end, it does not, without more, signal that he was at a substantial risk of harm.

Second, the AVS did not suggest that Dr. Rourke was worried about an occult injury. He did not order that Schuck see another provider or describe symptoms that unsettled him. (*Id.*); (*see also id.* at Ex. M at 28) (testimony that discharge summaries typically include doctor's orders). While deposed, Dr. Rourke testified that he was not "overtly concerned" about Schuck and included the possibility of an occult injury only as a "precautionary statement." (*Id.* at Ex. G at 43–44). By the time Nurse Kahl reviewed the notation, it had already been five days since Dr. Rourke drafted the AVS, and Nurse Kahl had not received direct information that Schuck began manifesting symptoms in the interim. Plaintiffs' assertion that the AVS made Nurse Kahl aware that Schuck "could have been suffering from internal bleeding or a brain injury based on the motor vehicle crash" does not dispute the evidence that Schuck was not at a substantial risk of suffering an occult injury from his motor vehicle accident. (CHP Opp'n 16). Their argument here is ultimately a red herring: Schuck's autopsy did not show evidence that he died from lacerations, internal bleeding, or any other injuries from the motor vehicle accident. (CHP MSJ Ex. AH at 58–59).

Third, Schuck's elevated blood pressure was insufficient to raise immediate concern. Plaintiffs' general argument here is that elevated blood pressure is indicative of a medical issue necessitating medical intervention. The record does not challenge this assertion. However, it simultaneously does not show that Nurse Kahl should have been alerted to a

substantial risk of harm.  Dr. Rourke testified that Schuck's blood pressure of 142/102 did not worry him because when traumatic injuries occur, people tend to have lower blood pressures.  (*Id.* at Ex. G at 44) ("And so in this clinical situation, his blood pressure did not overtly concern me based on a traumatic presentation.").  Dr. Olugbenga Ojo, Plaintiffs' medical expert, confirmed that dehydration—which Plaintiffs argue caused Schuck's death—causes low blood pressure.  (*Id.* at Ex. AH at 22).  Therefore, a reasonable nurse would have discerned a greater risk of Schuck experiencing withdrawal and dehydration from a lower, not higher, blood pressure.

Further, neither doctor found Schuck's blood pressure objectively alarming.  Dr. Rourke testified that people have above-average blood pressures in the emergency room due to the stressful environment.  (*Id.* at Ex. G at 44).  Dr. Ojo conceded similar remarks—while deposed, he explained that a blood pressure of 142/102 is not "life threatening" for the average patient and could have resulted from the stress of Schuck's motor vehicle accident.  (*Id.* at Ex. AH at 27, 67).  While Plaintiffs rely on the AHA's categorization of Schuck's blood pressure as "Hypertension Stage 2," the AHA does not recommend that an individual seek immediate medical advice until they have a blood pressure in the "Hypertensive Crisis" category.  (CHP Opp'n Ex. 23).  As a result, Schuck's blood pressure was not enough to demonstrate a substantial risk of harm, especially of withdrawal and dehydration.

In addition to the AVS, Plaintiffs contend that Nurse Kahl knew that Schuck was at a substantial risk of harm because he was aware of general statistics about prisons—namely that detainees are often under the influence of drugs or alcohol and that County jails have a high rate of in-custody deaths.  (CHP Opp'n 16).  These arguments are unpersuasive.  Taking them at face value would mean that all detainees would be at a substantial risk of harm.  The Court declines to find that a reasonable nurse would perceive a substantial risk of harm based on prison conditions alone, without corroborating facts about the health

situation of the particular detainee.[11]  *See Gordon I*, 888 F.3d at 1125 (noting that deliberate indifference test will "necessarily turn on the facts and circumstances of each particular case" (internal quotation marks and brackets omitted)).

In short, Nurse Kahl was not privy to facts displaying the severity of Schuck's condition.  Considering the information available to him, he acted diligently by requesting the nursing staff to obtain all of Schuck's records from UCSD.  (CHP MSJ Ex. V at 660; Ex. W at 79).  While Plaintiffs argue that it was unreasonable for Nurse Kahl to not review Schuck's other jail records, (CHP Opp'n 17–18), he was not requested to do so.  His assignment was to "[r]eview [Schuck's] scanned discharge order from UCSD."  (CHP MSJ Ex. K at 658).  The assertions of Plaintiffs' experts that Nurse Kahl acted below the standard of care when failing to review Schuck's other records support only a finding of negligence.  (CHP Opp'n Ex. 19 at 30–31; Ex. 20 at 9); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) ("[T]he Supreme Court has instructed that mere lack of due care . . . does not deprive an individual of life, liberty, or property under the Fourteenth Amendment.  Thus, the test to be applied . . . must require a pretrial detainee . . . to prove more than negligence . . . ." (internal citations and quotation marks omitted)).  Nurse Kahl complied with the plain meaning of Nurse DeGuzman's request: he checked the chart scanned from UCSD.  (CHP MSJ Ex. K at 658).  To the extent that "chart check" had a different meaning, Nurse Kahl cannot be held to that definition since no evidence suggests there were formal policies or procedures explaining the parameters of "medical doctor chart checks" and "sick calls."  (CHP Opp'n Ex. 19 at 28).

---

[11] The corroborating facts hinted at by Plaintiffs—that nursing staff had not obtained Schuck's records, and that Nurse DeGuzman requested a chart check in the first place—are farfetched.  (CHP Opp'n 21–22).  Regarding the former, the failure of nursing staff to request Schuck's records illustrates no more than negligence or subpar performance.  It does not speak to Schuck's deteriorating condition.  As for the latter, Nurse DeGuzman's request for a chart check lacked any indication of urgency or worry.  (CHP MSJ Ex. K at 658) ("Review scanned discharge order from UCSD[.]").

Therefore, the Court enters summary judgment in favor of Nurse Kahl for Plaintiffs' deliberate indifference claims.[12] *See Salzman v. Cnty. of Los Angeles*, 2024 WL 977663, at \*3 (9th Cir. Mar. 7, 2024) (affirming grant of summary judgment on deliberate indifference claim where inmate was killed by his cellmate because individual defendants saw only positive interactions between cellmates and no evidence existed that they heard or were made aware of noise and threats between them).

### viii.  Conclusion

In sum, with respect to Plaintiffs' deliberate indifference claims, the Court **DENIES** County Defendants' Motion for Summary Judgment as to Nurse DeGuzman, Deputy Valbuena, Deputy Ramirez, Deputy Page, Nurse Lymburn, Deputy Amado, and Deputy Mace; **GRANTS** County Defendants' Motion for Summary Judgment as to Nurse Echon; and **GRANTS** Defendants CHP and Kahl's Motion for Summary Judgment as to Nurse Kahl.

### b.  Entity Defendants (County and CHP)

Plaintiffs' third and fourth causes of action are against Defendants County and CHP for violation of the Fourteenth Amendment under 42 U.S.C. § 1983.  (TAC 37–42). Plaintiffs bring these claims under *Monell*.  (*See id.*).

A local government cannot be vicariously liable under § 1983 based on the acts of its employees; but a local government can be liable for deprivations of constitutional rights resulting from its formal policies, customs, or longstanding practices.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691–93 (1978).  To state a § 1983 claim under the *Monell* standard, a plaintiff must show: "(1) he was deprived of a constitutional right; (2) the [local government] had a policy; (3) the policy amounted to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy was the moving force behind the constitutional violation."  *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir.

---

[12] Because Plaintiffs have not presented evidence disputing the second and third factors of their deliberate indifference claims, the Court declines to address the fourth factor of causation.

2020).    The plaintiff must show a "direct causal link" between the policy and the constitutional deprivation.  *Castro*, 833 F.3d at 1075.

The *Monell* standard also applies to § 1983 suits against private entities acting under color of state law.  *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) ("[W]e see no basis in the reasoning underlying *Monell* to distinguish between municipalities and private entities acting under color of state law.").  To plead a § 1983 *Monell* claim against a private entity, a plaintiff must show that the entity "acted under color of state law" and that a constitutional violation was caused by an official policy, custom, or longstanding practice of that entity.  *Id.*

"A 'policy' is 'a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'"  *Id.* at 1143 (alteration in original) (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)).  A plaintiff can satisfy *Monell*'s policy requirement in one of three ways.  First, a plaintiff can show that the local government or private entity acting under color of state law acted "pursuant to an expressly adopted official policy."  *Gordon v. Cnty. of Orange* (*Gordon II*), 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014)).  Second, "a public entity may be held liable for a 'longstanding practice or custom.'"  *Id.* (quoting *Thomas*, 763 F.3d at 1170).  Third, a plaintiff can show that "'the individual who committed the constitutional tort was an official with final policy-making authority[,]' or [that] such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'"  *Id.* at 974 (quoting *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d at 1070).

The Court will now examine the *Monell* arguments applicable to the County and CHP, respectively.

### i.  The County

County Defendants argue that Plaintiffs cannot establish *Monell* liability because "a single occurrence of unconstitutional conduct" does not suffice to "establish the existence

of a policy." (County MSJ Mot. 16). According to County Defendants, "[n]o evidence exists of other in custody deaths in situations in which the detainee had refused evaluation, had withheld information about his drug use, and showed no physical sign of a need for immediate care." (*Id.*). Plaintiffs respond that the facts demonstrate *Monell* liability under several legal theories. (County Opp'n 26–29).[13]

### 1. Failure to Implement

Plaintiffs' first *Monell* theory is that the County failed to implement safeguards despite "staggering rates" of in-custody deaths. (County Opp'n 27) ("[T]he County has known for years that its detainees were dying at staggering rates . . . The County did not make any meaningful changes in response to this information and Hayden's death resulted from these same issues.").

Under Ninth Circuit caselaw, "[a] policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143. To establish a policy in this scenario, "a plaintiff must show, in addition to a constitutional violation, that this policy amounts to deliberate indifference to the plaintiff's constitutional right," which means that the entity "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Id.* at 1143, 1145 (internal quotation marks and brackets omitted). A plaintiff must also show "that the policy caused the violation, in the sense that the [local government] could have prevented the violation with an appropriate policy." *Id.* at 1143 (internal quotation marks and brackets omitted). Generally, there must be a pattern of "prior related incidents," *Simms-Belaire v.*

---

[13] Plaintiffs have put forth evidence raising a genuine dispute of material fact as to whether County employees acted with deliberate indifference and violated Schuck's constitutional rights. *See supra* IV.A.a. They have therefore shown the existence of a constitutional violation. *See Morton*, 2024 WL 5126281, at *30 ("First, County Defendants argue that Ms. Morton's *Monell* claim must fail to the extent it is based upon her individual liability claim against Alto and Sparks. However, as discussed above, a reasonable jury could conclude that Alto's and Sparks' conduct was objectively unreasonable and in violation of the Fourteenth Amendment." (internal citation omitted)). The Court does not address this element of each *Monell* theory further.

*Washington Cnty.*, 2024 WL 279020, at \*16 (D. Or. Jan. 25, 2024), not just a "single constitutional deprivation," *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

When these elements are met, liability attaches because an entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by [that entity] to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989)) (O'Connor, J., concurring in part and dissenting in part). It is thus distinct from *respondeat superior* liability, which is impermissible under *Monell*. *See Simms-Belaire*, 2024 WL 279020, at \*15 ("[T]he Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability."); *see also Harris*, 489 U.S. at 385 ("In *Monell* . . . , we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983.").

Plaintiffs raise triable issues of fact as to whether the County has a policy of omission—specifically, its failure to implement measures mitigating in-custody deaths. Plaintiffs reference statistics showing that in-custody deaths in County jails have been shockingly high for *years*. A report by the California State Auditor found that from 2006 through 2020, "185 people died in San Diego County's jails—one of the highest totals among counties in the State." (County Opp'n Ex. 46 at 1); (*see also id.* at 15) ("[M]ore individuals died of natural and accidental causes in the custody of the San Diego Sheriff's Department than in the custody of . . . comparable counties, raising concerns about its ability to provide adequate safety and medical care to those it incarcerates."). In 2021, the year prior to Schuck's death, there were eighteen in-custody deaths. (*Id.* at 14). Disability Rights California, examining deaths resulting from suicide, found that the County had over thirty reported suicides between 2010 and 2018, "the highest reported number of suicides in a California jail system." (*Id.* at Ex. 47 at 4).

These statistics in and of themselves raise an inference that the County has made subpar progress in combating in-custody deaths. However, the California State Auditor goes further, attributing these deaths to "systemic" deficiencies that persist because the County "has not consistently taken meaningful action in response when in-custody deaths have occurred." (*Id.* at Ex. 46 at 1, 33). For instance, state law requires "the Sheriff's Department [to] review every in-custody death within 30 days to determine the appropriateness of clinical care; to assess whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study." (*Id.* at 34). Despite this requirement, in twenty-two of the thirty cases the Auditor reviewed, "the Sheriff's Department was unable to provide . . . documentation from these reviews that detailed any findings or conclusions about the clinical care given; identified whether any concerns required further study; or stated whether changes to policies, procedures, or practices were warranted." (*Id.*). Although more recent cases included some recommendations, the Sheriff's Department still did not document whether the "recommendations had been implemented." (*Id.*).

County Defendants criticize the California State Auditor report as using unreliable metrics. (County Reply 10). The reliability of the report, however, is a jury question: it is for the jury to decide how much weight to give to the report's findings. County Defendants' rebuttal here does not demonstrate that there is no genuine dispute of material fact about the County's inaction in the face of in-custody deaths.

A reasonable jury could conclude that the County had notice of in-custody deaths and that their inaction amounted to deliberate indifference. Two months before Schuck's death, the County Sheriff's Department responded to the California State Auditor report. (County Opp'n Ex. 46 at 83). Families of the deceased have filed a slew of wrongful death lawsuits as well, increasing the publicity of these deaths. In fact, at oral argument on Plaintiffs' Motion for Sanctions, the County conceded that the Sheriff's Department "would have more resources" if it was not defending itself in so many "lawsuits." (ECF No. 144 at 39). While County Defendants have attempted to distinguish other wrongful

death cases, (County Reply 8–9), nitpicking granular factual differences[14] misses the bigger picture: detainees are dying because of insufficient medical attention. Ultimately, the County has received ample notice of systemic problems with their healthcare model.

Finally, there is a genuine dispute of material fact as to whether Schuck's death was caused by the County's inaction. For the reasons described previously, evidence exists that Nurse DeGuzman, Deputy Valbuena, Deputy Ramirez, Deputy Page, Nurse Lymburn, Deputy Amado, and Deputy Mace inadequately addressed Schuck's deteriorating condition. *See supra* IV.A.a. Dr. Ojo opined that "[t]he plethora of healthcare and custody deficiencies identified directly contributed to William Hayden Schuck's **preventable in-custody death**." (County Opp'n Ex. 50 at 37); (*see also id.*) ("His premature demise was completely preventable."). In line with Dr. Ojo's assessment, Mr. Price, Plaintiffs' correctional expert, found that failures in Schuck's care "are a direct result of the [County's] failure to ensure policies and procedures were performed correctly by [jail] staff." (*Id.* at Ex. 51 at 3); (*see also id.* at 4) ("The [San Diego County Jail] did not act accordingly, which ultimately led to Mr. Schuck's untimely death."). These opinions are in accord with Schuck's autopsy report, which indicates that Schuck died from dehydration, cocaine withdrawal, and sepsis. (*Id.* at Ex. 50 at 36–37). None of these conditions are inevitably fatal if treated and monitored. Accordingly, Plaintiffs' failure-to-implement theory is sufficient to withstand summary judgment.

## 2. Actual Policies

Plaintiffs' second *Monell* theory is that "the County had specific policies that were known to be dangerous," including its policy of "'mixed-use' cells and informal oral pass-

---

[14] There are also relevant similarities between Schuck's death and the deaths of detainees in the cases County Defendants attempt to distinguish. In *Sandoval*, for example, the detainee was disoriented, lethargic, shaking mildly, and appeared to be withdrawing from drugs. *Sandoval*, 985 F.3d at 662–63. So too here. *See supra* I.B, IV.A.a. Additionally, in *Serna*, the detainee reported using heroin, exhibited symptoms of dehydration and withdrawal, and was found dead an hour after she slid down the wall into a sitting position. *Est. of Serna v. Cnty. of San Diego*, 2022 WL 827123, at *1–*2 (S.D. Cal. Mar. 18, 2022). Schuck similarly claimed to use acid and was found dead twenty minutes after he barely engaged with jail staff while lying down in his cell. *See supra* I.B, IV.A.a.

down." (County Opp'n 27).  Although County Defendants argue that Schuck's death was a "singular" tragedy, (County MSJ Mot. 16), the Ninth Circuit has found that a reasonable jury could conclude that the County's adoption of "mixed use" cells with only an "informal verbal pass-off system" amounts to a deliberately indifferent practice.  *See Sandoval*, 985 F.3d at 681–83.  Plaintiffs present evidence suggesting that this practice persisted during Schuck's period of incarceration.  Deputy Ramirez testified that 7D, the housing unit Schuck died in, "was extremely fluid during COVID . . . –one day it could have been overflow and the next day it could have been COVID housing." (County Opp'n Ex. 33 at 71).  She further explained that there was no process in place for a correctional deputy to quickly identify why a detainee was placed in 7D, and that briefing occurred orally. (*Id.* at 74, 95–96, 98).  County Defendants attempt to attribute the continuance of this practice to the COVID-19 pandemic, "when conditions were far from optimal and housing availability was severely limited." (County Reply 11–12).  Even if the emergency circumstances required the housing system to remain fluid, they do not justify why the County failed to heed the lesson of *Sandoval* and implement a formal briefing system or other mechanism for jail staff to quickly identify whether a detainee required medical attention.  Thus, this Court follows *Sandoval* and finds that there is a triable issue of fact as to whether the County acted deliberately indifferent.

In terms of causation, County Defendants contend generally that Plaintiffs cannot "show that any policy, custom, or practice was the moving force behind a constitutional violation." (*Id.* at 12).  Plaintiffs have proffered facts, however, showing causation is in dispute.  When Deputy Ramirez left Schuck in 7D, she could not recall whether she orally briefed anyone on the fact that Schuck claimed to be Spiderman, pretended to row a canoe, and tried talking on an imaginary phone. (County Opp'n Ex. 33 at 98–99); (*see also id.* at 99) (responding "no" in deposition to question asking "whether [she] told anybody that [she] thought Mr. Schuck might be mentally disabled or might possibly be under the influence of drugs").  Had a formal, written system of briefing been in place, incoming deputies, including Deputies Amado and Mace, could have been notified of these behaviors

and conducted more comprehensive safety checks.  One of Deputy Amado's safety checks, for instance, lasted a little over one minute.  (*Id.* at Ex. 36 at 9:07:00 A.M.–9:08:15 A.M.). More comprehensive safety checks, in turn, could have prompted immediate medical attention, since deputies were able to bring detainees to medical right away if an urgent need presented itself.  (*Id.* at Ex. 39 at 30).  Accordingly, a reasonable jury could conclude that the County's practices caused Schuck's death.  Plaintiffs' *Monell* theory here is sufficient.  *See Sandoval*, 985 F.3d at 682 ("Moreover, had the nursing staff maintained written logs for patients held in MOC1, as they did for other medical cells, the incoming night shift nurses might have learned of Sandoval's condition from those logs and monitored him more closely.  A jury could find that had Sandoval been monitored by the nursing staff—instead of being abandoned for nearly eight hours—his deteriorating medical condition would have been discovered earlier.").

### 3.  Failure to Train, Supervise, or Discipline

Plaintiffs' third *Monell* theory is that the County failed to supervise, train, and discipline its employees, including after Schuck's death.  (County Opp'n 28).  "A failure to train or supervise can amount to a 'policy or custom' sufficient to impose liability on the County."  *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006).  While "[a] [local government's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," liability will attach when "a [local government's] failure to train . . . amount[s] to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Connick*, 563 U.S. at 61 (internal quotation marks omitted) (brackets in original).  "Under a failure-to-train theory, a plaintiff must provide evidence '(1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the [local government] properly trained their employees.'"  *Simms-Belaire*, 2024 WL 279020, at *17 (quoting *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153–54 (9th Cir. 2021)).

The Ninth Circuit has "recognized that a § 1983 plaintiff may prove . . . deliberate indifference[] through evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'" *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) (quoting *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011)). This includes lack of discipline after the event giving rise to the plaintiff's claims. *Henry v. Cnty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *as amended on denial of reh'g,* 137 F.3d 1372 (9th Cir. 1998) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry."); *see also id.* ("When a county continues to turn a blind eye to severe violations of inmates' constitutional rights—despite having received notice of such violations—a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference.").

The County's response to Schuck's death—or rather lack thereof—demonstrates a triable issue of fact as to whether the County has a policy or practice of failing to train, supervise, or discipline its employees. Following Schuck's death, at least nine of the jail staff involved did not receive feedback. (County Opp'n 16–18); *See Nyarecha v. Cnty. of Los Angeles*, 2024 WL 4511616, at *2 (9th Cir. Oct. 17, 2024), *cert. denied sub nom. Los Angeles Cnty. v. Nyarecha*, 145 S. Ct. 1930 (2025) (explaining that *Monell* liability can be found where constitutionally inadequate conduct "occurred in quick succession over a relatively short period of time"). Deputy Valbuena, Deputy Page, and Nurse Echon, for example, testified that they were not questioned or spoken to about Schuck's death. (County Opp'n Ex. 29 at 18; Ex. 34 at 101; Ex. 35 at 100–01). Deputy Ramirez learned only that Schuck died and was unaware of any training implemented because of his death. (*Id.* at Ex. 33 at 130). Nurses Lymburn and Gallegos similarly admitted that no one asked them what they could have done differently or could have learned from the experience. (*Id.* at Ex. 38 at 74; Ex. 40 at 140). The natural inference from this testimony is that

Schuck's death was pushed under the rug without any effort by the County to determine accountability and improve its medical procedures.

Beyond Schuck's death, Plaintiffs present evidence that the County has treated other in-custody deaths with the same apathy. Deputy Mace, for instance, explained that at the time of Schuck's death, he had not received training, briefing, or other correspondence on the jail's death rate. (*Id.* at Ex. 41 at 151–52).[15] Deputy Amado's testimony was in accord: when asked if he remembered ever participating in a meeting designed to review and learn from an in-custody death, Deputy Amado answered "no." (*Id.* at Ex. 39 at 89). This systemic lack of reflection after the death of a detainee is alarming. While not all in-custody deaths necessarily arise from unconstitutional conduct, this evidence suggests that the County has been passive in the aftermath of *all* deaths, resulting from deliberate indifference, mere negligence, or otherwise. A reasonable jury could find that this practice constitutes deliberate indifference.

Because a reasonable jury could also conclude that the County's unwillingness to investigate the root causes of in-custody deaths and to institute dialogue with its employees on how to be more proactive caused Schuck's death, Plaintiffs' failure to train, supervise, and discipline theory is sufficient to preclude summary judgment.

### ii. CHP

Defendants CHP and Kahl assert that Plaintiffs cannot establish *Monell* liability because they have shown neither the existence of a constitutional violation by Nurse Kahl nor a longstanding custom or policy by CHP. (CHP MSJ Mot. 19). Plaintiffs respond that CHP is jointly responsible for the County's policies and maintained its own policies giving rise to *Monell* liability. (CHP Opp'n 22–25).

---

[15] Since 2022, Deputy Mace explained that he has sat in on meetings discussing how to "address the small things [so] they don't turn into big things" with respect to detainees who had died. (County Opp'n Ex. 41 at 152). He attributes his attendance at these meetings to spending more time in the department and becoming "a more valued member of the team." (*Id.*). This implies that information and training related to in-custody deaths do not trickle down to employees who are more junior.

As a preliminary matter, the Court rejects Defendants CHP and Kahl's assertion that there must be a constitutional violation by Nurse Kahl for Plaintiffs' *Monell* claims to survive. *See Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 574 (9th Cir. 2022) ("[T]his Court has rejected the view that municipal liability is precluded as a matter of law under § 1983 when the individual officers are exonerated of constitutional wrongdoing."). A private entity acting under color of state law "may be liable under § 1983 even in situations in which no individual [defendant] is held liable for violating a plaintiff's constitutional rights." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019); *see also Tsao*, 698 F.3d at 1142–43 (applying rule to private casino company acting under color of state law). "If a plaintiff establishes he suffered a constitutional injury *by the [entity]*, the fact that individual [defendants] are exonerated is immaterial to liability under § 1983," regardless of "whether the officers are exonerated on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Fairley v. Luman*, 281 F.3d 913, 917 & n.4 (9th Cir. 2002). Thus, the Court must conduct a more searching inquiry into whether a reasonable jury could find that CHP is subject to *Monell* liability.

### 1.  Joint Responsibility

Plaintiffs' first theory of *Monell* liability is that CHP should be held jointly responsible for the County's policies. (CHP Opp'n 22) ("Accordingly, to the extent the County is liable for *Monell* violations for inadequate provision of healthcare, CHP is too liable."). In Plaintiffs' view, the County's policies are also CHP's policies because CHP entered into a contract with the County to provide medical care to detainees in County jails. (*See id.*). The Court disagrees. While the contract states that CHP is responsible for providing on-site physicians and specialty care services to inmates, it also makes clear that the agreement is a "necessary and critical *component* of the County's ongoing COVID-19 response" and that CHP is an independent contractor. (CHP Opp'n Ex. 1 at 1) (emphasis added). As a result of this status, "neither [CHP] nor [CHP's] employees or subcontractors shall be deemed to be employees of the County." (*Id.*). Further, the County has no control

or supervision over CHP except for "the results of the work." (*Id.*). As of March 2022, CHP employees were relatively far removed from everyday affairs at San Diego Central Jail: only one or two employees worked there per day. (CHP MSJ Ex. M at 17–18).[16] Although CHP certainly works in conjunction with the County to improve medical care at County jails, the sharing of a common aim—and the existence of a contract to achieve that aim—does not impute the County's policies to CHP. *Cf. Est. of Bonin v. Cnty. of San Diego*, 2024 WL 4439261, at *6 (S.D. Cal. Oct. 7, 2024) (finding at motion to dismiss stage that plaintiff's allegation "that the County and CHP have the same policies[] is not sufficient" to allege *Monell* claim against CHP). Therefore, the Court will not impose *Monell* liability on CHP for the County's policies. *See Monell*, 436 U.S. at 694 (making clear that *Monell* liability may only be imposed on an entity when "execution of [the entity's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury").

### 2. CHP's Own Policies

Plaintiffs' second *Monell* theory is that CHP has its own policies, including a failure to train its staff, a failure to implement measures in light of high death rates, and an inadequate "chart check" practice. (CHP Opp'n 22–25). The Court incorporates the rule statements found in IV.A.b.i as the basis for analyzing these policies.

### a. Failure to Train

Plaintiffs have not proffered sufficient evidence to support their failure-to-train theory. Plaintiffs direct this Court to testimony explaining that CHP relied on the County to train CHP employees on County procedures, and that the County's training on its procedures, including MSD.C.4, was mediocre. (CHP Opp'n 23); (CHP Opp'n Ex. 2 at 61, 143–44; Ex. 3 at 60–62, 65). Specifically, when Nurse Kahl began his employment at San Diego Central Jail, he received a one-day orientation from the County that covered

---

[16] Dr. Freedland, the president and CEO of CHP, could not remember whether only one nurse practitioner or one nurse practitioner and one physician worked at San Diego Central Jail per day in March 2022. (CHP MSJ Ex. M at 17–18).

general information like safety, but not how to perform his job. (*Id.* at Ex. 3 at 60). This County orientation, however, is one small part of CHP employees' training regimen. At the start of his employment, Nurse Kahl also underwent four weeks of onboarding training. (CHP MSJ Ex. W at 25). This included "shadowing," "learning the key components of what [nurse practitioners] need to accomplish daily," and understanding how to perform a sick call, chart review, and other procedures. (*Id.* at 32). Over the course of the four weeks, Nurse Kahl first shadowed his supervisors; then performed medical tasks with the supervisors observing him, where he asked questions and received feedback on his performance; and eventually became capable of performing his duties independently. (*Id.*). After onboarding, Nurse Kahl's performance was reviewed monthly. (*Id.* at 36). Once he became more seasoned, reviews occurred "twice a year and as needed." (*Id.*). CHP also randomly reviewed at least ten of his charts each month. (*Id.* at 41–42). These facts do not suggest a policy of inaction amounting to deliberate indifference, especially since Plaintiffs have not shown that other CHP employees received less training and supervision. *See Est. of Wilson v. Cnty. of San Diego*, 2023 WL 8360718, at *34 (S.D. Cal. Dec. 1, 2023), *aff'd sub nom. Jackson v. Germono*, 2024 WL 4144074 (9th Cir. Sept. 11, 2024) ("There is insufficient evidence in the record to determine whether CCMG had obvious inadequacies in policies and training regarding its employees' review of inmate-patients' medical charts prior to rendering a medical decision. CCMG hired providers with the necessary degrees for their requisite level of medical care and had proper licensure from relevant California accreditation boards. CCMG providers underwent a background check and orientation performed by the Sheriff's Department to familiarize CCMG providers with the jail's electronic medical records and protocols. Plaintiff failed to point to any deficiencies in the County's training that CCMG employees underwent and CCMG's awareness of any such deficiencies. Thus, it cannot be said CCMG's policies were so obviously likely to result in constitutional violations or that the violation of federal rights was a highly predictable consequence of its training program." (internal citations omitted)).

The Court enters summary judgment on Plaintiffs' *Monell* claims against CHP to the extent they are premised on CHP's failure to train.

### b. Failure to Implement

The Court declines to address whether CHP has a policy of failing to implement measures to counteract County jails' high in-custody death rate because Plaintiffs cannot demonstrate a direct causal connection between the alleged policy and Schuck's death. Nurse Kahl's involvement in Schuck's case was limited to a medical chart check, which the Court addresses separately in more detail. Even if CHP had instituted other safeguards and policies to ensure better medical treatment by its employees, they would have had no bearing on Schuck's case because he was tended to by jail staff for the rest of his time spent in custody. Accordingly, Plaintiffs' *Monell* claims against CHP are subject to summary judgment insofar as they rely on a failure-to-implement theory.

### c. Chart Check

Plaintiffs' theory with respect to CHP's chart check practice is sufficient to preclude summary judgment. First, it is disputable whether Schuck suffered a constitutional deprivation not from Nurse Kahl's actions, but "as a result of the collective inaction of [CHP]." *Fairley*, 281 F.3d at 917. Schuck, as a detainee in state custody, had "a constitutional right to adequate medical treatment." *Sandoval*, 985 F.3d at 667. Schuck demonstrated symptoms consistent with drug withdrawal, which itself "constitutes a serious medical need requiring appropriate medical care." *Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1184 (N.D. Cal. 2017). The jury could conclude that, in not specifying that nurse practitioners or physicians must review all of a patient's available records, CHP denied Schuck adequate medical treatment insofar as its practice enabled Nurse Kahl to miss or overlook his withdrawal symptoms.

Second, there is evidence in the record that CHP lacks a formal policy explaining the requirements of a chart check. Chart checks do not appear to be addressed in any of the policies and procedures manuals. (CHP Opp'n Ex. 19 at 28). Medical staff also understand the term differently: while Nurse Kahl did not review Schuck's jail medical

records because he did not think reading an individual's medical file was implied through a chart check, Nurse DeGuzman assumed that the chart check request he entered for Schuck prompted a nurse practitioner or doctor to "review [Schuck's] records . . . including the discharge order from UCSD." (*Id.* at Ex. 3 at 70; Ex. 6 at 69–71; Ex. 19 at 28).  Notably, Defendants CHP and Kahl do not contest the existence of the practice, conceding that chart checks have been in existence for many years.  (CHP Reply 8) ("Chart checks are a routine administrative process that existed long before CHP began providing medical services at the jail and is a common practice across Southern California correctional facilities."); (CHP MSJ Ex. M at 19–20).

Third, a reasonable jury could conclude that CHP was on notice that its lack of a formal policy resulted in doctors and nurse practitioners making uninformed medical decisions because they reviewed isolated charts rather than a detainee's entire medical record.  Plaintiffs point specifically to *Wilson*, an in-custody jail death case in which the district court denied summary judgment on the plaintiff's *Monell* claim against CHP's predecessor, Coast Correctional Medical Group ("CCMG"), for the same practice.  While Defendants CHP and Kahl argue that *Wilson*—and the three related cases *Wilson* cites— are irrelevant because CCMG, not CHP, was the named defendant, the Court finds that Plaintiffs have proffered facts suggesting a continuity between the entities.  Importantly, Dr. Freedland was a named defendant in *Wilson*; as part of its analysis when denying the defendants' motion for summary judgment, the court found that a jury could conclude that Dr. Freedland "did not sufficiently review all of [the detainee's] medical records, including his medication administration history, prior to or during [his] examination[] of him." *Wilson*, 2023 WL 8360718, at *34.[17]  In addition to the fact that Dr. Freedland practiced as a physician for CCMG and testified that the "chart check" policy "has been an ongoing

---

[17] The court found there were genuine disputes of material fact with respect to both Dr. Freedland acting deliberately indifferent and CCMG maintaining a deliberately indifferent practice partially demonstrated by Dr. Freedland's conduct.  *See Wilson*, 2023 WL 8360718, at *21–*22, *34–*35.

23-cv-785-DMS-AHG

process for many, many years," (County Opp'n Ex. 2 at 19), *Wilson* put Dr. Freedland on direct notice that this policy could amount to deliberate indifference.  Dr. Freedland's notice is significant because he was the president and CEO of CHP at the time of Schuck's death (and continues to hold that title). (*Id.* at 16).  He was also deposed in this case as the person most knowledgeable for CHP.  (*Id.* at 2).  A reasonable jury could impute his knowledge that the practice could result in a constitutional violation to CHP.

Fourth, Plaintiffs have shown causation is in dispute.  Schuck's jail records at the time of Nurse Kahl's chart check indicated that he made "grandiose statements"; did not understand the booking process; used acid drugs in the street; and appeared "disorganized, nonsensical, [and] disheveled," wearing a "soiled t shirt" and no pants. (*Id.* at Ex. 14 at 658–59).  From these notations, Dr. Guzman could have drawn the inference that Schuck was suffering from withdrawal and either evaluated him the same day or scheduled another nurse practitioner or physician to do so.  This evaluation, in turn, could have alerted the medical team to Schuck's condition and ensured that he was appropriately treated for withdrawal.  Thus, Plaintiffs' *Monell* claims against CHP survive to the extent they are premised on its chart check practice.[18]

### iii.  Conclusion

The Court **DENIES** County Defendants' Motion for Summary Judgment as to all three of Plaintiffs' *Monell* theories against the County; **GRANTS** Defendants CHP and Kahl's Motion for Summary Judgment as to Plaintiffs' *Monell* theories against CHP based on joint responsibility, a failure to train, and a failure to implement measures addressing

---

[18] Because Plaintiffs have raised a material question of fact as to whether CHP's chart check practice amounts to deliberate indifference, they are entitled to present their claim for punitive damages. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) ("We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.").

high death rates; and **DENIES** Defendants CHP and Kahl's Motion for Summary Judgment as to Plaintiffs' *Monell* theory against CHP for its chart check practice.

### c. Supervisory Defendants (Gore, Martinez, Montgomery)

Under their first and second causes of action, Plaintiffs seek to hold Sheriff Gore, Sheriff Martinez, and Dr. Montgomery directly liable for violations of the Fourteenth Amendment under 42 U.S.C. § 1983. (TAC 34–37). The Court construes these claims as "the same failure to train, supervise, or discipline jail employees that [Plaintiffs] allege[] against the County." *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1080 (S.D. Cal. 2023); (*see* County Opp'n 29) (incorporating supervisory liability in analysis of *Monell* liability). While "[a] supervisor will rarely be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury," "this does not prevent a supervisor from being held liable in his individual capacity" if "his participation . . . involve[s] the setting in motion of acts which cause others to inflict constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991). In other words, there must be "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). "The critical question is whether it was reasonably foreseeable [to the supervisor] that the actions of his or her subordinates would lead to the violations of the plaintiff's constitutional rights which are alleged to have occurred." *Greer*, 726 F. Supp. 3d at 1080 (internal quotation marks omitted) (brackets in original).

Plaintiffs have shown a triable issue as to "Supervisory Defendants' personal culpable inaction in the failure to train, supervise, or discipline their subordinates." *Id.* With respect to the Sheriffs, Sheriff Gore was "the Sheriff for the San Diego County Sheriff's Department just prior to Hayden's death" and Sheriff Martinez was "the Undersheriff for the . . . Sheriff's Department prior to Hayden's death and the Acting Sheriff at the time of Hayden's death." (TAC 6); (*see also* County Opp'n Ex. 52 at 1) (showing supervisors of Sheriff's Department in 2019–20 annual report). In these capacities, they were "responsible for the County's compliance with state and federal laws

48

and constitutions and for the training and supervision of County employees and agents." (TAC 6). They were also "final policymaker[s] . . . on matters relating to the Sheriff's Department, the San Diego [Central] Jail, and its deputies, employees, and agents." (*Id.*). This is evidenced by the fact that Sheriff Gore, on behalf of the Sheriff's Department, responded to the California State Auditor report, which criticized the high rate of in-custody deaths in the County. (County Opp'n Ex. 46 at 83, 114). In *Greer*, the district court found that from similar evidence, "a reasonable jury could infer that Sheriff Gore knew that his training policies gave rise to repeated medical staff failures to follow up to ensure treatment of inmates' medical needs and jail staff failures to properly communicate and coordinate the care of those needs between departments." *Greer*, 726 F. Supp. 3d at 1080–81. It therefore concluded that the plaintiff "raised a triable issue that, despite this obvious need for more or different training, Sheriff Gore failed to implement a better training policy or take other action to prevent future occurrences." *Id.* at 1081. This Court concurs and applies the same analysis to Sheriff Martinez.

The third Supervisory Defendant, Dr. Montgomery, was "the Chief Medical Officer for the Sheriff's Department and was responsible for overseeing the Medical Services Division at . . . San Diego [Central] Jail." (TAC 6–7); (County Opp'n Ex. 52 at 14). In this role, he was "responsible for overseeing, developing[,] and implementing medical, psychiatric, and nursing protocols. [He was] also known and referred to as the responsible physician or medical advisor. Final clinical decisions rest[ed] with [him]," which meant that he had "final authority . . . regarding clinical issues." (*Id.* at Ex. 50 at 37). This authority extended to reviews of in-custody deaths. (*Id.* at Ex. 46 at 34) ("Sheriff's Department policy states that the medical services administrator, in consultation with the chief medical officer, is responsible for reviewing all in-custody deaths within 30 days."). Dr. Montgomery testified that he was aware of the California State Auditor report and that, while some policies were evolving at the time the audit was made, no changes directly resulted from it. (County MSJ Ex. V at 49). He also stated that the Medical Services Division does not provide withdrawal training to sworn jail staff. (County Opp'n Ex. 13

at 73).  Although County Defendants argue that Plaintiffs offer no evidence with respect to Dr. Montgomery's role in training deputies, (County Reply 12), the Court disagrees.  Dr. Montgomery's job description speaks for itself.  A reasonable jury could conclude that it was foreseeable to Dr. Montgomery that his failure to swiftly implement training protocols and investigate in-custody deaths would lead to repeated occurrences.  Although Dr. Montgomery testified that he and the Sheriff's Department were in the process of instituting better procedures, that does not mean there is no genuine dispute of material fact as to the adequacy of their efforts.  (County MSJ Ex. V at 49).

Considering Plaintiffs' evidence that individual employees rarely receive feedback or discipline when an in-custody death occurs and that death rates remained high at the time of Schuck's death, there is a triable issue as to whether the Supervisory Defendants' inaction (or partial action) in the face of systemic deficiencies caused Schuck's death.  The Court **DENIES** County Defendants' Motion for Summary Judgment with respect to Plaintiffs' deliberate indifference claims against Sheriff Gore, Sheriff Martinez, and Dr. Montgomery.  *See Greer*, 726 F. Supp. 3d at 1081 ("For the reasons set forth above, a reasonable jury could infer that Dr. Joshua and Ms. Lee were on notice of medical staff failures to follow up with treatment for medical conditions and communicate that information to detention staff; that based on this notice, they had reason to believe that similar injuries could occur to inmates in the future if they did not take any action to fix this misconduct with better training; and their failure to train was the cause of Plaintiff's injury.").

**B. State-Law Claims**

 **a. Bane Act**

Plaintiffs' fifth cause of action is that all Defendants except Sheriff Gore violated the Bane Act.  (TAC 42–43).  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation[,] or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the

law." *Cornell v. City & Cnty. of San Francisco*, 17 Cal.App.5th 766, 791–92 (2017) (quoting Cal. Civ. Code § 52.1). Violations of federal and California constitutional and statutory rights are cognizable under the Bane Act. *See* Cal. Civ. Code § 52.1(b) (a violation occurs when a defendant "interferes . . . with the exercise or enjoyment . . . of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"). The Ninth Circuit has held that "the Bane Act does not require the 'threat, intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged" so long as the claimant shows the defendant had a "specific intent" to commit the constitutional violation. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018); *see also Serna*, 2022 WL 827123, at *8 (noting that "the act [amounting] to a deprivation of a constitutional right may . . . satisfy th[e] ['threat, intimidation, or coercion'] element"). There is specific intent when "the defendant . . . acted with '[r]eckless disregard of the right at issue.'" *Id.* (quoting *Cornell*, 17 Cal.App.5th at 804) (alteration in original).

County Defendants seek summary judgment on Plaintiffs' Bane Act claim on the ground that Plaintiffs have failed to show deliberate indifference. (County MSJ Mot. 17). Defendants CHP and Kahl make the same argument. (CHP MSJ Mot. 23–24). This is true only of Nurse Echon and Nurse Kahl. As discussed above, a reasonable jury could conclude that the County, Nurse DeGuzman, Deputy Valbuena, Deputy Ramirez, Deputy Page, Nurse Lymburn, Deputy Amado, Deputy Mace, Sheriff Martinez, Dr. Montgomery, and CHP acted deliberately indifferent with respect to Schuck's Fourteenth Amendment right to adequate medical treatment. Therefore, the Court **GRANTS** summary judgment in favor of Nurse Echon and Nurse Kahl and **DENIES** summary judgment as to all other County Defendants[19] and CHP on Plaintiffs' Bane Act claim. *See Scalia v. Cnty. of Kern*,

---

[19] Plaintiffs maintain their state-law claims against Nurse Barrera. (*See* County Opp'n 32). Because there is a genuine dispute of material fact as to whether Nurse Barrera acted deliberately indifferent to Schuck's medical needs, Plaintiffs' Bane Act claim is preserved. As an initial matter, there is a factual dispute about Nurse Barrera seeking information from Schuck's transporting officer about his condition. County Defendants rely on the transporting officer's testimony that he did not have anything "medical-wise" to

493 F. Supp. 3d 890, 903 (E.D. Cal. 2019) ("[T]he Court finds that summary judgment is not appropriate as to Plaintiff's Bane Act Claim.  First, the right at issue, a pretrial detainee's right to be free from deliberate indifference to serious medical needs, is clearly delineated and plainly applicable to the circumstances.  Second, as found above, there is at least a genuine dispute of material fact as to whether Nurse Blakely acted with deliberate indifference to Ms. Scalia's medical needs.  Thus, similarly, there is a genuine dispute of material fact as to whether Nurse Blakely acted with reckless disregard for Ms. Scalia's rights which is all that is necessary to demonstrate specific intent under the Bane Act." (internal citation and quotation marks omitted)); *see also Cravotta v. Cnty. of Sacramento*, 717 F. Supp. 3d 941, 965 (E.D. Cal. 2024) (finding in motion to dismiss context that because "Plaintiff has failed to sufficiently plead his deliberate indifference claim against the Officer Defendants[,] . . . . he has also failed to plead a Bane Act claim against [them]").

---

report.  (County MSJ Ex. C at 40). Plaintiffs, however, have proffered evidence suggesting that Nurse Barrera did not seek his input at all.  (County Opp'n 4).  After dropping Schuck off at intake, the transporting officer left after only seven seconds.  (County Opp'n Ex. 9 at 9:14:46 P.M–9:14:53 P.M.). Additionally, at her deposition, Nurse Barrera explained that "during . . . intake screens, we just basically speak to . . . the patient." (*Id.* at Ex. 12 at 58); (*see also id.* at Ex. 1 at 28) (transporting officer stating that he did not recall medical staff asking him questions about Schuck).  Even if Schuck's transporting officer did not arrest him, (*see* County MSJ Ex. W at 47–48), he still could have had relevant information about Schuck's condition.  Thus, whether Nurse Barrera sought the officer's input bears on the reasonableness of her conduct.

There is also evidence that Schuck displayed symptoms indicating that his health was at substantial risk. Although Nurse Barrera did not see signs of broken bones or bleeding, she did observe that Schuck made "grandiose statements" and did "not understand[] [the] booking process".  (*Id.* at Ex. D at 116); (County Opp'n Ex. 7 at 658).  She also knew that Schuck had been in a car accident, received a DUI for a controlled substance, and refused treatment at UCSD against medical advice *the same day*.  (*Id.* at Ex. 1 at 29; Ex. 7 at 646; Ex. 12 at 93–94).  Schuck arrived at booking without shoes and with an unbuttoned shirt.  (*Id.* at Ex. 8).  He also appeared jittery and lacked balance.  (*Id.* at Ex. 9 at 9:12:25 P.M.–9:12:50 P.M.).  Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that there were sufficient facts for Nurse Barrera to infer that Schuck was at a substantial risk of harm and required prompt medical attention.  As a result, summary judgment is not appropriate on Plaintiffs' Bane Act claim against her.

*23-cv-785-DMS-AHG*

**b. Failure to Summon Medical Care**

Plaintiffs' sixth cause of action alleges that County Defendants except Sheriff Gore failed to summon medical care in violation of Cal. Gov't Code § 845.6.  (TAC 44–46).  Under the California Government Code, the general rule is that "[n]either a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody."  Cal. Gov't Code § 845.6.  However, as an exception, "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  *Id.*  "Liability under the statute is limited 'to serious and obvious medical conditions requiring immediate medical care.'"  *Li v. City of Santa Ana*, 2021 WL 3207957, at *8 (C.D. Cal. May 25, 2021) (quoting *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal.App.4th 1051, 1074 (2013)).

County Defendants argue that this claim is subject to summary judgment because none of the individual Defendants had any reason to think that Schuck required immediate care and all of them, nonetheless, summoned further care.  (County MSJ Mot. 17–18). County Defendants further argue that the Nurse Defendants are "medical care" themselves and cannot be sued under this claim because their care was inadequate.  (*Id.* at 18).

As for Nurses Barrera, DeGuzman, Echon, and Lymburn, the Court agrees with County Defendants.  Nurses, by definition, are responsible for the provision of medical care.  "[O]nce an inmate is receiving medical care, § 845.6 does not create a duty to provide adequate or appropriate care."  *Villarreal*, 254 F. Supp. 3d at 1187; *Mkrtchyan v. Sacramento Cnty.*, 2023 WL 8698524, at *23 (E.D. Cal. Dec. 15, 2023) ("[Q]uestions regarding the need for specialized care or the quality of care that plaintiff received are questions regarding the provision of care to plaintiff rather than the failure to summon care."); *Castaneda*, 212 Cal.App.4th at 1074 ("Once summoned, the quality of medical care is a matter of medical policy and practice, . . . but it is not a violation of the employee's obligation to summon medical care under section 845.6.").  "[I]t simply makes no sense

for Plaintiffs to assert liability against [these] Defendants for failing to summon *themselves*." *Est. of Claypole v. Cnty. of Monterey*, 2016 WL 693282, at \*17 (N.D. Cal. Feb. 22, 2016).  Therefore, the Court **GRANTS** County Defendants' Motion for Summary Judgment on Plaintiffs' failure to summon medical care claim against Nurses Barrera, DeGuzman, Echon, and Lymburn.  The Court similarly **GRANTS** summary judgment in favor of Dr. Montgomery because there is no basis to find vicarious liability.[20]

For the reasons stated in IV.A.a, the Court cannot conclude as a matter of law that Deputies Valbuena, Ramirez, Page, Amado, and Mace reasonably summoned medical care.  Although County Defendants assert that the Deputies summoned care, (County MSJ Mot. 18), there is a genuine dispute of material fact as to whether they summoned care in a reasonable time frame and in a reasonable manner.  The Court **DENIES** County Defendants' Motion for Summary Judgment on this claim against the Deputy Defendants. Because the County and Sheriff Martinez can be held vicariously liable for the Deputies' conduct, the Court **DENIES** summary judgment as to them as well.  *See* Cal. Gov't Code § 845.6; *see also Villarreal*, 254 F. Supp. 3d at 1187 ("Prison officials may also be liable for their employees' failure to summon medical care under California Government Code § 845.6 . . . .").

### c.  Negligence

Plaintiffs direct their seventh claim against all Defendants except Sheriff Gore for negligence.  (TAC 46–48).  To succeed on a negligence claim, a plaintiff must show: "(1) the defendant had a legal duty to use due care, (2) the defendant breached such duty, and (3) the breach was the proximate or legal cause of the resulting injury."  *Lovett v. Cnty. of Los Angeles*, 2024 WL 4766205, at \*7 (C.D. Cal. Aug. 1, 2024), *report and recommendation adopted,* 2024 WL 4765853 (C.D. Cal. Sept. 23, 2024), *appeal dismissed,* 2025 WL 1216900 (9th Cir. Feb. 4, 2025) (citing *Ladd v. Cnty. of San Mateo*, 12 Cal.4th 913, 917 (1996)).

---

[20] It is the Court's understanding that Dr. Montgomery supervised only medical staff, not the deputies.

### i. County Defendants

County Defendants argue that Plaintiffs' negligence claim is precluded by statutory immunity. (County MSJ Mot. 19). The Court disagrees. As for the individual County Defendants, "a public employee is liable for injury caused by his act or omission to the same extent as a private person." Cal. Gov't Code § 820. The Court has already found that genuine disputes of material fact exist with respect to whether Nurse Barrera, Nurse DeGuzman, Deputy Valbuena, Deputy Ramirez, Deputy Page, Nurse Lymburn, Deputy Amado, Deputy Mace, Sheriff Martinez, and Dr. Montgomery acted with deliberate indifference. Because deliberate indifference entails conduct worse than negligence, the Court **DENIES** County Defendants' Motion for Summary Judgment on Plaintiffs' negligence claim as to these Defendants. *Gordon I*, 888 F.3d at 1125 (explaining that plaintiffs must "prove more than negligence" to succeed on a deliberate indifference claim).

By contrast, there is no evidence in the record suggesting that Nurse Echon breached a duty of care to Schuck. As described earlier in this Order, she promptly complied with the court order by making sure that Schuck was scheduled for an appointment. Accordingly, the Court **GRANTS** summary judgment in favor of Nurse Echon on Plaintiffs' negligence claim.

With respect to the County, "a public entity is not liable for . . . [a]n injury to any prisoner." Cal. Gov't Code § 844.6. However, this provision is limited by Cal. Gov't Code § 845.6, which provides that a public entity is not immune and may be held vicariously liable "if [its] employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Cal. Gov't Code § 845.6. Because a reasonable jury could conclude that the Deputy Defendants fall into this exception, the County could likewise be held liable. Therefore, Plaintiffs' negligence claim against the County is sufficient to survive summary judgment to the extent it is premised on County employees' failure to summon medical care. The Court **DENIES** County Defendants' Motion for Summary Judgment.

### ii.  Defendants CHP and Kahl

Defendants CHP and Kahl assert that "Plaintiffs cannot establish, based on the undisputed facts, that [they] breached the standard of care or that such breach led to Schuck's passing."  (CHP MSJ Mot. 24).

Because a reasonable jury could conclude that CHP's chart check practice amounted to deliberate indifference, Plaintiffs have presented sufficient evidence to sustain their negligence claim against CHP at the summary judgment stage.  Plaintiffs' negligence claim against Nurse Kahl survives as well.  Although the record does not suggest that Nurse Kahl acted with deliberate indifference, Plaintiffs provide two expert reports opining that Nurse Kahl's decision not to review Schuck's available medical records was "below the standard of care."  (CHP Opp'n Ex. 19 at 30–31; Ex. 20 at 9).  This is sufficient to create a genuine dispute of material fact here.   Accordingly, Defendants CHP and Kahl's Motion for Summary Judgment on Plaintiffs' negligence claim is **DENIED**.

### d.  Negligent Training and Supervision

Plaintiffs' eighth cause of action, which they consider "a theory of liability for the overarching tort of negligence," alleges negligent training and supervision by the County, Sheriff Gore, Sheriff Martinez, Dr. Montgomery, and CHP.  (TAC 48–49).  "A plaintiff alleging negligent training under California law must show that the employer negligently trained the employee as to the performance of the employee's job duties and as a result of such negligent instruction, the employee while carrying out his job duties caused injury or damage to the plaintiff."  *Est. of Escobar v. United States*, 2022 WL 3209380, at *4 (S.D. Cal. Aug. 8, 2022) (quoting *Garcia ex rel. Marin v. Clovis Unified Sch. Dist.*, 627 F. Supp. 2d 1187, 1208 (E.D. Cal. 2009)).  "An employer can be held liable for negligent supervision if it knows or has reason to believe the employee is unfit or fails to use reasonable care to discover the employee's unfitness."  *Id.* at *3 (quoting *Alexander v. Cmty. Hosp. of Long Beach*, 259 Cal.Rptr.3d 340, 356 (Cal. Ct. App. 2020)).

For the reasons described in IV.A.b.i.3 and IV.A.c, the Court finds there are triable issues concerning whether the County, Sheriff Gore, Sheriff Martinez, and Dr.

Montgomery can be held liable for negligent training and supervision. Conversely, a reasonable jury could not find that CHP's training and supervision of Nurse Kahl was negligent. *See supra* IV.A.b.ii.2.a; (CHP MSJ Ex. W at 13–14). CHP provided substantial training to Nurse Kahl and there is no evidence that he was unfit. Therefore, the Court **DENIES** County Defendants' Motion for Summary Judgment and **GRANTS** Defendants CHP and Kahl's Motion for Summary Judgment on Plaintiffs' negligent training and supervision claim.

### e. Wrongful Death

Plaintiffs' ninth cause of action is against all Defendants except Sheriff Gore for wrongful death. (TAC 50–52). Plaintiffs premise their wrongful death claim on Defendants acting deliberately indifferent in violation of § 1983, failing to summon medical care in violation of Cal. Gov't Code § 845.6, and engaging in negligent conduct. (*See id.*). "The elements of a California wrongful death claim are: (1) a wrongful act or neglect on the part of one or more persons that (2) causes (3) the death of person." *Ottele v. Martinez*, 2024 WL 3913469, at *14 (E.D. Cal. Aug. 23, 2024) (first citing *Est. of Prasad v. Cnty. of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013); and then citing Cal. Civ. Proc. Code § 377.60).

Except for Nurse Echon, a reasonable jury could conclude that the remaining individual County Defendants acted with deliberate indifference. Therefore, the Court **GRANTS** summary judgment in favor of Nurse Echon and **DENIES** summary judgment for the remaining County Defendants.[21] The same analysis applies to Defendants CHP and Kahl: because there are triable issues of fact about whether CHP acted deliberately indifferent and Nurse Kahl acted negligently, Plaintiffs' wrongful death claim survives.

---

[21] The Court **DENIES** summary judgment with respect to the County because the County may be held vicariously liable to the extent Plaintiffs' wrongful death claim is based on the Deputy Defendants' violation of Cal. Gov't Code § 845.6. *Resendiz v. Cnty. of Monterey*, 2015 WL 3988495, at *8 (N.D. Cal. June 30, 2015) ("[T]he Court concludes that Plaintiffs may state claims for negligent supervision and wrongful death pursuant to Cal. Gov't Code § 845.6.").

The Court **DENIES** summary judgment on Plaintiffs' wrongful death claim against them.

## V.    CONCLUSION AND ORDER

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** County Defendants' Motion for Summary Judgment and **GRANTS IN PART** and **DENIES IN PART** Defendants CHP and Kahl's Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: September 11, 2025

_____
Hon. Dana M. Sabraw
United States District Judge

23-cv-785-DMS-AHG